**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF GREENVILLE, ILLINOIS; VILLAGE OF COULTERVILLE, ILLINOIS; VILLAGE OF EVANSVILLE, ILLINOIS; VILLAGE OF FARINA, ILLINOIS; CITY OF GILLESPIE, ILLINOIS; CITY OF CAMERON, MISSOURI; CITY OF CONCORDIA, MISSOURI; CITY OF CARBONDALE, KANSAS; CITY OF DODGE CITY, KANSAS; CITY OF MARION, KANSAS; MIAMI COUNTY RURAL WATER DISTRICT NO. 2; CITY OF OSWEGO, KANSAS; CITY OF PLAINS, KANSAS; CITY OF JASPER, INDIANA; VILLAGE OF MONROEVILLE, OHIO; CITY OF UPPER SANDUSKY, OHIO; and CITY OF CRESTON, IOWA, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY DEMANDED |
| | ) | |
| Plaintiffs, | ) ) | Case No: 10-188-JPG |
| | ) | |
| v. | ) ) | |
| | ) | |
| SYNGENTA CROP PROTECTION, INC., and SYNGENTA AG, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

Plaintiffs, CITY OF GREENVILLE, ILLINOIS; VILLAGE OF COULTERVILLE, ILLINOIS; VILLAGE OF EVANSVILLE, ILLINOIS; VILLAGE OF FARINA, ILLINOIS; CITY OF GILLESPIE, ILLINOIS; CITY OF CAMERON, MISSOURI; CITY OF CONCORDIA, MISSOURI; CITY OF CARBONDALE, KANSAS; CITY OF DODGE CITY, KANSAS; CITY OF MARION, KANSAS; MIAMI COUNTY RURAL WATER DISTRICT NO. 2; CITY OF OSWEGO, KANSAS; CITY OF PLAINS, KANSAS; CITY OF JASPER, INDIANA; VILLAGE OF MONROEVILLE, OHIO; CITY OF UPPER SANDUSKY, OHIO; and CITY OF CRESTON, IOWA,

individually and on behalf of all others similarly situated, complain against Defendants SYNGENTA CROP PROTECTION, INC. and SYNGENTA AG, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this lawsuit to require Defendant herbicide manufacturers to bear the cost of removing their toxic product atrazine from the public's drinking water.  Defendants designed, marketed, and sold atrazine knowing that it would contaminate public water supplies when used as intended.  And while Defendants earned billions of dollars in revenues from the sale of atrazine, they left Plaintiffs to pay the ever-growing bill for filtering the toxic product from the public's drinking water.  Plaintiffs never consented to Defendants' contamination of their water and never derived any benefit from either the sale or the use of Defendants' atrazine. They now bring this lawsuit to force the Defendants, who reap the financial benefit from manufacturing and/or selling atrazine, to also bear the financial burden that the chemical imposes on third parties.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C § 1332(a) because there is complete diversity of citizenship among the parties, and the amount in controversy for each Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, this Court has jurisdiction over the subject matter of this action under 28 U.S.C § 1332(d) because there is minimal diversity of citizenship among the parties, there are more than one hundred members of the proposed class/subclasses, and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in this district, a

substantial part of the property that is the subject of this action is situated in this district, or because both Defendants are currently subject to personal jurisdiction in this district.

## PARTIES

4.     Plaintiff CITY OF GREENVILLE, ILLINOIS ("Greenville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.   At all times relevant hereto, Greenville has owned and operated the water district known as City of Greenville, an Illinois municipal corporation, and provides water to businesses and residents of Greenville, Royal Lake, Mulberry Grove, Smithboro, Donnellson, Ameren, and Panama, Illinois, under 65 ILCS 5/11-125, *et seq.*   The current water system has been in operation since 1969, and uses Governor Bond Lake as its source of raw water.   Governor Bond Lake is surrounded by agricultural operations utilized for corn, soybeans, and wheat.   Greenville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

5.     Plaintiff VILLAGE OF COULTERVILLE, ILLINOIS ("Coulterville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.   Coulterville, located primarily in Randolph County, owns and operates the water district known as Village of Coulterville, which provides water to businesses and residents in Coulterville, Illinois.   The water system has been in operation since 1939, and uses the Coulterville Reservoir as its raw water source.   The Coulterville Reservoir is adjacent to substantial agricultural territory consisting of mostly corn and soybeans, among other products. Coulterville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

6.     Plaintiff VILLAGE OF EVANSVILLE, ILLINOIS ("Evansville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.  Evansville owns and operates a water plant known as the Village of Evansville Municipal Waterworks System, and provides water to residents and businesses in and around Evansville, Illinois, and operates under 65 ILCS (2008) 5/11-125, *et seq*.  The Waterworks System is approximately 100 years old; the new water plant was constructed after the flood of 1993 and has been operational continuously, and uses the Kaskaskia River as its source of raw water.  The Kaskaskia River is adjacent to substantial agricultural territory consisting of mostly corn and soybean farming, among other products.  Evansville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

7.     Plaintiff VILLAGE OF FARINA, ILLINOIS ("Farina") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.  Farina, located primarily in Fayette County, Illinois, owns and operates its water system and provides water to customers within the corporate limits of Farina, under 65 ILCS 5/125-1, *et seq.*  The water system has been in operation since March 4, 1946.  Since 1982, Farina has used three borrow pits and the East Fork of the Kaskaskia River as its raw water sources. The borrow pits and river are adjacent to substantial agricultural territory consisting of mostly corn and soybeans, among other products.  Farina's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

8.     Plaintiff CITY OF GILLESPIE, ILLINOIS ("Gillespie") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.   Gillespie owns and operates the water district known as the City of

Gillespie, an Illinois Municipal Corporation, and provides water to the residents and businesses in and around Gillespie, as well as satellite customers including the Village of Dorchester, the Village of Mt. Clare, the City of Benld, the Village of East Gillespie, the Village of Eagerville, the Village of Sawyerville, the Village of Wilsonville and the Ka-Ho Public Water District.  The water system has been in operation continuously since approximately 1924 and uses the Gillespie Lakes (old and new) as its sources of raw water.  The Gillespie Lakes are adjacent to substantial agricultural territory consisting of mostly corns, soybeans, and wheat, among other products.  Gillespie's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

9.     Plaintiff CITY OF CAMERON, MISSOURI ("Cameron") is organized and exists under the laws of Missouri, and is lawfully engaged in providing drinking water for public consumption to Missouri residents.  Cameron owns and operates the water district known as City of Cameron Water District, and provides water to the businesses and residents of the City of Cameron, Missouri and Clinton County Water District #3.    The water district has been in operation since 1919, and uses the Grindstone Reservoir, Reservoir #1, Reservoir #2, and Reservoir #3 as its sources of raw water.  The Grindstone Reservoir is adjacent to agricultural operations that consist of corn, soybeans, alfalfa, wheat, oats, and grain sorghum, among others.  Cameron's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

10.     Plaintiff CITY OF CONCORDIA, MISSOURI ("Concordia") is organized and exists under the laws of Missouri, and is lawfully engaged in providing drinking water for public consumption to Missouri residents.  Concordia owns and operates the water district known as The Municipal Utilities of the City of Concordia, Missouri, and provides water to businesses and

residents of Concordia, Missouri.  Concordia also sells water to the City of Emma, Missouri, to Public Water Supply District #2 of Lafayette, Johnson, and Saline Counties, and to rural residents near Concordia.  The water system was established in 1958 under Ordinance 18. Concordia Lake, a 245-Acre reservoir surrounded by agricultural operations, is Concordia's source of raw water.  The watershed around the lake is approximately 1,000 acres with 60 percent of the acres planted in corn, beans and hay.  Concordia's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

11.    Plaintiff CITY OF CARBONDALE, KANSAS ("Carbondale") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Carbondale owns and operates a water plant known as the Waterworks System of the City of Carbondale, Kansas, which provides water to the residents and businesses in and around Carbondale.  Since 1946, the water plant has operated continuously and has used the Strowbridge Reservoir (a/k/a East Lake) as its source of raw water.  East Lake is essentially surrounded by agriculture consisting of corn, hay, and other products. Carbondale's water has been and will continue to be contaminated by Defendants' atrazine. Carbondale's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

12.    Plaintiff CITY OF DODGE CITY, KANSAS ("Dodge City") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Dodge City owns and operates a water plant which provides water to the residents and businesses in and around Dodge City, the City of Wright, and several county residents and businesses located adjacent to Dodge City.  Dodge City has owned and operated its plant continuously since 1910.  Dodge City's source of raw water is The Ogallala

Aquifer (a/k/a High Plains Aquifer), which is surrounded by residential areas and by land utilized for agricultural purposes.  Dodge City's water has been and will continue to be contaminated by Defendants' atrazine.  Dodge City's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

13.     Plaintiff CITY OF MARION, KANSAS ("Marion") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents. Marion owns and operates a water plant known as the City of Marion Municipal Water Plant, which provides water to residents and businesses in and around Marion and Marion County Improvement District Number 2.  Marion's source of raw water is the Marion Reservoir, which is essentially surrounded by land utilized for agricultural purposes. Agriculture around the Marion Reservoir includes corn and soybeans.  Marion's water has been and will continue to be contaminated by Defendants' atrazine.  Marion's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

14.     Plaintiff MIAMI COUNTY RURAL WATER DISTRICT NO. 2 ("District No. 2") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  District No. 2 owns and operates a water plant which provides water to the residents and businesses in and around Miami County, including the cities of Spring Hill and Edgerton in Johnson County.  District No. 2's source of raw water is Hillsdale Lake, which was constructed by the U.S. Army Corp of Engineers, and is essentially surrounded by land utilized for agricultural purposes.  District No. 2's water has been and will continue to be contaminated by Defendants' atrazine.  District No. 2's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

15.     Plaintiff CITY OF OSWEGO, KANSAS ("Oswego") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Oswego owns and operates a water plant which provides water to the residents and business in and around Oswego, including five (5) rural water districts: Labette County Rural Districts #1, #4 and #8, Neosho Water District, and Hoag Water District of Cherokee County.  Oswego's source of raw water is the Neosho River, which is essentially surrounded by land utilized for agricultural purposes.  The major agricultural activity in the area is the growing of row crops, including soybeans.   Oswego's water has been and will continue to be contaminated by Defendants' atrazine.   Oswego's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

16.     Plaintiff CITY OF PLAINS, KANSAS ("Plains") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Plains owns and operates a water plant known as the City of Plains Municipal Water System, which was established in 1919 under City Ordinance No. 152.  The system provides water to the residents and business in and around Plains, Kansas.  Plains' source of raw water is the Ogallala Aquifer, which is essentially surrounded by land utilized for agricultural purposes, including growing corn, wheat, soybeans, milo, and native grass.  Plains' water has been and will continue to be contaminated by Defendants' atrazine.  Plains' past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

17.     Plaintiff CITY OF JASPER, INDIANA ("Jasper") is organized and exists under the laws of Indiana, and is lawfully engaged in providing drinking water for public consumption to Indiana residents.  Jasper owns and operates the water district known as Jasper Municipal Water

Utility, which provides water to most residents and businesses within the City of Jasper, Indiana and to some customers outside the city limits. Jasper Municipal Water Utility sells water to Dubois Water Utilities, Inc. of Dubois, Indiana, and Ireland Utilities, Inc., of Ireland, Indiana. The water system has been in operation since 1895, and uses the Patoka River as its raw water source. The Patoka River is adjacent to substantial agricultural territory. Jasper's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

18.     Plaintiff VILLAGE OF MONROEVILLE, OHIO ("Monroeville") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents. Monroeville owns and operates a water plant known as Monroeville Village, and provides water to the residents and businesses in and around the Village of Monroeville, Ohio, and a portion of Richfield Township, Ohio. Monroeville also engages in bulk water sales. The water plant was built in 1938, and the Reservoir was built in 2001. The water plant uses the West Branch of the Huron River as its source of raw water. The Huron River is essentially surrounded by agricultural operations consisting of corn, soybeans, and wheat farming. Monroeville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

19.     Plaintiff CITY OF UPPER SANDUSKY, OHIO ("Upper Sandusky") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents. Upper Sandusky owns and operates a water plant known as the City of Upper Sandusky Water System, and provides water to the residents and businesses in the corporation limits of the City of Upper Sandusky, Ohio. Upper Sandusky also sells water to rural entities outside of the corporation limits. The water plant was organized in the 1880's

and uses the Upper Sandusky Reservoir, with influent from the Sandusky River, as its source of raw water.  The Sandusky River is essentially surrounded by agricultural operations consisting of corn, wheat, and bean farming.   Upper Sandusky's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

20.     Plaintiff CITY OF CRESTON, IOWA ("Creston") is organized and exists under the laws of Iowa, and is lawfully engaged in providing drinking water for public consumption to Iowa residents.  Creston owns and operates a water plant known as the City of Creston Water Works, and provides water to the residents and businesses in Creston, Iowa and to the Southern Iowa Rural Water Association.   The water plant was organized in the 1890's and purchased by Creston in 1932.  It uses Twelve Mile Lake and Three Mile Lake as its sources of raw water. These lakes are surrounded by 38,020 acres of farm ground used for pasture, hay, and row crops such as corn and soy beans.  Creston's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

21.     Defendant SYNGENTA CROP PROTECTION, INC. ("Syngenta Crop Protection") is a Delaware corporation with its principal place of business at 410 Swing Road, Greensboro, North Carolina 27419.  Syngenta Crop Protection is registered to do business in Illinois and transacts substantial business in Illinois, including manufacturing, selling, and supplying atrazine to farmers, cooperatives, and local herbicide dealers located throughout Illinois, including the Southern District of Illinois.

22.     Defendant SYNGENTA AG ("Syngenta AG") is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business at Schwarzwaldalee 215, 4058 Basel, Switzerland.  At all relevant times, Syngenta Crop Protection has acted as Syngenta AG's agent and/or alter ego in the United States.  Syngenta AG owns one

hundred percent of Syngenta Crop Protection.   Syngenta AG files consolidated financial statements on behalf of Syngenta Crop Protection with the SEC.  In its SEC filings, Syngenta AG lists the principal place of business of Syngenta Crop Protection as its United States headquarters.  In addition, Syngenta AG lists a number of Syngenta Crop Protection's properties in the United States as Syngenta AG's principal properties for research and production.  For example, Syngenta's global website lauds the safety record of "our employees" in the "Syngenta plant" located in Paris, Illinois.  That plant is owned by Syngenta Crop Protection.  The entities' corporate governance is structured so that Syngenta AG has involvement in, and control over, the activities of Syngenta Crop Protection.  Two of Syngenta Crop Protection's directors, John Atkin (COO) and Christoph Maeder (Secretary), sit on Syngenta AG's Executive Committee.  That Executive Committee is responsible for the operational management of Syngenta AG.  Upon information and belief, it was Syngenta AG's Executive Committee and Board of Directors that made the decisions for Syngenta Crop Protection that are relevant to this lawsuit – namely, the decision to manufacture, market, and sell atrazine in its current form.  Finally, Syngenta AG and Syngenta Crop Protection cooperate to produce, market, and sell atrazine in the United States.  Because Syngenta Crop Protection and Syngenta AG are indistinguishable for purposes of this lawsuit, they will collectively be referred to as "Syngenta."

## FACTS COMMON TO ALL PLAINTIFFS

23.   Atrazine, whose chemical name is 2-chloro-4-ethylamino-6-isoproplyamino-s-triazine, is an herbicide which is used mainly by corn, soybean, sorghum, and sugar cane farmers for pre-emergence broad leaf weed control.  Atrazine's Chemical Abstracts Service (CAS) Registry Number is 1912-24-9.  Syngenta markets atrazine as being advantageous to farmers because it does not readily bind to soil.  However, this same characteristic gives atrazine great

11

potential for run-off — a fact that is particularly problematic for public water providers who use surface waters such as rivers, lakes, and reservoirs as their source of raw water.

24.     Atrazine is used to control broadleaf and grassy weeds, with its most extensive use on corn and soybean fields.  Atrazine has been one of, and at times, the most widely used herbicide in the United States throughout the past four decades.  Currently, about 75 million pounds of atrazine are applied in the United States annually.  Approximately 75% of the field corn acreage grown in the United States gets treated with atrazine.  As a result, atrazine has been found in groundwater and surface water in many parts of the country where its target crops are most prevalent.

25.     Once released into the environment, atrazine is broken down into other chemicals known as "degradant chemicals" via microbial action, hydrolysis, dealkylation, dehalogenation, deamination, and photodegradation.  Degradant chemicals include, but are not limited to, chlorotriazines and hydroxyl triazines.  Chlorotriazines include, but are not limited to: deethylatrazine, deisopropylatrazine, and diaminoatrazine.  Hydroxyl triazine breakdown products include, but are not limited to: ammeline, ammelide, cyanuric acid, N-ethylammelide, N-isopropylammelide, hydroxyatrazine, hydroxydeisopropylatrazine, and hydroxideethyl-atrazine.  Atrazine can also react and combine with other chemicals commonly found in water supplies to form "combination chemicals."  For example, atrazine can combine with nitrates — commonly occurring chemical components found in public drinking water sources — to form N-nitrosoatrazine.  Atrazine degradant and combination chemicals also contaminate water supplies and often become more prevalent than the parent chemical.  Throughout this Complaint, any reference to "atrazine" shall include all atrazine degradant and combination chemicals.

26.     Atrazine was first discovered and synthesized at a Syngenta legacy company in the early 1950s.  Syngenta introduced atrazine to farmers in the 1959 growing season.  In the fifty years following atrazine's introduction, Syngenta became the largest producer and seller of atrazine and atrazine-containing products in the United States.  Today, Syngenta is one of only six registered manufacturers of atrazine in the United States.  Syngenta manufactures and sells atrazine to other manufacturers of atrazine products and manufactures and sells its own line of atrazine products which are registered for sale in Illinois.  Some of these products contain both atrazine and what Syngenta refers to as "atrazine related compounds."   Throughout this Complaint, any reference to "atrazine" should also be interpreted to include atrazine related compounds, whether in pure chemical form or as an ingredient in an herbicide product.  Syngenta's reported revenue from herbicides, including atrazine, exceeded $2.4 billion in 2008.

27.     Prior to or shortly after the time that Syngenta released atrazine for sale in the United States, it became aware that atrazine does not readily bind to soil and has a propensity to run off into surface water and to be found in groundwater.  As a result, Syngenta knew or suspected that atrazine would contaminate the water supplies of public water providers like the Plaintiffs.  Syngenta knew or suspected that atrazine would contaminate water supplies and drinking water even when atrazine was used as intended and as directed by Syngenta.

28.     After water testing data confirmed that atrazine was contaminating surface water and groundwater, and hence the water supplies of public water providers, Syngenta continued to manufacture, market, and sell atrazine in the same form.   Since Syngenta first began manufacturing and selling atrazine in the United States, atrazine has continually and consistently contaminated the water supplies of public water providers who use surface water as the source of their water.

29.     Today, atrazine is the most commonly detected herbicide in surface water.  For example, between 1992 and 2001, atrazine and its degradant chemicals were detected in more than 75 percent of stream samples in agricultural areas across the United States.   Atrazine's frequent detection in streams, rivers, groundwater, and reservoirs is related directly to both its volume of usage and its tendency to persist in soils and move with water.   Atrazine's contamination of surface water occurs when atrazine is used as intended and as directed by Syngenta.

30.     Atrazine's propensity to contaminate surface and drinking water has resulted in the ban of atrazine in other parts of the world.  For example, Italy and Germany, two major corn producing countries, banned atrazine in 1991.  Sweden, Denmark, and Finland followed suit and banned atrazine in 1994.   Finally, in 2005, all remaining European Union nations banned atrazine because it consistently contaminated water supplies.

31.     Syngenta has been independently testing public water providers' raw water as part of the Ecological Watershed Monitoring Program and the PLEX Monitoring Program since at least 1993.  But the results of this testing were not made publicly available until 2009.  The data from the Ecological Watershed Monitoring Program identified 1,172 watersheds at high risk of atrazine contamination across the United States.   Forty of these at-risk watersheds, in nine Midwestern and Southern states, were selected for an enhanced testing program.  The three-year program revealed that atrazine was pervasive in every one of the 40 watersheds.  Thirty-one of these watersheds had concentrations of atrazine higher than 1 part per billion (ppb) and nine watersheds had peak readings as high as 100 ppb. The highest atrazine concentration was measured in Indiana, where a watershed registered a 237.5 ppb reading.  Syngenta's data showed that atrazine concentrations in surface water peaked during the spring planting months when

14

atrazine use was most prevalent.  Syngenta did not inform Plaintiffs of either the data in its possession or of the seasonal variation of atrazine contamination.

32.     Syngenta's atrazine is re-applied anew every year in the United States.  As a result, every Plaintiff's water supplies have become contaminated with atrazine, and they become re-contaminated after each additional application.  Given atrazine's behavior in the environment, the contamination of Plaintiffs' water supplies is certain to continue as long as atrazine is used in its current form.

33.     Since atrazine's initial introduction, Syngenta has continuously denied any connection between exposure to atrazine and adverse human health effects.  Importantly, Syngenta has denied that atrazine poses a threat to human health when consumed through drinking water.  At the same time, however, Syngenta's own internal studies suggested that atrazine (and its degradant and combination chemicals) posed a threat to human health, perhaps through its endocrine disrupting properties.  Syngenta knowingly refused to disclose this information to public water providers and the public at large, choosing instead to deny atrazine's health risks and suppress science suggesting otherwise.  Syngenta has also vigorously fought against the performance of other safety studies on human health effects of atrazine and has resisted any further restrictions on the use of atrazine products during every re-registration of the chemical.  Not only has Syngenta denied the link between atrazine and human health effects and failed to disclose what it knew about the product, but it has also actively manipulated the weight of scientific evidence by funding, often secretly, deceptive and misleading scientific studies, and providing incomplete or false data to scientists.

34.     Recently-published scientific studies have found that exposure to atrazine may be linked with birth defects, low birth weight, and premature birth.  In addition, some studies have

indicated that atrazine is a possible human carcinogen, and others have concluded that atrazine is an endocrine disruptor. Due to the actual and potential health hazards of exposure to atrazine, Plaintiffs believe that Syngenta must pay the past, present, and future expenses associated with removing atrazine products from the public's drinking water.

## CLASS ALLEGATIONS

35.     Plaintiffs seek to certify this suit as a class action under Rules 23(b)(2), 23(b)(3), or 23(c)(4) on behalf of a class or subclasses consisting of all public water providers located in the states of Illinois, Indiana, Iowa, Kansas, Missouri and Ohio, that have had or will have in the future detectable levels of atrazine in their raw drinking water. Excluded from the class or subclasses are those water providers which have brought lawsuits for atrazine contamination individually or as part of a certified class. The class period spans from the time that Syngenta first placed its atrazine into the stream of commerce in the United States to the time the Court certifies this suit as a class action.

36.     The exact number of the members of the Class (or subclasses) is not currently known, but is believed to be, at a minimum, several hundred. The members of the Class are so numerous that joinder of all Class members is impracticable.

37.     There are questions of law or fact which are common to every member of the Class, including:

    a.      Whether atrazine is unreasonably dangerous to public water providers' raw drinking water when it is used as intended;

    b.      Whether atrazine contaminates surface and ground water sources of raw drinking water when it is used as intended;

    c.      Whether Syngenta could have foreseen that its atrazine would contaminate surface water and consequently Class members' drinking water sources;

d.      Whether Syngenta knew or reasonably should have known that atrazine would physically invade the raw drinking water of Class members;

e.      Whether atrazine's actual and potential effects on human health make the presence of atrazine in the Class members' raw water public nuisance;

f.      Whether Syngenta owed Class members a duty to ensure that its atrazine did not invade Plaintiffs' and Class members' raw water supplies and properties, and whether Syngenta breached that duty by designing, manufacturing and selling atrazine in its current form;

g.      Whether the breach of that duty directly and proximately caused Class members' damages;

h.      Whether the actual and potential human health risks associated with the consumption of atrazine in drinking water require Syngenta to compensate Class members for all costs and expenses for removing atrazine from drinking water;

i.      Whether Syngenta's conduct towards Plaintiffs and Class members was willful and wanton, and whether Plaintiffs and Class members are entitled to punitive damages.

38.   Plaintiff water providers' claims are typical of the claims of the Class because Plaintiffs and Class members were injured in the same way by the same conduct, namely Syngenta's design, manufacture, and continued sale of atrazine despite the knowledge that atrazine was substantially certain to physically invade Plaintiffs' and Class members' raw drinking water.  Neither Plaintiffs nor Class members had any direct contact with Syngenta, and were similarly situated victims of the common course of conduct by Syngenta.  Plaintiffs' claims are also typical because they assert the same legal theories for relief on behalf of all Class members.

39.   Plaintiffs will fairly and adequately protect the interests of the Class because they have no conflicts of interest with any Class members, and because they have retained counsel that are experienced in class action litigation and environmental litigation.

40.     Syngenta has acted or refused to act on grounds that apply generally to the Class because it designed, manufactured, and continuously sold atrazine products that Syngenta knew were substantially certain to physically invade Plaintiffs' and Class members' raw drinking water, and because Syngenta refused to prevent or abate the physical invasion of Plaintiffs' and Class members' raw water.

41.     Questions of law or fact which are common to the Class, as set forth in ¶ 37 above, predominate over questions affecting individual members because class members never had any contact or relationship with Syngenta, but are merely similarly situated victims of Syngenta's common course of conduct.   In addition, Syngenta has no defenses specific to individual Class members, and its defenses, if any, apply equally to all Class members.

42.     A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.  No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

## COUNT I
## (TRESPASS)

43.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 42 of this Complaint, and further allege as follows:

44.     Each Plaintiff and Class member is, and at all relevant times was, the lawful and actual possessor of water rights, including the right to appropriate water from surface water bodies,  watersheds, and groundwater sources for the beneficial purpose of providing public

drinking water, with all rights incident thereto. These water rights are recognized as valuable chattels and personal property rights that are owned by each Plaintiff and Class member.

45.     At all relevant times, Syngenta knew that atrazine does not readily bind to soil and instead runs off into surface waters such as streams, rivers, lakes, and reservoirs and into groundwater aquifers. Syngenta knew and intended that its atrazine products would be used by farmers near surface water, including surface waters used for public drinking water. Syngenta knew that its atrazine would contaminate these water sources even when atrazine was applied as Syngenta designed, intended, and directed it to be applied.

46.     Despite this knowledge, Syngenta manufactured, distributed, and sold its atrazine products for agricultural use, knowing to a substantial certainty that atrazine, when applied and used as intended, would invade Plaintiffs' water supplies.

47.     As a direct and proximate result of Syngenta's actions, Syngenta's atrazine has continuously physically invaded and contaminated the Plaintiffs' and Class members' water supplies. The physical invasion of Plaintiffs' and Class members' water continues to this day, and is substantially certain to continue in the future as long as Syngenta's atrazine is manufactured, sold, and applied in the same form.

48.     At all relevant times, Syngenta was aware that its atrazine products were persistently physically invading Plaintiffs' and Class members' water supplies, yet it continued to manufacture, market, and sell atrazine in the same form.  Syngenta acted with a reckless disregard for Plaintiffs' and Class members' rights, and its conduct was willful, wanton, and malicious.  In addition, acting in concert with other manufacturers, sellers, distributors and applicators of atrazine products, Defendants have aided and abetted the continuous contamination of Plaintiffs' property by those other manufacturers, sellers, distributors and

applicators.  Syngenta's conduct continues to this day and is substantially certain to continue in the future as long as atrazine is manufactured, sold, and applied in the same form.

49.     As a direct and proximate result of Syngenta's intentional and continued physical invasion of Plaintiffs' and Class members' water supplies, at all times relevant to this litigation, atrazine has:

      a.      posed and continues to pose a threat to Plaintiffs' and Class members' water supplies;

      b.      required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

      c.      contaminated, continues to contaminate, or will contaminate Plaintiffs' and Class members' water supplies; and

      d.      required or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

50.     Each Plaintiff seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT II
## (PUBLIC NUISANCE)

51.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 42 of this Complaint, and further allege as follows:

52.     Each Plaintiff and Class member is, and at all relevant times was, the lawful and actual possessor of water rights, including the right to appropriate water from surface water bodies, watersheds, and groundwater sources for the beneficial purpose of providing public drinking water, with all rights incident thereto.

53.     At all relevant times, Syngenta knew that atrazine does not readily bind to soil and instead runs off into surface waters such as streams, rivers, lakes, and reservoirs and into

groundwater aquifers.  Syngenta knew and intended that its atrazine products would be used by farmers near surface water, including surface water used for public drinking water.  Syngenta knew that its atrazine would contaminate these water sources even when atrazine was applied as Syngenta designed, intended, and directed it to be applied.

54.     Despite this knowledge, Syngenta manufactured, distributed, and sold its atrazine products for agricultural use, knowing to a substantial certainty that its products, when applied and used as intended, would contaminate Plaintiffs' water supplies.

55.     As a direct and proximate result of Syngenta's intentional and/or negligent conduct, Syngenta's atrazine did in fact contaminate Plaintiffs' and Class members' water supplies.  As long as Syngenta's atrazine continues to be manufactured, sold, and applied in the same form, Syngenta's contamination of Plaintiffs' and Class members' water supplies is substantially certain to continue in the future.

56.     Syngenta's past, present, and future contamination of Plaintiff's and Class members' water supplies threatens the public health and constitutes a continuous, substantial, and unreasonable interference with the public's use and enjoyment of that water for drinking and household purposes.  Because Plaintiff is a purveyor of public drinking water, it has suffered a distinct injury separate from the public at large.

57.     At all relevant times, Syngenta was aware that its atrazine products were persistently contaminating Plaintiffs' and Class members' water supplies, threatening the public health, and causing a continuous, substantial, and unreasonable interference with the public's use and enjoyment of that water.  Yet Syngenta continued to manufacture, market, and sell atrazine in the same form.  Syngenta acted with a reckless disregard for the public's health and well-being, and Syngenta's conduct was willful, wanton, and malicious.

58.     As a direct and proximate result of Syngenta's continuous, substantial and unreasonable interference with the public's use and enjoyment of the drinking water that Plaintiffs and Class members generate, at all times relevant to this litigation, atrazine has:

>    a.      posed and continues to pose a threat to Plaintiffs' and Class members' water supplies;

>    b.      required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

>    c.      contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

>    d.      required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

59.     Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT III
## (STRICT LIABILITY-DEFECTIVE PRODUCT)

60.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 42 of this Complaint, and further allege as follows:

61.     At all relevant times, Syngenta has designed, manufactured, and sold atrazine and atrazine-containing products.  Syngenta designed atrazine to resist binding to soil and to easily run off into surface waters such as streams, rivers, lakes, and reservoirs.  At all relevant times, atrazine possessed these design features at the time it left Syngenta's control.

62.     Syngenta owed a duty to all persons that its atrazine might foreseeably harm, including Plaintiffs, to not manufacture, market, or sell any product that is unreasonably dangerous for its intended and foreseeable uses and misuses.

63.     When Syngenta manufactured and placed its atrazine and atrazine-containing products into the stream of commerce in the United States, these products were in a defective condition unreasonably dangerous for their intended and foreseeable uses for the following reasons:

      a.     Atrazine is highly soluble in water and recalcitrant to biodegradation;

      b.     Atrazine and herbicides containing atrazine have a tendency to mix with surface water and groundwater and migrate great distances;

      c.     Even small amounts of atrazine and herbicides containing atrazine have a propensity to contaminate rivers, lakes, reservoirs, and groundwater aquifers that act as sources of raw water for public water providers;

      d.     Atrazine contaminates public drinking water sources on a massive scale.

64.     Syngenta's atrazine products were used in a manner that Syngenta intended and directed them to be used.

65.     In the course of atrazine's intended and foreseeable use, atrazine contaminated Plaintiffs' and Class members' water supplies.

66.     All of Plaintiffs' injuries were directly and proximately caused by the defective condition/s of Syngenta's atrazine products that existed at the time those products left Syngenta's control.

67.     At all relevant times, Syngenta was aware that its defective atrazine products could cause or were causing substantial damage to Plaintiffs' and Class members water and property rights. Yet Syngenta continued to manufacture, market, and sell atrazine in the same form.  Syngenta acted with a reckless disregard for Plaintiffs' and Class member's rights, and their conduct was willful, wanton, and malicious.

68.     As a direct and proximate result of Syngenta's manufacture and sale of atrazine and atrazine-containing products, at all times relevant to this litigation, atrazine has:

a.    posed and continues to pose a threat to Plaintiffs' and Class members water supplies;

b.    required and/or will require additional testing and monitoring of Plaintiffs' and Class members water supplies;

c.    contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

d.    required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

69.    Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT IV
## (NEGLIGENCE)

70.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 42 of this Complaint, and further allege as follows:

71.    At the time it manufactured, marketed, and sold atrazine, Syngenta could reasonably foresee that due to atrazine's design and the manner and place of its intended use, atrazine would contaminate Plaintiffs' and Class members water supplies.

72.    Syngenta owed a duty to Plaintiffs to avoid contaminating their water supplies with its atrazine.

73.    Syngenta breached its duty to Plaintiffs and Class members by:

a.    Negligently designing atrazine in a manner that made it reasonably foreseeable to contaminate Plaintiffs' and Class members' water supplies;

b.    Failing to adequately test the transport and environmental fate characteristics of atrazine, when adequate testing would have made it reasonably foreseeable that atrazine would contaminate Plaintiffs' water supplies;

c.    Failing to conduct reasonable and appropriate scientific research to evaluate the potential human health hazards of atrazine when consumed

through drinking water, despite knowing or reasonably foreseeing that atrazine would contaminate water supplies and public drinking water;

d.  Failing or refusing to prevent further contamination of Plaintiffs' water supplies even after discovering that atrazine contaminated, and would continue to contaminate Plaintiffs' water supplies and public drinking water.

74.  As a direct and proximate result of Syngenta's negligent design, manufacture, and sale of atrazine and atrazine-containing products, at all times relevant to this litigation, atrazine has:

a.  posed and continues to pose a threat to Plaintiffs' and Class members' water supplies;

b.  required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

c.  contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

d.  required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

75.  Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Syngenta as follows:

a.  Certifying this action as a class action under Rule 23(b)(2), 23(b)(3), or 23(c)(4), and appointing the undersigned attorneys as class counsel;

b.  Awarding Plaintiffs and class member all past costs incurred in removing Syngenta's atrazine from their water supplies, including costs of installing, maintaining, and operating filtration systems;

c.  Awarding Plaintiffs and class members punitive damages;

d.      Awarding Plaintiffs and class member all future damages likely to be incurred in the removal of atrazine from their water supplies, including costs associated with the purchase, construction, installation, maintenance and operation of granular activated carbon filtration systems or other appropriate systems for the removal of Syngenta's atrazine from Plaintiffs' water supplies and drinking water;

e.      Awarding Plaintiffs costs of suit and attorneys' fees;

f.      Awarding prejudgment interest; and

g.      Awarding Plaintiffs any other relief the Court deems just, proper and equitable.

**KOREIN TILLERY, LLC**

By:  /s/ Stephen M. Tillery
          STEPHEN M. TILLERY #2834995
          CHRISTINE J. MOODY #6211904
          STEPHEN A. SWEDLOW #6234550
          CHRISTIE R. DEATON #6276456
          MICHAEL E. KLENOV #6300228
          505 N. Seventh Street, Suite 3600
          St. Louis, Missouri 63101
          Telephone:  (314) 241-4844
          Facsimile:  (314) 241-3525

          *Attorneys for Plaintiffs*


          **BARON & BUDD, P.C**.
          SCOTT SUMMY
          CARLA BURKE
          CELESTE EVANGELISTI
          CARY MCDOUGAL
          CHAD WEST
          3102 Oak Lawn Avenue, Suite 1100
          Dallas, TX  75219-4281
          Telephone: (214) 521-3605
          Facsimile:  (214) 520-1181

          *Of Counsel*