```
 1                 UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3  CITY OF GREENVILLE, ILLINOIS,  )
    et al., individually and on    )   Docket No. 10-188-JPG-PMF
 4  behalf of all others similarly )
    situated,                      )
 5                                 )
              Plaintiffs,          )   Benton, Illinois
 6                                 )   July 27, 2010
    vs.                            )
 7                                 )
    SYNGENTA CROP PROTECTION, Inc.,)
 8  and SYNGENTA AG,               )
                                   )
 9            Defendants.          )

10
                      Telephone Hearing
11          BEFORE THE HONORABLE PHILIP M. FRAZIER
          UNITED STATES DISTRICT COURT MAGISTRATE-JUDGE
12
    APPEARANCES:
13
    For the Plaintiffs:   Mr. Christopher A. Hoffman
14                        Ms. Christie R. Deaton
                          Korein, Tillery
15                        505 North 7th Street, Suite 3600
                          St. Louis, Missouri 63011
16                        314-241-4844

17                        Ms. Patricia S. Murphy
                          Murphy Law Office
18                        P.O. Box 220
                          Energy, Illinois 62933-0220
19                        618-964-9640

20  For the Defendants:   Mr. Michael A. Pope
                          McDermott, Will, et al. - Chicago
21                        227 West Monroe Street
                          Chicago, Illinois 60606-5096
22                        312-372-2000
                          Email: mpope@mve.com
23
    Court Reporter:       Jane McCorkle
24                        301 W. Main Street
                          Benton, Illinois 62812
25                        618-439-7725
                          janemccorkle@verizon.net
```

1

```
 1              MS. MURPHY:  Hey, Judge, Trish Murphy for the

 2   plaintiff.  We are here at Korein, Tillery with counsel.  My

 3   co-counsel will introduce themselves.  We placed the call.

 4              MR. HOFFMAN:  Chris Hoffman, Your Honor.  I will be

 5   speaking for the plaintiff.

 6              MS. DEATON:  Christie Deaton for the plaintiffs, as

 7   well.

 8              MR. POPE:  Mike Pope in Chicago on behalf of the

 9   defendants.

10              (Inaudible.)

11              THE COURT:  Okay.  We are going to have one

12   speaking per side here.  Is Mike Pope going to speak for the

13   defendants?

14              MR. POPE:  Yes, Your Honor.

15              MR. HOFFMAN:  It's my motion.  I'll speak to the

16   motion when you're ready for us.

17              MS. DEATON:  We will have Chris Hoffman speaking

18   for the plaintiff.  We would have had Steve Tillery, but he's

19   out of the country.  We tried like crazy to get him

20   conferenced in, but we just couldn't do it.  So Mr. Hoffman

21   is going to speak for the plaintiff.

22              THE COURT:  Mr. Hoffman for the plaintiff and

23   Mr. Pope for the defendants.  Right?

24              MR. HOFFMAN:  I can hear you.

25              THE COURT:  Keep your voices clear and strong.  We
```

1   won't be able to have anyone talking over each other.  I

2   think it's hard to imagine.  Discovery disputes tend to stir

3   passion in people.  If there is anything that is not

4   deserving passion in a human being, it's a discovery dispute.

5   Sometimes people do, for whatever reason, act like they're

6   all huffy about it.  If you have trouble with it, you need to

7   schedule time with a priest or something afterwards.  We

8   don't need any here.

9          The motion is the defendants'.  I've been over it.

10  I've also looked at -- I don't have any trouble -- well, let

11  me back up here.  I did get the Syngenta's corporate "Where's

12  Waldo."  And did they actually use anything for that, Trish?

13  You know what that reminds me of?  The last time I saw one of

14  those was something on the news that they had somebody at the

15  pentagon who was showing how things had gotten in Afghanistan

16  or something.  Involved all the little cross arrows and

17  everything.

18         But I understand, I guess, the defendants are

19  objecting to, objecting to that for -- I got a copy of an

20  email that said there was no authentication, et cetera, but

21  for today's purposes, it's at least demonstrative and

22  illustrative of the fact that Syngenta is a very large

23  multi-national organization on which I think all of us can

24  agree; is that correct?

25         MS. MURPHY:  You got it, Judge.  That was the

1  purpose of sending it to you was how hard we're working, all

2  of us, and both sides included.

3          MR. POPE:  Judge, this is my motion, Judge.  Want

4  me to have just a little introduction to it?

5          THE COURT:  Real short.

6          MR. POPE:  And very dispassionate.  Let me say

7  that, too.

8          THE COURT:  Right.

9          MR. POPE:  Number one, as you know, they asked you

10 for targeted discovery on jurisdictional issues, and in your

11 order of July 29th, you gave them limited discovery.  In fact

12 in one paragraph you used the term "limited discovery" twice,

13 and then to emphasize the point, you gave very specific

14 directions with respect to what discovery could be addressed

15 to Syngenta AG, one and two there, the nature and extent of

16 their contact with Illinois, and the extent to which they've

17 been involved in the manufacture of products, atrazine

18 products, specifically.

19          Number two, as to Syngenta Crop Protection, they

20 could explore the nature and extent of the agency

21 relationship with respect to Crop Protection.  A very limited

22 order as I read it.

23          The flood of discovery documents that we received,

24 however, were neither targeted nor limited.  We got 32

25 requests for documents, most of which had ten subheadings, 24

1   interrogatories.  All of them had subheadings.  Sixty-two

2   requests for admissions, and nine notices of deposition with

3   document requests attached.

4           At that stage I immediately contacted Steve

5   Tillery, and I asked him to withdraw and start over again

6   because it looked like these things had all been drafted

7   before your order went out.  Ultimately, I talked to

8   Ms. Deaton several times.  We must have had several different

9   conversations on this.

10          My position was, number one, the discovery was way

11  beyond what you had ordered, and secondly, many of the

12  requests themselves were, obviously, overbroad with little

13  relevancy to the issues of the case.

14          As I said, we had many conversations with counsel

15  on a meet and confer basis, and we were able to reach some

16  agreement to modify some of those requests, but we were not

17  able to get an agreement on two major issues or get the

18  modification.  And of two major issues, the first is their

19  repeated request for discovery of eight or nine affiliated

20  Syngenta companies which seem to be beyond what you ordered

21  and, secondly, the idea of taking nine depositions of

22  employees and executives who work and reside in Switzerland

23  seem far beyond what you intended by limited discovery.

24          We've got no alternative but to seek your guidance

25  on the scope of your order.  That's why I didn't file that

1   motion.

2          THE COURT:  Let me interrupt.  I'm sorry.  But you

3   made reference several times to the fact that Syngenta would

4   be subjecting itself to criminal repercussions if it agrees

5   to participate in this without going through the Hague or

6   something.  What's up with that?

7          MR. POPE:  That's the third issue, Your Honor.

8   Once we know what the scope of the documents is that you

9   intended to order, there is a process, and it shouldn't take

10  much time.  The parties would simply draft up a proposed

11  letter that, under the Hague Convention, you would send to a

12  judge in Switzerland, and then that judge would then get the

13  documents and then make them available to the parties that

14  way.

15         THE COURT:  I've done the Hague thing several times

16  in the past, and it's always a nightmare.  It always closed

17  the case down by a couple of years, anyway.  So --

18         MR. POPE:  On this case we're not raising the Hague

19  as a shield.  We're just saying we will be very willing to

20  cooperate with the plaintiffs' lawyers to get this thing done

21  in a process that gets the documents to them that you rule on

22  without having to incur problems with Swiss authorities.

23         THE COURT:  Is there a Swiss law?  Because maybe I

24  missed it, but I never saw any citation in there to a

25  particular Swiss law.  It seems kind of curious that a

1   company could be subject to criminal problems for not going

2   through the international court.

3            MR. POPE:  Your Honor, there's a declaration that

4   is Exhibit No. 16 to our protective order.  An outside

5   counsel in Switzerland, and he sets forth the citations, I

6   believe.  Apparently, this is a law that was passed in the

7   30s in Switzerland.

8            I don't know how much of it had to do with World

9   War II or whatnot.  It's been on the books a long time.  It's

10  not a recent development.  But my point was I think in

11  working with counsel, we can get the right process that gets

12  this thing done fairly expeditiously and doesn't want to

13  follow Swiss law.

14           THE COURT:  Well, hang on a second here.  We've got

15  one here.  It wasn't 16.  That was some interrogatories.  And

16  here's the letter of request.  Well, yes, I never saw it in

17  there.  Okay.  Here it is.  Conditions for a commissioner or

18  diplomatic or counselor official to obtain evidence in

19  Switzerland.  A foreign request for obtaining evidence

20  according to Articles 15 through 17 of the Hague is subject

21  to prior authorization by the Federal Department of Justice

22  and Police.  That's different.  Oh, well.

23           You know, I'm sure you've been -- you know, you

24  guys are familiar with the law that is going to govern the

25  due process question on the substantial contacts with the

1   state of Illinois.  And what information do you have now,

2   Mr. Hoffman, to suggest, you know, when you sued Syngenta

3   that they were doing business in Illinois or had sufficient

4   contacts other than the name?

5           MR. HOFFMAN:  You're breaking up a little bit on us

6   there.

7           THE COURT:  I'm sorry.  What information do the

8   plaintiffs have to support their belief that at the time the

9   lawsuit is filed, that Syngenta AG has sufficient contacts

10  with the state of Illinois to subject it to personal

11  jurisdiction?

12          MR. HOFFMAN:  Well, Your Honor, we believe that the

13  decision to manufacture, market, and sell atrazine in the

14  United States and Illinois and spray it on an Illinois farm

15  field would make it the highest level of Syngenta's corporate

16  structure and defendants' Syngenta AG.

17          We have documents that show that the operation of

18  Syngenta's business is a unified whole.  Despite this

19  conglomerate of 250 separate corporations, what we find in

20  the document is that the control over what happens at the

21  U.S. subsidiary is exercised outside the true ownership of

22  that company and up in Syngenta entities.  And that there are

23  groups set up that can include members of many different

24  corporations that make business decisions about Syngenta's

25  global affairs and operations in the United States, including

1   Illinois, on business grounds, and they completely disregard

2   the corporate structure that they set up for tax and finance

3   purposes.

4           We have numerous documents to show that the new

5   personnel from one country to the other outside the chain of

6   ownership that -- so the decision to be made about what

7   happens at the U.S. company that are outside the (inaudible)

8   ownership that are designed for Syngenta's global business.

9           We also believe that, and if you look at that draft

10  that we have given you of the group structure at Syngenta,

11  Syngenta sits at the top, and you notice a peak line.  Those

12  represent six separate wholly owned companies by Syngenta AG

13  over which Syngenta has direct ownership of over 100 percent

14  of the U.S. subsidiary.  Our discovery of these entities is

15  designed to show that articles of incorporation, which these

16  entities have and which were set up by Syngenta AG, the

17  contracts between these entities all, basically, require the

18  U.S. subsidiary to do the bidding of the corporate head in

19  Switzerland.

20          THE COURT:  Well, I mean, essentially, in order to

21  subject Syngenta AG to jurisdiction here, I mean just showing

22  like you would on some formal alter ego type of analysis that

23  there's, you know, a lot of mixed management characters,

24  board of directors, et cetera, et cetera.  It happens to be,

25  essentially, that they're calling the shots.  And so, I mean,

1  how crucial is it?  I mean, obviously, the group that is

2  manufacturing, whose name is, no doubt about it, on this

3  atrazine, is a group that you already have --

4        UNIDENTIFIED:  A North Carolina company, Your

5  Honor.

6        THE COURT:  They have jurisdiction on that.  Do

7  they not have sufficient assets to cover any judgment that

8  might be entered?  Why would you imagine that Syngenta AG

9  would have more?  I mean, you know, bearing in mind that the

10  corporate form in America that exists is not primarily, at

11  least secondarily, to allow corporations to, well, tax

12  breaks, to avoid if not almost outright defraud creditors and

13  limit liability.

14        MR. POPE:  That's not our issue here either, Your

15  Honor.  By the way, Your Honor, it is clear in the case law

16  that just being a holding company doesn't grant --

17        THE COURT:  Just being a holding company is not

18  enough.  It's just being a holding company.  If you're a

19  holding company with the same directors, the same officers,

20  that's not enough.

21        MR. HOFFMAN:  Your Honor, we agree that being an

22  investment holding company did not subject the corporate head

23  jurisdiction of the United States.  But under the case law

24  that is developed, deals with similar multi-national

25  corporations in Europe.  The Supreme Court and several other

1    courts have held that jurisdiction can be exercised over

2    these companies if they are acting not as a mere

3    investigator, but actually managing the entire corporate

4    structure.

5            THE COURT:  Right.

6            MR. HOFFMAN:  Not so much whether Syngenta U.S. can

7    pay judgment, but we also believe that the ultimate decisions

8    that determined whether atrazine was going to be applied to

9    Illinois farm fields was made at Syngenta AG.  As you can

10   see, they are creating a lot of obstacles for us to farm

11   Syngenta AG.

12           In this Madison County case, we are getting

13   discovery from the U.S. subsidiary, but, again, they are not

14   giving us the documents from AG until -- although the U.S.

15   holding company may, as a result of funding from Syngenta AG,

16   be able to pay any judgment, it complicates our case and

17   makes it much more difficult if we can't get to the decision

18   makers and get information from them, get documents from

19   them.  And so that's our motivation in getting Syngenta AG to

20   be a defendant in this case.

21           THE COURT:  Let me, you know, there's lots of ways

22   to skin a cat, and I understand that, obviously, when you're

23   prosecuting something, you want to be able to look under as

24   many rocks as possible.  And, you know, it doesn't hurt the

25   prospect of maybe selling a case.  The more rocks you get to

1  look under, a lot of companies just get tired of it and say,

2  Here, take some money and go away.

3         But the problem is I don't want to get involved

4  with the Hague Convention.  I've never had a good result with

5  it.  This case will probably be over with by the time the

6  Hague Convention does its stuff.

7         MR. HOFFMAN:  The Hague Convention is not a

8  mandatory procedure of the United States Supreme Court.  Held

9  so about 25 years ago.  There are numerous decisions coming

10  out of the Seventh Circuit and other circuits that it's not

11  required when a company like Syngenta AG is created and

12  created corporations to do its business in the United States,

13  they have subjected themselves to the United States judicial

14  system.

15         They cannot operate a multi-billion dollar U.S.

16  crop protection and seed manufacturing and selling and

17  marketing business in the United States without being able,

18  without being subject to U.S. courts.  So the Hague

19  Convention is not required in this case.  We entirely

20  disagree with Mr. Pope, with all respect.  The Hague

21  Convention need not be applied in this case.

22         Moreover, many of the documents we seek regarding

23  SAG and the intermediary companies that separate SAG from the

24  U.S. subsidiary, we believe we can get those documents from

25  the U.S. company.  That they are in the control or possession

1    of the U.S. company, and that therefore, we are not asking

2    for any documents that are located in Switzerland.

3           So we think the whole thing is a ruse, you know, to

4    make it seem like this Court is going to have to go through a

5    whole lot of trouble if it keeps Syngenta AG in this case.

6    We don't think it will.

7           MR. POPE:  I disagree with references to the case

8    law.  Those are very distinguishable situations.  This is an

9    international company that sells all over the world.  It has

10   one subsidiary in the United States that is a proper party to

11   the case.

12          The question really is, basically, due process and

13   the basic fairness under the jurisdictional questions.  And

14   if counsel has evidence showing what, why he wants to make

15   them, why are we harassing the people in Switzerland.

16   They've got what they need.  We will take some discovery from

17   Crop Protection that the Carolina company does.  That's my

18   main point.  I think we've gone way beyond what's ordered,

19   Judge.  And you set some very limited areas for that, and

20   they've gone beyond that in the massive discovery they've

21   filed with us.

22          THE COURT:  I have no trouble saying the discovery

23   that's been requested goes far beyond what I had imagined.

24   So, I mean, among other things, I don't recall granting

25   anybody leave to file in excess of 25 interrogatories.

 1   That's just not going to work.

 2          But there's got to be a simpler way to get what you

 3   want.  If the control of Syngenta AG is as pervasive as the

 4   plaintiff believes, then what would be the difficulty in

 5   going after Crop Protection over whom you and the Court does

 6   have jurisdiction?  You've got your hooks in them.  And just

 7   start discovering from them what contacts they have with

 8   Syngenta AG.  I mean if, in fact, Syngenta AG is calling the

 9   shots, you should be able to get it from the Crop Protection

10   people just as easily as you get it from Syngenta AG.

11          MR. HOFFMAN:  Your Honor, I notice in a few of the

12   large discovery requests, we believe that the Court's order

13   perfectly tracks the case law that allows us to show the kind

14   of control we have seen a glimpse into, but we are not being

15   allowed to get enough to really show it.  So we've got --

16          THE COURT:  They will hide it from you if they can.

17   Don't get me wrong, but let's just say if, as you believe --

18   let's put it this way.  If Syngenta AG's presence in the

19   operation of the Syngenta Crop Protection defendant, if that

20   is pervasive to and significant to the point that would

21   sustain personal jurisdiction here, then you ought to be able

22   to get that information from Crop Protection.

23          MR. HOFFMAN:  Well, we would like to believe that's

24   true, but it's not true in our Madison County litigation

25   where obstacles are being raised, and we don't think that

1   having just Syngenta U.S. is the way to go.  And we also take

2   it Syngenta AG is the one calling the shots.  They are legal

3   in Switzerland.  Can't apply.  But yet they made a decision

4   from the very top of the Syngenta corporate head that they

5   were going to (inaudible).  And we know that the U.S.

6   corporation could not have made that decision on its own.

7        MR. POPE:  Now counsel is starting to testify, Your

8   Honor.  As a matter of fact, it's standard that what the

9   Court looks to is day-to-day decisions, and if they think

10  they can establish that the Swiss company controlled

11  day-to-day decisions as you suggested just a minute ago, I

12  believe they should go to Crop Protection and prove it that

13  way.

14       That is based on a lot of time, a lot of effort and

15  flying around the world.  And if they don't get the proper

16  answers there, they can come back.

17       MR. HOFFMAN:  I can't tell you about this Madison

18  County case.  I'm only recently part of that.  I haven't seen

19  any of the documents produced, and I don't think that's a

20  fair argument to make.

21       THE COURT:  Well, I mean, we're talking about a

22  very high level of involvement and control that Syngenta AG

23  is going to have to be shown to exert over the regular

24  operations of Crop Protection in order to be doing business

25  and have significant contacts with this stage to give

1   jurisdictional threshold.  Okay?

2            And that type of control that involves, you know,

3   there's two sides to that knife.  You've got the ones that

4   are giving the orders, and you've got the ones that are

5   getting the orders, and they're both involved, and they are

6   equally involved.

7            And so here's the way we're going to go about this.

8   Is that I will, and just so that there's no mistake down the

9   road because I imagine they're going to want to start really

10   beating this pretty hard, but I'm a very big believer in

11   liberal discovery when it's not really expensive and time

12   consuming and just looking for something that's pure fishing.

13   All right?

14            And so I'm going to let him really rattle cages at

15   Syngenta Crop Protection.  You're going to get to see every

16   communication.  Anything that's coming out of Switzerland to

17   Crop Protection is going to be fair game for discovery.

18            So now what could we possibly conclude if there's

19   very limited communication from Switzerland to Crop

20   Protection, and it's not the sort that is, that one would

21   find in the day-to-day operation of the business.  And all of

22   the higher ups, and they're going to be deposing the people

23   who are in the highest officers of Crop Protection, and these

24   people are willing to, you know, if their testimony under

25   oath is that You know what?  No, we run it.  They don't run

16

1  it.

2         I'm sure that that would not be satisfactory.

3  Certainly, if I were representing the plaintiffs, I wouldn't

4  be happy with that, but that's what we're going to have.

5         Because it's for sure that one of two things is

6  happening.  Either that's the way it really is or if you have

7  people who are willing to commit perjury, it's not likely

8  that anybody in Switzerland is going to come out and say, Oh,

9  yeah, not only are we running the show, but we told these

10 people a lie.  Or these people just decided to throw

11 themselves in front of the train to save us.  At some point

12 we've got to do this logically.

13        And the other thing.  Here's the other thing.  I

14 don't know if this would violate Swiss law, but what would be

15 the harm in having a couple of like 30(b)(6) designees from

16 Syngenta AG either make themselves available for depositions.

17 I mean surely they, if it's done without process, if they

18 just voluntarily agree to a deposition, they could do it

19 telephonically.  The plaintiffs' attorneys could send a

20 little delegation to Switzerland, any number of things.  And

21 what would be the difficulty in that?

22        MR. POPE:  Well, Your Honor, I understand one of

23 the declarants is from AG, and I offered to bring him to the

24 states to be deposed.  So you will get that one deposition of

25 Mr. Meili.  And then we also have a deposition we would be

1  willing to give of Ted Quarles who is the general counsel of

2  the North Carolina company, Crop Protection.  I will declare

3  one of whom who works in Switzerland.

4         THE COURT:  Well, I mean I'm talking about one of

5  the, I don't know how big a dog you're bringing to

6  Switzerland, but what would be the harm to bring someone?  If

7  you know that the plaintiffs' attorneys are going to look at

8  it and just say, Well, this isn't the right person or this

9  person can't know anything or this person is just a lackey.

10        MR. POPE:  We have discussed, Your Honor, if you

11 were to compel a third deposition, we talked about making

12 somebody available in someplace like Belgium and be in a

13 neutral country.  Easy for us to get to, and he could do it

14 all by telephone.  But if they wanted to be in person, my

15 firm has an office in Belgium, so that would work for one of

16 our purposes.

17        MR. HOFFMAN:  Your Honor, may I inject?  He talked

18 about the two affiants, and, of course, they are going to

19 have to testify to test the accuracy of their affidavit and

20 their knowledge to support the claims they make in their

21 affidavit.  But we've asked for seven other people, and they

22 all work for the U.S. company.

23        There's no need for a Swiss deposition here.  Of

24 course, two of them also serve on the executive committee,

25 the Syngenta AG, but every single one of the other

1    depositions, other than the affiant, are people who work for

2    or serve on the board of the U.S. subsidiary.  So we're not

3    asking for any deposition of somebody who doesn't have a

4    clear connection to the United States and of the U.S.

5    subsidiary.

6            MR. POPE:  Wait just a second.  The two people he's

7    talking about live in Switzerland and work in Switzerland.

8    They are not employed by Crop Protection.  They sit on the

9    board of directors of Crop Protection, but that doesn't mean

10   they come to the states with any regularity at all.  Many of

11   their board of directors' meetings are held by telephone.

12           And that's unfair to suggest that these two people

13   who live and work in Switzerland should be dragged over here

14   willy-nilly.  That's one of the first questions I raised with

15   counsel.  If you get the two declarants and the Court thinks

16   we need to have one other person from Switzerland available

17   in Europe, I can understand that, but we don't need nine

18   depositions.

19           THE COURT:  No.  No.  No.  We're not talking about

20   dragging anybody anywhere.  I'm talking about as far as these

21   people probably come to the United States occasionally, and

22   they're going to have to pay for you or somebody else to go

23   over there.

24           How hard would it be to pick a higher up?  I mean

25   somebody who's standing within the Syngenta AG cannot be

1  questioned even by the plaintiffs' attorneys in this case

2  because you know that they're going to question anybody that,

3  you know, they're going to think anybody you're willing to

4  produce is not somebody who knows anything is going to do

5  them any good.  That's just the nature of how this whole

6  thing goes.

7          MR. POPE:  I hope I can be trusted more than some,

8  Judge, but I understand what you're saying.

9          THE COURT:  It's a very cynical operation that we

10 have here in our business, and it's just the way it is,

11 unfortunately, and not likely to change.  So why not just

12 knock them over.  Give them somebody that not even they can

13 question, somebody who is so high up.  Don't make it somebody

14 who's so high up they will say he doesn't know anything.

15 He's too high up.

16         MR. HOFFMAN:  Your Honor, we have picked these nine

17 people, and there's seven other people we've requested.  And

18 we picked them based on the review of the documents produced

19 in the Madison County case that show that they have

20 particularized knowledge of certain aspects of Syngenta's

21 business that show that other courts have found show

22 jurisdiction over the parent.

23         THE COURT:  Who are those people?

24         MR. HOFFMAN:  Christoph Mader.  He serves on what's

25 called the executive committee of Syngenta AG.  That's a

1   group of a handful of people who are at the very top of

2   Syngenta's structure.  He also serves on the board of

3   directors of the U.S. subsidiary.  We've asked for his

4   deposition.  He's the chief lawyer for Syngenta Global.

5           THE COURT:  Now --

6           MR. HOFFMAN:  We'll find out that the corporate

7   structure was created and operates for talks and finance

8   purposes, but it doesn't have any business relatives.  It

9   isn't honored in the business practice.  It's just for this

10  sole purpose.

11          The second guy who has a position at AG, also on

12  that executive committee and also a member of the U.S.

13  subsidiary board of directors, he runs the whole Crop

14  Protection business of Syngenta across the world.  And we

15  believe that he will be able to show that Syngenta AG is

16  calling shots about how atrazine is manufactured, marketed,

17  and sprayed on Illinois farms.

18          The remainder of the people are all employees at

19  the U.S. subsidiary, people at the highest echelon of that

20  corporation.  And each of those are selected because they

21  have a particularized expertise, one in regulatory affairs,

22  one handles personnel affairs, one handles finance, and

23  another one handles special relationships with other Syngenta

24  entities that are not in the chain of ownership of SAG, SCPI.

25          So we think nine is not a whole lot.  Two we have

1  to take because of the affiants.  We think those will be

2  useless.  So we have seven real depositions we are asking for

3  in this very important case.  We don't think that's a fishing

4  expedition.  We think that is narrowly targeted to prove the

5  points that cases as shown give jurisdiction to this corp

6  over the U.S. parent.

7            There are a couple of those cases we could send you

8  or give you the cites, and they match what's going on here as

9  far as we can tell almost precisely.  And in a recent case,

10 one in 2008, one in 2009 --

11           THE COURT:  One of my law clerks is here on the

12 other end.  What are those cites?

13           MR. HOFFMAN:  674 F.Supp. 2d 580.

14           THE COURT:  That's going to be useless.  It's

15 another district court.

16           MR. HOFFMAN:  576 F.Supp. 2d 1053.

17           THE COURT:  Those are probably not going to be

18 useful.  Those are other district courts.

19           MR. HOFFMAN:  They offer you a glimpse of what's

20 going on.  And they cite other cases to support their

21 conclusions, as well.

22           THE COURT:  What districts are those?

23           MR. HOFFMAN:  Those are the Eastern District of

24 Missouri right across the river here and the Eastern District

25 of Pennsylvania, Your Honor.

1          THE COURT:  Well, normally, other district court

2    decisions are not -- well, they're certainly not --

3          MR. POPE:  I think you can summarize, Judge.  Most

4    of these cases suggest you do have some discretion.  There's

5    no question about that.  You can exercise your discretion

6    with two factors in mind.  One, the fairness to the

7    deponents, and secondly, the idea of economy.  And when you

8    have foreign countries involved, you have to think about

9    that, as well.

10         THE COURT:  I'm not too concerned about the Swiss.

11         MR. POPE:  I don't think they've shown any reason

12   why they need that for this limited issue on the jurisdiction

13   of Syngenta AG.

14         THE COURT:  I don't think the Swiss are too likely

15   to declare war over this.  But, you know, my biggest concern

16   is always in these things is the economy of it.  I understand

17   that there are certain things that are just not --

18         MR. POPE:  What is your biggest concern, Your

19   Honor?

20         THE COURT:  The economy of these things.  And I'll

21   be honest with you guys, too.  One of the things I'm thinking

22   about, and I may just kind of defer until Judge Gilbert has

23   an opportunity to make his ruling on the motion to dismiss

24   that's filed by Crop Protection on the actual substance of

25   the allegations.

1          I mean, this is not quite a *Palsgraf* situation, but

2    let's just say when I read the complaint, there were some red

3    lights that went off in my head.  You know, we bear some

4    close scrutiny as to whether or not there's even a claim

5    here.  And if, obviously, if there is no claim against Crop

6    Protection, there's not going to be a claim against Syngenta

7    AG on these, with these allegations.  I understand that that

8    motion is fully briefed and before Judge Gilbert now; is that

9    right?

10         MR. POPE:  Yes, Your Honor.

11         THE COURT:  So it may be worthwhile just to wait

12   and see what happens.  I would anticipate we will have a

13   ruling on that within the next two or three months.

14         In the meantime do this:  What is the possibility

15   of -- who were the people, the top people at Syngenta AG, who

16   you believe would be involved in knowing what's going on as

17   far as Syngenta AG direction and control?

18         MR. HOFFMAN:  Your Honor, we've identified two

19   people, Christoph Mader and John Atkin.  I described their

20   positions earlier to you.

21         THE COURT:  Now, these are ones that Syngenta AG

22   would be willing to make available for depositions in

23   Belgium?

24         MR. HOFFMAN:  I haven't inquired, but one of them

25   is available in Brussels.

24

1          THE COURT:  Where's the other one?

2          UNIDENTIFIED:  One of them is living in

3    Switzerland.  Where is the other one?

4          MR. POPE:  They both live in Switzerland.

5          THE COURT:  Could you like smuggle them over the

6    line into Belgium for their depositions?  I mean this is

7    starting to be one of the *Bourne* movies or something, but can

8    you get them over there and be deposed?

9          And, you know, the problem with the attorney, I

10   don't want to get this guy over to Brussels or someplace to

11   be deposed and have him sit there and start claiming a lot of

12   attorney-client privileges on things.

13         MR. POPE:  I don't think that's as much of a

14   problem as me going back to the client and saying, We need to

15   have two of the top executives of this international company

16   be deposed.  But if that's your order, we, obviously, will

17   comply with it.

18         THE COURT:  And I think that's probably where we

19   are headed on this.  You got these two guys.  You get the two

20   guys the plaintiffs have named, and I know they don't want to

21   be deposed.  But I'll tell you what.  We'll limit the

22   depositions to three hours apiece.

23         MR. POPE:  All right.  I can't speak right now with

24   the scheduling.  I will, obviously, follow up with those

25   clients and with counsel.

```
 1          THE COURT:  And, guys, we've got to believe, too,
 2   that at some point it's the plaintiffs' responsibility when
 3   you file a lawsuit, at the time you file a lawsuit.  To what
 4   you're alleging, personal jurisdiction, you better have some
 5   facts in hand.  I'm not talking about suspicion or what seems
 6   logical.  I'm talking about you better have some facts in
 7   hand that back up jurisdictional claims.
 8          And so I'm going to presume that you all, being
 9   very careful lawyers, that you do have some of the facts in
10   hand to support allegations that that would give this Court
11   jurisdiction over Syngenta AG.  And then, actually, if we're
12   going to go to all of that trouble, we will limit the
13   depositions to five hours apiece.  And I know it's going to
14   be an imposition, but I would imagine that these guys could
15   probably use a little vacation in Belgium.  Anybody seen the
16   movie *In Bruges*?
17          MR. HOFFMAN:  Yes.
18          THE COURT:  Very good movie.  I never thought
19   Belgium would be anyplace to be an interesting place to
20   visit.
21          MR. HOFFMAN:  You will have to arrange a vacation
22   there to take the depositions with us.
23          THE COURT:  I'll wait until Hawaii or something.
24   But, anyway, get those two depositions arranged within the
25   next three months.  All right?  And the whole thing may be a
```

26

1   moot issue by then if Judge Gilbert decides there's no claim

2   anyway.

3           But, you know, if we get them deposed and within

4   the next 90 days as to what they know about Syngenta AG's

5   control over Crop Protection activities here in the United

6   States.  I mean try the best you can to limit it to Crop

7   Protection because they could have any manner of other --

8   well, I guess if they were doing other business here.  What

9   if it turns out that Syngenta AG is not doing anything to

10  Crop Protection, but turns out that they own Wrigley Field

11  and are operating the Cubs?  So I mean --

12          MR. POPE:  We can stipulate that's not the fact,

13  Your Honor.

14          THE COURT:  I know it's probably not, but if they

15  have some other.  You're probably going to have to get into

16  what their other contacts with the state are.  But I guess it

17  would have to be if they don't live here or have a place of

18  business here, then is it going to be under like Illinois

19  long-arm jurisdiction analysis?

20          MR. POPE:  Due process under the federal

21  constitution.

22          THE COURT:  Well, all that is stuff all of us

23  forgot about after *Pennoyer vs. Neff*.  But, anyway, get going

24  on that, and I really want to keep this -- it's going be very

25  costly, and we want to keep this to a manageable situation.

```
 1                One of the questions I wanted to ask you guys about

 2    is there any common thread between all of these

 3    municipalities in terms of some geographical connection?

 4    Because I live in Nashville, Illinois.

 5                MS. DEATON:  This is Christie Deaton.  The

 6    connection, Judge, and I'm sorry for interrupting.  But the

 7    connection on all of these are all municipalities or water

 8    providers who have atrazine contamination.  Usually, it's a

 9    surface water issue.  There are some that have it in their

10    ground water because they have some kind of -- I won't bore

11    you with this, engineering details of how that occurred, but

12    it gets into the ground water from runoff from fills.

13                THE COURT:  That much I got from reading the

14    complaint.  I live just south of Greenville, Illinois.  And I

15    don't want to find out -- I guess I should do just a local

16    request to see if my municipality removes atrazine.

17                MS. DEATON:  If they have surface water that they

18    are pulling from in the midwest, then they probably have

19    atrazine that they are already removing from the water.  It's

20    just the midwest has it all over the place.  It ends up in

21    water supplies.  I mean, that's the crux of our case.

22                THE COURT:  Okay.  Well, I know.  It was fairly

23    close by to where I live.  I don't want to get too far into a

24    case and find out that I have to recuse if it turns out that,

25    say, my -- I know that my little town is not a named
```

1    plaintiff.  I don't know if they've considered it or anything

2    else.  But I just don't want to get too deeply into the case

3    and then find out that I have to recuse.  So because as it

4    stands right now, I may be doing a little questioning

5    around --

6              MR. POPE:  If I could ask you to keep your voice

7    up.

8              THE COURT:  I may ask locally and see if this is

9    something they have any concerns about in terms of that, but

10   you know, probably if it applies to me, it would apply to any

11   of the other judges in the district, as well.

12             So all right.  So does that resolve what we need to

13   get resolved today?  And I know we didn't resolve a lot, but

14   we got some of it done.

15             MR. POPE:  Your Honor, if I understand you

16   correctly, you've asked me to try to get Mr. Mader and

17   Mr. Atkin to be available in Belgium within the next 90 days

18   for a deposition that will be five hours each.  What about

19   the remainder of the discovery?  Is that going to be in lieu

20   of that?

21             THE COURT:  No, you need to keep going with your

22   discovery on that.  I don't know what else to tell you.

23             MR. HOFFMAN:  Your Honor, we would like it to be

24   clear that the U.S. Holding Company which doesn't have these

25   concerns about Swiss law and the Hague Convention, that they

1   be ordered to respond with documents regarding the

2   specific -- we've asked for seven non-parties, information

3   about seven non-parties in the possession of the U.S.

4   subsidiary so that we can understand the relationship,

5   contractual and otherwise, between those entities.

6          They are either in the direct line of ownership

7   going up to SAG or we've seen documents showing that these

8   companies completely outside the line of ownership are giving

9   orders to U.S. company.  So we would like that company, to

10  the extent they are in possession and control of those

11  documents we've requested about these entities, to produce

12  those prior to the depositions so that we have the documents

13  we could use to craft our questions and to challenge the

14  witnesses.

15         THE COURT:  Sure.  I don't care.  Anybody you've

16  got jurisdiction over that you can go for on some of these

17  things.  I mean I should say within reason, but yeah, if it

18  were me, I would be attacking it from the other end.  I would

19  be going after it from --

20         Like I say, if you are to get jurisdiction over

21  Syngenta AG, and it will only be because they are exhibiting

22  an extraordinary amount of control over the -- I think here's

23  what the -- was it here?  The United States Supreme Court

24  has, the personal jurisdiction cannot be premised on

25  corporate affiliation or stock ownership alone.  Parent does

1    not exercise an unusually high degree of control over the

2    subsidiary.  That's --

3           MR. HOFFMAN:  Your Honor, we think we can show

4    that.  We have tried what you are saying because that's what

5    we were thinking.  We were thinking the Swiss people are

6    going to be real difficult about documents or anything.  If

7    you look our discovery is primarily directed to the U.S.

8    court.  Our request for documents from the Swiss parent

9    corporation, if you look, they are very simple, very simple

10   and they are directed exclusively to show contacts with

11   Illinois. Now we are willing to forego those if we can get

12   documents from the U.S. subsidiary in response to the

13   requests we made to that company.

14          THE COURT:  You can either demonstrate -- right now

15   you can either demonstrate probably you've got 90 percent of

16   whatever, 95 percent of whatever you're ever going to have,

17   showing that Syngenta AG has done things in the state of

18   Illinois to subject it to jurisdiction.  So probably if you

19   were to be -- those are not rocks that are going to be likely

20   good rocks to look under.  If it were me, I would try to go

21   about it the other way and show that Syngenta AG is

22   exercising an unusual amount of control over a company that

23   does have contacts with Illinois.

24          MR. HOFFMAN:  Well, we believe that we need to show

25   that through this chain of ownership.  Because -- I mean,

 1   it's like this, Your Honor.  Let's suppose I'm in Missouri,
 2   which I am, and I tell somebody here, I want you to go spray
 3   some poison on an Illinois farm field, and that person tells
 4   another person in Missouri, Well, Hoffman says to spray it.
 5   And then he tells another person and he tells another person.
 6   Then somebody calls somebody in Illinois to spray, and that
 7   person sprays it.  And then they name me as a defendant.
 8          I say, Look, you can't talk to the people I talked
 9   to.  You can't show that I ordered that because all these
10   intermediaries are beyond discovery.  That's what they're
11   saying here, all these intermediaries and information about
12   them.
13          THE COURT:  I don't have any trouble if you work
14   backwards, work backwards.  We're on the same page with that.
15   You need to start off at -- you're going to need to just
16   start at the receiving end of the orders.  That would be
17   through Crop Protection and work your way backward.
18          It's like the age-old follow the money trail advice
19   people give when you want to find out what's going on with
20   anything.  You just follow the money.  In this case you're
21   just going to have to get on that, not the money trail, but
22   the orders and directions trail and follow it and see where
23   it goes.  Understanding, of course, that in your example if
24   there are four intermediaries between you and the person who
25   actually sprays the poison and one of them decides he's not

1    going to talk, well, then you're pretty much done.

2              MR. HOFFMAN:  We're not even asking those people to

3    talk.  We're asking the U.S. subsidiary to give us basic

4    documents like the articles of incorporation.

5              THE COURT:  Fine.  You should do that.  Drop

6    subpoenas on them.

7              MR. POPE:  Well, let's just remember one thing, and

8    if I may interpose an objection to referring to this as

9    poison.  This a legal product that's been sold for 50 years.

10             THE COURT:  You don't have to defend your product

11   with me.  I've been around a long time.  It probably is

12   poison, but go ahead.

13             MR. POPE:  It's poison to weeds.  That's for sure.

14   What they're asking for, they are going to Crop Protection

15   saying, Give us the articles of incorporation and bylaws of

16   these other nine companies.  I mean, that's just broadening

17   the scope of discovery far beyond what you suggested in your

18   order of June 29th.  I don't have the actual numbers, but why

19   would one company have the articles of corporation of

20   another?

21             THE COURT:  How hard, how much work can that

22   possibly be to say, We don't have it?

23             MR. POPE:  I know, but I think the scope of what

24   you ordered is being violated.

25             THE COURT:  And the scope on something like this is

1    really hard to find.  Like define the universe.  Give three

2    examples.

3            MR. HOFFMAN:  With regard to the depositions, are

4    you suggesting a phased approach here or what?  My

5    instruction was nine depositions is overkill.

6            THE COURT:  Well, this is just on jurisdiction, not

7    on -- now, obviously, they're probably going to ask some

8    questions about Syngenta, as to whether or not anybody at

9    Syngenta AG is monitoring the production of atrazine or had

10   anything to do with the development of atrazine.

11           MR. POPE:  My point was that a super contender

12   asking for nine people when you said we will bring in a

13   couple of top executives, but do we really need to take all

14   of these depositions?  Talk about economy.

15           MR. HOFFMAN:  Your Honor --

16           THE COURT:  We're taking a ton of depositions for a

17   case like this.  I'm trying to avoid like 200 depositions.

18   These cases are God awful expensive and, you know, they just

19   are.  They are God awful expensive, and they're a pain in the

20   butt for everybody.  But that's just the nature of the beast.

21           You know, we can make this -- the only way, the

22   only way that we can make this more expensive, more difficult

23   for everyone, is if we have a lot of these.  And the worse

24   possible thing -- it could happen for any of you -- is to

25   have me start defining how work is going to proceed.  Because

1    my schedule will not be one you'll like.  It just won't be,

2    and nobody will like it.

3             And so it's just, you know, you've really got to

4    figure out.  I've told plaintiff that, yes, what you've

5    planned is overly ambitious, and we are going to start off

6    with just those two from Syngenta AG, and then you're going

7    to have to start pounding it from the other direction.  And,

8    you know, my order with regard to the jurisdictional

9    discovery was really more limited to things that would be

10   directed to Syngenta AG itself.

11            Now, as far as Crop Protection, you know, they're

12   fair game.  They're fair game.  And I guess the people at

13   Crop Protection need to understand that, yes, this is going

14   to be a painful and expensive operation, and there's no other

15   way to do it.  And what they need to do is we need to get

16   this thing in a situation where maybe you guys want to settle

17   it.  Everybody would because it's going to be a painful

18   experience.

19            MR. POPE:  The situation where what, Judge?

20            THE COURT:  Once everybody realizes what a painful

21   and expensive thing this is going to be, maybe people will

22   want to get together, and we can settle this case.  But this

23   could be, well, this could be an expensive, plus this could

24   be over with the plaintiffs real quick.

25            MR. HOFFMAN:  Well, our understanding that even if

1    the U.S. subsidiaries' motion to dismiss, 12(b)(6), agrees in

2    full, this case would still not disappear.  There are

3    elements about claims that are not being attacked by their

4    motion to dismiss.

5            THE COURT:  Well, then, we would just deal with

6    what's left.  I don't know what elements those would be, but,

7    you know, we'll have to drive off that bridge when we get to

8    it.

9            So, you know, for now it may be in everybody's

10   interest, and, folks, you know, I don't usually get all that

11   involved in class actions.  The settlement is part of it

12   because that just seems to be the way those things go, but I

13   am always available.  That's what I do around here,

14   primarily, and I'm at your disposal within reason to anything

15   that promotes the smooth, efficient, and inexpensive

16   resolution of this case.  So, you know, we just need to bear

17   this in mind.

18           MR. POPE:  Judge, you're breaking up again.

19           THE COURT:  I said I am at your disposal.  You

20   know, if settlement is something you want to pursue, I am at

21   your disposal to do anything that is going to promote the

22   expeditious and inexpensive resolution of the case.  And but,

23   you know, I guess everybody is going to have a little -- get

24   a little blood in their mouth before that happens.

25           Like I said, the plaintiffs are probably going to

1    need to get some hard thought to what may be left after the

2    motions to dismiss are ruled upon.

3              And, you know, the only people who really know

4    what's going on are the people at Syngenta.  The people at

5    Syngenta AG know that they have been actively involved in

6    directing that the atrazine be sprayed in Illinois.  And, you

7    know, they know that these plaintiffs' attorneys are, this is

8    a go-get-em bunch and so, you know, they're going to keep

9    looking under rocks.  So they can save themselves some

10   expense if they want to pony up some dough and get it over

11   with.

12             So I mean it's just kind of the way it is.  But is

13   there anything else we can do today?

14             MR. HOPE:  Judge, are you going to issue an order

15   based on today?

16             THE COURT:  Well, hopefully, I have a law clerk and

17   a courtroom deputy who are taking this down.

18             MR. POPE:  The reason I ask this, could I be

19   granted 30 days to respond to discovery?  Will that be

20   allowed, the documents and all that stuff?  I mean the

21   interrogatories and all that?

22             THE COURT:  Sure.  Right.  That's fine.

23             MS. DEATON:  Judge, I guess I'm confused then.

24   What about the discovery that is out there already that,

25   basically, is directed to the U.S.?

1          MR. HOFFMAN:  I think he just said they had 30 days

2     to respond.

3          THE COURT:  Thirty days to respond to everything

4     that's direct to that.  And while we are on that subject,

5     okay, I have been doing discovery disputes now for 23 years,

6     and what I don't want is in response to the discovery, a lot

7     of times lawyers feel duty bound to their clients to try out

8     every objection and every privilege and everything and give

9     it all a whirl.  That almost never works with me.  My

10    favorite phrase in discovery is "just do it."

11         And if you've got a real live attorney-client or

12    something, that's fine, but don't forget to use your logs

13    because you're going to have to have the privilege.  But what

14    I really don't want are general objections, number one.

15    Useless.  Don't use them.  Nobody has ever been able to cite

16    me to any case where general objections have ever saved the

17    day or even been useful.

18         And all the other objections, a lot of times we get

19    the, you know, every objection known to mankind followed by a

20    simple answer, you know, subject to and without waiving any

21    of the foregoing, the answer is none.  Why do that?  I mean

22    it just promotes a very, very contentious and non-productive

23    atmosphere.

24         I can tell you guys that 99, historically 95

25    percent of your objections will be overruled.  You'll be

1   ordered to pay the other side's expenses and we'll go on.

2   So, you know, we will move this thing right on along.

3   Anything else from anybody?

4            MR. POPE:  Thanks for the advice.  We will wait for

5   the order.

6            THE COURT:  Jeremy, do you need anything else on

7   that order?

8            LAW CLERK:  No.  That's it.

9            THE COURT:  All right.  Thanks very much.

10    (End of telephone motion hearing.)

11

12                    REPORTER'S CERTIFICATE

13

14            I, Jane McCorkle, Official Court Reporter for the

15   United States District Court for the Southern District of

16   Illinois, do hereby certify that the above and foregoing is a

17   true and correct transcript of the proceedings of Telephone

18   Motion Hearing had in this cause as same appears from my

19   stenotype notes made personally during the progress of said

20   proceedings.

21

22

23   DATE:    8/3/10              s/s Jane McCorkle

24                                 JANE McCORKLE

25