# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF GREENVILLE, ILLINOIS, *et al.* ) | | |
| ) | | |
| Individually and on behalf of all others ) | JURY TRIAL DEMANDED | |
| similarly situated, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v. ) | Case No. 10-188-JPG-PMF | |
| ) | | |
| SYNGENTA CROP PROTECTION, ) | | |
| INC., and SYNGENTA AG, ) | | |
| ) | | |
| Defendants. ) | | |

## SECOND AMENDED COMPLAINT

Plaintiffs, CITY OF GREENVILLE, ILLINOIS; VILLAGE OF COULTERVILLE, ILLINOIS; VILLAGE OF EVANSVILLE, ILLINOIS; VILLAGE OF FARINA, ILLINOIS; CITY OF GILLESPIE, ILLINOIS; CITY OF CAMERON, MISSOURI; CITY OF CONCORDIA, MISSOURI; CITY OF CARBONDALE, KANSAS; CITY OF MARION, KANSAS; MIAMI COUNTY RURAL WATER DISTRICT NO. 2; CITY OF OSWEGO, KANSAS; CITY OF JASPER, INDIANA; VILLAGE OF MONROEVILLE, OHIO; CITY OF UPPER SANDUSKY, OHIO; CRESTON MUNICIPAL UTILITIES; ILLINOIS-AMERICAN WATER COMPANY; MISSOURI-AMERICAN WATER COMPANY; INDIANA-AMERICAN WATER COMPANY, INC.; IOWA-AMERICAN WATER COMPANY; OHIO-AMERICAN WATER COMPANY; CHARITON MUNICIPAL WATERWORKS; and VILLAGE OF OTTAWA, OHIO,  individually and on behalf of all others similarly situated, complain against Defendants SYNGENTA CROP PROTECTION, INC. and SYNGENTA AG, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this lawsuit to require Defendant herbicide manufacturers to bear the cost of removing their toxic product atrazine from the public's drinking water.  Defendants designed, marketed, and sold atrazine knowing that it would contaminate public water supplies when used as intended.  And while Defendants earned billions of dollars in revenues from the sale of atrazine, they left Plaintiffs to pay the ever-growing bill for filtering the toxic product from the public's drinking water.  Plaintiffs never consented to Defendants' contamination of their water and never derived any benefit from either the sale or the use of Defendants' atrazine. They now bring this lawsuit to force the Defendants, who reap the financial benefit from manufacturing and/or selling atrazine, to also bear the financial burden that the chemical imposes on third parties.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C § 1332(a) because there is complete diversity of citizenship among the parties, and the amount in controversy for each Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, this Court has jurisdiction over the subject matter of this action under 28 U.S.C § 1332(d) because there is minimal diversity of citizenship among the parties, there are more than one hundred members of the proposed class/subclasses, and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in this district, a substantial part of the property that is the subject of this action is situated in this district, or because both Defendants are currently subject to personal jurisdiction in this district.

## PARTIES

4.      Plaintiff CITY OF GREENVILLE, ILLINOIS ("Greenville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.   At all times relevant hereto, Greenville has owned and operated the water district known as City of Greenville, an Illinois municipal corporation, and provides water to businesses and residents of Greenville, Royal Lake, Mulberry Grove, Smithboro, Donnellson, Ameren, and Panama, Illinois, under 65 ILCS 5/11-125, *et seq.*  The current water system has been in operation since 1969, and uses Governor Bond Lake as its source of raw water.  Governor Bond Lake is surrounded by agricultural operations utilized for corn, soybeans, and wheat.  Greenville's water has been and will continue to be contaminated by Defendants' atrazine.  Greenville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

5.      Plaintiff VILLAGE OF COULTERVILLE, ILLINOIS ("Coulterville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.  Coulterville, located primarily in Randolph County, owns and operates the water district known as Village of Coulterville, which provides water to businesses and residents in Coulterville, Illinois.  The water system has been in operation since 1939, and uses the Coulterville Reservoir as its raw water source.  The Coulterville Reservoir is adjacent to substantial agricultural territory consisting of mostly corn and soybeans, among other products. Coulterville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

6.      Plaintiff VILLAGE OF EVANSVILLE, ILLINOIS ("Evansville") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public

consumption to Illinois residents.  Evansville owns and operates a water plant known as the Village of Evansville Municipal Waterworks System, and provides water to residents and businesses in and around Evansville, Illinois, and operates under 65 ILCS (2008) 5/11-125, *et seq*.  The Waterworks System is approximately 100 years old; the new water plant was constructed after the flood of 1993 and has been operational continuously, and uses the Kaskaskia River as its source of raw water.  The Kaskaskia River is adjacent to substantial agricultural territory consisting of mostly corn and soybean farming, among other products.  Evansville's water has been and will continue to be contaminated by Defendants' atrazine.  Evansville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

7.     Plaintiff VILLAGE OF FARINA, ILLINOIS ("Farina") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.  Farina, located primarily in Fayette County, Illinois, owns and operates its water system and provides water to customers within the corporate limits of Farina, under 65 ILCS 5/125-1, *et seq.*  The water system has been in operation since March 4, 1946.  Since 1982, Farina has used three borrow pits and the East Fork of the Kaskaskia River as its raw water sources. The borrow pits and river are adjacent to substantial agricultural territory consisting of mostly corn and soybeans, among other products.  Farina's water has been and will continue to be contaminated by Defendants' atrazine.  Farina's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

8.     Plaintiff CITY OF GILLESPIE, ILLINOIS ("Gillespie") is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.   Gillespie owns and operates the water district known as the City of

Gillespie, an Illinois Municipal Corporation, and provides water to the residents and businesses in and around Gillespie, as well as satellite customers including the Village of Dorchester, the Village of Mt. Clare, the City of Benld, the Village of East Gillespie, the Village of Eagerville, the Village of Sawyerville, the Village of Wilsonville and the Ka-Ho Public Water District.  The water system has been in operation continuously since approximately 1924 and uses the Gillespie Lakes (old and new) as its sources of raw water.  The Gillespie Lakes are adjacent to substantial agricultural territory consisting of mostly corns, soybeans, and wheat, among other products.  Gillespie's water has been and will continue to be contaminated by Defendants' atrazine.  Gillespie's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

9.     Plaintiff CITY OF CAMERON, MISSOURI ("Cameron") is organized and exists under the laws of Missouri, and is lawfully engaged in providing drinking water for public consumption to Missouri residents.  Cameron owns and operates the water district known as City of Cameron Water District, and provides water to the businesses and residents of the City of Cameron, Missouri and Clinton County Water District #3.   The water district has been in operation since 1919, and uses the Grindstone Reservoir, Reservoir #1, Reservoir #2, and Reservoir #3 as its sources of raw water.  The Grindstone Reservoir is adjacent to agricultural operations that consist of corn, soybeans, alfalfa, wheat, oats, and grain sorghum, among others.  Cameron's water has been and will continue to be contaminated by Defendants' atrazine.  Cameron's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

10.     Plaintiff CITY OF CONCORDIA, MISSOURI ("Concordia") is organized and exists under the laws of Missouri, and is lawfully engaged in providing drinking water for public

consumption to Missouri residents.  Concordia owns and operates the water district known as The Municipal Utilities of the City of Concordia, Missouri, and provides water to businesses and residents of Concordia, Missouri.  Concordia also sells water to the City of Emma, Missouri, to Public Water Supply District #2 of Lafayette, Johnson, and Saline Counties, and to rural residents near Concordia.  The water system was established in 1958 under Ordinance 18. Concordia Lake, a 245-Acre reservoir surrounded by agricultural operations, is Concordia's source of raw water.  The watershed around the lake is approximately 1,000 acres with 60 percent of the acres planted in corn, beans and hay.  Concordia's water has been and will continue to be contaminated by Defendants' atrazine.  Concordia's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

11.    Plaintiff CITY OF CARBONDALE, KANSAS ("Carbondale") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Carbondale owns and operates a water plant known as the Waterworks System of the City of Carbondale, Kansas, which provides water to the residents and businesses in and around Carbondale.  Since 1946, the water plant has operated continuously and has used the Strowbridge Reservoir (a/k/a East Lake) as its source of raw water.  East Lake is essentially surrounded by agriculture consisting of corn, hay, and other products. Carbondale's water has been and will continue to be contaminated by Defendants' atrazine. Carbondale's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

12.    Plaintiff CITY OF MARION, KANSAS ("Marion") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents. Marion owns and operates a water plant known as the City of Marion

Municipal Water Plant, which provides water to residents and businesses in and around Marion and Marion County Improvement District Number 2.  Marion's source of raw water is the Marion Reservoir, which is essentially surrounded by land utilized for agricultural purposes. Agriculture around the Marion Reservoir includes corn and soybeans.  Marion's water has been and will continue to be contaminated by Defendants' atrazine.  Marion's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

13.     Plaintiff MIAMI COUNTY RURAL WATER DISTRICT NO. 2 ("District No. 2") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  District No. 2 owns and operates a water plant which provides water to the residents and businesses in and around Miami County, including the cities of Spring Hill and Edgerton in Johnson County.  District No. 2's source of raw water is Hillsdale Lake, which was constructed by the U.S. Army Corp of Engineers, and is essentially surrounded by land utilized for agricultural purposes.  District No. 2's water has been and will continue to be contaminated by Defendants' atrazine.  District No. 2's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

14.     Plaintiff CITY OF OSWEGO, KANSAS ("Oswego") is organized and exists under the laws of Kansas, and is lawfully engaged in providing drinking water for public consumption to Kansas residents.  Oswego owns and operates a water plant which provides water to the residents and business in and around Oswego, including five (5) rural water districts: Labette County Rural Districts #1, #4 and #8, Neosho Water District, and Hoag Water District of Cherokee County.  Oswego's source of raw water is the Neosho River, which is essentially surrounded by land utilized for agricultural purposes.  The major agricultural activity in the area is the growing

of row crops, including soybeans. Oswego's water has been and will continue to be contaminated by Defendants' atrazine. Oswego's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

15.     Plaintiff CITY OF JASPER, INDIANA ("Jasper") is organized and exists under the laws of Indiana, and is lawfully engaged in providing drinking water for public consumption to Indiana residents. Jasper owns and operates the water district known as Jasper Municipal Water Utility, which provides water to most residents and businesses within the City of Jasper, Indiana and to some customers outside the city limits. Jasper Municipal Water Utility sells water to Dubois Water Utilities, Inc. of Dubois, Indiana, and Ireland Utilities, Inc., of Ireland, Indiana. The water system has been in operation since 1895, and uses the Patoka River as its raw water source. The Patoka River is adjacent to substantial agricultural territory. Jasper's water has been and will continue to be contaminated by Defendants' atrazine. Jasper's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

16.     Plaintiff VILLAGE OF MONROEVILLE, OHIO ("Monroeville") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents. Monroeville owns and operates a water plant known as Monroeville Village, and provides water to the residents and businesses in and around the Village of Monroeville, Ohio, and a portion of Richfield Township, Ohio. Monroeville also engages in bulk water sales. The water plant was built in 1938, and the Reservoir was built in 2001. The water plant uses the West Branch of the Huron River as its source of raw water. The Huron River is essentially surrounded by agricultural operations consisting of corn, soybeans, and wheat farming. Monroeville's water has been and will continue to be contaminated by

Defendants' atrazine.  Monroeville's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

17.     Plaintiff CITY OF UPPER SANDUSKY, OHIO ("Upper Sandusky") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents.  Upper Sandusky owns and operates a water plant known as the City of Upper Sandusky Water System, and provides water to the residents and businesses in the corporation limits of the City of Upper Sandusky, Ohio.  Upper Sandusky also sells water to rural entities outside of the corporation limits.  The water plant was organized in the 1880's and uses the Upper Sandusky Reservoir, with influent from the Sandusky River, as its source of raw water.  The Sandusky River is essentially surrounded by agricultural operations consisting of corn, wheat, and bean farming.  Upper Sandusky's water has been and will continue to be contaminated by Defendants' atrazine.  Upper Sandusky's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

18.     Plaintiff CRESTON MUNICIPAL UTILITIES ("Creston") is organized and exists under the laws of Iowa, and is lawfully engaged in providing drinking water for public consumption to Iowa residents.  Creston owns and operates a water plant known as the City of Creston Water Works, and provides water to the residents and businesses in Creston, Iowa and to the Southern Iowa Rural Water Association.  The water plant was organized in the 1890's and purchased by Creston in 1932.  It uses Twelve Mile Lake and Three Mile Lake as its sources of raw water.  These lakes are surrounded by 38,020 acres of farm ground used for pasture, hay, and row crops such as corn and soy beans.  Creston's water has been and will continue to be contaminated by Defendants' atrazine.  Creston's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

19.     Plaintiff ILLINOIS-AMERICAN WATER COMPANY ("Illinois-American")  is organized and exists under the laws of Illinois, and is lawfully engaged in providing drinking water for public consumption to Illinois residents.  Illinois-American has supplied drinking water to communities in Illinois for over 100 years.  Illinois-American is headquartered in Belleville, Illinois, with water districts that serve drinking water to more than 1.2 million people in over 120 communities.  The following districts are contaminated with atrazine:  Illinois-American's Alton District draws water from the Mississippi River to supply drinking water to over 22,000 customer connections.  The Cairo District draws water from the Ohio River to serve drinking water to over 1,100 customer connections.  The Interurban District serves communities in three main service areas:  Belleville, East St. Louis, and Granite City.  The district serves drinking water to about 73,000 customer connections with water drawn from the Mississippi River.  The Peoria District draws water from the Illinois River and the San Koty Aquifer to serve over 52,000 customer connections.  The Pontiac District uses water from the Vermillion River and the Saunermin Aquifer to serve over 4,400 customer connections.  The Streator District serves drinking water to over 7,800 customer connections in Streator, the Village of Kangley, and some unincorporated areas.  Water for this district is drawn from the Vermillion River.  Illinois-American's water has been and will continue to be contaminated by Defendants' atrazine. Illinois-American's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

20.     Plaintiff MISSOURI-AMERICAN WATER COMPANY, INC. ("Missouri-American") is organized and exists under the laws of Missouri, and is lawfully engaged in providing drinking water for public consumption to Missouri residents.  Missouri-American and its predecessors have provided drinking water to Missouri residents for over 100 years.  The largest investor-

owned water utility in the state, Missouri-American supplies drinking water to more than 1.5 million people in Missouri.  Missouri-American owns and operates several drinking water systems in Missouri.  The following districts are contaminated with atrazine:  Missouri-American's St. Louis County District serves more than 337,000 customer connections.  The Missouri and the Meramec Rivers supply water for St. Louis County customers.  The Jefferson City District is supplied by the Missouri River and serves over 10,000 customer connections. Missouri-American's water has been and will continue to be contaminated by Defendants' atrazine.  Missouri-American's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

21.     Plaintiff INDIANA-AMERICAN WATER COMPANY, INC. ("Indiana-American") is organized and exists under the laws of Indiana, and is lawfully engaged in providing drinking water for public consumption to Indiana residents.  Indiana-American and its predecessors have provided water and/or wastewater services in Indiana for more than 125 years.  The following districts are contaminated with atrazine:  The Muncie District has three wells that draw groundwater.  Additionally, the Muncie District draws water directly from the White River to serve approximately 28,000 customer connections.   The Kokomo District operates 20 wells to serve approximately 21,000 customer connections.  The Richmond District draws water from three ground wells, five infiltration galleries, and the Middle Fork Reservoir to serve more than 15,000 customer connections.  Indiana-American's water has been and will continue to be contaminated by Defendants' atrazine.  Indiana-American's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

22.     Plaintiff IOWA-AMERICAN WATER COMPANY ("Iowa-American") is organized and exists under the laws of Iowa, and is lawfully engaged in providing drinking water for public

consumption to Iowa residents.  Iowa-American and its predecessors have provided water service in Iowa for over 130 years.  Its Quad City District, which is contaminated with atrazine, provides water service to approximately 50,800 customer connections in five communities in the Iowa Quad Cities, including Bettendorf, Davenport, LeClaire, Panorama Park and Riverdale. Water for the Iowa Quad Cities is taken from the Mississippi River and treated at the East River Station treatment facility.  Iowa-American's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

23.     Plaintiff OHIO-AMERICAN WATER COMPANY ("Ohio-American") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents.  Ohio-American and its predecessors have provided water and wastewater services in Ohio for more than 75 years.  Two of its districts' water supplies are contaminated with atrazine.  The Marion District, which serves drinking water to approximately 16,500 customer connections, draws water from 16 wells and from the Scioto and Little Scioto Rivers.  The Tiffin District serves approximately 7,500 customer connections with water drawn from 5 wells and from the Sandusky River.  Ohio-American's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

24.     CHARITON MUNICIPAL WATERWORKS ("Chariton") is organized and exists under the laws of Iowa, and is lawfully engaged in providing drinking water for public consumption to Iowa residents.  Chariton owns and operates a water plant known as the Chariton Municipal Waterworks, and provides water to the residents and businesses in the corporation limits of the City of Chariton, Iowa.  Chariton also sells water to a water salesman who supplies water to rural entities outside of the corporation limits.  The waterworks was organized in its current form in the November 1953 and uses Lake Morris and Lake Ellis as its primary sources of raw water.  It

also can use Lake Red Haw as a secondary source of raw water. Chariton's water has been and will continue to be contaminated by Defendants' atrazine. Chariton's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

25.     VILLAGE OF OTTAWA, OHIO ("Ottawa") is organized and exists under the laws of Ohio, and is lawfully engaged in providing drinking water for public consumption to Ohio residents. Ottawa has provided drinking water services in Ohio for more than 100 years. Ottawa owns and operates a water plant which provides water to the residents and business in and around Ottawa, as well as to Bluffton, Ohio; Putnam County North and East; and Miller City, Ohio. Ottawa's source of raw water is the Blanchard River, which is essentially surrounded by land utilized for agricultural purposes. Ottawa's water has been and will continue to be contaminated by Defendants' atrazine. Ottawa's past, present, and future cost to filter Defendants' atrazine from its water exceeds $75,000, exclusive of interest and costs.

26.     Defendant SYNGENTA CROP PROTECTION, INC. ("Syngenta Crop Protection") is a Delaware corporation with its principal place of business at 410 Swing Road, Greensboro, North Carolina 27419. Syngenta Crop Protection is registered to do business in Illinois and transacts substantial business in Illinois, including manufacturing, selling, and supplying atrazine to farmers, cooperatives, and local herbicide dealers located throughout Illinois, including the Southern District of Illinois.

27.     Defendant SYNGENTA AG ("Syngenta AG") is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business at Schwarzwaldalee 215, 4058 Basel, Switzerland. At all relevant times, Syngenta Crop Protection has acted as Syngenta AG's agent and/or alter ego in the United States. Syngenta AG owns one hundred percent of Syngenta Crop Protection. Syngenta AG files consolidated financial

statements on behalf of Syngenta Crop Protection with the SEC.  In its SEC filings, Syngenta AG lists the principal place of business of Syngenta Crop Protection as its United States headquarters.  In addition, Syngenta AG lists a number of Syngenta Crop Protection's properties in the United States as Syngenta AG's principal properties for research and production.  For example, Syngenta's global website lauds the safety record of "our employees" in the "Syngenta plant" located in Paris, Illinois.  That plant is owned by Syngenta Crop Protection.  The entities' corporate governance is structured so that Syngenta AG has involvement in, and control over, the activities of Syngenta Crop Protection.  Two of Syngenta Crop Protection's directors, John Atkin (COO) and Christoph Maeder (Secretary), sit on Syngenta AG's Executive Committee.  That Executive Committee is responsible for the operational management of Syngenta AG.  Upon information and belief, it was Syngenta AG's Executive Committee and Board of Directors that made the decisions for Syngenta Crop Protection that are relevant to this lawsuit – namely, the decision to manufacture, market, and sell atrazine in its current form.  Finally, Syngenta AG and Syngenta Crop Protection cooperate to produce, market, and sell atrazine in the United States.  Because Syngenta Crop Protection and Syngenta AG are indistinguishable for purposes of this lawsuit, they will collectively be referred to as "Syngenta."

## FACTS COMMON TO ALL PLAINTIFFS

28.     Atrazine, whose chemical name is 2-chloro-4-ethylamino-6-isoproplyamino-s-triazine, is an herbicide which is used mainly by corn, soybean, sorghum, and sugar cane farmers for pre-emergence broad leaf weed control.   Atrazine's Chemical Abstracts Service (CAS) Registry Number is 1912-24-9.   Syngenta markets atrazine as being advantageous to farmers because it does not readily bind to soil.   However, this same characteristic gives atrazine great potential for run-off — a fact that is particularly problematic for public water providers who use surface waters such as rivers, lakes, and reservoirs as their source of raw water.

29.     Atrazine is used to control broadleaf and grassy weeds, with its most extensive use on corn and soybean fields.   Atrazine has been one of, and at times, the most widely used herbicide in the United States throughout the past four decades.   Currently, about 75 million pounds of atrazine are applied in the United States annually.   Approximately 75% of the field corn acreage grown in the United States gets treated with atrazine.   As a result, atrazine has been found in groundwater and surface water in many parts of the country where its target crops are most prevalent.

30.     Once released into the environment, atrazine is broken down into other chemicals known as "degradant chemicals" via microbial action, hydrolysis, dealkylation, dehalogenation, deamination, and photodegradation.   Degradant chemicals include, but are not limited to, chlorotriazines and hydroxyl triazines.   Chlorotriazines include, but are not limited to: deethylatrazine, deisopropylatrazine, and diaminoatrazine.   Hydroxyl triazine breakdown products include, but are not limited to: ammeline, ammelide, cyanuric acid, N-ethylammelide, N-isopropylammelide, hydroxyatrazine, hydroxydeisopropylatrazine, and hydroxideethyl-atrazine.   Atrazine can also react and combine with other chemicals commonly found in water

15

supplies to form "combination chemicals."  For example, atrazine can combine with nitrates —
commonly occurring chemical components found in public drinking water sources — to form N-
nitrosoatrazine.  Atrazine degradant and combination chemicals also contaminate water supplies
and often become more prevalent than the parent chemical.  Throughout this Complaint, any
reference to "atrazine" shall include all atrazine degradant and combination chemicals.

31.     Atrazine was first discovered and synthesized at a Syngenta legacy company in
the early 1950s.  Syngenta introduced atrazine to farmers in the 1959 growing season.  In the
fifty years following atrazine's introduction, Syngenta became the largest producer and seller of
atrazine and atrazine-containing products in the United States.  Today, Syngenta is one of only
six registered manufacturers of atrazine in the United States.  Syngenta manufactures and sells
atrazine to other manufacturers of atrazine products and manufactures and sells its own line of
atrazine products which are registered for sale in Illinois.  Some of these products contain both
atrazine and what Syngenta refers to as "atrazine related compounds."   Throughout this
Complaint, any reference to "atrazine" should also be interpreted to include atrazine related
compounds, whether in pure chemical form or as an ingredient in an herbicide product.
Syngenta's reported revenue from herbicides, including atrazine, exceeded $2.4 billion in 2008.

32.     Prior to or shortly after the time that Syngenta released atrazine for sale in the
United States, it became aware that atrazine does not readily bind to soil and has a propensity to
run off into surface water.   As a result, Syngenta knew or suspected that atrazine would
contaminate the water supplies of public water providers like the Plaintiffs.  Syngenta knew or
suspected that atrazine would contaminate water supplies and drinking water even when atrazine
was used as intended and as directed by Syngenta.

33.     After water testing data confirmed that atrazine was contaminating surface water, and hence the water supplies of public water providers, Syngenta continued to manufacture, market, and sell atrazine in the same form.  Since Syngenta first began manufacturing and selling atrazine in the United States, atrazine has continually and consistently contaminated the water supplies of public water providers who use surface water as the source of their water.

34.     Today, atrazine is the most commonly detected herbicide in surface water.  For example, between 1992 and 2001, atrazine and its degradant chemicals were detected in more than 75 percent of stream samples in agricultural areas across the United States.   Atrazine's frequent detection in streams, rivers, groundwater, and reservoirs is related directly to both its volume of usage and its tendency to persist in soils and move with water.   Atrazine's contamination of surface water occurs when atrazine is used as intended and as directed by Syngenta.

35.     Atrazine's propensity to contaminate surface and drinking water has resulted in the ban of atrazine in other parts of the world.  For example, Italy and Germany, two major corn producing countries, banned atrazine in 1991.  Sweden, Denmark, and Finland followed suit and banned atrazine in 1994.   Finally, in 2005, all remaining European Union nations banned atrazine because it consistently contaminated water supplies.

36.     Syngenta has been independently testing public water providers' raw water as part of the Ecological Watershed Monitoring Program and the PLEX Monitoring Program since at least 1993.  But the results of this testing were not made publicly available until 2009.  The data from the Ecological Watershed Monitoring Program identified 1,172 watersheds at high risk of atrazine contamination across the United States.   Forty of these at-risk watersheds, in nine Midwestern and Southern states, were selected for an enhanced testing program.  The three-year

program revealed that atrazine was pervasive in every one of the 40 watersheds.  Thirty-one of these watersheds had concentrations of atrazine higher than 1 part per billion (ppb) and nine watersheds had peak readings as high as 100 ppb. The highest atrazine concentration was measured in Indiana, where a watershed registered a 237.5 ppb reading.  Syngenta's data showed that atrazine concentrations in surface water peaked during the spring planting months when atrazine use was most prevalent.  Syngenta did not inform Plaintiffs of either the data in its possession or of the seasonal variation of atrazine contamination.

37.    Syngenta's atrazine is re-applied anew every year in the United States.  As a result, every Plaintiff's water supplies have become contaminated with atrazine, and they become re-contaminated after each additional application.  Given atrazine's behavior in the environment, the contamination of Plaintiffs' water supplies is certain to continue as long as atrazine is used in its current form.

38.    Since atrazine's initial introduction, Syngenta has continuously denied any connection between exposure to atrazine and adverse human health effects.  Importantly, Syngenta has denied that atrazine poses a threat to human health when consumed through drinking water.  At the same time, however, Syngenta's own internal studies suggested that atrazine (and its degradant and combination chemicals) posed a threat to human health, perhaps through its endocrine disrupting properties.  Syngenta knowingly refused to disclose this information to public water providers and the public at large, choosing instead to deny atrazine's health risks and suppress science suggesting otherwise.  Syngenta has also vigorously fought against the performance of other safety studies on human health effects of atrazine and has resisted any further restrictions on the use of atrazine products during every re-registration of the chemical.  Not only has Syngenta denied the link between atrazine and human health effects and

failed to disclose what it knew about the product, but it has also actively manipulated the weight of scientific evidence by funding, often secretly, deceptive and misleading scientific studies, and providing incomplete or false data to scientists.

39.    Recently-published scientific studies have found that exposure to atrazine may be linked with birth defects, low birth weight, and premature birth.  In addition, some studies have indicated that atrazine is a possible human carcinogen, and others have concluded that atrazine is an endocrine disruptor.  Due to the actual and potential health hazards of exposure to atrazine, Plaintiffs believe that Syngenta must pay the past, present, and future expenses associated with removing atrazine products from the public's drinking water.

## **CLASS ALLEGATIONS**

40.    Plaintiffs seek to certify this suit as a class action under Rules 23(b)(2), 23(b)(3), or 23(c)(4) on behalf of a class or subclasses consisting of all public water providers located in the states of Illinois, Indiana, Iowa, Kansas, Missouri, and Ohio that use surface water as their water source,  and that have consistently had detectable levels of atrazine in their raw drinking water.  Excluded from the class or subclasses are those water providers that have brought lawsuits for atrazine contamination individually or as part of a certified class.  The class period spans from the time that Syngenta first placed its atrazine into the stream of commerce in the United States to the time the Court certifies this suit as a class action.

41.    The exact number of the members of the Class (or subclasses) is not currently known, but is believed to be, at a minimum, several hundred.  The members of the Class are so numerous that joinder of all Class members is impracticable.

42.    There are questions of law or fact which are common to every member of the Class, including:

a.  Whether atrazine is unreasonably dangerous to public water providers' raw drinking water when it is used as intended;

b.  Whether atrazine contaminates surface and ground water sources of raw drinking water when it is used as intended;

c.  Whether Syngenta could have foreseen that its atrazine would contaminate surface water and consequently Class members' drinking water sources;

d.  Whether Syngenta knew or reasonably should have known that atrazine would physically invade the raw drinking water of Class members;

e.  Whether atrazine's actual and potential effects on human health make the presence of atrazine in the Class members' raw water a public nuisance;

f.  Whether Syngenta owed Class members a duty to ensure that its atrazine did not invade Plaintiffs' and Class members' raw water supplies and properties, and whether Syngenta breached that duty by designing, manufacturing and selling atrazine in its current form;

g.  Whether the breach of that duty directly and proximately caused Class members' damages;

h.  Whether the actual and potential human health risks associated with the consumption of atrazine in drinking water require Syngenta to compensate Class members for all costs and expenses for removing atrazine from drinking water;

i.  Whether Syngenta's conduct towards Plaintiffs and Class members was willful and wanton, and whether Plaintiffs and Class members are entitled to punitive damages.

43.  Plaintiff water providers' claims are typical of the claims of the Class because Plaintiffs and Class members were injured in the same way by the same conduct, namely Syngenta's design, manufacture, and continued sale of atrazine despite the knowledge that atrazine was substantially certain to physically invade Plaintiffs' and Class members' raw drinking water. Neither Plaintiffs nor Class members had any direct contact with Syngenta, and were similarly situated victims of the common course of conduct by Syngenta. Plaintiffs' claims

are also typical because they assert the same legal theories for relief on behalf of all Class members.

44.    Plaintiffs will fairly and adequately protect the interests of the Class because they have no conflicts of interest with any Class members, and because they have retained counsel that are experienced in class action litigation and environmental litigation.

45.    Syngenta has acted or refused to act on grounds that apply generally to the Class because it designed, manufactured, and continuously sold atrazine products that Syngenta knew were substantially certain to physically invade Plaintiffs' and Class members' raw drinking water, and because Syngenta refused to prevent or abate the physical invasion of Plaintiffs' and Class members' raw water.

46.    Questions of law or fact which are common to the Class, as set forth in ¶ 42 above, predominate over questions affecting individual members because class members never had any contact or relationship with Syngenta, but are merely similarly situated victims of Syngenta's common course of conduct.   In addition, Syngenta has no defenses specific to individual Class members, and its defenses, if any, apply equally to all Class members.

47.    A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.   Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.   No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

## COUNT I
## (TRESPASS)

48.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47 of this Complaint, and further allege as follows:

49.     Each Plaintiff and Class member is, and at all relevant times was, the lawful and actual possessor of water rights, including the right to appropriate water from surface water bodies,  watersheds, and groundwater sources for the beneficial purpose of providing public drinking water, with all rights incident thereto. These water rights are recognized as valuable property rights that are owned by each Plaintiff and Class member.

50.     At all relevant times, Syngenta knew that atrazine does not readily bind to soil and instead runs off into surface waters such as streams, rivers, lakes, and reservoirs.  Syngenta knew and intended that its atrazine products would be used by farmers near surface water, including surface waters used for public drinking water.  Syngenta knew that its atrazine would contaminate these water sources even when atrazine was applied as Syngenta designed, intended, and directed it to be applied.

51.     Despite this knowledge, Syngenta manufactured, distributed, and sold its atrazine products for agricultural use, knowing to a substantial certainty that atrazine, when applied and used as intended, would invade Plaintiffs' water supplies.

52.     As a direct and proximate result of Syngenta's actions, Syngenta's atrazine has continuously physically invaded and contaminated the Plaintiffs' and Class members' water supplies.  The physical invasion of Plaintiffs' and Class members' water continues to this day, and is substantially certain to continue in the future as long as Syngenta's atrazine is manufactured, sold, and applied in the same form.

53.     At all relevant times, Syngenta was aware that its atrazine products were persistently physically invading Plaintiffs' and Class members' water supplies, yet it continued to manufacture, market, and sell atrazine in the same form.   Syngenta acted with a reckless disregard for Plaintiffs' and Class members' rights, and its conduct was willful, wanton, and malicious.   In addition, acting in concert with other manufacturers, sellers, distributors and applicators of atrazine products, Defendants have aided and abetted the continuous contamination of Plaintiffs' property by those other manufacturers, sellers, distributors and applicators.  Syngenta's conduct continues to this day and is substantially certain to continue in the future as long as atrazine is manufactured, sold, and applied in the same form.

54.     As a direct and proximate result of Syngenta's intentional and continued physical invasion of Plaintiffs' and Class members' water supplies, at all times relevant to this litigation, atrazine has:

      a.    posed and continues to pose a threat to Plaintiffs' and Class members' water supplies;

      b.    required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

      c.    contaminated, continues to contaminate, or will contaminate Plaintiffs' and Class members' water supplies; and

      d.    required or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

55.     Each Plaintiff seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT II
## (PUBLIC NUISANCE)

56.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47 of this Complaint, and further allege as follows:

57.     Each Plaintiff and Class member is, and at all relevant times was, the lawful and actual possessor of water rights, including the right to appropriate water from surface water bodies, watersheds, and groundwater sources for the beneficial purpose of providing public drinking water, with all rights incident thereto.

58.     At all relevant times, Syngenta knew that atrazine does not readily bind to soil and instead runs off into surface waters such as streams, rivers, lakes, and reservoirs and into groundwater aquifers.  Syngenta knew and intended that its atrazine products would be used by farmers near surface water, including surface water used for public drinking water.  Syngenta knew that its atrazine would contaminate these water sources even when atrazine was applied as Syngenta designed, intended, and directed it to be applied.

59.     Despite this knowledge, Syngenta manufactured, distributed, and sold its atrazine products for agricultural use, knowing to a substantial certainty that its products, when applied and used as intended, would contaminate Plaintiffs' water supplies.

60.     As a direct and proximate result of Syngenta's intentional and/or negligent conduct, Syngenta's atrazine did in fact contaminate Plaintiffs' and Class members' water supplies.  As long as Syngenta's atrazine continues to be manufactured, sold, and applied in the same form, Syngenta's contamination of Plaintiffs' and Class members' water supplies is substantially certain to continue in the future.

61.     Syngenta's past, present, and future contamination of Plaintiff's and Class members' water supplies threatens the public health and constitutes a continuous, substantial,

24

and unreasonable interference with the public's use and enjoyment of that water for drinking and household purposes.  Because Plaintiff is a purveyor of public drinking water, it has suffered a distinct injury separate from the public at large.

62.     At all relevant times, Syngenta was aware that its atrazine products were persistently contaminating Plaintiffs' and Class members' water supplies, threatening the public health, and causing a continuous, substantial, and unreasonable interference with the public's use and enjoyment of that water.  Yet Syngenta continued to manufacture, market, and sell atrazine in the same form.  Syngenta acted with a reckless disregard for the public's health and well-being, and Syngenta's conduct was willful, wanton, and malicious.

63.     As a direct and proximate result of Syngenta's continuous, substantial and unreasonable interference with the public's use and enjoyment of the drinking water that Plaintiffs and Class members generate, at all times relevant to this litigation, atrazine has:

      a.     posed and continues to pose a threat to Plaintiffs' and Class members' water supplies;

      b.     required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

      c.     contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

      d.     required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

64.     Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT III
## (STRICT LIABILITY-DEFECTIVE PRODUCT)

65.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47 of this Complaint, and further allege as follows:

66.     At all relevant times, Syngenta has designed, manufactured, and sold atrazine and atrazine-containing products.  Syngenta designed atrazine to resist binding to soil and to easily run off into surface waters such as streams, rivers, lakes, and reservoirs.  At all relevant times, atrazine possessed these design features at the time it left Syngenta's control.

67.     Syngenta owed a duty to all persons that its atrazine might foreseeably harm, including Plaintiffs, to not manufacture, market, or sell any product that is unreasonably dangerous for its intended and foreseeable uses and misuses.

68.     When Syngenta manufactured and placed its atrazine and atrazine-containing products into the stream of commerce in the United States, these products were in a defective condition unreasonably dangerous for their intended and foreseeable uses for the following reasons:

        a.     Atrazine is highly soluble in water and recalcitrant to biodegradation;

        b.     Atrazine and herbicides containing atrazine have a tendency to mix with surface water and migrate great distances;

        c.     Even small amounts of atrazine and herbicides containing atrazine have a propensity to contaminate rivers, lakes, and reservoirs that act as sources of raw water for public water providers;

        d.     Atrazine contaminates public drinking water sources on a massive scale.

69.     Syngenta's atrazine products were used in a manner that Syngenta intended and directed them to be used.

26

70.     In the course of atrazine's intended and foreseeable use, atrazine contaminated Plaintiffs' and Class members' water supplies.

71.     All of Plaintiffs' injuries were directly and proximately caused by the defective condition/s of Syngenta's atrazine products that existed at the time those products left Syngenta's control.

72.     At all relevant times, Syngenta was aware that its defective atrazine products could cause or were causing substantial damage to Plaintiffs' and Class members water and property rights. Yet Syngenta continued to manufacture, market, and sell atrazine in the same form.  Syngenta acted with a reckless disregard for Plaintiffs' and Class member's rights, and their conduct was willful, wanton, and malicious.

73.     As a direct and proximate result of Syngenta's manufacture and sale of atrazine and atrazine-containing products, at all times relevant to this litigation, atrazine has:

      a.     posed and continues to pose a threat to Plaintiffs' and Class members water supplies;

      b.     required and/or will require additional testing and monitoring of Plaintiffs' and Class members water supplies;

      c.     contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

      d.     required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

74.     Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

## COUNT IV
## (NEGLIGENCE)

75.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47 of this

Complaint, and further allege as follows:

76.     At the time it manufactured, marketed, and sold atrazine, Syngenta could

reasonably foresee that due to atrazine's design and the manner and place of its intended use,

atrazine would contaminate Plaintiffs' and Class members water supplies.

77.     Syngenta owed a duty to Plaintiffs to avoid contaminating their water supplies

with its atrazine.

78.     Syngenta breached its duty to Plaintiffs and Class members by:

   a.     Negligently designing atrazine in a manner that made it reasonably
          foreseeable to contaminate Plaintiffs' and Class members' water supplies;

   b.     Failing to adequately test the transport and environmental fate
          characteristics of atrazine, when adequate testing would have made it
          reasonably foreseeable that atrazine would contaminate Plaintiffs' water
          supplies;

   c.     Failing to conduct reasonable and appropriate scientific research to
          evaluate the potential human health hazards of atrazine when consumed
          through drinking water, despite knowing or reasonably foreseeing that
          atrazine would contaminate water supplies and public drinking water;

   d.     Failing or refusing to prevent further contamination of Plaintiffs' water
          supplies even after discovering that atrazine contaminated, and would
          continue to contaminate Plaintiffs' water supplies and public drinking
          water.

79.     As a direct and proximate result of Syngenta's negligent design, manufacture, and

sale of atrazine and atrazine-containing products, at all times relevant to this litigation, atrazine

has:

   a.     posed and continues to pose a threat to Plaintiffs' and Class members'
          water supplies;

28

   b.  required and/or will require additional testing and monitoring of Plaintiffs' and Class members' water supplies;

   c.  contaminated, continues to contaminate, and/or will contaminate Plaintiffs' and Class members' water supplies; and

   d.  required and/or will require construction, installation, and operation and maintenance of a system to filter atrazine from each Plaintiff's and Class members' water supplies.

80. Each Plaintiff and Class member seeks all monetary damages (both compensatory and punitive) associated with the presence of atrazine in its water supplies.

**COUNT V**

**(DECLARATORY RELIEF UNDER 28 U.S.C. § 2201)**

81. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 80 of this Complaint.  Plaintiffs request declaratory relief through this Count that is separate from and in addition to the compensatory and punitive damages they seek in Counts I-IV.

82. Syngenta's atrazine has contaminated Plaintiffs' sources of raw water for many consecutive years.  Though the atrazine concentrations in Plaintiffs' water sources often fluctuate from month to month, week to week, and even day to day, each of the Plaintiffs' water sources has had detectable atrazine contamination during this growing season.  Every time that farmers apply Syngenta's atrazine products to their crops, atrazine inevitably runs off into in the surface water that Plaintiffs appropriate, treat, and distribute for human consumption.  Because Syngenta's atrazine contaminates surface water even when it is used as intended, the contamination of Plaintiffs' water supplies is substantially certain to continue for as long as Syngenta continues to sell its atrazine-containing products.

83. As detailed in Counts I-IV above, Syngenta violates state law when it sells atrazine with the knowledge and expectation that it will contaminate Plaintiffs' raw water

sources.  Syngenta's past and continuing contamination of Plaintiffs' raw water sources presents an actual controversy that allows the Court to declare Plaintiffs' legal rights and Syngenta's legal obligations when atrazine inevitably contaminates Plaintiffs' water supplies again in the future. This declaration of legal rights is separate from and in addition to Plaintiffs' legal right to recover compensatory and punitive damages arising from Syngenta's past and current contamination of Plaintiffs' raw water sources.

84.    Recent scientific literature has revealed that atrazine's presence in Plaintiffs' water at any level presents a real and unnecessary risk to the health of Plaintiffs' customers, especially those in sensitive and vulnerable subpopulations.  Plaintiffs have the right to protect the health of their customers by completely removing the atrazine that Syngenta intentionally introduces into their water supplies.

85.    Given the expense of complete removal and the fiscal constraints that Plaintiffs face, Plaintiffs cannot responsibly incur substantial additional treatment costs without knowing whether Syngenta will be required to compensate them for those costs.  Thus, Plaintiffs face great uncertainty and need the Court to declare their legal rights and Syngenta's legal obligations relating to future atrazine treatment costs.  Only then will Plaintiffs have the information necessary to make informed fiscal decisions about how to respond to the inevitable future contamination of their water supplies with Syngenta's atrazine.

86.    If the Court finds that any level of atrazine in drinking water presents a risk to public health, Plaintiffs want a determination that Syngenta will have to pay for the testing and removal of its atrazine from the water that Plaintiffs serve to their customers.  Because Syngenta breaks the law when it knowingly causes atrazine to contaminate Plaintiffs' water supplies,

Syngenta—not Plaintiffs or their customers—must bear the cost of atrazine testing and removal.

87.     To establish the parties' legal rights and obligations when Syngenta's atrazine contaminates Plaintiffs' water supplies once again, Plaintiffs request that the Court issue the following declarations:

a.      Atrazine's inherent environmental fate and transport characteristics cause it to run off of farm fields and contaminate surface waters even when used as intended. Plaintiffs have property rights in those surface waters and use them to provide drinking water to the public. Atrazine is harmful to human health so its presence at any level injures Plaintiffs' water supplies. Because atrazine's inherent design characteristics cause it to contaminate and injure Plaintiffs' water supplies, the Court finds that the atrazine Syngenta sells is a defective product.

b.      Syngenta sells atrazine knowing and expecting that even when used as intended, atrazine will run off of farm fields and contaminate the surface waters that Plaintiffs use as their sources of raw water. Consequently, Syngenta sells its atrazine with the intent that it physically invade Plaintiffs' water supplies and interfere with Plaintiffs' property rights in those water supplies. Syngenta's sale of atrazine and atrazine's subsequent contamination of Plaintiffs' water supplies constitutes a trespass.

c.      The presence of Syngenta's atrazine in Plaintiffs' water supplies presents a real and unnecessary risk to the public health, especially the health of sensitive and vulnerable subpopulations. By manufacturing and selling its atrazine with the knowledge and expectation that it will contaminate the surface waters that Plaintiffs appropriate and distribute for public consumption, Syngenta intentionally creates a public nuisance.

d.      Due to the risk that Syngenta's atrazine presents to the public health, it is reasonable for Plaintiffs to choose to additionally test for and completely remove atrazine from the finished water that they serve to the public. Because Syngenta's sale of atrazine with the knowledge and expectation that it will contaminate Plaintiffs' water supplies violates the law, Syngenta will be responsible for reimbursing Plaintiffs for all future costs that Plaintiffs incur in testing for and removing Syngenta's atrazine from the water they distribute to their customers.


Or, in the alternative:

State and federal regulations under the Safe Drinking Water Act require Plaintiffs to distribute finished water that complies with the atrazine MCL of 3 ppb. Often,

and especially during the spring and summer months, the atrazine concentrations in Plaintiffs' raw water exceeds 3 ppb. Consequently, Plaintiffs have to take steps to remove atrazine from their raw water so that their finished water complies with the MCL. Syngenta sells its atrazine knowing and expecting that it will contaminate Plaintiffs' water supplies and will impose these costs on Plaintiffs. Because Syngenta violates the law by continuing to contaminate Plaintiffs' water supplies, Syngenta must reimburse Plaintiffs for all future costs that Plaintiffs incur in testing for and removing Syngenta's atrazine from their water in order to comply with the MCL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against

Syngenta as follows:

a.  Certifying this action as a class action under Rule 23(b)(2), 23(b)(3), or 23(c)(4), and appointing the undersigned attorneys as class counsel;

b.  Awarding Plaintiffs and class members all past costs incurred in removing Syngenta's atrazine from their water supplies, including costs of installing, maintaining, and operating filtration systems;

c.  Awarding Plaintiffs and class members punitive damages;

d.  Awarding Plaintiffs and class member all future damages likely to be incurred in abating current atrazine contamination of their water supplies, including costs associated with the purchase, construction, installation, maintenance and operation of granular activated carbon filtration systems or other appropriate systems for the removal of Syngenta's atrazine from Plaintiffs' water supplies and drinking water;

e.  Declaring Plaintiffs' and class member legal rights and Syngenta's legal obligations surrounding the future contamination of Plaintiffs' water supplies with Syngenta's atrazine;

f.  Awarding Plaintiffs costs of suit and attorneys' fees;

g.  Awarding prejudgment interest; and

h.  Awarding Plaintiffs any other relief the Court deems just, proper and equitable.

**KOREIN TILLERY, LLC**


By:  _/s/ Stephen M. Tillery_____
      STEPHEN M. TILLERY
      CHRISTINE J. MOODY
      CHRISTOPHER HOFFMAN
      CHRISTIE R. DEATON
      MICHAEL E. KLENOV
      505 N. Seventh Street, Suite 3600
      St. Louis, Missouri 63101
      Telephone:  (314) 241-4844
      Facsimile:  (314) 241-3525
      STillery@koreintillery.com
      CMoody@koreintillery.com
      CHoffman@koreintillery.com
      CDeaton@koreintillery.com
      MKlenov@koreintillery.com

      **MURPHY LAW OFFICE**
      PATRICIA S. MURPHY
      P.O. Box 220
      Energy, Illinois  62933-0220
      Telephone:  (618) 964-9640
      Facsimile:    (618) 964-1275
      tsuemurphy@gmail.com

      **BARON & BUDD, P.C**.
      SCOTT SUMMY
      CARLA BURKE
      CELESTE EVANGELISTI
      CARY MCDOUGAL
      3102 Oak Lawn Avenue, Suite 1100
      Dallas, Texas  75219-4281
      Telephone: (214) 521-3605
      Facsimile:  (214) 520-1181
      SSummy@baronbudd.com
      CBurke@baronbudd.com
      CEvangel@baronbudd.com
      CMcdouga@baronbudd.com


      *Attorneys for Plaintiffs*