IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF GREENVILLE, ILLINOIS, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:10-cv-188-JPG |
| | ) | |
| SYNGENTA CROP PROTECTION, INC., and | ) | |
| SYNGENTA AG, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Syngenta AG's ("SAG") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction (Doc. 26). The plaintiffs have responded to the motion (Doc. 112), and SAG has replied to that response (Doc. 134). The plaintiffs have submitted supplemental authority in opposition to the motion (Doc. 186), and SAG has responded to that supplemental authority (Doc. 187). The plaintiffs also move to strike portions of two declarations SAG submitted in support of its motion to dismiss (Doc. 121). SAG has responded to that motion (Doc. 128). The Court heard argument on the motion to dismiss on July 27, 2011.

## I.    Background

The plaintiffs, who are all providers of water to the public, have sued Syngenta Crop Protection, Inc. ("SCPI") and SAG alleging they are responsible for manufacturing atrazine, an herbicide, and selling it to farmers knowing it had great potential to run off of crop land and into bodies of water, including the bodies of water from which water providers like the plaintiffs draw their raw water. The plaintiffs seek to hold SCPI and SAG liable for the costs they have

incurred to test and monitor levels of atrazine and to remove it from their raw water, the costs that will be required for each plaintiff to construct, install, operate and maintain a special filtration system to filter atrazine from its raw water in the future, and for punitive damages.

SAG moves to dismiss the claims against it for lack of personal jurisdiction. Specifically, it argues that, as a Swiss corporation, it does not have sufficient contacts with the state of Illinois to be subject to suit in a federal court sitting in Illinois and that the Illinois contacts of SCPI, a subsidiary company, cannot be attributed to SAG for the purposes of personal jurisdiction.  It further states that SCPI is the appropriate defendant and has entered an appearance in this case.

The plaintiffs present evidence of an elaborate web of corporate relationships between various "Syngenta" entities and argue that the amount of control SAG has over SCPI is sufficient to justify imputing its Illinois contacts to SAG for jurisdictional purposes.

## II.     Legal Standards

### A.     Standard for Dismissal

When personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction over a defendant.  *Purdue Research Found. v. Sanofi-Syntholabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citing *Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000)).  If there are material facts in dispute regarding the Court's jurisdiction over a defendant, the Court must hold an evidentiary hearing at which the plaintiff must establish jurisdiction by a preponderance of the evidence.  *Purdue Research*, 338 F.3d at 782 (citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)).  Alternatively, the Court may decide the motion to dismiss without an evidentiary hearing based on the submitted written materials so

2

long as it resolves all factual disputes in the plaintiff's favor. *Purdue Research*, 338 F.3d at 782 (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)); *see Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir.), *cert. denied*, 131 S. Ct. 567 (2010). If the Court consults only the written materials, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Purdue Research*, 338 F.3d at 782 (citing *Hyatt*, 302 F.3d at 713); *Tamburo*, 601 F.3d at 700.

Here, the Court considered only the written materials and the oral argument. Thus, the plaintiffs' burden is to make a *prima facie* showing of personal jurisdiction.

B.     Personal Jurisdiction

A federal court sitting in diversity looks to the personal jurisdiction law of the state in which the court sits to determine if it has personal jurisdiction over a defendant. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002) (citing *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 945 (7th Cir. 1992)). Thus, this Court applies Illinois law. Under Illinois law, a court has personal jurisdiction over a defendant if an Illinois statute grants personal jurisdiction and if the exercise of personal jurisdiction is permissible under the Illinois and United States constitutions. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997); *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239 (7th Cir. 1990).

1.     Illinois Statutory Law

Under Illinois law, the long-arm statute permits personal jurisdiction over a party to the extent allowed under the due process provisions of the Illinois and United States constitutions. 735 ILCS 5/2-209(c); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714 (7th Cir. 2002); *Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). Therefore, whether the Court has jurisdiction over a defendant depends on whether

3

such jurisdiction is permitted by federal and state constitutional standards.

### 2.      Illinois Constitutional Law

The Illinois Constitution's due process guarantee, Ill. Const. art. I, § 2, permits the assertion of personal jurisdiction "when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990). When interpreting these principles, a court may look to the construction and application of the federal due process clause. *Id.* In fact, the Seventh Circuit Court of Appeals has suggested that there is no operative difference between Illinois and federal due process limits on the exercise of personal jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) (citing *RAR, Inc. v. Turner Diesel Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997)). The Court sees nothing in this case indicating that in this particular situation the federal and state standards should reach a different result. Therefore, if the contacts between the defendant and Illinois are sufficient to satisfy the requirements of federal due process, then the requirements of both the Illinois long-arm statute and the Illinois Constitution have also been met, and no other inquiry is necessary.

### 3.      Federal Constitutional Law

The Due Process Clause of the Fourteenth Amendment limits when a state may assert personal jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). Under federal due process standards, a court can have personal jurisdiction over a defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

4

*International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The defendant must have purposefully established such minimum contacts with the forum state such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), because it has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  *Burger King Corp. v. Rudzewicz*, 474-75 (1985);  *see J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2788 (2011) (Kennedy, J., plurality opinion).  In deciding whether exercising jurisdiction offends traditional notions of fair play and substantial justice, the Court may also consider "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief."  *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987).

What this standard means in a particular case depends on whether the plaintiff asserts "general" or "specific" jurisdiction.  Specific jurisdiction refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.  *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)).  General jurisdiction, on the other hand, may exist even in suits that do not rise out of or relate to the defendant's contacts so long as the defendant has "continuous and systematic" contacts with the forum state.  *Hyatt*, 302 F.3d at 713; *Helicopteros Nacionales*, 466 U.S. at 416.

The parties do not really dispute that the Illinois contacts of SAG, as an independent entity, are insufficient to confer specific or general jurisdiction.  However, the plaintiffs argue that SCPI's contacts with Illinois can be imputed to SAG for personal jurisdiction purposes

5

because of the degree of control SAG exercises over SCPI.  If SCPI's Illinois contacts can be imputed to SAG for personal jurisdiction purposes, there would be no question that the Court has personal jurisdiction over SAG.  Therefore, the resolution of this motion to dismiss turns on whether SCPI's contacts with Illinois can be imputed to SAG for jurisdictional purposes.

    C.    <u>Subsidiary Contacts</u>

Ordinarily, the jurisdictional contacts of a subsidiary corporation are not imputed to the parent corporation.  *Purdue Research Found. v. Sanofi-Syntholabo, S.A.*, 338 F.3d 773, 788 n. 17 (7th Cir. 2003) (citing *Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943-44 (7th Cir. 2000)).  "[C]onstitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary."  *Reimer Express*, 230 F.3d at 943.  However, where corporate formalities are not observed such that piercing the corporate veil is warranted or where a parent dominates the subsidiary, a court may have personal jurisdiction over a parent based on the subsidiary's contacts.  *See, e.g., id.* at 945; *Mart v. Berkshire Hathaway, Inc.*, No. 3:10 CV 118, 2011 WL 924281, * 4 (N.D. Ind. 2011).  The same is true where the subsidiary is acting solely as the parent's agent, and the parent is simply doing business through its subsidiary to shield itself from liability.  *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 904 N.E.2d 1050, 1059 (Ill. App. Ct. 2009) (citing *Maunder v. De Havilland Aircraft of Canada, Ltd.*, 466 N.E.2d 217, 222 (Ill. 1984); *Alderson v. Southern Co.*, 747 N.E.2d 926, 944 (Ill. App. Ct. 2001)).

Where a plaintiff claims a parent company is subject to a court's jurisdiction by virtue of its subsidiary's contacts because it exercised extraordinary control over the subsidiary, the court

6

considers factors including:

> (1) whether officers or directors are the same; (2) how much control is exerted by parent over daily affairs of its subsidiary; (3) whether parent arranges financing for and capitalization of subsidiary; (4) whether separate books, tax returns, and financial statements are kept; (5) whether parent holds its subsidiary out as agent; and (6) the method of payment made to parent by subsidiary.

*Bray v. Fresenius Med. Care Aktiengesellschaft Inc.*, No. 06 C 50197, 2007 WL 7366260, at *6 (N.D. Ill. 2007) (citing *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 867 (N.D. Ill. 1998)).  Control that is consistent with investor status – that is, monitoring the subsidiary's performance, supervising the subsidiary's finance and capital budget decisions, and articulating general policies – does not rise to the level necessary to impute the subsidiary's jurisdictional contacts to the parent.  16 James Wm. Moore *et al., Moore's Federal Practice* § 108.42[3][b] (3d ed. 2011);  *see United States v. Bestfoods*, 524 U.S. 51, 72 (1998).  A controlling shareholder "is entitled to ordain [a subsidiary's] officers and directors, influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits."  *In re Chocolate Confectionary Antitrust Litigation ("In re Chocolate")*, 674 F. Supp. 2d 580, 599-600 (M.D. Pa. 2009).  "These activities typify standard parent-subsidiary interactions and do not reflect daily, operational control that is the *sine qua non* of an alter ego relationship."  *Id.* at 600.

## III.    Motion to Strike

SAG has submitted two affidavits in support of its motion to dismiss, one by Tobias Meili, the Head of Corporate Legal Affairs of Syngenta International AG, and one by Elizabeth Quarles, Vice President and General Counsel of SCPI.  The plaintiffs ask the Court to strike portions of those affidavits (¶¶ 11-14, 16-18, 20-22 & 26 of Meili's affidavit; ¶¶ 4-8 & 10-12 of Quarles' affidavit) because they are not based on personal knowledge or because they state legal

conclusions rather than facts.  For example, they note that Meili, who only began working for Syngenta International AG in 2007, states in his affidavit that SAG's Executive Committee and board did not make decisions about how SCPI manufactures, markets or sells atrazine (¶ 18) and that SAG does not control SCPI (¶ 17), but stated in his deposition that he is not privy to what occurs at SAG's Executive Committee and board meetings and does not know about how SCPI's business is run.  As for Quarles, who has worked for SCPI since 2008 and other Syngenta entities since 2000, she makes statements in her affidavit regarding what SCPI does, but in her deposition states that she may be ignorant of certain matters relating to SCPI's business.

SAG contends that by virtue of the positions held by the affiants, they have the requisite personal knowledge to make the statements in their affidavits.  SAG notes that courts routinely accept statements by corporate officers about corporate operations and matters within their scope of responsibility.  It contends that Meili and Quarles do, indeed, have personal knowledge about the matters in their affidavits.

The Court declines to strike the affidavits.  However, since the Court is deciding this motion solely on the papers, where there is a factual dispute between what an affiant says and the plaintiffs' evidence, the Court will view the facts in the plaintiffs' favor.  Where there is no factual dispute, the Court will then consider whether, where the affiants say they have no knowledge, they are competent to testify in those areas and will disregard statements the affiants are not competent to make.  To the extent the affidavits contain legal conclusions, the Court will not credit those statements and will accept them only if they are justified by the evidence.

## IV.    Motion to Dismiss

No party disputes that SAG has no contact with the state of Illinois other than possibly through SCPI.  SAG is a Swiss holding company that has no employees, and its sole business is

8

owning shares in other Syngenta entities.  It has no independent contacts with Illinois:  it is not registered or authorized to do business here, it has no facilities, direct agents, accounts or property here, none of its officers or directors resides here, it has never held meetings or filed lawsuits here, and it has not manufactured or sold products here.  It urges the Court to follow *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636 (D. Del. 2006), in which a district court in Delaware held it did not have personal jurisdiction over SAG.

The plaintiffs argue that the foregoing is irrelevant because SAG exercises an unusually high degree of control over SCPI, which is essentially SAG's alter ego or agent for business in the United States, such that SCPI's contacts can be imputed to SAG to establish general personal jurisdiction.  It exercises this control, the plaintiffs allege, through functional reporting lines to "Product Heads" in charge of seed product or crop protection product divisions or to "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance, as opposed to legal reporting lines that follow corporate structure.  In support of their position, the plaintiffs point to *In re Chocolate*, 674 F. Supp. 2d 580 (M.D. Pa. 2009), and *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 344 F. Supp. 2d 686 (W.D. Wash. 2003) (finding subsidiary is agent of indirect parent where management system penetrates layers of ownership and parent actively controls decisions and activities of subsidiary through its board, committees and executives), both of which involved management structures overseen by an international parent company.  *See also Directory Dividends, Inc. v. SBC Communications, Inc.*,  No. Civ.A. 01-CV-1974, 2003 WL 21961448 (E.D. Pa. July 2, 2003) (finding subsidiary is alter ego where parent controls business at the subsidiary level through vertical and horizontal integration of companies);  *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011) (finding subsidiary is agent of parent for

jurisdictional purposes where comprehensive written agreement between parent and subsidiary gave parent control over nearly all aspects of subsidiary's current and future operations).

In reply, SAG disputes that it is doing business in Illinois through SCPI or that it exercises day-to-day control over SCPI.  It points to the plaintiffs' lack of evidence showing SAG itself, as opposed to some other Syngenta entity, controlled SCPI or used it as an agent.  It reiterates that SCPI maintains its own separate identity and that global or regional managers simply formulate and coordinate an overall strategy for related businesses to guide SCPI.  It cites *LaSalle National Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857 (N.D. Ill. 2000) (declining to impute subsidiary's contacts to parent where parent conducted business through divisions, offered training to subsidiary's employees and had comprehensive business plan but did not take active day-to-day control over subsidiary), as a similar case in further support of its position.

In *Monsanto*, the court addressed jurisdiction over the same defendant at issue in this motion:  SAG.  It held it did not have personal jurisdiction over SAG based on United States subsidiaries' contacts with the state because SAG was not involved in the United States subsidiaries' manufacturing or production activities and the United States subsidiaries were not acting as SAG's distributors or sales agents.  *Monsanto*, 443 F. Supp. 2d at 644-45.  On the contrary, the court found that the United States subsidiaries "[made] their own decisions about day-to-day activities, and design, manufacture, market and distribute" the Syngenta product in issue.  *Id.* at 645.

Perhaps *In re Chocolate*, is the most enlightening of all the cases cited because it provides a contrast between numerous companies sitting atop worldwide networks of subsidiaries.  Indeed, the plaintiffs argue SAG is similar to defendant Cadbury plc and Cadbury

10

Holdings (collectively, "Cadbury"), while SAG argues it is more like defendant Nestlé, N.A. ("Nestlé").  Like SAG, Cadbury and Nestlé are the ultimate parents of their respective group of operating companies.

In Nestlé's case, two immediate subsidiaries, Nestec N.A. ("Nestec") and Société des Produits Nestlé S.A. ("Société") loosely coordinated operations of Nestlé's operational subsidiaries but each operating subsidiary was responsible for its own product sales and distribution.  *In re Chocolate*, 674 F. Supp. 2d at 588.  Nestlé, Nestec or Société owned the intellectual property rights to Nestlé-branded products and provided product design and manufacturing support to the operational subsidiaries, and those subsidiaries made royalty payments to Nestlé.  *Id.* at 589.  Centralized trademark oversight was achieved through advisors employed by operational subsidiaries who reported both to the subsidiary, which maintained day-to-day control over the trademarks it used, and to Nestec or Société.  *Id.*

Nestlé managed its products through strategic business units ("SBUs") and strategic generating demand units ("SGDUs") organized around product lines rather than legal corporate structures.  *Id.* at 590.  SBUs engaged in transnational product development, facilitated sharing of expertise of subsidiaries that made similar goods and was responsible for maintaining the integrity of the respective trademark portfolio.  *Id.*  With one exception, SBUs answered to Nestec, which then answered to Nestlé.  *Id.*  The SGDUs worked with SBUs and operating subsidiaries to market and sell Nestlé products in particular markets, but operating subsidiaries were free to reject SBU and SGDU proposals if they deemed them ill-suited.  *Id.*  All operating companies reported financial and production data to Nestlé using a common internet-based platform.  *Id.*

Nestec and Société did not "directly supervise the manufacturing, sales, and marketing

11

processes, which [were] functions that remain[ed] the responsibility of operating entities such as defendant Nestlé USA, Inc.," which was the exclusive supplier of Nestlé products in the United States.  *Id.*  Nestlé USA, Inc. administered its strategic business plan in the United States without involvement from Nestlé, Nestec or Société and formulated its budget independently of Nestlé, although it had to submit monthly financial information to Nestlé.  *Id.* at 590-91.  It created its own independent SBUs and an SGDU distinct from those overseen by Nestec, organized around different product clusters and focused exclusively on the American market.  *Id.*

The *In re Chocolate* court found that Nestlé USA was not the alter ego of Nestlé such that its contacts with the forum could be imputed to Nestlé.  Important to this conclusion was that Nestlé did not control Nestlé USA's use of intellectual property, which was actually managed by Nestec and Société, and did not control Nestlé USA's business strategy through SBUs or SGDUs, which only made proposals that Nestlé USA was free to reject in light of its own SBUs' and SGDU's proposals.  *Id.* at 605-07.  The court further noted that Nestlé's monitoring of Nestlé USA's financial and management data, collection of royalties and recommending optional cost-saving measures were normal incidents of the parent-subsidiary relationship and not "pervasive control over essential functions."  *Id.* at 607-09.  Nestlé USA, the court concluded, exercised "a significant degree of autonomy over its daily affairs" in that it "maintain[ed] its own production facilities, purchase[d] raw materials through contracts to which Nestlé S.A. [was] not a party, formulate[d] its own budget, and establishe[d] its own administrative policies."  *Id.* at 609.  Therefore it was not an alter ego of Nestlé.

In contrast, Cadbury managed the affairs of its subsidiary corporations through the Cadbury plc's Chief Executive Officer's Committee ("Committee") which was responsible "for the day-to-day management of the operations and the implementation of strategy."  *Id.* at 591-92.

12

The Committee was made up of the heads of the Cadbury group's business units, which like Nestlé's SBUs were organized around product lines, and other executives of the operating subsidiaries including the president and CEO of Cadbury Adams USA LLC ("Cadbury USA"). *Id.* at 592.  Thus, those executives had responsibility through the Committee for global operations as well as their own companies.  *Id.*  The Cadbury group was managed through a matrix organizational structure in which operating subsidiaries' executives supervised their own employees and, under the coordination of global functional heads, shared information with other similar subsidiaries from different geographical areas to develop global expertise and best practices.  *Id.*  The Committee recommended intercompany transfers of personnel from one operating subsidiary to another based on operating needs, but the operating entities could reject the proposed transfer.  *Id.* at 593.  Cadbury was also directly involved in subsidiaries' budgeting procedures in that Cadbury plc's president and CFO approved the budgets and set sales targets. *Id.*

The *In re Chocolate* court found that Cadbury USA was the alter ego of Cadbury such that its contacts with the forum could be imputed to Cadbury.  The court first considered Cadbury pcl's and Cadbury Holdings' actions together "because they coordinate[d] all of their corporate activities and function[ed] as a unified parent entity" and "operate[d] as a single indistinguishable entity on a daily basis."  *Id.* at 614 n. 51.  Key to the Cadbury USA alter ego status was that Cadbury "vertically manage[d] the Cadbury group through business units aligned with product groups rather than corporate boundaries" where "senior executives of Cadbury operating entities double[d] as *both* the leaders of business units *and* as the heads of production activities."  *Id.* at 614.  The conscription of subsidiaries' employees "to discharge group-wide management functions across corporate boundaries" provided "strong evidence of an alter ego

relationship." *Id.* at 615.  Similarly, the centralized management of territory through business units and personnel was further evidence that corporate boundaries did not reflect accountability lines.  *Id.* at 615 n. 53.  The court also noted that the Committee was required to give final approval before Cadbury USA could implement a new project and that the Committee performed functions like evaluating market research and supply chain management that were normally performed by an operating company.  *Id.*  Also important to the alter ego finding was that the Cadbury USA board lacked operational control – Cadbury USA's CEO did not know the board's members, the board never met in person or by telephone and had only agreed to actions on paper.  *Id.* at 615-16 & n. 54.  In contrast, the Committee, which met six to nine times a year for one to three days, actively addressed issues affecting Cadbury USA's operations.  *Id.* at 616.  The court concluded that Cadbury USA simply did not exercise a sufficient measure of autonomy to escape alter ego status.  *Id.* at 617.

  A. <u>Facts</u>

  An understanding of the legal and functional structure of SAG and its subsidiaries is essential to untangling the issues in this case.  SAG has no employees;  it is a holding company that owns stock, either directly or indirectly, in other Syngenta entities.  One of its direct, wholly-owned subsidiaries is Syngenta Crop Protection AG, which employs global operational managers of production, distribution and marketing for the Crop Protection ("CP") Division and the Seeds Division, two product lines of the Syngenta entities that do not have separate legal, corporate existences.  Syngenta Crop Protection AG, in turn, directly and wholly owns Syngenta International AG, the coordination center for the entire Syngenta group.  Syngenta International AG employs the "Heads" of the CP Division and Seeds Division, and the "Heads" and senior staff of global corporate functions (e.g., Human Resources, Corporate Affairs, Global

Operations, Research and Development, Legal and Taxes, and Finance).  These global Heads and senior staff are for the most part housed in the same office space in Basel, Switzerland.

SAG is the indirect parent of SCPI through multiple layers of corporate ownership.  SAG directly and wholly owns Syngenta Participations AG, which directly and wholly owns Seeds JV C.V., which directly and wholly owns Syngenta Corporation, which directly and wholly owns Syngenta Seeds, Inc., which directly and wholly owns SCPI.  SCPI is incorporated in Delaware, has its principal place of business in North Carolina and has its own board of directors.  It manufactures, markets and sells atrazine and products containing atrazine in the United States.  SCPI's sales of all products account for more than 17% of the sales for the entire Syngenta group of companies in 2009.  SAG has organized its group of subsidiary companies, including SCPI, purposefully to limit the jurisdictions in which it is subject to court authority.

SAG represents Syngenta as a "global company."  It also shares a common website with its subsidiaries like SCPI and controls what is communicated at that site.  However, SCPI is not undercapitalized, prepares its own financial statements, keeps its own books and records and files its own United States tax returns.  SAG does not file financial statements on behalf of SCPI, although it includes SCPI's financial results in its consolidated financial results to the United States Securities and Exchange Commission and Swiss authorities in accordance with generally accepted accounting principles.

The SAG board of directors is chaired by Mike Mack.  The SAG board has established the Executive Committee comprised of employees of Syngenta International AG, including Mack and many global Heads.  John Atkin**,** the CP Division Head, and Christoph Maeder, the global Head of the Legal and Taxes function, both serve on the Executive Committee and on SCPI's five-member board of directors.  The Executive Committee formulates and coordinates

global strategy for Syngenta businesses, and there are central corporate policies requiring Syngenta subsidiaries to operate independently under the general guidance of Syngenta group control.

There is no overlap between the SAG and SCPI boards of directors, which do not meet at the same time. The SAG board meets five to six times a year, but the SCPI board rarely meets, either in person or by telephone. In fact, it has only met a handful of times over the last decade. Instead, the SCPI board's actions, including selection and removal of SCPI's officers, have been by unanimous written consent of actions recommended by global or regional managers and delivered via e-mail to board members. Similarly, the Syngenta Seeds, Inc.'s board appoints and removes SCPI board members upon recommendation by Mack.

The CP Division has its own structure, which is not defined by legal, corporate relationships but by reporting relationships. This ensures that employees doing similar jobs around the world are able to share knowledge and ideas with each other so that they can learn how to do their jobs better. Within the CP Division is the CP Leadership Team, which includes CP Division Head Atkin, CP region Heads (including SCPI President Vern Hawkins) and some global corporate function Heads. The CP Leadership Team meets bi-monthly to develop strategy for new products, markets and operational efficiencies and to monitor performance of Syngenta's worldwide CP business. Under the CP Leadership Team are regional leadership teams, including the NAFTA Regional Leadership Team, which oversees SCPI and its Canadian and Mexican Syngenta counterparts. The NAFTA Regional Leadership Team is chaired by SCPI President Hawkins and includes employees of SCPI and its Canadian and Mexican Syngenta counterparts. Generally, those North American Syngenta entities report to the NAFTA Regional Leadership Team, which reports to the CP Leadership Team, which reports to the

16

Executive Committee, which answers to the SAG Board, although some specific members of the NAFTA Regional Leadership Team, including some SCPI employees, also report directly to some global Heads.  Where global managers supervise SCPI employees, those managers participate in those employees' performance reviews and request salary increases, if appropriate. On occasion, the functional reporting lines result in employees of parent companies reporting to officers of subsidiary companies.

SCPI performs its functions according to its role in the CP Division structure.  CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the NAFTA Regional Leadership Team, and given final approval by the Executive Committee.  With respect to new product development projects, new CP products are developed by Syngenta entities that conduct research and development functions for the entire CP Division.  The products they develop are then tested by other Syngenta entities such as SCPI under the direction and supervision of global managers and/or the CP Leadership Team.  Syngenta entities, including SCPI, do not have contracts with each other or compensate each other for these services they provide for each other;  the costs are simply included in the operating budgets of the individual entities.  If a product shows promise based on the testing and potential markets, either global or regional leaders (depending on whether the target market is global or regional) decide whether to sell a product, and that decision must be approved by the Executive Committee.  The products sold all bear the same Syngenta trademark and logo.

As for atrazine in particular, the supply chain is controlled and coordinated globally from raw materials through delivery to the customer.  For example, atrazine for global demand is manufactured in an SCPI plant in St. Gabriel, Louisiana.  A member of the Executive Committee

17

and a team that reports to him are responsible for communicating global demand to the St. Gabriel plant, and SCPI then manages day-to-day production to make sure that demand is met. The Executive Committee member and his team is also responsible for deciding how atrazine is allocated to markets after it is manufactured, although local distribution strategies may independently be tailored to local needs.  Global managers also provide sales and marketing strategies to SCPI and have negotiated a number of sales deals on behalf of SCPI.  Because atrazine is a global product, SCPI could not decide to stop manufacturing it without approval from CP Division Head Atkin.

SCPI is subject to additional oversight by global managers through a system of "reserved powers" that require subsidiary companies to seek approval for certain decisions from higher levels within the functional reporting structure.  For example, although subsidiaries can handle small legal matters on their own, under the "reserved powers" system, they must get approval from various higher levels of the functional reporting relationships when the matters exceed certain thresholds of value or importance.  For instance, settlement of this lawsuit would need to be approved by the SAG board because its value likely exceeds $60 million.  Similarly, in the personnel arena, appointments of senior managers at SCPI must be approved by higher levels than the SCPI board, although the SCPI board is the body that formally appoints the managers. SAG maintains that the subsidiary companies have the legal authority to take action on their own without higher approval, but the actual practice is that only after the higher level pre-approves an action does SCPI take it.  Similar restrictions exist in other arenas including human resources, communications and public affairs, corporate structure or ownership, asset sales or acquisitions, key appointments to boards, committees and management positions, compensation packages and training for those appointments, finance and tax.

18

Under this oversight, global managers initiate and the global Head of human resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another in another country.  The international assignment program aims, in part, to improve succession planning by developing corporate talent to make employees fit for higher positions within the Syngenta group of companies.

Also under this oversight, there is a central global finance function – known as Syngenta Group Treasury – for the Syngenta group of companies, including SCPI, that is governed by a global treasury policy.  That policy subordinates the financial interests of SAG's subsidiaries to the interests of the Syngenta group as a whole.  Under the policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries, holds the cash on account, and lends it to other subsidiaries that need liquidity.  This reduces the need of subsidiaries to seek financing from non-Syngenta entities, which is only allowed with the approval of Syngenta Group Treasury. Syngenta Group Treasury also decides whether SCPI will issue a dividend to its parent Syngenta Seeds, Inc. and how much that dividend will be, and the SCPI board approves the dividend accordingly without discussion.

Despite oversight from above, SCPI handles its own human relations matters below senior management level, runs its facilities, and manages its relationships with United States retailers of its products independently of other Syngenta entities.  It also manages its own advertizing and promotion budget and enters into contracts with third parties on its own.

B.    Analysis

1.    Contacts With Illinois

The plaintiffs have made a *prima facie* showing that the Court has personal jurisdiction over SAG.  While SCPI's jurisdictional contacts are not attributable to SAG simply because of

19

their corporate affiliation, the evidence shows SAG exercises an "unusually high degree of control over" and, in fact, dominates SCPI despite the multiple layers of corporate ownership between them. *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). SAG's control of SCPI exceeds that which is consistent with investor status, and SAG is therefore subject to the personal jurisdiction of this Court.

The evidence in this case shows that the Executive Committee functions as the means by which the SAG board exercises control over SCPI. The Executive Committee has some degree of influence over the SCPI board because CP Division Head Hawkins and Legal and Tax Head Maeder serve on the SCPI board and the Executive Committee. More importantly, however, is the fact that the SCPI board rarely meets in person and decides almost everything by unanimous consent of a recommendation provided by a higher functional reporting level outside SCPI's or parent Syngenta Seeds Inc.'s legal boundaries. SAG argues that it is a common practice for boards to pass measures by unanimous consent where they have been discussed and agreed upon ahead of time. It notes that three of SCPI's five-member board work in the same office in Greensboro, North Carolina, the other two work in Basel, Switzerland, and they are in constant communication. Nevertheless, the Court will not assume deliberations that are not reflected in corporate records. The Court is hard-pressed to see how such a board can diligently and seriously consider the issues before it if it rarely even holds a discussion in person or otherwise. No matter how many Executive Committee members serve on the SCPI board, the reality is that the board does not appear to function independently and instead simply ratifies decisions already made by higher functional reporting levels and communicated to it by Maeder or through the CP Division structure.

20

While not controlling of the Court's decision, *see LaSalle Nat'l Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000) ("Personal jurisdiction is based on actual evidence of control . . . rather than on a corporation's general descriptions."), it is worth noting that SAG centralizes uniform marketing in which it represents that "Syngenta" is a single-integrated globally managed entity.  SCPI uses the same corporate insignia, marks and logos as SAG and does not have an independent website for its business.

Additionally, management of human resources indicates the Syngenta group of companies functions more like a monolithic corporation controlled by SAG through the Executive Committee as opposed to a group of independent though related companies.  Through the NAFTA Leadership Team, managers from SCPI are tasked with managing the Canadian and Mexican Syngenta entities within the CP Division although SCPI has no ownership interest in those entities.  SCPI employees are also occasionally tasked with global management roles that far exceed their SCPI domain.  For example, Peter Hertl, an SCPI employee was in charge of global product safety for the entire Syngenta group of companies.  Indeed, 35 SCPI employees have NAFTA job titles and 15 SCPI employees have global job titles.  Conversely, some SCPI employees take orders from global managers who work for Syngenta entities that have no ownership interest in SCPI.  Those managers participate in reviews of those SCPI employees and can request raises or other personnel action, functions beyond those of managers of a normal parent.  That the formal decisions regarding those SCPI employees are technically made by SCPI's managers does not change the reality that higher levels actually make the real decisions. In addition, the global Human Resources function centrally orchestrates movement of managers between Syngenta entities, including SCPI, as if it were managing a single human resources department.  These practices demonstrate that personnel technically employed by one entity

actually function as if they were employed by SAG for the use of the Syngenta group of companies.  Indeed, a number of employees of Syngenta entities cannot identify for which Syngenta entity they or their coworkers work.

With respect to SCPI's production of atrazine in particular, global managers exercise a high degree of control.  In practice, they dictate how much atrazine SCPI will produce at its St. Gabriel plant and the countries where and the companies to which atrazine will be sold, even going so far as to negotiate sales contracts on behalf of SCPI and to direct its marketing messages.  They also decide what testing SCPI will do – without compensation – and the protocols for that testing for the benefit of the Syngenta group of companies.  While many of these decisions are cloaked as general direction, advice or recommendations to local managers, in reality they are viewed and treated as authoritative commands that must be followed. Additionally, SCPI does not control the decision whether to discontinue atrazine, its own product;  it would need to get approval from Executive Committee member and CP Division Head Atkin before it could stop production.  These activities and oversight go beyond what a normal parent company does for its subsidiary.

More compelling evidence is the "reserved powers" that require approval from higher levels of the functional reporting system for certain decisions.  While it is true that corporate parents may supervise certain budget decisions and set general policies, the "reserved powers" go beyond that general oversight to cover such things as compensation packages and settlement of legal proceedings.  SAG maintains that the SCPI board retains the ultimate authority to make decisions and that the "reserved powers" only require consultation with higher functional reporting levels.  This argument is specious in that, as noted above, the SCPI board appears not to function independently as a board.

22

The case at bar is distinguishable from *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636 (D. Del. 2006), in that there is more evidence presented here that SAG, through the Executive Committee and the CP Leadership Team, made decisions about day-to-day operations of SCPI – such as how much atrazine the St. Gabriel plant would produce and at what price it would be sold – than was presented with respect to SAG's control over its United States subsidiaries at issue in that case.  There is also more evidence here that SAG controls the designing of the product and determines marketing strategies and distribution plans.  For this reason, *Monsanto* is not persuasive to this Court.

It appears to the Court that SAG is more akin to Cadbury than to Nestlé in the *In re Chocolate* case.  SAG's control over SCPI through the Executive Committee is more than just loose control over operating activities as was the case with Nestlé.  On the contrary, the Executive Committee or the CP Leadership Team makes decisions for SCPI in areas including strategic business planning, budgeting, product testing, production levels, marketing, sales and personnel, all of which SCPI was required to – and did – formally adopt.  In the case of Nestlé, Nestlé USA was permitted to reject proposals made by the product line SBUs and SGDUs or recommendations for cost-saving measures.  The Syngenta reserved powers also require SCPI to get approval from higher levels in the functional reporting structure before it takes a broad range of corporate actions for its own business.  In sum, SCPI simply does not have the level of autonomy from SAG that Nestlé USA had from Nestlé, Nestec or Société.

On the contrary, the level of autonomy exercised by SCPI more closely resembles the level exercised by Cadbury USA.  As with Cadbury, operating subsidiary employees have responsibilities beyond their legal corporate domains and are overseen by an executive committee directly answerable to the ultimate parent.  The Executive Committee and CP

Leadership Team require SCPI employees to manage the businesses of SCPI's Mexican and Canadian counterparts as well as some global aspects of the Syngenta group of companies. They also require SCPI to test products for the benefit of other SAG subsidiaries without compensation for those efforts. Also as with Cadbury, the Executive Committee and CP Leadership Team are involved in SCPI's budgeting process and other operational decisions, while the SCPI board has never deliberated, has rarely met, and has only adopted measures by unanimous written consent. Like Cadbury, SAG exercised a sufficiently high degree of control over SCPI that it is proper to impute SCPI's contacts to SAG for jurisdictional purposes.

2.    <u>Reasonableness of Exercising Jurisdiction</u>

The Court now turns to the question of whether exercising personal jurisdiction over SAG would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). In making this determination, the Court considers "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987). The Court is especially mindful of the burden on foreign corporations which might not be familiar with the United States legal system. *Id.* at 115. The defendant bears the burden of showing jurisdiction is unreasonable despite its contacts with the jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

SAG has not made such a showing. As a preliminary matter, by its actions to control SCPI within this forum, SAG has purposefully availed itself of this forum's law such that it should not be a surprise that it is being haled into court here. Furthermore, in light of SAG's vast global presence, global legal department and regular travel to many regions, it would not be unduly burdensome for it to appear in this forum to litigate this case. Moreover, modern

advances in electronic communication tend to reduce many formerly onerous burdens of litigating in a distant forum.  It is clear that Illinois has a substantial interest in this litigation in that the allegations are that SAG is responsible for contaminating the water supply of numerous municipalities within the state.  Finally, while it is true that the plaintiffs may be able to obtain complete relief from SCPI, which is not undercapitalized, could pay a judgment in this case, and has willingly appeared to litigate it, SAG's control over SCPI's budget makes it an important player in this dispute.

For these reasons, the Court finds that exercising personal jurisdiction over SAG does not offend due process.

## V.      Conclusion

For the foregoing reasons, the Court:

• **DENIES** the plaintiffs' motion to strike SAG's affidavits in support of its motion to dismiss (Doc. 121); and

• **DENIES** SAG's motion to dismiss for lack of personal jurisdiction (Doc. 26).

**SO ORDERED.**
**DATED:  November 23, 2011**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**