IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CITY OF GREENVILLE, ILLINOIS, et al. individually and on behalf of all others similarly situated, ) ) ) Plaintiffs, ) v. ) ) SYNGENTA CROP PROTECTION, INC., and ) SYNGENTA AG, ) ) ) Defendants. ) | Case No. 3:10-cv-188-JPG ORAL ARGUMENT REQUESTED |

**DEFENDANT SYNGENTA CROP PROTECTION, LLC'S
<u>MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
ON THE CLAIMS OF PLAINTIFF CITY OF MARION, KANSAS</u>**

This Court should enter summary judgment in favor of Defendant, Syngenta Crop Protection, LLC ("Syngenta"), on all of the claims of Plaintiff, City of Marion, Kansas ("Marion"), because as a matter of law Marion lacks standing to assert those claims. Marion lacks standing because there is no specific, imminent threat of atrazine in its water supply in excess of the maximum contaminant level ("MCL") of 3 parts per billion ("ppb"), which was established by the U.S. Environmental Protection Agency ("EPA") in 1992, after extensive scientific review, and adopted by the Kansas Department of Health and Environment ("KDHE").

Not surprisingly, in 1995, the KDHE approved a significant reduction in the monitoring Marion had to do for atrazine; namely, from once every quarter to once a year.[1] This is a direct result of the consistently low to nonexistent levels of atrazine in Marion's water supply. Since then, the only water results reported with regard to the U.S. EPA's Safe Drinking Water Act ("SDWA") are annual results also all under 1.1 ppb.[2] Because Marion's water readings for

---

[1] See Exhibit 3 (Letter from the KDHE to Marion from April 18, 1995, labeled with Bates Number MARION010441). The four detects that year were 1.0, 0.3, 0.6, and 0.8 ppb.
[2] See Exhibit 4.

1

atrazine fall considerably below the atrazine MCL, there is no risk of imminent injury to Marion. As a result, Marion has not suffered an injury as a matter of law, and Defendant is entitled to summary judgment.

## STATEMENT OF FACTS

Atrazine is a synthetic organic compound ("SOC") and has been a very valuable herbicide for growers of corn, sorghum and sugar cane since it was first registered in the United States in 1958.  Atrazine is advantageous to farmers because it does not readily bind to soil and has limited solubility in water.[3]  In 2006, the U.S. EPA re-registered atrazine after a twelve-year, thorough scientific review from the standpoint of both environmental risk and human safety.  In re-registering atrazine, the EPA concluded that atrazine posed "no harm that would result to the general U.S. population, infants, children or other...consumers."

The EPA regulates atrazine, and a community water supplier ("CWS") is required under the SDWA to test its finished drinking water for atrazine and many other substances at points where the water enters the distribution system.  40 C.F.R. 141.24(h)(2).  Since 1991, the EPA has set the MCL for atrazine at 3 ppb, computed on a four quarter finished water rolling average. 56 Fed.Reg. 3526-01 (Jan. 30, 1991); § 40 CFR 141.50(b).[4]  MCLs are deemed "safe levels that are protective of public health."  52 Fed. Reg.25690, 25693-94 (July 8, 1987).  MCLs are based on "the best available, peer-reviewed science and supporting studies," as well as "data collected by accepted methods or best available methods."  42 U.S.C. 300g-1(b)(3)(A)(i)-(ii).  All six

---

[3] First Amended Complaint at ¶ 30.
[4] The SDWA only regulates finished water, not raw water.  40 CFR§141.24 (h)(2).  The regulatory bodies in Illinois, Indiana, Iowa, Missouri, Kansas and Ohio similarly use 3 ppb as their MCL, even though each could have chosen an MCL lower than 3 ppb, if desired.  This human health based MCL of 3 ppb carries with it a 1000 fold safety factor over the lowest level showing no adverse effects in laboratory animals.  "Drinking water that meets the EPA standard is associated with little or no potential health risk."  *See Iberville Parish Waterworks No. 3 v. Novartis Crop Protection, Inc.*, 45 F. Supp.2d 934, 938 (S.D. Al. 1999).

states involved in this litigation have adopted the U.S. EPA 3 ppb MCL standard for atrazine in drinking water.[5]

Doug Kjellin has been the City Administrator for Marion since January 1, 2011, and also has been the Economic Development Manager since 2008. (See Exhibit 1, copy of the June 29, 2011 deposition of Doug Kjellin at pp. 22–24). Mr. Kjellin succeeded David Mayfield, who was the previous City Administrator. (See Exhibit 1 at p. 64, ll. 24–25). Mr. Kjellin was a Rule 30(b)(6) representative for Marion. (See Exhibit 1 at pp. 9-12). Marty Fredrickson, a Class II water treatment operator and the street superintendent for the Marion water treatment plant, was the other representative for Marion at its Rule 30(b)(6) deposition on June 28 and 29, 2011. (See Exhibit 2, copy of the June 28, 2011 deposition of Marty Fredrickson at p. 18, ll. 4–23, pp. 20–21, p. 34, ll. 12–23). Together, Mr. Kjellin and Mr. Fredrickson provided the following testimony on behalf of Marion.

Marion obtains its raw water from the Marion Reservoir. (See Exhibit 1 at pp. 31–34). The Marion Municipal Water Company first started treating and distributing water in 1938. (Exhibit 1 at p. 30, ll. 6–16). Marion upgraded the clearwell in 2000, and in 2007 it undertook a major expansion into ozone treatment. (Exhibit 1 at p. 30, ll. 17–21). Marion used powdered activated carbon ("PAC") in its water treatment plant from 1963 through 2007 specifically for taste and odor control. (Exhibit 2 at p. 75, ll. 9–12). Along with the 2007 ozone expansion, Marion installed granular activated carbon ("GAC") as its filter media. (See generally Exhibit 2 at pp. 117–130). Instead of installing size twenty by fifty (20 x 50) GAC mesh, which typically was used for the treatment of municipal drinking water, Marion installed eight by thirty (8 x 30)

---

[5] *See* Ill. Admin. Code §§ 611.100, 611.311; Mo. Code Regs. Ann. Tit. 10, § 60-4.040 (2003); Kan. Stat. Ann. § 65-1,176 (West 1997); 327 Ind. Admin. Code 8-2-5, § 5.(a) (1987); Ohio Admin. Code 3745:81-12(2010); Iowa Admin. Code r. 567-61.3(3), Table 1 Criteria for Chemical Constituents**.** A copy of these regulations is attached as Exhibit 7 for ease of reference.

mesh, which typically is used for the absorption of taste and odor. (See Exhibit 2 at pp. 124–125, 126, ll. 5–10; see also Exhibit 19 to the deposition of Mr. Fredrickson, attached here as Exhibit 6). Further, Mr. Fredrickson himself made the decision to install GAC on only one of the three filters at the plant in order to ensure that the other filters still served as an alternative disinfection method if the ozone equipment malfunctioned. (See Exhibit 2 at pp. 121–122).

Marion's raw and finished water never has exceeded 3 ppb on a four quarter rolling average; in fact, Marion has never had a finished water detect higher than 1.1 ppb according to the records it has kept since 1994. (See attached Exhibit 1 at p. 126, ll. 4–8, p. 145, ll. 19–24; see also attached Exhibit 2 at p. 99, ll. 12–24). Moreover, Marion never even tested its raw water for atrazine until February 25, 2011 at the request of its own counsel. (See Exhibit 2 at pp. 107–109). And even though defense counsel has not been privy to the results of these raw water samples, Mr. Frederickson stated that none of the raw water testing conducted by Marion ever exceeded 3 ppb. (Exhibit 2 at p. 99, ll. 18–24). Mr. Frederickson further stated that, prior to counsel's instructions to start monitoring its raw water for atrazine, Marion only started testing its raw water in January 2010 on a monthly basis for total organic carbons ("TOCs"). (See Exhibit 2 at pp. 24–26).

Marion's finished water sample results for atrazine are provided in the table below, which is submitted as a Federal Rule of Evidence Rule 1006 summary of sample results produced by Marion. The abbreviation, "ND," stands for "non-detect." The table does not include any raw water sample results for atrazine because Marion did not test its raw water samples for atrazine until instructed to do so by its counsel in 2011.

| Name | Year | Sample Date | Type | Atrazine Concentration (ppb) | Detection Limit | Bates No. |
|---|---|---|---|---|---|---|
| Marion | 1994 | 4/13/1994 | Finished | 1.00 | 0.10 | MARION010101 |
| Marion | 1994 | 11/29/1994 | Finished | 0.60 | 0.10 | MARION010101 |
| Marion | 1995 | 2/22/1995 | Finished | 0.60 | 0.10 | MARION010441 |
| Marion | 1996 | 4/15/1996 | Finished | 0.53 | 0.30 | MARION010860 |
| Marion | 1998 | 4/29/1998 | Finished | 0.48 | 0.10 | KS.FOIA.0003496 |
| Marion | 1999 | 6/7/1999 | Finished | 0.62 | 0.10 | KS.FOIA.0003555 |
| Marion | 2000 | 6/4/2000 | Finished | 0.37 | 0.10 | KS.FOIA.0003630 |
| Marion | 2001 | 6/3/2001 | Finished | ND | 0.30 | MARION011887 |
| Marion | 2002 | 6/10/2002 | Finished | 1.10 | 0.10 | MARION012436 (MARION012457) |
| Marion | 2003 | 6/23/2003 | Finished | 0.62 | 0.30 | MARION012611 (MARION012625) |
| Marion | 2004 | 6/9/2004 | Finished | 0.50 | 0.30 | KS.FOIA.0003985 |
| Marion | 2005 | 6/8/2005 | Finished | 1.10 | 0.30 | KS.FOIA.0003726 |
| Marion | 2006 | 6/7/2006 | Finished | 0.75 | 0.30 | KS.FOIA.0004174 |
| Marion | 2007 | 6/6/2007 | Finished | 0.83 | 0.30 | MARION015304 |
| Marion | 2008 | 6/11/2008 | Finished | 0.38 | 0.30 | MARION015416 |
| Marion | 2009 | 6/9/2009 | Finished | 0.64 | 0.30 | MARION007965 |
| Marion | 2010 | 6/7/2010 | Finished | 0.39 | 0.30 | MARION015989 |

For the purpose of determining whether an atrazine MCL violation occurs, the applicable state agency with jurisdiction over the matter averages the atrazine finished water detect level over a four quarter rolling period. If the average concentration of atrazine in those samples exceeds 3 ppb, then there is a violation. One sample exceeding 3 ppb does not constitute an MCL violation unless it is the only sample taken during those four quarters.

Significantly, the uncontested facts show that the levels of atrazine in Marion's raw and finished water do not credibly threaten Marion with a potential MCL violation. According to the table, no finished water detects have exceeded 1.1 ppb. These results demonstrate that no four quarter rolling average even exceeded 1.1 ppb, let alone came anywhere close to approaching the 3 ppb MCL for finished drinking water. Additionally, there are no raw water atrazine sample results because Marion never deemed it necessary to test the level of atrazine in its raw water supply until joining this lawsuit.

5

Marion first was required to test for the presence of atrazine in its finished water in 1994. (Exhibit 2, at pp. 61–62, ll.21–25 & 1).  Mr. Fredrickson was unable to testify about much of the atrazine testing, but the records produced by Marion confirm that Marion first tested its finished drinking water for atrazine quarterly in 1994.  (See Exhibit 4, a chart providing the lab results from 1994 through 2010 taken in accordance with the SDWA).  Soon thereafter on April 18, 1995, Marion received a letter from the KDHE informing it that it could reduce its atrazine monitoring from quarterly to annually.  (See Exhibit 3, a letter from the KDHE to Marion dated April 18, 1995, labeled with Bates Number MARION010441, and indicating finished drinking water results of 1.0, 0.3, 0.6, and 0.8 ppb for the quarterly results). The KDHE reduced this requirement because it determined the Marion system "to be reliably and consistently below the MCL for atrazine."  (See Exhibit 4).

After KDHE lowered Marion's monitoring requirement, Marion submitted annual finished drinking water tests through 2010. These test results consistently were below the 3 ppb MCL; in fact, they were all below 1.1 ppb.  (See Exhibit 4.)  These results also are reflected in the annual Consumer Confidence Reports ("CCRs"), which Marion uses to communicates to its customers about the quality of its water.[6] (See Exhibit 5, copies of the CCRs for 1998 through 2010 obtained from Marion and through the Freedom of Information Act ("FOIA"), *in globo*).[7] The data through 2010 reflects all of the atrazine SDWA testing data provided by Marion to

---

[6] These CCRs were not discussed in either Marty Fredrickson's or Doug Kjellin's deposition, but Plaintiffs' counsel did stipulate and authenticate as business records the CCRs from 1998 through 2010 at Marty Fredrickson's Rule 30(b)(6) deposition on June 29, 2011.  Exhibit 2 at p. 131, ll. 2–22.

[7] These CCRs cover every year between 1998 and 2010, but Marion apparently did not test report atrazine test results in its CCRs in 2001, 2002, or 2003.  A summary of these detects in the CCRs is as follows: 0.48 (1998), 0.62 (1999), 0.37 (2000), 0.5 (2004), 1.1 (2005), 0.75 (2006), 0.83 (2007), 0.38 (2008), 0.64 (2009), and 0.39 (2010).

Syngenta. There is no atrazine testing data for 2011 because Marion has not produced any atrazine testing data for this time period.

Mr. Kjellin did not conduct any research into atrazine until April 2009, when he did some preliminary Google searches on "atrazine" for the then City Administrator, Mr. Mayfield. (See Exhibit 1 at pp. 69, 150–151). Mr. Kjellin did not conduct any research into the health effects of atrazine. (See Exhibit 1 at pp. 127–129). Also, Mr. Fredrickson never performed any research on atrazine, nor was he aware of any research that Marion had performed on atrazine or its health effects. (See Exhibit 2 at pp. 68, 72). Marion never issued materials or warnings to its customers that its water was unsafe because of the potential human health effects of atrazine in its drinking water. (See Exhibit 2 at p. 72). Nor has Marion convened a council meeting to advise its citizens of any potential health effects of atrazine. (See Exhibit 1 at p. 129, ll. 7–13). Prior to speaking with its attorneys, no one at Marion thought that or knew whether atrazine in water at levels below 3 ppb was a human health hazard. (See Exhibit 1 at pp. 148–149). In contrast, on the CCRs that Marion distributes to its customers, it assures them, "The bottom line is that your drinking water is safe." (See generally Exhibit 5). Thus, the undisputed facts demonstrate that there is no specific, imminent threat of atrazine in Marion's raw or finished water supply.

## ARGUMENT

This Court should enter summary judgment in favor of Defendant on all of Marion's claims because there is no specific, imminent threat of atrazine in its water supply that threatens the MCL or exceeds the MCL.

## I. Legal Framework for Summary Judgment in This Case

### A. Summary Judgment Standard

Summary judgment is appropriate when the moving papers show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Maclin v. SBC Ameritech*, 520 F.3d 781, 785 (7th Cir. 2008). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). A mere scintilla of evidence in support of the non-movant's position is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A party will not be successful in opposing summary judgment unless it presents "definite, competent evidence to rebut the motion." *EEOC v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

### B. Choice of Law

Plaintiffs claim to be citizens of six different states, each of which has its own laws governing tort actions. A federal court sitting in diversity applies the choice of law rules of the forum. *Chang v. Baxter Healthcare Corp.*, No. 09-2280, 2010 U.S. App. LEXIS 6257, at *6 (7th Cir. Mar. 26, 2010). *See also* Restatement (Second) of Conflict of Laws, §5, Comments *a, b,* at 9 (1971) ("Subject to constitutional limitations, the forum court applies the choice-of-law rules of its own state."); accord *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 516 (1953).

Illinois applies the "most significant relationship" test to determine which state's substantive law applies. *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 343 (N.D. Ill.

2002). Under this test, the law of the place of injury presumptively applies. *Fredrick v. Simmons Airlines*, 144 F.3d 500, 504 (7th Cir. 1998); *Abad v. Bayer Corp.*, 563 F.3d 663, 669 (7th Cir. 2009) (same); *Carris v. Marriott Int'l Inc.*, 466 F.3d 558, 560 (7th Cir. 2006) (same); *see also* Restatement (Second) of Conflict of Laws, § 147, Comment e ("[t]he local law of the state where the injury occurred is most likely to be applied when the injury is done to land or to a chattel that has a settled connection with the state, which means that it is located in the state for other than a temporary purpose.") Thus, the laws, excluding conflicts provisions, of each of the six separate states apply to each of the causes of action raised by the Plaintiffs residing in each state. *See, generally, Barbara's Sales, Inc. v. Intel Corp.,* 227 Ill.2d 45, 879 N.E.2d 910, 925 (2007). Here, Kansas substantive law applies to each of Marion's claims because Marion's alleged injuries were sustained in Kansas.

## II.     Marion Has Not Suffered Any Injury in Fact

The doctrine of standing is part of the U.S. Constitution's restriction of federal courts' jurisdiction to actual cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see* U.S. Const. art. III, § 2. There are three elements of standing:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical…. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly … trace[able] to the challenged action of the defendant, and not … the result [of] the independent action of some third party not before the court…. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations, quotations and footnotes omitted); *accord Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008). Marion lacks standing because it has not suffered or alleged an injury in fact that is actual or imminent.

9

### A. Marion Lacks Standing to Assert its Trespass, Nuisance, Strict Liability and Negligence Claims

A federal court considering the atrazine MCL in a similar putative class action already has determined that under the federal regulations "[d]rinking water that meets the EPA standard is associated with little or no potential health risk presented by Atrazine contamination." In *Iberville Parish Waterworks Dist. No. 3 v. Novartis Crop Protection, Inc.*, 45 F. Supp.2d 934, 938 (S.D. Al. 1999), *affirmed without opinion*, 204 F.3d 1122 (11th Cir. 1999), a plaintiff water district from Louisiana and one from Ohio filed a putative class action against Syngenta's predecessor to recover past and future costs of removing atrazine from their drinking water. As in this case, the plaintiffs sought relief under theories of trespass, nuisance, negligence, and strict products liability. 45 F.Supp.2d at 936-37. Because the *Iberville Parish* plaintiffs could not demonstrate that their respective water sources contained atrazine at levels that either exceeded the MCL or were in imminent danger of exceeding the MCL, the court concluded that they could not establish a redressable injury-in-fact and, therefore, lacked standing to sue. Specifically, because the plaintiffs were actually in compliance with drinking water standards, the court determined "it cannot be said that either has suffered any actual invasion of a legally protected interest. Both water systems seek recompense for an injury that has not, and may never, occur." *Id.* at 942. Because neither water district established standing to assert claims for costs incurred in removing atrazine from drinking water in compliance with the MCL, the plaintiffs were not entitled to any relief. *Id.* at 943.

Later, in *Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 458 F. Supp. 2d 149, 157-58 (S.D.N.Y. 2006), the court ruled that a public water supplier may sustain an injury even when the raw water quality does not exceed the MCL if the level of contamination in the raw water supply makes injury likely to occur and causes the public water supplier to incur

10

necessary expenses to remediate the contamination.  In *MTBE*, the plaintiffs alleged that the defendants had contaminated their public water supply with gasoline additives, which negatively affected the taste and odor of the water.  *Id.* at 151.  Although a vast majority of the defendants' wells did not exceed the MCL, the Court found that the plaintiffs had standing because they had alleged sufficient facts to show that the defendants' contamination affected the taste and odor of their water, which had caused the plaintiffs to incur necessary water treatment expenses.  *See id.* at 158-59.  Moreover, the court suggested that injury likely had occurred given that the plaintiffs had been required to shut down wells due to contamination. *See id.* at 159.

   Unlike the *Iberville Parish* case, the *MTBE* case is a minority opinion which actually distinguished its own facts from the *Iberville Parish* atrazine case.  Contrary to *Iberville Parish*, the *MTBE* court found that there were sufficient facts to demonstrate a causal relationship between the plaintiffs' remediation expenses and the defendants' contamination of the water.  *See id.* at 158-59.  Conversely, in *Iberville Parish*, there was no causal relationship between any contamination and the level of atrazine in the water.  *See id.* at 156.  In addition, *MTBE* involved issues of offensive water taste and odor, with separate lower level MCLs, that neither the *Iberville Parish* atrazine case nor this atrazine case involve.  *Id.* at 154-56 & n.42.  The *MTBE* plaintiffs claimed injury from low level contamination that affected water quality because of offensive taste and odor, separate and apart from threats to health or the environment. *Id.* at 159-160.  Significantly, the *MTBE* court specifically noted that the MCL inquiry is actually well suited to cases involving contamination posing a threat to health or the environment, *Id*. at 158, n.47, which are the allegations that Marion asserts in this case as the reason it must incur additional costs of doing business.

   Notwithstanding the court's opinion in *MTBE*, courts increasingly are using regulatory standards to define common law duties in toxic tort cases as was done in *Iberville Parish*.

11

Indeed, numerous courts have incorporated the MCL into their analysis of whether there is a threat of injury to support a claim, or a duty owed, and found no injury when chemical levels do not exceed the MCLs. These opinions recognize that the legislative branch sets chemical level standards based on current scientific and health information, which offer objective, bright line tests for courts to follow.[8]

A series of federal appellate decisions over the last eighteen months consistently has rejected common law claims of trespass or nuisance where there was no violation of the federal standard. In *Rhodes v. E.I. DuPontde Nemours and Co.*, No. 10-1166, 2011 U.S. App. LEXIS 7199 (4th Cir. Apr. 8, 2011), the Fourth Circuit affirmed the entry of summary judgment in favor of the defendant on all of the plaintiff's claims (including trespass and nuisance) except for the claim for medical monitoring. The plaintiffs, residential water consumers, alleged that a DuPont plant discharged perfluorooctanoic acid ("PFOA") into the environment, which polluted their municipal drinking water and could be detected in their blood. The court held that the mere

---

[8]*See also*, *Rockwell v. Wilhite*, 143 S.W.3d 604, 618 n.71, 625 & 627 (Ky. Ct. App. 2004) (finding that the plaintiffs did not establish injury on their trespass and nuisance claims where PCBs on plaintiffs' land were below the federal standard); *Rose v. Union Oil Company of California*, No. C97-3808, 1999 WL 51819, *9 (N.D. Cal. 1999) (granting summary judgment where plaintiffs could not establish injury for RCRA negligence and nuisance claims because alleged chemical levels were below MCL); *Brooks v. E.I. DuPont de Nemours & Co.*, 944 F. Supp. 448, 449 (D.N.C. 1996) (granting summary judgment where chemical levels on plaintiffs' properties did not exceed state groundwater standards); *Hartwell Corp. v. Superior Court of Ventura Co.*, 27 Cal. 4th 256, 276 (determining that the plaintiff had no claim against water authorities when drinking water met state water quality benchmarks); *City of Moses Lake v. U.S.*, 430 F.Supp.2d 1164, 1184-85 (E.D. Wa. 2006) (concluding that there is an absence of injury under nuisance, trespass or negligence when wells do not exceed MCL concentrations); *Adams v. A.J. Ballard, Jr. Tire & Oil Co.*, 2006 WL 1875965, *31-32 (N.C. Super. June 30, 2006) (allowing only the plaintiffs with private water wells contaminated above MCL levels to pursue claims for negligent contamination); *Gleason v. Town of Bolton*, 14 Mass L. Rep. 678, 2002 WL 1555320 (Mass. Super. 2002) (ruling that the plaintiff suffered no compensable injury and his claims for negligence, trespass, nuisance and strict liability failed where the MTBE levels in the water supply never exceeded the MCL); *In re: Wildewood*, 52 F.3d 499, 501 (4th Cir. 1995) (finding that the TCE contamination levels of lake were near or above federal and state drinking water MCLs but still did not rise to level of concern to interfere with use and enjoyment of property).

presence of PFOA in the public water supply or in the plaintiffs' blood was not enough, standing alone, to establish a harm or injury for negligence or trespass claims. *Id.* at *10. The court further held that the plaintiffs could not state claims for public or private nuisance.[9]

In *State of North Carolina v. TVA*, 615 F.3d 291 (4th Cir. 2010), the Fourth Circuit reversed an injunction requiring defendant to install emissions controls at electricity generating plants which purportedly caused a public nuisance in North Carolina. The court held that the defendant could not be liable under state nuisance law where it was in compliance with EPA requirements. The court stated, "[i]t ill behooves the judiciary to set aside a congressionally sanctioned scheme of many years' duration – a scheme, moreover, that reflects extensive application of scientific expertise and that has set in motion reliance interest and expectations on the part of those states and enterprises that have complied with its requirements." *Id.* at 301.

In *Cook v. Rockwell International*, __ F.3d __ (10th Cir. Sept. 3, 2010), the Tenth Circuit rejected the plaintiffs' trespass and nuisance claims arising from the defendants' release of plutonium particles onto the plaintiffs' properties. The court specifically found that expert testimony that "*any* exposure to plutonium whatsoever increases the risk of health problems to

---

[9] Similarly, in *Emerald Coast Utilities Auth. v. 3M Company*, 746 F. Supp. 2d 1216 (N.D. Fla. 2010), the plaintiff asserted various state law tort claims, including public and private nuisance and trespass, alleging that toxic chemical byproducts of the defendants' industrial operations, perflurooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), contaminated its wells. *Id.* at 1218. The defendants moved for summary judgment, arguing that Emerald Coast had failed to present any evidence that it was in danger of an MCL violation concerning PFOA or PFOS. *Id.* at 1225-26. Citing the *Iberville Parish* decision, the court granted the defendants' motion for summary judgment, holding "not only did the contamination levels not exceed the MCL, but additional undisputed facts show that [Emerald Coast] has not suffered any injury as a result of the presence of [PFOA and PFOS] in its water supply." *Id.* at 1228. These "additional undisputed facts" included, *inter alia*: (1) "Emerald Coast's water supply has never been contaminated above any EPA advisory level"; (2) there was no evidence of monitoring or testing costs; and (3) there was no evidence of the frequency with which Emerald Coast changed its filter to deal with its alleged PFOA and PFOS contamination problem. *Id.* at 1228-31.

some degree" was not enough. *Id*. at 23. The Court concluded that the plaintiffs must show either actual physical damage to the property or loss of use of the property.

In *Koronthaly v. L'Oreal USA, Inc.*, No. 08-4625, 2010 WL 1169958 (3d Cir. March 26, 2010), the Third Circuit affirmed dismissal of a class action complaint for lack of standing where lead in lipstick was below the FDA threshold for safety and concluded that the plaintiff had asserted "only a subjective allegation that the trace amounts of lead in the lipsticks are unacceptable to her, not an injury-in-fact sufficient to confer Article III standing."

In *Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010), the Third Circuit affirmed the district court's dismissal of a putative class action asserting claims under Pennsylvania common law that cell phone manufacturers made false statements concerning the safety of cell phones. *Id.* at 104-05. The district court dismissed the plaintiffs' claims because the defendants' representations regarding safety were consistent with regulations promulgated by the Federal Communications Commission ("FCC") stating that the cell phones at issue were safe. *Id.* at 121-23. The Third Circuit affirmed the district court's holding that the plaintiffs' claims were preempted because, in order to prevail on their claims, the plaintiffs would need to challenge the FCC's regulations stating that cell phones were safe. The Court explained:

> A jury determination that cell phones in compliance with FCC's…guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives. Were the FCC's standards to constitute only a regulatory floor upon which state law can build, juries could re-balance the FCC's statutory objectives and inhibit the provision of quality nationwide service.

*Id.* at 125.

In this Court's November 18, 2010 Memorandum and Order (Dkt. 106), this Court wrote that "in order to establish standing at the summary judgment stage and at trial, the plaintiffs will be required to show that any costs they seek to recover, past or future, must have been or will be

14

necessary in order to satisfy their statutory obligation to provide potable water, not simply to serve a lesser, though laudable goal." Specifically, the plaintiffs must show "**levels of atrazine in their raw water sources so exceed the MCL**" or "**the atrazine in the plaintiffs' raw water sources is at a level that credibly threatens to push the atrazine level in the plaintiffs' finished water above the MCL**." (Doc.106, p. 8)(emphasis added). Consistent with the recent decisions of the appellate courts, this Court added that, in the absence of "a specific, imminent threat of atrazine in excess of the MCL, establishing standing will be difficult, if not impossible." *Id*.

In the present case, Defendant is entitled to summary judgment because the undisputed facts demonstrate that Marion has suffered no injury as a matter of law resulting from Defendant's conduct. Clearly, the atrazine levels in Marion's finished water do not present an imminent threat of an MCL violation. Additionally, the level of atrazine in Marion's raw water does not present a specific, imminent threat of an atrazine MCL violation because Marion never deemed it necessary to test its raw water for atrazine until joining this lawsuit, and all raw water testing for atrazine conducted since then has not exceeded 3 ppb according to Mr. Fredrickson. Contrary to *MTBE*, the levels of atrazine in Marion's water supply do not credibly threaten the MCL nor do they make injury likely to occur. Rather, both the KDHE testing results and the CCRs reveal that the four quarter running average for the level of atrazine in Marion's finished water is far below the atrazine MCL. Additionally, unlike in *MTBE*, Marion never has been forced to shut down operations due to the level of atrazine present in its raw or finished water. In fact, in April 1995, well before Marion ever filed this lawsuit, the KDHE allowed Marion to reduce its monitoring for atrazine from quarterly to annually, finding Marion's drinking water

"to be reliably and consistently below the MCL for atrazine."[10] And at no time since then has the atrazine level posed any credible threat that would even require more frequent monitoring requirements. Clearly, the KDHE would not have taken such action, and continued such action, if there were an imminent threat of atrazine in excess of the MCL in Marion's water supply.

Furthermore, Marion never has issued materials or warnings to its customers that its water was unsafe because of the potential human health effects of atrazine in its drinking water. (See Exhibit 2 at p. 72). Nor has Marion convened a council meeting or taken steps to advise its citizens of any potential health effects of atrazine. (See Exhibit 1 at p. 129, ll. 7–13). Moreover, none of the CCRs distributed by Marion identify atrazine as a threat to Marion's customers; instead, Marion has assured them, "The bottom line is that your drinking water is safe." (See generally Exhibit 5). Accordingly, there is no evidence that the level of atrazine present in Marion's water affects the quality of Marion's water supply or that the level of atrazine present below the MCL presents a risk of injury. Because the undisputed facts show that Marion's finished water samples consistently have fallen below the atrazine MCL and that the atrazine levels do not pose an imminent threat, Marion has not suffered any injury as a matter of law. Therefore, Defendant is entitled to summary judgment.

Injury is an "indispensable part" of Marion's claim, and Marion has failed to support its claimed injuries "with the manner and degree of evidence required" at the summary judgment stage. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The undisputed facts demonstrate that Marion has not suffered injury as a matter of law because it has not incurred any necessary costs in monitoring and removing atrazine from its water given that the atrazine levels in its water supply do not credibly threaten Marion with an atrazine MCL violation.

---

[10]Exhibit 4.

Because Marion has not sustained any injury, Defendant is entitled to judgment as a matter of law.

### B.     Marion Lacks Standing to Assert its Declaratory Judgment Claim

In addition, Defendant is entitled to summary judgment on Marion's declaratory judgment action (Count V) because Marion lacks standing to assert this claim. Primarily, Count V does not present an "actual controversy" because it improperly attempts to declare the rights of future potential litigants and is duplicative of Marion's trespass and nuisance claims. Marion does not have an atrazine issue, and whether Marion will have an atrazine issue in the future is both unlikely and speculative. Accordingly, Defendant hereby incorporates by reference the arguments raised in its pending motion to dismiss the declaratory claims in support of its motion for summary judgment on Marion's declaratory claim.  *See Benjamin v. Ill. Dep't of Fin. &Prof'l Regulation*, No. 09-5019, 2011 U.S. Dist. LEXIS 87269, at *24 (N.D. Ill. Aug. 8, 2011) (permitting the defendants to incorporate by reference a prior argument raised); *EBI Holdings, Inc. v. Butler*, No. 07-3259, 2009 U.S. Dist. LEXIS 11535, at *19-20 (C.D. Ill. Feb. 17, 2009) (allowing the defendant to incorporate by reference the arguments raised in the co-defendant's motion to dismiss). Clearly, Marion's declaratory judgment action raises no "actual controversy" as a matter of law. Therefore, the Court should grant Defendant's motion for summary judgment on Marion's declaratory claim.

## **CONCLUSION**

Based on the foregoing reasons and authorities, Defendants' Motion for Summary Judgment should be granted.

                                              Respectfully submitted,

**REEG LAWYERS, LLC**

/s/ Kurtis B. Reeg
Kurtis B. Reeg, ARDC # 3126350
1 North Brentwood Blvd. Suite 950
St. Louis, MO. 63105
Telephone:  (314) 446-3350
Facsimile:  (314) 446-3360
kreeg@reeglawfirm.com

ATTORNEYS FOR DEFENDANT
SYNGENTA CROP PROTECTION, LLC

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing has been filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, this 30th day of November, 2011 to:

Stephen M. Tillery, Esq.
Christie R. Deaton, Esq.
Korein Tillery, L.L.C.
U.S. Bank Plaza
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone:  (314) 241-4844
Facsimile:  (314) 241-3525

ATTORNEYS FOR PLAINTIFFS

with a copy sent via United States mail, properly addressed and postage paid, upon the following counsel:

Scott Summy, Esq.
Celeste Evangelisti, Esq.
Baron & Budd
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181

Patricia S. Murphy
Murphy Law Office
PO Box 220
Energy, IL 62933-0220
Telephone:  (618) 964-9640
Facsimile:  (618) 964-1275

ATTORNEYS FOR PLAINTIFFS

                                                /s/ Kurtis B. Reeg