**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CITY OF GREENVILLE, et al., individ-ually, and on behalf of all others similarly situated,** ) ) ) ) | |
| ) | **Case No.: 3:10-cv-00188-JPG-PMF** |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **SYNGENTA CROP PROTECTION, INC., and SYNGENTA AG,** ) ) | |
| ) | |
| **Defendants.** ) ) | |

---

**CLASS COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND EXPENSES FROM THE COMMON FUND**

---

The settlement at hand confers substantial relief upon the class; however, it came at immense risk and extreme cost in both time and money. Under such circumstances, counsel are entitled to a reasonable award of attorneys' fees and costs from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Seventh Circuit precedent requires such an award reflect "the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). In a case like this, "[w]here the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered." *Will v. General Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010). This is the fee amount to which plaintiffs' and their counsel agreed at the outset and one supported by all of the

available evidence. The Court should award class counsel a fee of one-third of the fund and reimburse their costs and expenses.

## ARGUMENT

### I.   Counsel is Entitled to the "Market Price" for Legal Services in Light of the Risk of Nonpayment and the Normal Rate of Compensation in the Market.

It is settled law in the Seventh Circuit that a lawyer's compensation is best determined by the market, even when it is awarded by a court. "It is not the function of judges in fee litigation to determine the equivalent of the medieval just price." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992). Instead, counsel is "entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *Id.* at 572; *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) ("what is reasonable is what an attorney would receive from a paying client in a similar case.").

The proper application of this rule is illustrated in the Seventh Circuit's treatment of two appeals in *In re Synthroid Marketing Litigation. In re Synthroid,* involved numerous, consolidated class actions against Knoll Pharmaceuticals for deceptively inducing physicians to prescribe Synthroid, when it knew less costly, equally effective treatments were available. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 714 (7th Cir. 2001). An early settlement of consumer claims was rejected by the district court, in part, because insurance companies were not parties to the case. *Id.* at 714-15. A group of third-party payors were then added to the case as class representatives. More than 100 of these third-party payors hired lawyers for a 25% contingent fee, while 18 others hired counsel for a 15% contingent fee. *Id.* at 719-20. The district court subsequently approved a settlement that provided $88 million to consumers and $46 million to third-party payors, in exchange for a release of all claims. *Id.* at 715.

Counsel for the consumer class sought a fee award of 29% of the fund, and the insurance

companies' lawyers sought 22%. *Id.* at 717. The district court held that recoveries of greater than $75 million constituted "megafunds," and that fees should not exceed 10% of a megafund. *Id.* at 718. On appeal, the Seventh Circuit reversed. It began by disapproving the district court's reliance on out-of-circuit decisions that were clearly contrary to binding, Seventh Circuit authority. *Id.* As the court explained, a megafund cap would result in lawyers earning more in fees for a smaller recovery; under such a rule, "no sane lawyer would negotiate a settlement of more than $74 million." *Id.* "Markets would not tolerate that effect." *Id.*

Instead, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id.* The court of appeals instructed the district court on remand to "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case." *Id.*

While recognizing that "it is impossible to be sure what would have happened earlier," *id.*, the court of appeals detailed three benchmarks available "to approximate the arrangements that would have prevailed at the outset." *Id.* at 722. "The first benchmark is [the] actual agreements" entered into by the third-party payors. *Id.* at 719. "Insurers are sophisticated purchasers of legal services and these contracts *define* the market." *Id.* at 720 (emphasis in original). Because the insurers in *Synthroid* only joined the litigation after a substantial settlement was on the table and their fee agreements required them to pay ongoing costs (unlike the consumer clients, for whom counsel advanced costs), their fee agreements were less reliable indicia of a market-based fee negotiated before anyone knows how the litigation will proceed. In order to more accurately recreate the fee arrangement likely to have been negotiated prior to filing suit, the Seventh Circuit directed the district court to also consider: the amount of privately negotiated fees in other large

common pool cases and the fee amounts established through class counsel auctions. *Id.* at 722.

On remand, the district court reasoned that "fixing the market rate for the legal services of the [third-party payors'] counsel is simple ... because attorneys and clients set it themselves through arms'-length negotiations." *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 976 (7th Cir. 2003) ("*Synthroid II*"). The court awarded the payors' counsel the average of the negotiated fee amounts, which was 22% of that class's recovery. *Id.* at 975-76. A group of payors then appealed that fee award as too large. *Id.* The Seventh Circuit affirmed. *Id.* at 980.

The court reasoned that the insurance companies are "sophisticated financial intermediaries with in-house counsel who can (and do) shop for legal services in a national market." *Id.* at 976. Many of the insurance companies had hired firms on a contingency basis, the average of which was 22%. *Id.* "As we remarked the last time around, the outcome of this competitive process among informed buyers and sellers *defines* the market rate for legal services, given the risks and investments of time that the lawyers expected to encounter in this case." *Id.* at 976 (emphasis in original). The court affirmed the district judge's adoption of the average amount of fees that were actually negotiated in a competitive market "as the measure of [the payors'] class counsel's compensation," because it was "exactly" the kind of methodology contemplated in *Synthroid I.* *Id.* at 976–77, 980.

**A.   The Legal Services Agreements in this Case Set the Market Rate at One-Third of the Recovery After Reimbursement of Costs and Expenses.**

Fixing the market rate in this case is as simple as it was in *Synthroid*. Like the insurance companies there, the named plaintiffs in this case are sophisticated clients with real stakes in the litigation. They negotiated the fee agreements at arm's length with their lawyers. As the Seventh Circuit asked rhetorically, "[w]hat could be a better gauge of the market than an actual transaction in it?" *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986). Because there is no better

guage, "[t]he first benchmark is actual agreements." *Synthroid I*, 264 F.3d at 719.

American Water is the largest publicly traded water and wastewater utility company in the United States. (Kerckhoff Decl., ECF No. 308-1 at ¶ 3). It provides drinking water, wastewater and other related services to an estimated 15 million people in more than 30 states, as well as parts of Canada. (*Id*.). When this case was filed, American Water estimated their potential damages to be millions of dollars. (*Id*. at ¶ 6). The other named plaintiffs are municipal corporations that also suffered significant damages from atrazine contamination of their water supplies. (Perica Decl., ECF No. 308-2 at ¶ 5); (Tillery Decl., ECF No. 308-4 at ¶ 17).

However, the outcome of litigation was extremely uncertain from the outset. Even before the first suit was filed, it was clear there would be many novel, difficult legal issues. (Kerckhoff Decl., ECF No. 308-1 at ¶ 7); (Tillery Decl., ECF No. 308-4 at ¶¶ 10-16). Because atrazine is widely used in farming and generates huge revenues for well-financed, national and international corporate defendants, it was obvious that the defense would raise a myriad of factual, scientific challenges to Plaintiffs' claims about the hazards of atrazine, requiring months if not years of intensive, time consuming legal work to prepare the cases for trial. Merely establishing atrazine's hazards, however, would be only part of the undertaking; Plaintiffs' core claim would require upending widely held views about the safe limits of atrazine in public drinking water supplies. Thus, this litigation would require hiring a team of experts, both consultants and testifiers, from a wide range of disciplines and fields of expertise, including state and federal regulatory issues, the health effects of atrazine in water supplies at very low levels, the economic cost to community water systems in removing atrazine from their finished water, and the movement of atrazine from each manufacturer to Plaintiffs' water supplies. (*Id.*). All of which meant that prosecuting these cases was going to be an extraordinarily expensive undertaking. (Summy Decl., ECF No. 308-5

at ¶ 13); (Kerckhoff  Decl., ECF No. 308-1 at ¶ 7); (Tillery Decl., ECF No. 308-4 at ¶ 16).

Like many municipalities, the plaintiff municipalities here simply lacked the resources neces-
sary in litigation of this scope to pay hourly legal fees and on-going litigation expenses, particu-
larly in light of the risk that they might never recoup those costs. (Perica Decl., ECF No. 308-2 at
¶ 7) (Summy Decl., ECF No. 308-5 at ¶ 15). Even though American Water was in a vastly dif-
ferent financial position, it too balanced that same risk of not recouping large hourly fee expendi-
tures and litigation expenses against the benefit of a contingency fee arrangement under which
counsel would advance costs. (Kerckhoff  Decl., ECF No. 308-1 at ¶¶ 9-10). That risk-benefit
analysis led all of the named plaintiffs to conclude that a contingency fee with litigation expenses
advanced by counsel was the most sensible arrangement for this litigation.

In addition, the plaintiffs recognized that litigation expenses had the potential to swallow the
their individual recoveries. This required that the matter be pursued on a class-wide basis. If a
class were certified, litigation expenses would be paid from any class recovery, and thus shared
on a pro-rata basis by all members of the class. This litigation strategy further narrowed the field
of potential litigation counsel, because it added to the complexity of the litigation and would re-
quire counsel with yet another skill-set: experience prosecuting large class actions.

In that same vein, due to the complexity and magnitude of the litigation, it was apparent that
Plaintiffs' counsel would have to meet a variety of criteria. The legal team would require sea-
soned trial lawyers and lawyers with expertise in environmental and class action litigation. The
combined requirements for litigation counsel immediately narrowed the field to only a few law
firms. The plaintiffs needed a firm that worked on a contingency basis and advanced litigation
costs, but the firm would also need to be able to afford to advance the extremely high costs that
were certain to be incurred in this litigation. Even among those firms meeting these criteria, not

all would be willing to undertake this particular litigation due to the risks. The already small field of firms able and willing to take on such financial risks is reduced further when relevant legal expertise and litigation experience are taken into account. Given all those factors, there were few law firms that could undertake such representation. (Kerckhoff Decl., ECF No. 308-1 at ¶ 10); (Crosby Decl., ECF No. 308-3 at ¶¶5-6) (Summy Decl., ECF No. 308-5 at ¶ 77); (Tillery Decl., ECF No. 308-4 at ¶¶ 8-9).

Korein Tillery and Baron & Budd are both firms with reputations for providing first-class representation to plaintiffs in high-risk, contingent fee litigation. (Kerckhoff Decl., ECF No. 308-1 at ¶ 11); (Tillery Decl., ECF No. 308-4 at ¶¶ 8-9); (Summy Decl., ECF No. 308-5 at ¶¶ 6-11); (Crosby Decl., ECF No. 308-3 at ¶¶ 5-6). At the time the plaintiffs' fee agreements were negotiated, both firms had years of experience litigating complex litigation, including class actions and environmental cases. (Summy Decl., ECF No. 308-5 at ¶¶ 8-9); (Tillery Decl., ECF No. 308-4 at ¶¶ 8-9). Both firms also had the resources necessary to prosecute actions of this magnitude, and just as importantly, the willingness to commit those resources to litigation like this. (Tillery Decl., ECF No. 308-4 at ¶¶ 8, 17). (Summy Decl., ECF No. 308-5 at ¶¶ 74-77).

In light of these complexities and economic limitations, all of the legal services agreements that the named plaintiffs entered into with Korein Tillery and Baron & Budd provide for attorneys' fees of one-third of any recovery. (*See* Sealed Exhibits to Tillery Decl., ECF No. 309). In addition, all of the agreements require Korein Tillery and Baron & Budd to advance all litigation expenses, for which the firms are to be reimbursed out of any recovery. (*Id.*). The municipalities' agreements and the American Water agreements, however, differ in one respect. Under the municipalities' agreements, the one-third fee amount is to be based on total recovery, before deducting the amount of advanced litigation expenses for which counsel is entitled to be reimbursed.

American Water negotiated for its subsidiaries a more advantageous fee formula based on *net* recovery (*i.e.*, the one-third fee is calculated after the total recovery is first reduced by the amount of the reimbursement to counsel for advanced expenses). (Kerckhoff Decl., ECF No. 308-1 at ¶ 13); (Summy Decl., ECF No. 308-5 at ¶ 72). Given the anticipated costs, this change would likely reduce the amount of any fee by millions of dollars. (Kerckhoff Decl., ECF No. 308-1 at ¶ 14).[1]

The terms of these agreements was reviewed by American Water's counsel prior to the agreements' execution. (Kerckhoff Decl., ECF No. 308-1 at ¶ 14). Likewise, the municipality plaintiffs were represented in these negotiations through counsel and the resulting contracts were approved and adopted by the municipalities' governing bodies. (Crosby Decl., ECF No. 308-3 at ¶ 7); (Perica Decl., ECF No. 308-2 at ¶ 12).

American Water, which reported operating revenues of more than $2.5 billion and net income in excess of $300 million for 2011[2], concluded a one-third contingency fee with advanced costs was in its subsidiaries' best financial interests in this litigation. (Kerckhoff Decl., ECF No. 308-1 at ¶¶ 9-12). So did all sixteen municipal plaintiffs. Given those arm's-length evaluations and in light of the magnitude of the risks and undertaking, it is unlikely Plaintiffs would have been able to secure legal representation of comparable skill and experience on substantially better terms. (Summy Decl., ECF No. 308-5 at ¶ 77); (Crosby Decl., ECF No. 308-3 at ¶ 8).

These contracts *define* the market. *In re Synthroid Mktg. Litig.*, 325 F.3d at 976. A contingent fee of one-third of net recovery was the fee agreed to by sophisticated clients with substantial stakes in the litigation, negotiated at arm's length through separate counsel. This is "[t]he best

---

[1] In fact, given the immense costs of this case, this change lowers the effective fee request to 30.67% of the total fund.

[2] American Water Works Company, Inc.  2011 Annual Report.

evidence of the value of the lawyer's services." *Assessment Techs. of WI, L.L.C. v. WIREdata, Inc.*, 361 F.3d 434, 438-39 (7th Cir. 2004). For these reasons, this Court should adopt American Water's contingent fee agreement as the appropriate measure of class counsel's compensation. *In re Synthroid Mktg. Litig.*, 325 F.3d at 976.

**B. The Legal Services Agreements in Other Contingent Environmental Contamination Litigation Confirm a Market Rate at One-Third of the Recovery After Reimbursement of Costs and Expenses.**

Even if the Court were to independently "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers," *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), the result would be the same. All of the evidence the Seventh Circuit has endorsed for such a simulation points to the same conclusion: a contingent fee of one-third of any recovery after the reimbursement of costs and expenses reflects the market price for legal services for a case of similar risk.

When a direct market determination is infeasible because no member of the class has a sufficient stake to bargain for the lawyer's services, Seventh Circuit precedent requires the Court to attempt to simulate it by, among other things, obtaining evidence about the terms of retention in similar suits where the market fixes the terms. *In re Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572-73 (7th Cir. 1992).

Baron & Budd is one of the leading law firms in the country handling litigation resulting from environmental contamination of public water supplies. (Summy Decl., ECF No. 308-5 at ¶¶ 6-11). Baron & Budd's customary fee in those cases is one-third of any recovery. Mr. Summy has represented hundreds of water providers in contamination cases, and those "sophisticated" clients customarily agree to one-third contingency fees. (*Id.* at ¶ 17).

Occasionally these contracts have required court-approval, and when they have, courts have found them to be reasonable for litigation of this type. For example, Judge Shira Scheindlin of

the Southern District of New York approved Baron & Budd's Legal Service Agreement with the State of New Mexico in a complex water contamination case. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 04-cv-1726 (S.D.N.Y. Sept. 18, 2008) (one-third contingent fee was "reasonable in light of the experience, reputation and ability" of counsel, "the time and labor required," "the skill required to pursue the litigation," and the risk assumed).

The New Mexico contract, the Plaintiffs' contracts in this litigation, and the contracts executed by hundreds of individual clients who have retained Baron & Budd to pursue recovery for contamination of their water supplies are substantially identical examples of Baron & Budd's standard retention agreement that provides for payment of attorneys' fees equal to one-third of any recovery before reimbursement of costs and expenses. (*Id.* at ¶¶ 17-18). "When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'" *Kirchoff*, 786 F.2d at 324. "The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d at 572. Hundreds of sophisticated purchasers of legal services have all agreed to retain Baron & Budd to pursue similar actions for the same contingent fee arrangement. (*Id.*). These contracts "define" the market and confirm that a one-third contingency fee in this kind of litigation is a market driven price.

## C. Court Awarded Attorneys' Fees in the Seventh Circuit for Other Complex Litigation Confirms a Market Rate of One-Third of the Recovery After Reimbursement of Costs and Expenses.

A third benchmark for gauging the market price for fee awards is the amount of court-awarded attorneys' fees in comparable cases. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005). In *Taubenfeld*, objectors appealed a 30% fee award, arguing that because it was based solely on evidence of awards in other cases, it failed to "re-create" the market as required by *In*

*re Synthroid*.  *Id.* at 598-99. The Seventh Circuit affirmed the award reiterating that "courts must do their best to recreate the market by considering facts such a actual fee contracts that were privately negotiated for similar litigation, information from other cases and data from class counsel auctions." *Id.* at 599. The Court also approved the district court's consideration of a table of thirteen cases in the Northern District of Illinois where fee awards were 30-39%. *Id.* at 600 ("indicative of a rational relationship" between those awards and the fee awarded in *Tauben*).

Since *Taubenfeld*, courts throughout the Seventh Circuit routinely consider the fee awards in other class actions and conclude that a one-third contingency fee is standard. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 380 (N.D. Ill. 2011) ("The fee request in this case equals just under 32.7% of the cash common fund created under the settlement. Such a figure is widely recognized as a reasonable percentage"); *Will v. Gen. Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010) ("Where the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered."); *Mansfield v. Air Line Pilots Ass'n Int'l*, No. 06-C-6869, ECF No. 373, at * 9 (N.D. Ill. Dec. 14, 2009) ("a fee award of 35% of the aggregate settlement fund is consistent with awards in similarly complex cases in this and other jurisdictions and accurately reflects the market rate for class counsel's services..."); *Meyenburg v. Exxon Mobil Corp.,* No. 05-cv-15-DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"); *Teamsters Local Union No. 604 v. Inter–Rail Transp., Inc.,* No. 02-cv-1109-DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-three and one-third (33 1/3%) in a class action in [sic] not uncom-

mon").

In fact, updating the table submitted in *Taubenfield*[3] nearly triples the number of fee awards

in the Seventh Circuit of 30% or greater of the settlement fund.

## Attorneys' Fee Awards Greater than 30% of the Common Fund

| Case Name | Fee % |
|---|---|
| *Campbell v. Advantage Sales & Mktg. L.L.C.*, 2012 WL 1424417 (S.D. Ind. Apr. 24, 2012) | 33⅓% |
| *Downes v. Wis. Energy Corp. Ret. Account Plan*, 2012 WL 1410023 (E.D. Wis. Apr. 20, 2012) | 30% |
| *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) | 33⅓% |
| *In re Ky. Grilled Chicken Coupon Mktg. & Sales Prac. Litig.*, 280 F.R.D. 364 (N.D. Ill. 2011) | 32.7% |
| *Pavlik v. FDIC*, 2011 WL 5184445 (N.D. Ill. Nov. 1, 2011) | 33⅓% |
| *Will v. Gen. Dynamics Corp.*, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) | 33⅓% |
| *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990 (N.D. Ind. 2010) | 33⅓% |
| *Harzewski v. Guidant Corp.*, 1:05-cv-01009-LJM-TAB (S.D. Ind. Sept. 10 2010) | 38% |
| *Goodell v. Charter Commc'ns, L.L.C.*, 2010 WL 3259349 (W.D. Wis. Aug. 17, 2010) | 30% |
| *In re Ready-Mixed Concrete Antitrust Litig.*, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) | 33⅓% |
| *Kitson v. Bank of Edwardsville*, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) | 33⅓% |
| *Mansfield v. Air Line Pilots Ass'n*, No. 06-C-6869 (N.D. Ill. Dec. 14, 2009) | 35% |
| *McKinnie v. JP Morgan Chase Bank*, 678 F. Supp. 2d 806 (E.D. Wis. 2009) | 30% |
| *Kelly v. Bluegreen Corp.*, No. 08-cv-401 (W.D. Wis. Oct. 30, 2009) | 33% |
| *Perry v. Nat'l City Bank*, No. 05-cv-891 (S.D. Ill. Mar. 3, 2008) | 33% |
| *Taubenfeld v. Aon Corp.*, No. 02-cv-5631 (N.D. Ill. July 27 2004) | 30% |
| *Alexander v. Phoenix Bond & Indem. Co.*, No. 98-3234 (N.D. Ill. Oct. 20, 2003) | 39.5% |
| *Great Neck Cap. Appreciation Inv. P'Ship, L.P. v. Pricewaterhousecoopers*, 212 F.R.D. 400 (E.D. Wis. 2002) | 30% |
| *Retsky Family Ltd. v. Price Waterhouse L.L.P.*, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) | 33⅓% |
| *In re Mercury Fin. Co.,* No. 97-cv-3035 (N.D. Ill. July 6, 2001 and July 26 2000) | 33⅓% |
| *Gilbert v. First Alert*, 1998 U.S. Dist. LEXIS 3640 (N.D. Ill. Mar. 19, 1998) | 30% |
| *In re Nuveen Fund Litig.,* No. 94-cv-360 (N.D. Ill. June 3 1997) | 33⅓% |
| *Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. Sept. 30, 1996), *aff'd* 160 F.3d 361 (7th Cir. 1998) | 38% |

---

[3] Taubenfeld's original chart can be found in his Mem in Supp. of Pltf's Counsel's App. for an Award of Attorneys' Fees and Reimbursement of Expenses, No. 02CV5631, 2004 WL 2256446 (N.D. Ill. July 22, 2004).

| Case Name | Fee % |
|---|---|
| *In re Soybean Futures Litig.*, No. 89-cv-7009 (N.D. Ill. Nov. 27 1996) | 33⅓% |
| *Goldsmith v. Tech. Solutions Co.*, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) | 33⅓% |
| *Feldman v. Motorola*, Inc., No. 90-cv-5887 (N.D. Ill. June 28, 1995) | 30% |
| *In re Caremark Int'l Sec. Litig.*, No. 94-cv-4751 (N.D. Ill. Dec. 15 1997) | 33⅓% |
| *Liebhard v. Square D Co.*, No. 91-cv-1103 (N.D. Ill. June 6, 1993) | 33⅓% |
| *Long v. Trans World Airlines*, 1993 U.S. Dist. LEXIS 5063 (N.D. Ill. Apr. 15, 1993) | 32% |
| *Wanninger v. SPNV Holdings*, No. 85-cv-2081 (N.D. Ill. May 10, 1993) | 32% |
| *Hammond v. Hendrickson*, No. 85-cv-9829 (N.D. Ill. Nov. 20 1992) | 33⅓% |

These thirty-one awards range from 30% to 39.5%, with a mean of 33% and a median and mode of 33 ⅓%. These awards confirm the findings of district courts throughout this Circuit that "the normal rate of compensation in the market" is "33.33% of the common fund recovered." *Will v. Gen. Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010). One-third of the recovery is also the appropriate attorneys' fee award in this matter.

### D. An Award Equal to One-Third of the Fund is Also Reasonable Under A Lodestar Analysis.

The Seventh Circuit has never endorsed or required a lodestar cross-check. "[I]f substantially similar results must be reached under the lodestar and percentages approaches, then *Harman* might as well have eliminated the lodestar altogether." *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998). On numerous occasions, the Seventh Circuit has reiterated that it is not a district court's role to decide what is "fair" or "excessive" "based on nothing more than a subjective judgment regarding Counsel's work." *Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (internal quotations omitted). A lodestar cross-check interjects just such subjective judgments into the analysis. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) ("this determination is inevitably somewhat subjective").

This may explain why a lodestar cross-check was not performed in the majority of common fund awards in this Circuit. *Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and*

*Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 269 (2010). Of the forty-one fee awards in the Seventh Circuit between1993 and 2008, four were determined using the lodestar method; seven using a percentage-of-the-fund with a lodestar cross-check; and twenty-five using the percentage-of-the-fund alone. *Id.* Table 11. In other words, of the thirty-two fee awards calculated using a percentage-of-the-fund, 78% were calculated without a cross-check. *Id*.

Nevertheless, a fee award in this case equal to one-third of the common fund is also justified under the lodestar method. To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-37 (1983)). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, L.L.C. v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *See also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003).

The attorneys of Korein Tillery, LLC and Baron & Budd, P.C. served as lead counsel for all of the Plaintiffs in this litigation but the plaintiffs were represented by six other firms as well. These six law firms dedicated thousands of attorney hours and millions of dollars over eight years to pursue this action with no guarantee of ever recovering their investment. Korein Tillery has expended in excess of 46,600 hours prosecuting this case. (Tillery Decl., ECF No. 308-4 at Exhibit B). Baron & Budd has expended in excess of 36,700 hours. (Summy Decl., ECF No. 308-5, at Exhibit A). While Class counsel almost exclusively represents plaintiffs on a contingent basis, occasionally Korein Tillery is retained on a hybrid or hourly basis. Recently, Korein Tillery was engaged by a national institution on an hourly basis. In that engagement, the client

has agreed to compensate Korein Tillery partners at rates between $425 and $750 per hour, Korein Tillery associates at a rate between $250 and $350 per hour, and Korein Tillery paralegals at a rate between $100 and $175 per hour. Using these billing rates, Class Counsel's lodestar in this matter exceeds $24,000,000. (*See* Tillery Decl. ECF No. 308-4 at Exhibit B; Summy Decl. ECF No. 308-5 at Exhibit A).

But this lodestar rate is only the first step in determining a reasonable fee under the lodestar method. In cases like this one, where counsel "had no sure source of compensation for their services," the Court must apply a risk multiplier to compensate the attorneys for the risk of non-payment in the event the litigation were unsuccessful. *Florin*, 34 F.3d at 565. In this litigation, class counsel assumed such a risk, and given the high litigation costs and protracted nature of the litigation, that risk was a very substantial one.

To determine the appropriate multiplier, a district court must attempt "a retroactive calculation of the probability of success as measured at the beginning of litigation." *Cook*, 142 F.3d at 1013. The multiplier is determined by dividing 1 by the probability of success. *Florin v. Nationsbank of Ga., N.A.*, 60 F.3d 1245, 1248 n.3 (7th Cir. 1995). "Multipliers anywhere between one and four, have been approved." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (citation omitted). The 2010 Eisenberg-Miller's study found that between 1993 and 2008, the mean multiplier in the Seventh Circuit was 1.85. *Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010).

Given the extreme difficulty presented by this matter and the attendant risk in investing years of attorney time carrying millions in litigation expenses with no guarantee of recovery, a substantial risk multiplier is warranted. However, the fee sought by counsel is justified under this

method with a multiplier of only 1.34. This multiplier would correlate to a risk of loss of only

26%. But a successful outcome of this case was far from that certain. A fee award of one-third of

the fund is thus appropriate whether calculated as a percentage of the fund or as a lodestar.

**II.      Counsel's Advanced Costs and Expenses Should be Reimbursed as they are the
Type the Paying, Arms' Length Market Reimburses.**

The Court should also approve reimbursement of the litigation expenses Counsel advanced in

the prosecution of these cases. As a leading treatise states:

> An attorney who creates or preserves a common fund by judgment
> or settlement for the benefit of a class is entitled to receive reim-
> bursement of reasonable fees and expenses involved. The equitable
> principle that all reasonable expenses incurred in the creation of a
> fund for the benefit of a class are reimbursable proportionately by
> those who accept benefits from the fund authorizes reimbursement
> of full reasonable litigation expenses as costs of the suit in contrast
> to the more narrowly defined rules of taxable costs of suit under
> Fed. R Civ. P. 54 (d).... The prevailing view is that expenses are
> awarded in addition to the fee percentage.

Alba Conte, *1 Attorney Fee Awards* § 2:19 (3d ed.). *See also Sprague v. Ticonic*, 307 U.S. 161,

166-67 (1939) (recognizing a federal court's equity power to award costs from a common fund);

*Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) ("In accordance with the

well-established common fund exception to the American Rule, …class counsel…are entitled to

an award of their…expenses out of the fund that has been created for the class by their efforts");

*In re Ins. Brokerage Antitrust Litig.,* MDL 1663, 2012 WL 1071240 (D.N.J. Mar. 30, 2012)

("Counsel for a class action is entitled to reimbursement of expenses that were adequately docu-

mented and reasonably and appropriately incurred in the prosecution of the class action." ).

The Seventh Circuit's view of cost reimbursement mirrors its view of attorneys' fees. "Par-

ties should submit information on what expenses private clients in large class actions (auctions

and otherwise) pay." *In re Synthroid Mktg. Litig.*, 264 F.3d at 722. *See also Harris v. Marhoefer*,

24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those

16

out-of-pocket expenses that 'would normally be charged to a fee paying client.'").

"Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge things costs too high in general is not." *In re Synthroid Mktg. Litig.*, 264 F.3d at 722. "Likewise, the amount of itemization and detail required is a question for the market. If counsel submits bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Id.*

According to Conte, reimbursable expenses include many litigation expenses beyond those narrowly defined "costs" recoverable from an opposing party under Rule 54(d), such as:  expert fees; travel; long-distance and conference telephone; postage;  delivery services; and computer-ized legal research. Conte, *supra*, § 2:19. *See also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred-which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review are the type for which "the paying, arms' length market" reimburses attorneys. For this reason, they are properly chargeable to the Settlement."); *Anwar v. Fairfield Greenwich Ltd.*, No. 11-CV-813 VM, 2012 WL 1981505 (S.D.N.Y. June 1, 2012) ("Plaintiffs' Counsel seek re-imbursement for expenses such as mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type 'the paying, arms' length market' reimburses attorneys.").

Counsel brought this case without guarantee of reimbursement or recovery, so they had a strong incentive to keep costs to a reasonable level, and they did so.  However, given the com-plexity of this case, the costs incurred were substantial. As of the date of this filing, Korein Tillery has paid $4,031,942.12 in costs and expenses. Baron & Budd has paid $4,355,834.03 in costs and expenses.

Many of these costs were incurred as a result of the extensive document discovery. There were thirty-two named Plaintiffs that were subject to discovery in this case that owned and operated more than fifty community water systems in six states and possessed the number between few hundred to tens of thousands responsive documents. From these named Plaintiffs, Plaintiffs' counsel reviewed and produced more than 640,000 documents totaling more than 3.8 million pages.

This process required visiting each client's physical facilities to locate documents kept in offices, files, and other document storage areas as well as becoming familiar with the client's electronic document files and maintenance procedures. During these visits, attorneys and staff reviewed, collected, and copied physical documents and electronic media. Because these clients are located throughout the Midwest, attorneys and staff traveled to locations where they stayed for days at a time to complete each collection.

Likewise, Defendants produced more 8 million pages of production and third-parties produced 1.39 million more. Depositions of Defendants' employees took place in Brussels, Belgium; Chicago, Illinois; Greensboro, North Carolina and New Orleans, Louisiana. Accordingly, the costs associated with document copies, processing and review and travel were significant and account for more than $2,599,00.00.

Another source of a significant portion of the expense came from expert consultants. Plaintiffs retained numerous experts who are leaders in their field who were prepared to testify concerning a variety of scientific and technical matters, including the health effects of atrazine in water supplies at very low levels, the economic cost to community water systems in removing atrazine from their finished water, and the movement of atrazine from each manufacturer to Plaintiffs' water supplies. The resulting fees exceeded $4,200,000.00

Although these costs are significant, they are in line with what would be expected in a typical environmental case of this size. An empirical study of the costs awarded in class action litigation found that the average cost award was equal to 4% of the relief obtained for the class. *See* Theodore Eisenberg and Geoffery P. Miller, *Attorney Fees in Class Action Settlements: an Empirical Study*, 1 Journal of Empirical Legal Studies 27, 70 (2004). However, for environmental cases, costs were significantly higher with an average of 6.8% of the recovery and a standard deviation of 8. *Id.* at 71, Table 6. This study suggests that "requests falling within one standard deviation above or below the mean should be viewed as generally reasonable." *Id.* at 74. The total amount of costs here, although substantial, is equal to just 8 percent of the total recovery; well within the range to be considered "generally reasonable."

A description of these costs and expenses, broken down by category, is contained in Exhibit C to the Tillery Declaration and Exhibit B to the Summy Declaration.  The costs and expenses are the types of costs and expenses that are routinely reimbursed by paying clients, such as experts' fees, other consulting fees, deposition expenses, travel, and photocopying costs. (Kerckhoff  Decl., ECF No. 308-1 at ¶ 15). In light of the length and complexity of this litigation, Counsel's request for reimbursement of costs and expenses should be approved as fair and reasonable.

## CONCLUSION

For all of the reasons stated above, Class Counsel prays that the Court award them reimbursement of their costs and expenses and attorney's fee of one-third of the remaining fund.

Dated:  July 31, 2012                      Respectfully submitted,

**KOREIN TILLERY**


By: s/ Aaron M. Zigler
Stephen M. Tillery

Christine J. Moody
Aaron M. Zigler
Christie R. Deaton
Christopher A. Hoffman
Michael E. Klenov
John C. Craig
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, Missouri  63101-1625
Telephone:     (314) 241-4844
Facsimile:      (314) 241-3525

***Attorneys for Plaintiffs***

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

CITY OF GREENVILLE, et al., individ-         )
ually, and on behalf of all others similarly )
situated,                                    )
                                             )
      **Plaintiffs,**                      )    **Case No.: 3:10-cv-00188-JPG-PMF**
                                             )
vs.                                          )
                                             )
SYNGENTA CROP PROTECTION,                    )
INC., and SYNGENTA AG,                       )
                                             )
      **Defendants.**                      )

---

## CERTIFICATE OF SERVICE

---

     I hereby certify that on July 31, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

- Aaron M. Zigler
- Albert Ettinger
- Brian A Fogerty
- C. Raymond Bell
- Carla Burke
- Celeste Evangelisti
- Charles Adam Cerise
- Christie R. Deaton
- Christine J. Moody
- Christopher A. Hoffman

- Christopher MacNeil Murphy
- David M. Stein
- Elizabeth A. Laughlin
- Holland Marie Tahvonen
- Howard A. Learner
- Jocelyn D. Francoeur
- John C. Craig
- Kurtis B. Reeg
- Lara E. White

- Mark C. Surprenant
- Michael A. Pope
- Michael E. Klenov
- Mitchell E. McCrea
- Patricia S. Murphy
- Peter M. Schutzel
- Scott Summy
- Stephen M. Tillery
- Todd R. Wiener

**KOREIN TILLERY**

/s Aaron M. Zigler
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, Missouri  63101-1625
Telephone:    (314) 241-4844
Facsimile:    (314) 241-3525
azigler@koreintillery.com