## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CITY OF GREENVILLE, et al., individually, and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>SYNGENTA CROP PROTECTION, INC., and SYNGENTA AG,<br><br>       Defendants. | **Case No.: 3:10-cv-00188-JPG-PMF** |

---

## MOTION FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). However, a district court may approve a class settlement only if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The settlement here easily meets that standard.

## BACKGROUND

Atrazine is an herbicide used to control broadleaf and grassy weeds in a variety of crops, but is applied primarily to corn fields. (Compl., ECF No. 229 at ¶¶ 28-29). A Syngenta legacy company discovered and synthesized atrazine in the early 1950s, and brought it to the U.S. market in 1959. (*Id*. at ¶ 31). Since then, atrazine has been one of the most widely used herbicides in the U.S. (*Id*. at ¶ 29). Syngenta is the largest manufacturer and distributor of atrazine and atrazine-containing products in the U.S. (*Id*. at ¶ 31).

A.  **Procedural History**

Although this particular case was filed in 2010, the litigation between Class Members and Syngenta dates back to July 2, 2004, when Holiday Shores Sanitary District filed six separate lawsuits against manufacturers and distributors of atrazine and atrazine-containing products in the Illinois Circuit Court in Madison County. (Tillery Decl., ECF No. 308-4 at ¶¶ 18-19). In 2009, seven more public water systems joined the *Holiday Shores* case. Like Holiday Shores, these Plaintiffs were community water systems who had spent significant sums removing atrazine from their water before serving it to their customers. (*Id*. at ¶ 20). On March 8, 2010, seventeen public water systems from six states filed the *Greenville* case against Syngenta Crop Protection, Inc. and its Swiss parent Syngenta AG. (*Id*. at ¶ 21). On March 23, 2010, Plaintiffs amended their complaint to add seven additional Plaintiffs, including five subsidiaries of American Water, one of the largest suppliers of potable water in North America. (*Id*.). Currently, there are 30 public or private water providers who are Plaintiffs in these cases. (*Id*. at ¶ 22). These Plaintiffs own and operate more than 50 community water systems impacted by atrazine and provide drinking water to more than 2.3 million customers. (*Id*.).

Plaintiffs allege that atrazine continuously enters their water supplies, injuring their property rights. (Compl., ECF No. 229 at ¶¶ 52). Plaintiffs claim that, as a result of this contamination, they have to test and monitor their water supplies for atrazine, as well as to install, operate, and maintain systems to filter atrazine from their water supplies. (*Id*. at ¶ 54).

This litigation has been extremely hard-fought, burdensome and expensive. The parties collected, reviewed, and produced more than 10 million pages of discovery. (Tillery Decl., ECF No. 308-4 at ¶¶ 54-96). The parties also were subject to significant disruption of their business, including the depositions of dozens of employees. (*Id*. at ¶¶ 93, 100). In addition, the parties in-

curred substantial costs through the retention of numerous expert consultants and the preparation of expert reports. (*Id.* at ¶¶ 101-102, pp. 112-113).

The *Holiday Shores* and *Greenville* cases survived multiple motions to dismiss on grounds ranging from preemption to violation of the U.S. Constitution and from lack of standing to pursue a claim, to technical failures in stating those claims under state law. (*Id.* at ¶ 25). Additionally, *Holiday Shores* survived United Agri Products, Inc.'s motion to dismiss for lack of jurisdiction. (*Id.*). In *Greenville,* Plaintiffs successfully defeated motions to dismiss filed by Syngenta AG and Syngenta Crop Protection, Inc. (*Id.*). There have been five interlocutory appeals filed during this litigation, including two petitions for leave to appeal in the Illinois Supreme Court. (*Id.* at ¶ 26).

### B.  Key Terms of the Settlement

The proposed settlement would put an end to the expense, inconvenience and distraction of further litigation while providing significant monetary relief to the Class. In exchange for $105 million, Plaintiffs release claims related to the presence of atrazine in their water. (Settlement Agreement, ECF No. 294-1). All of the fund, after fees and costs, will be distributed to the Class. (*Id.* at ¶ 8.4.2.). No part of the settlement fund reverts to the defendant. (*Id.*).

The release is narrowly tailored. The settlement does not interfere with the jurisdiction of any regulatory agency, and it preserves any claims arising from future point-source contamination or off-label use, and claims that otherwise could not have been brought in this litigation by a Community Water System. (*Id.* at ¶ 9.1). In other words, no water consumers' claims are released.[1] The settlement also takes care to ensure effective notice to the Class and a claims process that was designed to encourage full participation in the settlement. (Simmons Decl., ECF No. 294-2).

---

[1] One class member, Citizens Water of Indianapolis, sought confirmation of the narrow contours of the release. (Letter, ECF No. 321-7).  Plaintiffs ask the Court to ensure that its final order provides the specificity necessary to assure class members that the only claims released are those that could have been asserted in this litigation.

The class consists of at least 1,930 Community Water Systems that have detected atrazine in their water supplies. (Craig Decl., ECF No. 312-1 at ¶ 12, 15).These systems range in size from very small to very large, but every Class Member has found atrazine in its. (*Id*. at ¶ 9). Some systems find atrazine in their water sources year-round. (*Id*.). Others have detected atrazine only in the spring and summer months. (*Id*.). Still others have detected atrazine only in the past. (*Id*.).

Regardless of the amount, however, systems that experience any atrazine contamination face costs associated with testing and treatment. (Buchheit Decl., ECF No. 312-2 at ¶ 16). Testing costs are generally fixed, but the cost of removing atrazine increases as the concentration of atrazine and the amount of water treated increases. (*Id*. at ¶ 37). Accordingly, the settlement allocates payment based on objective and independently-verifiable data and a formula that awards each claimant a fixed amount devised to offset testing costs and apportions the remainder according to the levels of atrazine that have been found in each system's water, the frequency at which atrazine has been found in each system's water, and the relative cost of removing it for a system of that size. (*Id*. at ¶ 38).

The settlement formula thus awards each claimant $5,000, which is equal to the approximate cost of 20 water tests, and the remaining fund is allocated among the claimants based on: (1) the levels of atrazine in their water; (2) how often atrazine has been found in their water; (3) how long ago atrazine was found in their water; and (4) the size of the populations they serve. (*Id*. at ¶ 40). Generally, if a system processed more water or frequently had high concentrations of atrazine, it is eligible for more money; if it processed less water or its atrazine experience was sporadic or limited, it will get less money.

To facilitate the claims process, Class Counsel collected 20 years of atrazine testing data into a database that was made available to each Class Member through the settlement website. (Reid

Decl., ECF No. 321-3 at ¶ 6). From there, Claimants were able to view the test data already collected for their system and provide additional evidence of atrazine contamination to increase their share of the settlement fund. (*Id*. at ¶ 7). Under the terms of the settlement, all $105 million, less court-approved fees and costs, will be distributed to Class Members. (Settlement Agreement, ECF No. 294-1 at ¶ 8.4.2.).

## C.  Notice

In accordance with the court-approved, expert-designed Notice Plan, on June 11, 2012, the Settlement Administrator mailed Summary Notice to the last known address of all Class Members who could be identified. (Reid Decl., ECF No. 321-3 at ¶¶ 3-4). A Summary Notice was also published in the July issues of American Water Works Association Magazine, Public Works Magazine, and American City and County Magazine. (*Id*. at ¶ 5). The settlement administrator established a website and a toll-free number to notify Class Members of the settlement, address common questions about the settlement, and provide updates on the settlement process. (*Id*. at ¶¶ 6, 9). The settlement website included a more-detailed Notice providing additional information about the settlement. (*Id*. at ¶ 6).

Furthermore, on June 4, 2012, Defendant's counsel served Notice of the settlement on the U.S. Attorney General, and the Attorney Generals and Department of Agriculture for each individual state. (Schutzel Aff., ECF No. 321-4 at ¶¶ 4-5). As the Court previously found, this Notice Plan satisfies due process.

Class Counsel also undertook a multi-pronged supplemental notice campaign. Class Counsel sent a *second* individual notice by first-class letter on August 2, 2012, to each of the known Class Members who had not yet filed a claim. (Deaton Decl., ECF No. 321-5 at ¶ 5). The next day, Class Counsel sent a *third* individual notice by email to each of the 765 known Class Members

for which a valid email address could be identified. (*Id.*). In addition, from August 2 to August 28, 2012, ten of the lawyers representing the plaintiffs in this matter placed personal phone calls to class members.  (*Id.* at ¶ 6). These calls were either with attorneys serving as counsel to the class member or a member of management. (*Id.*). Over the course of four weeks, these lawyers were able to personally reach more than 99 percent of the non-Plaintiff class members with estimated claims greater than $10,000 that had yet to file claims. (*Id.*). The attorneys explained the settlement terms, answered questions, and made themselves personally available to assist in the claims process.  (*Id.*). Finally, on August 13, 2012, Class Counsel sent a fourth notice letter to Class Members who were identified as having not yet filed a claim or having received a personal phone call. (*Id.* at ¶ 7).

### D.  Claims Experience

The Notice provided here was successful. The claims administrator logged 557 calls to the toll-free information line, and the settlement website received a total of 10,313 visitors who viewed a total of 25,627 web pages. (Reid Decl., ECF No. 321-3 at ¶¶ 8-9).  More importantly, however, the unusually high claim rate confirms the effectiveness of notice in this case. Although many class actions experience claims rates of less than 15%, in this case, more than half (54% (1,017/1,885)) of all class members identified before the claims period began have filed claims. (*Id.* at ¶¶ 11-14). Based on preliminary estimates of the amount each class member would receive, these claims account for 85.7% of the total net settlement proceeds. (Craig Decl., ECF No. 321-1 at ¶13). As would be expected, systems with the most atrazine contamination, and therefore the largest claims, filed claims at an even higher rate. Almost 83% (478/578) of class members with preliminary estimates greater than or equal to $10,000 have filed claims, accounting for more than 91% of the funds preliminarily allocated to this group. (*Id.* at ¶ 14). In

contrast, only twenty-three class members with claims totaling $ 549,606.55, or 0.523% of the total settlement proceeds, have opted out. (*Id*. at ¶15).

Class Counsel also took all available steps to insure that every claim is valid and that every valid claim is paid in full. Following the close of the claim period, Counsel notified each known Class Member for which a claim was not received of the expiration of the deadline to ensure no claims were lost in transit. (Deaton Decl., ECF No. 321-5 at ¶ 8). This letter represented the fifth direct mail notice of this lawsuit. This audit process identified several claims that were not received. Counsel assisted these claimants in re-filing their claims and each was accepted. (*Id*.).

Counsel also audited the claims that were received. Each claimant's information was reviewed to ensure that the system met the class definition. (Deaton Decl., 321-5 at ¶¶ 11-14; Craig Decl., ECF No. 321-1 at ¶¶ 17-18). This audit revealed nine claims filed by non-class members, and one unauthorized claim, that were disregarded. (Reid Decl., ECF No. 321-3 at ¶¶ 12-14). Counsel then reviewed the submitted test data for accuracy. (Craig Decl., ECF No. 321-1 at ¶19). This review revealed 5,449 test records that were inaccurately reported or that were taken from a source other than the Class Member's Water. (*Id*. at ¶ 20). These test records were disregarded. (*Id*.). This data was run against the allocation formula and compared to Class Counsel's pre-notice estimate to identify any unexpected results. (*Id*.). This process identified an additional 168 invalid test results, which were also disregarded. (*Id*.).

Finally, the validated data was run against the allocation formula. (Reid Decl., ECF No. 321-3 at ¶ 16). As can be seen by the attached compilation of claimants' results, the formula plainly allocates the proceeds of the settlement in proportion to the Class Member's exposure and expense. (Report, 321-6). However, to assure that no errors were made in the claims process, each

claimant was provided with its calculation under the allocation formula by U.S. and electronic mail. (Reid Decl., ECF No. 321-3 at ¶ 17).

All told, 1,085 community water systems will receive substantial payments under the settlement. (Report, 321-6). The settlement is more than fair. The Court should finally approve the settlement.

## ARGUMENT

Courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" to determine if the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)). But a settlement will not be rejected simply because it does not provide a complete victory to the plaintiffs. *See EEOC v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985). Instead, the district court is to weigh a number of factors to determine the "fairness" of the settlement. These factors include (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer, (2) an assessment of the likely complexity, length and expense of the litigation, (3) an evaluation of the amount of opposition to settlement among affected parties, (4) the opinion of competent counsel, and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *See Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby*, 75 F.3d at 1199). Application of these factors to the settlement overwhelmingly support its approval.

A.    **The settlement is fair, reasonable and adequate.**

1.   **The settlement is a fair compromise because it provides substantial recovery to the class and avoids the risk of non-recovery.**

While no one "fairness" factor is to be given dispositive weight, courts have consistently stated that the relative strength of the plaintiff's case on the merits as compared to what the defendant offers by way of settlement is the most important consideration. *Id*. In conducting this analysis, the Court should begin by "quantify[ing] the net expected value of continued litigation to the class." *Reynolds*, 288 F.3d at 284-85.[2] To do so, the Court should "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." *Id.* at 285. The district court should, however, "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective rights[.]" *Isby*, 75 F.3d at 1196-97 (internal quotation omitted). Although "[a] high degree of precision cannot be expected in valuing a litigation," the court should nevertheless "insist[ ] that the parties present evidence that would enable [ ] possible outcomes to be estimated," so that the court can at least come up with a "ballpark valuation." *Reynolds*, 288 F.3d at 285.

To assist the Court in arriving at this ballpark evaluation, Plaintiffs commissioned an expert to estimate the cost of carbon filtration for the entire class over the last twenty years. Plaintiffs' expert used industry accepted methods to calculate the amount of carbon expended solely to remove atrazine from the drinking water sources of a sample of Class Members and extrapolated from those result to the entire class. This study estimates a filtration cost for the entire class of $139,187,601. (Buchheit Decl., ECF No. 321-2 at ¶ 36). However, recovery of this amount is far from certain.

---

[2] "The 'expected gain' is the gain if the judgment is favorable, discounted (that is, multiplied) by the probability of a favorable judgment. The qualification 'net' signals the need to subtract the cost of pressing ahead to judgment in order to estimate the value of litigating to judgment rather than of settling." *In re Fort Wayne Telsat, Inc.*, 665 F.3d 816, 820-21 (7th Cir. 2011).

Absent settlement, Plaintiffs would face a number of very serious obstacles to their claims – any one of which might leave them with no recovery whatsoever. Proving that the manufacturer of a highly-regulated product was liable for the damage caused to community water systems is a difficult task. To prevail, Plaintiffs had to establish that the actions of Syngenta and the other Defendants were the legal and actual cause of their damage, that Plaintiffs' claims were not preempted, and that Plaintiffs had standing to pursue those claims. Many environmental contamination cases have been pursued successfully in the United States based on a variety of different causes of the contamination. For example, leaking underground storage tanks, nuclear by-products, heavy metal groundwater contamination and a myriad of other types of contamination have been subject of successful lawsuits.

This litigation presented a completely different challenge, however, because Plaintiffs' claims presumed that this highly-regulated pesticide was being used precisely according to manufacturers' directions and governmental regulations. In other words, Plaintiffs' claims were based not on some unforeseen release of atrazine into raw drinking water supplies but from the fully-predictable fate and transport characteristics of the chemical. Plaintiffs' lawsuits challenged the basic nature and safety of atrazine itself when used as intended and as approved. Plaintiffs' counsel are aware of no other successful class action environmental contamination case that has overcome this challenge. (Tillery Decl., ECF No. 308-4 at ¶ 10).

To prevail here, Plaintiffs would have to show not only that atrazine entered their water supplies and caused damage, but also that the atrazine or atrazine-containing products that caused the damage originated from Syngenta. Thus, expert scientific testimony would have had to determine the path taken by atrazine from fields through the watershed, and from the manufacturer through the supply chain to the fields in the watershed. This would have been difficult in many

cases because the proof of the origin of the atrazine found in each Class Member's water was in the records kept by third-parties with limited record-keeping requirements. (Craig Decl. ECF No. 321-1 at ¶ 3). Accordingly, the likelihood of proving Plaintiffs' damages was inversely related to their age. Plaintiffs' estimated maximum recovery includes damages incurred over the last twenty years. Although Plaintiffs believe that their legal basis to recover for that period is sound, the passage of time made proving these claims far from certain.

Defendants offered plausible defenses. They maintained that Plaintiffs' only legally protected interest is the right to provide water that complies with the MCL for atrazine. Since 1991, the U.S. Environmental Protection Agency ("EPA") has set an MCL of 3 parts per billion (ppb) for atrazine on an average annualized basis. 56 Fed. Reg. 3526-01 (Jan. 30, 1991); 40 CFR § 141.50(b). The EPA considers MCLs to be "safe levels that are protective of public health." 52 Fed. Reg. 25690, 25693-94 (July 8, 1987). Thus, Defendants have maintained that Plaintiffs who have not experienced a violation of the MCL have not suffered a legally cognizable injury and were therefore entitled to no recovery.

In fact, the only other lawsuit brought by a community water system seeking damages from atrazine contamination was dismissed for this very reason. *See Iberville Parish Waterworks Dist. No. 3 v. Novartis Crop Prot., Inc.*, 45 F. Supp. 2d 934, 937 (S.D. Ala. 1999), *aff'd,* 204 F.3d 1122 (11th Cir. 2009) (unpublished table decision). While the legal theories and facts were quite different, there were similarities between *Iberville* and this litigation.

For example, like *Iberville*, many of the Class Members here have never found concentrations greater than the MCL in their water supplies. In fact, during the 20-year period covered by the extensive Syngenta database to which Plaintiffs counsel had access, 1,537 class members – more than 81 percent of the Community Water Systems that had at least one atrazine detection

during that period – had never found atrazine at a concentration of more than the MCL. (Craig Decl., ECF No. 321-1 at ¶ 10).  Although, as Plaintiffs' expert explains, Class Members suffer costs as a result of atrazine contamination at any concentration, (Buchheit Decl., ECF No. 321-2 at ¶ 16), the Class faced significant risk that the Court would limit any recovery to exposures in excess of the MCL. Such a ruling would have substantially limited Plaintiffs recovery and most Class Members would have received nothing.

Yet these are only a few of the defenses raised to this action. Syngenta pled twenty-one affirmative defenses other than those already discussed. These defenses ranged from contributory fault, the economic loss rule, statutes of limitations, the learned intermediary doctrine, preemption, estoppel, failure to mitigate, lack of standing and lack of subject-matter jurisdiction. (Answer, ECF No. 109 at 29-32). Any of these defenses could had substantially reduced or eliminated Plaintiffs' recovery.

Nevertheless, even with immense risks, Plaintiffs were able to secure a $105 million settlement fund. The amount represents approximately 76 % of the $139 million estimated to be the Class's maximum potential recovery. This is a substantial recovery in any litigation and is far closer to the maximum recovery found adequate by numerous other courts. *See, e.g. Williams v. Rohm & Hass Pension Plan,* 658 F.3d 629, 634 (7th Cir. 2011) (affirming approval of settlement that awarded retirees about 24.3% of their estimated maximum recovery); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583-84 (N.D. Ill. 2011) (approving settlement amounting to approximately 10% of the class's maximum possible recovery.); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) (approving settlement worth between 4.4% to 13.6% of maximum possible recovery); *In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *9 (E.D.Pa. Apr. 18, 2005) (approving settlement, which

amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the Class Members' estimated losses.") (internal citations omitted). More importantly, under Seventh Circuit law, given the risks, Class Members are "better off" with the settlement than pressing forward to trial.  As a result, this settlement is substantively fair.

In *Mars Steel Corp. v. Continental Illinois National Bank*, the Seventh Circuit noted that a "settlement is fair to the plaintiffs in a substantive sense . . . if it gives them the expected value of their claim if it went to trial, net the costs of the trial."  *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 682 (7th Cir. 1987).  As Judge Posner explained, the issue is simply a matter of arithmetic.

> Suppose the claim of the class in this matter is worth $750 million, but the probability that the class would prevail if the case were tried is only one percent and if it did prevail it would have to pay a contingent fee of $10 million.  Then assuming risk neutrality (meaning indifference between a sum certain and its uncertain equivalent--e.g., between $2 and a 10 percent chance of $20), the class would be better off settling for any amount greater than $7.4 million than taking its chances on a trial.  And if the members of the class were risk averse they might consider themselves better off even if the settlement were much smaller.

*Mars Steel*, 834 F.2d at 682.

Here, Plaintiffs' expert has estimated that the maximum total recovery is $139 million. (Buchheit Decl., ECF No. 321-2 at ¶ 36). Even assuming a generous probability of recovery of 75%, the Class would "be better off" with a settlement for any amount greater than $104.25 million.  Under the *Mars Steel* analysis, the $105 million settlement is substantively fair.

In short, the settlement provides immediate value to the Class Members that is well within the range of their expected recovery from proceeding to trial. The amount of a class settlement must be viewed in light of the strength of the case, the time and expense needed to achieve a fa-

vorable outcome at trial, and the risk that the plaintiff will be unsuccessful and recover nothing
for the class. Viewed in this context, the settlement in this case is certainly fair, reasonable, and
adequate.

### 2.   The settlement is a fair compromise given the complexity and corresponding difficulty and expense of proceeding to trial.

As is explained in Class Counsel's fee petition and accompanying affidavits, this litigation
was exceedingly difficult and expensive. Despite the significant work and costs already incurred,
however, the case was far from over. Briefing and argument on Plaintiffs' forthcoming motion
for class certification had yet to begin. Regardless of the outcome of that motion, the disappoint-
ed party would assuredly seek review under Rule 23(f). Following that appeal, the parties would
move toward trial and given the high stakes of this litigation for both sides, an appeal of a final
judgment would be all but guaranteed. As a result, this litigation would likely continue for sever-
al more years without any resolution or recovery. "[A] dollar today is worth a great deal more
than a dollar ten years from now." *Reynolds*, 288 F.3d at 284. Under the terms of the Settlement,
Class Members will receive money within months, not years. As a result, this factor weighs in
favor of approval of the Settlement.

### 3.   The settlement's fairness is corroborated by the overwhelmingly positive response.

 The reaction of the class is one factor to be considered in determining the fairness of the set-
tlement. Many courts have found that a settlement can be fair even when there are large numbers
of objectors. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1997) (approving settlement
over objections of counsel purporting to represent almost 50% of the class); *Bryan v. Pitt. Plate
Glass Co.*, 494 F.2d 799 (3d Cir. 1974) (approving settlement over objections of 20% of class).

Here, out of nearly 2,000 Class Members, only 24 opted out and there were no timely objec-
tions. Notably, no state attorney general, no governmental body or representative and no advo-

cate group have voiced opposition to the settlement. (Schutzel Aff. ECF No. 321-4, at ¶ 6).  Especially in view of the comprehensive direct mail notice campaign, the fact that no Class Member filed a timely objection to the settlement shows the Class overwhelmingly approves the settlement. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993) ("silence constitutes tacit consent to the agreement"). "[S]uch overwhelming support by class members is strong circumstantial evidence that the settlement is fair." *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 5062697, at *6 (S.D. Ill. June 5, 2006).

### 4.   Experienced Counsel fully support the settlement

A district court may also rely on the opinion of class counsel as to the fairness, reasonableness and adequacy of the Settlement. *Isby*, 75 F.3d at 1200. *See also, In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019-20 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

Class counsel are highly-experienced law firms who specialize in class action and other complex litigation. They believe the settlement is an excellent result in the best interest of the Class, especially in light of the risk of no recovery. Likewise, Professor Robert Fellmeth, a noted consumer advocate and expert in class action litigation, also endorses the settlement as an example of the "raison d'être" of the class action device. (Fellmeth Decl., ECF No. 321-8 at ¶ 7). Professor Fellmeth commends the settlement for the high number of Class Members receiving compensation as well as its ancillary public health benefits. (*Id*. at ¶ 12). This factor also counsels in favor of final approval.

### 5.   The litigation's long and contentious history confirms the settlement is the result of fully-informed adversarial negotiations.

Another important factor favoring the settlement is that it was reached only after extensive discovery was conducted, briefing on a number of the key issues was done, and arguments over

the relative strengths and weaknesses of the parties' positions were developed in connection with Syngenta's motion for summary judgment. This is not a case where the settlement occurred in a vacuum without substantial discovery.

Plaintiffs propounded extensive discovery to each defendant. They organized and administered a sophisticated, thorough review of the factual record, including millions of pages of documents. They then compiled a massive computer database of those documents. They took dozens of depositions and retained the services of numerous experts. Consequently, Plaintiffs had a thorough understanding of the benefits and risks of proceeding to trial. Accordingly, the relevant factors all support a finding that the settlement is fair, reasonable and adequate.

**B.      The Class Notice Satisfies Due Process as it fairly apprises the class of the Settlement terms.**

In addition to a fair and adequate settlement, Constitutional due process and Rule 23 require that class members be provided the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). Accordingly, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify others." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 (S.D. Ill. 2001).

That is exactly what occurred here. In accordance with the court-approved, expert-designed Notice Plan, on June 11, 2012, the Settlement Administrator mailed Summary Notice to the last known address of all potential Class Members who could be identified. (Reid Decl., ECF No.321-3, at ¶ 4). Summary Notice was published in the July issues of American Water Works Association Magazine, Public Works Magazine, and American City and County Magazine. (*Id*. at ¶ 5). The settlement administrator established a website containing a detailed notice, a toll-free number for Class members to call and updates on the settlement process. (*Id*. at ¶¶ 6-9). The

Seventh Circuit has for years found the use of an internet website to supplement publication no-tice an important and useful component of an adequate Notice plan. *Mirfasihi*, 356 F.3d at 786. Furthermore, on June 4, 2012, Defendant's counsel served Notice of the settlement on the U.S. Attorney General, and the Attorney Generals and Department of Agriculture for each individual state. (Schutzel Aff. ECF No. 321-4, at ¶¶ 4-5). As the Court previously found, this Notice Plan plainly satisfies due process.

Nevertheless, Class Counsel went far-beyond what due process requires. In August, Class Counsel undertook a multi-pronged supplemental notice campaign. First, on August 2, 2012, Class Counsel sent a *second* individual notice by first-class letter to each of the known class members who had not yet filed a claim. (Deaton Decl., ECF No. 321-5 at ¶ 5). The next day, Class Counsel sent a *third* individual notice by email to each of the 765 known class members for which a valid email address could be identified. (*Id*.).

In addition, from August 2 to August 28, 2012, ten of the lawyers representing the plaintiffs in this matter placed personal phone calls to class members. (*Id*. at ¶ 6). These calls were either with attorneys serving as counsel to the class member or a member of management. Over the course of four weeks, these lawyers were able to personally reach more than 99 percent of the class members with estimate claims greater than $10,000. The attorneys explained the settlement terms, answered questions, and made themselves available to personally assist in the claims pro-cess.  (*Id*.). Finally, on August 13, 2012, class counsel sent a *fourth* notice letter to the class members who were identified as having not yet filed a claim or having received a personal phone call. (*Id*.). Not only was due process satisfied, in Counsel's experience, the notice given in this matter represents the most comprehensive class action notice campaign ever undertaken.

C.        **The Plan of Allocation should be approved**

The allocation of a class action settlement fund is a traditional equitable function. *Curtiss-Wright Corp. v. Helfand*, 697 F.2d 171, 174 (7th Cir. 1982). In allocating the fund, the Court need not resolve trial-type issues of liability; it need only to weigh the relative deservedness of class members. *Id*. *See also, Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 326 (3d Cir. 2011) (en banc) (A district court's "principal obligation" in approving a plan of allocation "is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.").

The parties' allocation plan provides that the entire Settlement Fund, minus any Court-approved attorneys' fees, expenses, and costs, will be paid to Class Members who submit valid claims. Every Class Member will receive $5,000 to cover the cost of testing for atrazine and the remainder of the settlement is allocated based on the Class Member's history of atrazine detection, its size, and the age of its claim. This allocation plan is fair because it ensures that every Class Member who submits a valid claim will receive a portion of the settlement fund, while providing a proportionally larger share to those who are most affected by the presence of atrazine. (Buchheit Decl., ECF No. 321-2 at ¶ 38). "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011).

Class Counsel also took all available steps to insure that every claim is valid and that every valid claim is paid in full. Following the close of the claim period, Counsel notified each known class member for which a claim was not received of the expiration of the deadline to insure no claims were lost in transit. (Deaton Decl., ECF No. 321-5 at ¶ 8). This letter represented the *fifth* direct mail notice of this lawsuit. This audit process identified several claims that were not received. Counsel assisted these claimants in re-filing their claims and each was accepted.  (*Id*.).

Counsel also audited the claims that were received. Each claimant's information was reviewed to ensure that the system met the class definition. (Craig Decl., ECF No. 321-1 at ¶ 17). This audit revealed nine claims filed by non-class members, and one unauthorized claim, that were disallowed. (Reid Decl., ECF No. 321-3 at ¶¶ 12-14). Counsel then reviewed the submitted test data for accuracy. (Craig Decl., ECF No. 321-1 at ¶19). This review revealed 5,449 test results that were inaccurately reported or that were taken from a source other than the Class Member's Water. (*Id*. at ¶ 20). These test records were disregarded. (*Id*.). This process identified an additional 168 invalid test results, which were also outside the payment guidelines and were accordingly disregarded. (*Id*.).

Finally, the final validated data was run against the allocation formula. (Reid Decl., ECF No. 321-3 at ¶ 16). As can be seen by the attached compilation of claimants' results, the formula plainly allocates the proceeds of the settlement in proportion to the Class Member's exposure and expense. However, to further assure that no errors were made in the claims process, each claimant was provided with its calculation under the allocation formula by U.S. and electronic mail. (Reid Decl., ECF No. 321 at ¶ 17).  The allocation plan and the claims process is more than fair.

## CONCLUSION

The settlement before the Court provides substantial awards to each member of the Class. Counsel for the Plaintiffs have carefully considered and evaluated the relevant legal authorities and evidence to support the claims and defenses, the likelihood of prevailing on the claims or defenses, the risk, expense and duration of continued litigation and the likely appeals, and have concluded that the settlement is a favorable resolution of the litigation for all parties. Absent ap-

proval of the settlement, the litigation would likely take several years to complete and be both extremely costly and have considerable uncertainty. The settlement should be approved.

Dated:  October 16, 2012        Respectfully submitted,

**KOREIN TILLERY**

By: <u>s/ Aaron M. Zigler</u>
Stephen M. Tillery
Christine J. Moody
Aaron M. Zigler
Christie R. Deaton
Christopher A. Hoffman
Michael E. Klenov
John C. Craig
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, Missouri  63101-1625
Telephone:    (314) 241-4844
Facsimile:    (314) 241-3525

***Attorneys for Plaintiffs***

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CITY OF GREENVILLE, et al., individ-<br>ually, and on behalf of all others similarly<br>situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>SYNGENTA CROP PROTECTION,<br>INC., and SYNGENTA AG,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)     Case No.: 3:10-cv-00188-JPG-PMF<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on October 16, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

- Aaron M. Zigler
- Albert Ettinger
- Brian A Fogerty
- C. Raymond Bell
- Carla Burke
- Celeste Evangelisti
- Charles Adam Cerise
- Christie R. Deaton
- Christine J. Moody
- Christopher A. Hoff-
  man

- Christopher MacNeil
  Murphy
- David M. Stein
- Elizabeth A. Laughlin
- Holland Marie
  Tahvonen
- Howard A. Learner
- Jocelyn D. Francoeur
- John C. Craig
- Kurtis B. Reeg
- Lara E. White

- Mark C. Surprenant
- Michael A. Pope
- Michael E. Klenov
- Mitchell E. McCrea
- Patricia S. Murphy
- Peter M. Schutzel
- Scott Summy
- Stephen M. Tillery
- Todd R. Wiener

**KOREIN TILLERY**

/s Aaron M. Zigler
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, Missouri  63101-1625
Telephone:     (314) 241-4844
Facsimile:     (314) 241-3525
azigler@koreintillery.com