IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CITY OF GREENVILLE, et al.,** individually, and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>**SYNGENTA CROP PROTECTION, INC., and SYNGENTA AG,**<br><br>　　　Defendants. | Case No.: 3:10-cv-00188-JPG-PMF |

### MEMORANDUM AND ORDER

This matter comes before the Court on the Unopposed Motion for Final Approval of Settlement (Doc. 321), and Class Counsel's Motion for an Award of Attorneys' Fees and Expenses from the Common Fund. (Doc. 308). The parties ask the Court to dismiss with prejudice all claims asserted by the Settlement Class against the Defendants and permanently enjoin any Class Member who has not opted out from bringing any proceeding in any Court based on any released claim. Class Counsel also asks the Court to award them attorneys' fees and costs. Having considered the matter, and being duly advised, the Court **GRANTS** the motions (Docs. 308 & 321) and **ORDERS** as follows.

### I. PROCEDURAL BACKGROUND

On May 30, 2012, this Court granted preliminary approval of the Settlement Agreement, conditionally certified a Settlement Class, appointed Class Counsel, designated the Plaintiffs as Settlement Class Representatives, approved forms of notice to be sent to the Settlement Class members, and scheduled a final fairness hearing (Doc. 297).

The class consists of at least 1,930 Community Water Systems that have detected atrazine in their water supplies. These systems range in size from very small to very large, and include systems that have found varying levels of atrazine in their water. Notice was given to these systems in accordance with the Court's Order by both direct mail and publication and the settlement administrator established a settlement website and toll-free question line. Furthermore, on June 4, 2012, Defendants' counsel served Notice of the settlement on the U.S. Attorney General, and the Attorney General and Department of Agriculture for each individual state. As the Court previously found, this Notice Plan satisfies due process.

Class Counsel nevertheless undertook a multi-pronged supplemental notice campaign. Class Counsel sent a *second* individual notice by first-class letter on August 2, 2012, to each of the known class members who had not yet filed a claim. The next day, Class Counsel sent a *third* individual notice by e-mail to each of the 765 known class members for which a valid e-mail address could be identified.

In addition, from August 2 to August 28, 2012, ten of the lawyers representing the plaintiffs in this matter placed personal phone calls to class members. These calls were either with attorneys serving as counsel to the class member or a member of management of the class members. Over the course of four weeks, these lawyers were able to personally reach more than 99 percent of the class members with estimated claims greater than $10,000. The attorneys explained the settlement terms, answered questions, and made themselves available to personally assist in the claims process. Finally, on August 13, 2012, class counsel sent a *fourth* notice letter to the class members who were identified as having not yet filed a claim or having received a personal phone call.

The claims administrator logged 557 calls to the toll-free information line and the settlement website received a total of 10,313 visitors who viewed a total of 25,627 web pages. The settlement also experienced an unusually high claim rate. Even though many class actions experience claims rates of less than 15%, more than half of the class members identified prior to notice filed claims, and those claims account for 85.7% of the total net settlement proceeds based on Class Counsel's preliminary estimates.

As would be expected, systems with the most atrazine contamination, and therefore the largest claims, filed claims at an even higher rate. Almost 83% of the class members with preliminary estimates greater than or equal to $10,000 have filed claims, accounting for 91.4% of the funds preliminarily allocated to this group.

In contrast, only twenty-four class members with claims totaling $549,606.55, or 0.523% of the total settlement proceeds, have opted out. No timely objections were received.

Class Counsel audited the claims process. Following the close of the claim period, Counsel notified each known class member for which a claim had not been received as of the expiration of the deadline to ensure no claims were lost in transit. For each claim received, the claimant's information was reviewed to ensure that the system met the class definition. This audit revealed 10 claims filed by non-class members. Counsel then reviewed the submitted test data for accuracy. This review revealed 5,617 test records that were inaccurately reported or that were taken from a source other than the Class Member's Water.

Consistent with the notice given, a final fairness hearing was held on October 22, 2012. Counsel for the parties appeared and several class members appeared to support the settlement. One class member appeared and objected to the exclusion of its wholesale water business from

the class definition.  This class member had not filed a formal objection to the settlement.  No other interested person appeared to be heard regarding the fairness of the settlement.

## II. SETTLEMENT TERMS

The proposed settlement would put an end to the expense, inconvenience and distraction of further litigation while providing significant monetary relief to the proposed class in the form of $105,000,000.00, in exchange for a release resolving Plaintiffs' claims related to the presence of atrazine in their water. (Agreement, ECF No. 294-1). The fund is not illusory. All of the fund, after fees and costs, will be distributed to the class. (*Id*. at ¶ 8.4.2.). None reverts to the defendants. (*Id*.).

In exchange for this monetary relief, the Releasing Parties (i) release the Released Parties from all Released Claims, and (ii) covenant not to sue the Released Parties based on any Released Claims. In addition, upon entry of the Final Judgment, the Releasing Parties shall be deemed to have granted the Released Parties an irrevocable, nonexclusive, transferrable license for a period of ten (10) years commencing with the date that is the earlier of Final Judgment or July 1, 2014, holding them harmless for all Released Claims or claims which, had they accrued prior to Final Judgment, would have been Released Claims. *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002). Provided however, that this license shall not apply to any claim arising from point-source contamination, as defined in Section 502(14) of the Clean Water Act, resulting from the Released Parties' development, manufacture, formulation, distribution, transportation, storage, loading, mixing application, or use of atrazine (2- chloro-4 ethylamino-6-isopropylamino-s-triazine) or products that contain atrazine (2- chloro-4 ethylamino-6-isopropylamino-s-triazine) as an active ingredient or to any claim against any applicator or user of any product that contains atrazine (2-chloro-4 ethylamino-6-isopropylamino-s-triazine)

as an active ingredient arising from the presence of Atrazine in the Releasing Parties' Water as a result of any use of such product not in accordance with the precautionary statements and instructions for use on the label of such product. (Agreement, ¶ 9.1).

Released Claims means all claims of the Releasing Parties arising out of, or relating to, the presence of Atrazine in the Releasing Parties' Water as a result of the development, manufacture, formulation, distribution, transportation, storage, loading, mixing, application, or use of atrazine (2-chloro-4 ethylamino-6-isopropylamino-striazine) or products that contain atrazine (2-chloro-4 ethylamino-6-isopropylamino-striazine) as an active ingredient that any Releasing Party asserted or could have asserted in the Litigation. Released Claims shall not include any claim for indemnity, contribution among joint tortfeasors or apportionment of liability or fault, with respect to any claim against a Releasing Party, arising from the consumption of the Releasing Parties' Water, that is not a claim for property damage or economic loss. (*Id.* at ¶ 2.28).

Released Parties means Defendants and all other manufacturers, contract manufacturers, research collaborators with Defendants or with such other manufacturers, formulators , distributors, retailers, purchasers, applicators, and users of Atrazine, including the defendants (in addition to the Defendants) in the Litigation, which are Sipcam Agro USA, Inc., Growmark, Inc., Drexel Chemical Co., United Agri Products, Makhteshim-Agan of North America, Inc. and Dow Agrosciences LLC, and their present and former parents, subsidiaries, divisions, affiliates, stockholders, benefit plans, officers, directors, employees, attorneys, insurers, agents and any of their legal representatives, and the predecessors, heirs, executors, administrators, successors and assigns of each of them. (*Id.* at ¶ 2.29).

Releasing Parties means the Plaintiffs, on behalf of themselves and all Class Members, and their respective successors, heirs and assigns, and anyone acting on their behalf, including in

a representative or derivative capacity. (*Id.* at § 2.30).

The release is narrowly tailored. The settlement does not interfere with the jurisdiction of any regulatory agency, and it preserves certain claims arising from future point-source contamination or off-label use and claims that otherwise could not have been brought in this litigation. (*Id.* at ¶ 9.1).

Although testing costs for class members are generally fixed, the cost of removing atrazine increases as the concentration of atrazine and the amount of water treated increases. Accordingly, the settlement allocates payment based on objective and independently-verifiable data that awards each claimant a fixed amount devised to offset testing costs, and allocates the remainder according to the levels of atrazine that have been found in each system's water, the frequency at which atrazine has been found in each system's water, and the relative cost of removing it for a system of that size.

The settlement formula allocates the proceeds among claimants by first awarding each claimant a payment of $5,000, which is equal to the approximate cost of 20 water tests. Each claimant is then allocated a percentage of the remaining fund based on evidence of: (1) the levels of atrazine in its water; (2) how often atrazine has been found in its water; (3) how long ago atrazine was found in its water; and (4) the claimant's size. Generally, if a system processed more water or frequently had high concentrations of atrazine, it is eligible for more money.

To facilitate the claims process, Class Counsel collected 20 years of atrazine testing data into a database that was made available to each class member through the settlement website. From there, Claimants were able to view the test data already collected for their system and provide additional evidence of atrazine contamination to increase their share of the settlement fund.

6

Under the terms of the settlement, all $105 million, less court-approved fees and costs, will be distributed to Class Members. (Settlement Agreement, ECF No. 294-1 at ¶ 8.4.2.).

### III. DISCUSSION

District judges must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" to consider whether the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)).

However, a settlement will not be rejected simply because it does not provide a complete victory to the plaintiffs. *EEOC v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985). Instead, the district court is to weigh a number of factors to determine the "fairness" of the settlement. These factors include (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer, (2) an assessment of the likely complexity, length and expense of the litigation, (3) an evaluation of the amount of opposition to settlement among affected parties, (4) the opinion of competent counsel, and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

Having carefully scrutinized the proposed settlement, it is clear that the settlement is fair, reasonable, and adequate. The settlement was reached after arm's-length negotiations in a matter where the plaintiffs faced a number of very serious obstacles to their claims – any one of which might leave them with no recovery whatsoever. To prevail, Plaintiffs had to establish that the actions of Syngenta and the other Defendants were the legal and actual cause of their damage, that Plaintiffs' claims were not preempted, and that Plaintiffs had standing to pursue those claims. Yet these are only a few of the defenses raised to this action. Syngenta pled twenty-one

affirmative defenses other than those already discussed. These defenses ranged from contributory fault, the economic loss rule, statutes of limitations, the learned intermediary doctrine, preemption, estoppel, failure to mitigate and lack of standing and subject-matter jurisdiction. (Answer, ECF No. 109 at 29-32). Any of these defenses could have substantially reduced or completely eliminated Plaintiffs' recovery.

Nevertheless, even with immense risks, Plaintiffs were able to secure a $105 million settlement fund. The amount represents approximately 76 % of the $139 million estimated by Plaintiffs' expert to be the class's maximum potential recovery for past damages. This is a substantial recovery in any litigation and is far greater than the percentages found adequate by numerous other courts. *See, e.g. Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 634 (7th Cir. 2011) (affirming approval of settlement that awarded retirees about 24.3% of their estimated maximum recovery); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583-84 (N.D. Ill. 2011) (approving settlement amounting to approximately 10% of the class's maximum possible recovery); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) (approving settlement worth between 4.4% to 13.6% of continued litigation); *In re Ravisent Techs., Inc. Sec. Litig.*, No. Civ. A. 00-CV-1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses") (internal citations omitted).

Here, Plaintiffs' expert has estimated that the maximum total recovery is $139 million for past water treatment. Assuming a generous probability of recovery of 75%, the class would "be better off" with a settlement for any amount greater than $104.25 million. The settlement pro-

vides immediate value to the Class Members that is well within the range of—and may in fact significantly exceed—their expected recovery from proceeding to trial. The amount of a class settlement must be viewed in light of the strength of the case, the time and expense needed to achieve a favorable outcome at trial, and the risk that the plaintiff will be unsuccessful and recover nothing for the class. Viewed in this context, the settlement in this case is certainly fair, reasonable, and adequate.

Class Counsel also seek an award of attorneys' fees from the settlement fund. Seventh Circuit precedent requires such an award reflect "the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). "It is not the function of judges in fee litigation to determine the equivalent of the medieval just price." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992). Instead, counsel is "entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *Id.* at 572; *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) ("[W]hat is reasonable is what an attorney would receive from a paying client in a similar case."). In a case like this, "[w]here the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered." *Will v. General Dynamics Corp.*, No. 06-cv-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010).

Here, the sophisticated plaintiffs in this matter concluded a one-third contingency fee with advanced costs was in their best financial interests in this litigation. Given those arm's-length evaluations and in light of the magnitude of the risks and undertaking, it is unlikely Plaintiffs would have been able to secure legal representation of comparable skill and experience on

better terms. Accordingly, these contracts *define* the market. *In re Synthroid Mktg. Litig.*, 325 F.3d at 976. A contingent fee of one-third of net recovery was the fee agreed to by sophisticated clients with substantial stakes in the litigation, negotiated at arm's length through separate counsel. This is "[t]he best evidence of the value of the lawyer's services." *Assessment Techs. of WI, L.L.C. v. WIREdata, Inc.*, 361 F.3d 434, 438-39 (7th Cir. 2004).

Moreover, even if the Court were to independently "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers," *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), the result would be the same. All the evidence the Seventh Circuit has endorsed for such a simulation points to the same conclusion: a contingent fee of one-third of any recovery after the reimbursement of costs and expenses reflects the market price for legal services for a case of similar risk.

"The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d at 572. Hundreds of sophisticated purchasers of legal services have all agreed to retain Baron & Budd to pursue similar actions for the same contingent fee arrangement. (*Id.*). These contracts "define" the market and confirm that a one-third contingency fee in this kind of litigation is a market driven price.

Likewise, the third benchmark for gauging the market price for fee awards is the amount of court-awarded attorneys' fees in comparable cases. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005). Courts throughout the Seventh Circuit routinely consider the fee awards in other class actions and conclude that a one-third contingency fee is standard. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 380 (N.D. Ill. 2011) ("The fee request in this case equals just under 32.7% of the cash common fund created under the settle-

10

ment. Such a figure is widely recognized as a reasonable percentage"); *Will v. Gen. Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010) ("Where the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered."); *Meyenburg v. Exxon Mobil Corp.,* No. 05-cv-15-DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"); *Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc.,* No. 02-cv-1109-DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-three and one-third (33 1/3%) in a class action in [sic] not uncommon").

A fee award in this case equal to one-third of the common fund is also justified under the lodestar method. To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-37 (1983)).

Class Counsel dedicated thousands of attorney hours and millions of dollars over eight years to pursue this action with no guarantee of ever recovering their investment. Korein Tillery has expended in excess of 46,600 hours prosecuting this case. Baron & Budd has expended in excess of 36,700 hours. Using Korein Tillery's current billing rates, Class Counsel's lodestar in this matter exceeds $24,000,000.

But this lodestar is only the first step in determining a reasonable fee under the lodestar method. In cases like this one, where counsel "had no sure source of compensation for their ser-

11

vices," the Court must apply a risk multiplier to compensate the attorneys for the risk of nonpayment in the event the litigation were unsuccessful. *Florin*, 34 F.3d at 565.

To determine the appropriate multiplier, a district court must attempt "a retroactive calculation of the probability of success as measured at the beginning of litigation." *Cook*, 142 F.3d at 1013. The multiplier is determined by dividing 1 by the probability of success. *Florin v. Nationsbank of Ga., N.A.*, 60 F.3d 1245, 1248 n.3 (7th Cir. 1995). "Multipliers anywhere between one and four, have been approved." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (citation omitted).

Given the extreme difficulty presented by this matter and the attendant risk in investing years of attorney time carrying millions of dollars in litigation expenses with no guarantee of recovery, a substantial risk multiplier is warranted. However, the fee sought by counsel is justified under this method with a multiplier of only 1.34. This multiplier would correlate to a risk of loss of only 26%. But a successful outcome of this case was far from that certain. A fee award of one-third of the fund is thus appropriate whether calculated as a percentage of the fund or as a lodestar.

In addition, Counsel also seek reimbursement of their litigation expenses. The Seventh Circuit's view of cost reimbursement mirrors its view of attorneys' fees. "Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge things costs too high in general is not." *In re Synthroid Mktg. Litig.*, 264 F.3d at 722. "Likewise, the amount of itemization and detail required is a question for the market. If counsel submits bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Id.*

As the affidavits submitted by Illinois American Water and Holiday Shores Sanitary Dis-

trict show, the costs sought here are of the type that are routinely reimbursed by paying clients, such as experts' fees, other consulting fees, deposition expenses, travel, and photocopying costs. In light of the length and complexity of this litigation, Counsel's request for reimbursement of costs and expenses is fair and reasonable.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. The Court finds that this action satisfies the requirements of Rule 23 and is properly certified pursuant to Federal Rules of Civil Procedure 23(b)(3) and further finds that the members of the Class have at all times been adequately represented by the Class Representatives and Class counsel.

2. The Court has personal jurisdiction over the Class Members and parties, and the Court has subject matter jurisdiction to approve the Settlement Agreement and all exhibits thereto pursuant to 28 U.S.C. § 1331.

3. The Class is comprised of:

> Every Community Water System, as defined in 42 U.S.C. § 300f(15)(2006), in the United States of America for which any Qualifying Test Result shows any Measurable Concentration of atrazine (2-chloro-4 ethylamino-6-isopropylamino-s-triazine).

A "Qualifying Test Result" is defined as the result of analytical testing of the Class Member's "Water" performed before August 28, 2012, using any state or federal agency-approved analytical method. "Water" is defined as water in which a Class Member possesses a legal or equitable right, title or interest, and that is drawn from a lake, reservoir, river, stream, creek, well or other source of water used by the Class Member to provide drinking water, including such drinking water. "Measurable Concentration" is defined as a concentration equal to or greater than the limit of quantitation of the analytical method used.

4.      The Notice approved by the Court was sent by first class mail, postage prepaid, to the last known address of each individual identified as a likely Class Member. In addition, the Notice was posted on a Website. The Notice adequately described the relevant and necessary terms of the proposed Settlement Agreement. *In the Matter of VMS Ltd. Partnership Sec. Litig.*, 26 F.3d 50, 51-52 (7th Cir. 1994).

5.      The Notice provided to the Class fully complied with Rule 23, was the best notice practicable, satisfied all constitutional due process requirements, and provides the Court with jurisdiction over the Class Members. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78 (1974); *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985).

6.      The settlement provides immediate value to the Class Members that is well within the range of their expected recovery from proceeding to trial. Viewed in light of the strength of the case, the time and expense needed to achieve a favorable outcome at trial, and the risk that the plaintiff will be unsuccessful and recover nothing for the class, the settlement in this case is fair, reasonable, and adequate.

7.      Class Counsel's request for fees and costs is fair, reasonable, and appropriate. Accordingly, the motion (Doc. 308) is granted; Class Counsel are awarded costs of $8,572,647.67 and fees in the amount of $32,116,332.37 plus one-third of any interest earned by the settlement fund in the escrow account.

8.      The parties' proposed allocation plan is fair because it ensures that every Class Member who submits a valid claim will receive a portion of the settlement fund, while providing a proportionally larger share to those who are most affected by the presence of atrazine. "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose

claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011).

9.  Within fourteen (14) calendar days of the entry of this Order, Syngenta Crop Protection, LLC shall pay $100 million (US$100,000,000.00) into the settlement's escrow account. Within thirty (30) days of the date of this Order, the Escrow Agent shall pay BMC Group's invoice of October 15, 2012, in the amount of $51,667.57. Fourteen (14) calendar days after the Effective Date of the settlement the Escrow Agent shall pay to Class Counsel $8,572,647.67 in costs, and $32,116,332.37 plus one-third of any interest earned by the settlement fund in the escrow account, in attorneys' fees. Fourteen (14) calendar days after the Effective Date, the Escrow Agent shall release all funds remaining in the Settlement Fund to Class Counsel for the benefit of the Settlement Class. Within thirty (30) calendar days of the Effective Date, Class Counsel will cause the Settlement Administrator to distribute all of the res remaining in the Settlement Fund to Class Members who submitted valid claims and did not opt out, in accordance with the percentages listed in the Settlement Administrators' report of claims. (Doc. 321-6).

10.  Five claims were filed by systems that were not members of the class because they did not meet the definition of "Community Water System" in the Settlement Agreement, as they did not serve more than fifteen service connections used by year-round residents of the area: Clarence Cannon Wholesale Water Commission (Claim 1000820), City of Pratt Airport (Claim 1001909), TRA Huntsville Regional Water Supply (Claim 1001929), TRA Tarrant County Water Project (Claim 1001930), and Livingston Regional Water Supply (Claim 1001931). Their claims are hereby denied.

11. One system, Nocona [Texas] Water Department (Claim 1001944), submitted a claim based on a single purported detection of a Measurable Concentration of atrazine, but did not pro-

15

vide documentation of any such test result. BMC sent the claimant notice of this deficiency on September 7, 2012, and requested the necessary documentation no later than 14 days following receipt of its request. The claimant never produced the requested documentation, and subsequently withdrew both its claim and the untimely objection that it had attempted to file. Furthermore, records of the claimant's atrazine test results available to the public through the State of Texas's Drinking Water Watch database, as well as all records available to the parties, show that Nocona has never reported a Measureable Concentration of atrazine. Accordingly, Nocona is not a member of the class, and its claim is hereby denied.

12. Three claims were filed by systems that did not establish membership in the class because all of the atrazine test results they submitted were less than the limit of quantitation, and they therefore failed to submit at least one test result showing a "Measureable Concentration" of atrazine: Bramble Hill, Maryland (Claim 1001902), Bark Hill, Maryland (Claim 1001903), and Pleasant Valley, Maryland (Claim 1001901). Their claims are hereby denied.

13. One individual, Brenda Grimes, filed a claim purporting to be on behalf of the Greenville [North Carolina] Utility Commission (Claim 1001892). This claim was not authorized by the Greenville Utility Commission, which subsequently filed a claim that was approved. This unauthorized claim is hereby denied.

14. Twenty-four (24) Class Members opted out of the Settlement: (1) Naval Support Activity Crane (Claim 1000076); (2) Fort George G. Meade (Claim 1000306); (3) Thibodaux Water Works (Claim 1000437), (4) City of Hagerstown (Claim 1000512); (5) Great Smoky Mountains National Park Headquarters (Claim 1000543); (6) Fort Riley (Claim 1000659); (7) Shangri La MHP (Claim 1000731); (8) Edmonson County Water District (Claim 1000761); (9) Muscatatuck Urban Training Center (Claim 1000775); (10) Rock Island Arsenal (Claim

1000802); (11) City of Aurora (Claim 1000891); (12) Chester Water Authority (Claim 1000986); (13) Fort Knox Engineering & Housing (Claim 1001017); (14) Kansas Army Ammunition Plant (Claim 1001164); (15) USMC Lejeune Hadnot Point (Claim 1001304); (16) Lake Lorelei Regional Water PWS (Claim 1001324); (17) City of Arkansas City (Claim 101412); (18) APG Edgewood Arsenal (Claim 101472); (19) Lafourche Parish Water District No. 1 (Claim 101663); (20) Goodyear Water Dept (Claim 101676); (21) Fort Detrick (Claim 1001733); (22) Henderson Municipal Water & Sewer (Claim 1001776); (23) Henderson Water Utility / South (Claim 1001777); and (24) Jericho Water District (Claim 1001928). There are no other valid opt outs.

  15. Upon entry of Final Judgment, the Releasing Parties and all Class Members release the Released Parties from all Released Claims. In addition, upon entry of Final Judgment, the Releasing Parties grant the Released Parties an irrevocable, nonexclusive, transferrable license for a period of ten (10) years holding them harmless for all Released Claims or claims which, had they accrued prior to Final Judgment, would have been Released Claims. Provided however, that this license shall not apply to any claim arising from point-source contamination, as defined in Section 502(14) of the Clean Water Act, resulting from the Released Parties' development, manufacture, formulation, distribution, transportation, storage, loading, mixing application, or use of atrazine (2- chloro-4 ethylamino-6-isopropylamino-s-triazine) or products that contain atrazine (2- chloro-4 ethylamino-6-isopropylamino-s-triazine) as an active ingredient or to any claim against any applicator or user of any product that contains atrazine (2-chloro-4 ethylamino-6-isopropylamino-s-triazine) as an active ingredient arising from the presence of Atrazine in the Releasing Parties' Water as a result of any use of such product not in accordance with the precautionary statements and instructions for use on the label of such product.

17

16. This Final Order incorporates and makes a part hereof the Settlement Agreement and each exhibit previously approved by the Court.

17. The Parties and their legal counsel are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

18. The terms of the Settlement Agreement and this Final Order are declared to be binding on, and to have res judicata and preclusive effect on all Released Claims asserted by any Released Party.

19. All Class Members are hereby permanently barred and enjoined from suing any the Released Parties based on any Released Claims. The Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's jurisdiction over the action and to protect and effectuate the Final Order.

20. This Court will retain jurisdiction over the interpretation, implementation and enforcement of the Settlement Agreement, as well as any and all matters arising out of, or related to, the interpretation, implementation and enforcement of the settlement or the Settlement Agreement. Without regard to the previous sentence, however, any court may dismiss a Released Claim if such a claim is asserted in such a court.

21. Nothing in this Final Order shall preclude any action to enforce the terms of the Settlement Agreement.

22. Without in any way affecting the finality of this Final Order, the Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order, and for any other necessary purpose, including, without limitation:

(a) enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part are related to or arise out of the Settlement Agreement or this Final Order;

(b) entering such additional Orders as may be necessary or appropriate to protect or effectuate this Final Order approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement;

(c) entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction; and

(d) resolving any other dispute that may arise under the Settlement Agreement.

23. This action, including all individual and Class claims asserted in it, is hereby dismissed on the merits and with prejudice and without additional costs. This finding is entered without any admission by the Defendants as to the merits of any of the allegations in the Complaint and does not constitute a finding as to any of the allegations in the Complaint. There is no just reason for delay of entry of judgment or any appeal.

24. The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/J. Phil Gilbert<br>**Honorable J. Phil Gilbert**

**Dated: October 23, 2012**