Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 218 of 486

Hertl, Peter                    11-4-2010
Confidential

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS


CITY OF GREENVILLE, et al.,      )
                                 )
            Plaintiffs,          )
                                 )
        vs.                      )   No. 10-188-JPG
                                 )
SYNGENTA CROP PROTECTION,        )
INC., and SYNGENTA AG,           )
                                 )
            Defendants.          )


        The deposition of PETER HERTL, called by the

Plaintiffs for examination, taken pursuant to notice and

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, taken before Jennifer D. Riemer,

Certified Shorthand Reporter, Registered Professional

Reporter, and Certified Realtime Reporter, at 227 West

Monroe Street, 45th Floor, Room J, Chicago, Illinois,

commencing at 9:42 a.m. on November 4, 2010.

Exhibit 006 Page 1
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                        11-4-2010
Confidential

## Page 2

1   APPEARANCES:
2   On behalf of the Plaintiffs
        STEPHEN M. TILLERY, ESQ.
3   JOHN CRAIG, ESQ.
        KOREIN TILLERY, LLC
4   505 North Seventh Street, Suite 3600
        St. Louis, Missouri 63101
5   Phone: 314.241.4844  Fax: 314.241.3525
        E-mail: stillery@koreintillery.com
6   E-mail: jcraig@koreintillery.com
7
8   On behalf of the Defendants
9   MICHAEL A. POPE, ESQ.
        PETER M. SCHUTZEL, ESQ.
10  McDERMOTT WILL & EMERY, LLP
        227 West Monroe Street
11  Chicago, Illinois 60606
        Phone: 312.372.2000  Fax: 312.984.7700
12  E-mail: mpope@mwe.com
        E-mail: pschutzel@mwe.com
13
14  KURTIS B. REEG, ESQ.
        REEG LAWYERS, LLC
15  One North Brentwood Boulevard, Suite 950
        St. Louis, Missouri 63105
16  Phone: 314.446.3350  Fax: 314.446.3360
        E-mail: kreeg@reeglawfirm.com
17
18
19  ALSO PRESENT:  MR. ALAN NADEL, in-house counsel,
        Syngenta Crop Protection, Inc.;
20
21      MR. JERRY BROWN;
22      MR. JEREMY MANGAN, Videographer.
23      * * * * * *
24
25

## Page 3

1               I N D E X
2   WITNESS                          PAGE
3   PETER HERTL
4   Direct Examination by Mr. Tillery.......... 7
5
            E X H I B I T S
6
    HERTL DEPOSITION EXHIBIT          PAGE
7
8   Exhibit 1    curriculum vitae........... 10
9   Exhibit 2    2002 localization agreement.... 58
10  Exhibit 3    e-mails re: raise............ 65
11  Exhibit 4    2006 objectives.............. 68
12  Exhibit 5    8-18-06 Swaine e-mails....... 70
13  Exhibit 6    status work document......... 74
14  Exhibit 7    status work document......... 75
15  Exhibit 8    The Vision of Syngenta....... 78
16  Exhibit 9    3-06 Environmental Fate.......107
                presentation
17
18  Exhibit 10   3-01 management meeting.......168
19  Exhibit 11   human safety document..........178
20  Exhibit 12   12-04 e-mails.................181
21  Exhibit 13   AI lead roles.................182
22  Exhibit 14   meeting request...............184
23  Exhibit 15   8-11-08 Botham e-mail..........185
24  Exhibit 16   AI specialists................186
25  Exhibit 17   5-7-04 Swaine e-mail...........187

## Page 4

1   Exhibit 18   Seiler e-mails...............189
2   Exhibit 19   2005 Wall e-mail..............189
3   Exhibit 20   7-17-08 Stypa e-mail..........192
4   Exhibit 21   9-23-08 e-mail re: Minnema......193
5   Exhibit 22   IM presentation document......193
6   Exhibit 23   Hendley e-mail................195
7   Exhibit 24   10-30-07 presentation........196
                Product Safety Greensboro
8
    Exhibit 25   2-12-08 presentation...........196
9               Product Safety Americas
                Goal Setting Session
10
    Exhibit 26   business review report........197
11
    Exhibit 27   presentation..................198
12              Product Safety 2009,
                NAFTA Product Safety
13              Strategic Star
14  Exhibit 28   4-2-09 presentation...........199
15              Product Safety Greensboro
    Exhibit 29   11-5-09 Doe e-mail............200
16
    Exhibit 30   Environmental Safety SynCRA....205
17
    Exhibit 31   10-5-09 e-mails; technical.....207
18              evaluation documents
19  Exhibit 32   10-23-09 Wobmann e-mail.......207
20  Exhibit 33   2-09 presentation............208
21              Easy 123 Implementation
                Roll Out
22  Exhibit 34   6-17-04 Cornes e-mail.......209
23  Exhibit 35   12-15-04 Fowler e-mail.......210
24  Exhibit 36   3-05 Cornes e-mail...........211
25

## Page 5

1   Exhibit 37   5-05 CP PLCM Project..........212
                Management Handbook
2
    Exhibit 38   presentation..................213
3               2009 Portfolio Investment
4   Exhibit 39   Furter e-mail re:.............213
                development portfolio 2009
5
    Exhibit 40   Hertl e-mail re:..............214
6               development portfolio 2009
7   Exhibit 41   6-10-09 Barnes e-mail.........215
8   Exhibit 42   4-3-01 Hosmer e-mail.........216
9   Exhibit 43   7-25-01 Parker e-mail.........217
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

Exhibit 006 Page 2
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

**Page 6**

1  THE VIDEOGRAPHER: We are now on the record. Here
2  begins the videotaped deposition of Peter Hertl in the
3  matter of City of Greenville, Illinois, et al., versus
4  Syngenta Crop Protection, Inc., and Syngenta AG in the
5  United States District Court for the Southern District
6  of Illinois, Case No. 10-188-JPG. Today's date is
7  November 4th, 2010, and the time on the video monitor is
8  9:41 a.m.
9      The video operator today is Jeremy Mangan,
10  representing Westlaw Deposition Services. The court
11  reporter today is Jennifer Riemer of Jensen Court
12  Reporting, reporting on behalf of Westlaw Deposition
13  Services. Today's deposition is taking place at
14  227 West Monroe Street, Chicago, Illinois. Counsels,
15  please introduce yourselves and state whom you
16  represent.
17      MR. TILLERY: For the plaintiffs, from the law firm
18  of Korein Tillery in St. Louis, Steve Tillery and John
19  Craig.
20      MR. POPE: Michael Pope and Peter Schutzel,
21  McDermott Will & Emery, on behalf of the defendants.
22      THE VIDEOGRAPHER: Would the court reporter please
23  swear in the witness.
24          (Witness sworn.)
25      THE VIDEOGRAPHER: Please proceed.

**Page 7**

1  WHEREUPON:
2          PETER HERTL,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5          DIRECT EXAMINATION
6  BY MR. TILLERY:
7      Q. Before we get started, I'm going to sort of
8  warn you that I'm getting over a Brussels cold, so I --
9  I may be coughing. I apologize for that in advance.
10  Okay?
11      A. Sorry.
12      MR. POPE: In other words, keep your distance.
13      MR. TILLERY: Actually, I don't think I'm
14  contagious.
15  BY MR. TILLERY:
16      Q. For this record, would you state your name,
17  please.
18      A. My name is Peter Hertl.
19      Q. And would you tell us where you were born,
20  sir?
21      A. I was born in Stuttgart, Germany.
22      Q. How old are you?
23      A. I'm 54 years old.
24      Q. Where do you -- where is your permanent
25  address?

**Page 8**

1      A. My permanent address is in Jamestown,
2  North Carolina, 109 Thora Drive.
3      Q. How long have you lived there?
4      A. Since '97.
5      Q. And consistently at that same address?
6      A. Yes, correct.
7      Q. What is your current job?
8      A. My current job is I am the head of global
9  product safety for Syngenta Crop Protection.
10      Q. How long have you had that job?
11      A. First -- Beginning of 2010. I have to go with
12  that.
13      Q. I'd like to walk back through your education
14  and training now, if we can, to start off. Where was
15  your first education after what we in America would call
16  high school?
17      A. You know, I attended the University of
18  Tübingen in Germany. Did get a -- a diploma, degree in
19  chemistry. You know, that compares to a master's degree
20  here in the U.S. And then proceeded to get a Ph.D.
21  degree in organic chemistry from the same university.
22      Q. Again, that university is?
23      A. University of Tübingen. T, umlaut, U B E --
24  B I N G E N
25      Q. And where is that?

**Page 9**

1      A. That's in southern Germany in the state of
2  Baden-Württemburg, which is the southwestern state of
3  Germany.
4      Q. By whom are you employed today?
5      A. Today I'm employed by Syngenta Crop
6  Protection, Inc., in Greensboro.
7      Q. How long have you been employed by Syngenta
8  Crop Protection, Inc., in Greensboro?
9      A. Since September 1st, 1997. Well, and the
10  predecessor company. You know, my first employment was
11  with Novartis Crop Protection in Greensboro, which was
12  one of the predecessors of Syngenta, before the merger
13  to Syngenta.
14      Q. Which became ultimately Syngenta --
15      A. Syngenta --
16      Q. -- Crop Protection, Inc.?
17      A. -- correct, yes.
18      Q. Okay. After you got your master's degree, did
19  you have a job? A full-time job?
20      A. No. I did receive my master's degree, and
21  then I did receive a grant of the National Academy of
22  Sciences in Germany to -- to get my Ph.D. degree.
23  Which -- And I started right after I received my
24  master's degree.
25      Q. What was your Ph.D. degree major area of

3  (Pages 6 to 9)

**Exhibit 006 Page 3**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                              11-4-2010
Confidential

## Page 10

1  study?
2      A.  Electrochemical organic chemistry, and
3  specifically I was investigating the reaction mechanisms
4  of --
5      THE REPORTER:  You were studying what?
6  BY THE WITNESS:
7      A.  Electrochemical organic chemistry;
8  specifically it was the reaction mechanisms of oxidation
9  mechanisms of anilines, which is one class of organic
10  molecules.
11     Q.  And what year was it that you were awarded
12  your Ph.D. degree?
13     A.  1987.
14     Q.  How old were you at that time?
15     A.  31 years old.
16     Q.  And then what was your first job after that?
17     A.  My first job after that was in a small
18  chemical company in Germany called Rinol, R I N O L.
19  And they were developing electro conducting polymers for
20  industrial applications.
21     Q.  What did you do there?
22     A.  Product development.
23         (Hertl Deposition Exhibit No. 1
24          marked as requested.)
25  BY MR. TILLERY:

## Page 11

1      Q.  The court reporter has marked your curriculum
2  vitae as Exhibit No. 1.
3      A.  Mm-hmm.
4      Q.  Is this an accurate, up-to-date CV?
5      A.  That's correct.
6      Q.  Now, what did -- How long did you stay in this
7  job you just told me about?
8      A.  Only a couple of months, really.  I started it
9  in summer 1987.  And -- And then I joined Sandoz in
10  Basel 1st of April 1988.  So it was three, four months.
11     Q.  Okay.  And -- And what did you do at Sandoz in
12  your first job?
13     A.  My first job, I was team lead for the residue
14  chemistry group in Basel, Switzerland.
15     Q.  And what does that mean?
16     A.  Well, you know, it -- it included
17  responsibility to manage a team of 10 to
18  11 scientists -- I don't recall the exact number -- to
19  generate crop residue data, mainly supporting
20  registration of our compounds in European markets.
21     Q.  Tell us what residue data is.
22     A.  Well, when you do apply a crop protection
23  chemical to a crop, there will be occasionally minute
24  amounts of that material left on the crop once they are
25  harvested and in the commercial trade.  And these

## Page 12

1  residue levels, these small quantities, they're
2  regulated.  We generate the data that allow the regu --
3  regulatory limits for those crop residues on the crops
4  to be set by the authorities.
5      Q.  And what particular molecules were you
6  studying at that time?
7      A.  Well, that would have included the range of --
8  of compounds that Sandoz Agro at that point in time
9  developed and marketed in Europe.  So it was -- I don't
10  recall the exact list of active ingredients, but it was
11  probably seven, eight, nine, ten different active
12  ingredients that we developed.
13     Q.  That you were developing?
14     A.  Developing and supporting.
15     Q.  This wasn't existing crops that were all --
16  sorry -- Strike that.
17         This wasn't existing compounds that were
18  already on the market?  This was a new type of compound?
19     A.  Both.  Both.  It was existing compounds, and
20  when you do have existing compounds and you continue to
21  develop them, there is a need to support new data for
22  continued development of existing compounds.  But it
23  also included new compounds that weren't on the market
24  at that point in time.
25     Q.  The -- when was the first time you ever worked

## Page 13

1  with atrazine?
2      A.  The first time I've worked with atrazine was
3  after I arrived in the U.S.  So that was in -- following
4  my arrival here in 1997.  Probably my direct involvement
5  started around the year 2000.
6      Q.  Okay.  So back to this job you had starting in
7  1988.  How long did you have that position?
8      A.  I had that position until 1990 -- end of 1993,
9  beginning of 1994.  Let me check my -- It says August
10  1994.  Until August 1994.  And then moved on to assume a
11  similar but slightly broader position in the -- a
12  different Sandoz affiliate in France.
13     Q.  And how was that position in France different?
14     A.  The area of responsibility was a little bit
15  larger.  So -- But used to be crop residue data,
16  development, and my first position in Basel was then
17  extended to environmental exposure data generation and
18  included also environmental and crop metabolism studies.
19  It also included the responsibility for a larger team.
20  We had about 40 team members at the site in France.
21     Q.  Generally, what were those team members, those
22  40 people, doing?
23     A.  Generally, what they were doing was they were
24  working with, you know, samples of biological systems,
25  so crop samples, plant samples, soil samples, water

4  (Pages 10 to 13)

Exhibit 006 Page 4
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                               11-4-2010
Confidential

### Page 14

1  samples. They developed methods to analyze residues of
2  hard compounds in those samples. They actually did the
3  analyses and quantified residue levels in those samples.
4  So that was about one-half of the group.
5      The other half of the group was doing, you
6  know, basic research to understand how compounds break
7  down in those biological systems. That's one of the --
8  you know -- how do you call it? -- technical questions
9  we need to answer for crop protection chemicals is not
10  only how much is there, but also how do they break down
11  in the different crops and in the different
12  environmental compartments. So that was what the second
13  half of the team was responsible for.
14      Q.  And when you say "break down," what do you
15  mean, sir?
16      A.  Well, chemicals undergo reactions in the
17  environment. You know, they undergo photo degradation
18  in the influence of light. They undergo a hydrolytic
19  degradation under the influence of water. And, you
20  know, that happens not only to crop protection
21  chemicals; any -- any chemical breaks down under
22  environmental conditions.
23      So for crop protection chemicals, you have to
24  demonstrate how they break down, how long it takes for
25  them to break down, and what degradation products are

### Page 15

1  formed. And, you know, if there is concern about some
2  of those degradation products, these are regulated, as
3  well. So we need to understand what the degradation
4  process is. And if there is a safety --
5      Q.  How do you assess the safety of a breakdown
6  product versus the original chemical compound?
7      A.  That's a good question. There is a direct and
8  an indirect means to do that. So imagine you have a
9  Chemical A breaks down into degradation Product B. If
10  that same pattern of breakdown occurs in a mammalian
11  test system, we usually, you know, do rodents tests to
12  assess hazards or growth effects.
13      So if you have the same breakdown pattern in
14  the rodents we are testing, then, you know, the -- the
15  actual test accounts for the parent and the degradation
16  product because you have to -- the test has been exposed
17  to it. So that's the indirect way of doing it.
18      If the chemical doesn't break down in your
19  animal test system into that metabolite, you have to
20  test that metabolite separately in a -- in a -- in a
21  rodent assay.
22      Q.  How do you do that?
23      A.  Well, the rodent assays are usually designed
24  to, you know, show an adverse effect. So what you do is
25  you take the chemical, feed it to rodents over certain

### Page 16

1  periods of time, and you would dose high enough that you
2  can ensure that you do see an adverse effect so that you
3  know what the adverse effect is.
4      And then you have various lower dose levels
5  that allow you to establish what the no-effect level is.
6  So what is the level of chemical that you can expose the
7  test system to so you don't see any of those effects.
8      Q.  So this is the sort of thing in a very general
9  sense, that was being done while you were in France?
10      A.  We did do the breakdown and the
11  quantification. We didn't do the animal assays. So
12  there was no animal work done in France.
13      Q.  Where would that be done?
14      A.  The animal work -- well, that goes back to
15  pre-Novartis times. The animal work would be done at a
16  facility in -- close to Basel, Switzerland. That was a,
17  you know, a Sandoz toxicology department that did the
18  animal assays.
19      Q.  Okay.
20      A.  That's it.
21      Q.  Excuse me.
22      Did that job change over the course of the
23  time you spent in France, or was that roughly just the
24  job in a summary form?
25      A.  Well, it was -- As you can see, it was a

### Page 17

1  relatively short assignment, two years -- less than --
2  well, a little bit more than two years. And, no, the
3  job did not change because the job was -- The main
4  subject of the job was to build up the team. It was a
5  brand-new test facility. And to get them up and running
6  and to get them GLP certified, which is a quality system
7  that -- that you have to pass before you can do studies
8  for regulatory purposes, which we achieved, I think
9  in -- in 1995.
10      Q.  What does "GLP certified" mean?
11      A.  It is -- GLP stands for good laboratory
12  practice. And it essentially means that each step of
13  the work that is done in generating residue data or FAY
14  data or animal assays is documented and recorded in a
15  way that it is fully reproducible from the records, that
16  all the conclusions that are drawn from the technical
17  data are fully supported by the raw data, that the raw
18  data have been fully collected and documented and are
19  properly archived so that any conclusions drawn from the
20  technical -- from the technical data and the studies can
21  be repeated, reproduced, by an independent scientist.
22      Q.  What was your next job?
23      A.  My next job was -- I was just after the
24  merger of Ciba-Geigy and Sandoz to Novartis, which
25  happened, I think, towards the end of 1996. So I

Exhibit 006 Page 5
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 223 of 486

Hertl, Peter                          11-4-2010
Confidential

## Page 18

1  started my next job in January 1997 with Novartis Crop
2  Protection in Basel.  And I was heading the dietary
3  exposure department for the merged company and -- for
4  the crop protection business of the merged company, I
5  have to say.
6      Q.  And -- and your job there was in what city?
7      A.  That was in Basel, Switzerland.
8      Q.  And what is dietary exposure data?  What does
9  that mean?
10     A.  It's -- it's very similar to what I did in the
11  previous two roles.  It included the crop residue
12  studies that I had described earlier.  And it included
13  what I -- what we called "Dietary metabolism studies."
14  So this is how do crop protection chemicals break down
15  in the crops, and, also, how do crop protection
16  chemicals break down or are taken up and excreted by
17  farm animals.  So this time we looked into crops, crop
18  residues, and farm animals, and did do metabolism and
19  residue work for both those biological systems.
20     Q.  And that was a job that lasted for how long?
21     A.  All of two months.
22     Q.  Okay.
23     A.  All of two months.
24     Q.  And then what did you do?
25     A.  And -- Well, in -- by the end of February

## Page 19

1  1997, I assumed the additional responsibility for the
2  toxicology department of human safety -- the toxicology
3  department of Novartis Crop Protection, which was a
4  partner department of the dietary exposure team.
5      So the organization consisted at that point in
6  time of three groups.  Dietary exposure, toxicology, and
7  environmental safety was headed by a head of product
8  safety, which left the company in February 1997, because
9  he got an outside offer that he found more attractive.
10     So for an interim period I was responsible for
11  the toxicology and the dietary exposure department,
12  which were joined into the human safety department.
13     Q.  Who was the head of this product safety at
14  that time?  Who left?
15     A.  First name was Martin.  I -- I don't recall
16  the second name.  I'm sorry.
17     Q.  Okay.  So that job started in March of 1997?
18     A.  That's correct.
19     Q.  And you became then the -- the head of human
20  safety department?
21     A.  Department for Novartis Crop Protection in
22  Basel, yes, that's correct.
23     Q.  Okay.  What did you do in that job?
24     A.  Well, you know -- So this was, you know,
25  managing the technical teams which did the dietary

## Page 20

1  exposure work that I described previously.  The
2  additional responsibility was to manage the tox testing
3  facility that we had in -- in a site close to Basel,
4  where the -- the animal assays were conducted which I
5  described earlier for our range of new and existing
6  products.
7      Q.  And what were you doing with respect to human
8  health or safety that you hadn't been doing in your
9  previous jobs?
10     A.  Well, that was the first time where we --
11  where I was responsible not only for determining what
12  people are potentially exposed to, you know, through
13  residues on crops that are treated, but I was also
14  responsible for a group that did the other part of the
15  equation, which is to determine what are potential
16  adverse effects if you expose test animals to high
17  doses, and what are the null effect levels, safe levels,
18  in those test animals.
19     Q.  And how did you go about conducting human
20  toxicology studies or studies -- toxicology studies that
21  could impact humans?
22     A.  Okay.  You know, I have to maybe be quite
23  clear that we don't do toxicology testing in humans.
24     Q.  Right.
25     A.  This is not part of the test program.  So we

## Page 21

1  use animal species, quite a range of animal species as
2  surrogate biological test systems to determine safe
3  levels that can then be used for human risk assessments
4  with additional safety factors added on top on those end
5  points.
6      So what we do -- What we did do in that
7  toxicology department, we did do the animal assays.
8  And these are mostly rodent assays, but, you know, there
9  are also tests done in rabbits and in dogs.
10     Q.  Okay.  And what were the tests designed to --
11  back to my point -- to assess in terms of impact on
12  human health?
13     A.  Well, the -- The test framework that -- First
14  of all, it's a test framework that's sanctioned by OECD
15  that's, you know, is under -- it contained in WHO
16  frameworks and EPA frameworks.  So that the assays that
17  you have to do in order to establish safe level for
18  human exposure is pretty well-defined in the regulatory
19  community.  It's not something that a company decides to
20  do a certain way.  It's very well-prescribed.  So I have
21  to just say that as an intro.
22     We would do a series of tests that would look
23  at short-term exposure, which, you know, you probably
24  know as acute exposure.  So if you expose over a very
25  short time period to -- to a set of biotics, what is a

Westlaw Deposition Services    800.548.3668 Ext. 1

Exhibit 006 Page 6
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                               11-4-2010
Confidential

Page 22

1  level where you see an effect?  What is a safe level?
2     And then we would, you know, open up that
3  exposure window, up to -- to do a life cycle study in
4  rodents where we would look at chronic exposure, the
5  test system is exposed chronically over their entire
6  life span to a chemical.  What would be -- the adverse
7  effects be and what would be the level that shows no
8  effect whatsoever.
9     Q.  Was this for purposes of releasing new
10 molecules to the market?
11    A.  Yes.  Yes.
12    Q.  And was this required as part of the
13 regulatory scheme that you were working within?
14    A.  Yes.
15    Q.  And was this a European, American, or both
16 regulatory scheme?
17    A.  Both.  And I have to say that -- it -- it --
18 it -- it does depend on the discipline you're looking
19 at.  And -- And since we're -- You know, we have to
20 separate different disciplines.  So if you look at
21 toxicology, this is really human -- the -- the animal
22 assays that are used to define a safe dose in humans.
23    These are tests that involve a lot of test
24 animals, are quite complicated to do, and they are
25 typically done to globally agreed protocols.  So a

Page 23

1  two-years' rat chronic assay is usually done only once.
2  And in line with the globally agreed protocol under
3  OECD, that's accepted by regulatory authorities
4  worldwide.
5     Q.  What is the goal when you're using animal
6  studies.  And I know that certain mammalian species
7  allow you to extract --
8     A.  Mm-hmm.
9     Q.  -- impacts on --
10    A.  Mm-hmm.
11    Q.  -- on human beings --
12    A.  Mm-hmm.
13    Q.  -- and accepted in scientific study and
14 analysis.
15    A.  Mm-hmm.
16    Q.  What is it that you seek to achieve in terms
17 of a particular human being that you're looking at?  Is
18 there a particular hypothetical model of a human that
19 you're looking at?  A size?  An age?  What is that?
20    A.  Well, we -- we look at all of them.
21    Q.  Right.
22    A.  Okay.  We look at all of them.  So -- And
23 that's why you have assays that span a quite broad range
24 in terms of time, but also in terms of purpose, what
25 they run for.

Page 24

1     So, you know, obviously the -- the lifelong
2  assay looks after chronic exposure.  So if -- if people
3  would be eating for 70 years a certain dose of their
4  entire life, you know, what's -- what's a safe level and
5  what are potential effects that you would see when you
6  go to excessive doses.  So that's -- So that's the goal
7  for the two-years' rat assay.
8     But there are certainly assays that look at
9  the, you know, developing offspring.  So do we have any
10 teratogenic effects as a result of exposure of models to
11 the test chemical and what are safe levels, the same
12 question.  So we -- we look at certain life spans.
13    We also do look at effects and their relevance
14 to humans.  That's also part of the investigation.  So
15 when you do see an effect in a study, there is a
16 question, and how does this apply to human risk
17 assessment?  And if those questions are on there,
18 there's more work done.
19    Q.  Now, this particular program that you were in
20 at this time, this went on until -- until when, sir?
21    A.  Until September '97.
22    Q.  Okay.  And when you did that, how was the
23 protocol established in terms of releasing a new
24 molecule?  Was this worked through a lab first that
25 developed the molecule?

Page 25

1     A.  Well, molecule development -- Product safety
2  is an important part of molecule development, but it's
3  not the only part.  So clearly you have to develop the
4  biological efficacy or effect of the molecule, which is
5  what you actually market.  So a herbicide has to be an
6  effective weed control agent or an insecticide has to be
7  effective in controlling noxious insects.  So that's the
8  second component of product development.
9     There's a third component, which is the actual
10 product that you bring to the market.  So packaging,
11 formulation of it.  So you have these three components.
12 Product safety is one of the product development
13 streams -- streams that you would do.  And you would
14 bring it together with efficacy, which defines how much
15 you'll have to use in order to get proper control and,
16 you know, the product formulation, which is the physical
17 bottle or container in which it is sold.  And those
18 together would then, you know, be evaluated as a -- as a
19 product, you know, to be marketed.
20    Q.  I was actually looking more toward the sort of
21 stages of development of --
22    A.  Okay.
23    Q.  -- molecules --
24    A.  Okay.
25    Q.  -- which we -- which we will talk about --

7  (Pages 22 to 25)

Exhibit 006 Page 7

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                         11-4-2010
Confidential

Page 26

1   A. Mm-hmm.
2   Q. -- later on --
3   A. Mm-hmm.
4   Q. -- in this --
5   A. Mm-hmm.
6   Q. -- deposition.
7   A. Mm-hmm.
8   Q. But -- And you're very familiar with --
9   A. Mm-hmm.
10   Q. -- obviously with the stages of development.
11   The work that you were doing at that time in your
12   career, at what stage in the four-step process would
13   that have occurred?
14   A. It would -- We would start doing work at
15   Stage 2.
16   Q. At Stage 2?
17   A. At Stage 2.
18   Q. This was after the molecule left the
19   laboratory?
20   A. It was after the molecule left the research
21   laboratory and the molecular structure was defined as
22   the candidate of choice.
23   Q. I see.
24   A. So we would -- We would do work at Stage 2,
25   and what we call Stage 2 was a fitness evaluation.

Page 27

1   Q. All right.
2   A. So we looked at, you know, profiles, chemical
3   profiles, safety profiles, biological profiles.
4   Q. Okay.
5   A. And if it was deemed to be fit, it would be
6   promoted into full development, which is Stage 3.
7   Q. Now, the products that you were dealing with
8   from September -- up until September of 1997, any of
9   those molecules currently being sold by any Syngenta
10   entities?
11   A. Yes.
12   Q. Which ones?
13   A. Let's see. That will be Phiametoxan was in --
14   in Stage 3 development. And I -- I was in charge of the
15   function in Basel, which is currently our biggest
16   product worldwide.
17   MR. POPE: Do you want to spell that for the court
18   reporter.
19   THE WITNESS: Phia -- P H I A M E T O X A N.
20   BY THE WITNESS:
21   A. So that -- That springs to the foreground --
22   And, you know, there were probably one or two others
23   which I can't recall.
24   Q. Okay. How many total molecules were you
25   working on at that time?

Page 28

1   A. We typically had -- I -- I -- I cannot tell
2   you exactly how many we were working on during that time
3   window, but we typically had one or two new, different
4   ingredients, new molecules, each year. So -- And since
5   development phase takes about four years' time, you
6   know, it would have to be somewhere between four and
7   eight molecules --
8   Q. Okay.
9   A. -- to work on simultaneously at different
10   stages in that four years' period.
11   Q. And what was the next job you had?
12   A. The next job was the head of environmental
13   sciences in Greensboro, North Carolina, for Novartis.
14   Q. And that started in September 1997?
15   A. That's correct.
16   Q. And could you tell us what your duties and
17   responsibilities were at that job?
18   A. Okay. So this is now a kind of a change in
19   direction. You know, I had been responsible for crop
20   exposure, residue exposure, and, you know, for a short
21   period of time to do the animal assays for human safety
22   assessment.
23        We do the same for environmental evaluations.
24   So the environmental safety department looks at exposure
25   levels that you might see in the environment as a

Page 29

1   consequence of using our chemicals on the field. So is
2   there any volatilization going on; is there any runoff
3   from fields going on? How do they degrade; how quickly
4   do they degrade in the field once they're in the various
5   crops? And do these levels that move from the site of
6   application to nontarget sites --
7   THE REPORTER: To where?
8   THE WITNESS: To nontarget sites --
9   BY THE WITNESS:
10   A. -- do they cause an effect in nontarget
11   organisms? In -- in organisms that you don't want to
12   control.
13        So there is data generated around that, and
14   that department was responsible for all that data
15   generation for the U.S. These are local requirements
16   because you look at local environments where you use the
17   data using local use levels. It looks into the amount
18   of product that's in those environmental compartments,
19   so that's one part of the studies we do.
20        And then the other part of the studies we do
21   is we establish safe levels in what we call
22   representative nontarget organisms, where we study
23   representative nontarget plants, nontarget animals. And you do simply
24   the same risk assessment that I described earlier for
25   the humans, but you look at environmental species

8   (Pages 26 to 29)

Exhibit 006 Page 8
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 226 of 486

Hertl, Peter                    11-4-2010
Confidential

Page 30

1  instead.
2    Q.  And you kept that job until actually the
3  change from Novartis Crop Protection, Inc., to Syngenta
4  Crop Protection, Inc.?
5    A.  Yes, that's correct.
6    Q.  Did your responsibility stay the same when the
7  change occurred?
8    A.  It -- It -- In -- In terms of technical
9  responsibility, yes, it did stay the same.  In terms of
10  portfolio of products that we were responsible for, it
11  grew because we had now the joint portfolios of
12  previously used to be Syneca and Novartis to support
13  through that team.
14    Q.  So what did your job become after 2000?  In
15  December of 2000.
16    A.  Well, it -- it -- I was responsible for
17  environmental safety and ecological scientists for
18  Syngenta, but for a larger range of products than
19  previously.  So that was a change.  And we had a couple
20  of new team members that joined as a result of the
21  merger, which would be ex-employees that Syneca had in
22  California.  So the team grew and the number of active
23  ingredients or products grew.
24    Q.  Who were those team members?
25    A.  Which ones?

Page 31

1    Q.  You said you had a couple of additional team
2  members that joined you from Syneca.
3    A.  Yeah.  Well, I don't -- I don't know if I can
4  recall all of them because some of them have retired in
5  the meantime.  But it was -- Paul Hennely was one of
6  those team members.  Paul Forensis was one of those team
7  members, which are still there today.  And there might
8  have been two more, which I don't recall which have left
9  in the meantime, retired.
10    Q.  Excuse me.
11        You said that you were responsible for
12  environmental safety and ecological science --
13    A.  Mm-hmm.
14    Q.  -- for Syngenta.
15    A.  Mm-hmm.
16    Q.  Now, was that for the entire operation?
17    A.  Well, it was for Crop Protection, Inc., in --
18  in the U.S.
19    Q.  Okay.  Was it -- Did you have duties and
20  responsibilities beyond the United States?
21    A.  No.
22    Q.  So when you were working in -- in your job at
23  that time, you weren't working, then, in a NAFTA
24  position?
25    MR. POPE:  That time being December of 2000.

Page 32

1    MR. TILLERY:  When he started at Syngenta.
2  BY THE WITNESS:
3    A.  To March -- Well, we did coordinate
4  activities.  First of all, I have to say there is very
5  little environmental science data and support needed in
6  Mexico.  We did have a team in Canada, and there's a,
7  you know, a group of scientists there that largely
8  deliver studies and support needs in support of Canadian
9  registrations.  We would coordinate with them.  But it
10  would be their accountability to make sure that they did
11  what they needed to do in terms of data generation for
12  Canada.  So this was a U.S.-based role.
13    Q.  Okay.  So what you're saying to me is that --
14  And what -- Just so we're clear on the record, what time
15  frame are you talking about?
16    A.  2000 to 2003.
17    Q.  From 2000 to 2003?
18    A.  Yeah.  And also the '97 to 2000.  That -- That
19  six-year period, really.
20    Q.  And -- And was that the total -- totality of
21  your job and responsibility at that time?
22    A.  Yes.
23    Q.  And you're saying to me that you had no job
24  responsibilities outside of the United States?
25    A.  No, no.

Page 33

1    Q.  You didn't?
2    A.  I did not have job --
3    Q.  Okay.
4    A.  -- responsibilities.
5    Q.  And you had no -- You had no report -- Did you
6  have reporting obligations outside of the United States?
7    A.  No, I did not.
8    Q.  So who did you report to at that time?
9    A.  To the vice president of development.
10    Q.  And who was that?
11    A.  Let's see, the people changed.  From 1997 to
12  2000, it was a Dave Wataker.
13    Q.  Where was his office?
14    A.  In Greensboro, North Carolina.
15    Q.  What was his job?
16    A.  He was the vice president of development for
17  Novartis Crop Protection.  And he retired with the
18  formation of Syngenta, I believe.  And his successor was
19  Gary Dickson, who became vice president of development
20  for -- development for Syngenta Crop Protection, Inc.
21    Q.  Is there a functional reporting obligation
22  that's different than the type of reporting obligation
23  you've been telling me about?
24    MR. POPE:  General or for him at that period of
25  time?

9  (Pages 30 to 33)

**Exhibit 006 Page 9**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 34

BY MR. TILLERY:
1
2    Q.  For you.
3    A.  For me.  Well -- I mean, function -- We would
4    always coordinate activities in areas where we could use
5    data more broadly.  You know, for example, I did
6    describe to you that the toxicology testing -- and also
7    some of the ecotoxicology testing -- is using animals,
8    is then -- is then to always heed the protocols and to
9    the extent it's possible, you would do those tests only
10   once.  You know, for animal use reasons, for cost
11   reasons.
12        So, I mean, there was coordination, functional
13   coordination, going on so that when these studies were
14   done, irrespective of where they were done in the
15   organization, that they were done in a form and fashion
16   that they could be used by whoever needed to use them
17   without having to be repeated.
18   Q.  Do you know what I mean when I say the words
19   "functional reporting"?
20   A.  No.  Describe that for me.
21   Q.  Well, actually, it's been a term that's been
22   used by other Syngenta witnesses --
23   A.  Mm-hmm.
24   Q.  -- and I was wondering if you're familiar with
25   it?

Page 35

1    A.  Well, we -- You know, I -- I -- I -- I
2    think -- I believe --
3    MR. POPE:  You're -- you're -- you're not being
4    asked to testify what the other people testified to.
5    He's just asking you a question as to what you
6    understand the use of the term, if you do.
7    BY MR. TILLERY:
8    Q.  Right.  I'm asking you what "functional
9    reporting" means.
10   A.  Well, the functional reporting means, for me,
11   the coordina -- coordination of test programs with our
12   product safety teams elsewhere that generate data that
13   we use to support registrations in the U.S.
14   Q.  So was that --
15   A.  So it's a coordination of work progress.
16   Q.  Okay.  What does the word "coordination" mean,
17   then, when you use it in that context?
18   A.  Well, the coordination means for me that, you
19   know, if -- if you look at an environmental safety test
20   program that we would do in support of -- of a new
21   product we develop, there is a list of activities that
22   need to be done in order to pass regulatory
23   requirements.
24        And coordination would mean that you would sit
25   down and clearly define, these are local requirements,

Page 36

1    they have to be done in the respective regions.  They
2    would be done in Europe or in the U.S., because they had
3    to be done in local environments.
4         And then there is a piece of the work program
5    that is laboratory based, and that data can be used
6    everywhere, if done properly, where you are looking to
7    gain registration.  And the coordination discussion
8    would be to agree who is doing it, how is it being done,
9    where it is being done, how it is being funded.
10   Q.  Would you agree with me, sir, that there are
11   multiple different components to getting a molecule
12   ultimately to the market in terms of scientific analysis
13   that has to be done?
14   A.  Yes.
15   Q.  And when you talk about coordination, you're
16   talking about some of the work being done here in the
17   United States, some of the work being done at the UK in
18   laboratories, correct?
19   A.  Correct.
20   Q.  And that work wouldn't be repeated in the
21   U.S., would it?
22   A.  No, it wouldn't.  And some of the work would
23   be done in the U.S. and would be used in the UK, and it
24   wouldn't be repeated there.
25   Q.  Exactly.  And some of the work would be done

Page 37

1    in Basel, too, wouldn't it?
2    A.  Not nowadays, but maybe --
3    Q.  At that time?
4    A.  When we had units in Basel, some of the work
5    would be done in Basel and used in the U.S.
6    Q.  So coordination, what you meant was, is that
7    rather than redoing all of these things in each area,
8    you have one part of the group or project being done in
9    one part of the world, and another being done in another
10   part of the world, and putting all those pieces together
11   to conclude with a molecule that can be sold?
12   MR. POPE:  Objection to the form of the question.
13   MR. TILLERY:  Go ahead.
14   MR. POPE:  You're trying to summarize his
15   testimony.  And it's not accurate.
16   BY MR. TILLERY:
17   Q.  You can go ahead.
18   A.  Just to make that clear, when we -- product
19   data safety package contains a lot of elements, but we
20   can clearly break it down to two major pieces.  The
21   first piece is all the work that needs to be done in the
22   environments where we use the product.
23        So give you an example.  If we develop a corn
24   herbicide in the U.S., we have to do the environmental
25   test programs in the U.S.  If we develop the same set of

10  (Pages 34 to 37)

Exhibit 006 Page 10
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                              11-4-2010
Confidential

1  corn herbicide elsewhere, there is the tox testing that
2  is necessary to get the registration, would be done only
3  once and can be done in the U.S., or can be done
4  anywhere that we have a competent laboratory, and the
5  assay would be done only once.
6      Q.  Back to my question, though.
7      A.  Yeah.
8      Q.  That was really a different question.  My
9  question to you is, these different facets of the
10  overall process that are involved in getting a molecule
11  into a product onto the market --
12      A.  Mm-hmm.
13      Q.  -- involve different components being done in
14  different operations by different subsidiaries around
15  the world; isn't that correct?
16      A.  Different components done by different
17  subsidiaries around the world, that's correct, yes.
18      MR. TILLERY:  Can we take just a couple-minute
19  break.
20      MR. POPE:  Of course.
21      THE VIDEOGRAPHER:  This marks the end of Videotape
22  No. 1 in the deposition of Peter Hertl.  It's now
23  10:24 a.m.  Going off the record.
24          (A short recess was had.)
25      THE VIDEOGRAPHER:  Going on the record.  This marks

1  the beginning of Videotape No. 2 in the deposition of
2  Peter Hertl.  The time is now 10:34 a.m.
3  BY MR. TILLERY:
4      Q.  What was your next job?
5      A.  My next job was head of global environmental
6  fate.
7      Q.  And what was your responsibility?
8      A.  My responsibility was to, well, lead the
9  environmental fate groups in their program development
10  for -- at the various Syngenta sites to deliver the
11  environmental fate program that we needed to support
12  globally to gain our registrations.
13      Q.  What does "environmental fate" mean?
14      A.  Environmental fate has two pieces to it.  One
15  is to define how a compound breaks down in environmental
16  compartments.  So very much like what we did previously
17  with crops and farm animals.  Now it's environmental
18  compartments, so it's soil, water, air.
19          And the second piece of it is once we
20  understand how it breaks down, to conduct studies and
21  tests in the local environments to see what residue
22  levels you would expect in environmental compartments as
23  part of the application and the breakdown processes.
24      Q.  When you said that you were the global head
25  over the various Syngenta sites, what were these various

1  other Syngenta sites over which you had global
2  responsibility?
3      A.  Well, we had -- I had direct lineman's
4  responsibility for the Greensboro operation, where I was
5  the line manager.  And then there were two more teams
6  in -- in the organization.  One was based in the UK, in
7  Jealott's Hill; the other one was based in Basel,
8  Rosenthal, which did environmental fate programs in
9  support of European registrations.
10          And so that role -- I then agreed lineman
11  responsibility for the Greensboro site and coordination
12  of programs where we did mutual data generation for the
13  three sites that did develop data.  Some of them can be
14  used irrespective of site.
15      Q.  And who was the head of the UK site who
16  reported to you as global director?
17      MR. POPE:  Objection to the form of the question.
18  No foundation.
19          Go ahead.
20  BY THE WITNESS:
21      A.  Who was the head of the UK site?  I have to go
22  down memory lane for a minute.  Mike Earl.
23      THE REPORTER:  What was that name?
24      THE WITNESS:  Mike Earl.
25      THE REPORTER:  U R L?

1      THE WITNESS:  E A R L.
2      THE REPORTER:  Thank you.
3  BY MR. TILLERY:
4      Q.  And what was his title?
5      A.  I don't recall.
6      Q.  And who did he work for?
7      A.  You mean employer?
8      Q.  Yes.
9      A.  Well, he --
10      Q.  Who was his employer?
11      A.  Well, I don't know the legal name of the
12  affiliate, but it would -- would have been the -- you
13  know, the crop protection organization of Syngenta in
14  the UK.
15      Q.  Right.  I'm -- I'm -- I'm wanting to know who
16  employed him.
17      MR. POPE:  He just said he didn't know.
18  BY MR. TILLERY:
19      Q.  Who did he work for?
20      MR. POPE:  Objection.  He just said he didn't know.
21  BY THE WITNESS:
22      A.  I -- I -- I don't know.  I didn't employ him.
23      Q.  Okay.  And he did not work for Syngenta Crop
24  Protection, did he?
25      A.  I --

11  (Pages 38 to 41)

Exhibit 006 Page 11
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 42

1     Q.  Syngenta Crop Protection, Inc.?
2     A.  No.  In the U.S., no.
3     Q.  He worked for another Syngenta subsidiary,
4  would you agree?
5     A.  I don't know.
6     Q.  So you don't know that he even had any
7  connection with the business?
8     A.  Well, he did work for a Syngenta organization.
9     Q.  So we got that.
10    A.  Yes.
11    Q.  So you -- would you agree with me -- I -- I'm
12  trying to make this --
13    A.  Yeah.
14    Q.  -- as easy as we can.
15    A.  Yeah.
16    Q.  Okay.  And would you agree with me, then, that
17  he worked for another subsidiary within the Syngenta
18  umbrella?
19    A.  Yes.
20    Q.  And you just don't happen to know which one
21  that is?
22    A.  That is correct.
23    Q.  Okay.  It didn't matter to you?
24    A.  It didn't matter to me.
25    Q.  Okay.  It didn't matter.  You were sharing

Page 43

1  information, working together?
2     A.  Coordinating programs, yes.
3     Q.  Coordinating.  You were working together on a
4  project.  And what projects were you working together
5  on?
6     A.  Oh, that would have been development projects
7  that we had in development in that time period.  So a
8  new active ingredient that we developed in that time
9  period, was mendiproponite, which was one of our newer
10  fungicides; there was prinoxadan, which is one of our
11  new herbicides.  These are the two active ingredients
12  that were in Stage 2 or 3 at that time.
13      And then there's always a lot of support work
14  for compounds either range where you have to develop data
15  as part of the life cycle management program.
16    Q.  Was mesotrione one of those?
17    A.  Mesotrione was established and introduced to
18  the market at that point in time.  So we -- I don't
19  think that there was a lot of work going on with
20  mesotrione.
21    Q.  Was there any?
22    A.  There might have been some small, but not big
23  programs, because, you know, that was after mesotrione,
24  which is both in Europe and in the U.S.
25    Q.  Who was the person who headed up the Basel

Page 44

1  site, the Syngenta site, who reported to you?
2       MR. POPE:  Objection to the form of the question.
3  I don't believe there's any testimony that these people
4  reported to him.
5       MR. TILLERY:  Well -- okay.  You can make your
6  objection if --
7       MR. POPE:  I have.
8       MR. TILLERY:  -- you want to speak.
9       MR. POPE:  I have made my objection.
10      MR. TILLERY:  But I -- I don't like the
11  speaking objections.  If you think it misstates
12  evidence, you can say that.  But I don't like the
13  speaking objections.
14  BY MR. TILLERY:
15    Q.  Who was the person at Basel who headed up the
16  Basel site that you said was within this group over
17  which you were global director?
18    A.  That was Udo, Plücken, P L, umlaut, U C K E N.
19    Q.  And what was his title?
20    A.  I don't recall.
21    Q.  Do you know which entity he worked for of the
22  Syngenta entities?
23    A.  He would have worked for Syngenta Crop
24  Protection AG.
25    Q.  And do you know what his job title there was

Page 45

1  at all at Syngenta Crop Protection AG?
2     A.  Well, he was a Syngenta fellow and team lead
3  for the environmental fate group.  But I don't recall
4  the exact title.
5     Q.  How many total people were working within the
6  Syngenta umbrella of entities within this group?
7     A.  Within the environmental fate group?
8     Q.  Yes.  The -- the group that you said you
9  started in April 2003 as head of global environmental
10  fate.
11    A.  Yeah.
12    Q.  How many would be involved in that?
13    A.  About 100.  About 100.
14    Q.  And where were they located?
15    A.  We had -- about 40 of them were in Greensboro.
16  We had about 45-ish in Jealott's Hill in the UK and
17  about 15 in Basel.
18    Q.  Did that group that you just identified, the
19  global environmental fate group, do work to support
20  registrations in other countries?
21    A.  Well, some of the work they did did support
22  registrations in all the countries where the product
23  needed support.  And these are the -- the fundamental
24  breakdown tests that you do in laboratories.  And so
25  there were tests done in the UK that were used in Europe

12  (Pages 42 to 45)

Exhibit 006 Page 12

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

Page 46

1  and in the U.S.  There were tests done in the U.S. that
2  were used by European colleagues to support
3  registrations.
4        But the majority of the work had to be done in
5  local environments, so the actual determination of
6  residues in environmental compartments in fields or
7  close to fields had to be done in the respective
8  countries even.
9        So here in the U.S., you have to do it
10 locally.  In Europe, you have -- you have regulation to
11 do these tests locally, which is also true in some of
12 the countries outside of Europe and the U.S.
13      Q.  But my question to you was whether -- first of
14 all -- whether that group was doing work to support
15 registrations in other countries, outside of the area
16 where the work was being done?
17      A.  Yes.
18      Q.  So work was being done in the United States
19 that would facilitate a registration for a product in
20 another country, correct?
21      A.  A smaller part of that work, yes, you know,
22 fell in that category.
23      Q.  And work was being done at Jealott's Hill to
24 support registrations in the United States --
25      A.  Correct.

Page 47

1      Q.  -- or other countries, correct?
2      A.  Correct.
3      Q.  And at that time work -- some work was being
4  done at Basel to support registrations in the United
5  States, correct?
6      A.  Basel was an exception because Basel had no
7  experimental facilities at that point in time.  So all
8  they did was document preparations, official document
9  preparation, and coordination of activities.
10     Q.  So that --
11     A.  No -- no actual studying work done --
12     Q.  Okay.
13     A.  -- in Basel.
14     Q.  But you -- so you could have gotten by without
15 the document preparation?  You could have cut that out
16 at that time?
17     A.  Well, not for Europe but for the U.S., we
18 couldn't have -- we could have gotten by without it
19 because you don't have to do specific submittal
20 documents for the U.S.
21     Q.  Okay.
22     A.  So wouldn't have submitted it.
23     Q.  But in Europe you would have needed it, right?
24     A.  In Europe you need it, yes.
25     Q.  And you're saying you don't submit documents

Page 48

1  to the EPA?
2      A.  We do submit -- I have to correct that.
3        We do submit studies to the EPA.
4      Q.  And the work they did in Basel included the
5  submission of these types of documents for registration
6  at that time, didn't it?
7      A.  The work they did in Basel at that time was
8  not submitted to the EPA, if that is what your question
9  was.
10     Q.  Was it done to support registrations?
11     A.  In Europe, but not in -- in the U.S.
12     Q.  Okay.  Now, what was the next job you had?
13     A.  The next job I had was -- was heading the
14 environmental safety group for the Americas in 2007.  So
15 it was January 2007 to October 2007.
16     Q.  So it was for a period of about nine months?
17     A.  It was a period for about nine months, yes.
18     Q.  And what was your responsibility for the
19 Americas?  Was that Latin America and NAFTA?
20     A.  It was Latin America and NAFTA, that's
21 correct.
22     Q.  So this was environmental safety function for
23 which countries?
24     A.  Well, it would have included the three NAFTA
25 countries, so Canada, the U.S., and Mexico.  And there

Page 49

1  is very little environmental safety data needed in Latin
2  at this point in time, but there is some needed in
3  Brazil, so we did support our Brazilian colleagues,
4  predominantly with technical advice and supporting their
5  data generation activities scientifically in the --
6      Q.  So --
7      A.  -- Brazilian laboratories.
8      Q.  -- what you're saying is you did no scientific
9  testing for any of the other Latin American countries
10 where it was sold, where these products were sold?
11     A.  The upper Latin American countries usually
12 accept data that have been generated elsewhere.
13     Q.  Okay.
14     A.  Only Brazil has a specific requirement to
15 generate local data.
16     Q.  And which countries are those besides Brazil?
17     A.  Well, it would be all the 32 that are in Latin
18 America on that continent, but the biggest ones are
19 Brazil; Argentina is a big one; Chile; and then, you
20 know, some of the smaller ones, too.
21     Q.  Did Syngenta Crop Protection, Inc., do
22 business in Latin America?
23     A.  I don't know.
24     Q.  Do you know of any Syngenta Crop Protection,
25 Inc., products that were sold outside the United States?

13  (Pages 46 to 49)

Exhibit 006 Page 13

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                           11-4-2010
Confidential

Page 50

1  A. I don't know that, no.
2  Q. Do you know which Syngenta entity sold
3  products in Brazil?
4  A. No, I don't know that.
5  Q. Do you know which Syngenta entity sold
6  products in Canada?
7  A. Well, you know, I -- I do know the people, but
8  I don't know the -- you know, the name of -- of the
9  legal entity.
10  Q. You don't know the name of the company?
11  A. No.
12  Q. Do you know the name of the company, the
13  Syngenta company, that sold product in Mexico?
14  A. No, I don't know the name.
15  Q. Did -- When you had this job for nine months
16  in 2007, from January to October, did you have people
17  from these countries who had -- Strike that.
18  Who did you work with in Canada from January
19  2007 until October 2007?
20  A. Names?
21  Q. Yes.
22  A. It was one individual that was covering the
23  environmental safety needs. Last name Purdy, P U R D Y.
24  I'm missing the first name. He has retired in the
25  meantime.

Page 51

1  Q. And --
2  A. But he was the key contact for environmental
3  safety in Canada.
4  Q. And when environmental safety filings were
5  required to be done from January to October 2007 in the
6  country of Canada --
7  A. Mm-hmm.
8  Q. -- how was that done?
9  A. Well, the Canadian affiliate would do those
10  filings --
11  Q. Okay.
12  A. -- locally.
13  Q. Who would do the work that was generated
14  necessary for the environmental testing for Canada?
15  A. The local work would be done locally by
16  Mr. Purdy, so there is a local requirement in data to
17  generate local data, environmental data, so he would
18  commission that and he would do it in contract research
19  organizations. And he would use -- And the work that
20  was independent of location and make that part of the
21  submission, as well.
22  Q. Okay. What's the other part of the component
23  that wasn't done locally?
24  A. Yeah, I give you an example. And we do a soil
25  study, we have to test mobility under field conditions,

Page 52

1  so that would be a test that would have to be done
2  locally in the field.
3  In order to understand what you need to test
4  for, you do a laboratory test where you investigate how
5  it breaks down so that you actually do know what you
6  have to look for in terms of degradation products, and
7  that would be a test that is shared globally.
8  Q. So where would that test that was necessary to
9  be done for that filing in Canada have been done?
10  A. Could have been done in any of the contract
11  labs that does testing for us. So it could have
12  been done in a -- in a contract lab or in our own
13  facility. I mean, we had -- back in 2007, we didn't
14  have technical facilities anymore. So it would have
15  been done in a contract lab that is competent to do the
16  test. And these typically operate in the U.S., there
17  are Canadian labs, as well, and there are European labs.
18  Q. Do you have your Jealott's Hill facility
19  anymore?
20  A. In 2007 we had a Jealott's Hill facility, but
21  we had discontinued testing in the UK by the end of
22  2006. So we have -- We shut down the laboratory
23  facilities in the UK to do the testing.
24  Q. All testing?
25  A. All testing. All GLP testing was

Page 53

1  discontinued.
2  Q. G -- what's GLP?
3  A. That's the testing that's done under these
4  good laboratory principals, which you need to follow in
5  order to have an acceptable study, acceptable data set.
6  Q. What about for generating new products? Did
7  you terminate that testing, too? Research?
8  A. No. That activity still continues in the UK.
9  Q. So how else would the global team support
10  registration, for example, in Mexico?
11  A. Registration in Mexico would predominantly be
12  supported out of the NAFTA organization. So the
13  regulatory colleagues in Greensboro would be working
14  with their regulatory colleagues in -- in Mexico to
15  provide them the data and submission support to make the
16  Mexican submission. And if there's -- If there was
17  technical support needed from product safety, this would
18  be done through the Greensboro team.
19  Q. How did your job change in the next -- How did
20  your responsibility change in the next job?
21  A. The next job was head of product safety,
22  NAFTA, which included now both the environmental and the
23  human safety groups in -- in Greensboro. And the
24  responsibility for support in NAFTA, in the three NAFTA
25  countries. So that function was, then, human safety,

14  (Pages 50 to 53)

Exhibit 006 Page 14

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

Page 54

1  which included the crop residues, the animal assays that
2  I described earlier that we do to assess exposure to
3  humans and -- and null effect levels to humans, and the
4  environmental components, as well.
5      Q.  And then your job changed again in January of
6  this year?
7      A.  That's correct.
8      Q.  And what is it now?
9      A.  So I'm now leading the global product safety
10  function for Syngenta Crop Protection.
11     Q.  And your responsibilities in that job?
12     A.  Well, my responsibilities is to -- to oversee
13  data development in support of generating safety
14  profiles for our compounds in the regions.  We operate
15  in four regions.  We have product safety units in the
16  four regions to ensure that the right data are developed
17  to proper quality, and that the right evaluations of the
18  data allow us to make proper safety assessments, and
19  then decisions for -- product promotion decisions, and
20  finally for releasing products for sale in the markets.
21     Q.  Let me ask one point -- We have a technical
22  problem here.
23        How much time do you spend in Basel?  Any?
24     A.  Well, I will be spending more time in Basel
25  once I move to Basel, which will happen next year.

Page 55

1  Probably have been to Basel two or three times this
2  year, a week at a time.
3      Q.  For how long?
4      A.  A week at a time.
5      Q.  A week at a time.  I'm sorry, sir.
6         And you list that your current professional
7  experience is with Syngenta AG?
8      A.  Syngenta Crop Protection AG is my employer.
9      Q.  Syngenta Crop Protection AG?
10     A.  Yes, AG, that's correct.
11     MR. POPE:  Are we talking about as of the first of
12  the year?
13  BY MR. TILLERY:
14     Q.  Yeah, since --
15     A.  Beginning first of January 2011.  So
16  currently --
17     Q.  You list -- Yeah, you list here on your CV at
18  the beginning, first page, "Syngenta AG, Basel,
19  Switzerland."  Do you see that?
20     A.  Yeah.
21     Q.  Name and location, your current employment,
22  Syngenta AG, Basel, Switzerland?
23     A.  Yeah, this is incorrect.
24     Q.  You're saying that's wrong?
25     A.  That's wrong.  I'm --

Page 56

1      Q.  It's Syngenta Crop Protection AG?
2      A.  I'm currently by Syngenta Crop Protection,
3  Inc., in Greensboro.  I will be employed by Syngenta
4  Crop Protection AG in Basel beginning the first of
5  January 2011.
6      Q.  That starts January 1st?
7      A.  2011, yes.
8      Q.  And your employment with Syngenta Crop
9  Protection, Inc., will terminate?
10     A.  Yes.  Yes.
11     Q.  And who made the assignment of your move to
12  Basel?
13     A.  The assignment was made by the head of crop
14  protection development.  Name?  Do you want a name?
15     Q.  Yes.
16     A.  Gerardo Ramos.
17     Q.  Where is his office?
18     A.  His office is in Basel.
19     Q.  Who does he work for?
20     A.  He reports to the head of R&D, Sandro Aruffo.
21     Q.  Who does -- I don't know the fellow's name
22  that you said.  I'm trying to read it.
23     A.  Sandro --
24     Q.  -- Ramos.  Mr. Ramos, who does he work for?
25     A.  You mean the employer?

Page 57

1      Q.  Yes.
2      A.  Well, I haven't seen his employment contract,
3  but I would assume Syngenta AG in Basel.
4      Q.  Okay.  Will you be doing the same job in Basel
5  as an employee of Syngenta AG that you're currently
6  doing in the United States as an employee of Syngenta
7  Crop Protection, Inc.?
8      A.  Well, no.  The role is different.  You know, I
9  do have successor here in the U.S. who will be doing the
10  role that I have done as head of product safety NAFTA.
11  And she is in place and has been operational since the
12  first of the year.
13        My role will be in a global coordination of
14  the programs as it is laid out in my role profile in
15  overseeing, you know, all the sourcing activities for
16  the teams worldwide.
17     Q.  What is your job right now?  Isn't it head of
18  global product safety?
19     A.  Yes.
20     Q.  Right this second?
21     A.  Yes.
22     Q.  Now, so the NAFTA job is the one you had --
23  the last job, correct?
24     A.  Yes, that's correct.
25     Q.  So let's talk about the job you have now.

15   (Pages 54 to 57)

Exhibit 006 Page 15

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 58

1  Okay?
2      A.  Okay.
3      Q.  Will you be doing the same job you're doing
4  now in Basel as an employee of Syngenta Crop
5  Protection AG --
6      A.  Yes.
7      Q.  -- that you're currently doing in the United
8  States as an employee of Syngenta Crop Protection, Inc.?
9      A.  Yes.
10     MR. TILLERY:  Let's take a one-minute break -- we
11  don't have to leave -- so we can fix the technology
12  here.
13     THE VIDEOGRAPHER:  Going off the record.  The time
14  is now 10:59 a.m.
15         (A short recess was had.)
16     THE VIDEOGRAPHER:  Going on the record.  The time
17  is now 11:03 a.m.
18     MR. TILLERY:  Can you mark that as Exhibit 2,
19  please.  Thank you.
20         (Hertl Deposition Exhibit No. 2
21          marked as requested.)
22  BY MR. TILLERY:
23     Q.  Can you identify Exhibit No. 2, please.
24     A.  Yes.  That's a relocation agreement --
25  localization agreement -- sorry -- signed by head of

Page 59

1  compensation relocation at that time, Mary Marsh, and
2  myself on July 16th, 2002.
3      Q.  And this is a relocation or a localization
4  agreement?
5      A.  This is correct.
6      Q.  Just prior to this, who were you employed by?
7      A.  I was employed by Syngenta Crop Protection,
8  Inc., in Greensboro.
9      Q.  Okay.  So here it says, "We are pleased that
10  you will be localizing to employment with Syngenta Crop
11  Protection, Inc., effective August 1, 2002.  You will be
12  transferred from employment with your home country as of
13  that date."
14         So the day prior, you were employed in your
15  home country?
16     A.  Well, I was on an international assignment
17  between 1990 -- September 1997 and 15th of July, 2002.
18     Q.  Okay.
19     A.  But, you know, that international assignment
20  did include, you know, all the compensation and benefits
21  and pension conditions, I believe, that are commensurate
22  with a local employment by Syngenta Crop Protection,
23  Inc.  So I did not receive any compensation from what
24  used to be my home country in Basel.
25     Q.  And with whom were you technically associated

Page 60

1  by employment at that time?  Was there an entity with
2  whom you were associated with employment in Basel?
3      A.  I don't know that.
4      Q.  You don't know?
5      A.  I don't know.
6      Q.  You don't know what the Syngenta entities had
7  you listed as?
8      A.  No, I don't know that.
9      Q.  Who are Gary Dickson and Tobi Bosset?
10     A.  Gary Dickson was my line manager at that point
11  in time.  He was the head of development, crop
12  protection development.
13     Q.  Where?
14     A.  In Greensboro.
15     Q.  In Greensboro?
16     A.  In Greensboro.  And Tobi Bosset did coordinate
17  international assignments for the company, I believe, in
18  HR Basel.  So he's located in the human resources group
19  in Basel.
20     Q.  Bosset was?
21     A.  Bosset was, yes.
22     Q.  And do you know which entity he worked for?
23     A.  I don't know that.
24     Q.  Was there a -- What's a line manager, as you
25  just used that term?

Page 61

1      A.  What's a line manager?  The individual that
2  you report to on a day-to-day basis that sets your
3  objectives for the year, does execute your performance
4  evaluation and your performance appraisals.
5      Q.  Did you have some other manager, other than a
6  line manager?
7      A.  At what time?
8      Q.  Well, at any time.
9      A.  At any time?
10     Q.  Yes.
11     A.  Well, I -- We did have -- Well, people that we
12  worked with and were associated to in a functional
13  management role.
14     Q.  We're back to our functional role.
15     A.  Yes.
16     Q.  So you do know what "functional" means?
17     A.  Well, if it's about coordination of test
18  programs and the like, that's -- that happens with the
19  functional management group.
20     Q.  Now there's a functional line manager, right?
21     A.  As I am in that role right now, so I have a
22  functional, you know, association with the heads of
23  product safety that operate in the regions and develop
24  data for us, yes.
25     Q.  And what's the difference between a line

16  (Pages 58 to 61)

Exhibit 006 Page 16
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 62

1  manager and a functional manager?
2      A.  Well, the line manager is the direct reporting
3  line.  They do set the objectives.  They, you know, do
4  the performance evaluations.  They look at individuals'
5  performance and, you know, have all the duties and
6  responsibilities that you do have as a manager versus to
7  your employee.
8      Q.  Is a functional manager sometimes referred to
9  as a dotted-line reporting relationship?
10     A.  Could be, yes.
11     Q.  I see in a lot of documents references to
12 dotted-line -- dotted-line reporting relationship.  What
13 does that dotted-line reporting relationship mean, if it
14 doesn't mean functional manager?
15     A.  Well, the dotted-line reporting responsibility
16 -- I can only tell you about my case, so I don't want to
17 generalize.
18     Q.  Okay.
19     A.  So --
20     Q.  So in your case, are you the functional
21 manager of people around the world?
22     A.  Right.
23     Q.  In your current job?
24     A.  So -- Well, I am a functional manager of
25 people around the world in my current job.  So what I do

Page 63

1  with these is, in order to be able to do my role, we
2  need to do the coordination of test programs that we do
3  in support of our registrations worldwide.  We do
4  coordinate the sourcing of data that are generated in
5  line with, you know, the legal requirements for product
6  approval and continued product registration in the
7  various markets.
8          And as I explained earlier, there are global
9  components to it, pieces that can be used irrespective
10 of where we use the market, and there are local and
11 regional elements to it which are done in the
12 accountability of the regions.  But the coordination of
13 the global programs, you know, I do as a functional
14 manager with my functional reporting lines.
15     Q.  So these people may have a direct reporting
16 relationship with someone in their country?
17     A.  Yes.
18     Q.  And a functional-type of reporting
19 responsibility to you?
20     A.  Yes.
21     Q.  And tell me who these people are.
22     A.  Currently?  Mine?
23     Q.  The people who have a dotted-line or
24 functional reporting relationship with you.
25     A.  So this is -- in NAFTA, that's Patricia

Page 64

1  Malarkey.
2      Q.  And she took your place in that job?
3      A.  She took my place in that job.
4      Q.  So she's in Greensboro?
5      A.  That's correct.  In Europe --
6      Q.  Excuse me for interrupting you, sir.  Do you
7  know who she's employed by?
8      A.  Syngenta Crop Protection, Inc.
9      Q.  Okay.  In Europe who reports to you?
10     A.  It's -- As a functional reporting line, it's
11 Phillip Botham.  And he's located in Jealott's Hill.
12     Q.  By whom is he employed?
13     A.  I don't know.  I mean, that's the same
14 question that we had half hour ago.
15     Q.  Right.  He's employed by a Syngenta --
16     A.  Syngenta.
17     Q.  -- subsidiary in Europe?
18     A.  I assume, yes.
19     Q.  All right.  And who else has a functional
20 reporting relationship with you?
21     A.  It's Rose Rodriguez in Sao Palo, Brazil.  And
22 it's Alex Yau in Singapore.
23     Q.  And who is Ms. Rodriguez employed by?
24     A.  A local entity Syngenta --
25     Q.  Subsidiary?

Page 65

1      A.  -- subsidiary in Brazil.
2      Q.  Mr. Yau in Singapore?
3      A.  Ms. Yau.
4      Q.  Sorry.
5      A.  Same applies here.
6      Q.  Some entity of Syngenta?
7      A.  Yes.
8      Q.  Okay.
9          (Hertl Deposition Exhibit No. 3
10          marked as requested.)
11 BY MR. TILLERY:
12     Q.  Handing you what's been marked as Exhibit 3
13 and ask you to identify that.
14     A.  This is an e-mail sent by Joann Hernandez.
15     Q.  Actually, if you look at the whole document.
16     A.  Oh, yeah.  Okay.
17 MR. POPE:  Take your time, read the whole thing.
18 BY THE WITNESS:
19     A.  Okay.
20     Q.  These are a series of e-mails about a raise
21 for you, right?
22     A.  It looks like, yes.
23     Q.  And the first one is signed or generated by
24 Mr. Harry Swaine?
25     A.  Yes.

17  (Pages 62 to 65)

**Exhibit 006 Page 17**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 235 of 486

Hertl, Peter                    11-4-2010
Confidential

Page 66

1    Q.  And where was Harry Swaine?
2    A.  Located?
3    Q.  Yes.
4    A.  In the UK.
5    Q.  Okay.  So he was asking Mr. Christoph
6  Koelbling -- Who is Christoph Koelbling?
7    A.  He is human resources in Basel, Switzerland.
8    Q.  Okay.  He was asking Mr. Christoph Koelbling in
9  Basel about a raise for you, correct?
10    A.  Yeah.  That's what it says, yes.
11    Q.  Okay.  So we're clear, Mr. Swaine in UK had
12  what relationship to you?
13    A.  He had -- He was my functional manager.
14    Q.  And he was employed by whom?
15    A.  By some subsidiary in the UK.
16    Q.  Not by Syngenta Crop Protection, Inc.?
17    A.  No.
18    Q.  Did you have a direct line manager ever send
19  an e-mail asking for a raise at Syngenta Crop
20  Protection, Inc.?
21    MR. POPE:  Could I have that question back again.
22        (Record read as requested.)
23    MR. POPE:  Listen to --
24  BY THE WITNESS:
25    A.  I don't know.

Page 67

1    Q.  The only one you're aware of is this one here?
2    A.  I don't know the document.  I've not been
3  copied on any of those.  So that's the first time I've
4  seen that.
5    Q.  Okay.  So take a look at it, then, and see.  I
6  will represent to you -- you see this Bates number here
7  on the bottom, where it says SYN 03157685?
8    A.  Yes, I see that, um-hmm.
9    Q.  These were documents supplied to us in this
10  lawsuit.
11    A.  Okay.
12    Q.  From Syngenta entities.
13    MR. POPE:  But you're not representing that he's
14  ever seen this before.
15    MR. TILLERY:  I'm not.
16  BY MR. TILLERY:
17    Q.  I'm representing, however, that it's a true
18  and accurate copy of something Mr. Pope gave me.
19    A.  All right.  I don't debate that.
20    Q.  Well, here it shows that a Mr. Harry Swaine,
21  who was your functional manager in the UK, asks somebody
22  in Basel to give you a raise in the U.S., when you
23  worked for Syngenta Crop Protection, Inc., correct?
24    A.  Well, it looks like that, yes.
25    Q.  Okay.  And that raise was approved, wasn't it?

Page 68

1    A.  Yeah, I have no reason to believe that this is
2  not true.  I don't remember it, but...
3    Q.  You don't dispute that you got a raise?
4    A.  I don't dispute it, yeah.
5    Q.  And the raise was because of your new global
6  role, wasn't it?
7    A.  That's what it says, yes.
8        (Hertl Deposition Exhibit No. 4
9         marked as requested.)
10    Q.  I'll hand you what's been marked as Exhibit
11  No. 4.
12    A.  Mm-hmm.
13    Q.  Ask you to take a look at that.  Okay?
14    A.  Yep.
15    Q.  What is this document?
16    A.  This is a listing of annual objectives for
17  myself for the year 2006, and it is a self-appraisal,
18  which is my view on how I was doing against those
19  objectives.
20    Q.  And who does it list as your manager?
21    A.  It lists Harry Swaine.
22    Q.  Okay.  Does it list him as your functional
23  manager?
24    MR. POPE:  Objection to the form of the question.
25  BY THE WITNESS:

Page 69

1    A.  Well, the document says "manager."
2    Q.  It says he was your manager.  And at that time
3  in 2006, where was Mr. Swaine located?
4    A.  In the UK.
5    Q.  Okay.  And, again, he was employed by another
6  Syngenta subsidiary, but you don't know the name of that
7  subsidiary?
8    A.  That's correct.
9    Q.  Who was the line manager at exactly that
10  moment?
11    A.  My line manager?
12    Q.  Yes.
13    A.  Gary Dickson.
14    Q.  Okay.  And did you do another one of these
15  performance management reports for Mr. Dickson?
16    A.  No.  He would probably have received the same
17  performance management report.
18    Q.  But it shows here that you gave this to
19  Mr. Swaine, correct?
20    MR. POPE:  Objection to the form of the question.
21  I don't think it says that at all.
22  BY MR. TILLERY:
23    Q.  Isn't that who you gave it to?
24    A.  I don't recall.
25    Q.  He was looking over your and approving your

18  (Pages 66 to 69)

Exhibit 006 Page 18

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                           11-4-2010
Confidential

---

### Page 70

1  individual objectives and team objectives, wasn't he?
2      A.  Well, that's correct, because it included
3  teams in NAFTA as well as in Europe.
4      Q.  Yes.
5          (Hertl Deposition Exhibit No. 5
6          marked as requested.)
7  BY MR. TILLERY:
8      Q.  I'll show you what's been marked as Exhibit 5,
9  sir, and ask you to look at that.  Can you tell me what
10 that document is?
11     A.  This document is an e-mail dated August 18th,
12 2006, sent from myself to Harry Swaine in response to an
13 e-mail I had received that same day with an attachment
14 of my performance management form sheet including
15 self-appraisal and manager appraisal.
16     Q.  And you sent this to Mr. Swaine in Great
17 Britain, correct, or England?
18     A.  This is correct.
19     Q.  And this was, again, your performance
20 management, correct?
21     A.  Interim for 2006, yes.
22     Q.  Right.  And show me where you sent this to any
23 other line manager at Syngenta Crop Protection, Inc.
24     A.  He's the only recipient.
25     Q.  Okay.  And he is the only -- "He" being

---

### Page 71

1  Mr. Swaine in England, correct?
2      A.  Correct.
3      Q.  And Swaine did the manager appraisal for you,
4  didn't he?
5      A.  Well, he did provide commands.  Now, this is
6  the interim for 2006, so I don't know how the final was
7  applied.
8      Q.  Well, here under oath today, are you
9  suggesting that anybody else besides Mr. Swaine was
10 doing an appraisal for you?
11     MR. POPE:  Let's be clear, Steve, he's under oath
12 like all the other witnesses are.  There's no special
13 part about your question there.  He just told you this
14 is an interim report.
15     MR. TILLERY:  He can make the objections any way he
16 wants.
17     MR. POPE:  You didn't let him finish is the other
18 thing.
19     Go ahead.
20 BY THE WITNESS:
21     A.  I think the agreement was that this would be a
22 consultative process between functional manager and line
23 manager.
24     Q.  So where is the consultation?
25     A.  Well, I don't see it here.

---

### Page 72

1      Q.  Okay.  The consultation you had with a manager
2  was with Mr. Swaine, correct?
3      A.  The written consultation I had with
4  Mr. Swaine, yes.
5      Q.  And the appraisal of what your plans on an
6  individual and group objective were were done by
7  Mr. Swaine, weren't they?
8      A.  In written form, this is correct.
9      Q.  Are you aware of the existence of any
10 document, sir, that reflects any consultation with a
11 line manager like that document?
12     A.  I don't know.
13     Q.  You're not aware of any?
14     A.  Well, I don't know if they exist or they don't
15 exist.  I haven't looked for them.
16     Q.  Well, if you don't know, then the answer is
17 you are not aware of any; is that correct?
18     A.  I do not know if they exist or not.
19     Q.  Do you have any?  Do you have any such
20 document?
21     A.  You know, I would have to look in my files to
22 look for them.
23     Q.  Do you remember ever seeing one?
24     A.  An appraisal that I received from my line
25 manager?

---

### Page 73

1      Q.  A document like that where you made a report
2  to a line manager at Syngenta Crop Protection, Inc.
3      A.  Sure enough, my last performance review was
4  drafted by my functional manager and revised by my line
5  manager and finalized.
6      Q.  When are you talking about?  Right now?
7      A.  Well, that was, I believe, last year's, 2009.
8      Q.  And which job was that?
9      A.  That was as the head of product safety NAFTA.
10     Q.  And it was drafted by you, revised by whom?
11     A.  It was revision and inputs by my global head
12 of product safety.
13     Q.  Who was that?
14     A.  That was John Doe.
15     Q.  Okay.  So let's reflect.  Now we're on a
16 different job than at this time.
17     A.  Okay.
18     Q.  Okay.  Correct?
19     A.  Yes.
20     Q.  Okay.  Let's go back to this job.  The one I'm
21 talking to you about.
22     A.  Okay.
23     Q.  Did you ever -- Do you remember ever seeing a
24 document like that document where you reported to a line
25 manager in Syngenta Crop Protection, Inc.?

19  (Pages 70 to 73)

Exhibit 006 Page 19
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 74

1     A.  I -- I do not remember, but this doesn't
2  necessarily mean they do not exist.  I would have to
3  check for it.
4     Q.  You don't know of any?
5     A.  I don't know of any.
6     Q.  All right.  If such a document existed at the
7  time of your 2006 interim review, as far as you know,
8  would that be the type of document that would be
9  maintained by Syngenta Crop Protection, Inc., in the
10  ordinary course of business?
11     A.  Yes, it would be maintained.
12     Q.  Okay.  I'm representing to you no document
13  like that's been produced to me.  Okay?
14           (Hertl Deposition Exhibit No. 6
15           marked as requested.)
16  BY MR. TILLERY:
17     Q.  Can you explain this document or identify it?
18     A.  This is a -- I don't know what it is.  I need
19  to look at it.  I've not seen that before.  This looks
20  like a status report from one of our administrative
21  systems that speaks about my change to my new role in
22  January 2010.
23     Q.  Look on the very last page of that document.
24  It says, "This is a temporary position to be shut down
25  on February 1, 2010.  No direct reports."

Page 75

1     A.  Yes.
2     Q.  What does that mean?
3     MR. POPE:  Objection to the form of the question.
4  BY THE WITNESS:
5     A.  The -- My relocation to Basel was originally
6  planned for February 1, 2010, but had to be postponed
7  for personal reasons.
8     Q.  And the "no direct reports," what's that mean?
9     A.  I don't have line reporting responsibility for
10  anyone in Greensboro.
11     Q.  Okay.  And how long has that been the case?
12     A.  You know, since, you know, January 1st, 2010.
13     Q.  Does that mean you're not the line manager for
14  anyone in Greensboro?
15     A.  This is correct.
16           (Hertl Deposition Exhibit No. 7
17           marked as requested.)
18  BY MR. TILLERY:
19     Q.  If you'd look at that same document, if you go
20  to page 2 of that document, which is exhibit -- What is
21  the exhibit number you're holding, sir?
22     A.  6 [sic].
23     Q.  6.  Thank you.
24       Take a look at this and tell me if you can
25  identify it for me.

Page 76

1     A.  This is another status work document generated
2  by one of our administrative systems.
3     Q.  And if you'd look at the second -- or I -- I
4  think it's actually the third page of the document, it's
5  the one Bates No. 661 at the end, at the bottom.
6       Do you see that?  Lower right-hand corner.  Do
7  you see that Syngenta, SYN 03 --
8     A.  Yeah.
9     Q.  Okay.
10     A.  I see that, yeah.
11     Q.  Yeah.  And --
12     MR. POPE:  Which page are you looking at?
13     MR. TILLERY:  The last page.
14  BY THE WITNESS:
15     A.  The last page.
16     Q.  And that's -- Claire Bladen sent this e-mail?
17     MR. POPE:  But not to this witness.
18  BY MR. TILLERY:
19     Q.  Who is Claire Bladen?
20     A.  I don't know.
21     Q.  And --
22     A.  I don't know her.
23     Q.  And what is CHBS?
24     A.  That's Basel.
25     Q.  That's Basel?

Page 77

1     A.  Yeah.
2     Q.  And -- and Don Isley is USGR?
3     A.  That's Greensboro.
4     Q.  And the communication, Don says, "As
5  discussed, we've converted Peter's approved package from
6  ████ Swiss francs to USD using the average over the
7  six-month period June to December of 2009."
8     A.  Mm-hmm.
9     Q.  Correct?
10     A.  Correct.
11     Q.  "Please could we ask you to implement this."
12  Correct?  So this is a communication coming from Basel
13  to the U.S. about an increase for you?
14     A.  Correct.
15     Q.  Is that correct?  Okay.
16       And that's February 4, 2010, correct?
17     MR. REEG:  February 24.
18  BY MR. TILLERY:
19     Q.  February 24th.
20     A.  24th.
21     Q.  Yes.
22       Who approved that package?
23     A.  The Swiss franc, ████?
24     Q.  Yes.
25     A.  I don't know who approved it.

20  (Pages 74 to 77)

Exhibit 006 Page 20
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 78

1  Q.  Okay.  So you don't know who --
2  A.  I don't know.
3  Q.  -- gave you your raise?
4  A.  No, I don't.
5  MR. TILLERY:  All right.  We're going to go off the
6  record right now.
7  THE VIDEOGRAPHER:  This marks the end of Videotape
8  No. 2 in the deposition of Peter Hertl.  The time is now
9  11:36 a.m.  Going off the record.
10  (Discussion off the record.)
11  THE VIDEOGRAPHER:  Going on the record.  This marks
12  the beginning of Videotape No. 3 in the deposition of
13  Peter Hertl.  The time is now 11:41 a.m.
14  (Hertl Deposition Exhibit No. 8
15  marked as requested.)
16  BY MR. TILLERY:
17  Q.  Mr. Hertl, the reporter has marked a document
18  as Exhibit 8.  Can you look at that and identify it for
19  me, please.
20  A.  It is a -- about 25 pages of a document that
21  shows on the title page a -- "The Vision of Syngenta."
22  And then three bullets underneath.
23  Q.  I'm going to ask you some questions about
24  this.  You're listed throughout this document, and we're
25  going to go through it.  If you aren't familiar directly

Page 79

1  with it, if you want to look at it and familiarize
2  yourself with it for a second.  I'm going to ask you
3  some questions.  Okay.  You've been through it?
4  A.  Yes.
5  Q.  What is this?
6  MR. POPE:  Objection to form unless you determine
7  whether he's ever seen it before.
8  BY MR. TILLERY:
9  Q.  What is this?
10  A.  This looks like a pretty comprehensive
11  presentation of operational scope, organizational setup,
12  operational principals for what used to be the health
13  assessment and environmental sciences function of when
14  Syngenta was formed in 2000.  So that probably goes back
15  to 2000, 2001.
16  Q.  We were told, just so you know, by Mr. Reeg's
17  office that produced this, that the date of production
18  was April 5th, 2001, if that helps.
19  A.  Yes.
20  Q.  That's consistent with what you said?
21  A.  Yes.
22  Q.  Okay.
23  MR. POPE:  You don't mean the date of production,
24  you mean the date you would -- the date the document was
25  created?

Page 80

1  MR. TILLERY:  That's what we were told.
2  BY THE WITNESS:
3  A.  Mm-hmm.
4  Q.  Okay?
5  A.  That seems --
6  Q.  Is that consistent?
7  A.  It's consistent.
8  Q.  All right.  Let's go to the page of this
9  document, it's the sixth page where it says, "HAES
10  organization" at the top?
11  A.  The organizational chart?
12  Q.  Yes.  And the Bates number ends in 56.
13  A.  Yes.
14  Q.  Okay.  And at that time the head of -- And
15  what does HAES stand for?
16  A.  Health, assessment, and environmental
17  sciences.
18  Q.  Okay.  Is this a program that is still used
19  at --
20  A.  No.
21  Q.  -- Syngenta today?
22  A.  No.
23  Q.  How long did this program remain intact?
24  A.  Until Dr. Smith moved on to become the head of
25  global development for Syngenta.  And I do not remember

Page 81

1  the date or the year.
2  Q.  Is it now called global product safety?
3  A.  Well, global product safety is one of the
4  organizations that does provide the same services to the
5  organization that the HAES organization did ten years
6  ago but has a very drastically different structure and
7  footprint.
8  Q.  Who is Dr. Smith?
9  A.  Dr. Smith used to lead the HAES function until
10  he was promoted to global head of development.  And he
11  had that global head of development role in Basel until
12  he was replaced by his successor, umm, at some point in
13  time which I don't remember.
14  Q.  When this chart was created in April 5th,
15  2001, where was Dr. Smith located?
16  A.  He was located in CTL in Manchester, close to
17  Manchester in the UK, Alderley Park.
18  Q.  And by whom was Dr. Smith employed, directly
19  employed?
20  A.  I don't know that.
21  Q.  It was a Syngenta subsidiary?
22  A.  I would assume, yes.
23  Q.  Okay.  CTL, what's that stand for?
24  A.  That was the central toxicology laboratory.
25  So it was one of the test facilities within that HAES

21  (Pages 78 to 81)

Exhibit 006 Page 21

c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

Page 82

1  organization.
2      Q.  And CTL was where?
3      A.  In Alderley Park, which is close to Manchester
4  in the UK.
5      Q.  Now, let's go down and look at this
6  organizational chart at that time.  Over on the far
7  left, there was a group headed by J. Doe, product
8  management.
9      A.  Correct.
10     Q.  Where was Mr. Doe?
11     A.  Located?
12     Q.  Yes.
13     A.  He was located at the same site, CTL,
14  Alderley Park, in the UK.
15     Q.  And below him are listed -- And what is --
16  What is Mr. Doe's full name?
17     A.  John Doe.
18     Q.  Okay.  And below him is a category of people
19  that includes Mr. Joseph, Mr. Rose, Mr. Hackett,
20  Mr. Lewis, Mr. Kobel, and Mr. Wilks?
21     A.  Correct.
22     Q.  Where was Mr. Hackett?
23     A.  In Greensboro, U.S.
24     Q.  And where were these other people?
25     A.  Mr. Joseph was located in Jealott's Hill, UK.

Page 83

1      Q.  Okay.
2      A.  Mr. Rose was located in Alderley Park,
3  Manchester.  Mr. Hackett we mentioned already.  And
4  Mr. Lewis was located in Jealott's Hill, Mr. Kobel was
5  located in Basel, and Mr. Wilks at that time was located
6  in Alderley Park in Manchester.
7      Q.  What was the -- What was the purpose of this
8  organizational chart?
9      MR. POPE:  Objection to the form of the question.
10  BY THE WITNESS:
11     A.  The organizational chart is an outline of the
12  health, assessment and -- health, assessment, and
13  environmental sciences organization for Syngenta in
14  April of 2001.
15     Q.  That product management role that you
16  have there on the far left, what was that role?  If you
17  could briefly define it.
18     A.  Very briefly, these -- one, two, three, four,
19  five -- six people were coordinating test programs
20  across the product safety sites in order to deliver a
21  comprehensive product safety data set in support of our
22  business projects.  So they had project responsibility.
23  Each individual had one or more projects they were
24  responsible for coordinating.
25     Q.  And what about the business management cycle?

Page 84

1      A.  Business management cycle had two
2  responsibilities, one was to sell services of the tox
3  facility in Alderley Park, also sell services to other
4  clients, non-Syngenta clients.  So it was a sales
5  organization of toxicology services to competitors,
6  pharmaceutical companies.  And they were also involved
7  in administering the outsourcing process so that the
8  studies we contracted to external providers, which was
9  very limited at this point in time.
10     Q.  You have -- the next two categories are Health
11  Assessment 1 and Health Assessment 2.  What were they?
12     A.  These were -- We had two experimental
13  facilities doing the animal tests at that time.
14  Phil Botham was the head of the animal test facilities
15  that were located in Alderley Park, Manchester.  Gian
16  Winkler was heading the organization, the laboratory,
17  that was located in Stein, Switzerland, which is about
18  30 minutes from Basel.  So it was a toxicology testing
19  facilities, and we had two of those.
20     Q.  Okay.  And then the next heading is "Global
21  Risk Assessment."  A group that you were located at?
22     A.  Correct.
23     Q.  And the head of that was Mr. Dickson?
24     A.  Yep, located in Greensboro.
25     Q.  And who is -- Where is Mr. Bray?

Page 85

1      A.  It's actually Ms. Bray.
2      Q.  Ms. Bray.
3      A.  She's in Greensboro.
4      Q.  And -- and Mr. Pastoor?
5      A.  In Greensboro.
6      Q.  And Mr. Ross?
7      A.  In Greensboro.
8      Q.  And you were there in Greensboro, as well?
9      A.  That's correct.
10     Q.  Okay.  When -- you have these full names, if
11  you wouldn't mind.  What is Ms. Bray's first name?
12     A.  Leslie Bray.
13     Q.  And Mr. Ross?
14     A.  Richard.
15     Q.  Okay.  And back a little bit you had a
16  J. Parker.  What is that name?
17     A.  John Parker.
18     Q.  John Parker.  Okay.  And then there's another
19  heading by a Mr. Swaine, "Dietary Safety."  That's --
20     A.  That's correct.
21     Q.  -- the next one?
22         Who is that?
23     A.  Harry Swaine located Jealott's Hill, UK.
24     Q.  Okay.  What was the dietary safety?  Is that
25  what you've explained to us in the deposition?

22  (Pages 82 to 85)

Exhibit 006 Page 22
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG-PMF   Document 334   Filed 12/26/12   Page 23 of 56   Page ID
#12887
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 240 of 486

Hertl, Peter                          11-4-2010
Confidential

Page 86

1    A.   The dietary safety function was -- They were
2  doing residue data generation, metabolism studies,
3  growth and animal metabolism studies, and livestock
4  metabolism studies, and dietary risk assessments.
5    Q.   In Europe?
6    A.   In Europe.  Yep.
7    Q.   And all of these people, where were they
8  located, below him?
9    A.   Roland Dieterle in Basel.  We did have a test
10 facility in Basel at that point in time.  Michael
11 Kaethner in Basel.  Mike Skidmore in Jealott's Hill.
12 Terry Clark in Jealott's Hill.  Kim Travis in Jealott's
13 Hill.
14    Q.   The work that Mr. Swaine was doing in dietary
15 safety, you said those people were for Europe.  Was it
16 dietary safety just working for products or molecules
17 sold in Europe?  Or was there dietary safety work they
18 were doing on a global basis?
19    A.   The metabolism studies and the livestock
20 studies were used globally.  The residue studies were
21 used only in Europe.
22    Q.   Okay.  The next is an ecological science
23 group?
24    A.   That's correct.  Peter Campbell, located in
25 Jealott's Hill; Steve Maund, located in Jealott's Hill;

Page 87

1  Marco Candolfi, located in Basel; Tim Kedwards located
2  in Jealott's Hill; and Frank Dorobek located in Basel.
3    Q.   And they were doing a global work.  Was that
4  done?
5    A.   They were doing ecological testing.  We did
6  have test facilities both in Jealott's Hill and in
7  Basel.  And they -- Part of the studies had to be
8  used globally were used globally.  But, again, it was
9  split program for -- global pieces were used globally,
10 and then they did do the pieces that were necessary for
11 European support.
12    Q.   And the next is "Environmental Safety"?
13    A.   Environmental safety.  Chris -- Chris --
14 Chris -- Christian d'Hondt located in Basel.  Albrecht
15 Flaenzel, located in Basel.  Mike Earl, located in
16 Jealott's Hill.  Enrico Kiefer located in Basel.  And
17 Stefan Sack located in Basel.
18    Q.   And the last one is --
19    A.   Ian Kimber, located in CTL, Alderley Park,
20 close to Manchester.  George Orpha -- Orphanides,
21 Alderley Park.  John Ashby, Alderley Park.  R. Deaman, I
22 don't recall that person.  And Mrs. Roberts, I don't
23 recall her first name.  Ms. Roberts was located in -- in
24 Alderley Park.  And I don't recognize Deaman.
25    Q.   And what was the research division?

Page 88

1    A.   They did very specific mechanic scientistic
2  research for human effects assessment.
3    Q.   To support all of the different products?
4    A.   To -- Well, to -- mainly to support the data
5  generation that was done in the toxicology function in
6  Basel and in -- and in Alderley Park.
7         This was -- If -- If you may, this was a new
8  methods development unit.  So how could we -- how could
9  we do better data generation, scientifically more solid
10 data generation, for future questions.
11    Q.   But this was being done on a global support
12 basis?
13    A.   Well, the data would typically be published in
14 scientific journals and be used globally, but they did
15 not constitute any specific studies that were necessary
16 for product registration.  It was pure -- I mean, you
17 could call it a capability development investment.
18    Q.   Go to the next page where it says, "HAES
19 expertise and resources."
20    A.   I am.
21    Q.   Okay.  Can you see there?  And it says,
22 "Health AP."  What does that mean?
23    A.   AP means -- So these are the sites across.  So
24 AP stands for Alderley Park.
25    Q.   Okay.  What does it mean there's an X there?

Page 89

1    A.   That they do have expertise and resources and
2  data generation respective relative to human health
3  assessment.
4    Q.   Okay.  And then in the next one is Jealott's
5  Hill?
6    A.   Doesn't have that.  Basel, BL stands for
7  Basel, did have it.  SN stands for Stein.  That's the
8  site of the second tox laboratory that's 20 minutes
9  outside of Basel.  They had it.
10    Q.   Okay.
11    A.   GO stands for Greensboro.  They had it.  And
12 we had all expertise in contracting studies.
13    Q.   Okay.  The next page, if you would look at
14 that.  "HAES operating vision," what does this mean?
15    A.   Well, it is what you're aspiring to reach as
16 an organizational goal for the function.
17    Q.   If you look to the third bullet point,
18 "Delivering one global technical plan for new work
19 synthesized from regional business needs," was that one
20 of the goals?
21    A.   Yes.
22    Q.   If you'd go to 22461, which is a couple of
23 pages later.
24    A.   Yes.
25    Q.   And you see that chart?

23   (Pages 86 to 89)

Exhibit 006 Page 23
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

---

Page 90

1    A.  Yes, I do.
2    Q.  Just very briefly, the head of the chart was
3  John Doe, and he was at the UK?
4    A.  That's correct.
5    Q.  And then on the left side is Mr. Hackett.  He
6  was at Greensboro?
7    A.  That's correct.
8    Q.  And the human was -- safety manager,
9  Mr. Kobel, was where?
10   A.  Basel, Switzerland.
11   Q.  Basel.  And then the products medical advisor,
12  Mr. Wilks, was where?
13   A.  At Alderley Park in the UK.  Mr. Wilks at some
14  point in time moved to Basel, Switzerland, and I don't
15  recall when he actually did move.
16   Q.  Okay.  And then the human safety assessment is
17  where?
18   A.  In Greensboro.
19   Q.  And then below that, the exposure assessment
20  is Greensboro?
21   A.  Greensboro.
22   Q.  And then under human safety manager, it's
23  Basel and Alderley Park?
24   A.  Correct.
25   Q.  Okay.  And then there's a location, operator

---

Page 91

1  safety, Fernhurst?
2    A.  Yes.
3    Q.  Where is that?
4    A.  In the UK.
5    Q.  Okay.  And then below that, operator safety,
6  Basel?
7    A.  Basel.
8    Q.  Let's go to the next page.  When the mandate
9  from Lewis Smith came here, at the top, where it says
10  "Mandate from Lewis Smith," do you know where he was?
11  Was he at his same employment in Jealott's Hill -- I
12  mean, Alderley Park?
13   A.  He was in Alderley Park, yes.
14   Q.  Alderley Park?
15      The last bullet there says, "Mr. Smith was
16  mandating that these all different components of this
17  organizational chart encourage global use of expert
18  resources."  What does that mean?
19   A.  Well, it does mean that -- If you look at
20  product safety or HAES as one of the functions that were
21  replaced later on by product safety, it's a
22  multidisciplinary activity.  You -- you do have people
23  that are toxicologists, you do have -- within the
24  toxicology group certain specialties, like a
25  pathologist, for example.  You do have statisticians;

---

Page 92

1  you do have environmental engineers.  So it's a very
2  broad range of individual experts.
3       And there is limited capacity of expertise
4  available.  So if you look at -- at my function today,
5  we have one pathologist within the global products
6  safety organization.  So wherever a pathologist expert
7  piece is needed, this is the individual we use to
8  display that expertise or display that expertise
9  irrespective of where it is needed.
10   Q.  And irrespective of which company needs that
11  expertise?
12   A.  It's driven by the need, yes.
13   Q.  And wasn't Mr. Smith doing that same thing
14  here?  He was encouraging people.  He was -- wasn't
15  encouraging, he was mandating, according to this
16  document, that there be a use of the expert resources
17  that were available in the various different Syngenta
18  subsidiaries around the world?
19   A.  Yes.  And, you know, clearly this is a vision
20  document.  So --
21   Q.  Did you --
22   A.  It was in aspiration that we worked against.
23   Q.  And you've accomplished that, haven't you?
24   A.  Well, over the last ten years, we have --
25   Q.  Yes.

---

Page 93

1    A.  -- getting closer to accomplishing it, yes.
2    Q.  Let's go to 2465.  And that's another
3  organizational chart portfolio management.  What does
4  "portfolio management" mean?
5    A.  Portfolio management means really the -- the
6  sum of all the projects that we do within the HAES
7  organization in any given year.
8    Q.  Okay.
9    A.  So it's a totality of -- of projects.
10   Q.  So if you look at this document, the head of
11  product management was John Doe.  Excuse me.  And he was
12  in the UK?
13   A.  Correct.  Alderley Park.
14   Q.  All right.  And on the far left, there is an
15  R. Joseph.  Where was he from?
16   A.  Jealott's Hill, UK.
17   Q.  Okay.  And then go across the line and tell us
18  where these people were and the headings, real quickly.
19   A.  Robert Joseph, Alderley Park, UK; Patrick
20  Rose, Alderley Park, UK; Dennis Hackett, Greensboro;
21  Frazier Lewis, Jealott's Hill, UK; Rona Kobel, Basel;
22  Martin Wilks, Alderley Park, or potentially Basel,
23  depending on when he moved.
24   Q.  Okay.  Is each of these individual groups
25  responsible for projects relating to the description at

---

24  (Pages 90 to 93)

Exhibit 006 Page 24
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                     11-4-2010
Confidential

Page 94

1   the top?
2       A.   This is correct, yes.
3       Q.   If you could move ahead to several pages to
4   the next document, which is 22475, and tell me what is
5   represented in that diagram?
6       A.   This is a pictogram of an -- an HAES active
7   ingredient team.
8       Q.   What's "active ingredient" mean?
9       A.   Active ingredient means one of the chemicals
10  we're developing that might be in one or more of our
11  products.
12      Q.   Okay.
13      A.   So this typically would be a Stage 3 compound,
14  one of the chemicals.  Once it is in the markets, this
15  might be part of our product.
16      Q.   Stage 3?
17      A.   At Stage 3 it's only one chemical.
18      Q.   All right.  Let's, if you would, walk me
19  through this particular diagram and how it works.
20      A.   Okay.  We had four disciplines, which are
21  the -- the outer -- outer most bubbles, which are
22  labeled "Technical experts in health and dietary and
23  ecology and environment."
24      Q.   And if I could interrupt you, when you say
25  "technical experts," what do you mean there?

Page 95

1       A.   These are individuals that have technical --
2   specific technical expertise in how to generate data and
3   to do studies to develop data in the regions of --
4   needed for health assessment, needed for dietary
5   exposure assessment.  This would be the residue data
6   needing for -- needed for ecological risk assessments
7   and for environmental fate assessments.
8       Q.   Would these be in-house technical experts?
9       A.   These would be -- would have been at that time
10  in-house technical experts in 2001.
11      Q.   So these would be people employed by one of
12  the Syngenta entities -- one or more?
13      A.   Yes.
14      Q.   Okay.  Go ahead.
15      A.   So then we have the second ring is labeled "AI
16  specialists" and has the same technical denomination to
17  it.  So within the functions we had people specializing
18  on certain active ingredients.  So there was a
19  specialist for estmatolozol (phonetic) which is one of
20  our herbicides, that specialized on the dietary, for
21  example, on the dietary exposure component of it.
22          So they knew for this specific discipline most
23  of the data that had been generated in support of that
24  product safety profile.  So you had four of those.  And
25  these four specialists were working with the AI lead to

Page 96

1   define the program that was needed to deliver continued
2   support for the AI under question.
3       Q.   And there's a little arrow that says RDT, PLT,
4   R&T project.  What does that mean?
5       A.   I cannot tell you what RDT means.  Simply
6   because I don't recognize the acronym.  It's ten years
7   ago, and we don't have anymore.  PLT was a product
8   leadership team that typically would run a project
9   that -- that contained not only the product safety piece
10  of it, but also the regulation, biological, and
11  manufacturing parts of the project.  And R&T projects
12  were early stage research and technology investigative
13  projects which needed input.
14      THE REPORTER:  Which needed what?  The end of your
15  sentence.
16      THE WITNESS:  Which needed input.
17  BY THE WITNESS:
18      A.   Which needed technical input from product
19  safety.
20      Q.   Is that RDT regulatory development team?
21      A.   I don't know.  I don't know.
22      Q.   Go to the next page.  The question is, how do
23  we bring in the regional dimension.  And it says there's
24  one -- the plan was to have one global active ingredient
25  lead, correct?

Page 97

1       A.   Correct.
2       Q.   And that would be a person, an individual,
3   correct, assigned?
4       A.   It would be an individual, yes, correct.
5       Q.   And would that person be assigned to a
6   particular molecule or an active ingredient?
7       A.   To -- to one or more.
8       Q.   One or more?
9       A.   One or more, yes.
10      Q.   But would -- would the active ingredient only
11  have one lead?
12      A.   The active ingredient would only have one
13  lead, that's correct.
14      Q.   Okay.  And that one active ingredient lead
15  would take the global lead and is the standing member of
16  the HAES active ingredient team?
17      A.   Yes.  On the previous slide, that would be the
18  same person, the AI lead that you see in the center.
19      Q.   And how were the active ingredient leads
20  selected?
21      A.   Well, I -- I cannot speak to that because I
22  didn't do the selection.
23      Q.   Who did it?
24      A.   John Doe, who was responsible for the -- for
25  the function.

25  (Pages 94 to 97)

Exhibit 006 Page 25
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                               11-4-2010
Confidential

Page 98

1     Q.   Were the active ingredient leads from all
2  around the world of Syngenta entities?
3     A.   They were, yes.
4     Q.   And give us some examples of leads from, for
5  example, England?
6     A.   Well, there was, you know, Patrick Rose, you
7  saw his name on one of the previous slides, would have
8  been one of the active ingredient leads from England.
9     Q.   Go to 465, if you would.  It's back up a
10 little ways.  I think we looked at this one briefly.
11    A.   Yeah.
12    Q.   Okay.  Do you see it says "AI lead" on this
13 exhibit, on -- There's an Ed Pilling, a J Markle --
14    A.   Yeah.
15    Q.   -- B. Swaine --
16    A.   Yeah.
17    Q.   -- M. Mills?
18    A.   Yeah.
19    Q.   Where are these people from?
20    A.   These people are from -- Patrick Rose is, you
21 know, the one -- name I just gave you and previously.
22 He was managing the team of two.  Ed Pilling was
23 reporting to him.  So Patrick did have some
24 responsibility in that.  These people are -- Ed Pilling,
25 at that time, was in Jealott's Hill, UK.

Page 99

1          Do you want me to go through the full list?
2     Q.   I mean, with -- Is it -- Without spending the
3  time to do it, is it --
4     A.   Okay.
5     Q.   -- safe to say they are basically
6  representative of different Syngenta entities throughout
7  the organization of --
8     A.   That's correct.  We had people located in
9  Greensboro.  We had people located in -- in UK sites.
10 We had people located in Basel.
11    Q.   Right.  And then if you'd go to Exhibit 2478.
12 Just briefly, explain this exhibit to me.  There's a
13 NAFTA team and an EU team.
14    A.   Correct.
15    Q.   If you can explain how this works in -- in
16 conjunction with their input to the AI leads?
17    MR. POPE:  How it worked in 2005 you mean?
18 BY MR. TILLERY:
19    Q.   Yes.
20    A.   2001.
21    MR. POPE:  2001.  Excuse me.
22 BY THE WITNESS:
23    A.   2001.
24    Q.   How long did this process last?
25    A.   Less than two years.

Page 100

1     Q.   And then it was replaced by what?
2     A.   It was replaced by a new organizational setup
3  which dissolved this whole, you know, HAES projects team
4  because it did not work.
5     Q.   And why didn't it work?
6     A.   Because the AI leads could not deliver the
7  role as they were expected to.  The task was too big.
8  It was too complex.
9     Q.   Okay.  And what was it replaced with?
10    A.   It was replaced by giving responsibilities
11 back to the tactical functions to -- to build up the
12 project plan and deliver the project plans in the
13 respective units.
14    MR. TILLERY:  Tell me when you want to take a
15 break.
16    MR. POPE:  It's totally up to you, Steve.
17    THE WITNESS:  Do you have a question to that
18 specific one that we looked at already?
19    MR. POPE:  I'm sorry; he's ready to move on.
20    THE WITNESS:  Okay.
21    MR. TILLERY:  Yes.  Yes.  Why don't we do this.
22 Why don't -- it's 12:15.  Why don't we take a brief -- I
23 don't care how long.
24    MR. POPE:  45 -- 45 minutes?
25    MR. TILLERY:  Yes, until 1:00.  Yes.

Page 101

1     THE VIDEOGRAPHER:  This -- this marks the end of
2  Videotape No. 3 in the videotaped deposition of Peter
3  Hertl.  The time is now 12:16 p.m.  Going off the
4  record.
5          (A lunch recess was had.)
6     THE VIDEOGRAPHER:  Going on the record.  This marks
7  the beginning of Videotape No. 4 in the deposition of
8  Peter Hertl.  The time is now 1:01 p.m.
9  BY MR. TILLERY:
10    Q.   In the document which is marked, I believe, as
11 Exhibit 8 in front of you, sir, you were looking at some
12 pages, different pages.  If you'd look at 2478.  I had
13 directed your attention to that earlier.
14    A.   Yes.
15    Q.   Now, this is the group you said that was --
16 Strike that.
17        This is the organization you said that no
18 longer is in effect?
19    A.   Well, not only this one, also the ones on the
20 previous slides.  This whole HAES products group that we
21 had been talking about for quite some time, existed for
22 less than two years.
23    Q.   Okay.
24    A.   Yeah.  Which would include the AI lead on that
25 Exhibit 2478, the AI lead role, which was part of the

26  (Pages 98 to 101)

Exhibit 006 Page 26
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                           11-4-2010
Confidential

## Page 102

1  products, HAES products, group.
2     Q.  And these people, this AI specialist health,
3  AI specialist dietary, at the time that these place --
4  that this organization was in place, who were these
5  people heading up these groups?
6     A.  This -- The people that you have in this AI
7  specialist bubbles, they were not heading up groups.
8  They were people that were part of the NAFTA -- you
9  know, in the top line, of the NAFTA health functions.
10        So that would be a team member, which would
11  have been in the NAFTA Greensboro organization in the
12  toxicology group.  It would be an individual in the
13  dietary function in Greensboro, an individual in the
14  environmental function in Greensboro, and the ecology
15  function in Greensboro.
16     Q.  And then likewise the EU would have been from
17  where?
18     A.  People mainly -- Well, they would come from
19  three sites, which would include CTL, Alderley Park in
20  Manchester, Jealott's Hill in the UK and Basel.
21     Q.  Okay.  If you go to the next page, if you
22  could briefly explain this one to me, as well.
23     A.  All right.  This is a pictogram that displays
24  schematically how we build up the work program for the
25  year and the product safety component of it.  So what

## Page 103

1  you typically have is a -- you know, a business proposal
2  for a development project, which you do not see on the
3  pictogram because there are no product safety projects
4  without a business project -- project supporting them.
5     Q.  Before you go on, this is Syngenta 02022479,
6  isn't it, sir?
7     A.  That's correct.
8     Q.  All right.
9     A.  That's correct.
10     Q.  I'm sorry.  Go ahead.
11     A.  So yet -- let me say again, we have an annual
12  project proposal process, which involves support needs
13  from various functions, product safety being one of
14  them.  These projects are scoped.  We do a business case
15  analysis.
16     THE REPORTER:  A business what?
17     THE WITNESS:  A business case analysis.
18  BY THE WITNESS:
19     A.  So it's a reasonable project to do from a
20  business perspective.
21        They are scoped in terms of the tactical
22  elements that they need in order to be completed
23  successfully, and product safety contribution is part of
24  that list of tasks that are needed.
25        Then these projects are prioritized and

## Page 104

1  implemented based on the funding that's available to
2  fund those projects in any given year.
3     Q.  Who proposes the projects?
4     A.  They come out of the business functions in the
5  organization.
6     Q.  When you say "business functions" --
7     A.  Yeah.
8     Q.  -- what does that mean?
9     A.  Well, these are functions outside of the
10  product safety organization.  So this would be the
11  marketing and sales organization in the regions, and
12  globally if it's an AI development project.  But it
13  would be the marketing and sales organization.
14     Q.  It would be the business end of --
15     A.  The business end.  They would -- they would --
16  I give you an example.  They would say, with we want --
17  We need a new corn herbicide mixture.  And -- which
18  controls certain weeds that we don't control.  And a
19  business case would be developed how it could be
20  delivered.  And then it would be costed.  And product
21  safety costs would be a part of that project.
22     Q.  And who would decide the funding for the
23  entire project for the entire project?
24     A.  For the -- for the entire project would be
25  decided -- if it's a global project, would be decided by

## Page 105

1  the portfolio management group and, you know, the
2  management organization in -- in Basel.  If it's a
3  regional project, it would be decided by the region.
4     Q.  Who would prior -- prioritize it on a global
5  funding basis?
6     A.  The -- the global projects are prior --
7  prioritized by the global head of development in
8  conjunction with the global marketing function.  And the
9  regional projects, similarly in the region.  So the
10  regional head of development in conjunction with the
11  regional marketing function.
12     Q.  Go to the next page, which is
13  Syngenta 02022480.  I think there's actually two pages
14  to this.
15     A.  Yeah.
16     Q.  And this was a document where there were
17  active ingredients requiring technical plans?
18     A.  Yes.
19     Q.  And in the second category, selective
20  herbicides, mesotrione is listed?
21     A.  Yes.
22     Q.  And then fluorotyrosines, including atrazine,
23  is listed below?
24     A.  Yes.
25     Q.  What does it mean that this particular

27 (Pages 102 to 105)

Exhibit 006 Page 27
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

## Page 106

1  selective herbicide required a technical plan?
2      A.  Well, it would mean that there was a
3  significant amount of work to be done for that specific
4  active ingredient, you know, in the near future.  Or
5  that looks at the work that you would need to do in the
6  next year or two.
7          So in 2001 this would have meant that in
8  addition to the new active ingredients -- and I don't
9  quite recall which ones were still in Stage 3 -- but
10 there were a number of active ingredients that were
11 active reregistration, and they would have a work
12 program to be developed.
13     Q.  In 1997 when you came to America in September
14 and started working for --
15     A.  Mm-hmm.
16     Q.  -- Novartis Crop Protection?
17     A.  Mm-hmm.
18     Q.  In terms of the management structure of
19 Novartis Crop Protection, how has that changed in a
20 general way with the way that the operation is conducted
21 today?
22     A.  For product safety?
23     Q.  Actually, for the overall management of the
24 operation.
25     A.  Well, I -- You know, I really can only talk to

## Page 107

1  the product --
2      Q.  The product safety --
3      A.  -- safety component of it.
4      Q.  -- component of it?
5      A.  Because I only work in the product safety
6  functions.
7      Q.  You wouldn't be familiar with the rest of the
8  operations in terms of --
9      A.  I would not be familiar with that, no.
10     Q.  Okay.
11     THE REPORTER:  Just a reminder to speak one at a
12 time.
13     THE WITNESS:  Sorry.
14          (Hertl Deposition Exhibit No. 9
15          marked as requested.)
16 BY MR. TILLERY:
17     Q.  The reporter has marked a document as No. 9.
18 Tell me what that document is, please.
19     A.  It is a printout of it, looks like, a
20 presentation entitled "Environmental Fate," March 2006.
21     Q.  If you go to page Syngenta 03135185.
22     A.  Yes.
23     Q.  And look at that box at the top.  This is crop
24 protection development?
25     A.  This is crop protection development, yes.

## Page 108

1      Q.  What does that mean?
2      A.  The -- That's the crop development protection
3  function, which is led by the head of crop protection
4  development located in Basel.
5      Q.  Okay.  And who is in this very top head?
6      A.  I believe that reads Ralf Furter.  You can't
7  read it very well.
8      Q.  And he reports to the head of R&D?
9      A.  R&D.
10     Q.  And chief operating officer?
11     A.  Officer for crop protection, yes.
12     Q.  Okay.  And these heads below are which, if you
13 could read them for me?
14     A.  They are health assessment, John Doe.  They
15 are environmental sciences, vacant.  There is
16 CP development business management, John Parker; global
17 regulation affairs, John Street; stewardship, Rich
18 Brown; development portfolio, Jasper Barnes; issue
19 management, Georg Diriwachter; global field support,
20 Franz Doppman; and technical management, Klaus Gehmann.
21     Q.  Where were these people from?
22     A.  Do you want me to go through it one by one?
23     Q.  Well, let's start off with the head of R&D,
24 where was he from?
25     A.  Oh, the head of R&D at that point in time was

## Page 109

1  David Lawrence, located in, I believe, Jealott's Hill in
2  the UK.
3      Q.  Okay.  And the chief operating officer?
4      A.  Was John Atkin.
5      Q.  Okay.  And he was at --
6      A.  Basel.
7      Q.  In Basel.  And at Syngenta Crop Protection AG?
8  Is that where he was?  Do you know?
9      A.  I don't know.
10     Q.  Okay.  And -- and let's look at the other
11 people.  Were -- were these people from Basel and
12 Europe?
13     A.  John Doe, UK, Jealott's Hill.  John Parker, in
14 2006, I think that was -- Sorry.  I misspoke.  2006,
15 that is -- John Doe still would have been in Alderley
16 Park in Manchester, UK; John Parker, Alderley Park,
17 Manchester, UK; John Street, Basel; Richard Brown,
18 Basel; Jessica Barnes, Basel; Georg Diriwachter, Basel;
19 Frank Dorobek, Basel; Klaus Gehmann, Basel.
20     Q.  Okay.  Let's go to Syngenta 03135188.  Do you
21 see "Global Resource Distribution"?  Can you explain
22 that document to me, please.
23     A.  This is a breakout into areas of expertise
24 within the teams in Basel, Greensboro, and Jealott's
25 Hill, within the subteams of the environmental fate

28  (Pages 106 to 109)

Exhibit 006 Page 28
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 246 of 486

Hertl, Peter                                11-4-2010
Confidential

Page 110

1  function.  So what you see across the top is a listing
2  of sites:  Basel, Greensboro, Jealott's Hill.
3         And then you have going down vert --
4  vertically, the three skill sets, one being
5  ecochemistry, that's a specialist discipline; one being
6  environmental residues; another one, specialist; and
7  then we have environmental risk assessment and modeling.
8  And in the fields that make up the matrix, we have a
9  number of experts at the various sites listed.
10    Q.  Is there a document similar to this that would
11  describe the global product safety arm that you head
12  now?
13    A.  I don't think so, no.
14    Q.  And if we were going through and -- and doing
15  a similar analysis with respect to your department?
16    A.  Yes.
17    Q.  I'll call it a department.
18    A.  Yes.
19    Q.  Where would the people be?
20    A.  Well, the department includes more than those
21  three skill sets.  But roughly we had -- We would have
22  about 140 people in Jealott's Hill, in a number of skill
23  areas which include these three, but there would be
24  more.  We would have about 80 people in Greensboro,
25  which are spread out over similar skill set areas.  We

Page 111

1  would have about 50 in Research Triangle Park in
2  Raleigh, which --
3     Q.  I'm sorry, in where?
4     A.  In Raleigh, North Carolina.
5     Q.  Okay.  And who do those people work for?
6     A.  They work for, you know, Syngenta.  I don't
7  know the legal entity.
8     Q.  And what do those people -- What is that
9  facility in Raleigh?
10    A.  They do support seeds and traits development
11  activities.
12    THE REPORTER:  They support?
13    THE WITNESS:  Seeds and traits --
14    THE REPORTER:  Thank you.
15    THE WITNESS:  -- development activities.
16  BY THE WITNESS:
17    A.  And do product safety data generation for that
18  part of the product portfolio.
19    Q.  Seeds and --
20    A.  Seeds and traits.
21    Q.  Traits.  So it's on the seeds side of the
22  business?
23    A.  It's on the seeds side of the business.
24    Q.  And who is the head of that group?
25    A.  Trish Malarkey.

Page 112

1     Q.  What is Trish's title?
2     A.  Head of product safety, NAFTA.
3     Q.  And she is at which entity?
4     A.  She's an employee of Syngenta Crop Protection,
5  Inc., in Greensboro.
6     Q.  But she heads up the Raleigh group?
7     A.  Yes.  There are more than these 50 people in
8  Raleigh, but she manages the Raleigh group of these
9  50 employees, about 50 employees.
10    Q.  All right.  And where is this facility in
11  Raleigh?
12    A.  It's in Research Triangle Park, Cornwallis
13  Drive.
14    Q.  Okay.  How -- how long has the facility been
15  there?
16    A.  I don't know the exact year, but since the
17  '70s.
18    Q.  And what is the type of work they do?  The --
19  not the whole group --
20    A.  Yes.
21    Q.  The -- the group that's within the umbrella
22  that you head globally.
23    A.  Yeah.  They do traits, characterization.
24    Q.  Traits --
25    A.  Traits --

Page 113

1     Q.  -- characterization?
2     A.  -- characterization work.
3     Q.  Can you explain that to a lay person what that
4  means.
5     A.  Yes, we -- So we -- We -- One of our products
6  lines are traded seeds.  So these are seeds that contain
7  genetically modified organisms and express a certain
8  property as part of the genetic made -- makeup they have
9  been -- that has been bred into them.
10       So the -- the traits express insecticides, so
11  they're protected against insecticide attack.  Another
12  trait that they express is they're herbicide resistant
13  so that you can treat them with a herbicide that they --
14  that otherwise would not have been able to be treated
15  with because they would suffer from a, you know -- you
16  know, a plant photo synthesis effect.
17       What the group does is they look at the
18  traited material and confirm that the expression of the
19  proteins, these active principals are expressed as
20  proteins, that the expression of the proteins in those
21  plants is consistent.
22       When you plant the crop in different
23  geographies, when you have the trait in different gene
24  lines, so they look for consistency of biology effect.
25  And they look at what we call agricultural similarities.

29  (Pages 110 to 113)

Exhibit 006 Page 29
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 114

1    So they confirm that a traited crop in its
2  makeup and nutrient content is no different from the
3  untraited crop that was used as a starting point.
4    Q.  And they do their work under the direction of
5  this woman -- I can't remember.  You said Trish?
6    A.  Yes.  Patricia Malarkey, that's correct.
7    Q.  What is her title?
8    A.  She's head of product safety, NAFTA.
9    Q.  So she took your job?
10   A.  Yes.
11   Q.  What was her job before you left head of
12  product safety, NAFTA?
13   A.  She was portfolio manager, corns, for the
14  seeds organization.
15   Q.  Is the operation that you just described in
16  terms of Patricia Malarky's responsibility, still in
17  existence today?
18   A.  Yes.
19   Q.  Okay.
20   A.  And that organization became part of global
21  product safety on the first of January 2010.  So that's
22  a very recent development.
23   Q.  And where was it before then?
24   A.  Well, localized, it was at the same site,
25  Research Triangle Park, Cornwallis Drive, it was part of

Page 115

1  the Syngenta biotechnology organization.
2    Q.  And Syngenta biotechnology organization is
3  located where?
4    A.  In Research Triangle Park, North Carolina,
5  Cornwallis Drive.
6    THE REPORTER:  Could you spell the city in North
7  Carolina, please.
8    THE WITNESS:  Research Triangle Park.
9    MR. POPE:  Research Triangle --
10   THE REPORTER:  Research Triangle Park?
11   MR. POPE:  -- Park.
12   THE WITNESS:  Park.
13   THE REPORTER:  Thank you.
14   THE WITNESS:  It has a zip code and an address.
15   THE REPORTER:  And it's Cornwallis Drive?
16   THE WITNESS:  Yes, Cornwallis Drive.
17  BY MR. TILLERY:
18   Q.  All right.  You were describing for me the
19  groups in this overall umbrella.
20   A.  Yes.
21   Q.  And -- when we got side tracked a little bit.
22  If we could get back to this, you had described groups
23  in Jealott's Hill, and you described groups in -- in the
24  U.S.  And where else -- what else would be included
25  within this group?

Page 116

1    A.  So Jealott's Hill, U.S., we have covered.  We
2  are currently in the phase of building up a group in Sao
3  Paulo, Brazil.  This is ongoing, as we speak.  And we
4  are planning to build up a small group in Singapore.
5  Again, that's a project that's ongoing.
6    Q.  And who will the heads of those organizations
7  be?
8    A.  The respective heads of product safety in
9  those regions, which I mentioned earlier.
10   Q.  If we could go back to Syngenta number at the
11  bottom right-hand Bates No. 03135185.  And this is the
12  group that you had identified before.
13    Can you explain each of these development
14  functions.
15   A.  Start with the left-hand corner.  Health
16  assessment, managed by John Doe, is responsible for data
17  generation that allow it to assess potential risks to
18  humans, so that they're accountable for all those
19  studies that are being done to allow an assessment to be
20  developed.
21    Environmental sciences, that's the same group
22  that was responsible for the environmental component of
23  it.  And we have covered that previously.
24    CP development business manager, John Parker.
25  John Parker's group was responsible to coordinate and

Page 117

1  organize outsourced activities across all the
2  development functions.  So there were -- These -- But
3  these were mainly or almost exclusively activities that
4  had to do with data sourcing or started sourcing for the
5  two safety product functions through third-party
6  contract research organizations.
7    We have global regulatory affairs.  This role
8  supports global regulatory strategies for global AI
9  development projects when you have a new chemical that
10  goes into multiple markets.  And coordinates also
11  regional support activities for registration or
12  reregistration with the regional leads that exist in the
13  four regions.  So you have regional units for those
14  regulate -- regulatory groups, as well.
15    The stewardship group looks at post-market
16  introduction compliance.  Just to give you an example,
17  that all our products come with very precise, defined
18  labels and how materials should be handled and how it
19  should not be handled.  The stewardship role is
20  accountable to, you know, do some market surveillance to
21  make sure that these labor recommendations are actually
22  followed and that products -- products are handled
23  properly.
24    We have a development portfolio organization,
25  which is a unit that collects on an annual basis all the

30  (Pages 114 to 117)

Exhibit 006 Page 30
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

## Page 118

1  project information, all the information to new business
2  projects, help develop the business cases, and help them
3  and support this ranking process where you make priority
4  decisions about projects you want to fund or not fund
5  going forward.
6      Q.  Uh-huh.
7      A.  For global projects, that is.  He does that
8  for only global projects.  We have, then, the same
9  processes running in the regions for regional products,
10 as well.  Issue management, if there are specific
11 technical issues for specific products, this is a
12 one-man show.  And this individual coordinates and makes
13 sure the communication flow is -- is happening, the data
14 are available.
15     Global field support.  We do extensive field
16 test programs in all -- in countries in all the regions
17 where we sell our products.  And this is really centered
18 around the biological efficacy, so do the project -- do
19 our products, actually deliver what we think they should
20 be delivering.  And this role, Franz Doppman, head --
21 head of support organization, to -- to facilitate these
22 programs.  So he was running the data systems and making
23 tools available to get the work done in the regions.
24     And then we have technical management, Klaus
25 Gayman.  He oversees the global programs for efficacy,

## Page 119

1  biology, data generation for global registrations.  So
2  that is mainly looking at new active ingredients and the
3  biolog -- biological programs and efficacy programs that
4  are developed in -- in order to support reproducible
5  biological efficacy across all the markets.
6      Q.  Has this structure remained the same since
7  this document was created?
8      A.  It has changed somewhat.  So the health
9  assessment and environmental sciences function were
10 merged into product safety.  So those two boxes became
11 one.
12     Q.  Under -- under your leadership?
13     A.  Yes, and previously under John Doe's
14 leadership.  So he had that role, you know, after 2006.
15     The CP development business management
16 function doesn't -- does not exist anymore, but we have
17 a business management function within product safety
18 because all they did was product safety-related support
19 activity, so that became part of product safety.  Global
20 regulatory affairs is unchanged.  Stewardship and issue
21 management was combined just recently, just last month,
22 so it's now stewardship and issue management function.
23     Development portfolio still exists.  Global
24 field support and technical management were combined
25 under -- under technical management structure.  The

## Page 120

1  functionality is very similar.
2      Q.  Otherwise, it's -- it is as you described it?
3      A.  Yes.
4      Q.  Now, in your particular division of global
5  product safety, do you have a budget within your
6  operation?
7      A.  Yes.
8      Q.  And do you submit a budget proposal?
9      A.  We do submit a budget proposal, but in order
10 to understand that, it's really important to understand
11 how we operate as a product safety organization.  We
12 have about --
13     Q.  Well, I -- I'm going to get to that, but --
14     A.  Okay.
15     Q.  -- I'm just asking, do you --
16     A.  Yes.
17     Q.  -- submit one?
18     A.  I do submit one.
19     Q.  And who do you submit your budget proposal to?
20     A.  I submit my budget proposal to the global head
21 of development.
22     Q.  And who is that?
23     A.  Today it is Geraldo Ramos.
24     Q.  And he is employed by whom?
25     A.  Well, I haven't seen the contract, but I

## Page 121

1  assume it's Syngenta Crop Protection AG in Basel.
2      Q.  He's in Basel?
3      A.  He's in Basel, yes.
4      Q.  Do you know if he has final authority over
5  your -- over your budget proposal, or if he has to
6  submit it to someone else?
7      A.  He has to submit it to the global head of R&D.
8      Q.  And who is that?
9      A.  That's Sandro Arrufo.
10     Q.  Okay.  And then where does it go from there?
11     A.  Well, Sandro Arrufo is a member of the
12 Syngenta executive committee, so he takes it forward and
13 has it approved by the Syngenta executive committee.
14     Q.  Okay.  If you'd go to Syngenta -- it's in that
15 same document -- 03135189.
16     Do you see that document, sir?
17     A.  Yes, I do.
18     Q.  The head of it is -- The top is entitled
19 "GSO Environmental Fate Group"?
20     A.  Yes.
21     Q.  What is this document?
22     A.  I think this is a -- a short summary of how we
23 did deploy individuals and resources within the
24 Greensboro organization against projects that were done
25 in 2005.

31  (Pages 118 to 121)

Exhibit 006 Page 31
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                                   11-4-2010
Confidential

## Page 122

1    Q.  And it shows, in just a general sense, that in
2  the environmental fate group, 75 percent of the
3  full-time equivalent employees were in regional tasks,
4  and 25 percent were in shared global data development,
5  correct?
6    A.  Correct.
7    Q.  And that would be to support the other groups
8  from around the world?
9    A.  Or to support data development, which is used
10 around the world for registrations.
11   Q.  Okay.  And if you go to the very next page,
12 which is Syngenta 03135190.
13   A.  Yes.
14   Q.  It's entitled "Key Success
15 Factors/Challenges."
16   A.  Yes.
17   Q.  One of the factors identified is the internal
18 category of capabilities of attracting the right, best
19 people maintaining a global network of competencies.
20      Do you see that?
21   A.  I see that, yes.
22   Q.  And that's in keeping with what you testified
23 to earlier about the shared pool of expertise and
24 selecting the right people for the job within the
25 umbrella of Syngenta entities?

## Page 123

1    A.  Correct.
2    Q.  Does that policy remain today, in terms of
3  trying to do the same thing?
4    A.  To use -- The policy, you mean to use the best
5  people and to match up the best experts with the -- the
6  question at hand irrespective of where the experts are
7  or --
8    Q.  Irrespective of where they're technically
9  employed within the Syngenta group of companies.
10   A.  Yes, it does.
11   Q.  If you go to Syngenta 03135196.  And if you'd
12 look at that and look at the center, "RDT lead," what
13 does that mean?
14   A.  I don't recall that acronym.
15   Q.  Okay.
16   A.  I don't recall that acronym.
17   Q.  All right.
18   A.  Sorry.
19   Q.  And if you'd go to the next page, which is
20 Syngenta 03135197.
21   A.  Mm-hmm.
22   Q.  And just tell me what this is.
23   A.  This is a slide that describes the
24 environmental science organization, which was headed by
25 Harry Swaine located in Jealott's Hill and how it was

## Page 124

1  set up at the various sites that we had facilities.
2    Q.  So just generally, we have head of
3  environmental sciences was -- head was Harry Swaine,
4  correct?
5    A.  Correct.
6    Q.  And then below that was what, sir, if you'd
7  explain to me?
8    A.  You have the -- The assistant boxes that go to
9  the left and the right that was shared support activity
10 with the human safety group.  And then underneath in
11 that horizontal bar, we had site teams, starting out of
12 Basel on the very left, led by Christian d'Hondt.
13 Followed by the head of dietary safety, which was Sarah
14 Reese, located in Jealott's Hill, UK.
15      Next, Peter Campbell, head of ecological
16 sciences located in Jealott's Hill, the UK.  And next
17 you had myself located in Greensboro.  And each of those
18 four groups looked at function across the sites.
19      So we talked earlier about the
20 environmental -- Global environmental fate function, so
21 that -- that was my role as head of global environmental
22 fate, and I would have teams.  Being myself located in
23 Greensboro, I would have teams in Basel and Jealott's
24 Hill and in Greensboro and the same applied for the
25 other functions.

## Page 125

1    Q.  Okay.  If you'd look at the very next page,
2  which is Syngenta 03135198 --
3    A.  Yes.
4    Q.  -- entitled "How Do We Assess Fate and
5  Exposure?"
6    A.  Yes.
7    Q.  What is that diagram?
8    A.  This is a diagram that summarizes the type of
9  work we are doing and the type of data we develop and
10 how to use the data to develop an environmental fate
11 assessment for crop protection chemicals, in this case.
12   Q.  Where does the diagram come from?
13   A.  Well, that -- That diagram, I think, was
14 copied from an OECT brochure, I believe.  And I got it
15 handed down by a colleague, so I can't be sure about the
16 original source.  But it's a fairly schematic diagram of
17 what environmental fate assessment and determination
18 tries to accomplish.
19   Q.  So if -- if you could just walk me through it.
20 On the right-hand side, there's a reference to a
21 laboratory studies, which would include controlled model
22 experiments, decomposition rate pathways, transportation
23 processes.
24   A.  Correct.
25   Q.  What are those?

32  (Pages 122 to 125)

Exhibit 006 Page 32
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG-PMF   Document 334   Filed 12/26/12   Page 33 of 56   Page ID
#12897
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 250 of 486

Hertl, Peter                                11-4-2010
Confidential

Page 126

1    A.  So these are typically studies that are done
2  under controlled conditions in a laboratory, in a test
3  system.  So I give you one example.  You would have a
4  small amount of soil.  You would dose it with a
5  regulated chemical.  You would preserve it, maintain at
6  controlled conditions, humidity, temperature.
7         You would take samples at certain time
8  intervals, and would investigate how the chemical breaks
9  down in soil over time, and what degradation products
10  are formed, and you would do quite a number of those
11  tests to --
12    Q.  In the laboratory?
13    A.  In the laboratory.  So these would be
14  laboratory tests that follow internationally accepted
15  protocols, typically EOCD-type or EPA-type protocols
16  that have been develop -- developed by the agencies and
17  discussed globally for many, many years.
18    Q.  And would these be done at a certain stage of
19  the development of the compound?
20    A.  You would typically do them late in Stage 2
21  and early in Stage 3.  So they would typically be done
22  the first two years in Stage 3 development.
23    Q.  The product life cycle management program that
24  we're going to talk about later today --
25    A.  Yes.

Page 127

1    Q.  -- would include in Stage 1 what process for
2  the development of the compound?
3    A.  Well, the product life cycle management
4  products usually have all those data because they would
5  have been developed when the product was originally
6  developed for full registration.  So there are really
7  two instances.  One is, since it is an older compound,
8  not all the data requirements would have been satisfied
9  when you applied new regulator and modern regulator
10  frameworks.
11    THE REPORTER:  When you applied for what?
12    THE WITNESS:  Modern regulator frameworks.
13  BY THE WITNESS:
14    A.  Because the regulations change all the time,
15  so you have to fill in data gaps that exist simply
16  because the requirement didn't exist when the compound
17  was first developed.  Or you would have studies in your
18  data set that were outdated just by the methodology that
19  was used to do them in the first place, and those would
20  have to be repeated.
21         But typically, if you have a fairly up-to-date
22  data package for compounds on the range, you wouldn't
23  have to redo those laboratory experiments?
24    Q.  Where would those studies be done within
25  Syngenta initially on Stage 1?

Page 128

1    A.  Well, on Stage 1, we typically would not do
2  these studies, because we wouldn't have enough material
3  to even initiate that kind of work.  It would be late
4  Stage 2 or -- early Stage 3 development when we would
5  do those studies.
6         Nowadays, they would be done in contract labs.
7  Whoever is capable and competent to do the study, it
8  would be done in a contract lab.
9    Q.  But when you're developing the molecule
10  yourself --
11    A.  Mm-hmm.
12    Q.  -- when you're developing it, do you do that
13  in a contract lab?
14    A.  Oh, yes.
15    Q.  Okay.  And have you started doing that since
16  2006?
17    A.  That's correct, yes.
18    Q.  Do you have your own laboratories for
19  developing your own molecules still?
20    A.  No.
21    Q.  I thought you told me before lunch that
22  Jealott's Hill was still -- still used to develop your
23  own products.
24    A.  Okay.  So that -- that's a fine
25  differentiation between research and development.  So we

Page 129

1  have research laboratories in Jealott's Hill that
2  basically discover the chemistry.
3    Q.  Right.
4    A.  Right?  And once you have a candidate that you
5  want to take forward into development, there are
6  development activities -- And we're speaking about
7  product safety.  I was speaking about product safety.
8         There are activities that are necessary in
9  product safety, like these laboratory studies in the
10  controlled conditions, that are part of Stage 2, Stage 3
11  development program.  We don't do any product safety
12  studies internally anymore at any of the Syngenta sites
13  since 2006.
14    Q.  But what about product development?
15    A.  Well, the other development functions, like
16  formulation development or biological development, which
17  is not related to product safety, are still in parts
18  being done internally and in parts being contracted.
19         But product safety is contracted entirely in
20  terms of data generation.  So the studies that are being
21  done today, since 2006 to today, that define and support
22  our product safety profile are done in contract research
23  organizations.
24    Q.  What site contracts these out?
25    A.  Excuse me?

33  (Pages 126 to 129)

Exhibit 006 Page 33
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG-PMF   Document 334   Filed 12/26/12   Page 34 of 56   Page ID
#12898
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 251 of 486

Hertl, Peter                    11-4-2010
Confidential

Page 130

1    Q.  What site, Syngenta site, is in charge of
2  contracting them?
3    A.  Well, all the sites do contracting of studies,
4  so Jealott's Hill does study contracting, Greensboro
5  does study contracting, SDI does study contracting.
6  That's the RTP site that joined earlier this year.
7    Q.  Okay.  What -- what about -- Let's get back to
8  the product development, the research, the new
9  molecules.  Okay?  And let's make sure that --
10    A.  Yeah.
11    Q.  -- we're not confusing the point here.
12    A.  Yeah.
13    Q.  I want to make sure we understand the
14  distinction.
15      In the part where Syngenta is developing its
16  own molecule, walk me through that process, gen --
17  generally.
18    A.  Okay.  So we do have a stage plan, and that
19  stage plan differentiates development phases.  There are
20  four main stages, 1, 2, 3, 4.
21      Phase 1 is under full control of crop
22  protection research.  So this is all about finding the
23  right molecule with the desirable biological effects
24  that we need in order to satisfy a market need.  And
25  that can be manufactured with a reasonable cost.

Page 131

1      Once we have -- So these are activities that
2  are still done internally for the global organization in
3  Switzerland and in the UK.  So we have -- we have crop
4  protection research facilities in those two countries.
5      Stage 2, as we have identified a candidate and
6  we take the candidate to a preliminary evaluation.  We
7  do some preliminary product safety testing, which is not
8  the full studies, that allows us to decide if this is a
9  molecule that is registrable in the markets.
10    THE REPORTER:  That is what in the markets?
11    THE WITNESS:  Registrable in the markets.
12  BY THE WITNESS:
13    A.  If you can get registration.  If you can use
14  it safely in the markets.
15    Q.  All right.  If you'd stop just for a second.
16  Where is the Stage 1 work done?
17    A.  The Stage 1 work is done in Stein, which is a
18  site in Basel, which is not related to product safety,
19  and in Jealott's Hill, which is an organization that's
20  separate from product safety.  So it's the CP, crop
21  protection, research organization in Jealott's Hill.
22    Q.  And who owns the technology -- Strike that.
23      Who owns the intellectual rights, property
24  rights, to the molecule?
25    A.  Well, Syngenta Crop Protection AG, I would

Page 132

1  presume --
2    Q.  Okay.
3    A.  -- owns the intellectual rights to the
4  invention, if there's no previous invention and it's not
5  IP protected.
6    Q.  Of course.
7    A.  Yes.
8    Q.  That's a licensing-type --
9    A.  Yes.
10    Q.  -- agreement?
11    A.  Yes.
12    Q.  I'm talking about a four-stage development of
13  a new molecule.  So it goes through this -- this first
14  one, this first process, and is it at that stage a
15  fairly closely guarded secret?
16    A.  No, not really because by the -- We have to do
17  some field testing at Stage 2.
18    Q.  I'm just talking about Stage 1.
19    A.  Stage 1.  Well, I don't know what you mean by
20  "closely guarded secret."
21    Q.  Well, I mean, is -- I mean, you don't want
22  competitors knowing what you're developing in the
23  molecule, do you?
24    A.  You certainly don't want that to happen,
25  exactly, that's right.

Page 133

1    Q.  So you keep this close within the group of the
2  Syngenta people who are doing the research?
3    A.  The -- You know, the exact structural
4  identification is confined to, you know, a limited
5  number of people until we have secured intellectual
6  property --
7    Q.  Okay.
8    A.  -- for a molecule.
9    Q.  Now, then you said you moved to Stage 2, and
10  then there's some testing.  Is the product ready to go
11  to market yet?
12    A.  No. No. No.
13    Q.  Okay.
14    A.  It's years -- years away from market.
15    Q.  Years away?
16    A.  Years away.
17    Q.  And where is the field testing done?
18    A.  Well, it's done in the key markets.  And that,
19  you know, begins in stage -- In late Stage 1, continues
20  through Stage 2, and Stage 3.  The field testing is done
21  in all the key markets.
22      So if it would be a compound that has a market
23  in all four regions, it would be tested in all four
24  regions.
25    Q.  Is this a sort of soil or farm testing in the

34  (Pages 130 to 133)

**Exhibit 006 Page 34**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                           11-4-2010
Confidential

Page 134

1  areas where the product would be --
2      A.  Yes.
3      Q.  -- anticipated to be used?
4      A.  That's correct.  On a very limited scale, yes.
5      Q.  Where it's anticipated to be used?
6      A.  Yes.
7      Q.  And explain to me how, then, the product is
8  shipped to this location to where it's going to be
9  tested.  How is this done, mechanically?  Who does it?
10     A.  How it's shipped and received, I don't know.
11 I don't know.
12     Q.  Okay.  But -- but a product is now in late
13 Stage 1, early Stage 2 testing.
14     A.  Yes.
15     Q.  And it's some years before it's going to
16 get --
17     A.  Yes.
18     Q.  -- onto the market?
19         And it's shipped, for example, to some place
20 in Europe?
21     A.  Yes.
22     Q.  Or some place in the United States?
23     A.  Yes.
24     Q.  And it's submitted there for testing?
25     A.  Yeah.

Page 135

1      Q.  And it's put in test plots in certain farms?
2      A.  Yes.
3      Q.  And who contracts with the farms?
4      A.  This would be the, you know, biological R&D
5  organization in NAFTA, for example.  Can I just say
6  that.  These are all regional groups that would initiate
7  the regional test programs or the country-level test
8  programs even.
9      Q.  And who would tell NAFTA what products need to
10 be tested?
11     A.  I don't know that.
12     Q.  Would NAFTA have -- Strike that.
13         NAFTA would have no ownership rights over the
14 molecule, would they?
15     A.  I don't know that.
16     Q.  Well, do you know whether they would or not?
17     MR. POPE:  He just said no.
18 BY THE WITNESS:
19     A.  I don't know, no.  I don't know.
20     Q.  Okay.  Well, you told me a few minutes ago
21 that the molecule would be owned by a particular group
22 in Basel, all of them are, aren't they?
23     A.  Well, that was my presumption.
24     Q.  Yes.  And I will say to you --
25     A.  Yeah.

Page 136

1      Q.  I will represent to you that Mr. Maeder and
2  Mr. Atkin have said that exact same thing.
3      A.  Okay.
4      Q.  Okay.  When they've testified in this same
5  case.
6      A.  Yeah.  Yeah.
7      Q.  Now, what I'm asking you is, when that mol --
8  When that molecule or that compound is being tested in
9  these different locations, who tells the people at NAFTA
10 which products need to be tested?
11     MR. POPE:  Objection.  I think you asked him that
12 before.
13 BY THE WITNESS:
14     A.  I -- I really don't know who tells them.
15     Q.  Who would you go to ask about that?
16     A.  Well, I would go to the head of biological
17 R&D.
18     Q.  Who is that?
19     A.  Who -- Well, in the case of NAFTA, this would
20 be -- Give me a minute with the names.  Mike.  Mike.
21 Mike.  Last name.
22         If you do have a organigram of -- of the NAFTA
23 development organization, you will find that function.
24 I'm sorry; I don't recall the last name.
25     Q.  At this point in time, the product -- or the

Page 137

1  compound --
2      A.  Mike Johnson.  Sorry.
3      Q.  Okay.  Let me start my question over.
4      A.  Yeah.
5      Q.  At this point in time, the compound is not
6  ready for sale, is it?
7      A.  No.
8      Q.  And it has to go through a regulatory process,
9  doesn't it, and be --
10     A.  Yes.
11     Q.  -- approved for use?
12     A.  Correct.
13     Q.  And it has to go through packaging --
14     A.  Correct.
15     Q.  -- and processing --
16     A.  Yes.
17     Q.  -- and all that?
18     A.  Yes.
19     Q.  And that could take some considerable period
20 of time?
21     A.  Yes.
22     Q.  But the whole idea before you spend all that
23 money and time on this particular compound, is to see if
24 it works in a test plot where you're likely going to
25 sell it, correct?

35  (Pages 134 to 137)

Exhibit 006 Page 35
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 138

1   A.  That's correct, yes.
2   Q.  So if you're going to sell it in Brazil, you
3   want to put it in a test plot in Brazil?
4   A.  That's correct.
5   Q.  If you're going to sell it in Illinois, you're
6   going to put it on a farm ground in Illinois and test to
7   see if it kills certain weeds that you want to sell it
8   for?
9   A.  That's correct.  Or in the greater corn area.
10  Q.  Exactly.
11  A.  Yeah.
12  Q.  In corn -- I mean, Iowa --
13  A.  Yes.
14  Q.  -- Illinois --
15  A.  Yes.
16  Q.  -- Indiana?
17  A.  Yes.
18  MR. REEG:  You guys are stepping on each other.
19  The record's going to be messed up.
20  MR. TILLERY:  Thank you.  Sorry.  Try -- I'll try
21  not to do that.  I'm sorry.  If I'm interrupting you, I
22  don't want to do that.  Okay.
23  BY MR. TILLERY:
24  Q.  After these tests are conducted in these
25  various areas, for example, in the United States in the

Page 139

1   corn belt, including those three states I just
2   mentioned, Illinois, Indiana, Iowa, and you found that
3   the product was able to kill the type of -- of weeds
4   that you wanted to kill with the product, what would you
5   do then?
6   MR. POPE:  This is a hypothetical, right?
7   MR. TILLERY:  Well, actually -- actually, I guess,
8   you can put it in any construct you want, but we were
9   talking about how this process would work in a Stage 4
10  analysis.
11  BY THE WITNESS:
12  A.  Well, this is not a sequential process; this
13  is actually a simultaneous process.  So if you look at
14  us testing the biological performance of the product
15  under local environmental or agricultural conditions,
16  that happens in -- Almost all of it happens in Stage 3.
17  I mean, this is what Stage 3 is about, is to develop and
18  test a product under the appropriate environmental
19  conditions and to optimize the product to perform to its
20  best abilities.
21  Simultaneously, at the same time, you would
22  conduct a full range of product safety studies that you
23  had to do under those same environmental conditions in
24  order to generate the data that ensures that the product
25  can be used safely in that environment, that the

Page 140

1   residues and crop tolerances resulting from its use are
2   registrable, so you do build your database
3   simultaneously generating the biological information.
4   Q.  I understand.
5   A.  Okay.
6   Q.  I understand now.  And when you're doing that
7   product safety testing, are you doing that like you do
8   the -- the testing in farm fields?  Do you test that in
9   the areas where you anticipate the product's --
10  A.  Yes, we do.
11  Q.  -- going to be used?
12  A.  Yes, we do.
13  Q.  And how do you do that?
14  A.  Well, a typical minimum program would ask you,
15  for the U.S., for the U.S., would ask you to do about
16  20 residue trials.  You would have to find
17  20 representative fields with farmers in the corn belt,
18  if it's a corn product, where you would contract the
19  field part of the trial.
20  You would, you know, rent a piece of land.
21  You would apply the product in controlled conditions,
22  you would take samples, and then ship the samples to
23  Greensboro, have them processed, and ship the processed
24  samples out to contract research organizations to
25  analyze for residues.  One example.

Page 141

1   You would have to do the same type of
2   investigation for what we call field soil dissipation.
3   So it's not only what's on the drop, it's also what's on
4   the field, how does the product or its degradation
5   products move through the soil or off the soil.  So you
6   would have to do two or three of those studies, which
7   are fairly expensive and typically last two years.
8   And these are only two examples.  So there are
9   a number of additional programs you would do alongside
10  the biological testing.
11  Q.  Would you do these before the product can be
12  registered and sold?
13  A.  Yes, absolutely.
14  Q.  Yes.
15  A.  Yes.
16  Q.  And report the data --
17  A.  Yes.
18  Q.  -- too.
19  A.  Yes.
20  Q.  And have you done this or been in charge of
21  this yourself?
22  A.  Yes.
23  Q.  And have you done these tests in Illinois?
24  A.  The field tests in Illinois, no, no, I
25  don't -- I have not done any field tests myself.

36  (Pages 138 to 141)

Exhibit 006 Page 36
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

### Page 142

1    Q. And where have you done your field tests?
2    A. Well, I did field tests as part of my career
3  in Europe, but I have not done any -- personally any
4  field tests in the U.S.
5    Q. Okay.
6    A. I had teams of mine doing the field tests.
7    Q. And do the -- do the teams do field tests
8  in -- in Illinois?
9    A. Well, the teams contract field testing.
10   Q. Do they do that in Illinois?
11   MR. POPE: Objection; form of the question, asked
12 and answered.
13 BY THE WITNESS:
14   A. I -- I don't know.
15   Q. You don't know if they do field testing --
16 Mr. Atkin told us they have multiple field tests in
17 Illinois.
18   MR. POPE: Objection; form --
19 BY MR. TILLERY:
20   Q. For growth --
21   MR. POPE: -- of the question.
22 BY MR. TILLERY:
23   Q. -- the biological part at least.
24   A. Yeah. Yeah.
25   Q. Okay. Are you saying, for your product

### Page 143

1  safety, if there are field tests for his -- that
2  component to the product, that is to see if it worked,
3  that you don't test the product safety component in one
4  of the largest market areas for application?
5    A. Well, what I --
6    MR. POPE: Objection.
7    A. -- told you is --
8    MR. POPE: Form of the question.
9    Go ahead.
10 BY THE WITNESS:
11   A. -- I do not know. I cannot exclude that but I
12 cannot confirm it positively because I would have to
13 look at the test protocols, the distribution of -- of
14 test lots, which I don't have access to right now.
15   Q. How many of these tests, product safety tests
16 have been done since you've been in the United States?
17   A. I would say we do probably an average of -- It
18 depends on the year. We do between 300 and
19 700 individual field trials per year.
20   Q. 300 and 700?
21   A. 700 per year on all crops in all geographies.
22   Q. When you say 300 to 700 a year, are you
23 talking about worldwide?
24   A. No, in -- In the U.S.
25   Q. Okay. When you say "we" do this, who does it?

### Page 144

1    A. This is we, I was speaking for -- for the
2  product safety NAFTA team doing it.
3    Q. Okay. Product safety NAFTA does 300 to 700 --
4    A. Field trials.
5    Q. -- field trials. And let's make sure our
6  terms are correct. What is a field trial?
7    A. These are field residue trials.
8    Q. These are product safety tests?
9    A. These are product safety field residue tests
10 sites.
11   Q. And are these for products that are likely to
12 be sold for -- for corn?
13   A. Some of them will be. Some of them will be,
14 yes.
15   Q. Okay. Which ones?
16   A. Well, the ones that are done with corn
17 herbicides.
18   Q. Yes, which ones would those be? Which
19 molecules? Do you know?
20   A. Certainly mesotrione was one of the corn
21 herbicides that we developed in the late '90s. We
22 have -- You know, we have one development compound
23 active right now, which is a corn herbicide, which is
24 not on the market yet. But I think the other new active
25 ingredient projects we had were not corn herbicides.

### Page 145

1    Q. Is that the No. 449280?
2    A. That's correct.
3    Q. And that one's being tested in Illinois, isn't
4  it?
5    A. It is likely, but I -- I need to see the trial
6  sites to --
7    Q. You want to see --
8    A. -- confirm that.
9    Q. -- the piece of paper?
10   A. I want -- I want to see -- I don't know where
11 the sites are.
12   Q. It's likely, isn't it, sir?
13   A. It's likely.
14   MR. TILLERY: Okay. The reporter says -- the
15 videographer says we've got to go off the record.
16   THE VIDEOGRAPHER: This marks the end of Videotape
17 No. 3 in the deposition of Peter Hertl. The time is now
18 1:59 p.m. Going off the record.
19       (Discussion off the record.)
20   THE VIDEOGRAPHER: Going on the record. This marks
21 the beginning of Videotape No. 5 in the deposition of
22 Peter Hertl. The time is now 2:09 p.m.
23 BY MR. TILLERY:
24   Q. I think we had started this discussion by
25 looking at Exhibit 9, page 03135198.

37 (Pages 142 to 145)

Exhibit 006 Page 37
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                11-4-2010
Confidential

Page 146

1    A. Correct.
2    Q. Hadn't we?
3       Now, this little diagram is just basically
4  demonstrating the fate and exposure and what happens to
5  a chemical when time, water, heat and sun and all other
6  components interact, other chemicals, everything else,
7  interacts with it, breaks it down, right?
8    A. Correct.
9    Q. You don't want to sell a product that, when it
10 breaks down, causes problems for people, for humans, for
11 the environment, do you?
12   A. Correct.
13   Q. Okay. So part of your testing in your global
14 product safety analysis is to discern what ends up
15 happening to these products when they are placed into
16 the environment and when all of these different aspects
17 of the environment come to play on that product, right?
18   A. Yes.
19   Q. All right. Now, you were telling me that
20 these tests were done. You told me that without looking
21 at the specific 3- to 700 field trials, you couldn't
22 tell exactly where they were done in the U.S., but that
23 you suspected because Illinois is a large corn-growing
24 state, that the field trials would likely have been
25 conducted in that state, as well, correct?

Page 147

1    A. Yes.
2    Q. Now, the results of those studies, when you
3  get those -- Now, we're still some distance away from
4  going on the market, aren't we?
5    A. Yes.
6    Q. Yeah. With 449280, that product is not being
7  marketed, is it?
8    A. No.
9    Q. Would that be a substitute for atrazine?
10   A. Well, I cannot speak to that because I'm not
11 in biological development, so I'm really not competent
12 to say how the --
13   Q. Well --
14   A. -- biological performance compares.
15   Q. -- here's -- here's what I -- I'm -- and --
16 and I did it again.
17      Mr. Reeg told me not to walk over your
18 answers, and I just did it. I'm sorry.
19   MR. TILLERY: Did you get his --
20   THE REPORTER: Mm-hmm.
21   MR. TILLERY: -- his full answer?
22 BY MR. TILLERY:
23   Q. I apologize, sir.
24      Would that product be used to kill the same
25 kind of weeds?

Page 148

1    A. I have to repeat what I said. I'm not a
2  biological expert. I cannot testify to that.
3    Q. Okay. All right. You don't know what the
4  business people would be selling it for, that 449280?
5    A. Well, they would sell it as a corn herbicide.
6    Q. But specifically for which types of weeds, you
7  wouldn't know?
8    A. I do not know that, no.
9    Q. All right. Now, when you do these 3- to 700
10 field trials, is that in a year, by the way?
11   A. That's in a year, yes.
12   Q. Right. Do you start new ones every year?
13   A. Yeah, we do start new ones every year. A few
14 ones are multi-year trials, but most of them are
15 seasonal trials.
16   Q. With whom do you contract to do these in the
17 U.S.?
18   A. To do the field experiments?
19   Q. Yes.
20   A. You know, we have a list of about 50 to
21 60 contract research organizations that are doing trials
22 on our behalf.
23   Q. And do those organizations who contract this
24 out -- Strike that.
25      Are they located in multiple different states,

Page 149

1  some of them loc -- I -- localized in a single state?
2  How does that work?
3    A. Well, there are organizations that operate in
4  a single state. There are organizations that cover more
5  than one state. But the 50 have been selected to cover
6  the geographical growing areas of the U.S.
7    Q. Are some of them universities?
8    A. For product safety testing, I don't think so.
9  I would be surprised if we would give it to a
10 university.
11   Q. Do you have any involvement with these
12 particular contractors?
13   A. No.
14   Q. Who does at Syngenta Crop Protection, Inc.?
15   A. At Syngenta Crop Protection, Inc., it would be
16 the test team that manages and contracts the field
17 trials.
18   Q. And -- and who is the person who heads that
19 up?
20   A. That would be Charlie Pearson.
21   Q. Who is his boss?
22   A. Trish Malarkey.
23   Q. Okay. Now, these field residue trials that
24 you talked about as part of the product safety testing,
25 are those test results put in some kind of report or

38 (Pages 146 to 149)

**Exhibit 006 Page 38**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

---

**Page 150**

1  analysis, a data set, once the results are in?
2      A.  Yes.  There will be a report written, which
3  will detail the data that have been found in each of the
4  test sites.
5      Q.  And what is that report used for?
6      A.  This report is used for determining the
7  potential dietary exposure resulting from the use of the
8  compound on that -- on that specific target drop to
9  humans or to farm animals that are fed any parts of the
10  crop.
11      Q.  And is that report from the field residue
12  trials passed on to the person or group in Basel that's
13  in charge of developing the new active ingredient?
14      A.  Well, the report will become part of our
15  global data management system.  So it will end up in a
16  database.  I would not necessarily see why Basel needed
17  the individual reports because they have only value in
18  the U.S. for gaining a U.S. registration.
19      Q.  Well --
20      A.  They would be submitted by the U.S. team.
21      Q.  Okay.  So you don't share -- Strike that.
22          The people from Jealott's Hill who are
23  developing a product, a molecule, get it past Stage 1
24  and into Stage 2 --
25      A.  Mm-hmm.

---

**Page 151**

1      Q.  -- and send that compound in some type of --
2  of method that you are not familiar with to the U.S. for
3  testing in a field --
4      A.  Yes.
5      Q.  -- trial.  Okay?
6      A.  Yes.
7      Q.  And as part -- And this is long before the
8  product is --
9      A.  Mm-hmm.
10      Q.  -- on the market.  Are you telling me that you
11  don't give the reports back from the product safety
12  right back to the people who were developing the
13  molecule?
14      A.  Well, what I told you is factual.  I mean,
15  the -- the reports are in -- in our database, global
16  report database, and they can be extracted by whoever
17  wants to see the results.
18      Q.  So you do this report.  And it's the method by
19  which you load the data?
20      A.  Yes.
21      Q.  You put the data --
22      A.  Into a database.
23      Q.  So it's accessible to everybody?
24      A.  It is accessible, yes.
25      Q.  So that -- that information is accessible to

---

**Page 152**

1  all of the -- of the entities associated with Syngenta?
2      A.  That do have access to the database, yes.
3      Q.  All right.  Would -- would Jealott's Hill have
4  access to that database?
5      A.  Jealott's Hill will have access to the
6  database.
7      Q.  Okay.  Basel people have access to the
8  database?
9      A.  Basel has access to the database, yes.
10      Q.  Okay.  So -- and then they use this
11  information from these field trials to decide whether to
12  take this product to the next step, don't they?
13      A.  Well, it's part of the data they will be using
14  to make that decision, yes.
15      Q.  As a matter of fact, if -- if the field trials
16  came back and showed a problem with a molecule, that
17  could be the end of the entire analysis for that
18  molecule, couldn't it?
19      A.  In a specific market.
20      Q.  Well, I mean, if it came back and showed that
21  it was a dangerous molecule to humans or to animals, you
22  wouldn't sell it anywhere, would you?
23      A.  Yes.  That's correct, yes.
24      Q.  Okay.  So if those field trials came back
25  showing there was a danger to farm animals or humans in

---

**Page 153**

1  Illinois, let's say, and that report went on this global
2  database, that could spell the end or doom for that
3  particular compound; is -- is that a fair statement?
4      A.  Well, no, not really, because it's an
5  incomplete statement.  You know, the -- the field trial
6  itself, it will give you only two pieces of information.
7  One is does the product work as it is designed, does it
8  control weeds, which is not the work that product safety
9  is doing.
10          And the second piece of information you would
11  be getting out of that residue study is the amount of
12  residual levels that you have in the crop.  That's all
13  it's going to tell you.  This doesn't constitute an
14  assessment if it's dangerous or not.
15      Q.  Okay.
16      A.  Okay?
17      Q.  So what you're saying is that the field test
18  results may not show that it's dangerous?
19      A.  It -- all it shows you is the amount of
20  residues that's left over in the crops.
21      Q.  Okay.
22      A.  And you use it according to what we think the
23  label recommendation will be in the future.
24      Q.  Okay.  Well, is there some test result that
25  would come from the field residue studies that would be

---

39  (Pages 150 to 153)

Exhibit 006 Page 39
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 154

1  inconsistent with future marketing of the product?
2      A.  I don't think so.
3      Q.  So, in other words, irrespective of your test
4  results, they have nothing to do with whether or not
5  you're going forward with your marketing of the product?
6      A.  Well, the test results together with the end
7  points that define an acceptable dose allow you to make
8  that conclusion.
9      Q.  Are there --
10     A.  You cannot do with -- one without the other.
11     Q.  Are there environmental fate field studies?
12     A.  There are, yes.  Yes.
13     Q.  Are they different than the ones you're
14  talking about?
15     A.  They are different, yes.
16     Q.  Okay.  And are there health studies?
17     A.  There are health studies, yes.
18     Q.  Are they different than the ones you're
19  talking about?
20     A.  Different than the residue studies you mean?
21     Q.  Yes.
22     A.  Yes, they are different.
23     Q.  Okay.  Who does those?
24     A.  Well, environmental fate field studies would
25  be done in -- in, you know, wherever you want to market

Page 155

1  the compound.  So that's a data requirement.  So if you
2  would market it in the U.S., you would do it in the U.S.
3  If you want to market it in Europe, it would have to be
4  done in Europe.
5      Q.  And, likewise, if you're going to market it in
6  Illinois, a big, large, corn production state, you would
7  likely put it in a farm field there and test it,
8  wouldn't you?
9      A.  Well, you would have to do it in a typical
10  environment.  And a typical environment could -- could
11  not be Illinois.
12     Q.  Could not be?
13     A.  I mean, you -- you -- you could do a typical
14  study in Iowa which would represent the situation in
15  Illinois.
16     Q.  Okay.  Are you saying that you don't test --
17  that you're -- Are you testifying here, sir, that you
18  don't do environmental fate field studies in Illinois?
19     A.  I haven't been saying that.  I said we could
20  do.  I cannot say over the last 15 years of our
21  environmental fate test sites for Stage 3 compounds,
22  which is the subject of our discussion here, where they
23  have been over the last 15 years, you know.  And I -- I
24  don't know if we have test sites in Illinois to that
25  extent.

Page 156

1      Q.  Yeah.  What I -- What I'm trying to do now for
2  product safety or for any single aspect of product
3  before it goes onto the market, I'm talking about before
4  it's finally approved and sold.
5      A.  Yes.
6      Q.  I want to know every single type of test that
7  is done on those compounds in the market area where that
8  product's going to be used.  So let's see if we can
9  slowly go through every one of those.
10         One of them --
11     A.  Okay.
12     Q.  -- is a -- is a residue study, right?
13     A.  Yes.
14     Q.  Hold on just a second, and we'll write down
15  residue study.
16         Would there be an environmental fate field
17  study?
18     A.  Yes.
19     Q.  Would there be a health study?
20     A.  No.  You wouldn't have to do that in a market.
21     Q.  Okay.  So we have residue study, environmental
22  fate field study.  What else?
23     A.  These are basically the two study types you
24  have to do in the target markets.
25     Q.  You do the biological study --

Page 157

1      A.  Not --
2      Q.  -- which is on the product itself.
3      A.  Not within product safety.
4      Q.  That's -- that's before product safety?
5      A.  Well, that's concurrent with product safety
6  data generation, but it's not done within my area of
7  responsibility.
8      Q.  Is that done to determine whether the product
9  is going to work?
10     A.  Yes.
11     Q.  All right.  Is that done by a different group
12  of people?
13     A.  Yes.
14     Q.  Who does the -- the -- What do you call that
15  study?
16     A.  I would call them biological efficacy studies.
17     Q.  An efficacy study, a biological efficacy
18  study?
19     A.  Yeah, mm-hmm.
20     Q.  Okay.  We have a residue study.  A biological
21  efficacy study, and an environmental fate field study.
22     A.  Yes.
23     Q.  What other studies are done in the area where
24  the product is going to be marketed before the product
25  is sold?

40  (Pages 154 to 157)

Exhibit 006 Page 40
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 158

1    A.  I -- I think there's the three study types --
2    Q.  Okay.
3    A.  -- you have to do.
4    Q.  Now, the biological efficacy study is done by
5  whom?
6    A.  By the biolog -- biological research and
7  development crew.
8    Q.  And who would that be?
9    A.  That would be -- The manager of the group?
10   Q.  Yes.
11   A.  It would be Mike Johnson, part of the NAFTA
12  research and development organization.
13   Q.  Does the NAFTA research and development
14  organization have a functional reporting relationship
15  with somebody in Jealott's Hill or Basel?
16   A.  You know, you would have to ask -- ask the
17  NAFTA biological research and development organization
18  that question.
19   Q.  You don't know?
20   A.  I don't know.
21   Q.  Okay.  But as we go through these stages and
22  development of the product, the product is not created
23  on a molecular site by Syngenta Crop Protection, Inc.,
24  is it?
25   A.  What do you mean --

Page 159

1    Q.  Stage 1.  Stage 1.
2    A.  Stage 1, no.
3    Q.  That's done at Jealott's Hill?
4    A.  Or Stein in Basel.
5    Q.  Or Stein in Basel?
6    A.  Yeah.
7    Q.  Okay.  Now, when it gets to -- What stage does
8  it get to for biological efficacy studies?
9    A.  It gets to -- It depends how much material is
10  available, obviously.  It's a question of material,
11  ability to produce material.  It typically would be in
12  Stage 2 and certainly would be in Stage 3.
13   Q.  Okay.  And what is the next study that would
14  be undertaken?  Of the remaining two studies.  You said
15  there are a --
16   A.  Okay.
17   Q.  -- residue study and environmental fate and
18  field study?
19   A.  Okay.  The dietary residue studies and the
20  environmental field studies would be started in Stage 3.
21   Q.  And who would do the residue study?
22   A.  They would be done by product safety.
23   Q.  And what would you be looking for with
24  residue?  What is it that you're assessing or testing?
25   A.  We test the amount of residual active

Page 160

1  ingredient or relevant degradation products that remain
2  in the -- parts of the crop after treatment and, you
3  know, the crop reaching typical maturity so that it can
4  be harvested.
5    Q.  And the environmental fate field studies are
6  done by whom?
7    A.  By product safety.
8    Q.  Yes.  And what is it that you seek to assess
9  in those studies?
10   A.  The field half life, so half life under field
11  conditions for the active ingredient and relevant
12  metabolites.  So how long does it take to degrade.  The
13  mobility in the field conditions, which is focused on
14  vertical movement.  And that's pretty much the gist of
15  the study.
16   Q.  Vertical movement?
17   A.  Vertical movement and degradation.
18   Q.  What is vertical movement?
19   A.  Vertical movement is the pesticide residue,
20  the active ingredient or degradation products moving
21  down to the water phase into the soil profile.
22   Q.  Absorption?
23   A.  Absorption, desorption, is part of that
24  process, as well, yes.
25   Q.  Do you look at a horizontal movement of the

Page 161

1  product in this environmental fate field study?
2    A.  We would now.  You know, I think the EPA's
3  newest test guideline, if it would be triggered by
4  certain properties of the compound.
5    Q.  Explain what you mean by that.
6    A.  By certain properties, if a compound would
7  have a high solubility, if it would have a low solvent
8  coefficient, and if it would be persistent under field
9  conditions, you would be looking at horizontal movement,
10  as well.
11   Q.  Is atrazine one of those?
12   A.  I would say atrazine is -- Well, I mean, it's
13  field half life is about four to six weeks, four to
14  eight weeks, I would say.  In the field conditions, it
15  varies a little bit.  It's moderately mobile.  Certainly
16  when you look at -- at concentrations we see in -- in
17  surface water bodies in certain sites, you know, there
18  is a possibility that atrazine moves horizontally off
19  the field.
20   Q.  How long have you known that?
21   A.  Me personally?
22   Q.  Yes.
23   A.  Well, I think when I became involved with
24  atrazine in 2000 --
25   Q.  Okay.

41  (Pages 158 to 161)

Exhibit 006 Page 41
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                                    11-4-2010
Confidential

Page 162

1    A. -- and we were looking at the data.
2    Q. Now, the environmental field study results,
3    could those result in the chemical not moving forward in
4    the process of -- of advancing towards ultimate sale?
5    A. Well, they would certainly contribute to it,
6    as would the dietary residue data, too.
7    Q. Well, let me ask you, what is it that goes
8    into all of the decision-making regarding whether that
9    product is going to ultimately be sold?
10   A. From a product safety perspective?
11   Q. No. From an overall perspective.
12   A. From an overall perspective. Well, it has to
13   have an acceptable biological efficacy profile. So it
14   has to work. It has to do what we think it should do.
15   It has to pass a regulatory test regime, which would use
16   the data that we have been talking about that are
17   generated by product safety. And we have to be able
18   to -- to, you know, manufacture it for a competitive
19   price. That certainly goes into it.
20       It has to be equivalent or better than the
21   current products that are being sold in the market, so
22   that you actually do have a better solution. It has to
23   have -- It has to have an acceptable safety profile,
24   certainly one of the components. And that's what the
25   regulatory process determines as part of the approval

Page 163

1    process.
2    Q. Now, how is all of this -- All of these
3    factors put together and a decision made?
4    A. Well, the -- the -- You know, the individual
5    elements -- I'm only going to speak about the product
6    safety piece because that's what -- what my department
7    is accountable for.
8    Q. Okay. So -- I -- I'm talking about the entire
9    group. Do you know how all of these pieces are put
10   together and a decision is made, ultimately, taking into
11   account all of these factors you have discussed --
12   A. Yes, there are --
13   Q. -- and then ultimately --
14   MR. POPE: Let him finish, please.
15   THE WITNESS: Sorry.
16   BY MR. TILLERY:
17   Q. Do you know how these components fit together
18   in terms of a decision?
19   A. Yes, I do.
20   Q. And do you know who makes the decision?
21   A. Well, for a global product release, it's the
22   head of development globally. For a regional product
23   release, it's the head of development in -- in the
24   region.
25   Q. Are you talking about before -- You're talking

Page 164

1    about after the product is registered and ready to sell,
2    correct?
3    A. Yes.
4    Q. That's not my question, sir. My question is
5    who makes the decision about whether to advance the
6    molecule for ultimate registration and sale, taking into
7    account all these field tests and all these other
8    criteria you have discussed? Who -- who makes the call?
9    A. For -- Well, it's the same committee. So it's
10   that development committee that has a representation of
11   all the functions, mine being one of them.
12   Q. And that's in Basel?
13   A. For global products, it is in Basel. For
14   regional products, we have the regional units who do
15   that.
16   Q. The regional -- the regional unit is after the
17   product is already registered. Actually, what I'm
18   asking you, sir --
19   A. Okay.
20   Q. Are -- are we having -- we're having trouble
21   communicating. Do you not understand what I'm asking
22   you?
23   A. Ask it again.
24   Q. All right. I'm asking you for the decision
25   about bringing a product onto the market. Are we clear?

Page 165

1    A. A new active ingredient.
2    Q. A new active ingredient.
3    A. Active ingredient. Okay.
4    Q. Okay. Okay. You're not going to let the
5    folks in Brazil make a new active ingredient, right?
6    A. That is correct.
7    Q. Okay.
8    A. That is correct.
9    Q. You're going to do that out of Basel, aren't
10   you?
11   A. That is correct.
12   Q. All right. And an atrazine replacement would
13   be a global product, wouldn't it?
14   A. This is correct, yes.
15   Q. Now, what -- walk me through the product
16   safety component in taking a product off the market.
17   Have you ever been involved in that?
18   A. I have not been involved in taking a product
19   off the market.
20   Q. Has Syngenta ever taken a product off the
21   market because of safety concerns?
22   A. The -- You know, some of our products that
23   were organophosphates, were taken off the market because
24   they couldn't meet a regulatory standard and indicated a
25   safety risk -- risk. Now, I don't recollect the actual

42 (Pages 162 to 165)

Hertl, Peter                        11-4-2010
Confidential

Page 166

1  timeline for those decisions.  So that might have been
2  Syngenta.  It might have been one of the predecessors.
3       Q.  Now, we talked about the three different types
4  of tests that were done, and then you said these reports
5  are concluded and they are placed on the -- the Syngenta
6  intranet system.  Okay?
7            What is the next step in this process about
8  taking a product to ultimate market?
9       A.  Well, this data generation process runs over a
10  number of years.  And there are review points as you do
11  the data development.  It allows you to see if you do
12  meet a regulatory standard, if you do have a safe
13  product, as far as product safety is concerned.
14            The next step is once you have completed the
15  relevant studies, you make a regulatory submission to
16  authorities that regulate that market.  It would be the
17  U.S. EPA here in the U.S., and they review the data, do
18  their own safety assessment, and grant you an approval,
19  if they're satisfied that, in this case, the safety
20  aspects have been adequately addressed, and by the way
21  the product is packaged and used, labeled, that they're
22  satisfied that this meets their regulatory standards.
23       Q.  Do you know what the development committee is?
24       A.  Yes.
25       Q.  Are you on the development committee?

Page 167

1       A.  Yes.
2       Q.  What is your role with the development
3  committee?
4       A.  I represent product safety positions on the
5  development committee.
6       Q.  How long have you been on that committee?
7       A.  Since January 2010.
8       Q.  Prior to that time, you weren't a member?
9       A.  No.
10       Q.  How many members are there on the development
11  committee?
12       A.  Portfolio -- Well, the head of development is
13  chairing it.  We have biological R&D representation.  We
14  have portfolio management representation.  We have
15  product safety representation.  We have stewardship
16  regulatory representation.  We have stewardship
17  representation.  We have issue management
18  representation, which is now a joint function.  I think
19  that's -- We have formulation development
20  representation, as well.
21       Q.  How many development committee members are
22  employees of Syngenta Crop Protection, Inc.?
23       A.  Well, there are -- There's more than one
24  development committee.  We have a global development
25  committee that does the AI promotions.  And then we have

Page 168

1  the regional development committees.  So --
2       Q.  I'm talking about the global committee.
3       A.  Well, they would be employees of Syngenta Crop
4  Protection AG in Basel.  Except for myself in my current
5  role.  I've been on that committee since January 2010
6  and still a member of and employee of Syngenta Crop
7  Protection, Inc.
8       Q.  And everybody else is from Basel?
9       A.  This is correct, yes.
10       Q.  Does the development committee, the global
11  one, have to approve the release of a new active
12  ingredient?
13       A.  Yes, it does.
14            (Hertl Deposition Exhibit No. 10
15            marked as requested.)
16  BY MR. TILLERY:
17       Q.  Now, this is a March 15th, 16th management
18  meeting.  And I presume that everything --
19       MR. POPE:  Did you say 2001?
20  BY MR. TILLERY:
21       Q.  I'm sorry.  2001.
22       A.  Okay.
23       Q.  Excuse me.
24            And I presume that this document is old news,
25  right?

Page 169

1       A.  It's nine years old.
2       Q.  But it doesn't -- What I'm saying is that it
3  doesn't reflect current management --
4       A.  No.  No.
5       Q.  Is that a fair statement?
6       A.  Yes.
7       Q.  All right.  Was this document, this global
8  environmental safety document, if you can tell me,
9  accurate at least for the period of time that you said
10  those couple of years, was it an accurate reflection of
11  the means by which products were handled at that time?
12       A.  I -- I don't recall the document so --
13       Q.  If you can just go through it and tell me
14  if -- what I'm trying to find out is, was this -- was
15  this type of organization reflected.  It's got a chart,
16  if you want to look at it, on GRNVL 0000015977.  It's
17  got a --
18       MR. POPE:  Can I ask him to look at the whole
19  document?
20       MR. TILLERY:  Yeah, I'm not going --
21       MR. POPE:  Do you want him to --
22       MR. TILLERY:  -- to spend much time on it.
23       MR. POPE:  -- just look at a page, then?  Yeah, I
24  would --
25  BY MR. TILLERY:

43  (Pages 166 to 169)

Exhibit 006 Page 43
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 170

1    Q.  Here's what I'm trying to do is find out if
2 this actually reflects what the management structure was
3 at that time.  That's all I'm trying to find out.
4    MR. POPE:  He might not be the best witness to
5 answer that.
6 BY MR. TILLERY:
7    Q.  And -- and if you can't tell me, that's okay,
8 too.  Just -- but you are included in these analyses, is
9 the reason I'm asking.
10    A.  From -- from what I can tell, it looks like
11 a -- you know, proper summary of the function at that
12 point in time.  It obviously has changed significantly.
13    Q.  I'm sorry?
14    A.  It obviously has changed significantly since
15 then.
16    Q.  Did it accurately reflect the organization at
17 that time?
18    A.  Well, I cannot speak to -- to the accuracy,
19 because there are parts of the organization on there
20 which, you know, I'm not familiar with.  Like on
21 page 15977, the economics organization, discovery --
22    THE REPORTER:  The what?
23    THE WITNESS:  The economics organization.
24 BY THE WITNESS:
25    A.  -- discovery organizations, I, you know, have

Page 171

1 really no familiarity with those.
2    What I do have familiarity with is the health
3 assessment and environmental safety organization under
4 Lewis Smith, which is on this slide.
5    Q.  And it's accurate, at least as of that
6 time?
7    A.  At that time.
8    Q.  Skip ahead there, if you would, to 15988.
9    Do you see that document, sir?
10    A.  Yes.
11    Q.  Okay.  Can you explain this document to me.
12    A.  You're looking at the global environmental
13 safety activities, 2001 --
14    Q.  Yes.
15    A.  -- heading?  I think this is a breakdown, I
16 believe, of work that was done in 2001 within the
17 environmental safety teams in Europe and in NAFTA in
18 support of the portfolio approach actually worked on in
19 2001.  And it's broken down by skill area or area of
20 expertise.
21    Q.  Is there such a chart for your global group at
22 this time?
23    A.  No, there is not.
24    Q.  Do you have this type of data or retain it?
25    A.  We do have this type of data and retain it,

Page 172

1 yes.
2    Q.  And for what purpose do you keep this data?
3    A.  Well, there is a functional management purpose
4 to it.  So, you know, you -- you need to know what you
5 do in order to be able to use the resource optimally.
6    The second reason is data compensation.  If
7 competitors of ours use our data to get products
8 containing active ingredients which are no longer under
9 patent protection, they owe us compensation for using
10 it, referring to our data.  So we have to know how much
11 resource we spent in the first place to generate that
12 information.
13    And I think the third reason for this, product
14 safety has different customer groups, so I think we did
15 talk about the work we do for the global development
16 function, but we also do work for the regional
17 development organizations which are being paid for by
18 the regional marketing and sales organization.  So we
19 have to keep these two things separate because they're
20 funded differently.
21    Q.  Who decides on -- currently, sir.  Let me
22 start over.
23    Currently who decides how many product safety
24 full-time equivalent employees will be located at
25 Greensboro?

Page 173

1    A.  Well, I do this with my management team
2 depending on the actual needs in the specific regions.
3    Q.  You do that?
4    A.  In coordination, collaboration, with my teams.
5    Q.  And you'll do that when you move to Basel,
6 won't you?
7    A.  In coordination with the regional teams, yes.
8    Q.  And who decides how many full-time equivalent
9 employees you'll have in your product safety group in
10 the UK?
11    A.  Well, I will do that.
12    Q.  Okay.
13    A.  Same story, in cooperation --
14    Q.  Okay.
15    A.  -- with the team leaders responsible for that
16 team?
17    Q.  Now, we were talking about this particular
18 type of data and information.  Do you seek to avoid
19 repetition of the same type of product safety research
20 or early screening or product support or contracting by
21 keeping track of who's doing it in which Syngenta
22 entity?  At least with respect to product safety.
23    A.  With respect to -- Well, we seek to avoid
24 repetition of studies.  So that the same study is not
25 done over and over again.  Which means we need to

44  (Pages 170 to 173)

Exhibit 006 Page 44
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 174

1  coordinate who is doing the work programs. And that's
2  this global coordination that I was referring to
3  previously for the global pieces that we do in support
4  of the global AI development proj -- programs.
5      Q. Are there different skill sets within the
6  groups of employees that you have at Jealott's Hill and
7  Basel and the U.S.?
8      A. Yes, there are different skill sets.
9      Q. And you call upon these different skill sets
10 of people based upon your knowledge that they're there
11 and that they can serve a function that's beneficial to
12 a project with respect to product safety that's going on
13 at some part of the world?
14     A. Well, and -- and -- I would say --
15     Q. But is that -- Is that correct?
16     A. Well, let me -- If you'll -- There are two
17 answers to that. One is the resource utilization, which
18 is, do I call upon experts independent of where they
19 are to support projects where they are needed through
20 their expertise? Yes, we do that.
21     The second one is the areas of expertise are
22 slightly different at the sites, because the customer
23 groups at the sites are slightly different. So
24 Jealott's Hill has an early stage support activity
25 simply because they're co-located with the research

Page 175

1  group in Jealott's Hill. They're on the same side. So
2  there's collaboration between those teams. Which is not
3  the case for the Greensboro operation, since they are
4  geographically remote.
5      Q. For example, Greensboro would not be able to
6  do everything, beginning to end, that is, necessary to
7  develop and register a new active ingredient on its own
8  without Jealott's Hill, would it?
9      A. Oh, we are perfectly able to do that once we
10 have a compound in Stage 2.
11     Q. No. You didn't hear my question, sir. I move
12 to Strike that as unresponsive to my question.
13     A. Okay.
14     Q. I said, would Greensboro today be able to do
15 everything necessary to develop, from the very
16 beginning, a brand-new molecule and compound, to develop
17 it, test it, register it on its own, without the
18 facilities at Jealott's Hill? Or one of the other
19 laboratories.
20     A. Well, let me -- You know, I think one of the
21 misunderstandings is the definition of develop.
22     Q. You know that I'm talking about a new
23 molecule.
24     A. Well, I can tell you we could not develop or
25 find a new molecule in Greensboro because we don't have

Page 176

1  Stage 1 activities in Greensboro.
2      Q. That's my point. You don't have that?
3      A. We don't have that.
4      Q. So -- so if -- If developing a product
5  includes Stage 1, a new product, and it does, doesn't
6  it?
7      A. Well, I would call that a research activity
8  because we could -- we could take -- Quite honestly, we
9  could take a compound from a third party and develop it
10 into a product.
11     Q. Okay. Well, then let's call it research.
12     A. Yeah.
13     Q. Does that -- does that make you feel more
14 comfortable?
15     A. That -- It's -- It's in -- in sync with the
16 way we call things, yes.
17     Q. So a researched product from a new compound,
18 if I limit it to those new compounds --
19     A. Yes.
20     Q. -- starting up, you cannot do that at
21 Greensboro, can you?
22     A. No, we cannot.
23     Q. Does -- Strike that.
24     Are there any rights associated with the sale
25 of atrazine today, to your knowledge?

Page 177

1      A. I don't know.
2      Q. You don't know about that?
3      A. I don't know -- know about that, no.
4      Q. Do you know if there ever have been?
5      A. I don't know that, no.
6      Q. Do you know if there are mixes or different
7  compounds that include atrazine that are protected
8  products?
9      A. Well, I do know there are mixes, but I don't
10 know if they are protected products.
11     Q. You know if they are sold or licensed to other
12 entities outside of Syngenta subsidiaries?
13     A. I don't know that.
14     Q. Do you know if there are any compounds that
15 Syngenta license for sale to other entities?
16     A. I don't know that. I'm not in that part of --
17     Q. You don't know any of that process?
18     A. I'm not in that part of the business, no.
19     Q. Okay.
20     MR. POPE: Just as an aside, Mr. Hertl is on the
21 same plane home as Beth was last -- last week.
22     MR. TILLERY: What time?
23     MR. POPE: So if you could get him a taxi at 4:30
24 or so, that would be great.
25     MR. TILLERY: Oh, shoot.

45 (Pages 174 to 177)

Exhibit 006 Page 45
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

Page 178

1    MR. POPE: He's been -- he's been very cooperative
2  here.
3    MR. TILLERY: Let's go off then.
4    THE VIDEOGRAPHER: This marks the end of Videotape
5  No. 5 in the deposition of Peter Hertl. The time is now
6  2:57 p.m. Going off the record.
7        (Discussion off the record.)
8        (Hertl Deposition Exhibit No. 11
9        marked as requested.)
10   THE VIDEOGRAPHER: This marks the beginning of
11 Videotape No. 6 in the deposition of Peter Hertl. The
12 time is now 3:16 p.m.
13 BY MR. TILLERY:
14   Q. I can move quicker if you work with me on
15 things to get through the documents. Okay?
16   A. Okay.
17   Q. What I'm looking for -- I'm going to tell you
18 before I even show you any documents -- is some
19 identification and background to explain what the
20 document is. And we can move through our group of
21 documents quicker, and then perhaps you can make your
22 plane. Okay?
23   MR. POPE: All I would ask on that regard is you
24 allow him to say whether he's ever seen the document
25 before you ask him questions.

Page 179

1    MR. TILLERY: Of course.
2  BY MR. TILLERY:
3    Q. Have we given to this him? We have. Have you
4  looked at No. 11?
5    A. No, not yet.
6    MR. POPE: Are you ready, Mr. Hertl?
7    THE WITNESS: Yes.
8    MR. POPE: Have you ever seen that before?
9    THE WITNESS: I've seen parts of it, I think. I'm
10 not sure if I've seen the entire pile presentation.
11 BY MR. TILLERY:
12   Q. If you would just -- This was a document
13 produced to us in discovery in this case.
14   A. Mm-hmm.
15   MR. TILLERY: And what we're going to have to have
16 if there's going to be an issue about the authenticity
17 of them, Mike, is I think some description of them, so
18 we have a way of getting them into the record for use.
19   MR. POPE: You -- you misunderstood me, Steve. I
20 just think -- I'm not anticipating any authenticity
21 problems. The only question is whether this particular
22 witness has ever seen it before.
23   MR. TILLERY: Right.
24   MR. POPE: That's all.
25   MR. TILLERY: Right.

Page 180

1  BY MR. TILLERY:
2    Q. Can you go to 1877. Do you see that?
3    A. Yes.
4    Q. And you see the second bullet, "Level 1
5  products will be managed globally within a sector as far
6  as possible taking into account chemical class and major
7  business markets"?
8    A. Yes.
9    Q. Was that done when this particular protocol
10 was in place?
11   A. Well, the -- It was one of the attempts to do
12 it. And I think the -- This refers to a statement I
13 made earlier when we talked about the health products
14 manage -- products management group, which we
15 discontinued after, I think, less than two years because
16 it didn't work. And I think this was one of the changes
17 to the process they made midstream to make it work
18 better. If I remember correctly. But that's a long
19 time ago.
20      The reason why I had seen only parts of the
21 document, I was not part of the human safety
22 organization at -- at this point in time. I was in
23 environmental safety, and this mainly talks about human
24 safety organizational principals.
25   Q. Back to my question --

Page 181

1    A. Yeah.
2    Q. -- the Level 1 products managed globally, was
3  that attempted at that time as part of --
4    A. It was attempted, yes.
5    Q. Yes. And atrazine was listed as a Global 1
6  product, wasn't it?
7    A. It -- I believe it was, yes.
8    Q. All right.
9        (Hertl Deposition Exhibit No. 12
10       marked as requested.)
11 BY MR. TILLERY:
12   Q. Take a look at Exhibit 12. Do you know any of
13 these people?
14   A. I do know Paul Hendley. I do know Paul
15 Sweeny.
16   Q. And you're copied on this e-mail exchange,
17 aren't you?
18   A. Yes, on the second one.
19   Q. And this e-mail exchange took place in
20 December 2004?
21   A. That's what the date says, yeah, that's
22 correct.
23   Q. And it's referencing a meeting that was held
24 at Greensboro with Lewis Smith?
25   A. I have to go through that. 1 -- I don't

46  (Pages 178 to 181)

**Exhibit 006 Page 46**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

---

### Page 182

1  recall the e-mail, so let me just take a couple of
2  minutes to look at it. Okay.
3      Q.  And it involves a conversation in Greensboro
4  that Mr. Hendley had with Lewis Smith. That's the
5  communication?
6      A.  Yes.
7      Q.  About funding operations or help?
8      A.  Well, I think it was much more about personal
9  time commitment and resource rather than funding.
10     Q.  Right. And who was Mr. Smith?
11     A.  Smith was the -- At this point in time, it
12 would have been the head of HAES, I believe. This was
13 probably before he moved on to become head of
14 development. And in --
15     Q.  Where was he located at that time?
16     A.  He was located in Alderley Park in England.
17     Q.  And by whom was he employed?
18     A.  By the local entity of -- Syngenta entity.
19     Q.  Whichever one, you don't know?
20     A.  Whichever one. That, I don't know about.
21     Q.  He was not employed at Syngenta Crop
22 Protection, Inc., was he?
23     A.  No, he was not.
24            (Hertl Deposition Exhibit No. 13
25             marked as requested.)

### Page 183

1  BY MR. TILLERY:
2      Q.  Can you tell what this document is?
3      A.  This document lays, you know, out the -- I
4  suppose from the title, the AI lead roles and the
5  process they should be doing. The AI lead refers back
6  to one of the exhibits we had looked at earlier this
7  morning, which were the individuals that should be
8  pulling product safety information together on an AI
9  basis.
10     Q.  What is a virtual team?
11     A.  Virtual team is a team that's at multiple
12 sites. So they're actually not co-located.
13     Q.  Give me an example of a virtual team --
14     A.  Okay.
15     Q.  -- as contemplated by this document?
16     A.  Okay. Let me just look at the document. So a
17 virtual team would be comprised of --
18     Q.  Go ahead.
19     A.  A virtual team would be comprised of the
20 necessary specialists that are needed to address a
21 certain question or a specific active ingredient
22 independent of location. So it could include people
23 from Greensboro and from Jealott's Hill.
24     Q.  And from Basel?
25     A.  At -- at this point in time, they didn't have

### Page 184

1  Basel -- Basel representation anymore. But if there
2  were people in Basel, it could have included Basel
3  product safety stuff as well, yes.
4      Q.  So it's -- it's a group of -- of employees of
5  different subsidiaries working together to accomplish
6  their goals with respect to an active ingredient?
7      A.  Based on their expertise.
8      Q.  Based on their expertise?
9      A.  Based on their expertise.
10     Q.  Irrespective of who they worked for directly
11 in the umbrella of Syngenta entities?
12     A.  That's correct, yes.
13            (Hertl Deposition Exhibit No. 14
14             marked as requested.)
15 BY MR. TILLERY:
16     Q.  If you could just quickly tell me what
17 this is.
18     MR. POPE:  This is Exhibit 14?
19     MR. TILLERY:  Yes.
20 BY THE WITNESS:
21     A.  It's a meeting request.
22     Q.  I'm sorry? What is this?
23     A.  This is a meeting request. And -- and it
24 speaks to organizing a discussion around what the title
25 says. The subject is, "updated EPA's recently released

### Page 185

1  endocrine disruption screening list."
2      So that's a discussion around the program.
3  It's a test -- new test program that EPA announced
4  around mid-2007 for a whole list of pesticides,
5  including some of ours, but there were in total, I
6  believe, 63 on that list. So not all of them were
7  Syngenta's.
8      Q.  And look at the required attendees. At the
9  bottom of the group, you have Phil Botham. Where is he
10 from?
11     A.  He's located in Jealott's Hill.
12     Q.  And Donna Houghton?
13     A.  She's located in Canada.
14     Q.  And Steve Maund?
15     A.  Located in Basel.
16     Q.  And Kersten Mewes?
17     A.  Located in Basel.
18     Q.  And then you had Maureen Smith was an optional
19 attendee?
20     A.  Jealott's Hill.
21     Q.  And James Wheeler?
22     A.  Jealott's Hill.
23     Q.  Okay.
24            (Hertl Deposition Exhibit No. 15
25             marked as requested.)

47  (Pages 182 to 185)

Exhibit 006 Page 47
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 186

BY MR. TILLERY:
1
2      Q.  This is Exhibit No. 15, sir.  Can you tell me
3  what it -- it is?
4      A.  This is an e-mail that I did send out on
5  August 11th, 2008, to Phillip Botham in Jealott's Hill.
6      Q.  Regarding?
7      A.  The endocrine disruption global team
8  representation.
9      Q.  The two pages there are part of that same
10  e-mail exchange, aren't they?  Or three pages.  I guess
11  it's -- We were given three pages as part of this whole
12  thing.
13      A.  I've got three pages, yes.  The last page is
14  empty.
15      Q.  Okay.
16          (Hertl Deposition Exhibit No. 16
17           marked as requested.)
18  MR. TILLERY:  This is No. 16.
19  BY MR. TILLERY:
20      Q.  Can you tell me what this is.
21      A.  This is a list of AI specialists.  So these
22  are people that do have specific technical expertise in
23  the human safety area for the list of active ingredients
24  that Syngenta has in the markets or was developing at
25  this point in time.

Page 187

1      Q.  Who decided these assignments?
2      A.  That was a joint decision of the team leads
3  that were in human -- in the various human safety groups
4  in the organization.
5      Q.  When you say "organization," what do you mean?
6      A.  Product -- in the product safety organization.
7      Q.  So who are the team leads that you're
8  referencing?
9      A.  Well, this would be -- would have been a Phil
10  Botham in Jealott's Hill.  Would have been Tim Pastoor
11  in Greensboro.  I think these were probably the two key
12  people.
13          (Hertl Deposition Exhibit No. 17
14           marked as requested.)
15  MR. TILLERY:  Let's look at No. 17.
16  BY MR. TILLERY:
17      Q.  Can you tell me what this is?
18      A.  This is an e-mail that I sent to Harry Swaine
19  on May the 7th, 2004.  It does talk about a succession
20  plan, I believe.  Succession plan -- succession plan
21  attached.  Which is, you know, an exercise we go through
22  on an annual basis to look at talent development within
23  the teams and potential next assignments that we would
24  like to give them in order to develop their potential
25  further.

Page 188

1      Q.  Harry Swaine was in Jealott's Hill in --
2      A.  He was in Jealott's --
3      Q.  -- the UK?
4      A.  Yes.
5      Q.  He wasn't working for Syngenta Crop
6  Protection?
7      A.  No.
8      Q.  He was -- You described him as your functional
9  manager at one point in this deposition?
10      A.  Yes, correct.
11      Q.  And he was the person that you went to for
12  some personal matter -- personnel matters regarding
13  merit increases for some of the employees, weren't you?
14      A.  For the employees that were located in
15  Jealott's Hill.
16      Q.  And you asked for those?  You said, "I need to
17  talk to you Monday to discuss some personnel matters,
18  merit increases, status NS."  What does that mean?
19      A.  I don't recall what status NS meant.
20      Q.  What's a merit increase?
21      A.  It's a salary increase.  An annual salary
22  increase.
23      Q.  Okay.  And Jeremy Dyson?
24      A.  He's one of the team members that, at this
25  point in time, probably would have been in Jealott's

Page 189

1  Hill, but was about to move to Basel to take on a
2  development position.
3      Q.  And you were calling Mr. Swaine to discuss
4  these personnel matters, weren't you?
5      A.  Yeah, because he works within my function, but
6  he was actually in the management line of Harry Swaine,
7  who was the line manager in Jealott's Hill.
8      Q.  This is the same Harry Swaine who approved or
9  was involved in your own salary increase?
10      A.  Yes.
11          (Hertl Deposition Exhibit No. 18
12           marked as requested.)
13  BY MR. TILLERY:
14      Q.  If you'd look at this e-mail exchange and tell
15  me who Alfred Seiler?
16      A.  Alfred Seiler, located in Basel, used to be
17  the global regulator and mentor for traited seeds, which
18  would include atrazine.
19      Q.  And he was at Syngenta Crop Protection AG --
20      A.  That's correct.
21      Q.  -- as of September 20th, 2004?
22      A.  I presume that this is correct.
23          (Hertl Deposition Exhibit No. 19
24           marked as requested.)
25  THE WITNESS:  Oh, sorry.

48  (Pages 186 to 189)

**Exhibit 006 Page 48**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Case 3:10-cv-00188-JPG-PMF   Document 334   Filed 12/26/12   Page 49 of 56   Page ID
#12913
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 266 of 486

Hertl, Peter                            11-4-2010
Confidential

## Page 190

BY MR. TILLERY:
1
2      Q.  If you'd look at No. -- Exhibit No. 19,
3  please.  And this is an exhibit and appears to be an
4  e-mail exchange between Steven Wall, and it's USGR.
5        Where would that put him?
6      A.  Steven Wall is located in Greensboro.
7      Q.  Okay.  And he was communicating with a person
8  Jackson -- How do you pronounce the last name?
9      A.  Gheissari Amelia.
10     Q.  What was her title?
11     A.  She's located in Basel, and she was part of
12  the product safety team in Basel at that time.
13     Q.  And what was Mr. Wall's job?
14     A.  He was a -- 2005 -- a -- a technical expert,
15  an ecologist in the ecology group in Greensboro.
16     Q.  And if you look here at her request to him,
17  she's asking for information.  Can you look --
18     A.  Yes.
19     Q.  -- and see --
20     A.  Yes.
21     Q.  -- what she's looking for?
22        What is it she's looking for?
23     A.  The EPA has what they call an online database,
24  and -- which -- which summarizes technical information
25  for pesticides -- all pesticides that they register.  So

## Page 191

1  she was asking him to help her to pull that information
2  from EPA's online database.
3      Q.  And could you tell me, was there a global
4  hiring freeze in all Syngenta entities at that time in
5  2005?
6      A.  I don't recall this honestly.  I mean, we had
7  them on and off, but I don't recall what the situation
8  was.
9      Q.  How many of them had there been?
10     A.  A few.  I mean, I haven't counted them.
11     Q.  Who decides whether there's a global hiring
12  freeze?
13     A.  Well, that's a decision that's made by the
14  entity that has problems to deliver a budgetary goal for
15  the year.
16     Q.  Who would that be?  Who -- who decides a
17  global hiring freeze for all Syngenta entities?
18     A.  Oh, a global hiring freeze.  Oh, it would be a
19  global decision if it's a global hiring freeze.
20     Q.  And where would that be?
21     A.  That decision would be made in Basel.
22     Q.  That would be the executive committee,
23  Syngenta AG executive committee?
24     A.  Or whoever leads this -- You know, the -- the
25  big group within the Syngenta organization to which a

## Page 192

1  global hiring freeze applies.
2            (Hertl Deposition Exhibit No. 20
3            marked as requested.)
4      MR. TILLERY:  That's one exhibit.
5  BY MR. TILLERY:
6      Q.  Can you look at Exhibit No. 20 and tell me
7  what that is, please.
8      A.  This is an e-mail that I had sent to Marian
9  Stypa on July 17th, 2008.
10     Q.  Regarding?
11     A.  I think it is about breakdown of resources
12  that we use to support regional projects versus the
13  resource we keep to support global data -- global data
14  development activities.
15     Q.  And it had had an attachment to it?
16     A.  Yeah, it had an attachment.  Which for the two
17  teams, groups people into global roles and dedicated
18  regional roles.
19     Q.  Who created the attachments?
20     A.  I did.
21     Q.  And the -- Included with -- within your e-mail
22  group is John Doe, Lewis Frazier, and Phil Botham.
23        Where are they located?
24     A.  They're all located in Jealott's Hill.
25     A.  Where was Marian Stypa employed at that time?

## Page 193

1      A.  Syngenta Crop Protection, Inc., in Greensboro.
2            (Hertl Deposition Exhibit No. 21
3            marked as requested.)
4  BY MR. TILLERY:
5      Q.  And if you can identify -- Sorry.  If you can
6  identify Exhibit 21 for me, please.
7      A.  This is an e-mail I had sent on
8  September 23rd, 2008, to Phil Botham and John Doe copied
9  to Jim Pastoor, Janis McFarland and Jonathan Akins.
10     Q.  What does this concern?
11     A.  This concerns the résumé of one Dan Minnema,
12  which we looked at as an -- as a candidate to fill one
13  of our technical expert specialist roles.  I believe
14  it's about setting up an interview plan and people that
15  should be considered for that interview.
16            (Hertl Deposition Exhibit No. 22
17            marked as requested.)
18  BY MR. TILLERY:
19     Q.  Before you start on that, who was going to be
20  at that interview that you just talked about, that you
21  were talking about setting up?
22     MR. POPE:  Who was going to be there?  Not who was
23  actually --
24  BY MR. TILLERY:
25     Q.  Yeah, who was anticipated.  You said it was

49  (Pages 190 to 193)

Exhibit 006 Page 49
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                          11-4-2010
Confidential

| Page 194 | Page 196 |
|---|---|

**Page 194**

1  about setting up an interview, right?
2      A.  Well, I -- I cannot tell you who actually did
3  participate in the interview, but, you know, typically
4  how we do these things, we have the local line
5  management and peer groups participating in the
6  interview.  And we -- For specialists that we use across
7  the globe, we also do a telephone interview with one of
8  our people at the other location --
9      Q.  So --
10      A.  -- wherever the other location is.
11      Q.  -- you're talking about people from the UK
12  would participate in some way?
13      A.  If they are available, yes.
14      Q.  And they would do that by video conferencing?
15      A.  Telephone -- telephone conference.
16      Q.  Can you tell me what Exhibit 22 is?
17      A.  I have to look at it.  I don't recognize it.
18      Q.  Okay.
19      A.  I don't recognize the presentation.  I don't
20  think I've seen it before.
21      Q.  Is what you've read in the document consistent
22  with a project which was undertaken while you were at
23  Syngenta?
24      A.  Well, I haven't time to read the document.  It
25  looks like a project charter for a -- for an IM project.

**Page 195**

1  It does talk about documentation and organizing
2  documentation, I believe.  I don't know what in the
3  presentation, so that's really new to me, so --
4      Q.  Okay.
5      A.  -- I can't comment on it.
6          (Hertl Deposition Exhibit No. 23
7          marked as requested.)
8  BY MR. TILLERY:
9      Q.  Tell me what Exhibit 23 is, please.
10      A.  It's an e-mail I received from Paul Hendley.
11      Q.  If you'd look at all of them all the way
12  through.
13      A.  Okay.
14      Q.  It's several pages.  Three pages.
15      A.  All right.  I've seen the document.
16      Q.  Yes.  What is it?
17      A.  So I think it is -- What -- What you see here
18  is Paul Hendley was the originator of the e-mail chain.
19  He's one of the our Syngenta fellows.  Part of the
20  larger Syngenta fellow group which includes people in
21  product safety but also many other functions.
22          They look at technology trends, science trends
23  that we should be looking into for the future.  And as
24  part of this responsibility, he suggested a number of
25  technical areas that are of interest, general interest

**Page 196**

1  for product safety for future developments.
2          And he suggested that we should be looking at
3  those from a global perspective because they do have
4  relevance in the U.S., in Europe, and increasing
5  relevance in other areas, like Latin America, where we
6  do business, as well.
7          (Hertl Deposition Exhibit No. 24
8          marked as requested.)
9  BY MR. TILLERY:
10      Q.  This is Exhibit 24.  Can you tell me what
11  it is?
12      A.  It is a presentation entitled "Product Safety
13  Greensboro," October 30, 2007.
14      Q.  Who made it?
15      A.  That's -- there's no author given, but I would
16  assume that I probably did it myself.
17      Q.  Did you write the document?
18      A.  Yes.
19      Q.  Okay.
20          (Hertl Deposition Exhibit No. 25
21          marked as requested.)
22  BY MR. TILLERY:
23      Q.  This is Exhibit 25.  Can you identify it?
24      A.  That's a presentation entitled "Product Safety
25  Americas Goal Setting Session," February 12th, 2008.

**Page 197**

1      Q.  And are you familiar with it?
2      A.  I am.
3      Q.  Did you write it?
4      A.  I did.
5      Q.  Did you make the presentation?
6      A.  I did.
7          (Hertl Deposition Exhibit No. 26
8          marked as requested.)
9  BY MR. TILLERY:
10      Q.  Can you take a look at Exhibit 26 and tell me
11  if you can recognize it?
12      A.  I do recognize it.
13      Q.  What is it?
14      A.  It is a -- the output of a business review --
15  well, product safety business review session that we had
16  in Jealott's Hill.  "We" means the global product safety
17  leadership team with the head of R&D.  And so the
18  presentations and conclusions, and this presentation --
19  presentation summarizes the work that was done.
20      Q.  The second page is 67844?
21      A.  Yes.
22      Q.  Can you explain to me what is depicted there?
23      A.  This was what we did during 2009 where we had
24  a, you know, discussion about overall functional
25  strategy for the year, which we depicted as a strategic

50  (Pages 194 to 197)

**Exhibit 006 Page 50**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                              11-4-2010
Confidential

---

### Page 198

1  star, which I think you believe -- you see on the next
2  slide. So the different fields around that central
3  bubble are a -- you know, inputs and -- and -- and
4  discussions that we had during that session.
5      We had the NAFTA global leadership summary as
6  an input. We did have some input from the global head
7  of R&D, which is Sandro Arrufo. We had an internal
8  review session with John Doe, which was an input. And
9  then we looked at the work program for 2009 that we had
10  to do. And from all those four, we identified our
11  issues and challenges.
12         (Hertl Deposition Exhibit No. 27
13          marked as requested.)
14  BY MR. TILLERY:
15      Q. Can you tell me what Exhibit 27 is, please.
16      A. It's a presentation entitled "Product Safety
17  2009, NAFTA Product Safety Strategic Star."
18      Q. Are you familiar with it?
19      A. Yes, I'm familiar with it. I produced it as
20  part of the goal setting session that we did for the
21  year 2009, so that was a work product that came out of a
22  joint work session with the NAFTA product safety team.
23      Q. And where did you present this?
24      A. This was for internal consumption. It was
25  presented back to the team as goal directives for the

### Page 199

1  year 2009.
2      Q. And with -- to whom was it distributed?
3      A. Well, it was certainly distributed to the
4  NAFTA products safety team. I don't know what -- what
5  the full distribution was.
6      Q. Beyond NAFTA, who did you distribute it to?
7      A. Beyond NAFTA, I -- I don't recall.
8         (Hertl Deposition Exhibit No. 28
9          marked as requested.)
10  BY MR. TILLERY:
11      Q. 28 is the next exhibit. Can you identify that
12  for me, please.
13      A. It's a PowerPoint presentation entitled
14  "Product Safety Greensboro," April 2, 2009.
15      Q. It's another presentation?
16      A. Another presentation, yes.
17      Q. Who made this?
18      A. I probably did and -- and jointly with the
19  team.
20      Q. And for whom or to whom did you make the
21  presentation?
22      A. This was a presentation that was made to the
23  NAFTA product safety organization in Greensboro on that
24  date.
25      Q. And -- who would that be? Explain who the

### Page 200

1  NAFTA product safety organization would be.
2      A. Well, this would be the 80 full-time
3  equivalents that were located in Greensboro on that
4  second quarter in 2009. So all local Greensboro
5  employees.
6         (Hertl Deposition Exhibit No. 29
7          marked as requested.)
8  BY MR. TILLERY:
9      Q. Can you explain what Exhibit 29 is? Identify
10  it and tell me what it involves?
11      A. Well, the title page shows an e-mail message
12  that John Doe sent to me on November the 5th, 2009.
13      Q. Okay. Can you tell what's attached to this
14  e-mail?
15      A. This was after I had accepted my global role
16  already, and I was interviewed in October 2009. By
17  November 5, 2009, it was clear that I was offered and
18  had accepted the role, the global role. And this was
19  about one of the employees which was on the management
20  team, John Parker, who was leading our outsourcing
21  activity. And he had decided to leave the organization.
22  He has left in the meantime. So this was a
23  communication about John leaving.
24      Q. Okay. If you would go to the bottom of the
25  second page where it starts, "Principals."

### Page 201

1      A. Yeah.
2      Q. Look at the rest of the document. Can you
3  tell me who created that?
4      A. This was created by John Doe.
5      Q. Was John Doe at Jealott's Hill at that time?
6      A. John Doe was located at Jealott's Hill but was
7  head of global product safety reporting into the global
8  head of development in Basel.
9      Q. Okay. And what was the purpose of the
10  "Principal" section that was created by Mr. Doe?
11      A. The -- Well, the -- the purpose of the
12  "Principal" section was to outline his thoughts about a
13  future product safety organization.
14      Q. Is this an accurate reflection of the
15  organization now?
16      MR. POPE: His views or the actual --
17  BY MR. TILLERY:
18      Q. Yeah, the principals in this attachment to the
19  e-mail. Just so we're clear, I'm -- I'm talking about a
20  total of 11 pages for that.
21      A. Yeah. Well, I -- you know, I cannot speak to
22  the detail of contents that -- that's in all those 11
23  pages. So let me -- let me go through that.
24      Q. Well, just start, if you wouldn't mind, at the
25  bottom of the second page, under principals.

51 (Pages 198 to 201)

**Exhibit 006 Page 51**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

Page 202

1      A.  Yes.
2      Q.  Is there one product safety set of standards
3  for all of Syngenta?
4      A.  That's correct, yes.
5      Q.  Did you create that?  Or was that already
6  created?
7      A.  Well, we are -- You know, part of this new
8  organization that we have put in place in 2010 was to
9  create that one set of standards for all of safety.
10      Q.  Second page, the next page, the "Technical
11  disciplines operate as global platforms"?
12      A.  Yes, correct.
13      Q.  Have you done that, as well, or are you doing
14  that?
15      A.  I have created that in 2010, yes.
16      Q.  And go down to 3, where it says, you're
17  "Operating to headquarters, to set standards, and using
18  headquarters-provided databases"?
19      A.  Well, we are operating to commonly agreed
20  standards.  The databases are actually maintained on a
21  site provided by headquarters, but they are fed by
22  wherever the product safety organizations are.
23      Q.  And the next page, the top, "Develop a unified
24  product safety organization based on four technical
25  centers operating the product safety policy and

Page 203

1  standards supporting all of Syngenta activities."
2      Were you trying to do that?
3      A.  Yes, correct.
4      Q.  Next is "Jealott's Hill stays as technical
5  center for CPR, global CPD, EAME, CP, L&G, seeds, EAME."
6  Whatever all those acronyms mean.
7      Is that correct, too?
8      A.  There are some modifications to that proposal
9  at that point in time.
10      Q.  Well, tell me what Jealott's Hill is going to
11  stay as now?
12      A.  Well, Jealott's Hill will be a technical
13  center for CPR but not exclusively.  So that will
14  change.  We will be supporting global CPD development
15  projects out of Jealott's Hill and continue to support a
16  product global CPD development projects out of
17  Greensboro and increasingly do that out of Sao Paulo and
18  out of Singapore.
19      Q.  The -- the next one is -- It says "PS
20  Greensboro."  What does that stand for?
21      A.  That is the product safety Greensboro -- Well,
22  the NAFTA product safety organization --
23      Q.  Okay.
24      A.  -- in Greensboro.
25      Q.  So "Product safety Greensboro and regulatory

Page 204

1  sciences, SBI."  What is that?
2      A.  That's Syngenta biotechnical institute.
3      Q.  Okay.
4      A.  That was a group within that Syngenta
5  biotechnical institute in Research Triangle Park in
6  Raleigh that I mentioned earlier.
7      Q.  So Mr. Doe's recommendation was for "Product
8  safety Greensboro and regulatory sciences SB1 join to
9  form one technical center for global CPD, NAFTA CPD,
10  traits research, and NAFTA seeds."  Is that being done?
11      A.  This is correct, yes.
12      Q.  Okay.  And the next is to "Create a product
13  safety center in Sao Paulo incorporating product safety
14  experts in CP regulatory, residues labs"?
15      A.  That's happening now.
16      Q.  Is that being done?
17      A.  Yes.
18      Q.  And is that for a global support?
19      A.  In a global support, global and regional
20  projects, but the majority are being done to support
21  regional projects.
22      Q.  But they'll do global and regional?
23      A.  Since they do new AI development support for
24  studies that have to be done in the country, yes, by
25  that definition they would support global projects.

Page 205

1      Q.  Go to page 6.
2      A.  Yes.
3      Q.  Where it says "principle."  It says, "Product
4  safety people are located in technical centers organized
5  into global technical platforms."  What is that?
6      A.  This is an accurate reflection of the current
7  organization, but we have toxicologists in Jealott's
8  Hill, in Greensboro, in Sao Paulo.  They're all tied
9  together as scientists in one global technical platform.
10      Q.  Below that it says, "Additional product safety
11  expertise lies with people in registration units were
12  part of a product safety network."
13      Is that consistent with what you told me in
14  this deposition, as well?
15      A.  This part has -- Well, it's -- It's an
16  accurate reflection of the status quo.  We do have, in
17  some of the regulatory units, people with technical
18  expertise.  But they're currently not yet part of the
19  product safety network.  So they're not organizationally
20  incorporated.  So it's -- it's -- it's a collaboration.
21      Q.  But the plan is to do that?
22      A.  The -- the plan needs to be worked out.  This
23  is a -- a project in progress.
24          (Hertl Deposition Exhibit No. 30
25           marked as requested.)

52  (Pages 202 to 205)

Exhibit 006 Page 52
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                            11-4-2010
Confidential

---

Page 206

BY MR. TILLERY:
1   Q.   Explain what Exhibit 30 is, please.
2   A.   It's a document entitled "Environmental Safety
3   SynCRA, General Principles and Guidance."
4   Q.   And are you familiar with it?
5   A.   I'm familiar with the document, not the
6   details.  Certainly the document itself.
7   Q.   How are you familiar with the document?
8   A.   Well, it was -- This was a document that was
9   developed to define how we would support quality
10  evaluations for products that are registered and
11  marketed and sold in regions and in countries where we
12  don't have very intense regulatory frameworks.  So this
13  is an internal guidance of how the safety evaluation
14  should be conducted.
15  Q.   Is it currently in effect?
16  A.   It is currently in effect, yes.
17  Q.   When did it go into effect?
18  A.   The document should have a title.  It does
19  have a title.  2009.  It is part of an initiative that
20  we started in January 2009 where the concept was
21  developed, that we developed the guidance document.
22  This is version 3.  So throughout 2009.
23  Q.   Okay.
24  A.   And as you can see, this is still a work in

Page 207

1   prog -- progress because it says "Draft document."
2         (Hertl Deposition Exhibit No. 31
3         marked as requested.)
4   BY MR. TILLERY:
5   Q.   This document that's been marked as
6   Exhibit 31.  Can you tell me what it is?
7   A.   This is an e-mail that I sent to Phil Botham,
8   Dick Lewis, Steve Maund, and the first two recipients in
9   Jealott's Hill, the third one in Basel, and a number of
10  people in Greensboro were copied on it.  It's dated
11  October 5th, 2009.
12  Q.   What was this about?
13  A.   This is about technical evaluation documents.
14  And this was to address a -- need that we had
15  identified to support and compile documentation of large
16  bodies of science that is contained in external
17  publications and large volumes of internal documents to
18  bring that in a comprehensive position document so that
19  it is available for internal use, so that people didn't
20  have to read a large amount of reports and could get a
21  quick technical summary.
22        (Hertl Deposition Exhibit No. 32
23        marked as requested.)
24  BY MR. TILLERY:
25  Q.   Can you tell me what No. 32 is, sir?

Page 208

1   A.   It's an e-mail sent out by Andreas Wobmann,
2   Jealott's Hill, on Friday, October the 23rd, 2009, to
3   the product safety management team, which is John Doe's
4   management team which had my role before he retired and
5   I was offered the job as his successor.  So that's just
6   before the job was offered to me.
7         (Hertl Deposition Exhibit No. 33
8         marked as requested.)
9   BY MR. TILLERY:
10  Q.   Can you tell me what this exhibit is, sir?
11  A.   This is a presentation entitled "Easy 123
12  Implementation Roll Out."
13  Q.   This is Exhibit 33?
14  A.   Yes.
15  Q.   Okay.
16  A.   It is dated February 2009, if I read
17  correctly.  And this is a -- another presentation.  This
18  is a presentation that was given in all four regions to
19  the regulatory and product safety teams for a new
20  support system that we implemented in early 2009.
21  Q.   And you said all four regions.  Which four
22  regions?
23  A.   That was EAME, Europe, NAFTA, APEC, and LATAM.
24  Q.   All around the world?
25  A.   All around the world, yes.

Page 209

1   Q.   And who gave the presentation?
2   A.   This specific one, I cannot tell you.  The
3   ones to -- the one to the product safety and regulatory
4   teams in NAFTA, I did jointly with a presenter that
5   joined us via telephone from Basel, if I remember
6   correctly.  But I certainly did part of the
7   presentation.
8   MR. TILLERY:  We are out of time on our tape at
9   this point.
10  THE VIDEOGRAPHER:  This marks the end of videotape
11  No. 6 in the deposition of Peter Hertl.  The time is now
12  4:11 p.m.  Going off the record.
13        (Discussion off the record.)
14        (Hertl Deposition Exhibit No. 34
15        marked as requested.)
16  THE VIDEOGRAPHER:  Going on the record.  This marks
17  the beginning of Videotape No. 7 in the deposition of
18  Peter Hertl.  The time is now 4:14 p.m.
19  BY MR. TILLERY:
20  Q.   Can you identify Exhibit 34, please.
21  A.   It's an e-mail sent by Derek Cornes, Basel, on
22  June the 17th, 2004, to Paul Hendley in Greensboro.
23  Q.   Who's Derek Cornes -- Cornes?
24  A.   Derek Cornes, I believe he was in biological
25  development in Basel for herbicides at that point in

---

53 (Pages 206 to 209)

**Exhibit 006 Page 53**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

## Page 210

1  time but I --
2      Q.  Which -- which entity?
3      A.  Syngenta Crop Protection AG in Basel.
4      Q.  Okay.
5      A.  But I'm not 100 percent positive.  That's
6  six -- six years ago.  We'll -- we'll have to check.
7      Q.  Do you remember the circumstances surrounding
8  this e-mail exchange?
9      A.  Yes.
10      Q.  Tell me what it's about.
11      A.  It is about a potential innovation in a early
12  relation process, what -- what could be done on the
13  formulation development side to reduce off-site or
14  off-field movement of compounds.  So what kind of
15  technology could be developed to reduce the amount of
16  material that's lost in the field conditions.
17      Q.  Okay.
18          (Hertl Deposition Exhibit No. 35
19          marked as requested.)
20  BY MR. TILLERY:
21      Q.  And if you could identify 34, please.
22      MR. POPE:  35.
23      MR. REEG:  35.
24  BY MR. TILLERY:
25      Q.  Or 35.

## Page 211

1      A.  Yes.  That's an e-mail sent by Jeff Fowler on
2  December 15th, 2004, to myself and Victor Chow that did
3  talk about funding atrazine run-off mitigation studies,
4  so to test some of his ideas under field conditions.
5      Q.  And there's a reference of Derek Cornes's
6  decision not to continue the project in favor of other
7  priorities.  Do you see that part?
8      A.  Yes, I see that.
9      Q.  So Derek Cornes had made the decision not to
10  proceed with this?
11      A.  Well, in fact, we have done the project.
12      Q.  So what was this e-mail about?
13      A.  I think this was a discussion around funding.
14  Where can we find the money to pay for the field studies
15  late in the year when the budgets for 2005 had already
16  been set.
17      Q.  Okay.  When was the project finished?
18      A.  I don't recall that.  We have the project
19  finished, but I don't recall when it was finished.
20          (Hertl Deposition Exhibit No. 36
21          marked as requested.)
22  BY MR. TILLERY:
23      Q.  Okay.  Can you identify this exhibit, sir?
24      A.  That's another e-mail from Derek Cornes sent
25  in March of 2005, so three months after the previous

## Page 212

1  e-mail, to Mike Bean in Jealott's Hill, who was in
2  formulation and development in Jealott's Hill and Janis
3  McFarland with a copy to myself, Bob Hendley, Bob Brown,
4  Jeff Fowler, David Stock, all -- with the last one
5  located in Greensboro.
6      Q.  Okay.
7          (Hertl Deposition Exhibit No. 37
8          marked as requested.)
9  BY MR. TILLERY:
10      Q.  Can you identify No. 37, please.
11      A.  No. 37 is a guideline entitled "CP PLCM
12  Project Management Handbook."  It's dated May 2005.
13      Q.  What is the document?
14      A.  Well, I don't know the document.  But I would
15  assume it is a handbook that advises teams how to manage
16  PLCM projects in the organization.
17      Q.  Do you know if this one is still in effect?
18      A.  I don't know that.
19      Q.  Have you ever seen this document before?  If
20  you don't recognize it, sir --
21      A.  I don't recognize it.  And, you know, just
22  looking at it, it seems to be outdated because we don't
23  have PPT teams anymore.  So that's probably a version
24  that was in effect in 2005 but is no longer.
25

## Page 213

1          (Hertl Deposition Exhibit No. 38
2          marked as requested.)
3  BY MR. TILLERY:
4      Q.  Would you look at Exhibit 38 and identify that
5  for me.
6      A.  It looks like a PowerPoint presentation
7  entitled "2009 Portfolio Investment, Impact of Cost
8  Savings in External PS Dollars."
9      Q.  Are you familiar with it?
10      A.  I have not seen that.
11      Q.  Okay.
12          (Hertl Deposition Exhibit No. 39
13          marked as requested.)
14  BY MR. TILLERY:
15      Q.  No. 39, can you tell me what that is?
16      A.  No. 39 is an e-mail chain that originated in
17  Basel, sent out by Ralf Furter, head of development.
18      Q.  And the topic was "Development portfolio 2009,
19  ready to implement."
20      A.  Yeah, and that would be the part of the funds
21  or resources in product safety that are supporting the
22  global development portfolio projects.
23      Q.  Okay.  And what -- what percentage was that?
24      A.  In 2009?  All I can tell you for 2010, and the
25  number would be very similar.  So --

54 (Pages 210 to 213)

**Exhibit 006 Page 54**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                      11-4-2010
Confidential

---

Page 214

1   Q.  Okay.  What's in --
2   A.  About 70 million in 2010 out of 150 million
3   total.
4   Q.  Who's Jasper Barnes?
5   A.  He is the development portfolio manager for
6   the globally prioritized run and implemented projects.
7   So he's collecting the data and running the
8   prioritization machine.
9   Q.  By whom was he employed?
10   A.  Syngenta Crop Protection AG in Basel.
11              (Hertl Deposition Exhibit No. 40
12              marked as requested.)
13   BY MR. TILLERY:
14   Q.  I think this is No. 40?
15   A.  Correct.
16   Q.  Can you tell me what this e-mail exchange
17   involves?  First of all, it's e-mails involving you,
18   correct?
19   A.  Yes.  It's an e-mail I -- The last -- It's a
20   chain mail again.  The last e-mail I -- I did send out.
21   It is -- it is in relation to the 2009 development
22   portfolio ready to implement that we've discussed in the
23   previous exhibit.
24   Q.  And your reference to Jon Akins and Steven
25   Wall?

---

Page 215

1   A.  Yes.
2   Q.  And Nina Heard?
3   A.  Yeah.
4   Q.  You need to assess the implications in your
5   teams quickly.  What were their teams?
6   A.  The implication -- The teams?  John team's --
7   John Akins was team lead for the toxicology team in
8   Greensboro.  Steven Wall was the team lead for the
9   environmental safety team.  Nina Heard for the dietary
10   safety team.  And as prioritization decisions are made,
11   it will impact the work schedule for those teams.
12   Q.  I'm sorry?
13   A.  As prioritizations are made, projects are
14   being funded and other ones are not funded, it will
15   affect the work program for the teams, and this was
16   in -- a call to them to say, well, how does this project
17   prioritization affect the work program for your teams
18   relative to the objectives that we had discussed earlier
19   in the year in one of my previous -- your previous
20   exhibits.
21              (Hertl Deposition Exhibit No. 41
22              marked as requested.)
23   BY MR. TILLERY:
24   Q.  Can you tell me what Exhibit 41 is?
25   A.  It's another e-mail, Exhibit 41, sent out by

---

Page 216

1   Jasper Barnes in June -- on June the 10th, 2009, to a
2   long, long distribution list.  And it is entitled "CP
3   and SC Support Project Proposals For Scoping For the
4   2010 Portfolio."
5   Q.  What is the project scoping phase that's --
6   that's in bold in this e-mail on the first page, the
7   bottom of the first page?
8   A.  Okay.  It's a build-up.  And you start off
9   with an idea, which starts out with an idea collection,
10   global idea collection.  So project proposals.  Which
11   has been completed.  Then it goes through a ranking
12   phase, regionally, so we do regionally ranking in NAFTA
13   and in the other regions, and there's a global ranking
14   phase for global projects.
15       And then there are -- the top-ranked projects
16   are proposed for evaluation and scoping.  And scoping
17   means you take it beyond the idea phase.  You develop a
18   business case.  You develop the actual investment need
19   because there -- you need to probably generate data and
20   studies and the like.  So you work up both sides of the
21   project.  Its costs and its benefits.
22              (Hertl Deposition Exhibit No. 42
23              marked as requested.)
24   BY MR. TILLERY:
25   Q.  Can you tell me what this Exhibit 42 is?

---

Page 217

1   A.  Exhibit 42 is an e-mail sent by Alan Hosmer to
2   Peter Campbell, with a copy to Gary Dickson, head of
3   development NAFTA, and myself.  It's dated April the
4   3rd, 2001.  And it's entitled "South African Amphibian
5   Study."
6              (Hertl Deposition Exhibit No. 43
7              marked as requested.)
8   BY MR. TILLERY:
9   Q.  Tell me what Exhibit 43 is.
10   A.  It's an e-mail chain mail sent by John Parker
11   located in the UK, Alderley Park, on July 25th, 2001, to
12   a number of people, including myself, in Greensboro,
13   Basel, Jealott's Hill, and copied to individuals in
14   Greensboro, Alderley Park.  It's entitled New
15   Quotations -- "Urgent, New Quotations, ES Contract Needs
16   to Go."
17   MR. TILLERY:  Do you have anything else you think I
18   should ask?  No?  No further questions.
19   MR. POPE:  Thank you, Steve.  I appreciate your
20   courtesy.
21   THE WITNESS:  Thank you.
22   MR. POPE:  Thanks, John.  We have no questions.  I
23   will reserve signature, however.
24   THE VIDEOGRAPHER:  This marks the end of Videotape
25   No. 7.

---

55 (Pages 214 to 217)

Exhibit 006 Page 55
c6b220c7-b24e-45f5-b797-4c3d709c9bbe

Hertl, Peter                    11-4-2010
Confidential

---

**Page 218**

1    MR. POPE: By the way, this deposition, as they all
2  have been, is confidential under our protective order.
3    THE VIDEOGRAPHER: This marks the end of the
4  videotaped deposition of Peter Hertl. This is the
5  conclusion of the deposition. It is 4:34 p.m.
6       (Witness excused.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 219**

1       IN THE UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF ILLINOIS
3
     CITY OF GREENVILLE, et al.,    )
4                                   )
         Plaintiffs,     )
5                                   )
     vs.                )  No. 10-188-JPG
6                                   )
     SYNGENTA CROP PROTECTION, INC.,   )
7    and SYNGENTA AG,         )
                             )
8         Defendants.       )
9
10      I, PETER HERTL, state that I have read the
11  foregoing transcript of the testimony given by me at my
12  deposition on the 4th day of November, A.D., 2010, and
13  that said transcript constitutes a true and correct
14  record of the testimony given by me at the said
15  deposition except as I have so indicated on the errata
16  sheets provided herein.
17
18
19  _____
           PETER HERTL
20
     SUBSCRIBED AND SWORN to
21  before me this _____ day
     of _____, 2010.
22
23
     _____
24     NOTARY PUBLIC
25

---

**Page 220**

1    UNITED STATES OF AMERICA   )
     SOUTHERN DISTRICT OF ILLINOIS )
2                            )  SS.
     STATE OF ILLINOIS        )
3    COUNTY OF COOK           )
4
5       I, Jennifer D. Riemer, Certified Shorthand
6   Reporter, Registered Professional Reporter, and
7   Certified Realtime Reporter, do hereby certify that
8   PETER HERTL was first duly sworn by me to testify to the
9   whole truth and that the above deposition was reported
10  stenographically by me and reduced to typewriting under
11  my personal direction.
12      I further certify that the said deposition was
13  taken at the time and place specified and that the
14  taking of said deposition commenced on November 4, 2010,
15  at 9:42 a.m.
16      I further certify that I am not a relative or
17  employee or attorney or counsel of any of the parties,
18  nor a relative or employee of such attorney or counsel,
19  nor financially interested directly or indirectly in
20  this action.
21
22
23
24
25

---

**Page 221**

1       In witness whereof, I have hereunto set my
2   hand at Chicago, Illinois, this 14th day of November,
3   A.D., 2010.
4
5
6
7
8
9
10      JENNIFER D. RIEMER, CSR, RPR, CRR
        205 West Randolph Street
11      5th Floor
        Chicago, Illinois  60606
12      Phone: (312) 236-6936
13
14
     CSR No.  084-003901
15
16
17
18
19
20
21
22
23
24
25

---

56  (Pages 218 to 221)

**Exhibit 006 Page 56**
c6b220c7-b24e-45f5-b797-4c3d709c9bbe