Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

---

CITY OF GREENVILLE, ILLINOIS,  )
et al.,                        )
                               )
           Plaintiffs,         )
                               ) Case No.
vs.                            ) 10-cv-188-JPG-PMF
                               )
SYNGENTA CROP PROTECTION, INC.,)
et al.,                        )
                               )
           Defendants.         )

---

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF VERNON RICHARD HAWKINS

VOLUME I


Tuesday, November 9, 2010

At: 10:05 a.m.


Taken at:

Regus Business Centers

7800 Airport Center Drive

Suite 401

Greensboro, North Carolina


Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR

Exhibit 007 Page 1
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

## Page 2

APPEARANCES
ON BEHALF OF THE PLAINTIFFS:
STEPHEN M. TILLERY, Esq.
MICHAEL KLENOV, Esq.
ROSEMARIE FIORILLO, Esq.
JERRY BROWN, Esq.
Korein Tillery, LLC
505 N. 7th Street, Suite 3600
St. Louis, Missouri 63101
Phone: 314.241.4844 Fax: 314.241.3525
E-mail: stillery@koreintillery.com
E-mail: mklenov@koreintillery.com

ON BEHALF OF THE DEFENDANTS:
MICHAEL A. POPE, Esq.
PETER SCHUTZEL, Esq.
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606
Phone: 312.372.2000 Fax: 312.984.7700
E-mail: mpope@mwe.com
E-mail: pschutzel@mwe.com
Also Present:
ALAN NADEL, Esquire
Syngenta Crop Protection, Inc.

GARY TODD, CLVS, Videographer

VIDEOTAPED DEPOSITION OF VERNON RICHARD
HAWKINS, a witness called on behalf of the
Plaintiffs, before V. Dario Stanziola, CSR, RPR,
CRR, Notary Public, in and for the State of North
Carolina, held at the Regus Business Centers, 7800
Airport Center Drive, Suite 401, Greensboro, North
Carolina, on Tuesday, November 9, 2010, commencing
at 10:05 a.m.

## Page 3

INDEX OF EXAMINATIONS

By Mr. Tillery          PAGE   7

INDEX OF EXHIBITS
NUMBER       EXHIBIT           MARKED
Plaintiff's Exhibit Number 1: E-mail    73
string with the top from Tobias Meili
dated 6/27/08, Bates GRNVL0000085568 -
5572

Plaintiff's Exhibit 2: Syngenta document  119
entitled Summary Notes dated 6/26/09,
Bates GRNVL0000080732 - 0737

Plaintiff's Exhibit 3: An e-mail string   124
with the top from Brian Manley dated
3/20/06, Bates SYN03444291

Plaintiff's Exhibit 4: An e-mail string   128
with the top from Pat Stiner dated
7/6/06, Bates GRNVL0000042011 - 2012

Plaintiff's Exhibit 5: An e-mail string   131
with the top from Robert Wurz dated
10/24/01, Bates SYN01791910

Plaintiff's Exhibit 6: An e-mail string   136
with the top from Dan Campbell dated
10/19/07, Bates SYN012751724 - 726

Plaintiff's Exhibit 7: A document        140
entitled Review of Triazine Strategy
from a Global Perspective March 22, 2005
Greensboro, Bates SYN02781983 - 2726
Plaintiff's Exhibit 8: An e-mail string   163
with the top from Ayannah Chance, Bates
GRNVL0000064906 - 907

## Page 4

Plaintiff's Exhibit 9: An e-mail string   168
with the top from Ayannah Chance dated
11/11/07, Bates GRNVL0000064902
Plaintiff's Exhibit 10: An e-mail string  171
with the top from Eileen Watson dated
4/27/06, Bates GRNVL0000052306
Plaintiff's Exhibit 11: An e-mail string  175
with the top from John Abbott dated
11/9/05, Bates SYN01190631 - 32
Plaintiff's Exhibit 12: An e-mail string  177
with the top from Rush Ducote dated
12/7/04, Bates GRNVL0000064978
Plaintiff's Exhibit 13: An e-mail        181
document from Willy Maurer dated
11/4/05, Bates SYN02781966
Plaintiff's Exhibit 14: An e-mail string  185
with the top from Scott Langkamp dated
3/22/06, Bates GRNVL0000065798 - 799
Plaintiff's Exhibit 15: An e-mail string  187
with the top from Philippe Costrop dated
5/19/08, Bates SYN02768444 - 445
Plaintiff's Exhibit 16: An e-mail string  190
with the top from Susan Morris dated
10/19/06, Bates GRNVL0000042446 - 448
Plaintiff's Exhibit 17: Syngenta         195
Triazine Supply Chain Redesign July
2004, Bates SYN01146557 - 6607
Plaintiff's Exhibit 18: An e-mail string  204
with the top from Scott Langkamp dated
6/13/07, Bates SYN03446466
Plaintiff's Exhibit 19: An e-mail string  208
with the top from Jasper Barnes dated
6/10/09, Bates SYN03146593 - 6594
Plaintiff's Exhibit 20: An e-mail string  212
with the top from Barbara Descenzo dated
11/21/07, Bates GRNVL0000065140 - 142

## Page 5

Plaintiff's Exhibit 21: Syngenta Minutes  215
dated 7/5/03, Bates SYN00756454 - 6477

Plaintiff's Exhibit 22: Syngenta         221
document entitled Syngenta Production
Strategies in the U.S. and Worldwide,
Bates SYN01790993 - 994
Plaintiff's Exhibit 23: An e-mail string  226
with the top from Frank Knight dated
12/7/06, Bates SYN02995494

2  (Pages 2 to 5)

Exhibit 007 Page 2
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 6

1    THE VIDEOGRAPHER: Here begins the
2  videotaped deposition of Vernon Hawkins, tape
3  one, volume one in the matter of City of
4  Greenville, Illinois, et al. v. Syngenta Crop
5  Protection Incorporated, et al., Case Number
6  10-CV-188-JPG-PMF. Today's date is
7  November 9th, 2010. And the time on the video
8  monitor is 10 o'clock and five minutes.
9    The video operator today is Gary Todd of
10  TeleVisual representing WestLaw Deposition
11  Services. The court reporter is Dario
12  Stanziola of Huseby Incorporated, reporting on
13  behalf of WestLaw Deposition Services.
14    Today's deposition is being taken on
15  behalf of the plaintiff and is taking place at
16  7800 Airport Center Drive, Suite 401,
17  Greensboro, North Carolina.
18    Counsel, please introduce yourselves and
19  state whom you represent.
20    MR. TILLERY: For the plaintiffs, Steve
21  Tillery, Michael Klenov, Rosemarie Fiorillo
22  from the law firm of Korein Tillery in St.
23  Louis.
24    MR. POPE: For the defendant, Michael
25  Pope and Peter Schutzel from McDermott, Will &

Page 7

1  Emery in Chicago.
2    MR. NADEL: Alan Nadel, Syngenta Crop
3  Protection, Inc.
4    THE VIDEOGRAPHER: Others present.
5    MR. TILLERY: Others present is Jerry
6  Brown from Korein Tillery.
7    THE VIDEOGRAPHER: Would the court
8  reporter please swear in the witness.
9    (Witness Sworn.)
10    THE VIDEOGRAPHER: Please continue.
11    VERNON RICHARD HAWKINS,
12  having been duly sworn, was examined and testified
13  as follows:
14    EXAMINATION
15  BY MR. TILLERY:
16    Q. Would you state your name for the record,
17  please.
18    A. Vernon Richard Hawkins.
19    Q. And what is your permanent residential
20  address?
21    A. ███████████████████████████
22  █████████████████
23    Q. When and where were you born, sir?
24    A. I was born in Kokomo, Indiana in 1963.
25    Q. Have you ever had a deposition before?

Page 8

1    A. I have, yes.
2    Q. And how many?
3    A. Three or four, I believe.
4    Q. Okay. And how many times -- other times
5  have you testified besides depositions?
6    A. I don't recall any other testimonies
7  other than the depositions.
8    Q. Okay. And could you tell me what those
9  depositions involved?
10    A. They were related to data compensation
11  via arbitration cases. I believe there was one
12  particular case related to a disagreement with the
13  EPA related to data comp as well.
14    Q. Would you, for the record, explain what
15  data compensation means?
16    A. Sure. Data compensation is when a
17  manufacturer, the proprietary company that invents
18  a product, has certain rights to the use of the
19  data if other people want to enter the market. And
20  so it's a legal process which the manufacturer can
21  ensure that they get paid the fair -- the fair
22  share of the data if somebody else chooses to use
23  it in the marketplace.
24    Q. Why don't you give us an example of that.
25    A. An example would be we sell a particular

Page 9

1  compound that we invented, and after the patent
2  fall, a company may choose to enter and they would
3  make a claim to pay, and then we would seek an
4  agreement on the payment amount. And if there is
5  an agreement on the payment amount, often
6  arbitration is how you settle what the value of the
7  data is worth. Meanwhile, the company that chooses
8  to enter is able to sell and the arbitration is
9  about what is the value that the company would owe
10  the proprietary inventor.
11    Q. And you have testified in you think three
12  or four of those?
13    A. I believe. I recall three or four, yes.
14    Q. Did the -- did you testify by deposition or
15  at the arbitration?
16    A. I believe I've done both.
17    Q. But you don't know for certain?
18    A. I do recall that they were different.
19  One I was in the arbitration recently in 2010. The
20  others were a few years ago. And one of those I
21  believe was a deposition.
22    Q. Any of these involve atrazine?
23    A. Yes.
24    Q. All of them involve atrazine?
25    A. No.

3  (Pages 6 to 9)

Exhibit 007 Page 3
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 10

1    Q. How many?
2    A. I believe two of them did involve
3  atrazine and the others would have been other
4  molecules for Syngenta Crop Protection, Inc.
5    Q. Okay. Could you tell me about your
6  education after high school, please.
7    A. I received a BS degree from Purdue
8  University studying in agronomy. I later went onto
9  get an MBA at Temple University through an
10  executive program about five years after I got my
11  undergrad degree.
12    Q. When did you -- what year did you get your
13  undergraduate degree?
14    A. I think December '85 is when I would have
15  graduated from Purdue.
16    Q. And what was your first full-time job?
17    A. I joined a company called ICI Americas at
18  the time, which actually is one of the legacy
19  companies of Syngenta Crop Protection, Inc.
20    Q. And what work were you doing?
21    A. I started at the company after being an
22  intern in the summers in sales support and what was
23  the headquarters at that time in Wilmington,
24  Delaware. Was there for just under a year before
25  taking a sales territory in Illinois.

Page 11

1    Q. And what were you selling?
2    A. I was selling the products that our
3  company either invented or had rights to sell,
4  herbicides, insecticides predominantly.
5    Q. And that -- you said that was a legacy
6  company?
7    A. Legacy is a term that we use for the
8  companies that make up Syngenta Crop Protection,
9  Inc. through the course of history. And the
10  formation of Syngenta and Novartis and AstraZeneca,
11  you know, came together was what formed Syngenta.
12  So prior companies before the creation of the
13  company is what we refer to as legacy.
14    Q. And what year did you do the sales work in
15  Illinois?
16    A. 1986 or early 1987 through 1989 I believe
17  were the dates. I was a sales rep for almost three
18  years.
19    Q. All of those years spent in Illinois?
20    A. Yes.
21    Q. Did you ever sell atrazine?
22    A. We didn't have atrazine as part of our
23  portfolio when the company was ICI Americas.
24    Q. Okay.
25    A. However, we did have a premix product

Page 12

1  while I was a sales rep which did have atrazine in
2  it, which we would have sourced from a supplier.
3    Q. What did you do after your job at ICI
4  Americas?
5    A. After ICI Americas became Syngenta -- or
6  excuse me, became Zeneca before Syngenta was
7  formed. So I stayed with the company even though
8  the company name and structure had changed. And
9  after leaving sales, I moved into the headquarters
10  in Wilmington, Delaware. And I was a business
11  analyst there in the headquarters. And it's at
12  that time that I started my MBA studies while I was
13  in Delaware.
14    Q. And that would have been in what year that
15  you started then?
16    A. I don't recall the exact date of when
17  Zeneca was formed. I essentially stayed with the
18  company and the company changed names. But it
19  would have been in the period around '89, '90 when
20  I moved into Delaware, and then in the early '90s I
21  believe is when Zeneca was formed.
22    Q. And what did you do as a business analyst?
23    A. I was primarily responsible for
24  tabulating the ten-year forecast or long-term
25  forecast for the product lines that we sold in the

Page 13

1  U.S. market, and various projects related to
2  strategy for the U.S. market.
3    Q. How long did you stay in that job as a
4  business analyst?
5    A. I believe it was one to two years. And
6  then I moved into a production scheduling role in
7  the same location before I finished my MBA.
8    Q. And the production scheduling role involved
9  what products?
10    A. I had a portfolio. I don't recall the
11  exact products I was responsible for. But it would
12  have been in the order of ten to 20 active
13  ingredients and a host of products from those
14  active ingredients.
15    Q. And as a production scheduler, what would
16  you do?
17    A. Primarily I was responsible for ensuring
18  that the ability to supply the demand that was
19  forecasted from the marketing teams for U.S. sales
20  were deliverable and where possible we would adapt
21  the schedule to ensure demand could be met.
22    Q. Were these products being manufactured in
23  the United States?
24    A. Many of them were. Some probably were
25  not. I don't recall the exact portfolio. But a

4  (Pages 10 to 13)

Exhibit 007 Page 4

7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 278 of 486

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

|  | Page 14 |
|---|---|

1 number of our molecules are -- the active
2 ingredient, which is the core part of the module,
3 are not made in the U.S. But the formulator
4 products often are made in the U.S. And we do some
5 of both here, active ingredient and formulation.
6    Q. And the MBA was awarded from Temple in what
7 year?
8    A. I believe it was 1992.
9    Q. Any particular area of study?
10    A. It was an executive program. So it was
11 generally a marketing management MBA format.
12    Q. Have you had any other formal education
13 passed that MBA?
14    A. I have not.
15    Q. What was your next job?
16    A. After I completed my MBA, I went overseas
17 to work in the global headquarters for -- I believe
18 it was still ICI at the time. It may have been
19 Zeneca. But it was in Fernhurst, England. And I
20 was there for almost two years doing a global
21 product management role.
22    Q. And what products did you deal with at that
23 time?
24    A. Primarily fungicide products. And I did
25 have one or two insecticide products as well.

|  | Page 15 |
|---|---|

1    Q. Did you involve yourself with atrazine at
2 that time?
3    A. At that time, no. Again, the company at
4 that stage, the legacy company, we did not own
5 atrazine at that time.
6    Q. And how long did you stay there in England?
7    A. I was there for just under two years.
8    Q. And then what job did you take?
9    A. I returned to the U.S. and for a short
10 time did a electronic commerce role. I related to
11 standardizing information for the industry, working
12 with a group that was focused on that across
13 industry. And then probably in nine to ten months
14 moved into lead the fungicide business management
15 for North America.
16    Q. You mentioned that when you were in England
17 that you worked in a global products management role.
18 What does that mean?
19    A. Well, global product management is a
20 function that we still broadly have in the company
21 today. And it was a function that was really
22 focused on identifying what were the best markets
23 to develop the compound for, and then once you had
24 a compound that was deemed to have opportunity, you
25 were trying to assess what value and what market

|  | Page 16 |
|---|---|

1 segments it best fit into. So that was a core part
2 of the job. There certainly were some elements of
3 working with supply chain and those sort of things
4 to ensure product could be supplied. But largely a
5 strategy role.
6    Q. Did you involve yourself in negotiating
7 individual deals for sales at that time?
8    A. No.
9    Q. Who would have done that?
10    A. All of the countries or regions are
11 accountable for sales. So much like I am
12 accountable today at Syngenta Crop Protection,
13 Inc., all of the sales and customer interactions
14 are my responsibility. Because we do operate, and
15 did then at the time, on a global strategy approach
16 with local tailoring implementation at the customer
17 level.
18    Q. What was the name of the company you worked
19 for in England?
20    A. The -- while was in England, I believe it
21 did move from ICI to Zeneca. And I was on an
22 expatriate assignment. So I don't remember which
23 -- which part of the company I actually was
24 employed by for that term. But it would have been
25 ICI for a period and Zeneca for a period.

|  | Page 17 |
|---|---|

1    Q. What was the year that you returned to the
2 U.S.?
3    A. I returned to the U.S. I believe it was
4 about four years after -- well, excuse me, it would
5 have been -- I went to England twice. So the first
6 time it would have been probably '94. Could have
7 been '95. But in that time zone.
8    Q. When you returned?
9    A. Right. And then I went after the
10 fungicide role that I had referenced in the U.S.
11 market responsible for North America, I did go back
12 to England prior to the formation of Syngenta and
13 managed the global insecticide business from
14 Fernhurst, England again.
15    Q. Was that the global headquarters of the
16 business?
17    A. It was at that time, yes.
18    Q. And how long were you there at global
19 headquarters a second time?
20    A. A little over two years.
21    Q. So you returned to the U.S. what year from
22 that stint in Europe?
23    A. I returned right at the formation of
24 Syngenta. So late 2000. I probably didn't
25 relocate until early 2001.

Westlaw Deposition Services   800.548.3668 Ext. 1

Exhibit 007 Page 5

7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 279 of 486

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 18

1    Q.   And you came back to work where, what
2    location?
3    A.   The Greensboro, North Carolina location
4    of Syngenta Crop Protection, Inc.
5    Q.   And have you been employed by Syngenta Crop
6    Protection, Inc. ever since?
7    A.   I have, yes.
8    Q.   Now, immediately before you came back, who
9    were you employed by?
10   A.   Again, I was -- AstraZeneca owned the
11   company at the time.  And the agriculture division
12   was Zeneca.  So I don't remember the exact company
13   name.  But it would have certainly been part of the
14   AstraZeneca company that I reported to before the
15   formation of Syngenta.
16   Q.   Was there a time prior to that particular
17   corporate entity that you worked for a different one?
18   In other words, before your assignment back
19   at Syngenta Crop Protection, Inc., you said you don't
20   know the exact name of the company you were working
21   for.  Was there another entity that you do remember
22   prior to that assignment?
23   A.   So prior to going to England?
24   Q.   Actually, let's back it up this way, you
25   came back here in the latter part of 2000 and started

Page 19

1    working for Syngenta Crop Protection, Inc.?
2    A.   That's correct.
3    Q.   Okay.  Your immediately preceding job was in
4    England.  But you don't remember the name of that
5    company?
6    A.   No.  I know it was a portion of the
7    AstraZeneca firm.  I was on expatriate assignment,
8    as I mentioned, in the first experience.  So second
9    experience also on an expatriate assignment.
10   Q.   Was it the same company both times to
11   England that you worked for or different companies?
12   A.   It would have been different.  Because --
13   well, I believe it would have been different in
14   terms of the firm ownership.  Because I was always
15   in the ag division, I'm not sure if there was a
16   company structure change when Astra and Zeneca came
17   together.
18   Q.   And just before you came back what were you
19   doing in England?
20   A.   I was responsible for the global
21   insecticide business.
22   Q.   That second assignment in England, who was
23   paying your salary while you were on that assignment?
24   A.   I don't know definitively.  Typically the
25   way expatriate assignments work is there is a

Page 20

1    policy.  So I was paid according to the policy at
2    that time.
3    Q.   And what do you mean there was a policy?
4    A.   For expatriate assignments there are --
5    like many things in our company, there are sort of
6    procedures which we follow.
7    Q.   And whatever that procedure was, you
8    presume that whatever it called for, that's how you
9    were being paid?
10   A.   That's correct.  And that was
11   communicated to me at the time.  I just don't
12   recall how it was structured.
13   Q.   Sorry about the cough.  I've been fighting
14   this for a bit.  So apologize to you.
15   A.   No problem.
16   Q.   Okay.  In the fall of 2000 you came back to
17   America and started working at Syngenta Crop
18   Protection, Inc.  What was your job at that time?
19   A.   I was vice president for the company
20   Syngenta Crop Protection, Inc. at that time leading
21   a group called product portfolio management.  And
22   that particular role entailed leading the brand
23   management on marketing teams.  It also included
24   regulatory affairs, our development, development
25   planning areas of the business.  So mostly the

Page 21

1    things related to developing and marketing of
2    product.
3    Q.   How long did you stay in that job?
4    A.   I believe it was two to three years in
5    that role.
6    Q.   So --
7    A.   I don't recall exactly.  But in that time
8    range.
9    Q.   And then what job did you take?
10   A.   I moved from that role to lead one of our
11   business units, which we called horticulture, which
12   was predominantly focused on fruit and vegetable
13   crops, you know, covering the east and west coast
14   primarily.
15   Q.   What were your responsibilities there?
16   A.   I was responsible for sales, customer
17   relations, leading the team to deliver all sales of
18   the products that we sold in those markets.
19   Q.   What was the first time that you started
20   regularly working with atrazine in your career?
21   A.   The first time that the company owned
22   atrazine was the formation of Syngenta in 2000.  So
23   atrazine certainly would have been one of the
24   products in the portfolio when I had the product
25   portfolio management role.  I did mention

6  (Pages 18 to 21)

Exhibit 007 Page 6
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 22

1  previously that in my early sales career we did
2  sell a mixture product which had atrazine in it
3  which -- so I did sell product called sutazine was
4  the name of it. So I was working with it in that
5  regard earlier in my career.
6      MR. POPE: Spell it for the court
7  reporter.
8      THE WITNESS: S-U-T-A-Z-I-N-E.
9      Q. So it would have been in the fall of 2000
10 that you became actively involved on let's say a
11 routine basis with atrazine?
12     A. I would have had accountability when I
13 was appointed. Much of the discussion around the
14 portfolio probably didn't occur until into 2001
15 once the procedures and ways of working were sorted
16 in the course of integrating the company during
17 merger acquisition.
18     Q. Now, you mentioned to me that you had a
19 horticulture assignment on the east and west coast.
20 That would have been around 2002 or 2003?
21     A. I believe 2003 because --
22     Q. How long did that job last?
23     A. That job would have been two to three
24 years as well.
25     Q. Were you working with the sales of atrazine

Page 23

1  at that time?
2      A. I was working somewhat with the sales of
3  atrazine at that time and a sister product called
4  simazine.
5      Q. And how long did you stay on the job, two
6  to three years?
7      A. Two to three years.
8      Q. So that takes us to 2005 or 2006?
9      A. That's correct.
10     Q. Then what did you do?
11     A. Then I was appointed to lead the U.S.
12 commercial operations business for Syngenta --
13 Syngenta Crop Protection, Inc., which gave me
14 accountability for the whole business of the U.S.
15 related to crop protection product sales and
16 customer accountability.
17     Q. So how did that job differ from your
18 preceding assignment in terms of responsibility?
19     A. The primary difference was scope. It was
20 U.S. in terms of accountability. I did have a
21 relationship and accountability with all the major
22 customers for the U.S. business that Syngenta Crop
23 Protection, Inc. is accountable for.
24     Q. Just a little bit about ago you were
25 explaining to me about sales occurring through

Page 24

1  Syngenta Crop Protection. Has the manner in which
2  the contracts are negotiated for sales of atrazine
3  and other pesticides in the United States been
4  consistent since the formation of Syngenta Crop
5  Protection, Inc. or has it changed?
6      A. We have a contract relationship with a
7  number of customers, some of which are specific to
8  atrazine and some of which are around our
9  portfolio. And we have what we call third-party
10 customers, which could be competitors which we sell
11 atrazine to, much like the situation I described
12 when I was selling sutazine. And we have a sales
13 of atrazine to our distributor customers who sell
14 our other products. So while the contract terms
15 may have changed, the process for which we enter an
16 agreement and the accountability for the agreement
17 under my role at Syngenta Crop Protection, Inc. has
18 not changed.
19     Q. Okay. And the manner in which contracts are
20 negotiated, the manner in which sales leads are
21 followed up, those sorts of things have been fairly
22 consistent since let's say 2001 at Syngenta Crop
23 Protection, Inc. for the sales of products in the
24 United States?
25     A. The sales of the products in the United

Page 25

1  States for the life of the company have been the
2  accountability of Syngenta Crop Protection, Inc.
3      Q. Yeah, here's what I'm trying to understand,
4  has the methodology by which you do this been the
5  same or has there been any abrupt change in the way
6  you've done it?
7          We're going to talk at great length in this
8  deposition about the way it's done.
9      A. Okay.
10     Q. What I want to know is has there been any
11 change or is it roughly the same pattern of
12 conducting business in terms of sales?
13     A. In terms of the customers that we
14 transact with, there has been very little change.
15     Q. Okay.
16     A. Which we would call our go to market
17 strategy.
18     Q. There may be changes in terms of the sale
19 price of the product or the volume in a particular
20 year for a sale, this sort of thing. I'm talking
21 about the way in which it's done has been generally
22 the same, correct?
23     A. In terms of the way we go to market --
24     Q. Yes.
25     A. -- who we sell to, yes.

7 (Pages 22 to 25)

Exhibit 007 Page 7

7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 281 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 26

1    Q.  Okay.  And you told us about your last job
2  there through I think you said in 2005 or 2006 you
3  assumed that job.  How long did you have it?
4    A.  Up until January of 2010 when I was
5  appointed president of Syngenta Crop Protection,
6  Inc. responsible for the North American market,
7  which for us is U.S., Canada and Mexico.
8    Q.  Okay.  Are you familiar with the term dotted
9  line or functional reporting relationship as that
10  term is used within the Syngenta group of companies?
11    A.  It is a term that we do utilize in the
12  company related to people connecting with other
13  parts of the organization, yes.
14    Q.  Can you tell me what your understanding of
15  that term is?
16    A.  The way that I would define it if it's a
17  dotted line relationship is there is value in
18  conversing or consulting with another part of the
19  organization.  Obviously dotted line is contrast
20  against direct line.  So the direct line is the
21  person that the employee's accountable to.  That's
22  the person who does the performance reviews.  And
23  dotted line is really seeking advice and
24  consultation to ensure the best decision.
25    Q.  Are direct -- are management reporting

Page 27

1  relationships always confined within a particular
2  legal entity?
3    A.  I don't know.
4    Q.  Are they with respect to Syngenta Crop
5  Protection, Inc.?
6    A.  The reporting relationships for my team I
7  can answer yes.  I'm not sure I know the answer for
8  the whole organization.
9    Q.  When you say the whole organization, are
10  you talking about -- strike that.
11         What do you mean when you say the whole
12  organization?
13    A.  Well, the Syngenta Crop Protection, Inc.,
14  the answer is yes.  There are people that do
15  operate in the U.S. market or the NAFTA market that
16  are not part of Syngenta Crop Protection, Inc.  And
17  I'm not sure about that population.
18    Q.  And which ones of those are you unsure of?
19    A.  There are a number of employees that do
20  connect to the organization outside of Crop
21  Protection, Inc.  For example, Canada.  There are a
22  number of folks that I wouldn't have good
23  visibility of.  So I couldn't name them
24  specifically for you.
25    Q.  There are people at Canada through the

Page 28

1  NAFTA relationship who report to you?
2    A.  There is one person that does, yes.
3    Q.  And who is that?
4    A.  Jay Bradshaw.
5    Q.  And what is his job?
6    A.  He is the head of the Canadian business,
7  president.
8    Q.  Is the NAFTA group a separate legal entity?
9    A.  I don't know that there's a structure for
10  NAFTA, an entity definition.
11    Q.  So when you're head of NAFTA in this
12  organization, you're head of all North American
13  operations, aren't you?
14    A.  I'm responsible --
15         MR. POPE:  Objection to the form of the
16    question.  I think he just answered that he
17    didn't know.
18    Q.  You can answer.
19         MR. POPE:  Go ahead.
20    A.  I'm responsible for the sales and
21  customer delivery for the region that I've been
22  appointed to, which is U.S., Canada and Mexico.  So
23  I have to speak on behalf of where the performance
24  is.  And I make the decisions related to the -- the
25  product sales in those countries.

Page 29

1    Q.  Okay.  So just so we're clear, who appointed
2  you head of NAFTA?
3    A.  John Atkin is my supervisor.  So the
4  formal offer would have come from John.
5    Q.  And where is John Atkin located?
6    A.  John is located in Basel, Switzerland.
7  He's part of the Syngenta executive team.
8    Q.  Syngenta executive committee?
9    A.  Yes.
10    Q.  Is that different from the Syngenta
11  executive team?
12    A.  I'm not sure the formal definition.  But
13  John is a member, as you rightly clarified, of
14  Syngenta executive council.
15         MR. POPE:  Executive committee you mean?
16         THE WITNESS:  Or committee.  I'm sorry.
17         MR. POPE:  We don't need to add another
18    --
19    A.  The acronym's SEC, so that's how I know.
20    Q.  Now, you were telling me that the head of
21  Canada reported to you.  Does the head of Mexico
22  report to you as well?
23    A.  He does, yes.
24    Q.  What is his name?
25    A.  Marcelo Valentin.

8  (Pages 26 to 29)

Exhibit 007 Page 8
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 30

1    Q.  Are there any other groups that report to
2  you besides Mexico and Canada?
3    A.  No, there are not.  Outside of the U.S.
4    Q.  Now, in terms of functional reporting
5  relationships, are there people within the Syngenta
6  Crop Protection entity who have functional reporting
7  relationships outside of Syngenta Crop Protection,
8  Inc.?
9    A.  Could you ask that question again,
10 please.
11   Q.  Sure.
12      Are there people at Syngenta Crop
13 Protection, Inc. who have functional reporting
14 relationships with people outside of that company?
15   A.  In terms of the dotted line definition?
16   Q.  Yes.
17   A.  I'm sure there are.  I don't know exactly
18 who.  But certainly in the course of global
19 strategy development, there are a number of
20 functional dotted line relationships to make the
21 best decision for the company.
22   Q.  And those would be outside of the legal
23 entity of Syngenta Crop Protection, Inc., wouldn't
24 they?
25   A.  Those being?

Page 31

1    Q.  Those functional reporting relationships?
2    A.  Where the dotted line connects to, yes.
3    Q.  Yes.
4    A.  Yes.
5    Q.  And that would exist independent of the
6  corporate structure of the particular entities for
7  which the people were employed?
8       MR. POPE:  When you say that, you're
9       referring to functional reporting
10      relationships?
11      MR. TILLERY:  Correct.
12   A.  So please restate the question.
13   Q.  Well, that functional reporting
14 relationship would exist independent of the corporate
15 structure of the particular entities for which those
16 different people were employed?
17   A.  Yeah, the way our company operates,
18 certainly we look for functional excellence we call
19 it.  So it would make sense for the people in the
20 U.S. market and the European market to be talking
21 to the global functional head about best practice.
22 So in that sense, yes, they would communicate.
23   Q.  A minute ago you used the term that using
24 functional reporting relationships would -- I'm
25 trying to get -- strike the question.

Page 32

1       You said using functional reporting
2  relationships is best for your company.  What were
3  you referring to when you said the company?
4    A.  Well, if I look at Syngenta from a global
5  standpoint, as I said, we have a global strategy
6  philosophy and we have a local implementation and
7  execution implementation plan.  So Syngenta Crop
8  Protection, Inc. is accountable for the local
9  implementation.  And the global strategy aspect is
10 about getting the best input from all parts of the
11 company to make the best decision, be efficient, be
12 effective.  So that's really what I was trying to
13 convey there.
14   Q.  When you started your job in January of
15 this year, was that a promotion?
16   A.  It was, yes.
17   Q.  And tell me how it was that you obtained
18 that job?  Did you apply for it?
19   A.  That particular job was -- became open
20 because my predecessor chose to leave the company.
21   Q.  And who's your predecessor?
22   A.  Valdemar Fischer was his name.  And he
23 left the company.  And so I received a call from
24 John Atkin seeking my interest in the role.
25   Q.  When did he call you?

Page 33

1    A.  Would have been over the Thanksgiving
2  holiday.
3    Q.  Of 2009?
4    A.  Of 2009.
5    Q.  Did you speak to anybody else about the
6  job?
7    A.  After I spoke with John, I did go have a
8  discussion with other members of the Syngenta
9  executive committee to better -- it was effectively
10 an interview.  But it was mostly to understand
11 expectations of the role and vice versa, make sure
12 that I understood the role.
13   Q.  Where did you have those interviews?
14   A.  I would have traveled to Basel for those
15 discussions.
16   Q.  And with whom did you meet?
17   A.  I don't recall the whole list, but I
18 would have met with six or seven of the members of
19 the Syngenta executive committee.
20   Q.  So did you meet with Mr. Mack?
21   A.  I did meet with Mr. Mack, yes.
22   Q.  Prior to your job as head of -- strike
23 that.
24      Prior to your job as president of Syngenta
25 Crop Protection, Inc., did you have a functional

9  (Pages 30 to 33)

**Exhibit 007 Page 9**
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 283 of 486

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 34

1  reporting relationship with anybody in your preceding
2  job?
3      A. No, I did not. I was directly
4  responsible for delivering the business. The sales
5  and profit was my primary accountability. And
6  customer partnerships.
7      Q. Did you have a functional reporting
8  relationship in any of our jobs at Syngenta Crop
9  Protection, Inc. prior to becoming president?
10     A. When I started with the company in 2000
11 and had the product portfolio management role,
12 probably weren't using the term functional
13 excellence at that point. But certainly I had an
14 obligation in leading the brand group and
15 development group to have conversations with the
16 global team related to what we saw as the best
17 market opportunities.
18     Q. And who were you reporting to?
19         MR. POPE: On the functional basis?
20         MR. TILLERY: Yeah.
21     A. I did not have a functional reporting
22 relationship that was formalized or on a dotted
23 line or structured, if that's your question.
24     Q. Right.
25         Now, in your role of head of NAFTA, what's

Page 35

1  the exact title of your job today?
2      A. The head of NAFTA CP is what we use, CP
3  standing for crop protection internally. When I
4  communicate externally, president Syngenta Crop
5  Protection, Inc. NAFTA.
6      Q. But internally it's head of NAFTA?
7      A. Right. We did that years ago where a lot
8  of the senior leaders we just used the title of
9  head, trying not to overemphasize nomenclature
10 related to titles and levels.
11     Q. What is the management structure in NAFTA
12 today?
13         You're the head of NAFTA. What is the
14 group immediately reporting to you at NAFTA? Explain
15 that to me.
16     A. We would -- we would call that my
17 regional leadership team.
18     Q. Is that what it's called within the
19 organization of NAFTA?
20     A. NAFTA regional leadership team. Most of
21 those people are part of Syngenta Crop Protection,
22 Inc. and report directly to me. There are some key
23 people that have corporate responsibilities, you
24 know, beyond Crop Protection, so --
25     Q. Beyond Crop Protection, Inc.?

Page 36

1      A. Beyond Crop Protection, Inc.
2      Q. Okay. Tell me who those people are.
3      A. The main one that I'm recalling would be
4  the head of our corporate affairs who's based in
5  Washington, D.C.
6      Q. And who is that?
7      A. Jessica Adelman.
8      Q. And she's part of the NAFTA team?
9      A. She's part of the regional leadership
10 team, yes.
11     Q. What is her role at the regional leadership
12 team?
13     A. She is, as I say, manages our Washington,
14 D.C. office. So she participates as a member to
15 exchange insights on what's happening in the
16 Washington, D.C. office and shares her
17 accountabilities where appropriate.
18     Q. Who else besides Jessica Adelman?
19     A. I think I referenced the gentlemen that
20 run Canada and Mexico.
21     Q. Okay. He's on your regional leadership
22 team?
23     A. He is.
24     Q. Okay. And his name again?
25     A. Canada, Jay Bradshaw.

Page 37

1      Q. And who else is on the regional leadership
2  team?
3      A. The -- I'll try to recall all the names
4  for you. All the gentlemen that manage the
5  business units. So there are five of those. There
6  is a person that manages U.S. commercial
7  operations, which is effectively the role that I
8  moved from this role for Syngenta Crop Protection,
9  Inc.
10     Q. Could you tell us who these people are?
11         So you said there are five of those. These
12 are the people who head up the business units.
13         Who are those five people?
14     A. Charles Flippin would be one. And he
15 does the seed care business.
16     Q. Okay.
17     A. Scott Langkamp would be managing the
18 horticulture business. Mike Boden would manage the
19 southern field crop business. Jim Peters who
20 managed the prairie and mountain business unit.
21     Q. Okay. Now, so we're clear --
22         MR. POPE: You want him to finish?
23     Q. Oh, I'm sorry. Were you finished? I'm
24 sorry.
25     A. Tommy Jackson who managed the northern

10  (Pages 34 to 37)

Exhibit 007 Page 10
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 38

1 field crop business.
2    Q.   Okay.
3    A.   And then Corey Huck would be the U.S.
4 commercial operations head that I referenced. Now,
5 there are more -- there are more, but those are the
6 commercial business unit leaders.
7    Q.   Now, when you say the Charles Flippin, is
8 that what you said?
9    A.   That's correct.
10    Q.   Flippin.
11         What is the responsibility that Charles
12 Flippin has for the seed care business in North
13 America?
14    A.   He's responsible predominantly for sales
15 and customer relationships of companies that sell
16 seed care products as well as seed companies that
17 buy seed care products.
18    Q.   For the -- all North American sales?
19    A.   Charles is -- does have a little broader
20 responsibility than some of the other employees.
21 He's predominantly accountable for delivery of U.S.
22 sales, but he does perform a NAFTA strategic role
23 with Canada.  There's not really a lot of sales in
24 Mexico for seed care products.  So he does have
25 relationship with Canada.

Page 39

1    Q.   And what does he do for Canada?
2    A.   He largely exchanges guidance on strategy
3 and takes input on strategy development.
4    Q.   So you're saying he never goes there to
5 help them with actual sales of seeds; is that right?
6    A.   He goes to Canada, yes.
7    Q.   Okay.
8    A.   But he doesn't make customer calls in
9 Canada.
10    Q.   But you're not saying that he doesn't help
11 them with the sales of products in Canada, are you,
12 sir?
13    A.   What I'm saying is Charles makes customer
14 calls in the U.S. as he's accountable for that
15 business. There is a seed care head in Canada that
16 does not report to Charles, he reports to Jay
17 Bradshaw. So Charles will, again, be an advisor
18 where appropriate on information about the market
19 for product line and those kind of things. So that
20 -- it's a strategy relationship.
21    Q.   Does Syngenta Crop Protection, Inc. sell
22 seeds in Canada?
23    A.   I don't know.  I believe all sales are
24 reported through Syngenta Canada Crop Protection,
25 Inc.

Page 40

1    Q.   Okay. So when sales are -- strike that.
2         When sales occur in Canada, they are
3 reported as occurring through the Canadian
4 subsidiary?
5    A.   My understanding is that Syngenta Canada
6 Crop Protection, Inc. would report all sales made
7 to customers in the country of Canada.
8    Q.   Okay. And that would occur irrespective of
9 who made the deal or from where the seeds came?
10    A.   Well, the country is accountable for all
11 sales.  So if you mean irregardless of where in
12 Canada, yes.
13    Q.   But if the seeds came from America, from
14 Syngenta Crop Protection, Inc., for example, were
15 sent to Canada and sold and then attributed to the
16 Syngenta entity in Canada, correct?
17    A.   Well, the -- our supply chain in crop
18 protection and seed care products is a global
19 supply chain.  So where the products were sourced
20 from is a function of supply. You know, the
21 transfer of title of the product, you know, I'm not
22 quite sure how that works.  So it could have from
23 the U.S., it could have come from another country.
24    Q.   How does it work when it takes place with
25 Syngenta Crop Protection, Inc. when you get supplies

Page 41

1 from other Syngenta AG subsidiaries?
2    A.   Well, we would -- supply chain would
3 manage a -- some sort of transfer pricing process,
4 and we then own the inventory and we are
5 accountable for selling that inventory and managing
6 that inventory.
7    Q.   What if it goes directly from a import
8 directly to the customer?
9    A.   I'm not aware of that situation
10 occurring.
11    Q.   You're saying that has never occurred?
12    A.   I don't know to my knowledge.
13    Q.   Who --
14    A.   It's certainly not the -- it's certainly
15 not a common business practice if it has occurred.
16    Q.   Who does Jessica Adelman actually work for?
17    A.   I don't know -- well, the person that she
18 works for, he's -- is in Jonathan Seabrook's group
19 in Basel and Sarah Hull I believe is her direct
20 manager who works in that same team.
21    Q.   At Basel?
22    A.   They're -- Sarah and Jonathan Seabrook
23 would be a functional reporting -- Jessica direct
24 line reports to me.
25    Q.   And Jessica is employed by which Syngenta

11 (Pages 38 to 41)

Exhibit 007 Page 11
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 285 of 486

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 42

1  entity?
2      A.  I'm not sure.
3      Q.  She's not employed by Syngenta Crop
4  Protection, Inc., is she, sir?
5      A.  She's not.  As I mentioned, she has a
6  NAFTA-wide business accountability, which goes
7  beyond crop protection.  Because we do have other
8  business divisions, seeds being, you know, the
9  major one besides crop protection.  So she has some
10 accountability in that business as well.
11     Q.  Does she report to anybody else on the seed
12 side of the business besides you?
13     A.  My understanding is she would have a
14 dotted line with David Morgan, who is the head of
15 the Syngenta seeds for the U.S. business.
16     Q.  And he's in Basel?
17     A.  No, he is in Minnesota.
18     Q.  Okay.  And David Morgan works for whom?
19     A.  I don't know which entity he works for.
20 But he has accountability for North American seeds.
21     Q.  Does he work for Syngenta Crop Protection,
22 Inc.?
23     A.  No, he does not.
24     Q.  He works for another entity in the Syngenta
25 AC umbrella of subsidiaries, doesn't he?

Page 43

1      A.  He's certainly part of the Syngenta
2  group.  I don't know which entity he -- he reports
3  to.
4      Q.  What does Syngenta group mean when you say
5  that?
6      A.  Well, all -- what I mean by the Syngenta
7  group, I'm talking about in broad terms, all the
8  assets, you know, that Syngenta owns.
9      Q.  And what role does he have in NAFTA in
10 terms of seeds?
11     A.  He has a very similar role that I do for
12 the seeds business.  So he would be accountable for
13 U.S. and Canada.  I don't believe he has Mexico,
14 but I'm not positive of that.  But sales in the
15 U.S./Canadian markets and customer relationships in
16 the U.S./Canadian markets.
17     Q.  And his office is in Minnesota?
18     A.  It is.
19     Q.  Where in Minnesota?
20     A.  Minnetonka I believe is the name of the
21 city.
22     Q.  Do you coordinate your activities with Mr.
23 Morgan in terms of NAFTA responsibilities?
24     A.  We don't coordinate our business
25 management activities.  But we certainly do have

Page 44

1  occasional what we call operating committee
2  discussions to make sure that policies related to
3  people or things that should be natural --
4  naturally in common in the company, make sure that
5  we're coordinated.  But it's typically around those
6  sort of items.
7      Q.  Are there any other people with NAFTA roles
8  that you haven't told me about either in seeds or the
9  agrochem business?
10     A.  When you say NAFTA, do you mean --
11     A.  The same way you've used it in the
12 deposition?
13     A.  But there's NAFTA crop protection, there
14 would be NAFTA seeds.
15     Q.  That's what I'm saying both.  Any NAFTA
16 operation of Syngenta.
17     A.  There would be folks that would have
18 accountability for NAFTA, but I couldn't tell you
19 who all those people are.
20     Q.  Okay.  And what do you believe their roles
21 to be?  If you don't know who they are --
22     A.  I can give you an example.
23     Q.  Okay.
24         MR. POPE:  You mean beyond the answers
25 he's already given you about certain people?

Page 45

1          MR. TILLERY:  Right.
2      A.  Right.  So maybe restate the question to
3  make sure that I answer it.
4      Q.  Well, I asked you if there were other
5  people with NAFTA roles for Syngenta, irrespective of
6  which entity they work for that you haven't talked to
7  me about?
8      A.  So, for example, NAFTA development crop
9  protection, Marian Stypa would manage that
10 function.  And so he would have dialogue with
11 Canada around their local development plans,
12 resource needs.  And he would also for Syngenta
13 Crop Protection, Inc. have that same kind of
14 discussion in the U.S.  And he would be
15 accountable for managing the field trials and all
16 of the things we do to test a product in the U.S.
17 for the U.S. market.
18         But much like the discussion we had about
19 seed care, he would have a relationship with the
20 Canadian development manager.  So there's somebody
21 that manages the Canadian development.
22     Q.  Who does Marian Stypa work for?
23     A.  He reports to me.
24     Q.  Okay. Who does he work for?
25     A.  I believe Marian is a Syngenta Crop

12  (Pages 42 to 45)

**Exhibit 007 Page 12**

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 46

1  Protection, Inc. employee.
2      Q.  And that's your best understanding?
3      A.  That's my understanding.
4      Q.  Okay. How long has he been an employee of
5  Syngenta Crop Protection, Inc.?
6      A.  I believe he would have relocated and
7  taken that position about three years ago. He
8  actually was working in Canada prior.
9      Q.  For whom?
10     A.  I don't know the specific -- but the
11 Canadian organization is where he came from.
12     Q.  And he has a direct reporting obligation to
13 you?
14     A.  He does.
15     Q.  Could you tell me who are the people that
16 have direct reporting obligations to you?
17     A.  In the direct line definition that I gave
18 previously, that would be the commercial people
19 I've previously named, the five business unit
20 heads, the head of commercial operations, Mr. Corey
21 Huck, Marian Stypa would report to me. I mentioned
22 Jessica Adelman. And there are a few other
23 functional people that have a dotted line
24 relationship with me because of the functional
25 excellence, which would be the head of our HR.

Page 47

1      Q.  Who's that?
2      A.  Daniel Loria. An he performs a NAFTA
3  role across much like Jessica does, seeds and crop
4  protection in the U.S.
5      Q.  Who does Daniel Loria work for?
6      A.  His direct line relationship would be I
7  believe at the HR head in Basel.
8      Q.  Who's he employed by?
9      A.  Because he serves the North American
10 markets, Syngenta Crop Protection, Inc. is my
11 understanding of who he reports to or what business
12 he's classified under.
13     Q.  Does he have HR responsibilities for Canada
14 and Mexico as well?
15     A.  Daniel's responsibilities would be very
16 much like I described the others. There are heads
17 of HR in Mexico and heads of HR in Canada. But he
18 certainly is accountable to ensure that those
19 strategies are being implemented effectively. In
20 the U.S. he is accountable to manage the team
21 directly in both Syngenta Crop Protection, Inc. --
22     Q.  Are there people in the human resources
23 departments of Mexican and Canadian subsidiaries who
24 report to Daniel?
25     A.  Not to my knowledge. Not that I'm aware

Page 48

1  of.
2      Q.  Okay. Who else is this group that has
3  direct reporting obligation to you?
4      A.  Can you rephrase that?
5      Q.  Yeah.
6          Who are the other people? You were in the
7  process of telling me who that is.
8      A.  Right. Right. I mentioned HR, I
9  mentioned corporate affairs. John Riley in supply
10 chain has a functional relationship to me, so he's
11 on the regional leadership team. And has, again,
12 NAFTA responsibilities.
13     Q.  Who is he employed by?
14     A.  Syngenta Crop Protection, Inc.
15     Q.  Who is his direct reporting obligation to?
16     A.  I'm not sure, but it would be I believe
17 the head of supply chain in Basel. But I'm not
18 sure --
19     Q.  Okay.
20     A.  -- who that person -- which specific
21 person that is.
22     Q.  Okay.
23     A.  So this is where the functional -- and
24 the functional excellence sometimes it was aligned
25 differently.

Page 49

1      Q.  What is functional excellence, just as the
2  term?
3      A.  Right. I explained that earlier to be it
4  makes sense for our company to share best practice
5  for the purposes of efficiency and making sure that
6  where appropriate we have alignment. And so when
7  you're talking about a function, you know, many
8  things are done in a common way, whether in the
9  U.S. or Canada or another country. So it's just
10 looking for those efficiency opportunities to still
11 provide the desired service of the function. So
12 communication and networking are a key part of
13 doing that well.
14     Q.  Have we concluded all the people who have a
15 direct reporting obligation to you?
16     A.  I think I may have left one out, but it's
17 not coming to me right now. But if I think of it,
18 I'll come back and clarify it for you.
19     Q.  How often do you travel to Basel?
20     A.  I travel about every other month, so six
21 to seven trips a year probably on average. This is
22 my first year. But that's what the schedule's been
23 this year.
24     Q.  And how long do you stay there?
25     A.  Usually two days of meetings.

13  (Pages 46 to 49)

Exhibit 007 Page 13
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 50

1    Q.  And those meetings are with whom?
2    A.  They typically are John Atkin's global
3  crop protection leadership team where we exchange
4  information about how the business is performing
5  with the customer, what the customer issues are,
6  opportunities.
7    Q.  Did you have any personal interaction with
8  the global HR department in Basel during the process
9  of becoming president of Syngenta Crop Protection,
10  Inc.?
11    A.  I did not have any directly with the HR
12  department.
13    Q.  Okay. Who actually presented you with your
14  compensation package?
15    A.  John Atkin I believe did. I may have
16  gotten an e-mail from somebody in HR to follow it
17  up. But John would have been the one that extended
18  the offer.
19    Q.  Do you receive stock-based compensation as
20  president of Syngenta Crop Protection, Inc.?
21    A.  I do.
22    Q.  And that's of Syngenta AG stock?
23    A.  I don't believe it is. I have the ADR.
24    Q.  ADR?
25    A.  But I don't know for sure. It's American

Page 51

1  Depository Receipt, what that stands for, which
2  means it's not a Swiss share.
3    Q.  So do you know what stock you're getting,
4  which entity's stock you're getting?
5    A.  I don't.
6    Q.  Okay. It's not Syngenta Crop Protection,
7  Inc., is it?
8    A.  I don't know.
9    Q.  Do you know who owns the shares of stock of
10  Syngenta Crop Protection, Inc.?
11    A.  No, I don't. I don't know.
12    Q.  Do you know who employs John Atkin?
13    A.  I don't know which entity employs him, if
14  that's what you're asking. I know he reports to
15  Mike Mack.
16    Q.  Do you know what his job title is?
17    A.  I believe I do.
18    Q.  What is it?
19    A.  He's COO of crop protection.
20    Q.  Okay.
21    MR. POPE:  Steve, you want to take a
22  break.
23    MR. TILLERY:  No, I'm okay.
24    Q.  What entity is he COO of?
25    A.  I don't know for sure.

Page 52

1    Q.  Is he also a member of the Syngenta Crop
2  Protection, Inc. board?
3    A.  I don't know for sure. But John is on
4  one of the boards that I belong to, and I think it
5  is that particular one. But I'm not sure.
6    Q.  How many boards are you on?
7    A.  I'm on two that have formal decision
8  power. We have the Canadian one I mentioned.
9    Q.  The Canadian company?
10    A.  Right.
11    Q.  And --
12    A.  And Syngenta Crop Protection, Inc.
13    Q.  And Syngenta Crop Protection, Inc.?
14    A.  And most of the other things that we
15  do --
16    Q.  Excuse me, sir.
17    A.  Okay.
18    MR. TILLERY:  Let's go off for just a
19  second.
20    THE VIDEOGRAPHER: Going off the record.
21  The time is 11:06.
22    (A BRIEF RECESS WAS TAKEN.)
23    THE VIDEOGRAPHER: We're back on the
24  record. The time is 11:23 and eight seconds.
25  Please continue.

Page 53

1    Q.  You said you were on the board of a
2  Canadian subsidiary. Who else is on that board with
3  you?
4    A.  I don't recall the full membership.
5  Certainly the legal person in Canada, you know, the
6  head of Canada, finance head of Canada would be on.
7  There are a few others, but I don't recall the full
8  list.
9    Q.  Who owns that Canadian subsidiary?
10    A.  I don't know.
11    Q.  Do you know who's on the board of the
12  Mexican subsidiary?
13    A.  I don't.
14    Q.  Do you know who owns the Mexican
15  subsidiary?
16    A.  No.
17    Q.  Does Syngenta Crop Protection, Inc. own
18  either of them?
19    A.  I don't know.
20    Q.  How often do you have contact with John
21  Atkin?
22    A.  Formally meetings --
23    Q.  In any way.
24    A.  Right. In the meetings, as I said, every
25  other month I'll talk to or exchange e-mails with

14   (Pages 50 to 53)

Exhibit 007 Page 14
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010

Confidential - Pursuant to the Protective Order

Page 54

1 John a few times a month. Certainly there are
2 certain meetings where our communication will be
3 more fluid around preparing for meetings like
4 budget discussions and so forth.
5     Q. When you have meetings of your NAFTA group,
6 your leadership team, how do you conduct those
7 meetings, in person or by telephone?
8         How do you do that?
9     A. I do those in person. We don't meet
10 frequently. Probably three times a year on
11 average. And I would lead those meetings or assign
12 people to lead certain portions of the meetings
13 face-to-face.
14    Q. Are you a member of any global teams or
15 groups?
16    A. I mentioned the global crop protection
17 leadership team. So I am a member of that team,
18 which includes all the regions that report to John
19 Atkin. There is a -- I don't remember the exact
20 name of it, but it's a people development
21 management group for some of our highest potential
22 talents, which I'm a member of.
23    Q. Where does that group meet?
24    A. That meeting is typically couple times a
25 year added onto the CPLT meeting when I'm already

Page 55

1 in Basel.
2     Q. Who leads that group meeting?
3     A. The head of HR and John Atkin I believe
4 co-chair it formally.
5     Q. The global Crop Protection Leadership Team
6 meets in Basel?
7     A. Usually it does, yes.
8     Q. Were you a board member before you became
9 president of Syngenta Crop Protection, Inc.?
10    A. A board member of?
11    Q. Of any board.
12    A. No. We actually did trigger a thought
13 though. The Syngenta corporate board is another
14 board I am on, which is the one that I was
15 explaining Jessica Adelman has broader scope.
16    Q. So you're on the boards of three companies?
17    A. Three boards.
18    Q. Three different boards of three companies?
19    A. I'm not sure there's a company related to
20 the Syngenta corporation board, which is the one
21 that Jessica Adelman is part of. It includes
22 people from seeds, our biotech institute and crop
23 protection. That would be the third one.
24    Q. Did those come automatically when you
25 became president of Syngenta Crop Protection, Inc.?

Page 56

1     A. I'm sure there were some formalities.
2 But yes they came with the position.
3     Q. Who are the members of the Crop Protection
4 Leadership Team?
5     A. Well, the Syngenta Crop Protection, Inc.
6 I think I explained to you the -- the leadership
7 team. People that -- I'm not sure I directly
8 mentioned who's the head of finance. I referenced
9 that. But that person's name is Jason Fogden.
10    Q. You're talking about the Syngenta or NAFTA
11 crop protection team?
12    A. Right. The NAFTA regional --
13    Q. What about the global team called Crop
14 Protection Leadership Team?
15    A. I'm not sure I know the makeup of --
16    Q. Are you on that team?
17    A. I'm only on the Crop Protection
18 Leadership Team.
19    Q. At Syngenta Crop Protection, Inc.?
20    A. No, I mentioned the -- I'm a crop --
21 Syngenta Crop Protection, Inc. employee.
22    Q. Right.
23    A. And John Atkin has the Crop Protection
24 Leadership Team, which I'm a member of.
25    Q. Right. That's what I'm asking about.

Page 57

1     Who's on that team?
2     A. The other region heads for crop
3 protection. So there's one from Asia Pacific, one
4 from Europe, Africa, Middle East, there's one from
5 Latin America and myself. And there are a few
6 other members from the global marketing team, the
7 global development leadership. I believe there's a
8 global supply chain representative and a legal
9 representative that attend the meetings regularly.
10    Q. And these are the meetings you have when
11 you go to Basel?
12    A. When I go to -- for the Crop Protection
13 Leadership Team, yes.
14    Q. And you have these about how many times a
15 year?
16    A. About six to seven based on 2010's
17 experience.
18    Q. Who decides who will be part of that global
19 team?
20    A. I don't know. But I would -- John Atkin
21 chairs the committee.
22    Q. What is your specific role on that team?
23    A. My role is to communicate what's
24 occurring in NAFTA; U.S., Canada and Mexico. We
25 often will discuss where the performance of the

15 (Pages 54 to 57)

Exhibit 007 Page 15

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard  11-9-2010

Confidential - Pursuant to the Protective Order

Page 58

1 business is, what the competitor issues are. So
2 I'm largely educating John and the team about what
3 decisions we're making and why.
4      Q.  Are there minutes of those meetings?
5      A.  There are.
6      Q.  Are there agendas created in advance of the
7 meetings?
8      A.  There are.
9      Q.  Who creates the agenda?
10      A.  John Atkin is the chair.  I'm not sure
11 that he creates them himself.  But he's
12 accountable.
13      Q.  And by whom are the minutes maintained?
14      A.  There is a secretary committee
15 representing legal that issues the minutes for
16 approval.
17      Q.  Out of Basel?
18      A.  She's located in Basel, yes.
19      Q.  Does she work for Mr. Maeder's office?
20      A.  I don't know.
21      Q.  Are they distributed to all the members of
22 the global protection team, leadership team?
23      A.  The -- all the members of the committee,
24 yes, that attend regularly.
25      Q.  Do you discuss budgets at those meetings?

Page 59

1      A.  We don't discuss setting the budgets.  We
2 do discuss how we're performing against budget.
3 This is the time of year when budgets are set.  So
4 we're certainly discussing what would be an
5 appropriate level of performance the company should
6 aspire for.  But the budgets are set between myself
7 and John Atkin, and then we manage all the pricing,
8 customer decisions through Syngenta Crop
9 Protection, Inc.  As you might expect, line item
10 assumptions never are completely accurate.  So our
11 real value is having a connection with the
12 customer, making the right decisions on sales,
13 pricing and volume.
14      Q.  Do you interact with any Syngenta employees
15 in Basel besides Mr. Atkin?
16      A.  I mentioned the members of the Crop
17 Protection Leadership Team, and so I have
18 interaction with other members of that team that
19 are located in Basel.
20      Q.  Anybody else in Basel you interact with?
21      A.  Not on a regular basis.  I did mention
22 the Syngenta corporate board, John Ramsey and
23 Christoph Maeder are on that board.  So that meets
24 once or twice a year usually, via telephone.
25      Q.  Do you interact with any of the Syngenta

Page 60

1 entities in other parts of the world?
2      A.  The only interaction that I typically
3 have would be at the Crop Protection Leadership
4 Team meeting.  Occasionally I will make a visit to
5 Brazil, for example, to understand what
6 developments are occurring.  But that would be once
7 a year at best.
8      Q.  Brazil is not included within your NAFTA
9 jurisdiction, is it?
10      A.  It is not.
11      Q.  Who heads up the Latin America operations
12 for all of the companies?
13      A.  The person that has a like position to
14 mine in Latin America is Antonio Guimaraes.  I
15 don't know what his full scope of accountabilities
16 are --
17      Q.  He reports to somebody in Basel?
18      A.  I don't know.  He is a peer of mine, so
19 he's on John Atkin's team.  But I don't know his
20 actual reporting relationship.
21      Q.  What is the role of Syngenta International
22 AG within the group of Syngenta companies?
23      A.  I don't know.
24      Q.  You attend meetings where Syngenta
25 employees from Basel are present?

Page 61

1      A.  I probably have attended meetings where
2 there are employees from Basel.  But I don't
3 typically -- I can't recall organizing a meeting
4 for Basel employees.  There are a number of folks
5 who visit the site who might come to what we would
6 call a town meeting where I'm giving an update on
7 the state of the business to all our employees.
8 They might be in the audience.
9      Q.  Do the Basel employees come to Syngenta
10 Crop Protection, Inc. in Greensboro for meetings as
11 well?
12      A.  Occasionally they would.
13      Q.  And who would those people be?
14      A.  Well, if I maybe take one example, if
15 that's all right.  I couldn't speak to every
16 situation, but we would have a marketing team
17 meeting, which might be in the U.S., it might be in
18 Basel where the NAFTA marketing employees of
19 Syngenta Crop Protection, Inc. would have a
20 discussion with the people from global marketing
21 around, you know, what opportunities we're pursuing
22 and why.  And that would be one example.  And you
23 might have similar meetings from other functions.
24      Q.  Are these employees that you just mentioned
25 from Basel who come to Greensboro typically employees

16  (Pages 58 to 61)

Exhibit 007 Page 16

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 62

1  of a global business operations role within the
2  Syngenta group of companies?
3     A.  No.  They would be -- typically in the
4  case --
5        MR. POPE:  Let him -- let him finish both
6     his question and his cough before you answer.
7     Q.  Now, start over if you don't mind.
8     A.  So if I reference the marketing example
9  again. Let's say the global marketing group is
10 responsible for strategy development for the globe,
11 and we're accountable for local implementation and
12 execution of strategy.  So that would be the
13 typical interface that global and Syngenta Crop
14 Protection, Inc. would be dialoguing about.
15    Q.  Well, give me an idea of the people who
16 have come in the last three months from Basel in the
17 meetings at Syngenta Crop Protection, Inc.?
18    A.  I wouldn't have visibility of how many
19 have come.  I do know that we would have an annual
20 product line team meeting, which was the example I
21 was referencing.  So a global product manager would
22 be the typical kind of person that would come and
23 engage in that meeting.  Much like the position I
24 explained to you that I had earlier in my career.
25    Q.  What does a global product manager do, the

Page 63

1  same sorts of things you told me before?
2     A.  Develop strategy for the globe, make sure
3  that there's an -- a good understanding of the
4  opportunities so we pursue the right direction.
5     Q.  How many meetings have you attended of the
6  board of Syngenta Crop Protection, Inc. since you've
7  been president of Syngenta Crop Protection, Inc.?
8     A.  I don't recall us having a meeting in
9  person or phone.  We may have had a few decisions
10 via e-mail.
11    Q.  And that would be a unanimous consent that
12 you would have signed?
13    A.  Typically is, yes.  It's only one I
14 recall, actually.
15    Q.  Okay.  Do you know if your predecessor as
16 president of Syngenta Crop Protection, Inc., Mr.
17 Fischer, also sat on the same boards that you
18 currently sit on?
19    A.  I don't know if he sat on all of them.
20 But I know he did sit on some of them.  Because the
21 minutes would have reflected that.
22    Q.  In this meeting or meetings that you said
23 you remember taking unanimous consent at Syngenta
24 Crop Protection, Inc., who proposed the resolutions
25 to you as a board member?

Page 64

1     A.  I don't recall who the resolution came
2  from.
3     Q.  Did it come by e-mail?
4     A.  The one I'm recalling did come by e-mail.
5     Q.  Did you then just print this and sign it?
6     A.  I would have had to have signed it --
7  signed it, the one I'm recalling, yes.  I would
8  have printed it out and probably did have to send a
9  formal copy back.
10    Q.  You're talking about Syngenta Crop
11 Protection, Inc., right?
12    A.  Syngenta Crop Protection, Inc.
13    Q.  Okay. What about the other boards, the two
14 Syngenta Corporation and the Canadian subsidiary,
15 have you had meetings since you've been on the boards
16 of those companies?
17    A.  We have had meetings.  Typically by
18 conference call.
19    Q.  Okay. And are there minutes of those
20 meetings?
21    A.  There are minutes to both boards, yes.
22    Q.  Okay. And who sits on the board of Syngenta
23 Corporation with you?
24    A.  The -- I won't recall the full
25 membership.  But I think I referenced the NAFTA

Page 65

1  leader for seeds, the head of our biotech
2  institute, Jessica Adelman, Cheryl Quain is the
3  legal secretary on the team.  And I mentioned that
4  John Ramsey and Christoph Maeder are on it.  There
5  are a couple other attendees or members.  I don't
6  recall the full set though.
7     Q.  And how many times have you had meetings?
8     A.  I don't recall specifically, but in the
9  order of two to three.
10    Q.  Were those in-person meetings?
11    A.  No, they were not.
12    Q.  They were telephone?
13    A.  Yes.
14    Q.  Do you remember the topics of discussion?
15    A.  Not the full set, no.
16    Q.  Do you remember how long the meetings
17 lasted?
18    A.  They varied.  But less than a half a day.
19    Q.  Okay.  Were board actions taken?
20    A.  They were.
21    Q.  Were they by unanimous consent?
22    A.  Not all of them, I don't believe.  But
23 I'm not sure without going back and reviewing the
24 minutes.
25    Q.  Who writes the memos for the Syngenta

17  (Pages 62 to 65)

Exhibit 007 Page 17
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 66

1 Corporation board resolutions?
2     A.  I'm not sure who writes the memos.
3     Q.  Does Syngenta Crop Protection, Inc. have
4 any subsidiaries?
5     A.  I'm not sure.
6     Q.  If you're not sure, you wouldn't know if
7 they had boards of directors, would you, if you don't
8 know?
9     A.  I mentioned the boards that I'm on.
10     Q.  Okay. But you don't know whether those are
11 owned by Syngenta Crop Protection, Inc. or by whom,
12 do you?
13     A.  I don't --
14     Q.  All right.
15     A.  -- in my role, so.
16     Q.  Are you familiar with the term senior
17 management group as it is used within the Syngenta
18 group of companies?
19     A.  I am familiar with the senior management
20 group term, yes.
21     Q.  What's that mean?
22     A.  The -- I don't know what it means in its
23 entirety. It certainly is a group of employees
24 that would receive different benefits than other --
25 other members of the company.  But I couldn't

Page 67

1 explain the full differentiation to you.
2     Q.  Do you know who the senior management group
3 is?
4     A.  No. I certainly know members of the
5 senior management group, but I couldn't tell you
6 who all is included in it.
7     Q.  Who are the members of the senior
8 management group that you know?
9     A.  I would know my direct reports that are
10 part of the group.
11     Q.  And who's that?
12     A.  I would need to check a list, but the
13 business unit heads that I mentioned previously
14 would be. And I believe the full set of RLT
15 members, regional leadership team members that I
16 mentioned are also SMG level. I need to check, but
17 I think most if not all of my team is SMG.
18     Q.  So it's your understanding that the senior
19 management group term applies to Syngenta Crop
20 Protection, Inc.?
21     A.  Not specifically. But we do have
22 Syngenta Crop Protection, Inc. employees that
23 receive the benefits under the SMG status.
24     Q.  What is the SMG benefit?
25     A.  It tends to be related to incentive

Page 68

1 levels.
2     Q.  Are you a member of the SMG?
3     A.  I am as well, yes.
4     Q.  And you're paid according to a senior
5 management group?
6     A.  As I say, the senior management group is
7 about the levels of incentive and in some cases
8 types of incentives that would be available.  So I
9 would be a member of that group.  And my incentive
10 levels may be the same or different than other
11 members of that team or of that group of people.
12     Q.  Is this senior management group you're
13 identifying now the senior management group for
14 Syngenta Crop Protection, Inc.?
15     A.  The ones that I specifically --
16     Q.  Yes.
17     A.  -- identified, yes.
18     Q.  Are you aware of the senior management
19 group for the entire Syngenta group of companies?
20     A.  I think as I communicated earlier is
21 there are other members with SMG status around the
22 world.  And the SMG is about a level of incentive
23 that are made available to that group of employees,
24 whether it is from Syngenta Crop Protection, Inc.
25 or another part of the world if it was appropriate

Page 69

1 for the employees to earn those incentive
2 opportunities.
3     Q.  And how do these -- these incentive
4 opportunities work?
5     A.  Well, as I discussed previously, it would
6 tend to be options for stock or it would tend to be
7 cash incentive levels related to business
8 performance in the area of accountability.
9     Q.  Who makes these incentives available to
10 members of the senior management group?
11     A.  The -- I don't know where they're paid
12 from. But they're certainly communicated as part
13 of the compensation package that all employees
14 would get in my team. So I would communicate to my
15 direct reports their incentive package, whether
16 they're SMG or whether they're not SMG.
17     Q.  But if these are stock options that are not
18 coming from Syngenta Crop Protection, Inc., who makes
19 that money or those stock options available so that
20 you can provide that to people within Syngenta Crop
21 Protection, Inc.?
22     A.  I don't know, as I say, where they are
23 funded from. But clearly we have a HR policy,
24 which the SMG is one classification of. And that,
25 you know, dictates what is el -- what employees are

18  (Pages 66 to 69)

Exhibit 007 Page 18
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 292 of 486

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 70

1  eligible to earn.
2      Q.  You're talking about a worldwide HR policy
3  for Syngenta employees who are at a senior management
4  group level from different entities around the world?
5      A.  The SMG, as I say, is a level of
6  incentive structure.  And it's not the same in the
7  U.S. as it is in other parts of the world because
8  the compensation system is about competitive pay in
9  the market.  So we call that kind of market pay.
10  So the fact that I would be at a level in the U.S.
11  doesn't mean that the same level of incentives
12  would be offered if I had the same position in
13  another region.
14     Q.  Yeah, that's not what I'm asking you
15  though.  I'm asking who it is within the Syngenta
16  umbrella of companies who provides the actual
17  monetary benefit for these senior management group
18  employees?
19     A.  And I don't know.
20     Q.  You don't know who it is?
21     It's not Syngenta Crop Protection, Inc., is
22  it?
23     A.  I don't know.
24     Q.  Well, you're the president of that company?
25     A.  Right.

Page 71

1      Q.  Do you know that stock options aren't
2  coming out Syngenta Crop Protection, Inc., are they?
3      A.  Well, I mentioned to you that the
4  differentiation, there's the New York Stock
5  Exchange, there's the Swiss exchange.  And the U.S.
6  employees do receive the American depository shares
7  or receipts --
8      Q.  Yeah, but not from Syngenta Crop
9  Protection, Inc.?
10     MR. POPE:  Let him finish.
11     A.  I don't know.
12     Q.  Okay.
13     MR. POPE:  Don't argue with him.
14     A.  So the fact that there are different
15  shares, I don't know how those are funded or
16  provided from a corporate entity standpoint.
17     Q.  Do you know if Syngenta Crop Protection,
18  Inc., the company you work for, is publically traded
19  or not?
20     A.  Under the entity name, I don't know.
21     Q.  So is it your thinking that these shares
22  you may be getting are from Syngenta Crop Protection,
23  Inc.?
24     A.  Well, the -- I do know a little bit about
25  how the American Depository Receipt works.  It's

Page 72

1  just a calculation of the base share in Swiss, and
2  I think it's five to one.
3      Q.  Of Swiss what?
4      A.  Swiss shares.
5      Q.  Of what company?
6      A.  I don't know.  Syngenta.
7      Q.  Syngenta what?
8      A.  I said I don't know which company it is.
9      Q.  Okay.  Is it your belief that what you're
10  getting as a stock option are these other people in
11  the senior management group are getting as a stock
12  option comes from Syngenta Crop Protection, Inc.?
13     A.  I don't know what other people think and
14  -- as I say, I'm not sure of how it's funded.  But
15  clearly it's, as I mentioned, based off of the
16  Swiss exchange before it turns into American
17  Depository Receipt.
18     Q.  Who ultimately approves the compensation
19  packages for senior management group employees?
20     A.  Well, I would approve my direct reports.
21  If I was to hire a new employee, I certainly would
22  consult with John, who probably has a conversation
23  with HR to make sure it's appropriately positioned.
24     Q.  When you say John?
25     A.  John Atkin.

Page 73

1      Q.  Okay.  And when he has -- consults with HR,
2  who are you talking about?
3      A.  The head of global HR is Caroline
4  Luscombe.
5      Q.  Okay.
6      A.  So I don't know if he speaks with her or
7  somebody else.
8      Q.  Do you know if there's another senior
9  management group for the entire Syngenta group of
10  companies?
11     A.  Not that I'm aware of.
12     MR. TILLERY:  Could you give me your
13  stickers, please.
14     Thank you very much.
15     THE COURT REPORTER:  You're welcome.
16  (Plaintiff's Exhibit Number 1: E-mail string
17  with the top from Tobias Meili dated 6/27/08,
18  Bates GRNVL0000085568 - 5572 marked for
19  identification, as of this date.)
20     Q.  I'll hand you what's been marked as Exhibit
21  Number 1.  When we talk about these depositions
22  during -- I'm sorry, these exhibits during the course
23  of the deposition, we'll mark them as a number for
24  your deposition.  This is number one.  But we'll also
25  reference, if you look in the bottom of the exhibit,

19  (Pages 70 to 73)

Exhibit 007 Page 19

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 74

1  a Bates number, okay?  And that way if we're -- as we
2  proceed, we can reference this particular page of the
3  exhibit.
4        So in this case the first page of Exhibit 1
5  is 5568.  That's the last four numbers of that
6  exhibit Bates number.
7        A.  Okay.
8        Q.  Do you understand what I'm saying?
9        A.  I do.
10       Q.  Just so you get the -- now, could you take
11  a look at this exhibit, please.
12        This is a Greenville number, by the way, as
13  opposed to a Syngenta number.
14        Okay?
15       A.  Okay.
16       Q.  This document reflects the delegations of
17  authority with respect to the organization and
18  management of group companies as of June of 2008,
19  doesn't it, sir?
20       A.  That's what it says, yes.
21       Q.  All right.  And the group companies just
22  means the Syngenta AG subsidiaries, doesn't it?
23       A.  Well, it says regulations governing the
24  internal organization of Syngenta AG, so all the
25  components of that.

Page 75

1        Q.  Right.  Correct.
2        And then the table, if you look at the page 69,
3  the second page of the document, table lists the CEO
4  of the Syngenta group of companies as having the
5  authority for recommendation appointment of heads of
6  group companies, doesn't it?
7        A.  Management of group companies
8  recommendation/appointment.  It says the CEO.
9        Q.  CEO.
10       A.  That's what the document says.
11       Q.  Okay. All right.  So the CEO has the
12  authority to recommend or appoint the heads of
13  Syngenta AG subsidiaries, including Syngenta Crop
14  Protection, Inc., correct?
15       A.  That's what the document says.
16       Q.  All right.  And the CEO of Syngenta is Mike
17  Mack, isn't he?
18       A.  It is Mike Mack.
19       Q.  Do you know whether Mike Mack recommended
20  your appointment as president of Syngenta Crop
21  Protection, Inc.?
22       A.  I don't know if Mike recommended me.  But
23  Mike was certainly aware that I was the recommended
24  candidate.
25       Q.  You met with him, didn't you?

Page 76

1        A.  I did.  I spoke to John Atkin first, as I
2  mentioned.  And then Johns asked me to come over
3  and meet with Mike.
4        Q.  Okay.  Come over meaning come over to Basel?
5        A.  To Basel.
6        Q.  And look -- continuing to the look at the
7  table, the table also lists SEC members as having the
8  authority for recommendation appointment of functions
9  one level below the heads of group companies, doesn't
10  it?
11       A.  That's what the document says, yes.
12       Q.  And SEC is what here?
13       A.  The body that I had referenced before
14  that Syngenta executive committee has outlined in
15  the document.
16       Q.  Okay. So SEC members have the authority to
17  recommend or appoint functions one level below you,
18  don't they?
19       A.  That's what the document says, yes.
20       Q.  And you don't have any -- this was a
21  document, I'm going to represent to you, produced to
22  us, if you look at the page in discovery, sent by
23  Tobias Meili to Beth Quarles, and a document that's
24  been marked in other depositions.
25        Do you recommend a name for the people

Page 77

1  directly below you for appointment of a certain in
2  one of these heads of positions that -- in your
3  direct reporting that you've described?
4        MR. POPE:  Is your question does he?
5        MR. TILLERY:  Yes.
6        MR. POPE:  Like on a regular basis?
7        Okay.
8        A.  Absolutely.
9        Q.  You recommend that person?
10       A.  Absolutely.  In the last -- as I took on
11  my new role as head of NAFTA crop protection --
12  Syngenta Crop Protection, Inc. I appointed via
13  recommendation business unit head Tommy Jackson,
14  which I mentioned to you previously, and the U.S.
15  commercial operations head Corey Huck.
16       Q.  And you followed this guideline, didn't
17  you?
18       A.  I spoke with John about who I
19  recommended, yes.
20       Q.  And you spoke to John Atkin?
21       A.  John Atkin, yes.
22       Q.  And John Atkin then approved going forward
23  with those people, didn't he?
24       A.  John did agree to let me proceed with my
25  recommendation.

20  (Pages 74 to 77)

Exhibit 007 Page 20
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 294 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 78

1    Q.  Okay. And have there been any others
2  besides those two since you've been president?
3    A.  Not since I've been president.  But I
4  would say prior to my presidential role, it would
5  have operated in a similar way.
6    Q.  With you?
7    A.  With my peers being appointed.
8    Q.  And the then president of Syngenta Crop
9  Protection, Inc., your immediate predecessor
10  following the same protocol that you have in your
11  hand?
12    MR. POPE:  Objection to form of the
13    question.  I don't think you asked a question.
14    I think you made a statement.
15    Q.  Do you understand me?
16    A.  No.
17    Q.  You said that your peers -- let me see what
18  you said exactly.  Prior to my presidential role it
19  would have operated in a similar way.
20    A.  Right.  So let me explain that.
21    Q.  Well, that's all right.  I'm going to get
22  to -- hold on one second.  We have a little technical
23  issue.
24    MR. POPE:  You're stopping him from
25    explaining his answer?

Page 79

1    MR. TILLERY:  No, I'm -- he's going
2    ahead.  He's not answering my question.
3    A.  I was going -- I was going to try.
4    Q.  Well, here's my question:  My question is,
5  do you know whether or not before you became
6  president this was the manner in which the operations
7  were conducted?
8    A.  The -- before I took on the U.S.
9  commercial operations role, all the business units
10  reported to the president of Syngenta Crop
11  Protection, Inc.  So this is, you know, five years
12  ago.  So at that time I know that a conversation
13  would have been had with John Atkin around who is
14  being proposed to run the business units.
15    Q.  Okay. Did you have contact with John Atkin
16  during that period of time prior to becoming
17  president of Syngenta Crop Protection, Inc.?
18    A.  Related to that recommendation, no.
19    Q.  No, related to anything?
20    A.  Well, I would see John once or twice a
21  year, John Atkin, at a global leadership conference
22  or if John happened to be making a customer visit
23  to understand the marketplace, you know, I would be
24  a host to take him around to all the customers I
25  was accountable for.

Page 80

1    Q.  Who are the people at a function one level
2  below you?
3    A.  Well, each of the members I mentioned on
4  the regional leadership team for NAFTA would have a
5  management team or a leadership team.  So there are
6  a large number of people.
7    Q.  One functional level below you?
8    A.  So --
9    Q.  Or people who function one level below you?
10    A.  Well, if you're talking one level below
11  me, it would be the regional leadership team.
12    Q.  All right.  And how many of those people
13  are there?
14    A.  There's 16 or 17.  I think I went through
15  the names.  I'm not sure I got --
16    Q.  You said you thought you might have one
17  missing.
18    A.  Right.  So 16 or 17 I think is the
19  number.
20    Q.  Okay.
21    A.  We do have a -- I mentioned Beth Quarles,
22  legal, which I'm not sure I said in the first
23  summary.
24    Q.  You didn't mention her before.
25    A.  Okay.  And Eric Kuhn we put on a special

Page 81

1  project a year ago reporting to me, and he leads
2  our triazines management for NAFTA.
3    Q.  Does he function one level below you as
4  head of -- as head of NAFTA?
5    A.  He reports to me, yes.
6    Q.  And who does he -- who is he employed by?
7    A.  Syngenta Crop Protection, Inc.
8    Q.  Okay. So the people you just identified,
9  the 16 people, are they the people, as far as you
10  understand, that are contemplated by this exhibit you
11  have in front of you, page two?
12    MR. POPE:  Objection to form of the
13    question.
14    Q.  When they say functions one level below
15  heads of GCs.
16    MR. POPE:  Objection to the form of the
17    question.  He hasn't said he has any
18    understanding what they mean by this document.
19    A.  John Atkin, as I mentioned, in the case
20  of the commercial folks, I would have a discussion
21  with.  In the case of the functions, I don't know
22  the reporting relationships to say if that same
23  discussion is occurring or should be occurring.
24    Q.  When these people, these two people who you
25  recommended to Mr. Atkin for employment, what were

21  (Pages 78 to 81)

Exhibit 007 Page 21
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 82

1    their names again?
2        A.   Corey Huck.
3        Q.   Corey Huck?
4        A.   And U.S. commercial operations head.
5        Q.   Okay.
6        A.   And Tommy Jackson.
7        Q.   Tommy Jackson?
8        A.   Head of the northern field crops business
9    unit.
10       Q.   What were their jobs before they took those
11   roles?
12       A.   Corey Huck was running one of the
13   business units in northern field crops.  And Tommy
14   Jackson was running the eastern Canadian business.
15       Q.   And their salary when they came in, did it
16   stay the same or increase?
17       A.   It did increase.
18       Q.   And according to the program, that was
19   approved by Mr. Atkin or by HR?
20       A.   I would have worked with local HR,
21   Syngenta Crop Protection, Inc., and we would have
22   sent over a recommended compensation package --
23       Q.   To whom?
24       A.   -- which John Atkin would have looked at.
25       Q.   To -- and who else besides Mr. Atkin?

Page 83

1        A.   I'm not sure.
2        Q.   Okay. And did he come back and approve a
3    salary for these people?
4        A.   He accepted the recommendations, yes.
5        Q.   For both of the people?
6        A.   Yes.
7        Q.   And -- and that salary, after he
8    recommended it, was put in place?
9             I'm sorry, strike that.
10            That salary after he approved it was put in
11   place?
12       A.   The agreed salary was what we offered the
13   employee formally in a letter.
14       Q.   Go to the top chart on the second page of
15   Exhibit 1, please.  That's table 3.1.
16            There it says that the SEC has the approval
17   authority over the main organizational chart of group
18   companies with sales over 150 million, correct?
19       A.   That's what it says, yes.
20       Q.   What does main organizational chart mean?
21       A.   I don't know what main organizational
22   chart means.  I explained to you how it operates in
23   practice.  But I don't know what that term is meant
24   to mean.
25       Q.   For companies with sales below 150 million,

Page 84

1    it says that the executive committee has the approval
2    authority over the main organizational chart,
3    correct?
4        A.   It says the executive committee of
5    division has the authority.
6        Q.   Executive committee of the division?
7        A.   That's what it says.
8        Q.   Does division refer to a business segment?
9        A.   I'm not sure what's referenced by the
10   word division.
11       Q.   Is crop protection a division?
12       A.   I would in my own language consider crop
13   protection division and seed as a division, but I'm
14   not sure what was meant by this document.
15       Q.   Does Syngenta Crop Protection division have
16   its own executive committee apart from the Syngenta
17   executive committee?
18            MR. POPE:  Objection to the form of the
19       question.  There's no such entity as Syngenta
20       Crop Protection.
21       Q.   Can you answer my question?
22       A.   Could you restate the question?
23       Q.   Does Syngenta Crop Protection division have
24   its own executive committee apart from Syngenta
25   executive committee?

Page 85

1            MR. POPE:  Same objection.
2        A.   Not that I'm aware of.
3        Q.   Okay.
4            MR. TILLERY:  We are out of time on our
5        tape.  So we have to go off the record.
6            THE VIDEOGRAPHER:  Stand by.
7            This marks the end of videotape number
8        one, volume one in the deposition of Vern
9        Hawkins.  Going off the record.  The time is
10       12:08:35.
11           (A BRIEF RECESS WAS TAKEN.)
12           THE VIDEOGRAPHER:  This marks the
13       beginning of videotape number two, volume one
14       in the deposition of Vern Hawkins.  The time
15       is 12:56 and 47 seconds.
16           Please continue.
17       Q.   We're still on Exhibit Number 1, Mr.
18   Hawkins.  If you go to the page Bates stamped 5571,
19   which is appendix two.  This table shows the
20   delegation of authority with respect to personnel
21   appointments, doesn't it, sir?
22           Table two specifically addresses the
23       appointments of board of directors of group
24       companies.  Do you see that at the bottom?
25       A.   In table two, yes, that's what it says.

22   (Pages 82 to 85)

Exhibit 007 Page 22
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 86

1    Q. Okay. Table two states that, and I'm
2  quoting, the decision-making authority, in quote,
3  over personnel appointments to the board of directors
4  of the group companies with sales over $150 million
5  rests with the CEO, correct?
6    A. That's what the document says.
7    Q. And the CEO is Mr. Mack?
8      MR. POPE: Let him finish, please.
9    Q. I'm sorry, I interrupted you.
10   Is that correct?
11   A. That's what the document says.
12   Q. And you don't disagree with it, do you?
13   A. I've never seen the document.
14   Q. Do you disagree with the statement of this
15  -- in this document?
16   A. I don't know how accurate the -- or how
17  current the document is. But that's what the
18  document says.
19   Q. Well, if it's not current then, I mean,
20  we've been -- we were given this as a current
21  version, okay? All --
22      MR. POPE: Whoa, whoa, no representations
23    were made that any documents provided to you
24    were current documents.
25   Q. Documents that were provided to us

Page 87

1  represented by -- implicitly that they're accurate
2  documents when they're provided. They're not
3  providing phonied up documents.
4    You don't have any reason to believe this
5  is a phonied up document, do you?
6    A. No, I didn't say that. I was just saying
7  I haven't seen the document and I was just
8  confirming that it says board of directors of group
9  companies.
10   Q. Okay. Do you have any reason to believe
11  this is a phonied up document that you have in front
12  of you?
13   A. No, I do not.
14   Q. That Syngenta's attorneys gave us documents
15  that were fraudulent or phony in any way?
16   A. I didn't --
17   Q. Do you have any belief in that?
18   A. I didn't suggest that they were phony.
19   Q. All right. Okay.
20   A. I'm was just clarifying I haven't seen
21  the document.
22   Q. All right. Then now let's look at this, do
23  you see that Bates number on there, Greenville
24  number? This is stuff given to us in discovery by
25  your attorneys, okay? So I'm not in a position to

Page 88

1  tell you where it came from or anything about it.
2  But I'm asking you because you're the president of
3  Syngenta Crop Protection, Inc.
4      MR. POPE: I'm going to object -- I'm
5    going to move to strike all this
6    colloquialism. This is a document between
7    Tobias Meili and Beth Quarles, who you had a
8    chance to depose and asked them what they knew
9    about it, and instead you're asking this
10   person who claims he's never seen it before
11   and says he doesn't know anything about it and
12   he's trying to do the best he can to answer
13   your question.
14   Q. You're -- you are the president of Syngenta
15  Crop Protection, Inc. right? Right?
16   A. I am the president.
17   Q. All right.
18   A. Now let me finish, please.
19   Q. Oh, but -- no, but my question is --
20      MR. POPE: Let him finish.
21   Q. -- are you president?
22   A. Syngenta Crop Protection, Inc.
23   Q. Yes.
24   A. And the comment I was trying to
25  clarify --

Page 89

1    Q. That's my only question on the table right
2  now.
3    A. I would like to finish clarifying my
4  answer.
5    Q. I don't know what question you're
6  clarifying.
7    A. Well, I'll restate it for you. What I
8  was trying to clarify is I made a comment that I
9  wasn't sure, given the date of the document, how
10  accurate the current delegation of authority were
11  today. But the document does say board of
12  directors on the appendix two, table two of group
13  companies for sales greater than 150 million, that
14  the decision-making authority in the document says
15  CEO. I didn't say the document wasn't accurate.
16  What I asked about was the timeliness of the
17  document.
18   Q. What I'm asking you now is do you believe,
19  looking at this document, that it is the CEO who has
20  decision making authority to appoint the board of
21  directors of group companies with sales over $150
22  million?
23   A. That's what the document says.
24   Q. Okay. Now, who was the CEO in 2008?
25    Who was that person?

23  (Pages 86 to 89)

**Exhibit 007 Page 23**

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 90

1    A. That would have been Mike Mack.
2    Q. And what was he the CEO of?
3    A. I don't know which part of the company,
4  but clearly he is the chief executive officer of
5  Syngenta --
6    Q. Okay. When you say Syngenta, what does that
7  mean?
8        He's the chief executive officer of
9  Syngenta. What does Syngenta mean?
10   A. I don't know which entity he is
11 classified under for chief executive officer. I
12 don't know.
13   Q. When you think of him -- you think of him
14 as the highest ranking official in the Syngenta group
15 of companies, correct?
16   A. Yes, except for the board.
17   Q. Continuing with this same document,
18 decision-making authority over personnel appointments
19 to board -- boards of directors of group companies
20 with sales below 150 million, at least as of July --
21 or sorry, June 27th, 2008, two and a half years ago
22 rested with group general counsel, correct?
23   A. That's what the document says, yes.
24   Q. And that was Christoph Maeder, correct?
25   A. I believe so.

Page 91

1    Q. Which of Syngenta Crop Protection, Inc.
2  subsidiaries have sales over 150 million a year; do
3  you know?
4    A. Please state the question again.
5    Q. Which of Syngenta Crop Protection, Inc.'s
6  subsidiaries have sales over 150 million a year?
7    A. The U.S. does, clearly. The U.S.
8  business.
9    Q. Which U.S. business?
10       MR. POPE: That isn't the question.
11   Listen to his question.
12   A. Please answer -- or ask the question
13 again, please.
14   Q. Which of Syngenta Crop Protection, Inc.'s
15 subsidiaries have sales over 150 million a year?
16   A. I think I mentioned earlier, I didn't
17 know for sure if there was subsidiaries of Syngenta
18 Crop Protection, Inc.
19   Q. Okay. Let's go to 5570 of that same
20 document, sir. And you see under 3.2, institution
21 settlement of legal proceedings?
22   A. I do see that section, yes.
23   Q. And as of June 27th, 2008 this table set
24 out who within the -- within the Syngenta group of
25 companies had the authority over institution or

Page 92

1  settlement of legal proceedings by the Syngenta group
2  companies, didn't it?
3    A. Well, there's a table there that shows
4  different approving corporate bodies for different
5  dollar amounts. So what was your question?
6    Q. Yes, for lawsuits or settlements with an
7  amount and in dispute above 60 million, at that time
8  the approval had to come from the Syngenta AG board,
9  correct?
10   A. Or greater than 60 million, that's what
11 the document says.
12   Q. Okay. For lawsuits or settlements between
13 30 and 60, at that time the approval had to come from
14 the chairman's committee of the Syngenta AG board,
15 correct?
16   A. That's what the document says, yes.
17   Q. For lawsuits or settlements valued between
18 5 million and 30 million, the approval at that time
19 had to come from the Syngenta executive committee,
20 correct?
21   A. That's correct, the Syngenta executive
22 committee for 5 to 30 million.
23   Q. And for those types of lawsuits or
24 settlements which had values of less than 5 million,
25 the approval had to come from group general counsel,

Page 93

1  correct?
2    A. That's what the document says.
3    Q. And that would have been Christoph Maeder
4  at that time?
5    A. I believe so.
6    Q. And he's still group general counsel, isn't
7  he?
8    A. He is currently group counsel, yes.
9    Q. With the exception of possibly higher
10 levels being increased because of the difference
11 between two and a half years and this document, are
12 the levels of authority still the same?
13   A. I don't know.
14   Q. Have you ever tried to file your own
15 lawsuit as president of Syngenta Crop Protection,
16 Inc.?
17   A. No, I haven't.
18   Q. Okay.
19   A. Since January.
20   Q. And have you instituted the defense of a
21 lawsuit?
22   A. I haven't personally, no.
23   Q. Who's done that?
24   A. The -- our legal group may have been
25 involved. I don't know.

24  (Pages 90 to 93)

Exhibit 007 Page 24
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 94

1    Q. Do you know what the source of these
2    various delegations of authority is?
3    A. No, I do not.
4    Q. Do you know if any entity in the Syngenta
5    group of companies delegates authority to Syngenta
6    Crop Protection, Inc.?
7    A. I don't know.
8    Q. Has Syngenta Crop Protection, Inc. ever
9    delegated authority in a manner that was inconsistent
10   with these regulations in Exhibit 1?
11   A. I don't know.
12   Q. Do you know how many -- strike that.
13        Do you know how often Syngenta Crop
14   Protection employees are either temporarily or
15   permanently transferred to work at other Syngenta
16   group companies?
17   A. Can you repeat the question?
18   Q. Yes.
19        Do you know how often Syngenta Crop
20   Protection employees are either temporarily or
21   permanently transferred to work at other Syngenta
22   group companies?
23   A. I don't know. It wouldn't be a common
24   practice in Syngenta Crop Protection, Inc. to be
25   done on a frequent basis.

Page 95

1    Q. Do you have -- do you know one way or
2    another?
3    A. No.
4    Q. Are there people right now who are assuming
5    global responsibilities in roles for the Syngenta
6    group companies who are being paid by Syngenta Crop
7    Protection, Inc.?
8    A. Not to my knowledge.
9    Q. Do you know who Peter Hertl is?
10   A. I know Peter Hertl.
11   Q. Do you know who he's employed by?
12   A. No, I don't.
13   Q. Okay. Do you know what his job title is?
14   A. I know he's in the product safety group.
15   But I don't know his exact title.
16   Q. Did you know that Peter Hertl is the global
17   head of product safety for all of the Syngenta
18   entities?
19   A. He recently changed roles. But I don't
20   know what his current title is.
21   Q. So my question to you is do you know
22   whether Peter Hertl is the global head of product
23   safety for all Syngenta entities?
24   A. No, I do not know for sure.
25   Q. Did you know that Peter Hertl is directly

Page 96

1    employed by Syngenta Crop Protection, Inc.?
2    A. No, I did not.
3    Q. How are global transfers accomplished?
4    A. Can you clarify what you mean by global
5    transfers?
6    Q. Well, for example, with respect to Peter
7    Hertl, were you aware -- strike that.
8        Were you contacted about Peter Hertl's
9    transfer?
10   A. I would not have been personally
11   contacted. I do know that Marian Stypa, NAFTA
12   development head, had awareness.
13   Q. Had what?
14   A. Had awareness of a role change. But I
15   don't know the specifics of it.
16   Q. Okay. So as president of Syngenta Crop
17   Protection, Inc., you did not assign Peter Hertl to a
18   different job, did you?
19   A. As I said, Peter didn't report to me. So
20   I wouldn't have done it personally. But I don't
21   know who was responsible for the employment change.
22   Q. Who did Peter report to?
23   A. I'm not sure if it was Marian or somebody
24   else. But Marian Stypa is the head of development.
25   So I'm not sure without looking at the org chart.

Page 97

1    Q. And where does Marian Stypa work?
2    A. Marian Stypa works in Greensboro, North
3    Carolina, Syngenta Crop Protection, Inc., for me.
4    Q. For you.
5        And your understanding was that Peter Hertl
6    reported to Marian Stypa when you became -- let's
7    just -- let's figure a time we're clear on this
8    line of questions. Let's talk about January 1, 2010.
9    This year, okay? On up to the current time since
10   you've been president.
11        At that time when you came there, what was
12   Peter Hertl's job?
13   A. I don't recall. He's been working in
14   product safety the whole time. I'm just aware he
15   was -- he underwent a role change because I was
16   advised of that by Marian Stypa.
17   Q. And when were you advised that he underwent
18   a role change?
19   A. I don't remember the specific date. But
20   it was this year.
21   Q. And what did you understand the role change
22   to involve?
23   A. I understood a change in responsibilities
24   related to product safety. Many of the product
25   safety activities that Peter did were helpful to

25  (Pages 94 to 97)

Exhibit 007 Page 25
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 98

1  U.S. Crop Protection, Inc., but Peter also, much
2  like the other global teams, did contribute input.
3  So I don't know the scope of his responsibility
4  change.
5      Q.  Did you know the scope of his job before
6  the transfer?
7      A.  Not very well, no.
8      Q.  Did you know who he reported to directly
9  before the transfer?
10     A.  Not with certainty.
11     Q.  Do you know who his functional reporting
12 obligation was to?
13     A.  Not definitively, no.
14     Q.  Did he ever report to you?
15     A.  Peter never reported to me.
16     Q.  Did you ever have a meeting with Peter
17 since you've been president of Syngenta Crop
18 Protection, Inc.?
19     A.  No, I have not related to employment.
20     Q.  When you say related to employment, you
21 mean you may have seen him socially?
22     A.  I would have seen Peter in our facility
23 and had a conversation with Peter.  As I said, I do
24 not know Peter.  But I wouldn't have had a
25 discussion about his role.

Page 99

1      Q.  You wouldn't have had a discussion that
2  involved the business of Syngenta?
3      A.  I would not have had a discussion with
4  Peter involving his role.  I know Peter is part of
5  the Greensboro -- he's located in Greensboro.  And
6  my understanding is he is potentially going to
7  relocate.
8      Q.  Do you know where he's going to relocate?
9      A.  I don't.
10     Q.  Do you know when he's going to relocate?
11     A.  I don't, no.
12     Q.  Would it be safe to say that all of these
13 decisions were undertaken without your knowledge?
14     A.  I was not involved in the decision
15 related to Peter Hertl, that is true.
16     Q.  Since January 1st, 2010, as president of
17 Syngenta Crop Protection, Inc., you weren't even
18 consulted --
19     MR. POPE:  Wait a minute --
20     MR. TILLERY:  Excuse --
21     Q.  You weren't even consulted about Peter
22 Hertl's promotion, were you, sir?
23     MR. POPE:  I have an objection to this
24 line of questioning.
25     MR. TILLERY:  If it's an objection and

Page 100

1  not a speech.
2      MR. POPE:  Well, let me just say this.
3  In all fairness, Steve, you took Mr. Hertl's
4  deposition and you know he's got that new
5  title on January 1st, 2010.  So he wasn't
6  president at the time this happened.  It's an
7  unfair question that way, Steve.
8      MR. TILLERY:  Mike, we're going to have
9  to get an order on this.  Either that or --
10 you can't.  You know better than to do this.
11     MR. POPE:  Yeah, and you know better than
12 to misstate the record as you are.
13     MR. TILLERY:  You know better.  I'm
14 conducting an interrogation and you're not to
15 give speaking objections, and the federal
16 rules provide it.  So you can make an
17 objection or not.  But if you do it this way,
18 we're going to terminate it and we'll get
19 Frazier on the phone or we'll go back and see
20 him.  But we're not going to do it by speaking
21 objections.  That's it.
22     Q.  So let's go back to my question, make sure
23 we're clear.
24     You weren't aware of the fact that Peter
25 Hertl had been promoted when he was, in fact,

Page 101

1  promoted, you were advised by that after the fact by
2  Marian Stypa, weren't you?
3      A.  I was advised probably before it was
4  communicated.  But I don't know when the actual
5  decision was made.
6      Q.  Okay.  Do you know who made the decision?
7      A.  No, I do not.
8      Q.  Were you consulted about the decision?
9      A.  I was -- Marian Stypa briefed me.
10     Q.  Yeah, but were you asked about it or you
11 were just told about it after -- by Marian Stypa?
12     A.  Well, Marian Stypa works in my team.  So
13 Marian would have been consulted, I would not have
14 been.
15     Q.  All right.  And you were not consulted
16 about approving his transfer, were you?
17     A.  Not directly, no.
18     Q.  Okay.  Well, were you consulted indirectly
19 about approving his transfer?
20     A.  It's possible that the documentation that
21 I would receive and report would have had Peter's
22 information in it.  But I didn't have a direct
23 conversation about it.
24     Q.  Do you even know where he's going to work?
25     A.  Not definitively, no.

26  (Pages 98 to 101)

Exhibit 007 Page 26
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard          11-9-2010
Confidential - Pursuant to the Protective Order

Page 102

1    Q. Okay. Do you know -- can you guess?
2    A. I could. But I'm not going to because I
3 don't know.
4    Q. Okay. So you when you say definitively, you
5 don't know is the answer, right?
6    A. Right.
7    Q. Okay. And you don't know what job he's
8 going to have either, do you?
9    A. No, I know he's relocating because he
10 mentioned that when I met with him socially.
11    Q. Right, right.
12    A. But it was a two-minute conversation.
13    Q. But you don't know what his new job
14 responsibility will be either, do you?
15    A. I do not.
16    Q. All right. Have you ever asked for other
17 employees from other Syngenta group companies to be
18 transferred to Syngenta Crop Protection, Inc.?
19    A. I have never asked that, no.
20    Q. Okay. Are you familiar with the
21 international transfer policy?
22    A. Not by that title. I mentioned
23 expatriate assignments earlier in my deposition.
24 So I don't know if that's what you're referring to
25 or not.

Page 103

1    Q. What do you mean when you say expatriate
2 assignment?
3    A. Where a person would be taking on a new
4 position outside of the U.S. for career development
5 purposes or experience sharing.
6    Q. And who approves these transfers?
7    A. I believe it depends on the level. But I
8 don't -- I don't personally approve all of them.
9    Q. In Peter Hertl's case, do you know who
10 approved the transfer?
11    A. I already said, I don't know.
12    Q. Syngenta Crop Protection, Inc. manufactures
13 atrazine, doesn't it, sir?
14    A. We make atrazine, yeah, in the U.S. I'm
15 not sure how the manufacturing is classified.
16    Q. What is atrazine technical?
17    A. I mentioned active ingredient earlier in
18 my deposition, so the technical is the form of the
19 active ingredient that likely would be used to make
20 other atrazine formulations or it's potentially
21 even the product that we would sell to other
22 companies to formulate their own finished products.
23    Q. Which plant does Syngenta Crop Protection
24 use to manufacture technical grade atrazine?
25    A. The facility at St. Gabriel, Louisiana is

Page 104

1 where the manufacturing is done.
2    Q. Does Syngenta Crop Protection own that
3 plant?
4    A. I'm not sure.
5    Q. Is that the only plant in the United States
6 where Syngenta Crop Protection manufactures atrazine?
7    A. It is, yes.
8    Q. Are there other Syngenta companies outside
9 the U.S. that also manufacture atrazine?
10    A. I don't know.
11    Q. What percentage of Syngenta's global
12 atrazine production takes place at St. Gabriel?
13    A. I don't know. But the majority certainly
14 would.
15    Q. Roughly how many atrazine does Syngenta
16 Crop Protection produce annually at St. Gabriel?
17    A. I don't know.
18    Q. Does Syngenta Crop Protection sell atrazine
19 technical directly to customers?
20    A. To some customers, yes. Not all
21 customers.
22    Q. And it also -- Syngenta Crop Protection
23 also creates branded mixtures that contain atrazine
24 along with other active ingredients, correct?
25    A. We do.

Page 105

1    Q. How does Syngenta Crop Protection create
2 branded mixtures that contain atrazine and other
3 active ingredients?
4    A. Can you clarify what you mean by how do
5 we do it?
6    Q. Yeah. I mean, how do you mix them?
7 How is that done?
8    A. Well, it's a technical process. I don't
9 personally know. But we make multiple formulations
10 of products which contain atrazine. And I suspect
11 that they are all done somewhat different depending
12 on the chemical characteristics.
13    Q. How many branded mixtures containing
14 atrazine does Syngenta Crop Protection, Inc.
15 currently sell in the United States?
16    A. I don't know.
17    Q. Does Syngenta Crop Protection, Inc. create
18 branded mixtures containing atrazine that it doesn't
19 sell in the United States?
20    A. I don't know.
21    Q. Do you know what percentage of the atrazine
22 that Syngenta Crop Protection, Inc. manufactures gets
23 sold as atrazine technical versus being included in a
24 branded mixture with other active ingredients?
25    A. No, I don't.

27 (Pages 102 to 105)

Exhibit 007 Page 27

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 106

1      Q.   There are other Syngenta companies outside
2  the U.S. that sell atrazine technical or branded
3  mixtures containing atrazine?
4      A.   There would be other countries selling
5  products containing atrazine.  I don't know what
6  form.
7      Q.   Are they selling some of the product that's
8  manufactured in the United States?
9      A.   I don't know that definitively.  But
10 typically we would ship from an active ingredient
11 plant to other countries.
12     Q.   And when you would ship, are you talking
13 about shipping it from the U.S.?
14     A.   Yes.  Well, it would start from the
15 plant.  I don't know the route.
16     Q.   It would start from the --
17     A.   We would ship it --
18     Q.   -- St. Gabriel plant?
19     A.   Right.  We would ship it from the plant
20 if it was exported.  But whether it -- where it
21 goes on sea or air freight, I don't know.
22     Q.   Is technical grade atrazine fungible?
23     A.   What do you mean by that?
24     Q.   Of a character or having characteristics
25 that makes it indistinguishable from other molecules

Page 107

1  of atrazine?
2      A.   Not necessarily.
3      Q.   Explain that.
4      A.   Well, it's technical.  So the
5  manufacturing processes, I'm not a chemist.  But
6  sometimes you can identify an active ingredient by
7  the process used and sometimes it's quite similar.
8  And I don't know how easy it is to identify.
9      Q.   Where do these other Syngenta entities
10 outside the United States get their technical grade
11 atrazine?
12     A.   I mentioned to you, I'm not sure who
13 receives technical grade atrazine from St. Gabriel
14 plant.  So it may come from St. Gabriel, it may
15 come from another source.  I don't know.
16     Q.   Do the atrazine mixtures have other brand
17 names in other countries?
18     A.   Other names versus --
19     Q.   What you used for Syngenta Crop Protection,
20 Inc. sales in the United States or NAFTA.
21     A.   Yes.  There certainly would be some
22 products that we brand here that are different than
23 products that would have atrazine in them sold in
24 other countries.  It's one of the things that we're
25 -- we do differently, we name the product to serve

Page 108

1  the customer.
2      Q.   Do the other Syngenta companies package the
3  products themselves?  Or if they're using
4  American-produced products, are they packaged here?
5      A.   I don't know.
6      Q.   Besides atrazine, does Syngenta Crop
7  Protection, Inc. also manufacture other active
8  ingredients?
9      A.   It does.
10     Q.   How many?
11     A.   I don't know.
12     Q.   Does Syngenta Crop Protection, Inc.
13 manufacture any proprietary active ingredients that
14 are still under patent protection?
15     A.   We do manufacture some active ingredients
16 that are still under patent protection, yes.
17     Q.   Do you do that in the United States?
18     A.   We have some that we do in the United
19 States.
20     Q.   And how many?
21     A.   I don't know.
22     Q.   Who owns the patents to those proprietary
23 active ingredients?
24     A.   I don't know.
25     Q.   Do you know if Syngenta Crop Protection,

Page 109

1  Inc. is manufacturing active ingredients under
2  license?
3      A.   I don't know for sure.
4      Q.   Does it manufacture any active ingredients
5  where the intellectual property is owned by a non
6  Syngenta entity?
7      A.   I don't know.
8      Q.   Does it have contracts with other Syngenta
9  entities regarding manufacture of active ingredients?
10     A.   Does who have contracts?
11     Q.   Does Syngenta Crop Protection, Inc.?
12     A.   Have contracts with?
13     Q.   Other Syngenta group companies.
14     A.   I don't know if they have contracts or
15 not.
16     Q.   Have you ever seen one?
17     A.   I have not.
18     Q.   So when these transfers are made to other
19 Syngenta group companies for sales of
20 atrazine-containing products outside the United
21 States, are you aware of any contract governing those
22 transfers of product?
23     A.   I mentioned to you earlier that I know
24 we've receive product under a transfer pricing
25 process.  But I don't have a lot of details on it.

28  (Pages 106 to 109)

Exhibit 007 Page 28
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 302 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

### Page 110

1  I would expect it's reciprocal in that regard.
2      Q.  You're talking about a transfer pricing
3  policy?  And you understand that the transfer pricing
4  policy is run through one group in Basel, don't you?
5      A.  I said I don't.  I don't know how it's
6  fully managed.
7      Q.  You're the of Syngenta Crop Protection,
8  Inc.  Would it be safe to say that you don't do
9  transfer pricing policy at Syngenta Crop Protection,
10  Inc. in Greensboro; is that correct?
11      A.  I don't do it personally, no.
12      Q.  Does anybody do it?
13      A.  I don't know.
14      Q.  Okay.  In terms of total numbers, do you
15  know how many active ingredients the Syngenta group
16  of companies have active U.S. patents on them?
17      A.  No, I do not.
18      Q.  Do you know if Syngenta Crop Protection,
19  Inc. owns a single patent?
20      A.  I don't know.
21      Q.  Is Syngenta Crop Protection, Inc. the only
22  company that distributes crop protection products in
23  the United States that contain active ingredients
24  proprietary to Syngenta entities?
25      A.  Repeat that question.

### Page 111

1      Q.  I will.
2          Is Syngenta Crop Protection, Inc. the only
3  company that distributes crop protection products in
4  the United States that contain active ingredients
5  proprietary to Syngenta entities?
6      A.  So Syngenta company, not a third-party
7  company?
8      Q.  Correct.
9      A.  I'm not aware of -- of a Syngenta company
10  selling in the U.S.
11      Q.  Okay.  Is Syngenta Crop Protection, Inc.
12  the exclusive U.S. distributor of Syngenta's
13  proprietary crop protection products?
14      A.  There are I believe a couple examples
15  where other companies would sell our active
16  ingredients.
17      Q.  Who would those companies be?
18      A.  I couldn't give you a full list, but it
19  wouldn't be uncommon for us to sell a product to a
20  competitor for mixture.  So I couldn't tell you the
21  full list of the folks that would be included in
22  that.
23      Q.  Does Syngenta Crop Protection, Inc. have a
24  research and development of active ingredient
25  department?

### Page 112

1      A.  We have a department we call development,
2  and they are responsible for doing the in country
3  U.S. field trials which will include some active
4  ingredient testing.  But often formulation testing
5  is the major part of the work because that's what
6  we sell is a formulated product.
7      Q.  And are they involved in testing molecules
8  that have not yet made it through regulation?
9      A.  Yes, the sort of definition of
10  development would be prior to registration usually.
11      Q.  Are you familiar with the four-step staging
12  process for the development of a new molecule?
13      A.  I'm broadly familiar with it, yes.
14      Q.  Do you know at what stage Syngenta Crop
15  Protection, Inc. becomes involved in testing
16  molecules?
17      A.  I don't, no.
18      Q.  You're aware of the fact, I saw in some of
19  the materials that you were at some point in your
20  history over -- you had oversight over this area,
21  didn't you?
22      A.  That's correct.
23      Q.  All right.  You are aware of the fact that
24  Syngenta Crop Protection, Inc. either has test plots
25  or testing locations in farmer fields in the areas

### Page 113

1  where the product is likely going to be sold?
2      A.  Syngenta Crop Protection, Inc. certainly
3  would have many trials like that.
4      Q.  And that you understand to be done to test
5  the product to see, for one thing, if it's going to
6  have efficacy for that particular purpose?
7      A.  That would be one of many things, yes.
8      Q.  Right.
9          And that would be before the product is
10  actually authorized to be sold?
11      A.  Typically that is the case.  Occasionally
12  you would be looking at a new use for an active
13  ingredient that's approved.
14      Q.  Right.
15          In the typical case where the product has
16  not yet been authorized, at that stage who is
17  directing the development of that product; if you
18  know?
19      A.  I don't know.  It links back probably to
20  the stage process you referenced.
21      Q.  Who at Syngenta is in charge of doing those
22  testings?
23      A.  Well, it's Marian Stypa, as I mentioned
24  previously, who is in charge of development and
25  product safety for Syngenta Crop Protection.  So he

29 (Pages 110 to 113)

Exhibit 007 Page 29

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 114

1 would have a team of people accountable for doing
2 that.
3    Q.  Are all sales of Syngenta Crop Protection
4 products in the U.S. conducted with the involvement
5 of Syngenta Crop Protection, Inc.?
6    A.  To my knowledge, U.S. sales are all
7 managed by Syngenta Crop Protection, Inc.
8 employees.
9    Q.  Now, when these tests are done for the new
10 products that are in one part of the staging process,
11 and it's my understanding that at some point in
12 either stage two, stage -- late stage one or stage
13 two testing could occur, but there could be multiple
14 stages of testing going on simultaneously, okay?
15 I'll just tell you that, that that's something that I
16 learned last week.
17    A.  Okay.
18    Q.  Okay. Now, assuming that's the case, when
19 this is done, as you said, by Marian -- is it Stypa?
20    A.  Stypa, yes.
21    Q.  Stypa. How is the coordination of that
22 molecule being tested?
23        How does that work being done from the
24 people at Jealott's Hill, developing the molecule and
25 the testing being done in the U.S.?

Page 115

1    A.  Well, testing generally requires a
2 protocol. So the protocol, if it's written for
3 efficacy, would be written by the Syngenta Crop
4 Protection team related to the use rates that we
5 believe is registerable for, and the pests that we
6 believe we need to control. So that's one kind of
7 testing.
8        If it's a regulatory test, we would agree
9 -- a residue level, which can be registered, and
10 then that would be still done by the Syngenta Crop
11 Protection team, but it would be clearly done with
12 some foresight of what was registerable.
13    Q.  How do the people who are developing the
14 molecule communicate with the people who are doing
15 the testing?
16    A.  So which people are you referring to?
17    Q.  I'm talking about the -- I'm talking about
18 the Jealott's Hill people developing the molecule.
19 Assuming it's a Jealott's Hill product, okay? And
20 that particular molecule is being devised that could
21 have application for certain types of weeds in corn
22 applications, okay? How is that molecule testing
23 protocol communicated to the people at Syngenta Crop
24 Protection, Inc.?
25    A.  Typically there would be a committee or a

Page 116

1 team that would discuss the opportunities for a
2 given molecule, then the Crop Protection, Inc. team
3 would develop the protocols to deliver the value
4 that that active ingredient or product could
5 provide via confirmation through testing. So a
6 conversation, typically.
7    Q.  And with whom?
8        Who from Jealott's Hill?
9    A.  I don't know who from Jealott's Hill.
10 But clearly you would want somebody that understood
11 the molecule's capabilities before it was handed
12 off.
13    Q.  Do you have any personal knowledge beyond
14 what you've told me?
15    A.  No. As I say, I -- I was involved in an
16 earlier stage in my career. But I don't have any
17 definitive knowledge around molecules that we're
18 developing today.
19    Q.  Do you know where Syngenta's primary
20 research facilities are for new active ingredients?
21    A.  My understanding is the two major ones
22 are Jealott's Hill that you -- which is in the
23 U.K., and Stein, which is in Switzerland.
24    Q.  Are you familiar with Goa?
25    A.  I'm aware of Goa, yes.

Page 117

1    Q.  Do you know what they do?
2    A.  I know they manufacture, but I don't know
3 the full scope of what they do at Goa.
4    Q.  How does the Syngenta group of companies
5 determine who will apply for a patent on a new active
6 ingredient?
7    A.  I don't know.
8    Q.  Have you been to field testing operations
9 yourself?
10    A.  I have. Not in recent years, but I have
11 been, yes.
12    Q.  And you've visited field testing locations
13 in Illinois?
14    A.  Early in my career when I was a sales
15 rep, yes, I did.
16    Q.  Where did you visit those?
17    A.  Well, my sales territory was in west
18 central Illinois. I lived in a little town called
19 Knoxville, which is near Galesburg, so that general
20 area. I would have gone to university trials at
21 Champaign as well.
22    Q.  Okay. Do you know who actually does the
23 field testing today?
24    A.  I don't know who does all the field
25 testing. Most of it we contract out. But we do

30  (Pages 114 to 117)

Exhibit 007 Page 30
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 304 of 486

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 118

1  some of our testing at our Vero Beach, Florida
2  facility.
3      Q.  Do you know if research and development
4  funds for new products are allocated on a global
5  level in the Syngenta group of companies?
6      A.  I don't know where the allocation is
7  done. But certainly there are resources allocated.
8      Q.  Do you know if the field trial work is
9  being paid in part by other Syngenta entities?
10     A.  I don't know.
11     Q.  Do you know if employees from other
12 Syngenta Crop Protection subsidiaries monitor the
13 progress of field testing that's being done in the
14 United States?
15     A.  I don't know.
16     Q.  Do you know if they physically come to the
17 United States to visit field testing?
18     A.  I don't know if they come regularly, but
19 we would have a annual crop tour, which would
20 include people from these product teams that I
21 mentioned previously. So it wouldn't surprise me
22 if there was a global occasionally in those groups.
23     Q.  And what does your annual crop tour
24 involve?
25     A.  It's reviewing the trials.

Page 119

1      Q.  And who comes to that?
2      A.  I don't know. But it's a large group of
3  folks invited from our company and Syngenta Crop
4  Protection, Inc. But as I say, we have product
5  line teams. It would -- an invitation or an
6  awareness certainly would be communicated to others
7  if they wanted to come.
8      Q.  Take a look at Exhibit Number 2.
9          (Plaintiff's Exhibit 2: Syngenta document
10     entitled Summary Notes dated 6/26/09, Bates
11     GRNVL0000080732 - 0737 marked for
12     identification, as of this date.)
13     Q.  And you can take your time to go through
14 it, sir, if you want to just refresh your
15 recollection. I'm sure this is a document something
16 like you've seen before. But go ahead and spend a
17 couple minutes looking at it.
18         I'm actually not going to ask you questions
19 about the core of the document so much. In other
20 words, what they're saying in the context. Just
21 going to ask you about sort of the basics on the
22 front page. But I want you to familiarize yourself
23 with it enough to know what it's involving.
24     A.  Okay. Thank you.
25     Q.  This particular document marked as

Page 120

1      Exhibit 2 has a Greenville Bates number ending in
2  0732, right?
3      A.  Correct.
4      Q.  These appear to be summary notes of a field
5  visit by a number of Syngenta personnel to a testing
6  location in Rend Lake College in Ina, Illinois; is
7  that right?
8      A.  That's what the document says, yes.
9      Q.  All right. And these notes, at least from
10 looking at the top of the document, appear to be
11 those of Ian Zelaya. If I'm pronouncing that
12 correctly.
13     A.  Exactly. You may as good at pronouncing
14 that one as I am. I'm not sure.
15     Q.  Whose letterhead, at least, indicates he's
16 a team leader for weed control biology at Syngenta
17 Limited, correct?
18     A.  That's what the document says.
19     Q.  And that's in the United Kingdom?
20     A.  I don't know.
21     Q.  Okay. Is that a Syngenta company
22 responsible for developing new active ingredients; do
23 you know?
24     A.  I don't know.
25     Q.  There's a long list of individuals who were

Page 121

1  present. He lists those present, partial
2  participation and then copied on this.
3          In the present group there's a individual
4  listed as Michel Albrecht. Do you know who that is?
5  Or Michel Albrecht.
6      A.  Where are you referencing?
7      Q.  On the present invited and present on the
8  front page.
9      A.  I don't -- I don't know that person.
10     Q.  And the CHBSs is what, an abbreviation for
11 Basel?
12     A.  I think it is A Switzerland e-mail
13 descriptor.
14     Q.  Okay. And the next person is Hofer Urs,
15 U-R-S, and that's also a Basel location?
16     A.  That's correct.
17     Q.  And next is at least probably a reverse, so
18 it's probably Jeremy Reynolds is the name?
19     A.  That's what the document says.
20     Q.  And that's also Basel?
21     A.  That's what the document says.
22     Q.  Do you know who that person is?
23     A.  No, I do not.
24     Q.  And then there is Brett Miller from Basel?
25     A.  Yes.

31  (Pages 118 to 121)

Exhibit 007 Page 31
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 122

1      Q.  And then there is -- the next is Mark
2   Spinney from Jealott's Hill; is that right?
3      A.  That's what the document says.
4      Q.  The GHJH would be Jealott's Hill in the
5   U.K.?
6      A.  That's correct.
7      Q.  And then down a ways there's Eric Palmer
8   from USVB.  What does that stand for?
9      A.  I'm not sure what that one stands for.
10     Q.  Okay. And then there's Adrian Longstaff,
11  and that's GHJH, that's Jealott's Hill, right?
12     A.  Correct.
13     Q.  Okay. And then there's Andre
14  B-A-C-H-I-E-G-A, and that's BRSP. What does that
15  stand for?
16     A.  I'm not sure.
17     Q.  And then there's Brian Manley from USRE.
18  What does that stand for?
19     A.  I'm not sure.
20     Q.  And then there's Matthew Sherriff at the
21  bottom from AUSY. What does that stand for?
22     A.  I'm not sure.
23     Q.  All of those different abbreviations are
24  different from the ones you use for Greensboro,
25  aren't they?

Page 123

1      A.  That's correct.
2      Q.  The one you use for Greensboro would be
3   USGR, correct?
4      A.  That's correct.
5      Q.  And you see several of those people
6   indicated on that present list as well?
7      A.  Correct.
8      Q.  Would this be the kind of tour that you
9   were talking about or a different kind of tour?
10     A.  This tour may be similar. And typically
11  what would happen in the U.S., all the local people
12  would also receive in invite. So there would
13  typically be more people at the kind of tour I was
14  talking about.
15     Q.  Than this one?
16     A.  But this could have been the core, the
17  core attendees that were invited formally. Very
18  possible.
19     Q.  And this would last for several days?
20     A.  Typically if it's a corn tour, it would
21  be at least a week.
22     Q.  And looking at this, it looked to me like
23  it lasted from June 22nd to June 29th -- sorry,
24  June 26th.
25     A.  Okay.

Page 124

1      Q.  Is that typical?
2      A.  That would be typical of the example that
3   I -- I was referencing.
4      Q.  And what would they do on a corn tour?
5      A.  Well, the tours that I've attended, you
6   typically are looking at the different trials that
7   were in the protocols and assessing performance
8   against competitive products to gain a better
9   understanding of how the product is working.
10  That's typically what you would do.
11     Q.  Is there at least one of these every year?
12     A.  There is if there isn't a weather event.
13  Probably not for every crop. But for the major
14  crops.
15     Q.  Is there one of these in Illinois every
16  year?
17     A.  I don't know.
18     Q.  You've been to them in Illinois?
19     A.  I don't know if I've been to the formal
20  crop tour in Illinois. But I've certainly been on
21  a crop tour.
22     Q.  Okay.
23         (Plaintiff's Exhibit 3: An e-mail string
24      with the top from Brian Manley dated 3/20/06,
25      Bates SYN03444291 marked for identification,

Page 125

1      as of this date.)
2      Q.  I'll show you what's been marked as
3   Exhibit 3 and ask you to take a look at it. This is
4   an e-mail exchange in March 2006.
5          Okay. Now, this appears to be an e-mail
6   from a -- from a Syngenta employee, I'm going to ask
7   you about that, in Illinois to a Syngenta employee in
8   Basel asking you whether he could alter the protocol
9   on a field trial, correct?
10     A.  That's what the dialogue --
11     Q.  Looks like?
12     A.  -- looks like.
13     Q.  All right. Now, here's what I want to ask
14  you, Joe Bruce lists him as an R&D scientist. Is
15  that research and development?
16     A.  The R&D would stand for research and
17  development.
18     Q.  Do you know Mr. Bruce?
19     A.  I don't know Mr. Bruce.
20     Q.  It says, Syngenta Crop Protection, northern
21  regional technical center.
22         Do you know where that is?
23     A.  I believe this is a facility that we've
24  since closed. But we did used to have a research
25  and development testing site in -- near Champaign,

32  (Pages 122 to 125)

**Exhibit 007 Page 32**
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 126

1  Illinois.
2       Q.  And this is a person who apparently would
3  have worked at that site as a scientist?
4       A.  Either at the site or did the trials on
5  the site.
6       Q.  Okay.  He lists his address at that site?
7       A.  That's correct, he does.
8       Q.  Okay.  Now, what I wanted to ask is look at
9  the -- under his name, Syngenta Crop Protection.  Do
10 you know if he worked for Syngenta Crop Protection,
11 Inc.?
12      A.  At that period of time, I don't know
13 definitively.  But the development employees today
14 that served his role, if he's a field rep, would
15 report to Syngenta Crop Protection, Inc.  But I'm
16 not sure what his scope of responsibilities were.
17      Q.  And the person that he was speaking to is
18 Brian Manley at Basel, correct?
19      A.  In this note, that's correct.
20      Q.  In this e-mail exchange.
21      A.  That's right.
22      Q.  And this Brian Manley appears to be a
23 global technical manager for herbicides?
24      A.  That's what the note says.
25      Q.  And he, Mr. Manley, responds that his

Page 127

1  initial reaction was to say no to this request, but
2  he changed his mind, correct?
3       A.  That's what the document says.
4       Q.  And he gives this Syngenta Crop Protection
5  employee the go ahead to alter the protocol, doesn't
6  he?
7       A.  He gives the consent to make the change
8  recommended by the employee, yes.
9       Q.  Now, the global technical manager for
10 herbicides was associated with which Syngenta entity
11 in Basel?
12      A.  I'm not sure.
13      Q.  Do you know which entity Mr. Manley worked
14 for directly?
15      A.  No, I do not.
16      Q.  Do you know what Mr. Manley's overall
17 global responsibilities were?
18      A.  At that time, I do not, no.  I know he's
19 in a different position now.
20      Q.  What does he do now?
21      A.  I'm not sure.  But I believe he operates
22 out of our Syngenta biotech institute, North
23 Carolina.
24      Q.  Who's he employed by at this time?
25      A.  I'm not sure.

Page 128

1          (Plaintiff's Exhibit 4: An e-mail string
2          with the top from Pat Stiner dated 7/6/06,
3          Bates GRNVL0000042011 - 2012 marked for
4          identification, as of this date.)
5       Q.  Exhibit Number 4 is another e-mail
6  exchange.
7          MR. POPE:  Steve, could we just put on
8  the record the date or the number so that
9  there's something --
10         MR. TILLERY:  Oh, the Bates number?
11         MR. POPE:  Yeah.
12         MR. TILLERY:  Oh, of course.  I'm sorry.
13         MR. POPE:  We're talking about the 206
14 document.
15         MR. TILLERY:  I'm sorry.
16      Q.  And it's my understanding that the -- as
17 typical, the e-mail exchange would start on the last
18 and work its way forward?
19      A.  In our system, that would be correct.
20      Q.  Mine too.
21         And if you look at it, and Mr. Pope is
22 correct, the number on this is Greenville 42011,
23 Greenville 42012.
24         MR. TILLERY:  This just, for the record,
25 while Mr. Hawkins is looking at it, is an

Page 129

1  e-mail exchange between Mr. Derek Cornes and
2  Mr. Pat Steiner with some other people being
3  copied among that e-mail chain.
4       Q.  Do you know who Derek Cornes is?
5       A.  I know the name, yes.  I think it's
6  actually Cornes.
7       Q.  Cornes?  Okay.
8       A.  I think so.
9       Q.  The first e-mail is from Mr. Pat Steiner to
10 a group of people.
11      A.  That's correct.
12      Q.  And that's dated June 23rd, 2006?
13      A.  That's what the document says, yes.
14      Q.  And inviting these people to a day and a
15 half workshop for brand X at July 19th and 20th at
16 the des Moines office, correct?
17      A.  That's what the document says, yes.
18      Q.  The people he invited were -- included Mr.
19 Corey Huck, and he was at Basel, correct?
20      A.  According to this document, he was at
21 that time, yes.
22      Q.  And was he on assignment from Syngenta Crop
23 Protection, Inc. at that time?
24      A.  He would have been, yes.
25      Q.  Okay. And what would his role have been in

                    33  (Pages 126 to 129)

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

## Page 130

1  Basel at that time?
2      A.  I don't know definitively the title, but
3  he would have been in global product management.
4      Q.  Okay. And then there was David Hosking at
5  Basel who was also asked to attend. And do you know
6  what his job was?
7      A.  I don't.
8      Q.  And then Ms. Irina Mocker?
9      A.  I don't know.
10     Q.  Okay. And then there -- then the exchange
11  came back from Derek Cornes, who lists a e-mail
12  address at Basel. Was he at Basel?
13     A.  Mr. Cornes?
14     Q.  Yes.
15     A.  According to this document, his e-mail
16  address would indicate that.
17     Q.  And in the e-mail address he indicates he's
18  been traveling with sales reps in Illinois, correct?
19        MR. POPE: Where are you reading from?
20        MR. TILLERY: The bottom of the first
21     page one, been traveling with sales reps this
22     week visiting growers. Lumax message goes
23     from no problems to needs reformulating
24     urgently.
25     A.  I see that, yes.

## Page 131

1      Q.  And then the last paragraph, in Illinois
2  corn on corn gaining traction. Do you see that?
3        Three farmers I spoke to had, and the whole
4  paragraph he's there in Illinois with the reps,
5  correct?
6      A.  That's what this document says, yes.
7      Q.  And Mr. Cornes worked for which Basel
8  entity at that time in July 2006?
9      A.  I don't know.
10     Q.  Do you know what his job title was?
11     A.  I do not.
12        (Plaintiff's Exhibit 5: An e-mail string
13     with the top from Robert Wurz dated 10/24/01,
14     Bates SYN01791910 marked for identification,
15     as of this date.)
16     Q.  I'll show you what's been marked as
17  Exhibit 5 and ask you to look at that, please.
18     A.  Okay.
19     Q.  Does this appear to be an e-mail where a
20  Syngenta Crop Protection, AG employee is organizing a
21  corn strategy meeting in Greensboro in November 2001?
22        MR. POPE: Could we note that it's
23     Syngenta number 0 --
24        MR. TILLERY: Oh, I'm sorry.
25        MR. POPE: -- 179?

## Page 132

1        MR. TILLERY: Excuse me. Mr. Pope, I'm
2  sorry. I apologize. Syngenta 791910.
3        MR. POPE: 2001, right?
4        MR. TILLERY: Yes, this is -- this
5     exchange is Wednesday, October 24, 2001.
6      A.  Yes, that's what the document appears to
7  be.
8      Q.  And the sender of the e-mail is a Mr.
9  Andreas Nyfeler?
10     A.  Yes, that's what the document says.
11     Q.  Do you know who he is?
12     A.  I've met Andreas, but I can't picture him
13  right now.
14     Q.  Okay. His signature on the e-mail lists him
15  as global products manager. Do you see that?
16     A.  Yes.
17     Q.  And lists him in Basel, Switzerland?
18     A.  Yes, he would have been in Basel at that
19  time.
20     Q.  So he was organizing a strategy meeting
21  creating an agenda and sending it around to different
22  participants who were invited to this meeting,
23  correct?
24     A.  Yeah, this particular meeting, that's
25  what the document says, related to corn strategy

## Page 133

1  and triazine scenarios.
2      Q.  The primary objectives for that meeting, he
3  says shows you what we consider as the primary
4  objective to objective of the workshop.
5        Do you see that reference?
6      A.  Well, the attached agenda it references
7  is not there. But I see the words that you
8  referenced.
9      Q.  And I don't have it either, sir, or I'd
10  give it to you.
11        Judy and myself prepared the attached draft
12  agenda which shows you what we consider as the
13  primary objective of the workshop.
14        Do you see that?
15     A.  That's what the document says, yes.
16     Q.  Now, the people who were invited to this
17  were Norma Glidewell. She's from Syngenta Crop
18  Protection, Inc.?
19     A.  She would have been at that time, yes.
20     Q.  And Alan Camp was?
21     A.  Yes.
22     Q.  And Matt Comer?
23     A.  Matt would have been with Syngenta Crop
24  Protection, Inc. at that time, yes.
25     Q.  Derek Cornes? He was in Basel, wasn't he?

34  (Pages 130 to 133)

Exhibit 007 Page 34
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 134

1    A.  According to his e-mail indicator.
2    Q.  And Judy Garrett was in Basel?
3    A.  That's what the document says.
4    Q.  Vern Hawkins, you were invited, weren't
5    you?
6    A.  I was, yes.
7    Q.  And a Mr. J.R. James was invited, he was
8    from Crop Protection, Inc., right?
9    A.  Syngenta Crop Protection, Inc., yes.
10   Q.  And Mike Johnson from was from Syngenta
11   Crop Protection, Inc.?
12   A.  Yes.
13   Q.  So was Frank Knight and Janis McFarland?
14   A.  Yes.
15   Q.  And Greg Peters was from Crop Protection,
16   Inc.?
17   A.  Yes.
18   Q.  And then Alfred Seiler, who was from Basel,
19   correct?
20   A.  That's what the document says, yes.
21   Q.  And Dino Sozzi was from Basel?
22   A.  Correct.
23   Q.  Okay.  And Andreas Zoschke on the bottom was
24   from Basel, correct?
25   A.  That's what the document says, yes.

Page 135

1    Q.  Did you have this meeting?
2    A.  My recollection -- I don't remember
3    attending the meeting myself.  But I know that
4    there was a meeting on this topic.
5    Q.  And where did they have the meeting?
6    A.  I don't recall.
7    Q.  It says that the meeting's to take place in
8    Greensboro on November 27th.  It was a meeting you
9    didn't attend, as far as you can recollect?
10   A.  I recall the subject.  I don't know if I
11   was at the meeting or not.
12   Q.  Okay.
13   A.  But we certainly would have had
14   conversations about this topic.
15   Q.  Okay.  It's not uncommon for Syngenta's
16   Basel-based employees to organize strategy meetings
17   where Syngenta Crop Protection, Inc. employees are
18   asked to attend, is it?
19   A.  Well, as I mentioned before, we operate a
20   global strategy umbrella with local execution to
21   tailor to local needs.  So in -- for a subject like
22   this, you know, it would not be uncommon for the
23   triazine scenarios to be worked with the U.S. team.
24   Q.  So this sort of thing would not be an
25   uncommon occurrence?

Page 136

1    A.  If the U.S. market was an important part
2    of the decision, Syngenta Crop Protection, Inc.
3    employees would -- would be present.
4    Q.  I'll show you what's been marked as
5    Exhibit 6.
6        (Plaintiff's Exhibit 6: An e-mail string
7        with the top from Dan Campbell dated 10/19/07,
8        Bates SYN012751724 - 726 marked for
9        identification, as of this date.)
10   Q.  Take a look at that, please.  This is Bates
11   rates range Syngenta 51724 through 51726.  And this
12   involves a exchange in October 2007 by e-mail.
13       MR. POPE:  Thank you.
14   A.  Okay.
15   Q.  Okay.
16       If you go to the very last page, which is
17   the first e-mail that is dated I think around
18   August 15th, 2007.  It comes from a person named
19   Willy Maurer.  Do you see that?
20   A.  I do see that, yes.
21   Q.  Do you know who Willy Maurer is?
22   A.  I've met Willy, yes.
23   Q.  Do you know what his job is?
24   A.  He -- he's in global product management,
25   but I don't know what his full job is, no.

Page 137

1    Q.  Does this appear, this first e-mail, to be
2    an e-mail from a Basel employee asking a Syngenta
3    Crop Protection employee, actually two of them, to
4    attend a workshop on the long-term future of
5    atrazine, and the workshop is to be conducted in
6    Basel?
7    A.  It is a request to run a scenario
8    planning workshop for atrazine for long-term future
9    scenarios for the compound.
10   Q.  And Mr. Maurer, Willy Maurer from Basel
11   lists himself as the global product manager for
12   triazines?
13   A.  Where do you see that?
14   Q.  I understand it's coming in the next
15   exhibit.
16   A.  Okay.
17   Q.  But let me just ask you, do you know what
18   his title was at that time?
19   A.  I don't, no.
20   Q.  Okay.  Well, let me ask you to assume that
21   he listed himself at around that time as the global
22   product manager for triazines.
23   A.  Okay.
24   Q.  Okay.  In around August 2007 he decided to
25   run a workshop on the long-term future of atrazine in

35 (Pages 134 to 137)

Exhibit 007 Page 35
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  Basel Switzerland and asked these two men to attend,
2  correct, from this e-mail?
3      A.  Yes, that's what the document says.
4      Q.  Mr. Camp was already going to be in Basel
5  the week before, according to this e-mail?
6      A.  That's what it says, yes.
7      Q.  Do you know who Jan Suter is?
8      A.  It's Jan Suter.
9      Q.  January, I'm sorry?
10     A.  Yeah.
11     Q.  And do you know who he is?
12     A.  I know him, yes.
13     Q.  Doves he work for Syngenta Crop Protection,
14 Inc.?
15     A.  He did not at the time.  And I don't
16 think he does now.
17     Q.  Do you know where he works?
18     A.  Not specifically.  It's in Europe today.
19 Or our Europe, Africa, Middle East region I should
20 say.  He works in that region.
21     Q.  Is it common for Basel employees to ask
22 Syngenta Crop Protection employees to attend
23 workshops in Basel?
24     A.  Well, if it's a strategy planning
25 session, as I mentioned before, global strategy,

**Page 139**

1  local execution, it wouldn't be uncommon to have it
2  there for the sake of easy travel and planning.
3      Q.  How often -- I'm sorry.
4      A.  We would have had some in the U.S. as
5  well on corn herbicides or markets that were
6  important to the U.S.
7      Q.  How often do Syngenta Crop Protection
8  employees travel to Basel for meetings?
9      A.  I don't know.  But we do try to manage
10 the frequency just due to costs.  But I don't know
11 what typical would be.
12     Q.  Do you have to approve those trips?
13     A.  Today I do, yes.
14     Q.  When did it change?
15     A.  My recollection is probably two to three
16 years ago.  So it had been changed prior to me
17 being appointed the president.  But only for a one
18 to two-year period.
19     Q.  Did Mr. Atkin tell you you couldn't travel
20 first class to Basel anymore?
21     A.  No, he did not.
22     Q.  Are you sure about that?
23     A.  I didn't, but he did not tell me that,
24 no.  Fact of it is our whole team doesn't fly
25 business class without my approval.  That was our

**Page 140**

1  decision.
2      Q.  I'll show you what's been marked as
3  Exhibit 7.
4          (Plaintiff's Exhibit 7: A document
5          entitled Review of Triazine Strategy from a
6          Global Perspective March 22, 2005 Greensboro,
7          Bates SYN02781983 - 2726 marked for
8          identification, as of this date.)
9      Q.  This is Bates range Syngenta 81983 through
10 82026.  I mean, this looks to me like some kind of
11 Power Point presentation that was given to us or some
12 kind of a presentation by Mr. Maurer in Greensboro on
13 March 22, 2005.  He lists himself as global product
14 manager for triazines in Basel.
15         Do you see that on the front page?
16     A.  I do see that, yes.
17     Q.  All right.  Who are the global product
18 leaders or global product managers within Syngenta's
19 worldwide crop protection business?
20         Do you know who those people are?
21     A.  I would know some of them, but I don't
22 know all of them, no.
23     Q.  Do you know who they're employed by?
24     A.  No, I don't.
25     Q.  Are they all located in Basel?

**Page 141**

1      A.  I believe they are, but I don't know that
2  definitively.
3      Q.  Who are the ones you know?
4      A.  Michael Stepan would be one of the senior
5  gentlemen.  And then Mark Bidwell is another global
6  product manager.  I believe Willy Maurer is still
7  there doing some role in global product management.
8  There would be a few that I can recall.  But there
9  are -- there are many more.
10     Q.  And are there regional product managers for
11 NAFTA as well?
12     A.  Not to my knowledge.
13     Q.  What about U.S. product managers?
14     A.  Not to my knowledge.  Not in Basel.  We
15 have those clearly in Greensboro.
16     Q.  Right.
17     A.  And those are Syngenta Crop Protection,
18 Inc. employees.  They all report to Travis
19 Dickinson, who is the head of marketing.  Reports
20 to me.
21     Q.  Now, this is a sort of a global product
22 strategy meeting on triazines, wasn't it?
23         Did you attend this, by the way?
24     A.  I don't recall attending this, no.
25     Q.  Who would Mr. Maurer -- by looking at the

36  (Pages 138 to 141)

Exhibit 007 Page 36
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

### Page 142

1   document, if you can tell, one way or another, who he
2   would have been likely presenting this to?
3          MR. POPE:  Objection to the form of the
4      question.
5      Q.  Can you tell?
6      A.  No, I can't tell by looking at the
7   document.
8      Q.  Yeah, but I include with that your
9   understanding of how the operation works when a
10  Syngenta, AG employee comes from Basel to talk to a
11  group of Syngenta Crop Protection employees on a
12  review of triazine strategy from a global
13  perspective?
14         MR. POPE:  In 2005?
15         MR. TILLERY:  In 2005.
16     Q.  Do you know who he might have been talking
17  to?
18         MR. POPE:  Objection to form of the
19     question.  Go ahead.
20     A.  I mean, I certainly could envision who a
21  couple of the people might be.  But I couldn't give
22  you a whole attendee set.  It likely would have
23  been the product line teams that I referenced
24  earlier.
25     Q.  Okay.  Would you look at page two of that

### Page 143

1   document. That's Syngenta 81984.
2      Do you know what these figures represent?
3      A.  The document, it says they represent the
4   variance between 2005 and 2004 for major countries.
5   Doesn't say if it's sales for atrazine or
6   terbuthylazine.  But it probably is sales.
7      Q.  And what are those numbers?
8          MR. POPE:  Help him with the spelling of
9      that.
10         THE WITNESS:  T-E-R-B-U-T-H-Y-L-A-Z-I-N-E.
11     Q.  What do these numbers reflect, sir, on page
12  two of Exhibit 7?
13         MR. POPE:  Objection to the form of the
14     question.
15     A.  I think I -- he doesn't say whether
16  they're sales.  But that's what -- and I don't know
17  what currency it's in.
18     Q.  You don't know what currency it's in?
19     A.  Well, not according to this chart I
20  don't.  Unless you see it on there and I don't.
21     Q.  I don't, sir.  This -- I actually was --
22  this is not a question that I think I know the answer
23  to.  I was really looking to find out something from
24  you.
25         MR. POPE:  And Mike doesn't either.

### Page 144

1          MR. TILLERY:  No.  And the smart kids
2      don't know it either, so.
3      Q.  I was just --
4          MR. POPE:  We're all in this together
5      then.
6          MR. TILLERY:  Yeah.
7      A.  I mean, it looks like sales to me.  But I
8   can't tell you the currency.
9      Q.  And we don't know what currency.
10         So we're in the U.S., maybe they were using
11  U.S. currency for the meeting?
12     A.  Possibly.
13     Q.  Okay.  But that 17.5 number in the U.S.A.
14  versus year to date in a meeting conducted in March
15  or February says 17.7.
16     Q.  Do you know if those -- what those numbers
17  reflect?
18     A.  No, I don't.
19     Q.  Okay.  Take a look at the next page.
20         At the top of it it gives a year to date
21  variance versus budget.  Do you see that?
22     A.  Yes, I do.
23     Q.  Now, do you know what budget that would
24  have been referencing?
25     A.  Well, according to the document, it's

### Page 145

1   2005.
2      Q.  Yes, but do you know which -- which 2005
3   budget they're talking about?
4      A.  It looks like for atrazine and
5   terbuthylazine.
6      Q.  All right.  Did Syngenta Crop Protection,
7   AG set budgets for atrazine on a global level?
8      A.  I don't know what happened in 2005, but I
9   can sort of explain how it works in practice.
10     Q.  Today?
11     A.  Today.  And very similarly when I was in
12  the marketing group previously, is we would agree a
13  budget for the U.S. or NAFTA region based on some
14  dialogue.  There would be assumptions by product.
15  But performance would be delivered in total.
16  That's what the obligation is in terms of how we're
17  measured.  But we would start with a plan by active
18  ingredient.
19     Q.  Based on the preceding year's performance
20  as an expected performance as costs?
21     A.  As one input, history would be one input,
22  future opportunity of the markets in the next year,
23  competitive products, all those things would be
24  factors that we would provide input on.
25     Q.  And who do you submit those budgets to?

37  (Pages 142 to 145)

Exhibit 007 Page 37

7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 146

1    A.  I would have a budget review discussion
2   as the president and in my role today with John
3   Atkin.
4    Q.  And what about marketing budgets, how is
5   that done?
6    A.  I would set the marketing budgets for
7   Syngenta Crop Protection, Inc.  Occasionally there
8   would be a strategic project that we would be given
9   mid year funding on that wasn't in the budget, but
10  -- or we would be a given a concession to exceed
11  our planned spend.
12   Q.  Is the marketing budget subsumed within the
13  overall budget?
14   A.  In terms of how we're measured at the
15  U.S. Syngenta Crop Protection, Inc., yes, but it is
16  line item as marketing expense.
17   Q.  Is there any person besides Mr. Atkin you
18  go to with your budget proposals?
19   A.  Not typically.
20   Q.  Okay.  Have you done that as president yet?
21  Are you doing it right now?
22   A.  I'm doing it right now.
23   Q.  Have you submitted your budget to him this
24  month?
25   A.  We have talked about a first draft and a

Page 147

1   second draft.
2    Q.  Turn to page seven of that document.  Well,
3   let's --
4    A.  If you don't mind, give me a few minutes
5   just to sort of get the full context of the
6   document.
7    Q.  Of course.  Of course, sir.
8        MR. TILLERY: While he's looking at this,
9    I want the record to reflect that I have not
10   coughed for five minutes.
11       MR. POPE: While he's reading.
12   I think you have turned up the heat in
13   here.
14   A.  Okay.  Page seven?
15   Q.  Page seven, sir.
16       Could you read the first bullet for me on
17  the record.
18   A.  We need atrazine to secure our position
19  in the corn marketplace.  Without atrazine we
20  cannot defend and grow our business in the USA.
21  That's what the first bullet says.
22   Q.  What business do you think Willy Maurer was
23  referring to when he said our business?
24       MR. POPE: Objection to the form of the
25  question.

Page 148

1    A.  I don't know.
2    Q.  Is he talking about Syngenta group of
3   companies crop protection business?
4        MR. POPE: Objection to the form of the
5    question.
6    A.  I would certainly read it when it says
7   defending grow our business in the U.S.A. because
8   all sales are reported from Syngenta Crop
9   Protection, Inc., look at it that way.
10   Q.  He's talking about our business in the
11  U.S.A., right?
12   A.  That's what the document says.
13   Q.  Okay. Is it fair to say that Syngenta Crop
14  Protection, Inc. represents Syngenta's crop
15  protection business in the United States?
16       MR. POPE: Objection to the form of the
17  question.
18   A.  It represents Syngenta's crop protection
19  business only.  There are other U.S. sales not in
20  Syngenta Crop Protection, Inc.
21   Q.  Yeah, but for the sales they do, it
22  represents Syngenta's crop protection business?
23   A.  For the sales who does?
24   Q.  The sales Syngenta Crop Protection, Inc.
25  does.

Page 149

1        MR. POPE: Same objection.
2    A.  Repeat the question, please.
3    Q.  Is it fair to say that Syngenta Crop
4   Protection, Inc. represents Syngenta's crop
5   protection business in the United States?
6    A.  For the most part I believe that to be
7   true, yes.
8    Q.  Okay. Now can you read the third bullet
9   there?
10   A.  Atrazine, turbuthylazine are critical
11  mixing partners for our high value corn brands and
12  corn strategy is what bullet three says.
13   Q.  Are the brand trademarks that appear in the
14  top right-hand corner of that page corn herbicide
15  products?
16   A.  I recognize two of them, yes.  But I
17  don't know about all six --
18   Q.  Which two do you recognize?
19   A.  Lumax and Lexar, which are the brand of
20  products sold by Syngenta Crop Protection, Inc.
21   Q.  Gardo Gold and Polaris you don't recognize?
22   A.  I don't recognize them certainly as U.S.
23  Syngenta Crop Protection, Inc. brands.
24   Q.  Could they be -- I'm sorry, I interrupted.
25  Were you finished, sir?

38  (Pages 146 to 149)

Exhibit 007 Page 38
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 150

1    A.  Yes.
2    Q.  Okay.  Could they be products that are sold
3  by other Syngenta entities around the world?
4    A.  They could be, yes.
5    Q.  When Willy Maurer mentions our high value
6  corn brands, is he talking about Syngenta's high
7  value corn brands, not just Syngenta Crop Protection,
8  Inc.'s?
9         MR. POPE:  Objection to the form of the
10  question.
11    A.  I don't know what his intent would have
12  been.
13    Q.  Well, let's look at the next bullet.
14  55 percent of the sales of Syngenta's lead active
15  ingredient mesotrione will depend on triazines in
16  2009.
17         Okay?  Do you see that?
18    A.  I do see that, yes.
19    Q.  Okay.  What are the total $340 million he's
20  referring to?  Is that U.S. sales or global sales?
21         MR. POPE:  Objection to the form of the
22  question.
23    A.  I don't know without looking.
24    Q.  So when he says 188 million out of 340
25  million, what are those two numbers referencing?

Page 151

1         MR. POPE:  Objection to the form of the
2  question.
3    A.  I don't know off the top of my head.
4    Q.  You think those might be U.S. sales only?
5    A.  I don't know.
6    Q.  Okay.  Does it appear to be that the 55
7  percent is a -- represents the $188 million in U.S.
8  of the 340 million global?
9         MR. POPE:  Objection to the form of the
10  question.
11    A.  Read it again here.
12         It would -- it would imply that according
13  to this document.
14    Q.  Do you know what the sales of all products
15  containing atrazine in the United States are for
16  Syngenta Crop Protection, Inc.?
17    A.  Today?
18    Q.  Yeah. Yes.
19    A.  Not definitively, I don't.
20    Q.  What would they be in 2009?
21    A.  If you count mixtures, certainly would
22  have expected them to be north of -- of 300
23  million.  But I don't know the exact number.
24    Q.  Look at the next page where entitled that
25  Syngenta 81990, Syngenta sales forecast, SYMPACT

Page 152

1  final cut 2004.  Do you see that?
2    A.  I do, yes.
3    Q.  And the graph includes sales 2002 through
4  2009 projected.  Those are forecasts.
5         Those are global sales or are they just
6  U.S. sales?
7         MR. POPE:  Objection to the form of the
8  question.
9    A.  I don't know without researching it.
10    Q.  If you go -- what does SYMPACT mean there?
11    A.  SYMPACT is an internal planning tool
12  which is how we develop plans which frame the
13  budget discussion.  So every market segment, every
14  proposed price, every volume and the competitor
15  analysis is done through that tool.
16    Q.  Is it a global planning tool?
17    A.  It's a regional and a global planning
18  tool.  So we would create a regional plan and then
19  it's formatted in a similar structure such that it
20  can be aggregated by the global team when they want
21  to.
22    Q.  Do Syngenta companies that do proposed
23  budgets, anyone that does this proposed budget like
24  Syngenta Crop Protection, Inc., do they have access
25  to SYMPACT?

Page 153

1    A.  Somebody in the company would.  But I
2  personally don't have access to SYMPACT.
3    Q.  But somebody that works for you and reports
4  to you has it?
5    A.  Yeah, we load the plan in the system and
6  Syngenta Crop Protection, Inc., yes.  And create
7  our regional view, which we then have a business
8  discussion at the NAFTA regional leadership team
9  level before proposing a final plan for budget
10  discussion and/or future opportunity.
11    Q.  Is it part of when you make these
12  contributions to it, a -- an evolving global document
13  that is constantly updated?
14    A.  No.  It's one-time a year process.  So we
15  do it typically in -- completed in August.  So
16  we've just finished that process.
17    Q.  Okay.  If you go to Syngenta 81992.  And
18  this slide is entitled key strategic elements.  The
19  first bullet, if you'd read that, please.
20    A.  Defend atrazine to make it sustainable
21  outside Europe.  Preserve regulatory position via
22  vigorous stewardship is what the first bullet says.
23    Q.  What does that mean to you?
24         MR. POPE:  Objection to the form of the
25  question.

39  (Pages 150 to 153)

Exhibit 007 Page 39
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 154

1   A.  What it means to me that we want to
2   protect the registration of atrazine for use not
3   just in the U.S., but outside the U.S. as well,
4   Europe specifically.
5   Q.  And the limitation outside Europe refers to
6   the fact that atrazine could not be sold in western
7   Europe, the EU?
8   A.  Say that again, please.
9   Q.  And that limitation where he says, outside
10  Europe, refers to the fact that atrazine couldn't be
11  sold in the EU, correct?
12      MR. POPE:  Object to the form of the
13      question.
14  A.  I don't know.  It may not.  Because I
15  don't think every EU country cells atrazine.  So I
16  don't know.
17  Q.  You said you don't think every EU country
18  cells atrazine?
19  A.  I don't think so, but.
20  Q.  Which EU country sells it?
21  A.  I know one that does.
22  Q.  Which one?
23  A.  There's more than one.  But France, Italy
24  at this time.
25  Q.  At which time?

Page 155

1   A.  This is a 2004, 2005 document, right?
2   Q.  Okay. Do they sell it now?
3   A.  They do not now.
4   Q.  Okay.
5   A.  They sell terbuthylazine.
6   Q.  Okay.
7   A.  It's a better fit for the marketplace.
8       MR. TILLERY:  We're out of tape.  So we
9   have to shut down at this point.
10      THE VIDEOGRAPHER:  Stand by.  This marks
11  the end of videotape number two, volume one in
12  the deposition of Vern Hawkins.  Going off the
13  record.  The time is 2:41:53.
14      (A BRIEF RECESS WAS TAKEN.)
15      THE VIDEOGRAPHER:  This marks the
16  beginning of videotape number three, volume
17  one in the deposition of Vern Hawkins.  The
18  time is 2:56 and 35 seconds.
19      Please continue.
20  Q.  We were discussing Plaintiff's Exhibit
21  Number 7, page ten.  And I think you have that in
22  front of you.  That's Bates SYN 81992.
23  A.  I do have it.
24  Q.  Go to the third bullet and read that one,
25  please.

Page 156

1   A.  Reduced production cost at St. Gabriel
2   through cost saving project and redesign supply
3   chain elements to guarantee a cost effective
4   atrazine source is what bullet three says.
5   Q.  What cost saving project does this bullet
6   refer to?
7       MR. POPE:  Objection to the form of the
8       question.
9   Q.  If you can tell.
10  A.  To me, it's referencing the costs to make
11  atrazine.
12  Q.  Okay. And then it says the redesign of
13  supply chain elements. With your knowledge of
14  Syngenta vernacular, what would that mean?
15      MR. POPE:  Objection to the form of the
16      question.
17  A.  Well, it could mean in the term supply
18  chain, as I know it, it could mean anything related to
19  where the product's sourced, how it's moved, how
20  it's made from a processing standpoint, raw
21  material purchasing.
22  Q.  To guarantee a cost effective atrazine
23  source.
24      Okay.  So does Syngenta have a global
25  supply chain function?

Page 157

1   A.  There are global supply chain person --
2   or people that are accountable for managing the
3   supply chain globally, yes.  How they're
4   structured, I'm not sure.
5   Q.  Their structure effects the production of
6   atrazine at the St. Gabriel plant, doesn't it?
7   A.  The plant is managed by St. Gabriel per
8   employees.
9   Q.  Right.
10  A.  What I don't know is how they manage the
11  export versus the domestic supply.
12  Q.  And their production needs, they're told
13  how much to produce, aren't they?
14  A.  Well, I mentioned the -- we have a
15  forecasting process called SYMPACT.  We also have a
16  -- a monthly process where we forecast demand for
17  markets.  And Syngenta Crop Protection, Inc. would
18  forecast demand for our market just as other people
19  would for their markets.
20  Q.  What is that called?
21  A.  It's the S&OP, sales and operations
22  planning.
23  Q.  S&OP?
24  A.  Right.
25  Q.  Is that another software system?

40  (Pages 154 to 157)

Exhibit 007 Page 40
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG-PMF   Document 335   Filed 12/26/12   Page 41 of 60   Page ID
#12961
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 314 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 158

1    A.  No.  It is a process.  There is software,
2  clearly, that we use to operate the process.  But
3  that is a process.
4    Q.  The key elements of atrazine, are those
5  ingredients sourced globally for the St. Gabriel
6  plant?
7    A.  I don't know.
8    Q.  Is that done through a global supply
9  function?
10    A.  I don't know because I'm not sure they
11  source -- how they source raw materials for that
12  plant.
13    Q.  Look at the last bullet and read that one,
14  please.
15    A.  Focus marketing efforts on mixtures to
16  maximize sales and profit of new brands to
17  compensate for the low profit of atrazine tech is
18  what the last bullet says.
19    Q.  This was the marketing approach that the
20  global product leadership in Basel thought was best
21  to maximize global profit on atrazine, wasn't it?
22    MR. POPE:  Objection to the form of the
23    question.
24    A.  That -- that's what this bullet point
25  reads on the slide.  What it's full intent was and

Page 159

1  where it was derived from is not clear.
2    Q.  The front page tells where it's derived
3  from, doesn't it?
4    A.  The front page tells who presented the
5  presentation.
6    Q.  And he presents himself as Willy Maurer,
7  global product manager for triazines in Basel,
8  correct?
9    A.  That's what the slide says.
10    Q.  And he's still with the company?
11    A.  To my knowledge, he is.
12    Q.  Does he have the same role?
13    A.  I don't know.
14    Q.  Go to the next slide, page 11 of the
15  presentation, Syngenta 278193.
16    I'm sorry, 2781993.
17    And this says, for the record, we reduced
18  the supply price of atrazine tech to recuperate
19  market share from the generics and regain volumes.
20  Two, the increase of volumes and other triazine
21  redesign activities allows the substantial reduction
22  of the production costs of atrazine.  Three, we
23  maintain, increase the selling price of our new
24  products to maximize the growth -- gross profit of
25  the mixtures.

Page 160

1    MR. POPE:  Of our new brands.
2    Q.  Sorry, of our new brands to maximize the
3  gross profit of the mixtures.  And four, the loss of
4  gross profit on atrazine tech is compensated by the
5  increase of gross profit on the mixtures.
6    Do you understand what's being said there?
7    MR. POPE:  Objection to the form of the
8    question.
9    A.  I understand the dialogue is largely
10  around capacity utilization, volume of sales versus
11  price.  So a price volume trade off.
12    Q.  Was that strategy implemented?
13    A.  I don't know if it was.  What I can tell
14  you is today the atrazine business is in a lot
15  different place financially than where it was at
16  this time.
17    Q.  We'll talk about that.
18    But can you tell me whether or not when you
19  had other jobs at this time period, which would have
20  been March of 2005, were you in a position to know
21  whether or not this strategy was utilized?
22    A.  I knew that the strategy was being
23  considered due to a reregistration approval in
24  2006.  I'm not sure if the strategy was
25  implemented.

Page 161

1    Q.  And this strategy was presented by Willy
2  Maurer from Basel, the global product manager for
3  triazines, correct?
4    A.  That's what the slide deck says.
5    Q.  And the next page, Syngenta 1994, says
6  global commercial triazine strategy.  Like a puzzle,
7  some pieces in place, others still missing.
8    Do you see that?
9    A.  I do see that, yes.
10    Q.  And the pieces that are in place, Syngenta
11  is committed to preserve regulatory position on
12  atrazine.
13    Do you see that?
14    A.  I do see that, yes.
15    Q.  Was that a reference to the global Syngenta
16  organization?
17    MR. POPE:  Objection to the form of the
18    question.
19    A.  I don't know what reference that is based
20  on the wording.
21    Q.  Was atrazine undergoing a review by the EPA
22  in 2005?
23    A.  It was, yes.
24    Q.  Could you please read the second item under
25  pieces in place?

41 (Pages 158 to 161)

Exhibit 007 Page 41
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 162

1    A. New ready mixtures containing meso and/or
2    S-MOC plus triazines are introduced.
3        Q. Do you know what that reference is?
4        A. I don't know definitively, but what it
5    probably refers to is the introduction of mixture
6    products in the marketplace.
7        Q. Was that about the time they were
8    introduced?
9        A. I don't recall specifically. But it's --
10   it's close to that time.
11       Q. And what was your job in March of 2005?
12       A. I would have been either just taking on
13   the U.S. commercial operations role or just
14   finishing up my horticulture business unit
15   management role, depending on what time in 2005.
16       Q. Where were those -- strike that.
17           Where were the mixtures developed?
18       A. In what -- what regard, in terms of
19   product concepts or formulated?
20       Q. Look at item three under pieces in place.
21       A. Mixes of glyphosate plus atrazine are
22   being developed.
23       Q. Yes.
24           Where were they being developed?
25       A. I don't know where the work was being

Page 163

1    done. But they would have been planned for launch
2    in the U.S. market for sales.
3        Q. Where was the work being done?
4        A. I don't know.
5        Q. When I say developed, I mean actually
6    developed.
7            MR. POPE: He means actually I don't know
8        when he says I don't know.
9        Q. So you don't know where?
10       A. It could have very well been the U.S., I
11   just don't know.
12       Q. Okay. Go to page 14, which is Syngenta
13   1996. And the presentation references in the first
14   bullet the need to finalize atrazine mid long-term
15   agreements with third-party companies.
16           What is a mid-long term agreement with
17   third-party companies that could be referenced there?
18           MR. POPE: Objection to the form of the
19       question.
20       A. I'm not sure I could give you a specific,
21   but I suspect it's managed by the legal guidelines
22   of length of contract. Probably three to five
23   years would be a typical example.
24           (Plaintiff's Exhibit 8: An e-mail string
25       with the top from Ayannah Chance, Bates

Page 164

1    GRNVL0000064906 - 907 marked for
2    identification, as of this date.)
3        Q. Please take a look at Exhibit No. Eight
4    please. This is Greenville 64906, 64907. This is an
5    e-mail exchange November 6, 2007 starting with Willy
6    Maurer.
7            MR. POPE: Off the record.
8            (A DISCUSSION WAS HELD OFF THE RECORD.)
9        A. Yeah, I've read it.
10       Q. Earlier you mentioned that the atrazine
11   financial picture is different now than it was in
12   2005.
13           How is it different?
14       A. The period of this document is still
15   quite different, you know, than today as well.
16           MR. POPE: I don't think your question
17       was focused on this document, was it?
18       A. No, I'm sorry, sir.
19           MR. POPE: This is a general question.
20       Q. I'm sorry, he's right.
21       A. So what I was referencing when I made
22   that comment was the demand for atrazine for 2005
23   surged quite significantly, which this document
24   references a need to allocate product because
25   demand exceeded supply. And atrazine now is back

Page 165

1    at a point where there's plenty of supply and not
2    the same demand curve. So a lot of that is driven
3    by corn acres, which is the crop where most of the
4    atrazine is used.
5        Q. So it's gone in a sort of a bell curve
6    since that 2005 document?
7        A. More of a roller coaster, yes.
8        Q. All right. The document you have in front
9    of you that we've identified, I think it's marked as
10   Exhibit Number 8. This is an e-mail exchange where
11   Willy Maurer sends around a global proposal for an
12   allocation plan for the first two campaigns of
13   atrazine 90, correct?
14       A. That's what the document says, yes.
15       Q. And he sends it to Syngenta employees in
16   the U.S. as well as in Basel, right?
17       A. That's what the document shows, yes.
18       Q. And he refers to himself as the global
19   product manager in Basel, correct? Or at least
20   that's what he was timing-wise from other documents?
21       A. From the other document we reviewed in
22   2005, that's true. I don't see it on this
23   particular document.
24       Q. What is atrazine 90?
25       A. It's a dry formulation product of

42  (Pages 162 to 165)

Exhibit 007 Page 42
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 166

1  atrazine.
2      Q.  Was it manufactured at the St. Gabriel
3  plant?
4      A.  I believe it is.  Because it's a
5  formulation, it's possible that it's different done
6  at a different site.
7      Q.  Michael Ciszak, do you see his response?
8      A.  I do, yes.
9      Q.  Yes.
10         And Michael Ciszak is also from Basel?
11     A.  According to this document.  His e-mail
12  address would indicate that.
13     Q.  And he responds that he will try to get it
14  approved from the finance perspective while Alan
15  could follow up on supply chain.
16         Do you see that?
17     A.  That's what the document says.
18     Q.  And who is Alan?
19     A.  I don't believe I know.
20     Q.  Okay.  Michael Ciszak from this e-mail
21  exchange appears to be a business controller in
22  Basel, correct?
23     A.  I don't know that that's the case.
24  Supply chain allocation would typically be done by
25  the supply chain.

Page 167

1      Q.  Do you know what entity in the Syngenta
2  group of entities he's employed by?
3      A.  I don't know him, so no.
4      Q.  Do you know what he's referring to when he
5  says approved from the finance perspective?
6      A.  I don't know definitively.  I suspect
7  it's related to product mix variations from one
8  product type to another.
9      Q.  Who would actually approve the global
10  allocation of atrazine 90 from the finance
11  perspective?
12     A.  Typically that would be a decision taken
13  by the SOP group that I referenced before.
14     Q.  And what's the SOP group?
15     A.  Sales and operating planning.
16     Q.  And who would they be?
17     A.  We have one in NAFTA which manages our
18  allocations and supply to demand correlation for
19  the U.S., Canada and Mexico market.  And there's
20  one global, which is for the active ingredient
21  placement, which would have supply chain, John
22  Atkin would be on that, the region heads, myself
23  would be on that.  It would be a finance person on
24  that team as well.  Probably a few others.  But
25  predominantly supply chain and business personnel.

Page 168

1      Q.  And this Basel person who is Michael Ciszak
2  in Basel, who, as far as you know, would he contact
3  in the global supply chain group for approval for
4  this process?
5      A.  I don't know that he would contact one
6  person.  It's probably the SOP.
7      Q.  It would be the group in Basel.  What do
8  you call them, the SOP?
9      A.  Yeah, sales and operation planning --
10     Q.  Yes.
11     A.  -- team.
12         (Plaintiff's Exhibit 9: An e-mail string
13         with the top from Ayannah Chance dated
14         11/11/07, Bates GRNVL0000064902 marked for
15         identification, as of this date.)
16     Q.  Okay.  Number 9 is a document Bates
17  numbered Greenville 64902, which appears to be a
18  November 7th, 2007 e-mail exchange between Mr. Maurer
19  and Stepan -- or Michael Stepan and others.  If you'd
20  look at that for a second.
21     A.  Okay.  Ready.
22     Q.  Okay.  This is the Willy Maurer -- I think
23  from the other e-mails we've seen, the global product
24  manager in Basel sending around a proposed allocation
25  of atrazine WG 90 that is being produced by Syngenta

Page 169

1  Crop Protection, Inc. at its St. Gabriel plant,
2  correct?
3      A.  That's what the document refers to, yes.
4      Q.  And he solicits comments on the proposed
5  plan from SCPI employees and Syngenta employees in
6  Basel, correct?
7      A.  Talking about the note that Willy --
8      Q.  Yes, the last note, the first one.
9         Do you see that on the bottom?
10     A.  Yes, so Alan Camp and -- would be supply
11  chain employees, yes.
12     Q.  And he says he will build the comments in
13  and send the final product to Mark Peacock.
14         Who is Mark Peacock?
15     A.  I believe Mark Peacock is the chair of
16  the sales and operating team I referenced.  Also
17  the head of supply chain globally.
18     Q.  So these e-mail exchanges in 8 and 9 were
19  referring to the Basel supply chain operations for
20  this product?
21     A.  They would have referred to the sales and
22  operating planning process decision protocol.
23     Q.  In Basel?
24     A.  The people are located in Basel, yes.
25  But there are people from around the world that

43  (Pages 166 to 169)

Exhibit 007 Page 43
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard          11-9-2010
Confidential - Pursuant to the Protective Order

Page 170

1   participate on the call, myself included.
2       Q.   Okay.  Is Mr. Peacock also on the Syngenta,
3   AG executive committee?
4       A.   I'm not sure who the members of the
5   Syngenta, AG executive committee are.  He's a
6   member of the Syngenta executive committee that we
7   talked about previously, the SEC.
8       Q.   Okay.  At this time he was head of global
9   supply, wasn't he?
10      A.   I believe that was one of his
11  responsibilities at this time.
12      Q.   Right.
13          Among others?
14      A.   Yes.
15      Q.   In the e-mail at the top a Syngenta Crop
16  Protection employee responds and writes, per the
17  global process, we are to give the regions a chance
18  to review the proposed allocation before submitting
19  it to global for approval, correct?
20      A.   That's what it says, yes.
21      Q.   Is that a fair representation of how the
22  global atrazine allocation process works?
23      A.   Well, this is likely referring to the
24  regional NAFTA SOP process, which does feed into a
25  global dialogue.

Page 171

1       Q.   Yes.  But this person, is this Ayannah,
2   Ayannah Chance?
3       A.   Yes.
4       Q.   This person still work at the company?
5       A.   She does.
6       Q.   And she refers to a global process,
7   correct?
8       A.   Yes, she does in this document.
9       Q.   Okay.  So if we could summarize, tell me if
10  I understand the process, a person, in this case
11  Willy Maurer in Basel, creates a proposed allocation
12  plan, solicits comments, the regions are given a
13  chance to review, and finally the allocation plan is
14  submitted to global for approval.  Is that a fair
15  statement of how it works?
16      A.   This is what the document portions say.
17  If it is, as I believe it to be, connected to sales
18  and operating planning process, we would have
19  submitted demand, it would have been reviewed and
20  then we would have checked it before it was
21  finalized.  It's a monthly process, so it's very
22  well documented.
23          (Plaintiff's Exhibit 10: An e-mail string
24          with the top from Eileen Watson dated 4/27/06,
25          Bates GRNVL0000052306 marked for

Page 172

1       identification, as of this date.)
2       Q.   Please take a look at Exhibit Number 10,
3   please.  This is Greenville 52306, e-mail exchanges
4   April 2006, April 27th, 2006.
5       A.   Okay.  I've read it.
6       Q.   Okay.  And this is Willy Maurer again, isn't
7   it?
8       A.   Willy Maurer started this particular
9   e-mail.
10      Q.   And he lists under his name global product
11  manager for triazines in Syngenta CP Basel,
12  Switzerland, right?
13      A.   He does in this document 2006, yes.
14      Q.   Does this appear to be an e-mail from Mr.
15  Maurer to a person at a company called Agan?
16      A.   I think it's Agan, yes.
17      Q.   Where is Agan located?
18      A.   Well, it's -- an Israeli company,
19  Makhteshim.  I don't know the actual difference
20  between the Makhteshim and the Agan piece, but it
21  would likely be located in Israel.
22      Q.   Okay.  And there are Basel and Syngenta Crop
23  Protection, Inc. employees copied on this e-mail,
24  correct?
25      A.   There are, yes.

Page 173

1       Q.   And Mr. Maurer in the e-mail is affirming
2   an offer to sell atrazine from the St. Gabriel plant
3   to Agan, correct?
4       A.   That's what the e-mail says, yes.
5       Q.   And he says he cannot go lower than a price
6   of $6 -- $6.6 per gallon of four L atrazine
7   formulation, correct?
8       A.   That's what the document says.
9       Q.   And also said that Syngenta's interested in
10  producing terbutryn tech from Agan at the agreed
11  price?
12          MR. POPE:  Purchasing.
13      Q.   Oh, purchasing, sorry.
14      A.   That's what the document says, yes.
15      Q.   Do you know where the terbutryn tech was to
16  be used?
17      A.   I don't know.
18      Q.   Do Syngenta employees in Basel negotiate
19  and purchase other active ingredients for Syngenta
20  Crop Protection, Inc. from other companies?
21      A.   I don't know how the transactions are
22  done.  But if we were to source an active
23  ingredient which was sold outside the U.S. as well
24  as in the U.S., global would be involved.  If we
25  were to source a product specifically for the U.S.

44   (Pages 170 to 173)

Exhibit 007 Page 44
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 174

1  market, that would be in our accountability,
2  Syngenta Crop Protection, Inc., to source it.
3      Q.  Where was this sale to occur from this
4  e-mail exchange?
5          MR. POPE:  Objection to form of the
6  question.
7      A.  I don't know where the sale was to occur.
8  It certainly speaks that the product would come
9  from St. Gabriel.
10     Q.  And it says in USA, doesn't it?
11     A.  St. --
12     Q.  In other words, they were to -- the product
13  was to be -- if you look in the first paragraph,
14  sir --
15     A.  I see it.
16     Q.  -- of Mr. Maurer's comment, he says after
17  having discussed this again within Syngenta, we have
18  to inform you that our offers for supplying atrazine
19  to Agan for 2007 in USA cannot be lower than $6.6 per
20  gallon 4 L atrazine formulation bulk ex works St.
21  Gabriel USA.
22         What does that mean to you?
23         MR. POPE:  Objection to the form of the
24  question.
25     A.  Well, we have an agreement with Agan to

Page 175

1  supply technical, which is reported under Syngenta
2  Crop Protection, Inc.  So what this refers is it
3  would be sourced from the St. Gabriel plant and it
4  would be for sales in the U.S.
5      Q.  Okay.
6      A.  To Agan.  And invoiced, you know, as part
7  of the Syngenta Crop Protection, Inc. business is
8  how it was done.
9      Q.  Okay. If you'd look at Exhibit 11, please.
10         (Plaintiff's Exhibit 11: An e-mail string
11  with the top from John Abbott dated 11/9/05,
12  Bates SYN01190631 - 32 marked for
13  identification, as of this date.)
14     Q.  This is Syngenta 90631, an e-mail dated
15  November 9, 2005.
16     A.  Okay. Read the document.
17     Q.  Okay. And this is an e-mail exchange first
18  from Frank Knight dated November 9th, 2005.
19         Do you see this?
20     A.  I do see this.
21     Q.  And it's to other people at Syngenta Crop
22  Protection, Inc., isn't it?
23     A.  And Frank Knight is from Syngenta Crop
24  Protection as well -- Inc.
25     Q.  He is informing the group, as he calls

Page 176

1  them, that our global atrazine management has
2  solidified a supply agreement between Syngenta and
3  Agan to supply 500,000 gallons of atrazine 4 L to a
4  gone for the U.S. market, correct?
5      A.  That's what the e-mail says, yes.
6      Q.  And this was product that was to be
7  manufactured by Syngenta Crop Protection, Inc. at the
8  St. Gabriel plant, correct?
9      A.  I'm just reviewing the note again.
10  Previous note referenced that it would be sourced
11  from St. Gabriel.
12     Q.  Okay.  I don't see it in this one.  Unless
13  I missed it.
14         Whose name is on the supply contract?
15     A.  From Syngenta Crop Protection, Inc.
16  standpoint or from Makhteshim.
17     Q.  Yes, from Syngenta's standpoint.
18     A.  I don't know without looking at the
19  contract.
20     Q.  Are you familiar with the Agan contract
21  that you have with them now ongoing?
22     A.  I'm broadly aware of this particular
23  contract, yes.
24     Q.  You don't who it's with, which Syngenta
25  entity?

Page 177

1      A.  Not without looking.
2      Q.  Okay. Does it matter for purposes of
3  ongoing operations who signed it?
4          MR. POPE:  Who you mean which company?
5          MR. TILLERY:  Yes.
6      A.  In terms of would we be obligated to
7  sell?
8      Q.  Right.
9      A.  We would be obligated to sell.  But it
10  certainly matters as to how it was reported.
11     Q.  If you'd look at Exhibit 12, please.
12         (Plaintiff's Exhibit 12: An e-mail string
13  with the top from Rush Ducote dated 12/7/04,
14  Bates GRNVL0000064978 marked for
15  identification, as of this date.)
16     Q.  This is Greenville 64978.  This is another
17  e-mail exchange.  This one from Alan Camp
18  December 7th, 2004, and they Rush Ducote the same day
19  to various different people?
20     A.  Okay. I've read the document.
21     Q.  All right.  This e-mail suggests that on
22  December 8, 2004 a company called BASF would be in
23  Basel to negotiate global contracts for dicamba and
24  atrazine, correct?
25     A.  That's what the document says, yes.

45  (Pages 174 to 177)

**Exhibit 007 Page 45**
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 178

1    Q.  Am I pronouncing that correct, dicamba?
2    A.  Yes, that's another active ingredient
3  that --
4    Q.  Does Syngenta Crop Protection, Inc.
5  manufacture dicamba?
6    A.  Not to my knowledge.  We source it.
7    Q.  You source it from whom?
8    A.  We purchase it.  I don't know if we still
9  buy it from BASF, but this would imply that we did
10 at one time.
11   Q.  Okay.  And in these e-mails Syngenta Crop
12 Protection, Inc. employees along with Mr. Maurer, the
13 global product manager for triazines in Basel, are
14 discussing how to tie the price of atrazine to raw
15 material costs, aren't they?
16   A.  Yes, that's what the document says.
17   Q.  And Mr. Camp, who's been in touch with Mr.
18 Maurer, is asking them to expedite their assessment
19 of costs that could impact the contract terms with
20 BASF, correct?
21      MR. POPE:  Objection to the form of the
22   question.
23   A.  The e-mail stating that Alan would like
24 some information provided to Willy related to
25 correlation of cost of atrazine and the raw

Page 179

1  materials.
2    Q.  And this is so he can complete his
3  negotiations with BASF, correct?
4      MR. POPE:  Objection to the form of the
5   question.
6    A.  It says he needs good guesses for
7  tomorrow morning's discussions is what the e-mail
8  says.
9    Q.  And at the first line it says tomorrow
10 morning BASF will be in Basel to negotiate global
11 contracts for dicamba and atrazine, correct?
12   A.  That's what it says, yes.
13   Q.  And as far as you know, would that be for
14 --given the fact that they're asking the Syngenta
15 Crop Protection, Inc. people to respond, this would
16 be for the production from the St. Gabriel plant,
17 wouldn't it?
18      MR. POPE:  Objection to the form of the
19   question.
20   A.  I don't know where all the atrazine would
21 be sourced.  If it was only for the U.S., very
22 possibly.  Dicamba would be sold in other countries
23 around the world beside U.S.
24   Q.  But the -- but the atrazine, they call it
25 triazine cost, would be associated with those numbers

Page 180

1  and costs, chlorine and natural gas and electricity
2  costs that they had their arms around in the U.S.;
3  isn't that fair, sir?
4      MR. POPE:  Objection to form of the
5   question.
6    A.  The e-mail states that they were seeking
7  cost information for the U.S. production of
8  atrazine.  But it says the negotiation is for
9  dicamba and atrazine global needs.
10   Q.  Right.  But for at least for the part of
11 the atrazine associated costs, they were looking to
12 the U.S. people in connection with the production
13 costs of atrazine?
14      MR. POPE:  Objection to the form of the
15   question.
16   Q.  Correct?
17   A.  That's what the e-mail says.
18   Q.  What Syngenta entity's names are on those
19 global supply contracts?
20      MR. POPE:  Which ones?
21   Q.  The ones referenced in Exhibit 12.
22      MR. POPE:  Objection to the form of the
23   question.
24   A.  I don't know, first of all, if global
25 contracts were secured.  And if they were, I don't

Page 181

1  know whose name is on them.
2    Q.  Okay.  What about global contracts
3  generally that involve atrazine, who signs those?
4    A.  I'm not aware of a specific global
5  contract.  So I don't know.
6    Q.  Who has the authority to enter into global
7  supply contracts for atrazine at Syngenta?
8    A.  I would have to review the delegations of
9  scope.  But typically, as I said earlier, if it's
10 for the U.S. market, we have full accountability for
11 the license in.  If it's for sales and use outside
12 of the U.S. market, global would be involved.  But
13 I don't know who signs the contract.
14   Q.  My question, though, was who has authority
15 to enter into global supply contracts for atrazine?
16   A.  It wouldn't be Syngenta Crop Protection,
17 Inc. for a global contract if it was sold in other
18 countries besides the U.S.
19   Q.  Even if Syngenta Crop Protection, Inc. was
20 manufacturing the product?
21   A.  To my knowledge, it doesn't
22 differentiate.
23   Q.  Okay.
24      (Plaintiff's Exhibit 13: An e-mail
25   document from Willy Maurer dated 11/4/05,

46  (Pages 178 to 181)

Exhibit 007 Page 46
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 182

1    Bates SYN02781966 marked for identification,
2  as of this date.)
3    Q.  Would you take a look at Exhibit 13.  This
4  is Syngenta 81966.  It's an e-mail exchange from
5  Willy Maurer to a number of people on November 4,
6  2005.
7    A.  Okay.  I've read it.
8    Q.  All right.  Let's look at who this e-mail
9  was sent to.  Mr. Hans Elmsheuser, Elmsheuser at
10  Basel.  Do you know what his job was?
11    A.  I believe he would have been the head of
12  purchasing at the time.
13    Q.  Which company?
14    A.  I don't know.
15    Q.  In Basel, but --
16    A.  He was located in Basel.
17    Q.  Okay. David Wolverton at Greensboro, do you
18  know what his job was?
19    A.  He would have been in the purchasing
20  group in the U.S. team.
21    Q.  And then there's Peter -- or Greg Peters,
22  and he was at Syngenta Crop Protection, Inc.?
23    A.  Yes.
24    Q.  And Frank Knight at Crop Protection, Inc.?
25    A.  Syngenta.

Page 183

1    Q.  Syngenta Crop Protection, Inc.?
2    A.  Yes.
3    Q.  And Kevin Fields Syngenta Crop Protection,
4  Inc.?
5    A.  Yes.
6    Q.  And then there's Hans Gut at Basel, do you
7  know what his job was?
8    A.  I don't know him, no.
9    Q.  And Marek Luczak in Basel, correct?
10    A.  Yes.
11    Q.  Do you know what his job was?
12    A.  I believe he was in global product
13  management.  But I don't know if he was there at
14  this time.
15    Q.  And here is an e-mail exchange discussing
16  the fact that the global supply team had a meeting to
17  discuss profit margins on the BASF atrazine contract,
18  correct?
19    A.  That's what the e-mail says.
20    Q.  And the BASF deal will turn a profit for
21  Syngenta, correct?
22    A.  Just let me just review the language for
23  your last question.
24      It actually referenced to your prior
25  question, that supply chain meeting to understand

Page 184

1  the effect on the margins in the new BASF contract.
2    Q.  It shows that the terms and conditions
3  included in the BASF atrazine contract are adequate
4  to allow Syngenta to make a margin?
5    A.  And it does say that as well following
6  the sentence I --
7    Q.  Okay.  And what is meant there as far as you
8  know by the word Syngenta?
9    A.  I don't know.
10    Q.  And Mr. Maurer recommends the signing of
11  the atrazine and dicamba contracts without delay?
12    A.  And he recommends it to all of the people
13  on the list.  So it's not clear to me who executed
14  the contract.
15    Q.  You don't know who did it?
16    A.  I don't.  But there were --
17    Q.  You don't know --
18    A.  There were four people from the U.S.
19  Syngenta Crop Protection business and one from the
20  Basel operation.
21    Q.  Do you know if the contract was signed?
22    A.  I don't know definitively.  I do know
23  that we do have a contract today with BASF.  But I
24  don't know if it's this contract.
25    Q.  Okay.  Let's look at Exhibit 14.

Page 185

1      (Plaintiff's Exhibit 14: An e-mail string
2      with the top from Scott Langkamp dated
3      3/22/06, Bates GRNVL0000065798 - 799 marked
4      for identification, as of this date.)
5    Q.  This is Greenville 65798, 65799.
6    A.  Okay.  I've read the document.
7    Q.  Does this appear to be an e-mail between
8  Mr. Maurer, global product manager triazines, and how
9  do you pronounce that?
10    A.  Sulfonylureas.
11      THE COURT REPORTER: I'm sorry?
12    Q.  Say it again.
13    A.  Sulfonylureas, S-U-L-F-O-N-Y-L-U-R-E-A-S.
14  Sulfonylureas.
15    Q.  Let's just say triazines and company.
16    A.  Say SUs, that's what we call it.
17    Q.  SUs.  Got it.
18      Okay. Does this appear to be an e-mail
19  between Mr. Maurer, the global product manager,
20  triazines and SUs, in Basel and SCPI employees on the
21  sales of atrazine to MANA in the United States in
22  2007?
23    A.  Yes, that's what the e-mail says.
24    Q.  And MANA is a separate entity, correct?
25    A.  From Syngenta Crop Protection, Inc., yes.

47  (Pages 182 to 185)

Exhibit 007 Page 47

7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF  Document 112-2 *SEALED*  Filed 12/17/10  Page 321 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 186

1     Q.  And the person in Basel, Mr. Maurer, is the
2  point person for talks with MANA to meet their U.S.
3  demand for atrazine, correct?
4     A.  That's what the e-mail implies, yes.
5     Q.  Mr. Maurer makes some proposals on what he
6  thinks he should tell MANA about a possible deal in
7  the U.S.?
8     A.  That's what the e-mail proposes, yes.
9     Q.  And a Syngenta Crop Protection employee
10 responds and gives some of his thoughts on the
11 potential arrangement as well, doesn't he, sir?
12    A.  The U.S. and Syngenta Crop Protection,
13 Inc. employee says that we would not -- he would
14 recommend that we not communicate the same price,
15 but we should push for a price strategy that is
16 aligned with where we want to go with our longer
17 term agreement.
18    Q.  Do you know if a deal was reached?
19    A.  We have an agreement with Makhteshim,
20 which is MANA.  But I don't recall what the
21 specific terms are.
22    Q.  Do you know whose name appeared on the
23 contract to supply atrazine to MANA in the United
24 States?
25    A.  I do not know.

Page 187

1     Q.  And as far as you know, this was atrazine
2  to be manufactured in the United States at the St.
3  Gabriel plant?
4     A.  Based on the earlier e-mail discussions,
5  it did say St. Gabriel.  I don't believe it said it
6  in this particular e-mail.
7     Q.  What does Scott Langkamp do at Syngenta
8  Crop Protection, Inc.?
9     A.  Scott Langkamp is currently a business
10 unit head for the horticulture business and he
11 reports to me.  At that time he would have been a
12 NAFTA brand management head.
13    Q.  Okay.
14    A.  So he would have been responsible for
15 brand management for herbicides.
16    MR. POPE:  Talking about that time being
17 2006?
18    THE WITNESS:  2006, yes.  When this e-mail
19 was written.
20    Q.  Let me show you what's been marked as
21 Exhibit Number 15 and ask you to look at that.
22    (Plaintiff's Exhibit 15: An e-mail string
23 with the top from Philippe Costrop dated
24 5/19/08, Bates SYN02768444 - 445 marked for
25 identification, as of this date.)

Page 188

1     Q.  This is a Syngenta 68444 and 68445 Bates
2  number document, e-mail exchanges occurring in
3  May 2008?
4     A.  Okay.  I've read the document.
5     Q.  The first e-mail, May 13th, 2008,
6  references a TBA supply agreement.  Do you understand
7  what they're referencing in this e-mail exchange?
8     MR. POPE:  Objection to the form of the
9     question.
10    A.  I'm not sure what TBA stands for.  It
11 could be terbuthylazine, but I don't know for sure.
12    Q.  And what's a supply agreement that they're
13 referencing?
14    MR. POPE:  Objection to form of the
15    question.
16    A.  That's what I was talking about.
17    Q.  I mean, what -- in general terms, what's a
18 supply agreement that this e-mail exchange could
19 reference?
20    MR. POPE:  Objection to the form of the
21    question.
22    A.  The e-mail says that they would like to
23 finalize a deal with Oxon and propazine and plan on
24 using the current TBA agreement we have with that
25 same company Oxon as a template.  So propazine is

Page 189

1  the subject matter.  TBA is an agreement that
2  appears to be in place already.
3     Q.  And this exchange is taking place between
4  Kevin Gesse?
5     A.  Kevin Gesse.
6     Q.  Gesse.
7     At Syngenta Crop Protection, Inc. with
8  Philippe Costrop and Os -- Rene Oskar Kuehne, both of
9  them are from Basel?
10    A.  That's what the e-mail says, yes.
11    Q.  And what are their jobs at Basel?
12    A.  I don't know either one.
13    Q.  And they copy a Mr. Peter Lutz in Basel.
14 Do you know who he is?
15    A.  I do not.
16    Q.  And it appears they had a meeting to
17 discuss this supply agreement.
18    A.  They being?
19    Q.  The people on this e-mail exchange.
20    A.  Yes.
21    Q.  And then the last e-mail is from Mr.
22 Costrop to Kevin Gesse did you say?
23    A.  Gesse.
24    Q.  Gesse.
25    And pointing out to be careful because

48  (Pages 186 to 189)

Exhibit 007 Page 48
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG-PMF   Document 335   Filed 12/26/12   Page 49 of 60   Page ID
#12969
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 322 of 486

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

Page 190

1 there's an inconsistency that needs to be clarified
2 before the deal is done, correct?
3    A.  That's what the e-mail says.
4    Q.  Okay.
5    A.  Related to the spec of the product.
6    Q.  This is May 18th, 2008, correct?
7    A.  May 19th.
8    Q.  May 19th, 2008.
9        Is the exchange that we just referenced
10 representative of the type of cooperation that would
11 exist in terms of the creation of supply agreements
12 in the United States?
13    A.  Again, if it's a supply agreement that
14 serves more than one geography of the world, it
15 would probably -- you know, is common dialogue.
16    Q.  Did that supply more than one -- that one
17 anticipate supplying more than one market of the
18 world?
19    A.  I don't know.
20    Q.  Okay. I show you what's been marked as
21 number 16.
22        (Plaintiff's Exhibit 16: An e-mail string
23        with the top from Susan Morris dated 10/19/06,
24        Bates GRNVL0000042446 - 448 marked for
25        identification, as of this date.)

Page 191

1    Q.  Okay. This is a October 19, 2006 --
2 actually, a -- starts off with a August 2006, then
3 September and then October exchange of e-mails Bates
4 numbered Greenville 42446 through 42448, if you'd
5 look at this, please.
6    A.  Okay. I've read the document.
7    Q.  Excuse me. I'm sorry.
8        In general, do you know the topic of this
9 discussion?
10    A.  It's related to market research spin for
11 a noted product or products.
12    Q.  It's a 2007 corn marketing research budget
13 that's being referenced here, isn't it?
14    A.  That's what the title of the subject is,
15 yes.
16    Q.  And this Syngenta Crop Protection employee
17 who started this e-mail exchange, Susan Morris?
18    A.  That's correct.
19    Q.  Says she has submitted the budget.
20        Do you see that?
21    A.  I did see that, yes.
22    Q.  Okay. Do you know to whom she would have
23 submitted the budget?
24    A.  I don't know definitively in this case.
25 But the way budgets are submitted is only through

Page 192

1 my accountability.  The special projects that Basel
2 funding noted in here was what I referenced
3 earlier. So she would have been submitting an
4 expense budget for the NAFTA region is the way I
5 would interpret that, knowing how the process
6 works.
7    Q.  She said this budget is considerably higher
8 than last year's, so we're not likely to get the
9 entire amount I've put in for.
10        Do you know what she's referring to when
11 she says we're not likely to get the entire amount
12 from home?
13        MR. POPE: Objection to the form of the
14    question.
15    A.  I don't know.  But as I way, the way I
16 would interpret it and knowing how this particular
17 process does work, she probably asked for more than
18 she spent the prior year and was concerned that she
19 wouldn't get approval for the additional funds
20 requested as part of the Syngenta Crop Protection,
21 Inc. business.
22    Q.  And this is part of the NAFTA budget?
23    A.  Yes.
24    Q.  And then you submit the NAFTA budget to Mr.
25 Atkin?

Page 193

1    A.  I do, yes.
2    Q.  Okay. And do you see the e-mail from the
3 Syngenta employee in Basel responding to Mrs. Morris?
4    A.  Which -- which portion?
5    Q.  Bertrand Mametz.
6    A.  He's responded twice on this.
7    Q.  The second -- the first response?
8    A.  Okay. Yes.
9    Q.  Does it look like the Basel employee has
10 integrated the previous budget into a global budget
11 proposal?
12        MR. POPE: Objection to the form of the
13    question.
14    A.  Yeah, this e-mail to me references a
15 request for supplemental funding from the global
16 market research funds.
17    Q.  MLT references what?
18    A.  Market -- marketing leadership team.
19    Q.  And where are they?
20    A.  There is one in NAFTA and there is a
21 global one as well.
22    Q.  And with the one that she was talking about
23 was the one in Basel, wasn't she?
24    A.  Well, the one he was talking about.
25        MR. POPE: Objection.

49  (Pages 190 to 193)

**Exhibit 007 Page 49**
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 323 of 486

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 194

1    Q.  Or he was talking about.
2    A.  He was talking about.  Probably was.
3       MR. POPE:  Objection to the form of the
4    question.
5    Q.  Yeah, it says the -- actually, it says
6    global proposal 2007, and then it references the
7    market leadership team.
8       Can you tell from this that it's a -- it's
9    a Basel group that's responding?
10      MR. POPE:  Objection to the form of the
11   question.
12   A.  You can't tell definitively, but he
13   probably is referencing the global group.
14   Q.  Okay.
15   A.  And because this particular brand may
16   have had trademark use outside the U.S., that
17   appears to me the basis for which he's asking for
18   supplemental funding.
19   Q.  And who was the head of the global market
20   leadership team?
21   A.  At that time, I don't know.
22   Q.  Who is it now?
23   A.  Rob Neill, who is the head of marketing
24   globally.
25   Q.  And where is he located?

Page 195

1    A.  He's located in Basel.
2    Q.  And with which entity does he have
3    association?
4    A.  I'm not sure.
5    Q.  Okay. Let's look at Exhibit 17.
6       (Plaintiff's Exhibit 17: Syngenta
7    Triazine Supply Chain Redesign July 2004,
8    Bates SYN01146557 - 6607 marked for
9    identification, as of this date.)
10      MR. TILLERY:  Let's take a break.
11      THE VIDEOGRAPHER:  Going off the record.
12   The time is 10 -- or 4:06 and 41 seconds.
13      (A BRIEF RECESS WAS TAKEN.)
14      THE VIDEOGRAPHER:  We are on the record at
15   4:24 and 48 seconds.
16      Please continue.
17   Q.  You've had an opportunity to take a look at
18   Exhibit 17?
19   A.  I have.
20   Q.  Can you tell me what it is?
21   A.  Well, the document is titled Triazine
22   Supply Chain Redesign In 2004 Recommendations And
23   Conclusions.
24   Q.  And it says at the top of the first page,
25   Global Product Supply Chain Management, GPSCM.

Page 196

1       What is that?
2    A.  Well, the -- it's actually a logo that
3    was used at that time.  And it would have been the
4    Global Product Supply Chain Management -- it would
5    have been the employees and the management.  That's
6    what they refer to themselves as at that time.
7    Q.  This is Syngenta 46557 through Syngenta
8    46607.
9       Did you attend this meeting?
10   A.  I don't believe I did.
11   Q.  Do you know where the meeting took place?
12   A.  I don't.
13   Q.  Do you know who the presentation was made
14   to?
15   A.  I do not know who was present, no.
16   Q.  Do you know if the recommendations that
17   were included within this document were implemented?
18   A.  I don't know.  I don't believe they all
19   were based on the evolution in the market 1
20   described earlier.  But I don't know what was
21   implemented.
22   Q.  Were some of the objectives -- strike that.
23      Were some of the recommendations
24   implemented or any of the recommendations
25   implemented?

Page 197

1    A.  Let me review them again, the document.
2    Q.  Actually, why don't you go to page 14.
3    A.  So this speaks to objectives and
4    deliverables.  So could you restate your --
5    Q.  Yes.
6       The objectives are listed on the left side
7    of that page and then it indicates on the right side
8    at the top the team.
9       Do you recognize any of those people?
10   A.  I do know some of those people, yes.
11   Q.  And let's go down the list.
12   Where is Mr. Lidbetter from?
13      MR. POPE:  Where was he in 204?
14   Q.  Yes, excuse me, July 2004.
15   A.  I'm not positive of where he's from.
16   Q.  What about Mr. Camp?
17   A.  He would have been a supply chain
18   representative in the U.S. business.
19   Q.  And Syngenta Crop Protection, Inc.?
20   A.  Syngenta Crop Protection, Inc., to my
21   knowledge?
22   Q.  And then there's a Rush Ducote and Bob
23   Slaven.  Where were they from?
24   A.  I don't know Rush.  Bob Slaven would have
25   been the St. Gabriel plant manager at the time.

50  (Pages 194 to 197)

Exhibit 007 Page 50
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

### Page 198

1    Q.  Okay. And then a Jesef Amrein, product
2  manager, where was he from?
3    A.  Don't know him.
4    Q.  And then a NAFTA representative was Frank
5  Knight?
6    A.  That's correct, Frank would have been a
7  Syngenta Crop Protection, Inc. employee in NAFTA
8  brand management.
9    Q.  And then program manager was Steve Fulton.
10  Where was he from?
11    A.  I don't know him.
12    Q.  Finance was Rob -- Bob Wren and Phoebe
13  Broussard.  Do you know where they're from?
14    A.  I don't.
15    Q.  And then purchasing was Gayle Talorydean?
16    A.  And Gayle is a U.S.-based employee.
17    Q.  And then T&P, what's that stand for?
18    A.  Technology and projects. I know Larry.
19    Q.  Mr. Gasper, Larry gasper?
20       Where is he from?
21    A.  I think at that time he was located in
22  Greensboro.
23    Q.  And then T&P Mr. Art Bayer, where is he
24  from?
25    A.  I don't know him.

### Page 199

1    Q.  And then SCT, what does that stand for?
2    A.  I don't know.
3    Q.  Okay. The objectives list on that same
4  page, Syngenta 46570 to identify scenarios to deliver
5  major accelerated step change improvement in the
6  performance of the triazine supply chain, especially
7  in terms of profit and COGS.
8       What's that stand for?
9    A.  Cost of goods.
10    Q.  To meet short and term long-term business
11  goals. And then it says to -- in order to regain
12  competitive edge, the target is to reduce triazine
13  supply chain cost of goods by 20 percent to maintain
14  as fully absorbed gross margin of 27 percent based on
15  current SYMPACT volumes by 2006, correct?
16    A.  That's what it says in this document,
17  yes.
18    Q.  All right. And do you know whether or not
19  this particular proposal there or at least the goal
20  or objective was achieved?
21    A.  I don't know if it was achieved.
22  Certainly we would have pursued COGS savings, but I
23  don't know what was achieved.
24    Q.  Do you know if any of these objectives were
25  realized?

### Page 200

1    A.  Definitively, no, I do not know.
2    Q.  Does this document make recommendations on
3  a global triazine business as far as you can tell?
4    A.  Well, the objectives in slide 14 that we
5  were just talking about certainly reference COGS
6  for the all the markets that were supplied.
7    Q.  For the entire Syngenta group of companies?
8    A.  Or wherever atrazine would be sold.
9    Q.  Worldwide?
10    A.  Right.
11    Q.  Look at page 46571 where there's a
12  comparison of scenarios.  Do you see those?
13    A.  I do.
14    Q.  One is to exit all triazines, including in
15  mixtures.  And then a proposal down the line of
16  variations on that theme.
17       Do you see that?
18    A.  I do see that
19    Q.  Okay.  Have you ever been in a meeting
20  where anybody proposed getting out of the triazine
21  business?
22    A.  I don't believe I attend the meetings,
23  but I certainly was aware that there was discussion
24  about options, that being one of them.
25    Q.  If you go down the line on that same page,

### Page 201

1  number 15 of this exhibit.  Do you see volume
2  stabilization, sourced from St. Gabriel, slows
3  decline in volumes.
4       Do you have any idea what would have been
5  referenced by that -- those words?
6       MR. POPE:  Objection to the form of the
7    question.
8    A.  I don't know definitively.  The document
9  would imply that the volumes would be stable or
10  near flat as opposed to declining.
11    Q.  Let's go to the next page, page 16.
12       If you look in the center column.  These
13  are assumptions, at least, or things being
14  considered, one would be an aggressive price
15  reduction of atrazine tech by 13 percent.  And excess
16  capacity would drop as generics drop out along price
17  increase after market share gain.
18       Do you see that?
19    A.  I see a summary of three bullets under
20  the scenario titled volume stabilization. So all
21  of those would have been a description of the
22  volume stabilization scenario is the way I read it.
23    Q.  Was there an aggressive price reduction of
24  atrazine tech in the United States following
25  July 2004?

51 (Pages 198 to 201)

Exhibit 007 Page 51
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF  Document 112-2 *SEALED*  Filed 12/17/10  Page 325 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 202

1    A.  I don't recall a major change in price.
2  Certainly there were some price declines.  But I'm
3  not sure what the change in pricing was.
4    Q.  Now, go to the following page, which is
5  46573.
6        The recommendation or the basis for the
7  recommendation was that if we do not protect the
8  triazine business now, we will not have a business
9  left, correct?
10   A.  That's what the second bullet of this
11  slide says, yes.
12   Q.  The next bullet, the volume stabilization
13  strategy provides the most benefit to Syngenta.
14       Do you see that?
15   A.  That's what it says based on MPV
16  calculations, identified risk and perceived
17  benefits.
18   Q.  And let me ask you, what molecules are
19  included within the triazine business?
20   A.  Well, it mentioned two of them, atrazine
21  and simazine.  I'm not sure if we produced any
22  others.  But there are other triazines sold in the
23  marketplace.  So I'm not sure of the full
24  definition.  But certainly atrazine and simazine
25  would be included.

Page 203

1    Q.  Do you know the names of any other
2  triazines sold in the marketplace?
3    A.  In the U.S., no.  But we talked about
4  terbuthylazine earlier, which is another triazine.
5  Propazine was referenced in one of the documents
6  you shared.
7    Q.  Are either of them sold in America?
8    A.  Not to my knowledge.
9    Q.  The only triazine sold in America are
10  atrazine and simazine?
11   A.  Those are the only two I recall.  And
12  certainly those would be the two material ones for
13  certain.
14   Q.  The two others, propazine and help me again
15  with the --
16   A.  Terbuthylazine.
17   Q.  Yes.  Those two, where are they sold?
18   A.  I'm not sure where propazine is sold.
19  Terbuthylazine is sold in Europe today, some
20  countries in Europe.
21   Q.  Are they marketing substitutes for
22  atrazine?
23   A.  Well, it is a triazine, so similar
24  chemistries.  So it does something similar to
25  atrazine, if that's what you mean by substitute.

Page 204

1  But it's the same class of chemistry.
2    Q.  Do you sell them for the same type of
3  activities and farming activities and farming
4  applications?
5    A.  Both products are for control of weeds.
6  I don't know if the species are exact.  There
7  probably are some differences.
8    Q.  Look at Exhibit Number 18, if you would,
9  sir.
10   A.  Um-hum.
11       (Plaintiff's Exhibit 18: An e-mail string
12       with the top from Scott Langkamp dated
13       6/13/07, Bates SYN03446466 marked for
14       identification, as of this date.)
15   A.  Okay.  I've read the document.
16   Q.  Okay.  The first e-mail is from Marek
17  Luczak at Basel?
18   A.  That's correct.
19   Q.  Where it does Marek Luczak work?
20       Which entity in Basel?
21   A.  I'm not sure.
22   Q.  The e-mail that was sent out by Marek
23  Luczak to various different people around the world
24  and at Syngenta Crop Protection, Inc. references a
25  development project herbicides for 2008, doesn't it?

Page 205

1    A.  For new ideas, yes, that's what the
2  document says.
3    Q.  And it mentions that ideas submitted have
4  been consolidated, some have been rejected.  Both
5  categories have been seen on a separate sheet.
6  Apparently the idea submissions were attached as an
7  exhibit or attachment to the e-mail, correct? I don't
8  have the ideas --
9    A.  Right.  It goes on to say that they were
10  roughly scored, and we have a process for
11  prioritizing project value.
12   Q.  Right.
13       And this was sent to these people, and
14  there's a note here in the second paragraph, before
15  we consider this list as a final selection of
16  candidate ideas, we have to make sure that the global
17  and regional views are aligned.
18       Do you see that?
19   A.  I do see that, yes.
20   Q.  Is there an effort throughout the Syngenta
21  group of companies to align global and regional views
22  on development projects?
23   A.  Well, there is a process which I
24  referenced where there is a criteria that
25  prioritizes projects.  And all the regions will

52  (Pages 202 to 205)

Exhibit 007 Page 52
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard        11-9-2010
Confidential - Pursuant to the Protective Order

Page 206

1  submit projects that can be for resource. So where
2  you can match priorities, that's the best outcome.
3  But it's inevitable that some of the priorities
4  will be different and, therefore, prioritization is
5  made.
6      Q.  And where do the resources come from that
7  are referenced here?
8      A.  It probably depends on what portion of
9  the project you're talking about and what stage
10  it's in. But clearly the field testing resources
11  are Syngenta Crop Protection, Inc. But some of the
12  other studies for regulatory may or may not be.
13      Q.  And where would they -- resources be from?
14      A.  I don't know which entity. But it may be
15  outside of Syngenta Crop Protection, Inc.
16      Q.  If it's outside Syngenta Crop Protection,
17  Inc., which entity would supply the resources?
18      A.  I don't know. Some of the studies are
19  used with different regulatory bodies, same
20  studies.
21      Q.  What are the product leadership teams
22  referenced here?
23      A.  Well, this was the -- I probably called
24  it product line teams before. So this would be the
25  same team --

Page 207

1      Q.  Product line teams?
2      A.  Yeah, I'm not sure what the right acronym
3  translation is. But that was the teams I was
4  probably calling product line teams before. And
5  they basically look at the project list from all
6  the regions of the world and try to facilitate that
7  matching process, which is described in the note.
8  Not just on development projects, but sometimes on
9  other topics.
10      Q.  And the e-mail suggests that MLT will make
11  final decision on the candidate ideas. That's the
12  marketing leadership team, correct?
13      A.  And there is a representative from NAFTA
14  on that team. But it's chaired by Rob Neill, as I
15  said previously.
16      Q.  In Basel?
17      A.  Rob is based in Basel. Travis Dickinson
18  is based in Syngenta Crop Protection, Inc. and
19  travels normally to Basel, unless the meeting's in
20  Greensboro.
21      Q.  Who else is on the marketing leadership
22  team?
23      A.  There would be equivalence to Travis
24  Dickinson in the other three regions. And there
25  would be other people from the marketing team that

Page 208

1  would attend.
2      Q.  Do you know who the other people from the
3  marketing team are who would attend?
4      A.  Not a full list, no.
5      Q.  What does scoping mean?
6      A.  The way I would interpret it in this note
7  is scoping is assessing available resource versus
8  demand. There are multiple types of resource that
9  have to be utilized to completely develop the
10  product.
11      Q.  Would you look at the last line of the
12  exhibit where it says 2008 S-Y-P-O-S.
13      What's S-Y-P-O-S mean?
14      A.  SYPOS, that's the system that all of the
15  projects are reported into. So it would be the
16  corollary to SYMPACT for development projects. So
17  we would prioritize our projects, populate them,
18  inset SYPOS and then they could be viewed by the
19  global team in SYPOS.
20      Q.  And SYPOS is available to all of the
21  Syngenta entities worldwide?
22      A.  I don't know if all of them. But
23  certainly the entities in the regions.
24      Q.  Okay.
25      (Plaintiff's Exhibit 19: An e-mail string

Page 209

1  with the top from Jasper Barnes dated 6/10/09,
2  Bates SYN03146593 - 6594 marked for
3  identification, as of this date.)
4      Q.  Exhibit 8 -- I'm sorry, Exhibit 19 is a
5  Syngenta 46593 through 46594. It's an e-mail
6  exchange and one e-mail.
7      A.  Okay. I've read the document.
8      Q.  The list of addressees, this is from --
9  this is an e-mail from Jasper Barnes at Basel,
10  correct?
11      A.  That's correct.
12      Q.  Which entity is he associated with, which
13  of the Syngenta companies is he associated with?
14      A.  I'm not sure. He leads all the
15  development project planning activities.
16      Q.  Do you know what his job is?
17      A.  Well, that's -- I don't know what the
18  title is, but that's what he does, development
19  project planning.
20      Q.  Okay.
21      A.  He leads that.
22      Q.  And does he have a group of employees from
23  different subsidiaries from all over the world that
24  are part of that development committee?
25      A.  I don't know.

53 (Pages 206 to 209)

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 327 of 486

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 210

1    Q.  What is the portfolio investment cycle?
2    A.  Where have you read that?
3    Q.  That's the first line of the e-mail.
4    A.  I don't know that term.  But it's -- I
5  think it's connected to the process I described
6  with SYPOS.  I think SYPOS may have been replaced
7  by a newer system in this time frame.
8    Q.  Do you know what the global product
9  portfolio team is?
10    A.  No, I don't know its makeup.  But I'm
11  aware that there is one.
12    Q.  Do you know where they sit or where they
13  work?
14    A.  I don't know the representation.  But it
15  very possibly could have a similar makeup in the
16  MLT, but just for development.  Because Marian
17  Stypa would travel over for meetings to talk about
18  portfolio.
19    Q.  Traveling over to Basel?
20    A.  To Basel.
21    Q.  What is smart choice that's referenced in
22  the e-mail?
23    A.  I'm afraid I'm outdated on that one.  It
24  may be the new system.  I know that they were
25  working on the -- a system to upgrade SYPOS.  And

Page 211

1  that's possibly what it is, but I don't know.
2    Q.  What is the crop protection global
3  portfolio steering committee?
4    A.  I don't know the makeup of that team.
5    Q.  You're not on it?
6    A.  I'm not on it.  But that would be the
7  team that I would expect Marian Stypa to be on.
8    Q.  Why would Marian Stypa be on that team?
9    A.  Because Jasper Barnes is focused on
10  development planning projects, and Marian Stypa is
11  the lead for NAFTA development.  So he would lead
12  our process.  Dirk Drost is one of the key folks
13  that supports that process as well from the NAFTA
14  team.
15    Q.  Who does Marian Stypa functionally report
16  to?
17    A.  His direct line is to me and Gerardo
18  Ramos, who is the global head of development.
19  Would be the person that has global responsibility.
20    Q.  And where is Mr. Ramos?
21    A.  I believe he's located in Basel.
22    Q.  And do you know what his job is in Basel?
23    A.  I don't know the title.  But it's
24  effectively the global development leadership.
25    Q.  For what topic, development?

Page 212

1    A.  For development.
2    Q.  What does that mean, development?
3    A.  Well, it would mean all new products that
4  we would do testing on to prove efficacy,
5  registerability.  It's the core of how we bring a
6  product to market after it leaves research.
7         (Plaintiff's Exhibit 20: An e-mail string
8         with the top from Barbara Descenzo dated
9         11/21/07, Bates GRNVL0000065140 - 142 marked
10         for identification, as of this date.)
11    Q.  Okay.  Exhibit 20 is Greenville 65140
12  through 65142.  Series of e-mail exchanges starting
13  November 8, 2007 going through November 21, 2007.  If
14  you'd look at that, please.
15    A.  Okay.  I've read the document.
16    Q.  What is global sales and operations
17  planning?
18    A.  This is the team that I referenced
19  earlier.  So all of the NAFTA sales and operation
20  plans would be submitted.  And then they would be
21  reviewed and discussed at the global SOP.  And
22  where there are conflicts in supply versus demand
23  or allocation requirements, those discussions would
24  occur there at the global SOP.
25    Q.  Were you ever part of that group?

Page 213

1    A.  I am a member of the global SOP today.
2    Q.  And you became a member when you became
3  president of Syngenta Crop Protection, Inc.?
4    A.  That's correct.
5    Q.  Who leads the global sales and operations
6  planning group?
7    A.  The chair does move amongst two or three
8  people, John Atkin being one, Mark Peacock being
9  one and Mark Patrick, who is the finance person who
10  reports to John.  I'm not sure who is the formal
11  chair.
12    Q.  Is it based in Basel?
13    A.  It typically is held via teleconference.
14  But the people in Basel would be in Basel and I
15  would be in my office or somewhere in the U.S.
16    Q.  How often does it meet?
17    A.  Monthly.
18    Q.  What kind of things does this group do?
19    A.  It is a supply and demand discussion.  So
20  you look at inventory.  You look at phasing of
21  supply.  You look at active ingredient needs mostly
22  at that level, not formulation.  The formulation
23  level is done at the NAFTA SOP.  So you're mostly
24  trying to ensure that you could deliver the
25  customer forecast and adapt where necessary and

54  (Pages 210 to 213)

Exhibit 007 Page 54
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG-PMF   Document 335   Filed 12/26/12   Page 55 of 60   Page ID
#12975
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 328 of 486

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

Page 214

1  ensure you're efficient with your approach.
2      Q.  This e-mail that you're holding is from
3  global sales and operation planning manager in Basel
4  to a number of Syngenta employees from around the
5  world, correct?
6      A.  The first --
7      Q.  The first one.
8      A.  The first one is, yes.
9      Q.  And it contains a draft agenda for the
10  November meeting?
11      A.  That's actually the pre GSOP.
12      Q.  What is that?
13      A.  Pre GSOP is a preamble meeting
14  effectively for the GSOP, which I described.  And
15  the people that would typically be involved in that
16  would be the marketing heads that are accountable
17  for populating the forecasts.  So Travis Dickinson
18  would be the NAFTA representative.  As well as some
19  supply chain personnel from NAFTA.
20      Q.  Would they meet on a monthly basis as well?
21      A.  They would.
22      Q.  One of the things that happens in the pre
23  GSOP review is a forecast of sales by regions and by
24  different active ingredients?
25      A.  In the global pre GSOP, that's correct.

Page 215

1      Q.  Okay.
2      (Plaintiff's Exhibit 21: Syngenta Minutes
3  dated 7/5/03, Bates SYN00756454 - 6477 marked
4  for identification, as of this date.)
5      MR. POPE:  We're now at 21?
6      Q.  Exhibit 21 is Syngenta 756454 through
7  Syngenta 756477.
8      MR. TILLERY:  Sir, he's going to go off to
9  change the tape.  So we have to take a break
10  right now.  You can keep reading if you want.
11      THE VIDEOGRAPHER: This marks the end of
12  videotape number three in the deposition of
13  Vern Hawkins. Going off to record, the time is
14  5:01 and 14 seconds.
15      (A BRIEF RECESS WAS TAKEN.)
16      THE VIDEOGRAPHER: This marks the
17  beginning of videotape number four, volume one
18  in the deposition of Vern Hawkins. The time is
19  5:05 and 49 seconds.
20      Please continue.
21      Q.  What is the development committee, sir?
22      A.  I'm just about done with the document.
23      Q.  Oh, excuse me.
24      MR. POPE:  The record will reflect he
25  stayed here during the break and continued

Page 216

1  reading.
2      MR. TILLERY:  Yes, he did.
3      MR. POPE:  You won't get a more
4  cooperative witness than that.
5      MR. TILLERY:  Can we go off the record
6  for just a second, please.
7      THE VIDEOGRAPHER: Going off the record.
8  The time is 5:07 and 51 seconds.
9      (A DISCUSSION WAS HELD OFF THE RECORD.)
10      THE VIDEOGRAPHER: Going on the record.
11  The time is 5:09:54.
12      Please continue.
13      Q.  What is the development committee?
14      A.  It's the committee that broadly is
15  accountable for approving progression of our
16  development portfolio from one stage to the next.
17  I'm sure they have a large project review
18  accountability as well related to the objectives.
19  But that's predominantly what they do.
20      Q.  Do you know who serves on the development
21  committee?
22      MR. POPE:  You mean now?
23      MR. TILLERY:  Yeah.
24      A.  I don't know all the members.  I do get
25  the committee reports.  I don't review all the

Page 217

1  reports.  But I do receive them.
2      Q.  When did you start receiving the reports?
3      A.  I don't recall exactly.  But I think I've
4  been getting reports for a few years.
5      Q.  Okay. Is the development committee
6  responsible for retiring a product as well as
7  approving a new product?
8      A.  Well, if it is related to -- depends is
9  the answer.  Is if a product -- formulated product,
10  for example, you know, isn't meeting sufficient
11  sales, then my business would make that decision.
12  Syngenta Crop Protection could stop selling an SKU.
13  If you were going to exit an active ingredient
14  which would have implications beyond the U.S., then
15  certainly you would have a conversation, if not the
16  development committee, some other committee that
17  could speak to the impact beyond the U.S.
18      Q.  You think you could go back to your office
19  tomorrow morning and unilaterally decide to stop
20  selling atrazine in the United States on your own?
21      A.  Not atrazine.
22      Q.  You'd have to pass that onto Mr. Atkin,
23  wouldn't you?
24      A.  Well, if it was a --
25      Q.  But just answer my question.

55 (Pages 214 to 217)

Exhibit 007 Page 55
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 329 of 486

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 218

1    A. If it was a decision unilateral of law or
2  say it was not a registration action, then yes, I
3  would be of a level of sales that I would have to
4  have a conversation with John Atkin.
5    Q. And the level of sales meaning the total
6  amount per year that's being sold?
7    A. That's correct.
8    Q. And that's because you're aware of what
9  that authority comes from, aren't you?
10    A. What do you mean by that?
11    Q. Well, what is the regulation that causes
12  you to have do that?
13    A. Well, as I mentioned earlier, there is a
14  delegation of authority around decision rights of a
15  certain level, and once the budget is set, we can
16  operate within the full accountability of the
17  business plan. But if there's a variance above a
18  level in the delegations, then a conversation with
19  John Atkin is my accountability.
20    Q. And when discontinuation of a product would
21  cause financial impact exceeding certain levels, you
22  would also have to do the same and call Mr. Atkin,
23  wouldn't you?
24    A. I would have a conversation with John
25  Atkin, yes.

Page 219

1    Q. Yes.
2        This particular document references a
3  meeting in Basel, doesn't it?
4    A. It does, yes.
5    Q. And is that where the development committee
6  meets?
7    A. Typically they do meet in Basel, yes.
8    Q. And the development committee was
9  discussing global triazine strategy in this meeting,
10  weren't they?
11    A. That's what this document says, triazine
12  lifecycle management is what's noted here.
13    Q. And that was May 7th, 2003, wasn't it?
14    A. The development committee was, yes.
15    Q. And had there been a particular incident in the
16  world that had provoked this meeting?
17    A. I don't know.
18    Q. Okay. This particular development
19  committee resulted in the assignment of tasks across
20  company lines, didn't it?
21        MR. POPE: Objection to the form of the
22    question.
23    A. You're speaking in relationship to
24  atrazine right now?
25    Q. You can look at page 19 under actions if

Page 220

1  you want.
2    A. Page 19 in my document is reference to
3  discussion and conclusions of a product called
4  Bion.
5    Q. I'm sorry, it's the wrong -- that's
6  referenced in the index -- I'm sorry, it's -- it is
7  page 19. So it would be -- why don't look at
8  Syngenta 756473.
9    A. Okay. The actions page?
10    Q. Yes.
11    A. Okay.
12    Q. Do you see at the bottom, sir?
13    A. Okay. It does assign an action that a
14  comparison of atrazine and terbuthylazine with
15  respect to the position on debating endocrine
16  disruption needs to be completed. It's assigned to
17  H. Swaine and J. Doe.
18    Q. And who are those people?
19    A. Harry Swaine, I'm not sure what his
20  responsibilities were. But he was not a U.S.
21  employee. And I believe John Doe was. He was --
22  well, John Doe I think had had multiple roles since
23  I've known him. So I don't know where he was at
24  this time.
25    Q. Might he have been at Jealott's Hill?

Page 221

1    A. It's possible he was.
2    Q. Okay.
3        (Plaintiff's Exhibit 22: Syngenta
4    document entitled Syngenta Production
5    Strategies in the U.S. and Worldwide, Bates
6    SYN01790993 - 994 marked for identification,
7    as of this date.)
8    Q. Number 22, if you could tell me what this
9  document is. This is Syngenta 1790993 and 099 --
10  0994.
11    A. What's the date of this document; do you
12  know?
13    Q. This is how it came to us. I'm sorry. Mr.
14  Pope might be able to help you on that.
15        MR. POPE: Why do you say that, sir?
16    Knowing full well that the indication at the
17    bottom means I have no idea.
18        If you don't know what it is, just tell
19    him.
20    A. I recognize the subject. Let me read it.
21  Just looking for a time frame.
22        Okay. I've reviewed the document.
23    Q. What is it?
24    A. It's a communication from employee of
25  Syngenta Crop Protection. This person's no longer

56  (Pages 218 to 221)

Exhibit 007 Page 56
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard       11-9-2010
Confidential - Pursuant to the Protective Order

Page 222

1  with the company. But he was in corporate
2  communications.
3      Q.  Where was he, which company?
4          You're talking about Michael Vanausdein?
5      A.  Right. I believe -- I believe he was a
6  Syngenta Crop Protection, Inc. employee, because he
7  worked in the Greensboro office.
8      Q.  And what was his job?
9      A.  Well, it says he was manager of corporate
10 communications.
11     Q.  Do you know Michael Vanausdein?
12     A.  I did when he was with us as an employee.
13 He's no --
14     Q.  When did he leave?
15     A.  I don't recall. That's why I was asking
16 what the date of the document was. But I would say
17 it was probably a few years ago, estimate, two or
18 three.
19     Q.  And the purpose of this was to send to
20 customers?
21     A.  I don't know if this was a -- I don't
22 know. I don't now who the target audience was for
23 this document.
24     Q.  If you look under frequently asked
25 questions on the first page, the question, should

Page 223

1  U.S. customers or farmers be concerned about our
2  ability to supply needed contracts?
3      A.  I don't know if this was an internal --
4  what I meant, I don't know if this was an internal
5  document to give our field course some background
6  or if it was an external document.
7      Q.  I see.
8          So you think Mr. Vanausdein could have
9  prepared it for your own internal use?
10     A.  It's possible.
11     Q.  And to whom would this have been provided
12 or shared if it was for internal use only?
13     A.  Well, if it was a Q&A document to brief
14 our sales force, it would have been the Syngenta
15 Crop Protection, Inc. sales team. Potentially the
16 marketing team as well.
17     Q.  Where is Mr. Van -- no. When did Mr.
18 Vanausdein leave the company?
19     A.  I said I don't recall.
20     Q.  Was the ultimate target audience the
21 customers, whether or not this was shared with
22 customers, was the ultimate target audience for this
23 information the customers?
24         MR. POPE: Objection to form.
25     A.  I don't know. It's possible that we

Page 224

1  wanted the field team to be able to respond if they
2  got a question.
3      Q.  Yes.
4      A.  But it wasn't necessarily a target
5  message that was intended for all customers to
6  receive.
7      Q.  Okay. But if the field team got this
8  information and this was the answer they were to use
9  in responding to customer's claims, wouldn't it
10 ultimately go to the customers?
11     A.  If that's -- if it was an internal
12 document, that's probably right.
13     Q.  And if it wasn't an internal document, it
14 likely would have gone to customers or farmers,
15 correct?
16     A.  It would have gone to the press. So it
17 would have gone to whoever was searching it. We
18 wouldn't -- we would not have sent it directly to
19 farmers.
20     Q.  Does Syngenta Crop Protection, Inc.
21 represent itself to its customers to be a global
22 company?
23     A.  Certainly our customers know that we are
24 headquartered in Switzerland. If that's what you
25 mean by your question.

Page 225

1      Q.  Okay.
2      A.  Some customers know.
3      Q.  In fact, this particular document uses the
4  Syngenta name and Syngenta trademark, doesn't it, on
5  the front page?
6      A.  It does. This document talking about the
7  logo, it says just Syngenta.
8      Q.  Yes.
9          Does Syngenta Crop Protection, Inc. tell
10 its customers that it makes decisions on -- strike
11 that.
12         Does Syngenta Crop Protection, Inc. tell
13 its customers that it makes decisions based upon
14 global strategy?
15     A.  That wouldn't be a common conversation
16 that we would have with a customer. We typically
17 would talk about our go to market strategy, what
18 products are going to be available for them to sell
19 to their customers.
20     Q.  But it could say that you're saying?
21         MR. POPE: Objection to the form of the
22 question.
23     Q.  But it might say that?
24     A.  What might say it?
25     Q.  That it makes decisions based upon a global

57  (Pages 222 to 225)

Exhibit 007 Page 57
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard      11-9-2010
Confidential - Pursuant to the Protective Order

Page 226

1  strategy, just like this document states?
2      MR. POPE: Objection to the form of the
3  question. It's incomprehensible where you're
4  going with this, Steve. Can you just explain
5  what the question is?
6      Q.  Are you telling me that this -- that any
7  statement in here is in error?
8      A.  No.  What I'm saying is it wouldn't be
9  the first thing we would talk to a customer about.
10 It's possible that we would reference a global R&D
11 strategy, for example.
12     Q.  Yes.
13     Okay.  And you would tell customers that
14 Syngenta has manufacturing facilities all over the
15 world, too, wouldn't you?
16     A.  We would.
17     Q.  All right.
18     (Plaintiff's Exhibit 23: An e-mail string
19     with the top from Frank Knight dated 12/7/06,
20     Bates SYN02995494 marked for identification,
21     as of this date.)
22     A.  Okay.  I've read the document.
23     Q.  Does Syngenta Crop Protection, Inc. update
24 the global product leadership teams on litigation or
25 other actions involving atrazine which could impact

Page 227

1  its usage?
2      A.  The product leadership team specifically
3  is your question?
4      Q.  Yes.
5      A.  Typically any material business issue
6  that would effect the business performance, it
7  could be a topic of discussion at a PLT.
8      Q.  This e-mail from Gary Dickson is dated
9  December 6, 2006.  And this is Syngenta 2995494.  And
10 he sent this e-mail to the president of Syngenta Crop
11 Protection, Inc., right?
12     A.  He copied it to --
13     Q.  Yeah, he copied it to --
14     A.  Valdemar Fischer.
15     Q.  To Mr. John Atkin in Basel, to Sarah Hull.
16 And where is she?
17     A.  At that time I believe she was in our
18 Washington office.  So she was the head of
19 corporate affairs.
20     Q.  With which company?
21     A.  I don't know which company she was with.
22 But I referenced the Jessica Adelman situation.
23 She would have had a similar role to Jessica at
24 that time.
25     Q.  And then there's a reference to Travis

Page 228

1  Dickinson --
2      A.  Travis is the head of marketing at
3  Syngenta Crop Protection, Inc. employee.
4      Q.  Okay.  And the e-mail was sent to Rolf
5  Furter in Basel.  What was his job?
6      A.  I believe Rolf was the head of global
7  development at that time.
8      Q.  And then Travis Dickinson responded about
9  ten minutes, 14 minutes later saying that an issue
10 for PLT, wanted to get this to you in case it gets to
11 Willy first, Travis.
12     What's an -- what's a PLT?
13     A.  It's product line team or product
14 leadership teams that we've previously talked
15 about.
16     Q.  Okay. So this topic or this sort of topic
17 as evidenced in the content of the first e-mail is
18 the thing that would go straight to Basel for
19 consideration?
20     MR. POPE:  Objection to the form of the
21     question.
22     Q.  Correct?
23     A.  Well, this was a -- a potential threat.
24 And the way I read it is it was highlighted that it
25 was of a materiality that we would inform PLT,

Page 229

1  which has global personnel also on it.
2      Q.  Okay. And in the top one Frank Knight
3  responds to Dan Campbell saying, as Travis suggests
4  below, we will need to discuss potential strategies
5  developed under the scope of the triazine PLT. We
6  may want to initiate this at next meeting in January.
7      Okay?
8      A.  That's what the document says.
9      Q.  All right.  And which triazine PLT?
10     A.  Well, the triazine PLT likely has
11 responsibility for all the triazine active
12 ingredients.
13     Q.  Worldwide?
14     A.  All the product leadership teams have a
15 global discussions.  That's why the regions are
16 represented.
17     Q.  Okay. And the reference to developing
18 response strategies is that the triazine product
19 leadership team to events effecting atrazine in the
20 United States, correct?
21     A.  Rephrase that, if you would, please.
22     Q.  Yes.
23     I mean, the point of this is to -- strike
24 that.
25     The entire discussion is concerned about

58  (Pages 226 to 229)

Exhibit 007 Page 58
7fb4483a-c27e-4333-8ef9-18d424457f77

Case 3:10-cv-00188-JPG-PMF   Document 335   Filed 12/26/12   Page 59 of 60   Page ID
#12979
Case 3:10-cv-00188-JPG -PMF   Document 112-2 *SEALED*   Filed 12/17/10   Page 332 of 486

Hawkins, Vernon Richard     11-9-2010
Confidential - Pursuant to the Protective Order

### Page 230

1   events occurring in Minnesota and there's a fleeting
2   reference to a Holiday Shores case in the top e-mail.
3   But the entire reference is U.S. based, correct?
4        A.  Well, the reference of the issue --
5        Q.  Yes, the threat.
6        A.  -- that created the threat, yeah, was
7   U.S. based, yes.
8        Q.  Right.
9        A.  Now, yeah, the sort of the connector to
10  that is, you know, it's understood that if you had
11  a registration lost in the U.S., it might effect
12  other areas.  But this was a specific U.S. issue.
13       Q.  Can I ask you, sir, who are the top
14  management people at Syngenta Crop Protection, Inc.
15  that you would consult before you would make a key
16  decision?
17       A.  It would depend on the topic or area.
18  But I have an operating committee for Syngenta Crop
19  Protection, Inc.
20       Q.  An operating committee?
21       A.  Syngenta operating committee.  And it
22  includes Corey Huck, who's my U.S. commercial
23  operations head; it includes Marian Stypa, who's
24  the head of development product safety; includes
25  Jason Fogden, who's my head of finance; and it

### Page 231

1   includes Travis Dickinson, who's my head of
2   marketing.
3        Q.  You wouldn't necessarily talk to all of
4   them about each decision, but depending on the area
5   of subject matter, you would likely talk to one of
6   them before making a decision?
7        A.  Well, it would -- in practice, it would
8   depend on the urgency.  So we meet monthly and talk
9   about the business, make decisions related to the
10  business, prioritize resource where necessary.  But
11  if an issue came up, I might actually consult
12  somebody outside the operating committee, like Beth
13  Quarles who is in legal or John Riley, who's in
14  supply chain.
15       Q.  Would you do that for each decision?
16       A.  It would depend on the significance of
17  it.  If it's pricing, we'll make it in our
18  commercial steering team.  And we'll make -- we
19  have that -- we meet weekly via telephone.  So it
20  depends on the type of decision, the magnitude, the
21  impact in terms of its breadth.  But anything
22  related to running the business, you have to be
23  able to respond in a timely way to manage the
24  customer partnership.
25       MR. TILLERY: Okay.  No further questions.

### Page 232

1        MR. POPE:  I have no questions.  Thank
2   you very much.
3        I will reserve signature.  And this
4   deposition is deemed confidential under our
5   protective order.
6        THE VIDEOGRAPHER: Stand by.
7        This is the end of videotape number four,
8   volume one in the deposition of Vern Hawkins.
9   The original videotapes will be retained by
10  WestLaw Deposition Services.  Going off the
11  record, the time on the monitor is 5:35 and
12  seven seconds.
13            (TIME NOTED: 5:35 p.m.)
14            (SIGNATURE RESERVED.)
15
16
17
18
19
20
21
22
23
24
25

### Page 233

1            WITNESS' CERTIFICATE
2
3        I, VERNON RICHARD HAWKINS, do hereby
4   certify that I have read and understand the
5   foregoing transcript and believe it to be true,
6   accurate, and complete transcript of my testimony,
7   subject to the attached list of changes, if any.
8
9
10
11            VERNON RICHARD HAWKINS
12
13
14  This deposition was signed in my presence by
15  _____, on the _____ day of
16  _____, 2010.
17
18
19            NOTARY PUBLIC
20  My commission expires:
21
22
23
24
25

59 (Pages 230 to 233)

Exhibit 007 Page 59
7fb4483a-c27e-4333-8ef9-18d424457f77

Hawkins, Vernon Richard    11-9-2010
Confidential - Pursuant to the Protective Order

| Page 234 | Page 236 |
|---|---|
| 1         (Page 1 of 2) <br> 2 <br> 3     E R R A T A   S H E E T <br> 4   RE: City of Greenville, Illinois, et al. <br>        vs. Syngenta Crop Protection, Inc., et al. <br> 5   DEPOSITION OF: Vernon Richard Hawkins <br>        Please read this transcript with care, <br> 6   and if you find any corrections or changes you wish <br>        made, list them by page and line number below. DO <br> 7   NOT WRITE IN THE TRANSCRIPT ITSELF. Return the <br>        Certificate and Errata Sheet to this office after <br> 8   it is signed. We would appreciate your prompt <br>        attention to this matter <br> 9       To assist you in making such corrections, <br>        please use the form below.  If supplemental or <br> 10   additional pages are necessary, please furnish same <br>        and attach them to this errata sheet. <br> 11   Page:   Line:    should read: <br> 12   Page:   Line:    should read: <br> 13   Page:   Line:    should read: <br> 14   Page:   Line:    should read: <br> 15   Page:   Line:    should read: <br> 16   Page:   Line:    should read: <br> 17   Page:   Line:    should read: <br> 18   Page:   Line:    should read: <br> 19   Page:   Line:    should read: <br> 20   Page:   Line:    should read: <br> 21   Page:   Line:    should read: <br> 22   Page:   Line:    should read: <br> 23   Page:   Line:    should read: <br> 24   Page:   Line:    should read: <br> 25   Page:   Line:    should read: | 1   STATE OF NORTH CAROLINA <br>     COUNTY OF MECKLENBURG <br> 2 <br> 3      REPORTER'S CERTIFICATE <br> 4     I, V. Dario Stanziola, a Notary Public in <br> 5   and for the State of North Carolina, do hereby <br> 6   certify that there came before me on Tuesday, <br> 7   November 9, 2010, the person hereinbefore named, <br> 8   who was by me duly sworn to testify to the truth <br> 9   and nothing but the truth of his knowledge <br> 10   concerning the matters in controversy in this <br> 11   cause; that the witness was thereupon examined <br> 12   under oath, the examination reduced to typewriting <br> 13   under my direction, and the deposition is a true <br> 14   record of the testimony given by the witness. <br> 15     I further certify that I am neither <br> 16   attorney or counsel for, nor related to or employed <br> 17   by, any attorney or counsel employed by the parties <br> 18   hereto or financially interested in the action. <br> 19     IN WITNESS WHEREOF, I have hereto set my <br> 20   hand, this the 18th day of November 2010. <br> 21 <br> 22 <br> 23 <br>      V. DARIO STANZIOLA, CSR, RPR, CRR <br> 24      Notary Public No. 20011200120 <br> 25 |

| Page 235 |
|---|
| 1        (Page 2 of 2) <br> 2    Page:   Line:    should read: <br> 3    Page:   Line:    should read: <br> 4    Page:   Line:    should read: <br> 5    Page:   Line:    should read: <br> 6    Page:   Line:    should read: <br> 7    Page:   Line:    should read: <br> 8    Page:   Line:    should read: <br> 9    Page:   Line:    should read: <br> 10   Page:   Line:    should read: <br> 11   Page:   Line:    should read: <br> 12   Page:   Line:    should read: <br> 13   Page:   Line:    should read: <br> 14   Page:   Line:    should read: <br> 15   Page:   Line:    should read: <br> 16   Page:   Line:    should read: <br> 17   Page:   Line:    should read: <br> 18   Page:   Line:    should read: <br> 19   Page:   Line:    should read: <br> 20   Page:   Line:    should read: <br> 21   Page:   Line:    should read: <br> 22   Page:   Line:    should read: <br> 23   Page:   Line:    should read: <br> 24   Page:   Line:    should read: <br> 25   Page:   Line:    should read: |

60 (Pages 234 to 236)

Exhibit 007 Page 60
7fb4483a-c27e-4333-8ef9-18d424457f77