# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CITY OF GREENVILLE, ILLINOIS *et al.*,    )
    )
Plaintiffs,    )
    )
v.    )
    )    Case No. 10-188-JPG-PMF
SYNGENTA CROP PROTECTION, INC.,    )
and SYNGENTA AG,    )
    )
    )
Defendants,    )

---

## PLAINTIFFS' OPPOSITION TO SYNGENTA AG's 12(b)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

---

   /s/  Stephen M. Tillery

**KOREIN TILLERY, LLC**
STEPHEN M. TILLERY
CHRISTINE J. MOODY
CHRISTOPHER  HOFFMAN
CHRISTIE R. DEATON
MICHAEL E. KLENOV
505 N. Seventh Street, Suite 3600
St. Louis, Missouri 63101
Telephone:  (314) 241-4844
Facsimile:  (314) 241-3525
STillery@koreintillery.com
CMoody@koreintillery.com
CHoffman@koreintillery.com
CDeaton@koreintillery.com
MKlenov@koreintillery.com

**BARON & BUDD, P.C.**
SCOTT SUMMY
CARLA BURKE
CELESTE EVANGELISTI
CARY MCDOUGAL
3102 Oak Lawn Ave., Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605
Facsimile: (214) 520-1181
SSummy@baronbudd.com
CBurke@baronbudd.com
CEvangel@baronbudd.com
CMcdouga@baronbudd.com

PATRICIA S. MURPHY
**MURPHY LAW OFFICE**
P.O. Box 220
Energy, Illinois  62933-0220
Telephone:  (618) 964-9640
Facsimile:   (618) 964-1275
tsuemurphy@gmail.com

*Attorneys for Plaintiffs*

**INTRODUCTION**

This Court should exercise jurisdiction over Syngenta AG ("SAG") because it does business in Illinois through its wholly-owned subsidiary Syngenta Crop Protection, Inc. ("SCPI").  SAG is not a mere investment holding company, as it implies, but rather a management holding company.  SAG actively manages its worldwide network of roughly 300 subsidiaries, including SCPI, through its myriad global management arms.  Principal among them are the Syngenta Executive Committee ("SEC"), created by the SAG Board to manage the "day-to-day" operations of all Syngenta companies, and its subordinate the Crop Protection Leadership Team ("CPLT"), charged with managing SAG's global Crop Protection ("CP") subsidiaries, including SCPI.  The CPLT, in turn, conscripts the employees of SAG subsidiaries to manage smaller chunks of SAG's global enterprise through Regional Leadership Teams ("RLTs") which answer directly to the CPLT.  Through this matrixed global management system, SAG controls subsidiaries like SCPI which answer to RLTs, which answer to the CPLT, which answers to the SEC, which ultimately answers to the SAG Board.  These and other SAG management arms do not belong to any specific legal entity within SAG's global network, but instead operate across corporate boundaries to serve the interests of SAG's shareholders.

SAG endows its global managers with comprehensive power over subsidiaries like SCPI. Various of SAG's managerial arms select SCPI's Board members, its officers, and its senior managers; dictate the salaries and other benefits of SCPI employees; shuffle employees from other parts of SAG's organization to and from SCPI; appropriate SCPI's cash to serve the liquidity needs of other subsidiaries and to benefit SAG's shareholders; tell SCPI what products to sell, how to sell them, and who to sell them to; and even sell SCPI's products to other companies in the U.S. on SCPI's behalf.  Moreover, SCPI does not sell its own products in the

1

U.S. but rather those of SAG.  SAG has a centralized global R&D function that develops new products at dedicated research facilities around the world so that subsidiaries like SCPI can later sell SAG's products in exclusive geographic regions under the ubiquitous global "Syngenta" trademark.  In addition to selling its products, SAG conscripts subsidiaries like SCPI to do extensive field testing of SAG's products and to seek approval from national regulators like the EPA to sell those products.  From an operational perspective, SCPI exists to do whatever is necessary to get SAG's products to the lucrative U.S. agricultural market, especially the prolific corn-growing state of Illinois.

Because discovery was limited, Plaintiffs need only make a prima facie showing of jurisdictional facts to defeat SAG's Rule 12(b)(2) motion.  Courts that have considered Rule 12(b)(2) motions of global management structures resembling that of SAG have invariably found that local affiliates like SCPI act as "alter egos" or mere "regional branches" under the control of their ultimate parent, justifying the attribution of the local affiliate's in-state activities to that parent.  Similarly, courts have found that local affiliates that exist primarily to carry on the parent's business or to sell the parent's products within specific territories are mere "agents" of the parent, also justifying the attribution of the affiliate's in-state contacts to the parent for purposes of the jurisdictional analysis.  SAG possesses most if not all of the key organizational features that these courts have relied on in asserting jurisdiction over parent companies under both of these theories.  If this Court looks at the practical realities of SAG's management structure and business operation, rather than merely its legal form, it too should attribute SCPI's undisputed contacts with Illinois to SAG and find that it has personal jurisdiction over SAG.

**STATEMENT OF FACTS**[1]

I.      **S**AG **I**S A **G**LOBAL **C**OMPANY **H**EADQUARTERED IN **B**ASEL, **S**WITZERLAND.

The Syngenta group ("Syngenta") was formed in 2000 when Novartis and AstraZeneca merged their respective agricultural businesses to form the world's first and largest dedicated agribusiness headquartered in Basel, Switzerland.  The goal was to leverage the companies' combined global workforce and resources into a single, synergistic business with "global marketing across regions," "global sales and service networks," and "global research and science platforms."[2]  Syngenta consists of roughly 300 companies worldwide.[3]  At the top of the corporate hierarchy sits SAG,[4] a Swiss corporation with ADRs that trade on the New York Stock Exchange.[5]  SAG directly owns several Swiss subsidiaries which in turn own all other Syngenta entities.[6]  Through this convoluted corporate structure, SAG owns 100% of SCPI.[7]

SAG's global management structure is aligned with its two primary product divisions – Crop Protection (CP) and Seeds – and six centralized global functions: HR, Corporate Affairs, Global Operations, R & D, Legal & Taxes, and Finance.[8]  "The Crop Protection division has an

---

[1] Plaintiffs' evidence in support of jurisdiction is so voluminous that Plaintiffs cannot address fully here, and this Court would require hundreds of hours to review it.  Plaintiffs have therefore distilled thousands of pages of documents into a summary pursuant to Fed. R. Evid. 1006. *See* Exhibit 1.

[2] Exhibit 2, Deposition of Christoph Maeder at 19:15-20:5; Exhibit 3, Deposition of John Atkin at 136:11-138:4; Exhibit 12; Exhibit 13.

[3] Exhibit 4, Deposition of Tobias Meili at 61:2-5; Exhibit 333 at 1.  *All page numbers indicated in citations correspond to internal page numbers bates stamped on individual Exhibits.*

[4] Exhibit 333 at 1.

[5] Maeder at 48:14-25.

[6] Maeder at 34:14-37:18; Exhibit 333 at 1; Exhibit 325 at 28.

[7] SAG owns Syngenta Participations AG, which owns Seeds J.V. CV., which owns Syngenta Corporation, which owns Syngenta Seeds, Inc., which owns SCPI. Exhibit 333 at 1.

[8] Exhibit 318 at 3; Exhibit 17 at 6.

3

extensive global network of national companies."[9]  SCPI is one of those companies.  While the global management of SAG's product divisions is handled by individuals from numerous SAG subsidiaries,[10] its top management layer is housed in Syngenta's undifferentiated global headquarters in Basel.[11]

Syngenta's Basel headquarters houses SAG and 12 of its subsidiaries in office space that does not distinguish between the Syngenta entities.[12]  Employees of these subsidiaries generally have no knowledge of which subsidiary others work for, and do not consider it their business to know such matters.[13]  The top global managers of Syngenta's worldwide agribusiness are employed primarily by SAG's direct subsidiary Syngenta Crop Protection AG ("SCPAG") and its indirect subsidiary Syngenta International AG ("SIAG").[14]  SCPAG employs the global operational managers of SAG's CP and Seeds divisions, including those dedicated to atrazine. They include global managers of production, distribution, and marketing – "basically all the operative businesses of Syngenta." [15]  SIAG employs the Heads of SAG's product divisions, the Heads of its global functions, as well as senior staff in global departments like HR, Finance, Legal and Taxes, and Corporate Affairs.[16]  While SCPAG and SIAG employees oversee the daily operations of SCPI, neither company has any ownership interest in SCPI.  SAG is the only

---

[9] Exhibit 17 at 6.

[10] Maeder at 35:5-37:18.

[11] Maeder at 37:25-39:6; Exhibit 10, Deposition of Marian Stypa at 87:22-88:4.

[12] Maeder at 35:19-37:10.

[13] Meili at 14:14-17:21, 33:17-34:15

[14] Maeder at 40:14-41:7, 181:25-183:15.

[15] Meili at 66:22-67:7, 67:1-20; Maeder at 171:14-172:1.

[16] Maeder at 181:25-183:15; Atkin at 72:2-9.

link between them.[17]

## II.   SAG MANAGES ITS GLOBAL BUSINESSES THROUGH ITS TOP MANAGEMENT ARM: THE SEC.

Although SAG is a holding company, it is prohibited from being a "mere investment holding company."  Swiss law requires SAG's Board to be ultimately responsible for the operational management of the entire Syngenta group, including SCPI.[18]  Swiss law permits SAG's Board to delegate its "day-to-day" management responsibilities over the Syngenta group to a management committee, and the Board has done that by creating the SEC.[19]  As a result, the SEC sits at the top of Syngenta's management structure and has ultimate power over all Syngenta companies, including SCPI.[20]  The CEO of the Syngenta group (Mike Mack) is the highest ranking officer within Syngenta and chairs the SEC.[21]  The other members of the SEC report directly to the CEO and include the global Heads of the Seeds (Davor Pisk) and CP (John Atkin) divisions, the global Heads of Legal and Taxes (Christoph Maeder), R&D (Sandro Aruffo), Global Operations (Mark Peacock), and Business Development (Robert Berendes), as well as the CFO (John Ramsay) for the Syngenta group.[22]  Although the SEC derives its management authority from the SAG Board, all SEC members are employed by SAG's indirect

---

[17] Exhibit 333 at 1.

[18] Maeder at 132:17-133:12; Exhibit 17 at 16 ("The Board exercises full and effective control of the company as set out in the Swiss Code of Obligations and in the regulations governing the internal organization of Syngenta AG. This includes the ultimate direction and management of Syngenta, and establishes the basic strategic accounting, organizational and financial policies to be followed"); Exhibit 318 at 3, 10.

[19] Maeder at 132:17-133:12; Exhibit 17 at 17 ("Under the direction of the Chief Executive Officer, the Executive Committee is responsible for the operational management of the company"); Exhibit 318 at 3, 10.

[20] Maeder at 30:19-31:4; Exhibit 318 at 3, 10.

[21] Exhibit 7, Deposition of Vernon Hawkins, at 89:24-90:16.

[22] Exhibit 318 at 3, 10.

subsidiary SIAG.[23]  Two of the SEC members – Atkin and Maeder – sit on SCPI's Board.[24]

### III.   SAG CENTRALLY MANAGES ALL ITS CP SUBSIDIARIES AS AN INTEGRATED GLOBAL DIVISION.

SAG manages its worldwide CP business as an integrated division of one global company.  The convoluted network of separate corporate entities plays no functional role in the management of Syngenta group companies.  The global Head of Syngenta's CP division is SEC member John Atkin, the Chief Operating Officer of "Crop Protection."[25]  "Crop Protection" is merely the name of an SAG product line – there is no corresponding corporate entity.[26]  Atkin manages Syngenta's global CP business through the Crop Protection Leadership Team ("CPLT").[27]  Like all other global teams and committees within Syngenta, the CPLT derives its "global" authority from the SEC.[28]  These teams and committees are also not part of any corporate entity – they are merely layers within SAG's global management structure.

The CPLT represents the top layer of management within Syngenta's CP division.  It is comprised of COO Atkin, the four Region Heads of CP (including NAFTA Head and SCPI President Vern Hawkins), and a number of Heads of CP-related global functions at Syngenta's global headquarters in Basel.  These include the Head of Global Marketing (Rob Neil), the Head of Global Finance (Mark Patrick), the Head of Global Supply (Mark Peacock), and the Head of Global CP R&D (Gerardo Ramos).[29]  Each reports directly to Atkin.

---

[23] Maeder at 134:7-20.
[24] Exhibit 348 at 366.
[25] Atkin at 12:1-20; Exhibit 318 at 11-12.
[26] Atkin at 12:1-20.
[27] Atkin at 112:5-17.
[28] Maeder at 138:1-5.
[29] Atkin at 112:5-115:2.

The CPLT makes all of the important decisions affecting SAG's global CP business.  It manages global CP budgets and checks the performance of subsidiaries against targets.  If a subsidiary deviates from a budget or a performance target, it determines corrective action.  It is charged with assessing subsidiaries' operational efficiency, streamlining global performance, and reducing costs.[30]  It monitors talent within SAG's CP companies, develops global succession plans, and determines when subsidiaries should hire employees and what qualifications they must have.[31]  Unlike SCPI's Board, which has never met, the CPLT usually meets in Basel every other month.[32]

To address local issues incapable of effective management from Basel, SAG's global CP division is subdivided into four regions.  Each region has a Regional Leadership Team (RLT) chaired by a Region Head.  All four of the Region Heads sit on the CPLT and report to John Atkin.  Region Heads bring the issues of specific CP companies to the CPLT, and carry back instructions for local implementation.[33]  SCPI's headquarters in Greensboro, North Carolina doubles as Syngenta CP's NAFTA region headquarters.  Accordingly, SCPI's President Vern Hawkins is the Head of CP NAFTA and chairs the NAFTA RLT.[34]

The NAFTA RLT consists of Hawkins, the Heads of SAG's Canadian and Mexican CP companies, and roughly 13 other employees from SCPI and other SAG companies in the region.[35]  All members of the NAFTA RLT report directly to Hawkins, though several do not

---

[30] Atkin at 115:4-116:15; Hawkins at 58:25-59:13.

[31] Atkin at 65:10-67:15; Hawkins at 54:14-55:7.

[32] Hawkins at 49:19-50:6.

[33] Atkin at 116:22-117:13.

[34] Atkin at 36:24-39:3; 51:4-24; Hawkins at 26:1-7.

[35] Atkin at 36:24-39:3.

7

work for SCPI.[36]  The Canadian and Mexican company Heads report directly to Hawkins even

though SCPI has no ownership interest in their companies.[37]  Hawkins is also the boss of a

woman named Jessica Adelman, who Hawkins testified runs "our" Washington, D.C. office.[38]

While Hawkins has the power to fire Adelman, he does not know what Syngenta company she

works for.[39]  All he knows is that she does not work for SCPI, and that SCPI does not have a

Washington, D.C. office.

      Interestingly, when asked about their job titles, several SCPI employees gave a "global"

or "NAFTA" title rather than an SCPI title.[40]  According to SCPI's SEC-approved organization

chart, SCPI has 32 employees with NAFTA job titles, including its President and 12 of the 13

executives and managers who report directly to him.[41]  Hawkins explained that Syngenta

employees use different titles for internal and external purposes.[42]  While Hawkins's external

title is President of SCPI, within Syngenta he is simply Head of Crop Protection NAFTA.[43]  In

other words, internal titles reflect SAG's global management structure, while external titles

conceal it.

      Members of the NAFTA RLT oversee the management and operation of all three

---

[36] Hawkins at 35:11-36:25.

[37] Atkin at 35:18-36:15; Hawkins at 27:25-28:25, 29:20-30:3.

[38] Hawkins at 35:11-36:25.

[39] Hawkins at 41:16-42:20.

[40] Exhibit 6, Deposition of Peter Hertl at 8:7-9 (Head of Global Product Safety for Syngenta Crop Protection); Exhibit 11, Deposition of Janis McFarland, at 43:2-5 (Head of Regulatory Affairs, NAFTA); Stypa 21:14-21 (head of product development and product safety for NAFTA).

[41] Exhibit 338 at 51. This is hardly surprising: the heading on every page is "Syngenta AG", and the name "Syngenta Crop Protection, Inc." is conspicuous only for its absence.

[42] Hawkins at 34:24-35:10.

[43] Hawkins at 34:24-35:10.

Syngenta CP companies in the region.[44]  For example, even though SCPI does no business in Canada or Mexico, Hawkins makes decisions related to product sales in those countries.[45] Marian Stypa, an SCPI employee and Head of Development and Product Safety NAFTA,[46] oversees the Development functions in Mexico and Canada.[47]  Elizabeth Quarles, an SCPI officer and General Counsel NAFTA CP,[48] oversees the Legal departments in those countries.[49] Jason Fogden, SCPI's CFO and Financial Controller NAFTA CP,[50] oversees their financial departments.[51]  Janis McFarland, an SCPI employee and Head of Regulatory Affairs NAFTA,[52] oversees their Regulatory Affairs functions.[53]

All members of the NAFTA RLT in turn report to members of the CPLT or to other parts of Syngenta's top management layer in Basel.  As Head of CP NAFTA, SCPI President Vern Hawkins reports to COO and CPLT member John Atkin.[54]  As Head of Development for NAFTA, SCPI employee Marian Stypa reports to global Head of Development and CPLT member Gerardo Ramos.[55] As Head of Finance for NAFTA, SCPI employee Jason Fogden reports to global Head of Finance and CPLT member Mark Patrick.[56]  As Head of Supply Chain

---

[44] Exhibit 31.

[45] Hawkins at 28:11-25, 29:20-30:3.

[46] Exhibit 338 at 225.

[47] Hawkins at 45:4-46:14; Stypa at 77:10-78:3

[48] Exhibit 338 at 104.

[49] Meili at 43:9-25, 44:16-45:18; Exhibit 5, Deposition of Elizabeth Quarles at 31:1-19.

[50] Exhibit 338 at 52.

[51] Exhibit 9, Deposition of Jason Fogden, at 16:11-17:2.

[52] Exhibit 338 at 240; Fogden at 6:22-24.

[53] Exhibit 107 at 1.

[54] Hawkins at 29:1-9.

[55] Hawkins at 45:4-46:14

[56] Fogden at 19:19-20:6.

for NAFTA, SCPI employee John Riley reports to global Head of Supply Chain and CPLT member Mark Peacock.[57]  As Head of Regulatory Affairs for NAFTA, SCPI employee Janis McFarland reports to Syngenta's Head of Global Regulatory Affairs in Basel.[58]  Numerous other SCPI employees have reported to employees of other SAG subsidiaries, including – of particular relevance in this case – SCPI employees that are part of global functional departments that perform and manage health and environmental safety studies.[59]

These types of inter-company reporting relationships are referred to within Syngenta as "functional" or "dotted-line" relationships, and they are a central feature of SAG's "matrix" management system built around centralized global functions such as R&D, Operations (Supply), and Finance.[60]  Vern Hawkins testified that SCPI employees with a "functional" reporting obligation are required to "consult" their functional manager before taking action, to ensure that SCPI makes decisions in the best interest of the Syngenta group as a whole.[61]  SAG declarant Tobias Meili described functional reporting as "performance management," as distinguished from the legal ability to hire, fire, or discipline an employee.[62]

Apparently, the difference between "functional" reporting and "direct" reporting within Syngenta is that functional reporting ultimately matters, while direct reporting is required merely

---

[57] Atkin at 40:20-41:18; Hawkins at 48:5-25.

[58] McFarland at 73:18-74:18, 75:3-17.

[59] Exhibit 138 at 1, Exhibit 192 at 1, Exhibit 198 at 1, and Exhibit 202 at 1 (Ecological and Environmental Sciences); Exhibit 29 at 6 (Health Assessment and Environmental Safety), at 11 (Human Safety) and at 15 (HAES project management); Exhibit 40 at 3 (Human Safety); Exhibit 229 at 9 (Product Safety); Exhibit 306 at 6 (Product Safety Business Management and Compliance).

[60] Atkin at 40:2-13, 69:19-71:4.

[61] Hawkins at 26:8-24.

[62] Meili at 50:2-51:7.

to keep up appearances and formalize decisions made elsewhere.  For example, Hawkins explained that SCPI employee and Head of Supply Chain for NAFTA John Riley reports to him only formally; Riley's real reporting obligation is to the global Head of Supply in Basel – CPLT and SEC member Mark Peacock.[63]  Similarly, Hawkins testified that SCPI employee Daniel Lora, Head of HR for NAFTA, actually answers to the global Head of HR in Basel and reports to Hawkins in form only.[64]  In other words, the President of SCPI admitted that his subordinates at SCPI are, in reality, directly managed by SAG's global leaders in Basel.

Even limited discovery revealed that so-called "functional" managers not only conduct and collaborate on SCPI employees' performance reviews,[65] but also request salary increases for SCPI personnel.  SCPI employee Peter Hertl claimed he reported only functionally to Harry Swaine, a Syngenta global manager in Great Britain.  But in Hertl's performance review, Swaine was listed as his only Manager, with no mention of any manager at SCPI.[66]  When Hertl was promoted to a global role within the Syngenta management structure, Swaine emailed a global HR employee in Basel to ask that Hertl's salary at SCPI be increased.[67]  Like almost every other SCPI employee Plaintiffs deposed, Hertl did not know what Syngenta company his functional manager or his functional subordinates worked for.[68]

From Syngenta's inception, its leaders have known its management structure exposes SAG to jurisdiction in countries where its subsidiaries operate.  As a 2001 presentation to the

---

[63] Hawkins at 48:5-25.

[64] Hawkins at 46:15-47:21.

[65] Exhibits 138, 192, 198 and 202.  *See also* Exhibits 330 and 339.

[66] Exhibits 198 and 202.

[67] Exhibit 102 at 4. Hertl also discussed SCPI personnel matters with Swaine. Exhibit 119.

[68] Hertl at 42:3-43:2, 56:11-57:3.  *See also* Quarles at 103:15-25, Hawkins at 51:12-52:5, Exhibit 8, Deposition of Dirk Drost, at 28:8-33:23.

SEC explained: "Management of Group Companies only along management structure may violate legal requirements and therefore expose Syngenta to risks with respect to tax, jurisdiction, and claims against subsidiaries ('piercing the corporate veil')."[69]  The presenter suggested that governance of group companies should "[a]ssure legal compliance and a defendable position with respect to taxes and jurisdiction."[70]  While management of group companies would continue "along management lines," the SEC was told to "Avoid track record of Group Companies being run out of HQ or Region."[71]

Shortly thereafter, a global manager in the legal department warned that Syngenta's management structure could be legally indefensible:

> Syngenta's management structure does not follow the legal structure.  Most obviously, the regions are not as such incorporated as legal entities.  Further, each business function has its own management groups and committees composed of representatives from different legal entities.[72]

The author further noted that "[t]he discrepancy between [legal requirements] and Syngenta's group-wide management is obvious, in particular with regard to functional reporting lines."[73]  To create a plausible defense to jurisdiction, he provided detailed recommendations for creating the appearance of legal compliance: phrasing orders and instructions as "suggestions" or "recommendations,"[74] avoiding creating a written record of global management meetings,[75] and informing subsidiary Board members of new

---

[69] Exhibit 32 at 4-5.

[70] Exhibit 32 at 9.

[71] Exhibit 32 at 9.

[72] Exhibit 49 at 7.

[73] Exhibit 49 at 8.

[74] Exhibit 49 at 13.

[75] Exhibit 49 at 13.

Syngenta policies "preferably by phone."[76]

## IV.   SAG CREATES THE PRODUCTS SCPI SELLS, CONTROLS THEIR DEVELOPMENT AND RELEASE TO THE U.S. MARKET, AND DECIDES WHETHER SCPI CAN REMOVE A PRODUCT FROM THE MARKET.

SAG has a Global R&D function in which all proprietary active ingredients (AIs) in Syngenta CP products are discovered at dedicated research facilities.  SAG's primary CP R&D facilities are located in the UK and Switzerland, and they create the products Syngenta CP companies like SCPI sell.[77]  Individual CP companies like SCPI are incapable of developing their own AIs, and therefore rely for their continued survival on SAG's Global R&D function.[78]

The CP division's development process is divided into four stages.[79]  Stage 1 includes "discovery" and initial lab and greenhouse testing of basic chemical characteristics – efficacy, toxicity, and run-off.[80]  The global R&D facilities absorb the costs of this work without charging CP companies like SCPI who may later sell the products.[81]  Stage 2 is small plot testing at the R&D facilities and in a few representative areas, like the U.S., where a potential product may ultimately be sold.  The results of these tests determine whether the AI is a viable product and whether SAG will invest the roughly $200 million it costs to take a product from the lab to the market.[82]

Stage 3 is full-blown field testing in all countries where the AI may be sold. Marian

---

[76] Exhibit 49 at 14.

[77] Atkin at 74:23-76:6; 77:8-78:3; Stypa at 22:23-23:12; Exhibit 334 at 1, 2-3.

[78] Stypa at 22:23-23:12; Atkin at 78:4-78:25.

[79] For detailed descriptions of the Syngenta CP's global product development and life cycle management organization, process, and decision-makers, *see* Exhibits 19, 157, 159 and 165.

[80] Stypa at 34:23-35:10.

[81] Atkin at 161:7-163:2.

[82] Atkin at 80:20-81:16.

Stypa, an SCPI employee and Head of Development for NAFTA, testified that SCPI is testing between four and six new AIs at any given time, resulting in approximately 3500 field tests annually.[83]  Although SCPI has no intellectual property rights to these chemicals during testing, it does not enter into contracts with or charge other Syngenta companies for its work. When asked why other Syngenta companies do not pay SCPI for development work, Stypa testified: "Well, we're all working for the same company, so that wouldn't make a lot of sense."[84]

At any given time, Syngenta is running hundreds of tests in Illinois: about a fourth of its roughly 3,500 annual tests are on products intended for use on corn, and all such products are tested in Illinois.[85]  SAG's global managers supervise SCPI employees involved in Illinois field testing.  For example, when an SCPI scientist running field tests in Illinois wanted to change a testing protocol, he had to get permission from the Global Technical Manager in Basel.[86]  In addition to managing Illinois testing protocols, employees from other SAG subsidiaries travel to Illinois to observe field tests.  Based on visits to the sites of Illinois field trials of Stage 1 compounds, Syngenta CP's global Team Leader for Weed Control Biology reported on the status of these trials.[87]  These visits were part of a week-long "corn tour" of Midwest states by global development managers from Syngenta companies worldwide.[88]

Syngenta CP has a highly-structured project development portfolio process in which countless ongoing and proposed projects are prioritized by "countries" and "regions" (and in

---

[83] Stypa at 24:11-25:5.

[84] Stypa at 35:11-36:13.

[85] Atkin at 205:23-208:19; Stypa at 35:11-36:13

[86] Exhibit 182.

[87] Exhibits 294, 295 and 296.

[88] Hawkins at 118:3-119:7; Stypa at 40:23-42:18; Exhibits 241 and 288.

some cases, proposed by Basel for countries and regions), re-prioritized by Syngenta's global development and marketing managers in Basel, and are ultimately approved and funded (or not) by the SEC.[89]  As a result, SAG's global managers decide what projects SCPI employees will and will not do.  SCPI employees have commented internally on their lack of control over their own projects.  In a particularly revealing email string, after the global Marketing Leadership Team (MLT) did not "support" certain projects, an SCPI employee asked about the implications for those projects.[90]  SCPI's development project leader for herbicides in the NAFTA region[91] responded: "If global does not support them we are NOT supposed to do any work."  He later commented: "Total recentralization … perhaps by 2015 we'll be back to regional funds/decisions for regional projects.  Frickin' socialists!"[92]

When enough data has been gathered during Stage 3 to support a regulatory submission, SAG's global leadership decides whether a potential product will be promoted to Stage 4 – actual sale.[93]  The initial recommendation is made by the global Development Committee in Basel, chaired by global Head of CP Development Gerardo Ramos.  The CPLT chaired by John Atkin then makes the final decision with SEC concurrence.[94]  The bottom line is that SCPI cannot sell any new product unless and until the global Development Committee, the CPLT, and

---

[89] *See e.g.*, Exhibits 167, 169, 170, 193-96, 199, 209, 219, 222-24, 226, 272-75, and 289-92.
[90] Exhibit 292.
[91] Drost at 178:19-179:8.
[92] Exhibit 292.
[93] Atkin at 88:10-89:15; Hertl at 164:4-165:14, 166:23-168:13.
[94] Atkin at 124:9-125:14.

SEC in Basel give it permission to do so.[95]

Syngenta's global leadership also determines whether SCPI can stop selling a product. John Atkin explained that if there was a question about an existing product's viability, Head of Global Marketing Rob Neill would make a recommendation to the CPLT.  If the CPLT decided to discontinue the product, it would seek support from the SEC.[96]  In other words, SCPI cannot remove a product like atrazine from the market without a CPLT decision blessed by the SEC. Even SAG declarant Tobias Meili admitted that SCPI does not have the authority to stop selling atrazine.[97]  According to Atkin, Syngenta's top global management has discussed replacing atrazine or taking it off the market, but apparently it has decided to maintain the status quo.[98]

## V.   SAG'S GLOBAL CP MANAGERS TELL SCPI HOW MUCH ATRAZINE TO MAKE, WHERE THAT ATRAZINE WILL GO, AND EVEN ACTIVELY SELL ATRAZINE IN THE U.S.

SAG's global management also dominates SCPI's decisions about the manufacture and sale of atrazine.  Syngenta manages its supply chain globally, on a product-by-product basis, from raw materials to customer delivery.[99]  SCPI employee John Riley is Head of Supply Chain for NAFTA.  Riley reports to global Head of Operations and SEC member Mark Peacock, whose global team of AI planners, including a team dedicated to atrazine, decide not only how much atrazine SCPI will manufacture, but also to whom it will be sold.[100]  A global triazine supply

---

[95] For global Development Committee releases to first sale and other decisions about U.S. products *see, e.g.*, Exhibits 23; 25; 28; 59 at 6-8; 59 at 8-10; 60 at 7; 68; 69 at 23-26; 71; 116-17; 144; 152 at 17-19; 218 at 5-6; 225 at 5-6; 238 at 9-11; 255 at 6-7.

[96] Atkin at 109:17-112:4.

[97] Meili at 194:19-195:15.

[98] Atkin at 129:24-134:3, 215:24-217:18.

[99] Atkin at 145:5-17; Exhibit 185.

[100] Atkin at 40:20-41:18, 43:19-44:24, 46:7-47:15; Exhibits 54, 57, 79, 95, 123, 207 and 217.

chain team develops production and allocation plans for atrazine that SCPI manufactures at its Louisiana plant, which are then sent to Peacock's Global Sales and Operations Planning team for approval.[101]

In addition to planning SCPI's atrazine production and sale, Basel manages SCPI's marketing and sale of atrazine in the U.S.[102]   Syngenta's global product leaders organize strategy meetings at SCPI's headquarters, develop primary objectives for those meetings, and require SCPI employees to attend.[103]   According to SCPI's President, Syngenta's Basel employees routinely organize meetings that SCPI employees are expected to attend.[104]   Syngenta's Basel employees also travel with SCPI's sales reps, including in Illinois.   After one such trip to various corn growers in Illinois, a Basel employee told his SCPI colleague that the messaging on one of SCPI's atrazine-containing brands needed to be reformulated.[105]

In a meeting held in Greensboro, SCPAG's Global Product Manager for triazines, Willy Maurer, stressed the importance of atrazine "to secure our business in the corn market place," explaining that "[w]ithout atrazine, we cannot defend and grow our business in the USA."[106] Maurer informed SCPI that Syngenta was committed to preserving atrazine's regulatory position in the U.S.[107]   He also instructed SCPI to reduce atrazine's price to drive out generic competitors and increase market share, and to increase margins by promoting atrazine mixtures.[108]   Finally,

---

[101] Atkin at 42:11-44:5; Exhibits 231-32; Hawkins at 167:9-25, 169:12-171:22.

[102] Atkin at 184:23-187:25.

[103] Exhibits 36, 37 and 228; Hawkins at 135:15-136:3, 60:24- 63:4.

[104] Hawkins at 135:15-136:3.

[105] Exhibit 197.

[106] Exhibit 146 at 7.

[107] Exhibit 146 at 12.

[108] Exhibit 146 at 10-11.

Maurer emphasized SCPI's "need to finalize atrazine mid long-term agreements with third party companies."[109]

Apparently not content to let SCPI finalize these agreements, Maurer himself negotiated sales of SCPI's atrazine to other companies in the U.S.  One email shows Maurer affirming an offer to sell SCPI's atrazine to a company called Agan.[110]  SCPI ratified his ultra vires activities by email stating that "our global atrazine management has solidified a supply agreement between Syngenta and Agan to supply 500,000 gallons of atrazine to Agan for the US market."[111]  Another email shows Maurer negotiating the terms of an atrazine sale to a company called MANA to meet its U.S. demand for atrazine.[112]  Others yet show Maurer negotiating a global supply agreement for atrazine with BASF, and recommending that SCPI sign the agreement without delay.[113]  According to Hawkins, all of Syngenta's CP sales in the U.S. are recorded as SCPI sales. [114]  So, despite the fact that SCPAG's "global atrazine management" made these sales, they were recorded as SCPI sales.

## VI.   SAG's SUBSIDIARIES SELL SAG's PRODUCTS USING A COMMON GLOBAL MARKETING PLATFORM AND THE COMMON SYNGENTA TRADEMARK.

All Syngenta companies use the same "Syngenta" trademark and logo on all their product marketing materials.  SAG and its regional arms share an interlocking website with a monolithic design that is closely controlled by global headquarters in Basel.  SAG has retained authority over all Syngenta company web communications and has placed it in the hands of designated

---

[109] Exhibit 146 at 14.
[110] Exhibit 187.
[111] Exhibit 176 .
[112] Exhibit 181.
[113] Exhibit 175.  *See also* Exhibit 134.
[114] Hawkins at 174:25-175:8.

18

"web masters." Thus, "[a]ny communications on the web, internally and externally" must be approved by SAG's designated managers. This way, SAG can ensure "[c]onsistency of corporate messages and positions and use of visual identity," as well as "build the [Syngenta] brand."[115]

Syngenta has a U.S. webpage that simultaneously markets both its U.S. Seeds and Crop Protection "Business Divisions."[116] Clicking on the Crop Protection division leads to the SCPI website with an identical structure and the same ubiquitous "Syngenta" logo. The U.S. site also links to the Syngenta global site displaying the same logo, SAG's stock price, and detailed information for SAG investors and customers.[117] Both sites incessantly tout Syngenta's status as a global company[118] and list SCPI's atrazine-containing formulations as global products.[119] Indeed, SAG has reserved the power over brand names for everything but strictly local products to the SEC, the CPLT, and the RLTs in order to safeguard their "reputation."[120]

According to SAG's consolidated financial statements, the Syngenta group had total sales of almost $11 billion in 2009. Approximately $3.7 billion – more than a third – were in the NAFTA region.[121] About $1.9 billion – more than 17% of the total for the entire group, and about 50% of the total for the NAFTA region – were in the U.S.[122] Sales of atrazine and

---

[115] Exhibit 357 at 6.

[116] *See* http://www.syngenta-us.com/home.aspx (all cites referenced were last visited Dec. 11, 2010).

[117] http://www2.syngenta.com/en/index.html.

[118] *See* Exhibit 185 (SCPI informs its U.S. customers that it is a global company).

[119] http://www2.syngenta.com/en/products_brands/herbicides.html

[120] Exhibit 357 at 8.

[121] Exhibit 325 at 34.

[122] Exhibit 3 at 46:16-21.

atrazine-containing products accounted for approximately $350 million – more than 18% of Syngenta's U.S. sales.[123]

## VII.  SAG HAS RESERVED FOR ITSELF AND ITS TOP GLOBAL MANAGERS BROAD POWERS OVER VIRTUALLY EVERY ASPECT OF SCPI'S ORGANIZATION, MANAGEMENT, AND OPERATION.

SAG's Board and its top global managers have ultimate control over all Syngenta companies, including SCPI.  Although local subsidiaries – like any regional division within a single company – must necessarily make certain implementing decisions that cannot be handled from a distant location, SAG's global management makes all the important decisions.  Each subsidiary is permitted to act only within the narrow authority delegated to it by SAG.[124]  A mandatory corporate document called the Regulations Governing the Internal Organization of Syngenta AG apparently describes the precise nature of these delegations of authority.[125]  But SCPI has refused to produce these Regulations – despite repeated requests and an unsuccessful motion to compel – on the grounds that it does not physically possess them.[126]  Employees within the global Legal department have, however, summarized some of the "Reserved Powers" and made the summaries available to all Syngenta companies so that they know when they must obtain SAG's approval.[127]  Syngenta's top lawyer admitted the reserved powers process require

---

[123] Exhibit 3 at 46:19-25.

[124] *See, e.g.,* Quarles at 33:13-35:14, 35:24-36:15 (subsidiary legal departments have "authorization" to deal with minor legal matters when thousands of dollars are at stake, but must seek approval from SAG for larger matters); Hawkins at 217:18-218:25; Exhibits 357 through 360.

[125] Maeder at 51:16-52:2; 94:16-95:24.

[126] Exhibit 364.  *See also* Doc. 105.

[127] Maeder at 59:2-21, 86:5-87:2, 140:3-14, 103:25-104:13 (the competent global body has to give "pre-approval" before a subsidiary can make the "legally binding" decision); Exhibits 357 through 360.

more than mere "consultation," and gives SAG ultimate approval "authority."[128]

**A.**    **Members of the SEC decide who will be on SCPI's Board, which acts as a rubber stamp to formalize decisions made by SAG's global leaders.**

SAG has the sole power to appoint the Directors of all Syngenta company Boards, including SCPI's.  Until 2008, the Chairman's Committee of the SAG Board appointed Directors of group companies with annual sales above $150 million, while the SEC appointed Directors of companies with sales below $150 million.[129]  Now, this "decision-making authority" is in the hands of just two men: CEO and SEC member Mike Mack for Syngenta companies with sales above $150 million, and SEC member Christoph Maeder for Syngenta companies with sales below $150 million.[130]  So while SCPI's parent company Syngenta Seeds, Inc. formally "elected" the Directors of SCPI, they were in fact hand-picked by SAG's CEO.[131]  Maeder explained that having SEC members choose Directors ensures there are no "conflicts of interest" within the Syngenta group.[132]

SAG's policy is to elect at least one global or regional manager to every Syngenta company Board.  Corporate charters are written to ensure that the Board, rather than local management, has authority over all matters important to the Syngenta group.  Global and regional managers are responsible for bringing such matters to the attention of the competent SAG management body for review and decision.  These decisions are then communicated to the

---

[128] Maeder at 121:6-122:11

[129] Exhibit 360 at 5.

[130] Exhibit 249 at 4; Maeder at 109:18-110:18.

[131] Meili at 210:14-211:17.

[132] Maeder at 112:4-14. Maeder admitted that no Syngenta company has ever appointed a Board member that he or the global leadership in Basel did not want on that Board. Maeder at 126:8-127:13. He also testified that if he so desired, he could initiate a change in a Syngenta company's Board. Maeder at 110:19-111:19.

Board, which passes a resolution to formalize a decision made by others.[133]

Most SEC members sit on one or more Syngenta company Boards.[134]  Maeder himself sits on the Boards of at least ten Syngenta companies, including SCPI, Syngenta Corporation, Syngenta Participations AG, SIAG and SCPAG.[135]  Maeder testified his role on these Boards is, first and foremost, to represent the interests of the Syngenta *group*.[136]  In addition to Maeder, SEC member and COO of SAG's CP division John Atkin also sits on SCPI's Board.  According to Maeder, SEC members have sat on the SCPI Board since Syngenta's formation.[137]

Plaintiffs' limited discovery revealed that SCPI's Board acts as a mere rubber stamp for decisions made by SAG's global and regional managers.  Despite the fact that it presides over a company with $2 billion in annual revenue, SCPI's Board has never met in person or even over the phone.[138]  Instead, every SCPI Board decision has been by unanimous written consent,[139] delivered by email to Board members for execution.[140]  Accompanying memos almost invariably state that SAG's global or regional leaders "recommend" or "support" the resolution.[141]  One such memo proposed that the SCPI Board approve a $100 million settlement of environmental litigation, stating "SCP management recommends approval of the Settlement Agreement, which is supported by the SEC in Basel."[142]

---

[133] Exhibit 32.

[134] Maeder at 173:25-174:8.

[135] Maeder at 29:3-30:4.

[136] Maeder at 29:3-30:4.

[137] Maeder at 162:20-163:1.

[138] Maeder at 166:1-167:4.

[139] Exhibit 348.

[140] Hawkins at 63:5-64:12.

[141] Group Exhibit 346.

[142] Group Exhibit 346 at 2.

Remarkably, SCPI has unanimously approved every resolution put before it.[143]  SCPI is not alone in this.  Of the ten or more Boards that Maeder sits on, he cannot remember a single non-unanimous vote, and all but a few of those votes were taken through unanimous written consent without a meeting or discussion.[144]  Similarly, SAG declarant Tobias Meili, who also sits on a number of Syngenta Boards, cannot remember a single Board vote being taken through action other than unanimous written consent.[145]  The irrelevance of SCPI's Board from an operational perspective is demonstrated by the fact that its Chairman, Vern Hawkins, did not know that his boss, SEC member and CP COO John Atkin, sits on the SCPI Board with him.[146]  Hawkins also had little memory of who sits with him on the Board of Syngenta's Canadian CP company and, despite being the Chairman of the Syngenta Corporation Board, he was uncertain whether it was a functioning company.[147]

The SAG Board, by contrast, meets five to six times a year and virtually never acts through unanimous written consent.[148]  It has 12 Directors, compared to three at the vast majority of Syngenta companies and five at SCPI.  When asked why there was such a discrepancy in the number of Directors between SAG and its subsidiaries, global Head of Legal Christoph Maeder explained that the SAG Board "has the responsibility to overlook the operations of the whole group, whereas the Boards of the subsidiaries have a much more limited scope."[149]

---

[143] Quarles at 152:16-18; Group Exhibit 346.

[144] Maeder at 188:15-191:8.

[145] Meili at 38:13-39:4, 59:13-23.

[146] Hawkins at 51:12-52:5.

[147] Hawkins at 53:1-19, 55:16-23.

[148] Maeder at 50:25-51:15.

[149] Maeder at 49:4-22.

**B.      The SEC and other global managers choose SCPI's employees, decide how much to pay them, and move employees between Syngenta companies.**

SAG has reserved comprehensive power to make HR decisions for Syngenta companies, including SCPI,[150] beginning with the SEC's power to approve the "Main Organisational Chart" of companies like SCPI with sales over $150 million.[151]  Syngenta group CEO Mike Mack – also a member of the SEC and the SAG Board – appoints the Heads of all Syngenta companies.  The SEC appoints employees in a function one level below the Heads.  SEC member and Syngenta group General Counsel Christoph Maeder appoint the Secretaries of Syngenta Boards, while SEC member and group CFO John Ramsay appoints their CFOs.[152]  These decisions at the global level are then "rubber-stamped" by the Boards of the individual companies.[153]

In addition, three SAG global managers approve nominations for any position classified as being part of a subsidiary's "Senior Management Group" ("SMG"): the global Head of HR (SIAG employee Caroline Luscombe),[154] the Syngenta group CEO (Mike Mack), and the SEC member responsible for supervision of that global department or function.[155]  The SMG includes all top-level managers in smaller local subsidiaries, but extends to all those responsible for important functions in larger subsidiaries such as SCPI.[156]  Employees on whom SAG bestows

---

[150] Exhibit 249.  *See also* Exhibit 359, Exhibit 360.

[151] Exhibit 360 at 5.

[152] Exhibit 249 at 2.

[153] *See, e.g.,* Exhibit 348 at 321-22.

[154] Maeder at 147:2-24.

[155] Exhibit 359 at 1. In some cases, top management in Basel approves non-SMG promotions as well. Exhibit 322 (John Atkin tells Vernon Hawkins "we" can go ahead with a non-SMG promotion "if that's your final recommendation"). In other cases, whether the promotion is SMG or not is unclear, but approval from Basel is required. Exhibit 293.

[156] Maeder at 141:24-142:10, 143:14-145:6. Janis McFarland, the head of one of those functions at SCPI, is in the SMG, and understands the decision to include her was made by

SMG status are eligible for performance bonuses in the form of SAG stock.[157]  SCPI President Vern Hawkins, who is in the SMG, was uncertain which Syngenta company pays his and other SCPI SMG employees' stock compensation.[158]

   The same three global managers also decide how much SMG employees are paid.  If an SMG employee is to be paid more than the U.S. dollar equivalent of 250,000 Swiss francs, the CEO and the global Head of HR must approve the compensation package, and if an SMG employee is to be paid less than that, another SEC member and the global Head of HR must approve it.[159]  In fact, global managers' control over compensation packages is not limited to SMG positions: a similar approval process applies to certain non-SMG compensation packages, a power SAG has reserved for "consistency of compensation and cost control."[160]

   To facilitate global management of personnel, SAG also controls "succession planning." Divisional or functional "Global Leadership Teams" identify and discuss global talent with "SMG potential," and the SEC does so for global talent with "Senior SMG potential."  SAG centrally manages succession planning to promote the "[c]oordinated development of high quality successors for the most senior positions in the company." [161] On a related note, SAG

---

people outside SCPI; however, she does not know who occupies the different levels of the SMG, does not know who established the levels, does not know who decides what positions are in the SMG, and does not know who recommended her for the SMG; in fact, she did not know it existed until she was told she was to be in it. McFarland at 64:9-67:10.

   [157] Hawkins at 66:16-73:11.

   [158] Hawkins at 69:9-71:11. This may be due in part to Hawkins now knowing whether SCPI, the company of which he is President, is a publicly-traded company. Hawkins at 71:17-20.

   [159] Exhibit 359 at 1.

   [160] Exhibit 359 at 1-3.

   [161] Exhibit 359 at 3-4; Maeder at 151:2-152:3.

provides and controls access to global training programs for group company employees.[162]

SAG's global managers also dictate the movement of employees between Syngenta companies.[163]  The global HR department in Basel coordinates many HR matters within the Syngenta group, and issues policy documents concerning employee mobility and compensation that apply to all Syngenta companies.[164]  For a long time, the SEC itself signed off on international transfers of employees among Syngenta companies.[165]  Now, the "Business Unit Head" – i.e., the global Head of a division or function – must sign off on transfers within a region or division, and for employees moving between regions or divisions, the SEC members representing those divisions must sign off on the transfer.  This approval process "Applies to all transfers based on Syngenta's International Assignment Policy, including short-term and long-term assignments as well as other assignments managed through the global mobility team."[166]  The main purpose of international assignments is to develop the global corporate talent pool by making employees fit for promotion to higher positions within other Syngenta companies.[167]

Plaintiffs discovered numerous instances of Syngenta employees being transferred or promoted to other Syngenta companies as well as to other countries.[168]  SCPI employee Peter Hertl, for example, was promoted to global Head of Product Safety for Syngenta and was asked to transfer from SCPI to SCPAG in Basel.  While Hertl accepted the job, he had to delay his transfer for personal reasons and has therefore served in this global role for the past year as an

---

[162] Exhibit 359 at 4.

[163] Exhibit 359 at 4-5; Quarles at 101:12-103:14

[164] Maeder at 140:21-141:14, 147:25-148:15, 156:20-157:8; Group Exhibit 361.

[165] Maeder at 153:10-154:1.

[166] Exhibit 359 at 4-5.

[167] Maeder at 152:4-153:9.

[168] Exhibit 345 at 4-5, 22-25.

employee of SCPI.  When he officially becomes an employee of SCPAG next year, his job will remain exactly the same, with the same authority and responsibility over Syngenta employees around the world. [169]  Notably, Hertl's transfer was initiated not from Greensboro, but from Basel.  Gerardo Ramos, Syngenta's global Head of Development, offered him the global position and reassigned him to SCPAG.[170]  Shortly after Hertl accepted this global role, an employee from the global HR department in Basel sent an email to an HR employee at SCPI asking SCPI to implement an "approved" retroactive salary increase for Hertl.  The SCPI employee complied.[171]

Plaintiffs discovered other examples of Syngenta group employees being promoted by SAG management across corporate lines but within the group's management structure. SCPI employee Jason Fogden, for example, was "promoted" by his global manager in Basel from the CFO position at Syngenta Corporation, Syngenta's top-level holding company in the U.S., to the CFO position at its indirect subsidiary, SCPI.[172]  Similarly, SCPI employee Elizabeth Quarles was "promoted" from the General Counsel position at Syngenta Corporation to the General Counsel position at SCPI.[173]  If authority followed the corporate structure, these would be demotions.  But while SCPI is two levels below Syngenta Corporation in the corporate structure, it is above Syngenta Corporation in the NAFTA management structure.  Accordingly, when Fogden and Quarles worked at Syngenta Corporation, their boss was the President of SCPI.[174]

---

[169] Hertl at 54:8-58:9, 61:20-62:22.

[170] Hertl at 56:11-57:3.

[171] Exhibit 328.

[172] Fogden at 14:2-15:4.

[173] Quarles at 13:12-14:19, 19:3-19:9

[174] Quarles at 19:3-22; Fogden at 14:2-15:4.

SCPI's President Hawkins, who was himself hired by the SEC,[175] conceded that if he wanted to hire a new employee, he would have to consult with the COO of SAG's CP division John Atkin.  Atkin would then talk to someone in the global HR department in Basel to ensure that the prospective hire was "appropriately positioned."[176]  In the one year Hawkins has been President of SCPI, he has recommended that two employees be promoted to lead business units within SCPI.  He submitted both recommendations to Atkin, and on both occasions Atkin "agree[d] to let [him] proceed."[177]  Atkin also had to approve the proposed compensation packages for these employees, presumably because they were promoted to SMG status within the Syngenta group.

Peculiarly, no one at SCPI seems to know which corporate entities employ their global managers.[178]  For example, although SCPI President Vern Hawkins received his job offer from John Atkin and seeks his approval for personnel decisions at SCPI, Hawkins has no idea what corporate entity employs Atkin.[179] All he knows is that Atkin works for "Syngenta" and is the COO of the CP division, though there apparently is no specific corporate entity for which he holds that title.[180]  Hawkins's confusion is not surprising, given that Atkin himself describes his

---

[175] Hawkins at 32:14-33:21; Atkin at 67:16-68:18.

[176] Hawkins at 72:18-73:7.

[177] Hawkins at 76:6-78:7, 81:24-83:13. *See also* Exhibit 332 (Atkin tells Hawkins he assumes the headcount for Crop Protection and Seed Care are not rising, as "the only hiring proposals I received were from Andrew and these were mainly replacements").

[178] Hertl at 42:3-43:2, 56:11-57:3.  *See also* Quarles at 103:15-25, Hawkins at 51:12-52:5, Drost at 28:8-33:23.  Exhibit 363 summarizes deposition testimony where SCPI employees and Directors were asked about the corporate affiliation of their colleagues.

[179] Hawkins at 51:12-52:5.

[180] Hawkins at 51:12-52:5.

job as COO of CP for all Syngenta group companies.[181]  There is similar confusion about the specific corporate entity of which Mike Mack is CEO: SAG declarant Tobias Meili testified Mack is the CEO of the entire Syngenta group of companies, but is not the CEO of any of them individually.[182]

The fact that SCPI employees do not know what Syngenta entities employ the colleagues whom they deal with on a regular basis is not surprising: every Syngenta employee has a "syngenta.com" email address and intercompany emails identify only the country and city of the sender or recipient.[183]  SAG does not require employees to identify the companies they work for when they send emails to employees of other Syngenta companies.[184]  As even a cursory inspection of the numerous emails included as exhibits will reveal, they very rarely do so.

### C.    SAG controls SCPI's finances, uses SCPI funds to support other Syngenta companies, and decides how SCPI spends its money.

SAG has reserved broad powers over the financing and capital transactions of Syngenta companies.  In fact, SAG has centralized the finance function for the Syngenta group into one department that provides financial services to all Syngenta companies worldwide.  The finance function is housed within SIAG and SCPAG at Syngenta's global headquarters in Basel and is led by Syngenta group CFO John Ramsay.[185]  Group Treasury is a sub-group within the finance

---

[181] Atkin at 12:1-20.

[182] Meili at 45:19-46:1, 49:6-14. *See also* Hawkins at 89:24-90:16.

[183] The most-common country/city codes are: USGR – Greensboro, US (SCPI); CHBS – Basel, Switzerland; GBAP – Alderly Park, Great Britain; GBJH – Jealott's Hill, Great Britain; CATO – Toronto, Canada; and MXMC – Mexico City, Mexico.

[184] Atkin at 192:11-23, 198:21-199:1.

[185] Fogden at 99:3-99:10, Maeder at 61:25-62:15, 66:7-67:7.

function and handles most financial transactions for Syngenta companies worldwide.[186]

The Audit Committee of the SAG Board has approved a Group Treasury Policy that applies to all Syngenta companies, including SCPI.  Through this power of the purse, SAG bends – and in some cases eliminates – subsidiaries in service to the group.[187] One of the guiding principles of the Group Treasury Policy is: "Syngenta Group shall act as a single financial unit being centrally managed by Group Treasury. The economic interest of the Group always takes precedence over local interests of affiliates."[188] One of the main functions of Group Treasury is to strategically manage the liquidity of Syngenta group companies on both a short-term and long-term basis.[189]  To accomplish this goal, Group Treasury extracts money from individual Syngenta companies, aggregates it, and puts it to its most productive use within the Syngenta group.  At SCPI, for example, all excess cash is swept daily from SCPI's bank accounts and SCPI's CFO acknowledges that he does not know where that cash goes or who controls those bank accounts.[190]  At least some of that cash is reallocated to other parts of the organization to help other Syngenta companies maintain liquidity.[191]

As a by-product of Group Treasury's global liquidity management, SCPI does not engage in any external borrowing.  All of its financing comes from other Syngenta companies.[192] If SCPI needs to borrow money from a bank, it must get Group Treasury's approval.[193]  Even if

---

[186] *See generally* Exhibit 278.
[187] Quarles 37:20-42:3
[188] Exhibit 298 at 5.
[189] Exhibit 298 at 10.
[190] Fogden at 52:5-18.
[191] Exhibit 365 at 3.
[192] Fogden at 47:11-48:6. SAG has a Global Commercial Paper program. Exhibit 47 at 44.
[193] Exhibit 358 at 2.

SCPI received that approval, it could only borrow from Group Treasury approved banks.

Syngenta Group Treasury also decides whether SCPI will issue a dividend and the amount of that dividend.[194]  SEC and SCPI Board member John Atkin confirmed that SCPI has issued dividends in the past, and that the finance and legal functions in Basel decided the amounts.[195]  Similarly, SCPI Board member and CFO Jason Fogden explained that dividend payments are "requested" of SCPI, though he did not know by whom.[196]  The last dividend SCPI paid was $295 million – over 15 percent of its annual revenue – yet the SCPI Board approved this dividend, without discussion, by unanimous written consent.[197]

All of SCPI's investments in and divestments of tangible and intangible assets with a value above $40,000, as well as certain contracts above that value, must be approved in accordance with the Syngenta Sanctioning Process Guideline.  This Guideline applies to the purchase, sale or lease of real estate, equipment, intellectual property, software licenses, and even consulting contracts.[198]  For all such projects exceeding $40,000, SCPI must submit detailed documentation to either regional and/or global "decision bodies," which depending on cost may be individual SEC members, subcommittees of the SEC, the entire SEC, and even the SAG Board.[199]

The Guideline is careful to point out that the process described could create "legal issues"

---

[194] Exhibit 58 at 1.

[195] Atkin at 256:23-259:10.

[196] Fogden at 57:1-58:24.

[197] Exhibit 348 at 357-60; Group Exhibit 346 at 5.

[198] Exhibit 329 at 5; Exhibit 360 at 3.

[199] Exhibit 329 at 85.

if these decision bodies are seen to be approving projects at other Syngenta companies.[200]  To avoid such issues, the Guideline cautions that bodies outside the Syngenta company where the project is to take place should only use terms such as "support," "sanction," or "recommend," rather than "approve."[201]  The Guidelines do not mask where real authority lies, however, and explain that "support" from a regional or global decision body is "require[d]" before a Syngenta company with legal competency can officially "approve" it.[202]

### D. SAG's Board would have to approve the settlement of this lawsuit.

Another significant power SAG has reserved for itself is approving the institution and settlement of legal proceedings by Syngenta companies. Specifically, the filing or settlement of a lawsuit must be approved by the SAG Board if the amount in dispute is above $60 million; the Chairman's Committee of the SAG Board if the amount in dispute is between $30 million and $60 million, the SEC if the amount in dispute is between $5 million and $30 million, and the Group General Counsel and SEC member Christoph Maeder if the amount in dispute is below $5 million.[203]  Because the amount in dispute in this case far exceeds $60 million, the SAG Board will have to approve any settlement SCPI may reach with Plaintiffs.

### E. SAG controls myriad other aspects of SCPI's management and operation.

SAG has reserved a number of other powers for itself that are too numerous to address here in more than summary fashion: powers over acquisition of companies, sale of companies,

---

[200] Exhibit 329 at 9-10.

[201] Exhibit 329 at 9.

[202] Exhibit 329 at 85. For other types of decisions, *see* Exhibit 32 at 9-10 and Exhibit 49 at 6-15.

[203] Exhibit 249 at 3.

acquisition of product lines and licenses, establishment of legal entities, liquidation of legal entities, donations and sponsorship, changes to capital structure, issuances of guarantees and letters of awareness, external borrowing, transactions in derivatives, transfer pricing, tax audit coordination, press releases, media interaction, government interaction, investor interaction, internal communications, issue management, crisis communication, web communication, interaction with public organizations and NGOs, corporate identity, and even brand names of products.[204]

## STANDARD OF REVIEW

To prevail on its Rule 12(b)(2) motion, SAG must come forward with uncontradicted evidence showing that the Court cannot properly exercise personal jurisdiction. *See Gaidar v. Tippecanoe Distrib. Serv*., 299 Ill.App.3d 1034, 1041, 1044 (Ill. App. Ct. 1998); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987) *superseded by statute on other grounds*; *Nieman v. Rudolf Wolff & Co., Ltd.,* 619 F.2d 1189, 1190-1191 (7th Cir. 1980).  The only evidence SAG offered in support of its motion were the declarations of Tobias Meili and Beth Quarles. To refute the statements in those declarations, the Court permitted Plaintiffs to conduct limited discovery restricted to SCPI. Because of this limitation on discovery, Plaintiffs need only produce prima facie evidence supporting jurisdiction.  *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *Keller v. Henderson,* 359 Ill.App.3d 605, 610-611 (2005); *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co*., 517 F.3d 235, 242 (5th Cir. 2008).  The Court must view all evidence in the light most favorable to Plaintiffs and must resolve any conflicts between Plaintiffs' evidence and the assertions of SAG's declarants in Plaintiffs' favor. *See Purdue*

---

[204] Exhibits 357 through 360.

33

*Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *Gaidar*, 299 Ill.App.3d at 1041, 1044.

## ARGUMENT

"A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue Research*, 338 F.3d at 779. Illinois courts are authorized by statute to exercise jurisdiction to the full extent permitted by the Illinois and U.S. Constitutions. *See* 735 ILCS 5/2-209(c); *Kinslow v. Pullara*, 538 F.3d 687, 691 (7th Cir. 2008). Consequently, this Court may exercise personal jurisdiction over SAG if it has sufficient "minimum contacts" with Illinois such that forcing it to defend Plaintiffs' suit does not offend "traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-476 (1985).[205] Here, Plaintiffs contend that SAG has sufficient minimum contacts with Illinois through its wholly-owned subsidiary SCPI, which acts as SAG's "agent" or "alter ego" for purposes of jurisdiction. Doc. 8, ¶ 29.

## I.     SAG HAS SUFFICIENT MINIMUM CONTACTS WITH ILLINOIS THROUGH SCPI.

A parent's mere ownership of a subsidiary does not subject it to personal jurisdiction in Illinois. *See Alderson v. Southern Co.*, 321 Ill.App.3d 832, 854 (Ill. App. Ct. 2001). But Illinois courts have consistently held that when the parent steps beyond its limited role as an investor, ignores the corporate boundaries of its subsidiary, or conscripts the subsidiary to do the parent's

---

[205] The due process clause of the Illinois Constitution requires substantially the same analysis. *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990) (permitting jurisdiction "only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois").

34

business, there is no basis for distinguishing between the Illinois contacts of the parent and the subsidiary for purposes of jurisdiction. *See, e.g., Maunder*, 102 Ill.2d at 352, 355-356 (Ill. 1984); *Schlunk v. Volkswagenwerk AG*, 145 Ill.App.3d 594 (Ill. App. Ct. 1986); *Alderson*, 321 Ill.App.3d at 855; *Haubner v. Abercrombie & Kent Int'l, Inc*., 351 Ill.App.3d 112 (Ill. App. Ct. 2004); *Japax, Inc. v. Sodick Co. Ltd*., 186 Ill.App.3d 656 (Ill. App. Ct. 1989).  The two "theories" by which courts in Illinois and in other jurisdictions attribute the in-state contacts of a subsidiary to its parent are "agency" and "alter ego."

There is no precise test or definitive set of factors for determining when a subsidiary acts the "agent" of "alter ego" of its parent.  *See Maunder*, 102 Ill.2d at 350-51 ("We have been unable to fashion a precise test or talismanic phrase to guide us in this task.").  Courts have found subsidiaries to be the "agents" of their parents for jurisdictional purposes when the parent conscripts the subsidiary to do the parent's business such that it may fairly be said to be doing business in the jurisdiction through its subsidiary. *See id.* at 352.  Similarly, courts have found subsidiaries to be the "alter egos" of their parents for jurisdictional purposes when both are part of a "single economic entity" whereby the subsidiary acts as a "local department separately incorporated," an "incorporated division," or a regional office of its parent. [206]  *See id.* at 355-56 (concurring opinion); *Schlunk*, 145 Ill.App.3d at 608; *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd*., 508 F. Supp. 1322, 1333-35 (E.D.N.Y. 1981).

---

[206] A finding of "alter ego" for jurisdictional purposes is not the same as a finding that the corporate veil should be pierced for liability purposes. *See Bulova Watch*, 508 F.Supp. at 1342 ("Whether or not the court would pierce the corporate veil and impose liability on the parent for activities of the subsidiary is not the issue here."); *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.12 (5th Cir. 1985) ("[The] test for attribution of contacts, *i.e.* personal jurisdiction, is less stringent than that for liability.").

Although "agency" and "alter ego" are sometimes expressed as two distinct theories, there is no bright line between them. *See Bulova Watch*, 508 F.Supp. at 1334 (citing cases); *Maunder*, 102 Ill.2d at 355-356 (concurring opinion). Under either the "agency" or "alter ego" theory of attribution, courts must look at practical realities, not mere form. *See Maunder*, 102 Ill.2d at 350-51; *Japax,* 186 Ill.App.3d at 664. Technical compliance with corporate formalities and "indirect" ownership do not insulate parent companies from personal jurisdiction in Illinois. *See Alderson*, 321 Ill.App.3d at 855. If the parent exists for no purpose other than to manage and do business through its subsidiaries, courts may attribute the subsidiary's Illinois contacts to the parent. *See id.*; *Haubner*, 351 Ill.App.3d at 122. *See also Genetically Modified Rice*, 576 F.Supp.2d 1071, 1076 (E.D. Mo. 2008) ("The groups are 'independent' only to the extent that Bayer AG allows them to be. Bayer AG still manages the managers. That is why Bayer AG exists.").

### A.   The Court should impute SCPI's Illinois contacts to SAG under *Maunder* and its progeny.

Illinois courts routinely exercise personal jurisdiction over foreign parent companies when they use separately-incorporated subsidiaries to do business in Illinois. In the leading Illinois case of *Maunder*, for example, a Canadian airplane manufacturer was found to be doing business in Illinois through its wholly-owned distributor subsidiary. *Maunder,* 112 Ill.App.3d at 881-883. The *Maunder* court premised its exercise of jurisdiction on several key facts: the parent owned 100% of the subsidiary; the subsidiary's sole business was to sell and distribute parts for its parent's airplanes; the manager of the subsidiary reported directly to the President of the parent; the parent and the subsidiary shared officers; the parent paid for occasional trips to Illinois by an employee of the subsidiary; and the companies used a combined financial

statement.  *Id.*  The court found these facts sufficient to establish the parent's control of the subsidiary, and concluded that the subsidiary was doing its parent's business in Illinois.  *Id.*

Picking up on the *Maunder* analysis, an Illinois appellate court found the following facts sufficient to establish a the parent's control over its subsidiary: the parent loaned employees to the subsidiary; the parent had guaranteed the debt of the subsidiary, the parent's employees trained the subsidiary's employees; the parent's employees routinely visited the subsidiary's Illinois offices; and the subsidiary's officers reported to the parent's managing director.  *Japax,* 186 Ill.App.3d at 664-665.  These facts demonstrated a sufficient link between the companies "to impute [the subsidiary's] marketing and servicing activities in Illinois to its parent." *Id.* at 665. "To find otherwise would allow foreign corporations to purposefully exploit local markets and reap the benefits and advantages of doing business directly while insulating themselves from lawsuits by using 'separate' subsidiaries and distribution networks to implement their business activity." *Id.*

More recently, an Illinois appellate court applied *Maunder* to exercise jurisdiction over a holding company with no employees that, like SAG, did business in Illinois through several layers of subsidiaries.  *See Alderson,* 321 Ill.App.3d at 854-856.  The holding company owned a multi-layered network of subsidiaries that all operated under the same brand name.  *Id.* at 855. These subsidiaries shared officers and Directors, and some mid-level subsidiaries were responsible for overseeing the operation of the low-level subsidiary that was doing business in Illinois.  *Id.*  The court found that both the holding company and several mid-level subsidiaries were subject to jurisdiction because they were merely a conduit through which the holding company did business in Illinois.  *Id.*  Because the holding parent used the low-level subsidiary to generate revenue in Illinois, it "should not be able to insulate itself from the jurisdiction of the

states in which it does business by the simple expedient of separately incorporating its sales force

and other operations in each state." *Id.  See also Haubner,* 351 Ill.App.3d at 122 ("A & K

Luxembourg existed as a holding company doing business through its subsidiaries … . There is

no evidence that A & K Luxembourg existed for any other purpose."); *Schlunk*, 145 Ill.App.3d at

606 (VW AG found to be doing business in Illinois through its U.S. subsidiary).

  Plaintiffs' limited jurisdictional discovery has yielded ample evidence that SAG controls

SCPI, and that SCPI acts as SAG's agent or alter ego in marketing and selling Syngenta's

agrichemical products in the U.S. and Illinois.  SAG owns 100% of SCPI and files consolidated

financial statement for SCPI.  SAG conscripts SCPI's most important employees into SAG's

global management structure to serve NAFTA roles.  As a consequence, SCPI employees are

responsible for managing SAG's Canadian and Mexican CP subsidiaries even though SCPI has

no ownership interest in either company.  SCPI's NAFTA employees report not to their superiors

at SCPI, but to their superiors in SAG's global management structure.  SAG's global managers

assign employees from other subsidiaries to work at SCPI, and assign SCPI employees to work

at other SAG subsidiaries.  SAG's top leaders hand-pick SCPI's officers and Directors, decide

how much they get paid, "recommend" appropriate decisions, sweep SCPI's excess cash to fund

other SAG subsidiaries, control the filing and settlement of all lawsuits, and approve even

nominal capital expenditures.  Far beyond the parental control found sufficient for jurisdiction in

*Maunder,* SAG controls every non-trivial aspect of SCPI's operation.  In fact, SCPI's own

employees describe SAG's control over SCPI as "Frickin' sociali[sm]!"

  Like the subsidiaries in the *Maunder* line of cases, SCPI also exists solely to deliver

SAG's products to the lucrative U.S. agricultural market, including the Illinois corn and soybean

market.  Because SAG has centralized its R&D process, SCPI relies on SAG's other subsidiaries

to provide it with new products.  In order to be able to sell SAG's products in the U.S., SCPI conducts thousands of tests annually (hundreds of them in Illinois) to enable registration with the EPA, but does not charge SAG for this work.  Once the products are registered, SCPI sells them under the Syngenta trademark used by SAG subsidiaries around the world.  As a consequence of SAG's centralized global Supply Chain function, most of the products SCPI sells in the U.S. are manufactured by other SAG subsidiaries.  SAG advertises the products it sells through SCPI on an interlocking global website controlled by SAG that includes SCPI's website.  SCPI generates billions in revenue for SAG in the U.S. market, which SAG then appropriates by instructing SCPI to pay it dividends calculated by the global finance function in Basel.  But perhaps the most telling evidence that SCPI is selling SAG's products and not its own is that SCPI cannot remove products like atrazine from the U.S. market without CPLT and SEC approval.

Furthermore, SAG is intimately involved in SCPI's marketing and sale of SAG's products (including atrazine) in the U.S. and in Illinois.  SAG's global product leaders call meetings of SCPI employees and instruct them on how to market and price atrazine in the U.S. Employees from SAG's Basel headquarters travel with SCPI's sales reps to corn growers in Illinois and make brand messaging recommendations on SCPI's atrazine-containing products sold to Illinois farmers.  They inform SCPI's employees how much atrazine to manufacture and where that atrazine will go.  They even directly sell SCPI's atrazine to other companies in the U.S., which in turn sell their own atrazine containing products in Illinois.  While SAG's global leaders actually make these sales, they are all recorded as SCPI sales.

The evidence uncovered through limited discovery dwarfs the evidence found sufficient in *Maunder* and subsequent decisions.  That evidence reveals that SCPI exists solely to test,

39

register, and sell SAG's products in the U.S. and in Illinois.  The Court has personal jurisdiction over SAG and should deny its motion to dismiss.

> **B.      The Court should also follow recent district court decisions that have exercised jurisdiction over parent companies with management structures identical to SAG's.**

While the *Maunder* line of cases are ample authority for this Court to exercise jurisdiction over SAG, a number of district courts have also exercised personal jurisdiction over holding companies with management structures strikingly similar to that of SAG.  *See In re Chocolate Confectionary Antitrust Litig.*, 674 F.Supp.2d 580 (M.D. Pa. 2009); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 344 F.Supp.2d 686 (W.D. Wash. 2003); *Directory Dividends, Inc. v. SBC Commc'ns, Inc.,* 2003 WL 21961448 (E.D. Pa. 2003); *In re Genetically Modified Rice Litig.*, 576 F. Supp. 2d at 1073-74. [207]

> **i.      *In re Chocolate Confectionary Antitrust Litig.***

In *In re Chocolate*, the court found that it had personal jurisdiction over two top parents in the Cadbury group, which had a global matrix management structure that appears to be identical to SAG's.  Namely, Cadbury had an Executive Committee ("CEC") which, like the SEC, was charged with "'the day-to-day management' of all Cadbury entities." *In re Chocolate* 674 F.Supp.2d at 615.  The CEC met six to nine times a year to assess corporate affairs, evaluate the performance of regions and subsidiaries, discuss significant transactions by subsidiaries that required CEC approval, and evaluate market research and supply chain issues.  *Id.* at 615-616.

---

[207] While none of these district courts sat in Illinois, they conducted the same federal due process jurisdictional analysis that this Court must conduct under Illinois law.  In other words, all federal due process decisions provide relevant authority for whether an Illinois court would exercise jurisdiction.

The court noted that "[t]ypically, such functions are discharged by an operating company, yet [the foreign parents] managed these matters through the CEC." *Id.* at 615.

Cadbury also had separate global management teams aligned with product groups rather than corporate boundaries, and subdivided its global product group management into regions which included an Americas region. *Id.* Like SAG's NAFTA team, Cadbury's Americas business unit was not a distinct corporate entity, but rather a regional management layer within Cadbury's global management structure. *Id.* at 614 n. 3. The CEO of Cadbury's U.S. subsidiary, served as the Head of the Americas region and was responsible for his product division within the U.S., Canada, and Mexico. *Id.* The court explained that "[i]n effect, [the foreign parents] have conscripted the employees of their subsidiaries to discharge group-wide management functions across corporate boundaries." *Id.* at 615. "These dual responsibilities of senior executives provide strong evidence of an alter ego relationship." *Id.*

Several other features of Cadbury's management structure revealed that Cadbury's U.S. subsidiary and its foreign parents were merely alter egos for jurisdictional purposes. Cadbury had a centralized HR function that operated across corporate boundaries and served all Cadbury entities. *Id.* at 614 n. 3. Cadbury employees were occasionally transferred from one entity to another to serve larger organizational needs. *Id.* This "centralized management of territory and personnel provide prima facie evidence that Cadbury corporate boundaries are superimposed purlieus that do not reflect functional accountabilities within the corporate group." *Id.* Another telling piece of evidence was that the CEO of Cadbury's U.S. subsidiary could not tell who was on the U.S. subsidiary's Board with him or whether that Board had ever met in person. *Id.* at 616. The court held that this also constituted prima facie evidence that the U.S. subsidiary acted

as the alter ego of its foreign parents, and exercised general jurisdiction over the Cadbury parents. *Id.* at 617.

SAG's global management structure is identical in all key respects to Cadbury's. The SEC is charged with the "day-to-day management" of all Syngenta companies, and globally manages SAG's CP products division through the CPLT. The CPLT further divides the CP division into regional management layers like NAFTA, and then conscripts dozens of SCPI employees to discharge group-wide management functions, even though SCPI has no legal relationship to SAG's Mexican and Canadian subsidiaries. SCPI's NAFTA managers all report to their global bosses at SAG's headquarters in Basel. SAG also has a centralized global HR function that handles HR matters for all of SAG's subsidiaries and routinely transfers and promotes employees across regions and corporate boundaries. And while SCPI's President chairs the SCPI Board, he does not even know that his boss John Atkin sits on that Board with him. His ignorance is not surprising given that the SCPI Board has never met and acts only through unanimous written consents which are emailed along with "recommendations" by global or functional leaders outside the company. Moreover, the SCPI Board has never failed to unanimously approve any such "recommendation" put before it. Just like in *In re Chocolate*, the conclusion to be drawn from this evidence is inescapable: SCPI acts as SAG's alter ego in the U.S. and the Court has personal jurisdiction over SAG.

### ii.     *In re PPA Prods. Liab. Litig.*

In *In re PPA,* the court concluded that it had jurisdiction over a surviving entity of SAG's corporate predecessor, Novartis AG ("NAG"). NAG appears to have the same global corporate

42

and management structure as SAG.[208]  Specifically, like the SAG Board, the NAG Board is

"ultimately responsible for the organization, administration and direction of Novartis" group

companies worldwide.  *Id.* at 692.  Also like SAG, the NAG Board created an Executive

Committee ("ECN") responsible for "develop[ing] and implement[ing] strategies for the Group

and procur[ing] and allocat[ing] the required resources."  *Id.*  Members of the ECN served on the

Boards of multiple Novartis companies, including on the Board of its U.S. subsidiary, as well as

on NAG's global management teams.  *Id.* at 692-93.  Like SAG, NAG housed global group

functions within its other Swiss subsidiaries which on numerous occasions had to "authorize"

certain decisions for NAG's indirectly-owned U.S. subsidiary.  *Id.* at 693 n. 7.

In exercising jurisdiction over NAG even on plaintiffs' scant jurisdictional evidence, the

court found particularly telling the fact that the ECN was not "legally" housed within any

specific company, but instead operated across corporate boundaries.  *Id.*  In looking at the

"totality of the circumstances" –including the fact that the U.S. subsidiary generated a substantial

portion of NAG's global revenue – the court held that the subsidiary was NAG's agent in the

U.S.  *Id.* at 694-95.  Far from being a "simple investment mechanism," as NAG claimed, the

court found that in the U.S. subsidiary's absence, NAG would have to take over the subsidiary's

operations in order to sell its products on the U.S. market.  *Id.* at 695.  *See also SGI Air Holdings*

*II LLC v. Novartis Int'l AG,* 239 F.Supp.2d 1161, 1166-69 (D. Colo. 2003) (exercising

jurisdiction over NAG based on the ECN's approval of capital investment decisions, personnel

---

[208] The global leader of SAG's CP division, John Atkin, worked at Novartis before the
creation of Syngenta and testified that SAG's actually strengthened its centralized management
structure over that of Novartis: "We have a much more developed matrix system in Syngenta
than we did in – in – either in Novartis or in the Zeneca legacy company. … [W]e have a
stronger and more clearly defined matrix system."  Atkin at 70:7-70:13.

43

decisions, and operational strategy at U.S. subsidiary – facts that Plaintiffs have established for

SAG through their jurisdictional evidence); *Genetically Modified Rice*, 576 F. Supp. 2d at 1075

("[I]t is difficult to conceive how Bayer AG - a company that oversees the operations of over 350

entities worldwide - would ever be subject to jurisdiction anywhere but in its own back yard. …

Under the defendants' theory, the actual business of the company becomes artificially nested

inside an endless progression of Russian dolls.").

### iii.        *Directory Dividends, Inc. v. SBC Communications, Inc.*

In *Directory Dividends*, the court exercised jurisdiction over SBC, a holding company

which operated through a multi-layered network of subsidiaries all selling products under the

SBC brand name.  2003 WL 21961448 at *3-4.  While each individual subsidiary was a separate

corporate entity presumably complying with corporate formalities, the court nevertheless

exercised jurisdiction over all of them, including SBC, because they were part of one single

economic entity.  *Id.* at *6.  The court relied on the following facts to impute the in-state

subsidiary's contacts to SBC under the alter ego theory: all of the subsidiaries shared a single

national brand; they were connected to SBC through an interlocking website that represented all

the entities as one; there was considerable overlap in their officers and Directors; SBC had a

centralized HR department that oversaw personnel issues for all subsidiaries; the subsidiaries

exchanged employees and seemed confused about who worked for which entity; they shared a

centralized financial department that handled all of their banking matters; they were all

represented by the same lawyers in the litigation; and the employees of some subsidiaries

conducted business on behalf of other subsidiaries.  *Id.* at *4-6.  Plaintiffs have presented this

Court with these facts and more for SAG and its global network of subsidiaries.

44

In sum, Plaintiffs have presented prima facie evidence on every single factor that Illinois and federal courts around the country consider relevant and important to the agency or alter ego analysis of personal jurisdiction.  As a result, the Court should impute SCPI's Illinois contacts to SAG.

**II.     IT IS FAIR, JUST, AND REASONABLE FOR THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER SAG.**

Once the Court determines there are sufficient contacts to exercise personal jurisdiction, it must decide whether doing so would be "fair, just, and reasonable" under both federal and Illinois constitutional due process standards.  *See Liberty Mut. Fire Ins. Co. v. Reimer Exp. Enter., Ltd.*, 82 F. Supp. 2d 887, 891 (N.D. Ill. 2000).  These standards blend together and generally focus on the relative interests of the parties and on the forum's interest in resolving the dispute.  *FMC Corp. v. Trimac Bulk Transp. Servs., Inc.*, 97 F. Supp. 2d 872, 876 (N.D. Ill. 2000).  SAG "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the forum] would violate traditional notions of fair play and substantial justice." *Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 53 (7th Cir.1996) (quoting *Burger King Corp.,* 471 U.S. at 477).

There is indeed a compelling case here, but it favors Plaintiffs.  By co-opting SCPI's business in the U.S., SAG availed itself of the financial benefits resulting from access to the bountiful U.S. and Illinois agricultural markets.  SAG managed field test protocols in Illinois, sent its global product leaders on sales calls in Illinois, and even directly negotiated the sale of SCPI's atrazine to companies that later distributed their own atrazine-containing products in Illinois.  Through SCPI, SAG generates over $350 million in annual revenue from the sale of

atrazine products in the U.S.  With this golden goose on its hands, it is no surprise that SAG retains the exclusive authority over whether atrazine stays on the U.S. market.

SAG cannot credibly claim that it did not anticipate being haled into U.S. and Illinois courts to answer for the consequences of its decision to continue selling atrazine.  Its own legal leaders recognized from the company's inception that SAG's management structure violated legal requirements and exposed it to personal jurisdiction in the countries where its subsidiaries did its bidding.  Rather than changing that structure, SAG deliberately concealed it through a policy designed to paper over Syngenta's actual global management hierarchy.  Forcing SAG to litigate in this Court would not cause it undue burden, as SAG certainly has the financial means and is already represented by the same lawyers as SCPI.  SAG may be involved in this case in any event, as its Board would have to approve any potential settlement with the Plaintiffs.

SAG should be in this case for a number of reasons.  First, SAG possesses evidence essential to Plaintiffs' elements of proof.  Because the testing and sale of atrazine is a global enterprise within Syngenta, evidence necessary to prove SCPI's knowledge of atrazine's health hazards and its propensity to contaminate public water supplies may be buried at Syngenta companies in Basel and elsewhere.  As the ultimate arbiter of authority within the group, SAG is the only entity capable of giving Plaintiffs access to that evidence wherever it may be.  Second, SCPI has already taken the position that it does not have "control" over and will not produce any documents in the possession of other SAG subsidiaries.  So while it exchanges information and documents with these companies on a daily basis, SCPI has advised Plaintiffs that they must apply for such documents to Swiss authorities, where (it is claimed) there are criminal penalties for producing documents.  Finally, the Illinois water providers who pay to remove atrazine from public drinking water, along with millions of Illinois residents who consume that water, have a

46

profound interest in forcing SAG to defend in this Court the toxic and defective product it chose to keep on the market and in the Illinois water supply.

## CONCLUSION

Plaintiffs have clearly made a prima facie case that SAG is doing business in Illinois through SCPI and that SCPI acts as SAG's agent or alter ego in Illinois.  Plaintiffs have also provided evidence contradicting every relevant assertion in SAG's self-serving declarations.  This Court should deny SAG's 12(b)(2) motion.