Maeder, Christoph          10-14-2010
Confidential

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS


- - - - - - - - - - - - - - - - -
CITY OF GREENVILLE, ILLINOIS,    )
et al.,                          )
                                 )
               Plaintiffs,       )
vs                               ) Case No.:
                                 ) 10-cv-188-JPG-PMF
                                 )
SYNGENTA CROP PROTECTION, INC.,  )
et al.,                          )
                                 )
               Defendants.       )
- - - - - - - - - - - - - - - - -



CONFIDENTIAL VIDEOTAPED DEPOSITION
OF MR. CHRISTOPH MAEDER

VOLUME I


Thursday, October 14, 2010

AT:  9:09 a.m.



Taken at:

McDermott Will & Emery
Rue Pere Eudore Devroye 245
1150 Brussels
Belgium




Court Reporter:

        JUDITH WHITE

Exhibit 002 Page 1
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

## Page 2

1            A P P E A R A N C E S
2  Appearing on behalf of the plaintiffs:
3
     STEPHEN M. TILLERY, ESQ.
4    JOHN C. CRAIG, ESQ.
     KOREIN TILLERY, LLC
5    One U.S. Bank Plaza
     505 N. 7th Street, Suite 3600
6    St. Louis, MO 63101-1625
     Phone: 314.241.4844  Fax: 314.241.3525
7    Email: stillery@koreintillery.com
8    Email: jcraig@koreintillery.com
9

10
     Appearing on behalf the defendants:
11
     MICHAEL A. POPE, PC, ESQ.
12   McDERMOTT WILL & EMERY LLP
13   227 West Monroe Street
14   Chicago, IL 60606-5096
15   Phone: 312.372.2000  Fax: 312.984.7700
     Email: mpope@mwe.com
16

17
     MARK C. SURPRENANT, ESQ.
18   ADAMS AND REESE LLP
19   One Shell Square
20   701 Poydras Street, Suite 4500
     New Orleans, LA 70139
21   Phone: 504.581.3234  Fax: 504.566.0210
     Email:  mark.surprenant@arlaw.com
22

23

24
25

## Page 3

1   Also present:
2      MR. ALAN B. NADEL     (Litigation Counsel,
                Syngenta Crop Protection, Inc.)
3
       MR. JONATHAN SULLIVAN  (Group Litigation Counsel,
4                Syngenta International AG)
5      DR. JOHN ATKIN         (Chief Operating Officer,
                Syngenta Crop Protection AG)
6
7   Videographer:
8      MR. PHILLIP HILL
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1            W I T N E S S   I N D E X
2  Witness                              Page
3  MR. CHRISTOPH MAEDER (sworn)  . . . . . . . . . .  8
4      Examination by Mr. Tillery. . . . . . . . . . .  8
5      Examination by Mr. Pope . . . . . . . . . . . . 208
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1   EXHIBIT NAME     DESCRIPTION            PAGE #
2   Exhibit 1     Summary of CV of         8
3                 Christoph Maeder
4   Exhibit 2     Document headed          14
5                 "Definitions/General Matters"
6   Exhibit 3     Document on Syngenta letterhead,  41
7                 Bates stamped SYN01791911-912
8                 and SYN01958831-835
9   Exhibit 4     Syngenta Corporate Governance    46
10                Report for 2009
11  Exhibit 5     Document entitled "Finance       58
12                including Tax", Bates stamped
13                GRNVL0000081027-030
14  Exhibit 6     Document entitled "Legal and     85
15                Transactions", Bates stamped
16                GRNVL0000081116-120
17  Exhibit 7     Document entitled "Reserved      138
18                Powers for HR", Bates stamped
19                GRNVL0000081031-035
20
21
22
23
24
25

2 (Pages 2 to 5)

Exhibit 002 Page 2
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 6

1         PROCEEDINGS
2    (9:09 a.m.)
3         THE VIDEOGRAPHER:   This is the beginning of
4    videotape number 1, volume I.  This is the video
5    operator speaking, Phillip Hill, on behalf of
6    Westlaw Deposition Services, San Francisco.
7         Today's date is October 14, 2010.  The time on
8    the video screen is 09:09 a.m. Belgian time.
9         We are at the Brussels office of McDermott
10   Will & Emery to take the videotaped deposition of
11   Christoph Maeder.
12        This is taken in the matter of City of
13   Greenville, Illinois, et al., versus Syngenta
14   Corporation [sic] Protection Inc. versus [sic]
15   Syngenta AG.
16        This is being heard in the United States
17   District Court for the Southern District of Illinois,
18   case number 10-188-JPG.
19        Will counsel present please introduce
20   themselves and state whom they represent?
21        MR. TILLERY:   For the plaintiffs,
22   Steve Tillery, of the law firm of Korein Tillery,
23   St. Louis, Missouri.
24        MR. CRAIG:   John Craig, also of Korein
25   Tillery, for the plaintiff.

Page 7

1        MR. POPE:   For the defendants, Michael Pope
2    from McDermott Will & Emery in Chicago.
3        MR. SURPRENANT:   Mark Surprenant from
4    Adams and Reese in New Orleans.
5        MR. NADEL:   Alan Nadel, N-A-D-E-L,
6    Syngenta Crop Protection Inc.
7        MR. SULLIVAN:   Jonathan Sullivan,
8    Syngenta International AG.
9        MR. ATKIN:   John Atkin, Syngenta Crop
10   Protection AG.
11        MR. TILLERY:   And on the --- on the other end
12   of LiveNote, because they can -- I should tell you who
13   is on this, so you know.
14        MR. POPE:   Please.
15        MR. TILLERY:   Lawyer-wise, it is Chris Hoffman
16   of Korein Tillery; Michael Klenov may or may not be
17   on -- I don't know; there is Christie Deaton on;
18   and there is a technical person in the office, who is
19   assisting them, by the name of Jerry Brown.
20        MR. POPE:   And to the best of your knowledge,
21   that's all that's on there?
22        MR. TILLERY:   That's it.
23        MR. POPE:   That's all on the LiveNote?
24        MR. TILLERY:   Absolutely.
25        THE VIDEOGRAPHER:   The court reporter today is

Page 8

1    Ms. Judith White on behalf of Westlaw Deposition
2    Services.  Please will the court reporter swear in the
3    witness.
4              CHRISTOPH MAEDER,
5         having been duly sworn,
6         testified as follows:
7         MR. TILLERY:   We could get started, Mike, now
8    while we wait for these documents to be copied.  I could
9    go through a few preliminaries --
10        MR. POPE:   I'd be happy -- I'd be happy to see
11   us do that.
12        MR. TILLERY:   -- so we could get going.
13   EXAMINATION BY MR. TILLERY:
14   BY MR. TILLERY:
15        Q.  Would you state your name for this record,
16   please, sir?
17        A.  I am Christoph Maeder.
18        Q.  And could you tell me where you live?
19        A.  I live in Oberwil, near Basel,
20   Switzerland.
21   (Exhibit 1 marked for identification.)
22   BY MR. TILLERY:
23        Q.  I am going to show you what has been
24   marked as exhibit number 1 and ask you if you can
25   identify that, sir.

Page 9

1        A.  Yes, I can.
2        Q.  And what is that?
3        A.  This is a -- it is a summary of my CV.
4        Q.  The CV, your normal CV, is significantly
5    bigger than this, isn't it?
6        A.  It's not significantly bigger.  It's just
7    maybe some private aspects added to it.
8        Q.  Okay.  Fine.  Where are you employed, sir?
9        A.  I am employed in Basel.
10        Q.  By whom?
11        A.  By a company called Syngenta International
12   AG.
13        Q.  And could you tell me where and when you
14   were born?
15        A.  I was born in a village called Zetzwil on
16   the 21st of July 1959.  Zetzwil is in Switzerland.
17        Q.  And how many degrees do you hold?
18        A.  I hold a law degree from the University of
19   Basel, and I have passed the Bar exam in Switzerland.
20        Q.  And your undergraduate degree, your
21   college degree?
22        A.  I made what we call in Switzerland a
23   Matura (Type B).  That won't tell you a lot, I'm afraid.
24        Q.  What does that mean?
25        A.  We have a different system, in educational

3 (Pages 6 to 9)

Exhibit 002 Page 3
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 10

1 terms, than the US.  Before you join university,
2 you have to pass a Matura exam, and that's what I did.
3     Q.  When did you first start working for a
4 Syngenta predecessor?
5     A.  That was in 1992 -- '2, yes -- '2 or '3,
6 sorry.
7     Q.  Okay.  Which predecessor of Syngenta did
8 you start working for, sir?
9     A.  I started with a company called
10 Sandoz International AG.
11     Q.  And what did you do there?
12     A.  I was a corporate counsel in the legal
13 department.
14     Q.  And where was that located?
15     A.  That was located in Basel, Switzerland.
16     Q.  Is it in the same location you work today?
17     A.  It is not in the same location.
18     Q.  What business was Sandoz in?
19     A.  Sandoz was a group of companies active in
20 businesses such as pharmaceuticals, chemicals,
21 construction chemicals, nutrition and seeds.
22     Q.  And did they have US subsidiaries?
23     A.  They had US subsidiaries.
24     Q.  Do you remember whether the
25 US subsidiaries were involved in the agrochemical

Page 11

1 business?
2     A.  I do remember that they were involved in
3 the agrochemical business.
4     Q.  What was the agrochemical business arm in
5 the US named?
6     A.  I think it was Sandoz Agrochemicals Inc.
7     Q.  What was your title there, when you first
8 started?
9     A.  My first title was corporate counsel.
10     Q.  And then walk me through what your
11 responsibility became as you stayed there?
12     A.  I first started as a regular member of the
13 corporate legal department, basically involved in
14 company law aspects, financial market transactions,
15 contract law and anti-trust and mergers and acquisition.
16     Q.  Was that your first legal job?
17     A.  That was not my first legal job.
18     Q.  What was your first legal job?
19     A.  My first legal job was at the court in
20 Rheinfelden in Switzerland.
21     Q.  What did you do there?
22     A.  I was a clerk there.
23     Q.  And was that until 1982?
24     A.  That was until 1990.
25     Q.  And then what did you do?

Page 12

1     A.  And then I joined the University of Basel
2 as a scientific assistant.
3     Q.  For two years?
4     A.  For two, two and a half years, yes,
5 roughly.
6     Q.  Okay.  What was the next job you had at
7 Sandoz?
8     A.  After I became corporate counsel, which
9 I was for a couple of years, I was becoming senior
10 corporate counsel in the Sandoz legal department.
11     Q.  And what was your responsibility as senior
12 corporate counsel?
13     A.  Main responsibilities were around merger
14 and acquisition and anti-trust law.
15     Q.  How long were you there on that job?
16     A.  I was there until 1996, when Sandoz merged
17 with Ciba-Geigy to form Novartis.
18     Q.  How did your job change at that time?
19     A.  By becoming the senior corporate counsel,
20 I was assuming project responsibility, particularly for
21 merger and acquisition projects and other legal
22 projects.
23     Q.  And the merger resulted in what companies?
24     A.  The merger resulted in the new holding
25 company called Novartis AG with a series of subsidiaries

Page 13

1 underneath.
2     Q.  And did you work for Novartis AG?
3     A.  I worked for Novartis International AG.
4     Q.  And what was your job title at that
5 company?
6     A.  My job title was senior corporate counsel.
7     Q.  How many of Novartis AG subsidiaries were
8 headquartered in Basel?
9     A.  I couldn't tell you the exact number, but
10 a series.
11     Q.  Did Novartis AG remain in the
12 agribusiness?
13     A.  They remained in the agribusiness until
14 the spin-off and formation of Syngenta.
15     Q.  And They had a subsidiary in the US that
16 sold atrazine?
17     A.  That's right.
18     Q.  And that was Novartis Crop Protection
19 Inc.?
20     A.  That's right.
21     Q.  Where was Novartis Crop Protection Inc.
22 based?
23     A.  In Greensboro, North Carolina.
24     Q.  Now, if you would, tell me what your role
25 was in the merger with the formation of Novartis?

4 (Pages 10 to 13)

Exhibit 002 Page 4
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                     10-14-2010
Confidential

Page 14

1       A.  My main role was around the merger control
2   filings in the different jurisdictions where we had to
3   file.  I was responsible for those within the legal
4   department, including some subsequent divestitures we
5   had to do based on the decision of the merger control
6   authorities.
7       Q.  And how did it change -- excuse me,
8   let's go off the record.  Our copies have arrived.
9   Can we go off.
10      THE VIDEOGRAPHER:  Going off the record.  The
11  time is 09:20.
12  (9:20 a.m.)
13          (Break taken.)
14  (9:23 a.m.)
15      THE VIDEOGRAPHER:  Going back on the record.
16  The time is 09:23.
17  (Exhibit 2 marked for identification.)
18  BY MR. TILLERY:
19      Q.  Mr. Maeder, I am going to hand you what's
20  been marked as exhibit number 2, and, frankly, this is
21  just a list of definitions that I have lanced for
22  the -- for the deposition so that you and I are
23  referencing the same thing when we use different words
24  throughout the deposition, okay.  I am going to hand
25  these across to the counsel so you can see these.

Page 15

1       MR. POPE:  Thank you.
2   BY MR. TILLERY:
3       Q.  How long did you stay in your job as
4   senior corporate counsel at Novartis International AG?
5       A.  Until the divestiture of Novartis's
6   agribusiness to form Syngenta.  That was in 2000.
7       Q.  And did your job stay the same throughout
8   that period of time, or did it change?
9       A.  It did not stay the same.  I moved on to
10  become, on the 1st of January -- sorry, '99.  On the
11  1st of January '99, I became head of legal and public
12  affairs within what was at the time Novartis Crop
13  Protection AG.
14      Q.  Was that a promotion?
15      A.  That was a promotion.  It was a
16  different role.  The role within Syngenta -- Novartis
17  International, excuse me, was a corporate role, whereas
18  this was a divisional role.
19      Q.  Who promoted you?
20      A.  It was a decision taken by general counsel
21  at the time for the entire Novartis group.
22      Q.  Who was general counsel?
23      A.  Urs Baerlocher.
24      Q.  Would you spell that for the reporter,
25  please?

Page 16

1       A.  Of course.  U-R-S, the first name;
2   Baerlocher, B-A-E-R-L-O-C-H-E-R.
3       Q.  And your responsibilities as head of
4   legal and public affairs?
5       A.  Was running the legal group supporting
6   the crop protection business, plus overseeing the public
7   affairs -- the small public affairs group within
8   Novartis Crop Protection AG.
9       Q.  And where were you physically located at
10  that time?  Where were your offices?
11      A.  The offices were in Basel.
12      Q.  And is that in the same location you are
13  in now?
14      A.  It is in the same site, yes.
15      Q.  The same site, but a different building?
16      A.  Right.
17      Q.  And, generally, what can we refer to that
18  site as in this deposition, so we now we're talking
19  about the same thing?
20      A.  We call that site Rosental.
21      Q.  Rosental?
22      A.  Right.
23      Q.  All right.  That is what we'll call it.
24  So it was the Rosental compound?
25      A.  The Rosental site.

Page 17

1       Q.  Site, all right.  What did Novartis Crop
2   Protection AG do?
3       A.  Novartis Crop Protection AG oversaw the
4   global activities -- the global crop protection
5   activities of Novartis AG.
6       Q.  Have you ever given a deposition before?
7       A.  No.
8       Q.  Have you ever testified under oath before?
9       A.  No.
10      Q.  Have you ever testified without being
11  under oath?
12      A.  Not in front of a court.  In writing, yes.
13      Q.  Was Novartis Crop Protection AG, that
14  entity, that was -- and I may have asked you this, but
15  I wanted to confirm on the record, that was located at
16  the Rosental site?
17      A.  Yes.
18      Q.  All right.  Did you serve on any of the
19  boards at that time?
20      A.  I can't recall at this time.
21      Q.  Now, what was your role in the spin-off or
22  creation of Syngenta?
23      A.  I was part of the project team within
24  Novartis Crop Protection AG who prepared that
25  transaction.

5 (Pages 14 to 17)

Maeder, Christoph                    10-14-2010
Confidential

Page 18

1      Q.  And what was the project team that you're
2   referring to?
3      A.  The main project team consisted of
4   Heinz Imhof, the head of agribusiness for Novartis,
5   comprising crop protection and seeds; John Atkin, head
6   of crop protection -- Novartis Crop Protection AG at the
7   time; and Richard Steiblin, head of finance of Novartis
8   Crop Protection AG; and myself.  We were the core team,
9   of course supported by staff members.
10     Q.  What was the goal in creating Syngenta?
11     A.  The goal was to create a stand-alone
12  agribusiness company distinct from divisional activity
13  within a larger conglomerate, and at the same time,
14  of course, merging the Novartis agribusiness with the
15  agribusiness of AstraZeneca, who were spun off
16  simultaneously and merged into Syngenta.
17     Q.  Is it fair to say that one of the goals
18  was to create a single worldwide agribusiness under
19  common direction and control, a worldwide business that
20  acted as a single coordinated entity?
21     A.  I don't think that the purpose was to act
22  on a global basis as a single coordinated entity, but to
23  have a strategic alignment of all the agribusiness
24  activities worldwide.
25     Q.  Why would you put that quote that I just

Page 19

1   read from in your 2005 annual review at page 2, then?
2      MR. POPE:  Do you want to show him a document
3   that has that in it, Mr. Tillery?
4      MR. TILLERY:  I will.
5      THE WITNESS:  I don't know who put that quote
6   in and what the context of such a quote was.
7   BY MR. TILLERY:
8      Q.  Do you review these things that go into
9   annual reviews?
10     A.  I review things which go into annual
11  reviews, but I don't recall this particular item.
12     Q.  What part of that statement was it that
13  you disagreed with?  Do you want me to read it again?
14     A.  Please.
15     Q.  Would it be fair to say that one of the
16  goals was to create a single worldwide agribusiness
17  under common direction and control?
18     A.  In a strategic sense, I don't disagree
19  with that statement.
20     Q.  Okay.  Is it fair to say that, in forming
21  Syngenta, you were going to take all the resources and
22  organise them for the highest operational efficiency
23  across regions, corporate boundaries and operational
24  divisions?
25     A.  I think that's a pretty fair statement,

Page 20

1   yes.
2      Q.  Another goal was to present a single
3   unified company image across the world; correct?
4      A.  Of Syngenta agribusiness, I think that's
5   right.
6      Q.  In press releases announcing the formation
7   of Syngenta, some of them said, and I am quoting,
8   "Syngenta will be the first global pure play
9   agribusiness company".
10     MR. POPE:  Objection to the form of the
11  question.
12  BY MR. TILLERY:
13     Q.  When you use "pure play" in that context,
14  what do you mean?
15     MR. POPE:  Objection to the form of the
16  question.  Lack of foundation.
17     THE WITNESS:  I understand the term
18  "pure play" as being a company focused on agribusiness
19  activities, as opposed to further other activities.
20  BY MR. TILLERY:
21     Q.  In presentations to employees of Syngenta
22  after the company was formed -- and let me -- let me
23  strike that question and just explain to you.
24     The information that we have in forming
25  questions here today comes from documents that -- that

Page 21

1   I'll be referencing, and it comes from public
2   information, sir, that we have.  And some of these
3   documents I'll have, to the extent that I still have
4   them and they are not contained in the bowels of some
5   airplane at American Airlines, I -- I will reference
6   them.
7      We've seen some presentations that have a
8   reference to "One Syngenta", quote, "One", O-N-E,
9   "Syngenta".  Have you seen that before?
10     A.  I have come across the term
11  "One Syngenta", yes.
12     Q.  Actually, didn't you authorize the use of
13  that term?
14     A.  No, I didn't.
15     Q.  Who did?
16     A.  I cannot answer that question.  I don't
17  know.
18     Q.  What is the history of the phrase
19  "One Syngenta"?
20     A.  The substantive history, as far as
21  I recollect this, is that we wanted to give Syngenta the
22  appear between the different agribusinesses, seeds and
23  cost protection, vis-a-vis the customer as being one
24  offer to the customer.
25     Q.  What happened to Novartis International AG

6 (Pages 18 to 21)

Maeder, Christoph               10-14-2010
Confidential

---

Page 22

1   as a result of the merger?
2        A.   Nothing as a result of the merger to form
3   Syngenta.
4        Q.   What happened to it after Syngenta was
5   formed?
6        A.   It still exists, to the extent I know.
7        Q.   Where is it -- how does it exist?  Doing
8   what business?
9        A.   It is the management company, as far as
10  I understand, of the Novartis group of companies.
11       Q.   And what business is it involved in?
12       A.   Novartis today is mainly around
13  pharmaceuticals, but they have some diagnostics,
14  they have some over-the-counter health products, and --
15  and the like, but the main business is clearly
16  pharmaceuticals.
17       Q.   And that was Novartis International AG
18  you were talking about?
19       A.   I was talking about the group Novartis
20  under the umbrella of Novartis AG.
21       Q.   And what happened to Novartis
22  International AG?
23       A.   It still exists.
24       Q.   Okay.  Now, the employees of the
25  predecessor entities of Syngenta, how did they transfer

---

Page 23

1   into the Syngenta entity and the businesses that were
2   moved into Syngenta?  How did that happen?
3        A.   Some of them just stayed employed with the
4   company they had been employed before, the company
5   changing its name.  Others were becoming employees of
6   newly formed company into which three existing
7   businesses were merged into.
8        Q.   What happened to Novartis Crop Protection
9   AG as a result of the merger?
10       A.   It changed its name and became Syngenta
11  Crop Protection AG.
12       Q.   And did it stay at the same location?
13       A.   Yes.
14       Q.   Rosental?
15       A.   (Witness nods head.)
16       Q.   Okay.  And the employees of Novartis Crop
17  Protection AG, did they stay on in that new entity of
18  Syngenta Crop Protection AG?
19       A.   Most of them did.
20       Q.   Did the executives?
21       A.   Some did, some didn't.
22       Q.   Okay.  The board members?
23       A.   The board members were changed,
24  from memory.
25       Q.   Okay.  Now, what about Novartis Crop

---

Page 24

1   Protection Inc.?  In the merger, what did it become?
2        A.   I think it -- the corporate transaction
3   was it changed its name into Syngenta Crop Protection
4   Inc.
5        Q.   And the employees of Novartis Crop
6   Protection Inc., did they stay on as employees of
7   Syngenta Crop Protection Inc.?
8        A.   They broadly stayed on, yes.
9        Q.   The executives, in large measure, stayed
10  on the same?
11       A.   Again, some and some.
12       Q.   Were agreements signed between
13  AstraZeneca plc and Novartis AG about how the newly
14  formed Syngenta AG would operate?
15       A.   There was, of course, a merger agreement
16  between those two entities, yes.
17       Q.   Was that an overriding central agreement
18  that controlled the formation of the company Syngenta?
19       A.   Yes, that was the merger agreement
20  originally signed between Novartis and AstraZeneca.
21       Q.   Was there just one operating or merger
22  agreement or were there several?
23       A.   There were several agreements, but it was
24  one top agreement, so to speak.
25       Q.   Was -- where was the discussion or

---

Page 25

1   agreement regarding the authority or power over
2   subsidiaries reserved in Syngenta AG?  Was there a -- an
3   agreement reached to that effect?
4        A.   I'm not entirely sure I understand your
5   question.  Could you repeat?
6        Q.   When the -- when the -- of course.  And,
7   by the way, throughout the deposition, at any time
8   please feel free to do that.  I try to -- not to talk
9   over your questions, and if I do -- your answers, and if
10  I do, stop me.  I don't mean to do that at all.
11            Was there an agreement as to what type of
12  authority or power over subsidiaries was to be reserved
13  to Syngenta AG?
14       A.   I don't recall specific agreements to that
15  end.
16       Q.   Was there an agreement that addressed the
17  corporate structure of Syngenta AG and the Syngenta
18  group of companies worldwide?
19       A.   The agreement -- sorry, I missed one word.
20  Was there a corporate agreement that?
21       Q.   Addressed, addressed.
22       A.   Ah, "addressed", excuse me.  As far as
23  I recollect that agreement, there were very little,
24  very few, organizational aspects dealt with in that
25  agreement around corporate governance within the future

---

7 (Pages 22 to 25)

**Exhibit 002 Page 7**
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 26

1  Syngenta operation.
2      Q.  When you say "that agreement", you mean
3  the merger agreement?
4      A.  The umbrella agreement, yes.
5      Q.  Were there other agreements signed that
6  did in fact deal with governance by -- by Syngenta AG of
7  subsidiaries?
8      A.  The structure was that at the beginning
9  the two holding companies of the two businesses to be
10 merged would be merged into each other and then,
11 of course, we had a series of subsequent transactions to
12 be dealt with when Syngenta was formed.  But that was --
13 the governance structure was, from memory, mainly dealt
14 with within Syngenta after its formation.
15     Q.  After the formation, okay.  And was that
16 true with respect to the crop protection business?
17 In other words, was there anything dealt with
18 specifically regarding the crop protection business at
19 the time of formation, or was that afterwards?
20     A.  With respect to the governance?
21     Q.  Yes.
22     A.  I don't recall whether there were specific
23 clauses in the -- in the merger agreement on governance
24 for Crop Protection Inc.; I don't think so.
25     Q.  Same with respect to allocation of profits

Page 27

1  or dividends from Syngenta AG subsidiaries; was that
2  dealt with at that time or later?
3      A.  From memory, later.
4      Q.  Okay.  Did the issue of leadership of the
5  new company get dealt with in the merger agreements, or
6  did those come later as well?
7      A.  In the merger agreement, only the
8  top leadership of the group was dealt with.
9      Q.  And that's where there was an equal number
10 of representatives on the board of the formed --
11     A.  Of nominees from both sides, yes.
12     Q.  Correct.  And they agreed there'd be a
13 12-person board of directors at AG?
14     A.  Right.
15     Q.  Six from each entity?
16     A.  That was the nomination process.
17     Q.  All right.  There was an agreement to form
18 a Syngenta AG executive committee?
19     A.  Right.
20     Q.  And that was to consist of eight members,
21 four from Novartis and four from AstraZeneca; correct?
22     A.  That is correct.
23     Q.  You were one of the members of that
24 executive committee?
25     A.  That's correct.

Page 28

1      Q.  Was Mr. Atkin a member too?
2      A.  That's correct.
3      Q.  Did Novartis AG have an executive
4  committee before the merger?
5      A.  Yes.
6      Q.  With the merger and the creation of
7  Syngenta Crop Protection, in other words, changing it
8  from Novartis Crop Protection business to Syngenta Crop
9  Protection, was there anything contemplated at the time
10 of the merger for a change of the crop protection
11 business?
12     A.  I'm not sure I can answer the question --
13     Q.  All right, we'll get to that.
14     A.  -- in the way it is asked.
15     Q.  We'll get to that.  Now, in addition
16 to being a member of the Syngenta AG executive
17 committee, what were your other roles or job titles
18 within the Syngenta group of companies when they were
19 first formed?
20     A.  I was nominated to be a member of
21 several boards of group companies, particularly, and
22 I have several roles, of course, to play within
23 functional processes, committees, subcommittees,
24 pension funds of Syngenta, particularly in Switzerland,
25 because I have -- and I have had responsibility for

Page 29

1  Syngenta in Switzerland, as a whole; Syngenta
2  Switzerland as a whole, I mean.
3      Q.  Can you tell me the companies that --
4  where you have an official position?
5      A.  At this point in time, I am a member of
6  the board of about ten group companies, from memory, and
7  I am particularly a member of Syngenta Crop
8  Protection -- of the board of Syngenta Crop Protection
9  AG.  I am the chairman of that -- of that board.  I am
10 the chairman of Syngenta Participation AG; I am the
11 chairman of Syngenta Agro AG which is a Swiss entity;
12 I am a member of the board of Syngenta International AG;
13 and a couple of smaller group companies in Switzerland.
14     Q.  What are the smaller group companies in
15 Switzerland?
16     A.  One is, I think, called Syngenta Finance
17 AG and there is an entity in Spain I am on the board of,
18 and I am a member of the board of Syngenta Crop
19 Protection Inc. of course, in the United States and of
20 Syngenta Corporation.
21     Q.  What's the one in Spain?
22     A.  Spain is, I -- from memory, the crop
23 protection company in -- the legal entity in Spain
24 dealing with the crop protection business in Spain.  It
25 is called Syngenta Agro something Espana.

8 (Pages 26 to 29)

Exhibit 002 Page 8
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 30

1      Q.  What are your responsibilities in these
2  roles?
3      A.  I am a representative of the Syngenta
4  group of companies in these boards.
5      Q.  There are 13 Syngenta related companies
6  in -- in Basel; correct?
7      A.  I couldn't tell you the exact number from
8  memory.
9      Q.  The Swiss business registration records
10  list you as being a non-board member for three of the
11  13 companies.  Which ones are you not a board member of?
12      A.  This might be three foundations.  I -- I
13  am a member of the board of foundations.  This is the
14  pension fund in the legal form of a foundation; this is
15  a so-called umbrella foundation; and it's another
16  pension fund foundation in Switzerland.  They are in the
17  form of -- of foundations rather than AGs, companies
18  limited by shares.
19      Q.  Currently, you're a member of the
20  Syngenta AG executive committee?
21      A.  I am a member of the group executive
22  committee of the Syngenta group, yes.
23      Q.  Now, you said "group executive committee",
24  is that different than Syngenta AG executive committee?
25  Are they the same?

Page 31

1      A.  The executive committee oversees the
2  businesses of all Syngenta group companies.
3      Q.  I see.
4      A.  That's why I said it in the way I said it.
5      Q.  And there were names -- you -- you used
6  the word in some of your documents "affiliates", some of
7  the ones were.  What -- what does it mean to be an
8  affiliate company?
9      MR. POPE:  Objection to the form of the
10  question.
11      THE WITNESS:  An affiliate company is a
12  company held either directly or indirectly ultimately by
13  Syngenta AG.
14  BY MR. TILLERY:
15      Q.  So it would be one of them in the
16  umbrella?
17      A.  Right.
18      Q.  Syngenta Crop Protection Inc. would be one
19  of those?
20      A.  Right.
21      Q.  Are you an employee of Syngenta AG?
22      A.  I'm an employee of Syngenta International
23  AG.
24      Q.  Do you collect a paycheck?
25      A.  I collect a paycheck from Syngenta

Page 32

1  International AG.
2      Q.  That's what's on your paycheck?
3      A.  Yes.
4      Q.  It says "To Christoph Maeder", and it has
5  the bank record "Syngenta International AG"?
6      A.  I don't regularly look at my paychecks,
7  but that's what is on, yes.
8      Q.  And just quickly, I'm going to go through
9  these and confirm your status very quickly.  You are the
10  president of the board of Syngenta Agro AG?
11      A.  Right.
12      Q.  The president of the board of Syngenta
13  Crop Protection AG?
14      A.  Right.
15      Q.  President of the board of Syngenta Finance
16  AG?
17      A.  Right.
18      Q.  President of the board of Syngenta
19  International AG?
20      A.  No, I am not a member of the board.
21      Q.  Who's president?
22      A.  Mike Mack.
23      Q.  You are president of the board of Syngenta
24  Participations AG?
25      A.  I think so, yes.

Page 33

1      Q.  Okay.  Who would be if it wasn't you?
2      A.  No, it's me.
3      Q.  All right.  You're a member of the board
4  of Syngenta Crop Protection Inc.?
5      A.  Yes.
6      Q.  Have I left any out?
7      A.  You've left out Syngenta Corporation,
8  you've left out the Spanish company.
9      Q.  Those that you told me about before?
10      A.  Right.
11      Q.  Okay.
12      A.  From memory.
13      Q.  How do you allocate your time among these
14  different roles?
15      A.  I do not allocate specifically or keep
16  record of allocation of time between my different roles
17  within Syngenta.
18      Q.  Why is that?  Why don't you keep your time
19  as to which of these jobs you allocate time to?
20      A.  I have an overall role as head of my
21  department, which is eating up most of my time, and in
22  the context of that, I do many different things with
23  respect to many different legal entities in one or the
24  other way.
25      Q.  Do you distinguish between your roles as a

9  (Pages 30 to 33)

**Exhibit 002 Page 9**
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                 10-14-2010
Confidential

Page 34

1  director for the companies or -- and as a member of
2  Syngenta AG's executive committee, for example?
3          MR. POPE:  Objection to the form of the
4  question.  What do you mean "distinguish"?
5  BY MR. TILLERY:
6          Q.  You can go ahead.
7          A.  If I -- acting as a board member of one of
8  these companies, of course I act in that role.
9          Q.  Is it fair to say that you're working
10  toward a common goal or for a common purpose in all
11  these roles?
12          A.  For the common purpose of Syngenta group
13  as a whole, yes.
14          Q.  Okay.  The Rosental compound or site,
15  is that where all of the Syngenta offices are located?
16          A.  Almost all of them, yes.
17          MR. POPE:  You mean in Switzerland?
18  BY MR. TILLERY:
19          Q.  I mean in Switzerland, of course.
20          A.  We have -- sorry, I have to correct.
21  If you mean Switzerland -- I meant you were referring to
22  Basel.
23          In Switzerland, it is the majority of people
24  employed by Syngenta group companies in Switzerland, but
25  not all of them.  We have some other locations in

Page 35

1  Switzerland where people are located.
2          Q.  In terms of leadership as well?
3          A.  In terms of -- not in terms of global
4  leadership, no.
5          Q.  Global leadership would be in Basel?
6          A.  That's --
7          Q.  At the Rosenthal compound?
8          A.  Exactly.  Exactly.
9          Q.  Right.  Is that where the offices of the
10  rest of the Syngenta AG executive committee members are
11  located as well?
12          A.  That is correct.
13          Q.  Is that where the offices of the
14  Syngenta AG board is located?
15          A.  They don't have specific offices, except
16  for the chairman, and he sits in the same location.
17          Q.  How many employees does Syngenta AG have?
18          A.  Syngenta AG has no employees.
19          Q.  Just so we are clear as to which ones are
20  located at this -- for the record, if I could go through
21  this list and you tell me if I'm wrong on the list as to
22  the ones that are located at Basel, the Rosental site:
23  Syngenta Agro Services AG?
24          A.  Yes.
25          Q.  Syngenta Agri Services Asia AG?

Page 36

1          A.  Yes, from memory, yes.
2          Q.  Syngenta Crop Protection AG?
3          A.  Yes.
4          Q.  Syngenta Finance AG?
5          A.  Yes.
6          Q.  Syngenta Iberoamerica AG?
7          A.  From memory, yes.
8          Q.  Syngenta International AG?
9          A.  Yes.
10          Q.  Syngenta Omega AG?
11          A.  From memory, yes.
12          Q.  Syngenta Overseas AG?
13          A.  Again, from memory, yes.
14          Q.  Syngenta Participations AG?
15          A.  Yes.
16          Q.  Syngenta South Asia AG?
17          A.  From memory, yes.
18          Q.  Syngenta Supply AG?
19          A.  Yes.
20          Q.  Syngenta Agro AG?
21          A.  It's located in Dielsdorf in Switzerland,
22  but this is not in Basel.
23          Q.  I'm sorry, but what?
24          A.  In Dielsdorf, this is another canton of
25  Switzerland.

Page 37

1          Q.  Okay.  It has a Basel office, but it's not
2  headquartered in Basel?
3          A.  No it doesn't.
4          Q.  It doesn't have a Basel office?
5          A.  No.
6          Q.  And there is a Ciba-Geigy Handels.  Tell
7  me -- tell me about that?
8          A.  This is an old company which, from memory,
9  has one single asset, which is basically remote.  It is
10  not a -- an active company, from memory.
11          Q.  How many of these companies are direct
12  subsidiaries of Syngenta AG?
13          A.  From memory, Syngenta International AG,
14  Syngenta Participation AG, and I -- I couldn't tell you
15  about the others.  I -- I would need to look at the --
16  the overall structure, the chart, which is quite
17  complex.  Those -- those two are the important ones of
18  the list you just mentioned.
19          Q.  How does Syngenta AG transact business
20  without any employees?
21          A.  Syngenta AG is a holding company listed on
22  the stock exchange and it -- it acts not directly, but
23  has subsidiaries or affiliate companies conducting the
24  business.
25          Q.  In the compound or site where these

10 (Pages 34 to 37)

Exhibit 002 Page 10
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 38

1  businesses are located, are there separate indications
2  for the names of separate businesses when you go to the
3  Basel site?
4      A.  Basically, none.
5      Q.  It's all under the name "Syngenta", is it?
6      A.  Yes.
7      Q.  So if you went to your door, there would
8  be nothing saying that it said that you were an employee
9  of Syngenta International AG?
10      A.  There would be nothing.
11      Q.  It would say, "Syngenta"?
12      A.  It would say "Christoph Maeder".
13      Q.  Right.  But outside there might be a sign
14  saying "Syngenta"?
15      A.  That's right.
16      Q.  And would that be the same for all of the
17  businesses there at Basel under the Syngenta umbrella?
18      A.  With a few exceptions, probably yes.
19      Q.  Do you know which exceptions --
20      A.  There might be signs where companies are
21  listed on signs somewhere.
22      Q.  Do you remember any of those separate
23  Syngenta sites?
24      A.  Not in detail.
25      Q.  Do you remember any of them at all?  Can

Page 39

1  you -- this is where your office is where you go to work
2  every day.  Can you tell me a single one of those?
3      A.  Not specifically at this moment in time,
4  no.
5      Q.  It's all under "Syngenta"?
6      A.  Broadly, yes.
7      Q.  And -- and that's the same way it works in
8  terms of communications with the -- with -- within the
9  company outside the company:  employees, staff,
10  executives have a Syngenta email address; correct?
11      MR. POPE:  Objection to the form of the
12  question.  It sounds like two different questions to me.
13  Go ahead.
14  BY MR. TILLERY:
15      Q.  I'll -- if you're -- if you have a
16  problem, I'll withdraw it.
17      A.  From -- as far as I'm aware, the Syngenta
18  email address is --
19      Q.  Syngenta?
20      A.  -- for everybody, "syngenta.com" on a
21  global basis.
22      Q.  Right, syngenta.com.  If -- if a person
23  from Syngenta Crop Protection sent an email address to
24  somebody outside the Syngenta umbrella or within the
25  Syngenta umbrella, if the person didn't know

Page 40

1  specifically where they were from, would there be
2  anything in that communication by email that would
3  indicate they were from Syngenta Crop Protection Inc.?
4      A.  Most of the employees carry with their
5  email their name and location, including the name of the
6  company, in their address.
7      Q.  In their address?
8      A.  The email -- the email address would not
9  be distinguishable.
10      Q.  The email alone wouldn't, but if they
11  listed a separate address at the bottom of their
12  message, it might?
13      A.  Right.
14      Q.  Okay.  How many total Syngenta
15  employees -- and when I say "Syngenta", I mean the
16  umbrella Syngenta -- are there at Basel?
17      A.  In Basel, there are about 1,700 employees.
18      Q.  Are those 1,700 employees assigned to
19  specific companies at that location, or do they work
20  generally for the Syngenta umbrella?
21      A.  They are all employed by a specific
22  Syngenta legal entity and not by the same, all of them.
23      Q.  Are they paid -- when they receive a
24  check, are they paid on an account that designates the
25  separate legal entity by which they are employed?

Page 41

1      A.  Yes.
2      Q.  Which of those companies at the Basel
3  location have the most employees, do you know?
4      A.  As far as I'm aware, it is Syngenta Crop
5  Protection AG.
6      Q.  How many would it have?
7      A.  I couldn't tell you the exact number.
8      Q.  You just told me that Syngenta has no
9  employees.  Did they ever have -- Syngenta AG?
10      A.  Syngenta AG has no employees.
11      Q.  And did Syngenta AG ever have employees?
12      A.  No.
13      Q.  Do you know who Andreas Nyffeler is?
14      A.  No.  Andreas Nyffeler?
15      Q.  Nyffeler, N-Y-F-F-E-L-E-R?
16      A.  I don't know Andreas Nyffeler, no.
17      (Exhibit 3 marked for identification.)
18  BY MR. TILLERY:
19      Q.  Let me show you what's been marked as
20  exhibit number 3, if you would hand those other copies
21  across.  This is a document which was produced to us,
22  and it bears a Bates number SYN019 -- I'm sorry, 0179191
23  [sic].  It's marked as exhibit 3.
24      Do you see the top of this where it says
25  "Andreas Nyffeler", and it says "Product Manager SH.

11 (Pages 38 to 41)

Exhibit 002 Page 11
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  Syngenta AG"; do you see that?
2      A.  Yes.
3      Q.  Okay.  Why would this -- why would
4  Mr. Nyffeler -- does he have -- do you know what his
5  association with the Syngenta companies is?
6      A.  I don't know Mr. Nyffeler -- we would --
7      Q.  I will try to say it right, I'm sorry.
8      A.  That's fine.  It's a Swiss name.
9  Nyffeler.  I don't know Mr. Andreas Nyffeler at all.
10  I know actively he has never been an employee of
11  Syngenta AG.
12      Q.  Well, here we have a document produced to
13  us which shows that he's a product manager, and it --
14  and it says "Syngenta AG" at the top of it, doesn't it?
15      A.  That's what's on the document, yes.
16      Q.  Okay.  I mean, this -- I just want you to
17  know, this was given to us in this -- in discovery in
18  this case.  Do you have other communications that go out
19  on Syngenta -- as Syngenta AG documents by employees
20  designating it as Syngenta AG?
21      MR. POPE:  Objection to the form of the
22  question.
23      THE WITNESS:  I know that, particularly in the
24  first few years of Syngenta, some people were confusing
25  names of legal entities and were using, as I assume

**Page 43**

1  here, erroneously "Syngenta AG" in some instances.
2  We had these sort of cases, particularly at the
3  beginning of the company.
4  BY MR. TILLERY:
5      Q.  And this was at about what time?
6      MR. POPE:  Which was?  Objection to form.
7  BY MR. TILLERY:
8      Q.  This was 2003, I think.
9      A.  This was 11 months after the formation of
10  Syngenta.
11      Q.  Okay.  So you think that this could have
12  been just a mistake?
13      A.  I think that could have been a mistake.
14      Q.  So when -- when he sent this out, it could
15  be -- how would -- how would a mistake have resulted in
16  Mr. Nyffeler having letterhead produced showing
17  Syngenta AG as "Selective Herbicides" -- is that address
18  correct, by the way, PO Box CH-4002 Basel; is that
19  correct?
20      A.  That is correct.  The address is --
21  you would need to add the -- the name of the street to
22  have the formal --
23      Q.  Okay.
24      A.  But nothing is wrong with PO Box 4002,
25  Basel.

**Page 44**

1      Q.  And the telephone numbers and fax, are
2  they all correct?  Do they look good?
3      A.  The "323" I recognize as the right initial
4  three digits, yes.
5      Q.  All right.  And what would a product
6  manager be?
7      MR. POPE:  Objection to form of the question.
8      THE WITNESS:  Product manager is somebody
9  within the crop protection business who looks after one
10  or several products.
11  BY MR. TILLERY:
12      Q.  So is it your testimony, sir, that you've
13  never seen anything like this before with anyone listed
14  as an employee using letterhead like this designating
15  them as a -- as a representative of Syngenta AG?
16      A.  I have, from memory, seen a couple of
17  those what were mistakes at the time, and as -- as far
18  as I came across them, I tried to correct them.
19      Q.  And -- and that would have been about --
20  you think about the same time, about -- in the first
21  few months following the creation of Syngenta?
22      A.  I have no other explanation for that than
23  a mistake by Mr. Nyffeler, obviously.
24      Q.  And you think Mr. Nyffeler would have had
25  the power and authority to create his own letterhead?

**Page 45**

1      A.  He should have followed --
2      MR. POPE:  Objection to the form of the
3  question.  That's gross speculation you're seeking here.
4  Now, he's already said he doesn't know who he is.
5      THE WITNESS:  Mr. -- all I can say is, there
6  was never an authorization for anybody to use
7  Syngenta AG letterhead in the form as it's used here
8  who was a product manager.
9  BY MR. TILLERY:
10      Q.  All I'm trying to do is find out how this
11  letterhead could have been created, or the document, and
12  you're telling me you don't know how that could happen?
13  Is that right?
14      A.  Other than through an error, I have no
15  explanation for that.
16      Q.  All right.  What is the policy on creating
17  letterhead within the Syngenta group of companies?
18      MR. POPE:  Objection to the form of the
19  question.
20      THE WITNESS:  The general rule is that
21  everybody is required to use the letterhead of the
22  company he or she is employed with.
23  BY MR. TILLERY:
24      Q.  Who approves the creation of the
25  letterhead?

12 (Pages 42 to 45)

Exhibit 002 Page 12
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 46

1      A.  These letterheads are -- the rules have
2  been -- have been set out at the beginning of the
3  company by I think the communications department at the
4  time.  These letterheads are created on the computers of
5  each and every employee.
6      Q.  What does the "SH" behind "Product
7  Manager" mean?
8      A.  I guess that's selective herbicides.
9      Q.  Selective herbicides.  Was there
10  such a position within the Syngenta companies of product
11  manager, selective herbicides?
12      A.  There were, from my knowledge, several of
13  these positions, yes.
14      Q.  And within which of the Syngenta group of
15  companies did people who were product managers in
16  selective herbicides work?
17      A.  He presumably was employed at the time by
18  Syngenta Crop Protection AG.  That's where it -- where
19  these people are located.
20      Q.  But you don't know him?
21      A.  I don't know Andreas Nyffeler, no.
22  (Exhibit 4 marked for identification.)
23  BY MR. TILLERY:
24      Q.  I am going to hand you what's been marked
25  as number 4.

Page 47

1      A.  Thank you.
2      Q.  Can you identify the document, sir?
3      A.  I recognize the document.
4      Q.  What is it?
5      A.  It's the group corporate governance report
6  of 2009.
7      Q.  Could you take a look at page 2 of the
8  document, the group structure and shareholders.  Did
9  you -- did you approve this document?
10      A.  I approved that part of the document, yes.
11      Q.  Did you -- is there any part of the
12  document that you didn't review and approve before it
13  went out?
14      A.  I reviewed the whole document before it
15  went out.
16      Q.  All right.  On page 2, does the group
17  structure depicted in the diagram accurately reflect the
18  management of the Syngenta group of companies?
19      A.  You're referring to the graph on page 2?
20      Q.  That's correct.
21      A.  The graph adequately reflects that, yes.
22      Q.  And it's -- and it's accurate, too, isn't
23  it?
24      A.  I think it's still, yes.
25      Q.  Okay.  Does the Syngenta AG board have

Page 48

1  12 members?
2      A.  It has 11 members at the time.
3      Q.  Is there one person -- strike that.
4      Has it been changed by articles to limit it to
5  11 members, or is there just one member missing?
6      A.  One member who had retired was not
7  replaced.  It's not a change of the articles.
8      Q.  Where does the Syngenta AG -- strike that.
9      With which entity are the formalities of
10  formation and corporate compliance required?  Is it
11  Switzerland for Syngenta AG?  With which country?
12      A.  I'm not sure I understand the question
13  precisely.
14      Q.  Do you -- in terms of corporate governance
15  and corporate formation and registration, all
16  compliances are done with Switzerland for Syngenta AG?
17      A.  For Syngenta AG, yes.
18      Q.  Any other compliance required for any
19  other country?
20      A.  For Syngenta AG?
21      Q.  Correct.
22      A.  We have -- if -- if you understand as
23  compliance, we -- if you -- if you summarize it under
24  compliance, we have ADRs listed at the New York Stock
25  Exchange for Syngenta AG.

Page 49

1      Q.  Right.
2      A.  And of course there we have compliance
3  obligations.
4      Q.  All right.  The boards of the other
5  Syngenta companies that we've talked about being at the
6  Rosental site in Basel consist of three members;
7  correct?
8      A.  Most of them, from memory, yes.
9      Q.  Are there any you recall that have more
10  than three members?
11      A.  I couldn't answer with precision that
12  question.
13      Q.  Why is there such a discrepancy between
14  the size of the boards, between the Syngenta AG board
15  and the subsidiary boards?
16      MR. POPE:  Objection to the form of the
17  question.
18      THE WITNESS:  The board of Syngenta AG --
19  the board of Syngenta AG, of course, has the
20  responsibility to overlook the operations of the whole
21  group, whereas the boards of the subsidiaries have a
22  much more limited scope.
23  BY MR. TILLERY:
24      Q.  Is the chief executive officer of
25  Syngenta AG on the Syngenta AG board?

13 (Pages 46 to 49)

Maeder, Christoph          10-14-2010
Confidential

Page 50

1      A.  Yes, he is.
2      Q.  That's Michael Mack?
3      A.  Yes.
4      Q.  Is he the global head of all the Syngenta
5  companies?
6      A.  He is not the global head of all the
7  Syngenta companies.  He is the CEO of the group.
8      Q.  How -- then how is my question wrong?
9      MR. POPE:   Objection to the form of the
10  question.
11      THE WITNESS:   I was referring to the fact that
12  the group companies have their own boards and have their
13  own management teams.
14  BY MR. TILLERY:
15      Q.  Who is Michael Mack actually employed by?
16      A.  By Syngenta International AG.
17      Q.  What is Martin Taylor's role with respect
18  to the Syngenta AG board?
19      A.  He is the chairman of the board.
20      Q.  Do Martin Taylor and Michael Mack
21  represent the interests of Syngenta as a whole towards
22  authorities and business associations, both in
23  Switzerland and internationally?
24      A.  That is correct.
25      Q.  How often does the board of Syngenta AG

Page 51

1  meet?
2      A.  The board meets five or six times a year.
3      Q.  Is that in person?
4      A.  That is in person.
5      Q.  Is that in Basel?
6      A.  That is almost all of the time in Basel.
7  The vast majority of the meetings are in Basel.
8      Q.  Do you remember one that wasn't in Basel?
9      A.  I remember about one every 18 months or
10  so, yes.
11      Q.  Does the Syngenta AG board ever vote by
12  written unanimous consent?
13      A.  It has done so, from memory, only
14  twice since its formation.  Once or twice, from memory.
15  So the answer is, almost never.
16      Q.  Has Syngenta issued a document entitled
17  "Regulations governing the internal organization of
18  Syngenta AG"?
19      A.  Yes.
20      Q.  What is that document?  Describe it for
21  me, please.
22      A.  That is a document which describes the
23  basic allocation of responsibility between the different
24  bodies and management groups within Syngenta,
25  particularly between the board of directors and the

Page 52

1  executive committee, and describes the basic rules for
2  the committees of the board.
3      Q.  Does that document have limited -- strike
4  that.
5      Is that document limited to only certain
6  members of the Syngenta group of companies, in terms of
7  access?
8      A.  The document itself is not -- not
9  distributed to a vast number of Syngenta employees, yes.
10      Q.  Which -- which companies is it not
11  distributed to?
12      A.  It is basically only distributed in
13  Switzerland.
14      Q.  Okay.  And it's not accessible to any
15  other companies within the Syngenta group as well?
16      A.  Not automatically if not authorized by me.
17      Q.  Have you ever authorized it to be
18  distributed?
19      A.  I don't recall that I have authorized it
20  to be distributed outside Switzerland.
21      Q.  Is it filed with any governmental agency?
22      A.  Not to my knowledge.
23      Q.  Is it referenced in governmental
24  publications?
25      A.  It might be.  I -- I don't recall.

Page 53

1      Q.  And why is it -- if it lays out the
2  structure of governance over subsidiaries, why is it not
3  distributed to the heads of the subsidiaries?
4      A.  Because it covers a whole range of -- of
5  things which are of no relevance to those heads of
6  subsidiaries and, therefore, we decided not to
7  distribute it integrally as a document.
8      Q.  Do those regulations that we talked
9  about -- and I -- the quote I saw was a document
10  entitled "Regulations Governing the Internal
11  Organization of Syngenta AG".  Is that a correct
12  statement?
13      A.  That is the -- the English title of it.
14      Q.  And -- I mean, how many pages to that
15  document?
16      A.  Fifteen-ish, from memory.
17      Q.  Okay.  Does the document govern the
18  internal organizations of companies other than
19  Syngenta AG?
20      A.  No.
21      Q.  Does it address the internal organization
22  of Syngenta's global business segments?
23      A.  To a very limited degree only.
24      Q.  Does the Syngenta AG board exercise
25  full and effective control of the Syngenta group of

14 (Pages 50 to 53)

Exhibit 002 Page 14
14e2e5f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 54

1  companies consistent with the Swiss code of obligations,
2  the Syngenta AG articles of incorporation and the
3  regulations governing the internal organization of
4  Syngenta AG?
5      A.  That is correct.
6      Q.  Are you the secretary of the Syngenta AG
7  board?
8      A.  Yes, I am.
9      Q.  Does that board have a chairman's
10  committee?
11     A.  It has a chairman's committee.
12     Q.  And it consists of four members?
13     A.  It does.
14     Q.  Including the chairman of the board and
15  the CEO?
16     A.  Yes.
17     Q.  Who are those people?  Who are they?
18     A.  Martin Taylor and Mike Mack.
19     Q.  And you're the secretary of the chairman's
20  committee?
21     A.  Yes.
22     Q.  Does the chairman's committee approve
23  appointments to selected senior positions within the
24  Syngenta group of companies?
25     A.  It does:  a very small number, from

Page 55

1  memory.
2      Q.  Page 6 of the governance report, if you
3  want to reference it, says exactly that.  It says that
4  the chairman's committee arrives appointments to
5  selected senior positions within the Syngenta group of
6  companies.
7      A.  Yes.
8      Q.  If you want to reference it?
9      A.  No, no, it's all right.
10     Q.  Okay.  So you agree with that statement?
11     A.  Yes.
12     Q.  Does the chairman's committee approve
13  appointments to senior positions at Syngenta Crop
14  Protection AG, or at least have the power to do that?
15     MR. POPE:  Which is it?  Which is your
16  question?  Objection to the form of the question.
17     THE WITNESS:  Senior positions at Syngenta
18  Crop Protection AG are approved by the board of
19  Crop Protection AG.
20  BY MR. TILLERY:
21     Q.  Does the chairman's committee also have
22  authority to make appointments to senior positions
23  within the Syngenta companies on its own initiative?
24     A.  It does not do that.
25     Q.  Page 6 of the governance report, if you

Page 56

1  would look at that and see if that refreshes your
2  recollection.  I think "Chairman's Committee" is at the
3  bottom, sir, if you want to look at it there.  Halfway
4  through.  Do you see it?
5      A.  I was reacting to the term "on its -- on
6  its own authority", sorry.
7      MR. POPE:  Read the whole thing through so you
8  know what the question is before you answer it.
9      THE WITNESS:  Yes.
10  BY MR. TILLERY:
11     Q.  Would you agree, though -- would you agree
12  with my statement now?
13     A.  It approves the appointment -- sorry,
14  I have some troubles to read.  Excuse me.  It
15  approves -- it approves appointments to select the
16  senior positions in the way as I said, confirmed, to one
17  of your previous questions, yes.
18     Q.  Yes, you agree?
19     A.  (Witness nods head.)
20     Q.  On the record --
21     MR. POPE:  Did your -- did your previous
22  question use the term "upon the request of the CEO"?
23     MR. TILLERY:  I think it said does the
24  chairman's committee have authority to make appointments
25  to senior positions within the Syngenta companies.

Page 57

1      MR. POPE:  Okay.  And this -- you asked him to
2  read the provision.  It says:
3          "Upon request of the CEO, the Chairman's
4      Committee approves on its own authority appointments to
5      selected [committees] ..."
6          Is that the correct language you are pointing
7  to?
8  BY MR. TILLERY:
9      Q.  When he says these things, just focus on
10  my question.  He can make all the objections he wants.
11  Do they have that authority?
12     A.  I was -- with my initial answer, I was
13  reacting to the language I understood in your question
14  to say "on its own initiative" -- "on its own authority"
15  I was reacting to the -- do they initiate -- my
16  understanding was, do they initiate, themselves, changes
17  in these positions, and the answer to that question is
18  no, because they do it upon request of the CEO.
19     Q.  But they have the authority, don't they?
20     A.  In the way as it's stated here, yes.
21     Q.  Does the chairman's committee approve
22  capital investments and the acquisition of companies by
23  Syngenta AG subsidiaries?
24     A.  Up to a certain financial limit, yes.
25     Q.  What is that limit?

15 (Pages 54 to 57)

Exhibit 002 Page 15
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 58

1        A.  In terms of capital, it's, from memory,
2   US$60 million; in terms of equity investments,
3   US$30 million.
4        Q.  That would include capital investments and
5   acquisitions by companies like Syngenta Crop
6   Protection Inc.?
7        A.  Yes.
8        Q.  Tell me when you -- if -- when you -- if
9   you need to take a break at any time.  We will keep
10  going, otherwise.
11  (Exhibit 5 marked for identification.)
12  BY MR. TILLERY:
13       Q.  I'm going to show you what's been marked
14  as exhibit number 5, sir.
15       A.  Thank you.
16       Q.  Before we get to that document -- you have
17  seen it before; right?
18       A.  I need to look at it first.
19       Q.  While you're looking at it, this document
20  is Bates number GRNVL0000081027 through 81030, and I'll
21  represent to you, sir, this was produced to us in the
22  course of this litigation as a document responsive to
23  our document requests.
24       Are you the head of legal and taxes for the
25  Syngenta group of companies?

Page 59

1        A.  I am.
2        Q.  From -- this document is entitled -- there
3   are more components to it, but this document is entitled
4   "Finance including Tax".  What is this document from, or
5   reference these pages, what are they extracted from?
6        A.  I -- it seems to me that this is an
7   extract of -- from the intranet of Syngenta.
8        Q.  Intranet?
9        A.  Intranet, which is the internal network.
10       Q.  Okay.  And -- and to whom --
11       A.  In the context -- in the context of
12  reserved powers.
13       Q.  Okay.  To whom would this document be sent
14  to or available to?
15       A.  It would probably be available to the
16  whole of Syngenta.
17       Q.  When you say "the whole of Syngenta", does
18  that mean the employees of all of the subsidiaries as
19  well?
20       A.  Basically, yes, who have access to the
21  intranet.
22       Q.  What is the intranet?
23       A.  The intranet is the internal
24  information -- main internal information platform where
25  all sorts of internal information is available to

Page 60

1   Syngenta employees, around all aspects of human
2   resources, and so on.
3        Q.  And where is it maintained?  Where is that
4   database maintained?
5        A.  It is -- as -- as far as I understand, the
6   overall umbrella of it is dealt with in Basel in terms
7   of the headings, and so on, but it's fed into by several
8   sources from around the world.  There is information not
9   only relating to Syngenta as a whole, but also
10  information relating to operations in territories.
11       Q.  And would all of the Syngenta umbrella
12  companies have access to that intranet?
13       A.  They would, in principle, have access to
14  the intranet, but they won't have access to all the
15  databases referenced in the intranet, of course.
16       Q.  There would be limited access to certain
17  databases?
18       A.  To certain areas, I guess, yes.
19       Q.  And would that be limited by virtue of a
20  person's position within one of the subsidiary
21  companies?
22       A.  By virtue of -- of -- in the intranet,
23  you can access -- as far as I know, you can access
24  material which is relating to a certain group of people
25  only or a certain part of the organization only, and

Page 61

1   that information would not be available to everybody.
2        Q.  Let's just talk about, while we're on this
3   topic, studies, scientific studies.  Is there a location
4   for those scientific studies within the Syngenta group
5   of companies?
6        A.  I -- I guess there is one or several
7   locations where those people who need to have access can
8   have access, but that's not on the general intranet
9   site.
10       Q.  It's not on the intranet site?
11       A.  As far as I'm aware, no.
12       Q.  Are you familiar with the Syngenta group
13  treasury policy?
14       A.  Broadly.  Broadly familiar, yes.
15       Q.  Okay.
16       A.  Not in any shape or detail.
17       Q.  You are the head, though, of legal and
18  taxes for the whole group?
19       A.  Syngenta is organized such that the
20  treasury department is part of the finance organization,
21  whereas the tax group is part of my organization.
22       Q.  Okay.
23       A.  So I am not responsible for treasury at
24  all.
25       Q.  What -- what is the Syngenta group

16  (Pages 58 to 61)

Exhibit 002 Page 16
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

**Page 62**

1  treasury?  What is it?
2      A.  This is a part of -- of the corporate
3  finance organization who deals with capital market
4  transactions and internal funding matters for the group
5  as a whole.
6      Q.  And just for the purposes of terms, before
7  we get into questions, when we talk about "affiliate
8  capital structure" or "affiliated corporate entities",
9  these include the subsidiaries of Syngenta AG?
10      A.  That's my understanding.
11      Q.  And this, for these documents, as we go
12  through this, so I don't have to keep saying the same
13  thing, would include as affiliates Syngenta Crop
14  Protection Inc.?
15      A.  That's my understanding.
16      Q.  All right.  Now, if you'd look at this
17  first page of that document --
18      MR. POPE:  Exhibit number 5?
19      MR. TILLERY:  Yes, sir.
20  BY MR. TILLERY:
21      Q.  And I'm going to refer to it as 1027.  If
22  you look at the bottom, that Bates range number, 1027 of
23  exhibit 5, page 1, okay.
24      Is it true that the affiliate funding team has
25  the power to approve or reject changes to the capital

**Page 63**

1  structure of Syngenta AG subsidiaries?
2      A.  Are you referring to a specific part of
3  that page 1, sorry?
4      Q.  Yes, I'm just looking at this document,
5  if we can, the top of that page, where it says the
6  responsible reserved power is affiliate funding team in
7  Syngenta group treasury, and then it says above it, it
8  gives a rationale for reserving the power, and one of
9  those would be global tax optimization?
10      A.  Right.
11      Q.  Okay.  So then it gives examples:  an
12  additional share capital in any Syngenta company to
13  replace debt.  Do you see where I'm reading that?
14      A.  Yes.
15      Q.  Okay:
16      "Establishment of a new Syngenta subsidiary
17  company in a country either to replace a third party
18  distributor or to carry on a new trade."
19      And then it talks about thresholds for
20  application, which triggers this sort of issue; right?
21      A.  Right.
22      Q.  All right.  So if a subsidiary wanted to
23  establish a new subsidiary or issue additional share
24  capital to replace debt, it would have to receive
25  authorization from the affiliate funding team in

**Page 64**

1  Syngenta group treasury; correct?  Under this document.
2      A.  The reserved power asks that group company
3  to consult with the Syngenta group treasury before they
4  implement it locally, yes.
5      Q.  And this is the reserved power -- if you
6  look under "Source", it says here at "Source", "Syngenta
7  Group Treasury policy".  Where is the Syngenta group
8  treasury policy?  Is that a document?
9      A.  That is a policy document which -- which
10  exists, yes.
11      Q.  And where is it?  Who has it?  The
12  financial people?
13      A.  The financial -- the financial people have
14  it, yes.
15      Q.  Okay.  And where is Syngenta group
16  treasury located?  Where are they?
17      A.  The majority of it is located in Basel.
18  They have group treasury people also in some
19  territories.
20      Q.  When you say a territory, what do you
21  mean?
22      A.  We have some treasury functions in the
23  United States, we have some treasury functions in
24  countries like Brazil, and there are some people in
25  regional office in Singapore, and so on.  So there are a

**Page 65**

1  couple of people dispersed across the organization.
2      Q.  And these people are appointed to the
3  Syngenta group treasury position?
4      A.  The group in Basel is called the group
5  treasury -- is called group treasury for Syngenta as a
6  whole.  They have functional colleagues in the
7  respective territories in a limited number.
8      Q.  Is --
9      A.  They are appointed by the local companies
10  they are employed with.
11      Q.  And the Syngenta group treasury, is that a
12  separate entity or is that the name of a working group
13  within the Syngenta group of companies?
14      A.  The latter.  It's the name of -- of one
15  part of the finance organization.
16      Q.  And who heads up the Syngenta group
17  treasury?
18      A.  That's the head of group treasury.
19      Q.  Who?  Who is that?
20      A.  It's a gentleman called Nik Zuercher.
21      Q.  Would you spell his name for the reporter,
22  please?
23      A.  Yes, N-I-K, his first name, and then
24  Zuercher is Z-U-E-R-C-H-E-R.
25      Q.  And the rationale for reserving that power

17 (Pages 62 to 65)

Exhibit 002 Page 17
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                 10-14-2010
Confidential

**Page 66**

1  to the affiliate funding team is so Syngenta can
2  optimize taxes on a global level?
3       A.   Funding -- funding and taxes.
4       Q.   Does the affiliate funding team in
5  Syngenta group treasury -- let me strike that question
6  and go back to something you said.
7       The people who serve on this funding team,
8  do you know how many there are on this?
9       A.   I -- I don't know with precision.  A
10 couple of them.
11      Q.   And do you know from what companies they
12 come?
13      A.   This is mainly a group located in Basel
14 working together with their partners in the territories.
15      Q.   What I'm saying is, do you know where --
16 these employees are all employees of some -- some
17 Syngenta company; correct?
18      A.   Yes.
19      Q.   And do you know from where or which of
20 these subsidiaries -- subsidiaries they are employed?
21      A.   Some of them I guess are employed in Basel
22 by Syngenta, either International AG or Crop Protection
23 AG.
24      Q.   Do you know for sure?
25      A.   I don't know for sure who is employed

**Page 67**

1  by -- by which legal entity.
2       Q.   And then some of them are -- are appointed
3  from some of the other entities in territories, as you
4  suggest?
5       A.   There are treasury people who work
6  together with that team in Basel in different
7  territories, from my knowledge.
8       Q.   Do you know how often they get together?
9       A.   No, I don't.
10      Q.   And if you look at the bottom of that
11 page, the affiliate dividend payments, do you see that?
12 The affiliate funding team in Syngenta group treasury
13 has the reserved power, okay, and that relates, of
14 course, to dividend payments of subsidiaries, and the
15 example they give is "annual dividend process from all
16 dividends through to intermediate holding companies and
17 ultimately through to Syngenta AG"; correct?
18      A.   That's what it says, yes.
19      Q.   Does the affiliate funding team in
20 Syngenta group treasury have the power over the process
21 of dividend payments from subsidiaries so that they can
22 control those payments all the way through to
23 Syngenta AG?
24      A.   They have the reserved power to coordinate
25 that process, yes.

**Page 68**

1       Q.   And that, again, comes from the Syngenta
2  group treasury policy; correct?
3       A.   Right.
4       Q.   So Syngenta Crop Protection Inc. doesn't
5  have the reserved power to decide whether to issue its
6  own dividend?
7       A.   Syngenta Crop Protection -- the competent
8  corporate body of Syngenta Crop Protection Inc. has to
9  formally decide on the dividend to be paid out to its
10 shareholders.
11      Q.   Well, how does that jibe with the document
12 you just read that grants reserved power to the Syngenta
13 group treasury policy to do exactly that?  It says to --
14 for group tax optimization and balance sheet management,
15 that's the rationale for reserving the power, they have
16 the reserved power over dividend payments from the
17 affiliate or subsidiaries, including Syngenta Crop
18 Protection Inc., don't they?
19      A.   "Reserved power" means that they are being
20 consulted by the affiliated company before the competent
21 bodies of the affiliated company take the formal
22 decision around dividends.  That is what this means.
23      Q.   Well, it means, though, that they have the
24 ultimate power to do these things, doesn't it?
25      MR. POPE:   Objection to the form of the

**Page 69**

1  question.
2  BY MR. TILLERY:
3       Q.   Within the Syngenta group of governance,
4  these -- this entity has -- or this group has the
5  ultimate authority, doesn't it?
6       MR. POPE:   Objection to the form of the
7  question.
8       THE WITNESS:   The formal decision is taken by
9  the competent body of the legal entity who pays out the
10 dividend.  These people are responsible for coordinating
11 these funds flows --
12 BY MR. TILLERY:
13      Q.   Show me --
14      A.   -- on a global basis.
15      Q.   Show me where it says they're responsible
16 for coordinating it?
17      A.   That is what's implied in the -- in the
18 term "reserved power", as I understand it.
19      Q.   And -- and show me where any document --
20 can you point me to any document anywhere in anything
21 you've ever read where it says that its reserved power
22 authority puts them in an advisory position only?
23      MR. POPE:   Objection to the form of the
24 question.
25 BY MR. TILLERY:

18 (Pages 66 to 69)

Exhibit 002 Page 18
14e2e5f3-3c6e-4838-a1d5-331c25424516

Maeder, Christoph            10-14-2010
Confidential

---

Page 70

1    Q.  Do you know one?  Can you send me to one
2  to look at?
3    MR. POPE:  Objection to the form of the
4  question.
5    THE WITNESS:  I -- I cannot do that out of my
6  memory, no.
7  BY MR. TILLERY:
8    Q.  Which, as you say, competent corporate
9  body at Crop Protection Inc., Syngenta Crop
10  Protection Inc., declares the dividend?
11    A.  It's -- I'm not familiar with -- with --
12  with the details of -- of that.  It's either the board
13  or --
14    Q.  You're on the board of Syngenta Crop
15  Protection Inc. --
16    A.  Yes.
17    MR. POPE:  Don't interrupt him when he's
18  answering a question, Mr. Tillery.  You said you weren't
19  going to do that.
20    THE WITNESS:  The board is taking a resolution
21  around the dividend payment.
22  BY MR. TILLERY:
23    Q.  When has that ever happened?
24    A.  I -- I don't remember it.
25    Q.  I can show you all of the unanimous

---

Page 71

1  meeting consents since 2000 for Syngenta Crop
2  Protection.
3    A.  Right.
4    Q.  Do you remember one time where you
5  declared a dividend payment?
6    A.  I remember several times, but not with
7  precision when it was.
8    Q.  Which time?  When did that happen?
9    A.  I -- I don't have it in my memory.
10    Q.  And you say the board did that?
11    A.  From memory, yes.
12    Q.  And the board then would have had minutes
13  reflecting that action, wouldn't it?
14    A.  That -- that is as I -- I can't recall it
15  at this point in time.
16    Q.  Do you -- do you know how a dividend would
17  ever be issued by a board without some record being
18  created showing that a vote took place?
19    A.  No.
20    Q.  I'm sorry?
21    A.  No -- sorry, can you repeat my --
22  your question, sorry.
23    Q.  Yes.
24    A.  I was too quick.
25    Q.  Are you -- are you aware of how you would

---

Page 72

1  declare a dividend at Syngenta Crop Protection without a
2  record of it by the board?
3    A.  I am not.
4    Q.  That would be a board record, wouldn't it?
5    A.  That's what I guess, yes.
6    Q.  And do you recall a record, ever seeing a
7  record of Syngenta Crop Protection Inc. board voting on
8  a dividend issuance?
9    A.  Not at this point in time, sorry.
10    Q.  Is it your testimony, sir, that the
11  Syngenta Crop Protection -- strike that.
12    Syngenta Crop Protection then, under these
13  reserved powers, has no authority to refuse to pay a
14  dividend if it is instructed to pay one by the affiliate
15  funding team; correct?
16    MR. POPE:  Objection to the form of the
17  question.
18    THE WITNESS:  The question about dividends is
19  discussed between group treasury and the respective
20  affiliates, and it's done in coordination with each
21  other.  That's my understanding.
22  BY MR. TILLERY:
23    Q.  All right.  Let me -- let me read this
24  back to you, because I'd like an answer to this
25  question:  Syngenta Crop Protection Inc. has no

---

Page 73

1  authority to refuse to pay a dividend if it is
2  instructed to pay one by the affiliate funding team;
3  correct?
4    MR. POPE:  Objection to the form of the
5  question.  He's already answered that question.
6    THE WITNESS:  Sorry, I --
7    MR. POPE:  You have already answered the
8  question.
9    THE WITNESS:  The question of -- of rejection,
10  as far as I'm aware, has never been an issue because the
11  pay-out process of the -- of the dividends from
12  affiliated companies is discussed between the relevant
13  players in advance of making those decisions.
14  BY MR. TILLERY:
15    Q.  When you say the relevant players --
16    A.  The financial -- the financial officers
17  of -- of the respective companies, together with group
18  treasury.
19    Q.  And who at Syngenta Crop Protection is the
20  financial officer who would make the decision to issue a
21  dividend?  Syngenta Crop Protection Inc.
22    A.  The financial officer responsible for
23  Syngenta Crop Protection Inc. is Jason Fogden --
24    Q.  Is he at --
25    A.  -- and he would be the contact person for

---

19 (Pages 70 to 73)

Exhibit 002 Page 19
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 74

1  the group treasury.
2      Q.   And have you ever seen a record where
3  Jason Fogden authorized the issuance of a dividend?
4      A.   I don't recall such a document.
5      Q.   Is it your testimony that Jason Fogden has
6  the authority to refuse to pay a dividend if it is --
7  if it's instructed to pay one by the affiliate funding
8  team?
9      A.   That is not my testimony.
10     Q.   He would not have such authority, would
11 he?
12     A.   Again, I assume these things are being
13 discussed so that the question of a refusal is never an
14 issue at all.
15     Q.   Well, just in terms of pure authority,
16 Jason Fogden, Syngenta Crop Protection Inc.  Are you
17 telling me he has the authority to refuse to pay a
18 dividend if it is -- if there is one instructed to be
19 paid by the affiliate funding team?
20     MR. POPE:   Objection.  Hypothetical.
21     THE WITNESS:   I'm not telling you that.
22 BY MR. TILLERY:
23     Q.   He doesn't have that authority, does he?
24     A.   I was not saying that.  I was saying I'm
25 not telling you that he has the authority.

Page 75

1      Q.   Does he have that authority?
2      A.   All I can say is that he is discussing
3  with his group treasury colleagues the pay-out process
4  for the dividend.
5      Q.   Is the rationale for reserving the power
6  over dividends to the affiliate funding team so that
7  Syngenta AG can optimize taxes and manage balance sheets
8  on a global basis?
9      A.   That, and on top of that, manage its
10 funding structures, yes.  These are the main drivers for
11 that.
12     Q.   Who decides the amount of the dividend
13 from Syngenta Crop Protection Inc.?
14     A.   Again, the proposal for the amount is made
15 in cooperation between the financial controller of
16 the -- of Crop Protection Inc. and the treasury team.
17     Q.   So you're saying that Jason Fogden and the
18 treasury team made that decision?
19     A.   Together with the corporate finance people
20 in the United States, yes.
21     Q.   And who were the corporate finance people
22 in the United States who made that decision?
23     A.   There are people working in our -- in our
24 office in Wilmington within Sandoz -- excuse me, within
25 Syngenta Corporation, there are people in Greensboro who

Page 76

1  are working on these issues, and this is a team effort
2  to come up with the right proposal.
3      Q.   When you say "Syngenta Corporation", is
4  that a separate distinct legal entity?
5      A.   It is.
6      Q.   And that entity is located where?
7      A.   In Wilmington, Delaware.
8      Q.   And they have what role in deciding how
9  much Syngenta Crop Protection Inc.'s dividend to be
10 paid?
11     A.   Syngenta Corporation is the holding
12 company for our US activities as a whole, and they
13 coordinate treasury, dividends and tax aspects for the
14 United States.
15     Q.   Does the affiliate funding team have
16 ultimate authority over whether a Syngenta company can
17 guarantee the debt of another Syngenta company?
18     A.   It works in the same way, as I understand,
19 as the dividend process:  they are -- they have to be
20 consulted before such guarantees are being issued.
21     Q.   Actually, if you look at the document,
22 that's at 28, and at the top of 28, the issuance of
23 guarantees and letters of awareness, and it reserves
24 responsible reserved power to the affiliate funding
25 team, and it gives an example, doesn't it?  The second

Page 77

1  example would be any guarantee letter from a Syngenta
2  affiliate to a bank or a lender to guarantee or support
3  a loan given to another Syngenta affiliate?
4      A.   Right.
5      Q.   And the reason for reserving that power --
6  that's not reserving a recommendation, it says "power"
7  there, doesn't it?
8      A.   It does.
9      Q.   Okay.  And the reserve -- the reason or
10 rationale for reserving it is because of risk
11 management; right?
12     A.   Yes, financial risk management.
13     Q.   Financial risk management.  So an
14 affiliate or subsidiary could not guarantee a loan to
15 another one without getting authorization from the
16 affiliate funding team; correct?
17     A.   That's what this document says.
18     Q.   And you don't disagree with the document,
19 do you?
20     A.   I have no reason to disagree with that
21 document.
22     Q.   All right.  Does the affiliate funding
23 team have ultimate authority over whether a Syngenta
24 company can borrow money from an outside source like a
25 bank?

Westlaw Deposition Services   800.548.3668 Ext. 1          Exhibit 002 Page 20
                                                            14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 78

1    A.  That is my understanding.
2    Q.  So Syngenta Crop Protection couldn't get a
3  $10 million loan from a US bank without getting
4  authorization from the affiliate funding team; correct?
5    A.  As far as I know, they -- there are
6  agreements in place around certain thresholds above
7  which these authorizations or reserved power have to be
8  granted, but up to a certain limit, I guess that's an
9  agreement that they can do it without going back.
10    Q.  Are you saying there is --
11    A.  But that's not in this --
12    Q.  It's not here in this document?
13    A.  It's not in this thing, but that's my
14  understanding of their -- of their working practices.
15    Q.  But from what you're saying here in terms
16  of this document that your attorneys gave to me, okay,
17  in response to our discovery request, this document says
18  that they would have to seek approval from the affiliate
19  funding team to do that; correct?
20    A.  Yes.  All I'm saying is, I don't know
21  whether that's being done on a single-case basis or
22  whether it's done -- but it cannot be done within
23  certain limits on a general basis, on a more general
24  basis.
25    Q.  Now, according to these documents, the

Page 79

1  same one we're going through, Syngenta Crop
2  Protection Inc. couldn't even establish a new banking
3  relationship with a bank not on Syngenta AG's approved
4  bank list without authorization for the affiliate
5  funding team, could it?
6    MR. POPE:  Are you on page 29 now?
7  BY MR. TILLERY:
8    Q.  I think that's right.
9    A.  My understanding is that the concept of
10  establishing new banking relationships is being
11  consulted between the group treasury team and the
12  affiliate finance people, yes.
13    Q.  So the answer to my -- you would agree
14  with my statement?
15    A.  That is what this document says.
16    Q.  All right.  You have no reason to doubt
17  it, the accuracy of the document?  It is your document?
18    A.  I have no reason to -- to -- to doubt the
19  accuracy of the document.  My understanding is, however,
20  that, of course, in practical terms, there are general
21  agreements in place between those people responsible
22  around the details of that.  I couldn't tell you --
23    Q.  Do you know what those details are?
24    A.  No, I don't.
25    Q.  All right.  Are they in writing?

Page 80

1    A.  I don't know.
2    Q.  The rationale for reserving the authority
3  to the affiliate funding team is so Syngenta AG can
4  optimize funding costs globally across all Syngenta
5  companies; correct?
6    A.  You are on page -- on which page now?
7    Q.  That would be the same page we were
8  looking at.  I was looking at the rationale.
9    A.  The rationale for banking relationships?
10    Q.  Yes.  So that the reserved power rationale
11  for limiting the establishment of new banking
12  relationship is because the group funding and financing
13  cost optimizations: globally agreed relationships
14  minimize transaction costs.  Right?
15    A.  Right.  The group wants to limit the
16  number of banks the affiliated company deals with in
17  order to optimize costs of these banking relationships.
18    Q.  Where does Syngenta Crop Protection Inc.
19  bank?
20    A.  I don't know.
21    Q.  What is transfer pricing, sir?
22    A.  Transfer pricing in a tax context is
23  determining the price for supply of goods between
24  affiliated companies.
25    Q.  Does the Syngenta group of companies have

Page 81

1  one central transfer pricing manual?
2    A.  Yes, it does.
3    Q.  Who directs the transfer pricing in the --
4  in the group of Syngenta companies?
5    A.  On a group basis, this is the head of
6  group taxation.
7    Q.  I'm sorry?
8    A.  On a group basis, this is the head of
9  group taxation.
10    Q.  I see.  I'm sorry.  I didn't understand
11  you.
12    And is it true that all transfer prices between
13  Syngenta AG subsidiaries must be set in accordance with
14  the global transfer pricing policy?
15    A.  Yes.
16    Q.  So Syngenta Crop Protection Inc. must
17  price the products and services it provides to other
18  Syngenta AG subsidiaries in accordance with the
19  global transfer pricing policy?
20    A.  In accordance with the policy, yes.
21    Q.  Does Syngenta Crop Protection Inc.
22  do that?
23    A.  As far as I am aware, yes.
24    Q.  The Syngenta group taxation team is
25  responsible for setting the global transfer pricing

21 (Pages 78 to 81)

Exhibit 002 Page 21
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 82

1  policy?
2      A.  That is right.
3      Q.  Who are those people?
4      A.  This is a group of people led by a
5  gentleman called Peter Schreiner, S-C-H-R-E-I-N-E-R.
6      Q.  Where are they headquartered?
7      A.  Peter is located in Basel.
8      Q.  And who also is part of the group?
9      A.  He entertains -- he has a group with
10  himself sitting in Basel, but he has, of course,
11  contacts in different parts of the organization as well.
12      Q.  Who does Peter work for directly?
13      A.  He reports to me.
14      Q.  So he is a person who is employed by
15  Syngenta --
16      A.  International AG.
17      Q.  -- International AG?
18      A.  Yes.
19      Q.  How many people are in this group?
20      A.  The group he has in Basel is about
21  six people.
22      Q.  Are they all employed by the same company?
23      A.  Yes.
24      Q.  AG, International AG?
25      A.  International AG.  But, again, the network

Page 83

1  he entertains to discuss transfer pricing matter is not
2  only comprised of people directly working for him, but
3  working in other parts of the organization, and they are
4  then employed by other legal entities, possibly.
5      Q.  It's to look at it globally, in other
6  words, is what you're saying?
7      A.  To?
8      Q.  To look at it globally?
9      A.  Exactly.  And these are mainly people from
10  the finance function as well as the global supply
11  function, as you would expect.  Can I ask for a break?
12      MR. POPE:  A break, certainly.  Do you want to
13  finish one question?
14  BY MR. TILLERY:
15      Q.  One question.
16      A.  Yes, please.
17      Q.  Just so we can move on to another topic.
18      A.  Of course.
19      Q.  The rationale for reserving the authority
20  over global transfer pricing policy is so Syngenta AG
21  can optimize taxes and manage risk on a global level?
22      A.  And by managing -- that's right, and by
23  managing risk, that also means being compliant with the
24  tax rules all around the world.
25      MR. TILLERY:  All right.  Thank you.  We will

Page 84

1  take a break.
2      THE VIDEOGRAPHER:  Going off the record.  The
3  time is 10:59.  End of tape 1, volume I of the
4  videotaped deposition of Christoph Maeder.
5  (10:59 a.m.)
6      (Break taken.)
7  (11:15 a.m.)
8      THE VIDEOGRAPHER:  This is the beginning of
9  videotape number 2, volume I in the videotaped
10  deposition of Christoph Maeder.  Going back on the
11  record.  The time is 11:16.  Thank you.
12  BY MR. TILLERY:
13      Q.  Could Syngenta Crop Protection Inc. refuse
14  to sell properties to other Syngenta subsidiaries or
15  affiliates at the price set by the transfer pricing
16  manual?
17      A.  The prices of products sold between group
18  companies is set between the involved group companies
19  based on the guidelines from the global tax --
20      Q.  Right.
21      A.  -- transfer pricing policy.
22      Q.  What if they decided they didn't want to
23  do that?  Could they do that?
24      A.  Again, these things are resolved in
25  consultation with each other, and the question of

Page 85

1  refusal has never come up, to the best of my
2  recollection.
3      Q.  Let's talk about it in the context of what
4  their authority would be.  Would, in your view, they
5  have the authority or the power to simply reject the
6  transfer pricing model set up by the Syngenta group that
7  establishes it globally?
8      MR. POPE:  Objection to the form of the
9  question.
10      THE WITNESS:  I'm not sure I can answer more
11  than what I've just said: the question of whether they
12  have the power to refuse has never been a practical
13  issue since these discussions are taking place in
14  cooperation with each other, and so far it always has
15  been a solution to these questions.
16  (Exhibit 6 marked for identification.)
17  BY MR. TILLERY:
18      Q.  I want to show you what's been marked as
19  exhibit 6, if you could pass those others on.  This
20  document deals with legal and transactions; correct,
21  sir?
22      A.  That's what it says, yes.
23      Q.  This is in your group; right?
24      A.  Yes.
25      Q.  And is this from that same source?

22 (Pages 82 to 85)

Exhibit 002 Page 22
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

---

Page 86

1       A.   As far as I can see, yes.
2       Q.   And this is, as you said, a document
3  that's on the intranet; correct?
4       A.   As far as I know, yes.
5       Q.   What is the source document for exhibit 5
6  and exhibit 6?  From which other document is it
7  extracted?
8       A.   You are referring to this legal and
9  transaction document specifically?
10       Q.   Yes, and the other one as well, if you
11  look at that one that is in front of you.  What was the
12  source document for these two exhibits?
13       A.   It is, as far as I can see, different
14  sources with respect to a lot of the financial reserved
15  power rules, it is the treasury policy with respect to
16  the legal and transaction, it is other policies, or it's
17  the rules around the organization.
18       Q.   Who created these documents?
19       A.   These documents were, as far as -- to the
20  best of my recollection, were created in the context of
21  a project a couple of years ago to put these rules
22  comprehensively, or as comprehensively as necessary, on
23  the intranet.  People from my department were involved
24  in -- in putting that up in the form as they have been.
25       Q.   When you say your department, by whom were

---

Page 87

1  these people employed?
2       A.   By Syngenta International AG.
3       Q.   And who were those people who did it?
4       A.   The head of that group from my department
5  was Jonathan Sullivan, sitting at this table.
6       Q.   Jonathan?
7       A.   Sullivan.
8       Q.   Sullivan?
9       A.   The gentleman sitting here.
10       Q.   He is an attorney?
11       A.   He is an attorney.
12       Q.   And Mr. Sullivan is the one who is the --
13  at least worked to coordinate or create these documents?
14       A.   Sorry, I missed --
15       Q.   He worked to coordinate --
16       A.   He worked at the time to do that.
17       Q.   Okay.  Who did he have with him -- with
18  him creating these documents?
19       A.   Creating these documents?
20       Q.   Right.
21       A.   From the best of my knowledge, this was a
22  group of people composed of finance people, legal
23  people, tax people, who were putting these things
24  together.
25       Q.   If you look at exhibit 6, under the -- on

---

Page 88

1  the first page, under "Acquisition of companies and
2  associated companies"; do you see that?
3       A.   Yes.
4       Q.   In order to make an acquisition of another
5  company, no matter what size, a Syngenta group company
6  must -- must first get approval from the board of
7  Syngenta AG; correct?
8       MR. POPE:  Objection.  Does it say "of any
9  size" here on the paper you're looking at?
10       MR. TILLERY:  Yes, it does.
11  BY MR. TILLERY:
12       Q.   Go ahead, sir.  You can answer.
13       A.   That was the reserved power rule up to a
14  certain point.  This document does not reflect
15  accurately today's rules, which are slightly different.
16       Q.   Okay.  So -- so what you're saying is a
17  document was produced to us that's no longer in effect
18  in response to our request for production?
19       A.   I realized -- excuse me.
20       Q.   In response to our request for production,
21  a document was given to us that's not accurate; is that
22  what you're saying?
23       MR. POPE:  Objection to the form of the
24  question.
25       THE WITNESS:  I'm not saying that.  I'm

---

Page 89

1  saying that --
2  BY MR. TILLERY:
3       Q.   Well --
4       A.   -- the rules reflected in that document
5  around reserved powers for acquisition of companies is
6  no longer the one which is applicable with respect to
7  thresholds, because we have since introduced a threshold
8  for up to a certain limit where not the board of
9  directors decides, but the chairman's committee of the
10  board decides.
11       Q.   Okay.
12       A.   And the limit is US$30 million.
13       Q.   Okay.  So the --
14       A.   That's a slight variation of what is here.
15       Q.   All right.  Let's just see if we can
16  clarify now.  In order to make an acquisition of another
17  company of US$30 million or under, an affiliate or
18  subsidiary, let's say Syngenta Crop Protection Inc.,
19  would have to first get approval from the executive
20  committee?
21       A.   The support from the executive committee.
22  The executive committee has no approval power in that
23  respect.
24       Q.   Okay.  Then if there was above 30 million
25  American, they would have -- the reserved power for

---

23 (Pages 86 to 89)

Exhibit 002 Page 23
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 90

1   approval would be with the board of directors of
2   Syngenta AG?
3       A.  Up to US$30 million, it would be the
4   chairman's committee of the board of Syngenta AG.
5       Q.  Up 30 million?
6       A.  Yes.
7       Q.  Okay.  And then after 30 million it's the
8   board?
9       A.  The board of directors.
10      Q.  All right.  And the source for this is
11  regulations governing the internal organization of
12  Syngenta; that's the document that you said you keep in
13  Switzerland.  Right?
14      A.  That's correct.
15      Q.  It was the source of it, and would you
16  agree with me that this document, taken from that
17  regulation governing the internal organization of
18  Syngenta AG, was put on the Syngenta group of companies
19  intranet?
20      A.  At the time, yes.
21      Q.  Well, is it on there now?  Is it still on
22  there?
23      A.  It is on now, but there seems to be a
24  mistake in the document reflected on the intranet
25  inasmuch as it does no longer reflect that 30 million

Page 91

1   threshold introduced after the production of that
2   intranet site.
3       Q.  Rationale for reserving the power over
4   subsidiary acquisitions to Syngenta, the board,
5   depending on the level, as you said, is so Syngenta AG
6   can control global governance of its subsidiaries and
7   manage risk on a global basis; correct?
8       A.  That's correct.
9       Q.  All right.  Are there other reservations
10  of power to the Syngenta AG board contained in the
11  regulations governing the internal organizations of
12  Syngenta AG?
13      A.  There are some others, yes.
14      Q.  What are they?
15      A.  They are mainly around equity investments,
16  as we see here; they are around --
17      Q.  I didn't understand.
18      A.  Equity investments.  This is the
19  acquisition of companies and -- acquisition and
20  divestment of companies.  They are around capital
21  investment and they are around appointments of --
22      Q.  Okay.  Could you specify what those are
23  for the record, please?
24      A.  For example, the capital investments above
25  a certain threshold, which is $30 million, from memory,

Page 92

1   have to be approved by the chairman's committee of the
2   board; above $60 million, they have to be approved by
3   the full board.
4       Q.  And that's by any Syngenta subsidiary?
5       A.  That is a reserved power irrespective of
6   what the legal entity is.
7       Q.  Just so we're clear, that applies to all
8   Syngenta subsidiaries, including Syngenta Crop
9   Protection?
10      A.  Right.
11      Q.  Are there any other reserved powers that
12  you haven't told me about that are within or contained
13  within the regulations governing the internal
14  organization of Syngenta AG?
15      A.  Again, I don't have an exact recollection
16  of the whole document, but there are reserved powers
17  around capital investments, in the form I just told you;
18  about appointment of key positions, such as members of
19  the executive committee of Syngenta or the head of
20  internal audit, that's also a reserved power to the
21  board.
22          I'm -- from the best of my memory, I don't know
23  whether there are -- I don't think there are other
24  people appointed in there.
25          There is a reserved power about other strategic

Page 93

1   decision for the -- a general rule about other strategic
2   decision of group importance, which -- "of fundamental
3   significance" is I think is the wording, which have to
4   be taken by the board.
5       Q.  How does -- how does the document
6   regulations governing the internal organization of
7   Syngenta AG define those circumstances which are in the
8   realm of fundamental significance?
9       A.  From the best of my knowledge, it does not
10  further define them by thresholds or any other
11  descriptors.  It just leaves them as -- as these
12  terms -- in these terms.
13      Q.  Does it give discretion within a
14  particular board to make a determination as to what
15  category falls within this particular latter group that
16  you just described?
17      A.  By the nature of -- of that description,
18  there is a judgment involved which has to be applied
19  properly.
20      Q.  Anything else you recall about the
21  document entitled "Regulations governing the internal
22  organization of Syngenta AG" that -- in terms of
23  reserved powers to Syngenta AG, the board?
24      A.  For example, there are reserved powers
25  around nominations of members of the board of group

24  (Pages 90 to 93)

Exhibit 002 Page 24
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 94

1  companies.
2       Q.  That's under the HR heading?
3       A.  You could call it -- under the appointment
4  section, yes.  There are -- there is a -- a reserved
5  power around initiation of settlement of legal disputes
6  of fundamental significance, I think are the words,
7  for corporate purposes.  What else?
8       So it's HR, capital, equity, there is -- there
9  is -- and then there is this other strategic position of
10 fundamental importance, legal -- initiation of legal --
11 lawsuits or settlement of lawsuits of strategic
12 importance, and there is also the entering into
13 agreements of fundamental importance for the group,
14 I think is another clause.  I think these are the
15 categories, from memory.
16      Q.  The -- the regulations governing the
17 internal organization of Syngenta AG, who created those?
18      A.  This is a document which Swiss law
19 requires companies to create in furtherance of its
20 articles of incorporation, and they have to be approved
21 by the board of directors.
22      Q.  And do they have to be filed with the
23 Swiss government?
24      A.  No.
25      Q.  But they have to be created in compliance

Page 95

1  with Swiss law?
2       A.  Right.
3       Q.  And what are the criteria which must be
4  met in the creation?  Do they have, under Swiss law,
5  certain things that have to be set out and detailed in
6  that document?
7       A.  Swiss law, mandatory Swiss law, describes
8  what the non-delegatable, as it's called, the
9  non-delegatable responsibilities of the board of
10 directors are, and it also describes which -- which --
11 in broad terms, it describes which sort of governance
12 regulations the board has to decide in those rules
13 around the organization of the company, around
14 decision making, the financial plans, delegation of
15 management power to an executive committee, and so on.
16      Q.  When was it created?
17      A.  It was created at -- at the beginning of
18 Syngenta, and -- it was already then.
19      Q.  It was in existence at the time Syngenta
20 was created?
21      A.  It was part of the --
22      Q.  Forming documents.
23      A.  Exactly, I was looking for that term:
24 of the forming documents, yes.  Excuse me.
25      Q.  Now, if you look on to -- and we are on

Page 96

1  116, "Establishment of companies and associated
2  companies"; do you see that section?  Do you see that?
3       A.  Yes.
4       Q.  All right.  And that, of course, comes
5  from the same source, regulations governing the internal
6  organization of Syngenta AG.  Here we deal with the
7  rationale for governing being the governance and risk
8  management, appropriate tax structure, and it talks
9  about the limitations in the column entitled "Threshold
10 for application", and then it describes, with a number,
11 which group would have the reserved power for approval;
12 correct?
13      A.  Right.
14      Q.  So, if I'm reading this correctly --
15 I just want to go through and make sure I understand the
16 document correctly -- if Syngenta Crop Protection wanted
17 to establish a new company or a joint venture with a
18 capital value above US$25 million, it would have to get
19 approval from Syngenta AG board; correct?
20      A.  That's what this document says, yes.
21      Q.  If Syngenta Crop Protection wanted to
22 establish a new company or a joint venture with a
23 capital value between 10 million and 25 million, it
24 would have to get approval from the chairman's
25 committee of Syngenta AG's board?

Page 97

1       A.  Right.
2       Q.  And if it wanted -- if Syngenta Crop
3  Protection Inc. wanted to establish a new company or a
4  joint venture with a capital value below 10 million, it
5  would have to get approval from the Syngenta AG
6  executive committee; is that right?
7       A.  That's correct.
8       Q.  And, likewise, it has to request approval
9  from these same three Syngenta AG authorities to sell a
10 company as well; right?
11      A.  That's right.
12      Q.  And the Syngenta AG entity that would have
13 to approve it is reflected depending upon the sale
14 price; correct?
15      A.  That's right.
16      Q.  So if the sale were more than 25 million,
17 Syngenta Crop Protection Inc. would have to get approval
18 from the Syngenta board; correct?
19      A.  30 million.
20      Q.  Thirty, I'm sorry.  Did I say 30?
21      A.  That is an equity transaction you are
22 referring to; right?
23      Q.  If they were selling it, it would be 30,
24 then?
25      A.  It's the same as for acquisitions.

Westlaw Deposition Services   800.548.3668 Ext. 1          Exhibit 002 Page 25
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 98

1      Q.  All right.  Okay.  An affiliate or
2  subsidiary would have to request approval from these
3  same three authorities to acquire product lines or
4  licenses as well; correct?
5      MR. POPE:   When you say "three," you mean,
6  again, approve one of them, depending on the -- on the
7  size of the transaction?
8      MR. TILLERY:   Correct.
9      MR. POPE:   Not all three.
10  BY MR. TILLERY:
11      Q.  And he's right.  I got loose, we shouldn't
12  do that.  I'm sorry.
13      So it would be the board -- you knew what I was
14  saying --
15      A.  Yes.
16      Q.  -- but so we know, it's the board of
17  directors of Syngenta, the chairman's committee is
18  number two and the Syngenta executive committee is
19  number three, so we have understood each other.
20      A.  That's what it says, yes.
21      Again, if I may add, excuse me for that, these
22  thresholds have been reviewed, and I am -- I am
23  absolutely sure in the context of equity transactions
24  that the 30 million threshold for the chairman's
25  committee has been introduced.  I am not sure whether

Page 99

1  the thresholds under product lines and licenses, whether
2  they have been changed as well in the context of the
3  changes implemented when the equity transaction was
4  implemented, but the system has been maintained.
5      Q.  The system is maintained; it is just that,
6  as time goes by, the thresholds might change?
7      A.  And the threshold change is reflecting the
8  growth of the company over time.
9      Q.  Yes.  And would that be something that --
10  again, that would be handled by the people in your
11  office at your organization?
12      A.  Basically, yes.  You mean the change -- by
13  "handling", you mean the changes --
14      Q.  Yes.  Thank you, sir, yes.
15      A.  Okay.
16      Q.  Clarifying on this one point on -- on
17  page 117, if Syngenta Crop Protection Inc. wanted -- and
18  assuming these numbers -- the thresholds are still
19  accurate, and I know that they may change, but assuming
20  those are still accurate, and so we're clear, if
21  Syngenta Crop Protection wanted to acquire a patent
22  license from some other entity for more than
23  $25 million, it would have to get approval from the
24  Syngenta AG board?
25      A.  According to the --

Page 100

1      Q.  Yes, assuming that number is correct.
2      A.  That is right.
3      Q.  And if the patent license cost less than
4  10 million, Syngenta Crop Protection Inc. would have to
5  get approval from the Syngenta AG executive committee?
6      A.  Yes.  That has been increased to 30, but,
7  yes, the system is such.
8      Q.  Does the internal organization, the
9  document that we've been referring to, does it contain a
10  request -- let me strike -- strike that question.
11      Is there a formal way in which a subsidiary
12  requests approval for making one of these purchases or
13  sales?  How does that happen?
14      A.  If a group company has a proposal to make
15  under these reserved powers, it is made through either
16  the crop protection or the seeds divisional management
17  lines or through finance, as the case may be, or
18  business development, whatever -- whatever the
19  functional owner of the subject is, to the executive
20  committee.
21      Q.  So it would come up through -- in the case
22  of crop protection, it would come up through Mr. Atkins'
23  office at Syngenta Crop Protection AG?
24      A.  That is the way how it's handled.
25      Q.  All right.  Are you personally authorized

Page 101

1  to approve requests of Syngenta Crop Protection on
2  behalf of the Syngenta AG executive committee?
3      A.  Sorry, I am not sure I understand the
4  question.
5      Q.  Are you authorized to approve requests of
6  Syngenta Crop Protection while you serve as a board
7  member of Syngenta Crop Protection AG?  Do you
8  understand what I'm saying?  Yeah, and I may have said
9  Syngenta Crop Protection instead of Syngenta Crop
10  Protection Inc.
11      MR. POPE:   Why don't we rephrase it, Steve.
12      THE WITNESS:   Please.  Can you specify what
13  you --
14  BY MR. TILLERY:
15      Q.  Let me -- let me -- let me start over,
16  excuse me.
17      A.  Okay.
18      Q.  How do you distinguish between your role
19  as member of the Syngenta AG executive committee and
20  your role as a member of the board of Syngenta Crop
21  Protection Inc.?
22      A.  Under the system of reserved powers, if a
23  request from Syngenta Crop Protection Inc. has to be
24  dealt with by the executive committee, I am part of that
25  body to -- to -- to make that support decision.  If

26  (Pages 98 to 101)

Exhibit 002 Page 26
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 102

1 I then are asked to formally approve it under the
2 governance rules of Syngenta Crop Protection Inc., I am
3 part of a respective board resolution.
4     Q.  Okay.  Why don't --
5     A.  Which is formalized according to the
6 standard rules.
7     Q.  Well, do you represent the interests of
8 Syngenta Crop Protection Inc. when you act on the
9 Syngenta AG executive committee?
10    A.  I am not making a distinction if I look at
11 a request, whether that's being presented under the --
12 through the lens of Crop Protection Inc. only.  I am
13 there sitting at the table of the executive committee
14 with a lens to Syngenta as a whole, with a view to
15 Syngenta as a whole.
16    Q.  It is for the global issues of the -- of
17 the Syngenta group of companies, isn't it?
18    MR. POPE:  Objection to the form of the
19 question.
20    THE WITNESS:  By the nature of a group
21 executive committee, it deals with global aspects,
22 representing thereby, as well, the interests of the
23 different parts of the organization as well as it can.
24 BY MR. TILLERY:
25    Q.  If you move to page 18, if Syngenta Crop

Page 103

1 Protection wanted to buy or sell real property,
2 intellectual property, product lines or even enter into
3 a consulting contract, it would have to get approval
4 from someone outside -- and I may have misspoken.
5 I left out the "Inc."?  Okay.  Sorry.  Let me start
6 over.
7     A.  I would have asked.
8     Q.  All right.  Excuse me.  The question is
9 withdrawn.
10    If Syngenta Crop Protection Inc. wanted to buy
11 or sell real property, intellectual property, product
12 lines or even enter into a consulting contract, it would
13 have to get approval from someone outside Syngenta Crop
14 Protection Inc.; correct?
15    A.  Above the relevant threshold, it would
16 have to get the support according to the reserved power
17 described in here.
18    Q.  If Syngenta wanted -- Syngenta Crop
19 Protection Inc. wanted to buy a new plant in Illinois
20 for more than $50 million, it would have to first get
21 approval from the Syngenta AG board, wouldn't it?
22    A.  Again, from memory, the threshold is now
23 at 60 million, but don't take me by that.  Above that
24 threshold, that's true.
25    Q.  And we can -- I could go through the same

Page 104

1 questions with respect to smaller numbers, but whatever
2 the level would be would -- would be dictated by this --
3 by this document, indicating the source of authority
4 that they would have to get it from; correct?
5     A.  The system -- the system of reserved power
6 is the same in these instances where the pre-approval
7 has to be taken by the competent body, according to
8 these rules, and the final legal -- legally binding
9 decision has to be then taken by the relevant corporate
10 body of the respective legal entity.
11    Q.  If that same --
12    A.  Without that last decision, nothing will
13 happen, of course.
14    Q.  And if that same plant in Illinois cost
15 between 5 and 20 million, according to this document,
16 Syngenta Crop Protection Inc. would first have to get
17 approval from the Syngenta AG executive committee?
18    A.  That is the system here, yes.
19    Q.  If Syngenta Crop Protection Inc. wanted to
20 enter into a consulting contract with an Illinois
21 consulting company for $750,000, it would have to get
22 approval from an individual member of the Syngenta AG
23 executive committee, wouldn't it?
24    A.  According to that list of thresholds,
25 I think that's right, yes.

Page 105

1     Q.  What is the capital approvals committee?
2     A.  This is a committee -- a subcommittee of
3 the Syngenta executive committee consisting of I think
4 four members of the executive committee plus a couple of
5 other officers who are dealing with all capital
6 investments of Syngenta above a certain threshold.
7     Q.  Do you remember who these people are, sir?
8     A.  On the -- the committee is chaired by
9 Mark Peacock.  Members are John Atkin; John Ramsay, the
10 CFO; James Halliwell, the group financial controller.
11 Who else?  It is Davor Pisk, the -- the COO of seeds,
12 and maybe one or -- the other people.  I am not a
13 member of it.
14    Q.  What does the committee do?
15    A.  The committee reviews capital proposals
16 for the group.
17    Q.  What is the business -- business systems
18 committee?
19    A.  The business systems committee is another
20 subcommittee of the executive committee which basically
21 deals with IT system, if I may simplify it like that,
22 information technology system, around the world.
23    Q.  And could you tell me who sits on that
24 committee?
25    A.  That committee is chaired by Mark Peacock,

Exhibit 002 Page 27
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 106

1  again, the head of global operations.  The standing
2  members of this committee from the SEC table are
3  John Ramsay, the CFO; John Atkin, the head of crop
4  protection; Davor Pisk, the head of seeds;
5  Robert Berendes, the head of business development; and
6  Mike Mack, the CEO.  But it's chaired not by Mike, but
7  chaired by Mark Peacock.
8       Q.   Both of these, the capital approvals
9  committee and the business systems committee, are in
10 Basel?
11      A.   Yes.
12      Q.   And by whom are these individuals who
13 occupy these seats on these committees employed?
14      A.   The members of the executive committee,
15 as I mentioned, they are all employed by Syngenta
16 International AG.  I think the same is true for
17 James Halliwell in the CAC committee.
18      Q.   That's the capital approvals committee?
19      A.   The capital approval committee, excuse me,
20 yes.
21      Q.   They're all Syngenta International AG?
22      A.   As far as I know, yes.  By the way,
23 Martin Walker, I forgot Martin Walker in the business
24 systems committee.  He is head of Syngenta business
25 services, as we call it.

Page 107

1       Q.   Okay.
2       A.   He is also employed in Basel.
3       Q.   Do you know what the finance sanctioning
4  process guideline is?
5       A.   I know that the document exists.  I don't
6  know any details of it.
7       Q.   Do you know what in general it deals with,
8  sir?
9       A.   It deals with the -- as far as my
10 recollection is, it deals with the financial transaction
11 technicalities which have to be taken throughout the
12 group.  So it does not deal with capital investment
13 decisions.
14      Q.   Is that a document that Syngenta Crop
15 Protection Inc. would have access to?
16      A.   I don't know actively that question -- the
17 answer to that question, excuse me.
18      Q.   Does that guideline apply globally across
19 all Syngenta AG subsidiaries?
20      A.   As far as I know, yes.
21      Q.   Does the Syngenta group finance department
22 issue capital expenditure approval limits?
23      A.   Sorry, excuse me, can you rephrase?
24      Q.   Absolutely.  Does the Syngenta group
25 finance department -- I was just referencing this

Page 108

1  document --
2       A.   Yes, that's all right.
3       Q.   -- issue capital expenditure limits or
4  approval limits?
5       A.   Under -- below the threshold of where the
6  capital approval committee is relevant, that is the case
7  in -- in alignment with the capital approval charter of
8  the CAC, yes.
9       Q.   And do you know what those are?
10      A.   I don't know the details of that, no.
11      Q.   And do those limits apply globally across
12 all Syngenta AG subsidiaries, as far as you know?
13      A.   I don't think that the same thresholds
14 apply to each and every legal entity, but they are
15 kind of adapted to the size of operations.
16      Q.   So I saw in some reference that entities
17 above a certain amount of -- of --
18      A.   Turnover.
19      Q.   -- yes, revenues, had one level and
20 another one had another?
21      A.   I think that's -- that my recollection,
22 yes.
23      Q.   With that -- with that clarification,
24 would those guidelines apply to all subsidiaries
25 globally?

Page 109

1       A.   That's my understanding.
2       Q.   Do you know what Syngenta company the
3  Syngenta group finance department is part of?  Is it
4  also Syngenta International AG?
5       A.   A part of it is in Syngenta International
6  AG.  There are people, I guess, who are employed by
7  Syngenta Crop Protection AG as well.
8       Q.   And it's in Basel as well?
9       A.   Basically in Basel.  They have some
10 network contacts in the different territories as well.
11      Q.   Now, that is not part of Syngenta Finance
12 AG?
13      A.   No.
14      Q.   It's a different group?
15      A.   Syngenta Finance AG, to my knowledge -- to
16 the best of my recollection, has no employees.  It's an
17 intermediate finance company.
18      Q.   The chairman's committee of the
19 Syngenta AG board appoints the members of the boards of
20 all Syngenta AG subsidiaries with sales exceeding
21 $150 million under this document; correct?
22      A.   Which part are you referring to, please?
23      Q.   I will show you.  That's page 120.
24      A.   120?  You were saying the board?
25      Q.   It says that -- yes, "Appointments to

28 (Pages 106 to 109)

Exhibit 002 Page 28
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                   10-14-2010
Confidential

Page 110

1  Boards of Directors of Group companies" is the title.
2        A.  Right.
3        Q.  And the rationale for reserving the
4  power --
5        A.  Is governance.
6        Q.  -- is governance, and the responsible
7  reserved power is, number one, the chairman's committee,
8  and, number two, the Syngenta executive committee, and
9  the threshold application is sales over 150 million and
10  sales under 150 million?
11        A.  Yes.
12        Q.  And the source is, again, the regulations
13  governing the internal organization of Syngenta AG?
14        A.  And this is another instance where the
15  thresholds have been -- sorry, the rules have been
16  changed:  for companies with -- with sales above
17  150 million, it's no longer the chairman's committee but
18  the CEO, and below 150, it's myself.
19        Q.  Okay.  You -- you appoint the boards in
20  those -- with those subsidiaries with sales below
21  150 and the CEO appoints them for sales above 150?
22        A.  I have the reserved power to support the
23  appointment, which is then done by the competent body of
24  the relative -- of the relevant legal entity.
25        Q.  But the --

Page 111

1        A.  I cannot directly appoint them, of course.
2        Q.  But -- but, in truth, having the reserved
3  power means that if you decided you didn't want a board
4  member in a group to be there, you would have the
5  overall power to, under your -- your regulations
6  governing the internal organization of Syngenta AG,
7  to make that change, wouldn't you?
8        A.  I cannot make the changes myself.  I have
9  to be consulted before changes are being made.
10        Q.  But you can put into place -- whether it's
11  through a direct -- an indirectly owned subsidiary or a
12  directly owned subsidiary, you can put into place the
13  change in the board by your reserved power?
14        A.  I can initiate the change if I want it.
15        Q.  Yeah.
16        A.  The system works the other way around:
17  proposal for composition of boards of group entities are
18  brought to my attention.
19        Q.  And you have the reserved power for the
20  boards below 150 million?
21        A.  I have to be consulted on those before
22  they are being implemented.
23        Q.  Yes.  All right.  And the chairman has to
24  be consulted for all of the subsidiaries with sales
25  above 150 million?

Page 112

1        A.  No, it's the CEO.
2        Q.  I'm sorry, the CEO.  Excuse me.  Thank you
3  for changing that.
4        The rationale for reserving that power is so
5  the -- it's actually listed, I think, as "governance",
6  and what does that mean:  "governance"?
7        A.  We want these boards of the group
8  companies to be -- to have the right sort of composition
9  in order to endure good corporate governance, i.e., the
10  boards have to exercise a function, they are exercising
11  the power over the operations in the respective
12  territories, and they have to have the right composition
13  in order to be able to do that in order not to create
14  conflicts of interest.
15        Q.  And the listed -- I think the word is
16  just "governance", but I'm extracting from one of these
17  documents on the same topic, the rationale for
18  appointing boards is to maintain consistency at one
19  point; correct?
20        MR. POPE:  Objection to form.
21  BY MR. TILLERY:
22        Q.  I have seen that word used.  Is that
23  something that's --
24        A.  Consistency with respect to good
25  governance rules.

Page 113

1        Q.  The Syngenta AG executive committee is
2  responsible for appointing employees one level below the
3  heads of Syngenta group companies?
4        A.  That's what the document says, yes.
5        Q.  Explain what that means, for appointing
6  employees one level below the heads?  Who would the head
7  be?  Let's pick Syngenta Crop Protection Inc.  Who would
8  that be?
9        A.  The head of Syngenta Crop Protection Inc.
10  in that sense is Vern Hawkins.
11        Q.  The president?
12        A.  The president.
13        Q.  Okay.
14        A.  And then his direct report one level below
15  him would need -- would need to be sanctioned by the
16  Syngenta executive committee.  Appointed formally, they
17  are of course by the competent body of Syngenta Crop
18  Protection Inc. --
19        Q.  But the power --
20        A.  -- which is the board.
21        Q.  But the power of it is --
22        A.  The reserved power -- excuse me.
23        Q.  The reserved power is with the Syngenta AG
24  executive committee?
25        A.  That is what the document says, yes, the

29 (Pages 110 to 113)

Exhibit 002 Page 29
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 114

1    reserved power.
2       Q.   And the head of legal and taxes, namely,
3    you, is responsible for appointing the secretary to the
4    boards for all Syngenta group companies?
5       A.   Again, I cannot appoint them.  It's the
6    reserved power.
7       Q.   It is the reserved power.
8       A.   I need to be consulted by -- before a
9    secretary is appointed, yes.
10      Q.   And the -- again, referencing this
11   document, the CFO of Syngenta AG is responsible for
12   appointing the CFOs for all other Syngenta group
13   companies?
14      A.   With the same reservation: he is to be
15   consulted on the reserved powers.  The appointment is
16   done by the boards of the respective companies.
17      Q.   If you go back to page 118, please.  The
18   Syngenta AG board has the final authority over whether
19   one of its subsidiaries will institute or settle a
20   lawsuit valued above $50 million; correct?
21      A.   According to that list of thresholds,
22   that's what the reserved power says here, yes.
23      Q.   So the chairman's committee of the
24   Syngenta AG board of directors has the final authority
25   over whether one of its subsidiaries will institute or

Page 115

1    settle a lawsuit valued between 20 million and
2    $50 million?
3       A.   It has to be consulted under this reserved
4    power system in this -- according to these thresholds.
5    Again, I -- I think they have been changed here as well.
6    I would need to consult the document.
7       Q.   Assuming the numbers are the same, and I'm
8    not -- if they are, they are.  If you've changed --
9       A.   It is the reserved power of the --
10      Q.   It's the reserved power.
11      A.   -- chairman's committee --
12      Q.   Yes.
13      A.   -- to support such a -- such a settlement.
14      Q.   So Syngenta Crop Protection cannot file
15   a lawsuit in the United States without approval from
16   at least one member of Syngenta AG's board of directors
17   through that document?
18      A.   With respect to the thresholds allocated
19   to the board of directors.
20      Q.   Is that correct?
21      A.   They need to consult with the board first
22   before initiating it.  But these -- these thresholds
23   have changed, just to make that point again.
24      Q.   All right.  And Syngenta Crop Protection
25   cannot settle a lawsuit in the United States without

Page 116

1    approval from at least one member of Syngenta AG's board
2    of directors; correct?
3       A.   The same reserved power rules for
4    settlement apply, like for the initiation.
5       Q.   Can they go against the wishes of the
6    board and reject the wishes of the board?
7       A.   Again --
8       MR. POPE:   Can who?
9    BY MR. TILLERY:
10      Q.   If a -- if Syngenta Crop Protection Inc.
11   simply decided to reflect that governance power
12   authority and say, "We are going to file a lawsuit on
13   our own" --
14      MR. POPE:   Objection to form.
15   BY MR. TILLERY:
16      Q.   -- without authority?
17      A.   Again, the question of rejection in
18   practice is not an issue, since these decisions are
19   being taken in consultation with -- with each other.
20      Q.   Has Syngenta Crop Protection Inc. settled
21   any lawsuits in the United States?
22      A.   I'm sure they have.
23      Q.   There is actually one referenced in this
24   document.  Did they get approval from the board to do
25   that, pay $100 million?

Page 117

1       A.   From the board of Syngenta Crop
2    Protection Inc.?
3       Q.   Yes, to settle the litigation in Texas
4    with the Port of Houston Authority?
5       A.   Excuse me, where are you?  Can you help
6    me.
7       Q.   It's on the bottom of 118:
8       "Example:  settlement of litigation in Texas
9    with Port of Houston Authority regarding [the]
10   environmental liabilities associated with the
11   Greens Bayou plant"?
12      A.   The Greens Bayou settlement.  That has
13   been approved by the chairman's committee or the
14   board -- it has been supported under the reserved power
15   rule, as stated above.
16      Q.   If -- so it was subject to this and
17   approved; correct?
18      A.   Supported by the board, formally approved
19   by the board of the respective legal entity, we settled
20   the lawsuit.
21      Q.   Right.  Syngenta Crop Protection couldn't
22   settle this lawsuit without the approval of Syngenta AG
23   board, could it?
24      A.   It needs to consult with the -- with the
25   board of directors of Syngenta AG first before it

30 (Pages 114 to 117)

Exhibit 002 Page 30
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 118

1 settles.
2      Q.   Did the Syngenta Crop Protection Inc.
3 board pass a resolution to settle the Port Authority
4 case?
5      A.   From memory, it did.
6      Q.   And did you ever see that document in
7 writing, a signed document, a board resolution?
8      A.   Yes.
9      Q.   And do you know where that is, who would
10 keep it?
11      A.   The secretary of the board of Syngenta
12 Crop Protection Inc.
13      Q.   And who would that be?
14      A.   That is presently Beth Quarles.
15      Q.   What was the source of the money to settle
16 the Texas litigation against the Port of Houston
17 Authority?
18      A.   Can you specify your question?
19      Q.   Yes.
20      A.   Source of money?
21      Q.   Yes.  I mean, if it's insurance money, or
22 something like that, I'm not interested, but if the
23 money came from the Syngenta entities, one or more,
24 the money that was used to settle the Port of Houston
25 Authority regarding the environmental liability

Page 119

1 associated with the Greens Bayou plant, what was the
2 source of that funding?
3      A.   The money was paid by those legal entities
4 who were supposed to pay the money in the settlement,
5 who were party to the settlement.  If you ask me about
6 the details of how that money was sourced by these legal
7 entities, I don't know the answer to that.
8      Q.   So what does -- do you know if Syngenta
9 Crop Protection Inc. paid the money itself?
10      A.   I don't know actively whether that's the
11 case, but that -- they -- if they were a party to the
12 settlement, they were the party who needed to fulfill
13 the paying obligations, and, by the way, a significant
14 amount of money in that case came from indemnities we
15 got from other parties who were involved in that
16 litigation.
17      Q.   Syngenta Crop Protection Inc. could not
18 satisfy a judgment in this case without first getting
19 authorization from Syngenta AG's board or its executive
20 committee, could it?
21      MR. POPE:  Objection.  In what amount?
22 BY MR. TILLERY:
23      Q.   In any amount?
24      A.   Can you specify what you mean by
25 "a judgment"?

Page 120

1      Q.   A judgment would mean the entry of an
2 order at the conclusion of legal proceedings under
3 US rules requiring a party to do something, including
4 paying money?
5      A.   But your question was, could they
6 sanction -- could -- could they satisfy a judgment?
7      Q.   Yes.
8      A.   A judgment which is legally binding,
9 of course they can; they have to satisfy without
10 authority by any other entity.
11      Q.   And could they satisfy the judgment
12 against it in this case, that is, pay the money to
13 satisfy the judgment, without first getting Syngenta AG
14 board or Syngenta executive committee authority?
15      A.   If they have to pay according to a legal
16 obligation under such a judgment, they don't need an
17 approval from the -- from anybody else to pay that.
18 This is a payment they made, as I understand your
19 question, which they can release if they are obliged to
20 do that.
21      Q.   Is Syngenta's global finance department
22 responsible for allocating money to satisfy a judgment?
23      A.   They are -- I cannot answer that question
24 in that general form.  They are responsible for
25 coordinating global funding of group companies and --

Page 121

1 and global management of -- of cash flows to the extent
2 that's a global issue.  In that context, they could be
3 involved.  Your question was, are -- were they -- are
4 they responsible for satisfying.  My answer to that is,
5 it depends on the circumstances, who does what.
6      Q.   Does the document that we have been
7 referencing, regulations governing the internal
8 organizations of Syngenta AG, state that the governance
9 or the power or authority is limited to consultation?
10 In other words, does it say that your -- that your
11 authority or that your obligation, in terms of
12 management, is limited just to being consulted about
13 these positions?
14      A.   To the best of my recollection, the word
15 "consultation" is not the language used in that
16 document.
17      Q.   What does it say?
18      A.   I think it says "authority" --
19      Q.   You have authority.  What does "authority"
20 mean when it's used in that document that governs
21 Syngenta AG?
22      A.   My understanding is, as I have said, the
23 formal decision for a legal entity has to be taken by
24 the competent bodies.  If a pre-approval or a
25 pre-support has to be taken under the reserved power,

31 (Pages 118 to 121)

Exhibit 002 Page 31
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 122

1  that's what it is.
2      Q.  I don't quite understand what you're
3  saying, sir.  Are you saying "consulting" means --
4  versus the actual exercise of power?  Is there a
5  difference in your mind?
6      A.  If a decision has to be supported,
7  according to the reserved power rules, by a body above
8  the legal entity, that -- that support has to be granted
9  before the corporate decision in that legal -- before
10  the decision, excuse me, in that legal entity can be
11  taken.
12      Q.  So, in other words, the formalities of
13  asking the question for approval must be done by the
14  subsidiary, but the overall power in either -- whether
15  we're -- whether we're settling a case or appointing
16  members to a board, or whatever, always rests in the
17  group established under Syngenta AG by the internal --
18  I'm sorry, the -- I'm looking for the name of your
19  document again, the regulations governing the internal
20  organization of Syngenta AG; correct?
21          MR. POPE:  Objection to the form of the
22  question.  It is exactly the opposite of what he's just
23  testified to.
24  BY MR. TILLERY:
25      Q.  Isn't that the case?

Page 123

1      A.  It is not a formality.  The legally
2  binding decision is taken in the respective legal
3  entity.
4      Q.  And so they have the power to reject --
5  these legal entities, like Syngenta Crop Protection, can
6  simply reject the approval process contained within the
7  regulations governing the internal organizations of
8  Syngenta AG, if they choose to do it under your -- under
9  your statement?
10      A.  I was not saying that.
11      Q.  Well, do they have that authority or not?
12      A.  The question of rejection does not occur,
13  since everybody follows these reserved power processes.
14      Q.  Well -- well, you're saying they do it
15  almost informally.  What I'm saying is, do they have the
16  power to reject what Syngenta AG wants them to do?
17      A.  And I am saying that the question of
18  rejection doesn't occur, because --
19      Q.  Well, whether it occurs or not, do they
20  have the power?
21          MR. POPE:  You're asking a hypothetical now?
22  Is that what you're doing?
23  BY MR. TILLERY:
24      Q.  I'm not asking whether or not it has
25  occurred or whether you've gotten together and agreed to

Page 124

1  it.  I'm asking, do they have the authority to reject
2  this process under the regulations governing the
3  internal organization of Syngenta AG, if it says that?
4          MR. POPE:  Objection to the form of the
5  question.
6          THE WITNESS:  As a practical matter in a
7  corporation, these sorts of decisions are not being
8  taken if the competent body, according to the reserved
9  power, hasn't supported it.
10  BY MR. TILLERY:
11      Q.  That's not what I'm asking you.  I'm not
12  asking you that.  I am a -- we could go through each of
13  these questions.  Does the board or the leadership of
14  Syngenta Crop Protection Inc., for example, have the
15  power to appoint its own board?  Can the board members
16  there decide, "We want a different board, not the one
17  that has been approved upon consultation with
18  Syngenta AG members"?  Can they do their own board?
19      A.  They don't do that.  That's all I can
20  answer to that.
21      Q.  But can they?  The reason they don't do it
22  is because they can't do it?
23      A.  The only competent body to appoint board
24  members is the competent body according to the
25  governance of that legal entity.

Page 125

1      Q.  So they -- what you're saying is that they
2  can do -- they can appoint -- Syngenta Crop Protection
3  Inc. can appoint its own board and ignore Basel;
4  correct?
5      A.  In legal terms, they could do that.
6  I'm saying that they don't do it.
7      Q.  Okay.  You're saying they do have the
8  power.  Where is their power to do that?
9      A.  In their respective governance
10  constitution.
11      Q.  Which governance constitution at Syngenta
12  Crop Protection Inc. would give them the authority to do
13  that?
14      A.  I guess it's the articles of incorporation
15  which state who is competent to take which decision.
16      Q.  And would they also, likewise, have the
17  ability to settle a lawsuit without approval on their
18  own?
19      A.  According to their own competence rules in
20  the governance documents, they can take their respective
21  decision.
22      Q.  And you're saying that they have the
23  authority to do that as a member/subsidiary/affiliate of
24  Syngenta AG; they can do that on their own?
25      A.  I am saying that, in legal terms, for the

32 (Pages 122 to 125)

Exhibit 002 Page 32
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 126

1  purposes of the management of the legal entity, they can
2  take those decisions which they are competent for
3  according to the governance documents of that
4  legal entity, and that governance document of that
5  legal entity is the relevant document which regulates
6  that decision making.  This is a reserved power process
7  in the context of a globally active group of companies.
8       Q.  And none of them have ever gone against
9  the wishes of Basel, have they?
10      A.  I am not aware that any significant
11  decisions of relevance have been taken which were not
12  dealt with first through the reserved power process,
13  to the extent they needed to.
14      Q.  And no-one has ever appointed a board
15  member that you didn't want on a board; correct?
16      A.  I am not aware of any.
17      Q.  And no-one has ever filed a lawsuit that
18  Basel didn't want filed; right?
19      MR. POPE:  Objection to the form of the
20  question.
21      THE WITNESS:  I don't know the answer to that
22  question, because not all the lawsuits which are being
23  filed have come to my table.
24  BY MR. TILLERY:
25      Q.  Okay.  So you don't know whether that's

Page 127

1  happened.  No-one has ever settled a lawsuit without the
2  authority granted to it by Basel, have they?
3       MR. POPE:  Objection to the form of the
4  question.
5       THE WITNESS:  What I can say is that, when a
6  consultation with Basel under the reserved power was
7  deemed to be done, it has been done.
8  BY MR. TILLERY:
9       Q.  Has anybody ever obtained financing or
10 established banking relationships outside the guidelines
11 of Basel?
12      A.  Not in a -- in a material sense, according
13 to my best recollection.
14      Q.  Okay.  What if Syngenta Crop Protection
15 chose to ignore Basel?
16      MR. POPE:  Objection to the form of the
17 question.
18      MR. TILLERY:  What would happen?
19      MR. POPE:  It is an incomplete hypothetical.
20      THE WITNESS:  Can you specify your question?
21 BY MR. TILLERY:
22      Q.  Yes.  If they just chose to ignore Basel
23 altogether?
24      A.  In the context of a specific transaction,
25 or ...

Page 128

1       Q.  In the context of any transaction.
2       A.  If they --
3       Q.  I can say it in this context:  in the
4  context, for example, of creating their own board and
5  getting outside board members with no affiliation
6  whatsoever with Syngenta.
7       A.  Okay.  I -- again, I'm not aware of
8  anything of that sort ever happens in any material shape
9  or form; definitely not around board members.  I can
10 only speculate what happens in such a case: there would
11 be a discussion, I guess.
12      Q.  There would be a discussion and you would
13 tell them that they couldn't do that, wouldn't you?
14      A.  Again, it has never happened, so I cannot
15 state facts around it.
16      Q.  Because "consultation", as you have used
17 it in this discussion, really means approval from Basel,
18 doesn't it?
19      MR. POPE:  Objection to the form of the
20 question.
21      THE WITNESS:  "Consultation" means support in
22 the concept of reserved powers, as I tried to explain
23 it.
24 BY MR. TILLERY:
25      Q.  And reserved powers in these documents

Page 129

1  mean the power of approval.  So whether you -- if they
2  propose something that you agree with, you can simply be
3  consulted and agree, as long as they don't propose
4  something you don't agree with; correct?
5       MR. POPE:  Objection to the form of the
6  question.  Argumentative.
7       THE WITNESS:  I'm not sure I understand the
8  question.  Can you --
9  BY MR. TILLERY:
10      Q.  Well, "consultation".  You have used the
11 word that you are consulted under these terms.  Have you
12 seen one reference to the word "consulted" in any of the
13 documents I've shown you?
14      A.  No.
15      Q.  Okay.  Then is it set out in the
16 regulations governing the internal organizations of
17 Syngenta AG?
18      A.  Not to the best of my recollection.
19      Q.  Okay.  So the legal document that you
20 were -- you were bound to file with Switzerland
21 dealing with your governance authority over these
22 subsidiaries doesn't define it in terms of
23 "consultation", does it?
24      MR. POPE:  Objection to the form of the
25 question.

33 (Pages 126 to 129)

Exhibit 002 Page 33
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 130

1    THE WITNESS:  I don't think I said that the
2  regulations on the organization had to be filed;
3  I said -- I think -- my answer to that question was no,
4  it did not have to be filed.
5  BY MR. TILLERY:
6    Q.  Okay.  Then the -- then the document that
7  had to be created in compliance with Swiss law, entitled
8  "The regulations governing the internal organization of
9  Syngenta AG", that document doesn't talk in terms of
10  consultation from the subsidiaries, does it?
11    A.  To the best of my recollection, it does
12  not use the word "consultation".
13    Q.  It talks about having the power and
14  authority to do these things, doesn't it?
15    A.  I think the term it uses is "authority",
16  from my recollection.
17    MR. TILLERY:  I'm just about to start a whole
18  new line.  Do you want to start now or keep going --
19    MR. POPE:  Totally up to you.  Do you want to
20  take a break?
21    MR. TILLERY:  Well, aren't we having lunch in
22  about ten minutes?  Okay, we can do that.  Let's break
23  now.
24    THE VIDEOGRAPHER:  Going off the record.  The
25  time is 12:18.

Page 131

1  (12:18 p.m.)
2    (Lunch recess.)
3  (1:07 p.m.)
4    THE VIDEOGRAPHER:  Going back on the record.
5  The time is 13:07.  Thank you.
6  BY MR. TILLERY:
7    Q.  What is the authority for the creation of
8  the chairman's committee?
9    A.  Can you explain to me the term
10  "authority", excuse me?
11    Q.  Yes.  I mean, what was -- gives it the
12  right to exist?  How does it exist?  What empowers the
13  existence of the chairman's committee?
14    A.  The regulation governing the organization
15  foresee the creation of several board committees,
16  including the chairman's committee.
17    Q.  And which regulations are you talking
18  about?
19    A.  The regulations about the internal
20  organization of the company.
21    Q.  And where do those regulations come from?
22    A.  They come from the board.
23    Q.  Okay.  So the board of what company?
24    A.  Sandoz -- excuse me.  I was talking
25  Sandoz.  Syngenta AG.

Page 132

1    Q.  Syngenta AG.  If we can just walk through
2  this, then, I want to understand.  The Syngenta AG board
3  created a regulation.  How did it do that?
4    A.  It was a proposal submitted to the board
5  for formal approval at the beginning of the existence of
6  Syngenta.
7    Q.  Okay.  And it created which committees?
8    A.  It created as board committees the
9  chairman's committee, the compensation committee and the
10  audit committee.
11    Q.  Okay.
12    A.  And subsequently it also created, a couple
13  of years later -- I don't remember the exact year -- a
14  corporate social responsibility committee -- a corporate
15  responsibility committee, excuse me, CRC, without the
16  "social".
17    Q.  And when was the executive committee
18  created?
19    A.  At the beginning of Syngenta as well.
20    Q.  So that was another one that was created
21  at the beginning?
22    A.  Yes, but that's not the board committee;
23  that's an executive committee.
24    Q.  Okay.  So how is -- walk me through how
25  the Syngenta executive committee was created?

Page 133

1    A.  The articles of incorporation,
2  in accordance with Swiss law and then further explained
3  in the regulations about the internal organization,
4  foresee that the board, who, according to Swiss law,
5  is ultimately responsible for the operation of the whole
6  corporation, according to mandatory Swiss law, can
7  delegate the day-to-day management of the corporation to
8  an executive committee, and it has done so by creating
9  the Syngenta executive committee.
10    Q.  And that was done when Syngenta AG was
11  formed?
12    A.  Right.
13    Q.  And from -- strike that.  What were the
14  members -- where were the -- strike that.
15    Where were the members for the Syngenta
16  executive committee to come from?
17    A.  At the time of the creation of Syngenta,
18  four Syngenta executive committee members were former
19  executives of AstraZeneca, or Zeneca Agrochemicals, to
20  be precise, and four were coming -- were former
21  executives of the Novartis side, either Novartis Crop
22  Protection AG or Novartis Seeds AG at the time.
23    Q.  And is there a restriction on their
24  membership being tied to an association with one of the
25  Syngenta companies?

34  (Pages 130 to 133)

Exhibit 002 Page 34
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph           10-14-2010
Confidential

Page 134

1    MR. POPE:  Are you talking about now or
2  originally?
3    MR. TILLERY:  Now.
4    THE WITNESS:  I'm not sure I understand that
5  question.
6  BY MR. TILLERY:
7    Q.  Well, I mean, do all of the members of the
8  Syngenta executive committee have to have some
9  employment with one of the affiliated Syngenta
10  companies?
11    A.  They are all employees of Syngenta
12  International AG and it is not foreseen that a
13  non-employee could be a member of the executive
14  committee, if that's your question.
15    Q.  They are all -- they are all employees of
16  Syngenta International AG?
17    A.  Right.
18    Q.  And have they always been all employees of
19  Syngenta International AG?
20    A.  To the best of my recollection, yes.
21    Q.  And the capital approvals committee,
22  the committee we talked about before the break.
23    A.  Right.
24    Q.  How was it created?  What was the
25  authority for creating the committee?

Page 135

1    A.  That was created by the Syngenta executive
2  committee, based on its general competency to organize
3  the management of the corporation in the best possible
4  way, which is also laid down in the organizational
5  rules, the regulations.
6    Q.  And you -- when you reference
7  organizational rules or regulations, what are the
8  organizational rules for Syngenta AG?
9    A.  That the -- so to speak, the highest
10  document is the articles of incorporation.
11    Q.  Okay.  And let's stop right there for a
12  second.
13    A.  Okay.
14    Q.  The articles of incorporation.
15    A.  Right.
16    Q.  Tell me what it specifies in terms of
17  management or ongoing operation?
18    A.  It specifies the accountabilities of
19  the -- and responsibilities of the board of directors
20  particularly.  It gives the basis for the board of
21  directors to delegate the operational management, either
22  to committees or to an executive committee.  It talks on
23  a very high level on the roles of the chairman of the
24  company.  It has regulations around the shareholder
25  meetings, voting rights, dividend payments, and so on.

Page 136

1    Q.  Okay.  Now, beyond the articles of
2  incorporation, what other documents dictate the
3  operation of Syngenta AG?
4    A.  The most important document besides the
5  articles of incorporation is this regulation governing
6  the internal organization, the document we referred to
7  several times already, which has more detail on the
8  allocation of responsibilities between board, board
9  committees, executive committees and CEO.
10    Q.  And are there any other documents that
11  govern the ongoing operation of Syngenta AG?
12    A.  We have a number of legal entities,
13  of course, within the group, all of which have their
14  governance documents in the form of articles of
15  incorporation; similar documents, depending on the
16  jurisdiction, like the regulations governing the
17  internal documentation.
18    Q.  Now, which of the committees that we have
19  talked about -- and we've discussed the chairman's
20  committee, the executive committee, the capital
21  approvals committee, business systems committee, all
22  those are listed.  Which of those were created by the
23  Syngenta executive committee.
24    A.  The capital approval committee and the
25  business steering committee.

Page 137

1    Q.  Business steerings or --
2    A.  Excuse me, business systems committee.
3    Q.  Okay.
4    A.  I apologize.
5    Q.  Are there other committees created by the
6  Syngenta executive committee?
7    A.  We have a compliance and risk management
8  committee, which was created only about a year and a
9  half ago.  We have a mergers and acquisitions committee
10  as a subset of the executive committee.  These are the
11  most important ones which pop to my mind on a -- on a
12  group level.
13    Q.  And these are -- these are -- these are
14  all committees created under the auspices or direction
15  of the Syngenta AG executive committee?
16    A.  Right.
17    Q.  Do they derive their power or authority
18  through Syngenta AG to operate?
19    A.  They derive their power as part of the
20  power the Syngenta executive committee has based on the
21  organizational rules.
22    Q.  So their existence and their management
23  control or authority derives through the Syngenta AG
24  executive committee?
25    A.  That is correct.

Exhibit 002 Page 35
14e2e5f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 138

1      Q.   Are there any management committees in the
2  Syngenta group of companies that have global authority
3  which do not derive through the Syngenta AG executive
4  committee?
5      A.   Not that I can think of at the moment.
6  (Exhibit 7 marked for identification.)
7  BY MR. TILLERY:
8      Q.   If you would take the first one, which is
9  marked as number 7, and then pass the others, please.
10 Would you look at that as well.  Do you recognize that?
11     A.   Yes.
12     Q.   What is this?
13     A.   This is another part, as I can see, of the
14 reserved power documents we have talked to posted on the
15 intranet.
16     Q.   Now, if you would combine that with the
17 immediate two -- immediately preceding two exhibits,
18 5 and 6, is there any more to the reserved powers
19 documents that's contained on the intranet other than
20 those three exhibits?
21     A.   I am of the view this is probably it, but
22 I cannot certify that with certainty from the top of my
23 head, but I think that is it, broadly.  Broadly.  On a
24 group level.
25     Q.   Well, these are furnished in -- as part of

Page 139

1  documents that they were -- and they were not together,
2  as you will see from the Bates range numbers, and I was
3  wondering if -- how it is that they're set up on the
4  intranet and if you could describe that for me?  How do
5  they appear and how does one access them?
6      MR. POPE:   Let's be clear, when you say they
7  were produced, you mean they were produced by Syngenta
8  Crop Protection Inc. --
9      MR. TILLEY:   Yes, and they --
10     MR. POPE:   -- pursuant to the judge's order?
11     MR. TILLERY:   Well, it will say on the document
12 where they were produced and the Bates number, and --
13     MR. POPE:   This just says -- this just says
14 "Greenville", but you and I understand this was produced
15 by Crop Protection.
16 BY MR. TILLERY:
17     Q.   Now, if you can -- if you could tell me,
18 sir, what part -- are they part of a larger document on
19 the intranet?
20     A.   My understanding is that the three parts
21 of the document are probably -- and I can't -- couldn't
22 say that with certainty.  Again, as I said therefore,
23 they are three parts of the document you can access
24 through the intranet site under the heading of, I don't
25 know, "Reserved power", or something like that.  I don't

Page 140

1  know the details of it.  I haven't reviewed them on the
2  intranet.  A couple of years ago I got print-outs of it.
3      Q.   But the purpose of -- of creating it and
4  sending it out was to have it accessible to the
5  affiliate or subsidiary companies; correct?
6      A.   That's true.
7      Q.   And you've made that available on the
8  internet [sic] to these affiliated or subsidiary
9  companies?
10     A.   That was done at the time, yes.
11     MR. POPE:   Steve, when you use the term
12 "internet", you mean the Syngenta intranet?
13     MR. TILLERY:   Intranet.
14     THE WITNESS:   Intranet.
15     MR. POPE:   That's what you meant to say, fine,
16 thank you.
17 BY MR. TILLERY:
18     Q.   If you would look at page 31, which is the
19 bottom of the first page of exhibit 7.  Do you see 31?
20     A.   Yes.
21     Q.   Now, if you look at that front page, does
22 the Syngenta group of companies have a global head of
23 human resources?
24     A.   Yes, they do.
25     Q.   And where is the office of the global head

Page 141

1  of human resources?
2      A.   That is in Basel.
3      Q.   And affiliated with which entity?
4      A.   Syngenta International AG.
5      Q.   Who is the head of that department?
6      A.   It's a lady called Caroline Luscombe.
7      Q.   Do you want to spell her name for the
8  reporter?
9      A.   Caroline is clear.  Luscombe,
10 L-U-S-C-O-M-B-E.
11     Q.   And what is her title?
12     A.   Global head of HR.
13     Q.   Okay.  Who does she report to?
14     A.   To the CEO, Mike Mack.
15     Q.   Is there a member of the Syngenta AG
16 executive committee that is responsible for
17 human resource related matters?
18     A.   Caroline is not a member of that executive
19 committee, but she reports to -- still to the CEO.
20     Q.   But is there a member of the Syngenta AG
21 executive committee that is responsible for human
22 resource related matters?
23     A.   No.
24     Q.   Okay.  What does the term
25 "senior management group" mean when you're talking about

36 (Pages 138 to 141)

Exhibit 002 Page 36
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 142

1  an affiliate or subsidiary company?
2      A.   Senior management group is a group of
3  higher level managers throughout Syngenta globally who
4  have been designated as such based on their respective
5  positions in the different legal entities and
6  operations.
7      Q.   This would apply to or extend to
8  Syngenta Crop Protection Inc., wouldn't it?
9      A.   This would extend to Syngenta Crop
10 Protection Inc. as well, yes.
11     Q.   And if you look at this document, the
12 reserved powers and the global head of HR, a member of
13 the Syngenta executive committee and the CEO; right?
14     A.   That is right.
15     Q.   And that threshold application applies to
16 all senior management group nominations, including
17 recruit -- recruiting and promotion?
18     A.   That is what the document says, yes.
19     Q.   So if there's a job vacancy within the
20 senior management group of an affiliate or subsidiary
21 company, these people have the reserved power for
22 approval or appointment of that position?
23     A.   In the context of the reserved power, they
24 have it, yes.
25     Q.   Now, the senior management group.

Page 143

1  In earlier questions -- we talked about the heads of
2  companies in one line of questions, and then there were
3  people in the step or immediate step below the heads of
4  the companies.  Does the senior management group fall
5  below the people who are one step below the heads of
6  companies?  Where are they?
7      A.   That depends on the size of the company
8  you are talking about of the legal entity.  There are
9  big operational legal entities, such as Crop Protection
10 AG, where it falls below that level, possibly, but that
11 is not consistent -- or let's put it this way: the SMG
12 participation, whether you are part or not of that group
13 does not depend necessarily on your reporting level.
14     Q.   You have -- in earlier discussions, you've
15 identified the size of the company being a factor.  Give
16 me an example of where senior management group people
17 would not be applicable because of the size of the
18 entity?
19     A.   I'm thinking particularly about Syngenta
20 Crop Protection AG, the big company in Switzerland.
21 Where this is the case, I am thinking about Syngenta
22 International AG, there are people two levels below that
23 which are still SMG.  I cannot tell you with certainty
24 out of my mind whether that is true for other companies,
25 necessarily.

Page 144

1      Q.   And these positions would typically
2  involve what type or level of responsibility?
3      A.   This would be unit heads, functional
4  heads, heads of companies, of course; these sort of
5  people.
6      Q.   And how would that role or position be
7  different than the responsibility in the people who are
8  below the heads of the company, the one level below?
9      A.   Excuse me.  They can be the same.
10     Q.   Right.
11     A.   They can be one level below the company
12 head and SMGs.  Not everybody who is below -- who is one
13 level below a company head a given country is an SMG by
14 that definition.
15     Q.   The example that's given here is that,
16 in a case of filling a vacant senior management group
17 position, the responsible Syngenta executive committee
18 member, the global head of HR and the CEO need to
19 approve the senior management group status and the
20 linked compensation for the new hire; is that correct?
21     A.   That is correct.  However, I have to say
22 here, again, the rules have -- are in the course of
23 being amended slightly.
24         We are in the process of moving away from what
25 used to be at the time the SMG population into a

Page 145

1  slightly different system with new terminologies, new
2  levels.
3          So the rules are no longer -- and these rules
4  are -- we apply them already when it comes to the
5  appointment, but they are not promulgated throughout the
6  corporation yet, so --
7      Q.   These are the promulgated rules that you
8  have before you in exhibit 7?
9      A.   They are still formally in place, but they
10 are being revised and the launch of the new system is
11 imminent as we speak.
12     Q.   It hasn't -- but it hasn't happened yet?
13     A.   It hasn't happened yet, no, formally.
14     Q.   Right.  So as of today --
15     A.   As of --
16     Q.   -- the deposition, this would -- this set
17 would be what you would find on the intranet --
18     A.   Absolutely.
19     Q.   -- if you looked at it; right?
20     A.   Right.
21     Q.   And the rationale for reserving that power
22 of approval to these three different groups, the
23 reserved power groups, is so that Syngenta AG can
24 maintain global consistency and control over the most
25 critical leadership positions in Syngenta; correct?

37 (Pages 142 to 145)

Exhibit 002 Page 37
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 146

1    A. That senior management can keep that
2 consistency, that's right.
3    Q. Yes.
4    A. I would refer to terms like "internal
5 equity" and "consistency of -- of systems around the
6 globe".
7    Q. What's listed, though, as the rationale is
8 that "global consistency and control over the most
9 critical leadership positions in Syngenta"?
10   A. That's what it says, yes.
11   Q. Is John Atkin the Syngenta AG executive
12 committee member responsible for approving appointments
13 to SMG positions at Syngenta subsidiaries that are in
14 the crop protection business?
15   A. According to these rules, he has been that
16 person, yes. As I said, we are --
17   Q. It's changing now.
18   A. -- we are in the process of changing and
19 we have already adopted the new rule, which is that this
20 is done by the Syngenta executive committee rather than
21 the respective SEC member.
22   Q. Okay.
23   A. It is done by the Syngenta executive
24 committee as a whole. We are reviewing what is now the
25 equivalent of SMG nominations. They are -- we no longer

Page 147

1 call them SMG nominations.
2    Q. What Syngenta company is the global
3 compensation and benefit department located in?
4    A. That is under the leadership of the
5 global head of HR, Caroline Luscombe. She is employed
6 by Syngenta International AG, and I guess some of her
7 key people. Others are employed by Syngenta Crop
8 Protection in Basel.
9    Q. When you say the global compensation and
10 benefit department --
11   A. That's located in Basel.
12   Q. Okay. It's in Basel. But is it part of
13 one or more of the Syngenta AG companies?
14   A. That's right.
15   Q. Which ones, can you --
16   A. International AG or Crop Protection AG.
17   Q. Do you know, is it -- is it tied or linked
18 by paper to either one?
19   A. The more senior positions would probably
20 be within Syngenta International AG; the more junior
21 ones within Crop Protection AG.
22   Q. Is there a paper that designates where it
23 belongs or where it -- where it comes from? No?
24   A. Not to my knowledge.
25   Q. All right. Now, that particular

Page 148

1 department, the global compensation and benefit
2 department, issues policy documents that apply to
3 compensation of employees at all of Syngenta AG
4 subsidiaries; correct?
5    A. That is what it says, yes.
6    Q. And that means that if a senior management
7 group employee at Syngenta Crop Protection Inc. asked
8 for an increase of salary above the US equivalent of
9 250,000 Swiss francs, there is a -- on this particular
10 document, there is an indication of who that person
11 would have to get approval from: both the global head of
12 HR and the CEO of Syngenta would have to sign off on
13 that; correct?
14   A. Under the concept of reserved power,
15 that's what it says, yes.
16   Q. And that's true for employees who are not
17 part of the senior management group as well; it goes on
18 to list people who aren't in the senior management
19 group?
20   A. That is not my understanding, because the
21 title of that box says "Senior Management Group."
22   Q. Okay. Let's look at the bottom of the
23 page, 1031; do you see it?
24   A. Yes.
25   Q. It says "Non Senior Management Group

Page 149

1 compensation packages"?
2    A. Right.
3    Q. Okay. And there it says, for non senior
4 management group compensation practices, that the
5 threshold application is a base of 250,000 Swiss francs
6 above or below, and the responsible sign-off party is
7 either the global head of HR or CEO, and it gives an
8 example of a person who is not one of them making that
9 money; right?
10   A. That's right, sorry. Sorry, I was
11 probably confused by your question.
12   Q. All right.
13   A. I meant you were saying that the box with
14 the -- regulating the SMG process was applicable.
15 You're right. I cannot tell you with certainty whether
16 these thresholds are still valid.
17   Q. But assuming the thresholds are --
18   A. That's what it says. That's what it says.
19   Q. That's what it says, so we've now got the
20 head of the group, the head of the company, the
21 subsidiary, the people below the head of the group,
22 which would be senior management people, and then we
23 have people who are non senior management people who are
24 below them as well; correct?
25   A. Again, I think you are somewhat confusing

38 (Pages 146 to 149)

Exhibit 002 Page 38
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 150

1 senior management group and level below the head of the
2 company.
3     Q.  But they could be the same?
4     A.  That's not -- they could be the same.
5     Q.  That's right.
6     A.  It's not a necessary link; that's what I'm
7 saying.
8     Q.  All right.  Now --
9     A.  We can have -- excuse me.
10     Q.  Do go ahead.  I'm sorry.
11     A.  We have the thresholds applicable to SMG
12 nominations and we have the thresholds applicable to
13 non SMG.
14     Q.  All right.  And what I'm trying to say is
15 that the extent of authority or control over approval of
16 salary increases extends beyond the heads of the
17 companies, but also goes to senior management level and
18 to people who are not senior management group people; is
19 that correct?
20     A.  That can be correct based on salaries of
21 these people.
22     Q.  That's right.  And the rationale for
23 maintaining the control over non-senior management group
24 compensation packages is for cost control; correct?
25     A.  That's one of the rationales mentioned

Page 151

1 here.  The others are consistency of compensation.
2     Q.  Syngenta AG globally coordinates the
3 development of successors to positions within the
4 Syngenta senior management group jobs, doesn't it?
5     A.  That is correct.
6     Q.  And that's also set out here as well?
7     A.  Right.
8     Q.  And the Syngenta AG executive committee
9 holds reviews and meetings where it identifies potential
10 successors to senior management group positions among
11 the subsidiaries of Syngenta AG?
12     A.  As is usual in any other internationally
13 active company I am familiar with, succession plans are
14 reviewed across borders, because people are mobile and,
15 accordingly, it spans over people working in different
16 legal entities.
17     Q.  And Syngenta AG executive committee would
18 discuss employees or potential employees of, for
19 example, Syngenta Crop Protection Inc. at these talent
20 review meetings, wouldn't they?
21     A.  On a high level, to the extent they are
22 part of the plan, that is possible, yes.
23     Q.  And the Syngenta AG executive committee
24 recommends people to be appointed to positions within
25 the senior management group and high-level positions,

Page 152

1 don't they?
2     A.  Based on -- on the talent review and the
3 succession planning, that can be the case.
4     Q.  And, according to this document, 34 and
5 35, the Syngenta AG executive committee has authority
6 over international assignment of employees between
7 Syngenta companies?
8     A.  That is true in the frame of these
9 reserved powers here, yes.
10     Q.  And how is it that a company employee is
11 moved from one place to another?
12     A.  The most obvious example is the promotion
13 of an employee into a next level of job assignment, and
14 by doing so, changing from one country to the next, into
15 another position.
16     Q.  What about temporary assignments, where a
17 person is moved for 18 months or two years?
18     A.  We have detailed regulations from HR, who
19 are giving guidance how these cases are handled between
20 the different legal entities.
21     Q.  Is the intention here to benefit the
22 company in a cost-effective way, to take the most
23 talented person for a particular type of job and to
24 assign them to another entity to help that entity, to
25 avail themselves at a new entity, a different entity,

Page 153

1 with the talent that would be existing in another
2 subsidiary?
3     A.  I would say that, in the broader scheme,
4 these cross-border assignments are there for two
5 main purposes:  one is to develop the corporate talent
6 pool further, to make them fit for higher positions;
7 and, on the other hand, to cross-fertilize knowledge
8 amongst the different companies.  That is -- they are
9 the two reasons why we are doing that.
10     Q.  And according to this, the Syngenta AG
11 executive committee has to sign off on employee
12 transfers across regions or business units; is that
13 correct?
14     A.  That is what this document says.  However,
15 the practice around that, I have to say again, has
16 changed, as far as I can see, and I'm not sure whether
17 that is followed according to what is stated here
18 necessarily in each and every case.  My recollection is
19 that we have introduced some thresholds around --
20     Q.  But it's not contained in this document?
21     A.  It's not contained in this document here
22 and it may be -- it's probably laid down in more detail
23 in the more detailed rules issued by HR.
24     Q.  Which haven't come out yet?
25     A.  Which have come out but are not part of

39 (Pages 150 to 153)

Maeder, Christoph          10-14-2010
Confidential

1  that -- of that intranet site.
2      Q.   Who pays these people when they are on
3  assignment from one company to another?
4      A.   First of all, you would need to look at
5  the specific form and length of assignment to answer
6  your question precisely in a -- on a case-by-case basis.
7          Secondly, normally, it is -- if it's an
8  assignment which is lasting for a period of time, there
9  is a -- sharing of costs between the host country and
10 the home country of the assignee.  That is pretty much
11 according to international standards of multinational
12 companies.
13         I don't think we have anything which is
14 different from that well-accepted practice.
15     Q.   So it's -- it they are paid -- let me --
16 hold on a second.  Excuse me one second.
17         The transcript has read "country".  Did you
18 mean to say "country"?  I think you might have actually
19 used the word "county"?
20     A.   Can you repeat from the transcript?
21     Q.   We can read you -- we can read you what it
22 says in the transcript?
23     A.   Please.  Yes, please.
24     Q.   It says:
25         "First of all, you would need to look at the

1  specific form and length of assignment to answer your
2  question precisely in a -- on a case-by-case basis.
3          "Secondly, normally, it is -- if it's an
4  assignment which is lasting for a period of time, there
5  is a -- sharing of costs between the host country and
6  the home country of the assignee."
7      A.   I was probably simplifying.  By that,
8  I mean of the respective legal entity in the host
9  country and the respective legal entity in the home
10 country.
11     Q.   I just wanted that clarified.  So if --
12 what you're saying is that if an entity had an employee
13 from Syngenta Crop Protection Inc. who was assigned to a
14 Canadian entity who was a subsidiary of Syngenta AG,
15 they would split the -- the compensation?
16     A.   In some cases, these -- these -- the total
17 costs for an employee are split according to, also from
18 a tax perspective, accepted and allowable standards.
19         I can make an example:  if an assignee during
20 an assignment to a foreign country remains in the
21 social security system of his home company -- home
22 country, excuse me, then part or all of that social
23 security cost in the home country might still be borne
24 by the home country legal entity while he is working in
25 another country.  That's an example of sharing the cost.

1      Q.   Do you know --
2      A.   The direct -- sorry.
3      Q.   Do you know any details about how this
4  actually works?
5      A.   I know some details, but you have --
6  we get very sophisticated analysis of the situation when
7  a given case comes up, for example, in my department
8  with a series of line items, how the costs are borne and
9  allocated.  As a rule of thumb, what you can say is that
10 the direct salary is paid by the host country.
11     Q.   When you say -- when you say "host
12 company" --
13     A.   Sorry, I mean the host company in -- the
14 legal entity employing him during that time of the
15 assignment in the host country.
16     Q.   And I understood that's what you meant.  I
17 was just correcting it because we are bound by that --
18 what appears on the transcript.
19     A.   That's all right.
20     Q.   That host company, what I'm trying to find
21 out is, is there a protocol or head of an entity or
22 committee which oversees this and sets rules and
23 regulations for how it's paid?
24     A.   There is a group of people in the Basel
25 HR department who are overseeing these international

1  assignment cases.  This is a specialist area of --
2  this is a science in itself and these specialists are
3  dealing with that on a global basis.
4      Q.   And they -- and they promulgate rules that
5  are applicable for how these assignments, first of all,
6  take place, and then, secondly, how the compensation is
7  handled?
8      A.   They promulgate these detailed rules, yes.
9      Q.   I wanted to digress for just a moment and
10 ask you a question from a response we received in a
11 pleading and ask you a question about one of these
12 answers we received to a Syngenta Crop Protection
13 request for admission of fact, and we sent counsel
14 requests for admissions of fact and asked whether or not
15 Syngenta Corporation alone had the power to elect and
16 remove members of the board of directors of Syngenta
17 Seeds Inc., and the answer said:
18         "Syngenta Crop Protection admits that, absent
19 exceptional circumstances, Syngenta Corporation alone
20 has the power to elect and remove the members of the
21 board of directors of Syngenta Seeds."
22         What are -- what are the exceptional
23 circumstances?
24         MR. POPE:  Can you give me the number, Steve,
25 so I can --

40  (Pages 154 to 157)

Exhibit 002 Page 40
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 158

1       MR. TILLERY:  You can take mine.  If you want
2 to use them, these are mine.  Just give them back to me
3 when you're done.
4 BY MR. TILLERY:
5       Q.  All I'm just asking are the "exceptional
6 circumstances" language, is all.  There's about eight or
7 ten of those, and I wanted to know what they were.
8       A.  I don't know what -- what this refers
9 to --
10       Q.  All right.
11       A.  -- from the top of my head.
12       Q.  Do you -- are you aware of any such
13 exceptional circumstances?  No?
14       A.  I'm not aware at this moment in time, no.
15       Q.  All right.  And just so you know, I mean,
16 the same thing was asked about Syngenta Crop
17 Protection Inc.:
18       "Syngenta Seeds alone has the power to elect
19 and remove members of the board of directors of Syngenta
20 Crop Protection Inc.?"
21       And the answer was:
22       "Syngenta Crop Protection Inc. admits that,
23 absent exceptional circumstances, Syngenta Seeds alone
24 has the power to elect and remove members of the board
25 of directors of Syngenta Crop Protection Inc."

Page 159

1       A.  As the parent company.
2       Q.  You know -- yes.  And that's -- that's
3 what I was looking for:  what are those circumstances?
4       A.  I'm not sure what these exceptional
5 circumstances are referring to.
6       Q.  That they're referring to.  All right.
7 Is there an international assignment policy, to your
8 knowledge?
9       A.  To my knowledge, there is one, yes.
10       Q.  And what is that policy?  Is it something
11 that's in writing, a manual, or that sort of thing?
12       A.  To the best of my knowledge, that's the
13 case, yes.
14       Q.  And who created that international
15 assignment policy?
16       A.  That is developed within the
17 HR department, as you would expect, and it's then
18 finally, I guess, approved by the Syngenta executive
19 committee.
20       Q.  And Syngenta has a global mobility team?
21       A.  That is probably the name of the group of
22 specialists around international assignment I was
23 referring to earlier.
24       Q.  Do you know who the people are who
25 comprise that committee or that group that you're

Page 160

1 referring to, assuming it's the same group?  Are these
2 people from one entity or are they from several entities
3 or do you know where they come from?
4       A.  I don't know that term "global mobility
5 team" with any precision.  I cannot comment on that.
6 That's why I said I would assume this is the group of
7 experts dealing with the international assignments, but
8 I don't know that for sure.
9       Q.  Would the subsidiaries, like Syngenta Crop
10 Protection Inc., have a copy of the international
11 assignment policy?
12       MR. POPE:  Objection to the form of the
13 question.
14       THE WITNESS:  I would need to speculate to
15 answer that question.
16 BY MR. TILLERY:
17       Q.  Well, I mean, I -- I'm just wondering why
18 you would speculate.  You're a board member of Syngenta
19 Crop Protection Inc.  Why do you think you would have to
20 speculate?
21       MR. POPE:  If he doesn't know the answer he
22 doesn't know that answer.
23       THE WITNESS:  I don't know the answer is -- is
24 what I tried to say, excuse me.
25 BY MR. TILLERY:

Page 161

1       Q.  What you're saying is -- is that, whether
2 this is circulated or not, you don't know, or if it's
3 circulated to a limited -- a limited number of -- of
4 people?
5       A.  I would not be involved in my capacity as
6 a board member in knowing whether such a policy has been
7 sent to Syngenta Crop Protection Inc.
8       Q.  Does Syngenta administer global training
9 programs at its Basel headquarters?
10       A.  It administers certain global training
11 programs which might take place wherever in the world,
12 not just in Basel.  There are -- there are certain of
13 these programs, yes.
14       Q.  Does it do training programs in Basel?
15       A.  It might be the case that some sessions of
16 training programs are taking place in Basel or in
17 other -- I know that they, for example, are taking place
18 from time to time in other places of Switzerland and in
19 other parts of the world, such as the United States or
20 Latin America.  So this is not restricted to Basel where
21 they are being conducted.
22       Q.  How many board members are there on the
23 board of Syngenta Crop Protection Inc., sir?
24       A.  Let me do the count:  five.
25       Q.  And who are those people?

Westlaw Deposition Services   800.548.3668 Ext. 1        **Exhibit 002 Page 41**
                                                         14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 162

1        A.   Vern Hawkins, myself, John Atkin,
2   Jason Fogden and Beth Quarles.
3        Q.   You and Mr. Atkin are both members of the
4   Syngenta AG executive committee?
5        A.   You said Mr. Atkin, sorry?
6        Q.   Yes.  You and Mr. Atkin --
7        A.   Yes.
8        Q.   -- are -- are both members of the
9   Syngenta AG executive committee?
10       A.   That's true.
11       Q.   And Mr. Atkin is the global head of
12   Syngenta's crop protection business, isn't he?
13       A.   That is right.
14       Q.   How long have you been on the board of
15   Syngenta Crop Protection Inc.?
16       A.   From memory, since 2003 or '4.
17       Q.   How long has John Atkin been on it?
18       A.   I would not know that question out of my
19   head.
20       Q.   Have members of Syngenta AG's executive
21   committee always been on the Syngenta Crop Protection
22   board?
23       MR. POPE:   You mean since its formation at the
24   time of the merger.
25       THE WITNESS:   To the best of my knowledge,

Page 163

1   yes.
2   BY MR. TILLERY:
3        Q.   These three other directors who are not on
4   the executive committee, how were they appointed?
5        A.   To the board of Syngenta Crop
6   Protection Inc.?
7        Q.   Right.  I think you said Quarles, Fogden
8   and --
9        A.   Vern Hawkins.
10       Q.   Hawkins.  How were they appointed?
11       A.   They are appointed by the relevant
12   competent body, which is in this guess case, I guess, a
13   shareholder resolution of Syngenta Seeds Inc.
14       Q.   Okay.  So Syngenta Seeds Inc. appointed
15   them?
16       A.   Is -- is the parent company of Syngenta
17   Crop Protection Inc., and that's the -- from memory,
18   that's the competent body to appoint.
19       Q.   Okay.  And you say competent body, meaning
20   according to the --
21       A.   To the by-laws of Syngenta Crop Protection
22   Inc.
23       Q.   The by-laws, okay.  And who was the person
24   who would have appointed them, the individual?  Do you
25   know?

Page 164

1        MR. POPE:   Objection to the form of the
2   question.  Who says there is an individual?
3   BY MR. TILLERY:
4        Q.   That's what the documents show, that there
5   was an individual:  the president of -- by unanimous
6   ruling, being the only sole holder -- shareholder,
7   appointed them?
8        A.   So it was -- it was an act of the legal
9   entity Syngenta Seeds Inc., I guess.
10       Q.   I'm asking you who that was; do you know?
11       A.   I don't know from --
12       Q.   Okay.  And then who appoints the Syngenta
13   Seeds head?
14       A.   That's normally an act which has to be
15   made by its parent company, which is Syngenta
16   Corporation.
17       Q.   Okay.  And --
18       A.   The chairman of Syngenta --
19       Q.   Yes, go ahead.  Follow it through.  You're
20   on a roll.
21       A.   I don't want to be on a roll.  The
22   chairman of Syngenta Corporation is Vern Hawkins.
23       Q.   Is Vern Hawkins?
24       A.   Right.
25       Q.   So Syngenta Corporation has Vern Hawkins

Page 165

1   as the president?
2        A.   As the chairman.
3        Q.   As the chairman.  And who appointed
4   Vern Hawkins?
5        A.   The shareholder of Syngenta Corporation is
6   a Dutch entity.
7        Q.   Okay.  And what's it called?
8        A.   From memory, Syngenta JVBV or BC or
9   something.  Sorry.
10       Q.   Okay.  And who is the head of that
11   company?
12       A.   I couldn't tell you that.
13       Q.   Do you know who appointed that person?
14       A.   No.  Not from the top of my head.
15       Q.   And that entity is owned by whom?
16       A.   That is owned by Syngenta Participation AG
17   or by Syngenta AG; one of the two.  Participation
18   probably, most probably.
19       Q.   So that entity is owned by Syngenta
20   Participations?
21       A.   Yes, and Syngenta Participations is owned
22   by Syngenta AG.
23       Q.   So -- and Syngenta AG owns Syngenta
24   Participations?
25       A.   Right.

42  (Pages 162 to 165)

Exhibit 002 Page 42
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 166

1      Q.  How often does the board of Syngenta Crop
2  Protection Inc. meet?
3      A.  The board does not meet physically, but we
4  are taking written resolution by unanimous decisions.
5      Q.  And when you say you don't meet
6  physically, does that mean you don't appear in the same
7  location?
8      A.  Right.
9      Q.  Or does that mean you don't meet?
10      A.  We don't meet.  That's what I mean:  we
11  don't meet physically, yes.
12      Q.  Well, you could meet by phone.  Do you
13  meet by phone?
14      A.  Not as a regular matter, no.
15      Q.  You -- you sign unanimous consents, don't
16  you?
17      A.  And -- yes, that's true.
18      Q.  And lawyers, some lawyer or some person --
19  some person will prepare a unanimous consent and
20  circulate it among the members of the board, and you
21  sign them and that goes to the secretary of the
22  corporation; correct?
23      A.  Yes, and those requests for unanimous
24  decision come with an underlying documentation, which
25  gives the background to the decision to be taken, and

Page 167

1  if there are discussions around that topic, then they
2  are taking place between the peoples involved on a
3  one-to-one basis or in groups, if necessary, based on
4  the supporting documentation for the decision.
5      Q.  Okay.  Okay.  When was the last time you
6  remember ever having one of those discussions that
7  resulted in acting on business in Syngenta Crop
8  Protection?  When was the last time?
9      A.  I -- I don't remember it precisely:  a
10  couple of months ago, probably.
11      Q.  Did you have one in 2010?
12      A.  I guess so, from the top of my head.
13      Q.  Do you remember -- do you remember what it
14  was?
15      A.  I think it was about data compensation.
16      Q.  Data?
17      A.  Data compensation settlement -- dispute
18  settlement which we had to approve as a board.
19      Q.  Okay.  And did you pass a resolution?
20      A.  We did pass a resolution.
21      Q.  And you signed it?
22      A.  I did sign it.
23      Q.  Okay.  When -- how many of those meetings
24  did you have in 2009?  How many of those --
25      A.  Resolutions.

Page 168

1      Q.  -- resolutions or meetings?
2      A.  I couldn't tell you the exact number.
3  A series of them.
4      Q.  Has the Syngenta Crop Protection
5  Incorporated board ever met in Basel?
6      A.  No.
7      Q.  Has the Syngenta Crop Protection
8  Incorporated board ever refused to adopt a Syngenta AG
9  global policy?
10      A.  From the best of my recollection, no.
11      Q.  Has, to your knowledge, Syngenta Crop
12  Protection Inc. adopted every single Syngenta global
13  policy put before it?
14      MR. POPE:  Objection to the form of the
15  question. No foundation.
16      THE WITNESS:  Was the question referring to
17  the board of Syngenta Crop Protection Inc. or --
18  BY MR. TILLERY:
19      Q.  The board.  The board.
20      A.  No, not to the best of my knowledge.  No.
21      Q.  That's at least been the case for the
22  years that you've been there on the board; correct?
23      MR. POPE:  Objection.
24      THE WITNESS:  As I said, to the best of my
25  knowledge, that's how I can answer it.

Page 169

1  BY MR. TILLERY:
2      Q.  Right.  And you've been on there, I think
3  you said -- I think you said from --
4      A.  2003/2004.
5      Q.  2004.  At least since 2004, the Syngenta
6  Crop Protection Incorporated board has never refused to
7  adopt a Syngenta global policy?
8      MR. POPE:  Objection to the form of the
9  question.
10  BY MR. TILLERY:
11      Q.  Is that right?
12      MR. POPE:  Lack of foundation.
13      THE WITNESS:  To the best of my recollection,
14  the answer to that question is no.
15  BY MR. TILLERY:
16      Q.  The answer is no?
17      A.  It has never rejected.
18      Q.  All right.  Are there minutes of -- of
19  these meetings or resolutions passed?
20      A.  There are.
21      Q.  And who keeps the minutes?
22      A.  The secretary.
23      Q.  Is that Elizabeth Quarles?
24      A.  Yes.
25      Q.  Are the reports of those meetings sent to

43 (Pages 166 to 169)

Exhibit 002 Page 43
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

---

Page 170

1  Syngenta AG?
2        A.  To the extent that I know, not.
3        Q.  Have you ever abstained from a vote of the
4  Syngenta Crop Protection Inc. board of directors on the
5  ground of a conflict of interest?
6        MR. POPE:   Objection to the form of the
7  question.
8        THE WITNESS:   To the best of my recollection,
9  no.
10 BY MR. TILLERY:
11       Q.  Have you ever seen any situation in your
12 years associated with the Syngenta AG companies where
13 there has been any issue regarding a conflict between
14 the best interests of Syngenta AG and the best interests
15 of any of the subsidiary entities on boards that you sit
16 on?
17       A.  I don't think so.
18       Q.  Would it be fair to say that you've never
19 been placed in a position of conflict because all of the
20 Syngenta companies are working for a common -- common
21 and unified organizational interest?
22       MR. POPE:   Objection to the form of the
23 question.  Argumentative.
24       THE WITNESS:   On -- I can only answer it on
25 that generic level:  no.

---

Page 171

1  BY MR. TILLERY:
2        Q.  They're not working on -- for a common
3  goal --
4        A.  Sorry, maybe I was confused.  I was not
5  saying that.  I did not want to say that.  They are
6  working for a common goal --
7        Q.  They are working for a common goal?
8        A.  I think that's pretty obvious, yes.
9        Q.  And that's one of the reasons you've never
10 been placed in a conflict, isn't it?
11       A.  A globally active group of companies has
12 to be aligned amongst its pieces, I guess.  That's what
13 shareholders request us to do.
14       Q.  All right.  Could you tell me about
15 Syngenta Crop Protection AG and what its function is?
16       A.  Syngenta Crop Protection AG is the legal
17 entity operate -- under which the crop protection
18 activities in Switzerland are operated by -- and by
19 "in Switzerland", I mean the global functions dealing
20 with the crop protection business located in Switzerland
21 and their staff members are employed by Crop Protection
22 AG.
23       Q.  How many people do they have working at
24 AG?
25       A.  I couldn't tell you the exact numbers.  It

---

Page 172

1  must be hundreds, at least.
2        Q.  Are they in a different building than
3  you're in?
4        A.  Yes, they are.
5        Q.  And is there any indication that their
6  entity there is Syngenta Crop Protection AG as compared
7  to Syngenta?
8        A.  By "indication", you mean --
9        Q.  A big sign on the front that says
10 "Syngenta Crop Protection AG"?
11       A.  You will find some of these signs in the
12 hallways and so on, but not --
13       Q.  Have you ever seen one in the hallway that
14 says "Syngenta Crop Protection"?
15       A.  I have -- over the years, I have seen
16 posters and the likes with that in there, of course, but
17 formal signage of the building as "This is the building
18 of Syngenta Crop Protection AG" I'm not aware of, if
19 that's the question.
20       Q.  Tell me the last time you saw a sign in
21 any Basel entity -- any -- strike that.
22       Tell me the last time you saw a sign in any
23 Basel building telling you that it was a particular
24 entity, like Syngenta Crop Protection AG?
25       MR. POPE:   Well, it doesn't necessarily have

---

Page 173

1  to own the whole building, Steve.  I object to the form
2  of the question.
3  BY MR. TILLERY:
4        Q.  Part of it.
5        A.  Look, I come across the name Syngenta Crop
6  Protection AG and other legal entity names on
7  letterheads, and so on, all over the place, and -- and
8  on -- on product-related material, and so on, you can
9  find it.  If you ask me precisely when was the last day
10 I stepped in front of a signage of that sort, I couldn't
11 answer that question.
12       Q.  Are you the president of the board?
13       A.  I'm the chairman of the board, as we call
14 it, yes.
15       Q.  The chairman.  And the two other board
16 members?
17       A.  Are John Atkin and John Ramsay.
18       Q.  John Atkin is the chief operating officer
19 of Syngenta's global crop -- crop protection business?
20       A.  That's correct.
21       Q.  And all three directors of Syngenta Crop
22 Protection AG are also members of Syngenta AG's
23 executive committee?
24       A.  That is correct.
25       Q.  Do all members of Syngenta AG's executive

---

44  (Pages 170 to 173)

Exhibit 002 Page 44
14e2e5f3-c6e-4838-a1d5-331c25424516

Maeder, Christoph            10-14-2010
Confidential

Page 174

1  committee sit on one or more boards of Syngenta AG
2  subsidiaries?
3        A.   All but one or two, from the top of my
4  head. I'm not sure about -- I'm not -- I cannot give
5  you the answer with the last precision.
6        Q.   Okay.
7        A.   I would assume they are, in one at least,
8  but don't -- don't take this for granted.
9        Q.   Does the board of directors of Syngenta
10 Crop Protection AG hold meetings?
11       A.   We do not hold formal meetings where we
12 are all in present.
13       Q.   Are they done by -- you know, by consent?
14       A.   Right.
15       Q.   What is the relationship between Syngenta
16 Crop Protection AG and Syngenta Crop Protection Inc.?
17       A.   There is no direct relationship in terms
18 of shareholding/parent/subsidiary relationship. They
19 are part of the same group of companies under the roof
20 of Syngenta AG in legal terms.
21       Operationally, the global functions of
22 crop protection -- of the crop protection business are
23 mostly comprised within Syngenta Crop Protection AG.
24 John Atkin and his key staff members are -- John Atkin
25 himself not, but his key staff members are -- are

Page 175

1  employees of Syngenta Crop Protection AG.
2        Q.   Do you know if, for example, Syngenta Crop
3  Protection AG has dealings with issues involving
4  atrazine?
5        A.   In the context of its global involvement
6  in product research and development, yes.
7        Q.   Do they make decisions about atrazine
8  research?
9        A.   Since atrazine is an old compound,
10 research -- frontline research activities are pretty
11 minimal around atrazine, as far as I can see, so the
12 answer to that question is, I don't know whether there
13 are any significant decisions to be made around research
14 in atrazine at all.
15       Q.   Is John Atkin the chief operating officer
16 of Syngenta AG's global crop protection business?
17       A.   Right.
18       Q.   Can you tell me the logic behind having
19 the chief operating officer of Syngenta AG's global
20 crop protection business sitting on the boards of
21 multiple Syngenta AG crop protection subsidiaries?
22       MR. POPE:   Objection to form of the question.
23       THE WITNESS:   The logic is, from my
24 perspective, to be seen in -- in his role as the global
25 COO of the business, i.e., his intimate knowledge of the

Page 176

1  business aspects of that global business and, therefore,
2  his contribution he can make as a board member of some
3  of the more important operating units in a given
4  country.
5  BY MR. TILLERY:
6        Q.   It's also to manage and coordinate the
7  global business; right?
8        A.   That is part of it.
9        THE VIDEOGRAPHER:   So sorry, I need to change
10 the tape.
11       MR. TILLERY:   I'm sorry, I forgot all about
12 you.
13       THE VIDEOGRAPHER:   Going off the record, the
14 time is 14:10. End of tape 2, volume I in the
15 videotaped deposition of Christoph Maeder.
16 (2:10 p.m.)
17             (Break taken.)
18 (2:23 p.m.)
19       THE VIDEOGRAPHER:   Here begins videotape
20 number 3, volume I in the videotaped deposition of
21 Christoph Maeder. Going on the record. The time is
22 14:23. Thank you.
23 BY MR. TILLERY:
24       Q.   Can you tell me about how research is
25 shared among Syngenta AG subsidiaries?   And I say

Page 177

1  "research"; I don't mean to necessarily limit it to the
2  core issues or compounds in this litigation. I'm
3  talking about the -- just general scientific research
4  or -- how is is -- how is it done? How is this information
5  shared?
6        A.   How is it done first, maybe.
7        Q.   Okay.
8        A.   In our industry, we make a differentiation
9  between research and development. Research in the
10 chemicals business -- and I'm talking chemicals business
11 now only, and not seeds, because we are active in seeds
12 as well, which is a totally different research affair,
13 if I may say so.
14       The chemicals business research centers around
15 the development -- sorry, the invention, I should say,
16 because development is something else, the invention of
17 active ingredients, i.e., molecules, which are then,
18 through several development processes after they have
19 been invented by research, are brought into a saleable
20 form in the form of a product, which means formulation,
21 packaging, adjuvants, other ingredients, and so on.
22       So -- but research centers around the invention
23 of molecules, new molecules, that is done within
24 Syngenta in a series of global -- as we call them,
25 global research sites, the most important of which are

45 (Pages 174 to 177)

Exhibit 002 Page 45
14e2e5f3-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 178

1  located in Switzerland, the United Kingdom, the
2  United States, China, to a degree in India, something in
3  Singapore.  That is the research side to it.
4       These -- these molecules are then further
5  developed through development activities into final
6  products, as I said, and that means they need to be
7  adapted to the needs of the local markets, the local
8  customers.
9       That is dependent, of course, on climate,
10 dependent on the fauna, the plants to be treated, and,
11 therefore, that is -- development activities, there
12 is -- in an initial phase, there is a global -- a global
13 aspect to it, but then it goes more into a local
14 territorial aspect, and it needs to be done then in a
15 dispersed way around the globe.  That is a basic, broad
16 generic overview.
17      Q.  So if -- if some research were undertaken
18 in one of these locations that you've -- you have
19 mentioned and that research benefited more than one
20 subsidiary -- in other words, the work related to a
21 product that was being sold by multiple different
22 subsidiaries, how would that research or the findings,
23 conclusions or data or any of this stuff be shared by
24 the entities who would find it of interest to their
25 products?

Page 179

1       A.  Who would find, excuse me?
2       Q.  Who would find it of interest to their
3  products?
4       A.  Of interest.  Excuse me, I didn't get
5  that.  Okay.  Those subsidiaries would -- would market
6  products which they, together with global research and
7  development, develop for the purposes of their local
8  market based on intercompany agreements where they
9  are -- where they are getting supplied with -- with the
10 products who are -- are or -- might or might not be
11 manufactured in their respective territories which
12 normally are being formulated and packed in the
13 respective territory, labeled and registered in the --
14 in the local markets, and they would distribute those
15 products based on intercompany arrangements.
16      Q.  Would the -- would -- if they did research
17 studies or they had funded research studies, would -- is
18 there any way, any policy for sharing the results of
19 research or studies among companies and entities?
20      A.  Again, this may be a distinction to be
21 made between R&D --
22      Q.  Right.
23      A.  Research and development.  You are talking
24 about studies.  You are probably referring mainly to
25 development studies --

Page 180

1       Q.  Right.
2       A.  -- environmental studies, toxicology
3  studies --
4       Q.  Yes, that's right.
5       A.  -- animal studies, and so on, health
6  studies.
7       The results of these studies are relevant on a
8  global basis basically by their nature, because
9  registration authorities around the world who are
10 registering our products based on the results of these
11 studies, they want to be informed as a matter of
12 mandatory rules about findings around these compounds
13 wherever they occur.
14      So in the lifecycle of a product, we have to --
15 we have to support our product registrations with the
16 respective scientific data out of these studies.  If we
17 have findings around these studies, they need to be
18 reported to the registration authorities in territories
19 outside of the country where they have been produced as
20 a matter of -- of registration law, basically.
21      So study data is of global relevance by its
22 sheer nature --
23      Q.  Is there any --
24      A.  -- as a -- as a -- as a general comment.
25      Q.  And we have talked about this in the

Page 181

1  general context.  In terms of specifics, in terms of
2  science relating, let's say, to atrazine as the compound
3  to be used as stand-alone product or in a mix, is there
4  any limitation that would be placed upon any one of the
5  subsidiaries' access to information about atrazine?
6       A.  Not that I am aware of.
7       Q.  From -- from what you understand, would
8  there be any limitation placed on Syngenta's --
9  Syngenta Crop Protection Inc.'s ability to obtain
10 documents from Swiss entities relating to atrazine?
11      MR. POPE:  Again, you are talking about
12 research-type information?
13 BY MR. TILLERY:
14      Q.  Yes, I'm talking about studies, science,
15 anything like that at all?
16      A.  Not that I know.
17      Q.  You're not aware of any --
18      A.  I'm not aware of -- I'm not positively
19 aware of either of the possibilities.
20      Q.  So, as far as you know, there's no
21 limitation on their ability to obtain documents relating
22 to that product?
23      A.  I am not aware of those, which is to say
24 I don't know the precise answer to your question.
25      Q.  What does Syngenta International AG do?

46 (Pages 178 to 181)

Exhibit 002 Page 46
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph          10-14-2010
Confidential

Page 182

1      A.  Syngenta International AG, as we call it,
2  is the management company for the group management,
3  i.e., it is the legal entity employing the Syngenta
4  executive committee members plus some of their corporate
5  staff members.  For example, my corporate legal people
6  are all employed by Syngenta International AG.  So it's
7  group executive committee and staff, core staff,
8  basically.
9      Q.  How many people are employed by Syngenta
10 International --
11     A.  I couldn't tell you the exact number --
12     MR. POPE:  Let him finish his question,
13 please.
14 BY MR. TILLERY:
15     Q.  Syngenta International AG?
16     A.  I couldn't tell you the exact number.
17 My guesstimate is around a number of about 100.
18     Q.  Okay.  What role does Syngenta
19 International AG play within the Syngenta network of
20 companies?
21     MR. POPE:  Objection.  You said -- in addition
22 to what he's already testified to?
23 BY MR. TILLERY:
24     Q.  Yes, in addition.
25     A.  Since it is the -- home of the group

Page 183

1  executive committee and their respective core staff
2  members, it is what I would call the coordination center
3  for the -- for the Syngenta group.
4      Q.  Why -- why a separate group, Syngenta
5  International AG, as opposed to Syngenta AG and having
6  the same group of people in Syngenta AG?
7      A.  First of all, I know from the history that
8  the concept of having a separate entity where that has
9  been taken over from the Novartis model at the time of
10 the creation of Syngenta.  Novartis had the same
11 structure for the group executive committee and their
12 staff members.  That is the historic explanation of it.
13 The fact that Syngenta AG, the ultimate holding company,
14 does not have personnel is absolutely a usual concept
15 for Swiss-listed entities, corporations.
16     Q.  You made a comment about the
17 coordination -- not coordination, strike that.
18     You made a comment about this following,
19 effectively, Novartis, in terms of the model and
20 Novartis International AG.  What differences, in terms
21 of management structure, took place after Syngenta was
22 created than the Novartis model?  What was different
23 about it?
24     A.  There are many differences probably you
25 could refer to if you looked at the more detailed level

Page 184

1  of things.  The broad structure of having a holding
2  company which is the listed company with divisional
3  entities being concerned with the respective businesses
4  and having a group management company and some
5  intermediate holding company is comparable to the one of
6  Novartis.
7      Q.  Does Syngenta International AG have any
8  business relationship with Syngenta Crop
9  Protection Inc.?
10     A.  Not in terms of product-related business
11 interactions whatsoever.
12     Q.  No ownership interest?  In other words,
13 there is no direct or indirect line?
14     A.  Syngenta International AG has,
15 from memory, no subsidiary whatsoever underneath.
16     Q.  Is it only located in Basel?
17     A.  Yes, that's correct.
18     Q.  Does Syngenta International AG only do
19 business with and for other Syngenta entities?
20     A.  Sorry, can I --
21     Q.  Sure, of course.
22     A.  Say that again, excuse me.
23     Q.  Does Syngenta International AG only do
24 business with or for other Syngenta entities?
25     A.  Syngenta International AG can be the party

Page 185

1  to a contract with a third party as well in the context
2  of a financial transaction, financial market
3  transaction, in the context of an M&A transaction, but
4  in terms of the product market we are talking about for
5  Syngenta, Syngenta International AG doesn't take part in
6  the commercial activities of the group.
7      Q.  So as a practical matter, whether or not
8  it could engage in other types of business outside the
9  Syngenta umbrella of entities, it restricts itself to
10 working with or in connection with Syngenta entities?
11     A.  That's a fair description.
12     Q.  Michael Mack, John Ramsay and you are the
13 board of directors?
14     A.  That's correct.
15     Q.  Michael Mack is president of the board?
16     A.  Sorry, chairman --
17     Q.  Chairman.
18     A.  -- of the board.
19     Q.  Does the board of Syngenta International
20 AG hold meetings?
21     A.  Not physical meetings.
22     Q.  Does it by --
23     A.  By written resolutions.
24     Q.  -- written consent.  Syngenta
25 Participations AG, could you tell me what it does?

47 (Pages 182 to 185)

Exhibit 002 Page 47
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph            10-14-2010
Confidential

Page 186

1        A.   Syngenta Participation AG is basically an
2   intermediate holding company which has no direct
3   business activities, other than holding interests in
4   other Syngenta entities, on the one hand, and being the
5   owner of some intellectual property, on the other.
6        Q.   And in terms of intellectual property
7   rights, does it hold, for example, the patents with
8   respect to certain compounds?
9        A.   It does hold the patents of certain
10  compounds.
11       Q.   If we were talking about Syngenta Crop
12  Protection Inc., would compounds that it uses or sells
13  that are patented --
14       A.   Yes.
15       Q.   -- would -- would those patents --
16       A.   Some of them, not all of them.
17       Q.   Of course.  Would the ones that it has --
18  that its patent -- where the patents exist, would those
19  patents be held by Syngenta Participations AG?
20       A.   Some would, yes.
21       Q.   What are the exceptions to that?
22       A.   These are basically historic constructs.
23  Some of the intellectual property of Syngenta as a whole
24  is, for historic reasons, held in Switzerland or in the
25  United States or in the UK predominantly.  These are

Page 187

1   the countries where the main patents are being held.
2   That is the history of Syngenta and its predecessor
3   companies, how at the time this intellectual property
4   was created and funded.
5        Q.   And it basically stayed the same with the
6   creation of Syngenta Corporation?
7        A.   We did some transfers of intellectual
8   property rights, but the basic structure was reflecting
9   the historic portfolio of -- of holdings of intellectual
10  property plus what was coming subsequently in the
11  ten years since Syngenta existed, yes.
12       Q.   Do you know how many employees Syngenta
13  Participations AG has?
14       A.   I don't think that Syngenta Participation
15  AG has any employees.
16       Q.   Does it have offices outside of Basel?
17       A.   No.
18       Q.   As far as you know, it only does business
19  with other Syngenta companies?
20       A.   That's correct.
21       Q.   It has three members of its board --
22  Peter Schreiner, John Ramsay and you?
23       A.   I think that's correct, yes.
24       Q.   And you're the chairman --
25       A.   Chairman.

Page 188

1        Q.   -- of the board?
2        A.   Yes.
3        Q.   Is Peter Schreiner also on the board of
4   Syngenta AG?
5        A.   No.
6        Q.   To your knowledge, has there ever been
7   anything but a unanimous consent vote by the boards of
8   directors of any of the Syngenta subsidiaries?
9        MR. POPE:   Objection.  That's an awful lot
10  of --
11       THE WITNESS:   I can't answer that question.
12  BY MR. TILLERY:
13       Q.   Because you don't sit on --
14       A.   I don't know.  Of course.
15       Q.   Well, let's put it this way:  for the ones
16  you sit on, the boards that you sit on, the
17  subsidiaries, has there ever been in any of them
18  anything but unanimous consents?
19       A.   I do not have an active recollection of
20  that --
21       Q.   Do you recall --
22       A.   -- of a case where this was not the case.
23       Q.   Okay.  So just to clear up our record, to
24  make sure we're --
25       A.   Yes, that's fine.

Page 189

1        Q.   Your recollection is that the boards
2   you've sat on, they've all been handled by consent, the
3   meetings have been handled by consent, of all the
4   subsidiaries on which you serve as a board member?
5        A.   If you mean by unanimous written
6   consent --
7        Q.   That's what I mean.
8        A.   The answer is no, because we are holding
9   physical, by telephone most of the time, board meetings
10  of Syngenta Corporation, the US holding company.
11       Q.   Okay.  And that is a -- that is a
12  subsidiary as well?
13       A.   That is a subsidiary of Syngenta
14  Participation AG.
15       Q.   So is Syngenta Corporation the only
16  exception?
17       A.   That is the exception I am --
18       MR. POPE:   Of the boards he sits on.
19       THE WITNESS:   Of the boards I am sitting on,
20  yes.
21  BY MR. TILLERY:
22       Q.   Okay.  Syngenta Corporation has meetings
23  by phone?
24       A.   It has meetings by phone, yes.
25       Q.   And who is on the board of Syngenta

48  (Pages 186 to 189)

Exhibit 002 Page 48
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                 10-14-2010
Confidential

Page 190

1  Corporation?
2      A.  Okay.  Let me try to get that together.
3  It's John Ramsay and myself, Vern Hawkins, Cheryl Quain,
4  David Morgan and Jason Fogden.
5      Q.  Are each of those people, in one way or
6  another, employed by a Syngenta company?
7      A.  All of them are.
8      Q.  Has there ever been a board meeting -- as
9  you say, you have these meetings -- where the vote was
10  less than unanimous?
11      A.  There have been board meetings where we
12  had dissenting opinions reflected in the discussion, but
13  finally we found a majority or a unanimous vote on
14  things.
15      Q.  And -- and were those votes recorded in
16  the record?  Were they actually recorded?
17      A.  I don't remember.
18      Q.  And all of the other ones that you have
19  sat on, besides the board of Syngenta Corporation, all
20  of the business has been transacted by unanimous written
21  consent of the board members?
22      MR. POPE:  In accordance with the process he
23  talked about earlier.
24      MR. TILLERY:  I don't know what that was.
25  BY MR. TILLERY:

Page 191

1      Q.  But I was just asking you, of the boards
2  where you've sat on Syngenta subsidiary companies, other
3  than Syngenta Corporation that you've just described to
4  me, have they all been handled, that is, the board of
5  directors meetings, by unanimous written consent?
6      A.  Of the companies I am sitting actually on
7  the board of, except Syngenta Corporation, that is, to
8  the best of my memory, the case.
9      Q.  Thanks.
10      A.  I might add that, it seems to me that,
11  in the very early days, with respect to Syngenta
12  International AG, there have been one or the other
13  exceptions, but many years ago.  I -- I'm not sure if my
14  memory helps me, really, but I kind of seem to remember
15  something of that sort.
16      Q.  What does Syngenta Finance AG do?
17      A.  Syngenta Finance AG is a company
18  headquartered in Switzerland, which has, again, no
19  employees, to the best of my knowledge, but is -- is
20  used as a financial vehicle in the context of the
21  funding of the corporation as a whole.
22      Q.  What -- what role does it play with the
23  other entities?
24      A.  It is part of the -- of the global funding
25  of Syngenta as a company.  It plays a role, as far as

Page 192

1      I recollect, in capital market transaction, and so on,
2  but it has no direct business involvement in the daily
3  operations of the other entities.
4      Q.  Does it have any business relationship
5  with Syngenta Crop Protection Inc.?
6      A.  I couldn't tell you with certainty whether
7  there is any -- any of that.
8      Q.  Does it have offices outside of Basel?
9      A.  No.
10      Q.  And does it have employees?
11      A.  Not to my knowledge.
12      Q.  It has three directors.
13      A.  That is my recollection.
14      Q.  And those include you and Peter Schreiner?
15      A.  It includes me and Schreiner, that's for
16  sure.  I couldn't tell you the third one at this point
17  in time.
18      Q.  And Syngenta Agro AG; could you tell me
19  about that entity?
20      A.  I can.  Syngenta Agro AG is the entity
21  which hosts the Swiss operational business for the
22  Swiss market located in a place outside of Basel
23  in another part of Switzerland called Dielsdorf,
24  D-I-E-L-S-D-O-R-F, and it's an entity which is the --
25  has as its predecessor a company which at one point in

Page 193

1  time was acquired, and that's why the Swiss business is
2  not in Basel but is outside of Basel and it serves the
3  purposes of the Swiss market.  And I'm on the board
4  of that company in my capacity as the head of
5  Switzerland.
6      Q.  Does Syngenta Agro AG have any
7  relationship with Syngenta Crop Protection Inc., to your
8  knowledge?
9      A.  To my knowledge, I don't think they have a
10  direct relationship.
11      Q.  Does Syngenta Agro AG only do business
12  with other Syngenta entities?
13      A.  No, they do business with customers.
14      Q.  How many directors are on that board?
15      A.  I think it's three as well, from memory.
16      Q.  You, Mr. Schreiner and someone else?
17      A.  Exactly.  That is my recollection.
18      Q.  Were you involved in the discussions
19  regarding the naming of Syngenta?
20      A.  I was involved, yes.
21      Q.  The name was designed to call up the word
22  "synergy"?
23      A.  Not -- not directly, no.  It was -- the
24  first three letters, "syn", was -- was a reference to
25  several, I guess, Greek words which the naming agency

49 (Pages 190 to 193)

Exhibit 002 Page 49
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                 10-14-2010
Confidential

Page 194

1  who developed that name did -- synergy, synthesis was
2  another reference, and it was that notion of synthesis,
3  bringing things together, which was really dominating
4  that part of the name.
5      Q.   Your website says the Greek word, as you
6  say, "syn", reflects synergy and synthesis, integration
7  and consolidating strengths.  That's the same way -- the
8  same thing you said?
9      A.   That's exactly what it is.
10     Q.   Right.  In numerous employee, shareholder
11 and other documents, Syngenta discusses the value of
12 synergy and what synergy brings to the company.  Is it
13 fair to say that the image Syngenta seeks to protect is
14 that Syngenta is a highly integrated corporate organism
15 that works across traditional corporate boundaries to
16 achieve common goals?
17     A.   I think that is a fair statement.  The
18 main -- there are several complex elements to that,
19 I would guess.  The main one I can think of of such a
20 statement is around bringing different aspects of the
21 agribusiness together for the benefit of the customer,
22 and the synergy in that sense occurs particularly at the
23 customer levels through an integrated offer of different
24 technologies -- crop protection, seed, seed treatment,
25 traits, and so on, genetic traits.

Page 195

1      Q.   It also applied to the employees who --
2  and I think at one point there is a reference to the
3  fact the employees -- to make employees feel they are
4  part of an integrated whole?
5      A.   Employees feeling part of an integrated
6  agribusiness company is part of our corporate identity
7  effort, no doubt.
8      Q.   In your 2002 SEC filing, you informed
9  shareholders that Syngenta -- I'm quoting -- manages
10 its supply chain globally on a product-by-product basis
11 from raw materials through delivery to the customer.
12 Does this mean that there's a global control and
13 coordination of supply chains for products?
14     A.   We are operating our supply chain on a
15 global basis, which is to say that there is a central
16 coordination and direction for global supply operations
17 throughout the organization, but it takes a lot of
18 different steps of course to then -- to the point where
19 the products finally end up with the customer, which is
20 done from a local basis through our legal entities in
21 the territories.
22     Q.   Syngenta has informed its shareholders of,
23 and I'm quoting, an accelerated synergy program, that's
24 April 2002 SEC filing at page 10.  Are you familiar with
25 that and the comment?

Page 196

1      A.   Since this is 2002, you said?
2      Q.   Right.
3      A.   I would guess this refers to the fact that
4  at the time, in the furtherance of the merger, which
5  took place by the end of -- at the end of 2000, we were
6  still in the phase of consolidating our capacity
7  throughout the globe, and this -- the main contribution
8  to the synergies realized through the Syngenta merger
9  came -- on cost base came through the consolidation of
10 our production base, which had, of course, overlaps and
11 duplication through the fact that there were two fully
12 operating global supply operations before the merger,
13 and that took years to get those synergies, and so in
14 2002 that's still I guess a reference to that program
15 initiated at the merger, or which was a program -- a
16 multi-year program.
17     Q.   What was the operational program -- strike
18 that.
19         What is the operational program called
20 "operational efficiency"?
21     A.   I don't have a precise recollection.
22     Q.   It's in your financial report, 2006, at
23 page 54, and I didn't know what it meant.  It's an
24 operational --
25     A.   We had, in the context -- excuse me.

Page 197

1      Q.   Go ahead, sir.
2      A.   In the context of the years since the
3  creation of Syngenta, we had a series of bigger and
4  smaller efficiency improvement programs, as you would
5  expect, and this is referring to one of those.  I have
6  no precise recollection which one it refers to in 2006.
7      Q.   When you receive a communication from
8  anybody at any -- or from anybody in a related entity,
9  a Syngenta-related entity, do they ever send you
10 anything at any location other than Basel, at
11 Syngenta AG International?
12         MR. POPE:   Excuse me, excuse me, excuse me.
13 The last couple of words in your question --
14         MR. TILLERY:   I can start over.
15         MR. POPE:   It's confusing.
16 BY MR. TILLERY:
17     Q.   What I'm trying to find out is, do you get
18 communications addressed to you in any capacity other
19 than at your role in -- at Syngenta AG or Syngenta
20 International AG?
21         MR. POPE:   Objection.  There's two different
22 questions.  Go ahead.  You can answer.
23         THE WITNESS:   I get --
24 BY MR. TILLERY:
25     Q.   Emails, letters --

50  (Pages 194 to 197)

Exhibit 002 Page 50
1e2e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                10-14-2010
Confidential

Page 198

1      A.  If I'm getting emails, they come in
2  through my email address, which is always the same.
3  I don't have different Syngenta email addresses.  I do
4  not have two or more offices I occupy, other than the
5  one in Basel, and so if that's the background of the
6  question, they all come in to the same location.
7      If I am sent a request for a written content in
8  my capacity as a director of a -- of a company not
9  located in Basel, it's addressed in that form to me, but
10  it comes to my office address in Basel.
11      Q.  I'm looking at the 2006 financial report.
12  Syngenta's shareholder communications also state that
13  Syngenta has "control" and "power" over all of its
14  subsidiaries "to govern the financial and operating
15  policies" of those subsidiaries.  Is that true?
16      A.  Inasmuch as -- as this is referring to the
17  fact that on the -- the relevant accounting rules, we
18  are compelled to have and manage consistent rules and
19  reporting processes throughout the corporation.  This is
20  correct.
21      Q.  Does Syngenta AG ultimately approve the
22  public relations with respect to atrazine?
23      MR. POPE:  Syngenta?
24      MR. TILLERY:  AG.
25      THE WITNESS:  Syngenta AG has no personnel.

Page 199

1  Therefore, it doesn't approve anything of that sort.
2  BY MR. TILLERY:
3      Q.  Does the Syngenta executive committee or
4  any other committee created by Syngenta AG through the
5  merger or through its creation ever have any involvement
6  with the public relations related to atrazine?
7      A.  I'm not sure I can answer that question
8  specifically with respect to atrazine.  Public relation
9  activities in the group which are of relevance for the
10  group beyond a certain territory, i.e., which have a
11  global relevance, are being approved by the corporate
12  communications department in Basel at headquarters and
13  are reviewed by the CEO, in any case.
14      Q.  And what is the corporate communications
15  department?
16      A.  Corporate communications department, or,
17  as we -- as it's called -- technically in our case it's
18  corporate affairs department, is comprised of three
19  pillars:  one is internal communication, the other is
20  external communication -- four, actually:  internal
21  communication, external communication, media relation --
22  sorry, public affairs, public governmental affairs, and
23  the fourth pillar is investor relations.  Those
24  corporate functions are together forming the corporate
25  affairs department.  That is where every piece of

Page 200

1  communication of global relevance is getting reviewed.
2      Q.  Does Syngenta International AG, does it
3  consider atrazine to have global relevance?
4      A.  As you can see from our SEC filings, the
5  key litigation cases in our business are all considered
6  of relevance on a global basis, amongst which also one
7  case is atrazine.
8      Q.  So putting those pieces together, it would
9  seem that public relations regarding atrazine would fit
10  the criteria for being considered by one of the
11  committees of -- associated with Syngenta AG?
12      MR. POPE:  You mean including the litigation?
13      MR. TILLERY:  I'm sorry?
14      MR. POPE:  You mean including the litigation
15  aspects?
16  BY MR. TILLERY:
17      Q.  I mean you tell me:  litigation or not?
18      MR. POPE:  He just made -- he just made a
19  distinction is all I'm saying.
20      THE WITNESS:  Atrazine per se as a topic does
21  not mean that everything which is communicated
22  throughout the world around atrazine is per se global
23  affair.  That's not the case.  It has to meet the same
24  test of criteria as any other topic in the communication
25  arena, whether it's a global matter or not.

Page 201

1  BY MR. TILLERY:
2      Q.  But human health facts, safety, would
3  those things have global significance?
4      A.  Again, only to the extent the relevant
5  problem or issue or question covered in that public
6  relations statement, as I like to call it, only to the
7  extent that topic has, in the given case, a material --
8  has a material importance for the group as a whole.
9      Q.  Has there --
10      A.  Not because it's product A or B.
11      Q.  Has there -- I'm sorry.
12      A.  Topic A or B.  I cannot think of many
13  topics except dividend proposals, for example, where
14  every communication has, of course, a relevance to
15  shareholders on a global basis, but business topics are
16  not of that sort.  Not every acquisition is a global
17  matter.
18      Q.  Have you ever sat on any of the
19  Syngenta AG committees -- and I don't mean to include
20  the boards of subsidiaries; I mean any of the
21  committees -- and taken up any issues at any time
22  dealing with public relations issues relating to
23  atrazine?
24      A.  We have been updated from time to time
25  about the status of atrazine-related matters, also with

51 (Pages 198 to 201)

Exhibit 002 Page 51
14e2e2f5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 202

1  respect to litigation --
2     Q.  Yeah, but litigation, I -- you can't
3  really talk about that to me.
4     A.  That's right.
5     Q.  I understand that.
6     A.  Absolutely right.  In the broad context,
7  we have been updated on -- on -- let me phrase it this
8  way:  we are getting high-level updates in the context
9  of our business strategy reviews on product aspects as
10 they come along, and I guess there have been, over the
11 years, instances where also atrazine has been part of
12 that.  Whether that has been around publication outside
13 of -- of litigation, I couldn't tell you from the top of
14 my recollection.
15    Q.  What corporations operate in Syngenta's
16 NAFTA region?
17    A.  A series of.  I can name you a few of
18 them:  Syngenta Crop Protection Inc.; Syngenta
19 Seeds Inc.; there is Syngenta -- SBI, Syngenta
20 Biosciences Inc.; there are companies still around from
21 the former acquisitions of businesses like
22 Golden Harvest, like other acquisitions -- there are a
23 series of smaller companies.  The big -- Syngenta
24 Corporation, of course.  There are a series of companies
25 in the United States.

Page 203

1     Q.  Is there a Syngenta-affiliated company in
2  Canada and Mexico?
3     A.  Yes, there are.
4     Q.  And what are they?
5     A.  Syngenta Canada Inc. or Corporation and
6  Syngenta Mexico something, from recollection.  There
7  might be others.  These are the big ones.
8     Q.  Is it fair to say that the control over
9  the NAFTA area is centralized in the United States?
10    A.  That is, in terms of the managerial -- in
11 terms of the managerial supervision, that is true.
12    Q.  Which corporation is in charge of the
13 NAFTA geographical segment of Syngenta's business?
14    MR. POPE:  Objection to the form of the
15 question.  Foundation.
16    THE WITNESS:  Sorry, can you rephrase that?
17    MR. POPE:  She can read it back.
18    THE WITNESS:  Excuse me.  Can you repeat the
19 question?  I'm not sure I understood it.
20 BY MR TILLERY:
21    Q.  Is Syngenta Crop Protection Inc. in charge
22 of the NAFTA geographical segment of Syngenta's
23 business?
24    A.  To my knowledge, it's only in charge for
25 the United States.

Page 204

1     Q.  Is all of the research and development
2  data from NAFTA-related Syngenta companies under the
3  control of Syngenta Crop Protection Inc.?
4     A.  I would assume this to be the case, with
5  except to research and development related data, which
6  only refers to Canada and/or Mexico.
7     Q.  Do you know if there is any such research
8  and development related data which is only limited to
9  Canada and Mexico?
10    A.  I would assume so, for the purposes of the
11 local registration of products.
12    Q.  Do you know if Syngenta Crop
13 Protection Inc. has written agreements with Syngenta
14 companies located in Canada and Mexico?
15    A.  I couldn't answer that question with any
16 precision.  I don't know actively.
17    Q.  Is the NAFTA region designed to operate as
18 a fully aligned organization using the minimum amount of
19 resources to meet the region's goals?
20    MR. POPE:  Objection to the form of the
21 question.
22    THE WITNESS:  I'm not entirely sure
23 I understand the core of your question.  Can you please
24 rephrase it?
25 BY MR. TILLERY:

Page 205

1     Q.  Of course.  I can at least restate it.
2     MR. POPE:  You could probably even break it
3  into two questions.
4  BY MR. TILLERY:
5     Q.  Is the NAFTA region, in terms of the
6  Syngenta group of companies, which breaks it down --
7  you have several different atrazine, at least, related
8  regions of the world that are designated.  One them is
9  the NAFTA region; correct?  That --
10    MR. POPE:  That was a question to you.  If
11 that's not correct --
12    THE WITNESS:  I'm not sure what you understand
13 of atrazine-related region.
14 BY MR. TILLERY:
15    Q.  Well, let's talk literally.  There's a
16 business segment of the -- of the agrochemical business
17 and one of those is the NAFTA region?
18    A.  That is correct.
19    Q.  And what do you understand that to
20 include?
21    A.  The NAFTA regional set-up is designed to
22 oversee all -- we are talking crop protection here,
23 because seeds is different, the seeds organization, to
24 oversee all crop protection activities in the respective
25 region, i.e., NAFTA.

52 (Pages 202 to 205)

Exhibit 002 Page 52
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

Page 206

1    Q.  Okay.  And NAFTA would include Canada, the
2  United States, Mexico?
3    A.  Yes.
4    Q.  All right.  And the NAFTA region is
5  designed to operate as a fully aligned organization
6  using the minimum amount of resources to meet that
7  region's goal; is that a fair statement?
8    A.  We have a business model in the NAFTA
9  region where the regional oversight function is
10 exercised out of the United States, located in
11 Greensboro in crop protection, but we have fully
12 operating, fully staffed, fully equipped local
13 territorial operations, both in Mexico as well as in
14 Canada.
15   Q.  But do they coordinate their activities
16 such that they run, to the extent they can, in a -- in
17 a very -- strike the question.
18        Does Syngenta Crop Protection oversee the
19 activities of the Canadian and Mexican entities?
20   A.  Oversight is one of the aspects I would --
21 I would call it, yes.  Coordination and oversight is
22 I think -- are the right descriptors for what they do.
23 But we have a legal entity fully equipped, fully
24 operating in Canada as well.
25   Q.  Do you know if Syngenta Crop

Page 207

1  Protection Inc. owns any part of the Canadian or Mexican
2  operations?
3    A.  From the top of my head, no.
4    Q.  Do you know if it -- if it has any type of
5  agreement or understanding that gives it power or
6  authority to coordinate or operate with those
7  two entities?
8    A.  I am not aware of the existence of these
9  agreements, which is to say I don't know.
10   Q.  Can you explain to me how Syngenta Crop
11 Protection Inc. has oversight over those two other
12 entities?
13   A.  Oversight in that context means that
14 they have the same sort of relationship as a regional
15 head office in another continent has over its -- over
16 its country operations, i.e., they are trying to --
17 to coordinate activities between the countries, not
18 to duplicate things if not necessary.  They are -- they
19 are looking at the respective -- at the respective
20 financials of -- of these entities as well.
21 But it is a -- it is a strategic oversight inasmuch
22 as -- as this is the case in other instances of the
23 globe.
24   MR. TILLERY:  Let's go off the record just for
25 a minute.

Page 208

1    THE VIDEOGRAPHER:  Going off the record.  The
2  time is 15:15.
3  (3:15 p.m.)
4        (Break taken.)
5  (3:32 p.m.)
6    THE VIDEOGRAPHER:  Going back on the record.
7  The time is 15:32.  Thank you.
8    MR. TILLERY:  No further questions.
9    MR. POPE:  Thank you.  I just have a couple of
10 clarifies ones that will just take me a minute and we'll
11 be out of here.
12 EXAMINATION BY MR. POPE:
13 BY MR. POPE:
14   Q.  Mr. Maeder, a few minutes ago, in
15 talking about email address and addresses in Basel,
16 I think you said your office address, you only have
17 one, it's in Basel.  If someone were to send you a
18 letter, would that go to you care of Syngenta
19 International AG?
20   A.  Yes.
21   Q.  Okay.  And that's the only address you
22 have officially?
23   A.  That's right.
24   Q.  Okay.  A couple of the technical things
25 with regard to corporations.  I believe you said

Page 209

1  Syngenta Corporation is a sub of Syngenta
2  Participations.  Is it a direct subsidiary or is there
3  "Seeds JV" in there?
4    A.  This Seeds JVBV, the name of which -- this
5  Dutch entity, the name of which I don't know with
6  precision from the memory, is in between, as far as
7  I recollect.
8    Q.  Okay.  Maybe I had it wrong, then.  And
9  then, as to Syngenta International AG, I believe you
10 said it has no subsidiaries, and I'm going to ask you
11 just simply whether Syngenta Treasury Services Limited
12 is a direct or indirect subsidiary of Syngenta
13 International AG?
14   A.  I cannot answer that question.
15   Q.  Okay.  Very good.  One final area, in
16 connection with the exhibit number 6, and the reserved
17 powers question.  I didn't understand what your
18 testimony was with regard to whether these so-called
19 reserved powers apply to a legal judgment against a
20 subsidiary; does it?
21   A.  My understanding of the question was
22 that, if there is a legal judgment against the
23 subsidiary, that subsidiary is authorized to pay,
24 irrespective of any corporate approval or reserved
25 powers point.

53 (Pages 206 to 209)

Exhibit 002 Page 53
14e2ef5f-3c6e-4838-a1d5-331c25424516

Maeder, Christoph                    10-14-2010
Confidential

---

Page 210

1        MR. POPE:  Thank you very much.  That's all I
2   have.
3        MR. TILLERY:  Nothing.
4        THE VIDEOGRAPHER:  Going off the record.  The
5   time is 15:34.  End of tape 3, volume I.
6        This is the end of the videotaped deposition of
7   Christoph Maeder.
8        (Whereupon, the deposition concluded at 3:34 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 212

1              DEPONENT'S DECLARATION
2
3
4        I,              , hereby declare under
5   penalty of perjury under the laws of the United States
6   and the State of Illinois that I have read the foregoing
7   transcript and identify it as my own and approve same as
8   a true and correct transcript save and except for
9   changes and/or corrections, if any, as indicated by me
10  on the CORRECTIONS page hereof.
11
12        ,              ,              ,
13  Date        City         State
14
15
16        Signed:
17
18
19
20
21
22
23
24
25

---

Page 211

1              CORRECTIONS PAGE
2   Page No    Line No        Description
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 213

1              REPORTER'S CERTIFICATE
2
3        I, Judith White, of Westlaw Deposition
4   Services, do hereby certify that the foregoing testimony
5   was recorded by me stenographically and thereafter
6   transcribed by me, and that the foregoing transcript
7   constitutes a full, true and accurate record of said
8   examination of and testimony given by said witness, and
9   of all other proceedings had during the taking of said
10  deposition, and of the whole thereof, to the best of my
11  ability.
12        I further certify that I am not a relative,
13  employee or counsel of any of the parties of the within
14  cause, nor am I an employee or relative of any counsel
15  for the parties, nor am I in any way interested in the
16  outcome of the within cause.
17
18
19  Signed _____  Dated _____
20    (Judith White)
21
22
23
24
25

54 (Pages 210 to 213)

Exhibit 002 Page 54
14e2ef5f-3c6e-4838-a1d5-331c25424516