Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


- - - - - - - - - - - - - - - - -
CITY OF GREENVILLE, ILLINOIS,    )
et al.,                          )
                                 )
                Plaintiffs,      )
vs                               ) Case No.:
                                 ) 10-cv-188-JPG-PMF
                                 )
SYNGENTA CROP PROTECTION, INC.,  )
et al.,                          )
                                 )
                Defendants.      )
- - - - - - - - - - - - - - - - -



CONFIDENTIAL VIDEOTAPED DEPOSITION
OF DR. JOHN ATKIN

VOLUME I


Friday, October 15, 2010

AT:  8:56 a.m.



Taken at:


McDermott Will & Emery
Rue Pere Eudore Devroye 245
1150 Brussels
Belgium



Court Reporter:

        JUDITH WHITE

Exhibit 003 Page 1
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

---

Page 2

```
 1       A P P E A R A N C E S
 2  Appearing on behalf of the plaintiffs:
 3     STEPHEN TILLERY, Esq.
       JOHN C. CRAIG, Esq.
 4     KOREIN TILLERY LLC
       One U.S. Bank Plaza
 5     505 North 7th Street, Suite 3600
       St. Louis, MO 63101
 6     Phone: 312.641.9750 Fax: 312.641.9751
       E-mail: stillery@koreintillery.com
 7     E-mail: jcraig@koreintillery.com
 8
 9  Appearing on behalf the defendants:
10     MICHAEL A. POPE, Esq.
       McDERMOTT WILL & EMERY LLP
11     227 West Monroe Street
       Chicago, ILL 60606
12     Phone:  312.372.2000 Fax: 312.984.7700
       E-mail: mpope@mwe.com
13
14
15     MARK C. SUPRENANT, Esq.
       ADAMS AND REESE LLP
16     One Shell Square
       701 Poydras Street, Suite 4500
17     New Orleans, LA 70139
       Phone:  504.581.3234 Fax:  504.566.0210
18     E-mail: mark.surprenant@arlaw.com
19
20
21
22
23
24
25
```

Page 4

```
 1       W I T N E S S   I N D E X
 2  Witness                        Page
 3  DR. JOHN ATKIN (sworn) . . . . . . . . . . . . . 11
 4    Examination by Mr. Tillery. . . . . . . . . . .11
 5    Examination by Mr. Pope . . . . . . . . . . . .250
 6    Examination by Mr. Tillery. . . . . . . . . . .256
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1  Also present:
 2  MR. ALAN B. NADEL     (Litigation Counsel,
                   Syngenta Crop Protection, Inc.)
 3
    MR. JONATHAN SULLIVAN  (Group Litigation Counsel,
 4                 Syngenta International AG)
 5
    Videographer:
 6
    MR. PHILLIP HILL
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  EXHIBIT NAME     DESCRIPTION              PAGE #
 2  Exhibit 8     Summary of CV of        13
 3                John Atkin
 4  Exhibit 9     Syngenta document, entitled    175
 5                "Development Principles,
 6                Concepts and Processes",
 7                Bates stamped SYN02787781-837
 8  Exhibit 10     Executive summary of 2001     179
 9                request for approval of
10                release for first sales of
11                mesotrione/Callisto, Bates
12                stamped SYN02018694-735
13  Exhibit 11     Syngenta document, entitled    183
14                "Application: Release for
15                First Sales of an Active
16                Ingredient. Mesotrione",
17                Bates stamped GRNVL0000051641
18  Exhibit 12     Syngenta document, entitled    188
19                "Mesotrione. Release for
20                First Sales", Bates stamped
21                SNY02788061
22  Exhibit 13     Syngenta document, entitled    191
23                "Agenda", Bates stamped
24                GRNVL0000080397
25  Exhibit 14     Syngenta document, entitled    195
```

---

2 (Pages 2 to 5)

Exhibit 003 Page 2
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 6

1        "Minutes of the Meeting
2        'Review of Corn Strategy in
3        Various Triazine Scenarios'",
4        Bates stamped SNY01958831-835
5  Exhibit 15     Minutes of Development       197
6        Committee meeting in Basel on
7        September 10, 2002, Bates
8        stamped SYN01717371-396
9  Exhibit 16     Email chain, with the email at   200
10        the top of the first page
11        being from Alfred Seiler to
12        Chen Sunmao, dated July 31, 2002
13        Bates stamped SYN02235355-357 and
14        GRNVL0000032347-349
15  Exhibit 17     Syngenta document, entitled    212
16        "SYN-449208.  Project Review
17        Meeting & DeCo input", Bates
18        stamped GRNVL0000046203-207
19  Exhibit 18     Document entitled "NOA 449280   217
20        RDT & PMT Meeting", Bates
21        stamped GRNVL0000046196-202
22  Exhibit 19     Email chain, with the email at   218
23        the top of the first page
24        being from Derek Cornes to
25        Chen Sunmao, dated November 19,

Page 7

1        2002, Bates stamped
2        GRNVL0000032097-099
3  Exhibit 20     Document entitled "Memory.     219
4        29 October 2002", Bates stamped
5        GRNVL0000046281
6  Exhibit 21     Syngenta document, entitled    221
7        "Mesotrione Soil Persistence in
8        USA and Impact on LUMAX Launch",
9        Bates stamped SYN01785794-815 and
10        GRNVL0000033490-511
11  Exhibit 22     Syngenta document, entitled    222
12        "International Design Documents.
13        IDD Executive Summary.  Global
14        Development and Registration of
15        NOA 449280 and Core Formulations
16        in Maize", Bates stamped
17        SYN02024765-773
18  Exhibit 23     Syngenta document, entitled    225
19        "International Design Documents.
20        IDD Status.  Global
21        Development and Registration of
22        NOA 449280 and Core Formulations
23        in Maize", Bates stamped
24        SYN00808591-676
25  Exhibit 24     Syngenta document, entitled    227

Page 8

1        "Mesotrione Soil Persistence in
2        USA and Impact on LUMAX Launch",
3        Bates stamped SYN01900144-168
4        and GRNVL0000032110-134
5  Exhibit 25     Email chain, with the email at   229
6        the top of the first page
7        being from Derek Cornes to
8        Alfred Seiler and others,
9        dated December 9, 2002, Bates
10        stamped GRNVL0000033487-489
11  Exhibit 26     Minutes of Development       229
12        Committee meeting in Basel on
13        December 13, 2002, Bates
14        stamped GRNVL0000080500-505
15  Exhibit 27     Minutes of Development       230
16        Committee meeting in Basel on
17        May 7, 2003, Bates
18        stamped SYN00756454-477
19  Exhibit 28     Minutes of Development       233
20        Committee meeting in Basel on
21        August 6, 2003, Bates
22        stamped SYN00756412-435
23  Exhibit 29     Email chain, with the email at   239
24        the top of the page being from
25        Gary Dickson to Janis Mcfarland,

Page 9

1        dated September 29, 2003, Bates
2        stamped SYN01023334
3  Exhibit 30     Minutes of Extended Development   242
4        Management Meeting, dated
5        February 5, 2004, Bates stamped
6        SNY01790844-851
7  Exhibit 31     Minutes of Development       244
8        Committee meeting in Basel on
9        June 18, 2004, Bates
10        stamped SYN00756436-448
11  Exhibit 32     Email chain, with the email at   245
12        the top of the first page being
13        from Janis Mcfarland to Sherry
14        Duvall and Kay Carter, dated
15        May 16, 2000, Bates stamped
16        SYN01966494-495
17  Exhibit 33     Syngenta document, entitled    247
18        "Guideline.  CP PLCM Project
19        Management Handbook.  Version 1.1
20        (May 2005)", Bates stamped
21        GRNVL0000080975-018
22
23
24
25

3 (Pages 6 to 9)

Exhibit 003 Page 3
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 10

1          PROCEEDINGS
2   (8:56 a.m.)
3          THE VIDEOGRAPHER:  This is the beginning of
4   videotape number 1, volume I.  This is the video
5   operator speaking, Phillip Hill, on behalf of Westlaw
6   Deposition Services' San Francisco office.  Today's date
7   is October 15, 2010.  The time on the video screen is
8   08:57 Belgian time.
9          We are at the Brussels office of McDermott
10  Will & Emery to take the videotaped deposition of
11  John Atkin.  This is taken in the matter of City
12  of Greenville, Illinois, et al. Versus Syngenta
13  Corporation [sic] Protection Inc. and Syngenta AG.
14  This is being heard in the United States District Court
15  for the Southern District of Illinois, case number
16  10-188-JPG.
17         Will counsel please introduce themselves for
18  the record and state whom they represent?
19         MR. TILLERY:  For the plaintiffs,
20  Steve Tillery of Korein Tillery, St. Louis, Missouri.
21         MR. CRAIG:  For the plaintiffs, John Craig,
22  also of Korein Tillery.
23         MR. POPE:  For the defendants and the witness,
24  Michael Pope from McDermott Will & Emery in Chicago.
25         MR. SURPRENANT:  For the defendants,

Page 11

1   Mark Surprenant, Adams and Reese, New Orleans.
2          MR. NADEL:   Alan Nadel, Syngenta Crop
3   Protection Inc.
4          MR. SULLIVAN:  Jonathan Sullivan, Syngenta
5   International AG.
6          THE VIDEOGRAPHER:  The court reporter today is
7   Ms. Judith White on behalf of Westlaw Deposition
8   Services.  Please will the court reporter swear in the
9   witness.
10             JOHN ATKIN,
11         having been duly sworn,
12           testified as follows:
13  EXAMINATION BY MR. TILLERY:
14  BY MR. TILLERY:
15         Q.  Would you state your name for this record,
16  please?
17         A.  John Christopher Atkin.
18         Q.  And where do you live, sir?
19         A.  Basel, Switzerland.
20         Q.  How long have you lived there?
21         A.  Five years.
22         Q.  And prior to that time, where did you
23  live?
24         A.  I lived in Alsace, just over the border,
25  France.

Page 12

1          Q.  Could you tell me what your current job
2   is?
3          A.  I am chief operating officer, and I work
4   for Syngenta International AG.
5          Q.  You are chief operating officer of what?
6          A.  Crop protection.  Crop protection.
7          Q.  And what does "crop protection" mean?
8          A.  It means all our chemical business, which
9   includes the range of products that we sell worldwide.
10  It also includes seed treatments, and that's the breadth
11  of it.
12         Q.  Okay.  And when you say "our", what do you
13  mean by that?
14         A.  Syngenta's.
15         Q.  You're talking about the entire corporate
16  entity?
17         A.  I am.
18         Q.  And that's under the umbrella of
19  Syngenta AG?
20         A.  Yes.
21         Q.  Let's start off when you -- where you went
22  to school, your background.  I have your CV, but I am
23  guessing that your CV is more than a paragraph, the one
24  that you actually use, right?
25         A.  Yes.

Page 13

1   (Exhibit 8 marked for identification.)
2   BY MR. TILLERY:
3          Q.  So we've marked this as number 8.  It's --
4   it's a scant piece of information about your background.
5          A.  Okay.
6          Q.  We'll just stick it in this pile and talk
7   about you and your background.
8          A.  Okay.
9          Q.  Where did you grow up?
10         A.  In Leeds, England.
11         Q.  And what was your first college that you
12  attended after -- well, in America, we refer to it as
13  high school, so where would you -- where would your
14  college be after that period?
15         A.  Okay.  My high school was a school called
16  Fulneck Boys School, which is a small public school near
17  Leeds.
18         Q.  And then college, where did you go?
19         A.  I went to Newcastle University.
20         Q.  And what did you study as your major topic
21  of study?
22         A.  Agriculture and zoology.
23         Q.  What is that study?  What does it mean?
24         A.  It was quite broad, in that the
25  agricultural piece covered agronomy, agricultural

4 (Pages 10 to 13)

Exhibit 003 Page 4
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 14

1  economics; livestock; just everything you could think of
2  in the world of agriculture.  But the zoology piece was
3  quite specific.  It was mainly concerned with insects,
4  pests, a very applied science, but it also covered
5  ecology and the environment and other aspects.
6      Q.  Okay.  And was that a four-year program?
7      A.  No, that was a three-year program.
8      Q.  Okay.  And you graduated there?
9      A.  I did.
10     Q.  And that degree was --
11     A.  Honors degree, BSC.
12     Q.  Okay.  And then what did you do?
13     A.  They invited me back to do a PhD.
14     Q.  And the PhD was in what topic?
15     A.  It was about slugs, which are a shell-less
16  mollusc, which -- in this instance, I was studying the
17  attack of slugs on potatoes.
18     Q.  And what was the topic area of your PhD?
19     A.  It was.
20     Q.  And how long did -- did that PhD study
21  last?
22        A.  It lasted three years, and it took me a
23  year to write it up.
24        Q.  Okay.  And you were awarded a degree --
25  a doctorate?

Page 15

1      A.  I was.
2      Q.  And was that in the same topic area of
3  agricultural zoology?
4      A.  It was specifically for the thesis that
5  I wrote about slugs and their behavior in attacking
6  potatoes and the difference between potato varieties.
7  So it was a -- it was a specific thesis-driven PhD.
8      Q.  And what would the -- if -- if we were to
9  go to the university that awarded that -- that degree,
10 what would we find on your -- the listing for the
11 doctorate?  What would it be called?
12     A.  It would just be a -- a PhD.  It doesn't
13 have a subject title next to it.
14     Q.  But it corresponds to the dissertation
15 topic that you --
16     A.  Exactly.
17     Q.  I see.  Okay.  After that, that takes us
18 to what year on graduation after your dissertation?
19     A.  Okay.  So that takes us to 1977.
20     Q.  And -- and that -- did that end your
21 formal education?
22     A.  It did.
23     Q.  Okay.  After that, what did you do?
24     A.  I got a job working for the Ministry of
25 Agriculture, and I went to a place called Wolverhampton,

Page 16

1  and my -- my job was in the -- in the department which
2  was concerned with entomology, and it was advising
3  farmers on how to protect their crops against insect
4  pests and some non-insect pests, and it was also
5  involved in developing new technology, new techniques,
6  I should say, to -- to combat pests.
7      Q.  And how long did you remain in that job?
8      A.  Two years.
9      Q.  Then what did you do?
10     A.  I joined a company called May & Baker, who
11 belonged to the Rhone-Poulenc group of companies, a
12 French company.
13     Q.  What business were they in?
14     A.  They were in the business of researching,
15 developing, producing and manufacturing crop protection
16 products.
17     Q.  And where was your office located with --
18 did you say May & Baker?
19     A.  I did.
20     Q.  All right.
21     A.  It was in a place called Ongar, which is
22 north-east of London, and they had a research station
23 there and that was also their headquarters at that time
24 for people working in development.  My job was in
25 product development.

Page 17

1      Q.  What types of products were you
2  developing?
3      A.  Oh, herbicides, we had a lot of
4  herbicides.  There were a number of very well-known
5  products discovered at that site -- bromoxynil, ioxynil
6  would be two, called the HBNs as a class of chemistry.
7  We also -- we had new developments which were at the
8  very early stage there, testing compounds which I became
9  involved in.  But also fungicides I worked with.  So it
10 was a broad-range job.  But particularly herbicides,
11 I would say.
12     Q.  Have you given a deposition before?
13     A.  Never.
14     Q.  Have you ever testified before?
15     A.  No.
16     Q.  This is your first foray into this?
17     A.  It is.
18     Q.  All right.  How long did you stay at
19 May & Baker?
20     A.  I stayed between '79 and '84.
21     Q.  Job responsibilities remain approximately
22 the same?
23     A.  It evolved.  I joined as a member of the
24 department which was developing these products across
25 the UK, and I left as head of the department.

5 (Pages 14 to 17)

Exhibit 003 Page 5
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 18

1    Q.  And what did you do after you left
2  May & Baker?
3    A.  I came here, to Brussels, to work for an
4  American corporation called FMC.
5    Q.  And what was your job at FMC?
6    A.  I was responsible also initially for
7  product development with a particular focus on
8  insecticides here in Europe, both east and west Europe.
9    Q.  What type of insecticides were you working
10  on developing?
11    A.  Primarily pyrethroid insecticides.  They
12  had a new pyrethroid called bifenthrin, and that was
13  I think the main -- the main reason they brought me to
14  the company, to develop that product in Europe.
15    Q.  Were you working in a laboratory?
16    A.  No.  No, I was working about half a
17  kilometre from here, in an office.  We worked through
18  cooperators and distributors.
19    Q.  How was your research conducted?
20    A.  There was a research station in Princeton,
21  New Jersey, and that's where they did the -- basic
22  research, and then the development work we did through
23  cooperators, so we would contract field trials or we
24  would work with universities or other interested parties
25  to develop the technology.

Page 19

1    Q.  Did you deal directly with universities in
2  terms of retaining them to do research?
3    A.  Occasionally, particularly in east Europe,
4  but it was more common that we worked with contract
5  organizations specialized in doing field trials.
6    Q.  And what was your responsibility, or what
7  did it become at FMC?
8    A.  What did it become?  Oh, it became head of
9  marketing.  After a couple of years in this role,
10  I became the head of sales and marketing for -- for FMC.
11    Q.  In Europe?
12    A.  In Europe, yes.
13    Q.  And could you tell me what that job really
14  involved in terms of responsibility?
15    A.  Yes.  It involved positioning the product,
16  so deciding which markets they -- they go into; what the
17  price of these products should be; which customers --
18  and in our case, these were distributors, because we
19  were a very small operation, so we worked through
20  national distributors, usually, so a selection of
21  distributors, to market these products; and then I had a
22  couple of people helping me with the logistics, the
23  provisioning of the product, the support, the --
24  everything that's associated with putting a product on
25  the market and supplying it to customers and dealing

Page 20

1  with any complaints or other issues.
2    Q.  What kind of products were you selling at
3  that time?
4    A.  Well, by this time, this product,
5  bifenthrin, which was called Talstar, was launched,
6  so the primary goal was to -- to sell that, but we had
7  other products too.  One was called Marshall, which was
8  a carbamate insecticide, we also sold that one.  And we
9  developed a herbicide called clomazone, or Command, so
10  there were three -- three products, essentially, that we
11  were involved with.
12    Q.  You described a type of herbicide, and to
13  clarify for the reporter on the record, what type of
14  herbicide was it?
15    A.  It was a herbicide which was used
16  particularly here in Europe on oil seed rape crops.
17  Rape crops.
18    Q.  You used a term to describe it is what
19  I was --
20    A.  Oh, clomazone.  Oh, excuse me.  We called
21  it Command.  That was its trade name at the time.
22    Q.  All right.  Did you sell products that
23  were comparable at any time to atrazine?
24    A.  No.
25    Q.  How long did you stay with FMC?

Page 21

1    A.  I left FMC in 1989.
2    Q.  So you were there a total of how many
3  years?
4    A.  Five.
5    Q.  Your job title was the same when you left?
6    A.  No.  I came in the development capacity
7  and I left as head of the marketing and sales.
8    Q.  That's what I mean:  it's -- it was
9  marketing and sales director?
10    A.  Yes.
11    Q.  What did you do then?
12    A.  I went to join Sandoz in Switzerland.
13    Q.  What was your job at Sandoz?
14    A.  My job was as global product manager for
15  insecticides.
16    Q.  Your office in Switzerland was located
17  where?
18    A.  Basel, Switzerland.
19    Q.  How far from where it's currently located?
20    A.  About one and a half kilometres.
21    Q.  Have you been located there since the time
22  you joined Sandoz?
23    A.  Oh, sorry, the office I'm in now is
24  different from the one I was in --
25    Q.  Of course, yes --

6 (Pages 18 to 21)

Exhibit 003 Page 6
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

---

Page 22

1     A. -- when I was at Sandoz.
2     Q. Yes, of course.  But in that same area of
3 Basel, have you been there since joining --
4     A. No, when I -- I had -- I had two different
5 assignments when I -- outside of Basel.
6     Q. All right.  We'll get to those.
7     A. Okay.
8     Q. All right.  So your job, then, you've told
9 me, what was the specific responsibility within that
10 job?
11     A. Specifically, I was charged with taking
12 the insecticide portfolio, which was quite small, and
13 also included a compound in the same class as the one
14 I had been working with with FMC, pyrethroid products,
15 but there were one or two others, and I was charged with
16 trying to expand these products, to grow them, to
17 position them in new markets, to develop new labels,
18 new uses.  I didn't do that myself.  I worked with the
19 development team.  And to improve the business.
20     Q. And walk me through the jobs that you had
21 and your entire experience at Sandoz?
22     A. So after two years, '89 through '91,
23 in 1991 I went to Dallas, Texas, to work in a company
24 called Zoecon, which was a Sandoz company.  Zoecon was
25 involved in the animal health business.

---

Page 23

1     Q. Would you spell that for the reporter,
2 please?
3     A. Z-O-E-C-O-N.
4     Q. And what did you do there in Dallas,
5 Texas?
6     A. I was -- I had two roles.  One was
7 marketing for the whole of their product line.  Their
8 product line was insecticidal dog collars, against fleas
9 and ticks; also some very new and interesting treatments
10 for the animal itself, spray-on or shampoo-type
11 treatments.  So I had that marketing responsibility, and
12 the line was mainly sold through veterinary --
13 veterinary surgeons or through pet stores, and I had a
14 responsibility also to develop the business outside of
15 the United States, which was primarily in the UK,
16 Australia and starting in -- in Brazil and Japan.
17     Q. Who were you working for when you were in
18 the United States?  Who was your employer?
19     A. Zoecon.
20     Q. And you were paid by Zoecon?
21     A. I was.
22     Q. Okay.  Who was you were supervisor there?
23     A. Joe Lavin.
24     Q. And his title?
25     A. President.

---

Page 24

1     Q. And how long did you stay there?
2     A. Not very long:  about 18 months.  At that
3 time, the operating model changed, and the -- the
4 products were then distributed by the Sandoz operating
5 companies throughout the world, so the business ceased
6 to be coordinated or led through the Zoecon operation.
7     Q. And what did that mean for you?
8     A. It meant that I came back to Basel and
9 I was given the job as to be -- to be head of northern
10 Europe.
11     Q. Of -- what, for sales and marketing?
12     A. Sales and marketing for the entire Sandoz
13 product portfolio, yes, and to be responsible for the
14 operations in those countries of northern Europe.
15     Q. When you say "operations", what do you
16 mean?
17     A. Well, for example, in Germany, we had a --
18 an affiliate there.  We did in the UK.  So both those
19 countries had country offices.  In Scandinavia, we just
20 had a couple of people based in Denmark; in Belgium we
21 had -- I think we ran that at the time out of Basel,
22 actually, so that was different.  But the two main
23 operations were in England, the UK, and Germany.
24     Q. And how long did you stay in that job with
25 those responsibilities?

---

Page 25

1     A. I stayed there between '93 and '95, so
2 two years.
3     Q. Then what did you do, sir?
4     A. I became head of France, head of the
5 France -- the French affiliate for Sandoz.
6     Q. Doing what in terms of responsibility?
7     A. I was the general manager,
8 directeur generale.
9     Q. Was that for the -- all operations for
10 their --
11     A. All -- excuse me.  It was for all their
12 agrochemical operations, Sandoz Agro France it was
13 called at the time.
14     Q. And that included not only sales, that
15 included all aspects of the business?
16     A. It included all aspects of the business,
17 yes.
18     Q. How long did you stay in that job?
19     A. I stayed until the creation of Novartis,
20 which -- which happened right at the end of '96, so it
21 was -- it was almost two years, but not quite.
22     Q. What did you do then?
23     A. Then I was -- I was given a role as -- as
24 head of insecticides for the newly created Novartis
25 company and for what they called at the time patron,

---

7 (Pages 22 to 25)

**Exhibit 003 Page 7**
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

---

Page 26

1  patron for Asia, and I also had a seat on the -- on the
2  management -- I mean, it was a multi-divisional company,
3  but we had the equivalent of an executive committee to
4  run the business, and I had a position on that managing
5  board.
6       Q.   And when you say "managing board", was
7  that Novartis International AG?
8       A.   Was that Novartis International AG?
9       Q.   Or was it Novartis AG?
10      A.   It was -- I'm not sure. It was -- it was
11  Novartis Crop Protection that I worked for. But I --
12  I can't give you a precise answer, excuse me.
13      Q.   Of which committee -- what the committee
14  was attached to?
15      A.   It was Novartis crop -- it was -- I cannot
16  be -- I cannot give you a clear answer.
17      Q.   Okay. In terms of the executive
18  committee, was the executive committee the overriding
19  authority for operating that -- that company?
20      A.   Well, like the executive committee as we
21  have today, it dealt with strategic matters and it dealt
22  with performance. It was the most senior executive
23  group, yes.
24      Q.   That's what I'm saying, that Novartis
25  executive committee you served on was the most senior

---

Page 27

1  group for operations?
2       A.   For the crop protection business, yes.
3       Q.   All right. Was there a higher level
4  Novartis group?
5       A.   Oh, yes.
6       Q.   Okay. Above the crop protection?
7       A.   Sure.
8       Q.   Okay. And what was that one?
9       A.   That was the Novartis executive committee,
10  which was for the entire company.
11      Q.   All right. And do you know who was on
12  that committee?
13      A.   Sure.
14      Q.   Who?
15      A.   Daniel Vasella, who is -- who was at the
16  time CEO and who is now chairman; Raymond Brau, who was
17  CFO, recently retired. These were the two main
18  individuals that I dealt with from time to time.
19      Q.   Would you spell their names for the
20  reporter, please?
21      A.   Yes. Vasella, V-A-S-E-L-L-A. There may
22  be two Ss in there. I can correct it afterwards.
23  Daniel -- Raymond Brau. Raymond as it sounds and Brau,
24  B-R-A-U.
25      Q.   Okay. Now, how long did you stay in that

---

Page 28

1  job?
2       A.   How long did I stay in that job?
3  I was not much more than two years in that job, maybe
4  not quite two years.
5       Q.   And your responsibilities in that job?
6       A.   As I mentioned, I was -- I was responsible
7  for insecticides. They had a sort of business unit
8  running insecticides out of Basel, and then I was patron
9  for Asia, which was more of a coordination role for the
10  Asian countries.
11      Q.   With the same agrochemical orientation?
12      A.   Yes, always.
13      Q.   And what did you do after -- it would be
14  1998? Is that when the transition occurred, the next
15  job --
16      A.   The next job --
17      Q.   -- or was it '97?
18      A.   I think that is in my CV, actually, it --
19  in the short one. I think I moved -- yes, '98, I moved
20  on to be head of portfolio for the -- for the whole
21  company, portfolio management. I mean, shortly after --
22  things moved quite quickly. Shortly after that I was
23  named as chief operating officer and then right at the
24  end I became CEO.
25      Q.   Okay. Let's -- if -- if we can, let's --

---

Page 29

1  let's back up and make sure we get all this correctly.
2       A.   Sure.
3       Q.   In 1998, you became chief operating
4  officer?
5       A.   No, I -- I think chief operating -- yes,
6  it could -- could I look to be -- to be precise.
7       Q.   Yes. Of course you can. Of course.
8       A.   Those dates were quite compressed. Okay.
9  I was chief operating officer in '99, head of portfolio
10  of management in '98, so that's --
11      Q.   What -- what were the differences in those
12  responsibilities?
13      A.   Quite different: portfolio management was
14  responsibility for all the Switzerland, the Basel-based,
15  activities: product development, the global marketing
16  activities, everything that concerned the product
17  portfolio and the development and marketing of it from
18  Basel, Switzerland before the products were handed over
19  to our affiliate companies in the territories.
20      Q.   And then you -- then your next job --
21      A.   The next job, I was chief operating
22  officer.
23      Q.   And what year was that?
24      A.   That was in 1999.
25      Q.   And what was your responsibility as

---

Westlaw Deposition Services   800.548.3668 Ext. 1          Exhibit 003 Page 8
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 30

1  chief operating officer?
2      A.  Well, then I -- I had a responsibility for
3  essentially the whole crop protection operation
4  worldwide.  And then shortly after that, the reason why
5  I wanted to refer to this, I mean, shortly -- in the
6  same year, I was promoted to chief executive officer for
7  the crop protection business.
8      Q.  In 1999?
9      A.  Yes, and I reported, in that capacity,
10  to -- prior to this, I had reported to the previous CEO,
11  whose name was Wolfgang Samo, S-A-M-O.  In '99, he left
12  and I reported to Heinz Imhof, who was head of
13  agribusiness, so he had seeds and an over -- overarching
14  responsibility.
15      Q.  So at the time, or the day before Syngenta
16  was formed, what was your job title at that time?
17      A.  CEO crop protection.
18      Q.  CEO of crop protection for Novartis?
19      A.  Yes.
20      Q.  You served on the executive committee?
21      A.  I served on the executive committee that
22  I talked to you about -- I was leading it at that time,
23  just before the merger.
24      Q.  And I want to make sure we define which
25  executive committee.  Tell me which one that you served

Page 31

1  on?
2      A.  It was the one that was looking after the
3  crop protection business worldwide.
4      Q.  And do you know by what authority that
5  executive committee was formed?
6      A.  I don't, but it -- it was -- no, I don't.
7      Q.  Do you know by -- was it a separate legal
8  entity, that executive committee?
9      A.  I don't -- I don't know.
10      Q.  Do you know if it -- it derived its -- its
11  power to act through the overriding or overall
12  corporation or from the agribusiness corporation or the
13  source of its authority?
14      A.  My business card at the time said, if I'm
15  not mistaken, "Novartis Crop Protection AG", so we had
16  a -- a legal entity which covered the -- the crop
17  protection business.
18      Q.  Do you know which of the entities it
19  derived its authority to act?
20      A.  No.
21      Q.  Do you know, if you can tell me, what
22  authority that particular committee had at that time?
23      A.  Yes.
24      Q.  In other words, over which groups it had
25  authority?

Page 32

1      A.  Okay.  So it was -- it had authority over
2  all the worldwide employees in -- in crop protection;
3  over all the different affiliate groups that existed in
4  the different territories.  It -- it led the business.
5      Q.  And would that include all the subsidiary
6  employees?
7      A.  To the extent that that was laid out in
8  how we operated, yes.  I mean --
9      Q.  Let's put it this way:  all the subsidiary
10  crop protection employees?
11      A.  Yes.  But let me be clear:  I mean, those
12  subsidiaries were set up with their own articles of
13  incorporation, they had their own roles and
14  responsibilities, and in the center we had ours, but to
15  the extent that it was overall, in that context, yes.
16      Q.  And if you could tell me, was there a
17  Novartis Crop Protection Inc. in the US at that time?
18      A.  Yes.
19      Q.  And where was it headquartered?
20      A.  Greensboro.
21      Q.  Was it in the same location that Syngenta
22  Crop Protection Inc. is currently located?
23      A.  It was.  It was.
24      Q.  Now, tell me -- we are going to walk
25  through in a minute your responsibilities after Syngenta

Page 33

1  was formed, up until the current time, but if you could
2  tell me -- we'll start a new question at this time.
3  Okay.
4      Tell me the management differences, if you can,
5  in terms of the structure of the organization between
6  the Novartis structure of companies that you worked for
7  and the evolving Syngenta group of companies?
8      A.  In what sense do you mean the question?
9      Q.  In terms of -- in terms of the management
10  structure over the operations within the group that you
11  worked for, the agrochemical businesses?
12      A.  So there were some similarities and some
13  differences.  In Syngenta, we operate through -- in the
14  crop protection business we have four region heads, and
15  that was very similar to the way we operated in -- in
16  Novartis.
17      Q.  Would you tell me what those four region
18  heads are?
19      A.  Yes, I will.  They -- we have -- and still
20  have -- a region head based in Singapore looking after
21  Asia-Pacific, and we --
22      Q.  Was that the same at -- at Novartis?
23      A.  It was very similar, the difference being
24  that in -- well, there were two legacy companies.  We --
25  we were operating out of Hong Kong at the time with one

9 (Pages 30 to 33)

Exhibit 003 Page 9
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 34

1  of the legacy companies, and we -- we brought the
2  operations together in -- in Singapore subsequently.
3      We operated for Novartis -- we did not have the
4  concept of NAFTA.  We operated Greensboro for the
5  United States, and in Syngenta we have -- we have NAFTA
6  as a -- as a region, so that's -- that's both a
7  similarity in the sense of where it was based and a
8  difference in the -- in the scope.
9      Q.  Did -- at that time -- I'm sorry for
10  interrupting, but rather than waiting until the end to
11  ask, if you don't mind.
12      A.  Mmm.
13      Q.  The operations at Novartis, in terms of
14  North America, did Novartis Crop Protection Inc. have
15  authority over sales in Canada and in Mexico?
16      A.  No.
17      Q.  Were there any sales in Canada and Mexico
18  through Novartis Crop Protection Inc.?
19      A.  Not to my knowledge.
20      Q.  Okay.  Did the sales in Canada and Mexico
21  start after the formation of Syngenta?
22      A.  There were -- there were sales in those
23  places, but they came together after the formation of
24  Syngenta.
25      Q.  All right.  Were they being sold through

Page 35

1  Novartis entities in Canada and Mexico?
2      A.  Yes.  Yes.
3      Q.  And so after the formation of Syngenta,
4  Syngenta Crop Protection Inc. -- I think the term that
5  Mr. Maeder used was "had oversight over the Canadian and
6  Mexican operations"?
7      A.  Yes.  Yes, "oversight" is a good way of
8  putting it.  It was a kind of span breaker.  In order to
9  have manageable businesses for what was a much bigger
10  business than either legacy company, we -- we did group
11  Canada and Mexico in with -- with the United States, but
12  Canada and Mexico remain independently operating
13  affiliates.
14      What -- I can describe to you what -- where --
15  where there is a sharing and a consultation and a -- a
16  cooperation with the Greensboro office, but they operate
17  pretty independently.
18      Q.  And -- and so what then is different about
19  the operation, then, from Novartis Crop Protection Inc.
20  and the Canadian and Mexican operations than Syngenta
21  Crop Protection Inc.?
22      A.  Very precisely, the -- the boss of the
23  two gentlemen who run respectively Canada and Mexico is
24  sitting in Greensboro, so they report to him.
25      Q.  And who is that?

Page 36

1      A.  Currently, the president of Syngenta Crop
2  Protection Inc. is Vern Hawkins, the head of Canada is
3  Jay Bradshaw and the head of Mexico is Marcelo Valentin.
4      Q.  And who is the boss of the Canadian and
5  Mexican operations?  Who is that person from Greensboro?
6      A.  Oh, well, they report to Vern Hawkins.
7      Q.  They report to Hawkins?
8      A.  Yes, they do.
9      Q.  Does Hawkins have a position with either
10  of the other companies, in Canada or Mexico?  Is he
11  employed with them?
12      A.  No.  No, he is employed by -- he is
13  employed in -- in the US.
14      Q.  And by Syngenta Crop Protection Inc.?
15      A.  Yes.
16      Q.  How is it that they report to him?
17      A.  How?
18      MR. POPE:  Excuse me, how?
19      MR. TILLERY:  Yes.
20      MR. POPE:  Object to the question.
21      MR. TILLERY:  All right.  I'll withdraw the
22  question.
23  BY MR. TILLERY:
24      Q.  If you could explain to me how the --
25      A.  Sure.

Page 37

1      Q.  -- Canadian and Mexican operations,
2  in terms of the heads of their group, report to him in
3  terms of -- I would assume you're talking about overall
4  efficiency of practice within the three countries and
5  working in the context of NAFTA, I would imagine?
6      A.  Yes, that's -- that's close to being
7  right.  He operates a -- an RLT, a regional leadership
8  team, and there are about 17 members of that team, which
9  includes Marcelo Valentin from Mexico and Jay Bradshaw
10  from Canada, and the regional leadership team will talk
11  about overall strategy for NAFTA.
12      There are many products that these businesses
13  have in common.  They have similar customers,
14  particularly between Canada and the US, there are quite
15  some similarities, so there are -- you know, they will
16  talk about product strategy, they will talk about
17  performance, business performance, they will talk about
18  the strategic plan and action plans and what they're
19  doing, there will be a sharing of -- of information and
20  know-how and operational details at these regional
21  leadership teams.
22      Q.  And do you know -- you said 17 members.
23      A.  Yes.
24      Q.  -- where these other people are from that
25  comprise this group?

10  (Pages 34 to 37)

Exhibit 003 Page 10
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 38

1     A.  Sure.
2     Q.  Where are they from?
3     A.  All the rest are from -- are based in the
4  United States.
5     Q.  And do you know where, from which
6  companies?
7     A.  Yes, they work for Syngenta Crop
8  Protection Inc. and we have -- on that group, we have --
9  we have the heads of the US business units as well, so
10  Jim Peters from an area we call Prairie and Mountain,
11  which -- which I think describes itself well;
12  Tommy Jackson from -- from the north; we have
13  Scott Langkamp, who does horticulture; and we have
14  Michael Boden, who does the south.  And so these --
15  these are the US business units.
16     So, therefore -- and then we have the head of
17  marketing, who is Travis Dickinson, and then we have the
18  head of human resources, who is Daniel Loria.  We have
19  the head of finance, who is Jason Fogden.  I don't --
20  I don't know if you want me to go through the entire --
21     Q.  Keep going.  Your memory is amazing.  Keep
22  going.
23     A.  We have -- now you've thrown me off.
24     Q.  It was the only way I could stop you.
25     A.  John Riley is the head of supply chain.

Page 39

1  And we have a legal counsel on there, and I'm -- I'm not
2  going to recall -- it used to be Vince Alventosa, but it
3  isn't anymore.
4     Q.  Who are these people working for?  I mean,
5  do they -- if you could talk to me about where they come
6  from in terms of their orientation or their specific
7  link to a company in the Syngenta group?
8     MR. POPE:  You mean who are they employed by?
9     MR. TILLERY:  Yes.
10     THE WITNESS:  Well, I -- they're employed by
11  Syngenta Crop Protection Inc., but the way -- some of
12  them -- the functional people, for example, the head
13  of -- of HR, he has quite a strong link to his --
14  the global head of HR in Basel, whose name is
15  Caroline Luscombe.
16  BY MR. TILLERY:
17     Q.  And that person, the HR head, is -- is who
18  in the US?
19     A.  Daniel Loria.
20     Q.  Okay.  And that's a man?
21     A.  It is a man.
22     Q.  And this gentleman is employed by
23  Syngenta Crop Protection Inc.?
24     A.  (Witness nods head.)
25     Q.  And -- is that correct, sir?

Page 40

1     A.  I believe so.
2     Q.  All right.  And this individual, you said,
3  has a tie.  Can you explain that to me?
4     A.  Right.  So -- just a word about the
5  overall company set-up.  My responsibility is the
6  chief operating officer for crop protection, but that's
7  a commercial responsibility, primarily.  We are a
8  matrixed organization, so the functions have their own
9  reporting line, so in the case of human resources, there
10  are two -- Daniel Loria has two lines of connection,
11  one to his global leader, functional leader, who is
12  Caroline Luscombe, and one through the -- the operating
13  entity in the US.
14     Q.  And that would be who at the operating
15  entity?
16     A.  Vern Hawkins.  And -- and that -- that
17  same set-up is true for our supply chain, it is true for
18  our finance operation.  It is true -- it is the way we
19  operate the functions and the businesses.
20     Q.  When you say "for the supply chain", who
21  would that be in the supply chain?
22     A.  So that's John Riley, so --
23     Q.  And who would -- who would he respond to
24  on a global basis?
25     A.  Mark Peacock.

Page 41

1     Q.  And he is in Basel?
2     A.  He is.
3     Q.  And how would he -- explain to me how that
4  communication would take place?
5     A.  Well, let's -- well, we can use the -- use
6  the atrazine example.  I mean, the St. Gabriel
7  manufacturing plant serves our global atrazine demand,
8  so the scheduling of what that plant does and the whole
9  provisioning of orders from around the world is
10  coordinated globally.  It has to be.  And so he would --
11  he would be talking to Mark Peacock and Mark Peacock's
12  colleagues in Basel about that.  That would be one
13  example of how it works.
14     When it comes to packed product, we have
15  550 stock-keeping units in the United States.  When it
16  comes to local packed products, then he would -- he
17  would manage that with -- in the context of the US, with
18  little reference outside.
19     Q.  What -- when you say "packed product",
20  what do you mean?
21     A.  I mean it's -- it's a formulation in a --
22  in a jug or a bottle, or if it's a dry product, in a
23  packet.  There may be similar formulations in different
24  sized packets.
25     So we have 250 products.  "Products" I would

11 (Pages 38 to 41)

Exhibit 003 Page 11
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                          10-15-2010
Confidential - Pursuant to the Protective Order

Page 42

1  describe as being specific formulations.  But when
2  you -- when you look at them in their packed form, that
3  translates into around 550, so about double.
4      Q.  And when you say 550, that's 550 different
5  products?
6      A.  550 -- well, they've got -- they are in
7  different package sizes to meet different market needs.
8  I would say that -- there are 250 different products, so
9  formulations with different uses.  The multiplier is to
10  do with the pack size.
11     Q.  And how is it that when you're -- you --
12  you mentioned -- and I'm just trying to understand a
13  little better the Saint Gabriel location, and then how
14  the coordination would take place in terms of more of a
15  global connection with that operation.  Explain that to
16  me?
17     A.  Sure.  So they -- they have a process
18  which is well defined about active ingredient planning,
19  production planning, and what happens is all the
20  operating units have their S&OP processes, S&OP
21  processes, for planning the demand, and these demands
22  are all collected up globally and then relayed to the --
23  to the supply chain in -- in the United States.
24          So they are then in a position to -- to plan
25  the production of atrazine: you know, when it -- when

Page 43

1  it's needed for Australia, when it's needed for the US,
2  when it's needed for -- for Latin America, and that's
3  how it works.
4      Q.  And how does that communication take place
5  between the global needs and the production?  How does
6  that work?
7      A.  Well, at the highest level, Mark Peacock,
8  who is head of global supply, he has his -- his own
9  leadership team, on which John Riley will sit.  So at
10  the highest level, he has a planning vehicle for that --
11  that to take place.
12     Q.  And when -- so whoever -- Peacock or
13  people working with Peacock's office -- he's in Basel;
14  correct?
15     A.  Right.
16     Q.  Do they coordinate the global distribution
17  then?
18     A.  Yes, yes.
19     Q.  And how -- when -- if it's needed.  And we
20  haven't finished our discussion of all of these
21  four different groups, okay, but -- when we got into
22  this topic, but let's say more or less is needed in
23  different parts of the world from the St. Gabriel
24  production location.  Explain to me how that
25  communication would take place back to America in terms

Page 44

1  of that distribution?
2      A.  At the very highest level, Mark Peacock's
3  leadership team will -- will discuss the demand and the
4  plant capacity and the occupation.  Sometimes if it's
5  over capacity we have to buy it on the outside market.
6      Q.  Is that market primarily in China now?
7      A.  Yes.
8      Q.  All right.
9      A.  So --
10     Q.  I'm sorry for interrupting you.  Go ahead.
11     A.  But not uniquely.  If we ever have do it,
12  and we haven't done it recently.  But the -- the --
13  I should correct myself:  it's -- for this particular
14  molecule, it isn't primarily China, it is not, when we
15  buy -- if we have to buy on the -- on the -- on -- from
16  others.  It's not on this particular.  Most, it is.
17          So they would -- they would look at that.
18  We also have a -- a global S&OP process where I chair,
19  so we also would look at that with some of the marketing
20  and business people around the table.  But at a more
21  detailed level, there are active ingredient planners who
22  are working one level below, and they would communicate
23  this to their opposite numbers in the United States and
24  the -- the thing would get produced.
25     Q.  And when you say "S&OP", is that -- what

Page 45

1  does that stand for?
2      A.  The global -- this is the -- I think it's
3  better that I describe what it is.  It's the process by
4  which demand and supply comes together.
5      Q.  All right.
6      A.  It's just a planning process where we
7  discuss demand and we discuss supply and we try and
8  align them.  That's all it is.
9      Q.  Okay.  When you said these people who are
10  one step below, are they below Mr. Peacock?
11     A.  They are.
12     Q.  All right.  Are they in Basel?
13     A.  Most of them are, yes.
14     Q.  All right.  And they would be working
15  in -- from which company?
16     A.  They would -- they would almost
17  certainly -- I say "almost certainly" because I don't
18  have the absolute proof in -- or data in my head, but
19  Syngenta Crop Protection AG.
20     Q.  All right.  And under Mr. Peacock's
21  direction?
22     A.  Yes.
23     Q.  And he's an employee of Syngenta Crop
24  Protection AG?
25     A.  No, he's my colleague on the executive

12 (Pages 42 to 45)

Exhibit 003 Page 12
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 46

1  committee, so he's -- he's Syngenta International AG.
2      Q.  All right.  And do you know who would be
3  their boss at Syngenta Crop Protection AG?
4      A.  Okay.  If they're not reporting directly
5  to Mark Peacock, I don't, off the top of my head.
6  I'd have to reflect on that.
7      Q.  All right.  And, anyway, these people
8  then, as you say, make this recommendation.
9      A.  Mmm.
10     Q.  And they have now made a determination as
11  to where the atrazine goes.
12     A.  Yes.
13     Q.  What happens at that point?  How is it
14  communicated?
15     A.  It would be communicated back through the
16  United States planning process.  In the United States,
17  they have their own process, so they would receive the
18  international demand and they would then factor that in
19  to the running of the St. Gabriel operation, and they
20  would -- they would do the detailed scheduling of
21  production themselves.
22     Q.  And who would that be?  When you say
23  "they would do that in America", who would that be?
24     A.  Well, that would be all over John Riley,
25  who is looking after that whole thing, and of course we

Page 47

1  have a plant head and -- and some planners in the
2  United States, whose names I don't know.
3      Q.  And who is John Riley?
4      A.  He is the head of global supply for NAFTA.
5      Q.  And by whom is he directly employed?
6      A.  Syngenta Crop Protection Inc.
7      Q.  And where is his office?
8      A.  Greensboro.
9      Q.  And -- and what would the head of global
10  supply for NAFTA mean?
11     A.  It would mean he -- we have -- our
12  business in -- in -- in NAFTA in 2009 was around
13  $2.5 billion, so his responsibility is to provide the
14  products on time to the customers to satisfy that
15  $2.5 billion business.
16     Q.  For -- and when you said for -- is that in
17  the NAFTA region?
18     A.  NAFTA region, yes.
19     Q.  2.5 billion is from the NAFTA region?
20     A.  Yes.  There was 1.9 billion was the
21  United States, and the rest was Canada and Mexico.
22     Q.  Okay.  How much of that is atrazine?
23     A.  How much of that is atrazine?  About --
24  atrazine and atrazine-containing products, about
25  350 million.

Page 48

1      Q.  All right.  Now, where we -- I think where
2  my mind takes us back to and, and I -- I didn't want to
3  interrupt where you were going in your discussion in
4  explaining it to me, but it goes back to the 17-person
5  NAFTA group.
6      A.  Yes.
7      Q.  That -- is there -- is there a head of
8  that group?
9      A.  Vern Hawkins.
10     Q.  All right.  And does he have a title for
11  that group?
12     A.  Well, he's president of -- of
13  Crop Protection Inc. and in that -- he's head of the --
14  head of the region.
15     Q.  Head of the NAFTA region?
16     A.  That's what we call him, yes.
17     Q.  All right.  And do you know what his
18  responsibility as head of that region would be?
19     A.  Yes, in broad terms.  I mean, he's
20  responsible for the -- I mean, we have a global
21  strategy, which I could describe to you, but he's
22  responsible for -- our global strategy is a framework,
23  nothing more, nothing less, and he -- he is responsible
24  for developing a local strategy in line with Syngenta
25  framework and standards, and to expand our business,

Page 49

1  to grow it, to improve profitability, to increase market
2  share, and market share is one of our biggest measures,
3  most important measures, and in fact that -- you know,
4  profitably grow market share is -- is, if you like,
5  shorthand for what he -- he does.
6          He also has an important responsibility when it
7  comes to public affairs.  He works -- he works with
8  stakeholders in the United States to build the Syngenta
9  brand.
10     Q.  In terms of his NAFTA responsibilities,
11  or as head of that group, of the NAFTA group, of which
12  I think you said the heads of Canada and Mexico were
13  members --
14     A.  They are.
15     Q.  -- what is his job in terms of that -- and
16  you called that 17-person board or something, you called
17  the name -- I don't remember the name.
18     A.  Regional leadership team.
19     Q.  Regional leadership team.  What is
20  his responsibility as head of the regional leadership
21  team?
22     A.  He is driving and monitoring performance
23  of the business; corrective action, where necessary;
24  he is leading the creation and the adaptation of
25  strategy; he is leading the succession planning

13 (Pages 46 to 49)

Exhibit 003 Page 13
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 50

1  discussion, everything concerned with human resources,
2  how we -- we deal and manage people is brought together
3  in that group; they discuss things also such as
4  remuneration, pay, we're now in the process of
5  discussing pay rises around the world, that would be a
6  topic that they would discuss.
7       Q.  And he would have that over the NAFTA
8  region?
9       A.  He would discuss that -- he would -- yes.
10  Yes, he would -- well, yes, he would discuss it, but
11  that doesn't mean to say that they don't have those
12  discussions for Canada -- for Canada and Mexico.
13      Q.  I understand that.
14      A.  Yes.
15      Q.  But, I mean, in terms of the NAFTA region,
16  he would be at least given in this committee, as
17  regional head, the oversight or control over that
18  region, the NAFTA region?
19      A.  Yes.
20      Q.  Now, how long has that organization been
21  established?
22      A.  The RLT?
23      Q.  Yes.
24      A.  We've had RLTs -- and that's a
25  particularly large one, but we have them in all the

Page 51

1  regions and we've had them since the company was
2  created, or within a very short time of the creation of
3  the company.
4       Q.  Now, by what authority does he derive the
5  power as head of this regional group?
6       A.  By what authority?  Well, he is -- he is
7  chairman of the Crop Protection Inc. board, on which
8  I also sit.
9       Q.  Okay.  And the -- and so he is -- when you
10  say "Crop Protection Inc. board" --
11      A.  Mmm.
12      Q.  -- where is that company located?
13      A.  In Greensboro.
14      Q.  Okay.  I'm sorry Syngenta Crop
15  Protection Inc.?
16      A.  Excuse me.
17      Q.  I had a -- I had a mental block.
18      A.  Excuse me.  Yeah.  Yeah.
19      Q.  Okay.  So he derives that through his --
20  his role as president of -- of Syngenta Crop
21  Protection Inc.; correct?
22      A.  (Witness nods head.)
23      Q.  You have to say "yes" or "no", I'm sorry?
24      A.  Yes.  I -- yes.
25      Q.  What I'm saying is -- the reason I say it

Page 52

1  is because the -- while the video can see you nodding,
2  the reporter has to note it on the record.
3       A.  Okay.
4       Q.  All right.  So now, if you can, walk me
5  through, then, how the same type of thing would work in
6  the other three regions that you've identified?
7       A.  At a high level, it's quite simple,
8  because if we -- if we go south to -- to Latin America,
9  we're based in San Paulo, and there we have also a
10  regional leadership team, and Antonio Carlos Guimaraes
11  is the head of -- head of our region down there.
12      Q.  And what would the region be comprised of
13  in terms of Syngenta affiliates or subsidiaries?
14      A.  In terms of Syngenta affiliates or
15  subsidiaries?  I will not be able to describe to you in
16  detail the names of the affiliates that we have down
17  there --
18      Q.  All right.
19      A.  -- the legal entity names, but I can tell
20  you how we are organized down there.
21      Q.  All right.  Can you tell me how many of
22  them there are down there?
23      A.  How many affiliates there are?
24      Q.  Yes.
25      A.  No, because I don't know how many country

Page 53

1  affiliates there are down there.
2       Q.  Are there several?
3       A.  There will be several, yes.
4       Q.  All right.  And where are they located,
5  in what countries?
6       A.  Argentina, Chile, Colombia, Brazil, and
7  probably in one or two of the other Latin America north
8  countries --
9       Q.  And --
10      A.  -- Guatemala, for example.
11      Q.  And are those -- are they each separate
12  corporate entities in each country?
13      A.  I believe -- for example, Colombia,
14  I believe it would have its own legal entity -- it has
15  its own -- it has its own legal entity.  I just can't
16  tell you the name of it.
17      Q.  And I understand that, sir.  I'm not
18  trying to -- you're doing -- your recollection of these
19  is fine.  I'm not suggesting it isn't.  I'm just
20  saying -- I'm just trying to get my mind around the
21  organization.
22      A.  Okay.
23      Q.  With -- as best you know, knowing that
24  there may be one that straddles two countries or
25  something, would most of them have a separate entity for

14 (Pages 50 to 53)

Exhibit 003 Page 14
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 54

1  each country?
2      A.  Yes, mostly.
3      Q.  All right.  Now -- and then tell me how
4  that would work, then?
5      A.  So it's quite similar.  Antonio Carlos
6  Guimaraes would -- would have his regional leadership
7  team, and we've actually split that region as follows:
8  we have Latin America south, which -- which is
9  headquartered in Buenos Aires, and that brings in Chile,
10  Uruguay, Paraguay, Bolivia and Argentina together; and
11  then we have -- we have Brazil, which is Brazil; and
12  then we have what we call ACC, which is Andean --
13  Andean -- Central America and Colombia, Colombia and
14  Central America, which includes all -- almost all the
15  countries I haven't mentioned as far north as Mexico, it
16  stops at the Mexican border.  So Colombia, Guatemala,
17  all the Caribbean, Venezuela, right up to -- to the
18  Mexican border.
19      Q.  And do -- does the product atrazine get
20  sold in those entities?
21      A.  In many of them, yeah, it does.
22      Q.  All right.  Then tell me how this
23  individual -- and I'm not going to try to pronounce his
24  name -- that you -- you've described, how he works in
25  terms of that regional area?

Page 55

1      A.  How he works?
2      Q.  How he runs it or how the operation works,
3  in terms of a leadership team.
4      A.  Okay.  Well, we talked a lot about the
5  leadership team, but of course it's much more than that.
6  I mean, he -- he would travel regularly to these places
7  and meet with customers, meet with the operating -- and
8  country leadership teams that exist in these places.
9      He would -- he would -- in his regional
10  leadership team and outside it, he would discuss
11  strategy, he would discuss product portfolio, he would
12  discuss ideas about how we could segment the market,
13  new innovations that we have, either developed through
14  Basel or developed locally.
15      Q.  And which company does he work for?
16      A.  Brazil.  The Brazilian company.
17      Q.  Does he work for any of these other
18  companies?
19      A.  I don't believe so.
20      Q.  All right.  And do you know what his title
21  is at the Brazilian subsidiary?
22      A.  No.  No, I don't know exactly what his
23  title is, no.
24      Q.  Do you know if he is the head of that
25  Brazilian entity or is he in a leadership role there?

Page 56

1      A.  I'm not sure.
2      Q.  Okay.  Do you know how he derives his
3  authority to act as head of the leadership team for
4  South America?
5      A.  In the legal entity sense, no.
6      Q.  Who does he report to after he acts and
7  runs the leadership team?  I assume he has authority
8  over that whole area in South America --
9      A.  He has authority --
10      MR. POPE:  Objection.  Objection to what
11  "authority" means.
12      THE WITNESS:  Yes.
13      MR. POPE:  You've used "coordination", you've
14  used "control", you've used certain terms.
15      MR. TILLERY:  That's fine.  I'll withdraw it.
16  BY MR. TILLERY:
17      Q.  What -- what do you think of in terms of
18  his relationship with these other entities?
19      A.  I think of him as providing the strategic
20  leadership to these other entities, to helping --
21  to helping -- and not -- there's a big coaching.
22  I mean, he's a very -- he's the senior guy, he helps
23  coach some of the younger leaders on how -- on -- to
24  improve their -- their performance.
25      He is monitoring performance, he's -- he's

Page 57

1  looking at the income statements, are we spending too
2  much, have we invested -- he gets investment proposals,
3  acquisitions.  We're in the process of -- of acquiring a
4  business in Latin America south, and he's very much
5  involved in that.
6      Q.  Well, and who would -- who would be
7  acquiring that business?  Who would actually buy it?
8      A.  Who would -- who is buying -- buying it?
9  From a legal entity standpoint, I have to say I'm not
10  sure.
11      Q.  And when you say he's assisting the other
12  leaders, would that be the other leaders of the other
13  entities?
14      A.  The other leaders --
15      Q.  Of the other -- of the other subsidiaries
16  in South America?
17      A.  Yes, correct.
18      Q.  And would -- who would be in charge there
19  of coordinating the distribution in Latin America?
20      A.  The -- the physical distribution of the
21  products?
22      Q.  Yes.
23      A.  Okay.  So he would have his -- there is a
24  head of global supply also in San Paulo, very much in
25  the way I described to you the Greensboro set-up, and it

15 (Pages 54 to 57)

Exhibit 003 Page 15
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin           10-15-2010
Confidential - Pursuant to the Protective Order

Page 58

1   would operate in a very similar way.
2        Q.  And that would be a person who would do
3   what with respect to all of those entities?
4        A.  It's very similar to the way I described
5   John Riley's role.  We do have a very large formulation
6   facility in Paulinia, which is in the state of
7   San Paulo, and that is supplying product throughout
8   Latin America, and so, you know, the big task for him is
9   to -- he's not concerned in this instance with exporting
10  product outside Latin America -- Latin America.  He is
11  very much concerned with provisioning our customers
12  throughout the Latin American region.
13       Q.  And who would he work for, the person in
14  terms of global supply from South America?  Who would --
15       A.  So it's exactly the same as the set-up
16  with John Riley:  he works -- he works for both Antonio
17  Carlos Guimaraes, who is the business lead, and the head
18  of global supply, who is Mark Peacock.
19       Q.  And his assignment is in Brazil?
20       A.  His -- his assignment is in Brazil, yes.
21       Q.  Okay.  Now, we've talked about NAFTA
22  region and the South American region.  There are
23  two other regions.
24       A.  There are.
25       Q.  Could you walk me through those, please?

Page 59

1        A.  Europe is headquartered in Basel, and
2   that encompasses -- it's Europe, Africa, Middle East, so
3   it encompasses -- well, I think it's fairly descriptive:
4   it's everything, Europe east and west, Africa, the
5   Middle East and all of -- all of Russia and the CIS.
6        Q.  And how is that operated?
7        A.  Again, we have a regional leadership team.
8   The head of the whole region is called Jon Parr, with
9   two Rs, and he -- he leads his leadership team and he --
10  he is doing a similar role to that of Antonio Carlos
11  Guimaraes and -- and Vern Hawkins.
12       Q.  And that would include -- well, we don't
13  really need to go back over all of this and ask the same
14  questions.  It would be -- is there any notable
15  difference in terms of his authority or his -- or his --
16  his operation, or use any word you want to describe what
17  he's doing, that's up to you?
18       A.  I -- I don't think there is much of a
19  difference, except that that is our biggest region, so
20  it is bigger than the others, it's more -- more diverse
21  than the others because it encompasses Africa and -- and
22  Russia, but apart from that, it's -- you know, it's --
23  it's strategy, it's performance, it's new businesses,
24  it's investment proposals and --
25       Q.  And who does this leader -- head of the

Page 60

1   leadership team work for, directly?
2        A.  He reports to me.
3        Q.  And is he in Basel?
4        A.  He is.
5        Q.  And how many different legal entities are
6   within his -- within the umbrella of his leadership
7   team?
8        A.  A great number.  I mean, we have them in
9   France, Germany, Italy, Spain, Bulgaria recently set up.
10  Everywhere.
11       Q.  And are these all separate legal entities,
12  as far as you know?
13       A.  I believe so.
14       Q.  And without going through all of the same
15  questions we went through for NAFTA and
16  South America/Latin America, would the organization be
17  the same in terms of his -- his management of that
18  leadership team and responsibility, as well as the
19  coordination of global supply within that group?
20       A.  It has a lot of similarities, yes.
21       Q.  Are there any -- if there are any
22  differences, tell me?
23       A.  Well, we didn't go into all detail on
24  this, but of the information I've given you, I think
25  it's -- it's pretty similar.

Page 61

1        Q.  Okay.  About the Pan-Asian?
2        A.  Well, we head that -- we headquarter that
3   out of Singapore, and it's run by an Australian called
4   Andrew Guthrie, and he has his regional leadership team.
5   Of course his region is extremely diverse, from Japan in
6   the north to New Zealand in the south and China in the
7   -- in the west, China and India, and Pakistan is the
8   western boundary.  And, again, he -- he runs it in a --
9   in a similar way.
10       I should perhaps have pointed out that -- I did
11  tell you that Latin America was split up:  Latin America
12  south, ACC and Brazil.  In Europe, we have eastern
13  Europe as a -- you know, we have an area head who
14  reports to Jon Parr who runs the whole of eastern
15  Europe, and we have one man running Africa/Middle East
16  who reports to him.  So we have -- we have grouping of
17  countries.  And, equally, we do in -- in Asia.  We -- we
18  group south-east Asian countries, for example.
19       Q.  And how do they -- where do the group
20  leaders -- where do they work?
21       A.  In -- in the case of Europe, in Basel;
22  in the case of Asia, in Singapore.
23       Q.  And would they -- in Asia -- in Singapore,
24  would they work for one of the subsidiary entities?
25       A.  If they're based in Singapore, I believe

16  (Pages 58 to 61)

Exhibit 003 Page 16
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 62

1 they would work for our -- of which I'm a board
2 member -- our Asia-Pacific Pte Singapore listed --
3 registered company.
4      Q.  And do you know the name of that company?
5      A.  Asia-Pacific Pte, I think, I believe, but
6 I can correct that after the break.
7      Q.  If you can.  It's not -- that's -- that's
8 okay.  In terms of that particular entity, what role
9 does it have in terms of leadership in the Asian area?
10      A.  As an entity, it is an entity which houses
11 the people who work there.
12      Q.  I see.  So it's -- really, we're talking
13 about the people, then.  And the person or people that
14 come from there are just the leadership team leader or
15 head from that company?
16      A.  Yes, yes.
17      Q.  And what is his name?
18      A.  Andrew Guthrie.
19      Q.  All right.  And does his responsibility
20 parallel that of the other leadership team members, like
21 Mr. Hawkins that we talked about earlier?
22      A.  Yes, it's similar.  Yes, it's similar.
23      Q.  And -- and how would he -- how many
24 different corporate entities would exist that would be
25 sort of under that leadership team?

Page 63

1      A.  Well, we have legal entities in -- in
2 all -- all those countries, in all those countries.
3      Q.  As far as you know, it is a separate legal
4 entity in each one of the countries?
5      A.  As far as I know, apart from ones where
6 we -- you know, in places like Cambodia, you know, we do
7 it as an export business.  But apart from that, yes.
8      Q.  In terms of global supply or supply needs,
9 is there a person who does the same sort of thing there
10 as in NAFTA?
11      A.  There is.
12      Q.  Who is that person, do you know?
13      A.  We've just changed him.  He has just --
14 the previous incumbent has moved to Basel, and I cannot
15 recall the name of his replacement.
16      Q.  And what would that person's job be?  What
17 would they do in that responsibility?
18      A.  Well, in the case of -- of Asia, there's
19 quite a big logistic task.  We -- we have a lot of
20 product for ease of distribution that comes through
21 Singapore before going on to all the customers
22 throughout the region, so his task is -- is quite a
23 complex logistic task of making sure we get all these
24 different products in all these different markets on
25 time.

Page 64

1      And we also have manufacturing out there.
2 In Goa, India, we have active ingredient manufacturing.
3 In China we manufacture active ingredients, we have
4 formulation plants.  It's quite a complex supply chain
5 role that he has.
6      Q.  Well, that's one of the things I was going
7 to ask you:  how do you coordinate the -- this need in
8 Asia, this in Europe and NAFTA and South America?  How
9 does this all work?  Explain it to me?
10      A.  Well, at a very high level, that's the
11 reason why we have a strong supply chain function which
12 is globally coordinated, for exactly that reason,
13 because it is -- so the planning -- that's -- the
14 planning is centralized.
15      Every operating unit has its own planning
16 process that we talked about before, and that comes
17 together at a global -- in a global planning process,
18 and it -- it works reasonably well.
19      We're never fully satisfied with it, but it
20 works reasonably well.  So it's a combination of local
21 planning and global planning, but of course with,
22 you know, the benefits of modern computing and
23 communication, we can do that reasonably well.
24      Q.  And is there a head of -- of global
25 supply, then, in Basel that oversees all of this?

Page 65

1      A.  Yes, Mark Peacock, yes.
2      Q.  And he is -- he is the head of monitoring
3 the needs throughout the -- the corporate entity
4 throughout the world?
5      A.  Ultimately, and -- and he and I, on this
6 global team, will sit together with representatives from
7 the regions quite frequently and -- and discuss some of
8 the issues that are resulting from this rather complex
9 set-up.
10      Q.  And in terms of some of the other issues
11 you talked about, in terms of human -- well, let's just
12 pick human resources.  How do human resources work in
13 terms of your specific operation in the agrochemical
14 business of Syngenta?
15      A.  Okay.
16      Q.  In the terms of needs of people, and,
17 actually, if you could speak to how it works in terms of
18 moving one person to another.  I talked about that
19 yesterday with Mr. Maeder, but I'd like to see, in terms
20 of your specific business, how that works?
21      A.  Okay.
22      MR. POPE:  Should he focus on that last
23 question, as opposed to --
24      MR. TILLERY:  If you want me to withdraw it,
25 Mike, I will.

17 (Pages 62 to 65)

Exhibit 003 Page 17
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

---

Page 66

1      MR. POPE:  No, just so he is clear.
2      Dr. Atkin, you are being asked about simply
3  moving people from place to place.
4  BY MR. TILLERY:
5      Q.  Why don't we start with that, and if -- if
6  you want me to rephrase the question, I'll be happy to
7  do that.
8      A.  Okay.
9      Q.  All right.
10      A.  Well, we have a succession planning
11  process, so every -- every operating unit, you know,
12  that starts in a country will have identified talents,
13  people who -- who are capable of being promoted and
14  moved, and this will be discussed at the regional level
15  and then it will come together at the global level, and
16  so we'll have a -- a globally coordinated list and --
17  and plan against -- against each of the senior jobs:
18  who could replace this man or this lady if they left or
19  if they were promoted in turn.  So we -- we -- it is
20  bottom up, it's driven bottom up, but we have -- for the
21  more -- for the most senior jobs, we have -- I have this
22  visible at my level.
23      Q.  One of the things I talked to Mr. Maeder
24  about, as discussed, was a talent review, this sort of
25  thing.  Are you part of that group as well?

---

Page 67

1      A.  Very much so, yes.
2      Q.  How does that work?
3      A.  Well, first of all, we have a specific
4  meeting.  We haven't talked about my crop protection
5  leadership team at a global level, but we have a
6  specific meeting, which is most of the people who are in
7  that crop protection leadership team, to discuss the
8  talent.
9      So we will sit and -- we will sit and -- and
10  look at sometimes individual names, sometimes the shape
11  of it, have we -- you know, do we have enough people in
12  our pipeline or should we -- you know, should we be
13  hiring more, and, you know, what sort of people should
14  we be hiring.  So we do discuss it at the more senior
15  level, yes.
16      Q.  And how does it work in terms of
17  identifying a particular person?  For example, a need
18  arises at Syngenta Crop Protection Inc. for a particular
19  type of person.  How does your talent review end up with
20  selecting somebody that would be a good fit for a
21  particular company?
22      A.  Okay.  Well, that arose one year ago when
23  the head of -- when the head of -- the combination of
24  crop -- Syngenta Crop Protection Inc. resigned one year
25  ago.  We looked at the talent list and succession plan,

---

Page 68

1  and Vern Hawkins was in the succession plan, so he was
2  the proposal of the -- of the board, Syngenta Crop
3  Protection Inc.  He was already in the plan, and -- and
4  his name came forward on this principle of one over one.
5      Q.  What does that mean?  I saw that in some
6  of the documents:  one over one?
7      A.  Yeah, well, he reports to me, so the idea
8  is that I wouldn't just go away -- go ahead and nominate
9  him to that role without consulting my boss, who is the
10  chief -- chief executive operator.
11      Q.  And who is that?
12      A.  Mike Mack.  Officer.  Mike Mack is the
13  chief executive officer.  So that's -- that's the way it
14  works.  So that's -- that's a good example of what
15  happens.
16      Q.  And did that happen with respect to
17  Mr. Hawkins?
18      A.  It did, exactly that way.
19      Q.  Now, I think we've covered the
20  four different groups.  We were talking about --
21  what led us down all of this discussion was an initial
22  question about the comparison of Novartis AG and the
23  operations there with Syngenta AG's facilities --
24  facilities and operations, and you were trying to
25  describe, I think, the differences.

---

Page 69

1      Could you tell me, in terms of the overall
2  differences, you described that NAFTA was different, we
3  talked about that.  What else do you see in terms of
4  operational distinction between Novartis and Syngenta?
5      A.  It would take a long time to do.  There
6  are --
7      Q.  Are there a lot of them?
8      A.  There are a lot of differences.
9  I don't -- there are a lot of differences that have real
10  business meaning, whether you would call them all
11  operational, but, you know, the strategy that we deploy,
12  the way we work with public affairs, which we never did
13  very -- I mean, we're a public company now.  We were
14  part of a multi-divisional company before.
15      I mean, you -- you know, there are so many
16  striking differences in the way we -- the way we operate
17  that -- I don't know which particular bit you'd like to
18  talk about.
19      Q.  And I don't mean to -- I don't think it
20  would be helpful to go through the business differences,
21  because that's not, you know, really what we're talking
22  about.
23      In terms of, let's just say, operational
24  management, I mean, let 's narrow that question down to
25  the management structure of the company versus the

---

18 (Pages 66 to 69)

Exhibit 003 Page 18
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 70

1  business decisions that you make and the way you -- the
2  way you run your -- in other words, the way you go after
3  business or market share or anything else.  Let's just
4  talk about the operational systems in terms of the
5  set-up or hierarchy of responsibility.  How is it
6  different between Novartis and Syngenta?
7        A.  We have a much more developed matrix
8  system in Syngenta than we did in -- in -- either in
9  Novartis or in the Zeneca legacy company.  That would
10  be, I think, if you were to compare the two, and we're
11  talking ten years ago here, so maybe my memory will not
12  be as good as it should be, but we have a stronger and a
13  more clearly defined matrix system and --
14        Q.  What does that -- what does that mean, if
15  you don't mind, a matrix system?
16        A.  It means that we have heads of functions,
17  like Mark Peacock, who has a responsibility to ensure
18  that people sitting in the regions and the territories
19  are coordinating their activities globally, as opposed
20  to the local operating unit having total management
21  control of all aspects of that supply chain and not
22  having it coordinated very strongly globally.  That's a
23  difference.
24        Q.  Does that result in economies, in terms of
25  operational economies?

Page 71

1        A.  Yes.  Yes.
2        Q.  Does it streamline and make the overall
3  Syngenta AG and its affiliated companies more efficient?
4        A.  It does.
5        Q.  How -- explain that to me?
6        A.  Well, because it's enabled -- I mean,
7  one -- one of the things we did when we created the
8  company and we needed to do was -- one of the reasons it
9  was created was to be more efficient.
10        We -- you know, the two individual businesses
11  wouldn't have been viable to be public companies on
12  their own.  So, you know, we shared 3,000 jobs, we
13  had -- we had to do that.  Quite a few of those were in
14  the manufacturing area.  We didn't need all the -- the
15  formulation plants we had, we didn't need all the
16  facilities that we ran, and so we were able to create a
17  much more efficient global supply chain.
18        I would -- I would, though, like to draw a
19  distinction between what is global and what is local.
20  What I'm talking about is what is genuinely global.
21  To the extent that there is a local formulation facility
22  like we have in Omaha in the United States, that will
23  serve local needs and be managed locally, with a very,
24  very light touch globally, but the atrazine plant in
25  St. Gabriel is very strongly coordinated globally

Page 72

1  because its customers are global.
2        Q.  Well, let's now go back to the transition
3  date that we talked about, in terms of you starting at
4  your job with Syngenta, and when Syngenta was formed,
5  what was your title and responsibility?
6        A.  Chief operating officer for the crop
7  protection division.
8        Q.  And by whom were you directly employed?
9        A.  By Syngenta International AG.
10        Q.  And what was the group -- was there a
11  separate entity over which you had responsibility, a
12  separate legal entity?
13        A.  Well, I was on the board of -- I was on --
14  I was -- I was put on, or I -- I was invited to
15  participate -- I became on the board of crop -- Syngenta
16  Crop Protection AG, and I was already on the boards of
17  two of the legacy organizations, the Crop
18  Protection Inc. organization and the -- the one in
19  Asia-Pacific.
20        Q.  And the Syngenta Crop Protection AG
21  entity, is that in Basel?
22        A.  Yes.
23        Q.  And who also is on that board?
24        A.  John Ramsay and Christoph Maeder.
25        Q.  Did it have any subsidiaries?

Page 73

1        MR. POPE:  Do you mean at the time of the
2  merger or do you mean now?
3  BY MR. TILLERY:
4        Q.  You can expand that question.  He raises a
5  good point.  At any time from -- from the time of the
6  merger, its creation, up until now, did Syngenta Crop
7  Protection AG have any subsidiaries?
8        A.  I don't think I can answer your question
9  accurately.
10        Q.  What I'm looking for is to know if it is a
11  company which has any direct line to any of the crop
12  protection companies.  Do you know that one way or
13  another?
14        A.  It's in the word "direct" -- the phrase
15  "direct line," but I'm --
16        Q.  And if it -- and if it's indirect, that's
17  fine as well.
18        MR. POPE:  Objection to the form of the
19  question.
20        THE WITNESS:  I believe it -- I believe it
21  must have direct and indirect lines, but I can't
22  describe them all to you.  It's quite complicated.
23  BY MR. TILLERY:
24        Q.  Do you know what the relationship is
25  between Syngenta Crop Protection AG and Syngenta Crop

19 (Pages 70 to 73)

Exhibit 003 Page 19
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 74

1  Protection Inc. in the United States?
2       A.  No.
3       Q.  Now, you were talking about all of these
4  coordinated efforts of the -- the activities of these
5  different entities, and streamlining and making it more
6  efficient.  How do you share information in terms of any
7  research for any of the products that you sell?
8       A.  There are -- there are two principal ways.
9  The R&D community have a development committee.  They
10 have a global development committee and there are
11 development committees in all the regions and some of
12 the -- some of the affiliate country companies, so that
13 there are committees where all of these things are
14 reviewed:  new compounds, we have a stage plan, so if
15 something is in stage 2, which is just before -- stage 3
16 is the big development investment.  If it's in stage 2,
17 then it would be communicated to operating -- to the
18 regional development committees and they would discuss
19 what they had to do with preparation for it to be
20 promoted to stage 3, and of course whether it's in
21 stage 1, 2 or 3, it's debated in the Basel global
22 development committee.
23      Q.  And if you wouldn't mind, walk me through
24 how a new product in that context would find its way
25 onto the market in the -- in Syngenta today, how this

Page 75

1  process would take place?
2       MR. POPE:  This would be a hypothetical
3  product?
4  BY MR. TILLERY:
5       Q.  It is.  And if you want to pick one,
6  I don't care, it is up to you.  Otherwise, I'll just use
7  a hypothetical product.  But if you want to pick a
8  particular one for the purposes of explaining it, fine;
9  if not, just do a hypothetical?
10      A.  If it's ours from the start, and bear in
11 mind that we do license-in products.
12      Q.  I understand.
13      A.  If it's ours from the start, then it would
14 be discovered in one of three places:  either Stein,
15 which is our research station near Basel.
16      Q.  Would you spell that, please?  Stein?
17      A.  Yes, Stein?
18      Q.  Okay.  Stein.  I'm sorry, I didn't
19 understand.
20      A.  Stein or Jealott's Hill, which is --
21 Jealott's Hill specializes in herbicides, Stein
22 specializes in fungicides and insecticides.  So it will
23 be discovered -- the chances are, it would be discovered
24 in -- in one of those two places, although we do have a
25 small unit in Goa, India, where there are -- there is

Page 76

1  discovery work ongoing.
2       Q.  And what -- and what do these three -- are
3  these laboratories?
4       A.  Yes.
5       Q.  Scientific?
6       A.  Yes.
7       Q.  And the Stein location --
8       A.  Yes.
9       Q.  -- who runs the Stein location?
10      A.  Martin Clough.
11      Q.  And by whom is he employed?
12      A.  He -- well, he is head of our crop
13 protection research overall, actually.
14      By whom is he employed?  He is probably in
15 crop protection -- oh, no, he may not -- he may be
16 international also, he may be international.  I can't --
17 it's one or the other.
18      Q.  Okay.  He would be one or the other,
19 international -- or what was the other one?
20      A.  Crop Protection AG.
21      Q.  Crop Protection AG?
22      A.  Or International AG.
23      Q.  Or International AG.  Okay.  And do you
24 know what his responsibility is?
25      A.  Global responsibility for crop protection

Page 77

1  research.
2       Q.  And would that be for all three of the
3  laboratories?
4       A.  Yes.
5       Q.  And would you mind spelling his name
6  again?
7       A.  Clough, C-L-O-U-G-H.
8       Q.  Okay.
9       A.  Martin.  And so if we discover a molecule,
10 it will either -- either be discovered by serendipity,
11 random screening; more likely, it will be a -- it will
12 be a product of having understood the literature and
13 the -- the whole patent estate that is already in the
14 public domain or visible to us and found clever ways of
15 improving on it.
16      So, you know, you can do a lot of modeling
17 to -- to figure out what would a better compound look
18 like.
19      So once we have -- once we have a compound,
20 generally we wouldn't settle on exactly what this
21 compound would be in the very early stage, but once
22 we've found it, it then goes through preliminary
23 testing, and we're able to -- to screen it against most
24 weeds, pest and diseases that are of economic importance
25 worldwide, and we can do that screening in Stein or in

20  (Pages 74 to 77)

Exhibit 003 Page 20
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 78

1  Jealott's Hill.  These are the two principal places
2  where this screening -- these are the two places where
3  this screening would occur.
4      Q.  And -- now once, then, there's been a --
5  do any of these -- strike that question.
6      Do any of the subsidiaries have laboratories
7  themselves?
8      A.  They do.  We have a small laboratory in
9  Greensboro.
10      Q.  And what does the -- what is the purpose
11  or function of that laboratory?
12      A.  It's to support -- it's principally to
13  support the local business in matters such as analysis
14  and -- analytical methods and -- and other things which
15  pertain to -- to work which is required in the
16  United States, but it's not -- it's only a small unit
17  and it's -- it's nothing -- it doesn't have a role in
18  this first phase of -- of product.
19      Q.  It's not a product development laboratory?
20      A.  Not -- not really.  It's a support
21  laboratory.
22      Q.  Would it be like a compliance laboratory?
23      A.  You could call it that.  It's closely
24  linked to the registration requirements of the
25  United States.

Page 79

1      Q.  I understand.  And are there -- do many of
2  the other subsidiaries around the world have
3  laboratories?
4      A.  Well, this one, Goa, in India, is -- is
5  part of the Indian -- broader Indian operation.
6      Q.  Does it have an actual scientific base
7  crew that's developing molecules?
8      A.  It has -- in -- in Goa?
9      Q.  Yes.
10      A.  There's a -- there's a team that we've
11  developed out there that are involved in the discovery
12  process.  I can't give you much more detail than that.
13      Q.  All right.  Now, in terms of these
14  three --
15      A.  Yes.
16      Q.  -- Jealott's Hill --
17      A.  Yep.
18      Q.  That would be more relevant in terms of --
19  of herbicides, I guess.
20      A.  Yes.
21      Q.  Walk me through, then, how this happens?
22  One of them is identified, the -- the scientific
23  analysis is undertaken, and then --
24      A.  And then we test it -- we test it.  We --
25  we make sure -- I mean, it's got to work.  So does it

Page 80

1  control the major weeds -- in corn, for example, in
2  corn.  Is it -- is it going to be suitable as a corn
3  herbicide?  And once we -- once we've established --
4  there are two very distinct phases.  The first phase is
5  under cover.  So we do it in greenhouses.  And this is
6  extremely -- you need special permits to test compounds
7  of relatively unknown toxicology in -- in all parts of
8  the world wherever you want to do it, but we've got
9  these special permits in the UK and Switzerland to do
10  this, and so these are sealed systems that are -- they
11  are handled in very special ways because we don't know
12  the toxicology.
13      And then the next phase is they are permitted,
14  and there's a process behind that, to be used in small
15  plots outside, and then, as we -- as we move -- to make
16  it quick, we -- we move through all that phase into
17  large-scale field trials and experimental use permits
18  and then regulatory dossiers, and it takes seven years
19  before it shows up on the market.
20      Q.  And when it shows up on the market, then,
21  is it made available to all the subsidiaries?
22      A.  Is it made available?
23      MR. POPE:  You mean the product, you're
24  talking about?
25  BY MR. TILLERY:

Page 81

1      Q.  The product.
2      A.  Yeah.  Through these development
3  committees, and indeed through our -- our marketing
4  coordination, we ascertain where this product will fit,
5  and that's part of the process.
6      We -- we don't -- it costs $200 million from --
7  roughly from test tube to packed product to get it
8  there.  So we don't engage in the -- the majority of
9  that $200 million spend until we have reasonable
10  certainty that it will be suitable for a reasonably
11  large market.
12      So that involves consultation processes with
13  the regions and with the affiliates in different
14  territories, and that consultation process happens at
15  the development level and it happens at the marketing
16  level.
17      Q.  Now, Jealott's Hill is how big of an
18  operation?
19      A.  Quite big.  I can't tell you exactly how
20  many people work there, but it is -- it is quite big.
21      Q.  And who pays for that operation?
22      A.  It's -- it's -- okay.  At the highest
23  level, it's consolidated in our group income statement.
24  It -- it shows up in the Crop Protection income
25  statement in my division and --

21 (Pages 78 to 81)

Exhibit 003 Page 21
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John   Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 82

1      Q.  Under Crop Protection AG or crop -- or
2  International or do you know where it is located in the
3  operation?
4      A.  Okay.  I don't.
5      Q.  Okay.  It's not being paid for by a
6  subsidiary, I presume?
7      A.  No.
8      Q.  And --
9      A.  That's why I hesitate.  It's not --
10  it's not associated with our local business in the UK.
11  It operates quite separately from our local business in
12  the UK --
13      Q.  And --
14      A.  -- but we have a UK holding company.
15      Q.  Right.  And is the same true with respect
16  to Stein?
17      A.  Stein -- the cost of Stein does not show
18  up in our income statement for our Swiss Crop Protection
19  business; it does not.
20      Q.  And so it is, again, under the -- the
21  International operation?
22      A.  I believe so.
23      Q.  But you don't know which of the entities
24  it -- is paying for it?
25      A.  I don't know.

Page 83

1      Q.  And, likewise, in terms of the employees
2  who run Stein, do you know who they are connected to
3  within the corporate structure of Syngenta?
4      A.  I believe -- I don't know this, but I --
5  I think it should be Crop Protection AG, but that may
6  not be correct.
7      Q.  And you mentioned another unit in India
8  called Goa?
9      A.  Goa, G-O-A.
10      Q.  Goa, I'm sorry, sir.  Do you know who they
11  are connected to or who they are paid by?  Actually,
12  both questions.
13      A.  The likelihood there is that it's part of
14  the Indian affiliate, in that -- in that instance.
15      Q.  Because it's a smaller unit?
16      A.  Because it's a smaller unit and the --
17  it's associated with the manufacturing plant, and that
18  is part of the Indian unit.
19      Q.  What availability, in terms of research,
20  do the affiliated or subsidiary companies have in terms
21  of Jealott's Hill or Stein?
22      MR. POPE:  Availability?
23      MR. TILLERY:  Yes.
24      THE WITNESS:  Access?
25  BY MR. TILLERY:

Page 84

1      Q.  Yes, access.  Let me -- let me withdraw
2  that poorly worded question.
3      Mike does a good job of correcting my questions
4  and helping me improve my record.
5      MR. POPE:  All I seek is clarity.
6  BY MR. TILLERY:
7      Q.  Could you explain to me the access that a
8  subsidiary entity's employees would have to
9  Jealott's Hill or Stein, please?
10      A.  There are two levels.  They -- most of
11  these entities will take customers to these locations at
12  times which suit them, so we -- we often host
13  delegations from Italy.  I mean, there was one recently
14  who came to Stein from Italy, for example.  I had one
15  come from Venezuela to Stein also quite recently.  That
16  is to show and to demonstrate to customers, and indeed
17  our local employees, the process of -- of product
18  research and development, which I have described to you,
19  and to show them how much we are investing in their
20  business, essentially.
21      So we -- we use these sites to -- to both
22  educate and to -- and to demonstrate to customers,
23  you know, "This is a company you should do business with
24  because we are -- we're serious and we're innovative
25  and, you know, we're market leaders, and here is why".

Page 85

1      Q.  And would -- in terms of just the
2  scientific testing facilities, would subsidiary
3  companies have access to the scientific testing or
4  laboratory needs of Jealott's Hill?
5      A.  They would walk around in protective
6  clothing and they would see everything that I described
7  to you going on, but we would not be presenting to them
8  all the confidential product leads that still had not
9  come into --
10      Q.  Of course.
11      A.  -- full-scale development.
12      Q.  Of course.  Would -- would they -- if they
13  needed some testing done at Jealott's Hill, would they
14  be able to send samples to have them tested at
15  Jealott's Hill?
16      MR. POPE:  "They" being the customers?
17  BY MR. TILLERY:
18      Q.  And "they" are the people who work for one
19  of the subsidiary companies of Syngenta?
20      MR. POPE:  So you're not talking about
21  customers, you're talking about employees.
22  BY MR. TILLERY:
23      Q.  Absolutely.  I'm talking about employees.
24      A.  It's hard to imagine that they would have
25  that occasion to do that, but it actually has happened

22 (Pages 82 to 85)

Exhibit 003 Page 22
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                 10-15-2010
Confidential - Pursuant to the Protective Order

Page 86

1  that -- for example, through university contacts in
2  Brazil, we have come across something very interesting
3  and why wouldn't we test that?  Would we test that in
4  our facilities?  Yes.  And we do that under a
5  confidential disclosure agreement, non-disclosure
6  agreement, and -- and, yeah, that -- that does happen.
7  It does happen.
8        Q.  All right.  And when -- when intellectual
9  property rights are established through molecule
10  development, how are they retained within the umbrella
11  of agrochemical businesses of Syngenta?
12       A.  Who owns the IP?
13       Q.  Yes.
14       A.  I can't give you a complete answer to that
15  question.  It's owned by different legal entities, but
16  it -- it's -- I mean, that is -- that is done -- I'm not
17  determining who owns the IP.  It does not come into my
18  area of responsibility.
19       Q.  All right.  Now, in terms of -- in terms
20  of deciding the specific products, and let's just pick
21  the Latin America area, okay, and I say Latin or
22  southern, South America, that area that you talked about
23  under the leadership team that comes out of Brazil.  How
24  is it determined that a particular product will be
25  marketed within that South American region?

Page 87

1        A.  (a) because they want it.
2        Q.  Who wants it?
3        A.  The local affiliate, the local entity,
4  want it.  They need to be -- once they have been exposed
5  to it, they will test it and they will say, "The data
6  are such.  We think there's a great opportunity here",
7  and we'll debate how big that opportunity is and --
8  you can't -- you know, it's -- there's nothing more
9  local than agriculture, if I can say.
10       I mean, we have millions of farmer customers
11  around the world.  This is a very local and complex
12  business, and we rely on local people to understand
13  what's going on and to say, "This has a fit".
14       So when they do that -- I mean, that is the
15  single biggest and most important element to this.
16       Q.  Namely, that there is a market for the
17  product?
18       A.  Right, which they determine.
19       Q.  And so if you're selling -- if you're
20  seeking -- if you have on your product list things that
21  don't apply to products that they have in a particular
22  country in South America, it would be silly to try to
23  sell it there?
24       A.  It would, and we wouldn't try and suggest
25  that they do.

Page 88

1        Q.  Right.
2        A.  It has to work -- it has to work locally
3  and it has to be an opportunity for them.  But if that's
4  the case, if we don't have a product that fits in the
5  United States and it doesn't fit in Brazil, you're
6  really getting to the point where is it worth it, so
7  those are our number 1 and number 2 markets worldwide,
8  and we look for most of our technology to have
9  applications in the United States and Brazil.
10       Q.  Well, if -- how do you coordinate the
11  specific needs of a market area and how do you make a
12  decision about that, allocating product to those needs?
13       MR. POPE:  Excuse me, Steve, are you now still
14  talk about new products doing developed?
15       MR. TILLERY:  No.
16       MR. POPE:  Are you talking about -- you have
17  now gone back to the basic supply chain?  Okay.
18       MR. TILLERY:  Yeah, any product.
19       MR. POPE:  Just to be clear.
20       THE WITNESS:  Well, it happens from a very
21  early -- early stage, because the crops that Brazil
22  wants to market products on are in our screen, so we
23  have them in Stein and we have them in Jealott's Hill.
24  So from the very early stage, we have a preliminary view
25  as to whether these things could -- could -- could fit.

Page 89

1        And then, as we go through the testing program,
2  they get to test it, we bring it together at our
3  management team globally, our CP leadership team that we
4  haven't talked about, the -- the development committee
5  in the territories and in -- and globally, you know,
6  shares information on it and -- and -- then we get --
7  there are two big decision points, one is promotion to
8  stage 3, and at that point, we need the market
9  opportunity well defined and the technical profile
10  defined sufficiently.  That's -- that's a big -- that's
11  a big milestone.
12       And the second big milestone is going from
13  stage 3 to stage 4.  Stage 4 is selling.  So we need to
14  decide, "Yep, the testing is done, this product is fit
15  for sale".
16  BY MR. TILLERY:
17       Q.  Hold on one second.  Okay.  Let's take
18  five minutes and then I want to -- what I'm going to do
19  is go back to your last answer and just flesh out some
20  of these points.
21       A.  Okay.  Thank you.
22       THE VIDEOGRAPHER:  Going off the record.  The
23  time is 10:33 -- microphone.
24       End of tape 1, volume I of the videotaped
25  deposition of John Atkin.

23 (Pages 86 to 89)

Exhibit 003 Page 23
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 90

1  (10:33 a.m.)
2           (Break taken.)
3  (10:53 a.m.)
4       THE VIDEOGRAPHER:  Here begins videotape
5  number 2, volume I in the videotaped deposition of
6  John Atkin.  Going on the record.  The time is 10:53.
7  Thank you.
8  BY MR. TILLERY:
9       Q.  We talked a little bit about the use of
10  the laboratories at Jealott's Hill.  How is information
11  that is learned in one part of the world about a product
12  conveyed to other parts of the world in a way that would
13  help other members of the subsidiary -- subsidiary
14  groups benefit from that knowledge?
15       A.  They develop a database which is shared
16  between people who -- who are part of the development
17  process, so whether it's toxicology or efficacy data,
18  then reports are generated and these reports are able to
19  be shared, and that's how the scientific community
20  within the company gets informed, for the most part,
21  initially, initially.
22       Q.  And is there a particular center of the
23  scientific analysis in the community -- in the company?
24       A.  There are -- well, yes.  I mean, we have
25  toxicologists and we have a head of toxicology, for

Page 91

1  example, and he is -- he is the company's senior man on
2  all matters toxicological.
3       Q.  And who is that?
4       A.  Peter Hertl, H-E-R-T-L.
5       Q.  And what were his -- when you say he deals
6  with all toxicological issues, how would they be
7  presented to him?
8       A.  Two -- two ways.  One, first of all, in
9  the study design.  I mean, there are -- I don't know how
10  many people are involved.  There are toxicologists in
11  the company in different locations.  But studies are
12  designed.  He would be aware and involved in the most
13  important of those studies, and -- and then when the
14  studies are reported, he would have access to the data,
15  and those data would be shared with the regulatory
16  community to support petitions for registrations around
17  the world.
18       Q.  And how would -- does he have a committee
19  or does he work by himself or how does he work as a
20  toxicologist?
21       A.  No, he has a -- a team around him, and
22  I've never been part of his leadership team, so I -- I'm
23  not sure how -- exactly how he operates it, but he has a
24  team of scientists with whom he works.
25       Q.  And does he work -- let me -- explain to

Page 92

1  me how he would be contacted.  Where is he located?
2       A.  He's in Basel.
3       Q.  Okay.  And for whom does he work directly?
4       A.  He reports -- I'm -- I believe he now
5  reports to Sandro Aruffo.  Sandro Aruffo is our head of
6  global R&D.  That's who he reports to.
7       The reason I hesitated slightly is that we
8  recently combined all toxicology aspects, whether they
9  be seeds or crop protection, and he has that role and,
10  therefore, he reports to our head of R&D, global head of
11  R&D.
12       Q.  Has he just recently moved into that role?
13       A.  He fairly recently moved into it, yes.
14       Q.  And did he move to Basel?
15       A.  He did.  He was in the United States
16  before, although he is Swiss.
17       Q.  And what was his job before he moved into
18  his current position?
19       A.  He was responsible for all matters
20  toxicological and data preparation, although he wasn't a
21  regulator, in the United States.  He was doing a --
22  toxicologist-type role, but just for the United States.
23       Q.  Was it just for the United States or was
24  it for NAFTA?
25       A.  Yes, I believe he also was involved with

Page 93

1  Canada and Mexico.
2       Q.  All right.  And -- and now he is in charge
3  of toxicology for the entire umbrella of companies?
4       A.  Yes.
5       Q.  And what issues would be presented to
6  Mr. Hertl to -- for analysis from a toxicological
7  standpoint?  I guess all issues would be presented to
8  him?
9       A.  Yeah.  I mean, you know, his role is as
10  much to do with how the work is designed and planned as
11  it is to deal with the output of the work.  So he has
12  those two -- two responsibilities.
13       Q.  Do you know who he is employed by?
14       A.  I don't know.  I don't know, no.
15       Q.  Is -- is his office physically located in
16  Basel?
17       A.  I believe so, because -- I haven't visited
18  him in his Basel office, but I believe so.
19       Q.  The person that you indicated is his
20  supervisor, who does that person work for?
21       A.  He reports directly to the CEO,
22  Michael Mack.
23       Q.  Mr. Hertl does?
24       A.  No, Mr. Hertl reports to Sandro Aruffo,
25  who reports to Mike Mack.

24 (Pages 90 to 93)

Exhibit 003 Page 24
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr.  John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 94

1    Q.   Where does Mr. Aruffo work?
2    A.   In Basel.
3    Q.   And do you know which company?
4    A.   International.  Syngenta International AG,
5  I believe.
6    Q.   Now, in terms of the information -- as you
7  said, we were talking about sharing information.  If a
8  study is done that impacts a product in one part of the
9  world, how is that information transferred to other
10  people who are involved with that same product?
11    A.   Through the sharing of documentation that
12  I referred to, through the discussion of all matters,
13  development in these -- these development committees,
14  which happen centrally and in the -- the regions, and
15  also because we -- we have a -- an obligation to submit
16  data, whether it's generated in -- wherever it's
17  generated in the world, to authorities who are concerned
18  with our product, so we have -- we are under an
19  obligation to submit all data that may be relevant.
20    Q.   Is there a central store -- storage area
21  for -- for documents or information of a scientific
22  nature relating to Syngenta products?
23    A.   There is.  We recently -- correction.
24  We -- most of our archiving is now electronic,
25  I believe, although we also have physical documentation.

Page 95

1  Most of that centrally is in Basel.
2    Q.   Is the database in Basel?
3    A.   Most of it, although the regions will have
4  their own databases as it relates to their local
5  regulatory submissions, for sure.
6    Q.   Is information in that database restricted
7  from access by -- to the -- to the people in the
8  subsidiaries, or do they have access to it?
9    A.   It is -- it is restricted in the sense
10  that it is for those people who need to have it.  It
11  doesn't mean to say it's restricted from access to the
12  subsidiaries.  If they need it, then they have access to
13  it.  And here I -- I need to -- need to say I'm not
14  sure, but most of the data is visible to most of our
15  development specialists.
16    Q.   Whether --
17    A.   Whether they need it or not.
18    Q.   Right.  Outside of Basel is what you're
19  saying?
20    A.   Yes.
21    Q.   So whether -- what you're saying is that
22  some of the people in marketing may not need access to
23  scientific data, whether or not they could get it or
24  not, but the people who would actually need it would
25  have access to it?

Page 96

1    A.   Yes.
2    Q.   There are no restrictions that you're
3  aware of that would prevent them from getting other than
4  limitations within their field of -- of work?
5    A.   Other than limitations within their field
6  of work and the stage which the data is at.  Interim
7  data wouldn't routinely be shared.
8    Q.   What do you mean by that, sir?
9    A.   Well -- and I'm not a toxicologist, but
10  I do know that they -- they take interim data on a -- on
11  a study which is -- is perhaps of two years in duration.
12  These interim data may not be shared because they're not
13  final data, and it's -- it's not necessary and useful
14  for others to see it.
15    Q.   Wouldn't it also be the fact that some of
16  that data may not -- some of that study may not result
17  in the production of a product, so it wouldn't even be
18  relevant?
19    A.   That -- yes, and that's an important
20  distinction to make.  Products which are at the very
21  early stage, those data would not be routinely shared.
22    Q.   You were talking earlier today about
23  the individual in Brazil who is the head of the
24  South American leadership team in terms of marketing
25  efforts and helping.  Do you expect the other leadership

Page 97

1  team members to assist in that respect as well?
2    A.   In the respect of --
3    Q.   Marketing and assisting marketing?
4    A.   We have a head of marketing in all of the
5  regions who reports to the head of the -- the business,
6  the regional head, so we have a -- we have a marketing
7  function, sure.  It is their responsibility to do
8  marketing, yes.
9    Q.   Right.  What I meant was that -- could you
10  tell me the name of the fellow in Brazil again who heads
11  the leadership team for South America?
12    A.   Antonio Carlos Guimaraes.
13    Q.   Carlos?
14    A.   Antonio Carlos.
15    Q.   Carlos?
16    A.   Yes.
17    Q.   Carlos.  Okay.
18    A.   Antonio Carlos.
19    Q.   You indicated that he actually goes out
20  and assists in the other subsidiary regions and assists
21  them, or at least trains them, in terms of how to market
22  products?
23    A.   Maybe those -- those verbs or adjectives
24  aren't -- aren't quite right.  He supports them, he
25  consults with them.  Most of them are -- are

25 (Pages 94 to 97)

Exhibit 003 Page 25

8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 98

1  professionals of a high standing, but he does what is
2  needed to -- to improve the performance and optimize the
3  performance of these subsidiaries.
4      Q.  And the -- and the -- and the sales and
5  market share?
6      A.  Yes, to -- to help them.  And also,
7  there's quite a bit of transfer of know-how from Brazil
8  to other parts of Latin America.  Brazil is by far our
9  most developed business and most successful, and some of
10  the things they're doing, he will transfer -- or not
11  only him, but other members of his team.
12      Q.  Now, would you expect, for example, the
13  person in Asia to do the same thing as leadership team,
14  or is -- or is the South American experience different?
15  Are they all basically the same, in terms of marketing?
16      A.  They are all basically the same, but --
17  but I --I don't -- I want -- I want to be precise on
18  this point:  each of these affiliates in all these
19  territories are charged, and it's very explicit, with
20  running their own businesses.
21      I mean, we -- we talk about -- and it's -- it's
22  on our website and it's in the analyst presentations we
23  do.
24      We talk about tailored models.  What that means
25  is, every country has its own strategy, its own way of

Page 99

1  marketing, its own customer base, its own approach.  So
2  you -- when we have leaders from a region going to a
3  territory, he is -- he is going to help them in their
4  local operation, not to define their local operation.
5      Q.  Right.  But he assists them, and would
6  that apply in NAFTA as well?
7      A.  Yes.
8      Q.  With Mr. Hawkins?
9      A.  Mr. Hawkins and Mr. Bradshaw.  When he
10  goes to Canada he will -- he will -- he will discuss the
11  way that Canadian operation is going, and if there is
12  anything that he can do to help, then he will -- he will
13  do it.
14      Q.  All right.  Now, in terms of overall
15  marketing -- and I don't mean just in the local areas --
16  is there a -- is there a global strategy in terms of
17  marketing?
18      A.  We have a global -- we have a global
19  marketing group in Basel.
20      Q.  And what does that group consist of?
21      A.  It consists of people who are global
22  product managers, or business managers.
23      Q.  And from -- which entities would they come
24  from?
25      A.  I believe they are, in the most -- for the

Page 100

1  most part, working for Syngenta Crop Protection AG.
2      Q.  And do you know the names of those people?
3      A.  Yes.
4      Q.  Who are they?
5      A.  Rob Neill is the leader.  He is a
6  Canadian.  Mike Stepan is the second-most senior
7  individual, who has a group of products and product
8  managers under him.  And then we have more senior people
9  looking after some of our bigger products; for example,
10  a gentleman called Mark Bidwell is leading our
11  azoxystrobin business from a marketing -- a global
12  marketing standpoint.
13      Q.  And what do they do in this committee?
14      A.  What do they do?  They are -- they are
15  responsible -- they have a number of responsibilities.
16  They have an important link with the supply chain.
17  We talked about active ingredient management earlier.
18  These people are helping in the planning of -- of supply
19  to the demand, so they are bringing the demand bit to
20  the supply piece, and that's -- that's an important part
21  of what they do.
22      They are -- if it's an early stage product,
23  they're helping define the positioning of such a
24  product: how does it fit in the product range; how does
25  it compare with competitive products; what is the

Page 101

1  profile of this product?
2      They prepare some documentation which will help
3  the local affiliate to define their own marketing plans.
4  It's input for them to define on which they would base
5  their local marketing plans.  These are the types of
6  things that they do.
7      Q.  How do they coordinate their --
8  the results of their meetings and studies with the local
9  subsidiaries?
10      A.  There is a marketing leadership team
11  chaired by Rob Neill where the heads of marketing from
12  the regions participate, and some of these business
13  managers will also participate.  It will be on a,
14  you know, as-appropriate basis, for the most part, and
15  this is a -- you know, an approach that brings together
16  some of the most important products and some of the most
17  critical marketing decisions and strategies.
18      Q.  Let's pick NAFTA, if we can.  Talk to me
19  about how the coordination would work for the NAFTA
20  marketing and the NAFTA coordinated leadership team?
21      A.  All right.  So Travis Dickinson, who is --
22  who is head of marketing in NAFTA, would participate in
23  this global marketing leadership team, and he would --
24  they would discuss new products which could be available
25  for North America; they would discuss provisioning of

26  (Pages 98 to 101)

Exhibit 003 Page 26

8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                  10-15-2010
Confidential - Pursuant to the Protective Order

Page 102

1   existing products; they would discuss development
2   programs for -- for all products which had relevance for
3   NAFTA and, of course, relevance globally to try and --
4   to try and find, you know, where are the differences,
5   where are the synergies between North America and other
6   parts of the world.
7          Q.  Where is he, Travis -- I didn't catch his
8   last name?
9          A.  Dickinson.
10         Q.  Dickinson.  Where is he located?
11         A.  In Greensboro.
12         Q.  Does he work for Syngenta Crop Protection
13  Inc.?
14         A.  Yes.
15         Q.  And does he also then coordinate with the
16  global leadership team?
17         A.  With the -- he coordinates with the
18  marketing leadership team, with this team --
19         Q.  I'm sorry, excuse me, the marketing
20  leadership team, which is the overall global
21  leadership --
22         A.  Yeah, right.
23         Q.  -- in terms of marketing?
24         A.  Right.  Yes, it is.  I think it -- if I
25  can suggest, we're dealing with a, if I can use the

Page 103

1   analogy, a very small part of a big iceberg here.  The
2   majority of -- of what Travis Dickinson does relates to
3   marketing in -- in North America.  There are bits of the
4   marketing which need to be linked globally.  That is the
5   bit that he is dealing with when he participates in the
6   marketing leadership team.
7          Q.  Explain that to me.
8          A.  Well, for example, if we take our
9   fungicide range in North America, we have a product
10  called Quilt.  The pricing of Quilt, the positioning of
11  Quilt, the customer base, the sales volumes, everything
12  associated with Quilt locally is determined locally.
13  It's not anything to do with global.  The only time that
14  it touches global is the provisioning of the active
15  materials to manufacture the product.  That's where
16  there has to be a coordination, because azoxystrobin is
17  manufactured -- which is the active material, is
18  manufactured in the UK, so there clearly has to be a
19  linkage there.
20         When they discuss these types of products at
21  the global level, it's more to do with sharing --
22  sharing information, because we're trying to build,
23  for example, a fungicide business like they have in the
24  United States in Latin America, we're trying to build a
25  fungicide business like they have in the United States

Page 104

1   in Asia.
2          So what -- what the person from Asia can learn
3   about what they've done in America is very important for
4   deployment in their local markets.
5          Q.  Well, does Travis Dickinson have a team in
6   North America?
7          A.  Yes, he does.
8          Q.  Who is on his team?
9          A.  He has a team of brand managers who look
10  after these different product brands.  I mentioned Quilt
11  to you.  There'll be a -- there is somebody looking
12  after the corn herbicides, which would include atrazine,
13  and so on and so forth.  I cannot give you the names of
14  all the members of his team.
15         Q.  Does his team have members from other
16  NAFTA companies -- I'm sorry, other NAFTA subsidiaries?
17         A.  No.  No.  His team is a US team but he,
18  on an as-needed basis, links to -- to Canada and Mexico.
19         Q.  Now, do you know how he coordinates
20  marketing efforts with the global leadership team and
21  marketing?
22         A.  I have some knowledge of that, through
23  face-to-face meetings, which are not very frequent,
24  four or five per year, perhaps, maybe six at the
25  outside.  And, of course, there is informal contact,

Page 105

1   as -- as necessary.
2          Q.  Where is atrazine sold throughout the
3   world by Syngenta?
4          A.  The United States; Canada, I believe; most
5   of the countries of Latin America; Australia; several
6   countries in the rest of Asia-Pacific.
7          Q.  Europe, is it sold?
8          A.  It is sold in some parts of Europe, but
9   not in the European Union.
10         Q.  Which countries of Europe is it sold in?
11         A.  Parts of eastern Europe that are not in
12  the European Union.
13         Q.  Why isn't it sold in the European Union?
14         A.  Because in 2004 it was not -- the
15  registration was not renewed for it to be sold in the
16  European Union.
17         Q.  What other parts of the world is it sold
18  in, besides what you've told me?
19         A.  It's sold in many smaller territories.
20  I've given you the major ones.
21         Q.  All right.  Is there -- is there a global
22  leadership team which has atrazine as -- as a topic?
23         A.  Not a leadership team, but within global
24  marketing, atrazine is part of the responsibility of the
25  man who is looking after our global corn herbicide

27 (Pages 102 to 105)

Exhibit 003 Page 27
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 106

1  range.
2      Q.   Who is that?
3      A.   Dave Elser.
4      Q.   And what is his relationship with
5  atrazine?
6      A.   It's part of our global corn range.
7      Q.   So he would have responsibility for
8  atrazine?
9      A.   He has --
10     MR. POPE:   In what sense, excuse me?
11  BY MR. TILLERY:
12     Q.   In terms of oversight and marketing.
13     A.   Marketing, yes -- oversight of the -- the
14  bit -- the bit that is -- that is global, yes.
15     Q.   Is there some part of atrazine marketing
16  that he -- that is excluded from his consideration?
17     A.   He doesn't deal with the local positioning
18  of atrazine in the United States, he doesn't deal with
19  the pricing of atrazine in the United States, he doesn't
20  do any deals with the third parties that we sell
21  atrazine to, he is not involved in -- in the customer
22  deals.  I mean, most of it he's not involved in.
23     Yes, he's involved in -- linked to the supply
24  of atrazine.  He's -- he understands all the -- the --
25  the opportunities and issues and questions that surround

Page 107

1  atrazine, as he does with many other products, but he --
2  he is not deeply involved in atrazine in the
3  United States, in the sense I think you mean it.
4      Q.   Who has the ultimate -- strike that.
5      Let's pick a product in South America that --
6  one of your products that's sold there that's a
7  herbicide.  Can you give me an example of a product
8  that's sold in South America?
9      A.   Sure.
10     Q.   Let's -- let's say broad sales throughout
11  South America.
12     A.   Broad sales throughout South America and a
13  herbicide.  Well, the most ubiquitous one is -- is
14  glyphosate, of course, but that may not be a perfect
15  example for what we're going to discuss.
16     Q.   Okay.  And why wouldn't it?
17     A.   Well, simply because it's a commodity
18  product.  It's not one of -- it's not a speciality
19  product.  It's an important product.
20     Q.   Can you pick another one, then?
21     A.   All right.  Callisto.
22     Q.   Callisto; what does that do?
23     MR. POPE:   Do you want to spell that for her?
24     THE WITNESS:   C-A-L-L-I-S-T-O.
25  BY MR. TILLERY:

Page 108

1      Q.   And what does it do?
2      A.   It controls a broad spectrum of weeds in
3  corn.
4      Q.   Okay.  And -- and is that sold in many of
5  the subsidiaries or by many of the subsidiaries in
6  South America?
7      A.   In almost every place where we've got
8  corn, we -- we have a Callisto product.
9      Q.   Okay.  Who makes -- you said -- you were
10  talking to me about the fact that a local emerging
11  market, when we talked about South America, could ask
12  for a product that they think they could sell?
13     A.   Yes.
14     Q.   Who ultimately makes the decision about
15  whether it's going to be sold there?
16     A.   Well, several things.  There's no --
17  this -- this may sound -- sound as though I don't want
18  to answer your question directly, but there's -- the
19  decision emerges.  A decision emerges because the -- the
20  market is there -- I mean, several things have to
21  happen:  is there a market for it, is there enough
22  sites, "yes" or "no"; is the technical data such that
23  this thing can be registered in this place and does it
24  control the weeds, "yes" or "no"; is -- is the
25  opportunity of sufficient volume that we could formulate

Page 109

1  it in a place which would make it accessible to that
2  market?  And so on and so forth.  So there's a sort of
3  checklist of points.
4      And whether you're looking at that checklist
5  locally or globally or regionally, you will almost
6  always reach the same conclusion.  There are times when
7  we have to debate it.  It falls into a grey zone.  But,
8  typically, whether it should be sold there is -- is
9  quite obvious.
10     Q.   Yes, and -- and I would imagine that's the
11  case, is that on most of your products, if there's a
12  need in the market and it's subject to registration to
13  where it can be legally sold, then if they can sell
14  enough of it to make it worthwhile, then you sell it;
15  right?
16     A.   Yes.
17     Q.   The question I had is, let's say it falls
18  into one of those grey areas.  How is that evaluation
19  done?
20     A.   We use the same process, but then we --
21  we have to look at is it worthwhile or not?  Are we
22  going to -- are we going to invest the money needed to
23  develop this product which cannot be used in Brazil
24  because, you know, there's some concern about it
25  persisting in the soil or there's some other concern and

28 (Pages 106 to 109)

Exhibit 003 Page 28
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 110

1  we can't -- it's not going to work in Brazil, but it's
2  hugely valuable for Russia, Australia and the US.
3  I mean, is this going to make sense.
4       Q.  Who is doing that analysis?
5       A.  Well, the territories do that analysis
6  about their own markets, and then it will come together
7  at the global marketing level.
8       Q.  And -- and the global marketing people
9  then, as -- as you just went through the analysis, who
10  is the head of that team who would make that type of
11  analysis?
12       A.  Okay.  So then Rob Neill, who is head of
13  global marketing, would make a recommendation.  That
14  recommendation would come to the crop protection
15  leadership team, which I chair, and we would -- and
16  on -- on which sits the heads of regions, the head of
17  global marketing, so the leaders of the crop protection
18  business, and we would collectively decide what we
19  wanted to do.
20       Make it -- to decide whether to sell that
21  in that particular region or not, or --
22       A.  To the -- but often it -- often these
23  decisions are -- are global -- no, it wouldn't -- if the
24  product was viable and it was a local decision whether
25  to sell it or not, that would be a local decision.  If

Page 111

1  the grey area was such that it questioned the viability
2  of the product globally, we would make that decision.
3       Q.  That's where we were, is in this grey area
4  of the discussion.
5       A.  Yes.
6       Q.  And you would make the call on whether or
7  not it's going to be sold there?
8       A.  We would make the call on whether or not
9  it was going to be sold at all.  I think that's where we
10  may be not communicating in the same way.
11       Q.  Right.
12       A.  This would be a decision about whether
13  this product had a future globally or not; not whether
14  it could be sold in Brazil.
15       Q.  And what if you decided about -- who --
16  who would make -- strike that.
17       Who would make the same call with respect to
18  discontinuation of the product?
19       A.  That would follow a similar process,
20  so under my chairmanship, we would -- we would debate
21  it, and -- and we would decide whether a product should
22  be discontinued, and we may -- under those
23  circumstances, we -- we may end up making a
24  recommendation for support and for information to the
25  executive -- the executive committee.

Page 112

1       Q.  And the executive committee of SAG?
2       A.  Yes.
3       Q.  Syngenta AG?
4       A.  Yes.  Yes.
5       Q.  Now, you were talking before we took our
6  break about a crop protection committee -- CPLT it's
7  referred to?
8       A.  Yes, crop protection leadership team, yes.
9       Q.  And what is that?
10       A.  That's -- that's a group which is chaired
11  by me.  There are 11 members, four region heads,
12  heads of global marketing.  We have legal membership,
13  we have financial membership, we have global supply
14  chain, and we have HR participation as well on an
15  as-needed basis.
16       So, if you like, it -- it mirrors a bit how the
17  regional leadership teams operate, but it's global.
18       Q.  And could you walk me through the actual
19  head and membership on that committee?
20       A.  Yes, I can tell you who's in it.
21       Q.  All right.
22       A.  I'm the head of it; Vern Hawkins, head of
23  NAFTA; Jon Parr, head of Europe/Africa/Middle East;
24  Andrew Guthrie, head of Asia; Antonio Carlos Guimaraes,
25  head of Latin America; Mark Patrick, head of finance;

Page 113

1  Mark Peacock, head of supply chain; Gigi Hoh, who is a
2  legal counsel; Rob Neill --
3       Q.  You know, I'm going to interrupt your
4  answer, if you don't mind, and I'm terribly sorry.
5  Could you explain to me the locations, in terms --
6  as you're describing these people and which --
7       A.  Sure.
8       Q.  -- entities they come from?  I'm sorry,
9  sir.
10       MR. POPE:  Where they're -- where they're
11  employed, you mean?
12       MR. TILLERY:  Yes.
13       THE WITNESS:  Yes.  So they --
14       MR. POPE:  Just so you know.
15       THE WITNESS:  Okay.  Thank you.  So the region
16  heads, I think we've discussed where they are.
17  BY MR. TILLERY:
18       Q.  Yes, we have.
19       A.  Each of the --
20       Q.  We have talked about them.
21       A.  -- places.  Mark Patrick, head of finance,
22  he is --he is in -- he is in Basel.
23       Q.  Do you know which entity?
24       A.  It's probably International, but it could
25  be Crop Protection AG.  I -- I'm not sure.

29 (Pages 110 to 113)

Exhibit 003 Page 29
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin        10-15-2010
Confidential - Pursuant to the Protective Order

Page 114

1     Q.  All right.
2     A.  The lawyer Gigi Hoh is in Basel.
3     Q.  Do you know which entity?
4     A.  One or the other.  I suspect in her case
5  it's International.
6     Q.  Okay.
7     A.  Mark Peacock, he is International, he is
8  my SEC colleague, global supply chain.  A man called
9  Goppelsroeder, which we'll give you the spelling
10  afterwards, it is quite complicated, he is head of our
11  seed care business.  He is in Basel.
12     Q.  Do you know which entity?
13     A.  Either International or -- I believe
14  International.  I'm not sure.
15     Q.  Okay.
16     A.  And who else I have missed?  And then we
17  have HR participating also from time to time, and
18  sometimes that is Caroline Luscombe, who is global head
19  of HR, or it is a lady called Christina, and her second
20  name I find very difficult to pronounce, so I won't
21  pronounce it, but I will get it for you, and I seem to
22  have missed one out.
23     Q.  Right.
24     A.  We are almost there.  We are almost there.
25     Q.  If you think of that other person, let me

Page 115

1  know.
2     A.  Yes, I will.  I'm sure I'm will, if I have
3  it.
4     Q.  Could you tell me what this team does?
5     A.  Sure.  Strategy for the overall crop
6  protection business worldwide.
7     Q.  What does that mean?
8     A.  It means what is the framework,
9  strategic framework, in which we want to aim --
10  towards which we want to aim.  I can describe it to you
11  very quickly.  There are three elements to it:  what we
12  call portfolio enhancement, so accelerating new products
13  through to market and licensing-in technology that we
14  feel we should have and we don't; it is tailored models,
15  that means how we can particularly accelerate the
16  development of our business in emerging markets, what
17  can we do to do that; and it is operational efficiency,
18  how can we be more efficient as a company.  Those are
19  the three pillars to our global strategy.  That global
20  strategy was defined by the members of the crop
21  protection leadership team three or four years ago.  So
22  we do that.
23     We do performance checking: what's the latest
24  estimate, how are we doing compared with budget,
25  what's -- you know, how are we performing, and what, if

Page 116

1  there is deviation, could we do about that.
2     Q.  You talked about efficiencies with the
3  formation of Syngenta?
4     A.  Yes.
5     Q.  How does this team work in terms of
6  improving efficiencies on a global basis?
7     A.  So we -- we can compare income statements
8  across the company and we can look for companies,
9  affiliates, that are less efficient than others, and we
10  can help them to improve their efficiency.  That's one
11  way we can do it.
12     We can -- we can provide input to the supply
13  chain about how they could improve their efficiency as
14  well.  There are a number of ways that we can go about
15  it, but efficiency is an important part of what we do.
16     Q.  And how do you coordinate with -- you have
17  other leadership teams associated with the four regions;
18  correct?
19     A.  Yes.
20     Q.  Below this.
21     A.  Yes.
22     Q.  How does this overriding crop protection
23  leadership team coordinate with the four region
24  leadership teams?
25     A.  The four region heads who are on the crop

Page 117

1  protection global leadership team bring the most
2  important issues for them to the crop protection
3  leadership table.  In fact, the agenda is an agenda
4  which is largely developed by the members, so we
5  would -- I would invite Andrew Guthrie to put on the
6  agenda things that he thinks are important for him to
7  discuss at a global level but which might pertain to his
8  region.  So that's -- that's how the linkage would --
9  would be made.
10     And, equally, if there are matters which are
11  discussed which have a relevance to that leadership team
12  afterwards, then he would -- he would bring that back
13  with him when he returns to Singapore.
14     Q.  We've talked about marketing leadership
15  teams, overall crop protection leadership teams,
16  regional leadership teams.  You even talked about the
17  toxicology and development.  Are there others within
18  your particular agrochemical business section, apart
19  from seeds?  Is there -- is there some other group or --
20  of leadership teams?
21     A.  Country leadership teams.  They have their
22  own leadership teams by country, typically.
23     Q.  And give me an example of that;
24  for example, for Asia?
25     A.  So in Japan they have their leadership

30  (Pages 114 to 117)

Exhibit 003 Page 30
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr.  John  Atkin        10-15-2010
Confidential - Pursuant to the Protective Order

Page 118

1  team under the leadership of the head of the country,
2  and -- and, you know, they will do a lot of the things
3  we've discussed, but on a local -- local basis.
4       Q.  And any other leadership teams within the
5  Syngenta Crop Protection business?
6       A.  Some of the bigger territories, like the
7  US, will have a commercial steering team, what we call a
8  CST.  That -- that is a subset of the RLT.  I mean, the
9  RLT, with 17 people in it, is not very suitable for
10  discussing short-term commercial matters.
11      Q.  What is the RLT?
12      A.  The regional leadership team.
13      Q.  Right.
14      A.  So they have a smaller group called the
15  commercial steering team who discuss day-to-day
16  business, and that is a subset of the regional
17  leadership team, but for the United States only.
18      Q.  Are there any global leadership teams
19  within the Syngenta Crop Protection business we haven't
20  talked about?
21      A.  Are there any global leadership teams
22  within the business that we have not talked about?
23  We've talked about -- well, there is a finance
24  leadership team, but that -- as I mentioned to you, that
25  is within the function.  We have this matrixed

Page 119

1  organization, so I -- I don't consider that to be part
2  of --
3       Q.  What is the finance leadership team?
4       A.  That is chaired by John Ramsay, who is our
5  chief financial officer.
6       Q.  And how would that impact members of Crop
7  Protection subsidiaries?
8       A.  The -- Mark Patrick, who -- who provides
9  financial support and leadership for me, is on that
10  financial leadership team, so he would bring any matters
11  that were relevant to the crop protection leadership
12  team and, therefore, it would become connected.
13      Q.  Is there a global team for health
14  assessment and environmental science?
15      A.  That would be under Peter Hertl if it's
16  toxicology, but I'm -- you know, Gerardo Ramos, we
17  didn't mention his name, and he's the one I missed off
18  my crop protection leadership team, he's the head of
19  crop protection R&D, R-A-M-O-S, Gerardo in English.
20      He has his development -- well, devco, we did
21  talk about that, development leadership team.  But he --
22  he may have a subset dealing with -- he does have a
23  subset dealing with matters relating to environmental
24  science and -- and registerability of compounds.  He has
25  a small team which does that with the head of our

Page 120

1  registration worldwide sitting on it.  Yes, he does.
2       Q.  And where are they located?
3       A.  Basel.
4       Q.  And by whom is he employed?
5       A.  Ramos?  Either International or Crop
6  Protection.
7       Q.  And what does he do?  What is the
8  responsibility of his team?
9       A.  He has under him the whole product
10  development portfolio, so we spend -- we spend about
11  three hundred and -- between 300 and $350 million a year
12  on product development, as distinct from research, and
13  that -- he is responsible for the oversight as is
14  appropriate globally for that spend.
15      Q.  And, more specifically, who would be in
16  charge within his group of determining issues relating
17  to human health and environmental issues?
18      A.  Peter Hertl would be the man who had the
19  oversight on those kind of toxicology issues, in
20  coordination with a man called Dave French, who is our
21  regulatory head.  So the regulators would also
22  participate very much in that.  And the steward, we have
23  a -- we have a -- Richard Brown is head of global
24  stewardship.  He would also have an input.
25      Q.  What does "stewardship" mean?

Page 121

1       A.  It means looking after our products
2  and the health and welfare of our customers in the use
3  of these products.
4       Q.  And is there a global policy regarding
5  stewardship?
6       A.  Yes, there is.  This -- this takes many
7  forms.  In -- it is very different if you are discussing
8  stewardship in the United States with professional
9  farmers who are very conscious of what they need to do,
10  compared to if you're discussing it in Indonesia, where
11  you need to hand-hold farmers, small farmers, in how
12  they protect themselves when they operate -- use our
13  products.
14      Q.  But this policy, is there such a global
15  policy?
16      A.  We absolutely have -- and we have
17  documents which talk about Syngenta's stewardship.
18  I'm not sure you would describe it perhaps quite as a
19  policy in the way that you mean it, but we have lots of
20  documentation about how we go about stewardship, and --
21  and much of it in the public domain.
22      Q.  Who is in charge of determining that
23  policy regarding stewardship?
24      A.  Richard Brown is our lead steward.
25      Q.  And by whom is he employed?

31 (Pages 118 to 121)

Exhibit 003 Page 31
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 122

1     A.  Either -- either International or -- or
2   Crop Protection.
3     Q.  He is in Basel?
4     A.  Yes, he is.
5     Q.  How does he come up with --
6     MR. POPE:  Crop Protection AG you meant?
7     THE WITNESS:  Yes.
8   BY MR. TILLERY:
9     Q.  He is in Basel?
10    A.  Yes.
11    Q.  And by what method does he work with
12  subsidiaries in terms of that policy for stewardship?
13  How does he communicate with them?
14    A.  Yes.  Well, he personally travels quite a
15  bit to -- to -- to meet with them and familiarize them
16  with some of the latest developments in the world of
17  stewardship.
18      He also -- he is -- he supports stewardship
19  from the affiliates to the center.  But we -- I think
20  it's important to say, we -- we have product stewards in
21  all our affiliate operations, pretty well.  There is a
22  stewardship responsibility throughout the world.
23    Q.  I --
24    A.  I mean, it's an integral part of our
25  business.

Page 123

1     Q.  I understand.  I'm just asking you,
2   though, how he would coordinate his office
3   responsibilities with the subsidiaries?
4     A.  I understand.  I don't believe he has a
5   leadership team in the way I've described it, because
6   it's much more diffuse than some of the other things,
7   but he would -- within the development community
8   particularly, he is able to communicate face to face and
9   remotely.
10    Q.  You talked about earlier -- before we took
11  our break, about a step process for a particular
12  product?
13    A.  Yes.
14    Q.  Could you take me through that entire
15  process?
16    MR. POPE:  This is the development of a new
17  product.
18  BY MR. TILLERY:
19    Q.  Yes, let's -- the product step process
20  that you discussed earlier?
21    A.  Stage plan?  Yeah --
22    Q.  Stage -- stage planning?
23    A.  Stage plan.
24    Q.  Stage plan.
25    A.  Stage 1 -- stage 1 is discovery.  Stage 2

Page 124

1   is evaluation -- evaluation -- evaluation, where it's --
2   it's --
3     Q.  That's still in the laboratory?
4     A.  No, it goes into small plots in the
5   field --
6     Q.  Yes.
7     A.  -- under permit.  And stage 3 is
8   large-scale development.
9     Q.  Okay.  Would you walk me through how this
10  goes from 2 to 3 to 4 and who is responsible for doing
11  that?
12    A.  Yes.  So from -- to get from 2 to 3, there
13  are -- there are two important steps.  The
14  development -- the global development committee would
15  assemble all -- the members of that committee and
16  their different responsibilities would assemble the
17  data, and the product would be discussed at the
18  development committee:  is it safe, is it useful, is it
19  viable, commercially?  There's a marketing input to that
20  group.
21      And then they would -- they would propose it
22  for promotion to stage 3, or they would -- they would
23  say, "This product is ready to be proposed -- to be
24  promoted to stage 3".
25      That recommendation would come to the crop

Page 125

1   protection leadership team with the business people on
2   it, and we would --
3     Q.  Just so we're clear, I know I'm
4   interrupting you, but that crop protection leadership
5   team is the one that you head in Basel?
6     A.  Correct.
7     Q.  Go ahead, sir.
8     A.  And -- and we would -- we would look at
9   the proposal, which would have a commercial piece to it
10  and a technical development piece to it, and then we
11  would decide whether or not this should be promoted.
12      Then Syngenta's executive committee would be
13  informed, and we would seek their support for the
14  decision that we've made.
15    Q.  And the Syngenta AG executive committee is
16  composed of whom?
17    A.  Eight of us:  Mike Mack as CEO; myself,
18  head of the crop protection business; Davor Pisk as head
19  of the seeds business; John Ramsay as head of finance;
20  Christoph Maeder as head of legal and taxes;
21  Mark Peacock as head of the supply chain; and -- and
22  Sandro Aruffo as head of research and development.
23    Q.  And then this presentation would be made
24  to this group for a vote?
25    A.  It never -- I've never known it to be

32 (Pages 122 to 125)

Exhibit 003 Page 32
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 126

1  voted on.  It's not necessary to vote on.  It would be
2  made to them to tell them about the decision we've made
3  and to get any feedback they would wish to give us.
4        Q.   Why would you go to them?  What's the
5  purpose in taking it to them?  Why don't you just launch
6  the product yourself?
7        A.   Because we've spent $200 million of the
8  company's money, and because some of these assets can
9  generate sales of over half a billion, so we think they
10  should know about it.
11        Q.   Is that the only reason?
12        A.   It's the best reason.  It's the only one
13  that comes to mind immediately.
14        Q.   Is there another reason that you're
15  required to, under the -- under the operational
16  guidelines of the company?
17        A.   I'm not sure whether we're absolutely
18  required to do that, to be -- to be honest, but we do.
19        Q.   Have you ever taken a product to market
20  without going to the Syngenta AG executive committee?
21        A.   Yes, but not a big one that we have
22  invested a lot of money in.
23        Q.   What was the product you went on the
24  market without getting their permission to?
25        A.   We license-in many products from third

Page 127

1  parties, some of them have got local importance, some of
2  them have got regional importance.  I would not -- if
3  I did inform the executive committee, it would just be
4  an "any other business" matter.  I wouldn't seek any
5  feedback from them.
6        Q.   Okay.  Well, can you give me the name of
7  that product that you went on the market with without
8  getting permission?
9        A.   I didn't say I -- I was looking for
10  their permission, but -- well, there are so -- there are
11  so many examples.  Let me -- let me just -- just reflect
12  on it for a second.
13        We have reached agreement with Dow, with
14  Dow Agrosciences, to mix some of their technology
15  with ours and market it in -- particularly in Europe,
16  and we --
17        Q.   Is this a license?
18        A.   It's a license, yes.  It's a license deal.
19  It's a supply coupled with -- typically, in these cases,
20  it will be a supply contract and a licensing deal of
21  some sort, and -- and we -- we have done several of
22  these local deals.  We do that without any information
23  being passed upwards.
24        We did, however, do a much bigger deal with
25  Dow Agrosciences, and on this occasion I did inform the

Page 128

1  executive committee, but the local deal -- the local
2  deals we did not.
3        Q.   Are they subject to this four-part step
4  test?
5        A.   No, because they sometimes come in as
6  already-marketed products, and if we're going to --
7  if we're going to mix them with some of our technology,
8  they -- they may automatically enter into step 3, so
9  some basic formulation development and then they go
10  straight to step 4.  So they don't go through the whole
11  process.
12        Q.   Okay.  So of the process -- of those
13  molecules that are subject to that process that we were
14  talking about, have you ever taken any of them to market
15  without bringing it to the Syngenta AG executive
16  committee?
17        A.   Not of the ones we've done internally, no;
18  none of the big ones, absolutely not, no.
19        Q.   They have all been approved?
20        A.   They have all been discussed and consulted
21  on.
22        Q.   Have they ever been -- have you ever been
23  told by the Syngenta executive committee not to market a
24  product?
25        A.   That we have already approved at

Page 129

1  crop protection leadership team level, not to my
2  recollection, no.
3        Q.   Has Syngenta ever taken a product off the
4  market?
5        A.   Yes.
6        Q.   Which one?
7        A.   We have replaced several organophosphate
8  insecticides, both in the legacy company and Syngenta,
9  with better products that we could replace them with.
10        Q.   And tell me how that -- was that a
11  substitution or a withdrawal?  How did that happen?
12        A.   Yeah, it was a -- it was a -- it was a
13  substitution over time and we just -- I mean, you know,
14  we spend -- the company spends a billion dollars on
15  innovation across the business, we spend half that in
16  crop protection, and the idea is to innovate.  So it's
17  part of the whole lifecycle management.  You know, it
18  goes through a growth phase, it gets mature and then we
19  phase it out.
20        So when we phase it out, we replace it with
21  something better and, you know, a case in point, these
22  old insecticides that we had for many years were phased
23  out and replaced by better solutions.
24        Q.   That same discussion has taken place about
25  atrazine, hasn't it?

33 (Pages 126 to 129)

Exhibit 003 Page 33
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 130

1     A.  Oh, yes.
2     Q.  About phasing it out?
3     A.  About do we have a better solution and
4  should we replace it.
5     Q.  Yes.  I saw that as early as 2003 that
6  discussion was going on?
7     A.  Yes, yes, correct.
8     Q.  It's an ongoing discussion about atrazine?
9     A.  About atrazine, about paraquat, about
10  metolachlor, about most of our older chemistry, yes, of
11  course.
12     Q.  Who has charge of that discussion?  Where
13  is that discussion taking place?
14     A.  It's taking place between development and
15  marketing and between global, regional and local,
16  depending on the specific approach.
17     Q.  Well, specifically with respect to
18  atrazine, where has it been discussed that you're aware
19  of?
20     A.  It's been discussed globally, it's been
21  discussed in the United States, it's -- it's been
22  discussed in other parts of the world where atrazine is
23  important.
24     Q.  How is it being discussed globally?
25     A.  In the context of our overall development

Page 131

1  portfolio, so we'll look at where does atrazine fit,
2  what do we have to invest in it, what are the economic
3  consequences if we -- we decide to replace it or do we
4  have a suitable product to replace it with, how can
5  we -- how can we -- how can we optimize our -- our
6  business in the context of life with or without
7  atrazine.
8     Q.  And who is -- when you're saying "we" --
9  you are using a lot of "we"s.  Is that the crop
10  protection leadership team or is there some other
11  organization on a global basis that's talking about
12  atrazine?
13     A.  We have debated that at the devco, the
14  development committee that I referred to, and we have
15  debated it at the crop protection leadership team from
16  time to time.
17     Q.  Has it also been debated at the Syngenta
18  executive committee level?
19     A.  We've had discussions about that, but not
20  recently and not frequently.
21     Q.  How many times in the last ten years have
22  you had discussions at the Syngenta executive committee
23  level about atrazine?
24     A.  About replacing it or about atrazine in
25  general?

Page 132

1     Q.  Both.
2     MR. POPE:  Well, ask one at a time.
3  BY MR. TILLERY:
4     Q.  Well, you -- you answer it as you wish.
5     A.  We discuss atrazine frequently.
6     Q.  Okay.
7     A.  We have discussed replacing it very
8  infrequently.
9     Q.  And you discuss it frequently at the
10  Syngenta executive committee, frequently for what
11  reason?
12     A.  Frequently along with other products
13  that -- that -- we have matters that we need to --
14  we need to bring to our attention.  For example, the
15  SAP process is -- is running with the EPA in the
16  United States.  That's an important matter.
17     We are very conscious of and very aware of --
18  of stakeholder attitudes to atrazine, as with other
19  products.  We are very conscious and aware of customer
20  attitudes to atrazine, as with other products.  These
21  are matters that we -- we -- we discuss at the executive
22  committee relatively frequently.
23     Q.  Would you say it's -- how often -- strike
24  that.
25     How often does the executive committee meet?

Page 133

1     A.  It meets once a month, on average.
2     Q.  How many times in the last year have you
3  discussed atrazine?
4     A.  I would say at most of these meetings.
5     Q.  How long do the meetings last?
6     A.  A day -- between one and two days.
7     Q.  Has there been a meeting you can remember
8  where atrazine wasn't discussed in the last year?
9     A.  I can't remember a specific meeting when
10  it wasn't, no.
11     Q.  Is there a particular person on the
12  Syngenta AG executive committee -- strike that.
13     Is there a particular person on the executive
14  committee that you talked about who is charged with that
15  topic of atrazine, or do all of you have equal
16  responsibility or authority with it?
17     A.  There are three of us who are particularly
18  involved -- involved, informed.  Sandro Aruffo, who is
19  head of research and development; myself, as head of
20  business; and Jonathan Sullivan as well, who we've
21  mentioned before, sitting over there.
22     Q.  He is on the executive committee?
23     A.  No, he takes the minutes.
24     Q.  But he brings up the topics as well?
25     A.  No.  No, the topics are agendaed in

34  (Pages 130 to 133)

Exhibit 003 Page 34
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr.  John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 134

1   accordance with the plan.  He discusses agenda topics
2   with the CEO and it's -- it's the CEO's decision as to
3   what is and is not on the agenda.
4        Q.  Let's go back to your role at the
5   beginning of Syngenta.  What were you doing -- what --
6   strike that.
7        What did you do at the very beginning of
8   Syngenta, in terms of your role at the company?
9        A.  When it was created or before it was?
10        Q.  I think you've actually told me what you
11   were doing right before it was created, haven't you, in
12   the record?
13        A.  Yes.
14        Q.  All right.  So after the day it was
15   created, what was your role?
16        A.  Just to make the point that, before it was
17   created, we were able to meet and discuss its creation.
18   We didn't talk about that.
19        Q.  You know what, we talked -- I talked a lot
20   about that with Mr. Maeder yesterday.  Would you tell me
21   what your role was in terms of its creation?
22        A.  I was with Christoph Maeder -- I think he
23   mentioned Richard Steiblin and Heinz Imhof -- on the
24   small team that -- that was involved in creating it.
25        Q.  And what did that involve?

Page 135

1        A.  It involved a lot of things that
2   I understand Christoph Maeder talked about yesterday,
3   but for my -- my involvement was particularly around how
4   we prepare to operationalize the company, from the point
5   of view of people, the viewpoint of cost and -- and
6   sales, and from the viewpoint, in a very, very broad
7   framework sense, of -- of strategy.
8        Q.  The two entities that went together to
9   form it, create Syngenta --
10        A.  Yeah.
11        Q.  -- was it your view that they were
12   successful in the agrochemical business?
13        A.  Prior to the creation of the company?
14        Q.  Correct.
15        A.  They were successful for the most part,
16   but in the two or three years immediately preceding the
17   merger, less so.
18        Q.  Do you know why that was?
19        A.  Some of it was to do with the -- the
20   market and the fact that it wasn't growing at that time;
21   difficulties in -- in -- in getting sufficient return
22   for -- particularly for the R&D investment that both
23   companies were making, which was close to 10 percent.
24        Q.  What were the other reasons why it wasn't
25   successful?  All right.  Sorry, strike that.

Page 136

1        What were the other reasons why it wasn't as
2   successful as it could be?
3        A.  The market, the cost base I mentioned.
4   I mean, the other reason, which wasn't as apparent then
5   as it is now, was that both companies operated under
6   parent companies which had multiple divisions.  We
7   weren't free to do the things that we now do.  So that
8   became -- I mean, that was a -- that was -- we assumed
9   that would be the case, but it turned out to be much
10   more important than it seemed at the time.
11        Q.  Management structure was an issue, and was
12   inefficiency of operation a big issue?
13        A.  Yeah, sure.
14        Q.  And wasn't that something that you deemed
15   to be important, and I think every member of the team
16   deemed to be important, in terms of structuring the new
17   Syngenta company?
18        A.  Correct.  Because there's no way we were
19   going to be able to be a viable public company and spend
20   9 or 10 percent on R&D if we didn't get efficient, and
21   the only way -- we had to -- we had to spend this money
22   on innovation, because without that, the company
23   wouldn't have existed after very long.
24        Q.  Which translated into what formation?  It
25   translated into doing what with the new entity?

Page 137

1        A.  It translated into these two divisions:
2   one to focus on crop protection; and then
3   subsequently -- well, yeah, and then one to focus on
4   seeds.  And it translated into strong functions, a
5   strong finance function that could manage the financial
6   aspects of the business; it translated into a investor
7   relations function that could help to communicate what
8   our company was all about to financial analysts who
9   weren't familiar with -- with a company like this.  It
10   translated into many things.
11        Q.  Well, one of them -- and this is listed in
12   the 2005 annual review -- was a worldwide agrochemical
13   business under common direction and control that acted
14   as a single coordinated entity.  Wasn't that --
15        A.  Yeah, we --
16        Q.  Wasn't that one of the purposes?
17        A.  Well, to be coordinated, yes; absolutely.
18   Particularly in the areas I just mentioned:  finance,
19   supply chain.
20        Q.  Is it fair to say that, in forming the
21   company, you were going to take all of the resources and
22   organize them for the highest operational efficiency
23   across regions, corporate boundaries and operational
24   divisions?
25        A.  Yes, in so much as you can summarize that

35 (Pages 134 to 137)

Exhibit 003 Page 35
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 138

1 in a couple of sentences, that's right, but of course
2 that doesn't capture the full nature of running the
3 business. It doesn't capture the how-to, by any -- by
4 any means.
5       Q.  All I was trying to say is, rather than
6 repeating what the two predecessor entities were doing
7 in the same way, in order for you to have the vision, as
8 a member of this team, to have a company that was going
9 to do something different --
10      A.  Sure.
11      Q.  -- you had to look at this differently?
12      A.  We did.
13      Q.  And you did look at it differently?
14      A.  We did.
15      Q.  And that translated into something that
16 was going to be more efficient?
17      A.  It was, and is.
18      Q.  And is more efficient?
19      A.  (Witness nods head.)
20      Q.  You have to say "yes" or "no" on the
21 record, I'm sorry?
22      A.  Yes, it is more efficient.
23      MR. POPE:  Although you have to ask a question
24 before you get an answer.
25      MR. TILLERY:  We're going to be real tight

Page 139

1 with that.
2       MR. POPE:  Well, I need to wake up and say
3 something once in a while.
4       MR. TILLERY:  That's your tenth cup of coffee,
5 Mike.
6       MR. POPE:  And needed -- every one of them
7 needed.
8 BY MR. TILLERY:
9       Q.  In the 2003 annual report, there's a
10 reference to merger cost synergy program.
11      A.  Yes.
12      Q.  Do you know what that is?
13      A.  Yes.
14      Q.  What is it?
15      A.  That was the targets that we set and
16 communicated publicly which related to how much less
17 expensive the combined operation would be than the
18 two legacy operations.
19      Q.  Explain that to me?
20      A.  Well, we -- from memory, we were going to
21 run this thing on 3,000 less people than if you just did
22 the head count of the two organizations separately,
23 for example, and we said, as a consequence of that and
24 other things, that we'd save upwards of $500 million.
25 I don't have the exact number in my head, but it was a

Page 140

1 pretty big number.
2       Q.  It involved eliminating duplicate-type
3 functions at facilities?
4       A.  For example, yes.
5       Q.  It involved eliminating and moving other
6 employees to different corporate units?
7       A.  Sometimes.
8       Q.  I'm now just reading from some of the
9 documents.
10      A.  Sure.
11      Q.  Would that have involved changes for
12 people working at Syngenta Crop Protection Inc.?
13      A.  It did, yes.
14      Q.  Okay.  Could Syngenta Crop Protection Inc.
15 have refused to participate in that program upon the
16 formation of Syngenta?
17      MR. POPE:  Objection.  Which program are you
18 talking about?
19      MR. TILLERY:  The merger cost synergy program.
20      THE WITNESS:  Well, it maybe technically could
21 have, but it was perfectly clear to everybody involved
22 that this was the right thing to do, and the board of
23 Syngenta Inc. accepted that as part of the process of
24 merger.
25 BY MR. TILLERY:

Page 141

1       Q.  Why don't you walk me through how they --.
2       MR. POPE:  Excuse me, one second, Steve.
3 Would you read that last answer back?  Did you mean --
4 as part of the merger, did you mean Crop Protection
5 Inc.?
6       THE WITNESS:  Yes, I did:  Syngenta Crop
7 Protection Inc.
8 BY MR. TILLERY:
9       Q.  I'm sorry, that's what I thought you said.
10      A.  Yeah.
11      MR. POPE:  That's what he intended.  You
12 understood it.  I was just helping clear up your record,
13 as I like to do from time to time.
14 BY MR. TILLERY:
15      Q.  Now, tell me how they technically could
16 have done that, where they just said, despite the merger
17 and formation of the new Syngenta Crop Protection Inc.
18 from Novartis Crop Protection Inc., they just informed
19 you, "Sorry, we're not going to do that"?
20      A.  "We're not going to do the cost reduction
21 program"?
22      Q.  Yes, "We're not going to participate."
23 Walk me through how that would have worked out?
24      A.  Yes, it's very difficult to, because
25 I can't imagine how that would have occurred, especially

36  (Pages 138 to 141)

Exhibit 003 Page 36
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 142

1  as the -- there was a massive interest amongst almost
2  all employees in -- in doing this.
3      So I just -- it's very hypothetical.  I can't
4  conceive they would have -- they would have called me up
5  and said, "Look, great idea, but we just don't want to
6  do that".
7      Q.  Well, can you tell me how it would have
8  happened that Syngenta Crop Protection Inc. at that
9  moment could have said, "We're just not going to do
10 this"?
11     A.  Well, I guess what could have happened
12 would have been that the chairman of the board at that
13 time --
14     Q.  The chairman of which board?
15     A.  The Crop Protection Inc. board, and right
16 at the time of merger -- and I may need to correct
17 something on the record.  I -- I was not a member --
18 I only came on in 2001, which was -- actually, 2001 was
19 the first effective year of the company, okay, so
20 I guess -- I imagine in this hypothetical situation
21 that the chairman of that board could have said to the
22 others -- the others of us, "Look, this doesn't make
23 sense.  We -- we ain't going to do it", and -- and
24 sought -- and sought for us all to agree to it.
25     Q.  And who was the chairman of the board --

Page 143

1      A.  I --
2      Q.  -- at the merger?
3      A.  Well, I think -- I don't know, but I think
4  it probably was a man called Gugger, who was head of
5  the Novartis Crop Protection business in Greensboro and
6  was -- was nominated, appointed, as head of the combined
7  business at the time of the merger.
8      Q.  Are you talking about his position before
9  or after merger?
10     A.  I am now talking about his position after
11 merger -- after merger.  But he was appointed head of
12 the to-be-combined businesses of Zeneca and -- and
13 Syngenta, yes -- and Novartis.
14     Q.  Who else was on the board of Syngenta Crop
15 Protection Inc. at the newly formed entity after merger?
16     A.  Well, I was from -- from 2001.  I can't
17 give you the exact month; I believe Christoph Maeder was
18 from a similar time; and may -- I don't know -- I don't
19 know for sure who the others were.
20     Q.  And what you're saying is, it would have
21 taken an action of the board; right?
22     MR. POPE:  Of Syngenta Crop Protection Inc.?
23 BY MR. TILLERY:
24     Q.  Of Syngenta Crop Protection Inc.?
25     A.  I believe that that would have been the

Page 144

1  only way that such a position could have been taken,
2  yes.
3      Q.  And who was the sole shareholder of
4  Syngenta Crop Protection Inc. at that moment?
5      A.  I'm not sure.
6      Q.  And how was the coordination of moneys at
7  the moment of merger in the creation of Syngenta Crop
8  Protection Inc. handled in terms of voting dividends,
9  do you know?
10     A.  Well, I do know that we vote dividends
11 today as members of Crop Protection Inc.'s board.
12     Q.  Right.  I'm talking about at the time of
13 the merger; do you know how that would happen?
14     A.  I don't.
15     Q.  Okay.  What is the operational program
16 that was called "operational efficiency"?
17     A.  That was the program which encompassed
18 these cost-saving targets that you referred to earlier
19 on.
20     Q.  Eliminating duplicate functions and jobs
21 and facilities?
22     A.  Yes.  Yes.
23     Q.  In the April 2002 SEC filing, Syngenta
24 informed its shareholders of an accelerated synergy
25 program; do you know what that was?

Page 145

1      A.  Yes, that is the -- that is the
2  cost-saving program, the operational efficiency program.
3  The merger synergies were -- was the term used
4  externally to describe what we were doing.
5      Q.  I think in that same filing at page 18 you
6  said to the shareholders that Syngenta would manage its
7  supply chain globally on a product-by-product basis from
8  raw materials through to delivery to the customer?
9      A.  Yes.
10     Q.  Is that an accurate statement?
11     A.  Yes.
12     Q.  And that means there's a global control
13 and coordination of supply chains for products?
14     A.  Yes.  As we discussed before, the only
15 point I would emphasize is that, where it concerns local
16 formulations for local consumption, the coordination is
17 very light, if at all.
18     Q.  Now, when you decided to substitute these
19 products that you talked about -- remember?
20     A.  Yes, I do.
21     Q.  Let's pick one of those.  Let's say the
22 most readily -- heavily used one of the ones you
23 substituted.  Which one would that be?
24     A.  Profenophos.  I'll write it down for you
25 after.  It's an organophosphate.  P-R-O-F-E-N-O -- it's

37 (Pages 142 to 145)

Exhibit 003 Page 37
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 146

1  either P-H or F --
2      Q.  See, you're not that much better at
3  spelling than I am.
4      A.  I can't spelling without writing,
5  unfortunately.  I -- if I looked at it, I'd know,  but
6  we'll give it to you later.
7      Q.  All right.
8      A.  It's an insecticide.
9      Q.  Where was that sold?
10     A.  It was sold very broadly in the company at
11 the time.  We already started the -- the process of
12 phase-outs in the Novartis legacy company, but it was by
13 no means done, so most of it was done after.
14     Q.  Now -- well, maybe that's not a good
15 example, then --
16     A.  Oh, okay.
17     Q.  -- if it was already started at the --
18     A.  All right.
19     Q.  -- at the Novartis company?  Do you have
20 one that was done within the corporate structure at
21 Syngenta from beginning to end?
22     A.  I think I should point out that most of
23 the product assets that we didn't need we sold.  We
24 divested -- we reduced the range of active ingredients
25 from 130-something down to 80 or 75, and most of those

Page 147

1  assets were sold.  Some of them, for merger control, we
2  had to divest anyway.  So the number that were actually
3  phased out were few.  This isn't a bad example.  I mean,
4  there are other smaller ones that we also phased out.
5  I'm just trying to -- most of these assets were sold,
6  not phased out.
7      Q.  Do you have any that were just
8  substituted, that weren't sold?
9      A.  Well, particularly in this insecticide
10 field, this profenophos product was -- is a good example
11 of one that was phased out.
12     Q.  But that was started before at Novartis?
13     A.  It was started before, correct.  It was
14 started before.
15     Q.  All right.  So the ones that are sold,
16 what's the sale?  What are you talking about?  You sell
17 the technology to another company?
18     A.  Yeah, we sell the intellectual property
19 and we sell -- yeah, in the most basic case, we sell
20 them the rights to manufacture and market and do
21 everything they want with that product, so it's the IP
22 and -- and it's whatever assets go with it, inventory
23 and --
24     Q.  Does that mean you quit using it?
25     A.  It does.

Page 148

1      Q.  And how many of those have happened?
2  I'm talking about from Syngenta to now?
3      A.  Yes.  I would say 15, perhaps.  Ten or 15.
4      Q.  Which is the biggest, top two or three?
5      A.  The biggest that we -- well, okay, the
6  top -- we divested a product called fluvalinate, that
7  was required under the merger -- merger -- to get the
8  merger approvals.  We divested -- the most important one
9  we divested was a strobilurin fungicide called
10 trifloxystrobin, T-R-I-F-L-O-X-Y-S-T-R-O-B-I-N,
11 trifloxystrobin.  We sold that product --
12     Q.  When?
13     A.  To -- to Bayer.
14     Q.  When did you sell it?
15     A.  We actually had to sell that one before
16 we --
17     Q.  Yeah, that was part of the merger?
18     A.  It was part of the merger.
19     Q.  I'm sure you had regulatory concerns over
20 the merger.
21     A.  Yes, we had to deal with that, and that
22 was a lot of what we did.
23     Q.  Excluding those.  Which ones have you had
24 to divest yourself of since the formation of Syngenta?
25     A.  Permethrin.  Permethrin is --

Page 149

1      Q.  Excuse me a second.
2      A.  Yes.
3      Q.  Who names these chemicals?
4      A.  There's a -- there's a group in Britain --
5  it would have the British, right, who did that -- who
6  approves these common names.  It's a chemical name.
7      Q.  Okay.  Sorry.
8      A.  That's an example of a -- of a product, we
9  didn't have to divest it, it was very small.  We sold
10 the rights to permethrin, and there you go.  I mean,
11 that was --
12     Q.  Who did you sell them to?
13     A.  Yeah, I thought you might ask that, and I
14 cannot recall.
15     Q.  Well, it doesn't matter.  Let me just ask
16 you:  walk me through the process by which the decision
17 was made to sell that technology?
18     A.  Actually, that was a proposal that came
19 from the United States which said, "Look, we don't
20 really need this.  We have got other" --
21     Q.  Products?
22     A.  -- "products in the same class.  We don't
23 need it and -- and we're going to -- you know, we should
24 divest it.  It would be in our interests.  We could get
25 a small amount of money for it and -- and let's do it".

38 (Pages 146 to 149)

Exhibit 003 Page 38
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 150

1    Q.  So what happened then?  They made the
2  recommendation then?
3    A.  They did.
4    Q.  Who did it -- did it come to you?
5    A.  It did.
6    Q.  And --
7    A.  It came to me on the board of -- initially
8  on the board of -- of -- of Syngenta Crop
9  Protection Inc.
10    Q.  And -- and were you the representative of
11  the board, because it came up through Crop Protection,
12  that presented that?
13    A.  I did present that proposal and this was
14  presented for information to the executive committee as
15  well that we wanted to do that, and had decided to so
16  do.
17    Q.  And who decided?
18    A.  The US business.
19    Q.  Right.  I'm just saying, you said it came
20  up to you as -- on the Crop Protection --
21    A.  Inc., yes.
22    Q.  -- Crop Protection as -- in your role --
23    A.  Yeah.
24    Q.  -- and then you presented it to the
25  executive committee?

Page 151

1    A.  For information only.
2    Q.  Okay.  When was the decision made?
3    A.  Boy, back in the early 2000s.  It was one
4  of the earlier ones that we did, this one.
5    Q.  And it -- the decision was made by you,
6  and then you said you -- why did you submit it to the
7  Syngenta executive committee?
8    A.  I told them for information.  It wasn't a
9  submission for approval, or anything like that.  And, in
10  fact, the decision was made -- the whole proposal came
11  from the United States.  That was the --
12    Q.  Where was the product being sold?
13    A.  Predominantly in the United States.
14    Q.  So what you're saying is -- is that any of
15  the subsidiaries can sell the technology of the company
16  without even talking to you?
17    A.  No, I'm giving you -- I'm giving you some
18  comments on this particular one.
19    Q.  Okay.  Well, could they sell it?
20    A.  Well, I'm on the Syngenta Crop
21  Protection Inc. board, so I hope not.
22    Q.  You don't think so?  They couldn't do
23  that?
24    A.  No, because --
25    MR. POPE:  Wait, wait, wait, let's clarify,

Page 152

1  Steve.  Who is "they"?  I mean, if you're talking about
2  Syngenta Crop Protection Inc. cannot act without the
3  board of directors' approval, of course; I don't think
4  that's what you meant.
5  BY MR. TILLERY:
6    Q.  Who owned that -- who owned that
7  intellectual property?
8    A.  Yeah, who owned the IP?  I'm not sure who
9  owned the IP.
10    Q.  Is that --
11    A.  In this instance.
12    Q.  Is that Participations AG?
13    A.  I don't know who owned the IP.
14    Q.  Okay.  Do you think Syngenta Crop
15  Protection Inc. owned that intellectual property?
16    A.  I don't know.  I don't know who owned the
17  IP.
18    Q.  Okay.  Are you testifying here under oath
19  today, sir, that Syngenta Crop Protection Inc. had the
20  authority to sell the intellectual property rights to a
21  product line that it did not own?
22    A.  No.
23    Q.  All right.
24    A.  I don't know.
25    Q.  Okay.

Page 153

1    MR. TILLERY:  Are we going to have lunch soon?
2    MR. POPE:  We normally have lunch.
3    THE WITNESS:  It's a bit early.
4    MR. TILLERY:  Do you want to do that now or do
5  you want to keep going?
6    MR. POPE:  It's totally up -- totally up to
7  you.
8    MR. TILLERY:  What would be your preference,
9  sir?
10    THE WITNESS:  I'm happy to keep going for
11  another 20 minutes or so.
12    MR. TILLERY:  Okay.  Let's do that.
13  BY MR. TILLERY:
14    Q.  Do you have any other examples of
15  discontinued products?
16    A.  Yeah, we're dealing with one right now,
17  which is another insecticide, and we are on the point
18  of -- of divesting the right to sell that product in
19  Japan, and we are dealing with that one might now.
20    Q.  Who owns the rights to sell it?
21    MR. POPE:  To sell the product, you mean?
22  BY MR. TILLERY:
23    Q.  The product.  Who owns the right, the
24  intellectual property rights?
25    MR. POPE:  Well, those are two different

39 (Pages 150 to 153)

Exhibit 003 Page 39
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                 10-15-2010
Confidential - Pursuant to the Protective Order

Page 154

1  things, I think, Steve.  I object to the question.
2          THE WITNESS:   I cannot tell you which legal
3  entity owns those IP rights.  I cannot tell you.
4  BY MR. TILLERY:
5          Q.  Do you know of a subsidiary who owns any
6  intellectual property rights to a chemical that's sold
7  within the Syngenta umbrella besides Syngenta AG or
8  Syngenta Participations?
9          A.  From a viewpoint of legal entity, I am
10  very poorly informed on where these IP assets are held.
11          Q.  So you don't know the answer to my
12  question?
13          A.  I don't.
14          Q.  Now, we were talking about your role.
15  You discussed your role at the beginning of -- of
16  Syngenta formation.  You were discussing your role in
17  the transition.  What job did you occupy at the very
18  beginning of the formation of Syngenta?
19          A.  Essentially, the one I hold today.
20          Q.  Has there been any change in your job
21  title or responsibility?
22          A.  Responsibility.  Not in my job title, but
23  in my responsibility, yes.
24          Q.  How has it changed?
25          A.  At the start of the company and for a

Page 155

1  period of five years, I had responsibility for product
2  development directly.  The -- the function of R&D
3  collectively did not exist at that time.  I had
4  Crop Protection development as part of my
5  responsibility.
6          Q.  And which products?
7          A.  All of them.
8          Q.  All them sold by the agrochem business?
9          A.  Yes.
10          Q.  And who was in that committee -- what was
11  that committee -- strike that.
12          What was that committee called?
13          A.  We dealt with it at the crop protection
14  leadership team level, development matters, and my head
15  of development at the time had his own committee.
16          Q.  Who was that?
17          A.  Initially -- well, the last incumbent of
18  that role was Lewis Smith.  He was the man who -- at the
19  time the change occurred, he was in charge of
20  development --
21          Q.  And --
22          A.  -- reporting to me.
23          Q.  And where is he now?
24          A.  He's semi-retired.
25          Q.  And how has this changed over the last few

Page 156

1  years?
2          A.  It's now part of R&D under Sandro Aruffo.
3  So it's different.
4          Q.  When did that change occur?
5          A.  It occurred -- it occurred five or six
6  years ago.
7          Q.  Who did Lewis Smith work for?
8          A.  He reported to me.
9          Q.  Who did he -- who was his company
10  employer?
11          A.  Either -- I'm not -- I'm not sure.
12  I'm not sure.
13          Q.  Did he work for a Basel company?
14          A.  He -- he moved from the UK to Basel and he
15  was based in Basel, so I believe so.
16          Q.  You don't know for sure?
17          A.  I don't know for sure.
18          Q.  And when did he retire?
19          A.  He's not fully retired, but he -- he
20  actually ceased that role at the time that the -- the
21  function left my responsibility and became part of R&D.
22  He -- he stopped doing that.
23          Q.  Okay.  And tell me what other changes
24  occurred in your responsibility?
25          A.  Okay.  So up until four years ago, I had

Page 157

1  responsibility also for what we call professional
2  products.  Professional products are -- includes seed
3  treatments, which I still have, but it also includes
4  products for lawn and garden and golf courses and
5  non-crop products.  That we now call lawn and garden,
6  and that is the responsibility of Robert Berendes, and,
7  by the way, I should have named him as a member of the
8  SEC.  I failed to do that.  Robert Berendes.  He is head
9  of business development and he is also head of lawn and
10  garden.
11          Q.  As a member of "S"?
12          A.  He's a member of the Syngenta executive
13  committee as well.
14          Q.  I see.  I see.
15          A.  I should have --
16          Q.  Do you know who he's employed by?
17          A.  International.  Syngenta International AG.
18          Q.  Any other changes in your responsibility?
19          A.  No, those were the two changes.
20          Q.  Any change in terms of board positions?
21  Which boards --
22          A.  No.
23          Q.  Strike that.
24          Which boards do you sit on today?
25          A.  I sit on Syngenta Crop Protection AG,

40  (Pages 154 to 157)

Exhibit 003 Page 40
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr.  John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 158

1  Syngenta Crop Protection Inc. and Asia-Pacific --
2  Syngenta Asia-Pacific Pte, the Singapore entity: three.
3      Q.  Syngenta Crop -- I'm sorry, the executive
4  committee that you serve on?  The Syngenta executive
5  committee?
6      A.  I sit on that too, yes.
7      Q.  Right.  Can you tell me what entity that
8  Syngenta executive committee is connected to?
9      A.  Connected to Syngenta AG.
10     Q.  Do you know how?
11     A.  No.
12     Q.  Were you one of the original members of
13  the Syngenta executive committee?
14     A.  I was.
15     Q.  Was that planned from the beginning,
16  at the formation of the company?
17     A.  Yes, it was.
18     MR. TILLERY:  Now would probably be a good
19  time to break.
20     THE WITNESS:  Okay.
21     THE VIDEOGRAPHER:  Going off the record.
22  The time is 12:18.
23     End of tape 2, volume I of the videotaped
24  deposition of John Atkin.
25  (12:18 p.m.)

Page 159

1          (Lunch recess.)
2  (1:11 p.m.)
3      THE VIDEOGRAPHER:  Here begins videotape
4  number 3, volume I in the videotaped deposition of
5  John Atkin.  Going on the record.  The time is 13:11.
6  Thank you.
7  BY MR. TILLERY:
8      Q.  Earlier today, you talked about, I think,
9  roughly 10 percent of Syngenta's budget being allocated
10  to new product development; is that correct?
11     A.  For the company overall, it's --
12     Q.  For the company overall.
13     A.  It is closer to 9, but it's in that
14  region.
15     Q.  Closer to 9 percent?
16     A.  Yes.
17     Q.  Okay.  And you had talked about, in some
18  different times throughout your testimony, that bringing
19  a product to market may take a certain number of
20  dollars -- $200 million, or something like that.
21  Who pays that $200 million when the product is brought
22  to market?
23     A.  I cannot answer from a legal entity
24  standpoint; I cannot.  Part of it, though -- what I can
25  say, if it is field development in the United States,

Page 160

1  for example, that -- that is paid for within the
2  Crop Protection Inc. --
3      Q.  I'm talking about -- I move to strike that
4  as unresponsive.
5      Who would -- who would pay the $200 million
6  that you talked about?  I'm not talking about field
7  development, sir.  I'm talking about the 200 million to
8  bring a product to market.  Who pays that?
9      A.  That includes field development.
10     Q.  Okay.  If that includes -- it costs
11  200 million for field development?
12     A.  No, no, no.
13     Q.  Okay.  So who pays the 200 million?
14     A.  It's in all sorts of different places and
15  all sorts of different amounts and relates to some fixed
16  costs, some variable costs.  I mean, it's a -- it's a --
17  it's a lot of small things which amount to that -- to
18  that amount.
19     Q.  Well, let's do it this way, then.
20  The first stage, what's that first stage called?
21     MR. POPE:  What product?
22  BY MR. TILLERY:
23     Q.  Any product.
24     A.  Stage 1.
25     Q.  New product development.

Page 161

1      A.  Stage 1.
2      Q.  Stage 1.  Right.
3      A.  That would -- that would take place in --
4  in Stein and that would take place in Jealott's Hill,
5  and that's -- and I explained to you that I didn't know
6  which legal entity those two operations were part of.
7      Q.  Okay.  But let's say of the 200 million,
8  where would -- what -- strike that.
9      Of the 200 million you talked about, from
10  beginning to end for new product development, who would
11  pay the first stage for product development in one of
12  those two facilities, Stein or Jealott's Hill?
13     MR. POPE:  Objection to the form of the
14  question.
15     THE WITNESS:  It's -- it's almost entirely
16  fixed costs, so it's the time allocation of the people
17  working at those research stations, so that would be
18  showing up in whichever legal entity they are part of.
19  BY MR. TILLERY:
20     Q.  And -- and is there any allocation of that
21  to anyone else or any other entity in the umbrella of
22  Syngenta entities?
23     A.  No, it is not allocated out of the
24  country -- or territory entities.  It is not allocated
25  to country or territory entities.

41  (Pages 158 to 161)

Exhibit 003 Page 41
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 162

1     Q.  So whichever entity effectively owns
2  Jealott's Hill or Stein would be accountable for that
3  cost?
4     A.  It would, and then it comes into my line,
5  the crop protection P&L, the crop protection income
6  statement is where it would -- for me, I get a view of
7  it in the crop protection income statement.
8     Q.  Explain that to me?
9     A.  Last year, on R&D in the crop protection
10  income statement, there was around 500-and-some million
11  dollars of expenditure.
12     Q.  And you're talking about which crop
13  protection?
14     A.  I'm talking about the consolidated income
15  statement which I get.
16     Q.  Okay.  But I'm just saying, that comes
17  under a consolidated income statement, but where was
18  that particular charge taken or cost accounted for?
19  With which entity?
20     A.  Yeah.  I have to keep telling you that
21  I don't know the legal entity structures well enough to
22  tell you where that was accounted for.  I just don't.
23     Q.  On the documents that you saw, the
24  500-plus million dollars, where did it show that it was
25  being allocated on those documents?

Page 163

1     A.  It didn't -- it showed it in the
2  consolidated P&L, the consolidated income statement.
3     Q.  Okay.  And now let's go to the second
4  stage.  What is that stage?
5     A.  Stage 2.
6     Q.  Yes, what is it?
7     A.  It's testing -- either extended greenhouse
8  testing or limited small plot field trials and some
9  toxicology.
10     Q.  Okay.  And what is the -- what is the very
11  last product that you've put to field testing?
12     A.  There are many products.
13     Q.  No, the last one, sir.  Which is the last
14  one that's just gone out for field testing?
15     A.  In stage 2?
16     Q.  Yes.
17     A.  Chronologically, I couldn't be certain,
18  but we have -- we have a product called Dash, coded Dash
19  at that stage, for example.
20     Q.  Okay.  And do you know where it's been
21  field tested?
22     A.  It's been field tested at Jealott's Hill
23  and it has been subjected to some field testing,
24  I believe, in the United States as well.
25     Q.  Where -- how is it field tested at

Page 164

1  Jealott's Hill?
2     A.  In plots that we have outside.
3     Q.  And what is the cost of field testing at
4  Jealott's Hill?
5     A.  I don't know.  I don't know.
6     Q.  And how is the cost of field testing
7  allocated?  To which entity?
8     A.  I don't know which entity it's allocated
9  to.
10     Q.  Okay.  In -- in terms of the four steps of
11  $200 million, you said, from beginning to end, can you
12  give me a percentage of that total allocated to each of
13  the four steps in the usual circumstance?
14     A.  Okay.  I would say that 70 percent or more
15  is in stage 3.
16     Q.  And what about the remaining steps?
17     A.  Perhaps 20 percent in stage 2 and 10 in
18  stage 1.  These are estimates.
19     Q.  And where is the -- where is the
20  field testing done in the US?
21     A.  Vero Beach.  If it's an early stage
22  compound, we have a field research station at
23  Vero Beach, Florida.
24     Q.  And what is the third stage of the
25  process?

Page 165

1     A.  The third stage of the process involves
2  all the product safety or toxicology testing,
3  environmental safety testing and large-scale field
4  testing.
5     Q.  And the environmental testing, where is
6  that done?
7     A.  Some of that is carried out at our
8  locations in Stein and in Jealott's Hill, but some of it
9  is carried out in territories -- other territories
10  around the world.
11     Q.  Including the United States?
12     A.  Including the United States.
13     Q.  Where is it done in the United States?
14     A.  Environmental work, quite a bit of that is
15  done under contract.  So we would subcontract to
16  specialist organizations environmental testing.  We tend
17  to do that either in Europe or in the United States.
18     Q.  Okay.  If it's done in the United States,
19  with whom would you contract?
20     A.  I don't know the names of these
21  organizations that we contract to.
22     Q.  Could you tell me how they go about this
23  process?
24     A.  Yes.  We would -- we would define the sort
25  of studies that we want doing.  The contract lab would

                                   42 (Pages 162 to 165)

Exhibit 003 Page 42
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 166

1  build that into a protocol and a proposal with a cost,
2  and maybe there would be two, probably two or maximum
3  three, labs who would make the proposal to us, and our
4  scientists would pick the one which represented the best
5  mix of quality and price.
6      Q.  And who are the scientists who would make
7  that call?
8      A.  Scientists in the product safety
9  organization.  The organization that -- that I earlier
10 discussed is toxicology, which is headed up by
11 Peter Hertl.
12     Q.  So would the -- the scientists there would
13 be at Basel?
14     A.  The scientists would be in Basel or in the
15 United States.  The studies we contract in the
16 United States, the people in the United States,
17 are perfectly able to contract those studies themselves,
18 I believe.
19     Q.  Right.  Whether they are able to or not --
20     A.  They do.
21     Q.  Okay.  And who -- who is the contract with
22 when you contract out in this third stage?  Who signs
23 the contract?
24     A.  The -- the professionals who work in
25 product safety.

Page 167

1      Q.  Right.  With whom do they contract?
2      A.  With the third party.
3      Q.  Yes.  But who is the third party
4  contracting with?  What entity?
5      A.  Ah, okay.  We're coming back to the legal
6  entity.  I -- if it's in the United States, I assume
7  that it's Crop Protection -- Syngenta Crop
8  Protection Inc., I assume.
9      Q.  But you don't know?
10     A.  I don't know.
11     Q.  Okay.  And let me ask you, would some of
12 the work that would be done in this third stage involve
13 university testing?
14     A.  It could.  It could.
15     Q.  And -- and are you familiar with some of
16 the contractors that have been retained to do this?
17     A.  Earlier in my career, I was directly
18 involved in contracting work to be done.
19     Q.  Are you talking about earlier in your
20 career at Syngenta?
21     A.  No.
22     Q.  Okay.  I'm talking about at Syngenta now?
23     A.  No, I'm not familiar.
24     Q.  Okay.  You don't know any of them in the
25 United States?

Page 168

1      A.  In the United States, no.
2      Q.  Do you know of -- strike that.
3          Would you recognize the names if you heard
4  them?
5      A.  I might do.  I certainly know one in
6  Europe reasonably well.
7      Q.  Which --
8      A.  RCC.
9      Q.  And what is that, I'm sorry?
10     A.  RCC.
11     Q.  What does it stand for?
12     A.  I don't know, but I know it's called RCC
13 and I know they do contract -- toxicological product
14 safety type work.
15     Q.  And in the United States, you don't know
16 where the contractors are?
17     A.  I do not.
18     Q.  Who would keep a record of that?
19     A.  The product safety department.
20     Q.  Where?
21     A.  In Greensboro and in Europe.
22     Q.  And would that third stage include
23 field work?
24     A.  It would.  It does.
25     Q.  And what field work would be involved?

Page 169

1      A.  Most of this field work we would carry out
2  ourselves, and it would involve testing the product on
3  farmers' fields where the farmer enters into a -- a
4  cooperation with us to evaluate these products, and we'd
5  either rent a piece of his field, or sometimes not, and
6  we'd -- we'd set up our trials.
7      Q.  And do you do that with agricultural
8  departments of universities as well?
9      A.  It is done -- sometimes they do it
10 independently, anyway, of their own volition.
11     Q.  On products that you were getting to
12 market?  How would they have access to your products,
13 a new molecule?
14     A.  Well, they'll do it with products just
15 after launch, for example, when they can have free
16 access to it or --
17     Q.  Remember, I'm talking about part of the
18 three-part process.
19     MR. POPE:  Please don't interrupt, Steve.
20     MR. TILLERY:  He's going down the wrong path.
21     MR. POPE:  Even so, let him go down the path
22 and you can correct him.
23     THE WITNESS:  Let me go down the right path.
24 BY MR. TILLERY:
25     Q.  Remember I'm talking about the three-part

Westlaw Deposition Services   800.548.3668 Ext. 1

Exhibit 003 Page 43
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                          10-15-2010
Confidential - Pursuant to the Protective Order

Page 170

1  step.
2      A.  Okay.
3      Q.  They wouldn't have the molecule unless you
4  gave it to them, would they?
5      A.  Correct.
6      Q.  All right.  So let's talk about a
7  situation -- let's stay focused on the three-part
8  process, if we can.  In the three-part process, in that
9  third step, would universities be involved in the field
10  testing?
11     A.  They could be.  They could be.
12     Q.  How could they be?
13     A.  Because we ask them to be or because they
14  learned about the product and they wanted to be.
15     Q.  Would they -- how would they learn about
16  it before you launched the product?
17     A.  Because we publish our pipeline.
18     Q.  Before you go out?
19     A.  No, but we publish our pipeline whilst
20  products are still in stage 3 and sometimes whilst
21  they're in stage 2.
22     Q.  And do you do this before you have filed
23  before patent protection?
24     A.  No.
25     Q.  When do you file for patent protection?

Page 171

1      A.  As early as possible in the process.
2      Q.  And after the molecule is found to be
3  stable?
4      A.  It could be at that point, but that
5  wouldn't mark the end of the filing.  The filing would
6  continue, depending on what was patentable or what we
7  felt should be filed.
8      Q.  With whom would you file the patent?
9      A.  With the relevant authorities in countries
10  around the world.
11     Q.  Well, would you file in the United States
12  for protection?
13     A.  Yes.
14     Q.  With the United States Patent Office?
15     A.  Yes.
16     Q.  Who would file for that?
17     A.  I'm not sure whether it would be our local
18  professionals or it would be done from Basel.  I'm not
19  sure.
20     Q.  And you're unaware of the fact that a
21  particular entity owns the patent rights to your
22  developed molecules?
23     A.  I'm not unaware of the fact that they are
24  owned by particular entities, but I don't know which
25  entities own which molecule IP.

Page 172

1      Q.  Do you believe that a single entity owns
2  the intellectual property rights to developed products?
3      A.  For all our developed products around the
4  world?
5      Q.  Yes.
6      A.  I don't believe so, but I don't know.
7      Q.  You think that they could be owned by
8  different entities?
9      A.  I think they could be.
10     Q.  By more?  You don't know?
11     A.  I don't know.
12     Q.  Who would you get on the phone if you --
13  if you had this phone right here on the table, who would
14  you call to answer that question?
15     A.  I'd call the -- I'd call my colleague,
16  Sandro Aruffo, head of R&D.
17     Q.  Why would you call her?
18     A.  Him.
19     Q.  Him.
20     A.  Because he's head of R&D.  Therefore, he
21  has responsibility for the whole research and
22  development process.
23     Q.  And you're not familiar or you are
24  familiar with the filing process in the United States
25  for patent protection on a new molecule?

Page 173

1      A.  No, I'm not familiar.  I am not
2  responsible for R&D and I am not familiar with that
3  process.
4      Q.  And you don't know which of the Syngenta
5  entities is filing for protection?
6      A.  I'm not sure.  No.
7      Q.  Okay.  And you said universities could do
8  the field testing under one of the two conditions that
9  you outlined:  either they did it on their own --
10     A.  Yes.
11     Q.  -- because they learned after you'd filed?
12     A.  Yes.
13     Q.  And that would be while the patent was
14  pending, probably, wouldn't it?
15     A.  It could be.  I imagine it could be.
16  I say "I imagine" because I am not -- I cannot quote you
17  specific cases, but I do believe that that is the case,
18  yes.
19     Q.  And this is before a patent has been
20  issue, perhaps?
21     A.  Yes, it could be.
22     Q.  All right.  But you would, of course, get
23  patent protection once it was finally issued?
24     A.  Yes.
25     Q.  All right.  Now, in the process of

44  (Pages 170 to 173)

Exhibit 003 Page 44
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 174

1  granting patent protection in the United States, do you
2  know who is ultimately assigned the patent protective
3  rights?
4      A.  No.
5      Q.  Do you know of any universities in the
6  United States which have undertaken field testing in the
7  third part of this four-part process?
8      A.  I could have -- no, I don't know for sure.
9      Q.  Were you aware of the fact that the
10 University of Illinois has been retained to do field
11 testing for your products?
12     A.  I wasn't aware, but I'm not surprised.
13     Q.  Why?
14     A.  Because Illinois is an important state for
15 agriculture, and for corn and soybeans in particular.
16     Q.  That's a term -- that's a name you're not
17 unfamiliar with; correct?
18     A.  Illinois?
19     Q.  Yes, University of Illinois.
20     A.  No, I'm not unfamiliar with it.
21     Q.  How are you familiar with their
22 organization?
23     A.  I'm not familiar with the organization at
24 all, but I know -- I've heard the name before.
25     Q.  You're familiar with the school by

Page 175

1  reputation?
2      A.  Yes.
3      Q.  Do you know how that other 30 percent in
4  the four-step process breaks down among the remaining
5  three steps?
6      A.  I think I said -- I estimated 20 percent
7  in stage 2 and 10 percent in stage 1, but that's purely
8  my -- my estimate, based on what I know, which isn't
9  complete.
10     Q.  And in these other states -- strike that.
11     In these other stages, you're not familiar with
12 the allocation of cost associated with the different
13 testing levels -- for example, the toxicological
14 testing?
15     A.  I'm not -- I'm not familiar with how it is
16 allocated to legal entities, no.
17 (Exhibit 9 marked for identification.)
18 BY MR. TILLERY:
19     Q.  I'm going to hand you what has been marked
20 as exhibit number 9.
21     A.  Okay.
22     Q.  If you could hand a copy to Mr. Pope.
23 He actually ought to take the other one, so you can
24 reference that number.
25     A.  Right.

Page 176

1      Q.  Can you tell me what this document is?
2      A.  It's called "Principles, concepts --
3  development principles, concepts and processes".
4      Q.  Are you familiar with it?
5      A.  No.
6      Q.  Do you want to look at it and see if you
7  are?
8      A.  Sure.
9      Q.  And if -- if you'll note that the copies,
10 as you go through, or parts of them are cut off.  I will
11 point out to you that that is precisely the way it was
12 presented to us --
13     A.  Mmm-hmm.
14     Q.  -- delivered to us as a copy.  The one
15 I have here marked as 9 shows 57 pages.  Is that your --
16 the same as yours?
17     A.  It is.
18     Q.  Is this a PowerPoint presentation of some
19 sort, does it look like?
20     A.  It appears to be so, yes.
21     Q.  Does this exhibit 9 describe Syngenta Crop
22 Protection's product development process prior to the
23 restructuring of that function in 2005?
24     MR. POPE:  I object to the form.  I don't
25 think you've identified whether he's ever seen this

Page 177

1  before.
2      MR. TILLERY:  It doesn't matter for my
3  question.
4      MR. POPE:  Yeah, you've got to have a
5  foundation.  You have to have a foundation to ask a
6  question.
7      MR. TILLERY:  Not for my question it doesn't.
8      MR. POPE:  Yes, it is.
9      MR. TILLERY:  No, I do not.
10     MR. POPE:  I object to the form.
11 BY MR. TILLERY:
12     Q.  Go ahead, sir.
13     A.  It appears to describe the process right
14 at the very start of the company.
15     Q.  That's -- that's what I was asking.
16 That's the process.  This is a document that describes
17 the process that changed later.  Was there -- what was
18 the date of the change?
19     A.  The change related to when it -- the
20 development process did not report to me anymore.
21     Q.  Yes.
22     A.  That happened 2004, I think.
23     Q.  Does that exhibit describe the roles and
24 responsibilities in the product development process that
25 were assigned to certain groups within Syngenta Crop

45 (Pages 174 to 177)

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 178

1    Protection prior to that change?
2        A.  I'm not sure.  It describes principles,
3    concepts and processes.  I didn't -- I didn't study it
4    closely enough to know if it does what you say.
5        Q.  Can you take a look at it and see?
6    Take your time and look at it.
7        A.  What -- can you repeat the question?
8        Q.  Yes:  does it describe the roles and
9    responsibilities in product development that were
10   assigned to different groups within the Syngenta Crop
11   Protection division?
12       A.  It appears to describe the jobs held by
13   individuals in product development, as a --
14       Q.  And accurate at that time, from creation
15   to 2004 when that role changed?
16       A.  I would have to spend some time, because
17   we did improve the -- "improve"; we did change the
18   process of development when it reported to me.  I did --
19   took -- I took a glance at some of the time lines in
20   here for stage 1, 2 and 3, and we shortened -- we were
21   able to shorten some of these time lines.  It was a
22   project we ran to do so.
23       Q.  When did you do that?
24       A.  Right around the time that -- that the
25   responsibility left me and went to R&D.

Page 179

1        Q.  So from the inception of the company until
2    that time, is it an accurate description of the product
3    development process, as far as you know?
4        A.  As far as I know, yes.
5        Q.  Yes.  Does it accurately describe the
6    roles and responsibilities of people in the product
7    development process?
8        A.  As far as I know, but I haven't -- I would
9    have to really cross-check it to be sure.  I mean, I --
10   as far as I know.
11       Q.  I -- I want to represent to you, this
12   isn't something that I created.  It was something that
13   was given to me in production?
14       A.  Fine.
15       Q.  Okay.  I just want to make sure --
16       A.  That's right, and -- and if -- if there's
17   nothing erroneous in here, then I -- I believe it to be
18   correct.
19       Q.  All right.
20   (Exhibit 10 marked for identification.)
21   BY MR. TILLERY:
22       Q.  I'll hand you exhibit number 10 and ask
23   you to take a look at it.  Is that an executive summary
24   of a 2001 request for the release for first sales of a
25   selective herbicide called mesotrione?

Page 180

1        A.  It is.
2        Q.  What Syngenta group company was
3    Derek Cornes' employer at the time of the request?
4        A.  Derek Cornes.  He was based in Basel at
5    that time, so it would probably be Syngenta Crop
6    Protection AG, probably, but I cannot say for sure.
7        Q.  What Syngenta group company was
8    Charlotte Croudace's employer at the time of the
9    request?
10       A.  I don't know.  I don't know this lady.
11       Q.  What Syngenta group company was
12   Judy Garrett's employer at the time of the request?
13       A.  Probably the same as Derek Cornes.
14       Q.  Which would be?
15       A.  Syngenta Crop Protection AG.  I don't know
16   for sure.
17       Q.  And who was Hans Weber's employer at the
18   time of the request?
19       A.  He was also Basel-based, so probably
20   Syngenta Crop Protection AG, but I'm not sure.
21       Q.  To whom was this request submitted?
22       A.  This would have been submitted in the
23   first instance to the development committee.
24       Q.  Which development committee?
25       A.  The global development committee.

Page 181

1        Q.  Global development committee of
2    crop protection that you head up?
3        A.  No, I don't head that up.  It's headed up
4    by Gerardo Ramos now.  It's headed up by the head of
5    development.  I don't head that one up.
6        Q.  And this is in Basel?
7        A.  Yes.
8        Q.  And then what would the process have been
9    after they looked at it?
10       MR. POPE:  Objection to the form of the
11   question.
12       THE WITNESS:  It would probably -- it would
13   probably have come to the crop protection leadership
14   team.
15   BY MR. TILLERY:
16       Q.  And who was that?  You at its head?
17       A.  Yes.
18       Q.  Was it approved?
19       A.  It was approved for first sales.
20       Q.  And did your crop protection leadership
21   team approve it?
22       A.  I'm not sure.  And the reason I'm not sure
23   is that sometimes we didn't review all the -- we review
24   all the promotions from stage 2 to stage 3, but at that
25   time we didn't review formally all the first sales

46 (Pages 178 to 181)

Exhibit 003 Page 46
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                   10-15-2010
Confidential - Pursuant to the Protective Order

Page 182

1   proposals.
2       Q.   If it wasn't your group that approved it,
3   then global had the final word?
4       A.   The development committee would have had
5   the final word, alongside the local affiliated
6   development committees, who would also approve it.
7       Q.   And who would have paid for it to be
8   produced?
9       A.   The document?
10      Q.   No, the product.
11      A.   I think we touched on that before.  From a
12  legal entity standpoint, I don't know.
13      Q.   Was this a product that was sold in the
14  United States?
15      A.   Yes.
16      Q.   Was it sold in the state of Illinois?
17      A.   Yes.
18      Q.   Is it still being sold in the state of
19  Illinois?
20      A.   It is.
21      Q.   Do you know in what volume it's being sold
22  in the state of Illinois?
23      A.   I don't know the volume that's being sold
24  in the state of Illinois, no.
25      Q.   Who owns the intellectual property rights

Page 183

1   to this product?
2       A.   I don't know.
3       Q.   What are the US sales of this product?
4       A.   This particular version of this product,
5   the sales are probably less than $100 million, but
6   I can't -- we subsequently developed a range of mixtures
7   involving the same technology.  Collectively, it's much
8   more than that.
9       Q.   Much more than 100 million?
10      A.   Yes.
11      Q.   Today?
12      A.   Yes.
13      Q.   And what percentage of that is in
14  Illinois?
15      A.   I don't know.
16      Q.   When you do a general thumbnail estimate
17  of sales dealing with corn crops in the US, do you
18  mentally have an understanding of where sales will
19  normally come out per state in the corn belt?
20      A.   Me, no, but certainly the operating unit
21  in -- in Greensboro will have a -- a view of that.
22      Q.   What farm product, crop product, is this
23  chemical used on?
24      A.   It's used on corn.
25  (Exhibit 11 marked for identification.)

Page 184

1   BY MR. TILLERY:
2       Q.   I'm going to hand you what's been marked
3   as exhibit 11.
4       A.   Yes.
5       Q.   Does this exhibit 11 reflect the Syngenta
6   Crop Protection development committee's recommendation
7   for release to first sales of mesotrione?
8       A.   Yes.
9       Q.   Does the application -- that's what the
10  document's called; right?
11      A.   (Witness nods head.)
12      Q.   Who's the application to?
13      A.   To the development committee.
14      Q.   The application is to the development
15  committee and the development committee's making the
16  recommendation in the same document?
17      A.   Yes, I think that's right, because the
18  development -- what the development committee is saying
19  is there is no reason why this cannot go ahead and be
20  sold, but the decision to put it in packs and bottles
21  and to provide it to customers has to be taken by a
22  local entity.
23      Q.   Does the application describe Judy Garrett
24  as the leader of the respective team?
25      A.   It describes her as having provided the

Page 185

1   market overview, it seems.  But it also -- it also says
2   that she's a leader, it also says "Leader of respective
3   team".
4       Q.   What team does that refer?
5       A.   The corn team.
6       Q.   The what team?
7       A.   The global corn team, from a marketing
8   perspective.
9       Q.   What is the global corn team?
10      A.   That is a product leadership team.
11  She worked for our global marketing group and she is the
12  marketing person who headed up that product leadership
13  team.
14      Q.   Well, tell me more about this global
15  marketing group for corn.  Where is it headed up?
16  In Basel?
17      A.   In Basel.
18      Q.   And -- and she was the head of that group?
19      A.   She was, yes.
20      Q.   And is she still the head of it?
21      A.   No.
22      Q.   Who is now?
23      A.   Dave Elser.
24      Q.   And is it still located in Basel, the
25  group?

47 (Pages 182 to 185)

Exhibit 003 Page 47
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 186

1      A.   The head of the team is located in Basel.
2      Q.   Who else is on the team?
3      A.   Representatives of all the involved
4   functions, so product development, manufacturing,
5   research; whoever -- formulation people who need to
6   be -- who need to help to get this thing to first sales,
7   and they have extended -- extended teams which sometimes
8   extend into the territories so we make sure it's
9   properly coordinated.
10     Q.   The other team members, are they from all
11  over the world?
12     A.   The extended team members, to the extent
13  that they are involved, are from -- from international
14  locations, yes.
15     Q.   The immediate team members, where are they
16  from?
17     A.   Immediate team members, on the whole, are
18  based in Basel; on the whole.
19     Q.   And -- and which entities are they
20  employed by?
21     A.   If they're based in Basel, they would be
22  employed by Syngenta Crop Protection AB probably --
23  AG probably, but I don't know that.  Some of them, by
24  the way, could be coming from Jealott's Hill and,
25  therefore, be employed with the entity that

Page 187

1   Jealott's Hill is associated with.
2      Q.   What is the authority for the creation of
3   that committee, or that group?
4      A.   Could you explain what you mean by
5   "the authority for"?
6      Q.   Yes.  How was it -- how was that group
7   created --
8      A.   How was it --
9      Q.   -- that corn marketing group.
10     A.   It was created under our global marketing
11  team to -- with the express intent of bringing together
12  chemical assets for deployment in corn crops all over
13  the world.
14     Q.   Who created this marketing team?
15     A.   The head of global marketing at the time.
16     Q.   And who was that?
17     A.   At the very start, at the very start,
18  we didn't have global marketing.  There were separate
19  teams for fungicides, insecticides and herbicides, and
20  they -- the heads of those teams reported directly to
21  me, but fairly quickly we -- we nominated a head of
22  global marketing.  His name was Jan Suter.
23     Q.   Is he still there?
24     A.   No, he is now head of Africa/Middle East,
25  and he's been replaced by Rob Neill.

Page 188

1          MR. POPE:  Do you want to spell that for the
2   court reporter, please?
3          THE WITNESS:  Suter, S-U-T-E-R.
4   BY MR. TILLERY:
5      Q.   At the very bottom of the application,
6   it indicates it was to be distributed to the product
7   line manager?
8      A.   Right.
9      Q.   To whom does that refer?
10     A.   That's -- that -- because this is a very
11  early document, the product line manager was the head of
12  the herbicide product line.  At that time, there was
13  a -- it was a man called Dino Sozzi.
14     Q.   And -- and by whom was he employed?
15     A.   Crop Protection -- Syngenta Crop
16  Protection AG, I believe.
17  (Exhibit 12 marked for identification.)
18  BY MR. TILLERY:
19     Q.   I hand you number 12, sir.
20     A.   Thank you.
21     Q.   Just take a look at that.  Is this
22  exhibit 12 a presentation made to the development
23  committee?
24         MR. POPE:  Objection to the form of the
25  question.

Page 189

1          THE WITNESS:  It's difficult to tell if it was
2   made to the development committee.  It reports the
3   conclusions of the development committee on one of the
4   slides, so it's a little difficult to -- to be sure.
5   BY MR. TILLERY:
6      Q.   Okay.  If -- if not, was it made to a
7   group of which you were a member?
8      A.   I cannot recall.
9      Q.   Do you remember seeing this document?
10     A.   No.
11     Q.   What -- have you seen presentations like
12  this before?
13     A.   Oh, yes.
14     Q.   What do you believe it to be, by looking
15  at the document --
16         MR. POPE:  Objection to form --
17  BY MR. TILLERY:
18     Q.   -- whether or not you've seen it before?
19         MR. POPE:  Objection to the form of the
20  question.  I think he just told you he doesn't know what
21  it is.
22  BY MR. TILLERY:
23     Q.   And just so we're clear, under -- and
24  this will come up again.  When you produce documents in
25  Federal Court, you stand behind their integrity.  You

Westlaw Deposition Services   800.548.3668 Ext. 1

Exhibit 003 Page 48
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                 10-15-2010
Confidential - Pursuant to the Protective Order

Page 190

1  can't deny the existence of their authenticity, and
2  there are several cases in the Seventh Circuit directly
3  on point that say that.
4       So I'm -- I'm using documents that were given
5  to me in discovery, and -- and I'm representing to you
6  that there has been not one single change to this
7  document as given to you in its entirety?
8       A.  I'm not denying its authenticity.
9       MR. POPE:  I'm not denying the integrity of
10 the document, Mr. Tillery.  I'm just objecting to your
11 request that he do some speculation as to what it is.
12      MR. TILLERY:  Okay.
13      THE WITNESS:  I'm very familiar with the
14 content of this document.
15 BY MR. TILLERY:
16      Q.  Explain to me how you're familiar with it?
17      A.  Well, the -- the data that's in here,
18 we -- we and many of my colleagues have discussed on
19 many occasions and in many forms, in many different
20 forms.  So the content is -- is known to me.
21      Q.  And what -- what -- in terms of content,
22 what ultimately happened after the presentation or the
23 conclusions that were being sought -- strike the
24 question.
25      What ultimately happened in terms of

Page 191

1  mesotrione?
2       A.  Mesotrione was launched firstly in the
3  United States and subsequently in Europe and later on in
4  Latin America and other parts of the world.
5  (Exhibit 13 marked for identification.)
6  BY MR. TILLERY:
7       Q.  I show you what's been marked as
8  exhibit 13, sir.
9       A.  Thank you.
10      Q.  What's a global risk assessment?
11      A.  Risk is a combination of hazard and
12 exposure, so it takes the -- hazard of any given
13 product and relates that to its potential for human and
14 environmental exposure, so a global risk assessment
15 would talk about risk in that sense.
16      Q.  And if you could take a look at the people
17 to whom this agenda item was -- was addressed and copied
18 to, can you tell me where they were located?
19      A.  The -- the suffix indicates that
20 Vivienne Anthony was located in Basel; Paul Gordon was
21 located in Basel; David Lawrence located in
22 Jealott's Hill at this time; Lewis Smith was located in
23 Britain.
24      At this time, he was at a place called CTL,
25 which was a toxicology center we had in the north of

Page 192

1  English, Cheshire.
2       MR. POPE:  Would you clarify, when you say
3  "this time", what you mean?
4       THE WITNESS:  I mean on October the 16th,
5  2001.
6       John Street was located in Basel; Robert Durand
7  was in Basel; Patrick Huguet in Basel; Eric Kuhn also in
8  Basel; Dino Sozzi, Basel; Michel Bourguet, Basel;
9  Robert Nyfeler, Basel; Anthony Skidmore in the UK, I'm
10 not exactly sure where.
11      Q.  And can you look -- explain the codes that
12 are on those behind their names, please?
13      A.  "BS" is Basel.
14      Q.  And the "CH" is for Switzerland?
15      A.  Yes.
16      Q.  Okay.  And going down:  "GB",
17 Great Britain and "JH" is for Jealott's Hill?
18      A.  Right.
19      Q.  The others, please?
20      A.  I don't know exactly what "AP" stood for.
21 I just do know where he was located, though.  I don't
22 know what "FH" stands for either.  "USGR" is US,
23 Greensboro, Tim Pastoor.
24      Q.  And Tim Pastoor was making a presentation
25 then?

Page 193

1       A.  It appears to be the case.
2       Q.  And what was the presentation about?
3       A.  Global risk assessment.
4       Q.  For what?
5       A.  It doesn't say.
6       Q.  And what -- how would Tim Pastoor have
7  been making that presentation; do you know?
8       MR. POPE:  Objection to the form of the
9  question.
10 BY MR. TILLERY:
11      Q.  Do you know how he would have been making
12 that presentation?
13      A.  Do you mean whether he was in person or
14 remotely?
15      Q.  No, I'm sorry.  How would -- strike that.
16      Why would Tim Pastoor be making a presentation
17 to this group of people?
18      A.  Because --
19      MR. POPE:  Objection to the form of the
20 question.
21 BY MR. TILLERY:
22      Q.  Go ahead.
23      A.  Because he's -- he's an expert in this
24 field.
25      Q.  Okay.  And he's an expert in the field of

49 (Pages 190 to 193)

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 194

1  global risk assessment?
2        A.  Risk assessment in general, yes.
3        Q.  And does he occupy a leadership position
4  in risk assessment within the Syngenta group of
5  companies?
6        MR. POPE:  In 2001?
7        THE WITNESS:  I don't know what his job title
8  was in 2001.  I don't know.
9  BY MR. TILLERY:
10        Q.  Now or any time, does he?  Has he ever
11  occupied that?
12        A.  I don't know -- I don't know what his job
13  title is today.
14        Q.  Well, what -- irrespective of his title,
15  does he occupy any role at any time since Syngenta's
16  been formed on risk assessment?
17        A.  His job involves risk assessment.
18        Q.  Okay.  But does he do it for anything
19  beyond the scope of -- of activities at Syngenta Crop
20  Protection Inc.?
21        A.  He may do.  I don't know the answer.
22  He may do.  He's principally devoted to matters
23  involving Crop Protection Inc., but I -- he may have
24  been involved in other matters.
25        Q.  And how would he have been involved in

Page 195

1  those other matters, by what authority?
2        A.  He would have been invited to be involved
3  in them.
4        Q.  By whom?
5        A.  By the head of development at the time.
6        Q.  And the head of development at the time
7  was?
8        A.  At this time, it was Vivienne Anthony, who
9  is at the top of the list.
10  (Exhibit 14 marked for identification.)
11  BY MR. TILLERY:
12        Q.  If you'd take a look at number 14, please.
13  Did Syngenta Crop Protection Inc. ever have an office in
14  Basel with the Syngenta companies?
15        A.  Not to my knowledge.
16        Q.  Is exhibit 14 the minutes of a 2001
17  meeting of employees of various Syngenta group companies
18  on the subject of review of corn strategy and various
19  triazine scenarios?
20        MR. POPE:  Objection to the form of the
21  question.  No foundation.
22        THE WITNESS:  It's entitled "Review of Corn
23  Strategy in various Triazine Scenarios", indeed.
24  BY MR. TILLERY:
25        Q.  Was Mr. Nyffeler Syngenta AG's product

Page 196

1  manager for selective herbicides in December 2001?
2        A.  I'm not sure.
3        Q.  Who do you think was the product manager
4  for selective herbicides at that time?
5        A.  The global head of selective herbicides
6  was Dino Sozzi and the person in charge of the overall
7  corn strategy was -- was -- was himself and -- and
8  Judy Garrett, whose name is on this list.
9        Q.  Which Syngenta group company was
10  Mr. Nyffeler an employee of at the time, December 2001?
11        A.  I don't know, but if he was Basel-based,
12  which I believe he was, it would probably be Syngenta
13  Crop Protection AG, but I don't know.
14        Q.  Did this group have product management
15  authority with respect to selective herbicides sold in
16  the United States at that time?
17        MR. POPE:  By "this group," you mean the
18  participants on this sheet of paper?
19        MR. TILLERY:  Yes.
20        THE WITNESS:  No.
21  BY MR. TILLERY:
22        Q.  Who did?
23        A.  The authority for managing products in the
24  United States lay with the United States team.  At that
25  time, it was headed by Hieri Gugger, which is a name

Page 197

1  I have given you before, and his -- his marketing team.
2  Some of those people are on this -- were at this
3  meeting.
4  (Exhibit 15 marked for identification.)
5  BY MR. TILLERY:
6        Q.  Now take a look, if you wouldn't mind,
7  at exhibit 15.  Okay.  Is exhibit 15 the minutes
8  of a development committee meeting in Basel on
9  September 10th, 2002?
10        A.  It is.
11        Q.  It identifies the members of the
12  development committee, the document does?
13        A.  It does.
14        Q.  You were cc'd on those minutes; correct?
15        A.  Yes.
16        Q.  At that time, the development committee
17  included employees from more than one Syngenta group
18  company?
19        A.  It did.
20        Q.  How many different companies were
21  represented on that committee?
22        A.  I can't be sure because I don't know if
23  Mike Bushell and Lewis Smith were in the same legal
24  entity in the UK.
25        Q.  How would you -- how would you even

50  (Pages 194 to 197)

Exhibit 003 Page 50
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 198

1  identify which entity they were from?
2       A.  You can't.  You can only tell which site
3  they were at and which country they were in.
4       Q.  Okay.  Are the individuals listed to --
5  listed to the right of the "cc management" the persons
6  who had authority for the management of a specific
7  Syngenta group company or companies?
8       A.  No.  No, these people are product people.
9       Q.  Why are they listed as management?
10      MR. POPE:  Objection to the form of the
11 question.
12      THE WITNESS:  Because they're product
13 management.
14 BY MR. TILLERY:
15      Q.  And where were they employed?
16      A.  Excuse me, I -- I hadn't read the whole
17 list.  There are people in here who indeed were --
18 are -- were heads of the territories or the regions.
19 Maercio Rezende, San Paulo; Piet Smits, Europe;
20 Don Taylor, Asia; and Bob Woods at that time was US.
21      Q.  "USUW"?
22      A.  Yes, this was USUW.  At that time he
23 was -- he was not in Greensboro.  That's probably why
24 that's what it is.
25      Q.  Where was he?

Page 199

1       A.  Wilmington.
2       Q.  Have the development committee minutes
3  ever included the names of the company by which the
4  members were employed?
5       A.  Not to my knowledge.
6       Q.  Does Syngenta require employees from
7  different Syngenta group companies who communicate with
8  each other to identify which Syngenta company they work
9  for?
10      A.  I'm not sure if it's a requirement, but on
11 business cards it's usually stated.
12      Q.  Are they required to do it, or do you
13 know?
14      A.  I don't know if it's a requirement.
15      Q.  Do all of the employees of Syngenta group
16 companies have an email address that's @syngenta.com?
17      A.  Yes, I think that would be the case.
18      Q.  Looking at their email address, is there
19 any way to discern which Syngenta group company they're
20 employed by?
21      A.  No.
22      Q.  Has Syngenta AG ever required employees of
23 Syngenta group companies to identify the Syngenta group
24 company they work for in emails to persons outside the
25 Syngenta group of companies?

Page 200

1       A.  I don't know if it has -- if it has ever
2  required them so to do.
3  (Exhibit 16 marked for identification.)
4  BY MR. TILLERY:
5       Q.  Would you take a look at 16, please.
6  In about July 2002, did the development committee
7  approve the release to first sale of products called
8  Lumax and Camix?
9       A.  I believe it did.
10      Q.  What are those products?
11      A.  They are products containing, in the case
12 of Lumax, mesotrione, metolachlor and atrazine; in the
13 case of Camix, mesotrione and metolachlor.
14      Q.  Were those released for sale in the
15 United States?
16      A.  They were.  I cannot tell you exactly
17 when.
18      Q.  Would that include sales in the state of
19 Illinois as well?
20      A.  It would.
21      Q.  And were they sold in the United States?
22      A.  They were and are sold in the
23 United States.
24      Q.  And in Illinois as well?
25      A.  And in Illinois -- including in

Page 201

1  Illinois -- or, correction, I'm not sure if Camix is,
2  but it's available nationally.
3       Q.  In -- in the United States?
4       A.  Yes.
5       Q.  And would be available in the state of
6  Illinois?
7       A.  If a distributor wanted to buy it, yes.
8       Q.  And Lumax contains what products?
9  A mixture of what?
10      A.  Mesotrione, metolachlor and atrazine.
11      Q.  And what are the sales of Lumax in the
12 United States?
13      A.  I cannot tell you the exact number.
14 We launched another product which was similar but had
15 a different ratio of combinations between the two of
16 those products.  They will have sales in the order of
17 250 million or more.
18      Q.  In the United States?
19      A.  Mmm.
20      Q.  You have to say "yes" or "no"?
21      A.  Yes.
22      Q.  And what portion of those sales would be
23 in the state of Illinois?
24      A.  That's impossible for me to estimate.
25      Q.  Which state in the United States, in terms

51 (Pages 198 to 201)

Exhibit 003 Page 51
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 202

1  of corn herbicides, sells the greatest percentage of
2  product in the -- in the US?
3       A. Again, it's very difficult. Illinois
4  would be amongst the top five.
5       Q. Okay. This product was for the use with
6  corn crops; right?
7       A. It was -- is; is and was.
8       Q. And what are those five states that are
9  the top five in the United States?
10      A. The "I" States.
11      Q. The what states?
12      A. "I".
13      Q. Okay.
14      A. Which is Iowa -- I'm going to get my --
15  I'm going to show my limitations on the US here: Iowa,
16  Illinois, time goes on. Give me a clue.
17      Q. Indiana?
18      A. Indiana. Iowa, Indiana, Illinois and --
19  it's not Idaho. It isn't. It could be, I guess. No.
20  What's the other "I"?
21      MR. POPE: If you don't know, tell him you
22  don't know.
23      THE WITNESS: Well, I would know if I sat here
24  with a pencil. The other big one is Nebraska and
25  then -- and then the others are somewhat less important.

Page 203

1  BY MR. TILLERY:
2       Q. And Kansas, is that one of them?
3       A. Kansas is not as big as the ones we've
4  just mentioned.
5       Q. All right. Illinois, Indiana and Iowa.
6       A. The biggest.
7       Q. All right. The product Lumax that you
8  described, did it come before the -- actually, instead
9  of asking the question that way, let me ask you this:
10  walk me through the process by which Lumax was approved
11  for first sale and distribution in 2002?
12      A. From the point at which it was developed
13  right to --
14      Q. Yes. It came through your development
15  committee.
16      A. It came through the development committee
17  at the last -- it came through the development committee
18  to be approved for sale, but there were a lot of
19  activities that took place before it reached that point.
20      Q. Before that, of course.
21      A. Yes.
22      Q. And then it came through to the
23  development committee. Was that the committee that you
24  headed up?
25      A. No.

Page 204

1       Q. Who headed that up?
2       A. The head of development at the time,
3  and we are talking here about 2002. I'm not sure
4  if that was still the lady we discussed before,
5  Vivienne Anthony, or whether it was Lewis Smith by this
6  time. I'm not sure. But it was the head of
7  development.
8       Q. And that development, so we're clear on
9  the record, is which committee?
10      A. The global development committee.
11      Q. In Basel?
12      A. In Basel.
13      Q. And what happened after it was approved
14  for sale by the global development committee?
15      A. It would have been informed to the
16  crop protection leadership team that the development
17  committee had taken this step, and the local
18  organization in the United States would have gone
19  through its own process of readying it for sale and
20  agreeing that it was ready to go.
21      Q. And when you said it would have gone off
22  through the -- another group -- and let me look at your
23  answer.
24      A. The -- US has its own --
25      Q. I meant the -- I meant the other crop

Page 205

1  protection leadership team, I was going to ask you about
2  that?
3       A. The crop protection leader -- okay, my --
4  my team, yes.
5       Q. It would have come through --
6       A. Yeah. What -- what tends to happen there
7  is the -- actually, the -- the -- the approval for
8  first sale is much more to do with the development
9  committee than it is to do with the crop protection
10  leadership team.
11      We have already committed to the product,
12  the promotion to stage 3, and we followed it through its
13  last phase of development. The development committee
14  has the most important role, because it's -- it's
15  saying, "This product has passed all the safety tests.
16  It has got registered. It has a stable formulation".
17  These are technical matters.
18      So the leadership team would be informed of
19  that, and usually we would not have a -- long
20  discussion about it. It would be -- it would be the
21  development committee, the global and the local ones,
22  that have the last word on this.
23      Q. Where was Lumax tested?
24      A. Initially in the United States.
25      Q. Where in the United States?

52 (Pages 202 to 205)

Exhibit 003 Page 52
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 206

1      A.  In all the corn-growing states of any
2  significance.
3      Q.  So it would have been in Illinois for
4  sure?
5      A.  For sure.
6      Q.  Do you know whereabouts in Illinois?
7      A.  Well, at that time -- excuse me.
8      Q.  Do you know where it was tested in
9  Illinois?
10      A.  At that time, we still had our field
11  station in Champagne, Illinois, and it was definitely
12  tested there, but it would have been tested on fields
13  representative of the -- of the soils and the climate of
14  Illinois.
15      Q.  That field that you had in Champagne,
16  Illinois, was that in -- in conjunction with the
17  University of Illinois?
18      A.  No, that was a -- a private Syngenta Crop
19  Protection Inc. field station with buildings and plots,
20  and it was ours -- "ours" meaning Syngenta Crop
21  Protection Inc.
22      Q.  And it's still there, isn't it?
23      A.  But not -- it's not ours anymore.
24      Q.  You sold it?
25      A.  We sold it.

Page 207

1      Q.  Why does it still have a "Syngenta" sign
2  on it?
3      A.  I don't know.  I didn't know it did.
4  Maybe because we still -- we still do field work there,
5  in arrangement with the current owners.
6      Q.  And would it have been customary at the
7  time that Lumax was being developed to have different
8  farmers in Illinois apply it or have it on their crops?
9      A.  It would have been, yes.
10      Q.  And the purpose of doing that is to apply
11  it in the area where the soil type, the climate,
12  et cetera, is being -- the best possible way to
13  determine the efficacy of the chemical?
14      A.  Yes, that's a good summary.  I mean, it's
15  a -- it's a complicated matter trying to assess all the
16  parameters you have to assess before you can bring a --
17  a product to market.  It has to work robustly on
18  different soil types in different years under different
19  weather conditions.  It mustn't damage the crop in a way
20  which is in any way significant.  It has to be fit for
21  purpose.  And that's why widespread field trials are
22  done with private farmers.
23      Q.  How many products have been field tested
24  in Illinois since the creation of Syngenta?
25      A.  I do not know.  Certainly all the products

Page 208

1  we sell on corn that were not launched at the time of
2  Syngenta will have been -- will have been tested on
3  corn.
4      Q.  And what products would those be?
5      A.  Callisto.  We -- we have discussed a
6  couple of them:  Callisto; Lumax; Lexar -- L-E-X-A-R,
7  which came after Lumax; seed treatment products, such as
8  Cruiser; fungicide products, such as Quilt.  All these
9  products will have been tested in Illinois.
10      Q.  Were all of those products products that
11  went through the development committee?
12      A.  At one stage or another, yes.
13      Q.  In Basel?
14      A.  In Basel and in -- and in the local
15  Greensboro development committee as well.
16      There's another product I maybe should have
17  mentioned:  Halex, H-A-L-E-X.  That's another product
18  which will have been tested in Illinois, amongst other
19  states.
20      Q.  I'm trying to get this list together.
21      A.  All right.
22      Q.  Callisto.
23      A.  Callisto.
24      Q.  Lumax.
25      A.  Lumax, Lexar.

Page 209

1      Q.  L-E-X?
2      A.  A-R.  I mentioned Halex, H-A-L-E-X.
3      Q.  Quilt, Cruiser.
4      A.  Cruiser.  Cruiser like it sounds, Cruiser.
5      Q.  Okay.  So we're dealing with six that
6  you've told me, I think?
7      A.  Yeah, there'd be more.
8      Q.  And there's been more than that?
9      A.  Yep.
10      Q.  Do you know what the US sales are of these
11  various chemicals?
12      A.  Each individual chemical with precision,
13  no.
14      Q.  And I don't -- I'm not asking for
15  precision.  I know that without a balance sheet or
16  financial records you couldn't possibly give that to me.
17      A.  Well --
18      Q.  So just your best effort.
19      A.  Oh, throughout the US?
20      Q.  Yes.
21      A.  Throughout the US?  Collectively, I
22  mentioned Lumax and Lexar are in the $250 million range,
23  both together.  I mention them together because the
24  farmer chooses them in accordance with -- they can be
25  switched.  Lexar is more in the south and Lumax more in

53 (Pages 206 to 209)

Exhibit 003 Page 53
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 210

1  the north, but they can be switched. Cruiser -- Cruiser
2  is a -- Cruiser is a $200 million product in the
3  United States, close to.
4        Q.  And which of these are applied to corn
5  crops?
6        A.  Oh, I only gave you ones which are applied
7  to corn crops, although I point out that Quilt can be
8  used on soybeans and Cruiser can be used on soybeans
9  too.
10        Q.  Would Illinois be among the top
11  three states for sales in the United States of these
12  six chemical products?
13        A.  Yes.
14        Q.  Were the test results for these products
15  when they were tested in Illinois reported back to the
16  development committee?
17        A.  Not -- not as such.  They would be part of
18  the overall summary of field performance.  If there was
19  an interest in going down to state, individual state
20  trials, that could have been done, and -- certainly
21  when we had the Champagne site, that could be identified
22  readily, but typically these will be summarized as a
23  group.
24        Q.  When did you sell this -- the Champagne
25  site?

Page 211

1        A.  I'm not sure.  It was a -- it was four --
2  five -- five years ago or more.  Perhaps five years ago.
3  Five -- four or five years ago.
4        Q.  And is there another site that's replaced
5  it or do you rely upon private farmer contracts?
6        A.  In Illinois, we rely upon private farms.
7  Sometimes we would rent, if we need to, fields.
8        Q.  In different places.  Do you know
9  whereabouts in Illinois you do that?
10        A.  No, but it will be representative of
11  the -- of the state from north to south and east to
12  west.
13        Q.  Right.
14        A.  We have only one field station left, which
15  is Vero Beach.
16        MR. TILLERY:  Can we take like a five-minute
17  break?  Is that okay with you, doctor?
18        A.  Yes.
19        THE VIDEOGRAPHER:  Going off the record.  The
20  time is 14:34.  End of tape 3, volume I of the
21  videotaped deposition of John Atkin.
22  (2:34 p.m.)
23            (Break taken.)
24  (2:50 p.m.)
25        THE VIDEOGRAPHER:  This is the beginning of

Page 212

1  videotape number 4, volume I in the videotaped
2  deposition of John Atkin.  Going on the record.  The
3  time is 14:50.  Thank you.
4  (Exhibit 17 marked for identification.)
5  BY MR. TILLERY:
6        Q.  Let me hand you what's been marked as 17,
7  doctor.  Tell me when you've reviewed it.  What is this
8  document, sir?
9        MR. POPE:  Objection to the form of the
10  question.
11        THE WITNESS:  This document is entitled
12  "SYN-449208.  Project Review Meeting & DeCo input".
13  BY MR. TILLERY:
14        Q.  It's a presentation that was made to you?
15        A.  It's difficult to determine if -- who it
16  was made to, but I'm certainly familiar with the
17  content.
18        Q.  Okay.  Can you go to page 3?
19        A.  Yes.
20        Q.  Let me withdraw the question.  What was
21  SYN-449280?
22        A.  It is a herbicide which was in -- at
23  this time, in stage 2, I believe.
24        Q.  When you say "this time", you're talking
25  about --

Page 213

1        A.  2002.
2        Q.  -- 2002 in March?  Is it March or October?
3        A.  It's October.
4        Q.  October of 2002.
5        A.  Right.
6        Q.  Is it being used now?
7        A.  No.  It's still in development.
8        Q.  It's been in development for eight years?
9        A.  It has.
10        Q.  Can you explain that delay?
11        MR. POPE:  Objection to the form of the
12  question.
13        THE WITNESS:  I can explain what has happened
14  with this product.  It -- at the time of this review,
15  which I think makes clear it was -- it was not certain
16  that there was a market opportunity for this product,
17  neither was it certain that all the technical issues
18  were resolvable.
19  BY MR. TILLERY:
20        Q.  What were the technical issues?
21        A.  One of them is that if you use it at
22  reasonably high doses, and then in a rotation you plant
23  soybeans after corn, you can damage those soybeans.
24  So the question of, could we manage a product with a
25  lower dose rate, would it have sufficient market uptake

Exhibit 003 Page 54
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 214

1  if it had a rotational problem.
2      Q.  Why would it remain and damage soybeans as
3  a rotational crop?
4      A.  Because sufficient of it would remain in
5  the soil.  It's -- it's killing -- in a broad -- in a
6  broad sense, this product is -- is killing
7  dicotyledonous weeds.  It's -- it's controlling weeds in
8  a corn crop which are not unlike soybeans, if you like.
9  So, consequently, there is always this risk with
10 herbicides that you can -- you can damage successive
11 crops.  There's a risk.
12     Q.  Now, did you list your reasons on 3 to --
13 page 3 of the document to this group?  Were those the
14 reasons you gave for rejecting the product in 2002?
15     MR. POPE:  Objection to the form of the
16 question.
17     THE WITNESS:  I'm certainly familiar with
18 these reasons.  I can't -- you know, we're talking
19 eight years ago.  I can't remember how I articulated
20 these reasons, but I'm familiar with some of these
21 concerns.
22 BY MR. TILLERY:
23     Q.  Did you think that the production cost
24 estimate was too high in 2002?
25     A.  That's what it says, and I believe that to

Page 215

1  be true.
2      Q.  Did you think there was uncertainty of
3  RR market penetration and market value in 2002?
4      A.  I did, yes.
5      Q.  What's "RR market"?
6      A.  It's shorthand for Roundup Ready,
7  glyphosate tolerance, so genetically modified corn on
8  which you could apply the product glyphosate.
9      Q.  And the third item there, "leaching
10 concerns", is what you have already told me about;
11 correct?
12     A.  Well, it wasn't really leaching concerns
13 that I was referring to at all.  It was the potential
14 that this carry-over, which isn't clearly called out
15 here, but that -- that is what this says, and there is a
16 concern, particularly as it -- in respect to the
17 European Union, in relation to this issue.
18     Q.  Was this product, SYN-449280, being
19 considered as a triazine replacement product?
20     A.  It was being considered at one stage as at
21 least a part replacement, yes.
22     Q.  Triazines would include atrazine?
23     A.  They would.
24     Q.  And what was its -- strike that.
25     Why was it being considered as a triazine

Page 216

1  replacement?
2      A.  Because it's a very effective herbicide
3  and, in the initial trials, it seemed to have a broad
4  spectrum and it would have the potential to do at least
5  some of the things that atrazine can do, and do it
6  in a way which was at a lower dose than atrazine is and
7  in a -- in a way which could be attractive to the
8  farmer.  That's not how we see it now, by the way.
9      Q.  And how has your view changed about
10 SYN-449280?
11     A.  It's changed because we see -- I mean,
12 the -- the issue and the advantage is that atrazine
13 is -- is a highly effective herbicide used on 75 percent
14 of corn, much in demand and supported by growers in the
15 United States, and for a product to replace it, it would
16 have to have some really very strong qualities.  This
17 product doesn't have enough of those qualities to do so.
18 That's broadly it.
19     Q.  And it's still being evaluated?
20     A.  Yes, we still have it in development.
21 We have -- we have modified the dose, we have worked
22 with the formulation, we are -- we are still following a
23 course of, if we can make this product fit for use in
24 the United States and other markets, but not as an
25 atrazine replacement.

Page 217

1      Q.  For what purpose?
2      A.  Because one of the features of herbicides,
3  particularly ones that have been around for 50 years, as
4  is the case for atrazine, is weeds get resistant to
5  them, and although atrazine still retains extremely good
6  activity, there's one class of weeds, the chenopodium
7  species -- we can spell that for you later -- which --
8  which has some resistance issues.  So one of the
9  potential advantages here was that it would control
10 resistant weeds or it would -- would be a useful
11 enhancement to our range, and that remains the case.
12     Q.  Are you looking at other triazine
13 replacements now?
14     A.  We always are.  In the screen we are.
15 We -- we are, yes.  We are evaluating if there are other
16 replacements, as we do for paraquats and metolachlor and
17 all our herbicide range.  We are always looking to
18 renew; always.
19 (Exhibit 18 marked for identification.)
20 BY MR. TILLERY:
21     Q.  I'll show you what's been marked as
22 exhibit 18.
23     A.  Okay.
24     Q.  And, if you would, please take a look at
25 that.  All I'm asking you to do in this document is to

55 (Pages 214 to 217)

Exhibit 003 Page 55
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                    10-15-2010
Confidential - Pursuant to the Protective Order

Page 218

1  look at it and tell me if you can explain what it
2  relates to.
3      A.  Yes, this -- this is about the same
4  compound, 449, a regional development team meeting,
5  which would be a -- a North American one, and a product
6  management team meeting combined, and Mr. Andreas
7  Zoschke is feeding back to the team some of the comments
8  made by myself and Dino Sozzi, who was head of product
9  line herbicides at the time, around 449, and I think it
10  links to some of the other points, and I -- I note that
11  in the text they touch on some of the points that we
12  just discussed.
13      Q.  Okay.  Thank you.
14  (Exhibit 19 marked for identification.)
15  BY MR. TILLERY:
16      Q.  Exhibit 19, please.  I'm asking you the
17  same thing on this:  if you just tell me what it is?
18      A.  It's a summary of some mesotrione meetings
19  held at a place called CTL.  That was the central tox
20  laboratory I referred to in north-west England.
21      I now realize that "AD," which was a suffix
22  after Lewis Smith, Lewis Smith ran this place.  "AD"
23  referred to Alderley Edge, Alderley -- the
24  Alderley Edge, Alderley Park site, so this is a summary
25  of discussions which were held at this -- this

Page 219

1  toxicology laboratory.  It's written by Derek Cornes,
2  who is Basel-based, to Sunmao Chen, who is based in
3  Greensboro.
4      Q.  And what is Derek's company affiliation
5  within Syngenta?
6      A.  To the best of my knowledge, Syngenta Crop
7  Protection AG, to the best of my knowledge.
8  (Exhibit 20 marked for identification.)
9  BY MR. TILLERY:
10      Q.  I'll hand you what's been marked as
11  number 20, sir, and ask you the same question.  As you
12  look through it, I'm going to ask you two questions
13  about it, and then -- one is, what compound were they
14  referencing; and two is, basically, what the document
15  is.  So when you're finished, I'll ask them for the
16  record.
17      A.  It appears to be --
18      Q.  I can make the record clear for what
19  I'm doing.  What was the compound that was referenced?
20      A.  It appears to be 449, the same compound we
21  were --
22      Q.  Right.
23      A.  It appears to be.
24      Q.  And -- and what -- what is this document
25  referencing, if you know?

Page 220

1      A.  It's referencing a conversation that the
2  man called Andy Zoschke had with Judy Garrett and
3  myself.  It appears to be referencing a conversation
4  they had with me about this compound.
5      Q.  And describing your reaction to the
6  compound?
7      A.  Describing -- and it touches on some of
8  the points that we've already --
9      Q.  And without belaboring the point here,
10  would you look at it to see if it's an accurate
11  reflection of the conversation?
12      A.  Oh, that's very hard for me to --
13      Q.  I mean, is there anything that sticks out
14  as being something that's incorrectly reported or
15  recorded?  And I -- and if you don't -- don't remember,
16  that's fine?
17      A.  To be perfectly honest, I don't think it's
18  a particularly good memo.  It's not very -- it's not
19  very -- I mean, why wouldn't it be clear exactly what
20  they're talking about.  But it does reference the CM --
21  the CPMT, the crop protection management team, that we
22  subsequently called the crop protection leadership team,
23  the same thing in an earlier --
24      Q.  And so we are clear on the record,
25  which -- what is the crop protection leadership team?

Page 221

1  Is that the one --
2      A.  That's one that I lead --
3      Q.  -- that you lead?
4      A.  -- which has these 11 people in total,
5  including myself.
6      Q.  All right.
7      MR. POPE:  And so we're clear, it is dated
8  October 29th, 2002; correct?
9      MR. TILLERY:  Correct.
10      THE WITNESS:  Correct.
11      MR. TILLERY:  That's my understanding.
12  (Exhibit 21 marked for identification.)
13  BY MR. TILLERY:
14      Q.  And if you'd do the same with respect to
15  number 21, please?  I'm basically only looking for an
16  understanding of what this is.
17      A.  Yeah, I know about this.  It's a -- it
18  relates to the point I made earlier about the risk of
19  carry-over of some of these products from corn to
20  soybeans.  This risk exists with most herbicides of this
21  type and, in addition to existing with 449, it existed
22  with mesotrione.
23      In practice, it's not proved to be anything
24  like -- it's not a -- it's not a significant issue at
25  all, in practice, but at this time, we were being very

56 (Pages 218 to 221)

Exhibit 003 Page 56
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 222

1  cautious and we were assessing how much of an issue this
2  could be, particularly as it related to the upcoming
3  launch of Lumax, which is the mixture product with
4  mesotrione.
5  (Exhibit 22 marked for identification.)
6  BY MR. TILLERY:
7      Q. If you'd look at 22, please.
8      A. Thank you.
9      Q. Before you do that, though, I want to go
10  back to that last product. Again, tell me what it's
11  called again?
12     A. Lumax.
13     Q. No, not the Lumax, the one that was never
14  put on the market?
15     A. 449. Yet. Not yet.
16     Q. 449?
17     A. You want to know the full --
18     Q. Just the name for the record, is all.
19     A. All right: 449280.
20     Q. Was that tested in the United States?
21     A. Yes. All the -- of course all the testing
22  in the United States is carried out by the US team under
23  Syngenta Crop Protection Inc. It was tested by them --
24  it has been tested -- it is being tested by them.
25     Q. Is it being tested in Illinois now?

Page 223

1      A. I believe it is being tested in Illinois,
2  or has -- was this year tested in Illinois, but I can't
3  be 100 percent sure, but I believe it would have been.
4      Q. Thank you. Now if you go to 22.
5      A. Mmm-hmm.
6      Q. What is an HPPD inhibitor?
7      A. That refers to the class of chemistry
8  which includes mesotrione -- mesotrione, Callisto, in
9  it.
10     Q. Is 449280 an HPPD inhibitor?
11     A. That's what it says on the front page,
12  yes.
13     Q. Has this product ever been released?
14     A. No, it's in stage 3 still.
15     Q. Has it been named?
16     MR. POPE: Objection.
17  BY MR. TILLERY:
18     A. No.
19     Q. Have intellectual property rights been
20  filed?
21     A. Yes.
22     Q. In the United States?
23     A. Yes.
24     Q. Has it been tested in the United States?
25     A. It's been tested by the local teams in the

Page 224

1  United States.
2      Q. Has it been tested in Illinois?
3      A. I believe so.
4      Q. Do you know when it was tested in
5  Illinois?
6      A. No, but probably -- I don't want to
7  speculate. I don't want to speculate. But this product
8  has been in development for a number of years, and it
9  will have been tested in Illinois.
10     Q. And it's in stage 3 now?
11     A. Yes.
12     Q. And what has the role of the Syngenta
13  development committee been with respect to this?
14     A. To assess the human safety, the
15  environmental safety, the manufacturing process and the
16  cost of it through the marketing leaders who sit on that
17  development committee. In short, to assess its overall
18  viability.
19     Q. And has there been a determination of
20  overall viability?
21     A. There has been a determination that more
22  development work had to be carried out, and that's
23  what's under way at the moment.
24     Q. And development work would include what?
25     A. Development work would include field

Page 225

1  testing, and it also includes safety testing, human and
2  environmental safety testing.
3      Q. Who is doing the human and environmental
4  testing?
5      A. That is being done under the leadership of
6  Peter Hertl, head of safety testing, head of safety,
7  human/environmental safety, and -- but I can't tell you
8  exactly where the work is being done.
9      Q. And is it being done under -- strike that.
10  Mr. Hertl's office is located in Basel?
11     A. Yes, he has an office in Basel. I believe
12  he hasn't yet moved to Basel full time, but his office
13  is in Basel.
14     Q. Okay. And if you would remind me again as
15  to which entity he is associated with?
16     A. It will be, I believe, crop -- Syngenta
17  Crop Protection AG, I believe, or it could be Syngenta
18  International, I'm sorry, one or the other.
19     Q. Okay.
20  (Exhibit 23 marked for identification.)
21  BY MR. TILLERY:
22     Q. If you take a look at number 23, please?
23     A. Thank you.
24     Q. And look through that as well, please.
25     A. Would you like me to read all of this?

57 (Pages 222 to 225)

Exhibit 003 Page 57
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 226

1     Q.  No, I don't.  Look at the top of the page,
2 and it says "CP Portfolio Management.  International
3 Design Documents"?
4     A.  Yes.
5     Q.  What does that mean to you?
6     A.  This dates back to 2002.  Crop protection
7 portfolio management, and this relates to the work of
8 the herbicide team in Basel, essentially, although it
9 doesn't just cover their work, but the CP portfolio
10 management was led for herbicides by Dino Sozzi and his
11 team, which included some names we've discussed, such as
12 Judy Garrett and Derek Cornes, who were on that team,
13 and bringing together input on compounds such as this.
14     Q.  And what -- at what stage would this type
15 of analysis be pertinent?  What I'm trying to understand
16 is the -- to become oriented about this type of complex
17 analysis of a compound?
18     A.  Well, this is stage 2.  It's not in
19 stage 3 at this time.
20     Q.  This is stage 2?
21     A.  Right.  And this is the sort of detail
22 that we would need to understand to progress it to the
23 end of stage 2 and into stage 3, and I didn't read every
24 chapter of this -- this document.
25     Q.  And I'm not asking you to do that, sir,

Page 227

1 but what I am asking you to do is to tell me whether or
2 not this is sort of representative of the stage 2 work
3 for a new molecule?
4     A.  Yeah, I would say so.  It seems to be --
5 it doesn't seem to have a marketing component to it.
6 It's a purely technical evaluation.  But it -- it looks
7 pretty comprehensive, and the sort of thing that we
8 would -- we would need, and it -- it touches on a number
9 of the points that we've touched on before in relation
10 to the advantages and the challenges of this molecule.
11     Q.  Do you know this molecule?
12     A.  Yes.
13     Q.  Is it the same one we've talked about
14 before?
15     A.  It is.  It is.  It's 449, yes.
16 (Exhibit 24 marked for identification.)
17 BY MR. TILLERY:
18     Q.  All I'm asking about with exhibit 24 is
19 some understanding of -- and the document more or less
20 speaks for itself, but some understanding if you would
21 orient me as to what this document really was getting to
22 and what it related to.
23     A.  Yes, this looks like it is a good summary
24 of the work carried out by the US team on this issue of
25 carry-over risk in association with

Page 228

1 mesotrione-containing Lumax.
2     So this was -- this was about the risk
3 associated with launching Lumax and managing the risk of
4 carry-over.  That's what it's about.  It talks about the
5 work that was done and the risks that we would be taking
6 on.
7     Q.  Do you still have 24 there in front of
8 you?
9     A.  I do.
10     Q.  I think -- is that 24 or 25?
11     A.  24.
12     Q.  Okay.
13     A.  23 is here.
14     Q.  23.  Do you have 23 there, the one we
15 talked about?
16     A.  I do.
17     Q.  Okay.  In this document, the projects and
18 business analysis and other work that was described to
19 get it to the next stage of development, did it
20 contemplate work being done by several different --
21 several -- by people from several different Syngenta
22 entities?
23     MR. POPE:  Which one are we talking about now?
24     MR. TILLERY:  23.
25     MR. POPE:  Okay.

Page 229

1     THE WITNESS:  I could only determine that by
2 reading it in detail.
3 BY MR. TILLERY:
4     Q.  I see.
5     A.  But I -- I suspect it probably did
6 contemplate -- just if I can, just to correct you,
7 I don't see anything about marketing and business in
8 here.  It's purely technical.
9     Q.  Scientific?
10     A.  Yes.
11 (Exhibit 25 marked for identification.)
12 BY MR. TILLERY:
13     Q.  In 25 I'm looking for, as you will
14 understand, what those communications deal with.
15     A.  This, again, concerns the carry-over
16 question in relation to mesotrione, which is the active
17 material in Callisto and Lumax that we've -- we've
18 talked about before.
19     Q.  And this was a communication with --
20 regarding the presentation to you?
21     A.  It appears to be so, yes.
22 (Exhibit 26 marked for identification.)
23 BY MR. TILLERY:
24     Q.  If you'd look at 26, please?
25     A.  Right.  Yes.

58 (Pages 226 to 229)

Exhibit 003 Page 58
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John   Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 230

1      Q.  What is this?
2      A.  This is a -- a memo from a man called
3  Alfred Kohli, who was head of development portfolio,
4  so he would report to the head of development, and he's
5  writing this to Vivienne Anthony, who at that time was
6  still head of development, and he's talking about the
7  development committee meeting of December the 13th,
8  and he's -- he seems to be reporting on what steps would
9  be required to achieve a promotion for this 449 product
10  to stage 3.
11      Q.  Have there been other development
12  committee meetings with respect to this particular
13  product since 2002?
14      A.  Yes.  Yes, since 2002 there have -- this
15  product will almost certainly have been discussed at
16  development committees.
17  (Exhibit 27 marked for identification.)
18  BY MR. TILLERY:
19      Q.  27, please.
20      A.  Yes.  Would you like me to review it all?
21      Q.  Just -- if you just look at it.  I mean,
22  I'm not asking you to read the entire thing, but if you
23  could look at it.  It looks to me like you were cc'd on
24  the document.
25      A.  Yes, I am on all these development

Page 231

1  committee minutes.
2      Q.  Does that reflect a discussion on the
3  strategy to maintain the triazine business until about
4  2010?
5      A.  Oh, that -- that I don't know.  Would you
6  like to direct me to some of the text?
7      Q.  I can.  On page 2 --
8      A.  Page --
9      Q.  The second page of the document, in the
10  main box under "Triazine LCM"?
11      A.  Yes.
12      Q.  Am I -- when you're finished looking at
13  that, I'll --
14      A.  Yes, I think -- yes.
15      Q.  And on the first page, under item
16  number 9, there is a discussion where it says,
17  "Triazine - Life Cycle Management", and it refers you to
18  page 12 of the document?
19      A.  Right.
20      Q.  Do you know why that discussion was being
21  taken at -- undertaken at that time?
22      A.  If I can just have a quick look.  I think
23  for all our older compounds we have strategies of this
24  type.  The fact that it says the strategy is to maintain
25  it until 2010 doesn't mean to say, and it doesn't say,

Page 232

1  that we were going to phase it out at that point.
2      This was a -- this was looking forward, at that
3  time, seven years and saying, you know, we have a
4  strategy to maintain it to that point.  Of course it's
5  been superseded by strategies we've implemented since to
6  maintain it beyond 2010, but the time horizon
7  contemplated here was seven years.
8      Q.  And this was the development committee,
9  the same committee you've talked to me about in the
10  past?
11      A.  This was the development committee,
12  May the 7th, 2003, yes.
13      Q.  The people on the front page listed under
14  the "To" list, were they members of the development
15  committee?
16      MR. POPE:  As of 2003, I assume you mean?
17      MR. TILLERY:  Yes, I'm talking about
18  "7.05.03".
19      THE WITNESS:  I believe that to be the case,
20  although I -- I don't have a list of those members in
21  my -- in my memory, but it would appear to be the case,
22  yes.
23  BY MR. TILLERY:
24      Q.  And then there is a "cc management"?
25      A.  Yes.

Page 233

1      Q.  And then there is "cc dev. management",
2  what would that be?
3      A.  Development management.  So these would be
4  people in the development organization who were not
5  members of the development committee.
6      Q.  Okay.  Has the development committee ever
7  decided to quit marketing a product it deemed to be
8  unsafe?
9      A.  Not to stop marketing a product that it
10  deemed to be unsafe, but to abandon the development of a
11  product which wasn't meeting the right safety criteria.
12      Q.  And that -- and that product stopped at
13  that time?
14      A.  Yes.
15  (Exhibit 28 marked for identification.)
16  BY MR. TILLERY:
17      Q.  Look at 28.  I think this is the month
18  before -- this -- yes, this is the month before the last
19  one, I believe.  Do you remember from this particular
20  set of minutes what the discussion was?
21      A.  Oh, no.
22      MR. POPE:  Steve, could I just ask the witness
23  whether this is June 8th or August 6th, to the best of
24  his recollection?  Is this a --
25      THE WITNESS:  Oh, it's August 6th.

59 (Pages 230 to 233)

Exhibit 003 Page 59
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin           10-15-2010
Confidential - Pursuant to the Protective Order

Page 234

1      MR. POPE:  Thank you.
2  BY MR. TILLERY:
3      Q.  The document is August 6th?
4      A.  Yes, the day comes before the month.
5      Q.  And it's --
6      MR. POPE:  That's the reason for my question.
7  BY MR. TILLERY:
8      Q.  And it is a -- would you -- have
9  I missed -- have I misstated the date of any of the
10  other prior documents?
11      A.  I didn't -- I didn't notice.  I --
12  I don't -- I don't know that you mentioned the precise
13  date, but I didn't pay attention if you did.
14      Q.  Okay.  Thank you.  Did you attend the
15  meeting?
16      A.  No, I did not.
17      Q.  Does this set of minutes discuss studies
18  that had been done by outside contractors on amphibians,
19  endocrine effects of atrazine on amphibians?
20      A.  On page 12?  Is that what you're referring
21  to?
22      Q.  Yes.
23      A.  It refers to studies done by a gentleman
24  called Hayes.  At one point, Hayes was a cooperator with
25  us and then he ceased to be one, and it's not clear to

Page 235

1  me whether at this point he had ceased to be one.
2  I believe so.  I believe by this time he was no longer a
3  cooperator.
4      Q.  And this was a discussion of those --
5  those studies?
6      A.  It refers to these studies, and it also
7  refers to an Ecorisk Panel and laboratory tests as well.
8      Q.  And do you know who had retained Hayes?
9      A.  When he worked for -- I believe Hayes was
10  retained pre-merger and not post, but I can confirm that
11  if necessary.
12      Q.  So he would have been retained, as best
13  you recall, by Novartis?
14      A.  Yes, or maybe even by Ciba-Geigy prior to
15  that.
16      Q.  Okay.  Was there a discussion about
17  investigation of atrazine's effects on amphibians?
18      MR. POPE:  Are you asking him whether that's
19  what the document says?
20      MR. TILLERY:  I'm asking him whether he
21  remembers.
22  BY MR. TILLERY:
23      Q.  Do you remember?
24      A.  I wasn't in the meeting, so --
25      Q.  Do you remember -- do you have any

Page 236

1  knowledge about whether there was investigation of
2  impact of atrazine on amphibians?
3      A.  Oh, yes, there were discussions about that
4  subject.
5      Q.  Was that topic brought to you -- to your
6  attention?
7      A.  It was brought to my attention, yes, but
8  the topic was debated for the most part in development
9  circles, for obvious reasons; there were some quite
10  complicated technical points that had to be resolved,
11  and they were discussed in development circles and
12  regulatory circles.
13      Q.  By whom was it brought to you?
14      A.  The head of product development.
15      Q.  And who was that?
16      A.  At this time, it was -- let me see now.
17  It was about this time that it changed.  I believe by
18  this time it was John -- Lewis Smith.
19      Q.  And what entity of the Syngenta entities
20  would he have been affiliated?
21      A.  Well, it still shows him as "GB",
22  Great Britain, or "UK", Alderley Park, "AP", so he was
23  still shown as being located in this north-western
24  England toxicology laboratory or site, but he did move
25  to Basel and he was an employee based in Basel

Page 237

1  subsequently.
2      Q.  And do you know what -- what -- strike
3  that.
4      Do you know what entity he worked for at the
5  time he made the comment to you about amphibian studies
6  relating to atrazine?
7      A.  No.
8      Q.  And what did he ask of you with respect to
9  amphibian studies regarding atrazine?
10      A.  Nobody has asked anything of me with
11  regard to these studies.  They have informed me of them.
12      Q.  And they -- he just simply told you about
13  the studies?
14      A.  He and subsequently others have told me
15  about this whole matter, yes.
16      Q.  And was anything undertaken as a result of
17  this meeting with respect to the committee and atrazine
18  studies?
19      A.  Excuse me, I'm just reading the
20  conclusions.
21      Q.  Go ahead.
22      A.  We have the conclusion:
23      "DeCo feels that the time may have come to
24  wind-down this work programme".
25      Q.  Wind down whose work program?

60  (Pages 234 to 237)

Exhibit 003 Page 60
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 238

1     A.  The work program in connection with
2  these -- the amphibian -- the reptiles and amphibians.
3     Q.  Was reptile and amphibian studies relating
4  to atrazine ongoing?
5     MR. POPE:  Dr. Atkin, if that document
6  refreshes your recollection, that's fine --
7  BY MR. TILLERY:
8     Q.  Otherwise --
9     MR. POPE:  -- otherwise, don't try and --
10    THE WITNESS:  No, I'm just --
11    MR. POPE:  -- answer that question while
12  you're reading that piece of paper, okay.
13    THE WITNESS:  No, I wasn't going to do that.
14  But I was just trying to find reference to it.
15  BY MR. TILLERY:
16    Q.  Do you remember?
17    A.  I don't recall any details about any work
18  program connected with that we undertook or caused
19  to be undertaken.  I have been informed from time to
20  time about conclusions relating to this -- in the way
21  that this is recorded.
22    Q.  And who has given you updates from time to
23  time?
24    A.  The head of development, Lewis Smith
25  at that time, and in more recent times, the --

Page 239

1  Gerardo Ramos, who -- and before him, a man called
2  Rolf Furter, and of course --
3     Q.  Can you tell me which entities these
4  people are associated with?
5     A.  Those are all Basel-based people, but from
6  time to time, I have had some direct information on this
7  from the United States.
8     Of course, the United States is the most
9  concerned by this, and they have -- from both a
10  regulatory and a safety standpoint, they -- they are the
11  ones that understand this most deeply and have the
12  expertise.
13    So to the extent that I was getting relayed
14  information, it was information predominantly coming
15  from the United States.
16    MR. POPE:  Could you just clarify what you
17  mean by "from the United States".
18    THE WITNESS:  Crop Protection Inc., Syngenta
19  Crop Protection Inc.
20  (Exhibit 29 marked for identification.)
21  BY MR. TILLERY:
22    Q.  Would you take a look at exhibit number 29
23  for me, please.  Can you explain this, if you know what
24  it is?
25    MR. POPE:  Objection to the form of the

Page 240

1  question.  It is not addressed to him, it is not sent by
2  him and he's not even cc'd, as far as I can see.
3     THE WITNESS:  I can make some comments on it.
4  BY MR. TILLERY:
5     Q.  Go ahead.
6     A.  The -- the message is from Gary Dickson,
7  who at that time was head of development in the
8  United States, and what he's drawing to Mike Mack,
9  who was then head of the business in the United States,
10  so he had -- he was president of that -- in
11  Vern Hawkins' role, and he's drawing attention to the
12  fact that we were -- "we", the company was discussing
13  options to replace atrazine, and he's interpreting this
14  as being potentially problematic, and he's pointing out
15  reasons why those discussions should be very considered,
16  because of the importance of atrazine in the
17  United States and the support that he has.  That's what
18  he is -- that's what he is reminding us of.
19    I can tell you that this is a very relevant
20  point, and it's one that was always borne in mind, and
21  it is, of course, the reason -- one of the reasons why
22  atrazine is still a very critical product for us, but,
23  you know, he's -- he's drawing that to his boss's
24  attention, and -- and that was fine and --
25    Q.  Was -- was this information sent on to

Page 241

1  you?
2     A.  No, but I'm -- I'm very familiar with
3  the -- the concern expressed here, and it's just fine
4  that he expressed it in this way and he was absolutely
5  right and we acted upon it and if any reminder was
6  needed, he gave us it.
7     Q.  Did you act upon this discussion?
8     A.  I didn't act upon this memo at all.
9  It wasn't to me, as -- as has been pointed out, but we
10  took into account his comments here.
11    Q.  How did you take this specific comment
12  into account?
13    A.  It was more or less -- for those people
14  who were involved in this discussion, it was just a
15  reminder of something they already knew, so it didn't
16  constitute new information, but it -- it underlined an
17  important point.
18    Q.  Was there -- strike that.
19    Then there was some discussion at or near that
20  time by Crop Protection International in Basel, either
21  around September 2003, before or after, about the
22  possibility of getting out of the atrazine business?
23    A.  About replacing atrazine:  there'd been
24  discussions since the creation of Syngenta and before
25  about, did we have anything new that would be a better

61 (Pages 238 to 241)

Exhibit 003 Page 61
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 242

1  alternative -- would be a good alternative to atrazine,
2  and those discussions continue and -- and -- as we do
3  for paraquat and metolachlor and many of our other
4  products that are quite old.
5       Q.  Has any subsidiary stopped selling
6  atrazine because of safety concerns?
7       A.  No.
8  (Exhibit 30 marked for identification.)
9  BY MR. TILLERY:
10      Q.  I'll show you what's been marked as
11 exhibit number 30.  Do you know what this is?
12      MR. POPE:  Objection to the form of the
13 question.
14      THE WITNESS:  It's the minutes of an extended
15 development management meeting.  I've not seen --
16 I don't recall.  My name's -- I'm copied, but I don't
17 recall having seen this.
18 BY MR. TILLERY:
19      Q.  What's an extended development management
20 meeting mean?
21      A.  I believe it means -- well, it clearly
22 means it involved people beyond the devco, the
23 development committee, so the list -- the "To" list is
24 longer.
25      Q.  Do you know who these people are?

Page 243

1       A.  Yes.
2       Q.  Do you know what entities they are
3  associated with?
4       A.  I don't know all the legal entities of
5  these people, no.  I know where they are based, for the
6  most part.
7       Q.  Can you tell whether -- what countries
8  they're based in?
9       A.  Only because I know.  It's not indicated
10 here.
11      Q.  Which countries are represented?
12      A.  Mainly the UK, Basel -- Switzerland,
13 therefore.
14      Q.  UK and Switzerland?
15      A.  Mainly.  I'm just checking.  There's a
16 Brazilian here who was excused, Fernando Gallina.
17 Gary Dickson from Syngenta Crop Protection Inc. is here.
18 So this was an international meeting.
19      Q.  Can you tell if this particular meeting
20 was designed -- designed to secure or make
21 recommendations for decisions by you?
22      A.  I don't believe it was.
23      Q.  What was the purpose of the meeting?
24      A.  This was, I believe, to be Lewis Smith,
25 who was the head of development at the time, covering a

Page 244

1  whole range of items to improve the cost effectiveness
2  of his organization.  It talks about output and it talks
3  about costs, I can see that, and it talks about business
4  as well.  That was because of the input of Jan Suter,
5  who -- who was the head of our global marketing
6  organization at the time.
7  (Exhibit 31 marked for identification.)
8  BY MR. TILLERY:
9       Q.  If you would, take a look at exhibit 31,
10 please.  What is that, sir?
11      A.  It's another set of minutes from the
12 development committee.
13      Q.  And do you know what they're referencing?
14      A.  I can read what they're referencing.
15      Q.  Do you remember that discussion?
16      A.  I wasn't at the meeting, but I am well
17 aware of some of the points raised, particularly the
18 atrazine item which summarizes the input of
19 Janis Mcfarland.  Janis Mcfarland is the regulatory
20 leader in the United States of Syngenta Crop
21 Protection Inc., who is responsible for atrazine
22 registration in the United States.
23      Q.  And what do you remember about that
24 discussion of atrazine?
25      A.  I wasn't there.

Page 245

1       Q.  Okay.  But do you remember the topic?
2  I'm not asking you to -- about what you remember from
3  the meeting.  Do you remember that topic of discussion?
4       A.  That topic in the broad -- in a broad
5  sense, yes.  Yes.
6       Q.  Okay.
7  (Exhibit 32 marked for identification.)
8  BY MR. TILLERY:
9       Q.  Let's go to exhibit 32.  Tell me if you
10 recognize that.  Do you remember this?
11      A.  I remember some --
12      MR. POPE:  Objection to the form of the
13 question.
14      THE WITNESS:  I remember something of it.
15 BY MR. TILLERY:
16      Q.  In May of 2000, did Hieri Gugger --
17      A.  "Hieri".
18      Q.  Hieri Gugger, he was then the president of
19 Syngenta Crop Protection Inc.; right?
20      A.  He was.
21      Q.  At that time, did he ask you and a man
22 named Dino Sozzi whether you had any concerns about a
23 proposal to conduct a study of atrazine's effects on
24 luteinizing hormone surge in rhesus monkeys?
25      A.  That was the subject under discussion.

62 (Pages 242 to 245)

Exhibit 003 Page 62
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 246

1  I'm just trying to determine if he asked me or not.
2        MR. POPE:   Well, the first question is whether
3  you recall being asked.
4        THE WITNESS:   I recall being asked?  I recall
5  being asked what I thought about this.
6  BY MR. TILLERY:
7        Q.  Was the study proposed as part of Syngenta
8  Crop Protection Inc.'s defense of atrazine before the
9  Environmental Protection Agency in the United States?
10       A.  It's difficult to determine that from this
11  memo.  It appears to be the case.
12       Q.  Do you know what the purpose of the study
13  was?
14       A.  I only know what's written here.
15       Q.  You don't remember what the purpose of a
16  proposed study would be?  If you don't, that's fine.
17       A.  I do not.
18       Q.  Okay.
19       A.  I just remember that primates were
20  involved.
21       Q.  Was the study performed?
22       A.  I cannot recall.
23       Q.  Did you give your permission?
24       MR. POPE:   Objection to the form of the
25  question.

Page 247

1        THE WITNESS:   It wasn't a question of me
2  giving my permission --
3  BY MR. TILLERY:
4        Q.  I'm not asking -- I'm just asking did you.
5        MR. POPE:  Well, the foundation would be, if
6  he's not asked for his permission, how can he give it?
7  How can he answer your question?
8        THE WITNESS:   I did not provide that kind of
9  input to the team.
10  BY MR. TILLERY:
11       Q.  Okay.
12  (Exhibit 33 marked for identification.)
13  BY MR. TILLERY:
14       Q.  Now let's look at exhibit -- let's look at
15  exhibit 33 now.  Please tell me if you know what this
16  is?
17       A.  I know it's product -- "PLCM" stands for
18  product lifecycle management, and it says it's a project
19  management handbook.
20       Q.  And this is a -- a product of
21  Crop Protection?
22       A.  Yes, sir.
23       Q.  And Crop Protection, namely, the one that
24  you head in Basel?
25       A.  Yes.

Page 248

1        Q.  All right.  Now, tell me if this document
2  was placed into effect in 2005?
3        A.  Well, it says it's version 1.1, so I don't
4  know if this document was ever placed into effect.
5        Q.  You don't know whether it's in effect now
6  at all?
7        A.  I do not.
8        Q.  Do you know if there's a project
9  management handbook?
10       A.  We have guidance on the management
11  of product -- product lifecycle management.  We do have
12  guidance on this.  I don't know if this is it.
13       Q.  Is there another document, then, that
14  you're familiar with, other than this one, that deals
15  with the same topic?
16       A.  Not that I am intimately familiar with,
17  but I'm familiar with what this is trying to achieve and
18  what the goals are, and we do discuss product lifecycle
19  management frequently.
20       Q.  Well, why don't you look through this,
21  then, and tell me if this describes accurately the
22  processes that you take when you're dealing with product
23  lifecycle management today so I can tell if it describes
24  accurately the functions?
25       A.  Is there a particular piece that you would

Page 249

1  like me to --
2        Q.  No, I'm actually in this document
3  interested in the entire thing.
4        A.  Oh, you are?
5        Q.  Yes.
6        A.  I don't know how far you want me to go
7  through this.  I can see there are lots of things in
8  here that we do.
9        Q.  Do you find anything that's contained
10  within that document which is inconsistent --
11  inconsistent with your current process?
12       A.  Gosh, you really -- if -- I would need to
13  give this a thorough -- a thorough review.  I can see
14  lots of things that are consistent with it, but I'd need
15  to spend about fully 40 minutes if I was going to give
16  you an accurate answer to that question.  I mean, this
17  was five years ago.
18       Q.  All I'm looking for is if you have any
19  reason to believe that this isn't a reflection of your
20  current process.  If it -- if you don't know, that's
21  fine, but I -- what I'm trying to find out, the document
22  was provided to us as a guideline and --
23       A.  Yes, of course.  And, you know --
24       Q.  I'm just trying to -- I'm just trying to
25  authenticate the document as a document --

63 (Pages 246 to 249)

Exhibit 003 Page 63
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John Atkin                 10-15-2010
Confidential - Pursuant to the Protective Order

Page 250

1      A.  Of course.
2      Q.  -- that's in place for that?
3      A.  I think you can -- ah, that's the only
4  thing where I'd have to take a small reserve.  I don't
5  know if it -- it covers everything we do today.
6      I can see that what it tries to do is define
7  global, regional and country decision rights and --
8  and -- and priorities, which I think is an important
9  thing, so it -- it looks at how we organize vertically
10 for this, which I remember being something important
11 that we wanted to do.  I can see that it -- it touches
12 that.
13     So I can authenticate the document in the sense
14 that it was -- it contains much of the -- the ways of
15 working that we still incorporate today.
16     MR. TILLERY:  I have no further questions.
17     MR. POPE:  I just have a few clarifying
18 questions, Mr. Tillery.
19 EXAMINATION BY MR. POPE:
20 BY MR. POPE:
21     Q.  There was a question asked of you this
22 morning, I think, about Peter Hertl?
23     A.  Yes.
24     Q.  Do you know whether he's a toxicologist by
25 education?

Page 251

1      A.  I don't know.  I understand he may not be,
2  but he -- he works in the area of toxicology in --
3      Q.  Is he the head of product safety?
4      A.  He's the head of product safety.
5      Q.  Okay.  Some of the discussion regarding
6  the testing of -- of products in Illinois that -- you
7  had several questions from Mr. Tillery.  Do you recall
8  that testimony?
9      A.  Yes.
10     Q.  Okay.  As to any -- to the best of your
11 knowledge, as to any products that were tested,
12 field tested, in Illinois, what -- what -- who would
13 have done that, who would have been responsible for
14 doing this?
15     A.  Syngenta Crop Protection Inc.
16     Q.  In Greensboro?
17     A.  In Greensboro through the development
18 team, some of whom are based in the field in Illinois.
19     Q.  Has Syngenta AG ever undertaken any such
20 field tests?
21     MR. TILLERY:  Object to the form of the
22 question.
23 BY MR. POPE:
24     Q.  Go ahead.
25     A.  Syngenta AG never undertakes direct

Page 252

1  field testing in the United States.  It's all done by
2  our American organization.
3      Q.  All right.  To the extent any products
4  were tested in Illinois, is there any other company that
5  would have been involved in those, other than Syngenta
6  Crop Protection Inc.?
7      A.  Any other Syngenta company?
8      Q.  Yes, sir.
9      A.  No.
10     Q.  Okay.  You -- you had some discussion with
11 Mr. Tillery this morning on the concept of a subsidiary
12 discontinuing a product; do you recall that?
13     A.  Yes.
14     Q.  Okay.  In your understanding of the
15 legal rights of the subsidiaries of the companies,
16 of the various subsidiaries, does a local company have
17 the right to discontinue selling a product?
18     MR. TILLERY:  Excuse me.  I object to the form
19 of the question, and I also object to foundation, of the
20 witness.
21     MR. POPE:  I'm sorry?  You asked him --
22     MR. TILLERY:  I said I object to the
23 foundation.
24     MR. POPE:  You asked him the question.
25     MR. TILLERY:  I stand on my objection.

Page 253

1      MR. POPE:  Okay.
2  BY MR. POPE:
3      Q.  Do you understand the question?
4      A.  I think you'd better repeat it.
5      Q.  Okay.  Do you, sir -- do you have an
6  understanding of whether or not a subsidiary, such as
7  Syngenta Crop Protection Inc. or other such
8  subsidiaries, have the ability, the legal right,
9  to discontinue a product, discontinue selling a product?
10     MR. TILLERY:  And the same objection that
11 I said before:  form and foundation, lack of foundation.
12 BY MR. POPE:
13     Q.  The question is, do you have an opinion?
14     A.  I think, technically, a subsidiary could
15 probably do that, but in practice, such an event would
16 be highly unlikely.
17     It's hard for me to imagine that they would
18 want to do that, particularly if that subsidiary has
19 production sites producing the product in its entity and
20 is exporting such products to other parts of the
21 company, it would have to carry out the capacity --
22 to do such a thing without consultation with other
23 officers of the company does not seem to me to make
24 sense, but, technically, perhaps it would be possible.
25     Q.  In your period of time serving on the

64  (Pages 250 to 253)

Exhibit 003 Page 64
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin                10-15-2010
Confidential - Pursuant to the Protective Order

Page 254

1  Syngenta Crop Protection Incorporated board, can you
2  give any examples of situations where the company took
3  action -- the SCPI took action without the approval of
4  anyone in Basel or anywhere else?
5       A.  Oh, yes.
6       Q.  Can you give us those examples, please?
7       A.  I mean, most of -- of the business, as it
8  relates to customers, is run entirely independently.
9       Our sales in the United States last year were
10  1.9 billion.  We have 3,500 retailers that we are
11  servicing.  There are a subsection of those retailers,
12  about a thousand, who have what we call business
13  alignment agreements.  The entity over there is managing
14  something like $700 million of rebate programs.  Our
15  gross sales were around 2.5 billion, our net sales were
16  1.9.  Six or 700 million is entirely managed
17  independently by them.  There is no reference to anybody
18  else and, of course, that is the single biggest retailer
19  or distributor program that we have in the -- in the
20  company, and they manage that independently.
21       There are many other examples.  I mean, the
22  biggest deviation we have to our budget this year is
23  because the US organization reduced prices.  They
24  reduced prices at the half year, which we reported,
25  to the tune of $200 million.  By the end of the year,

Page 255

1  that will be about $300 million.  That is about --
2  to give you some perspective on that, that is
3  approaching 15 to 20 percent of the group's net income.
4       So this is the most significant financial
5  impact event that we have this year, and those decisions
6  are taken entirely by the Crop Protection management in
7  the United States.  They don't refer these decisions to
8  the board either.  They are done -- and I trust them,
9  we trust them to do it, that's their job, but these
10  decisions are made entirely independently by them and
11  they are of high significance to the company.
12       They administer their advertizing and promotion
13  budget entirely independently, that's some $60 million.
14  They contract to third parties, that is some 40 to
15  $50 million.  I mean, all their business affairs are
16  handled and managed by them.
17       Q.  "By them" being who?
18       A.  Syngenta Crop Protection Inc. under the
19  leadership of Vern Hawkins.
20       Q.  Are there any examples that you can point
21  to of policy decisions that were made by that company
22  without input from --
23       A.  All their -- all the commercial policy is
24  decided by them without any input from -- from Basel.
25  Occasionally, I will be informed or consulted about

Page 256

1  that.  When I make trips to the United States, they will
2  discuss these matters with me, but they take these
3  decisions.
4       Q.  You referred, I think, to some board
5  minutes of the Syngenta Crop Protection Inc. board where
6  dividends were authorized; that's right?
7       A.  Yes.
8       Q.  Describe how that process takes place,
9  please?
10       A.  We get a board resolution to authorize a
11  payment of these dividends, and we -- we sign them as
12  the crop -- Syngenta Crop Protection Inc. board.
13       Q.  Is there regularly a discussion about that
14  informally, on the telephone or in person?
15       MR. TILLERY:  Object to the form.  It's
16  leading and suggestive.
17       THE WITNESS:  There is little discussion about
18  that.
19       MR. POPE:  Okay.  Thank you very much.
20  No further questions.
21  EXAMINATION BY MR. TILLERY:
22  BY MR. TILLERY:
23       Q.  Who decides the amount of that dividend?
24       A.  I do not -- I do not know.  It's decided
25  in the finance and legal and tax area in general, but

Page 257

1  it's not -- I -- I do -- I do not have any involvement
2  in those decisions.
3       Q.  Well, I misunderstood, then.  You -- you
4  didn't discuss the issuance of a dividend as a board
5  member?
6       A.  We discussed the fact that it was to --
7  well, we approved that it would be paid.  We didn't make
8  the calculations as to how much it would be, nor did we
9  provide any information that resulted in it being
10  calculated.
11       Q.  Now, he asked you issues about your
12  understanding of the legal rights.  Is it your belief
13  that the board of directors of Syngenta Crop
14  Protection Inc. is the one that declares the dividend?
15       A.  We approve and agree the payments of those
16  dividends.
17       Q.  So you are the one that have that
18  authority; right?
19       A.  The board?
20       Q.  The board.
21       A.  The board agrees and approves those
22  dividends.
23       Q.  And not the sole stockholder, the owner of
24  the company, right, which would be the seeds company in
25  the US; is that right?  Are you absolutely certain about

65 (Pages 254 to 257)

Exhibit 003 Page 65
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

---

Page  258

1  that?
2        A.  No, I am just certain that -- I'm only
3  certain of one thing, that we approve the payment of
4  those dividends.  That's all I'm certain about.
5        Q.  Okay.  Are you the one that determined the
6  amount of the dividend.
7        A.  No.
8        Q.  Is that what you're saying?
9        A.  No, it's not what I'm saying.  I'm saying
10  that I get documents with dividends on and we approve
11  them.
12        Q.  You sign them?
13        A.  I sign, along with other board members,
14  the payment of those dividends.
15        Q.  You do a -- a unanimous consent signature
16  on a document --
17        A.  Yes.
18        Q.  -- that is presented by the legal
19  department to your office to sign; isn't that correct?
20        A.  It comes to all of us.  It comes to all of
21  us.
22        Q.  By the legal department?
23        A.  The legal and finance department.
24        Q.  It is a fact that you did not ever have a
25  meeting to talk about the issuance of a specific amount

---

Page  259

1  of a dividend at -- as a board member of the Syngenta
2  Crop Protection Inc. --
3        A.  We did not have a meeting to do that, no.
4        Q.  All right.  Now, in terms of legal rights
5  of the subsidiaries, I want to ask you some questions --
6  do you feel that you're competent to answer questions
7  about the legal rights of the -- of the subsidiaries?
8        A.  No.
9        Q.  Okay.  And that's because you have no
10  legal training at all, do you?
11        A.  I have no legal training at all.
12        Q.  And you cannot, as -- as a matter of fact
13  or law, offer any opinion about what their legal rights
14  are, can you?
15        A.  No.
16        MR. TILLERY:  Thank you very much.
17        MR. POPE:  All right.  We'll reserve
18  signature.
19        One other thing, while we're on the record,
20  Steve:  I can't remember exactly how the protective
21  order reads, but I would like to -- I would like to
22  designate these two depositions as confidential because
23  there's a lot of --
24        MR. TILLERY:  We were assuming that.
25        MR. POPE:  Okay.  I don't think we did that on

---

Page  260

1  the record, so yesterday's deposition and today will be
2  covered by the protective order because there's
3  confidential business information being discussed.
4        Thank you very much.  We will read and sign the
5  deposition.  Thank you.
6        THE VIDEOGRAPHER:  Off the record.  The time
7  is 16:20.  End of tape 4, volume I.  This is the end of
8  the videotape deposition of John Atkin.
9        (Whereupon, the deposition concluded at 4:20 p.m.)

---

Page  261

1                  CORRECTIONS PAGE
2  Page No     Line No             Description
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

66  (Pages 258 to 261)

Exhibit 003 Page 66
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5

Dr. John  Atkin          10-15-2010
Confidential - Pursuant to the Protective Order

Page 262

1           DEPONENT'S DECLARATION
2
3
4      I,              , hereby declare under
5    penalty of perjury under the laws of the United States
6    and the State of Illinois that I have read the foregoing
7    transcript and identify it as my own and approve same as
8    a true and correct transcript save and except for
9    changes and/or corrections, if any, as indicated by me
10   on the CORRECTIONS page hereof.
11
12         ,          ,        ,
13   Date        City       State
14
15
16         Signed:
17
18
19
20
21
22
23
24
25

Page 263

1           REPORTER'S CERTIFICATE
2
3        I, Judith White, of Westlaw Deposition
4    Services, do hereby certify that the foregoing testimony
5    was recorded by me stenographically and thereafter
6    transcribed by me, and that the foregoing transcript
7    constitutes a full, true and accurate record of said
8    examination of and testimony given by said witness, and
9    of all other proceedings had during the taking of said
10   deposition, and of the whole thereof, to the best of my
11   ability.
12        I further certify that I am not a relative,
13   employee or counsel of any of the parties of the within
14   cause, nor am I an employee or relative of any counsel
15   for the parties, nor am I in any way interested in the
16   outcome of the within cause.
17
18
19   Signed _____ Dated _____
20    (Judith White)
21
22
23
24
25

67 (Pages 262 to 263)

**Exhibit 003 Page 67**
8916a170-ccb5-44f7-8b6f-ffcb0f0513a5