Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

_____
                                )
CITY OF GREENVILLE, ILLINOIS,   )
et al.,                         )
                                )
            Plaintiffs,         )
                                ) Case No.
vs.                             ) 10-cv-188-JPG-PMF
                                )
SYNGENTA CROP PROTECTION, INC.,)
et al.,                         )
                                )
            Defendants.         )
_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF DIRK COOPER DROST, PhD.

VOLUME I


Wednesday, November 10, 2010

At: 9:33 a.m.



Taken at:

O'Henry Hotel

624 Green Valley Road

Greensboro, North Carolina




Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR

Exhibit 008 Page 1
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

---

Page 2

1           APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3        STEPHEN M. TILLERY, Esq.
         JOHN C. CRAIG, Esq.
4        JERRY BROWN, Esq.
         Korein Tillery, LLC
5        505 N. 7th Street, Suite 3600
         St. Louis, Missouri 63101
6        Phone: 314.241.4844  Fax: 314.241.3525
         E-mail: stillery@koreintillery.com
7        E-mail: jcraig@koreintillery.com
8  ON BEHALF OF THE DEFENDANTS:
9        MARK C. SURPRENANT, Esq.
         Adams and Reese LLP
10       One Shell Square
         701 Poydras Street
11       New Orleans, Louisiana 70139
         Phone: 504.581.3234 Fax: 504.566.0210
12       E-mail: mark.surprenant@arlaw.com
13
         PETER SCHUTZEL, Esq.
14       McDermott Will & Emery LLP
         227 West Monroe Street
15       Chicago, Illinois 60606
         Phone: 312.372.2000  Fax: 312.984.7700
16       E-mail: pschutzel@mwe.com
17  Also Present:
18       GARY TODD, CLVS, Videographer
19       PAUL LESKO, Esquire
         Simmons
20
21
22
23
24
25

---

Page 3

1        VIDEOTAPED DEPOSITION OF DIRK COOPER
2   DROST, PhD., a witness called on behalf of the
3   Plaintiffs, before V. Dario Stanziola, CSR, RPR,
4   CRR, Notary Public, in and for the State of North
5   Carolina, held at the O'Henry Hotel, 624 Green
6   Valley Road, Greensboro, North Carolina, on
7   Wednesday, November 10, 2010, commencing at 9:33
8   a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1           INDEX OF EXAMINATIONS
2
3  By Mr. Tillery      PAGE    8
4
5           INDEX OF EXHIBITS
6  NUMBER     EXHIBIT              MARKED
7  Plaintiff's Exhibit 1: An e-mail string   45
   with the top from Paul Francis dated
   3/17/03, Bates SYN02737460 - 461
8
9  Plaintiff's Exhibit 2: An e-mail string   52
   with the top from Viji Gowda dated
   5/21/03, Bates SYN00899481 - 482
10
11 Plaintiff's Exhibit 3: An e-mail string   56
   with the top from Viji Gowda dated
   7/8/03, Bates SYN00910044 - 45
12
13 Plaintiff's Exhibit 4: An e-mail string   60
   with the top from John Parker dated
   7/30/03, Bates SYN01100954
14
15 Plaintiff's Exhibit 5: An e-mail string   63
   with the top from Summao Chen dated
   8/4/03, Bates SYN01178402
16
17 Plaintiff's Exhibit 6: An e-mail string   67
   with the top from Dirk Drost dated
   10/20/03, Bates SYN01998108 - 110
18
19 Plaintiff's Exhibit 7: An e-mail string   73
   with the top from John Parker dated
   12/7/03, Bates SYN02590706 - 707
20
21 Plaintiff's Exhibit 8 An e-mail document  75
   from Bruce Thede dated 3/29/04, Bates
   SYN00905507
22
23 Plaintiff's Exhibit 9: An e-mail          78
   document from Merrill Tisdel dated
   6/16/04, Bates SYN01022688
24
25

---

Page 5

1  Plaintiff's Exhibit 10: An e-mail string  81
   with the top from John Parker dated
2  10/5/04, Bates SYN00818952
3  Plaintiff's Exhibit 11: An e-mail string  83
   with the top from Alan Hosmer dated
4  10/22/04, Bates SYN00926826 - 827
5  Plaintiff's Exhibit 12: An e-mail string  83
   with the top from John Parker dated
6  10/21/04, Bates SYN00842873 - 874
7  Plaintiff's Exhibit 13: An e-mail string  86
   with the top from Alan Hosmer dated
8  12/14/04, Bates SYN00942173 - 174
9  Plaintiff's Exhibit 14: A Syngenta        90
   Guideline document entitled CP PLCM
10 Project Management Handbook Version 1.1
   May 2005, Bates GRNVL0000080975 - 1018
11
   Plaintiff's Exhibit 15: Document         104
12 entitled Detailed List of 2007
   Accomplishments - Supporting Information
13 Dirk C. Drost November 11, 2007, Bates
   SYN03143576 - 578
14
15 Plaintiff's Exhibit 16: An e-mail string  112
   with the top from Bill Swain dated
16 3/9/10, Bates GRNVL0000075932 - 936
17 Plaintiff's Exhibit 17: A document        117
   entitled Syngenta Brands vs. Integrity
18 (BAS 78012), Bates GRNVL000076640 - 6662
19 Plaintiff's Exhibit 18: An e-mail string  124
   with the top from James Allen dated
20 5/18/05, Bates SYN01869094 - 9095
21 Plaintiff's Exhibit 19: An e-mail string  129
   with the top from Chuck Foresman dated
22 2/2/10, Bates GRNVL0000075743 - 746
23 Plaintiff's Exhibit 20: A document        134
   entitled Weed Control Biology -
24 Organization, Bates GRNVL0000071027 -
25 1029

---

Exhibit 008 Page 2
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

<table>
<tr><td>Page 6</td><td>Page 8</td></tr>
</table>

**Page 6**

1   Plaintiff's Exhibit 21: An e-mail string   135
with the top from Howard Stott dated
2   5/28/09, Bates SYN02831657 - 659
3   Plaintiff's Exhibit 22: A Syngenta   143
Summary Notes dated 6/26/09, Bates
4   SYN03628856 - 8861
5   Plaintiff's Exhibit 23: An e-mail string   152
with the top from Dirk Drost dated
6   11/26/07, Bates SYN02820990 - 991
7   Plaintiff's Exhibit 24: An e-mail   154
document to Dirk Drost, Bates
8   SYN01048112 - 113
9   Plaintiff's Exhibit 25: An e-mail string   164
with the top from Sarah Rees dated
10   7/3/06, Bates GRNVL0000046110 - 112
11   Plaintiff's Exhibit 26: An e-mail string   167
with the top from Sarah Rees dated
12   7/5/06, Bates SYN02642042 - 2045
13   Plaintiff's Exhibit 27: 2006 Development   168
Project Portfolio
14
Plaintiff's Exhibit 28: An e-mail   178
15   document from Kurt Carmean dated
10/18/07, Bates SYN02864385
16
Plaintiff's Exhibit 29: An e-mail string   181
17   with the top from Gordon Vail dated
6/11/09, Bates SYN02917550 - 552
18
Plaintiff's Exhibit 30: A Syngenta   185
19   Project Portfolio Process, Process in
Milestones in 2006, Bates
20   GRNVL0000063727 - 732
21
22
23
24
25

**Page 7**

1        THE VIDEOGRAPHER: Here begins the video
2   deposition of Dirk Drost, tape one, volume one
3   in the matter of City of Greenville, Illinois,
4   et al. v. Syngenta Crop Protection, Inc., et
5   al. in the United States District Court for
6   the Southern District of Illinois, Case Number
7   10-CV-188-JPG-PMF.
8        Today's date is November 10th, 2010, and
9   the time on the video monitor is 9:33 a.m.
10        The Video operator today is Gary Todd of
11   TeleVisual representing WestLaw Deposition
12   Services.  The court reporter is Dario
13   Stanziola of Huseby Incorporated reporting on
14   behalf of WestLaw Deposition Services.
15        Today's deposition is being taken on
16   behalf of the plaintiff and is taking place at
17   624 Green Valley Road, Greensboro, North
18   Carolina.
19        Counsel, please introduce yourselves and
20   state whom you represent.
21        MR. TILLERY:  For the plaintiff, Steve
22   Tillery, John Craig, Korein Tillery, St.
23   Louis, Missouri.
24        MR. SURPRENANT:  Mark Surprenant
25   representing the defendants.

**Page 8**

1        MR. SCHUTZEL:  Peter Schutzel
2   representing the defendants.
3        MR. TILLERY:  Also present from Korein
4   Tillery is Jerry Brown.
5        MR. SURPRENANT:  Dr. Drost is going to
6   read and sign the deposition.
7        THE VIDEOGRAPHER: Could the court
8   reporter please swear in the witness.
9        (Witness Sworn.)
10        THE VIDEOGRAPHER: Please begin.
11        DIRK COOPER DROST, PhD.,
12   having been duly sworn, was examined and testified
13   as follows:
14                EXAMINATION
15   BY MR. TILLERY:
16     Q.  Would you state your name for the record,
17   sir.
18     A.  My name is Dirk Cooper Drost.
19     Q.  And where do you live, sir?
20     A.  I live in High Point, North Carolina.
21     Q.  How long have you lived in High Point,
22   North Carolina?
23     A.  Nine years.
24     Q.  By whom are you employed?
25     A.  I'm employed by Syngenta Crop Protection

**Page 9**

1   incorporated.
2     Q.  What is your job at that company?
3     A.  My title is head of portfolio and project
4   management.
5     Q.  How long have you occupied that exact
6   position?
7     A.  I've occupied the position since the --
8   since the merger of Syngenta -- that formed
9   Syngenta.
10     Q.  Since 2000 or 2001?
11     A.  Yes, since 2000 or 2001.
12     Q.  When and where were you born?
13     A.  I was born in 1955, on February the 19th
14   and in Holland, Michigan.
15     Q.  And after you graduated from high school,
16   what was your education?
17     A.  After I graduated from high school I went
18   to Calvin College in Grand Rapids, Michigan for two
19   years, and subsequently transferred to Michigan
20   State University in East Lancing, Michigan and
21   finished my bachelor's degree there.
22     Q.  In what area of study?
23     A.  In crop and soil sciences in the College
24   of Agriculture.
25     Q.  What year was that?

**Exhibit 008 Page 3**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 10

1     A.  That would have been 1977.
2     Q.  Then what did you do?
3     A.  I went onto the -- to graduate school at
4  the University of Wisconsin in Madison.
5     Q.  And how long were you there?
6     A.  I graduated from the University of
7  Wisconsin in Madison in May of 1982.
8     Q.  And what was your degree?
9     A.  My degree is in agronomy.
10    Q.  Okay. Was it a PhD.?
11    A.  Yes.
12    Q.  Did you have full time employment up until
13  that time in your life?
14    A.  No.
15    Q.  What was your first job?
16    A.  My first job after I completed graduate
17  school was with Stauffer Chemical Company.
18    Q.  Where were they located?
19    A.  Stauffer was headquartered in Westport,
20  Connecticut.  I was based in Madison, Wisconsin.
21    Q.  What did you do for them?
22    A.  My job title with Stauffer Chemical
23  Company was field research representative.
24    Q.  What did that mean?
25    A.  I tested and evaluated crop protection

Page 11

1  products, which I was asked to do on behalf of the
2  company.
3     Q.  How did you go about testing them?
4     A.  I did field testing for biological
5  efficacy and crop safety, and I cooperated with
6  universities by supplying test material so that
7  they could do field tests as well.
8     Q.  How did you do field tests yourself?
9     A.  I found -- found trial locations --
10    Q.  And when you --
11    A.  -- established field trials.
12    Q.  I know I keep interrupting, but it's
13  because of the definition or terms.
14        You said you found trial locations.  Before
15  you go on with your answer, would you tell me what
16  that means?
17    A.  A trial location?
18    Q.  Yes, sir.
19    A.  A trial location would be a physical
20  location in a field where you could test the
21  efficacy or crop tolerance of a crop protection
22  product.
23    Q.  How did you go about finding a trial
24  location?
25    A.  With my knowledge of farmers and of

Page 12

1  agriculture, I was able to determine when and where
2  these products should be tested.
3     Q.  And this being your very first job, how did
4  you develop your knowledge of farmers and
5  agriculture?
6     A.  During my PhD. work, I had interacted
7  with farmers and been involved in agriculture and
8  had experience testing products.  So it was a
9  natural progression for me when I took the position
10  to continue with that based on prior learning.
11    Q.  Now, these trial locations, where were they
12  located geographically?
13    A.  I can't recall the exact locations, but I
14  can say that they were located in agricultural
15  fields.
16    Q.  Okay. Would those be in North America?
17    A.  Yes, they were in North America.
18    Q.  Okay. Were they in Illinois?
19    A.  No, I didn't have any in Illinois.
20    Q.  In Wisconsin?
21    A.  Yes, I had some in Wisconsin.
22    Q.  Okay. What criteria did you use in
23  selecting trial locations?
24    A.  Soil characteristics, weather
25  characteristics, crop, cropping systems and the

Page 13

1  presence or absence of pests.
2     Q.  Okay. You used another term, cropping
3  systems.  What does that mean?
4         I'm sorry about the cough.  It's just one
5  of those things we're going to have to deal with
6  today, unfortunately.  So the reporter yesterday in
7  the deposition suggested that you might not, if you
8  can, if you can control your answer at a time that
9  doesn't coincide when I'm coughing.  That seems to be
10  a better solution than me trying to control my cough
11  when you're talking.  So if we can do that it would
12  make our day a lot better and complete the record a
13  lot better.
14    A.  I hope you feel better.
15    Q.  Thank you.
16    A.  And I will wait to complete my answer.
17    Q.  Okay. Did you want me to read that back to
18  you?
19    A.  Yes, please.
20    Q.  All right.  You used another term, cropping
21  systems.  What does that mean?
22    A.  My definition of a cropping system would
23  be, for an example, I'll give you an example, a
24  corn and soybean rotation where corn is grown one
25  year and soy beans are grown the next year would be

4 (Pages 10 to 13)

Exhibit 008 Page 4
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

---

**Page 14**

1  one example of a cropping system.
2    Q.  Okay. All right.  Now, you took this job
3  with this company upon graduation and getting your
4  PhD. and you were describing your role in that job.
5  And part of it was doing field testing.  Did you
6  actually make arrangements with the farmers to secure
7  the field testing positions?
8    A.  Yes.
9    Q.  And how did you go about doing that?
10   A.  I talked to the growers, asked them
11  whether they would like to cooperate with the field
12  tests and whether I could utilize their land and
13  conduct the trials on their land.
14   Q.  And when you utilized their land, I presume
15  you identified the specific part of the property that
16  you want to use, right?
17   A.  No, that isn't correct.  It would be more
18  common that the farmer would offer a certain part
19  of his property and then I would have to decide
20  whether that was going to meet my criteria or
21  whether I needed to look for another opportunity.
22   Q.  And about how much would you pay a farmer
23  for this opportunity?
24   A.  I can't remember what the rate was at the
25  time. I'm sorry, I can't remember.

---

**Page 15**

1    Q.  Okay. And how long did you stay in this
2  job?
3    A.  I was a field research representative
4  with Stauffer for several years.  I don't remember
5  exactly how long it was.  I think it might have
6  been three or four -- it was four or five years
7  probably.
8    Q.  Were you doing field testing throughout
9  that period?
10   A.  Yes.
11   Q.  Okay. Since you've been at Syngenta, let's
12  say since 2000, have you used any of the same field
13  test locations in your work at Syngenta that you used
14  when you were at Stauffer?
15   A.  No, because my responsibilities at
16  Syngenta didn't -- do not include field testing.
17   Q.  Okay. So you said you also did contracting
18  for field testing when you were at Stauffer?
19   A.  No, I don't believe I said that.  I think
20  I said that I worked with university cooperators
21  and provided test chemical to them so that they
22  could do field trials.
23   Q.  Were they working under a contract?
24   A.  How would you define a contract?
25   Q.  Well, where they had a piece of paper that

---

**Page 16**

1  they signed with your employer that would give rise
2  to certain obligations in giving them the right to be
3  paid for performing?
4    A.  No, I don't recall that there were
5  contracts, as you've defined them, involved.
6    Q.  Okay. So no written instruments involving
7  the universities and how they would -- how they would
8  perform the tests?
9    A.  No, I don't recall any of those being
10  involved during my time at Stauffer.
11   Q.  Any confidentiality agreements with the
12  universities?
13   A.  I don't remember.
14   Q.  Any confidentiality agreements with the
15  farmers?
16   A.  I don't remember.
17   Q.  Okay. What else did you do in this job?
18   A.  My primary responsibility was field
19  research.  I worked with universities.  And I
20  represented the company sometimes at meetings that
21  included farmers, university people or other people
22  in the agricultural community.
23   Q.  And did any of those farmers at that time
24  in your career include Illinois?
25   A.  I don't recall that I ever worked with a

---

**Page 17**

1  farmer in the State of Illinois.
2    Q.  Okay. And which universities were you
3  affiliated with at that time?
4    A.  The universities I called on during that
5  time were the University of Wisconsin, Iowa State
6  University, the University of Minnesota and
7  Michigan State University.  Those are four that I
8  can -- that I remember right now.
9    Q.  Have you ever given a deposition before?
10   A.  Yes.
11   Q.  And how many?
12   A.  One -- one, I believe.
13   Q.  Have you ever testified at any other time
14  besides that deposition?
15   A.  No.
16   Q.  So the only time you've been sworn and
17  given testimony is in a single deposition?
18   A.  That is my -- my recollection.
19   Q.  And tell me what that deposition involved.
20   A.  I recall it was a patent -- it related to
21  a patent question.
22   Q.  When --
23   A.  This was quite a long time ago.
24   Q.  By whom were you employed at the time that
25  that deposition was given?

---

5 (Pages 14 to 17)

**Exhibit 008 Page 5**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 18

1    A.  I had several employers before I started
2  with Syngenta, and I'm not sure whether it was
3  Zeneca or the previous one, ICI.  I don't remember
4  the exact date nor the exact employer at the time.
5    Q.  Do you remember anything about the
6  deposition?
7    A.  I remember there was a videographer and a
8  -- and a court reporter and there was a plaintiff's
9  attorney, and I had my -- and I had representation
10  as well.
11    Q.  Okay.
12    A.  Those are some of the things that I
13  remember.
14    Q.  Were you a party to the litigation?
15    A.  I don't know what you mean by that.
16    Q.  Were you a plaintiff or a defendant being
17  sued or suing?
18    A.  No.
19    Q.  Okay.  What was your next job after
20  Stauffer?
21    A.  Stauffer was acquired by ICI Americas,
22  and so I was then employed by ICI Americas as part
23  of the merger.
24    Q.  And tell me the business that ICI Americas
25  was involved in?

Page 19

1    A.  I was working with the agricultural
2  products business.  I don't know about other
3  businesses that ICI had.
4    Q.  What did you do at ICI Americas?
5    A.  I think my position title was market
6  development representative or product development
7  representative.  And I continued to do field
8  testing and evaluation for crop protection
9  products.
10    Q.  Did your job change in any way from what
11  you had previously told me?
12    A.  Yes.
13    Q.  How?
14    A.  My geographical responsibilities were
15  reduced and my travel was reduced, and so I just
16  focused on the State of Wisconsin.
17    Q.  You talked -- strike that.
18      I asked you about deposition testimony
19  before.  Have you ever testified before the EPA?
20      Have you ever given any statement or
21  affidavit or any testimony before any administrative
22  body like the EPA?
23    A.  No, I have not testified before the EPA.
24    Q.  Have you given any written statement or
25  affidavit in any judicial or administrative

Page 20

1  proceeding?
2    A.  I don't remember having done that.
3    Q.  Okay.  How long did you stay in the job at
4  ICI Americas?
5    A.  I continued to work with ICI Americas
6  until ICI was acquired or became Zeneca.
7    Q.  What year was that?
8    A.  I don't remember.
9    Q.  How long do you think that job lasted at
10  ICI Americas?
11    A.  I don't remember how many years it was.
12  And I don't have my employment record right here
13  that shows it.
14    Q.  Okay.  And what was your next employment?
15    A.  I moved then on into the Zeneca
16  organization and began to work for Zeneca ag
17  products.
18    Q.  And where were you at that time?
19      Where were you located?
20    A.  I spent some time in Wilmington, Delaware
21  at the Zeneca headquarters.  And I also -- then I
22  moved to Des Moines, Iowa and spent some time at
23  the Zeneca office in West Des Moines, Iowa.
24    Q.  What did you do at Wilmington, Delaware?
25    A.  Wilmington I was a technical manager, and

Page 21

1  I was responsible for product development for
2  herbicides and for insecticides.
3    Q.  Which herbicides and which insecticides?
4    A.  There were a lot of herbicides and there
5  were a lot of insecticides.
6    Q.  What was the first time that you ever
7  worked with atrazine?
8    A.  I don't remember the exact date.
9    Q.  Do you remember the year?
10    A.  No.
11    Q.  Do you remember the decade?
12    A.  Could have been -- it could have been in
13  the '70s when I was in undergraduate or in graduate
14  school.
15    Q.  And what would you have done with atrazine
16  when you were in undergraduate school?
17    A.  I worked with the -- I was a student and
18  I was a student worker with the test -- the testing
19  group.  And I may have worked with atrazine at that
20  time.
21    Q.  Do you remember anything specifically about
22  that assignment or that experience with atrazine?
23    A.  No, I don't remember anything
24  specifically about it.  It was probably included --
25  it was included in the field trials and so that's

6 (Pages 18 to 21)

Exhibit 008 Page 6
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 22

1  how I would have worked with it.
2      Q.  Tell me the first experience that you
3  remember with atrazine in any job?
4      A.  When I was -- yes, in the -- in 1982 we
5  included atrazine as standard in our herbicide
6  evaluation programs under my direction with
7  Stauffer Chemical Company.  It was included as a
8  standard.
9      Q.  And Stauffer was selling it?
10     A.  I can't -- I don't know.  I can't answer
11  that.
12     Q.  What does it mean to be included as a
13  standard?
14     A.  Oh.  Now I understand your question.  The
15  -- when we do field trials, we include substances
16  that we want to test, new substances, and we will
17  also include market standards, which are
18  established products in the marketplace for
19  comparison purposes.  So that's what I mean by a
20  standard.
21     Q.  Okay.  You were describing your job
22  experience and you had gotten I think to did you say
23  Zeneca?  Is that where you were?
24         I'm trying to work my way forward to your
25  experience at Syngenta, so tell me your next job.

Page 23

1      A.  I believe I described that I worked with
2  Zeneca ag products, that I had spent time at
3  headquarters as a technical manager.
4      Q.  Right.
5      A.  And then I went out to Des Moines, Iowa
6  and continued as a technical manager.
7      Q.  What did you do in Iowa as a technical
8  manager?
9      A.  My responsibility, again, was product
10  development manager.  And I was responsible in the
11  Iowa years principally for herbicides.  So I
12  developed testing protocols, I worked with other
13  Syngenta -- excuse me, I misspoke.  Not Syngenta,
14  Zeneca representatives to ensure that those testing
15  protocols were implemented.  And the results were
16  gathered and they were evaluated.
17     Q.  Were these chemicals that were already on
18  the market or were they being developed for eventual
19  future sale?
20     A.  There were some of both.
21     Q.  And at what stage in development did you
22  become involved with these chemicals?
23     A.  In the Zeneca years I was involved with
24  developing protocols for testing research compounds
25  in the field and for compounds that were in

Page 24

1  development as well as compounds that were in the
2  commercial -- already commercialized.
3      Q.  You were involved in developing protocols
4  -- protocols for testing research compounds in the
5  field, right?
6      A.  Yes.
7      Q.  And specifically what products were you
8  working with toward development that were not yet on
9  the market?
10     A.  I remember two -- two compounds that I
11  worked with.  I'm sure there were many more.  One
12  was acetochlor, preemergence, a grass herbicide
13  that was being evaluated in corn.  And another one
14  was -- and I'm sorry, the -- this is a long time
15  ago, the details escape me.
16     Q.  You remember one of them?
17     A.  I remember one -- one I worked with was
18  acetochlor.
19     Q.  Okay. And how did you go about developing
20  the protocols?
21     A.  We had a criteria in mind that we were
22  trying to evaluate.  Criteria included crop
23  tolerance, efficacy of weed control and the need to
24  define the use rate.  So we were working on
25  defining use rates, use patterns, weeds that were

Page 25

1  controlled, and understand the similarities and
2  differences in those characteristics on different
3  soil types.  So that was -- that's an example of
4  the type of work that we were -- that I did during
5  that time.
6      Q.  How long did you stay in that job in De
7  Moines?
8      A.  I stayed in De Moines until I relocated
9  to -- to the Syngenta headquarters here in
10  Greensboro.  And I relocated physically in June of
11  2001.  That's when my family relocated.  I started
12  working here in November of 2000.
13     Q.  And your job title has stayed the same
14  since you've been here?
15     A.  No, my job title changed when I
16  transferred to Syngenta.
17     Q.  Okay. But since you've been here, it's
18  stayed the same?
19     A.  Yes, I'm sorry, I misunderstood you.
20  Since I've been here, my job title has been head of
21  development planning, which includes the project
22  and portfolio management, which I described
23  earlier.  So it's officially head of development
24  planning.  I believe that's the role.
25     Q.  What is development planning?

7 (Pages 22 to 25)

Exhibit 008 Page 7
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 26

1      A.  It encompasses two -- two aspects, a
2  project management, development project management
3  and development portfolio management.
4      Q.  Okay. Tell me what those two things are,
5  project and portfolio management.
6      A.  Project management involves scheduling.
7      Q.  Scheduling what?
8      A.  Scheduling studies, scheduling work.  It
9  also involves resourcing.  It involves stakeholder
10 interactions.
11     Q.  Okay. Let's stop here for a second.
12         What does resourcing mean in the way that
13 you used it in that answer?
14     A.  Resource -- resourcing would mean to be
15 -- to ensure that adequate people and -- and -- and
16 dollars are available to complete a required study.
17     Q.  Okay. And stakeholder interaction, what
18 does that mean?
19     A.  In a project environment, stakeholders
20 would include, for instance, my boss, my -- my
21 direct reports, other functional managers.  These
22 are stakeholders.  They're people who have a stake
23 in the task or the outcome.
24     Q.  Okay.
25     A.  And they're internal stakeholders.

Page 27

1      Q.  Okay. Did -- I interrupted your answer.  So
2  you were describing what's involved in project and
3  portfolio management.  You said scheduling study,
4  scheduling work, resourcing and stakeholder
5  interaction.  What else?
6      A.  Those are the principal components of
7  project management.
8      Q.  Okay. Has the responsibility changed over
9  the years in that job or has it stayed about the
10 same?
11     A.  I think my -- I recall that the -- the
12 objectives change from year to year.  But the
13 overall responsibilities of the job have remained
14 consistent over the years.
15     Q.  Are any of the stakeholders for projects
16 that you have managed since you've been at Syngenta
17 at other Syngenta legal entities besides Syngenta
18 Crop Protection, Inc.?
19     A.  The stakeholders that I interact with and
20 engage with in project management are located here
21 in Syngenta Crop Protection, Inc.
22     Q.  Only there?
23     A.  Yes.
24     Q.  Okay. So your functional managers are all
25 at Syngenta Crop Protection, Inc.?

Page 28

1      A.  My functional manager is in Syngenta Crop
2  Protection, Inc., yes.
3      Q.  And who is that?
4      A.  My functional manager is Dr. Marian
5  Stypa.
6      Q.  Who's your boss?
7      A.  Dr. Marian Stypa.
8      Q.  Okay. You in the prior answer said your
9  stakeholders included your boss, your direct reports
10 and your functional managers, okay?
11         You want me to -- I can go back and read
12 the answer to you.  But what I'm looking for, who are
13 all these people?
14     A.  Okay.  I understand now.
15         My boss is Dr. Marian Stypa.
16     Q.  Okay.
17     A.  He's my -- he's my -- I report to him.
18     Q.  Okay.
19     A.  Could you -- could you.
20     Q.  Yeah, who are these other people, the
21 direct reporting manager and the functional manager?
22     A.  Oh, my direct reports.
23     Q.  Okay.
24     A.  My direct reports include the people that
25 work for me. These --

Page 29

1      Q.  No, I'm sorry, we're going to get to them.
2  The ones that you communicate with as opposed to
3  relying upon.  Who else besides Marian Stypa?
4      A.  Oh, the couple -- couple of examples
5  would be Janis McFarland, who's the head of
6  regulatory affairs.
7      Q.  Okay.
8      A.  I consider her a stakeholder.  Dr. Peter
9  Hertl who worked in health assessment,
10 environmental safety, product safety.  I consider
11 him a stakeholder.  These are -- these are
12 functional managers.  And that's in the context
13 that I use that term.
14     Q.  Okay. Do you understand what global product
15 safety is?
16     A.  Yes, I'm familiar with the term global
17 product safety.
18     Q.  Okay. And what is your understanding of the
19 term?
20     A.  Product safety includes two aspects,
21 includes health assessment, environmental safety.
22 And global product safety is based in Basel.
23     Q.  Okay. And do you know who is the head of
24 global product safety?
25     A.  Yes.

8 (Pages 26 to 29)

Exhibit 008 Page 8
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 30

1      Q.   Who?
2      A.   The current head of global product safety
3   is Dr. Peter Hertl.
4      Q.   And where is he physically located?
5      A.   I don't know what his physical location
6   is today.
7      Q.   Okay. Do you know where he's employed?
8      A.   No.
9      Q.   Okay. Do you -- are you aware of the fact
10   that he is a Syngenta Crop Protection, Inc. employee?
11      A.   I am not aware of who his -- who his --
12   who his employer is.
13      Q.   Okay.
14      A.   I know it only as Syngenta.
15      Q.   Only as Syngenta?
16      A.   I'm at Syngenta Crop Protection as I know
17   it in the United States.
18      Q.   Okay.
19      A.   Syngenta Crop Protection, Inc.
20      Q.   Okay. Do you know who Marian Stypa works
21   for?
22      A.   No.
23      Q.   Okay. Do you know who actually employs John
24   Atkin?
25      A.   No.

Page 31

1      Q.   Do you know who John Atkin is?
2      A.   Yes.
3      Q.   What is your understanding of his role in
4   the Syngenta companies?
5      A.   I think his title -- my -- my
6   recollection is his title is chief -- or COO, chief
7   operating officer.
8      Q.   Chief operating officer of what?
9      A.   I don't know.
10      Q.   Okay. Would you consider him the boss of
11   your boss?
12      A.   No.
13      Q.   Okay. Is he the boss of all of crop
14   protection?
15      A.   I don't know.
16      Q.   Okay. So you don't even know if he's in the
17   line of companies to serve as a boss in your
18   operation?
19           MR. SURPRENANT:  Object to the form.
20      A.   I don't know what John Atkin's
21   responsibilities are.
22      Q.   Okay. Do you know who he is?
23      A.   I've seen him, yes.
24      Q.   Okay. And how have you seen him?
25      A.   I believe I recall seeing him at a

Page 32

1   meeting.
2      Q.   Okay.
3      A.   And he stood up in front and made a
4   speech.  And so that's how I know his name and his
5   face.
6      Q.   And how was he presented to you, as what?
7      A.   I was in the audience.  He wasn't
8   presented to me.
9      Q.   Oh, but you were one of the audience.  So
10   he was presented to you at the time as a speaker as
11   having some role with Syngenta or did you think he
12   was just some guy from some other business just there
13   to make a speech?
14           MR. SURPRENANT:  Object to the form.
15      A.   I don't know.
16      Q.   Okay. So you really can't tell me what role
17   he has in the Syngenta operation?
18      A.   I recall I said that I believe he is the
19   chief operating officer of Syngenta -- of Syngenta.
20   That's all I know.
21      Q.   And what do you mean when you use the word
22   Syngenta in that last answer?
23      A.   I'm not sure I understand your question.
24      Q.   You used the word.  Let me just remind you,
25   okay?  You just said, I'm quoting, I recall I said

Page 33

1   that I believe he is the chief operating officer of
2   Syngenta, of Syngenta, that's all I know.
3           When you gave that answer, what did you
4   mean when you said the word Syngenta?
5      A.   I'm confused by your question.
6      Q.   Well, actually, I'm just asking you to
7   explain your answer.
8           You told me you thought that John Atkin was
9   the CE -- COO of Syngenta.  I'm asking you what
10   entity Syngenta are you referring to?
11      A.   I don't know what entity.  All -- I just
12   know that that is his title.
13      Q.   Do you believe Syngenta to include a
14   particular group of companies when you answered that
15   way?
16      A.   No.
17      Q.   What did you mean it to be?
18           What did Syngenta mean when you just gave
19   me that answer?
20      A.   What I meant was that I believe the title
21   that John Atkin has is crop -- is COO, and that
22   he's COO of Syngenta.  I do not know what entity
23   that is.
24      Q.   Did you understand that to include the
25   entire operation of the -- all umbrella companies

9 (Pages 30 to 33)

Exhibit 008 Page 9
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

---

Page 34

1   under the name Syngenta?
2       MR. SURPRENANT:  Object to the form.
3       A.  No.
4       Q.  Okay. Then did you think it was something
5   else, some other company?
6       A.  I answered the best I could based on what
7   I know.
8       Q.  Okay.
9       A.  I don't have any other knowledge of this.
10      Q.  Okay. Well, I'm trying to understand who
11  you think John Atkin is COO of, what entity?
12      A.  I don't know.
13      Q.  Okay. Do you have an understanding as to
14  whether Syngenta Crop Protection, Inc. is accountable
15  in any way to -- strike that.
16      Do you have an understanding as to whether
17  anyone at Syngenta Crop Protection, Inc. is
18  accountable to Mr. Atkin?
19      A.  I don't know.
20      Q.  Okay. If I told you that the Syngenta
21  annual reports say that Mr. Atkin is COO of crop
22  protection, would that mean anything to you?
23      MR. SURPRENANT:  Object to the form.
24      A.  No.
25      Q.  Okay. Would you know what crop protection

---

Page 35

1   means within the umbrella of Syngenta companies?
2       A.  No.
3       Q.  Okay. Have we discussed all of the
4   stakeholders that you report to?
5       You mentioned Marian Stypa, Janis
6   McFarland. And I don't think you mentioned anybody
7   else. Was there somebody else?
8       A.  I don't -- I don't recall that I said
9   that I report to those individuals. I think I
10  report to Marian Stypa and I considered the
11  individuals I named, including Janis McFarland and
12  Peter Hertl as functional managers and stakeholders
13  in specific projects.
14      Q.  Okay. What's the difference between a boss
15  and a functional manager?
16      A.  I use the word boss to refer to my
17  immediate supervisor, Dr. Marian Stypa. So when I
18  used that term, it was to -- to mean my immediate
19  supervisor.
20      Q.  Do you know whether Janis McFarland has a
21  functional manager in Basel?
22      A.  I don't know.
23      Q.  Do you know whether Peter Hertl has a
24  functional manager?
25      A.  I don't know.

---

Page 36

1       Q.  Okay. What is portfolio management?
2       A.  Our individual projects group -- groups
3   into a development portfolio. So there are several
4   projects, and together I consider them a portfolio.
5       Q.  Okay. Tell me the portfolio management
6   activities you've had with atrazine or products
7   containing atrazine.
8       A.  Our crop protection, our Syngenta Crop
9   Protection, Inc. development portfolio contains
10  many projects. These projects include herbicides,
11  insecticides and fungicides and seed treatments.
12  In the herbicide portfolio we have projects that
13  include work with atrazine.
14      Q.  Okay. Yeah, tell me the ones that involve
15  atrazine since you've been there for the last ten
16  years. Excuse me.
17      A.  I can't remember the specific -- or the
18  specific projects. I don't have that information
19  here.
20      Q.  Do you remember any of them?
21      A.  Yes. I remember one.
22      Q.  All right. Let's just do it this way.
23      A.  Okay.
24      Q.  How many of them would you estimate you've
25  been involved with, including atrazine, in some way

---

Page 37

1   or another?
2       A.  I can't -- I can't estimate that. That
3   would be a guess. I can't guess.
4       Q.  Well, are you able to estimate a total
5   number?
6       A.  No.
7       Q.  Would it be -- well, just so we know, is it
8   in tens, hundreds; do you know?
9       Closer to a hundred or closer to ten?
10      A.  I don't know.
11      Q.  What has your role been with respect to
12  these projects involving atrazine?
13      A.  My role includes project and portfolio
14  management. So I described the project management.
15  So we sum the projects up into a portfolio, we
16  review the projects, we check the progress against
17  -- against milestones, and we want to make sure
18  that these projects are on track so that they can
19  be completed successfully. Those are portfolio
20  management role responsibilities.
21      Q.  What's the difference between portfolio
22  management and product management?
23      A.  And?
24      Q.  Product management -- project management.
25  I'm sorry.

---

10 (Pages 34 to 37)

Exhibit 008 Page 10
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.    11-10-2010
Confidential - Pursuant to the Protective Order

Page 38

1    A.  Oh. Could you restate the question?
2    Q.  Yes.
3        You used the words portfolio management and
4    project management as being different in your
5    responsibilities.  I want you to explain how they
6    differ.
7    A.  A project management involves individual
8    development projects in ensuring that they are
9    resourced, that there's time lines established,
10   that the work is scheduled properly and that it is
11   completed on time, on budget to specification.  The
12   portfolio management role involves oversight and
13   supervision of groups of projects to ensure that
14   they are all in alignment and proceeding as
15   expected.
16   Q.  Tell me, if you can, using one of these
17   examples of each involving atrazine and explain to me
18   how these portfolio management projects --
19   responsibilities would take place and then project
20   management responsibilities would take place.  So
21   what you would be doing, in other words.
22   A.  So let me ask a question for
23   clarification.
24   Q.  Of course, of course.
25   A.  So you want an example, you want me to

Page 39

1    use a specific example for project management and
2    portfolio management?
3    Q.  Right.  And I'd like to do it in the
4    context of a product that contains atrazine or
5    triazine type product.
6    A.  So a specific project might be an example
7    is the atrazine monitoring project.
8    Q.  Right.
9    A.  That would be a project that would be --
10   and a specific example of a project containing
11   atrazine.
12   Q.  What was your role with that?
13   A.  My responsibility was to ensure that the
14   -- the program was implemented properly.
15   Q.  And when did it start?
16   A.  The atrazine -- I don't remember when the
17   atrazine monitoring program started.  I believe it
18   started when we -- when the EPA -- the memorandum
19   of agreement was completed with U.S. EPA, and the
20   -- and that's when the monitoring of atrazine
21   began.
22   Q.  Was that 2003?
23   A.  I don't remember the date.
24   Q.  How did you first become involved with the
25   atrazine monitoring program?

Page 40

1    A.  In my project management -- portfolio
2    management responsibilities I was asked to make --
3    to ensure that these samples were collected, they
4    were analyzed and they were reported.
5    Q.  So your role was to collect samples only?
6    A.  No.
7    Q.  All right.
8    A.  I didn't collect any samples.
9    Q.  All right.  So let's see if we can first
10   understand each other and our terms.
11   A.  Okay.
12   Q.  What is the atrazine monitoring program?
13   A.  The atrazine monitoring program is a
14   collection of water samples at community water
15   systems in the U.S. under -- under the memorandum
16   of agreement with U.S. EPA.
17   Q.  And how many community water systems were
18   involved?
19   A.  I don't remember.
20   Q.  Where did the funding source come from for
21   the atrazine monitoring program?
22       What was the funding source?
23   A.  We funded it through our development
24   program for Syngenta Crop Protection, Inc.?
25   Q.  Okay. And tell me what your role has been

Page 41

1    with the atrazine monitoring program since the
2    agreement with the EPA.
3    A.  My responsibility was to oversee the
4    program, ensure that samples were collected, that
5    they were analyzed and that the -- the results were
6    reported.  I had an oversight responsibility.  I
7    was not involved in the day-to-day work.
8    Q.  You said your role was that of oversight.
9    Who was reporting to you with respect to the atrazine
10   monitoring program?
11   A.  No one reported to me with respect to the
12   program.
13   Q.  Okay. Who was involved besides you with the
14   program?
15   A.  Andrew Merritt was the study director.
16   Q.  What's his title?
17   A.  I don't know.
18   Q.  Who else was involved besides Mr. Merritt?
19       MR. SURPRENANT:  Talking about from the
20   beginning or at any point in time?
21   Q.  Yeah, at -- since you were involved in the
22   program.
23   A.  Dan Campbell was the -- as -- was the
24   regulatory -- was a regulatory manager that was
25   involved.

11 (Pages 38 to 41)

Exhibit 008 Page 11
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 42

1    Q.  Who else?
2    A.  David Flackney was in state government
3    relations, and he was involved.
4    Q.  What was his role?
5    A.  His title was state government relations
6    manager.
7    Q.  Okay. Who else?
8    A.  Well, Ron Williams was involved. That's
9    all I can remember.
10   Q.  And with respect to these people, what was
11   your role?
12   A.  My responsibility was to get them
13   together from time to time, to ask questions like
14   how -- how are the -- how is the sample collection
15   going? Are there -- is the -- are the analyses
16   proceeding as expected, et cetera. That was my --
17   my role as an oversight role.
18   Q.  Who was in charge of getting the samples
19   collected within the group?
20   A.  The study director.
21   Q.  And that was Mr. Merritt?
22   A.  Mr. Merritt.
23   Q.  Would he be the person who would have made
24   arrangements for the collection of the samples?
25   A.  Yes, he would have made arrangements for

Page 43

1    the collection of the samples.
2    Q.  Did you have any knowledge of who he
3    retained to collect samples?
4    A.  I don't recall who he retained -- who he
5    retained, if he -- if he disclosed it, I don't
6    recall it.
7    Q.  Okay. And in terms of the analysis of the
8    samples collected, who was responsible for that?
9    A.  The study director.
10   Q.  Yes, how was the analysis done?
11   A.  I don't know how the analysis were done.
12   Q.  Did you get reports of the analysis?
13   A.  I did receive reports.
14   Q.  And did you do anything with the reports in
15   terms of disclosing them to any other people?
16   A.  My responsibility was to ensure that the
17   samples were taken and the analyses were done and
18   the reports were generated. My responsibility did
19   not include summarizing data, reporting data. That
20   was outside of my responsibility.
21   Q.  Okay. Who was responsible for reporting
22   data?
23   A.  The study director will have -- has
24   responsibility for reporting.
25   Q.  And it's your understanding that Mr.

Page 44

1    Merritt did the reporting?
2    A.  Mr. Merritt and Mr. Campbell did the
3    necessary -- or necessary reporting to the best of
4    my knowledge.
5    Q.  Who negotiated the agreement with the EPA?
6    A.  I don't know.
7    Q.  Was that finished before you knew there was
8    going to be a monitoring program?
9    A.  I don't recall.
10   Q.  Do you know if any of the community water
11   systems that were within this atrazine monitoring
12   program were within the State of Illinois?
13   A.  Yes, they did include community water
14   systems in the State of Illinois.
15   Q.  Do you know how many?
16   A.  No.
17   Q.  Did you ever seek -- strike that.
18       Did anyone working at Syngenta Crop
19   Protection, Inc. involved in the community -- I'm
20   sorry, strike that.
21       Did anyone at Syngenta Crop Protection,
22   Inc. involved in the atrazine monitoring program ever
23   seek approval for funding any part of it from any
24   person outside of Syngenta Crop Protection, Inc.?
25   A.  I don't know.

Page 45

1    Q.  Would that have happened in the regular
2    course?
3    A.  I don't know.
4    Q.  Okay.
5    A.  Can we take a quick break?
6    Q.  Of course.
7       THE VIDEOGRAPHER: Stand by.
8       Going off the record. The time is 10:25
9    and 55 seconds.
10      (A BRIEF RECESS WAS TAKEN.)
11      THE VIDEOGRAPHER: We're going back on the
12   record. The time is 10:37 and 54 seconds.
13   Please continue.
14      (Plaintiff's Exhibit 1: An e-mail string
15   with the top from Paul Francis dated 3/17/03,
16   Bates SYN02737460 - 461 marked for
17   identification, as of this date.)
18   Q.  I'm going to show you what's been marked as
19   Exhibit 1. Unfortunately, I have one of these, so
20   it's the only one that I'm limited to, one copy.
21      While your counsel is looking at this, I'll
22   just tell you that we've been given in production a
23   number of documents that -- some of which include
24   e-mail exchanges involving you. So some of these
25   questions I'll be asking you will involve some of

12 (Pages 42 to 45)

Exhibit 008 Page 12
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 46

1  those e-mail exchanges, okay?
2       If you want to look at Exhibit 1.  This is
3  an e-mail exchange on March 17th, 2003.  It's
4  Syngenta 37460 through 37461.  Please familiarize
5  yourself with it.  You were an addressee on the
6  e-mail exchange.  I have some questions for you, sir.
7       Do you know what that is?
8    A.  It's a two-page document.
9    Q.  Okay.  Besides being two pieces of paper, do
10 you know what it is?
11   A.  It's a memo from Paul Francis.
12   Q.  To whom?
13   A.  It's to John Parker and Dirk Drost.
14   Q.  Okay.  So you're a person who received that
15 e-mail, right?
16   A.  I don't recall receiving it.
17   Q.  Okay.
18   A.  My name is on it.  I don't recall
19 receiving it.
20   Q.  Okay.  Well, I'm going to assume that what
21 was given to us was, in fact, an accurate document,
22 okay?  And off the Syngenta system and that you, in
23 fact, did receive it, like you say.
24       Go down the line there on the project
25 trials, 2003 trials.  And where the 2003 trials list

Page 47

1  146-03 atrazine.
2       Do you see that?
3    A.  I do.
4    Q.  Okay.  What would the $1,600 be?
5    A.  It's under a column titled EFTN cost.
6    Q.  What's that mean to you?
7    A.  It's a electronic data capture tool,
8  EFTN.
9    Q.  Okay.  So what's it mean?
10   A.  It means that it's under the column of
11 that is -- there's listed $1,600.
12   Q.  It's a cost.
13       And then it says total external contract
14 costs and it says $56,466, right?
15       Do you see that?
16   A.  I do.
17   Q.  Okay.  What would that number indicate?
18   A.  It was a cost of doing the work described
19 here.
20   Q.  Okay.  Well, tell me what the two numbers
21 mean in conjunction with each other.
22       One is it says the number of trials,
23 there's going to be two.  And then it says EFTN cost
24 1,600, and then total external contract costs 56,446.
25 What does this mean?

Page 48

1    A.  It was the cost of doing two dietary
2  residue studies in 2003.
3    Q.  Okay.  And did you have any role in
4  approving this?
5    A.  I don't recall receiving this and I don't
6  recall whether I approved it or not.
7    Q.  Okay.  If you look at the -- at the bottom
8  of the e-mail, which is on the second page, it says
9  all of these trials and studies are parts of approved
10 projects.
11       What does that mean?
12   A.  That means that the projects had
13 previously been approved and sanctioned and these
14 costs -- this was simply a recitation of the costs
15 associated with them.
16   Q.  As part of your job, would you typically
17 approve these sorts of projects?
18   A.  Part of my -- part of my responsibility
19 as a project and portfolio manager is to approve
20 the spend.  I don't recall this particular
21 instance.
22   Q.  If you look up at the top, it says, I
23 should have requested approval for the total cost in
24 the previous e-mail.  So please find below the total
25 external -- contract costs for dietary residue

Page 49

1  studies being started in 2003 for approval, Paul.
2       Now, is Paul at Syngenta Crop Protection?
3    A.  Paul Frances is in Syngenta Crop
4  Protection, Inc.
5    Q.  And where is John Parker?
6    A.  John Parker is no longer with the
7  company.
8    Q.  Okay.  At that time where was he?
9    A.  I think John -- at that time John worked
10 from England.
11   Q.  Where in England?
12   A.  I don't know.
13   Q.  And he had to approve these, didn't he?
14       He had to approve these expenses?
15   A.  I don't know whether John approved these
16 expenses or not.
17   Q.  And you're sure of that, right?
18       You don't -- you just simply don't remember
19 that?
20   A.  I don't remember whether John approved
21 these expenses or not.
22   Q.  Do you remember whether John approved any
23 expenses that were also being submitted to you for
24 different studies?
25   A.  No, I don't.

13 (Pages 46 to 49)

Exhibit 008 Page 13
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 50

1    Q.  You have no recollection of that?
2    A.  That's what I said, I have no
3  recollection.
4    Q.  Okay. All right.  Look at the bottom of the
5  last line of the first page where it says, I am
6  requesting approval for a PO with American Ag
7  Services to support the following studies at a unit
8  cost of 800 per trial.
9        What does that mean?
10   A.  I don't know what the author intended.
11   Q.  Would you agree from this document that
12 Paul Frances is asking John Parker to approve these
13 expenses?
14   A.  I don't know what -- what the author's
15 intent was.
16   Q.  Well, just read the document.  You're
17 copied on the document.  The author was requesting
18 approval for PO.  Is that a purchase order?
19   A.  PO sometimes means purchase order, yes.
20   Q.  Okay. Do you think it meant it there?
21   A.  I don't know.
22   Q.  Okay. And where -- what entity was John
23 Parker in Great Britain?
24   A.  I don't know.
25   Q.  Was he at Greensboro at Syngenta Crop

Page 51

1  Protection, Inc.?
2    A.  I'm not sure I understand your question.
3    Q.  Well, John Parker, it says GBAP.
4        Do you see that, after his name?
5    A.  GBAP, yes, I see that.
6    Q.  What's that acronym stands for?
7    A.  I don't know what that acronym stand for.
8    Q.  Okay. What does USGR behind your name stand
9  for?
10   A.  Part of my e-mail address.
11   Q.  Okay. Does that stand for U.S. Greensboro
12 Syngenta Crop Protection, Inc.?
13   A.  I don't know.
14   Q.  So you're telling me under oath here today
15 that you don't know what the USGR behind your name on
16 your e-mail address means, right, sir?
17   A.  I believe it is the United States
18 Greensboro.
19   Q.  Okay.
20   A.  But I do not -- it's not a part of the
21 business I get involved in.  It's my e-mail
22 address.
23   Q.  Has that been the same since you've started
24 at Syngenta for the last ten years?
25   A.  I don't remember.

Page 52

1    Q.  Okay.
2        (Plaintiff's Exhibit 2: An e-mail string
3        with the from from Viji Gowda dated 5/21/03,
4        Bates SYN00899481 - 482 marked for
5        identification, as of this date.)
6    Q.  I'll hand you what's been marked as Exhibit
7  Number 2.  This is a Syngenta document Bates range
8  899481, 482, e-mail exchange, May 21, 2003.
9        Please take a look at this document and
10 I'll ask you some questions, sir.
11       Who is Viji Gowda?
12   A.  I don't know.
13   Q.  But Viji Gowda worked at USGR; is that your
14 understanding from this e-mail address?
15   A.  I don't know Viji Gowda.
16   Q.  And is this an amphibian study that's being
17 discussed?
18   A.  I've not ever seen this document before.
19   Q.  Okay. And look in the top line where Mr.
20 Alan Hosmer, do you know who he is?
21   A.  Yes.
22   Q.  Okay. What his job?
23   A.  I don't know what his role is.  But I do
24 know him.
25   Q.  Okay. Does he work at Syngenta Crop

Page 53

1  Protection, Inc.?
2    A.  Yes.
3    Q.  Okay. Do you know what he does there?
4    A.  He works in the product safety group.
5    Q.  Okay. And this e-mail, the first one, is
6  to Mr. Bruce Thede and copied to Mr. Hosmer
7  discussing an ecological risk assessment and studies
8  that needed to be done, correct?
9        If you look at the bottom of the first
10 page.
11   A.  The bottom of the first page, I see Viji
12 Gowda to Bruce Thede, yes.
13   Q.  Okay. And these are amphibian field studies
14 that are referenced, correct?
15   A.  That's what the document says.
16   Q.  Okay. They were to be started in April of
17 2003 and finished in April 2004, this e-mail
18 suggests, correct?
19   A.  That's what I can read.
20   Q.  Okay. And this e-mail was seeking funding
21 for that, correct?
22   A.  I've never seen the e-mail before.
23   Q.  Right.
24       But you're also -- I'm going to get to the
25 point of the fact that you were -- you were the

14 (Pages 50 to 53)

Exhibit 008 Page 14
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 54

1    person that they were ultimately seeking funding
2    from, you and a person named Mr. Parker on the top
3    e-mail?
4        Was this request ever made to you for
5    funding?
6        A. I don't know.
7        Q. Okay. Now look at the top e-mail.
8        And it reads Alan, could you please request
9    approval from Dirk Drost and John Parker for the
10   below study so that Katherine could assign a PO
11   number and I can pass this onto Robert Bruce.
12       Who is Katherine Dixon?
13       A. Katherine Dixon is a -- an employee of
14   Syngenta Crop Protection, Inc.
15       Q. What does she do?
16       A. I don't know her title.
17       Q. Okay. But she would assign a purchase order
18   number?
19       A. According to this document, she would
20   assign a purchase order number.
21       Q. And you're saying you have no personal
22   knowledge that she assigns purchase order numbers; is
23   that correct?
24       Is that what your testimony is?
25       A. No, I didn't say that.

Page 55

1        Q. Do you have personal knowledge that she
2    does that?
3        A. I said I knew Katherine Dixon, and she
4    worked for Syngenta Crop Protection, Inc. And
5    that's what I had previously said.
6        Q. Okay. Does she work in a role of assigning
7    purchase order numbers?
8        A. She did. I don't know what she --
9    whether she continues to do that now.
10       Q. Okay. And then the reference here to John
11   Parker is the name same John Parker we referenced who
12   was from Great Britain, correct?
13       A. I don't know.
14       Q. You say you don't know John Parker?
15       A. I do know John Parker. I can only read
16   the document as you do and see the name John
17   Parker. I do know a person named John Parker.
18       Q. Okay. And his approval was required before
19   this funding could proceed and a purchase order could
20   be issued; is that correct?
21       A. No.
22       Q. Doesn't that -- isn't that exactly what the
23   e-mail says?
24       A. The document says his -- his approval was
25   requested.

Page 56

1        Q. Okay.
2        A. It doesn't say required, it says
3    requested.
4        Q. Okay.
5        A. That's why I answered no.
6        Q. All right. Well, then let me ask you this
7    way, if John Parker declined to approve this, is it
8    your testimony the study would have gone forward
9    anyway?
10       MR. SURPRENANT: Object to the form.
11       A. Would you repeat the question, please.
12       Q. Sure.
13       If John Parker declined to approve this
14   request for amphibian studies, is it your testimony
15   the studies would have gone forward anyway?
16       MR. SURPRENANT: Object to the form.
17       A. Yes, I -- if I approved this work, it
18   would have gone on.
19       Q. Okay. Did not require John Parker's
20   approval with yours?
21       A. No, in this case if I would have approved
22   it, it would have gone on.
23       Q. Okay.
24       A. I do not recall this particular instance.
25       (Plaintiff's Exhibit 3: An e-mail string

Page 57

1        with the top from Viji Gowda dated 7/8/03,
2        Bates SYN00910044 - 45 marked for
3        identification, as of this date.)
4        Q. Let me show you what's been marked as
5    Exhibit 3. This is another e-mail concerning the
6    same field studies, isn't it, sir?
7        Is this another e-mail concerning the same
8    field studies?
9        A. Part of the e-mail appears to be
10   referring to the same two studies.
11       Q. Okay. And just so the record's clear, this
12   is Syngenta 910044, 45. And it's an e-mail exchange
13   taking place in July 2003. And you were included in
14   some of these e-mails, weren't you, sir?
15       A. I -- my name is on the copy list.
16       Q. Okay. And in the -- on the page 44 there's
17   a reference to you and John, and that's to John
18   Parker, middle of the page on the first page, sir.
19       He says, I am requesting for the formal
20   approval for these two studies as these studies are
21   part of the ongoing atrazine eco risk project, the
22   same two, Viji.
23       Now, where were those tests to be
24   performed?
25       A. I don't recall the two studies or where

15 (Pages 54 to 57)

Exhibit 008 Page 15
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 58

1  they were to be performed.
2      Q.  And then the exchange was sent to Mr.
3  Parker, and he was asked to approve the studies for
4  amounts of $108,421 for the first one, and $129,166
5  for the second one, wasn't he?
6      A.  I said I don't recall the document.  I
7  don't recall seeing it before.
8      Q.  Okay.
9      A.  All I can do is read it.
10     Q.  You don't deny that you received this
11 e-mail exchange, right?
12         Your name's listed on it?
13     A.  I don't recall receiving it.
14     Q.  Okay.  And what did Mr. Parker say?
15         He said, are these covered by the planned
16 $12.3 million budget?  If so, please confirm and
17 proceed.
18     A.  That's correct.  That's -- that's what it
19 says.
20     Q.  Okay.  Did you send an e-mail approving it?
21     A.  I don't remember.
22     Q.  Okay.  But Mr. Parker approved it, didn't
23 he?
24     A.  As I said previously, if I had approved
25 it, it would proceed.  And John Parker concurred.

Page 59

1      Q.  If John Parker's approval was not required,
2  why was he being asked for it, sir?
3          MR. SURPRENANT:  Object to the form.
4      A.  I don't know.
5      Q.  Okay.  And the response was yes, it is
6  covered by the planned budget.  Thank you for your
7  quick response.
8          And did the project go forward after Mr.
9  Parker approved it, sir?
10     A.  I don't recall -- I don't recall the two
11 studies.  But if I approved them, they went
12 forward.
13     Q.  Actually, Mr. Parker approved them from --
14 in this e-mail exchange.  Your approval is nowhere on
15 this e-mail exchange, is it?
16         MR. SURPRENANT:  Object to form.
17     A.  There's document -- the document -- I can
18 just read the document.  I said I hadn't seen it
19 before.
20     Q.  Okay.  But look at it and show me where you
21 approved anything.
22     A.  This document doesn't -- doesn't include
23 my approval.
24     Q.  Okay.  Tell me who approved the studies in
25 this document?

Page 60

1      A.  If I approved them, they went forward.
2      Q.  Who approved the studies in the document?
3          Can you understand my question, sir?
4          MR. SURPRENANT:  Object to the form.
5      A.  This document indicates that John
6  concurred and the studies proceeded.
7      Q.  Who did he concur with?
8      A.  He concurred with the request.
9      Q.  Okay.  And that means he approved them and
10 they proceeded, right?
11         If he said if so, please confirm and
12 proceed.
13     A.  That's what the document says.
14     Q.  All right.
15         MR. SURPRENANT:  Off the record a second.
16     Steve, he's going to make a copy unless you
17     need it right now.
18         MR. TILLERY:  No, I don't.
19         MR. CRAIG:  You might want to staple that
20     copy together.
21         (Plaintiff's Exhibit 4: An e-mail string
22     with the top from John Parker dated 7/30/03,
23     Bates SYN01100954 marked for identification,
24     as of this date.)
25     Q.  I'll show you what's been marked as

Page 61

1  Exhibit 4. This is a July 30th, 2003 e-mail exchange,
2  Syngenta 1100954, single page.  And it starts off
3  with an e-mail from Mr. Steven Wall showing a
4  Greenville e-mail address asking to you and Mr.
5  Parker, Mr. John Parker, I need to establish a PO for
6  endangered species work with atrazine, $35,000.  The
7  task is for outside consulting fees related to an
8  atrazine endangered species assessment.  It is a
9  critical component of the ongoing IRED activities and
10 must be conducted this year.
11         Do you see that?
12     A.  I'm reading it, yes.  I see those words
13 here.
14     Q.  Okay.  And you see your name on the e-mail
15 exchanges too, don't you?
16     A.  I do.
17     Q.  All right.  And did Mr. Parker approve it?
18     A.  I approved it.  And it went on.
19     Q.  Where is your approval?
20         Was that left out of the group of documents
21 sent to us, you think?
22     A.  I don't know.  I don't know where --
23 where they -- where the approval is or where the
24 document came from.
25     Q.  Well, let's look at this page --

16  (Pages 58 to 61)

Exhibit 008 Page 16
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 62

1      A.  I'm looking -- I'm looking at it.
2      Q.  -- number four and show me where your
3  approval is on that one.
4      A.  It was sent to me, I was aware of it.
5  That's all that says.
6      Q.  Okay. Now, would you answer my question. I
7  asked you where is your approval on that page?
8      A.  I don't see my approval on that page.
9      Q.  Do you see an approval on that exhibit?
10     A.  Pardon?
11     Q.  Do you see an approval on that exhibit?
12     A.  I see a statement that says, if this is
13  included in the 12.35 M for 2003, then proceed.
14  That is not an approval.
15     Q.  And did the study go forward?
16     A.  To the best of my knowledge, the study
17  went forward because it was a regulatory
18  requirement, and we do studies that are regulatory
19  requirements.
20     Q.  And that language you just read was signed
21  by John for John Parker, correct?
22     A.  It says -- it says if this is included in
23  the 12.3 million, which is the -- was the budgeted
24  spend, then please proceed. That's not an
25  approval. That's just a -- that for me is just

Page 63

1  awareness and consultation.
2      Q.  Okay. So telling somebody to proceed with
3  it is just showing your awareness, right?
4          Is that what you're testifying to here?
5      A.  No. What I said was that if this is
6  included, it says conditional. If this is
7  included, then please proceed.
8      Q.  Okay. So if -- what does that mean to you,
9  if it's not included, come back to me?
10     A.  If it's not included, don't -- don't do
11  it.
12     Q.  Okay. All right. Now let's look at
13  Exhibit 5.
14         (Plaintiff's Exhibit 5: An e-mail string
15         with the top from Summao Chen dated 8/4/03,
16         Bates SYN01178402 marked for identification,
17         as of this date.)
18     Q.  This is a August 4, 2003 e-mail exchange,
19  Syngenta 1178402.
20     A.  I've read the document.
21     Q.  Do you remember this document?
22     A.  No, I don't recall this one.
23     Q.  Here we have an e-mail to you and to --
24  actually just to you requesting funding approval for
25  the community water system water survey per the

Page 64

1  memorandum of agreement mandate, correct?
2      A.  I read that, yes. That's what I
3  understand it to be.
4      Q.  E-mail to you is we need an approval to
5  initiate the water survey activities per atrazine
6  memorandum of agreement mandate for EPA submission by
7  February 2004.
8      A.  Yes, that's what it says.
9      Q.  And yes, this one is accounted for under
10  the 2003 budget cap, correct?
11     A.  That's what it says.
12     Q.  And then the last line is, please forward
13  to John Parker for approval if you agree, correct?
14     A.  That's what the document says.
15     Q.  Okay. And that's the same John Parker we've
16  been talking about, right?
17     A.  I believe so.
18     Q.  Okay. So they submitted it to you first,
19  correct?
20     A.  Yes, they sent it to me.
21     Q.  And then you sent your approval. This is
22  approved, I've copied John for his concurrence, and
23  that's John Parker, right?
24     A.  Sure.
25     Q.  And then John Parker approves it in the

Page 65

1  next e-mail, fine by me, correct?
2      A.  No, that's not the way I understand this
3  document.
4      Q.  Okay. So the words fine by me mean
5  something other than go forward?
6      A.  This document says -- my response is this
7  is approved, stop. I've copied John for his
8  concurrence. All I was doing was informing John
9  Parker that these funds had been disbursed. I did
10  not ask John Parker for his approval.
11     Q.  And his -- the word concurrence is the same
12  as informing him? That's what you think? That's
13  what concurrence means?
14         MR. SURPRENANT: Object to the form.
15     A.  In this context, the intent was to inform
16  him. I had clearly approved the expense.
17     Q.  Okay. And then it was only after Mr. Parker
18  responded with fine by me that the PO request was
19  sent to Katherine Dixon, wasn't it?
20     A.  I don't know what the timing of the
21  events were.
22     Q.  Well, let me refresh your recollection.
23  The timing was you sent an e-mail on August 1st, 2001
24  copying Peter Hertl and John Parker giving your
25  approval. Do you see that?

17 (Pages 62 to 65)

Exhibit 008 Page 17
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 66

1    A.  No, I don't.
2    Q.  Okay.
3    A.  I see a date August 1, 2003.
4    Q.  Yes, August 1, 2003.  You see that date?
5         And you say, this is approved, I've copied
6  John for his occurrence -- concurrence.
7         Do you see that?
8    A.  That's what it says.
9    Q.  Okay.  And then Mr. Parker didn't respond
10  for three more days, correct?
11        You see that?
12   A.  Yes.
13   Q.  Okay.  So on August 4th he sent his response
14  regarding funding approval, fine by me, and then five
15  hours later the person who had requested this, Mr.
16  Chen, sent along with he -- Mr. Parker's response
17  e-mail, sent it to Katherine Dixon for the purchase
18  order, correct?
19   A.  That's what the document says.  This is
20  what the document means.  I approved the study and
21  the study proceeded.  I informed John Parker and it
22  -- and he did not dispute it.
23   Q.  Actually, the study did not proceed until
24  he approved it?  Isn't that really the truth sir?
25   A.  No, that's not the case at all.

Page 67

1    Q.  And the study did not go forward until Mr.
2  Parker responded?
3    A.  That's not the case. The intent was for
4  the study to be sanctioned for implementation upon
5  my approval.
6    Q.  I want you to give me an example in any of
7  these, tell me right now if any one that you approved
8  that you can remember without it getting authority
9  from Mr. Parker, tell me one of them.
10   A.  I didn't -- didn't obtain authority from
11  Mr. Parker on any of these.
12   Q.  Okay. So none of these, all these e-mail
13  exchanges where he approves, involved an approval to
14  Mr. Parker, right?
15   A.  What I said was this is approved, this
16  document that you referred to says this is
17  approved, I've copied John for his concurrence.
18  That's what the document says.
19        (Plaintiff's Exhibit 6: An e-mail string
20        with the top from Dirk Drost dated 10/20/03,
21        Bates SYN01998108 - 110 marked for
22        identification, as of this date.)
23   Q.  Let's look at Exhibit 6.  This is a
24  Syngenta 998108 through 998110 e-mail exchange in
25  October of 2003.  And this e-mail exchange, you

Page 68

1  should look at it, involves the atrazine monitoring
2  program development and support work of both a budget
3  overrun and atrazine ecological monitoring program
4  site selection, atrazine water shed exposure and a
5  different study.
6    A.  I'd like to take a moment to read the
7  document.
8    Q.  Absolutely.
9         Do you remember this document?
10   A.  No.
11   Q.  Is this the sort of thing you would have
12  been requested in 2003 to approve?
13   A.  I don't recall this particular document.
14  And I can't speculate as to this is -- whether this
15  is the sort of thing or not that I would ask for in
16  2003.  I simply don't remember.
17   Q.  You don't deny that you received these
18  e-mails, right?
19   A.  I -- according to the e-mail, I received
20  it.  I do not recall the document.
21   Q.  Okay.  All right.  The first e-mail that it
22  shows that you received was to you and Mr. Parker
23  copying a number of other people on the e-mail,
24  including Katherine Dixon, Peter Hertl, Dennis
25  Hackett and Bruce Thede.

Page 69

1    A.  Okay.
2    Q.  Okay.  And that e-mail occurred on
3  October 13th, 2003.  And in that particular e-mail an
4  individual named Paul Hendley is a Syngenta fellow
5  environmental risk assessment at Syngenta Crop
6  Protection, Inc.
7         Do you know who he is?
8    A.  Yes, I know Mr. -- Dr. Paul Hendley.
9    Q.  Okay.  And he was in his e-mail saying,
10  quote, I need approval for the following programs
11  that have come to the forefront as a result of our
12  efforts last week to consolidate the budget position
13  and 2003 spend, and then he cites a number of
14  different studies involving atrazine monitoring
15  program and atrazine watershed exposure, atrazine
16  ecological monitoring program.  And he says that to
17  Mr. John Parker and Dirk Drost.  So he says to John
18  and Dirk, doesn't he?
19   A.  It is addressed to John and I, yes.
20   Q.  And seeking approval?
21   A.  He's seeking my approval, yes.
22   Q.  Oh, he's not also seeking Mr. Parker's
23  approval?
24   A.  It's addressed to both of us.
25   Q.  Okay.  And he says I need approval.  And

18 (Pages 66 to 69)

**Exhibit 008 Page 18**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 70

1  then the first e-mail back is from Mr. Parker,
2  correct?
3      A.  That's what -- that's what it looks like.
4      Q.  And it says dear all, sorry for delay.  He
5  doesn't respond for four days, correct?
6      A.  That's correct, four days.
7      Q.  And he says, sorry for delay, following
8  discussions with Dennis, et al., please take this
9  note as approval to proceed, John, correct?
10     A.  That's what it says.
11     Q.  So would you agree that he gave his
12 approval to proceed, sir?
13     A.  He did.  And so did I.
14     Q.  Okay. And John Parker is a person listed at
15 crop protection development business manager Syngenta
16 CTL, Alderley Park, Chesire, United Kingdom, correct?
17        See below his name?
18     A.  Yeah, that's -- you had asked earlier
19 where he was based, apparently that's where he was
20 based.
21     Q.  Okay. And is that part of -- strike that.
22        Do you know which Syngenta subsidiary that
23 is?
24     A.  No.
25     Q.  All right.  Is Mr. Parker a person you

Page 71

1  communicated with by e-mail frequently?
2      A.  I communicated with Mr. Parker by e-mail
3  and by telephone.
4      Q.  And how often did you communicate with him?
5      A.  I don't recall.
6      Q.  Is he still with the company?
7      A.  I previously stated he is no longer with
8  the company.
9      Q.  When did he leave the company?
10     A.  I don't remember.
11     Q.  Has it been in the last two years?
12     A.  I don't remember the exact timing of his
13 departure.  It's been recently.  But I don't
14 remember how recently.
15     Q.  Up until the time he left, how frequently
16 did you communicate with Mr. Parker?
17     A.  I worked with John Parker as a partner
18 and we worked together.  We worked on issues of --
19 that we had a mutual interest in.
20     Q.  And what were the issues that you partnered
21 with him on?
22     A.  On the -- I worked with him on approval
23 for studies.
24     Q.  And how did you work with Mr. Parker for
25 approval on studies?

Page 72

1      A.  He looked to me for -- for approval from
2  Syngenta Crop Protection, Inc.
3      Q.  And what was your communication with him in
4  terms of which studies?
5      A.  I don't recall the communication.  This
6  document is an example.  But he responded before I
7  did, often with e-mail, the delayed -- the response
8  and delays, things are not coordinated.  He
9  responded on this one first.  I agreed with his
10 response.  The studies were approved and they went
11 forward.
12     Q.  Yeah, I'm asking you the types of things
13 you partnered with him on.  What were the other
14 projects you worked with Mr. Parker on?
15     A.  I don't remember all of the projects that
16 I worked with Mr. Parker on.
17     Q.  How many?  How many?
18     A.  I don't remember how many.  There's a few
19 of examples are here that in addition to atrazine,
20 there's a project called the abamectin exposure
21 project, the Valencia study, among other studies.
22 That's what the document says.
23     Q.  Would it be fair to say you were working
24 with him at -- with some ongoing study up until the
25 time he left?

Page 73

1      A.  I don't recall whether that happened or
2  not.
3      Q.  And would it be fair to say that you
4  consulted him frequently?
5      A.  No, it wouldn't be accurate to say that.
6        (Plaintiff's Exhibit 7: An e-mail string
7        with the top from John Parker dated 12/7/03,
8        Bates SYN02590706 - 707 marked for
9        identification, as of this date.)
10     Q.  Take a look at Number 7, sir.
11        And this is Syngenta 2590706 and 0707,
12 another e-mail exchange.  This one occurring in
13 December 2003.
14        Do you remember this one?
15     A.  No.
16     Q.  This one appears to be from a person by the
17 name of Warner Phelps at Syngenta Crop Protection,
18 Inc. asking for permission to proceed with a atrazine
19 trend analysis incorporating 2001 and 2002 data at
20 EPA's request, total cost of $45,000, asking both you
21 and first Mr. Parker for approval; is that correct?
22     A.  The document is addressed to John Parker
23 and to I.
24     Q.  And you responded that day that a -- with
25 -- with a simple okay, right?

19 (Pages 70 to 73)

Exhibit 008 Page 19
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 74

1     A.  That was an approval.
2     Q.  Okay. Is an okay approval?
3     A.  In this case okay --
4     Q.  If you said -- if you said proceed, would
5  that be an approval?
6     A.  If I said proceed, that would signify my
7  approval.
8     Q.  Okay. Now, the next -- or first page is
9  from John Parker.  He's saying to Warner please go
10  ahead.  Is that an approval?
11     A.  I don't know what John's intent was.
12     Q.  Okay. So when he says please go ahead, you
13  don't know what that means, that could be turning it
14  down maybe or -- explain that to me.
15        MR. SURPRENANT:  Object to the form.
16     A.  I do not know how to interpret John
17  Parker's words.
18     Q.  Okay.
19     A.  I didn't write them.
20     Q.  And then he asked for clarification from
21  Mr. -- Mr. Hackett, and Mr. Hackett gives him
22  clarification.  And then John Parker responds saying
23  thanks for the clarification.  Anything that we can
24  legitimately put to 2003 and get up to two up to 11.7
25  would be of help since we will come in under budget,

Page 75

1  John, correct?
2     A.  That's what it says.
3     Q.  What budget is he talking about?
4     A.  I think my -- my -- I recall that he --
5  they were talking about a development -- the
6  development budget.
7     Q.  Which development budget?
8     A.  The crop protection -- Syngenta Crop
9  Protection, Inc. development budget.  And I
10  approved this expenditure on behalf of Syngenta
11  Crop Protection, Inc.
12        MR. TILLERY:  Yeah, I move to strike that
13     as unresponsive.  There was no question on the
14     table.
15     Q.  My question to you was which development
16  budget.  So I move it to strike it as unresponsive.
17        Now let's move to the next one, which is
18  Number 8.
19        (Plaintiff's Exhibit 8 An e-mail document
20     from Bruce Thede dated 3/29/04, Bates
21     SYN00905507 marked for identification, as of
22     this date.)
23     Q.  Got a couple extras here too.
24        This is Syngenta 905507.  It's an e-mail
25  exchange March 29th, 2004.

Page 76

1        Do you see this?
2     A.  Yes, I'm reading it.  I've read it.
3     Q.  Bruce, T-H-E-D-E, how do you pronounce
4  that, sir?
5     A.  I pronounce it Thede.
6     Q.  Thede.
7        He asks -- strike that.
8        Mr. Thede sends this to Hans Weber at Basel
9  and you.  Who was Hans Weber?
10     A.  Hans -- Hans Weber was my -- had a role
11  similar to mine in Basel at that time.  I was the
12  -- I'm the NAFTA -- or portfolio and project leader
13  and Mr. Weber had a role similar in Europe for
14  Europe based in Basel.
15     Q.  And his role was limited to Europe?
16     A.  His responsibilities were for the Europe
17  business and mine were for the NAFTA business, yes.
18     Q.  Okay. Can you tell me what's being
19  requested in this e-mail exchange?
20     A.  Yes, this is just requesting the creation
21  of a task, a specific task in the -- in the
22  portfolio project management system.
23     Q.  And the task is an atrazine amphibian
24  laboratory study, correct?
25     A.  That's what the document says.

Page 77

1     Q.  And it's to be conducted at Jealott's Hill
2  aquatic tox facility.
3        What was that?
4     A.  It's a laboratory facility.
5     Q.  Where?
6     A.  That laboratory facility was at -- was a
7  at Jealott's Hill.
8     Q.  Did Syngenta Crop Protection, Inc. have a
9  similar laboratory facility at that time?
10     A.  I don't know.
11     Q.  Did you ever see one?
12     A.  I'm not -- I don't know.
13     Q.  And he's suggesting that since the task
14  crosses several lines serving a NAFTA need but
15  conducted in European facility, he'll leave it to you
16  and Mr. Weber to decide who is the appropriate
17  individual to create the task?
18     A.  That's what the document implies.
19     Q.  And what did you end up doing?
20     A.  I don't remember.
21        MR. TILLERY:  Our videographer tells us
22     that he has to change tapes.  So we have to
23     take a break right now.
24        THE VIDEOGRAPHER:  Stand by.
25        This marks the end of videotape number

20 (Pages 74 to 77)

Exhibit 008 Page 20
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 78

1    one, volume one in the deposition of Dirk
2    Drost. Going off the record. The time is
3    11:29 and 39 seconds.
4        (A BRIEF RECESS WAS TAKEN.)
5        THE VIDEOGRAPHER: This marks the
6    beginning of videotape number two, volume one
7    in the deposition of Dirk Drost. The time is
8    11:40 and 26 seconds.
9        Please continue.
10       (Plaintiff's Exhibit 9: An e-mail
11   document from Merrill Tisdel dated 6/16/04,
12   Bates SYN01022688 marked for identification,
13   as of this date.)
14   Q.   If you'd look at Exhibit Number 9, please.
15       Do you remember this exchange?
16   A.   No, I don't remember this document. But
17   I did read it.
18   Q.   Okay. And you're listed after Mr. Parker as
19   one of the recipients of the e-mail exchange, right?
20   A.   Yes, I am listed as a recipient.
21   Q.   And Merrill Tisdel's an employee of
22   Syngenta Crop Protection, Inc.?
23   A.   Merrill Tisdel is an employee based in
24   Greensboro.
25   Q.   And seeking approval for acute studies?

Page 79

1    A.   Yeah, that's what it says.
2    Q.   All right. And the first line I want to
3    ask you a question or two about says, when I
4    requested task numbers to contract some acute studies
5    to satisfy the latest DCI for atrazine, I was made
6    aware of the 70 percent rule.
7        First of all, DCI for atrazine, what does
8    that stand for?
9    A.   DCI is an abbreviation that has been used
10   for data call in.
11   Q.   Okay. And the 70 percent rule?
12   A.   I'm not familiar with the 70 percent
13   rule.
14   Q.   If you read the next sentence, it says,
15   apparently we have passed 70 percent of the H-A-E-S
16   approved budget for 2004, and now all contracted
17   studies must be approved by you, John and Dirk,
18   correct?
19   A.   That's what the document -- that's what
20   the paragraph says.
21   Q.   And do you remember this occurring in 2004?
22   A.   In 2004 I recall that we -- we were under
23   a budget constraints and we put some triggers into
24   the -- to the -- to -- as we always do to monitor
25   how far we've proceeded so we don't go over -- over

Page 80

1    or under spend. And they must have decided
2    70 percent was the trigger.
3    Q.   Okay. And at the end of this it said --
4    strike that.
5        You said they must have decided 70 percent
6    was the trigger. Who must have decided?
7    A.   I don't know. It doesn't -- doesn't
8    refer to where -- where or who.
9    Q.   Okay.
10   A.   It alleges there was a 70 percent rule,
11   so. It doesn't say what the rule is or who
12   established it.
13   Q.   Did this approval occur for this study?
14   A.   This was a group of studies, apparently,
15   Q tox studies. I don't -- don't recall this
16   particular -- this particular instance and so I
17   can't answer your question.
18   Q.   And look at the last question, the last
19   line, do I need to get specific approval for every
20   acute study I contract for these approved projects?
21       What did you answer?
22   A.   I don't remember what I answered in this
23   particular case.
24   Q.   Okay. Do you know who made the decision
25   for Mr. Tisdel?

Page 81

1        MR. SURPRENANT: Object to the form.
2    A.   No.
3        (Plaintiff's Exhibit 10: An e-mail string
4    with the top from John Parker dated 10/5/04,
5    Bates SYN00818952 marked for identification,
6    as of this date.)
7    Q.   Okay. And now if you'd look at Exhibit
8    Number 10, which is Syngenta 18952.
9        This is an October 2004 e-mail from Mr.
10   Viji Gowda?
11   A.   Yeah, I'm reading it. I read it.
12   Q.   Okay. And he says on behalf of Alan Hosmer,
13   he writes to you and Mr. John Parker, and it says, as
14   part of the ongoing work, we need to establish PO for
15   the amphibian work in support of atrazine, and gives
16   the study number. The cost associated with the study
17   is $17,000. With this e-mail I kindly ask for formal
18   approval for this study.
19       Is that what it says?
20   A.   The document that's -- that's what the
21   document says.
22   Q.   All right. Do you remember this document?
23   A.   No, I don't.
24   Q.   All right. How many of these would you say
25   you get in a year?

21 (Pages 78 to 81)

Exhibit 008 Page 21
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 82

1     A.  I don't --
2         MR. SURPRENANT:  Object to the form.
3     A.  I don't remember this document.  And I
4  don't remember how many I would have received.
5     Q.  Would you receive one of these a day?
6     A.  I don't know.
7     Q.  You have no way of estimating how many you
8  would get?
9     A.  No, I have no way of estimating.
10    Q.  How many did you get last week?
11    A.  I don't know.
12    Q.  How many did you get yesterday?
13    A.  None.
14    Q.  Okay.  How many did you get on Monday?
15    A.  I don't remember.
16    Q.  Okay.  So Mr. Parker responds and says,
17  please go ahead and add to committed dollars, doesn't
18  he?
19    A.  That's what the document says.
20    Q.  Was that an approval?
21    A.  I don't know what his intent was.
22    Q.  Okay.  E-mail exchange doesn't include an
23  approval from you, does it?
24        MR. SURPRENANT:  Object to the form.
25    A.  There's no part of this document that

Page 83

1  includes an approval from me.
2     Q.  And do you remember whether this study went
3  forward?
4     A.  No, I don't remember the specific study.
5     Q.  Okay.
6         (Plaintiff's Exhibit 11: An e-mail string
7      with the top from Alan Hosmer dated 10/22/04,
8      Bates SYN00926826 - 827 marked for
9      identification, as of this date.)
10        (Plaintiff's Exhibit 12: An e-mail string
11     with the top from John Parker dated 10/21/04,
12     Bates SYN00842873 - 874 marked for
13     identification, as of this date.)
14    Q.  I'm going to give two exhibits at the same
15  time, sir.  Exhibits 11 and 12.  Ask you to look at
16  those.
17        11 is Syngenta 842873, 874.  And 12 is
18  Syngenta 926826, 827.
19        MR. SURPRENANT:  I think they may have
20     been marked the opposite, Steve.
21        MR. TILLERY:  I'm sorry?
22        MR. SURPRENANT:  I think they have been
23     marked the opposite.
24        MR. TILLERY:  I'm sorry.  I have 11 at --
25     11 is 84273.

Page 84

1         MR. SURPRENANT:  They're marked the
2  opposite.
3         MR. TILLERY:  Okay.  That's fine.
4         MR. SURPRENANT:  You want to just change
5  them?
6         MR. TILLERY:  Yeah, I'll correct it on the
7  record.
8         MR. SURPRENANT:  Okay.  That's fine.
9         MR. TILLERY:  So 11 is 926826, 827.  And
10  12 is 842873, 874.
11        MR. SURPRENANT:  Correct.
12    Q.  Take a look at those two, please.
13        These are e-mails that occurred in
14  October 2004, which included you as addressee, didn't
15  they, sir?  At least in some of them.
16    A.  Yes, I see my name on -- on both of the
17  documents.
18    Q.  Do you remember these?
19    A.  No, I don't.
20    Q.  And if you would look, the first e-mail
21  exchange on October the 21st is seeking approval for
22  particular amphibian studies by Mr. Alan Hosmer.  And
23  he lists himself as manager ecological sciences,
24  NAFTA, correct?
25    A.  That's what he lists his title as.

Page 85

1     Q.  And if you look at who he's sending the
2  e-mail to, he's sending it to you, to David Huggett
3  at GBJH, that's Great Britain Jealott's Hill, isn't
4  it, sir?
5     A.  It makes sense that that would be Great
6  Britain Jealott's Hill if the other one is Great
7  Britain AP.
8     Q.  Alderley Park?
9     A.  Yes, that makes sense.
10    Q.  Okay.  And the person behind him is to the
11  next addressee is johnparker@gbap@alderleypark, Great
12  Britain?
13    A.  Okay.
14    Q.  Okay.  And he's sending it for approval to
15  the three of you.  Do you know who Mr. Huggett is?
16    A.  Yeah, Mr. Huggett worked for -- worked
17  with Mr. Parker.  I don't remember what the working
18  relationship was.  But it was -- he was brought on
19  during that time.
20    Q.  And in the October 22 exchange Mr. Hosmer
21  seeks approval from Peter Campbell at GBJH Jealott's
22  Hill.  Who is Mr. Campbell?  And that's Exhibit
23  Number 11.
24    A.  No, I don't remember who Mr. Campbell
25  was.

22 (Pages 82 to 85)

Exhibit 008 Page 22
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 86

1    Q.  And he asked do you approve spend in 2004?
2  This basically takes us close to earlier estimates
3  before the money was reduced, Alan.
4    A.  Yeah, that's what it says.
5    Q.  And do you know why Mr. Hosmer would be
6  seeking approval for this after he's gone to -- to
7  you?
8    A.  No, I don't.  I don't know what his
9  intent was.
10    Q.  Do you have any Syngenta Crop Protection
11  employees at Jealott's Hill?
12    A.  I don't know what the -- what the
13  reporting relationship is at Jealott's Hill.
14    Q.  No, my question is do you have any Syngenta
15  Crop Protection, Inc. employees working physically at
16  Jealott's Hill?
17    A.  I don't know -- I do not know.
18    Q.  Okay.
19      MR. SURPRENANT:  Just for clarification,
20    talking about the present time or at what
21    point in time?
22    Q.  At this time or anytime, to your knowledge.
23    A.  I don't know.
24      (Plaintiff's Exhibit 13: An e-mail string
25    with the top from Alan Hosmer dated 12/14/04,

Page 87

1    Bates SYN00942173 - 174 marked for
2    identification, as of this date.)
3    Q.  Please look at this e-mail exchange,
4  Syngenta 942173, 174.
5    A.  Okay.  I looked at it.
6    Q.  All right.  And is this a follow-up to the
7  last e-mail exchange we just discussed?
8    A.  I've never seen this document before, and
9  so I don't know what the intent of the document
10  was.
11    Q.  So you're listed as a person who --
12  actually, the first person on the e-mail address.
13  But you say you've never seen e-mail before, right?
14    A.  No, that's not what I said.  We looked at
15  the -- a part of it dated October 20, 2004 in the
16  previous exhibit.  But the subsequent pieces,
17  October 21 and December 14, those two segments on
18  page 2173, I have not seen those segments before.
19    Q.  Did you see the one, though, that was sent
20  to you by Mr. Alan Hosmer dated October 20, 2004?
21      Do you see that?
22    A.  I see it listed here.  I don't -- as I've
23  testified earlier, I don't recall receiving this.
24    Q.  Okay.  In that e-mail he says he's in a
25  better -- finally in a better position to estimate

Page 88

1  costs regarding the atrazine frog work, correct?
2    A.  That's correct.
3    Q.  And he's seeking approval for additional
4  funds?
5    A.  He says he needs to spend more in 2004
6  than anticipated.  That's what it says.
7    Q.  He said I can legitimately spend
8  approximately 510,000 in 2004 for work completed in
9  this year.  The 2005 estimates are incomplete, will
10  they need to be increased to somewhat over the
11  current figures?
12    A.  That's what it says.
13    Q.  Okay.  You don't dispute any of that?
14    A.  I don't.
15    Q.  You don't have an independent different
16  recollection of that, do you?
17      MR. SURPRENANT:  Object to the form.
18    A.  No.  I can only read what's on the
19  document.  And as I testified earlier, I don't
20  recall receiving the document.  But I can read it
21  and that does say the things that you -- you
22  mentioned.
23    Q.  And is it your testimony that you don't
24  have any recollection of any of these exchanges?
25  When you say I don't recall this, you don't have any

Page 89

1  recollection of any of these exchanges, right?
2    A.  That's correct.
3    Q.  Okay.
4    A.  When I say I don't have any recollection,
5  I mean I don't have any recollection.
6    Q.  What I mean is of the entire subject
7  matter.
8      MR. SURPRENANT:  Object to the form.
9    A.  No, no.  What I testified was I didn't
10  recall receiving this specific document and that I
11  hadn't seen the first two parts of the e-mail chain
12  listed on page 942173.  We hadn't looked at those
13  earlier.  So I haven't seen them before.
14    Q.  And the response to Mr. Hosmer on Thursday,
15  October 21st, 2004 from Mr. Huggett was from Basel,
16  wasn't he?  No, I'm sorry, he's at Great Britain
17  Jealott's Hill?
18    A.  Yeah, according to the e-mail, your
19  interpretation of the e-mail address GBJH is Great
20  Britain Jealott's Hill.
21    Q.  I mean, do you dispute that?
22    A.  No.
23    Q.  Okay.  All right.  And he said that he would
24  discuss with John and get back to him.  And that's
25  John Parker, correct?

23 (Pages 86 to 89)

Exhibit 008 Page 23
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 90

1       MR. SURPRENANT:  Object to the form.
2     A.  I don't know.  It says just John.
3       (Plaintiff's Exhibit 14: A Syngenta
4     Guideline document entitled CP PLCM Project
5     Management Handbook Version 1.1 May 2005,
6     Bates GRNVL0000080975 - 1018 marked for
7     identification, as of this date.)
8     Q.  Okay.  Take a look at Exhibit 14, sir, and
9   tell me what it is.
10    A.  I may need to take a few minutes and
11  familiarize myself with this.
12    Q.  Go ahead.  That's fine.
13      If you're going to be a while, we'll go off
14  the record so you can spend some time.
15    A.  I'm nearly finished.
16    Q.  Okay.  Do you know what this document is?
17    A.  The document says CP PLC on project
18  management handbook.
19    Q.  Are you familiar with it?
20    A.  I'm familiar with parts of it.  I haven't
21  seen it in its entirety and haven't reviewed it in
22  a long time.
23    Q.  How long?
24    A.  I don't remember the last time I pulled
25  it out and looked at it.

Page 91

1     Q.  Was it placed in effect?
2     A.  Pardon?
3     Q.  Was it put into effect?
4     A.  The principles include -- the principles
5   of project and portfolio management that I
6   described earlier appear to be included in this
7   document.
8     Q.  Okay.  Do you know whether this guideline
9   was implemented?
10    A.  I do not know whether this guideline was
11  implemented or not.
12    Q.  Okay.  Was it ever given to you to review?
13    A.  I can't remember whether it was given to
14  me to review or not.
15    Q.  For what reason would it have been given to
16  you to review?
17    A.  I can't -- that's -- I couldn't speculate
18  on that.
19    Q.  Okay.  So if you look at the very last page
20  of the document.
21    A.  Okay.
22    Q.  And that's Greenville 81018.
23      Do you see the last page?
24    A.  Yes.
25    Q.  Where it says 3.9. document reviewers, the

Page 92

1   following persons have reviewed the current handbook
2   in spring of 2005, first column, sixth person, is
3   that your name?
4     A.  My name is there.
5     Q.  Okay.  Now, when they sent this to you, did
6   you comment on it?
7     A.  I don't remember.
8     Q.  Okay.  So you just have no recollection of
9   the document that goes to the heart of your
10  day-to-day work?
11    A.  That's not --
12      MR. SURPRENANT:  Object to the form.
13    Q.  Is that right?
14    A.  That's not what I said.
15    Q.  Okay.
16    A.  I said I don't remember receiving the
17  document, being asked to review it or -- or any
18  comments that I might have provided.
19    Q.  What does this document involve?  Tell me
20  in an overview.
21    A.  I didn't read it carefully.  I scanned
22  it.  What it includes, the principles of project
23  and portfolio management that I described to you
24  briefly earlier.
25    Q.  And this is a control document for project

Page 93

1   and portfolio management for the entire Syngenta
2   group of companies, isn't it?
3     A.  No, that's not what I said.
4     Q.  Okay.  But isn't it just that?  For Crop
5   Protection.
6     A.  I don't know.
7     Q.  Okay.  Look on the first page of the
8   document.
9     A.  Okay.
10    Q.  When it says CP, do you know what CP stands
11  for?
12    A.  I assume it means Crop Protection.
13    Q.  Okay.  When they gave you this to review in
14  2005, was there any question in your mind that it
15  involved the product lifecycle management project
16  management for Crop Protection?
17    A.  I don't remember.
18    Q.  Okay.  And the Syngenta on the top of the
19  page, do you know what that reference is?
20    A.  That's the logo that's used for the
21  Syngenta companies.
22    Q.  Which Syngenta companies?
23    A.  I don't know.
24    Q.  All of them?
25    A.  I don't know.

24  (Pages 90 to 93)

Exhibit 008 Page 24
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 94

1    Q.   Okay. Did you follow this guideline as part
2  of your day-to-day work?
3     A.   The principles outlined in the document
4  of project and portfolio management are -- are
5  utilized in my work.
6    Q.   Okay.  Is -- take a look at this -- at the
7  table of contents and tell me, it's -- consists of
8  two pages, and tell me if you're aware of any changes
9  in this document?
10    In other words, are you aware of anything
11  having changed in terms of how the product likes --
12  lifecycle management works?
13    MR. SURPRENANT:  Changed from what point
14  in time.
15    A.   This document was.
16    MR. TILLERY:  This document was issued in
17  May of 2005.
18    MR. SURPRENANT:  Up until the present?
19    MR. TILLERY:  Right, up until the
20  present.
21    MR. SURPRENANT:  Okay.
22    Q.   In other words, I want to know is there a
23  different document?
24    A.   So could you restate your question.  I
25  think I heard two questions and I'm confused about

Page 95

1  which one I need to respond to.
2     Q.   I'm asking you is this current and in
3  effect in terms of an outline of a current product
4  lifecycle management project management handbook?
5     A.   I do not know if this is current.  And I
6  previously stated that I do not know if it is in
7  effect.
8     Q.   Can you tell me then by looking at the
9  table of contents and referencing any part of the
10  guideline if it is inconsistent with the way you do
11  your job today?
12    A.   Pardon me, but while I was reviewing the
13  document, I -- you know, I may have -- I forgot the
14  essence of the question again.  So I apologize for
15  asking you to repeat it.
16    Q.   Does this -- strike this.
17    Is this document consistent as a procedural
18  guideline with the way in which you do your job at
19  Syngenta Crop Protection, Inc.?
20    A.   No, the document was -- is a -- fixed in
21  time, and some of the names, the names and the
22  acronyms have changed --
23    Q.   Okay.
24    A.   -- subsequent to this time.
25    Q.   Okay. Other than changing names, does the

Page 96

1  procedure which is discussed in the document apply
2  today?
3     A.   I can't answer that question.  I have not
4  had the opportunity to read the entire document.
5     Q.   Well, let's do it part by part then.
6    Let's look at page 7/44, which is Syngenta
7  80981 under roles and responsibilities.
8     A.   Okay.
9     Q.   Okay. Do you see that?
10    A.   Yes.
11    Q.   Take a look at that and tell me in -- under
12  2.1 if that's still in effect?
13    A.   The regulatory science committee doesn't
14  exist.
15    Q.   Okay. Is there a replacement for it?
16    A.   I don't -- don't know.
17    Q.   Any other changes?
18    A.   The project and portfolio team, that
19  nomenclature is different now.
20    Q.   What is it now?
21    A.   I believe -- I think we call it now
22  multifunctional team.
23    Q.   Okay. What else?
24    A.   Professional products business unit is --
25  is different, the nomenclature is different.

Page 97

1    Q.   Okay. What is it today?
2     A.   Lawn and garden business.
3     Q.   Okay.
4     A.   Those are some differences that I note
5  under that 2.1.
6     Q.   Well, let's go to the next one, 2.2, rules
7  -- or roles governing bodies in product lifecycle
8  management.
9    Do you see that?
10    A.   I do.
11    Q.   The first one is SEC.
12    Who's the SEC?
13    A.   It's the Syngenta executive committee.
14    Q.   And who's on the Syngenta executive
15  committee?
16    A.   I don't know.
17    Q.   Okay. And what's the next one which decides
18  on the release to first sales in stage D promotion?
19    What's the CPLT and PPLT?
20    A.   CPLT is Crop Protection Leadership Team.
21  PLT, I'm -- I'm not familiar with that
22  abbreviation.
23    Q.   And is the purpose governance role still
24  the same?
25    A.   I don't know.

25 (Pages 94 to 97)

Exhibit 008 Page 25
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 98

1    Q.  So you don't have any current knowledge as
2  to who has that function below the Syngenta executive
3  committee?
4    A.  In our current practice, my regional --
5  the regional development committee releases a
6  product to first sales and does a stage C promotion
7  and a release to first sales.  That is the -- that
8  is the way we are operating currently.
9    Q.  And that's the -- you said the -- strike
10  that.
11      With which entity is the Syngenta executive
12  committee associated?
13    A.  I do not know.
14    Q.  If you look at that 2.2 roles governing
15  bodies in product lifecycle management.
16    A.  Yeah, I see it.
17    Q.  It has regional management team RMT.  Do
18  you see that?
19    A.  I do.
20    Q.  Okay. And that's decides on stage C,
21  release to first sales and stage D promotion of
22  regional new formulation projects.
23    A.  That's what it says.
24    Q.  Okay. Is that the case today?
25    A.  It is.

Page 99

1    Q.  That's when the regional management team
2  becomes involved?
3    A.  That's when the NAFTA regional
4  development committee, yes, is involved.  The RMT,
5  that's -- that acronym I am not familiar with.  But
6  the regional development committee does decide on
7  stage C on the release to first sales and the
8  promotion of projects and makes the final decision
9  for the NAFTA region.  And I am -- I am the leader
10  of that and it -- in the Syngenta Crop Protection,
11  Inc.
12    Q.  And that's the regional development
13  committee for stage C and D promotion?
14    A.  That is -- that is how our current
15  practice is.
16    Q.  All right.  And let's go to the second box.
17      Who would you substitute for body or team
18  in that box?  It says CPLT, PPLT.
19      Do you see it?
20    A.  I do.
21    Q.  Okay. Is that accurate today?
22    A.  No, I've -- I said I didn't think it was.
23    Q.  But you don't know who has that
24  responsibility?
25    A.  I believe that the -- the global

Page 100

1  development committee has that responsibility --
2    Q.  Okay.
3    A.  -- for other areas of the -- of the
4  organization.
5    Q.  And where is the global development
6  committee situated?
7    A.  The members of the global development
8  committee are based in some -- in -- some are in
9  Basel.
10    Q.  Do you know who's on the global development
11  committee?
12    A.  No, I don't know all of the individuals.
13  I only know -- remember a few -- few of the
14  individuals.
15    Q.  Let's go to the next page.
16    A.  Okay.
17    Q.  And under purpose governance role, it lists
18  a number of items alongside the development
19  committee.  Is that still accurate today?
20    A.  Yes, as a regional development committee
21  we do provide technical regulatory approval, we
22  provide guidance and advice to project teams and --
23  and we prioritize our resources.
24    Q.  Do you know what DeCo means in this list?
25      Do you know how the -- do you know what the

Page 101

1  guideline provides?
2      Do you think that's referencing regional
3  development committee?
4    A.  I'm sorry?
5    Q.  Do you -- look at the box where it says
6  capital D-E, capital C-O.
7      Do you see that?
8    A.  I do.
9    Q.  What's that stand for?
10    A.  That could be the global DeCo and it
11  could be the regional DeCo.
12    Q.  Okay. Do you know for purposes of this
13  document what it references?
14    A.  No, I don't.  I'd have to look at the
15  reference page.
16    Q.  Okay. Well, look at the box alongside it
17  where it says prioritizes global development
18  resources.  Does that help you answer my question?
19    A.  Not necessarily.  I think it would be
20  easier to find a list of the acronyms.
21    Q.  But when you're saying -- when you look --
22  strike that.
23      When you look at a governance role,
24  including prioritizing global development resources,
25  that certainly falls under the jurisdiction of the

26  (Pages 98 to 101)

**Exhibit 008 Page 26**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 102

1  global development committee, doesn't it, sir?
2     A.  I couldn't answer that.  That would be
3  speculation.
4     Q.  Does a regional development committee
5  prioritize global development resources?
6     A.  I prioritize -- in my current role I
7  prioritize development resources which are by
8  global to implement our projects in the region.
9     Q.  Yes.
10       Can you answer my question?
11       Does regional development committee
12  prioritize global development resources?
13    A.  Yes.
14    Q.  Okay. For all of the Syngenta subsidiaries?
15    A.  I can't answer it for all of the Syngenta
16  subsidiaries.  I can answer for Syngenta Crop
17  Protection, Inc.
18    Q.  What is the next body team RSC?
19    A.  That acronym is no longer used and so I
20  can't comment on what it is.  It's not in my
21  current lexicon.
22    Q.  So you don't know what was referenced
23  there?
24    A.  RSC, as I said, I don't remember.  It's
25  not something we use today.

Page 103

1     Q.  Well, who would have the responsibility,
2  the governance role that provides technical
3  regulatory support for PPT and DeCo decisions,
4  provide stewardship review on technical and ethical
5  grounds?
6     A.  The current organizational structure that
7  we have, those would be some roles that would be
8  provided by what we call product safety.
9     Q.  What product safety?
10       What product safety team?
11    A.  The global product safety organization
12  would provide some of those services.  Or the
13  regional product safety organization.
14    Q.  Who heads up the global product safety
15  group?
16    A.  Peter Hertl.
17    Q.  Who employs him?
18    A.  I don't know.
19    Q.  Where is he located?
20    A.  I don't know where his -- where he's
21  located today.
22    Q.  Okay.
23       MR. TILLERY:  It's about 12:30.
24       MR. SURPRENANT:  Whenever you want to
25  break is fine.

Page 104

1        MR. TILLERY:  This might be a good time
2  to break.
3        MR. SURPRENANT: Okay.
4        THE VIDEOGRAPHER: Stand  by.  Going off
5  the record.  The time is 12:27 and 49 seconds.
6        (A LUNCH RECESS WAS TAKEN.)
7        THE VIDEOGRAPHER: Going on the record,
8  the time is 1:15 and 20 second.
9        Please continue.
10    Q.  Mr. Drost, you co-authored a white paper
11  entitled managing cross regional projects in Syngenta
12  CP with Elvira Molitor, didn't you?
13    A.  I don't remember -- I don't recall that.
14  I know Elvira.  I don't recall the specifics of
15  what you're referring to.
16    Q.  Well, it's -- yeah.
17       (Plaintiff's Exhibit 15: Document
18       entitled Detailed List of 2007 Accomplishments
19       - Supporting Information Dirk C. Drost
20       November 11, 2007, Bates SYN03143576 - 578
21       marked for identification, as of this date.)
22    Q.  This is a document that was given to us by
23  Syngenta in discovery concerning you.
24    A.  Okay.
25    Q.  Okay. And you see at the top it says

Page 105

1  November 11, 2007, about three years ago.
2     A.  Yes.
3     Q.  Okay. This is Syngenta 3143576.
4        Do you see that?
5     A.  Yes, I see that document number.
6     Q.  All right.  Does this information -- strike
7  that.
8        Did you author this document?
9     A.  I'm going to read it.
10    Q.  Okay.
11    A.  Okay. I've reviewed it.
12    Q.  Did you author this?
13    A.  It looks like a summary that was prepared
14  by me for -- as a listing of my 2007
15  accomplishments and preparation for our internal
16  performance management review.
17    Q.  Okay. So the answer is yes, you authored
18  it?
19    A.  Yes, I authored it.  And the purpose of
20  it was for an internal performance review update.
21    Q.  Okay. So look at the very last line of this
22  paper on page three.
23       Read that, would you.
24    A.  It says -- item number seven says I
25  attended the global project portfolio management

27 (Pages 102 to 105)

Exhibit 008 Page 27
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 106

1 conference in Zurich --
2     Q.   The last line, last sentence of that
3 paragraph seven.
4     A.   To get the context, I'd just like to read
5 the whole thing.
6          To influence the 2008 portfolio process,
7 work with our regions, agree and establish --
8          THE COURT REPORTER: I'm sorry, if you
9     could please slow down.
10         MR. SURPRENANT:  Slow down.
11         THE WITNESS:  Oh, I'm sorry.
12    A.   I'm going to start again.
13         To attend the global project and
14 portfolio management conference in Zurich, to
15 influence the 2008 portfolio process, to work with
16 other regions, agree and establish ways of working
17 in the 2020 development organization.
18    Q.   Yeah, and that was all really nice that you
19 read that.  But the next sentence is the one I'm
20 focused on.
21    A.   Right.
22    Q.   How about reading this one out loud too.
23    A.   I'm getting to it.
24    Q.   Okay.
25    A.   I've co-authored with Elvira Molitor a

Page 107

1 white paper managing cross regional projects in
2 Syngenta CP.
3     Q.   Okay. So now do you remember that you
4 co-authored with Elvira Molitor a white paper
5 entitled, Managing Cross Regional Projects In
6 Syngenta CP?
7     A.   No.  I mean, the document says I did
8 that.  But I didn't remember that.
9     Q.   And you don't remember it now?
10    A.   I remember working with Elvira Molitor on
11 a draft document, but that's -- this refreshed my
12 recollection.
13    Q.   Okay. And so you do remember doing it now?
14         You do remember it now?
15    A.   I said yes.
16    Q.   Okay. Tell me who has that document?
17    A.   I don't know -- I don't know where the
18 document is today.  It was a working paper to --
19 and that was discussed during this conference.  And
20 I do not recall the outcome of that discussion.
21    Q.   Where does Elvira Molitor work?
22    A.   Elvira Molitor is a project and portfolio
23 manager, and she happens to be based in Basel.
24    Q.   Okay. And how do you know her?
25    A.   I know all of the project and portfolio

Page 108

1 managers from Syngenta worldwide, including those
2 in Basel.
3     Q.   What is her area of jurisdiction?
4     A.   She handles global insecticide projects.
5 And on my team I have someone who handles
6 insecticide projects that are specific to the NAFTA
7 region.
8     Q.   Does someone in Basel handle global
9 herbicide projects?
10    A.   Yes, there is a project manager that
11 works with herbicide projects in Basel.
12    Q.   Who is that?
13    A.   One person's name that I can recall is
14 Christopher Ball.
15    Q.   Do you work with him too?
16    A.   I correspond with him and talk with him
17 from time to time, yes.  We do have a working
18 relationship.
19    Q.   Do you have a copy of this white paper that
20 you authored -- co-authored with Elvira Molitor?
21    A.   No.
22    Q.   Did you throw it away?
23    A.   No.  I don't recall having a copy of it.
24 Obviously, I didn't -- and my documents were turned
25 over, all relevant documents were turned over.

Page 109

1     Q.   What documents were turned over?
2     A.   The ones that the -- that I was asked to
3 produce in discovery.
4     Q.   And who decided what was relevant?
5     A.   I don't know.
6     Q.   Did you decide what was relevant?
7     A.   No, I gave my office to the council and
8 they took the relevant documents.
9     Q.   And what -- when you say relevant
10 documents, what are you referring to?
11    A.   I don't know.  I've just used the term
12 relevant.
13    Q.   Okay. So they took all of your documents?
14    A.   I don't know which took documents they
15 took and which ones they didn't.
16    Q.   And who is the counsel you turned them over
17 to?
18    A.   The Syngenta -- the Syngenta counsel.
19    Q.   Did they have names?
20    A.   Alan Nadel was one of them.
21    Q.   Okay. Do you know who the other were?
22    A.   I know -- someone who works for Alan.  Or
23 others may have come and done document collection.
24 I don't recall the names of the people.
25    Q.   When did you do that?

28 (Pages 106 to 109)

Exhibit 008 Page 28
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

---

Page 110

1    A.  I don't recall.
2    Q.  Was it this year?
3    A.  I don't recall.
4    Q.  So you don't know when it was at all?
5    A.  I don't remember.
6    Q.  When you're saying these things, are you
7  saying I don't recall because you don't want to
8  testify truthfully in this deposition?
9        MR. SURPRENANT:  Object to the form of
10    the question.
11    A.  No.  I am testifying truthfully in this
12  deposition.
13    Q.  But whenever I ask you something you don't
14  want to tell me, are you saying the words I don't
15  know because you don't want to give me the answer?
16        MR. SURPRENANT:  Object to the form.
17    A.  I'm answering all your questions
18  truthfully and directly.
19    Q.  Have you had any kind of an injury to your
20  head or causing you problems with your memory?
21        Simple question.  You want me to repeat it?
22    A.  No.  It's not necessary to repeat it.
23    Q.  All right.  Have you had a problem causing
24  you any kind of memory loss?
25    A.  No.

---

Page 111

1    Q.  Okay.  Are you on any medication or any --
2  any other type of -- taking any kind of substance
3  that would cause you to have a memory problem?
4    A.  No.
5    Q.  Okay. You think your memory is fine?
6    A.  Yes.
7    Q.  Okay.  Do global projects exclude U.S. and
8  NAFTA projects?
9    A.  U.S. and NAFTA projects are managed by
10  U.S. and NAFTA individuals.  Global projects are
11  managed by global individuals.
12    Q.  So when I say do global projects exclude
13  U.S. and NAFTA, is that a yes?
14    A.  Yes.
15    Q.  Okay.  So your definition of global means
16  global minus U.S. and NAFTA?
17    A.  My definition of global are projects that
18  are multi region, and those are global projects.
19  Global -- and NAFTA projects are projects that are
20  principally related to the business in NAFTA.  This
21  is a -- the designation that I'm using.
22    Q.  Does multi region include NAFTA?
23    A.  In some cases it does and in other cases
24  it doesn't.
25    Q.  Did you ever send your white paper to

---

Page 112

1  anybody besides Mrs. -- Ms. Molitor?
2    A.  I don't recall.
3    Q.  When did you do the white paper?
4    A.  I don't recall the specific time I did
5  it.  I obviously worked on it before I put this
6  document that you've referred to here as
7  Exhibit 15, before I wrote that I must have been --
8  must have worked on the white paper, based on the
9  date.
10    Q.  Did you ever give it as a hand out at a
11  conference or a meeting?
12    A.  Not that I recall.
13        (Plaintiff's Exhibit 16: An e-mail string
14     with the top from Bill Swain dated 3/9/10,
15     Bates GRNVL0000075932 - 936 marked for
16     identification, as of this date.)
17    Q.  I'll hand you what's been marked as
18  Exhibit 16, sir, ask you to take a look at it.
19        MR. TILLERY:  For the record, this is
20     Greenville 75932 through Greenville 75936.
21    Q.  Have you had a chance to look at that
22  document, sir?
23    A.  Yes, I have.
24    Q.  All right.  Can you tell me what it is,
25  just generally?

---

Page 113

1    A.  It appears to be some correspondence
2  related to a request for radio labeled mesotrione
3  and atrazine.
4    Q.  And what is mesotrione?
5    A.  Mesotrione is a broad leaf herbicide also
6  known by the brand name Calisto.
7    Q.  And just so we get the context of this
8  e-mail exchange correct, do you know who Bill Helke
9  is?
10    A.  Yes.
11    Q.  And who is he and where does he work?
12    A.  Bill Helke is -- works in Greensboro and
13  he dispenses radio labeled compound requests.
14    Q.  What's a radio labeled compound request?
15    A.  That's the subject of the document.
16    Q.  Yes, what is it?
17    A.  One -- 14 C -- C 14 labeled test
18  material.
19    Q.  That's what a radio label compound request
20  is?
21    A.  Yes.
22    Q.  Okay. And who is Gordon Vail?
23    A.  Gordon Vail is the technical brand
24  manager for herbicides.
25    Q.  Where is he located?

29 (Pages 110 to 113)

Exhibit 008 Page 29
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.    11-10-2010
Confidential - Pursuant to the Protective Order

Page 114

1     A.  He's based in -- out of -- in Greensboro.
2     Q.  Now, do you see in the very first e-mail it
3  shows at the time that he wrote this he was in West
4  De Moines, Iowa -- West Des Moines, Iowa?
5     A.  I answered your question based on what
6  his current location is.
7     Q.  Okay.  Where was he then?
8        Where was he then?
9     A.  According to the e-mail designation, at
10  the time he wrote the first e-mail he was based in
11  -- out of Des Moines, Iowa.
12     Q.  And for whom did he work?
13     A.  Worked for Syngenta Crop Protection, Inc.
14     Q.  Do you know that personally?
15     A.  Yes, he was -- because I used to be based
16  in De Moines as well.
17     Q.  In the same location?
18     A.  Yes.  So I know that personally.
19     Q.  Okay.  And can you tell me the exchange, if
20  you'd work your way towards the beginning of the
21  document, who in the exchange March 8th, 2010 --
22     A.  Okay.
23     Q.  Do you see that exchange?
24     A.  I'm looking for it.
25        Yes, I see it now.

Page 115

1     Q.  Now, this is just a few months ago, isn't
2  it?  About seven months ago?
3     A.  It says March 8, 2010.
4     Q.  Okay.  And who is Phillipe Costrop in Basel?
5     A.  I don't know what Phil is.  But I do
6  recognize the name.
7     Q.  You don't know what he does?
8     A.  I don't know what his job description is.
9     Q.  And he says, we're in the process of
10  signing an agreement with the University of Illinois
11  regarding work with mesotrione, and that's Mr.
12  Albrect -- Albrect, Michel or Michel, sending that
13  e-mail to Mr. Phillipe Costrop, correct?
14     A.  That's correct, that's what the document
15  says.
16     Q.  And are you aware of that agreement?
17     A.  No.
18     Q.  Have -- do you become involved in any of
19  the agreements, testing such chemicals?
20     A.  I'm not aware of this agreement.  I'm not
21  familiar with it.  I've not seen this document
22  before.
23     Q.  So this is an agreement that was undertaken
24  that didn't include your office at Syngenta Crop
25  Protection, Inc., correct?

Page 116

1     A.  That's correct.
2     Q.  Okay.  And do you know who Mr. Albrect was
3  speaking for at Basel when he said we are in the
4  process of signing that agreement?
5     A.  No, I don't.
6     Q.  Okay.  Mr. Phillipe Costrop responded to
7  Jerry and Bill saying he did not have any issues with
8  the request.  And he sent that e-mail to Bill Swain.
9        Who is that?
10     A.  Bill works in environmental sciences in
11  Greensboro.
12     Q.  Does he work in your department?
13     A.  No, he doesn't work for me.
14     Q.  Okay.
15     A.  He works in development, crop protection
16  development, but he doesn't work in my group.
17     Q.  So this was a mesotrione and atrazine
18  request for study.  Do you know what kind of study it
19  was from looking at this document?
20     A.  It appears to be uptick translocation, a
21  metabolism study, based on the document.
22     Q.  Is it common for the Syngenta companies to
23  use the University of Illinois to conduct similar
24  type studies?
25        MR. SURPRENANT:  Object to the form.

Page 117

1     A.  I can't answer that question.
2     Q.  Have you ever seen any document, other than
3  this one, that describes a relationship of any kind
4  for testing of any kind of product with the
5  University of Illinois?
6     A.  No.
7     Q.  At any time in your career?
8     A.  The answer is no.
9        (Plaintiff's Exhibit 17: A document
10        entitled Syngenta Brands vs. Integrity (BAS
11        78012), Bates GRNVL000076640 - 6662 marked for
12        identification, as of this date.)
13     Q.  Okay.  Now I'll show you what's been marked
14  as Exhibit 17.  Can you tell me what that document
15  is?
16     A.  The title of the document is Syngenta
17  Brands versus Integrity and in parentheses BASF
18  78012.
19     Q.  And have you ever seen it before?
20     A.  No.
21     Q.  Can you by looking at it tell me what it
22  references?
23     A.  I've not seen the document before.  I
24  don't know what the purpose or the context of the
25  document is.

30 (Pages 114 to 117)

Exhibit 008 Page 30
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 118

1    Q.  When studies are undertaken with Syngenta
2  Crop Protection, Inc. involving any kind of molecule
3  with a university or any testing being done in the
4  U.S., tell me how the approval process works at
5  Syngenta Crop Protection, Inc. for the payment of
6  that type of study in a very general sense?
7    A.  The work -- the work is proposed, the
8  number of trials or locations are determined and
9  then the resources if -- if the work is necessary
10  and approved, the resources are allocated and then
11  they're paid out from Syngenta Crop Protection,
12  Inc. to the various test -- testing locations or
13  individuals.
14    Q.  Where in Syngenta Crop Protection, Inc.
15  operational hierarchy does that approval process take
16  place for those types of tests?
17    A.  In this example you've provided, which I
18  haven't seen before, I don't know how the approval
19  process worked.
20    Q.  In the general sense day to day, tell me
21  how it works.
22    A.  Syngenta Crop Protection, Inc. allocates
23  resource for field trials, and the -- then the
24  field trials are implemented by the technical brand
25  manager and paid by our biological R&D group.

Page 119

1    Q.  Is your office involved in that process?
2    A.  Yes.
3    Q.  Is it invariably involved in each one of
4  those tests?
5    A.  Not in each individual instance.  But in
6  the overall allocation of resource for field
7  trials --
8    Q.  Yes.
9    A.  -- in a given year, yes.  But in each
10  individual instance, no.
11    Q.  Well, yeah, I think we may have a
12  miscommunication.  That's because there are people
13  involved on the ground, so to speak, that are working
14  with the studies individually.  But when it comes to
15  overall improvement of the entire testing protocol
16  for that year, it would come through your office?
17    A.  For the entire testing program --
18    Q.  Yes.
19    A.  -- for -- in this case herbicides?
20    Q.  Yes.
21      Would it go through your office?
22    A.  I would be fam - -- I would be familiar
23  with it and with the resources that were allocated
24  towards it, yes.
25    Q.  And the -- and the exchange that took place

Page 120

1  in the preceding exhibit you weren't familiar with,
2  were you?
3    A.  No.  In that -- that specific instance --
4    Q.  You weren't familiar with it?
5    A.  -- I have not seen that document before
6  and I'm not familiar with that --
7    Q.  Okay.
8    A.  -- exchange.
9    Q.  And the one in front of you now, which is
10  Exhibit 17, are you familiar with that?
11    A.  No, again, this is a specific study for a
12  specific trial, and I am not involved with the
13  individual -- with the individual studies.
14    Q.  Do you have any involvement -- strike that.
15      Do you have any knowledge of where field
16  testing has taken place in the United States for any
17  Syngenta product since you started working at
18  Syngenta?
19    A.  It's a very broad question and difficult
20  to respond to.  Could you just try to re -- reframe
21  it for me.
22    Q.  Yes.  What I'm asking is if you have had
23  any experience as part of your employment with
24  Syngenta since 2000 with any field testing locations
25  in the United States?

Page 121

1    A.  Yes.
2    Q.  Okay.  And with which product or products?
3    A.  So I went -- I go on a field tour, and I
4  went on a field tour in eastern North Carolina the
5  year before last, and I looked at some -- some
6  field trials on corn and on soy beans and -- some
7  cotton.
8    Q.  Okay.  Is that the only time you've done it?
9    A.  No, I go on field trials -- I go onto
10  field tours once in a while.  That was an example
11  that I remembered because it was an extremely hot
12  day, and so it's not one I was going to forget.
13    Q.  And how often do you go on field trials?
14    A.  On field tours?
15    Q.  Tours.
16    A.  Okay.  Once in a while I go and look at
17  field trials at the locations that they're being
18  conducted.
19    Q.  Okay.
20    A.  One -- one or two times a year.
21    Q.  And does that include Illinois?
22    A.  I don't recall having seen field trials
23  in Illinois recently in the last two or three
24  years.
25    Q.  Have you been to field trials in Illinois?

31 (Pages 118 to 121)

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 122

1      A.  Not in the last two or three years.
2      Q.  And I don't remember limiting my question
3  to the last two or three years.
4      A.  At some point, yes, I've been in fields
5  in Illinois.
6      Q.  Can you tell me why you just limited my
7  question to two to three years?
8      A.  I didn't limit your question.  I answered
9  it.
10     Q.  No, I need you to tell me why you did that.
11         MR. SURPRENANT:  Object to the form.
12     Q.  You need to tell me.  We need to
13  communicate here in this deposition.  I need to know
14  why you did that.
15     A.  Because that's the way it came out.
16     Q.  Okay.  So I ask you from the time of your
17  employment at Syngenta, you remember?
18         Now, how many times have you been to these
19  field trials in Illinois?
20     A.  I don't remember.
21     Q.  Okay.  Now you don't recall, right?
22     A.  I don't remember how many times.  I
23  remember being at a field trial in Illinois since
24  2000.  I do not remember how many times.
25     Q.  Okay.  Does your department perform project

Page 123

1  and portfolio management for all U.S. field trials?
2      A.  Yes, we resource the program for all U.S.
3  field trials.
4      Q.  And do you have contracts with any person,
5  company, university in Illinois to conduct field
6  trials?
7      A.  I'm not familiar with the -- with the
8  contracts, if any.  My -- my team's responsibility
9  and my personal role is to ensure that the projects
10  are resourced properly, that the -- that the
11  dollars are available to do the work.  But I don't
12  get involved in the implementation of the trials
13  which would include location or other -- other
14  matters related to that.
15     Q.  Who at Syngenta Crop Protection is in
16  charge of that?
17     A.  The head of our biological research and
18  development group is Mike Johnson.
19     Q.  And how long has he had that role?
20     A.  Nearly three years.
21     Q.  Now, if you'd look at this document marked
22  17 and looked at Syngenta 76657.
23         MR. TILLERY:  For the record, this is a
24     document marked Greenville 76640 through
25     Greenville 76662.  And I misspoke calling it

Page 124

1  Syngenta before.  It's Greenville 76657.
2      Q.  Do you see that?
3      A.  Yes, I'm looking at the page marked
4  76657.
5      Q.  All right.  Do you know what was being
6  tested at Lexar at that time?
7      A.  No.
8      Q.  Do you know who was doing that -- who was
9  conducting that testing at the University of Illinois
10  in Urbana?
11     A.  This is the first time I've seen this
12  document and the first time I've seen this page.  I
13  read it, it says location cooperator Urbana,
14  Illinois/D Maxwell.
15     Q.  You don't know what they were testing?
16     A.  No, I don't.
17     Q.  Okay.
18         (Plaintiff's Exhibit 18: An e-mail string
19     with the top from James Allen dated 5/18/05,
20     Bates SYN01869094 - 9095 marked for
21     identification, as of this date.)
22     Q.  This is a document Bates numbered Syngenta
23  869094, 095, and it's an e-mail exchange May 2005.
24         Tell me when you're ready to address some
25  questions.

Page 125

1      A.  I'm ready.
2      Q.  Okay.  The top of the first page says draft
3  promo three, urgent review, review needed draft promo
4  three.  What's that mean; do you know?
5      A.  I'm not familiar with the promo three.
6      Q.  Does any of this information ring a bell
7  with you?
8      A.  I've not seen the document before.  I do
9  recognize 449.
10     Q.  What is 449?
11     A.  It's a -- SYN 449 is a Syngenta
12  experimental herbicide.
13     Q.  Is it on the market yet?
14     A.  No.
15     Q.  What stage is it in?
16     A.  I think it's in -- as I recall, it's not
17  yet been promoted to development.  It's -- it's an
18  early stage compound.
19     Q.  What stage?
20     A.  I don't know what stage the
21  classification is.  It might be stage two right
22  now.
23     Q.  It was a stage 1.4 at the time of this
24  e-mail, wasn't it?
25     A.  Oh, the e-mail says that, yeah.  And that

32 (Pages 122 to 125)

Exhibit 008 Page 32
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 126

1  was five years ago, four years ago.
2      Q.  So what does a stage 1.4 mean?
3      A.  To me it means it's a research compound.
4  And no decisions have been made to -- on the future
5  of the compound.
6      Q.  And who owns the compound rights at that
7  time?
8      A.  I don't know who owns the compound rights
9  at that time.
10     Q.  And where was this compound being
11  developed?
12     A.  The compound wasn't being developed.  The
13  compound was being evaluated.
14     Q.  Right.
15         Where was the molecule developed initially?
16     A.  I don't know.
17     Q.  Do you know where molecules are developed
18  in the Syngenta organization initially?
19     A.  In a chemical lab.  Yes, in a chemistry
20  lab.
21     Q.  Where?
22     A.  It could be at -- it could be at
23  Jealott's Hill in a chemistry lab.  That just
24  happens to be where this discovery lab was at this
25  time.

Page 127

1      Q.  Okay. And do you know who owns that --
2      A.  No, I don't.
3      Q.  -- lab?
4      A.  No.
5      Q.  Do you know who the employees who work at
6  that lab are employed by?
7      A.  No, I don't.
8      Q.  Do you know who owns the intellectual
9  property rights of the compounds when they go to
10  market?
11     A.  No, I don't.
12     Q.  Do you know if Syngenta Crop Protection,
13  Inc. owns any intellectual property rights to any
14  compound?
15     A.  I don't have any knowledge of that.  It's
16  not in my area of responsibility.
17     Q.  So the answer would be you don't know at
18  all?
19     A.  I do not know.
20     Q.  Okay. In the body of that e-mail it refers
21  to of the four soils, the Champaign low PH looks to
22  be the same as we had last year, so it will tie in
23  the data to that earlier study.
24         What does the Champaign low PH mean?
25     A.  I'm not familiar with this document or

Page 128

1  with the work that was involved here.  So I can't
2  answer your question.  I don't know.
3      Q.  Do you know what project LOBO is?
4      A.  No.
5      Q.  Never heard of it?
6      A.  I've heard the term LOBO, but I don't
7  know what it is.
8      Q.  I want to read you a statement and ask you
9  whether you agree with it.
10         The NAFTA development company -- strike
11  that.
12         The NAFTA development committee is fully
13  aligned format process membership responsibilities
14  with the global development committee and other
15  regional development committees.  Members represent
16  the business units, global supply, technology and
17  projects, product safety, regulatory affairs,
18  biological R&D, Canada and Mexico.  The role of the
19  NAFTA development committee relates primarily to
20  product lifecycle management projects.  While the
21  global development committee takes the lead with new
22  active ingredients.  This ensures there is no
23  duplication of extra work.
24         Do you agree with that statement?
25     A.  I'm familiar with that statement.

Page 129

1      Q.  Do you agree with it?
2      A.  I said I was familiar with it.  I'm not
3  sure where you're reading it from.
4      Q.  Well, I'm asking you if you agree with it.
5  Is that an accurate statement?
6      A.  That's an accurate representation of the
7  way I work and the way we work.
8      Q.  Okay.  And I think you told me you've never
9  heard of any meeting or group with an acronym
10  L-O-B-O, correct?
11     A.  I'm familiar with the term, but I'm not
12  familiar with the -- any of the details of it.  I
13  heard you say the term.  I've heard it before.  But
14  I'm not familiar with it.
15     Q.  Do you know who Steve Powells is?
16     A.  Yes.
17     Q.  Who is he?
18     A.  He's a professor at -- in the western
19  Australia, yes.
20     Q.  Is he under contract?
21         MR. SURPRENANT:  Object to the form.
22     A.  I don't know.
23         (Plaintiff's Exhibit 19: An e-mail string
24         with the top from Chuck Foresman dated 2/2/10,
25         Bates GRNVL0000075743 - 746 marked for

33 (Pages 126 to 129)

Exhibit 008 Page 33
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 130

1      identification, as of this date.)
2      Q.  Would you take a look at Exhibit 19,
3  please.
4         While you're looking at that, I will note
5  for the record, this is Greenville 75743 through
6  75746.
7      A.  Okay.  I've read the document.
8      Q.  Who is Brian Manley?
9      A.  Brian Manley works -- works at Syngenta
10 biotechnology in Raleigh/Durham.
11     Q.  What's the name of the entity he works for?
12     A.  I don't know the name of the entity.  I
13 just know it as Syngenta biotechnology, Inc. SBI.
14 We abbreviate it.  I don't know what the entity is.
15     Q.  And can you determine the gist of the
16 request being made here, the communications being
17 made?
18     A.  Yeah, not -- not been involved in this
19 discussion at all, I'm not aware of the details
20 around it.  Any -- so I'm not sure I can be of very
21 much help to you on that.
22     Q.  Okay. Well, let's go to the second page
23 where it says basic stand by statements.
24     A.  All right.
25     Q.  Do you see that?

Page 131

1      A.  Yeah, I do.
2      A.  Okay. I -- this is the best copy we have,
3  and unfortunately my eyes aren't what they used to
4  be.  So if you could go to the second bullet and tell
5  me or read to me, take your time, what you think that
6  says?
7      A.  I'm sorry, but the copy isn't very good.
8      Q.  Okay. Well, go along with me.
9      A.  And my eyes are no better.
10     Q.  Can I -- can we try to do this together,
11 maybe?  Maybe Mr. Surprenant will help us, okay?
12        Syngenta is currently cooperating with the
13 University of Illinois on the investigation of a --
14 do you know the next line?
15     A.  I'm having a hard time with the -- with
16 the -- with the words.
17     Q.  Single reduced --
18     A.  Something.
19     Q.  -- performance report of multiple
20 herbicides on a water hemp population in central
21 Illinois.
22        Do you see that?
23     A.  I see what you're referring to.  It looks
24 like -- it looks like you read it accurately.
25     Q.  Okay.

Page 132

1      A.  But it's hard to tell.  The copy I have
2  is very faded.
3      Q.  Are you aware of any research being done
4  there like that?
5      A.  I'm not familiar with the work that's
6  referred to here and haven't been involved in this
7  correspondence.
8      Q.  Are you aware of any work being done at the
9  University of Illinois?
10        Are you aware -- strike that.
11        Are you aware of any work being done at the
12 University of Illinois at the current time for
13 Syngenta?
14     A.  Other than what you've -- you've shown me
15 in these documents, I'm not aware of any details of
16 work going on at University of Illinois.
17     Q.  The next bullet says, extensive performance
18 testing has begun on seeds collected from a corn
19 field in Illinois and is still in the very early
20 stages.  No further information is available at this
21 time.
22        Do you see that?
23     A.  I do.
24     Q.  Do you know what this references?
25     A.  No, I don't.

Page 133

1      Q.  Go to the next -- or the front page.
2      A.  Okay.
3      Q.  And this e-mail exchange is with Thomas
4  Peryachon.  Do you know who he is?
5      A.  No, I don't.
6      Q.  And he's at Basel.  And he says, I've just
7  spoken to Lionel and he's going to brief Syngenta
8  executive committee members tomorrow on various
9  issues -- I'm sorry, I misspoke.  I have just spoken
10 to Lionel and he is going to brief Syngenta executive
11 committee members tomorrow on various issues in
12 preparation of the annual results meeting.
13        Do you know what he's referencing there?
14     A.  No, I don't.  I've never seen this
15 before.
16     Q.  Who is Lionel?
17     A.  I don't know who Lionel is.
18     Q.  Okay. This project did not involve you or
19 your office?
20     A.  This project did not involve me.  I'm not
21 familiar with it.
22     Q.  Okay. So whatever they were doing at Basel
23 didn't come through your office to where you would
24 have been made aware of it personally?
25     A.  That's correct, I was not involved in

34 (Pages 130 to 133)

Exhibit 008 Page 34
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 134

1  what you've shown me here.
2  Q.  All right.  Thank you.
3  (Plaintiff's Exhibit 20: A document
4  entitled Weed Control Biology - Organization,
5  Bates GRNVL0000071027 - 1029 marked for
6  identification, as of this date.)
7  Q.  I'll hand you what's been marked
8  Exhibit 20.  And I have just a couple of brief
9  questions about this.
10  If you can tell me who Mr. Mark Spinney is
11  listed as group leader, who he is?
12  A.  I know Mark Spinney.  He works in the
13  herbicide biology group.
14  Q.  Where?
15  A.  He's based at Jealott's Hill.
16  Q.  Okay.  So do you know who his employer is?
17  A.  No, I don't.  I just know that he works
18  in herbicide biology group in Jealott's Hill.
19  Q.  Okay.  And -- and if you would look below
20  that, there's an Ian Zelaya under projects.
21  Do you see that?
22  A.  Yes.
23  Q.  Where does he work?
24  A.  Ian is based in Jealott's Hill.
25  Q.  Okay.  What does the herbicide biology group

Page 135

1  do?
2  A.  They screen -- they screen new herbicides
3  for biological performance and crop tolerance.
4  Q.  And these are herbicides that may be sold
5  in the United States eventually?
6  A.  They're research compounds and evaluation
7  compounds that could be sold anywhere after -- if
8  they pass through the development process.
9  Q.  Okay.  Our reporter says we are out of time
10  so we'll have to take a break.
11  MR. SURPRENANT:  Okay.
12  THE VIDEOGRAPHER:  Stand by.
13  This marks the -- this marks the end of
14  videotape number two, volume one in the
15  deposition of Dirk Drost.  Going off the
16  record.  The time is 2:09 and 36 seconds.
17  (A BRIEF RECESS WAS TAKEN.)
18  THE VIDEOGRAPHER:  This marks the
19  beginning of videotape number three, volume
20  one, in the deposition of Dirk Drost.  The
21  time is 2:22 and 23 seconds.
22  Please continue.
23  (Plaintiff's Exhibit 21: An e-mail string
24  with the top from Howard Stott dated 5/28/09,
25  Bates SYN02831657 - 659 marked for

Page 136

1  identification, as of this date.)
2  Q.  Would you look at Exhibit 21, please.
3  Does this reference a corn technology tour?
4  A.  Yes, it does.
5  Q.  And this was last year, wasn't it?
6  A.  Looks like it was in 2009.
7  Q.  And this was a Syngenta tour to Missouri
8  Illinois, Iowa and Indiana?
9  A.  That's correct.
10  Q.  The plan was to see on the tour stage one
11  products which would include - HPPD lead finding and
12  a few others.
13  That's what's stated in the very first
14  e-mail?
15  A.  That's what it says.
16  Q.  And to include Lumax, Camix formulation
17  projects as well?
18  A.  That's what it says.
19  Q.  Well, you were provided this e-mail at one
20  point, weren't you?
21  A.  Yeah, looks like the stuff forwarded to
22  me --
23  THE COURT REPORTER: I'm sorry?
24  A.  It looks like I received a copy of it,
25  yes.

Page 137

1  Q.  Okay.  And it also references 449 mixture
2  concepts.  What is that?
3  A.  Based on what's written here, 449 mixture
4  concepts could be tank mixes with 449 with other
5  herbicides.
6  Q.  Okay.  And then it mentions carryover trials
7  mesotrione mixtures.  What are those?
8  A.  Again, in the context of the message, I
9  interpret that to be mixtures, tank mixtures of
10  mesotrione with other -- with other herbicides.
11  Q.  Okay.  And this Howard Stott is from USDM
12  he says.  Where is USDM?
13  A.  Stott Howard is a regional biology
14  manager based in west Des Moines, Iowa.
15  Q.  What is the entity with whom he's
16  affiliated?
17  A.  Syngenta Crop Protection, Inc.
18  Q.  Do you know that for sure?
19  A.  I believe that.
20  Q.  Okay.  And the people to whom he sent the
21  e-mail, Mr. Peyrachon, he's in Basel, right?
22  A.  Mr. whom?  I'm sorry.
23  Q.  The first one, how do you pronounce his
24  name.
25  A.  You're looking at page 2959?  Excuse me,

35 (Pages 134 to 137)

Exhibit 008 Page 35
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 138

1  59?
2    Q.  Yeah, I'm looking, actually, at the first
3  e-mail from Stott Howard.
4    A.  Oh, okay. Great.
5    Q.  And I'm looking at the bottom of page one.
6  And he sent it to a number of different e-mail
7  addressees.  I'm going through that list.  Who's the
8  first one.
9    A.  It says Thomas Peyrachon.
10    Q.  And he's in Basel, right?
11    A.  CHBS.
12    Q.  Yes, that's Basel?
13    A.  To the best of my knowledge, yes.
14    Q.  Okay. And Patrick Crampton's in Basel?
15    A.  Was.
16    Q.  Where is he now?
17    A.  Canada.
18    Q.  Okay. What did he do in Basel?
19    A.  He was a herbicide business manager.
20    Q.  Okay.  And Albrecht, Michel, what did he do
21  in Basel?
22        He's on the list as well, right?
23    A.  Yes, he is.  He was a technical -- he was
24  a technical manager.
25    Q.  Kurt Carmean, who's he?

Page 139

1    A.  Kurt reports to me.  He's the -- a
2  herbicide development project manager based in
3  Greensboro.
4    Q.  Okay. And Urs Hofer, what does he do in
5  Basel?
6    A.  Urs is a herbicide technical managers.
7    Q.  And Jeremy Reynolds what does he do in
8  Basel?
9    A.  I don't know what his responsibilities
10  are.
11    Q.  And Brett Miller is in Basel.  What does he
12  do there?
13    A.  He was a -- he was a technical manager in
14  Basel.  But he's not in Basel anymore.
15    Q.  Where is he?
16    A.  He's here -- he's back in the United
17  States now.
18    Q.  At that time he was assigned to Basel?
19    A.  Yeah, he was an international assignee.
20        THE COURT REPORTER: He was an
21    international?
22        THE WITNESS: An international assignee.
23    Q.  And then there's Ian Zelaya at Jealott's
24  Hill in Great Britain.
25        What did he do there?

Page 140

1    A.  We looked at him -- at his name before on
2  the organizational chart for weed control biology.
3    Q.  Okay.  What is a technical manager that you
4  just mentioned at Basel, what do those people do?
5    A.  They're responsible for -- they work with
6  marketing and with the regions to coordinate the
7  testing programs in -- in different regions.  A
8  coordinator role.
9    Q.  Are they assigned to a particular active
10  ingredient?
11    A.  Sometimes they have active ingredient
12  responsibilities.  But our technical managers in
13  the United States also have active ingredient
14  assigned to them.  So each of them has an area of
15  focus.
16    Q.  What is Dash, D-A-S-H?
17    A.  That's an herbicide.  But it's a code
18  name for a herbicide.  And I don't -- can't
19  remember the name of it or the number of it.
20    Q.  What is HPPD?
21    A.  That stands for -- that's a type of a
22  herbicide, an HPPD inhibitor.  HPPD is an acronym
23  for the enzyme.  I can't remember the chemical name
24  for the enzyme.  But it's an acronym for an enzyme.
25    Q.  What is lead finding?  What does that mean?

Page 141

1    A.  Lead finding is like discovery.  Looking
2  for a needle in a haystack.  Finding a new
3  herbicide.
4    Q.  Okay.  Did you go on this tour?
5    A.  I think I did.
6    Q.  Okay. So --
7    A.  Now that I look at the agenda, yeah, I
8  think did go on it.
9    Q.  So your prior testimony about not having
10  been there in the last two or three years was in
11  error, wasn't it?
12    A.  Well, based on this in my -- and this
13  triggers my memory.  I think I did go on this tour.
14    Q.  And you went to Illinois?
15    A.  Yeah, we did stop in Illinois on that
16  tour.
17    Q.  Okay. Yeah.
18        Where in Illinois?
19    A.  Trying to remember where we overnighted.
20  Somewhere in western Illinois.  Might have been
21  Pekin, might have been we spent the night at Pekin,
22  Illinois.
23    Q.  And what did you do in Illinois?
24    A.  I rode a bus from place to place.
25    Q.  Okay. When you weren't riding the bus, what

36 (Pages 138 to 141)

Exhibit 008 Page 36
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 142

1  were you doing?
2      A.  We got out and looked at some field
3  trials.
4      Q.  Okay. And what did the field trials
5  include?
6      A.  Well, there were herbicide trials and
7  maybe some seed treatment trials.  I don't remember
8  the particulars of it.
9      Q.  Okay. You remember being there now, but you
10 don't remember the details?
11     A.  Yes, this document refreshed my
12 recollection about being there.
13     Q.  How many people were there?
14     A.  I don't know how many were there.
15     Q.  How many were on the bus?
16     A.  More than one and less than 52.
17     Q.  Okay. How many busses were there?
18     A.  There was only one.
19     Q.  Okay.
20     A.  I don't remember how many people were
21 there.
22     Q.  Were there people from Basel on the bus?
23     A.  I don't remember who was on the bus.
24     Q.  Okay.  Is there anything else you remember
25 about that experience?

Page 143

1      A.  That was a long ride from Kansas City to
2  where we ended up on the bus.
3      Q.  Okay. Maybe this next document will help
4  you.
5      A.  Okay.
6          (Plaintiff's Exhibit 22: A Syngenta
7      Summary Notes dated 6/26/09, Bates SYN03628856
8      - 8861 marked for identification, as of this
9      date.)
10     Q.  Why don't you take a look at Exhibit 22.
11         This is a Syngenta document Bates numbered
12 3628856 through 3628861.
13     A.  Okay.
14     Q.  And what is the document, sir?
15     A.  The document is a summary notes of the
16 U.S. herbicide field visit and held from -- in June
17 of 2009.
18     Q.  This was a field visit that you attended,
19 wasn't it?
20     A.  Yes, this is the field visit I referred
21 to previously which now I recall having attended.
22     Q.  Okay. And these were products -- strike
23 that.
24         None of the compounds that were being
25 observed were being sold at the time by Syngenta Crop

Page 144

1  Protection, Inc., were they?
2      A.  Well, that's not -- that's not accurate.
3  This is the summary of the stage one compounds that
4  we observed on that field tour.  But there were
5  other herbicides, including standards, I referred
6  to standards earlier as commercial -- currently
7  commercial compounds that are included for
8  comparison.  So there were other herbicides that
9  were observed in addition to the ones that were --
10 that are reported here.
11     Q.  What was it that refreshed your
12 recollection about that fact?
13         Did you look at this document and refresh
14 your recollection about that?
15     A.  Whenever we do this kind of testing, we
16 always include standards.  Standards are a typical
17 part of a herbicide protocol.  That's what we
18 refreshed my recollection.
19     Q.  Okay.  Well, let's -- let me ask you this
20 question then, none of the stage one compounds
21 discussed in this document were being sold by
22 Syngenta Crop Protection, Inc. when you went on this
23 bus tour, were they?
24     A.  I just -- I need to look at them before I
25 answer the question.

Page 145

1          Stage one compounds are a definition of
2  research in early evaluation compounds that are not
3  yet registered or available for sale.  So in this
4  case they are not -- they were not registered or
5  available for sale.
6      Q.  And who owned the rights for them at that
7  time?
8      A.  I don't know.
9      Q.  Now let's look at the document, sir.
10     A.  Okay.
11     Q.  Present, go through and tell me all the
12 people from Basel who were present and with which
13 entity in Basel they were associated?
14     A.  I can read -- I can read the names of the
15 persons who have CHBS.  But I do not know anything
16 about their entities.  So I will read Michel
17 Albrecht, CHBS; Jeremy Reynolds, CHBS; Brett
18 Miller, CHBS.
19         MR. SURPRENANT:  Can I interrupt?
20         Are you asking about the ones who
21 actually participated as opposed to invited?
22         MR. TILLERY:  Yes, who were present.
23         MR. SURPRENANT: Because I think he's
24 reading --
25     A.  Oh, I was reading the invited list.

37 (Pages 142 to 145)

Exhibit 008 Page 37
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 146

1   Yeah.  Well, I mean, my assumption from the
2   document was that they were present just based on
3   the way I was reading the document.
4       Q.  Yeah.
5          Now, doesn't it show present the list of
6   categories --
7       A.  It says present, right.
8       Q.  And you were reading that?
9       A.  I was in the process of doing that.
10      Q.  And I think you were doing it correctly.
11         So I think you were right except you left
12  Urs Hofer out.
13      A.  Well, I didn't -- hadn't gotten that far
14  yet.  Urs Hofer, CHBS.  Now, as I look down -- then
15  there were some partial participants.  Did you want
16  me to read those too?
17      Q.  Well, you had Jeremy Reynolds --
18      A.  Yeah, I mentioned him.
19      Q.  And then Brett Miller.
20      A.  Brett Miller, I mentioned him.
21      Q.  Okay.
22      A.  And that covers the present.
23      Q.  And who is Matthew Sherriff associated with
24  AUSY?
25      A.  That's a good question.  I don't recall

Page 147

1   -- I don't recall Matthew Sherriff.
2       Q.  Do you know what AUSY stands for?
3       A.  No, not without guessing.
4       Q.  Okay. It's Sidney Australia?
5       A.  I don't know what his location is.
6       Q.  Do you know whether Syngenta has an entity
7   that is located in -- in Sidney, Australia?
8       A.  I do not know.
9       Q.  Okay. And when the abbreviation there of --
10  you mentioned Andre -- you did not mention Andre
11  Bachiega at BRSP.
12         Do you know who that is?
13      A.  You know, I might have met Andre on the
14  tour.  But I don't recall that BRSP.  We had
15  representatives on this tour from many countries,
16  including Brazil.  And it could be Brazil.
17      Q.  Brazil, Sao Paulo, couldn't it?
18      A.  It's possible.
19      Q.  Okay.
20         Okay. The next page of the document.
21  Sorry, skip back to the first page again.  The very
22  top of the document lists a person by the name of Ian
23  Zelaya, PhD, team leader weed control biology,
24  Syngenta Limited.
25         Do you know where that is?

Page 148

1       A.  I know Ian works out of Jealott's Hill.
2   That's all I know.
3       Q.  And what was Mr. Zelaya's role in this corn
4   tour?
5       A.  He was obviously given the role of
6   summarizing the notes.
7       Q.  Is that what his role was, the notes?
8          Do you know what his role was?
9       A.  He -- this stage one tour would include
10  people from weed control biology at Jealott's Hill.
11  Because they have the responsibility overall for
12  screening and characterizing compounds that are
13  early stage.  And so he was there as a result of
14  that.  And I think he was deputized to take the
15  notes.
16      Q.  You didn't deputize him to do it, did you?
17      A.  No, absolutely not.  Someone else did
18  that.
19      Q.  Who did it?
20      A.  I don't know.
21      Q.  Okay. Who was leading this corn tour?
22      A.  Stott Howard organized the tour.  And I
23  would -- I would have characterized him as the
24  leader.  He made sure we got on the bus, and if he
25  if we didn't get on the bus he left us behind.

Page 149

1       Q.  If you go to the next page.
2          I just want to walk through this protocol
3   and title objectives and distribution so I understand
4   what the document's saying.
5          What is the protocol reference?
6       A.  The protocol is an internal trial number
7   that's established for tracking purposes.
8       Q.  It's just an ID number?
9       A.  It's an ID number.
10      Q.  Okay. And when it says stage 1.2, what does
11  that mean?
12      A.  That's in this -- our stage plan.  We
13  have stage one, you have stage 1.2 and you
14  mentioned earlier a stage 1.4.  It's just a
15  progression in the stage plan.
16      Q.  And it calls that late lead finding?
17      A.  That's correct, 1.2 equals late lead
18  finding.
19      Q.  Okay. And then title is evaluation of dicot
20  and grass weed control and crop tolerance of new
21  chemistry compounds in corn - pre - and post - EM in
22  U.S.
23         What is that?
24      A.  Statement of the type of work being done.
25      Q.  All right.  And then the objectives,

38 (Pages 146 to 149)

Exhibit 008 Page 38
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 150

1  generally could you tell me what that is?
2      A.  The objectives detail what we're trying
3  to accomplish in the studies that are being done.
4      Q.  And the distribution, what does that mean?
5      A.  This is who the trials -- who from our
6  field development group the trials are assigned to
7  for implementation.
8      Q.  Okay. So Schirmacher is who?
9      A.  Ms. Schirmacher is based in western
10 Illinois, and she does field trials for us.
11     Q.  By whom is she employed?
12     A.  She's a post doc, so she works for
13 Syngenta Crop Protection, Inc.
14     Q.  And out of which office?
15     A.  She'll work out of -- she's assigned and
16 reports through the Des Moines office.
17     Q.  And what is her first name?
18     A.  I'm trying to remember.  I think it's
19 Kirstin.  But I can't be -- I can't -- I'm not
20 sure.
21     Q.  And Cully, where is Cully?
22     A.  Cully is based in southern Illinois.
23     Q.  And who is Cully?
24     A.  He's a field development representative.
25     Q.  The same type of job?

Page 151

1      A.  Yeah.
2      Q.  And what is his first name?
3      A.  Scott.
4      Q.  And where does he live in southern
5  Illinois?
6      A.  I don't know what town he lives in.  He
7  works from his home and I'm not sure where that is.
8      Q.  How many field trials like this are ongoing
9  in Illinois in an average year?
10     A.  I don't know.
11     Q.  And then summary is what?
12     A.  At the end of the tour we had a two-hour
13 -- a roughly two-hour discussion.  These were some
14 of the points that were made during that
15 discussion.  People's observations or impressions
16 of the work that was done.
17     Q.  And to whom is this report or these field
18 notes distributed?
19     A.  I assume it's the list that's on the
20 front.  I don't know.  I didn't send them out.  But
21 that would be standard practice.
22     Q.  Do you approve the payment of invoices for
23 atrazine work in Canada?
24     A.  No.
25     Q.  Have you ever done that?

Page 152

1      A.  I don't recall approving work for -- in
2  Canada.
3      Q.  Okay.
4      A.  For atrazine.
5          (Plaintiff's Exhibit 23: An e-mail string
6       with the top from Dirk Drost dated 11/26/07,
7       Bates SYN02820990 - 991 marked for
8       identification, as of this date.)
9      Q.  I'll show you what's been marked as
10 Exhibit 23, sir, ask you to look at that.  This is,
11 by the way, Syngenta 2820990 and 0991.
12     A.  Okay.
13     Q.  Do you recognize this?
14     A.  I see my name on it as the author.
15     Q.  Yeah, it's from Connie Doggit (ph) to you?
16     A.  Right.
17     Q.  It's an e-mail exchange November 26,
18 2007 --
19     A.  That's correct.
20     Q.  Asking you to approve three Canadian
21 residue limit invoices?
22     A.  Okay.
23     Q.  Is that right?
24     A.  Yeah, that's what it looks like.
25     Q.  And then look above, these are a

Page 153

1  description, site selection, evaluation, support and
2  study for atrazine surface and ground water
3  monitoring in Canada.
4      A.  That's correct, that's what it says.
5      Q.  Okay. 82,000, 14,000 and $16,500 studies,
6  right?
7      A.  No, that's not correct.  The atrazine
8  study was 82,000, but the other two studies are not
9  atrazine.  One is malaoxon, the other is abamectin
10 benzoate.
11     Q.  Did you approve those as well?
12     A.  I approved all of these, I guess, because
13 that's what the document says.  I didn't -- I don't
14 remember having done it.  But that's what the
15 document says.
16     Q.  So it's -- you think you could be approving
17 a lot of these maybe that you don't remember, huh?
18     A.  No.  There's just a lot of -- there's a
19 lot of details, and I'm unable to recall all of the
20 details all of the time.
21     Q.  Okay.  Would you think that to be a --
22 let's see, $114,000 -- $112,000 approval, that's a
23 significant amount of money for studies, isn't it?
24     A.  Hundred -- a hundred thousand dollars is
25 a hundred thousand dollars.  The -- this was three

39 (Pages 150 to 153)

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 154

1  years ago, and I don't remember every specific
2  invoice that I may have approved.  I'm unable to
3  remember them all.
4      (Plaintiff's Exhibit 24: An e-mail
5      document to Dirk Drost, Bates SYN01048112 -
6      113 marked for identification, as of this
7      date.)
8   Q.  Let's take a look at Exhibit 24.
9      This is Syngenta 48112 and 48113.  E-mail
10  exchange with Paul Hendley and you, sir.
11  A.  I'm going to read it a moment.
12  Q.  Okay.
13  A.  Okay.
14  Q.  Do you remember the topic of this
15  discussion?
16  A.  No, I don't.
17  Q.  Can you tell from reading it what it
18  involves?
19  A.  Paul Hendley and Juan Gonzalez were
20  asking me to do something on -- in this document.
21  I just scanned it.  I don't -- I don't remember the
22  details of it.
23  Q.  Well, let's walk through it then.
24  A.  Okay.
25  Q.  Maybe it will help you.

Page 155

1      The CCs on this are Peter Hertl, right?
2   A.  Yes.
3   Q.  And Juan Gonzalez-Valero?
4   A.  That's correct.
5   Q.  Where was he from?
6   A.  I don't know where Juan was based at the
7   time.  He was head of global ecological risk.  But
8   I don't know where he was based.
9   Q.  And the subject is need for formal U.K.
10  approval for the start of various memorandum of
11  agreement team programs.
12  A.  That's the title, yeah.
13  Q.  And what is a memorandum of agreement?
14  A.  The memorandum of agreement was the
15  agreement between the Syngenta Crop Protection and
16  the U.S. EPA relative to studies that should be
17  done for atrazine, detailed -- detailed the work
18  that needed to be done, what the time lines were,
19  et cetera.
20  Q.  And about when did this take place?
21  A.  I don't know.  This document doesn't have
22  a date on it.  I don't recall the date associated
23  with it.
24  Q.  It said we hope that you're recovering well
25  and we will see you soon.  Had you just been off work

Page 156

1   with some problem?
2   A.  I -- I had surgery, yes.
3   Q.  When was that?
4   A.  I don't remember.
5   Q.  Okay.
6   A.  It was at least five years ago.
7   Q.  Okay.
8   A.  Could have been longer.
9   Q.  The first big paragraph there says we
10  worked through some budget issues with Peter
11  yesterday.  Peter is Peter Hertl, I presume, he's the
12  addressee on the e-mail?
13  A.  That's what I presume too.
14  Q.  Okay. Yesterday, and have a few areas where
15  we need your help with John Parker.
16  A.  Okay.
17  Q.  Okay. It also seems to us that in addition
18  to the two study areas we are specifically mentioning
19  here, there are a number of other memorandum of
20  agreement program projects that are being included in
21  SYPOS that need to be sanctified the formal U.K.,
22  quote, HAES, in quote, approval process.
23      What does that mean?
24  A.  I didn't write the e-mail, I don't know
25  what the person meant.

Page 157

1   Q.  Well, but you took some action on it,
2   didn't you?  It was addressed to you.
3   A.  I know what the MOA program is, we've
4   discussed that, the memorandum of agreement.  SYPOS
5   is the -- was the portfolio management tool at the
6   time.  The phrase sanctified with the formal U.K.
7   HAES approval process, I do not know what the
8   author meant by that.
9   Q.  Well, did you give them help to deal with
10  John Parker's approval?
11  A.  I don't recall the specific details.  The
12  work that needed to be done under the memorandum of
13  agreement was -- was approved and implemented and
14  has been or is being completed.
15  Q.  So you must have -- you must helped them.
16  A.  Yes, I probably helped them with this
17  because this was an important piece of work that
18  needed to be done.
19  Q.  Did then the U.K. ultimately approve this
20  project?
21  A.  John Parker is a business manager, and
22  his job was to make sure that the product safety or
23  in that time HAES did not include -- exceed a
24  certain budget number.  John had no technical or
25  operational responsibilities for -- technical or

40 (Pages 154 to 157)

Exhibit 008 Page 40
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 158

1  operational responsibilities. John was a business
2  manager, a finance manager. He was just watching
3  the numbers.
4      Q. I move to strike your answer as
5  unresponsive.
6          Here was my question, I'm going to read it
7  back to you, did the U.K. ultimately approve the
8  project?
9      A. I don't know.
10      Q. Okay. Did you have technical experience to
11  deal with this topic yourself?
12      A. My responsibility with this project was
13  not technical. My responsibility was to make sure
14  it got approved, it got -- the resources were
15  available for the work to be done and that the work
16  was actually implemented and delivered. Technical
17  responsibility for the studies were with Paul
18  Hendley at that time.
19      Q. Okay. I move to strike your answer as
20  unresponsive. Let me make sure you understand my
21  question. I'm going to read it back to you.
22          Did you have technical experience to deal
23  with this topic yourself?
24      A. Yes.
25      Q. Okay. What was your technical experience

Page 159

1  dealing with this particular project that you used in
2  this approval process?
3      A. A knowledge of field trials and how to
4  conduct them and the ability to judge whether work
5  was going to be satisfactory and sufficient to
6  deliver the intended outcome.
7      Q. Okay. What was the field trial that was
8  being contemplated here?
9      A. They were talking about selecting sites
10  for rural wells and selecting sites for ecological
11  monitoring.
12      Q. Did you evaluate these yourself or did you
13  just simply approve a number? What did you do from a
14  technical standpoint to approve this project?
15      A. My job was to make sure that the program
16  was consistent with the principles outlined in the
17  memorandum of agreement. And I used my technical
18  skills as a weed scientist to contribute to that.
19      Q. Okay. Now tell me, what did the memorandum
20  of agreement say about this project right here?
21      A. Memorandum of agreement asked us to do
22  community water system monitoring and ecological
23  monitoring, and thereby we had to select sites,
24  identify and select sites.
25      Q. Could you tell me what your technical

Page 160

1  skills as a weed scientist had to do with the
2  ecological and community water system monitoring
3  study?
4      A. In order to conduct a study like this you
5  need to have firsthand knowledge of how products
6  are used, where they're used, when they're used and
7  why they're used. And those are all things that
8  weed scientists learn by practical training and by
9  practical experience. And I've demonstrated that I
10  have that.
11      Q. So what technical skills as a weed
12  scientist did you use in this community water system
13  project?
14      A. I just stated those. An understanding of
15  how the products are used, when they're used and
16  why there's used.
17      Q. What products?
18      A. And I used -- and I used that knowledge
19  to make sure that we were delivering what needed to
20  be delivered.
21      Q. What products are you talking about, sir?
22      A. Herbicides. That's what weed scientists
23  are familiar with.
24      Q. Okay. Well, what product were they talking
25  about here?

Page 161

1      A. Well, this is an atrazine monitoring
2  program.
3      Q. Okay. Now, tell me what your technical
4  skill set is about atrazine. Tell me how you learned
5  that as a weed scientist?
6      A. Learned it by -- as I mentioned earlier,
7  I included atrazine as a standard in field trials
8  that I conducted, I looked at field trials that
9  have been done. So I'm familiar with the
10  performance of the product, when and how it should
11  be used and -- an excellent results that we get
12  from it.
13      Q. Did you have knowledge of the use patterns
14  of atrazine in -- before the 2000?
15      A. Sure. I'd started out my first job in
16  Stauffer Chemical Company. I mean, I tested and
17  evaluated atrazine as a standard many times in many
18  fields in many different years.
19      Q. Were you familiar with the runoff
20  characteristics of atrazine?
21          When did you become familiar with that?
22      A. I don't recall when I became familiar
23  with runoff characteristics of atrazine. But the
24  goal in all of this work is to ensure the product
25  is applied safely and effectively and delivers the

Westlaw Deposition Services   800.548.3668 Ext. 1

**Exhibit 008 Page 41**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 162

1  desired effect.
2      Q.  Well, do you have any knowledge of runoff
3  characteristics of at --
4      A.  Yes.
5      Q.  Well, tell me about it.
6          What do you understand to be the runoff
7  characteristics of atrazine?
8      A.  I understand that on heavy rain or in
9  erosive soils that products like atrazine can move
10  from one spot to another.
11     Q.  And --
12     A.  By surface -- by surface soil movement
13  and by soil erosion.  And so as an agriculturist we
14  try to minimize erosion, we use reduced tillage, we
15  manage applications to prevent -- limit or prevent
16  runoff.
17     Q.  How long have you known that?
18     A.  I don't recall.
19     Q.  Has that been, as you said, since the
20  beginning when you were using this as a standard?
21     A.  Pardon?
22     Q.  Has this been since the beginning of your
23  professional experience?
24     A.  I don't recall when I came -- when I came
25  to that -- would be pure conjecture.

Page 163

1      Q.  Okay. When was the last time you did any
2  atrazine field testing yourself?
3      A.  Before I moved to -- to Greensboro.
4      Q.  And when was that?
5      A.  That would have been in -- as I explained
6  earlier, I moved in the middle of 2001, and I
7  started my current responsibilities the previous
8  November, November of 2000.
9      Q.  Yeah, I remember when you told me you moved
10  here. I'm saying you said it was before then. I'm
11  trying to determine when before you moved did you
12  last do any atrazine field testing?
13     A.  I can't remember.
14     Q.  Have you ever been personally involved in
15  any testing of atrazine for the purpose of evaluating
16  fate and transport characteristics of the chemical?
17     A.  No, I've had no direct involvement in
18  fate and transport.
19     Q.  Do you know what the fate and transport
20  characteristics of the chemical are?
21     A.  I understand fate and transport.  But I'm
22  not a specialist in atrazine.
23         MR. TILLERY:  We're going to go off the
24  record now for a short break.
25         THE VIDEOGRAPHER:  Stand by.

Page 164

1          Going off the record.  The time is 3:04
2  and ten seconds.
3          (A BRIEF RECESS WAS TAKEN.)
4          THE VIDEOGRAPHER:  Going on the record.
5  The time is 3:15 and 39 seconds.
6          Please continue.
7          (Plaintiff's Exhibit 25: An e-mail string
8  with the top from Sarah Rees dated 7/3/06,
9  Bates GRNVL0000046110 - 112 marked for
10  identification, as of this date.)
11     Q.  I'll show you what's been marked as
12  Exhibit 25, sir.  This is Greenville 46110 through
13  46112.
14         THE WITNESS: Is this right there?
15         MR. SURPRENANT:  You think the number is
16  -- Bates number is different?  This one is 8.
17         MR. TILLERY:  I marked the one wrong?
18         MR. SURPRENANT:  We can just identify it
19  as this one, Steve.
20         MR. TILLERY:  Okay.  I may have the wrong
21  one marked?
22         MR. SURPRENANT:  Yeah.
23         Yeah, here you want 34?  Here's your copy
24  back.
25         MR. TILLERY:  All right. We're going to

Page 165

1  make a correction on the record.  Exhibit 25
2  now is Greenville 461.
3          What do you have?
4          MR. SURPRENANT:  46110 through 46112.
5          MR. TILLERY:  That's right.
6          MR. SURPRENANT:  That's fine.
7          MR. TILLERY:  That is the correct one.
8          MR. SURPRENANT:  And that's Exhibit 25?
9          MR. TILLERY:  That's Exhibit 25.
10     Q.  Please take a look at this e-mail exchange,
11  sir.
12         Can you tell me the subject matter of this
13  e-mail exchange?
14     A.  The document says it's HAES task review
15  conducted in 2006.
16     Q.  And what does it involve generally?
17     A.  It involves work -- work site balancing.
18  That is bringing supply and demand into balance.
19     Q.  Explain that, if you wouldn't mind.
20     A.  Supply would be things like, you know,
21  available man days or external cash to conduct
22  studies and to bring supply into balance with
23  demand.
24     Q.  And this exchange is taking place between
25  which groups of people?

42 (Pages 162 to 165)

Exhibit 008 Page 42
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 166

1       A.  Well --
2       Q.  You were included, weren't you?
3       A.  The July 2, the memo from Jasper Barnes
4  is to a range of people and it -- yes, it
5  references me.
6       Q.  And Jasper Barnes is from?
7       A.  Jasper Barnes is the head of project and
8  portfolio -- global project and portfolio team in
9  Basel.
10      Q.  And the response from Sarah Rees refers to
11 a portfolio prioritization guide from Jasper.
12          Do you see that?
13      A.  I see the note from Sarah Rees says we
14 have now received portfolio prioritization guidance
15 from Jasper.
16      Q.  And do you know what that was?
17      A.  My assumption in the context of the
18 document is that it's the stuff that Jasper Barnes
19 set out on July the 2nd.
20      Q.  Okay.  Do you know portfolio prioritization
21 guidance means?
22      A.  To me it means bring supply and demand
23 into balance.  So you set priorities because demand
24 for resources or work exceeds the capacity or
25 supply.

Page 167

1       Q.  And if the amount of money isn't there, you
2  have to decide which of your expenditures are the
3  most important?
4       A.  Yes.
5          (Plaintiff's Exhibit 26: An e-mail string
6          with the top from Sarah Rees dated 7/5/06,
7          Bates SYN02642042 - 2045 marked for
8          identification, as of this date.)
9       Q.  Okay.  Let's take a look at Exhibit 26.
10 This is Syngenta 642042 through 642044 -- I'm sorry,
11 045.
12         MR. SURPRENANT:  The one we have is the
13         rebuilt number on it.
14      Q.  I think this is a follow-up e-mail exchange
15 along that same line, sir.  And all I'm -- all I'm
16 pointing out is just trying to understand the
17 process.
18      A.  Sure.
19      Q.  Okay.  So if you take a minute and look at
20 it and just explain to me you're one of the
21 addressees in this e-mail list from Jasper Barnes, a
22 follow-up.
23         And with this one I do have the attachment.
24 If you keep that exhibit, okay, handy.  That's number
25 26.  And I do have this attachment that came with it,

Page 168

1  okay?  And I'm trying simply to understand it.
2          (Plaintiff's Exhibit 27: 2006 Development
3          Project Portfolio marked for identification,
4          as of this date.)
5       Q.  So number 27 is the attachment that came to
6  -- along with the e-mail, number 26, isn't it?
7       A.  I don't -- I don't remember this -- this
8  correspondence.  This is several years ago.  Nor do
9  I remember this -- the size of this attachment.
10      Q.  Okay.  But what I'm trying to do is to
11 understand from the directions that you were all
12 given from Mr. Barnes, Jasper Barnes.
13         He was laying out a prioritization system,
14 wasn't he?
15      A.  Yeah, he was trying to, yes.
16      Q.  And can you tell me how this system worked
17 -- was to work?
18         Is he asking you to prioritize the
19 particular activities from the spreadsheet so that
20 available funds that may not be available for all of
21 the projects could be assigned to different projects
22 and a decision could be made about which ones would
23 be funded?
24      A.  I'm going to read the memo --
25      Q.  Okay.  Take your time on this.

Page 169

1          MR. SURPRENANT:  Steve, is there a
2          separate Bates number on the attachment.
3          MR. TILLERY:  My copy does not have one.
4          MR. CRAIG:  I'll try to figure out what
5          it is and let you guys know.
6          MR. SURPRENANT:  Maybe we didn't provide
7          it with a Bates number.  I don't know.
8       Q.  Okay.
9       A.  Go ahead.
10      Q.  All right.  Do you remember my last point of
11 trying to describe what I thought this document was
12 and trying to get some help from you to understand
13 it.
14         After looking at this, can you tell me in
15 looking at the e-mail and looking at the document,
16 can you tell me what the prioritization system was or
17 how you went about doing this?
18      A.  There was a budget -- there was a budget
19 gap in 2006.
20      Q.  And before you go forward what does a
21 budget gap mean?
22      A.  I mean it was a difference of a gap
23 between available resource and perception of how
24 much -- how much was necessary to complete the work
25 for 2006.

43 (Pages 166 to 169)

**Exhibit 008 Page 43**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 170

1    Q.  So really what you're talking about is a --
2  a resource shortfall?
3    A.  Yes, there was a resource shortfall or a
4  gap.
5    Q.  Okay.
6    A.  Yes.
7    Q.  Go ahead now, sir.
8    A.  So the -- the health assessment and
9  environmental safety team was trying to deal with
10  that.  And Mr. Barnes was heading up the global
11  portfolio, and he had asked for insight and
12  involvement from folks to identify high priority
13  and low priority tasks so that resources could be
14  allocated.
15    Q.  And the those priorities were assigned by
16  the people.  And do you know how a decision was
17  ultimately made on which ones were to be funded and
18  which ones weren't?
19    A.  No, I don't know or don't recall how the
20  decisions were made.
21    Q.  And was this information then sent to
22  people at -- for example, Syngenta Crop Protection,
23  Inc. to -- where relevant and appropriate to what
24  they were doing to make a decision about the priority
25  to assign a particular priority number to the task?

Page 171

1    A.  No, I don't -- I don't believe so.  I
2  believe that there were high and low priority items
3  identified and that we went through an iterative
4  process to balance or to close the gap to an
5  acceptable point.
6    Q.  Did you get involved in this process?
7    A.  I was -- I was informed about it, but
8  correspondence indicates I was informed about it,
9  yes.
10    Q.  But were you involved in making the
11  decisions about the priorities?
12    A.  I believe I -- I did consult with the
13  business in the region, and I did provide input on
14  what our -- what priorities -- what the regional
15  business priorities were.  That would have been
16  part of my role and responsibility.  And it would
17  have been before this summary sort of memo came
18  out.
19    Q.  And then if you'd look at Exhibit 27.
20    A.  Okay.
21    Q.  And take a look at the type of items that
22  are listed, and you would agree with me that there
23  are literally hundreds and hundreds and hundreds of
24  items listed in this exhibit, correct?
25    A.  That's correct.

Page 172

1    Q.  Okay. And what are these types of exhibits?
2      I'm sorry, strike that.
3      What are these types of items that are
4  listed?  Let's just use, for example, page one.
5    A.  Okay.
6    Q.  The middle of the page, go through and
7  explain to me what is involved there.
8    A.  Do you have a particular line you'd --
9    Q.  Any one you want.  Just pick four or five
10  items.  I want to try to do a survey of what it is
11  that we're dealing with in terms of review?
12    A.  Okay.  So I'm going to refer to the first
13  item, first line on the first page.  This is our
14  product thiamethoxam.  It's a new formulation
15  project.  So developing a new product for our
16  professional -- what was called our professional
17  products business at that time.  And the name of
18  the product is Optigard gel.  That's the brand
19  name.  And the work slate or the task was in the
20  environmental exposure assessment area.  We needed
21  to do an environmental and fate exposure assessment
22  as a requirement to address that specific product.
23  So you'll see the next one, two, three lines after
24  that line all refer to that same Optigard gel ant
25  bait.  So these are different -- different work

Page 173

1  pieces necessary to do to successfully develop that
2  product.  So it's an iteration of all -- of lots of
3  different work pieces for lots of different
4  projects.
5    Q.  Yeah.  I'm sorry, I interrupted you.  Go
6  ahead.
7    A.  No, I'm finished.
8    Q.  Let's go across the topic, though, okay.
9  The title of the page.  And tell me the rest of these
10  items that are listed.
11    A.  So the first column is the priority.
12    Q.  Um-hum.  Yes.
13    A.  And then the second column is committed
14  external spend -- committed external tasks.  It
15  means that has the work been implemented or
16  contracted.  The next -- I don't know what the next
17  column means.  And then there's a column that says
18  external task, yes or no.  So that would be is it
19  being done internally at Syngenta or externally
20  with a third-party?  Then you have your specific
21  active ingredient followed by the type of project
22  -- project type.
23    Q.  What is a project type?
24    A.  Project type is the way we classify our
25  projects in the portfolio.  We group them into

44 (Pages 170 to 173)

Exhibit 008 Page 44
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 174

1 formulation new, formulation extension, label
2 extension. It's like that.
3    Q. Okay. And the next column?
4    A. Would be the product line or the business
5 that the -- that is being supported with that
6 product. So in this case professional products,
7 now we call it lawn and garden.
8    Q. Okay.
9    A. Next is the business line. That would be
10 the sub business, in this case professional pest
11 management. That would be like for pest control in
12 and around a home or in and around a business
13 structure.
14    Q. Okay.
15    A. And then the title. And that just
16 describes the work that's being done. And where
17 it's -- in some cases who it's for. In this case
18 USA is in parentheses. It's specifically for the
19 USA. Then we have our project -- root project
20 identification. That's our -- an internal tracking
21 number. The next column is not being -- is not
22 being used. And then the specific project
23 identification number. And followed by that the --
24    Q. What is -- how is that different from the
25 root project?

Page 175

1    A. It doesn't. It's -- in this case it was
2 unnecessary duplication. And then the specific
3 task number follows that.
4    Q. What's a task number?
5    A. It's the unique identifier for a study or
6 a unique piece of work.
7    Q. Okay.
8    A. And more than one task could be in a
9 project. And then the status, is it planned? That
10 is -- or is it approved? Planned task is pending
11 approval or an approved task has already been
12 sanctioned. The work slate is the -- part of our
13 -- part of our organization where the work is going
14 to be done, the department that it's going to be
15 done in. And then the location, what's the
16 location of the work -- the work is it done in. In
17 this case it's in Greensboro. But it could be done
18 in Jealott's Hill or it could have been done in --
19 somewhere else.
20    Q. And on this page, for example, let's go
21 through the list. Greensboro, Jealott's Hill,
22 Alderley Park, Basel.
23    A. Right. There's a range of --
24    Q. Different places?
25    A. -- there's a range of different places

Page 176

1 where we had the facilities and the people to do
2 the work ourselves if we were going to do it or
3 where the contractors were located that might do
4 the work.
5    Q. What's the next set?
6    A. Skill set is a -- in some departments you
7 have maybe two sub departments, and -- and in this
8 skill set is a -- like a sub -- sub department.
9    Q. And next?
10    A. A function type is -- was an
11 environmental sciences, was it health assessment?
12 Was it biology? I mean, those are some of the
13 examples of function types.
14        And then when was the -- when is the
15 study due? When is the report needed to be able to
16 meet the agreed time lines?
17        And then some more specific details on
18 the actual work being done, task type. And then
19 the status of the project. And funded projects are
20 sanctioned, approved and funded. So they've been
21 accepted into the portfolio. Funded means it's
22 part of the portfolio.
23        And then you've got the resource demand
24 following that. How many days?
25    Q. What does that mean?

Page 177

1    A. Man days, work days.
2    Q. Work days for?
3    A. Per person, for individual person days.
4    Q. To do what?
5    A. To do the -- to do the assessment or the
6 work that's requested.
7    Q. Okay.
8    A. And then the next column would be the
9 external cost in thousands of dollars.
10    Q. For what?
11    A. To do -- to do the study --
12    Q. Okay.
13    A. -- or the work required in that line.
14    Q. And the next?
15    A. And then it's a total of the -- the man
16 days and the external dollars in -- dollarized.
17 Dollarizes the value of the man days and it adds,
18 and that's addition of the dollar value of the man
19 days and the external cost. Okay?
20    Q. All right.
21    A. All right. And then the task -- is this
22 -- must.
23    Q. What is the difference between must and
24 contingency?
25    A. Must means it was -- was determined to be

45 (Pages 174 to 177)

Exhibit 008 Page 45
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 178

1  a requirement, it needed to be done. And a
2  contingency was something that had less than
3  50 percent probability of needing to be done.
4      Q.  Is must a regulatory requirement?
5      A.  It could have been a regulatory
6  requirement. But it may not have been that in
7  every case.
8      Q.  And what does task driver mean?
9      A.  This was a classification that was used
10  at the time, which is not used any longer. But it
11  helped give some -- what the -- the reason -- the
12  reason for doing the work. Was it proactive or
13  reactive or was it a regulatory requirement or was
14  it another requirement?
15      (Plaintiff's Exhibit 28: An e-mail
16      document from Kurt Carmean dated 10/18/07,
17      Bates SYN02864385 marked for identification,
18      as of this date.)
19      Q.  Would you look at Exhibit 28, please.
20      This is Syngenta 864385.
21      This is an e-mail exchange, and actually
22  it's e-mail from Mr. Kurt, is it Carmean?
23      A.  Yes.
24      Q.  And does he work for you?
25      A.  Yes, he does.

Page 179

1      Q.  What is his job?
2      A.  He's the development project leader for
3  herbicides for the NAFTA region.
4      Q.  Is he headquartered in Greensboro?
5      A.  Yes, he is.
6      Q.  How long has he been in that job?
7      A.  Kurt has been a development project
8  leader and worked for me since the merger.
9      Q.  Since the time you came here?
10      A.  Since the time I joined Syngenta.
11      Q.  He says, thank you for evaluating your 2008
12  field program again and making the necessary
13  reductions. I greatly appreciate your efforts and
14  timeliness. We are down to 458, equals 103 percent
15  of the target. Great job. Dirk is still working the
16  global funding prospect for 449 and Dash for us.
17      What is 449?
18      A.  The 449280 is a preemergence and post
19  emergence herbicide.
20      Q.  And who were you working on the global
21  funding with?
22      A.  I was trying to get a incremental funding
23  beyond what we had available in Syngenta Crop
24  Protection and NAFTA to allow us to do additional
25  field trials work on 449 and Dash. So I petitioned

Page 180

1  global. I don't recall in this case who -- people
2  have changed. I don't remember who I might have
3  asked.
4      Q.  The number 458, what does it refer to?
5      A.  I don't have the attachment available.
6      Q.  Nor do I.
7      Is that the number of trials?
8      A.  I assume -- my belief is that is the
9  number of field trials that we were doing in herb-
10  -- for herbicides in that year. Or, actually, they
11  were planned -- going to be planned for the next
12  year, for 2008. Because this correspondence is in
13  the fall of 2007 for 2008.
14      Q.  And some of those trials were in Illinois,
15  weren't they, sir?
16      A.  I don't remember where -- I don't
17  remember or know at this time where those trials
18  were.
19      Q.  Was the product intended to be sold for
20  corn application?
21      A.  Which product?
22      Q.  The product you were testing? You were
23  doing the field trials for.
24      A.  This was field trials on a broad range of
25  products.

Page 181

1      Q.  Okay.
2      A.  Not just corn products. But it would
3  have included other crops as well, like cereals,
4  rice, cotton, as examples.
5      Q.  So 449 and Dash would have included corn,
6  too, wouldn't it?
7      A.  Yes, 449 and Dash were -- at this time
8  were focused for evaluation on corn.
9      Q.  And if it's corn, you do the field trials
10  in locations where you anticipate selling the
11  product, don't you?
12      A.  That's correct. I don't know where these
13  trials were actually implemented. But it's logical
14  to assume that they could have been in the corn pro
15  -- that they were in the corn-producing states.
16      Q.  What are the biggest corn-producing states
17  in the United States?
18      A.  Iowa, Illinois, Indiana, Ohio are
19  examples of corn-producing states. There's others
20  besides that.
21      Q.  The I states?
22      A.  Yeah, they're sometimes called the I
23  states.
24      (Plaintiff's Exhibit 29: An e-mail string
25      with the top from Gordon Vail dated 6/11/09,

46 (Pages 178 to 181)

Exhibit 008 Page 46
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.    11-10-2010
Confidential - Pursuant to the Protective Order

Page 182

1     Bates SYN02917550 - 552 marked for
2     identification, as of this date.)
3     Q.  Let's take a look at Exhibit 29, if we can.
4         While you're looking at it, for the record,
5  this is Syngenta 2917550 through 2917552.
6     A.  Okay.
7     Q.  Do you remember this e-mail exchange?
8     A.  No.  I do remember the -- receiving the
9  Jasper Barnes segment on June the 10th, 2009.  Now
10  that would be part of our annual portfolio
11  investment cycle.  So that document -- that part of
12  the document I'm familiar with.
13     Q.  And to try to summarize, you tell me if I'm
14  wrong, you received an e-mail from Mr. Gordon Vail at
15  Syngenta Crop Protection, Inc. after Jasper Barnes
16  sent his e-mail.  His e-mail was dated June 10th,
17  2009, which included an attachment.
18         And Mr. Gordon Vail was asking whether or
19  not the fact that a project was not supported on the
20  list meant that there could be no testing in 2010.
21  And he said, I'm quoting, for example, atrazine on
22  switch grass and mesotrione acid mill based project,
23  end quote.
24         And he asked that to Mr. Carmean, right?
25     A.  Yeah, I'm reading it.  I'm working on

Page 183

1  reading it.  I didn't -- I didn't see this.  I have
2  no knowledge of this note, this segment from Gordon
3  Vail to Kurt Carmean.
4     Q.  Take a look at --
5     A.  Then I see a Kurt Carmean response and
6  some subsequent communications.
7     Q.  Okay.  Who is Mr. Vail?
8     A.  Gordon Vail is the technical brand
9  manager for herbicides based in Greensboro.
10     Q.  Okay.  And the response from Mr. Carmean
11  came back saying, quote, that is correct, if global
12  does not support them, we are not supposed to do any
13  work, end quote.
14         Is that a correct bit of advice to Mr.
15  Vail?
16     A.  In this -- in this case yes, it was.
17     Q.  Okay.  And then the very next e-mail,
18  June 11th, 2009, from Mr. Gordon Vail back to Mr.
19  Carmean where he says, guess this kills the atrazine
20  pasture projects.  Without global support, I could
21  likely get BR&D work, but can't -- won't get
22  regulatory or T&P work.
23         What does that mean, I could likely get
24  BR&D work?
25     A.  I didn't write that note.  I don't know

Page 184

1  what Kurt meant by -- by those -- by writing that.
2     Q.  Actually, that was Mr. --
3     A.  Excuse me.
4     Q.  -- Gordon Vail.
5     A.  Excuse me, I'm misstated myself.  Mr.
6  Vail.
7     Q.  You don't know what BR&D means?
8     A.  Biological research and development.
9  Field trials.
10     Q.  Did -- to your knowledge, did the project
11  that he's talking about at the bottom of Syngenta
12  917550, was it unfunded?
13     A.  There were two projects that he was
14  talking about there.  One was atrazine on switch
15  grass and the other was mesotrione acid mill base.
16  We did not progress the atrazine on pasture
17  project.  It just simply was not financially
18  attractive, wasn't a viable project proposal.  And
19  it didn't have local -- or global support.
20     Q.  Okay.  I move to strike your answer as
21  unresponsive.
22         To your knowledge, did the projects that
23  Mr. Gordon Vail referenced, the atrazine on switch
24  grass and the mesotrione acid mill based projects,
25  were they funded or not?

Page 185

1     A.  The switch grass project was not funded.
2  I do not know -- I do not recall whether the
3  mesotrione acid mill base project was funded or
4  not.
5         (Plaintiff's Exhibit 30: A Syngenta
6         Project Portfolio Process, Process in
7         Milestones in 2006, Bates GRNVL0000063727 -
8         732 marked for identification, as of this
9         date.)
10     Q.  I show you what's been marked as
11  Exhibit 30, sir.  Ask you first to identify it after
12  you look at it.
13         The process, this project portfolio process
14  described in Exhibit 30, does it accurately describe
15  the process at this time?
16     A.  No.
17     Q.  Did it accurately reflect the process in
18  2006?
19     A.  Yes, it was -- it did -- it was used in
20  2006.
21     Q.  Was it used in 2007?
22     A.  We changed our process -- portfolio
23  process starting in 2007 or 2008 to what we are --
24  to the process we're currently using.
25     Q.  And how does the process you're currently

47 (Pages 182 to 185)

Exhibit 008 Page 47
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

| Page 186 | Page 188 |
|---|---|
| 1 using differ from this one? | 1 WITNESS' CERTIFICATE |
| 2    A.  We have four phases in our current | 2 |
| 3 process idea.  Idea creation, evaluation, project | 3    I, DIRK COOPER DROST, PhD. do hereby |
| 4 scoping or -- which is detail -- detailing the work | 4 certify that I have read and understand the |
| 5 required.  Then we have portfolio analysis and then | 5 foregoing transcript and believe it to be true, |
| 6 decision -- portfolio decisions.  There's four | 6 accurate, and complete transcript of my testimony, |
| 7 phases to our current process. | 7 subject to the attached list of changes, if any. |
| 8    Q.  How many phases were there in this one? | 8 |
| 9    A.  Well, there were several more.  They're | 9 |
| 10 bulleted on page 3728.  This -- they're bulleted on | 10 |
| 11 page 3728. | 11    DIRK COOPER DROST, PhD. |
| 12    Q.  Okay. | 12 |
| 13    MR. TILLERY:  I have no further | 13 |
| 14 questions. | 14 This deposition was signed in my presence by |
| 15    MR. SURPRENANT:  I don't have any | 15 _____, on the _____ day of |
| 16 questions of the witness. | 16 _____, 2010. |
| 17    I just ask that, as has been done with | 17 |
| 18 the other depositions, that the deposition | 18 |
| 19 transcript and videotape be marked as | 19    NOTARY PUBLIC |
| 20 confidential pursuant to the protective order. | 20 My commission expires: |
| 21    Thank you. | 21 |
| 22    THE VIDEOGRAPHER: Stand by just a moment. | 22 |
| 23    This is the end of videotape number | 23 |
| 24 three, volume one in the deposition of Dirk | 24 |
| 25 Drost.  The original videotapes will be | 25 |

| Page 187 | Page 189 |
|---|---|
| 1    retained by WestLaw Deposition Services. | 1 |
| 2    Going off the record.  The time is 3:59 and 32 | 2    (Page 1 of 2) |
| 3    seconds. | 3    E R R A T A   S H E E T |
| 4    (TIME NOTED: 3:59 p.m.) | 4 RE: City of Greenville, Illinois, et al. |
| 5    (SIGNATURE RESERVED.) | vs. Syngenta Crop Protection, Inc., et al. |
| 6 | 5 DEPOSITION OF:  Dirk Cooper Drost, PhD. |
| 7 | Please read this transcript with care, |
| 8 | 6 and if you find any corrections or changes you wish |
| 9 | made, list them by page and line number below.  DO |
| 10 | 7 NOT WRITE IN THE TRANSCRIPT ITSELF.  Return the |
| 11 | Certificate and Errata Sheet to this office after |
| 12 | 8 it is signed.  We would appreciate your prompt |
| 13 | attention to this matter |
| 14 | 9    To assist you in making such corrections, |
| 15 | please use the form below.  If supplemental or |
| 16 | 10 additional pages are necessary, please furnish same |
| 17 | and attach them to this errata sheet. |
| 18 | 11 Page:   Line:   should read: |
| 19 | 12 Page:   Line:   should read: |
| 20 | 13 Page:   Line:   should read: |
| 21 | 14 Page:   Line:   should read: |
| 22 | 15 Page:   Line:   should read: |
| 23 | 16 Page:   Line:   should read: |
| 24 | 17 Page:   Line:   should read: |
| 25 | 18 Page:   Line:   should read: |
| | 19 Page:   Line:   should read: |
| | 20 Page:   Line:   should read: |
| | 21 Page:   Line:   should read: |
| | 22 Page:   Line:   should read: |
| | 23 Page:   Line:   should read: |
| | 24 Page:   Line:   should read: |
| | 25 Page:   Line:   should read: |

48 (Pages 186 to 189)

**Exhibit 008 Page 48**
794b781f-6eef-40ea-9d67-792b9c99da6f

Dirk Cooper Drost, Ph.D.   11-10-2010
Confidential - Pursuant to the Protective Order

Page 190

1            (Page 2 of 2)
2   Page:    Line:    should read:
3   Page:    Line:    should read:
4   Page:    Line:    should read:
5   Page:    Line:    should read:
6   Page:    Line:    should read:
7   Page:    Line:    should read:
8   Page:    Line:    should read:
9   Page:    Line:    should read:
10  Page:    Line:    should read:
11  Page:    Line:    should read:
12  Page:    Line:    should read:
13  Page:    Line:    should read:
14  Page:    Line:    should read:
15  Page:    Line:    should read:
16  Page:    Line:    should read:
17  Page:    Line:    should read:
18  Page:    Line:    should read:
19  Page:    Line:    should read:
20  Page:    Line:    should read:
21  Page:    Line:    should read:
22  Page:    Line:    should read:
23  Page:    Line:    should read:
24  Page:    Line:    should read:
25  Page:    Line:    should read:

Page 191

1   STATE OF NORTH CAROLINA
    COUNTY OF MECKLENBURG
2
3        REPORTER'S CERTIFICATE
4        I, V. Dario Stanziola, a Notary Public in
5   and for the State of North Carolina, do hereby
6   certify that there came before me on Wednesday,
7   November 10, 2010, the person hereinbefore named,
8   who was by me duly sworn to testify to the truth
9   and nothing but the truth of his knowledge
10  concerning the matters in controversy in this
11  cause; that the witness was thereupon examined
12  under oath, the examination reduced to typewriting
13  under my direction, and the deposition is a true
14  record of the testimony given by the witness.
15       I further certify that I am neither
16  attorney or counsel for, nor related to or employed
17  by, any attorney or counsel employed by the parties
18  hereto or financially interested in the action.
19       IN WITNESS WHEREOF, I have hereto set my
20  hand, this the 22nd day of November 2010.
21
22
23
         V. DARIO STANZIOLA, CSR, RPR, CRR
24       Notary Public No. 20011200120
25

49 (Pages 190 to 191)