Fogden, Jason        11-11-2010
Confidential - Under Protective Order

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

_____
                              )
CITY OF GREENVILLE, ILLINOIS, )
et al.,                       )
                              )
          Plaintiffs,         )
                              ) Case No.
vs.                           ) 10-cv-188-JPG-PMF
                              )
SYNGENTA CROP PROTECTION, INC.,)
et al.,                       )
                              )
          Defendants.         )
_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF JASON FOGDEN

VOLUME I


Thursday, November 11, 2010

At: 9:03 a.m.


Taken at:

O'Henry Hotel

624 Green Valley Road

Greensboro, North Carolina




Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR

Exhibit 009 Page 1
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 2

```
 1              APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3     STEPHEN M. TILLERY, Esq.
        MICHAEL KLENOV, Esq.
 4     JERRY BROWN, Esq.
        Korein Tillery, LLC
 5     505 N. 7th Street, Suite 3600
        St. Louis, Missouri 63101
 6     Phone: 314.241.4844  Fax: 314.241.3525
        E-mail: stillery@koreintillery.com
 7     E-mail: mklenov@koreintillery.com
 8  ON BEHALF OF THE DEFENDANTS:
 9     MICHAEL A. POPE, Esq.
        PETER SCHUTZEL, Esq.
10     McDermott Will & Emery LLP
        227 West Monroe Street
11     Chicago, Illinois 60606
        Phone: 312.372.2000  Fax: 312.984.7700
12     E-mail: mpope@mwe.com
        E-mail: pschutzel@mwe.com
13
        KURTIS B. REEG, Esq.
14     Reeg Lawyers, LLC
        1 North Brentwood Boulevard, Suite 950
15     St. Louis, Missouri 63105
        Phone: 314.446.3350  Fax: 314.446.3360
16     E-mail: kreeg@reeglawfirm.com
17
18
        Also Present:
19
        GARY TODD, CLVS, Videographer
20
        ALAN NADEL, Esq.
21     Syngenta Crop Protection, Inc.
22     PAUL LESKO, Esq.
        Simmons
23
24
25
```

Page 4

```
 1           INDEX OF EXAMINATIONS
 2
 3
    By Mr. Tillery          PAGE   6
 4
 5
 6          INDEX OF EXHIBITS
 7  NUMBER     EXHIBIT          MARKED
    Plaintiff's Exhibit 1: Syngenta Treasury  22
 8  Policy for the Syngenta Group, Bates
    GRNVL0000085593 - 5609
 9
    Plaintiff's Exhibit 2: Syngenta        71
10  Sanctioning Process Guideline March
    2010, Bates GRNVL0000085980 - 86123
11
    Plaintiff's Exhibit 3: Statement of      121
12  Expense documents, Bates GRNVL0000078282
    - 8350
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        VIDEOTAPED DEPOSITION OF JASON FOGDEN, a
 2  witness called on behalf of the Plaintiffs, before
 3  V. Dario Stanziola, CSR, RPR, CRR, Notary Public,
 4  in and for the State of North Carolina, held at the
 5  O'Henry Hotel, 624 Green Valley Road, Greensboro,
 6  North Carolina, on Thursday, November 11, 2010,
 7  commencing at 9:03 a.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1       THE VIDEOGRAPHER: Here begins the
 2  videotaped deposition of Jason Fogden, tape
 3  one, volume one in the matter of City of
 4  Greenville, Illinois, et al. v Syngenta Crop
 5  Protection Incorporated, et al. in the United
 6  States District Court for the Southern
 7  District of Illinois, Case Number
 8  10-CV-188-JPG-PMF.
 9     Today's date is November 11th, 2010, and
10  the time on the video monitor is 8:03.
11     The video operator today is Gary Todd of
12  TeleVisual representing WestLaw Deposition
13  Services.  The court reporter is Dario
14  Stanziola of Huseby Incorporated, reporting on
15  behalf of WestLaw Deposition Services.
16     Today's deposition is being taken on
17  behalf of the plaintiff and is taking place at
18  624 Green Valley Road, Greensboro, North
19  Carolina.
20     Counsel, please introduce yourselves and
21  state whom you represent.
22     MR. TILLERY:  For the plaintiffs, Steve
23  Tillery, Michael Klenov of Korein Tillery of
24  St. Louis.  Also present, Jerry Brown.
25     MR. POPE:  For the defendants, Michael
```

2 (Pages 2 to 5)

Exhibit 009 Page 2
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 6

1    Pope and Pete Schutzel, McDermott Will & Emery
2    in Chicago.
3         MR. REEG:  Kurt Reeg from Reeg Lawyers
4    representing the defendants.
5         MR. NADEL:  And Alan Nadel with Syngenta
6    Crop Protection, Inc.
7         THE VIDEOGRAPHER: And others present.
8         MR. LESKO:  Paul Lesko.
9         THE VIDEOGRAPHER:  Would the court
10   reporter please swear in the witness.
11        (Witness Sworn)
12        THE VIDEOGRAPHER:  Please begin.
13             JASON FOGDEN,
14   having been duly sworn, was examined and testified
15   as follows:
16             EXAMINATION
17   BY MR. TILLERY:
18        Q.  For the record, would you state your name,
19   please.
20        A.  Jason Fogden.
21        Q.  And what is your occupation, sir?
22        A.  Chief financial officer.
23        Q.  For?
24        A.  For Syngenta Crop Protection, Inc.
25        Q.  Okay. Could you tell me about your

Page 7

1    education and training.
2         A.  Educated in the U.K.  Did my high school
3    and the university in the U.K.  Joined Price
4    Waterhouse in London from university.
5         Q.  Which -- which university did you attend?
6         A.  University of New Castle.
7         Q.  And that was -- when did you start that?
8         A.  1989 to 1992.
9         Q.  Okay. And was that your first formal
10   education after high school?
11        A.  Yes.
12        Q.  And a degree was awarded?
13        A.  Yes.
14        Q.  And what was the degree, sir?
15        A.  Law and economics, joint honors.
16        Q.  Are you a licensed attorney?
17        A.  No.
18        Q.  Okay. As I've done with the other
19   witnesses, I apologize for my cough.  I'm sorry.  I
20   hope it doesn't interfere.  But I hope we can get a
21   record that's clear without me coughing over your
22   answers, okay.  Bear with me on that.
23             What was your first full-time job?
24        A.  For Price Waterhouse in London.
25        Q.  And what did you do there?

Page 8

1         A.  I started off in their corporate tax
2    group.
3         Q.  And what were you doing in the corporate
4    tax group?
5         A.  Tax consultancy, tax compliance.  I also
6    did a number of stints with the audit team to gain
7    experience for my job at the accountancy
8    qualification.  So that included going out to
9    clients and doing regular audit report work as well
10   as tax consulting and compliance work.
11        Q.  Have you ever given a deposition before?
12        A.  No.
13        Q.  Have you ever testified in any proceeding
14   before?
15        A.  No.
16        Q.  Did you have formal education after the
17   college that you spoke to us of?
18        A.  Just my chart of accountancy exams.
19        Q.  And when did you take those?
20        A.  Between 1993 and 1996.
21        Q.  Did you become a certified public
22   accountant in the United States?
23        A.  No.
24        Q.  Okay.
25        A.  I'm a chartered accountant in the U.K.

Page 9

1         Q.  All right.  And how long did you stay at
2    the Price Waterhouse job?
3         A.  I was there for seven years, from '93 to
4    2000.
5         Q.  And then what was your next job?
6         A.  With KPMG in London doing a similar role.
7         Q.  Until when?
8         A.  Until the end of 2002 when I joined
9    Syngenta.
10        Q.  Have we covered the general assignments
11   that you've had with those two different firms before
12   joining Syngenta?
13             Were there other jobs?
14        A.  No, those are the general assignments.
15        Q.  Where was your first assigned position with
16   Syngenta?
17        A.  In Basel.
18        Q.  And for which entity were you employed?
19        A.  I was employed by Syngenta International,
20   AG.
21        Q.  What was your job there?
22        A.  My job was deputy head of tax.
23        Q.  To whom did you report?
24        A.  I reported to Peter Schreiner.
25        Q.  Do you know what his title was?

3 (Pages 6 to 9)

Exhibit 009 Page 3
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                              11-11-2010
Confidential - Under Protective Order

Page 10

1    A.  His title is head of group tax.
2    Q.  And could you briefly -- the depositions
3  have been lasting hours and hours, and we've been
4  trying to short circuit them a little bit.  And I've
5  promised Mr. Pope to try to short circuit yours, to
6  cut -- so we can get you and Mr. Stypa done in one
7  day, okay?  So I promise you that's what my goal is,
8  all right?
9       So I just wanted to tell you that.  So as
10  we go forward, I'm going to -- I'm going to
11  abbreviate some of the areas that I would have
12  otherwise gone into at length.  But maybe you can
13  help me out at some of these points.  What were you
14  doing then in that job?
15    A.  My role mainly involved ensuring that the
16  group was in compliance with transfer pricing laws
17  around the world.  And dealing with sort of ad hoc
18  group tax matters, dealing with tax cases when they
19  came up, you know, generally those sorts of
20  matters.
21    Q.  When you say the group, you're referring to
22  the Syngenta group of companies?
23    A.  Yes.
24    Q.  And that's a term that we'll be using
25  throughout the deposition.  And that would include

Page 11

1  the principal holding company and all the subsidiary
2  affiliates of Syngenta, AG; is that your
3  understanding?
4    A.  That's my understanding.
5    Q.  Yes.
6       All right.  Did your responsibilities in
7  that position change or did -- when you were in
8  Basel?
9    A.  They were pretty steady over -- I was in
10  that role for about four years.  And they were
11  pretty steady during that time.
12    Q.  Did your report responsibility change?
13    A.  No.
14    Q.  Did you do any tax work for Syngenta Crop
15  Protection, Inc. when you were in Basel?
16    A.  No, the Crop Protection, Inc. has its own
17  tax team.
18    Q.  Okay. In the United States?
19    A.  Yes.
20    Q.  Did you have interaction with Syngenta Crop
21  Protection, Inc. when you were in Basel?
22    A.  Not in any meaningful way with Syngenta
23  Crop Protection, Inc. when I was in Basel.
24    Q.  Do you know the difference between direct
25  and functional reporting?

Page 12

1    A.  Yes.
2    Q.  Did anyone functionally report to you when
3  you were at Basel?
4    A.  No.
5    Q.  You told me who your direct report was.
6  Did you have a functional reporting obligation when
7  you were in Basel?
8    A.  They were the same thing.
9    Q.  Same one?
10    A.  Yes.
11    Q.  And with whom was this person affiliated in
12  terms of the entity; if you remember?
13    A.  He worked for Syngenta International, AG
14  as well.
15    Q.  Okay. And when was your last employment in
16  Basel?
17    A.  Around mid 2006.
18    Q.  And then you had a change of duties or
19  responsibilities?
20    A.  Yes.
21    Q.  And what happened then?
22    A.  Then I moved to the United States to
23  Syngenta Corporation in Delaware.
24    Q.  What was your job at Syngenta Corporation?
25    A.  My job there was CFO for that entity.  So

Page 13

1  that was in our Delaware office.
2    Q.  How did that move or transfer come about?
3    A.  That team in Delaware is a -- has a tax
4  team within it as well which deals with more U.S.
5  matters.  So it was an area with which I was
6  familiar.  I'm a chartered accountant.  I had
7  worked closely with my finance colleagues over the
8  four years I was in Basel, and they selected me for
9  that role.
10    Q.  Who selected you for it?
11    A.  Well, I got the notification from my boss
12  Peter Schreiner.
13    Q.  Did Mr. Schreiner -- strike that.
14       Was that considered a permanent move or a
15  temporary assignment.
16    A.  A temporary assignment.
17    Q.  How long did the assignment last?
18    A.  I was there a year and a half.
19    Q.  And your duties in that job?
20    A.  To basically run the team in the
21  corporate office.  It's a relatively small team.
22    Q.  And the team was a tax team?
23    A.  Tax, some finance, some treasury.
24    Q.  Did you have responsibility for other U.S.
25  subsidiaries while you were there?

4 (Pages 10 to 13)

Exhibit 009 Page 4
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                          11-11-2010
Confidential - Under Protective Order

Page 14

1    A.  No.
2    Q.  And what was your next job?
3    A.  My next job was my current role in
4  Greensboro.
5    Q.  So you started that when?
6    A.  January 2008.
7    Q.  How was that move initiated?
8    A.  My functional boss at the time had
9  requested that I move to Greensboro or had offered
10 me the opportunity to move to Greensboro when the
11 role in Greensboro was vacated.
12   Q.  Who was your functional boss?
13   A.  My functional boss was John Ramsey.
14   Q.  Where was he?
15   A.  He works for Syngenta International, AG.
16   Q.  In Basel?
17   A.  Yes.
18   Q.  Who was your direct report when you were in
19 --
20   A.  My direct report at the time was Valdemar
21 Fischer.
22   Q.  Before you came to Syngenta Crop
23 Protection, Inc.?
24   A.  Yes.
25   Q.  Where was Mr. Fischer?

Page 15

1    A.  He's based in Greensboro.
2    Q.  Was he at the time the president of
3  Syngenta Crop Protection, Inc.?
4    A.  Yes.
5    Q.  When Mr. Ramsey -- strike that.
6        When did Mr. Ramsey ask you to assume the
7  position at Syngenta Crop Protection, Inc.?
8    A.  I believe sometime in November of 2007.
9    Q.  7.
10       So while you were at Syngenta Corporation,
11 you directly reported to the president of Syngenta
12 Crop Protection, Inc.?
13   A.  Only in the organizational charts. I
14 mean, I had -- I had no real interaction with Mr.
15 Fischer.
16   Q.  But that's what the organizational charts
17 provided?
18   A.  I would have to check that, yes.  But as
19 I say, our interaction was nonexistent.
20   Q.  Was he the head of NAFTA?
21   A.  What do you mean by NAFTA?
22   Q.  Do you know what the -- what Syngenta Crop
23 Protection, Inc. means when it uses the word NAFTA in
24 its organizational charts?
25   A.  His official role is the CEO of Syngenta

Page 16

1  Crop Protection, Inc.  He has -- he has an
2  oversight accountability for the U.S., Canada and
3  Mexico for the crop protection division.
4    Q.  Do you understand that to be NAFTA?
5    A.  Yes, I would use that phrase.
6    Q.  Okay. Have you seen the term NAFTA used to
7  describe the responsibility over those three
8  countries?
9    A.  It's used in a variety of ways.  I have
10 seen it used in that way.
11   Q.  Do you have NAFTA responsibilities now?
12   A.  I have -- I have an oversight
13 responsibility for U.S., Canada and Mexico, yes.
14   Q.  And what is your oversight responsibility
15 over Canada and Mexico?
16   A.  We have a monthly business review process
17 where they talk us through how their business is
18 going and inform us on how the business is going
19 and the challenges that they're having or the
20 opportunities that they have.  We have a strategic
21 review once a year, which is generally for one day.
22 And then from time to time I would talk with them
23 on ad hoc matters.  But that's almost entirely with
24 the CFO of Canada and Mexico.
25   Q.  Who has functional reporting obligations to

Page 17

1  you from those two companies?
2    A.  Both of the CFO's.
3    Q.  What role do you have in terms of any
4  filings that the Mexican and the Canadian companies
5  filed with governmental agencies?
6    A.  No role whatsoever.
7    Q.  Okay. Are you on the boards of any board of
8  directors of any organizations of the Syngenta
9  affiliates or subsidiaries?
10   A.  Syngenta Corporation, Syngenta Crop
11 Protection, Inc. and I believe Conrad Fafard, Inc.
12 which is a small subsidiary in the U.S.
13   Q.  Can you spell the name of that small
14 subsidiary?
15   A.  C-O-N-R-A-D, F-A-F-A-R-D.
16   Q.  Have you recently resigned any role as a
17 board member?
18   A.  Yes, I think I used to be on the board of
19 Syngenta Biotechnology, Inc.
20   Q.  Why did you resign?
21   A.  Because it wasn't really -- I wasn't
22 really adding any value to the board.  I wasn't
23 really involved or attending a lot of the board
24 meetings, so.
25   Q.  Were there board meetings?

5 (Pages 14 to 17)

Exhibit 009 Page 5
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 18

1    A.  Yes, on -- telephone meetings.
2    Q.  Okay. And you weren't attending those
3  telephone meetings?
4    A.  No.
5    Q.  Did you attend any of them?
6    A.  Yes, I attended a few.  I don't recall
7  how many.
8    Q.  How long were you on the board?
9    A.  Year and a half.
10    Q.  Did someone ask you to resign?
11    A.  No.
12    Q.  Were you asked to join the boards of the
13  companies when you assumed your role at Syngenta Crop
14  Protection, Inc.?
15    A.  I was already on the board of Syngenta
16  Corporation, so that just carried over.  In my role
17  I became a board member of Syngenta Crop
18  Protection, Inc.  And when we acquired Conrad
19  Fafard, I became a board member of that company as
20  well.
21    Q.  Who acquired Conrad Fafard?
22    A.  I would have to check.  I'm not sure of
23  the legal entity relationship.
24    Q.  So you don't know who owns it?
25    A.  I believe it's Syngenta Corporation, but

Page 19

1  I'd have to check.
2    Q.  Who's on the board of directors of Conrad
3  Fafard?
4    A.  Myself, the head of Conrad Fafard, Keelan
5  Pulliam, I think that's P-U, double L, I-A-M.  I
6  believe Cheryl Quain.  And I don't know the other
7  board members' names.
8    Q.  Who are these two people employed by?
9    A.  I believe Keelan Pulliam is employed by
10  Conrad Fafard, Inc.  Cheryl Quain I believe is
11  Syngenta Corporation.  But we didn't have any
12  formal board meetings.
13    Q.  Are those unanimous consent documents
14  signed?
15    A.  Yes.
16    Q.  Do you know if 100 percent of Conrad
17  Fafard, Inc. is owned by a Syngenta entity?
18    A.  I believe so, yes.
19    Q.  Who do you functionally report to now?
20    A.  I functionally report to Mark Patrick.
21    Q.  Where is he located?
22    A.  He works for Syngenta International, AG.
23    Q.  In Basel?
24    A.  Yes.
25    Q.  Has that been since you've assumed your

Page 20

1  duties in 2008?
2    A.  Yes.
3    Q.  Is he the CFO of the Syngenta Group?
4    A.  No, he's not.
5    Q.  Who is?
6    A.  John Ramsey.
7    Q.  Why did Syngenta Crop Protection, Inc.
8  become an LLC?
9    A.  I think there are a number of reasons for
10  it.  It helps with -- it helps with administration,
11  it helps --
12    Q.  How does it help with administration?
13    A.  I believe there are less filings, fewer
14  filings to have.
15    Q.  Which fewer filings?
16    A.  I don't know.
17    Q.  Okay. How -- why else would it be
18  necessary?
19    A.  I don't know a great deal about that.
20    Q.  Is it safe to say that you had no active
21  role in that process of changing it?
22    A.  I had a very limited role, yes.
23    Q.  Who actually changed it?
24    A.  I don't know.
25    Q.  It wasn't done in your office in

Page 21

1  Greensboro, was it, sir?
2        MR. POPE:  His own office you mean?
3    Q.  Yes, in your own office.
4    A.  In my -- you mean the building or my --
5    Q.  In your -- in your office, namely in your
6  responsibility in your financial sector in your
7  office.
8    A.  We do not have the lead on that, no.
9    Q.  Okay. Do you know who was engaged in
10  changing the status?
11    A.  I don't know who lead it, no.
12    Q.  Did anybody consult with you about the
13  change in the status?
14    A.  We -- yeah, we would have been informed
15  in various meetings.
16    Q.  Okay. Who informed you?
17    A.  I believe it would have been Beth
18  Quarles.
19    Q.  Is that -- is that your testimony that she
20  is the one who informed you?
21    A.  Yes. I mean, I can't -- I can't -- I
22  can't recall definitively.  But she -- she would
23  have been the one who would have talked to me about
24  it.
25    Q.  Will the LLC have a board?

6  (Pages 18 to 21)

Exhibit 009 Page 6
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                                    11-11-2010
Confidential - Under Protective Order

---

Page 22

1    A.  I don't know.
2    Q.  Are any of the other entities being changed
3  from corporations to LLCs?
4    A.  Not that I'm aware of.
5    Q.  Do you know why it was just Syngenta Crop
6  Protection, Inc.?
7    A.  No, I do not.
8    Q.  Were you asked to give a tax opinion about
9  the change?
10    A.  No.
11    Q.  Did you have a tax opinion about the
12  change?
13    A.  No.  I'm not qualified to deal with U.S.
14  tax.
15    Q.  Do you know how the board members of
16  Syngenta Crop Protection, Inc. subsidiaries are
17  selected?
18    A.  I don't have a say in their selection,
19  no.
20    Q.  Do you know who does have a say?
21    A.  No.  I'm not consulted.
22      (Plaintiff's Exhibit 1: Syngenta Treasury
23      Policy for the Syngenta Group, Bates
24      GRNVL0000085593 - 5609 marked for
25      identification, as of this date.)

---

Page 23

1    Q.  We've marked for the deposition a document
2  entitled treasury policy for the Syngenta Group.  And
3  that's marked as Exhibit Number 1.  That bears a
4  number at the bottom of the page on the right side.
5  Do you see that number?  It says Greenville 85593.
6    A.  Yes.
7    Q.  The last page of the document is Greenville
8  85609.
9      I'll probably be referring to that number
10  so we know we're on the same page, okay?
11    MR. POPE:  Literally?
12    MR. TILLERY:  Yeah.
13    Q.  Are you familiar with this document?
14    A.  I have read it, yes.
15    Q.  This is a document on the front page that
16  says it was approved by the Syngenta audit committee
17  on July 20th, 2009, and it takes effect on July 1st,
18  2010.  I'm sorry, January 1st, 2010.  Excuse me.  I
19  misspoke.  Do you see that?
20    A.  Yes.
21    Q.  Do you have a copy of this document in your
22  office?
23    A.  There's a copy on the intranet, yes.
24    Q.  Okay. And when you say there's a copy on
25  the intranet, what does that mean?

---

Page 24

1    A.  We would tend to keep copies of policies
2  electronically rather than on paper.
3    Q.  Right.
4      Can you look at page at the bottom of the
5  page ending in 85595.  And if you would look at the
6  first paragraph and read that paragraph aloud,
7  please.
8    A.  The very first paragraph?
9    Q.  Correct, sir.
10    A.  The treasury policy establishes
11  objectives and organizational principles for all
12  treasury activities within the group and decides
13  responsibilities and authorities of the group CFO
14  and group treasury.
15    Q.  And who is the group CFO referenced there?
16    A.  John Ramsey.
17    Q.  And has his assignment stayed the same in
18  terms of his association with a particular Syngenta
19  entity, as far as you know?  Syngenta Crop -- I'm
20  sorry, Syngenta International, AG?
21    A.  Yes, as far as I'm aware.
22    Q.  Okay. Is he a member of the Syngenta
23  executive committee?
24    A.  Yes.
25    Q.  And the group treasury that is referenced

---

Page 25

1  there, what is the group treasury comprised of?
2    A.  There is a group treasurer who leads that
3  group and there are a number of treasury
4  individuals in various countries which functionally
5  report to him.
6    Q.  Do you know who the group treasurer is?
7    A.  Yes.  I believe it's Nik Zuercher.
8    Q.  And where is his office?
9    A.  He works for Syngenta International, AG.
10    Q.  Is he located in Basel?
11    A.  Yes.
12    Q.  Can you tell me what group treasury means
13  to you when that term is used in that first paragraph
14  of the introduction?
15    A.  In terms of me, I have no dealings with
16  group treasury other than with the treasurer based
17  in Wilmington, Delaware.
18    Q.  What is the group treasury that's mentioned
19  there, if you can tell me?
20    A.  I would read that to mean the global
21  treasury group, which includes the treasurer based
22  in Wilmington, Delaware.
23    Q.  All right.  And could you tell me when you
24  say the global treasury group, do you know how many
25  members there are in that group?

---

7 (Pages 22 to 25)

Exhibit 009 Page 7
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

---

Page 26

1    A.  No, I have no idea.
2    Q.  Do you know who the members of the group
3  treasury are employed by?
4    A.  No, I do not.
5    Q.  You know some of the members, right?
6    A.  Yes.  I know -- I know that the treasurer
7  whom I've had dealings with is employed, I believe,
8  by Syngenta Corporation.
9    Q.  And that treasurer is?
10   A.  Henry Graef.
11   Q.  And he's in the United States?
12   A.  He's in Wilmington, Delaware.
13       MR. POPE:  How do you spell Graef.
14       THE WITNESS: G-R-A-E-F.
15   Q.  Is the head of group treasury a different
16  person than the group CFO?
17   A.  Yes.
18   Q.  And who is the head of group treasury?
19   A.  I think -- I believe that is Nik
20  Zuercher.
21   Q.  Okay. You're not a member of group
22  treasury?
23   A.  No.
24   Q.  You see a reference of the audit
25  committee --

---

Page 27

1    A.  Yes.
2    Q.  -- on the first page, approved by the audit
3  committee?
4        What is the audit committee?
5    A.  I believe it's a subcommittee of the
6  Syngenta board.
7    Q.  It's the Syngenta AG board of directors,
8  isn't it, a subcommittee?
9    A.  I don't know who the exact constitution
10  of that committee is.  I have never reported to or
11  stood before that committee.
12   Q.  Is it your best understanding that that
13  treasury -- I'm sorry, strike that.
14       Is it your best understanding that the
15  audit committee is a committee of the Syngenta board
16  of directors?
17   A.  Yes.
18       MR. POPE:  Syngenta, AG board of
19    directors you mean?
20       MR. TILLERY:  Yes.
21   Q.  And according to the introduction, the
22  audit committee approved this policy on behalf of the
23  entire AG board, the Syngenta AG board?
24   A.  I don't know who they approved them of.
25   Q.  I think if you look at it there, it says --

---

Page 28

1  in the second paragraph, the treasury policy together
2  with its appendices was approved by the audit
3  committee on behalf of the board of directors.
4        Do you see that?
5    A.  Yes.
6    Q.  Okay. In July 2009 and it replaces group
7  wide all prior policies and sub policies as well as
8  any amendments thereof as of January 1, 2010.
9        Do you see that?
10   A.  Yes.
11   Q.  Was there another treasury policy in effect
12  before this one?
13   A.  Yes, I believe so.
14   Q.  Were you made aware of it?
15   A.  Yes.
16   Q.  How was it different than this one?
17   A.  I don't -- I wouldn't recall the details.
18   Q.  So you don't know if there was any material
19  difference between the prior treasury policy and this
20  one -- and this treasury policy?
21   A.  I don't recall whether there was.
22   Q.  Okay. Was there always a treasury policy in
23  place since you've been with Syngenta?
24   A.  I don't know from the -- from my earlier
25  time with the group.  There has been one in place,

---

Page 29

1  I believe, since I've been in my current role.
2    Q.  Since 2008?
3    A.  Yes.
4    Q.  And you don't know if there was one in
5  place before then?
6    A.  No.
7    Q.  Look at the section entitled scope, section
8  1.1. The scope of the treasury policy encompasses all
9  affiliates where Syngenta has management control.
10       Do you see that?
11   A.  Yes.
12   Q.  Does that include Syngenta Crop Protection,
13  Inc.?
14   A.  Under the definition used at the bottom
15  of the page, it would.
16   Q.  And you see that definition where it says
17  Syngenta has, at the footnote, management control
18  refers to those entities in which Syngenta has an
19  interest of more than one half of the voting rights,
20  which certainly is Syngenta Crop Protection, Inc.,
21  correct?
22   A.  Um-hum.
23   Q.  You have to say yes or no.  I'm sorry.
24   A.  I'm sorry, yes.
25   Q.  Now, look at the second half of that.  Or

---

8 (Pages 26 to 29)

Exhibit 009 Page 8
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                          11-11-2010
Confidential - Under Protective Order

Page 30

1  otherwise has the power to exercise control.
2       Do you know how that term has been used in
3  terms of the application of this treasury policy?
4       A.  That's not a phrase that is used.  In
5  terms of the treasury policy applying to Syngenta
6  Crop Protection, AG, Syngenta has an interest in
7  more -- more than one half of the voting rights of
8  Syngenta Crop Protection, AG indirectly.
9       MR. POPE:  You mean AG or Inc.?
10      THE WITNESS:  Syngenta Crop Protection,
11  Inc.
12   Q.  Yes, I understand that.
13      But what I'm saying is you've answered it
14  with respect to Inc., Syngenta Crop Protection, Inc.
15  in Greensboro.  I'm talking about any other entity
16  where Syngenta, AG would have the power to exercise
17  control?
18      A.  It's not within my agreement to answer on
19  behalf any other entity.
20   Q.  Look at the last sentence -- look at the
21  last sentence of section 1.2.  All affiliates are
22  accountable for the implementation of the treasury
23  policy and the compliance with the treasury policy
24  within their areas of responsibility.
25      Do you see that?

Page 31

1       A.  Yes.
2       Q.  And Syngenta Crop Protection, Inc. is an
3  affiliate under that definition, isn't it?
4       A.  I don't see on the page where affiliate
5  is defined, but I would assume so.
6       Q.  All right.  And has this treasury policy
7  then been implemented at Syngenta Crop Protection,
8  Inc.?
9       A.  Yes.
10      Q.  Okay.
11      A.  I mean...
12      Q.  Who at Syngenta Crop Protection, Inc. is
13  specifically responsible for complying with this
14  policy?
15      A.  Currently that would be our business
16  services organization.
17      Q.  And could you tell me who that is?
18      A.  The head of the finance business services
19  function is Chris Langley.
20      Q.  Do you know his title?
21      Is it just that, head of business finance
22  services?
23      A.  Yes, I believe so.
24      Q.  Can you tell me why a business finance
25  service head would have responsibility for this and

Page 32

1  it wouldn't be a job that would fall under your
2  jurisdiction?
3       A.  I mean, the treasury policy is designed
4  to make sure that transactions are effected
5  economically and at a low cost and that any
6  treasury transactions that we enter into are
7  entered in efficiently.  The business services
8  group deals with transactional activities and,
9  therefore, the implementation of the policy, which
10  would be transactional in nature, falls under their
11  arena.
12      Q.  Does Mr. Langley report to you?
13      A.  No, he does not.
14      Q.  Who does he report to?
15      A.  He reports to Dan Rose.
16      Q.  And what does Dan Rose do?
17      A.  He is the head of business services.
18      Q.  At Syngenta Crop Protection, Inc.?
19      A.  Yes.
20      Q.  Are you on any global team?
21      A.  I'm not on any global team, no.
22      Q.  Are you on any regional team?
23      A.  I'm on the regional leadership team.
24      Q.  What is that?
25      A.  It is a group that meets two or three

Page 33

1  times a year to talk about strategy and goings on
2  in the region.
3       Q.  Who's on the team?
4       A.  It comprises the CEOs of Syngenta Crop
5  Protection, Inc. and the Canadian and Mexican legal
6  entities.  It has the business heads of each of our
7  business units.  It has our head of legal, our head
8  of supply, our head of research, our head of
9  marketing within Crop Protection, Inc.  I think
10  that's the broad membership.
11      Q.  How often does that group meet?
12      A.  Two to three times a year.
13      Q.  Are you on any team or committee with the
14  person to whom you functionally report?
15      A.  The only -- the only committee I'm on
16  with him is a global finance career development
17  group.
18      Q.  Tell me about that.
19      A.  It's a group that meets every two months
20  to discuss talent management within the finance
21  function and to be aware of who's moving where.  So
22  I attend for one hour every two months.
23      Q.  Is that talent management within finance
24  function?
25      A.  Yes.

9 (Pages 30 to 33)

Exhibit 009 Page 9
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 34

1      Q.  Is that a review of talent in the finance
2  function across the Syngenta Group of companies?
3      A.  Yes.
4      Q.  If you would, look at paragraph two that's
5  on 85596.  Do you see that?  And it talks about the
6  objectives of treasury management.  Do you see that,
7  sir?
8      A.  Yes.
9      Q.  And the first bullet, I'll just read this
10  in the record, under objectives of treasury
11  management the first says, all treasury activities
12  shall be guided with the following objectives, taking
13  account of risk and cost constraints.  One, reduction
14  and management of financial risks.
15         Do you know what that means?
16      A.  I understand what that would mean in my
17  context.
18      Q.  What would it mean to you?
19      A.  Not -- not to take or enter into any
20  financial transactions or commits to any financial
21  transactions which would have unnecessary risk,
22  economic risk to the group or to -- or to Syngenta
23  Crop Protection, Inc.
24      Q.  Do the Syngenta Group of companies
25  centrally manage financial risk on a global basis?

Page 35

1      A.  I don't know the exact remit of group
2  treasury.  Syngenta Crop Protection, Inc. has most
3  of its dealings in terms of its external sales in
4  U.S. dollars, so.
5      Q.  Look at the second bullet, ensuring
6  adequate availability of liquidity.
7         What does that mean?
8      A.  I would take that to mean that there is
9  sufficient cash flow at any point in time and -- to
10  meet the obligations of an entity.
11      Q.  Does the Syngenta group of companies
12  centrally manage the availability of liquidity for
13  the subsidiaries around the world through the group
14  treasury?
15      A.  I don't know the management of the group
16  treasury function for Syngenta Crop Protection,
17  Inc. --
18      Q.  I'm just -- I'm asking you that question.
19  Does the Syngenta Group of companies centrally manage
20  the availability of liquidity for the subsidiaries
21  around the world?
22      A.  I don't know.
23      Q.  Okay.  The third bullet, can you read that
24  and tell me what that means?
25      A.  Optimal capital structuring with respect

Page 36

1  to currency and fixed floating interest rate mix.
2      Q.  Do you know what that means?
3      A.  I would take that as meaning having the
4  right profile of loans and the right profile of
5  loans in respect of currency and whether they are
6  short or long-term in nature.
7      Q.  The sixth bullet says risk adjusted in tax
8  optimized intercompany funding.
9         What does that mean?
10      A.  I would take that to mean from a risk
11  adjusted perspective, that for intercompany funding
12  that would be more around which currencies we have
13  -- we have debts in or not.  From a tax optimized,
14  I mean, funding is tax -- is tax deductible whether
15  external or internal.
16      Q.  Go to 3.1 entitled separation of front
17  office and back office.
18         Can you explain to me what front office
19  functions are?
20      A.  As I understand it, the definition of
21  front office would be more high level activity and
22  back office functions would be more transactional
23  in nature.
24      Q.  Front office is high level activity, is
25  that how it's defined?

Page 37

1      A.  I don't know how it's officially defined.
2      Q.  Well, what is your understanding of the
3  document?
4      A.  Well, my understanding of the document is
5  that front office is defined as execution of
6  external financial transactions.
7      Q.  So front office functions are the execution
8  of external financial transactions.
9         And who would have responsibility for front
10  office functions?
11      A.  Where in particular?
12      Q.  In any front office function, according to
13  this document.
14      A.  According to this document, it doesn't
15  define who has responsibility for front office
16  functions.  In terms of Syngenta Crop Protection,
17  Inc., as I understand it, our treasury function
18  both locally and in Wilmington, Delaware would deal
19  with any -- any of those.
20      Q.  So as this term is used in this document,
21  and I'm looking at 3.1, can you tell me what front
22  office means?
23      A.  As this term is used in this document, it
24  is defined as execution of external financial
25  transactions.

10 (Pages 34 to 37)

Exhibit 009 Page 10
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 38

1    Q.  What does back office means -- strike that.
2         What does back office mean?
3    A.  Back office is defined in this document
4  as settlement, payment and documentation of
5  financial transactions.
6    Q.  Give me a description in the Syngenta Group
7  of companies, pick any company, of a distinction
8  between front office and back office transactions.
9    A.  I can only give an answer in the context
10 of Syngenta Crop Protection, Inc.  I would say that
11 almost the entirety of the functions that we have
12 would be back office functions.  We do not have a
13 complex financial structure.
14   Q.  In your -- with your -- strike that.
15        With your knowledge of operations tax-wise
16 at Basel from your work there, would you agree that
17 the front office functions mentioned here would occur
18 in Basel?
19   A.  In my previous role in tax, I had limited
20 interaction with the treasury group.  And that was
21 quite some time ago.
22   Q.  So are you telling me you just don't know?
23   A.  Yes.
24   Q.  So as CFO of Syngenta Crop Protection,
25 Inc., you wouldn't be able to align within the

Page 40

1    A.  Because you wouldn't get -- you wouldn't
2  get efficiency if you'd blended the two.
3    Q.  Okay.  Are there other process guidelines
4  which flow from this treasury policy that are on your
5  intranet?
6    A.  I'm not aware of detailed policies other
7  than this one.
8    Q.  Can you explain to me what the four eyes
9  principle is that the treasury policy calls for?
10      MR. POPE:  Referenced in the next
11   paragraph?
12      MR. TILLERY:  It's in this section, yes.
13   A.  I believe that's just a general term
14 making sure at least two people see a document
15 before it is agreed.
16   Q.  Actually, doesn't it mean that all treasury
17 related payments require two signatures?
18   A.  That's what it states in this paragraph.
19   Q.  And that's one from the local entity and
20 one from global or group treasury, isn't it?
21   A.  I don't know.
22   Q.  Okay.  Look the at last sentence of the
23 page 85596.
24   A.  Yes.
25   Q.  Tell me what that means.

Page 39

1  company structure of the Syngenta Group of companies
2  who would have front office responsibilities?
3    A.  That's not what I'm saying.  What I'm
4  saying is that in terms of execution of external
5  financial transactions, as I would read it, we
6  don't have that activity in Syngenta Crop
7  Protection, Inc.
8    Q.  Okay.  You don't know who has front office
9  responsibilities as that term is defined in section
10 3.1, correct?
11   A.  Yes.
12   Q.  Why does the treasury policy call for a
13 strict separation of front office and back office
14 functions?
15   A.  I would assume that as with broader
16 finance, back office functions are collected
17 together for efficiency purposes.
18   Q.  Well, okay.  Whether or not they're
19 collected together for efficiency purposes, why does
20 the treasury policy call for a strict separation
21 between those functions you just mentioned and front
22 office functions?
23   A.  Entirely reasonable for the treasury
24 policy to have efficiency as one of its objectives.
25   Q.  But why for the strict separation?

Page 41

1    A.  I believe, though it's not entirely clear
2  to me, that in terms of treasury settlement or
3  payment, they would be referring to an external
4  transaction with regard to foreign currency.  But
5  all -- I mean, all payments made within Syngenta
6  Crop Protection, Inc. I'm authorized up to my
7  delegation of authority from the board to make.
8    Q.  Right.
9        MR. TILLERY:  I move to strike that as
10   unresponsive.
11   Q.  Can you tell me what that last sentence
12 means, please.
13   A.  I'll put it a different way.  That does
14 not restrict my obligation to sign on behalf of
15 Syngenta Crop Protection for -- for payments.  I
16 believe this is to do with foreign currency
17 payments of which we don't really have a great
18 deal.
19       MR. TILLERY:  I move to strike that as
20   unresponsive.
21   Q.  Can you tell me what the last sentence
22 means?
23       MR. POPE:  He's given you two -- twice
24   he's answered.  You don't listen to him,
25   Steve.

11 (Pages 38 to 41)

Exhibit 009 Page 11
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                        11-11-2010
Confidential - Under Protective Order

Page 42

1    MR. TILLERY:  I've got it right in front
2 of me.  His answer was, that does not restrict
3 my obligation to sign.  I'm asking --
4    MR. POPE:  I believe it has to do with
5 foreign currency payments of which we don't
6 have a great deal.
7    Q.  Is it your understanding that the last
8 sentence relates to foreign currency payments?
9    A.  That is my best reading of it at this
10 point in time, yes.
11    Q.  Okay.  Do you know anymore about what it
12 means other than it relates to foreign currency
13 payments?
14    A.  Not at this point in time, no.
15    Q.  Okay.  On the following page, paragraph
16 3.2.  Do you see that?
17    A.  Yes.
18    Q.  What is the middle office that's referred
19 there?
20    A.  I believe the middle office simply
21 collates transactional information so that it could
22 be recorded in a composite format.
23    Q.  Who occupies the middle office in your
24 operation at Syngenta Crop Protection, Inc.?
25    A.  We don't have it -- we don't have a

Page 43

1 defined middle office at Syngenta Crop Protection,
2 Inc.
3    Q.  Do you have a defined front office at
4 Syngenta Crop Protection, Inc.?
5    A.  No.
6    Q.  Would yours be the back office that's
7 referenced here?
8    A.  Syngenta Crop Protection, Inc.'s treasury
9 transaction's pretty operational in nature, and
10 therefore dealt with by the Syngenta business
11 services group.
12    Q.  Where is that?
13    A.  That's within Syngenta Crop Protection,
14 Inc.
15    Q.  Would that be considered a back office
16 function as it's -- as you understand the term to be
17 used in this document?
18    A.  Yes, I would say so.
19    Q.  So tell me what you understand the middle
20 office to be as referenced in this document?
21    In other words, where it would be located
22 if its not Syngenta Crop Protection, Inc.?
23    A.  Syngenta Crop Protection, Inc. would
24 perform similar functions in that we collect what
25 the sum of our risks are and we report what the sum

Page 44

1 of our risks are on the transactions that we have
2 undertaken.  By Syngenta Crop Protection, Inc. is
3 not a complex entity from a treasury perspective.
4 As I mentioned, we have a treasurer based in
5 Wilmington, Delaware who would tend to collate the
6 U.S. transactions as a whole from a reporting
7 perspective.
8    Q.  Sir, I'm trying to move us along as quickly
9 as I can.  Here was my question to you, in other
10 words, where would the middle office be located if
11 it's not in Syngenta Crop Protection, Inc.  That was
12 my question.
13    MR. POPE:  Objection to form.
14    Q.  Can you tell me where it's located?
15    A.  Yeah.  I mean, I would say, actually, the
16 activities -- if it is about accounting and
17 controlling and monitoring the transactions, we
18 would report that from Syngenta Crop Protection,
19 Inc.  So we would have a person who would actually
20 account for and control the financial transactions
21 which would then be collated at a group level.  So
22 we would actually have that function, although we
23 don't have a defined middle office.
24    Q.  And who's that person?
25    A.  That person within Syngenta Crop

Page 45

1 Protection, Inc. would probably be Jenn McMillan.
2    Q.  And who does she report to?
3    A.  She reports to -- indirectly to Chris
4 Langley.
5    Q.  And who does she report directly to?
6    A.  Will Crucian.
7    Q.  And where is he?
8    A.  He's in Syngenta Crop Protection, Inc. in
9 Greensboro.
10    Q.  Take a look at section 4.1.
11    4.1 reads in the second sentence of the
12 first paragraph, Syngenta Group shall act as a single
13 financial unit being centrally managed by group
14 treasury.  The economic interest of the group always
15 takes precedence over local interests of affiliates.
16    Do you see that?
17    A.  Yes.
18    Q.  And according to the next paragraph, group
19 treasury delegates some responsibilities and
20 authorities to affiliates in order to achieve
21 sensible operational effective -- effectives -- I'm
22 sorry, effectiveness within the scope of the treasury
23 policy.
24    Do you see that?
25    A.  Yes.

12 (Pages 42 to 45)

Exhibit 009 Page 12
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 46

1    Q.  Are there specific delegations of such
2    responsibility in writing?
3       A.  I would have to check.  As I say, we do
4    not have a complex treasury --
5       Q.  Sir, I'm asking you are there -- are there
6    documents in writing?
7       A.  I would have to check.
8       Q.  So you're -- today, unfortunately, we can't
9    sort of let you leave and come back to your office
10   and -- we're in the middle of a dep.
11       Do you know right now whether there are
12   such directives?
13      A.  No.
14      Q.  Okay. Have you ever used them?
15      A.  No.
16      Q.  Okay. Look at the following page, which is
17   85598, section 4.6.
18       What is a counterparty referenced there?
19      A.  A counterparty would be an entity or
20   person with whom you enter a loan transaction.
21      Q.  Are you talking about a bank?
22      A.  I wouldn't -- I wouldn't restrict it to
23   banks, no.
24      Q.  Okay.
25      A.  I'm not talking about commercial

Page 47

1    transactions.
2       Q.  Have you been involved in any transaction
3    with a counterparty?
4       A.  Under this definition, no.  Because this
5    definition would not cover our customers.
6       Q.  All of the counterparties have to be
7    approved by the group's CFO, don't they?
8       A.  All counterparties within the treasury
9    document, which I believe is for external financial
10   transactions.
11      Q.  Let me read the sentence at 4.6.  All
12   counterparties have to be approved by the group's CFO
13   with a counterparty limit assigned per instrument
14   type.
15      A.  Yes.  And by instrument type it is
16   referring to an external financial transaction such
17   as a loan, which we do not have within Syngenta
18   Crop Protection, Inc.
19      Q.  So you don't borrow?
20      A.  We borrow internally.
21      Q.  Okay. When you borrow internally, are you
22   borrowing from another Syngenta company?
23      A.  Yes.
24      Q.  Upon -- strike that.
25       Who does Syngenta Crop Protection, Inc.

Page 48

1    borrow funds from?  Which entity?
2       A.  Would probably be Syngenta Corporation.
3       Q.  Do you know?
4        Is it Syngenta Corporation or not?
5       A.  I would imagine its Syngenta Corporation,
6    yes.
7       Q.  You keep saying I imagine.  You're the --
8    you're the financial officer.  I'm trying to find
9    out.
10      A.  Intercompany debt is not something I
11   spend a great deal of my time on.
12      Q.  Do you spend any of your time on
13   intercompany debt?
14      A.  I see a review of what level of
15   intercompany debt we have every month in our annual
16   -- in our monthly review of financial statements of
17   Syngenta Crop Protection.
18      Q.  And is it your understanding that you're
19   borrowing from Syngenta Corporation?
20      A.  That would be my understanding, yes.
21      Q.  Okay. Who does Syngenta Corporation borrow
22   from?
23      A.  I don't know.
24      Q.  Let's go to 4.7.
25       That's a paragraph that starts at 85598

Page 49

1    carries over to the next page.  Do you see that?
2        In the carryover page, it refers to group
3    legal and group tax.
4        Where is group legal located?
5       A.  My understanding is that as with group
6    treasury and with group tax, that is a group of
7    individuals who may be located in a number of
8    different locations.  So there are group tax
9    individuals and I would assume group legal
10   individuals in different territories.
11      Q.  Do you understand that the head of group
12   legal is Christoph Maeder?
13      A.  Yes.
14      Q.  And he's in Basel?
15      A.  Yes.
16      Q.  Syngenta International, AG?
17      A.  Yes.
18      Q.  Member of the Syngenta executive committee?
19      A.  Yes.
20      Q.  And is he also head of group tax?
21      A.  Peter Schreiner is head of group tax.
22      Q.  Is Peter Schreiner a member of the Syngenta
23   executive committee?
24      A.  No, he's not.
25      Q.  Is he a board -- one of the Syngenta board

13 (Pages 46 to 49)

Exhibit 009 Page 13
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                           11-11-2010
Confidential - Under Protective Order

Page 50

1  of directors?
2      A.  No, he's not.
3      Q.  Okay.  Do you know who he -- do you know
4  who Peter Schreiner reports to?
5      A.  He reports to Christoph Maeder.
6      Q.  Do you know how group treasury maintains
7  the liquidity of Syngenta Group companies worldwide?
8      A.  No.
9      Q.  Are Syngenta Crop Protection, Inc.'s bank
10  accounts cleared daily to remove excess cash?
11      A.  Yes.
12      Q.  Is that clearing function referred to as
13  cash sweeping?
14      A.  Yes.
15      Q.  Could you tell me how the cash sweeping
16  process works?
17      A.  Not in detail, no.
18      Q.  Who's in charge of that?
19      A.  Henry Graef, who is the treasurer based
20  in Wilmington, will liaise with Will Crucian's team
21  to effect any transaction.
22      Q.  Henry Graef works for?
23      A.  Syngenta Corporation.
24      Q.  And Willy Christian?
25      A.  Will Crucian, C-R-U-C-I-A-N.

Page 51

1      Q.  Okay.  Who does he work for?
2      A.  He works for Chris Langley, that I
3  referred to earlier.
4      Q.  And they coordinate on a daily basis to
5  sweep the cash from the company?
6      A.  I would imagine so, yes.
7      Q.  Do you know where the cash goes?
8      A.  No, I do not.
9      Q.  Do you know which bank controls the funds
10  for the Syngenta Group companies?
11      A.  No.
12      Q.  From a tax standpoint, do you know why the
13  funds are swept?
14      A.  I don't believe it's -- I don't believe
15  it's a tax transaction.
16      Q.  Why is it done?
17      A.  Because it -- economically it means that
18  you can gain the most amount of interest income
19  over time by doing so because you collate your
20  funds in the highest earning account, such as an
21  individual would.
22      Q.  And where would those accounts be?
23      A.  I don't know the particular details of
24  the accounts.
25      Q.  Could they be in other countries?

Page 52

1      A.  I wouldn't have thought so.  Not for the
2  U.S., but --
3      Q.  You don't know?
4      A.  -- that's speculation, yeah.
5      Q.  Are the funds allocated to meet the
6  liquidity requirements of other Syngenta Group
7  companies?
8      A.  I don't know.
9      Q.  Do you know who decides how much money is
10  swept daily?
11      A.  I believe it is an automated process, but
12  I would have to -- I would have to check.  I don't
13  deal with the detail of that.
14      Q.  Automated in that all of the money is
15  swept?
16      A.  I believe so.
17      Q.  Is there a policy on cash sweeping?
18      A.  I haven't seen it.
19      Q.  Do you know what part of the global
20  operation of Syngenta companies has jurisdiction over
21  cash sweeping?
22      A.  I don't know what you mean in terms of
23  the global operation.
24      Q.  In Basel, who there would you go to to ask
25  the question about cash --

Page 53

1      A.  I have never dealt with a person from
2  group treasury --
3          MR. POPE:  Let him finish his question
4      before you answer, okay?
5      Q.  Okay.  Now, Syngenta Crop Protection, Inc.
6  needs funds that are not in its account to complete a
7  transaction.  Tell me how it secures those funds back
8  the following day or the following week to pay off
9  bills?
10      A.  Within the team of Will Crucian, they
11  have a weekly cash flow process where they
12  understand what their ins and outs for any
13  particular week will be and ensure that we have
14  sufficient liquidity to deal with any of those
15  obligations that we have.  That is -- that is a
16  weekly process.  So they are on top of any
17  short-term obligations that they have on a weekly
18  basis.
19      Q.  And Will Crucian works for whom?
20      A.  Chris Langley.
21      Q.  Okay. He's at Syngenta Crop Protection,
22  Inc.?
23      A.  Yes.
24      Q.  And again, if there are monies that are
25  going to be needed, who does he contact to secure

14 (Pages 50 to 53)

Exhibit 009 Page 14
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                        11-11-2010
Confidential - Under Protective Order

Page 54

1  those monies?
2      A.  All of his discussions would be with
3  Henry Graef.
4      Q.  And Henry Graef would talk to whom?
5      A.  I don't know who Henry Graef would talk
6  to.
7      Q.  Okay. Where would the money come from if
8  there was inadequate funds at Syngenta Corporation?
9      A.  I would find it hard to believe there
10 were any -- I would find it hard to believe there
11 were at any point in time inadequate funds at
12 Syngenta Corporation.
13     Q.  Do you know what funding they have?
14     A.  No, I have -- I have little interaction
15 with group treasury.
16     Q.  Go to, if you wouldn't mind, page 85602.
17        On this page there's a reference to a
18 shareholder cash return policy.  That's in the second
19 paragraph.
20        First sentence reads, on a yearly basis the
21 group funding strategy is agreed with the group CFO
22 and shareholder cash return policy with the board.
23        Tell me what that means.
24     A.  I have never been in one of those
25 meetings nor have I seen that strategy.

Page 55

1      Q.  Is this something that you ever get
2  involved with?
3      A.  No.
4      Q.  Do you know what a shareholder cash return
5  policy is?
6      A.  I don't believe there is a broad
7  definition of what that is, no.
8      Q.  Do the Syngenta Group companies pay
9  dividends?
10     A.  Yes.
11     Q.  How are dividends paid?
12     A.  Can you clarify your question.
13     Q.  Well, how would a dividend be paid to
14 Syngenta Crop Protection, Inc.?
15     A.  To Syngenta Crop Protection, Inc.?
16     Q.  Right.
17     A.  From -- from whom?  I.
18     Q.  I don't know.  That's what I want you to
19 tell me.
20     A.  I don't believe we have any subsidiaries
21 who would pay us dividends.
22     Q.  Okay. None of them pay dividends, right?
23     A.  Yeah.  I don't believe Syngenta Crop
24 Protection has subsidiaries.  Syngenta Crop
25 Protection, Inc.

Page 56

1      Q.  Has any subsidiaries.
2        So it doesn't pay dividends?
3      A.  It pays dividends. But your question was
4  to Syngenta Crop Protection, Inc.
5      Q.  Who does it pay dividends to?
6      A.  I believe it would be Syngenta
7  Corporation -- Syngenta Seeds, Inc.
8      Q.  Syngenta Seeds?
9      A.  Yes.
10     Q.  Okay. Walk me through how that process
11 works?
12     A.  If there was a -- we would not have a
13 formal policy around dividend payments within the
14 group.
15     Q.  Within what group?
16     A.  Well, within affiliates within the
17 Syngenta Group.
18     Q.  Of all of the affiliates?
19     A.  I can't speak for all of the affiliates.
20 I can speak for Syngenta Crop Protection, Inc.
21     Q.  Well, when you -- I'm trying to define
22 terms.  When you say within the group, what are you
23 talking about?
24     A.  If I mentioned the group, I would say in
25 Syngenta Group of companies.

Page 57

1      Q.  Okay.
2      A.  In terms of your particular question
3  around dividends, it is an ad hoc process and not a
4  regular process.
5      Q.  Okay. Who decides the ad hoc process?
6      A.  If there is a -- if there is a need to
7  pay a dividend or a request to a pay a dividend,
8  that would be dealt with by the board of Syngenta
9  Crop Protection, Inc.
10     Q.  And have there been board meetings where
11 that has been -- a dividend has been declared?
12     A.  We would not have meetings.  That would
13 generally be dealt with unanimous consent.  It is
14 not a regular process.
15     Q.  Have there been any since you've been on
16 the board where dividends have been declared?
17     A.  Yes.
18     Q.  And was that done by unanimous consent?
19     A.  Yes.
20     Q.  Did you sign those documents as part of the
21 unanimous consent?
22     A.  Yes.
23     Q.  And with whom -- strike that.
24        Who proposed the dividend?
25     A.  The proposal came to me from Beth

15 (Pages 54 to 57)

Exhibit 009 Page 15
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 58

1    Quarles, who is the legal counsel and member of the
2    board of Syngenta Crop Protection, Inc.
3        Q.  And did you prepare the documents?
4        A.  No, I did not.
5        Q.  Did she?
6        A.  She -- I believe she prepared the
7    documents, yes.
8        Q.  Did she send the same documents to
9    everybody else on the board?
10       A.  I don't know that.
11       Q.  Do you know who ultimately proposed that
12   dividend?
13       A.  No.
14       Q.  It wasn't you, was it?
15       A.  It wasn't me.
16       Q.  Okay.  Was there any dissent on the vote?
17       A.  No.
18       Q.  How many times has that been done?
19       A.  Only once, I believe, in my -- in my
20   tenure.
21       Q.  Where was that dividend or was it, to whom?
22       A.  It would be to Syngenta Seeds, Inc.
23       Q.  How much was it?
24       A.  Approximately $300 million.
25       Q.  Okay.  Does the Syngenta Group treasury

Page 59

1    determine whether Syngenta Group companies will pay
2    dividends?
3        A.  Not to my knowledge, no.
4        Q.  Are you familiar with the reserve powers
5    that are on the intranet?
6        A.  I have heard the term.  They're not, as
7    far as I'm aware, on the intranet.
8        Q.  Are you familiar with the reserve powers?
9        A.  Can you define more closely how you
10   determine familiar.
11       Q.  Well, I mean, have you ever seen them?
12       A.  I've seen -- I've seen a copy.  I do not
13   have a copy.
14       Q.  Where did you see a copy?
15       A.  I have -- I'm trying to remember.
16       Q.  Was it in preparation for the deposition?
17       A.  I have not seen a full copy in that.  We
18   discussed it.
19       Q.  Was it in preparation for the deposition?
20       MR. POPE:  Yesterday.
21       Q.  Was that the first time you'd ever seen the
22   reserve powers?
23       A.  Yes.
24       Q.  He has to hear a yes or a no.
25       A.  Yes.

Page 60

1        Q.  So as part of your day-to-day functions,
2    you weren't given this?
3        A.  In terms of my day-to-day functions, the
4    responsibilities that I have within Syngenta Crop
5    Protection, Inc. are delegated to me by the board
6    of Syngenta Crop Protection, Inc. under a
7    delegation of authority.
8        Q.  Okay. I move to strike your answer as
9    unresponsive.
10       Let me read you what I -- what I said,
11   okay, so we can be clear.  So as part of your
12   day-to-day functions, you weren't given this?
13       A.  No.
14       Q.  Okay.  Did you know before yesterday that
15   it was on the Syngenta intranet?
16       A.  No.
17       Q.  Did you read the -- the reserve power
18   section dealing with finance including tax?
19       A.  I did not read it in any detail.
20       Q.  So you really don't know what the reserve
21   powers section provides with respect to who
22   determines the dividends of Syngenta Group companies,
23   do you?
24       A.  No.  As I -- as I responded, my
25   responsibilities within Syngenta Crop Protection,

Page 61

1    Inc. are given to me under a delegation of
2    authority from the board of Syngenta Crop
3    Protection, Inc., and it's those that I follow in
4    carrying out my duties.
5        MR. TILLERY:  Okay. I move to strike that
6    as unresponsive.  We're going to be here all
7    day, I can tell you.  I'm going to take a
8    break now and let you talk to him.  But we're
9    going to be here and we're going to -- we'll
10   have to take -- we'll have to take Stypa next
11   week or tomorrow.  But I can't help that.
12       Let's take a short break.
13       THE VIDEOGRAPHER: Stand by.
14       Going off the record.  The time is 10:18
15   and 13 seconds.
16       (A BRIEF RECESS WAS TAKEN.)
17       THE VIDEOGRAPHER: We're going on the
18   record at 10:26 and 48 seconds.
19       Please continue.
20       Q.  Sir, according to the document marked as
21   Exhibit Number 1, treasury policy for the Syngenta
22   Group, group treasury is responsible for negotiating
23   and entering into legal agreements with financial
24   counterparties, aren't they?
25       A.  Which page are you referring to?

16 (Pages 58 to 61)

Exhibit 009 Page 16
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 62

1    Q.  I'm talking about -- well, first of all, do
2  you know without looking and reading the page
3  yourself?
4    A.  I would rather look in -- read the page.
5  Which page are you referring to?
6    Q.  That's fine.  We will.  But answer my
7  question first.
8      Do you know the answer to the question
9  without looking at the paragraph I direct you to?
10    A.  Would you repeat your question?
11    Q.  Yes.
12      According to the document marked as Exhibit
13  Number 1, treasury policy for the Syngenta Group,
14  group treasury is responsible for negotiating and
15  entering into legal agreements with financial
16  counterparties, aren't they?
17    A.  If that's what the policy says.  I don't
18  have experience with that.
19    Q.  Okay. I'm just -- I'm asking you with -- if
20  the document -- if I sent you to paragraph 4.7 and
21  you read that, you would agree, right?
22    A.  I would agree that that's what the
23  document is saying.
24    Q.  That's what the document says.
25      Without looking at that, you wouldn't know

Page 63

1  one way or another?
2    A.  In my current capacity I do not enter
3  into transactions with external counterparties.
4    Q.  Okay. So would you be able to answer me
5  without looking at the document one way or another
6  whether that statement is true?
7    A.  That's true for a number of things.
8    Q.  Okay. Would that be correct with respect to
9  what I just said?
10    A.  Yes.
11    Q.  Okay.  And according to the same document,
12  Exhibit 1, contracts for financial transactions of
13  any kind may only be concluded if the contracts
14  comply with the legal standards and requirements
15  specified by group treasury, group legal or group
16  tax, correct?
17    A.  I would not read that as holding true for
18  transactions of any kind.
19    Q.  I say contracts for financial transactions.
20    A.  Of any kind?
21    Q.  Yes.
22    A.  That's too broad, too broad in my mind.
23    Q.  Okay. Let's go to 4.7.
24      Last paragraph of the -- of the page, the
25  last sentence, contracts for financial transactions

Page 64

1  of any kind may only be concluded if the contract
2  itself complies with the legal standards and
3  requirements specified or agreed by group treasury,
4  group legal and group tax.
5      Is that correct?
6    A.  That's what the document says.
7    Q.  Okay. So is your recollection refreshed?
8    A.  My recollection is unchanged.  If I
9  wanted to enter into transaction, that would be
10  approved as noted in this document under the
11  delegation of authority.  And the delegation of
12  authority within Syngenta Crop Protection, Inc. is
13  a delegation of authority granted to me by the Crop
14  Protection, Inc. board, is a delegation of
15  authority granted to me on the Crop Protection Inc.
16  board.  If I was entering into a financial
17  contract, I would use my legal counsel based in
18  Syngenta Crop Protection, Inc. to review that.  And
19  she is -- is or may be defined as member of group
20  legal. That I do not know.
21    Q.  So you're saying you would just ignore this
22  provision?
23    A.  No.  I would say that I would use the
24  delegation of authority granted to me by the entity
25  I work for to define what is within my remit as an

Page 65

1  officer of the company.  And I would use my legal
2  counsel granted to me by that entity to define
3  whether or not the contract is valid.
4    Q.  Are Syngenta affiliates obligated to deal
5  exclusively with group treasury under the terms of
6  this agreement?
7    A.  In what context?  Deal exclusively with
8  them for every -- all treasury matters?
9    Q.  In financial transactions.
10    A.  I would say no, if you -- I mean, a
11  financial transaction may be that we extend the
12  customer's credit terms.  That's a financial
13  transaction.  I don't deal with group treasury when
14  I would undertake that.  I sign under my authority
15  under the delegation of authority to extend those
16  credit terms.
17    Q.  Look at paragraph 4.8, obligation of
18  affiliates to deal exclusively with group treasury.
19  All financial transactions including hedging and use
20  of derivatives carried out by affiliates are directly
21  contracted with or through group treasury.
22  Exceptions require prior approval by the group
23  treasurer.
24      Do you see that?
25    A.  Yes.

17  (Pages 62 to 65)

Exhibit 009 Page 17
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 66

1    Q.  Okay. Do you understand that paragraph?
2    A.  Just let me read through the definition
3  of financial transaction as referred to in that
4  paragraph.
5        I would not cite the example that I --
6  the example that I cited I would not define as a
7  financial transaction under this paragraph.
8    Q.  Do you understand the paragraph now that I
9  read to you?
10   A.  Yes, I understand the paragraph.
11   Q.  And does Syngenta Crop Protection, Inc.'s
12 policies comply with that paragraph?
13   A.  We don't have external financial
14 transactions as defined under that paragraph of any
15 materiality.
16   Q.  Okay. Look at paragraph five on 85600. And
17 the sentence reads the group-wide tasks lie within
18 the responsibility of the central treasury function,
19 but need to be supported by the affiliates.
20       What is the central treasury function
21 mentioned there?
22   A.  I don't know.
23   Q.  Okay.  Look at 5.1.1 on the same page.
24 Group treasury provides uniform formats and systems
25 in an annual reporting calendar for all

Page 67

1  treasury-related financial reports.  Group treasury
2  is responsible for the compilation, consolidation,
3  evaluation and preparation of the financial
4  information.
5        Do you see that?
6    A.  Yes.
7    Q.  How is the reporting of your information
8  made to group treasury?
9    A.  That would be within Will Crucian's team.
10   Q.  You don't do that?
11   A.  Not personally, no.
12   Q.  But the chief financial officer of Syngenta
13 Crop Protection, Inc. doesn't get involved in that,
14 right?
15   A.  No.
16   Q.  Okay.  What does your office do?
17   A.  I get copied on the information.  But I
18 don't prepare the information as I don't prepare a
19 number of roles within my team -- I -- for my role
20 --
21       MR. TILLERY: I move to strike that as
22    unresponsive.
23   Q.  My question is what does your office do?
24   A.  My office or my team or the business
25 services finance team or the Syngenta --

Page 68

1    Q.  Your office, what you do.
2        You're the chief financial officer, right?
3    A.  Yes.
4    Q.  What do you do and the people who work for
5  you?  What is the scope of your responsibility?
6    A.  The scope of my responsibility is to
7  manage the financial transactions of Syngenta Crop
8  Protection, Inc. within the authority granted to me
9  by the board of Syngenta Crop Protection, Inc.
10   Q.  What does that mean?
11   A.  Well, if you'd allow me to finish, I'll
12 tell you.  Syngenta Crop Protection, Inc. is a
13 dollar denominated company that carries out its
14 business in the U.S. and thus, the treasury policy
15 is of limited application to Syngenta Crop
16 Protection, Inc., it being a dollar company and not
17 having complex financial transactions in various
18 currencies.  In terms of treasury reporting within
19 the context of 5.1, we would report on a regular
20 basis weekly, monthly, annually, depending on the
21 process, our cash flow, our interest costs, you
22 know, whatever the financial metrics may be, I
23 would be copied on those and they would be provided
24 to the group to enable them to consolidate those
25 numbers.

Page 69

1    Q.  And when you say group, who are you
2  providing it to?
3    A.  We would provide it to Henry Graef.
4    Q.  Do you know who Henry Graef provides it to?
5    A.  No, I do not.
6    Q.  How is it then provided to the group in
7  Basel?
8    A.  I mean, I would assume that Henry would
9  do so.
10   Q.  And you talked about interest rates.  Are
11 you paying interest to Syngenta Corporation?
12   A.  We would pay interest on an intercompany
13 funding, yes.
14   Q.  Okay.
15   A.  The tax code of the U.S. requires us to
16 pay an arms length interest rate.
17   Q.  Okay.  Do you know what an affiliate
18 funding team is as used in Exhibit 1?
19   A.  No.
20   Q.  How are the taxes filed annually by
21 Syngenta Crop -- let's strike that.
22       How are the tax documents created for
23 Syngenta Crop Protection, Inc.?
24   A.  Syngenta Crop Protection, Inc.'s tax
25 filings are prepared in the Greensboro office.

18 (Pages 66 to 69)

Exhibit 009 Page 18
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 70

1    Q.  Okay. And they're filed by whom?
2    A.  They're filed by Syngenta Crop
3  Protection, Inc.
4    Q.  And where?
5    A.  There is a consolidated tax return which
6  would be filed by Syngenta Crop Protection. And the
7  individual tax returns of Syngenta Crop Protection,
8  Inc. would be filed in the various jurisdictions.
9  We make sales in pretty much every state in the
10  U.S., and therefore we have tax state tax filings
11  in pretty much every state in the U.S.
12    Q.  And the consolidated tax return encompasses
13  what entities?
14    A.  I don't know. All the entities, I
15  presume, that are owned by Syngenta Corporation.
16    Q.  Is that a federal return?
17    A.  Yes, there are federal and state tax
18  returns.
19    Q.  The federal return is a consolidated
20  return?
21    A.  Yes.
22    Q.  Do you prepare the consolidated return?
23    A.  No, I don't.
24    Q.  Does anybody who works for you prepare the
25  consolidated return?

Page 71

1    A.  Nobody who works for me prepares it. The
2  input from Syngenta --
3    Q.  I'm just asking if anybody who works for
4  you prepares it?
5    A.  No.
6    Q.  Okay. Now, and that's prepared at Syngenta
7  Corporation?
8    A.  No. That was the point I was trying to
9  make. The information for Syngenta Crop
10  Protection, Inc. is prepared in the Greensboro
11  office by Randy Smith, who does not work for me,
12  but who is a tax person.
13    Q.  But the consolidated return is prepared or
14  filed by Syngenta Corporation?
15    A.  Yes.
16    Q.  Okay. And Syngenta Corporation is located
17  where?
18    A.  In Delaware.
19    Q.  But you don't know all of the entities
20  involved in that consolidated return?
21    A.  No.
22        (Plaintiff's Exhibit 2: Syngenta
23      Sanctioning Process Guideline March 2010,
24      Bates GRNVL0000085980 - 86123 marked for
25      identification, as of this date.)

Page 72

1    Q.  Can you tell me what Exhibit Number 2 is?
2    A.  It's a sanctioning process guideline for
3  investments or divestments for tangible, intangible
4  fixed assets.
5    Q.  Are you familiar with the document?
6    A.  Yes.
7    Q.  And do you work with this every day?
8    A.  No.
9    Q.  How is it that you have used this document?
10    A.  This document would govern how business
11  cases for investments in capital assets are put
12  together. So I work with it irregularly.
13    Q.  And your understanding is that it is
14  limited to investments in capital assets?
15    A.  And in tangible fixed assets.
16    Q.  When was the last time that you looked at
17  the document?
18    A.  In its entirety?
19    Q.  Well, at any part.
20        When you consulted the document, when was
21  the last time?
22    A.  I don't recall off the top of my head.
23  Not recently.
24    Q.  Did you look at it in preparation for the
25  deposition?

Page 73

1    A.  No, I did not.
2    Q.  Have you looked at it or consulted it this
3  year?
4    A.  The last time I looked at it was I
5  believe to determine whether an investment in some
6  IS-related activity would be capital or would be
7  revenue.
8    Q.  What is IS-related activity?
9    A.  Sorry, information technology. So where
10  the --
11    Q.  IS is information technology?
12    A.  It's -- it's our term.
13    Q.  You call it IS?
14    A.  Yes.
15    Q.  It's your term IS is --
16    A.  Information systems.
17    Q.  Information systems.
18    A.  But more than more commonly known as
19  technology.
20    Q.  Was there another document that dealt with
21  the same topic before this guideline became effective
22  in March of 2010?
23    A.  I would imagine there's a similar
24  document.
25    Q.  Do you know?

19 (Pages 70 to 73)

Exhibit 009 Page 19
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 74

1    A.  No.
2    Q.  This document says it was issued by capital
3    project support.  What is capital project support?
4    A.  I don't know who that team is.
5    Q.  Let's go to this Bates range of the
6    document is Greenville 85980 through Greenville
7    86123. Let's go to 85986, sir.
8        If you look at the first -- basic first
9    page, introduction, does this guideline apply to all
10   Syngenta Group companies, including Syngenta Crop
11   Protection, Inc.?
12   A.  There is no -- from a quick review, there
13   is no formal definition of organizational units,
14   but yes, I would assume so.
15   Q.  And you see who signed it, Alexander, I
16   don't know how to pronounce his name.
17   A.  Pflugi.
18   Q.  Pflugi.
19       Do you know him?
20   A.  I know him from casual acquaintance when
21   I was back in Basel.
22       MR. POPE:  P-F-L-U-G-I.
23       THE WITNESS:  Yeah.
24   Q.  And it lists his association as capital
25   project support, Syngenta Crop Protection, Inc. G,

Page 75

1    Basel, correct?
2    A.  That is his mailing address.  I believe
3    he is -- I believe he's an employee of Syngenta
4    International, AG.
5    Q.  Okay. What is the capital committee?
6    A.  The capital committee reviews all capital
7    spend over certain limits, and to review the
8    business case behind those capital spends.
9    Q.  Do you know who's on the capital committee?
10   A.  I believe Mark Peacock is the chair, and
11   he is the head of the supply organization. I don't
12   know all the individual members of that committee.
13   Q.  Do you know how many members there are?
14   A.  No, I have -- I have never sat before
15   that committee.
16   Q.  Is Mark Peacock a member of the Syngenta
17   executive committee?
18   A.  Yes.
19   Q.  In Basel?
20   A.  Yes.
21   Q.  Do you know with which corporate entity the
22   capital committee is associated?
23   A.  I'm not aware he's associated with a
24   legal entity.
25   Q.  Okay. So do you know what it's connected

Page 76

1    to?
2    A.  I would need you to be more precise in
3    your question.
4    Q.  Well, if there's a committee, a committee
5    of what?  Capital committee?  I'm just trying to
6    think from what organization does it have legal
7    significance with?
8    A.  I've never sat in front of the committee.
9    Q.  So you wouldn't know?
10   A.  I wouldn't speculate.
11   Q.  Did you ever ask anybody that?
12   A.  No, I've not asked that question.
13   Q.  Okay. Did it ever matter to you in your
14   job?
15   A.  I have never had a capital approval be
16   rejected by a committee, so it doesn't -- it
17   doesn't effect my day-to-day activity.
18   Q.  Okay.  Would you go to the second page
19   under summary, which is Greenville 85987.
20       Can you read that first paragraph for the
21   record, please, three lines.
22   A.  All capital expenditure projects require
23   formal approval by the local approval bodies.  In
24   addition, these projects will have to follow the
25   sanctioning process in order to get a

Page 77

1    recommendation from the region and/or the
2    headquarters prior to formal approval within the
3    legal entity.
4    Q.  I'm told we're about out of tape.  We're
5    going to have to switch tapes.
6        MR. POPE:  Stay right here though.
7        MR. TILLERY:  I'm sorry?
8        MR. POPE:  Stay right here.
9        MR. TILLERY:  Yeah, stay right here.
10       THE VIDEOGRAPHER:  Stand by.
11       This marks the end of videotape number
12   one, volume one in the deposition of Jason
13   Fogden.  Going off the record.  The time is
14   10:50 and 43 seconds.
15       (A BRIEF RECESS WAS TAKEN.)
16       THE VIDEOGRAPHER:  This marks the
17   beginning of videotape number two, volume one
18   in the deposition of Jason Fogden.  The time
19   is 10:53 and 25 seconds.
20       Please continue.
21   Q.  According to this document, all capital
22   expenditure projects have to be submitted to a region
23   or to headquarters in Basel using standardized forms,
24   correct, sir?
25   A.  Yes, for recommendation purposes.

20  (Pages 74 to 77)

Exhibit 009 Page 20
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 78

1    Q.  You used the word recommendation?
2    A.  Yes, as used in the first paragraph you
3 had me read.
4    Q.  All right.  And did group treasury in Basel
5 create the forms?
6    A.  No, I wouldn't have thought so.
7    Q.  Do you know who created the forms?
8    A.  I don't know.  I would speculate that it
9 would be the supply organization.
10    Q.  The supply organization?
11    A.  Yes.  Which deals with plants and other
12 capital equipment.
13    Q.  Is that the global supply organization?
14    A.  Yes.
15    Q.  And when these projects are submitted to
16 headquarters in Basel, they're prioritized against
17 other opportunities in the country or the region or
18 globally, aren't they, according to the document?
19    A.  There is no official prioritization.
20 That is within the local or entity management to
21 make that decision for themselves.
22    Q.  And then it goes to headquarters, according
23 to the document, it goes to Basel?
24    A.  It goes to Basel for recommendation, but
25 it doesn't go in any prioritized order.  So a

Page 79

1 document that goes for the capital approval
2 committee does not have on it, you know, that it is
3 a priority five in the region or whatever it is.
4 So I'm just clarifying your point on
5 prioritization.
6    Q.  Do you know whether capital projects are
7 prioritized globally?
8    A.  I don't know that, no.
9    Q.  In paragraph three on the next page, page
10 three, paragraph three.  Do you see that?  That's
11 Syngenta 85988.  That's the page number we're number.
12 We're on the same page?
13    A.  Yes, yes.
14    Q.  The word Syngenta is referred to there.  Do
15 you see that?
16    A.  In paragraph three?
17    Q.  Actually, it's in the top of the page under
18 paragraph three, objectives.
19    A.  Yes.
20    Q.  As it's used there, it refers to the
21 Syngenta Group of companies generally, doesn't it?
22    A.  It looks like a generic term to me.
23    Q.  What does that mean, the generic term?
24    A.  Strategic investment, divestment planning
25 could be --

Page 80

1        THE COURT REPORTER: I'm sorry.
2    A.  Strategic investment, divestment planning
3 is a key requirement for the Syngenta -- it could
4 refer to the Syngenta Group of companies, it could
5 refer to the employees of any Syngenta legal
6 entity.  It's a generic term.
7    Q.  Okay.
8    A.  You're reading it to imply a group of
9 companies.  It's more generic than that.
10    Q.  As it's used here, do you think it applies
11 to the Syngenta Group?  That's all I'm asking you.
12    A.  And I would say it's more generic than
13 that.  I would say -- I would read it as wider than
14 just the group.  I would say it's, you know, the
15 individuals in the group or, you know, as a common
16 sense way of managing investments.
17    Q.  Okay.  Is it fair to say that the purpose
18 of the sanctioning process that's referenced here in
19 the document is to maximize return on investments for
20 the entire Syngenta group of companies?
21    A.  I don't know if that's -- if that's the
22 purposes of the recommendation.
23    Q.  That's all I'm asking you.
24       Do you know one way or another?
25    A.  No.

Page 81

1    Q.  Are you familiar with paragraph 3.1,
2 sanctioning process versus approval process?
3    A.  It's clear from the paragraph, yes.
4    Q.  This is something you've worked with
5 before?  You're familiar with this term, these terms?
6    A.  I have read it before in this document.
7 It's not something that's used commonly.
8    Q.  Okay.  I want to ask you something about
9 some of the terms used in the paragraph.
10       It says, from a legal perspective, only the
11 management or board of a legal entity can approve an
12 investment project, and the approval process is an
13 internal process of the in-market company.
14       What does the in-market company refer to
15 there?
16    A.  In this particular instance for me it
17 would be Syngenta Crop Protection, Inc.
18    Q.  So it would be one of the affiliates or
19 subsidiaries?
20    A.  Yes.
21    Q.  Okay. From a group perspective, and that
22 groups means from the group of Syngenta companies,
23 correct?
24    A.  I would read it as such.
25    Q.  From a group perspective, it is desired to

21 (Pages 78 to 81)

Exhibit 009 Page 21
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 82

1  align the IMC or in-market company investment
2  activities to the group's strategy. For the purpose
3  of this alignment, all cap ex exceeding a defined
4  threshold will have to follow the sanctioning
5  process.
6       What does cap ex mean?
7    A.  Capital expenditure.
8    Q.  Thus, the sanctioning process has to be
9  seen as a recommendation process that is obeying the
10 arms length principle.
11      Is that what you were referring to earlier?
12   A.  Yes.
13   Q.  In order to distinguish the approval within
14 the legal entity from the group's sanctioning
15 process, this document is using terms, quote,
16 support, in quote, and sanctioned, in quotes, to
17 reflect activities from within the group's
18 sanctioning process where the term, quote, approval,
19 end quote, and related is used to reflect IMC
20 activities, correct?
21      Do you use that -- do you follow this
22 guideline?
23   A.  In common use the way --
24   Q.  I'm asking you if you follow the guideline?
25   A.  Yes, I'm trying to explain.

Page 83

1    Q.  But I need to know. Not a speech. It's a
2  very simple question.
3       Do you follow this guideline?
4    A.  We submit capital projects for
5  recommendation to the capital committee. They are
6  formally signed off and approval by the appropriate
7  members of Syngenta Crop Protection, Inc., be it
8  myself or Vern or whoever has authority delegated
9  to them by the board.
10   Q.  Okay. So you follow this provision?
11   A.  We follow this provision in that capital
12 projects are approved by Syngenta Crop Protection,
13 Inc.
14   Q.  Okay. Are you telling me you follow this
15 provision or not, sir?
16      Can you answer that yes or no?
17   A.  Yes.
18   Q.  You do?
19   A.  Yes.
20   Q.  Okay. Thank you.
21      This document, if you go to page four,
22 which is the page marked as 85989, mentions the
23 approval process. When they are approved, when
24 actions are approved, for example, if you look at the
25 quote, any capital proposal exceeding the local

Page 84

1  competence limit has to be formally submitted into
2  the sanctioning process before it can be approved by
3  the legal entity according to the legal entity's
4  authority levels.
5       Do you see that?
6    A.  Yes.
7    Q.  Okay. And this document says that only
8  legal entities should sign on the cover sheet of any
9  proposal, but not regional or headquarter
10 representatives, correct?
11   A.  Yes.
12   Q.  Okay. How do you get confirmation of
13 approval?
14   A.  That would normally be an e-mail from
15 Alexander Pflugi to whomever had submitted the
16 capital proposal.
17   Q.  And who is he?
18   A.  I believe he acts as a secretary to that
19 committee.
20   Q.  And which committee?
21   A.  The capital committee.
22   Q.  Where? In Basel?
23   A.  Yes.
24   Q.  And do you get anymore than a e-mail?
25   A.  Not as far as I'm aware. We would get an

Page 85

1  e-mail saying whether or not they recommended --
2    Q.  Recommended as to -- recommended as the
3  term is used in the document, right?
4    A.  Yes.
5    Q.  Okay. And who receives these e-mails?
6    A.  I believe it would be whoever owns the
7  submission. So whoever is owning the capital
8  proposal.
9    Q.  Have you ever made such a submission?
10   A.  No, I've never owned a capital proposal.
11 I don't spend capital within my group.
12   Q.  What does it mean to own a capital
13 proposal?
14   A.  For me it would be the person who is the
15 most reasonable person in the entity who has said,
16 you know, we need to spend this money on a
17 particular asset or whatever, and they are central
18 towards pulling together the proposal for approval
19 by the board.
20   Q.  Mr. -- did you say his name was Pflugi?
21   A.  Yes.
22   Q.  Would you spell it for the reporter,
23 please.
24   A.  I think it's --
25   Q.  Is he the person -- is he the person listed

22 (Pages 82 to 85)

Exhibit 009 Page 22
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 86

1    at the very beginning of this document?
2        A.  Yes.
3        Q.  Okay.
4        A.  P-F-L-U-G-I.
5        Q.  Okay. Do you know who he works for?
6        A.  No, I don't.
7        Q.  And what -- have you ever seen one of his
8    e-mail confirming approval?
9            Or, as the term is used in the document,
10   recommendation?
11       A.  They would be -- yes, I -- I believe on
12   occasion they'd been appended to a proposal. I'm
13   not generally CC'd.
14       Q.  Have you ever seen one?
15       A.  Yes.
16       Q.  Okay. In what context have you seen it?
17       A.  I don't remember the context. It's
18   certainly not recent. But I have seen e-mails from
19   him.
20       Q.  Has this particular gentleman, Mr. Pflugi,
21   been doing this before March of 2010?
22       A.  I believe so, yes.
23       Q.  Okay. Has he been doing this since you've
24   become CFO of Syngenta Crop Protection, Inc.?
25       A.  I don't know when he started doing it.

Page 87

1        Q.  Was he doing it in 2008?
2        A.  I believe so, yes.
3        Q.  Okay. Do you know the types of projects
4    that required the sanctioning process?
5        A.  I think there would generally be
6    investments that we would account for as capital
7    assets as opposed to revenues assets. So, for
8    example, we spend hundreds of millions of dollars
9    locally on revenue spend which requires no
10   recommendation process whatsoever.
11       Q.  You just answered what doesn't. So I move
12   to strike it as unresponsive.
13           Let me read you my question, okay. Do you
14   know the types of projects that required the
15   sanctioning process. That doesn't mean the ones that
16   don't require it. So my question to you, I'm going
17   to make it real clear --
18       A.  I answered that.
19       Q.  -- what are the types of projects that
20   require the sanctioning process?
21       MR. POPE:  And I object to the form of
22       the question. And he's already answered and
23       he said there would generally be investments
24       that we would account for capital assets as
25       opposed to revenues.

Page 88

1        MR. TILLERY:  Yes. But the other part of
2        the answer is not responsive.
3        Q.  So can you tell me specifically the
4    projects that would fall under the sanctioning
5    process guidelines?
6        MR. POPE:  Objection form of the
7        question.
8        A.  Yes, it's contained in the first part of
9    my answer.
10       Q.  I'm sorry?
11       A.  It was contained in the first part of my
12   answer.
13       Q.  Okay. Do you know if it would involve the
14   sale or purchase of real estate?
15       A.  Let me look in the policy and I will tell
16   you.
17       Q.  Just go to page five. That will help you.
18       A.  To answer your question, real estate is
19   an example of a project which they listed.
20       Q.  Actually, in the scope provision on page
21   five, the scope lists examples of the projects that
22   would be included within the sanctioning process and
23   lists a number of different ones that would be
24   included, correct?
25       A.  Yes. And also states that that's

Page 89

1    non-conclusive, which I'm assuming to mean is
2    purely examples.
3        Q.  So it would include all of these and others
4    like them?
5        A.  These are examples given in this
6    document, yes.
7        Q.  Okay. Go to the following page, page six
8    or 85991.
9            The first paragraph where it says the board
10   of directors, the committee of the chairman and the
11   Syngenta executive committee. I want to make sure
12   we're clear on what those bodies are that are being
13   referenced there, in your understanding.
14           The board of directors of Syngenta AG; is
15   that your understanding.
16       A.  Yes.
17       Q.  Okay. The committee of the chairmen, what
18   is that?
19       A.  I don't know the scope. I've heard of
20   that committee. I don't know the full scope of
21   that committee.
22       Q.  It's a committee of the chairmen of the
23   Syngenta -- Syngenta AG?
24       A.  Yes.
25       Q.  Okay. And the Syngenta executive committee,

23 (Pages 86 to 89)

Exhibit 009 Page 23
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 90

1  we understand what that is.
2      A.  Yes.
3      Q.  If you go to pages eight and nine, that's
4  5993, 994.
5          Look at the term in capital program.  Are
6  these projects sanctioned according to the process
7  outlined in the guideline?
8      A.  I'm sorry, could you repeat your
9  question?
10      Q.  Yes.
11          I'm looking for the scope of your
12  understanding of capital program.  For example, look
13  at paragraph two.  What is cap ex master plan, what
14  is that?
15      A.  There was a review of -- we would have a
16  list of projects that we expected to spend capital
17  monies on ie: not revenues.  And I believe that we
18  do use the three-year time limit for that to say
19  here is -- here is a list of the projects that we
20  would expect to be spending capital monies on over
21  the next three years.  Whether or not they are part
22  to the capital committee for recommendation depends
23  on their size.
24      Q.  And what is the capital program referenced
25  in paragraph 6.1?

Page 91

1      A.  That's just a -- I believe that's just a
2  list of the projects that you expect to spend
3  capital monies on.
4      Q.  What is the cap ex pre budget referenced at
5  the bottom of the page?
6      A.  That would be a list of capital
7  expenditures that you would be making in the
8  following year.
9      Q.  And then --
10      A.  In the first year.
11      Q.  Okay. And then the cap ex budget on the
12  following page is differentiated how?
13      A.  I believe the cap ex pre budget is a more
14  informal collection of the spends that we're
15  intending to make.  The cap ex budget would be more
16  detailed and would be formally entered into our
17  systems.  Whereas I think the pre budget would be
18  more of an informal Excel based summary of what the
19  projects are.  I don't think there's a substantive
20  difference between the two.
21      Q.  Who creates the cap ex budget for Syngenta
22  Crop Protection, Inc.?
23      A.  That would be our supply team.
24      Q.  Not your office?
25      A.  No.

Page 92

1      Q.  Do you have any role in the budget?
2      A.  The head of the finance people for the
3  supply team reports into me functionally.
4      Q.  And who is that?
5      A.  Bob Molter, M-O-L-T-E-R.
6      Q.  And back to my question, do you personally
7  have any role in creating the budget?
8      A.  I don't have any role in creating the
9  budget.  I do see it.
10      Q.  Okay.  Do you have to approve the budget?
11      A.  Yes.
12      Q.  What is the Hyperion system?
13      A.  It is a IT system for collecting data.
14  So it's a reporting tool.
15      Q.  Is it available to all of the entities of
16  the Syngenta Group of companies?
17      A.  I don't know.  It is available to
18  Syngenta Crop Protection, Inc.
19      Q.  Look at the last sentence on page nine.
20          Depending -- quoting, depending on the
21  feedback received from either SEC CAC or SEC member,
22  it might be necessary to run this prioritization
23  process several times.
24          What prioritization process is referenced
25  there?

Page 93

1      A.  My assumption would be it's referring to
2  the previous paragraph where it's talking about the
3  projects planned for sanctioning in the budget
4  year.
5      Q.  So this answers the question that we talked
6  about earlier about prioritization, doesn't it, sir?
7  Speaks directly to it?
8      A.  What do you mean?
9      Q.  When I asked you if they pri -- prioritized
10  in Basel.
11      A.  That is your assumption.
12      Q.  Okay. Well, we'll do it this way, paragraph
13  6.5 says prioritization process, right?
14          Is that right?
15      A.  Yes.
16      Q.  Okay. And it says the capital program, cap
17  ex master plan and cap ex pre budget might contain
18  too many projects planned for sanctioning in the
19  budget year.
20      A.  Yes.
21      Q.  Do you understand what we're talking about
22  so far?
23      A.  Yes, I understand.
24      Q.  Therefore, it is recommended to the
25  business and functional units to prioritize the

24  (Pages 90 to 93)

**Exhibit 009 Page 24**
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 94

1  investment projects.
2      A.  Yes.
3      Q.  The functional units would be entities like
4  Syngenta Crop Protection, Inc., wouldn't it?
5      A.  That would be a business unit.
6      Q.  So, okay, a business unit.  I'm sorry.  I
7  misspoke.  So it's included in as a business unit,
8  right?
9          You have to say yes or no.
10     A.  Yes, sorry.
11     Q.  Okay.  And then depending on the feedback
12  received from either SEC, CAC or SEC member, it might
13  be necessary to run this prioritization process
14  several times.
15     A.  Yes.
16     Q.  Okay?
17     A.  Yeah.
18     Q.  So is your recollection refreshed about
19  that?
20     A.  My recollection isn't refreshed.  I
21  understand what this says.
22     Q.  Okay.
23     A.  I haven't seen in practice that happening
24  in that way.
25     Q.  If you'd go to the following page, page ten

Page 95

1  of the document marked as Number 2.  It's under
2  paragraph seven at the top.  And I would like for you
3  to explain the project phases mentioned here.
4  Including, as you do, the types of documents that a
5  Syngenta business unit like Syngenta Crop Protection,
6  Inc. would fill out for each phase of the project.
7      A.  Okay.  If I go through each of the phases
8  outlined in this document, the first phase is phase
9  A, where an opportunity is recognized and roughly
10  examined.  So during this phase, the documents that
11  might be prepared for that will vary and be ad hoc.
12  So they may be Power Point presentations, they may
13  be spreadsheets, they may be word documents.  They
14  may be meeting notes.  At the end of the phase --
15     Q.  End of phase A?
16     A.  At the end of phase A you would have a
17  project charter, and that would generally be a two
18  to three sheet Excel spreadsheet.  So relatively
19  low level of data involved in that.  That project
20  charter, as it notes in the document, is merged
21  with the planning credit in phase B so that really
22  is a starting outline to say here's a project that
23  looks worthwhile, here's some initial metrics on
24  the viability of that project.
25          In phase C, once you have secured

Page 96

1  approval from Crop Protection, Inc. for the
2  planning credit, the project team would spend that
3  money in detailing out the project in a more -- in
4  a more detailed way.  And that wouldn't be true for
5  all projects.  Smaller projects may not need a
6  planning credit for an early stage spending of
7  money.  So a $50,000 project may not need all these
8  phases.  A $2 million project would do.
9          During the third phase when the planning
10  credit is done, the project is fleshed out, it's
11  costed in more detailed so we understand what the
12  phases of the project are, what the resources
13  required are, what external resources may be
14  required.
15          At the end of those phases we would come
16  up with a formal capital proposal and -- which,
17  again, would be a three-page spreadsheet format
18  which has really a economic value case in it.  So
19  what the costs are over it, which of the years are,
20  what the pay back from the project is expected to
21  be in terms of revenues or savings.  Accompanying
22  that may be a Power Point presentation detailing
23  the project in more detail or expanding on some of
24  the areas contained within the spreadsheet format.
25          That would then go through the capital

Page 97

1  committee and the local sign off processes for
2  approval.  And following recommendation from the
3  capital committee, and then we would then deliver
4  the project.  And at the end of the project --
5      Q.  Where is the capital committee, at which
6  stage?
7      A.  That is after the -- when the capital
8  proposal is pulled together, it is sent to the
9  capital committee for recommendation.  And then
10  comes back for final approval by the local entity,
11  in this case Crop Protection, Inc.
12          And successful or unsuccessful, the
13  project would have a project completion report at
14  the end of the project.
15     Q.  Does each phase of the project have to be
16  presented to the sanctioning body according to this
17  document?
18          And you can look at the paragraph directly
19  below the --
20     A.  Yeah, the phases are -- the project
21  charter and planning credit would be combined and
22  presented.  The capital proposal would be presented
23  and then a project completion report would be
24  presented to the sanctioning body.  But it -- that
25  would generally be just a circulation for

25 (Pages 94 to 97)

Exhibit 009 Page 25
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                     11-11-2010
Confidential - Under Protective Order

Page 98

1  information.
2     Q.  Is there always a sanctioning process by
3  the authority outside of the business unit like this
4  one before the legal entity takes formal approval
5  actions?
6     A.  Not always, no.
7     Q.  So in this document where are the
8  exclusions for when it wouldn't apply?
9     A.  There should be approval limits contained
10  within --
11     Q.  It's $40,000 is what's in the approval
12  limits.  So would it be under 40,000?
13     A.  Yes.
14     Q.  Okay. Everything above 40 would require the
15  sanctioning process?
16     A.  I believe that projects go to the capital
17  committee for recommendation if it's above the
18  regional level of a hundred thousand.
19     Q.  Can you find that for me in the document?
20        I'll tell you what, given the limited time,
21  why don't you -- we'll get to that.  We'll get to that
22  question.  And I'll withdraw it for right now.  We're
23  going to get to that.
24        Who is the head of finance for the Syngenta
25  Group of companies?

Page 99

1     A.  John Ramsay is the chief financial
2  officer.
3     Q.  The term head of finance is used in the
4  document.  Is that the same term, as far as you know,
5  as a chief financial officer?
6     A.  No, they're not the same.  In some cases
7  they are and in other cases they may not be.
8     Q.  Then who is the head of finance?
9     A.  For the entire group would be John
10  Ramsay.
11     Q.  Do you know who's head of finance as the
12  term is used in this document?
13     A.  Which page are you referring to?
14     Q.  I'm talking about the general term I think
15  that's used.
16     A.  Well, that would depend on the context.
17  If it was talking about a local business unit, it
18  would -- it would in general refer to the CFO of
19  that business unit.  And if it was referring to a
20  functional area, it may not be a CFO, it may be a
21  head of finance in a particular functional area.
22     Q.  Go to page 22.
23     A.  Is this 86007?
24     Q.  It is, sir.
25        Actually, let's go to the two pages before

Page 100

1  that first, which would be 86005.
2        Explain that diagram to me, please.  That
3  -- there's a diagram on the preceding page from page
4  19 that you might need to refer to.
5        MR. POPE:  Well, that's clear.
6     Q.  Do you understand these diagrams?
7     A.  No, in broad concept, they're process
8  flows which should reflect the text of this
9  document in terms of the steps that are undertaken
10  for capital projects.
11     Q.  All right.  And if you go then to the top
12  of page 22.
13        The mandatory document, sanctioned
14  documents that are referred to there.
15        In the first paragraph it says this section
16  will give an insight view on the approval and
17  sanction documents.  These forms are mandatory for
18  all projects that need a formal recommendation
19  from region headquarters of a BU and/or headquarters
20  Basel.
21     A.  Um-hum.
22     Q.  What documents are referred to there?
23     A.  They would be talking about the documents
24  of the various phases that we said before.  So the
25  charter and planning credit, the capital approval

Page 101

1  and then the follow up documents that we referred
2  to in the earlier phases.
3     Q.  The same type of documents you mentioned
4  before?
5     A.  Yes.
6     Q.  In the next paragraph there's a reference
7  to the project manager.  Who would that be with
8  respect to the responsibility for submitting
9  documents?
10     A.  Yeah, that would be the person I referred
11  to earlier as being the person --
12     Q.  Who owns the project?
13     A.  Yeah.
14     Q.  Is -- if you look at page 53 of this
15  document, which I believe is Greenville 86038.
16        Is that an explanation of a form that has
17  to be submitted to the Syngenta executive committee?
18     A.  Yes.
19        I mean, it's a example of the information
20  that would be in such a form, yes.
21     Q.  All projects with a total projected cost
22  exceeding $5 million have to be submitted to the
23  Syngenta executive committee; is that your
24  understanding?
25     A.  Have to be presented to the SEC, yes.

26 (Pages 98 to 101)

Exhibit 009 Page 26
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 102

1    Q.  To the SEC, when you say that, you mean --
2    A.  The Syngenta executive committee, yes.
3        THE COURT REPORTER: I'm sorry?
4    A.  The Syngenta executive committee, yes.
5    Q.  And there's a special form that needs to be
6  filled out?
7    A.  Yes.
8    Q.  Have you been involved in any process where
9  Syngenta Crop Protection, Inc. has sought that type
10  of approval from the Syngenta executive committee?
11    A.  Not recently.
12    Q.  Does that mean you never have or it
13  happened some time ago?
14        When were you involved?
15    A.  I don't believe I've been in -- involved
16  in a formal SEC submission in my role here.
17    Q.  Who would handle this?
18        They would go outside the scope of your
19  job?
20    A.  I'm not authorized to -- I mean, I would
21  see every SEC submission that went -- went to SEC,
22  as would -- as would the -- John Riley, who is the
23  head of supply for Crop Protection, Inc. would
24  probably be the lead on those, because any projects
25  of that size would generally be a plant project.

Page 103

1    Q.  What does John Riley do?
2    A.  He's the head of supply for Crop
3  Protection, Inc.
4    Q.  He wouldn't have you put it together, he
5  would do it himself?
6    A.  Yeah, I've never put one of these
7  together.  I would be asked to review it, but I
8  wouldn't put it together.
9    Q.  Okay. Have you reviewed any?
10    A.  I don't believe I've reviewed one in the
11  SEC submission form.
12    Q.  When you say SEC, again, that means
13  Syngenta executive committee --
14    A.  Syngenta executive committee format.  All
15  the ones that I have seen in my current role are
16  all in a similar format, which I do get for
17  signature.
18    Q.  Have you signed them?
19    A.  Yes.
20    Q.  Do the contracts which are entered into
21  with -- strike that.
22        Do you have contracts with other Syngenta
23  entities when you're doing work that they request you
24  to do?
25    A.  If it's work of any significant size, we

Page 104

1  would generally have a -- a written agreement with
2  them to govern the payment for that and the scope
3  of the work.
4    Q.  If any testing is being done, field
5  testing, does that require a contract?
6    A.  I don't know the answer to that question.
7    Q.  Have you ever seen a field testing
8  contract?
9    A.  No.
10    Q.  Have you ever approved any payment --
11  strike that.
12        Have you ever approved any -- strike that.
13        Have you ever seen any charges that
14  billings that Syngenta Crop Protection, Inc. has
15  submitted for any of its field testing work done for
16  any other Syngenta entity?
17    A.  So a formal invoice?
18    Q.  Yes.
19    A.  No, I don't think so.
20    Q.  And has that occurred in the -- it wouldn't
21  have occurred in the nearly three years you've been
22  --
23    A.  It may well have occurred. In fact, I'm
24  -- but if it's -- if it doesn't require my
25  particular sign off within the delegation of

Page 105

1  authority. I mean, Marian, who -- Stypa will have a
2  delegation of authority to sign up to a certain
3  level.  And if he's within that delegation of
4  authority, I wouldn't normally see it.
5    Q.  What is the delegation of authority that
6  you won't see?
7    A.  It varies according to the type of
8  expenditure.
9    Q.  Well, the one I'm talking about now is
10  field testing.
11    A.  I don't know off the top of my head.
12    Q.  Have you ever authorized a payment or paid
13  through your office for field testing?
14    A.  I'm not aware that I've personally
15  authorized one.  And in terms of paid through my
16  office, you know, checks are cut by the Syngenta
17  business services team.  Historically that would
18  have been defined as within my team.  So certainly
19  during the period of my role checks may have been
20  cut physically by my team relating to those
21  payments.
22    Q.  You don't know, though, if they have been
23  or not?
24    A.  No.
25    Q.  And you don't know if the payment -- strike

27 (Pages 102 to 105)

**Exhibit 009 Page 27**
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 106

1  that.
2       You don't know if there has been any
3  invoicing to other Syngenta entities through your
4  office for any field testing?
5       A.  No.
6       Q.  And that's something you think that Mr.
7  Stypa would have some knowledge of?
8       A.  It's more in his area of responsibility,
9  yes.
10      Q.  Okay.  Look at page five.  That's
11 Greenville 86040.
12      Read the first sentence of section 8.4.
13 You can read it out loud if you wish.
14      A.  The steering team only has the authority
15 to commit expenditure to meet the project
16 objectives described in the capital proposal up to
17 the sanctioning tolerance, normally ten percent
18 over the sanctioned amount.
19      Q.  What is the steering team referenced there?
20      A.  I believe it is the team which is working
21 with the project manager to ensure the delivery of
22 the project.  So the individuals would vary from
23 project to project.  But they would be generally
24 managers involved in delivering the project.
25      Q.  Go to page 56, the following page, section

Page 107

1  8.6.3.
2       Do you see the reference to BSC?
3       A.  Yes.
4       Q.  What is that?
5       A.  I think it's business services committee,
6  but I'm not sure.
7       Q.  Is that another committee of the Syngenta
8  executive committee?
9       A.  It has some members of the Syngenta
10 executive committee sitting on it.  I don't know
11 the exact membership and I've never been to a
12 meeting.
13      Q.  Page 63 of the document, please.  That's
14 Greenville 86048.  If you'd read that first
15 paragraph.
16      A.  Ten working days prior to the CAC or BSC
17 meeting.  The project requiring CSC or BSC support
18 has to be submitted to the secretary to the CAC or
19 the secretary to the BSC.  The CAC meeting dates
20 are published in the intranet.
21      Q.  How often are they held?
22      A.  Every couple of months, I think, for the
23 CSC.  The BSC I have no idea.
24      Q.  The minutes are on the intranet?
25      A.  No.  I haven't looked for the -- I

Page 108

1  haven't looked for the minutes on the intranet.  So
2  I can't answer the question.  The only thing I've
3  seen is an extract of the minutes.
4       Q.  Go to page 68, Greenville Bates 6053,
5  paragraph 10.1.1.
6       A.  Would you like me to read it?
7       Q.  Yes.
8       Actually, you could read it to yourself.
9  I'm asking you questions about terms there.  Just
10 familiarize yourself with it and I'll tell you --
11 then I'll ask you a couple of questions.
12      What is a business case as referenced in
13 that paragraph, sir?
14      A.  A business case really describes the
15 economic value of the project over time and would
16 describe what the true economic value of the
17 project is expected to deliver.
18      Q.  What is the product line referenced there?
19      A.  I believe it means product line head or
20 crop head.  We don't really use those terms in Crop
21 Protection, Inc.
22      Q.  A global team, what does that mean?
23      A.  Sorry, could you repeat the question.
24      Q.  Yeah.
25      Is product line something that refers to an

Page 109

1  entire group of products sold?
2       A.  Yes, it would be herbicides or
3  fungicides.
4       Q.  So there would be a global product line
5  sold by the Syngenta Group of companies, perhaps
6  across jurisdictional borders?
7       A.  It -- that's not that clean a definition.
8  I mean, herbicides would be a global definition.
9  But a particular product may or may not depending
10 on the local regulation being able to be sold.  For
11 example, you can sell a product in the U.S. which
12 may not be able to be sold in Canada even though
13 they're very similar jurisdictions.
14      Q.  The reference there is crop head.  Do you
15 see that?
16      A.  Yes.
17      Q.  Who's crop head?
18      A.  I don't know who -- who the crop heads
19 are or what that role would be.
20      Q.  You don't know who the head of the crop
21 protection business is in the Syngenta companies?
22      A.  If that's what it's referring to, then
23 yes.
24      Q.  Who is that?
25      A.  If -- I mean, the head of crop protection

28 (Pages 106 to 109)

Exhibit 009 Page 28
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 110

1  is John Atkin.  If you're talking about a crop head
2  ie: corn or soy, I wouldn't know who those people
3  are or whether those roles exist.
4      Q.  Well, as that term is used as that
5  paragraph reads, who's COO as referenced there?
6      A.  John Atkin.
7      Q.  Let's go to page 71, paragraph 11.
8          What is a financial case, sir?
9      A.  I mean, the business case and the
10  financial case are effectively the same thing.  I
11  mean, the business case is saying -- the financial
12  case is part of the business case.  The business
13  case says this is why this particular project is a
14  good reason for the business, it will deliver
15  benefits X, Y and Z.  The economics of the business
16  case is the financial case.
17      Q.  So the financial case is a sub part of the
18  business case?
19      A.  Yes.
20      Q.  Why would you have separate submission
21  guidelines?
22      A.  I don't know what the detail is on the
23  submission guidelines for the business case.  For
24  the financial case, I suspect it's if people are
25  seeing, as we do, a large number of these things,

Page 111

1  it's nice if they're all in a similar format.
2  Because trying to read a different format every
3  time is extremely time consuming.
4      Q.  You see the reference to the finance
5  manager in the second sentence of that?
6      A.  Yes.
7      Q.  Who is the finance manager referenced
8  there?
9      A.  That would generally be somebody who the
10  project manager has grabbed to help them get out of
11  the -- get out of the financial case.
12      Q.  Would that be you?
13      A.  No, no, it wouldn't be -- it would be
14  most often someone in Bob Molter's team who I
15  referred to earlier as being the supply finance
16  lead.  Occasionally it would be a -- an analyst
17  within my team.  So the IS project that I referred
18  to was actually a marketing project.  So my
19  marketing analyst would have supported the
20  financial case of that.
21      Q.  Go to page 78, please.
22          Read the first paragraph.  Read it out loud
23  into the record, please.
24      A.  The whole of the first paragraph?
25      Q.  Yes.

Page 112

1      A.  Any project requires regional and/or
2  headquarters support before being approved by the
3  in-market company.  If the total project costs
4  exceed a limit of U.S. dollars 40,000 for in-market
5  companies.  Whether the project can be approved by
6  local management or board of directors will be
7  given in the terms of reference of the
8  in-market company.  The board of directors can
9  approve a project only if the project has been
10  examined by the executive committee of the company.
11      Q.  So under what you've just read, support
12  from regional or headquarters in Basel is mandatory
13  before a project can be formally approved by a
14  Syngenta subsidiary, correct?
15      A.  Yeah, what it says for projects over
16  40,000, regional or headquarters support a
17  recommendation is required.
18      Q.  Okay.  What are the terms of reference
19  included in the second sentence?
20      A.  I would read that as being a generic term
21  referring to what the delegation of authority is
22  for a particular legal entity in a particular
23  jurisdiction.
24      Q.  Is that what you understand the words terms
25  of reference to be?

Page 113

1      A.  From reading this now, yes.
2      Q.  Third paragraph says that members of the
3  in-market company shall sign the original approval
4  document and the in-market company just means the
5  particular subsidiary you've mentioned before in this
6  -- for you it would be Syngenta Crop Protection,
7  Inc., correct?
8      A.  Yes.
9      Q.  I think I talked over your answer.
10          Is that yes?
11      A.  Oh, yes, yes.
12      Q.  And if you'd look at the first sentence and
13  read it in paragraph four.
14      A.  If the project needs to be supported by
15  others, then the local management, brackets ie:
16  region and/or HQ Basel, closed brackets, the
17  approval documents as well as other relevant
18  project documents has to be sent to the region
19  and/or headquarters Basel with various examples of
20  what those documents might be.
21      Q.  And Syngenta Crop Protection, Inc. sends
22  these kinds of e-mails to regional or headquarters in
23  Basel with the relevant approval documents attached,
24  as far as you know?
25      A.  Yes.

29 (Pages 110 to 113)

**Exhibit 009 Page 29**
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                    11-11-2010
Confidential - Under Protective Order

Page 114

1    Q. And who actually sends these for approval?
2    A. The project manager would -- would take
3  the initiative to go around and brief whoever they
4  need to get approval from, collect the signatures
5  and then I'm assuming they would send it on.
6    Q. Okay. Look at the fifth paragraph. Can you
7  read that out loud.
8    A. Well, the global capital coordinator or
9  the regional capital coordinator as appropriate
10  will send confirmation that the required support
11  has been obtained. Without this confirmation the
12  in-market company is not allowed to spend any
13  money.
14    Q. Who's the global capital coordinator?
15    A. My guess would be Alexander Pflugi.
16    Q. Okay. Mr. Pflugi is the same person we've
17  talked about being in Basel at Syngenta Crop
18  Protection -- I'm sorry, at Syngenta International,
19  AG?
20    A. Yes.
21    Q. Who is the regional capital coordinator?
22    A. I don't believe we have one.
23    Q. Okay.
24    A. We don't -- it would be myself or Vern
25  who confirm back to the person.

Page 115

1    Q. And how -- who do these coordinators send
2  their confirmation to at Syngenta Crop Protection,
3  Inc.?
4    A. As I noted before, I think the global
5  ones would come as just an e-mail saying that --
6    Q. The project's approved?
7    A. -- the recommendation would come to the
8  project manager. If we get a regional one, we
9  would provide our recommendations straight back to
10  whoever sent it to us.
11    Q. Let's go to the following page. For the
12  record, this is Greenville 86064, heading 13 decision
13  bodies. Please read the first paragraph in the
14  record, the whole paragraph.
15    A. Projects are legally approved in the
16  local entity proposing the project. Please refer
17  to the corresponding documents of this specific
18  legal entity for information on the competence of
19  local management versus the board of directors.
20  Any project requires regional and/or headquarters
21  support before being approved by the in-market
22  company if the total project costs exceed a limit
23  of U.S. dollars 40,000.
24    Q. Please read that note below the first
25  paragraph that you just read.

Page 116

1    A. Note, all projects of global functions
2  R&D and global supply needs support by region or
3  headquarters prior to local sanctioning.
4    Q. Does that mean that all local projects
5  effecting global functions such as research and
6  technology or global supply requires support of
7  regional or headquarter regardless of the cost?
8    A. For R&D and global supply, I would read
9  that as being the Marian Stypa or John Riley who I
10  referred to earlier would look at all their -- all
11  the projects that come through their departments.
12    Q. Actually, doesn't the first paragraph say
13  it applies to all projects exceeding $40,000
14  American, correct?
15    A. Yes.
16    Q. Okay. And then the note below that is an
17  exception, isn't it?
18    A. Yes, I would read that as all projects of
19  any amount of R&D and global supply would require a
20  regional view, which is local within Crop
21  Protection, Inc. anyway.
22    Q. It would need support by
23  region/headquarters prior to local sanctioning,
24  correct?
25    A. In practice, I don't believe that

Page 117

1  headquarters signs off on any projects below 40,000
2  or recommends on any projects below 40,000.
3    Q. Do you know if Syngenta Crop Protection,
4  Inc. has become involved in projects of more than $60
5  million?
6    A. No.
7    Q. So you don't know if it has submitted for
8  approval projects to the Syngenta, AG board?
9    A. I don't -- I don't think it has, no. Not
10  in my tenure.
11    MR. TILLERY: Let's go off the record for
12    a little while, please, let me look at my
13    notes.
14    THE VIDEOGRAPHER: Stand by.
15    Going off the record. The time is 11:54
16    and 24 seconds.
17    (A BRIEF RECESS WAS TAKEN.)
18    THE VIDEOGRAPHER: We're back on the
19    record. The time is 12:02 and 59 seconds.
20    Please continue.
21    Q. Have you ever seen any minutes of the
22  Syngenta executive committee?
23    A. No.
24    Q. Let me start over because I didn't have my
25  mic on.

30 (Pages 114 to 117)

Exhibit 009 Page 30
5ed f3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 118

1    A.  Sure.
2    Q.  Have you ever seen any minutes of the
3  Syngenta executive committee?
4    A.  No.
5    Q.  And I'm talking about redacted or
6  unredacted.
7    A.  No.
8    Q.  Okay. Have you ever seen any minutes of the
9  capital committee?
10   A.  I've never seen a full set of minutes.  I
11 may have seen in one of the approval e-mails just
12 saying this was approved or recommended in the
13 meeting.  But I haven't seen a full set.
14   Q.  And that's where they redact everything out
15 except the part of the approval that replies to the
16 request?
17   A.  They would say the CAC is recommended --
18      THE COURT REPORTER: The what is
19    recommended?
20   A.  The CAC is recommended, CAC is
21 recommended for this project.
22   Q.  Have you ever seen minutes of the business
23 services committee?
24   A.  No.
25   Q.  Do you have a copy of the transfer pricing

Page 119

1  policy? Or have access to it?
2    A.  Yeah, I think I have access to it, yeah.
3    Q.  How do you have access to it?
4    A.  I believe it's on the intranet.
5    Q.  Is it limited access document?
6    A.  I don't know.
7    Q.  It's not limited to you, but you don't know
8  if it's limited to others?
9    A.  I don't know, no.
10   Q.  Do you know what kind of insurance Syngenta
11 Crop Protection, Inc. has?
12   A.  For what in specific?
13   Q.  I mean, you give me the full gamut of
14 different coverages.
15      Do know how the insurance is handled?
16   A.  Elements of it.  The one I'm most
17 familiar with is credit risk insurance.
18   Q.  Do you know of any like liability
19 insurance.
20      Do you know anything about that?
21   A.  No, I don't know any of the details about
22 that.
23   Q.  Do you know if there global insurance
24 policies?
25   A.  I'm sure there -- I'm sure there -- I'm

Page 120

1  sure there are, yeah.
2    Q.  Do you know if the insurance, liability
3  insurance that encompasses Syngenta Crop Protection,
4  Inc. is part of a global insurance policy?
5    A.  I don't, no.
6    Q.  Do you know whether there are U.S. wide or
7  U.S. separate insurance policies that cover Syngenta
8  subsidiaries in the U.S.?
9    A.  There would be for particular items like
10 fleet insurance and things like that.  The
11 specifics of all of them, I don't know.
12   Q.  Who handles insurance?
13   A.  We have a insurance specialist who sits
14 in Wilmington, Delaware.
15   Q.  Okay.
16   A.  And we will have individuals in Crop
17 Protection, Inc. who deal with them.  But I don't
18 know their names.
19   Q.  Who's the insurance specialist at
20 Wilmington, Delaware?
21   A.  John Burleigh.
22   Q.  And by whom is he employed?
23   A.  Syngenta Corporation.
24   Q.  I'm going to show you this.  I only have
25 one of these.  So I'll just give it to you.

Page 121

1       MR. TILLERY:  Do you have another one?
2    Actually, I have more.
3       (Plaintiff's Exhibit 3: Statement of
4    Expense documents, Bates GRNVL0000078282 -
5    8350 marked for identification, as of this
6    date.)
7    Q.  This was provided to us in discovery.  Call
8  it Exhibit 3.  Would you look through it, please.
9       MR. TILLERY: This is Greenville 78282
10    through 78350.
11   Q.  It was given to us as an exemplar.  Can you
12 tell us what it is?
13   A.  It's a statement of expense report which
14 shows the broad categories of expenses for various
15 organizational units within Crop Protection, Inc.
16   Q.  These statement of expenses are all within
17 the corporate entity of Syngenta Crop Protection,
18 Inc.?
19   A.  I cannot say for certain without looking
20 through every page of the report.  But I recognize
21 most of the groups -- all of the groups that I can
22 see on clicking through.  But I can't say for
23 certain they're all within --
24      THE COURT REPORTER: They're all?
25   A.  They're all within the Crop Protection,

31 (Pages 118 to 121)

Exhibit 009 Page 31
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 122

1  Inc. entity.
2      Q.  The first topic is northern field crops.
3  Do you see that?
4      A.  Yes.
5      Q.  Is that a recognized area within Syngenta
6  Crop Protection, Inc.?
7      A.  Yes.
8      Q.  And then prairie and mountain.  What is
9  that?
10     A.  It's a business unit within Syngenta Crop
11  Protection, Inc.
12     Q.  And are these certain geographical
13  distinctions?
14     A.  Yes.
15     Q.  Are they divided by state?
16     A.  Yeah -- mostly, yeah.  It's broad state.
17     Q.  What would northern field crops be?
18     A.  I don't know all the states and counties
19  that would be covered by each one.
20     Q.  Prairie and mountain, you don't know or do
21  you know?
22     A.  No.
23     Q.  Southern field crops, do you what's in --
24  again, another geographical distinction?
25     A.  Yes.

Page 123

1          And horticulture is the same.
2      Q.  I didn't understand what you mean
3  horticulture is the same?
4      A.  It's a geographically distinct business
5  unit.
6      Q.  Okay.  Where is it?
7      A.  East and west coast.
8      Q.  Okay.  And sales and channel strategy,
9  could you tell me what that is?
10     A.  That would generally be for sales that
11  aren't to our broad customer base in those
12  territories that we've referred to earlier.  They
13  would generally be sales to either distribution
14  companies that they would use our products to make
15  their own products or they would be sales to
16  competitors such as Dow or Monsanto.  And that also
17  contains some of our developmental sales reps.  So
18  trainee sales reps.
19     Q.  What is seed care?
20     A.  Seed care is a business unit that
21  services all geographies and is really around
22  applying our products directly to seeds prior to
23  germination.
24     Q.  Lawn and business -- lawn and garden
25  business?

Page 124

1      A.  Lawn and garden is really the gulf in
2  consumer element rather than the sort of broad
3  field crops.
4      Q.  Have you seen atrazine supply contracts
5  that Syngenta Crop Protection, Inc. has entered into?
6      A.  I don't think I've seen one, no.
7      Q.  Do the supply contracts that you have seen
8  have Syngenta Crop Protection, Inc.'s name on them or
9  some other Syngenta entity?
10     A.  I said -- my answer was I don't think
11  I've seen supply contracts.
12     Q.  Oh, I was asking a broader area.
13         You've never seen a supply contract of any
14  kind?
15     A.  No, I didn't say that.  I mean -- you said
16  -- you asked for atrazine.
17     Q.  No, the -- my -- I --
18         MR. POPE:  He's expanding --
19     Q.  -- the last question was do the supply
20  contracts that you have seen have Syngenta Crop
21  Protection, Inc.'s name on them or some other
22  Syngenta entity?
23     A.  Okay.  I can't recall.  You know, I've
24  seen some, but I can't recall the detail of them.
25     Q.  Have you ever seen a global supply

Page 125

1  contract?
2      A.  Not that I'm aware.
3      Q.  The next topic is marketing.  What is that?
4      A.  That's the marketing group that sits in
5  Greensboro, I would suspect.  Yeah, that's the
6  Greensboro group.
7      Q.  There's a topic for communications.  Do you
8  know what that is?
9      A.  Yeah, I believe -- I believe this one
10  would be for the local communications people that
11  we have.  So we do have a small team in Crop
12  Protection, Inc.
13     Q.  There's division management and portfolio
14  management.  Can you tell me what those are?
15     A.  Division management would be the
16  management group.  So it would be Vern's cost
17  center, but also the costs that would be in there
18  would be the -- the bonus -- bonus pot for Crop
19  Protection employees would be held in that cost
20  center and then charged out or not as it's earned.
21  So the bulk of that would be a broad bonus for the
22  employee population.  And the next one you asked
23  was?
24         MR. POPE:  Portfolio management was the
25  next one.

32 (Pages 122 to 125)

Exhibit 009 Page 32

5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                11-11-2010
Confidential - Under Protective Order

Page 126

1    A.  Do you have a page number for --
2       MR. POPE:
3    Q.  Actually, just -- I think I --
4    A.  I would have thought that would be within
5  marketing.
6    Q.  I think I have it.
7       This was produced to us, sir, as a budget
8  that's created with consultation or approval by
9  somebody outside of Syngenta Crop Protection, Inc.
10  Was in response to a specific request in discovery.
11  Do you know if that is accurate for purposes of the
12  document you have in front of you?
13    A.  No one outside of Syngenta Crop
14  Protection, Inc. would look at a document at this
15  level of detail.
16    Q.  So you don't know -- this -- I'm
17  representing to you it was given to us as a document
18  that was produced to us as a budget that is created
19  in consultation with or approval by someone outside
20  of Syngenta Crop Protection, Inc.
21       Are you telling me that's an incorrect
22  response?
23    A.  This document -- well --
24    Q.  I'm -- very specific question.
25    A.  Yeah, I'm just trying to make sure I'm

Page 127

1  understanding your question.  Are you asking
2  whether our budget process as a whole is --
3    Q.  All I can tell you is we asked for
4  documents that would reflect the type of budgets that
5  would be approved by entities outside of Syngenta
6  Crop Protection, Inc., and this was given to us.
7    A.  Okay.  Well, my answer to that would --
8  this level of detail would never be looked at by
9  someone outside of Crop Protection, Inc.  Even --
10  it's just way too much detail.
11    MR. TILLERY: No further questions.
12    MR. POPE:  Thank you.  I have no
13    questions either.  We will reserve signature
14    and designate this as confidential under the
15    protective order.
16    Thank you, Steve.
17    MR. TILLERY:  You're welcome.
18    THE VIDEOGRAPHER: Stand by.
19    This is the end of videotape number two,
20  volume one in the deposition of Jason Fogden.
21  The original videotapes will be retained by
22  WestLaw Deposition Services.
23    Going off the record.  The time on the
24  monitor is 12:17 and 37 seconds.
25       (TIME NOTED: 12:17 p.m.)

Page 128

1       (SIGNATURE RESERVED.)

Page 129

1       WITNESS' CERTIFICATE
2
3       I, JASON FOGDEN, do hereby certify that I
4  have read and understand the foregoing transcript
5  and believe it to be true, accurate, and complete
6  transcript of my testimony, subject to the attached
7  list of changes, if any.
8
9
10
11       JASON FOGDEN
12
13
14  This deposition was signed in my presence by
15  _____, on the _____ day of
16  _____, 2010.
17
18
19       NOTARY PUBLIC
20  My commission expires:
21
22
23
24
25

33 (Pages 126 to 129)

Exhibit 009 Page 33
5edf3bc0-a800-4a3d-adfe-b5b1336c0171

Fogden, Jason                     11-11-2010
Confidential - Under Protective Order

Page 130

(Page 1 of 2)

E R R A T A   S H E E T

RE:  City of Greenville, Illinois, et al.
        vs. Syngenta Crop Protection, Inc., et al.
DEPOSITION OF:  Jason Fogden
        Please read this transcript with care,
and if you find any corrections or changes you wish
made, list them by page and line number below.  DO
NOT WRITE IN THE TRANSCRIPT ITSELF.  Return the
Certificate and Errata Sheet to this office after
it is signed. We would appreciate your prompt
attention to this matter
        To assist you in making such corrections,
please use the form below.  If supplemental or
additional pages are necessary, please furnish same
and attach them to this errata sheet.

1
2
3
4
5
6
7
8
9
10
11  Page:   Line:    should read:
12  Page:   Line:    should read:
13  Page:   Line:    should read:
14  Page:   Line:    should read:
15  Page:   Line:    should read:
16  Page:   Line:    should read:
17  Page:   Line:    should read:
18  Page:   Line:    should read:
19  Page:   Line:    should read:
20  Page:   Line:    should read:
21  Page:   Line:    should read:
22  Page:   Line:    should read:
23  Page:   Line:    should read:
24  Page:   Line:    should read:
25  Page:   Line:    should read:

Page 131

(Page 2 of 2)

1
2   Page:   Line:    should read:
3   Page:   Line:    should read:
4   Page:   Line:    should read:
5   Page:   Line:    should read:
6   Page:   Line:    should read:
7   Page:   Line:    should read:
8   Page:   Line:    should read:
9   Page:   Line:    should read:
10  Page:   Line:    should read:
11  Page:   Line:    should read:
12  Page:   Line:    should read:
13  Page:   Line:    should read:
14  Page:   Line:    should read:
15  Page:   Line:    should read:
16  Page:   Line:    should read:
17  Page:   Line:    should read:
18  Page:   Line:    should read:
19  Page:   Line:    should read:
20  Page:   Line:    should read:
21  Page:   Line:    should read:
22  Page:   Line:    should read:
23  Page:   Line:    should read:
24  Page:   Line:    should read:
25  Page:   Line:    should read:

Page 132

1   STATE OF NORTH CAROLINA
    COUNTY OF MECKLENBURG
2
3        REPORTER'S CERTIFICATE
4        I, V. Dario Stanziola, a Notary Public in
5   and for the State of North Carolina, do hereby
6   certify that there came before me on Thursday,
7   November 11, 2010, the person hereinbefore named,
8   who was by me duly sworn to testify to the truth
9   and nothing but the truth of his knowledge
10  concerning the matters in controversy in this
11  cause; that the witness was thereupon examined
12  under oath, the examination reduced to typewriting
13  under my direction, and the deposition is a true
14  record of the testimony given by the witness.
15       I further certify that I am neither
16  attorney or counsel for, nor related to or employed
17  by, any attorney or counsel employed by the parties
18  hereto or financially interested in the action.
19       IN WITNESS WHEREOF, I have hereto set my
20  hand, this the 23rd day of November 2010.
21
22
23
          V. DARIO STANZIOLA, CSR, RPR, CRR
24        Notary Public No. 20011200120
25

34 (Pages 130 to 132)

Exhibit 009 Page 34
5edf3bc0-a800-4a3d-adfe-b5b1336c0171