McFarland, Janis                    11-17-2010
Confidential

                IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS


     CITY OF GREENVILLE, et al.,      )
                                      )
                 Plaintiffs,          )
                                      )
            vs.                       ) No. 10-CV-188-JPG-PMF
                                      )
     SYNGENTA CROP PROTECTION,        )
     INC., and SYNGENTA AG,           )
                                      )
                 Defendants.          )


          The videotaped deposition of JANIS McFARLAND,

     called by the Plaintiff for examination, taken pursuant

     to notice and pursuant to the Federal Rules of Civil


     Procedure for the United States District Courts


     pertaining to the taking of depositions, taken before


     Tracy Jones, Certified Shorthand Reporter, Registered


     Professional Reporter, Certified LiveNote Reporter, and


     Notary Public, at 227 West Monroe Street, 44th Floor,


     Chicago, Illinois, commencing at 9:00 a.m. on


     November 17, 2010.

Exhibit 011 Page 1
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                     11-17-2010
Confidential

---

### Page 2

1  APPEARANCES:
2  On behalf of the Plaintiffs:
       STEPHEN M. TILLERY, Esq.
3      KOREIN TILLERY, LLC
       505 North Seventh Street, Suite 3600
4      St. Louis, Missouri 63101
       Phone: 314.241.4844  Fax: 314.241.3525
5      E-Mail:  stillery@koreintillery.com
6
7  On behalf of the Defendants.
       MICHAEL A. POPE, Esq.
8      PETER K. SCHUTZEL, Esq.
       McDERMOTT WILL & EMERY, LLP
9      227 West Monroe Street
       Chicago, Illinois 60606
10     Phone: 312.372.2000  Fax: 314.984.7700
       E-Mail: mpope@mwe.com
11     E-Mail: pschutzel@mwe.com
12     MARK C. SUPRENANT, Esq.
       ADAMS AND REESE, LLP
13     701 Poydras Street, Suite 4500
       New Orleans, Louisiana 70139
14     Phone: 504.581.3234  Fax: 504.566.0210
       E-Mail: mark.suprenant@arlaw.com
15
16
17
   ALSO PRESENT:   MR. ALAN NADEL, in-house Counsel,
18         Syngenta Crop Protection, Inc.;
19     MR. JERRY L. BROWN
       Korein Tillery, LLC
20
       MR. JEREMY MANGAN, Videographer
21
22
23         *  *  *  *  *  *  *
24
25

### Page 3

1          I N D E X
2  WITNESS                              PAGE
3  JANIS McFARLAND
4     Examination By Mr. Tillery.................... 6
5
6          E X H I B I T S
7  NO.    DESCRIPTION                   PAGE
8  Exhibit 1  Syngenta Web Page....................... 50
9  Exhibit 2  Syngenta Comments on ................... 61
       EPA 1/19/01 Decision
10 Exhibit 3  Talent Summary........................... 63
11 Exhibit 4  4/13/06 E-Mail from John Street.......... 76
12 Exhibit 5  NAFTA Coordination Meeting Notes......... 84
13 Exhibit 6  NAFTA Regulatory Actions - 2002.......... 92
14 Exhibit 7  NAFTA Organizational Chart.............. 95
15 Exhibit 8  PMRA - Syngenta Meeting Agenda.......... 104
16 Exhibit 9  E-Mail Chain SYN01791470................ 115
17 Exhibit 10 E-Mail Chain SYN00797641................ 115
18 Exhibit 11 E-Mail Chain SYN01776061-SYN01776063.... 118
19 Exhibit 12 E-Mail Chain SYN00751645-SYN00751648..... 120
20 Exhibit 13 E-Mail Chain SYN02735998-SYN02736002.... 121
21 Exhibit 14 E-Mail Chain SYN02735585-SYN02735597.... 121
22 Exhibit 15 Syngenta Memo of 11/19/01............... 123
23 Exhibit 16 E-Mail Chain SYN02030726................ 127
24 Exhibit 17 Draft Planning for ..................... 131
       Triazine RDT/PMT Meeting
25 Exhibit 18 Active Ingredients' GRA Responsibilities. 137

### Page 4

1          E X H I B I T S
2  NO.      DESCRIPTION                 PAGE
3  Exhibit 19 Memo of 5/24/01........................ 139
4  Exhibit 20 E-Mail Chain SYN01010540-SYN01010541..... 142
5  Exhibit 21 E-Mail Chain SYN01713849-SYN01713850..... 146
6  Exhibit 22 E-Mail Chain SYN01713672................ 146
7  Exhibit 23 EPA Communication Plan................... 149
8  Exhibit 24 Draft Agenda 10/25/04.................... 151
9  Exhibit 25 Minutes Regulatory Sciences ............. 151
       Committee Meeting of 10/27/04
10 Exhibit 26 Minutes Regulatory Sciences ............. 161
       Committee Meeting of 4/25/05-4/26/05
11 Exhibit 27 Draft Agenda 5/19/05.................... 166
12 Exhibit 28 EASY 1-2-3 Implementation Roll Out....... 168
13 Exhibit 29 EASY 1-2-3 Draft v.1.................... 174
14 Exhibit 30 Atrazine RDT February 2005 Presentation.. 174
15
16
17        *  *  *  *  *
18
19
20
21
22
23
24
25

### Page 5

1      THE VIDEOGRAPHER:  We are now on the record.
2      Here begins the videotaped deposition of Janis
3  McFarland, Tape 1, Volume 1, in the matter of City of
4  Greenville v. Syngenta Crop Protection, in the U.S.
5  District Court, Southern District of Illinois, Case
6  No. 08 C 7661.
7      Today's date is November 17th, 2010, and the
8  time on the video monitor is 9:22 a.m.
9      The video operator today is Jeremy Mangan
10 representing Westlaw Deposition Services.  The court
11 reporter today is Tracy Jones of Jensen Reporting
12 reporting on behalf of Westlaw Deposition Services.
13     Today's deposition is taking place at 227 West
14 Monroe Street, Chicago, Illinois.
15     Counsels, please introduce yourself for the
16 record.
17     MR. TILLERY:  For the plaintiff, from Korein
18 Tillery in St. Louis, Steve Tillery.  Also present is an
19 employee of Korein Tillery, Jerry Brown.
20     MR. POPE:  Michael Pope and Peter Schutzel,
21 McDermott, Will & Emery, on behalf of the Defendants.
22     MR. SUPRENANT:  Mark Suprenant, Adams & Reese in
23 New Orleans on behalf of the Defendants.
24     MR. NADEL:  Alan Nadel from Syngenta Crop
25 Protection, Inc.

Exhibit 011 Page 2
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

---

Page 6

1        (Witness sworn.)
2    WHEREUPON:
3          JANIS McFARLAND,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6          EXAMINATION
7    BY MR. TILLERY:
8        Q.   Would you state your name for this record,
9    please.
10       A.   Janis Eileen McFarland.
11       Q.   And would you tell us your personal address.
12       A.   108 Stoneridge Drive, Chapel Hill, North
13   Carolina.
14       MR. TILLERY:  Let's go off the record for just a
15   second.  Off the record.
16       THE VIDEOGRAPHER:  Off the record.  The time is now
17   9:23 a.m.
18          (Discussion off the record.)
19       THE VIDEOGRAPHER:  Going on the record.  The time
20   is 9:24 a.m.
21   BY MR. TILLERY:
22       Q.   Where you employed, ma'am?
23       A.   I'm employed with Syngenta Crop
24   Protection, Inc.
25       Q.   And could you tell me about -- Let's start off

---

Page 7

1    with your education and training.  Let's talk about your
2    formal education after high school.
3        A.   Yes.  I received my B.S. degree from Virginia
4    Tech, my master's degree from Purdue University in plant
5    pathology, and my Ph.D. degree from Purdue University in
6    plant physiology.
7        Q.   Okay.  If we take the first one, did you go to
8    Virginia Tech after high school?
9        A.   I did.
10       Q.   And where did you grow up?
11       A.   I graduated from Virginia Tech.  My initial
12   undergraduate schooling was at Frostberg State College,
13   now Frostberg University in Frostberg, Maryland.
14       Q.   And when -- Would you mind telling me when
15   that took place?
16       A.   Yes.  In the fall of 1974, I entered Frostberg
17   State College.
18       Q.   Okay.  And you stayed there for how long?
19       A.   Two years.
20       Q.   All right.  And then you went to Virginia
21   Tech?
22       A.   Yes.
23       Q.   And were you there for two years?
24       A.   I was there for slightly longer than two
25   years --

---

Page 8

1        Q.   Okay.
2        A.   -- because I graduated two years later, but I
3    stayed to work as a technician.
4        Q.   Okay.  And your degree there was a B.S. in
5    biology?
6        A.   Yes, sir.
7        Q.   All right.  And then you went to a graduate
8    program and a master's program?
9        A.   Yes.
10       Q.   And where was that?
11       A.   Perdue University.
12       Q.   And when was that awarded?
13       A.   That master's degree was awarded in 1982.
14       Q.   Was that in a particular area of study, that
15   master's degree?
16       A.   My master's degree is in plant pathology,
17   plant diseases, with a particular focus in virology,
18   viruses.
19       Q.   And did you then continue on at Perdue in a
20   Ph.D. program?
21       A.   Yes, I did.
22       Q.   Straight on after your master's?
23       A.   Yes, I did.
24       Q.   And when did you complete your Ph.D.?
25       A.   I completed my Ph.D. in May of 1986.

---

Page 9

1        Q.   And your Ph.D. was awarded in what area of
2    specific study?
3        A.   Plant physiology.
4        Q.   Could you tell me what plant physiology means.
5        A.   The study of -- My particular focus was in the
6    way herbicides, their modes of action in controlling
7    growth in plants.
8          Plant physiology is a wonderful, broad
9    discipline in understanding the biochemistry of plants,
10   how they grow, the adaptive factors in causing crop
11   production, plant production, weed production.
12       Q.   Okay.  Was your first full-time job with
13   Ciba-Geigy Corporation?
14       A.   Yes, sir.
15       Q.   And when was that?
16       A.   That was in the beginning of February of 1986.
17       Q.   And that was before you completed your Ph.D.
18   program?
19       A.   Yes.  Yes.  My Ph.D. work was completed, and
20   the thesis was being submitted and filed.  But I had had
21   my final exams.
22       Q.   And what was your thesis in?
23       A.   It was in -- It was on the mode of action of
24   acid annelid herbicides.
25       Q.   Was it published?

---

Westlaw Deposition Services   800.548.3668 Ext. 1

Exhibit 011 Page 3
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                11-17-2010
Confidential

Page 10

1    A.  In various forms.  Various forms, parts of the
2  thesis were published, yes.
3    Q.  Can you tell me where your thesis was
4  published or parts of it were published.
5    A.  I can -- I can recall the -- I won't be able
6  to recall where all parts were, but I can offhand was in
7  a book chapter on modes of action of pesticides.
8    Q.  And what was that book?
9    A.  I would -- I can't recall the exact title of
10  that book.
11    Q.  And was that book published in the 1980s?
12    A.  Yes.
13    Q.  Okay.  Do you know who some of the other
14  authors were, who the editor of the book was?
15    A.  The editor of that book -- I published in a
16  few different books, so I would have to recall that
17  particular chapter.  But I did know one of my coauthors.
18  Some of my coauthors would have been Dan Hess
19  (phonetic), my Ph.D. advisor.
20    Q.  Were you listed as an author of the chapter
21  that was submitted, or coauthor?
22    A.  Yes.
23    Q.  Do you remember the topic of that particular
24  chapter?
25    A.  The mode of action of the acid annelid

Page 11

1  herbicides, metolachlor.
2    Q.  And what was your responsibility in your first
3  job in 1986?
4    A.  I was an animal metabolism chemist.
5    Q.  And could you tell me what that means.
6    A.  Yes.  I was developing and doing the
7  analytical work and the biological work on pesticides --
8  pesticide degradation pathways in rodents as my initial
9  job.  The analytical chemistry of defining the pathways
10  of how different pesticides breakdown in animals,
11  laboratory work.  Those studies were then submitted to
12  EPA, and many of them were conducted for EPA under their
13  requirements for understanding breakdown pathways for
14  pesticides.
15    Q.  What type of pesticides were you working with
16  in 1986 at Ciba-Geigy?
17    A.  I worked on several different compounds,
18  one -- and some of them were numbered compounds.  And I
19  worked specifically on an herbicide safener.  I
20  worked -- In those early years, I worked on many
21  different compounds, an insecticide, a fungicide,
22  herbicide safeners, herbicide work in the early years
23  too on new chemistry, sulfonylureas.
24    Q.  Did you work on any compound that would fall
25  within the triazine category?

Page 12

1    A.  One of the sulfonylureas I worked in was not a
2  triazine chemistry but was part of a triazine ring.
3    Q.  Would you spell the sulfonylurea.
4    A.  Yes.  Certainly.  S U L F Y N L U R E A [sic],
5  sulfonylurea.
6    THE COURT REPORTER:  Once again, please.
7  BY THE WITNESS:
8    A.  Yes.  S U L F Y N L U R E A.
9    Q.  And how long did you continue in that
10  particular job?
11    A.  I was in different positions in the laboratory
12  doing metabolic pathways up until 1993, but I went from
13  understanding pesticide defining pathways of breakdowns
14  from rats; we also do required studies for EPA in
15  chickens and goats, rotational crops and crops.  So I
16  evolved into -- in the laboratory in those different
17  matrices of required studies for EPA.
18    Q.  And were any of the compounds in that entire
19  period -- That went to what, 1993?
20    A.  Yes.  And in 1993, I also did environmental --
21  I ran the group that did environmental metabolism?
22    Q.  Did your work stay generally the same from
23  1986 until 1993?
24    A.  The many different studies that are required
25  have different studies designed into their protocols

Page 13

1  under which we do the studies, changed with different
2  matrices whether it was rodents, plants, environment, or
3  soil.  So over time, I did have larger groups.  But when
4  I was doing metabolism environment, larger teams that
5  were doing the different work, I managed the
6  environmental metabolism team.  And there were several
7  people doing many different types of studies in 1993.
8    Q.  Where were you working from the period from
9  1986 until 1993?
10    A.  Greensboro, North Carolina.
11    Q.  In the same place you're working today?
12    A.  The same building -- buildings.  Not exactly
13  the same.  I'm in a different building, the laboratory
14  building.  I was in different ones when I did the
15  laboratory work; I'm in a different building today.  But
16  still located in Greensboro, North Carolina.
17    Q.  Have you ever worked at any other location
18  since 1986?
19    A.  No, sir, for my formal job.
20    Q.  Your formal job has always been in Greensboro?
21    A.  Yes.  My office location and laboratory
22  locations are in Greensboro, North Carolina.
23    Q.  And they've been there consistently since
24  1986?
25    A.  Yes, sir.

Westlaw Deposition Services   800.548.3668 Ext. 1

Exhibit 011 Page 4
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 14

1    Q.  Have you ever taken an assignment outside of
2  Greensboro on a temporary basis?
3    A.  I have not.
4    Q.  Now, when was the first date that you became a
5  supervisor over other individuals in Greensboro?
6    A.  When I first came to Greensboro, I supervised
7  one technician.  And then over time, I went to two, to
8  five, to ten, to twenty-five, and then matrix managed
9  the larger groups.
10   Q.  Now, from the period of time from 1986 when
11 you began your employment until, let's say, 1983 when
12 you started directing --
13   MR. POPE:  '93.
14 BY MR. TILLERY:
15   Q.  I'm sorry.  1993; excuse me -- (continuing)
16 until you started directing a team of scientists, did
17 you in that entire period of seven years, did you work
18 on any triazine products, any compounds?
19   A.  One sulfonylurea had a triazine ring which was
20 a breakdown product of triazine.
21   Q.  And which one was that?
22   A.  That was a sulfonylurea herbicide.
23   Q.  Okay.  Was it being man- -- Strike that.
24       Was it being sold on the marked?
25   A.  No.  I -- The work I was doing was in the

Page 15

1  early stages of development.
2    Q.  And is the work still being done at that plant
3  on early stage development of molecules?
4    A.  The -- I guess the early work that I used was
5  in the context of doing preliminary -- preliminary
6  guideline studies early -- in early stage development
7  for our products is not done at Syngenta Crop
8  Protection, Inc., currently.
9    Q.  It's done at Jealott's Hill and maybe another
10 location?
11   A.  The early -- early crop protection work is
12 done with -- at the Syngenta Crop Protection AG.
13   Q.  And where is that?
14   A.  They're at different locations.
15   Q.  Do you know which one, where they're located?
16   A.  I would -- Some of the early stage work, yes.
17   Q.  Where is it?
18   A.  There is one location in Jealott's Hill, the
19 United Kingdom; one location in Stein, Switzerland; Goa,
20 India.
21   Q.  Okay.  Have you ever given a deposition
22 before?
23   A.  Yes, sir.
24   Q.  When did you do that?
25   A.  I can't recall the exact year.  It was in the

Page 16

1  '90s.
2    Q.  And in what context did you give a deposition?
3    A.  With a litigation proceeding, Iberville Parish
4  v. Ciba-Geigy Corporation.
5    Q.  And who took your deposition?
6    A.  I don't recall.
7    Q.  Okay.  Do you recall the topic of your
8  deposition?
9    A.  Yes.
10   Q.  What was it?
11   A.  It was on triazine, atrazine.
12   MR. POPE:  I didn't know depositions had only one
13 topic, but I'm happy to hear it.
14 BY MR. TILLERY:
15   Q.  Do you know where you gave your deposition?
16   A.  It was held at -- close to Greensboro, North
17 Carolina.
18   Q.  Did anybody else from your department give a
19 deposition in that case?
20   A.  One person who reported to me at that time may
21 have given a dep-- -- one person may have given a
22 deposition also in my group at that time.
23   Q.  Who was that?
24   A.  Dennis Tierney.
25   Q.  Is he still there?

Page 17

1    A.  He retired.
2    Q.  Where is he now?
3    A.  He lives in Greensboro, North Carolina.
4    Q.  Do you know of any other employee of Syngenta
5  Crop Protection, Inc., who gave a deposition in the
6  Iberville Parish case?
7    A.  There were others, but I don't recall.
8    Q.  Were they in your department or elsewhere?
9    A.  No.  Dennis would have been the only one in my
10 department at that time.
11   Q.  Okay.  How long did your deposition last?
12   A.  They always seem to last forever.  But I think
13 -- I don't recall the exact amount of time.
14   Q.  Was that the only deposition you've ever given
15 before this one?
16   A.  Deposition, yes.  I've testified before in
17 arbitrations.
18   Q.  When have you testified before?
19   A.  In various data compensation arbitrations.
20   Q.  Can you remember any of those specifically?
21   A.  I recall the Sippican atrazine dep on data
22 compensation and also a Drexel data compensation.
23   Q.  Do you remember the years in which you gave
24 that testimony?
25   A.  One would have been in 2007, and one would

5 (Pages 14 to 17)

Exhibit 011 Page 5
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 18

1  have been in 2010.
2     Q.  So one was earlier this year?
3     A.  Yes, sir.
4     Q.  And which corporation did that involve?
5     A.  Drexel Corporation.
6     Q.  And the earlier one was Sippican?
7     A.  Yes, sir.
8     Q.  And where did you give that testimony?
9     A.  Washington, D.C.
10    Q.  And could you tell me if you've given any
11 other testimony in any other proceeding.
12    A.  There might be affidavits that are in other
13 data compensation type of work.
14    Q.  Other than affidavits in other data
15 compensation work, two times you've testified in data
16 compensation arbitrations and the Iberville Parish
17 deposition.  Have you given any testimony at any
18 hearing, arbitration, or deposition prior to this date?
19    A.  Other than those you just mentioned?
20    Q.  Yes.
21    A.  I can't recall additional.
22    Q.  Okay.  We left off at a point where you were
23 telling me that you were working at Ciba-Geigy on an
24 early development, and you drew a distinction between
25 your work and the early molecule development at

Page 19

1  Jealott's Hill.  Could you tell me what you were doing
2  then on the development you were doing in the 1986 to
3  1993 era.
4     A.  When I was referring to early development in
5  that particular -- in that particular context, I was
6  referring to preliminary -- preliminary formula, trying
7  to figure out how to formulate a dose solution that you
8  would use; trying to figure out how you would generate
9  additional breakdown products in plants by using tissue
10 cultures and injections.  And I would think the
11 preliminary work also involved guideline studies of --
12 that I -- we would say were preliminary because they
13 were glass cage work.
14       So we did different types of preliminary
15 studies and guideline studies -- and guideline studies.
16 And some of those guideline studies would be done in
17 other parts of -- In our new companies in the merger,
18 they're done with a different company and different
19 sites.
20    Q.  You said the -- This was last stage work?  Is
21 that what you said?
22    A.  You know, I said -- I was saying glass cage
23 work.
24    Q.  Glass cage.  It came out on the record as
25 "last stage."

Page 20

1     A.  And what I meant is we tried to understand
2  trapped carbon dioxide with rodents in early stage work
3  then.  We don't do that work now -- with our company in
4  Greensboro now.
5     Q.  Let me ask you, what stage of product
6  development were you working in the work you were doing
7  between 1986 and 1993?
8     A.  The majority -- The type of work probably
9  spanned with that when we were Ciba-Geigy with mostly
10 stage -- late stage 2 to stage 3.  Because we did
11 several guideline studies, and then we also did field
12 studies in the United States, stage 3 and 4.
13    Q.  Were you working in field studies at that
14 time?
15    A.  I did some field studies as it related to
16 using the material in the field for metabolism pathway
17 to find how pesticides break down in the environment.
18    Q.  Where were you doing your field studies?
19    A.  We did them at our research stations.
20    Q.  In Greensboro?
21    A.  No.  We had various -- We had different
22 research stations in different locations in the United
23 States at that time.
24    Q.  And could you tell me where those locations
25 were at that time geographically.

Page 21

1     A.  Yes.  I can tell you the general regions.
2  Hudson, New York; Vero Beach, Florida; Champaign-Urbana,
3  Illinois; and the Delta Mississippi area; Greenville,
4  likely, and one was out in California.
5     Q.  And was the selection of the different
6  geographic locations designed to focus on different
7  climatic conditions where the product might ultimately
8  be sold?
9     A.  The work I did was focused on generating
10 material that we would get under real life conditions
11 that we would define a metabolic pathway in the field or
12 in the -- with field crops or soil.  And they would not
13 be -- They would not have been done in all the states
14 where a product would eventually be sold.  They were
15 conducted in order to match some real life geographical
16 conditions of the crops.
17    Q.  Trying to understand what you just said,
18 using, for example, the Champaign-Urbana testing area,
19 would that be designed to test a particular product in
20 an area where the products may ultimately be sold, in,
21 let's say, Illinois, Indiana, and that part of the
22 Midwest?
23    A.  Yes, depending on the crop.
24    Q.  Yes.  For example, corn.
25    A.  Corn.  Yes.  Although sometimes even if a

Exhibit 011 Page 6
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
                Confidential

---

Page 22

1   product would be in Illinois, you may -- depending on
2   the studies, you may do the study in Iowa or Missouri
3   and similar -- similar environmental and soil crop
4   growing regions.  Not every state -- It depends on the
5   study design.
6       I worked in metabolism, and that was a
7   particular guideline area for EPA.  And more field
8   testing is done in stage 3 and 4 that are residue
9   testing, and those are also chosen by geographical
10  region.
11      Q.  And were you doing this testing to comply with
12  regulation requirements for reporting to get the product
13  on the market?
14      A.  We were doing the studies to provide
15  information to EPA that was required for a registration
16  of a pesticide.
17      Q.  Do you know who owned the molecule or the
18  product at the time that you were doing your testing
19  between 1986 and 1993?
20      A.  No, sir.
21      Q.  Okay.  Do you know if your laboratory at that
22  time was working under a contract with any other
23  Ciba-Geigy related affiliate entity?
24      A.  No.
25      Q.  Who was your supervisor at that time?

---

Page 23

1       A.  I had different supervisors throughout that
2   period.
3       Q.  Did you have a person in the same facility who
4   was a supervisor?
5       A.  Yes.
6       Q.  Who was that, the very first one?
7       A.  Very first one, Dr. Jim Cassidy.
8       Q.  And is he affiliated with a Syngenta entity at
9   this time?
10      A.  No.
11      Q.  Okay.  How long was he your supervisor?
12      A.  He was my supervisor for the first two years
13  with Ciba-Geigy Corporation.
14      Q.  And then who was your supervisor?
15      A.  My next supervisor was under Bruce Simenow.  I
16  actually had a few different supervisors at the time I
17  had additional supervisory responsibility.
18      Q.  In other words, as you moved up in the
19  corporation --
20      A.  Yes.  I had different people.
21      Q.  Okay.
22      A.  Several excellent metabolism chemists that I
23  helped.  And I considered myself to be very lucky.
24      Q.  I wouldn't expect you to talk about them any
25  differently.

---

Page 24

1       So in any event, this work that you described
2   when in the laboratory from 1986 until 1993, correct?
3       A.  Yes.  And that actually extended until late
4   1994.
5       Q.  Okay.  Was Ciba-Geigy corporation a U.S.
6   subsidiary of a Swiss entity at that time?
7       A.  I -- I don't know the details beyond the
8   Greensboro site that I was on.  But I -- Yeah.
9       Q.  I'm sorry.  But what?
10      A.  Nothing.  I just was focused on the Greensboro
11  area.
12      Q.  You don't know -- You don't know who owned the
13  company that you worked for?
14      A.  I don't.  I didn't at that time.
15      Q.  All right.
16      A.  I wouldn't have paid attention to that.
17      Q.  All right.  So in 199- -- Strike that.
18      Between 1986 and 1993, did you appear or
19  present to any EPA panel or any committee of the EPA?
20      A.  Panel -- I had meetings with EPA --
21      Q.  Okay.
22      A.  -- scientists.
23      Q.  Okay.  And could you tell me how those EPA
24  meetings would take place.  And I'm talking about that
25  seven-year period now, because I want to move up in a

---

Page 25

1   little bit when your responsibility makes a dramatic
2   change.  So in that period of time, did you have
3   meetings with EPA?
4       A.  Yes.
5       Q.  Could you tell me about how those would occur.
6       A.  The regulatory manager for the product would
7   have arranged the meeting, and then I would go up to
8   give information on the metabolic pathway of a certain
9   product.
10      Q.  And these would be sessions at the EPA?
11      A.  Yes.
12      Q.  Now, up until this time, 1993, had you made
13  any presentations to the EPA about any triazine
14  compound?
15      A.  No, except for the one sulfonylureas that had
16  a triazine, we probably had a meeting on metabolism.  I
17  don't recall the specifics.
18      Q.  Oh, about 30 minutes ago, you used the word
19  "safener."
20      A.  Yes.
21      Q.  Okay.  I want you to tell a nonscientist in
22  words that a 6-year-old can understand what safener
23  means.
24      A.  I would be happy to.  A safener in the context
25  that I used the product is a chemical designed to help a

---

7 (Pages 22 to 25)

Exhibit 011 Page 7
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                11-17-2010
Confidential

Page 26

1  plant tolerate a pesticide better, break it down faster.
2  So many times with the case with a herbicide, a crop may
3  be injured at the same time you're trying to control
4  weeds.  It could have some growth inhibition on the crop
5  itself.  And so there's different classes of compounds
6  used to actually help that crop be -- tolerate the
7  herbicide better.
8      Q.  Is that the burning, burnout effect on a
9  plant?
10     A.  It can be.  And then there's other types of
11 injury depending on the type of chemistry whether it's
12 stunting, germination, or, as you say, some foliar
13 aspect that looks like a burndown.
14     Q.  Okay.  Could you tell me what an adjuvant is
15 in roughly the same level of communication, if you
16 wouldn't mind.
17     A.  An adjuvant is a chemical that's added to
18 different mixtures of a crop protectant tool, so
19 fungicides, insecticides, and herbicides, that allow --
20 that actually facilitates more getting in -- more of the
21 product that's controlling the disease or controlling
22 the weed getting to the plant.
23     Q.  Are safeners regulated by the EPA?
24     A.  Yes.
25     Q.  Are adjuvants regulated by the EPA?

Page 27

1      A.  Currently some adjuvants -- adjuvants are
2  approved by the EPA.
3      Q.  And when you say, "approved," is there a
4  difference between approval and regulation?  In other
5  words, if they don't approve them, are you able to use
6  them?
7      A.  I don't know if they're -- I don't know about
8  the adjuvants.
9      Q.  Are adjuvants regulated differently in NAFTA,
10 other NAFTA countries?
11     MR. POPE:  By "NAFTA" you don't mean
12 the treaty, you mean the way that the term is used in
13 the depositions?
14     MR. TILLERY:  Yes, sir.
15 BY MR. TILLERY:
16     Q.  Mr. Pope -- Mr. Pope constantly keeps me
17 straight on my questions.  And he did it again, and I
18 thank him for it.
19         So what I meant by NAFTA is in the way that
20 Syngenta Crop Protection, Inc., uses the term.
21     A.  Every -- Different countries have different
22 regulatory requirements for both pesticides and
23 adjuvants.
24     Q.  Okay.  Have we fairly well covered the
25 1986-to-1993 chapter of your life work-wise?

Page 28

1      A.  We could talk for many years about the
2  exciting work we did during that time period.
3      Q.  We could go on and on.  Okay.
4          Were you still employed by Ciba-Geigy at that
5  time?
6      A.  Yes.
7      Q.  All right.  How did your job responsibilities
8  change in 1993?
9      A.  In 1993, I was -- I was manager of the
10 Environmental Metabolism Group, and that lasted until
11 November of 1994.
12     Q.  Okay.  So the change occurred in '94?
13     A.  Yes.
14     Q.  And tell me what happened in 1994 that changed
15 your responsibilities.
16     A.  I was asked to run and manage the
17 atrazine/simazine special review.
18     Q.  And what is that?
19     A.  Special review is a proceeding that is part of
20 EPA's review process where a product is re reviewed to
21 ensure that there's no adverse health effects or no
22 unreasonable harm to humans' health or the environment.
23 It's a risk-benefit assessment that has a very formal
24 proceeding and very discrete steps.
25     Q.  And before we get into that, can you tell me

Page 29

1  how many people were working with you or for you at that
2  time in that job.
3      MR. POPE:  On the special review, you mean?
4  BY MR. TILLERY:
5      Q.  Yes.  In 1994 in November when you assumed
6  that responsibility.
7      A.  I matrix managed different teams who were
8  working on the special review.
9      Q.  What does matrix manage mean?
10     A.  It means the different scientists or experts
11 were reporting in to their functional supervisors on --
12 their supervisors on site, and I coordinated the
13 different science and benefits response across different
14 teams.
15     Q.  And did the functional reporting include
16 scientists who were not in the United States?
17     A.  They did not report to me even functionally.
18 I just coordinated.  They stayed in their groups, and I
19 coordinated the work.  So they stayed in their groups in
20 Greensboro.
21     Q.  Were there any people at that time working on
22 the atrazine re review project who were not directly
23 employed by Syngenta Crop Protection, Inc.?
24     I'm sorry.  Excuse me.  The predecessor entity
25 of Syngenta Crop Protection, Inc.

8 (Pages 26 to 29)

Exhibit 011 Page 8
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis            11-17-2010
Confidential

Page 30

1    A.  The core teams that I was coordinating across
2  were Ciba-Geigy Corporation employees in Greensboro.
3    Q.  And were all of those employees that you were
4  working with on the atrazine re review employees of the
5  Ciba-Geigy Corporation in Greensboro?
6    A.  In the core teams, I believe, yes.
7    Q.  Okay.  Do you remember who --
8    A.  But I'm only recalling that, but they all were
9  right there.
10   Q.  Okay.  Who were those people?  Who were the
11 people you were working with?
12   A.  There is -- There are dozens of people.  Would
13 you like me to review some that I recall?
14   Q.  Yes.  Let's do it -- Let's do it this way:
15 Were there people you were working with who were not on
16 these core teams that were part of the atrazine re
17 review?
18   A.  Yes.  There were sub teams.  There were sub
19 teams also.
20   Q.  And were any of them from outside Greensboro?
21   A.  Yes.  Some of the people who helped on the sub
22 teams would have been in the field or living in the
23 states outside of Greensboro.
24   Q.  And do you know if they worked for different
25 entities?

Page 31

1    A.  No.  As far as I recall, the names that I am
2  thinking of right now back from this group in 1994, they
3  were Ciba-Geigy Corporation employees.
4    Q.  Was the entity in 1994 still known as
5  Ciba-Geigy that you worked for?
6    A.  Yes.
7        And the reason I hesitate is there was a
8  change to Ciba before -- at some time, and I don't
9  recall when.
10   Q.  And when did it change names?
11   A.  I don't recall.
12   Q.  And what did it become?
13   A.  Just Ciba.  I believe, just Ciba.
14   Q.  And did it change again and become some other
15 name?
16   A.  No.  Because the company, subsequent
17 changes -- subsequent changes that I recall were
18 different companies were formed as a result of mergers.
19   Q.  Okay.  Let's, if we can, so we can get this
20 straight, when did it become Ciba?
21   A.  I don't recall.
22   Q.  And what was the next entity that you worked
23 for after Ciba?
24   A.  There was a new company, Novartis Crop
25 Protection.

Page 32

1    Q.  And when did it become Novartis Crop
2  Protection?
3    A.  In either late '96, '97.
4        And it was not the same company.  It was a
5  different company because we actually merged with Sandoz
6  Corporation.  So a different -- a different company.
7    Q.  And the next entity you worked for after
8  Novartis Crop Protection, Inc., it was Novartis Crop
9  Protection, Inc., you worked for then?
10   A.  I don't recall whether the exact formal title
11 was Novartis Crop Protection.
12   Q.  Do you know if in 1996 your employer was just
13 Novartis?
14   A.  My recollection is that I was Novartis Crop
15 Protection.
16   Q.  Okay.  And then after Novartis Crop
17 Protection, your next employer became what?
18   A.  Syngenta Crop Protection, Inc.
19   Q.  And it's remained that until this day?
20   A.  Yes.  And that's also a different company
21 because it was formed as a result of a merger.
22   Q.  Okay.
23   A.  With AstraZeneca.
24   Q.  All right.  Now let's get back to that work
25 you did on the re review of atrazine.

Page 33

1    A.  Mm-hmm.  Yes, sir.
2    Q.  Were you working with any people outside of
3  the United States who were not on the core teams?
4    A.  Me directly?
5    Q.  Directly or indirectly.
6    A.  Or one of my teams?
7    Q.  Yeah.  Any way at all.
8    A.  There were some toxicology experts that worked
9  with our toxicology team.
10   Q.  And where were they from?
11   A.  The -- They were from -- Excuse me -- In the
12 beginning -- In the beginning, it would have been --
13 they would have been with a -- the European or the
14 Switzerland company, and only one or two that I recall.
15   Q.  When you say, "the European or Switzerland
16 company," which European or Switzerland company are you
17 talking about?
18   A.  The -- In the beginning Ciba-Geigy
19 Corporation, there would have been a regulatory manager
20 that was informed of the atrazine re review and a
21 toxicologist who gave guidance and helped the toxicology
22 team on the mode of action.
23   Q.  Who were those people?
24   A.  The Regulatory Manager was Fredi Seiler, and
25 he was an add, and we kept him informed.

9 (Pages 30 to 33)

Exhibit 011 Page 9
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

---

Page 34

1    Q.   And do you know with which entity he was
2  associated?
3    A.   I wouldn't know the -- I wouldn't know the
4  exact company name.
5    Q.   Do you know where he was physically located in
6  the world?
7    A.   Yes.  He was physically located in Basel.
8    Q.   In Basel, Switzerland?
9    A.   Yes.
10    Q.   And who was the other person?
11    A.   Christoph Werner.
12    Q.   And where was Christoph Werner located?
13    A.   He was a toxicologist in Basel.  In
14  Switzerland.  Actually, I'm not sure the site.
15    Q.   And do you know which company or entity he was
16  associated with?
17    A.   I wouldn't know the formal name of his
18  company.
19    Q.   Okay.  What was your role with respect to the
20  re review of atrazine?
21    A.   I was responsible for the -- for the actual
22  coordination of providing the EPA information on the
23  risks and benefits of atrazine that they had requested
24  in a document that was issued in 1994.
25    Q.   When did you start on it?

---

Page 35

1    A.   When I started on -- Right when the first
2  position document, when the special review started.
3    Q.   So what month and year did you start on the
4  project?
5    A.   It was November of 1994.
6    Q.   And you issued the report in later 1994?
7    A.   We provided a lot of different science
8  information and risk and benefit information on risk
9  assessments to EPA starting -- the first major
10  submission was in March of 1995.
11    Q.   The Mr. Seiler that you mentioned a few
12  minutes ago, was his title Global Regulatory Manager at
13  that time?
14    A.   He was the Global Regulatory Manager for
15  atrazine.
16    Q.   And "global" meaning the whole world in which
17  the product was sold, all the countries where the
18  product atrazine was sold?
19    A.   Well, each country would have a regulatory
20  manager.  In each country -- company would have a
21  regulatory manager.  And his role was a strategic role
22  across the groups.
23    Q.   But he had -- What I'm saying is, is that if
24  you use the term jurisdiction, authority,
25  responsibility, his was more than just the United

---

Page 36

1  States, it was for all countries where atrazine was
2  being sold?
3    MR. POPE:  Objection to form of the question.
4    Go ahead.
5  BY THE WITNESS:
6    A.   He did not have jurisdiction or authority over
7  atrazine in the United States.
8    Q.   Do you -- Strike that.
9    Can you tell me if some of the scientific
10  information provided to the EPA in 1994 and 1995 as part
11  of the re review of atrazine was generated by
12  laboratories in the U.K. such as Jealott's Hill and that
13  type of laboratory or at Switzerland?
14    A.   We had thousands and thousands of pages of
15  data, and I don't recall.
16    Q.   Okay.  Are you telling me that you don't
17  recall if any information was generated from any of
18  those labs from outside the United States?
19    A.   We were updating -- We were providing
20  information in summary form.  So if there had been
21  studies that had important information that were
22  conducted overseas, we would have used it.
23    Q.   When used the word "global," when you answered
24  my question, can you tell me what that word "global"
25  means in your vernacular.

---

Page 37

1    A.   I would be happy to.  When I talk about
2  global, there's a coordination role.  My global context
3  would be with Syngenta Crop Protection AG, and they
4  coordinated it across different regions for -- to work
5  on strategy and coordination.
6    Q.   I'm actually looking for the word "global."
7  What does that mean?
8    MR. POPE:  Objection to form of the question.
9    Go ahead.
10  BY THE WITNESS:
11    A.   Yes.  "Global" is a word we use in our
12  structure where each -- Syngenta Crop Protection, Inc.,
13  has -- does -- conducts the work for the U.S. crop --
14  U.S. registration, and our global counterpart just to
15  coordinate.  So there's a region Latin America, there's
16  a region Asia Pacific, and there's region Europe and
17  East Africa.
18    Q.   What does CTL stand for?
19    A.   CTL was a research laboratory in Manchester.
20    Q.   Manchester?
21    A.   England.
22    Q.   Was it called the Central Toxicology Lab?
23    A.   Yes.
24    Q.   Okay.  All right.  Now, who were -- Strike
25  that.

---

10 (Pages 34 to 37)

Exhibit 011 Page 10
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 38

1      How many scientists were you supervising as
2  part of the reregistration of atrazine?
3      A.  In the -- For the special review of atrazine,
4  I did not supervise scientists when that started.  I was
5  coordinating the work for the US EPA.
6      Q.  Okay.  How long did that process take?
7      A.  The special review for atrazine, that is still
8  ongoing.
9      Q.  Okay.  So it started in 1994?
10     A.  Yes.
11     Q.  And it's still ongoing?
12     A.  Yes.
13     Q.  Okay.  Have you been working on it
14  consistently since 1994?
15     A.  I have been working in different capacities on
16  it since 1994 but with different roles.
17     Q.  Okay.  Well, let's go through the work you did
18  on that project in 1994 and then move forward with your
19  work history with the companies.
20     What else did you do as part of the
21  reregistration in 1994-1995?
22     A.  In 1994 and 1995, we compiled hundreds of --
23  we conducted hundreds of studies and assessments,
24  provided them to EPA; and when we got additional
25  requests for data from EPA to further investigate any

Page 39

1  aspect of whether it was the benefits of the product or
2  the different information on the biochemistry of the
3  product, we did ongoing studies.
4      Q.  Did you start the studies in 1994?
5      A.  Some studies were started in 1994.
6      Q.  And how many did you do in 1994-1995?
7      A.  The studies we -- There was a series of
8  submissions with more than many studies, more than a
9  hundred different types of studies and assessments.
10     Q.  And where were you doing the studies?
11     A.  The studies were conducted, most of them, in
12  different universities or contract labs or within our
13  own laboratories or within the expertise of our teams at
14  Syngenta Crop Protection, Inc.
15     Q.  Were any of them being conducted by Syngenta
16  entities outside the United States?
17     MR. POPE:  We're talking about 94-95 right now?
18     MR. TILLERY:  Yes.
19  BY THE WITNESS:
20     A.  The conduct of the studies would have been
21  done -- potentially been done in a contract lab.  In
22  those days, I don't recall.  I don't recall the exact
23  locations during that particular timeframe.
24     Q.  How many of those studies that you did did you
25  report to the EPA?

Page 40

1      A.  We were providing the information to EPA for
2  EPA.  So the studies were -- were submitted to EPA.
3      Q.  Did you report to the EPA all of the studies
4  that you were going to do before you finished them?
5      A.  We provided -- In that timeframe, we provided
6  EPA in our submission of current assessments that we
7  started turning in in '95, a list of the protocols and
8  studies that we were going to do to further refine and
9  to give information that would be further helpful to
10  them or that they were asking us for throughout that
11  period.
12     Q.  So just so I'm clear, to make sure that that
13  is a yes to my last question, you told them all the
14  studies you were going to do before you started the
15  studies?
16     A.  No, sir.
17     Q.  So were there studies you did that you didn't
18  report to the EPA?
19     A.  Well, we reported all the studies we did.  We
20  provided the information to the EPA.  The question I
21  thought you said was did EPA know we were starting them
22  before we started them.  Some of them, they would; and
23  some of them, however -- some of them, they would have
24  known while we were generating the studies.  We may have
25  started them prior.

Page 41

1      Q.  Okay.  In 1995, what did you do as part of
2  this?
3      A.  I worked full-time on the special review from
4  November of '94 through the end of '96.
5      Q.  Okay.
6      A.  And really into '97.  And we had major data
7  submissions, exciting work that was really state of the
8  art science on information and studies the EPA would
9  review and has reviewed.
10     Q.  And how frequently were you meeting with the
11  EPA at that time?
12     A.  We would provide EPA various updates on what
13  the submissions had.  And in some cases, EPA would ask
14  us to tell them more about a study or say what would be
15  helpful if we did a study.
16     Q.  And how did your job change then in 1997, I
17  think you said?  How did it change then?
18     A.  We -- I continued coordination of special
19  review activities, although EPA was reviewing all of
20  the -- all of the science at that time.  And I then ran
21  the Stewardship and the State Government Group for
22  Novartis Crop Protection.
23     Q.  And what does "Stewardship and State
24  Government Group" mean?
25     A.  The Stewardship Group was -- is our

Exhibit 011 Page 11
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

**Page 42**

1  educational and our monitoring arm, how do -- how do you
2  look at different use practices that could -- could
3  reduce exposure, help your efficacy, how do you give
4  education materials to farmers on -- help us to follow
5  the label and understand a label of a different product.
6  And we conducted a lot of atrazine monitoring and other
7  product monitoring in waters under our Stewardship
8  Group.
9      And State Government works with different
10  grower groups and work on pesticide legislation in
11  government in the states.
12     Q.  And you said you worked in terms of reducing
13  exposure.  What did you mean by that?
14     A.  We were looking for different ways with
15  different products to have -- to install buffers.  If
16  you plant a buffer along a stream, will you prevent the
17  runoff of pesticides and sediments.  And we worked with
18  different universities, different watershed groups at
19  that time.
20     And it made it exciting because those
21  practices have really shown now to work.  And residues
22  for several different products are actually declining in
23  water.
24     Q.  How long did you work in that job?
25     A.  I was in that job until our company merged and

**Page 43**

1  we formed Syngenta Crop Protection, Inc.
2     Q.  And how did it change then?
3     A.  I became Head of Regulatory Affairs, NAFTA, at
4  the merger when Syngenta Crop Protection, Inc., was
5  formed.
6     Q.  And what does it mean to be Head of Regulatory
7  Affairs NAFTA?
8     A.  I was responsible -- I'm directly responsible
9  for the registrations for pesticides in the U.S.,
10  herbicides, fungicides, and pesticides; and I coordinate
11  with Canada and Mexico.
12     Q.  So who is it that has a functional reporting
13  relationship to you outside the United States?
14     A.  No one.
15     Q.  Do you know what a dotted line relationship
16  is?
17     A.  I know how I think of a dotted line.
18     Q.  Okay.  How do you think of it as different
19  than a functional reporting relationship?
20     A.  Direct reporting is your direct reporting or
21  the solid line is you would be -- how I think is that is
22  you get your direct day-to-day supervision, and your --
23  really, your job is reporting to the solid line.
24     A dotted line is often used in different --
25  usually it's an informational and strategic role in

**Page 44**

1  terms of updating or providing information to somebody
2  who coordinates across broader groups.
3     Q.  And what does functional reporting mean?
4     A.  Functional reporting is often dotted line
5  reporting -- Well, it can be; not always.
6     I think of functional reporting as you are in
7  the same area of expertise, so you would be providing
8  information in that area of expertise.
9     Q.  So you're telling me you have no
10  responsibility for or involvement with the registration
11  of any products sold in Canada, correct?
12     A.  Involvement, I'm updated on working.
13     Q.  Let's correct the question.
14     Other than just being updated, your testimony
15  is you have no involvement in Canada or Mexico with the
16  registration of products?
17     A.  Yes.  We can -- just strategic coordination.
18     Q.  And that's all it is?
19     A.  Yeah.
20     Q.  Just coordination?
21     A.  Yes.
22     MR. TILLERY:  Our reporter says we have to go off
23  the record to change the tape.
24     THE VIDEOGRAPHER:  This marks the end of Videotape
25  No. 1 in the deposition of Janis McFarland.  The time is

**Page 45**

1  now 10:20 a.m.
2     (A short break was had.)
3     THE VIDEOGRAPHER:  Going on the record.
4     This marks the beginning of Videotape No. 2 in
5  the deposition of Janis McFarland.  The time is now
6  10:28 a.m.
7  BY MR. TILLERY:
8     Q.  Has your job responsibility remained the same
9  since you started at Syngenta Crop Protection, Inc.?
10     A.  Yes.
11     Q.  What was the date of the beginning of your
12  employment with Syngenta Crop Protection, Inc.?
13     A.  I believe it was November of 2000.
14     Q.  Okay.
15     A.  Perhaps October.
16     Q.  And has the work with the US EPA continued
17  with respect to atrazine?
18     A.  Atrazine has gone through different phases of
19  review and assessment by EPA.
20     Q.  But your work has continued?
21     A.  We are structured differently than we were at
22  the beginning of the special review, so I continue to be
23  very involved.  I have a regulatory manager who handles
24  the atrazine regulatory area.
25     Q.  Tell me, in your department at Syngenta Crop

12 (Pages 42 to 45)

Exhibit 011 Page 12
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 46

1  Protection, Inc., who is employed.
2     A.  We have about 50 employees in my group.
3     Q.  In your -- And what's that group called?
4     A.  Regulatory Affairs of Syngenta Crop
5  Protection, Inc.
6     Q.  Are you the head of that group?
7     A.  I am.
8     Q.  Okay.  And tell me the people who directly
9  report to you.
10    A.  Certainly.  Dennis Kelly, Dennis Hackett.
11    Q.  What do the two Dennises do?
12    A.  Dennis Kelly runs the registrations for all of
13 our products with Syngenta Crop Protection, Inc., and
14 also runs the state government team for Syngenta Crop
15 Protection, Inc.
16        Dennis Hackett runs our Compliance and Label
17 Support Group and the Quality Assurance.  So he's a
18 compliance support team lead and runs data management,
19 the label team, and quality assurance for auditing
20 studies.
21    Q.  And what are their titles?
22    A.  Dennis Kelly's title is Team Lead of
23 Registration and State Government, and Dennis Hackett, I
24 refer to him as Compliance and Label Support.  That name
25 has evolved a little bit over the last few years.

Page 47

1     Q.  Do you have any other -- Strike that.
2         Do you have any other people who directly
3  report to you in that division?
4     A.  Yes.
5     Q.  Who else?
6     A.  Carol Somody, Beth Carol.
7     Q.  Carol Somody, what does she do?
8     A.  Carol Somody heads up our stewardship area.
9     Q.  And what does Beth do?
10    A.  She runs -- She works on education and
11 education projects as well as our monitoring and state
12 monitoring work and watershed management work is in
13 Carol's group.
14    Q.  And how many people report to Carol?
15    A.  One person reports to Carol, Ron Williams.
16    Q.  And what does Beth Carol do?
17    A.  Beth Carol leads my policy work, but she
18 actually has been on -- working with the litigation team
19 also.
20    Q.  In -- You're talking about in connection with
21 this lawsuit?
22    A.  She does various aspects of litigation
23 support.
24    Q.  Okay.  And who else reports to you?
25    A.  Dan Campbell.

Page 48

1     Q.  Okay.  What does he do?
2     A.  Dan Campbell leads my Herbicide Regulatory
3  Team for registrations for all of our herbicides.
4     Q.  Okay.  And anyone else who reports to you?
5     A.  Fred Pearson.
6     Q.  Okay.  And what does he do?
7     A.  Fred Pearson is the team lead for our
8  professional products and seed treatment for our
9  different herbicides, fungicides, and insecticides.
10    Q.  Anyone else?
11    A.  John Abbott.
12    Q.  Okay.  What does he do?
13    A.  John Abbot runs -- is the regulatory team lead
14 for all of our fungicides and insecticides.
15    Q.  Anyone else?
16    A.  Bunny Konat (phonetic) is the administrative
17 assistant.
18    Q.  For you?
19    A.  For me.  And she supports some of the other
20 teams also.
21    Q.  Have we covered all of the subgroups of your
22 particular division?
23    A.  Yes.  Those were the direct reports into me.
24    Q.  Is there any other working subgroup of your
25 Regulatory Affairs section that we haven't accounted

Page 49

1  for?
2     A.  Not that don't report into the people who
3  report to me.  So some of them have groups under them.
4     Q.  And there's a total of about 50 people?
5     A.  Yes.
6     Q.  Where are these people physically located?
7     A.  All but three are located in Greensboro.
8     Q.  And the three that aren't, where are they?
9     A.  They are -- One is located in Austin, Texas;
10 one is located in Springfield, Missouri; and one is
11 located in Madison, Wisconsin.
12    Q.  And what are their names, and what do they do?
13    A.  They are State Government Relations Managers,
14 and they cover multiple states for registration and some
15 government issues related to my area of work,
16 regulatory.  And Dave Flakne is in Madison, Wisconsin;
17 Danelle Farmer is in Austin, Texas; and Todd Barlow -- I
18 apologize; I said Missouri, but Todd Barlow is in
19 Lexington, Kentucky.
20    Q.  Who has responsibility for Illinois?
21    A.  David Flakne.
22    Q.  Okay.  Your title is Head Regulatory Affairs,
23 NAFTA?
24    A.  For Syngenta Crop Protection, Inc., yes.
25    Q.  Is it Head of Regulatory Affairs, NAFTA?

13 (Pages 46 to 49)

Exhibit 011 Page 13
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                11-17-2010
Confidential

Page 50

1     A.  Yes.
2     Q.  Which includes United States, Canada, and
3  Mexico, correct?
4     A.  Yes.
5     MR. TILLERY:  I don't have multiple copies of this
6  print of a web page for Syngenta.  I'll give you that so
7  that you can look at that first.  Just take a look at
8  that; and, unfortunately, I don't have multiple copies.
9          (McFarland Deposition Exhibit No. 1
10              marked as requested.)
11     MR. POPE:  We'll get copies at the next break.
12  BY MR. TILLERY:
13     Q.  I'll show you what's been marked as Exhibit
14  No. 1, Ms. McFarland, and ask you to look at it.
15     MR. POPE:  And I guess you're representing this was
16  fairly recently?
17     MR. TILLERY:  I think, yesterday; but it might have
18  been earlier.  It's certainly within the last few weeks.
19     MR. POPE:  So it's a seven-page document.  I just
20  ask because it does say, "July 19th, 2010," at the
21  bottom.
22     MR. TILLERY:  Okay.  So if it's July 19th, it was a
23  few -- it's actually two or three months ago.
24     MR. POPE:  It's a seven-page document.
25        Go ahead and look at it.

Page 51

1     THE WITNESS:  Thank you.
2  BY MR. TILLERY:
3     Q.  And that's off the Syngenta website.
4        If you would take a look at it, please.
5     A.  (Complying.)
6     Q.  Okay.  Have you been through the document?
7     A.  I've skimmed the document.
8     Q.  Okay.  I'm representing to you that that's a
9  copy or printout, I don't know the exact date, but I
10  guess it's in July of this year, for Syngenta.
11        Does that exhibit accurately describe the
12  global presence of Syngenta AG and its subsidiaries?
13     MR. POPE:  Objection to form of the question.
14  BY THE WITNESS:
15     A.  This appears to be more of a marketing or more
16  of a communications piece, and so it does not provide
17  the detail of -- to answer your question of subsidiaries
18  or other companies.
19     Q.  Okay.  Where does it inaccurately describe the
20  relationship of Syngenta AG and its subsidiaries?
21     MR. POPE:  Object to form of the question.
22        I don't think you can hand a witness a
23  seven-page document and ask what's inaccurate.
24     MR. TILLERY:  Well, it's on the Syngenta website
25  available for the whole world.

Page 52

1     MR. POPE:  So what?  It doesn't make the question
2  any better.
3  BY MR. TILLERY:
4     Q.  Can you answer my question?
5     A.  I would -- could do a detailed review of areas
6  that would be more clarified if they had additional
7  detail.  But one aspect that came out to me was that
8  it -- this mentions generally Syngenta, Syngenta Crop
9  Protection, and there's actually various different
10  companies in there that their official names aren't
11  included.
12     Q.  Okay.  Do you know all those names?
13     A.  No.
14     Q.  Do you know the name of the company at the top
15  of the list of ownership of all the Syngenta entities?
16     A.  The -- The document would say -- I don't
17  really know the name.
18     Q.  Okay.  Do you know if this document marked as
19  Exhibit No. 1 accurately describes the global presence
20  of the Syngenta group of companies?
21     MR. POPE:  Objection to form of the question.
22        Go ahead.
23  BY THE WITNESS:
24     A.  The type of -- Could you repeat the question?
25     Q.  Yes.  Do you know if the document marked as

Page 53

1  Exhibit 1 accurately describes the global presence of
2  the Syngenta group of companies?
3     A.  There's a good -- good information on
4  different sites, but it's not a description of the
5  companies.
6     Q.  Does it give an accurate representation of the
7  global presence of the Syngenta group of companies?  Can
8  you answer that question?
9     MR. POPE:  Objection to form of the question.
10  BY THE WITNESS:
11     A.  I don't understand what you mean by "global
12  presence."
13     Q.  Well, so there's something about that question
14  that's hard to understand.  What is it, the words that
15  I'm using that you don't understand?  Tell me what, and
16  I'll help you with the question.  What is it about
17  "global presence" that you don't understand?
18     A.  What the word -- What you mean by "presence"
19  and what you mean by "global."
20     Q.  Well, actually, that's what I asked you.
21        You've read through the document marked as
22  Exhibit 1, which describes locations of Syngenta
23  operations, plants, research facilities, manufacturing
24  locations in China, the United States, Switzerland,
25  England, all over.  I'm asking you if it accurately

14  (Pages 50 to 53)

Exhibit 011 Page 14
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 54

1  describes the global presence of the Syngenta group of
2  companies or if there's something that you can look at
3  and tell me that is wrong about that.
4       MR. POPE:  Same objection to form of the question.
5  BY MR. TILLERY:
6       Q.  And if you're concerned about -- And for
7  purposes of my question if you're concerned about what
8  "global" means, I mean as the term is used on that web
9  page marked as Exhibit No. 1.
10      A.  It would take a lot more than this marketing
11  piece to, I think, accurately describe the different
12  companies like Syngenta Crop Protection, even Inc.
13  There's a lot of presence that isn't noted, a lot of
14  details that aren't included in this document.  Because
15  I think that it's meant more as just an informational
16  general piece, not as an accurate description.
17           So from my perspective, no, it does not.
18      Q.  So is there anything inaccurate about it,
19  where it says the relationship exists or doesn't exist
20  that's wrong?
21      A.  I would have to read the document more
22  carefully to give you specifics.
23      Q.  Do you receive any stock-based compensation?
24      A.  Yes.
25      Q.  From which company?

Page 55

1       A.  I receive Syngenta AG stock.
2       Q.  Okay.  What is your understanding of the
3  company that you're getting stock interest in?  What is
4  that company?
5       A.  Can you -- I -- Could you --
6  My understanding --
7       Q.  It's a simple question.  I'm just asking you
8  what is it that you're getting stock in, what's the
9  entity?
10      A.  Syngenta AG -- Syngenta AG stock is
11  representative of several different companies.
12      Q.  Okay.  So you're getting, you think, stock in
13  several different companies?
14      A.  I get just Syngenta AG stock.
15      Q.  Okay.  So what is the entity that you're
16  getting stock in?
17      A.  I don't know the formal name of that company.
18      Q.  Is it your understanding that the entity that
19  you're getting stock-based compensation in owns all of
20  the other Syngenta group of companies?
21      A.  I don't know.
22      Q.  Okay.  Does Syngenta Crop Protection, Inc.,
23  register and sell crop protection products in Canada?
24      A.  No.
25      Q.  Does that same company have a subsidiary that

Page 56

1  registers and sells crop protection products in Canada?
2       A.  No.
3       Q.  Do you know if Syngenta AG is the ultimate
4  owner of all of the Syngenta companies?
5       A.  No, I do not know.
6       Q.  Does Syngenta AG have a subsidiary that
7  registers and sells crop protection products in Canada?
8       A.  The company that registers products in Canada
9  is Syngenta Crop Protection Canada, Inc.
10      Q.  Do you know who owns Syngenta Crop Protection
11  Canada, Inc.?
12      A.  No.
13      Q.  Okay.  So when you deal with them, and they
14  are within NAFTA, you're telling me you don't really
15  understand how they relate to Syngenta Crop
16  Protection, Inc.?
17      MR. POPE:  Objection to form of the question.
18  BY THE WITNESS:
19      A.  We have a coordinating role with our Canada
20  country that --
21      Q.  I'm asking with --
22      MR. POPE:  Let her finish the question, please,
23  Steve.  Come on.
24      MR. TILLERY:  Maybe I'll withdraw the question.
25  I'll withdraw the question.  She's programmed to say one

Page 57

1  speech to answer every question.
2  BY MR. TILLERY:
3       Q.  So I'm going to ask you this question:  Do you
4  know the legal relationship between Syngenta Crop
5  Protection, Inc., and Syngenta Canada?
6       A.  We're different legal entities.
7       Q.  Do you know the legal relationship between
8  them?
9       A.  I -- we are different companies and different
10  legal entities.  That's the extent of what I understand.
11      Q.  Is it your understanding there is any legal
12  relationship between Syngenta Crop Protection, Inc., and
13  Syngenta Crop Protection Canada?
14      A.  I don't know because we're separate legal
15  entities.  And I don't know the relationship other than
16  that.
17      Q.  And as Director of Regulatory for NAFTA, which
18  includes Canada, you're telling me today that you don't
19  know if the company who pays you, Syngenta Crop
20  Protection, Inc., has any legal relationship with the
21  two other Syngenta related entities in Canada or Mexico,
22  correct?
23      MR. POPE:  Objection to form of the question.
24  BY THE WITNESS:
25      A.  Yeah.  I don't know because we all report into

15  (Pages 54 to 57)

**Exhibit 011 Page 15**
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 58

1  our different country heads, and those are our legal
2  entities that I'm familiar with, just the group that I
3  coordinate with.
4      Q.  Okay.  Does Syngenta Crop Protection, Inc.,
5  register and sell crop protection products in Mexico?
6      A.  No.
7      Q.  Does it have a subsidiary which registers and
8  sells crop protection products in Mexico?
9      A.  No.  We have -- It's a separate company, just
10  like Canada.
11      Q.  Okay.  Does Syngenta AG have a subsidiary that
12  registers and sells products in Mexico?
13      A.  I don't know.  I just work with the Mexico
14  country.
15      Q.  Does the Syngenta Crop Protection entity in
16  Mexico have a legal relationship with Syngenta Crop
17  Protection, Inc.?
18      A.  I don't -- It's a separate legal -- separate
19  legal entity, is all I know.  And I don't know other
20  relationships.
21      Q.  Do you coordinate with any other Canadian
22  companies other than Syngenta Crop Protection Canada?
23      A.  No.  I coordinate with Syngenta Crop
24  Protection Canada, Inc.
25      Q.  Okay.  Do you coordinate with any other

Page 59

1  Mexican companies besides Syngenta Crop Protection
2  Mexico?
3      A.  Yeah.  They have a slightly -- They have a
4  different name with Mexico.  But it's the same idea.
5  No, I only coordinate -- I only coordinate with our
6  Mexico company in crop protection.
7      Q.  And what is the name of the Mexican company?
8      A.  It's -- I wouldn't say it exactly.  I would
9  have to give you the exact term of it.
10      Q.  That's what I'm -- I'm looking for the exact
11  term right now.
12      A.  The exact term, I can't give you right now.
13      Q.  Can you give me a general term for that
14  company?
15      A.  It would be Syngenta AG SA -- I would have
16  to -- I don't know --
17      Q.  Okay.
18      A.  -- the official name of that company.
19      Q.  And in the regulatory department of Syngenta
20  Mexico, how many people are there?
21      A.  The exact number, I don't know.
22      Q.  Okay.  Do you know who the head of regulatory
23  is in Mexico?
24      A.  My coordination contact is Mario Flores, and
25  regulatory is in his -- in his contact area.

Page 60

1      Q.  And you don't know how many people work in his
2  department?
3      A.  No.
4      Q.  And what about in Canada, can you tell me how
5  many people work in the regulatory area of Syngenta Crop
6  Protection Canada, Inc.?
7      A.  Not specifically.
8      Q.  Well, generally?  Can you give me an estimate?
9      A.  I would be just speculating.
10      Q.  Have you ever had meetings with the regulatory
11  people of the Canadian entity?
12      A.  Yes, we have.
13      Q.  Have you ever been there for meetings?
14      A.  We have met with them, usually in public
15  stakeholder meetings.
16          There's a Government Group that meets with
17  Canada, Mexico, and U.S., and we have met with different
18  authorities in those meetings.
19      Q.  In the course of your career at Syngenta, have
20  you authored or coauthored any study that was submitted
21  by Syngenta Crop Protection, Inc., to the EPA in support
22  of the reregistration of atrazine?
23      A.  The -- I can't recall exactly.  I'm on
24  different reports, you know, but most of the studies are
25  done by the different teams in Syngenta Crop

Page 61

1  Protection, Inc.
2          (McFarland Deposition Exhibit No. 2
3           marked as requested.)
4  BY MR. TILLERY:
5      Q.  Exhibit No. 2, if you take a look at it, and
6  this is Syngenta Bates number at the bottom --
7  Throughout the deposition, I'm going to refer to
8  different numbers.
9          Do you see the numbers on the bottom
10  right-hand side of the document?
11      A.  Yes.
12      Q.  Okay.  Syngenta 00376698 and Syngenta
13  00376762, those two pages.  And take a look at those two
14  pages, please.
15          The first page ending 376698, did Syngenta
16  submit that study to the EPA as part of a document
17  entitled "Syngenta's Comments on the EPA's January 19,
18  2001, Atrazine HED's Revised Preliminary Human Health
19  Risk Assessment"?
20      A.  These were our comments.  It probably wouldn't
21  be considered a study; but yes.
22      Q.  Okay.  Well, look at the second page of that
23  document.
24          Is that the first page of the document
25  submitted to the EPA, title page of this study that was

16  (Pages 58 to 61)

Exhibit 011 Page 16
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 62

1  included as Appendix D to the contents of that
2  submission?
3      MR. POPE:  Just so we're clear on the record here,
4  there's a major gap between page 1 and page 2.
5      MR. TILLERY:  Of course.  I'm in -- In submitting
6  documents to this, I thought this was noncontroversial.
7  I didn't think we'd argue about --
8      MR. SCHUTZEL:  I'm not saying it is.  I'm just
9  saying that I know there is something missing in between
10 there.
11     MR. TILLERY:  Yes.
12     MR. SCHUTZEL:  And this is a two-page exhibit,
13 right?
14     MR. TILLERY:  Yes.  Instead of submitting hundreds
15 of pages of documents, I'm asking you if -- I didn't
16 think we would quarrel over whether a public record was
17 submitted.  But I just wanted confirmation on the
18 record.
19 BY MR. TILLERY:
20     Q.  So, first of all, did it get submitted to the
21 EPA by Syngenta Crop Protection, Inc.; and is the study,
22 the second page of that exhibit; that is, Appendix D of
23 Attachment 1?
24     A.  These documents would have both been submitted
25 to EPA.  I'm just not sure that -- if the actual

Page 63

1  Attachment 1 was part of the comments.  But I do know
2  that both of these would have been submitted to EPA.
3      Q.  And how would they have been submitted?
4      A.  They're submitted through our Regulatory Group
5  provides them to EPA.
6      Q.  And who was the Regulatory Group who presented
7  them to EPA, was that you?
8      A.  They would have been submitted to EPA through
9  a process by my regulatory manager to either a docket or
10 to the Special Review Manager at the EPA.
11     Q.  And when would that have been -- When would
12 that have been done?
13     A.  The timing of the front page would have been
14 right around the Health and Effect Division Comments.
15 And I don't recall -- I don't recall exactly when this
16 Appendix D would have gone.  In it would have been at
17 the same time as you mentioned.
18     Q.  So in 2001?
19     A.  Yes.
20         (McFarland Deposition Exhibit No. 3
21          marked as requested.)
22 BY MR. TILLERY:
23     Q.  Okay.  I want you to look at and then identify
24 Exhibit 3 for me, please.
25         Do you understand what this is?

Page 64

1      A.  I don't know that I've seen this form before;
2  but yes, I understand that it's a talent summary
3  template.
4      Q.  Okay.  What is a talent summary?
5      A.  These are documents that -- templates where we
6  have -- we actually provide information on different
7  employees for their development and their current skill
8  set.
9      Q.  Look, if you would, under Point 2, Aiming
10 Point.  And then it has under Aiming Point, "Ultimate
11 Aiming Point, and then there's "SMG Band C."
12         What does SMG mean there?
13     A.  Senior Management Group.
14     Q.  Okay.  And what's Band C?
15     A.  There -- There are different levels of the
16 Senior Management Group.
17     Q.  And tell me those different levels.
18     A.  The levels, as I understand them, are A, B,
19 and C.
20     Q.  Okay.  And who occupies the different levels?
21     A.  I don't know.
22     Q.  Okay.  So did you indicate that the ultimate
23 aiming point was Senior Management Group?
24     A.  No, sir, I did not.
25     Q.  Okay.  What is Senior Management Group?

Page 65

1      A.  Senior Management Group, as far as I
2  understand it is a group in the company that has a
3  different -- that gets compensated in different ways
4  based on -- based on their -- based on their different
5  functions that they -- functional roles that they serve
6  in the company.
7      Q.  Who established those levels?
8      A.  I don't know.
9      Q.  Who decides what positions are in the Senior
10 Management Group?
11     A.  I also don't know that.
12     Q.  Who decided the different bands?
13     A.  I don't know.
14     Q.  Did you ever ask these questions?
15     A.  No, sir.
16     Q.  Who is your direct supervisor?
17     A.  Current -- My current direct supervisor?
18     Q.  Right.
19     A.  Is Dr. Marian Stypa.
20     Q.  Who decides what positions are in the various
21 bands?
22     A.  I don't know that.
23     Q.  What's the difference of a Senior Management
24 Group position with respect to hiring and compensation?
25 How are they compensated differently in the Senior

17 (Pages 62 to 65)

Exhibit 011 Page 17
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 66

1  Management Group?
2      A.  There are different stocks -- stocks that you
3  receive when you are in the Senior Management Group.
4      Q.  Are you in the Senior Management Group?
5      A.  Yes, I am.
6      Q.  How long have you been in the Senior
7  Management Group?
8      A.  Since the middle of 2007 or -- middle of 2007.
9      Q.  And who made the recommendation for your
10  inclusion in the Senior Management Group?
11      A.  I don't know.
12      Q.  Okay.  Who told you you were going to be added
13  to the Senior Management Group?
14      A.  Dr. Gary Dickson.
15      Q.  And was your inclusion in the Senior
16  Management Group decided by people outside of Syngenta
17  Crop Protection, Inc.?
18      A.  My understanding is that, yes.
19      Q.  And who made that decision?
20      A.  I don't know.
21      Q.  Was that decision made in Basel?
22      A.  I don't know where -- where they made it.
23      Q.  Did you have to be interviewed or approved by
24  somebody in Basel in order to be included in the Senior
25  Management Group?

Page 67

1      A.  Not that I'm aware of.
2      Q.  Did you talk to anybody from Basel before you
3  were included in the Senior Management Group?
4      A.  No, I didn't.  No.  No, sir.
5      Q.  Is Marian Stypa --
6      A.  And I should say, and talked to about the
7  Senior Management Group.  When you say talked to Basel,
8  did I talk to anybody before I was included, have I
9  spoken to people in Basel, but not about the SMG.  I
10  didn't know it existed until I was handed the packet.
11      Q.  Is Marian Stypa in the Senior Management
12  Group?
13      A.  Marian has told me he is.
14      Q.  What band are you in?
15      A.  I am in Band C.
16      Q.  Is Band B a higher paying than Band C?
17      A.  It's my understanding it is.
18      Q.  Is Band A higher than Band B in terms of
19  compensation?
20      A.  It is in terms of my understanding.
21      Q.  Do you know if Mr. Pope is in Band A?
22      MR. POPE:  Would that I were.  Would that I were,
23  Steve.  I wouldn't be sitting here.
24  BY MR. TILLERY:
25      Q.  All right.  Let's go to No. 4 on that

Page 68

1  document.
2      Do you see where it says:  "Career Development
3  Action," there's a reference to International
4  Assignment.  Do you see that?
5      A.  Yes.
6      Q.  What is an International Assignment?
7      A.  An International Assignment is, as I
8  understand it, is when different individuals from a
9  company -- a company in one country cross-train or go in
10  development into -- into another country company and
11  work in that area.
12      Q.  In a company that isn't owned by Syngenta Crop
13  Protection, Inc.?
14      A.  If a person from Syngenta Crop
15  Protection, Inc., went to another company --
16      Q.  Yes.
17      A.  -- that other company would not be owned by
18  Syngenta Crop Protection, Inc., as it's cross-training
19  development work.
20      Q.  Are you sure it's limited to cross-training
21  development?
22      A.  No.  That's just in the context that I'm aware
23  of.  I'm sure it might be -- this cross-training skill
24  set might be -- that's only the context I'm aware of.
25      Q.  Do you work with Peter Hertl?

Page 69

1      A.  Yes.
2      Q.  Do you know what his current title is?
3      A.  His role has recently changed.
4      Q.  When?
5      A.  His official role changes -- His official --
6  His official job changes in January of 2011.
7      Q.  You weren't aware that his official job
8  already changed?
9      A.  His role did change.
10      Q.  Then why did you tell me it's going to change
11  in 2011?
12      A.  I said his role changed, but his title and
13  official position takes place in January of 2011, as far
14  as I know.
15      Q.  Actually -- Actually, were you aware of the
16  fact that that already happened?
17      A.  It's probably my own understanding he has been
18  serving the role at the global Product Safety level.
19      Q.  Right.
20      A.  But because of circum- -- business, other non
21  business circumstances, he has stayed within the U.S.
22  for a year longer.
23      Q.  Right.  And he's still employed by Syngenta
24  Crop Protection, Inc., isn't he?
25      A.  Yes, until January 2011, when he will be

18 (Pages 66 to 69)

Exhibit 011 Page 18
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 70

1  officially part of a different company.
2      Q.  He'll go to Basel?
3      A.  Yes.
4      Q.  Okay.  Let's look at the remaining part of
5  this document here on paragraph 4.  It says:
6  "Cross-business move."  What does that mean?
7      A.  I don't know the exact context that they would
8  have meant it, but we would -- we would have in our
9  own -- there are different businesses, businesses that
10 you potentially would cross-train into.
11     Q.  Look on down where it says:  "Global
12 Leadership Educational Programs," and it says, "ALPs."
13 What are the ALPs?
14     A.  That is a course that I don't know what the
15 initials actually stand for, but the course -- and I
16 could think about it, and I could perhaps come up with
17 it -- but it's an exciting development course that some
18 of our people take to learn all about agriculture around
19 the world and different aspects of agriculture.
20     Q.  Where is the ALPs conducted?
21     A.  They're taught by -- Perdue University
22 facilitates the teaching, and they hold their -- they
23 hold their training workshop weeks in various parts
24 around the world.
25     Q.  Okay.  And they're all taught by Perdue

Page 71

1  University?
2      A.  They're the main coordinator of that.
3  Scientists or experts, at least, from Perdue are the
4  main coordinators.
5      Q.  And with respect to this document under
6  Section 4, where it says "Global Leadership Educational
7  Programs, ALPs," where are those programs conducted?
8      A.  The only ALPs I'm aware of are the ones I just
9  described.
10     Q.  Right.  Where, though?  You said around the
11 world.  Where, though?
12     A.  Yes.  I think it changes with different
13 courses or with different groups.  It's not state
14 static.
15         I've had some people on my team take this
16 course, and they would have a course at Perdue
17 potentially at Greensboro; one was in Brazil; one was in
18 Switzerland, different workshop weeks.  One in
19 Washington, D.C., because I've helped teach some at that
20 one.
21     Q.  Is this a project that Perdue has with
22 Syngenta?
23     A.  This -- And I should clarify that I don't -- I
24 just know that some of the experts that coordinate are
25 professors at Perdue.  But I don't know the exact

Page 72

1  contractual relationship.  I don't know it generally,
2  either.
3      Q.  Are the courses open to anybody outside the
4  Syngenta group of companies?
5      A.  Not that I'm aware of.
6      Q.  Okay.  And they are taught at Syngenta
7  facilities around the world?
8      A.  No.  They're taught in different areas around
9  the world.
10     Q.  Do those areas happen to coincide with the
11 location of a Syngenta related company?
12     A.  I don't know if they always do or not.
13     Q.  Okay.  Let's go to the next word, "Horizons."
14 What does that mean?
15     A.  Horizons is also the name of a course -- of a
16 course that people take for their development.  It lasts
17 one week.
18     Q.  And where are they taught?
19     A.  I don't know where they're -- where they're
20 taught.
21     Q.  Are these available to all employees of
22 Syngenta entities around the world?
23     A.  I don't -- I don't know.
24     Q.  Okay.  What are E -- Strike that.
25         What are LDPs, what does that reference?

Page 73

1      A.  LDP is also a leadership course.  It lasts
2  about a week.
3      Q.  Okay.  And who teaches those?
4      A.  I don't -- I don't know who currently teaches
5  those.
6      Q.  And where are they conducted?
7      A.  I don't know.  When I took the course, it was
8  in North Carolina.  And the sites vary, but I don't know
9  exactly where or how that's determined.
10     Q.  And who taught the course?
11     A.  When I -- When I was in, the main coordinators
12 were the Center For Creative Leadership located in --
13 close to Greensboro, Brown Summit, North Carolina.
14     Q.  Look at the bottom of that page 72185,
15 Greenville 72185, and it says:  "Local D and L manager."
16         What does that mean?
17     A.  I don't know.
18     Q.  Okay.  Do you know who John Street is?
19     A.  Yes.
20     Q.  What is his employment with Syngenta?
21     A.  John Street is not currently -- currently
22 employed by any of the Syngenta companies.
23     Q.  When did he last work for Syngenta companies?
24     A.  I don't recall.  I don't remember when he
25 left.  It was a few years ago.

19 (Pages 70 to 73)

Exhibit 011 Page 19
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

---

Page 74

1     Q.  Was he employed there in 2006?
2     A.  I'm not sure exactly if he was still there.
3  But he may have just -- He may -- That might have been
4  the year that he left the company, left Syngenta Crop
5  Protection AG.
6     Q.  Is that where he was employed?
7     A.  Yes.
8     Q.  Was he employed there at Basel?
9     A.  Yes.
10    Q.  Has he ever been employed by Syngenta Crop
11  Protection, Inc.?
12    A.  No.
13    Q.  Okay.  Was his title Head of Global Regulatory
14  Affairs for the Syngenta group's Crop Protection
15  Division?
16    A.  I knew -- I knew he was Global Head of
17  Regulatory Affairs, but I didn't -- I'm not sure on the
18  last part of that title that you read.
19    Q.  Did you have a dotted line reporting
20  relationship with Mr. Street?
21    A.  I -- I've functioned -- I don't know if I ever
22  had a dotted line shown on any organizational chart with
23  John Street, but I did provide updates and information
24  to him as -- for his coordination role.
25    Q.  It's going to make us go a lot easier today if

---

Page 75

1  we just answer what I'm asking you so I don't have to
2  repeat the question.
3        So you can't tell me whether you had a
4  functional or dotted line relationship with Mr. Street;
5  is that correct?  You don't know whether you did or not?
6     A.  I just said it would have been -- the way we
7  worked was like a dotted line.
8     Q.  So did you --
9     A.  So I would say it was a dotted line.  I just
10  didn't know if you meant whether it was on an
11  organizational chart like that.  I just don't know.
12    Q.  I'm just asking whether you had a functional
13  or dotted line relationship with Mr. Street, and you say
14  that you did?
15    A.  We kept close touch, yes.
16    Q.  Would that be a "yes"?
17    A.  Yes.
18    Q.  Okay.  Did Mr. Street have any role in the
19  management of Syngenta Crop Protection employees who
20  reported to you?
21    A.  Any role?
22    Q.  Yeah.  Did he have any role?
23    A.  How would you define --
24    Q.  I'm asking, in 2006, did John Street, as head
25  of Global Regulatory Affairs for Syngenta Crop

---

Page 76

1  Protection AG, I think you said, did he have any role in
2  the management of employees in Greensboro who reported
3  to you?
4     A.  No.  Not at all.
5     Q.  Okay.  Did he have any say at all in how you
6  managed Syngenta Crop Protection, Inc., employees who
7  reported to you?
8     A.  No.
9     Q.  And did he ever tell you how to manage your
10  employees?
11    A.  No.
12    Q.  In 2006, was Beth Carol one of your
13  direct reports?
14    A.  In 2006, Beth Carol was not a direct report of
15  mine.
16    Q.  Where did she work?
17    A.  She worked in the Stewardship Group in -- and
18  with Jennifer Shaw.
19    Q.  Okay.  Now I'm going to show you what's been
20  marked as Exhibit No. 4.
21        (McFarland Deposition Exhibit No. 4
22         marked as requested.)
23  BY MR. TILLERY:
24    Q.  And this is an e-mail to you from Mr. Street,
25  isn't it?

---

Page 77

1     A.  Yes, it's an e-mail.
2     Q.  Do you remember this e-mail?
3     A.  I'll read it.
4     Q.  I'm sorry.  I apologize.  You go right ahead.
5        Who is the Beth that's being referenced in
6  this e-mail?
7     A.  Beth Carol.
8     Q.  Okay.  And did Jennifer Shaw report to you?
9     A.  Yes, she did.
10    Q.  Did Beth Carol report to Jennifer Shaw?
11    A.  In 2006, yes.
12    Q.  Okay.  And then Shaw reported to you?
13    A.  Yes.
14    Q.  Okay.  And this is a confidential -- personal,
15  confidential e-mail from Mr. Street to you, isn't it?
16    A.  He also copies Dave French.
17    Q.  Okay.  So it's to you and Dave French?
18    A.  Yes.
19    Q.  And where was Mr. Street?  It says "CHBS."  Do
20  you know what that means?
21    A.  Yes.
22    Q.  That's Basel, isn't it?
23    A.  Yes.  That's Switzerland.  That's the site
24  location, Switzerland.
25    Q.  So the site location CHBS is from Basel?

---

20  (Pages 74 to 77)

Exhibit 011 Page 20
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 78

1   A. Yes.
2   Q. Okay. And you knew that Mr. French was from
3   Basel?
4   A. Yes.
5   Q. Okay. And Mr. French's job was what?
6   A. At the time he was a Global Regulatory
7   Manager.
8   Q. Okay. And the e-mail started off by talking
9   about, he says: "The background to this is exactly what
10  Philippe has been trying to manage. The WHO intend to
11  look at the drinking water guideline for atrazine and
12  see if it is still approximately set in light of the EPA
13  review conclusions."
14      And in the next paragraph, he says: "I really
15  do not appreciate Beth's comments at all. It is clear
16  that she has just not been paying attention to what has
17  been going on or is not in the loop or maybe does not
18  need to be."
19      Correct? Is that what he says?
20  A. That is what's written in the e-mail.
21  Q. Okay. And then, go to the -- skip a paragraph
22  and go down, and it says: "Can you have a word with
23  Beth, please? This is not the first time we've suffered
24  HQ bashing."
25      That's an abbreviation for "headquarters,"

Page 79

1   isn't it?
2   A. I don't know, but I would expect that's what
3   he meant.
4   Q. And what he was saying to you is he wanted you
5   to tell Beth to quit bashing Basel, correct?
6   MR. POPE: Objection to form of the question.
7   BY THE WITNESS:
8   A. It -- Yes. He asked me to have a word with
9   Beth.
10  Q. And to quit bashing Basel; to tell her to stop
11  bashing Basel, correct?
12  A. The e-mail doesn't exactly go to that place.
13  It says that they suffered it.
14  Q. And it says: "This is not the first time we
15  have suffered [headquarter] bashing," doesn't it?
16  A. Yes.
17  Q. So he was telling you to talk to one of your
18  people, wasn't he?
19  A. If you go further in the paragraph, it looks
20  like he was mentioning that his interpretation at the
21  time was that she was searching websites and some work
22  had already been done in that area.
23  Q. And your --
24  MR. TILLERY: I move to strike your answer as
25  unresponsive.

Page 80

1   BY MR. TILLERY:
2   Q. Mr. Street, the Global Head of Regulatory, was
3   telling you to talk to one of your employees about
4   bashing Basel, wasn't he?
5   MR. POPE: Objection to form of the question.
6   That's not what it says.
7   BY THE WITNESS:
8   A. I don't know what he was actually saying.
9   Q. Okay. So when he says: "Can you have a word
10  with Beth, please? This is not the first time we have
11  suffered [headquarter] bashing," you don't know what he
12  meant, right? Is that what your testimony is under
13  oath?
14  A. I -- I -- I can't know what John meant because
15  if you read further, you can see that it looks like
16  there was some redundancy there.
17  Q. Did you talk to Beth?
18  A. I don't recall.
19  Q. So did you report back to Mr. Street?
20  A. I don't remember. I don't remember.
21  Q. You don't remember this -- any of this
22  transaction?
23  A. I remember the World Health Organization
24  information exchange that we were providing to Basel to
25  submit, so I remember that process.

Page 81

1   Q. Okay. But you don't remember --
2   A. Which is mentioned in this e-mail.
3   Q. Do you deny having received this e-mail?
4   A. No, sir.
5   Q. Okay. All right. Is Syngenta Crop
6   Protection, Inc., the regional headquarters for NAFTA
7   region?
8   A. The -- I don't -- I don't really know if we
9   have a regional headquarters, although our president --
10  our president of our company works with Canada and
11  Mexico.
12  Q. On that last e-mail, there was a reference to
13  a Dave French, and you said he was the Global Regulatory
14  Manager. What was he Global Regulatory Manager of, of
15  what?
16  A. If I recall directly, at that time, he would
17  have been the Herbicide Global Regulatory Manager team
18  lead.
19  Q. Did you note that on Exhibit No. 1, that
20  Greensboro was listed as the regional headquarters for
21  NAFTA?
22      Do you want to look at that?
23  A. I don't have my Exhibit 1. We just have one
24  copy. One minute, please.
25  Q. Sorry.

21 (Pages 78 to 81)

Exhibit 011 Page 21
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis              11-17-2010
Confidential

Page 82

1    A.  Yes.
2    MR. TILLERY:  I'm sorry.  We're out of time on this
3  tape.  We'll have to go off for a couple of minutes.
4    THE VIDEOGRAPHER:  This marks the end of Videotape
5  No. 2 in the deposition of Janis McFarland.
6    The time is 11:26 a.m.  Going off the record.
7    (A short break was had.)
8    THE VIDEOGRAPHER:  Going on the record.
9    This marks the beginning of Videotape No. 3 in
10  the deposition of Janis McFarland.  The time is now
11  11:36 a.m.
12  BY MR. TILLERY:
13    Q.  Do you have Exhibit 4 there in front of you?
14    A.  Yes.
15    Q.  Let's look, if we can, at the fourth paragraph
16  again after he said, "Can you have a word with Beth,
17  please?  This is not the first time we have suffered
18  [headquarter] bashing."
19    He says, "If we are not meeting NAFTA needs,
20  please let us know."  Correct?
21    A.  Yes.
22    Q.  Did you talk to him about that too?
23    A.  I don't recall.
24    Q.  Okay.  Then he says:  "We've been working up
25  rating our efforts on JMPR, and I thought these were

Page 83

1  starting to pay dividends."
2    What is JMPR?
3    A.  That's the actual body of -- body of
4  scientists who were reviewing the toxicology under the
5  World Health Organization.
6    Q.  Okay.  Then he says:  "There seems little
7  point in Beth searching websites for information that we
8  already provided as far as I know," correct?
9    A.  Yes.  That's what he says.
10    Q.  He's telling you to have Beth Carol stop doing
11  that work, isn't he?
12    MR. POPE:  Objection to form of the question.
13  BY THE WITNESS:
14    A.  He was asking me to have a word -- word with
15  Beth, and he was requesting -- requesting that.  And in
16  this area of the World Health Organization submission,
17  he's asking.
18    Q.  Okay.  Do you now remember the e-mail?
19    A.  No.  I'm --
20    Q.  I'm just asking if you remember it.
21    A.  When I said I didn't recall the -- I didn't
22  recall the actual -- this actual e-mail.
23    Q.  Okay.  Now, is this the kind of coordination
24  you had in mind earlier when you talked about the role
25  of Global Regulatory Affairs?

Page 84

1    A.  I wouldn't -- This -- This particular area
2  has to do with the World Health Organization review, the
3  joint meeting for pesticide review on atrazine.  And
4  so -- And we have -- We keep -- We coordinate with
5  Global.  This would have been their responsibility.
6    Q.  But these kinds of communications, is this the
7  type of coordination you had in mind earlier when you
8  talked a little bit earlier about coordination?
9    A.  The type of coordination is information on
10  pesticide registrations and data submission.  This could
11  be one aspect of that.
12    Q.  And you've looked at Exhibit 1 and how it
13  lists Syngenta as the regional headquarters for NAFTA?
14    A.  Yes.
15    Q.  You don't dispute that, do you?
16    A.  No.
17    (McFarland Deposition Exhibit No. 5
18    marked as requested.)
19  BY MR. TILLERY:
20    Q.  Please take a look at Exhibit No. 5.
21    A.  (Complying.)
22    Q.  Okay.  Have you been through that?
23    A.  I've skimmed it.
24    Q.  Okay.  This is a review of a NAFTA
25  coordination meeting that took place on January 9th,

Page 85

1  2001, isn't it?
2    A.  Yes.
3    Q.  And you were present for that meeting, weren't
4  you?
5    A.  Yes.
6    Q.  And there's a group of participants listed at
7  the very beginning of the document.  Do you see that?
8    A.  Yes.
9    Q.  And which of those participants identified on
10  the first page were employees of Syngenta Crop
11  Protection, Inc.?
12    A.  Robert Wurz, Dick Fuelner, Dirk Drost, Karen
13  Strumpf, Jennifer Shaw, Tom Beidler, and Greg Watson.
14    Q.  Which ones of the participants on the first
15  page were employees of Syngenta AG's Canadian
16  subsidiary?
17    A.  For Syngenta Crop Protection Canada Inc. It
18  would be John Purdy, Judy Shaw, Donna Houghton, Duane
19  Fairbairn, and Marian Stypa.
20    Q.  The purpose of the meeting was to begin to get
21  the U.S. subsidiaries, Canadian and Mexican
22  subsidiaries, to function as a region rather than as
23  separate companies, correct?
24    A.  No.
25    Q.  Okay.  Look at page 2 of the document.  Under

22 (Pages 82 to 85)

Exhibit 011 Page 22
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 86

1 the agenda, "Introduction - team emphasis," read into
2 the record what that says.
3     A.  "What we are trying to achieve is to function
4 as a region without the added bureaucracy."
5     Q.  And actually the presenter on that was a
6 person named Janis?
7     A.  Yes.
8     Q.  And who is that?
9     A.  That would have been referring to me.
10    Q.  Okay.  So actually you were the one who
11 actually would have said that, weren't you, and told
12 them that in 2001?
13    A.  I did say that.  But your question was worded
14 slightly differently than that.
15    Q.  Okay.  And to that end, a team was set up to
16 coordinate the processes for registration activities for
17 the entire region, correct?
18    A.  We were coordinating -- yes, coordinating
19 activities.
20    Q.  For the entire region, that's what I'm asking.
21 Just answer my question, please.
22        Do you want me to restate it?
23    A.  Yes, please.
24    Q.  Okay.  To that end, a team was set up in this
25 meeting to coordinate the activities for the entire

Page 87

1 region?
2     A.  Yes.  The word "activities" could be very
3 broad, but we did -- we were coordinating processes and
4 information exchange, ways of working.
5     Q.  Okay.  And so that ways of working wouldn't
6 include NAFTA processes for registering activities?
7 Would it include those?
8     A.  It would have included ways of working when we
9 were working with our governments on a common project.
10    Q.  Okay.  Would it include regional management of
11 product registrations?
12    A.  I wouldn't have interpreted this as a regional
13 management.
14    Q.  Okay.  Well, then, why don't you go to the
15 second page again under Agenda.  I think this is still
16 under -- No.  This is under Jennifer.  Who is that?
17    A.  Jennifer -- Jennifer Shaw.
18    Q.  Okay.  And let's see, the scope of the team,
19 which was the NAFTA team, it says under that:  "Primary
20 overall coordination on NAFTA processes for registration
21 activities," correct?
22    A.  Yes.
23    Q.  Okay.  So you agree with that now?
24    A.  Exactly how did you phrase the question?
25    Q.  I read it word for word from the document in

Page 88

1 front of you.
2     A.  The document says we were doing overall
3 coordination on NAFTA processes for registration
4 activities, yes.
5     Q.  Okay.  So you agree with that statement,
6 right?  You agree that that's what you were doing in the
7 team you were setting up?
8     A.  The primary overall coordination on NAFTA
9 processes for registration activities is what was
10 defined in this memo as part of the scope of the team.
11    Q.  Right.  And Jennifer Shaw, who made that
12 presentation, reported to you, didn't she?
13    A.  Yes, she did.
14    Q.  And the second one in that list is regional
15 management of product registrations, right?
16    A.  Yes.  That's what the second line says.
17    Q.  Right.  The focus of the regional team was to
18 include product development, regulatory programs, and
19 issue management, wasn't it?
20    A.  Part of the meeting discussed all of those,
21 yes.
22    Q.  Actually, that's not my question.  My question
23 is whether or not the focus of the regional team was to
24 include product development, regulatory programs, and
25 issue management.

Page 89

1     A.  I don't know what regional team --
2     Q.  Okay.  Why don't we go to page 3.
3         Top of the page, last bullet in the first
4 group:  "Group to focus on 1.  Product development,
5 2.  Regulatory programs, and 3.  Issue management."
6         Do you agree with that?
7     A.  That's what the last bullet says, yes.
8     Q.  You don't have any different understanding
9 that conflicts with this document, do you?
10    A.  No.  The understanding I have on the document
11 and why I was hesitating on some of your questions was
12 this was created right when most of the team was just
13 starting their role in Syngenta Crop Protection, Inc.
14    Q.  Right.  That's what I asked at the very
15 beginning.  This was the beginning meeting to start this
16 NAFTA organization, wasn't it?
17    A.  Yes.
18    Q.  Okay.  Continuing to the next topic where it
19 says, "Discussion Topics," it says:  "Coordination with
20 HAES and Global Regulatory Affairs Joint Reviews."
21         Do you see that?
22    A.  Page 3?
23    Q.  Page 3.  That's Syngenta 2023277.  Okay?
24    MR. POPE:  She has the page.  She's trying to
25 figure out where your reference is.

23 (Pages 86 to 89)

McFarland, Janis          11-17-2010
Confidential

Page 90

1  BY MR. TILLERY:
2     Q.  Okay.  Under "Discussion Topics."
3     A.  Yes.
4     Q.  It says:  "Coordination with HAES and Global
5  Regulatory Affairs," right?
6     A.  Yes.
7     Q.  What is HAES and Global Regulatory Affairs
8  Joint Reviews?
9     A.  Joint Reviews are processes set up by our
10  government regulators where the US EPA establishes a
11  joint review on a specific product with other countries,
12  Canada -- Canada, Europe, Australia.  So the government
13  agencies got together to determine how a product that
14  was going to be registered in different parts around the
15  world would actually -- they could facilitate an
16  efficiency review process in the different regulatory
17  bodies in the different countries.
18     Q.  Okay.  Let's go to page 4, which is
19  Syngenta 2023278.
20        And the third bullet on the top says:  "Need
21  to develop interface between this group and global."
22        Was that done?
23     A.  Yes.
24     Q.  Okay.  Next one says:  "Janis's team to carry
25  the burden of regional representation."

Page 91

1        Did your team carry the burden of regional
2  representation?
3     A.  In actual practice, it's been more a different
4  country takes the lead.
5     Q.  So you're saying this didn't happen, right?
6     A.  No.  It didn't happen.
7     Q.  Okay.  So was there another meeting where it
8  didn't happen, where it was voted that it wouldn't
9  happen?
10     A.  I don't recall.  I was thinking about in terms
11  of common practice today --
12     Q.  Okay.
13     A.  -- that we have -- somewhere we would take the
14  lead, somewhere Canada would take the lead.
15     Q.  Do you see the next topic where it says, "Big
16  issues agreed by group," and it says, "Global
17  registration/harmonize/sharing," and then it says, "PDT
18  teams - NAFTA/GLOBAL."  What does PDT mean?
19     A.  That's product management development team.
20     Q.  And then it says:  "NAFTA/Global issues/PR
21  management."  What does that mean?
22     A.  I -- It looks like it just means issues in
23  public relations management.
24     Q.  Do you remember what that -- what was agreed
25  there?

Page 92

1     A.  No, I don't.
2     Q.  Now, you agree with me that at the time you
3  left this meeting, Janis's, namely your team, was to
4  carry the burden of regional representation, right?
5     A.  I don't know that I -- I don't know that we
6  were really at that place.  There were probably
7  subsequent meetings.  Most people had been in their jobs
8  about -- their new jobs a few months at that time.
9     Q.  All right.  Tell me when the subsequent
10  meeting would have took place?
11     A.  I don't recall.
12     Q.  Okay.  Look at the last page of the document,
13  page 9, which is Syngenta 2023283.  And it says:  "Janis
14  will provide feedback from global meeting on operations
15  of PLT and LtS teams and link to NAFTA."
16        Can you explain what that means to me?
17     A.  I could partially explain that there were
18  product leadership teams with Syngenta Crop Protection
19  AG and -- linking to us.  I don't recall what LtS is.
20     Q.  So you can't give me any information about
21  what that means?
22     A.  I can't give -- No.
23     Q.  Okay.
24        (McFarland Deposition Exhibit No. 6
25        marked as requested.)

Page 93

1  BY MR. TILLERY:
2     Q.  Please take a look at Exhibit No. 6 which, for
3  the record, is Syngenta 1181950 through 57.
4     A.  (Complying.)
5     Q.  Tell me what it is.
6     A.  I'll look through it for a minute, please.
7     Q.  Have you looked at it?
8     A.  Yes.  I've skimmed it.
9     Q.  What is it?
10     A.  Looks like it's a package of information from
11  a meeting for NAFTA in Syngenta.
12     Q.  Okay.  And was it a meeting that -- Strike
13  that.
14        Was it a packet of information generated by
15  your office?
16     A.  I don't know.
17     Q.  Were you at the meeting?
18     A.  I don't know.
19     Q.  Okay.  Look at the bottom of the first page
20  where it says:  "Submit Canadian AI registration
21  package."
22        Do you see that?
23     A.  Yes.
24     Q.  What products did that package relate to?
25     A.  From what I can tell, it's mostly related to

24 (Pages 90 to 93)

Exhibit 011 Page 24
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                11-17-2010
Confidential

Page 94

1  mesotrione herbicide and for a new use in sweet corn and
2  popcorn.
3      Q.  Were employees of Syngenta Crop
4  Protection, Inc., besides you involved in putting that
5  package together?
6      MR. POPE:  Objection to form of the question.  She
7  didn't say she was involved.
8  BY THE WITNESS:
9      A.  I don't know who put the package -- Oh.  Who
10 put the registration package together?
11     Q.  Yes.
12     A.  We would not have been involved in the
13 Canadian registration package, but we would have for the
14 U.S.
15     Q.  Okay.  So you wouldn't take any role in
16 registration of products outside the United States?
17     A.  Only -- Our registration role was in the U.S.,
18 and there are joint reviews that are co submitted with
19 Canada, us, Australia, Europe, sometimes.
20     Q.  Okay.  If they're not joint reviews, do you
21 get involved outside the United States?
22     A.  No.
23     Q.  Okay.  So you wouldn't help another country
24 with its own submission that wasn't a joint review,
25 correct?

Page 95

1      A.  Right.  We would provide information if they
2  requested if we could, but we would not do the
3  submission.
4      Q.  So you're not involved in any way even with
5  coordination or oversight, correct, of the -- of the
6  regulatory filing of another Syngenta AG subsidiary in
7  another country?
8      A.  No.  We only coordinate strategies with Mexico
9  and Canada.
10     Q.  Okay.  So when this says, "NAFTA Regulatory
11 Actions Completed" in 2002, "Submit Canadian AI
12 Registration Package," it doesn't mean that that was
13 submitted by NAFTA, it means it was submitted by
14 somebody else, correct?
15     A.  I think I would interpret it as meaning that
16 one of the countries was submitting that package.
17     Q.  Okay.  If you go to Syngenta 1181954, which is
18 the fifth page of that exhibit, No. 6, there's an
19 Ames (1) mentioned.  What is that referring to?
20     A.  I believe it's referring to work connected to
21 the manufacturing of mesotrione.
22     Q.  Okay.
23         (McFarland Deposition Exhibit No. 7
24          marked as requested.)
25

Page 96

1  BY MR. TILLERY:
2      Q.  Look at Exhibit 7, please.
3      A.  (Complying.)
4      Q.  If you look at page 1 of that document, do you
5  see that?
6      A.  Yes.
7      Q.  It says:  "Janis McFarland, Director, NAFTA
8  Regulatory Affairs."  Do you see that?
9      A.  Yes.
10     Q.  And you see the dotted line?
11     A.  Yes.
12     Q.  And the dotted line on the left goes where?
13     A.  To Canada.
14     Q.  And to Marian Stypa, right?
15     A.  Yes.
16     Q.  And then the dotted line on the right goes to
17 Maruilio Flores, right?
18     A.  Yes.
19     Q.  In Mexico?
20     A.  Yes.
21     Q.  And is this a NAFTA organizational chart?
22     A.  It is a partial -- It is part of a NAFTA
23 organizational chart.
24     Q.  Okay.  And those dotted lines mean that you
25 were Mr. Stypa and Mr. Flores's functional manager at

Page 97

1  that time, that was in 2003?  We were provided this
2  document as being effective in 2003 in discovery.
3      A.  We would have -- We would have had -- In the
4  dotted line in my contacts, it meant we would coordinate
5  and share information.  But I would not have been
6  considered their functional manager.
7      Q.  Okay.  Do you know how this document was
8  generated?
9      A.  No.  I have not looked through it all.
10     Q.  Go to the next page entitled "Herbicide
11 Regulatory Affairs - General."
12     A.  Yes.
13     Q.  And the first heading:  "Regulatory affairs is
14 a sales job."
15         Would you agree with that statement?
16     A.  No, sir, I wouldn't.
17     Q.  Okay.  So -- And it says:  "We sell data and
18 decisions."
19         Do you consider that you sell in Regulatory
20 Affairs data and decisions?
21     A.  No.
22     Q.  And would you agree that Regulatory Affairs is
23 a mixture of science and politics?
24     A.  No.
25     Q.  Okay.  And the next bullet, would you agree

25 (Pages 94 to 97)

Exhibit 011 Page 25
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 98

1  regulatory strategy is a component or an extension of
2  the marketing strategy?
3     A.  No.  I don't know what they mean by that.
4     Q.  Did you create this document?
5     A.  I don't think so.
6     Q.  Are you sure?
7     A.  Well, I'm positive I wouldn't have created
8  this page in this document.
9     Q.  Do you know who created it?
10    A.  No, sir.
11    Q.  And were you present when this presentation
12 was made?
13    A.  I don't know.
14    Q.  Did you receive a copy of this document?
15    A.  I don't know.  I have not read the whole
16 document yet, either.  Based on the first two pages, I
17 don't know.
18    Q.  Tell me when you're finished with the third
19 page.
20    A.  (Reviewing document.)
21    Q.  Okay?
22    A.  Yes.
23    Q.  On that page, I'm going to ask you about some
24 terms that are used.  The second bullet, it says:
25 "Globally - work with Regulatory Development Teams to

Page 99

1  feed into the Global Product Leadership Team."
2        What was the Regulatory Development Team
3  that's referenced there?
4     A.  I don't -- I don't know exactly.  I don't
5  know.
6     Q.  You were the head of NAFTA Regulatory, but you
7  can't tell me what the team was?
8        MR. POPE:  Objection to the form of the question.
9  Same question you just asked her.
10 BY MR. TILLERY:
11    Q.  So you don't know, ma'am?
12    A.  I don't -- I don't recall a team with that
13 specific name.
14    Q.  Okay.  Do you recall one that was like that
15 that did the same function?
16    A.  We had product development teams, yes.
17    Q.  What about regulatory development teams, did
18 you have one of those?
19    A.  In my NAFTA group, not that I recall a formal
20 team.
21    Q.  Did you have an informal regulatory
22 development team?
23    A.  I don't recall that either.
24    Q.  Then there is a Global Product Leadership
25 Team.  Do you see that?

Page 100

1     A.  Mm-hmm.
2     Q.  What's that reference?
3     A.  That references -- Global Product Leadership
4  Team was a team of global regulatory -- regulatory
5  representatives in the business.
6     Q.  Where were they headquartered?
7     A.  They were -- functioned out of Syngenta Crop
8  Protection AG, and we weren't on that team.
9     Q.  Okay.  Where were they headquartered?
10    A.  In Basel.
11    Q.  And who was on the team?
12    A.  There would have been teams for each product.
13    Q.  Okay.  Was there a team member from Syngenta
14 Crop Protection, Inc.?
15    A.  No, not -- I don't know.  Nobody in Regulatory
16 was on those teams.
17    Q.  Then it says:  "Global holds the development
18 budget."
19        Do you see that?
20    A.  Yes, I see.
21    Q.  And "Global" is referring to the Global
22 Product Leadership Team?
23    A.  I don't know what it's referring to.
24    Q.  Okay.  But, "Global holds the budget," you
25 don't know what's meant there?

Page 101

1     A.  No.  Sorry.
2     Q.  And, "have to work internally for NAFTA's
3  share," of the global budget.  Do you know what that
4  means?
5     A.  No.
6     Q.  Okay.  And at the bottom, it says:
7  "Separation of key science facilities at ICTL and JH in
8  UK from Regulatory and Business concern."
9        Do you see that?
10    A.  Yes.
11    Q.  What is the research facility at ICTL?
12    A.  I believe that would have been the Manchester
13 Center For Toxicological -- or Toxicology Laboratories
14 in Manchester in the U. K.  But I don't know that exact
15 four-letter combination.
16    Q.  Look at the first page of that document where
17 it says, Herbicide Team Leader Greg Watson.
18        Did he work for you?
19    A.  Yes.
20    Q.  Did Tom Parshley work for you?
21    A.  Yes.  He reported -- Yes.  He's in my
22 department.
23    Q.  And Jerry Wells, did he report to you?
24    A.  Yes.
25    Q.  And Mr. Watson, who did he report to?

26  (Pages 98 to 101)

Exhibit 011 Page 26
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 102

1    A.  Mr. Watson reported directly to me.
2    Q.  Okay.  And were there any meetings of this
3  group called the Regulatory Development Team?
4    A.  I don't --
5    Q.  You don't even remember it existing, do you?
6    A.  I don't know that term.  I apologize.
7    Q.  Okay.  You don't remember any group even like
8  that, right, in your NAFTA group?  You don't even
9  remember a group like that?
10   A.  I ...
11   Q.  Okay.  Does Syngenta Crop Protection, Inc.,
12  use information, reports, studies of any kind of key
13  science from other Syngenta companies to support and
14  maintain the registration for Syngenta products sold in
15  the United States?
16   A.  Yes.
17   Q.  Okay.  And which facilities, Jealott's Hill?
18   A.  Some studies that we support our registrations
19  are conducted at Jealott's Hill.
20   Q.  Okay.  And you've done that for atrazine as
21  well, haven't you?
22   A.  Atrazine, most of the work for atrazine has
23  been done in the States with contract labs here.  But
24  I'll think about that.  I don't have anything
25  specifically that comes to mind.

Page 103

1    Q.  Okay.  Well, why don't you tell me as an
2  example of the registrations that you made or sought to
3  maintain in the United States where you've used
4  scientific information from other Syngenta entities,
5  give me an example of that.
6    A.  The environmental work, the ecological --
7  required ecological studies, required toxicology studies
8  for some of our activities would be done by other
9  companies within Syngenta, and we've used that data.
10   Q.  Okay.  Do you pay the other Syngenta entities
11  for that work?
12   A.  I don't know.
13   Q.  Have you ever seen evidence that a payment was
14  made to another Syngenta subsidiary for that scientific
15  work?
16   A.  Not that I -- Not that I'm aware of.  I'm not
17  familiar with that.
18   Q.  Okay.  Why don't we look to page Syngenta
19  945847 of that same document.  And I'm focusing you on
20  the last line of the page.
21     Was U.S. data used to support that Mexican
22  registration?
23   A.  I don't -- I don't know specifically.  But we
24  do provide information that Mexico submits for products.
25   Q.  Okay.  Did the Syngenta AG subsidiary in

Page 104

1  Mexico, crop protection subsidiary in Mexico, compensate
2  your office or your company in Greensboro for that work?
3    A.  I don't know.
4    Q.  Did you ever see any evidence of it?
5    A.  No.
6         (McFarland Deposition Exhibit No. 8
7          marked as requested.)
8  BY MR. TILLERY:
9    Q.  This is a one-page document, Syngenta 1744617.
10  Okay?
11   A.  Yes.
12   Q.  In the preceding exhibit, I had asked you
13  about Canada.  Do you remember the mesotrione
14  description, that particular chemical, I forgot to ask
15  you a question.  And all I was going to ask you is, do
16  you know if Syngenta Crop Protection, Inc., provided
17  support for the Canadian subsidiary for the registration
18  of that chemical, any data that was used in support of
19  that submission?
20   A.  Yes.  The data to support that submission,
21  yes, would have come from -- There would, yes, there
22  would be.
23   Q.  Okay.  When Syngenta Crop Protection, Inc.,
24  seeks and receives data compensation from unrelated
25  companies, are you aware of that?

Page 105

1    A.  Sometimes I'm aware of that.
2    Q.  Okay.  And when you supplied information to
3  the Canadian subsidiary in support of the mesotrione
4  submission, do you remember what we were talking about a
5  minute ago with the preceding exhibit?
6    A.  I remember your question a minute ago.
7    Q.  All right.  Did you charge the Canadian
8  subsidiary for your work?
9    A.  I don't know.
10   Q.  Did you ever try to put together a list or --
11  of the number of hours or the cost within your
12  department for that work to support either the Mexican
13  or Canadian submissions?
14   A.  I don't -- I don't know.
15   Q.  No.  I'm asking you if you remember doing
16  that?
17   A.  No, I don't.
18   Q.  Did anybody ever do that at your request?  Did
19  you ever ask anybody to do it?
20   A.  I know in Mexico, we wanted -- we have asked
21  for how much time it would take to provide information
22  for resource planning on our end.
23   Q.  Okay.  For your own budgetary or internal use?
24   A.  For -- Yes, for planning purposes.
25   Q.  Okay.  What I'm asking is, did you ever ask

Exhibit 011 Page 27
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                 11-17-2010
Confidential

## Page 106

1    anybody to put together what it really cost to support
2    the Canadian and Mexican registrations?
3       A.  I don't -- I don't recall.
4       Q.  Okay.  You don't remember ever doing it?
5       A.  I don't remember.
6       Q.  And you don't remember ever seeing a report of
7    the cost of that, right?
8       A.  Not a -- No.
9       Q.  Now, if you look at this exhibit, which is
10   No. 8, it's entitled "PMRA - Syngenta Meeting and
11   Information Exchange."
12          What is PMRA?
13      A.  The Canadian regulatory body for pesticides
14   for the Canadian government.
15      Q.  Have you ever met with the PMRA?
16      A.  I have met with some of -- Yes.
17      Q.  Okay.  And when did you do that?
18      A.  I don't -- I don't know exactly the times
19   because they're at some joint meetings with us
20   sometimes.
21      Q.  Okay.  And when did you meet with the PMRA
22   office in Ottawa?
23      A.  I was trying to remember.  I don't remember
24   going to their office, although I do remember providing
25   information.

## Page 107

1       Q.  Okay.  You remember meeting with them, don't
2    you?
3       A.  I don't recall the specific meeting.
4       Q.  Okay.  And how many meetings have you had with
5    the Canadian office known as PMRA?  How many times have
6    you been there?
7       A.  I couldn't say.  I don't know.
8       Q.  Okay.  Can you tell me if it's been more than
9    five over the course of these years?
10      A.  That I've talked to individuals from PMRA?
11      Q.  Yes.
12      A.  Yes.
13      Q.  Okay.  Has it been more than ten times?
14      A.  I don't know.  It's probably in that ballpark.
15   Not very often.
16      Q.  Okay.  And how many face-to-face meetings have
17   you had with them?
18      A.  We've -- We've met with them at public
19   stakeholder meetings, and there's two a year.  And I've
20   probably attended four or five of those.  They're held
21   in either Mexico or Canada or the U.S.
22      Q.  Have other employees of Syngenta Crop
23   Protection, Inc., met with PMRA in support of any
24   registrations for the Canadian subsidiary?
25      A.  They have met with PMRA to discuss products

## Page 108

1    for registrations in the U.S., and so they've been in
2    meetings before with PMRA.
3       Q.  Okay.  If you exclude those that involve
4    products for registration in the U.S., and I'm talking
5    about just products for registration by the Canadian
6    subsidiary, is it your testimony -- Strike that.
7          If we limit this to the Canadian subsidiary's
8    registration, how many times have Syngenta Crop
9    Protection, Inc., employees met with PMRA in support of
10   those registrations?
11      A.  I don't know.  It's mostly in the context of
12   the joint reviews of new products --
13      Q.  Right.
14      A.  -- that we do between Canada and the U.S.
15      Q.  Right.  I'm not asking about that.  I'm asking
16   about a product for the Canadian registration.
17          I want to know, how many times Syngenta Crop
18   Protection, Inc., employees have talked to or met with
19   PMRA office people in support of the Canadian
20   registrations?
21      A.  I don't know that.
22      Q.  It's happened many times, hasn't it?
23      A.  I don't know that.
24      Q.  Okay.  You've done that, haven't you?
25      A.  I've only met with PMRA on broader information

## Page 109

1    exchanges a handful of times.
2       Q.  Let's put it this way:  Are you denying that
3    you have ever met with PMRA representatives in support
4    of Canadian product registrations?
5       A.  The definition of "support," I've provided
6    information on products or studies we -- we have
7    registered in the United States at a meeting with PMRA.
8       Q.  What I'm talking about -- You may have
9    registered a product at some point in the U.S. that
10   isn't being sold in the -- in Canada.
11          I'm talking about when a Canadian subsidiary
12   is registering a product, they want to sell a Syngenta
13   Canada product in Canada, okay, and they need to get it
14   approved in some way, and they go through the PMRA
15   office.  I'm asking you, in that context, have you
16   either spoken to or met with PMRA representatives?
17      A.  Only in the context of -- in that context of
18   joint reviews.
19      Q.  So you've never done a contact with PMRA in
20   support of a product being sold in Canada by the
21   Canadian subsidiary?
22      A.  If I was -- If it's a product -- I would have
23   been at a few meetings where I would have talked about a
24   product that we register in the U.S. that we would have
25   known about.  But not very many times.

28 (Pages 106 to 109)

**Exhibit 011 Page 28**
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 110

1      I'm sorry.  I don't recall the specifics to
2  answer you.
3      Q.  Okay.  What was the purpose of the meeting
4  described here in Exhibit 8?
5      A.  It looks like it was to describe the -- they
6  were talking about atrazine.
7      Q.  Okay.  And it says: "Canada Focus."
8          Do you see that?
9      A.  I'm sorry.  Where are you in the document?
10     Q.  Are you at Syngenta 1744617?
11     A.  Yes.
12     Q.  Okay.  At the middle of the page, it says:
13  "Canada Focus."
14         Do you see that?
15     A.  Oh, yes.  Thank you.
16     Q.  All right.  Then under 10:05, there's a Marian
17  Stypa, correct?
18     A.  Yes.
19     Q.  He worked in Canada at that time, right?
20     A.  Yes.
21     Q.  And then below that, it says: "Syngenta
22  science comments and review," at 10:20.  Do you see
23  that?
24     A.  Yes.
25     Q.  And that was by Paul Hendley?

Page 111

1      A.  Yes.
2      Q.  Who did he work for?
3      A.  Paul worked for Syngenta Crop
4  Protection, Inc.
5      Q.  For you?
6      A.  He's not in my department.
7      Q.  Okay.  And then the topic of his specific
8  objective was: "Presentation and discussion on the PMRA
9  proposed PACR in relation to Syngenta comments,"
10  correct?
11     A.  Mm-hmm.  Yes.
12     Q.  Okay.  And then it had PMRA, and it listed
13  those people.  I presume those are Canadian regulatory
14  officials, right?
15     A.  Mm-hmm.  Yes.
16     Q.  And then it had Syngenta, okay?
17     A.  Yes.
18     Q.  And then it has under that a group of people,
19  Marian Stypa from Canada, Judy Shaw from Canada, John
20  Purdy, where was he from?
21     A.  Canada.
22     Q.  Okay.  And the next person is who?
23     A.  Me.
24     Q.  You were there, weren't you?
25     A.  Yes.

Page 112

1      Q.  All right.  And then it said Peter Hertl was
2  there, right?
3      A.  It has Peter listed.
4      Q.  And he was Head Global Environmental Risk
5  Assessment, correct?
6      A.  If that's what his title is on there.
7      Q.  And then it had listed Paul Hendley, Senior
8  Syngenta Fellow Environmental Risk Assessment, correct?
9      A.  Yes.
10         MR. TILLERY:  Okay.  Our videographer says we have
11  to break for lunch now.
12         THE VIDEOGRAPHER:  This marks the end of Videotape
13  No. 3 in the deposition of Janis McFarland.
14             Going off the record at 12:31 p.m.
15             (Lunch Break.)
16         THE VIDEOGRAPHER:  Going on the record.
17             This marks the beginning of Videotape No. 4 in
18  the deposition of Janis McFarland.
19             The time is now 1:29 p.m.
20  BY MR. TILLERY:
21     Q.  Do you have the exhibits handy, Ms. McFarland?
22         There you go.
23         If you could look at Exhibit 8 again.
24     A.  (Complying.)
25     Q.  Was that a public meeting or a private

Page 113

1  meeting?
2      A.  It appears to be a private Syngenta -- It
3  appears to be a Syngenta Crop Protection and PMRA --
4  Syngenta Crop Protection, Inc., and PMRA and Syngenta
5  Crop Protection Canada Inc., meeting.
6         MR. TILLERY:  Okay.  I move to strike that as
7  unresponsive.
8  BY MR. TILLERY:
9      Q.  Was that a public or a private meeting?
10     A.  It was a -- So it was a meeting between our --
11  between Syngenta and the registrant.  So if that's how
12  you would define -- Syngenta Crop Protection, Inc., and
13  the PMRA regulatory body.  If that's how you define
14  private, that would be private.
15     Q.  So that would be a private meeting, right?
16     A.  Yes.
17     Q.  Okay.  Were there any representatives from the
18  US EPA there?
19     A.  I don't see any US EPA people mentioned on the
20  participant list on this page.
21     Q.  Okay.  And it says: "Proposed PACR."
22         Do you see that?
23     A.  Where in the document?
24     Q.  Do you see in the second area under "Canada
25  Focus," 10:20?

29  (Pages 110 to 113)

Exhibit 011 Page 29
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 114

1     A. Yes.
2     Q. "Presentation and discussion on the PMRA
3  proposed PACR."  Do you see that?
4     A. I do see that.
5     Q. Okay.  What is that?
6     A. I don't know what PACR means in that sentence.
7     Q. Okay.  Did -- Strike that.
8        Has Syngenta Crop Protection, Inc., provided
9  support to Syngenta AG's Australian subsidiary when
10  atrazine was under review by the Australian regulatory
11  authority?
12    A. Syngenta Crop Protection, Inc., provided data
13  and information on atrazine to our regulatory managers
14  in Australia that worked for Syngenta in Australia.
15    Q. Did Syngenta Crop Protection, Inc., sell any
16  product in Australia?
17    A. Not that I'm aware of.
18    Q. Okay.  Does it have any subsidiary doing
19  business in Australia?
20    A. Not that I'm aware of.
21    Q. Okay.  Did it charge for its services to
22  Australian subsidiary?
23    A. I don't know.
24    Q. Did Syngenta Crop Protection, Inc., provide
25  that support for the Australian filings in response to a

Page 115

1  request from a Mr. Alfred Seiler?
2     A. I don't recall.  Most of our requests would
3  have been from the regulatory manager in Australia.
4     Q. Mr. Seiler is an employee of Syngenta Crop
5  Protection AG, correct?
6     A. He's not currently an employee of Syngenta
7  Crop Protection AG.
8     Q. He was, correct?
9     A. He was.
10       (McFarland Deposition Exhibit No. 9
11       marked as requested.)
12  BY MR. TILLERY:
13    Q. Would you take a look at that document which
14  has been marked as Exhibit 9 and tell me what it
15  discusses, first.
16       Do you see it?
17    A. Yes.
18    Q. And you ought to look at the second page too.
19       Is there a second page to it?
20  MR. POPE:  One page.
21  MR. TILLERY:  Just one page?
22       Oh, no.  I'm sorry.  Let's just look at that
23  one.
24       (McFarland Deposition Exhibit No. 10
25       marked as requested.) .

Page 116

1     MR. TILLERY:  I'm just going to substitute.  I'm
2  not going to withdraw No. 9; this is just more
3  inclusive.  But this is No. 10.  It includes the same
4  e-mails plus another one.
5     MR. POPE:  We're focusing right now on 10, not
6  No. 9?
7     MR. TILLERY:  Right.
8     MR. POPE:  Okay.  So we'll hold that one.  They're
9  not really related.
10  BY MR. TILLERY:
11    Q. Do you see this?
12       Do you need to go through the rest of it?  Go
13  ahead.
14    A. Yes.  Thank you.
15    Q. This is an e-mail exchange you were copied on,
16  correct?
17    A. Correct.
18    Q. And the first one at the top says it's from
19  Alfred Seiler, correct?
20    A. Correct.
21    Q. And he's from Syngenta Crop Protection AG in
22  Basel, correct?
23    A. Correct.
24    Q. And the topic was: "Important atrazine
25  questions affecting the Australian and IARC review."

Page 117

1  What's the IARC review?
2     A. The International Agency on Research in
3  Cancer.
4     Q. Okay.  And he proposes two questions.  One is
5  based upon an article published by T. Hayes.
6       Do you see that?
7     A. Yes.
8     Q. And the second refers to atrazine cancer
9  classification made by the IARC, correct?
10    A. Yes.
11    Q. And he's asking your office to supply
12  information to respond to these questions so that the
13  people in Australia can respond, correct?
14    A. He's asking some of the scientists and the
15  Regulatory Affairs Department at Syngenta Crop
16  Protection, Inc. --
17    Q. To help respond.
18    A. -- to help respond to Product Safety, which is
19  CHBS, and my team.
20    Q. And you did respond too, didn't you?
21    A. We would have provided information that we had
22  to our Australian colleagues.
23    Q. Okay.  And you were paid for that?
24    A. I don't know.
25    Q. Did you ever see evidence of being paid or

30 (Pages 114 to 117)

Exhibit 011 Page 30
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

## Page 118

1  reimbursed for it?
2      A.  No.
3      Q.  Okay.
4          (McFarland Deposition Exhibit No. 11
5          marked as requested.)
6  BY MR. TILLERY:
7      Q.  If you would look at 11 and just tell me what
8  it is.
9          This is another e-mail exchange involving
10 Mr. Seiler's office, isn't it?
11     A.  Yes.
12     Q.  And this involves -- His subject line is:
13 "Urgent:  Atrazine support to Australia," correct?
14     A.  Yes.  It's the subject in the first e-mail.
15     Q.  And this involves a November 6, 2002,
16 exchange, right?
17     A.  Correct.
18     Q.  Okay.  And here, Mr. Seiler is asking you and
19 other people from different entities, subsidiaries of
20 Syngenta AG, to provide information to your Canadian
21 counterparts -- I'm sorry -- to your Australian
22 counterparts to support them in Australia, correct?
23     A.  Correct.
24     Q.  And you did that, didn't you?
25     A.  We would have provided information for the

## Page 119

1  Australian questions and review of the scientific
2  information.
3      Q.  Okay.  And did you do that again in 2004?
4      A.  I don't remember the exact -- another date.
5      Q.  That particular e-mail exchange you have in
6  front of you was for 2002, wasn't it?
7      A.  Yes.
8      Q.  Did the topic come up again in 2004?
9      A.  I don't know if the topic came up again.  The
10 topic came up again -- Atrazine questions were asked
11 again of us.
12     Q.  How many times were you asked to support
13 Australian filings with regulators?
14     A.  I don't know.  But when we're asked, we try to
15 provide our scientific information.
16     Q.  Do you know how many times?
17     A.  No.
18     Q.  Do you know how many times you've been asked
19 to do that in Canada?
20     A.  No.
21     Q.  Do you know how many times you've been asked
22 to do it in other parts of the world?
23     A.  No.
24     Q.  Have you been asked to do it in Japan?
25     A.  For atrazine?

## Page 120

1      Q.  For any chemical product to supply information
2  to support a subsidiary counterpart in Japan.
3      A.  Yes.
4      Q.  I don't want to spend much time on this, but
5  we'll mark as No. 12 yet another e-mail exchange.  And
6  I'll just simply ask you to look at it and confirm for
7  me that this is yet another request from Mr. Seiler
8  regarding an Australian review of atrazine, and this one
9  being in 2004.
10         (McFarland Deposition Exhibit No. 12
11         marked as requested.)
12 BY MR. TILLERY:
13     Q.  My question is simply whether or not this is
14 yet another exchange by e-mail requesting support from
15 you for an Australian filing.
16     MR. POPE:  Objection to form of the question.
17 BY MR. TILLERY:
18     Q.  This time in 2004.
19     A.  This was sent to both Product Safety and
20 Regulatory people and also -- with Australia.  And it
21 does request information for -- on atrazine science.
22     Q.  And the people involved in this e-mail
23 exchange, they are from Canada, Greensboro, Australia,
24 and Basel, aren't they?
25     A.  Yes.

## Page 121

1      Q.  Okay.  Is Syngenta Crop Protection, Inc., the
2  only Syngenta subsidiary that manufactures atrazine?
3      A.  Yes, as far as -- Yes.
4      Q.  Does Syngenta Crop Protection, Inc., sell
5  atrazine to Syngenta AG's Japanese subsidiary?
6      A.  I don't know.
7      Q.  Did it do that in 2008?
8      A.  I don't know.
9      Q.  Did Syngenta Crop Protection, Inc., provide
10 any support to Syngenta AG's Japanese subsidiary in 2008
11 with respect to the registration of atrazine for use on
12 turf in Japan?
13     A.  I don't remember.
14         (McFarland Deposition Exhibit No. 13
15         marked as requested.)
16 BY MR. TILLERY:
17     Q.  Please take a look at Exhibit 13.  And while
18 you're looking at that, we may as well add Exhibit 14.
19         (McFarland Deposition Exhibit No. 14
20         marked as requested.)
21 BY MR. TILLERY:
22     Q.  On the same topic, you see.
23         Now, as you go through it, I want to ask you
24 about a few of the names that you'll see.  Mr. Dennis
25 Stanley, can you tell me who he was in May 7th, 2008,

31 (Pages 118 to 121)

Exhibit 011 Page 31
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

---

Page 122

1  with respect to the Syngenta group of companies?
2      A. No for both Exhibit 13 and 14, neither I or
3  any of my people in my quick scan received any of these
4  e-mails on Exhibits 13 and 14.
5      Q. But do you know who he was?
6      A. I don't.
7      Q. You don't know who Mr. Stanley was in Basel?
8      A. I don't.
9      Q. Okay. Do you know who Mr. Philippe Costrop
10  was?
11      A. Yes.
12      Q. Who is he?
13      A. He's the Global Regulatory Manager for
14  atrazine.
15      Q. Where does he work?
16      A. He works in Basel.
17      Q. For which company?
18      A. For Syngenta Crop Protection AG.
19      Q. Can you explain from your knowledge of the
20  organization of Regulatory Authority, let's say,
21  specifically with respect to atrazine, how it is that
22  Mr. Costrop had the authority from Basel to decide
23  whether Syngenta AG's Japanese subsidiary could register
24  and sell a particular product for a particular use in
25  Japan?

---

Page 123

1      MR. POPE: Objection to form of the question.
2  BY THE WITNESS:
3      A. My understanding of Philippe Costrop's role is
4  he does not have the authority.
5      Q. Do you know why he would do that in this
6  e-mail exchange?
7      MR. POPE: Objection to form of the question.
8  BY THE WITNESS:
9      A. I've not read the e-mail exchange carefully to
10  know what Philippe's role is in the e-mail exchange.
11      Q. Okay. You know what his role is in Syngenta,
12  right?
13      A. I know his role is as a Global Regulatory Head
14  for atrazine and how he interacts with us in Syngenta
15  Crop Protection, Inc.
16          (McFarland Deposition Exhibit No. 15
17          marked as requested.)
18  BY MR. TILLERY:
19      Q. Earlier, we talked about a Regulatory
20  Development Team, and you said you hadn't heard of
21  them -- hadn't heard of that term, right?
22      A. I said I wasn't sure what it meant in those
23  e-mails.
24      Q. Okay. Do you know if there were RDTs for
25  particular products or groups of product?

---

Page 124

1      A. I don't -- I don't know.
2      Q. I'll show you what's been marked as 15.
3          Can you identify that for me for the record.
4      A. Yes. This is a memo of an RDT meeting for the
5  chloro-triazine herbicides that I'm not listed as a
6  participant on, but there are several other people on
7  the participants.
8      Q. It says an RDT meeting?
9      A. Yes.
10      Q. What did that RDT stand for?
11      A. If it's spelled out, you were calling it a
12  Regulatory Development Team, and I would presume that
13  that's what this is. And the date of this is
14  November 15th, 2001.
15      Q. And at the top, it's got Dr. Alfred Seiler,
16  Syngenta Crop Protection AG, with a Basel address,
17  correct?
18      A. Yes.
19      Q. And it says participants, G. Watson by phone.
20  Who is he?
21      A. Greg Watson was team leader for herbicides in
22  my Regulatory Affairs Department.
23      Q. He worked for you at that time?
24      A. He did.
25      Q. Okay. What kind of decisions did this group

---

Page 125

1  make at that time?
2      MR. POPE: Objection to form of the question.
3  BY THE WITNESS:
4      A. I don't know.
5      Q. Okay. They were global teams, weren't they?
6      A. By "global" -- By a "global team," what do you
7  mean?
8      Q. Well, I mean, would you say that would apply
9  to products that Syngenta sold globally and which were
10  subject to regulation in different countries throughout
11  the world? That's what I mean by "global."
12      A. Atrazine is, and I can tell by some of the
13  participants, one is from Latin America. So that would
14  be consistent.
15      Q. It would be consistent with what I said?
16      A. That it would be RDT representatives from
17  different regions. I don't know if --
18      Q. On a global level?
19      A. -- if it would fit your global description.
20      Q. Who is D. French under Regulatory Affairs?
21  Who is he?
22      A. He would have been a Global Regulatory
23  Manager.
24      Q. What about L. Schwager?
25      A. I don't remember.

---

32 (Pages 122 to 125)

Exhibit 011 Page 32
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 126

1    Q.  What about R. Rodriguez?
2    A.  A Regulatory -- Regulatory leader head for
3  Latin America.
4    Q.  And H.P. Buser?
5    A.  Global Regulatory Manager.
6    Q.  Okay.  So H.P. Nigitz?
7    A.  I don't remember.
8    Q.  A. Nyffeler?
9    A.  I don't know.  I don't recall.
10    Q.  And then look at the Objectives section.  It
11  says:  "PM."
12        What does that mean?  What does that refer to?
13    A.  Objective.  It looks like -- It would -- In
14  this context, I would expect it to mean product
15  management, product manager.
16    Q.  Okay.  So product management, "expects to keep
17  the atrazine herbicides on the market although at
18  reduced volumes for the next ten years.  During this
19  period, it is important to secure registrations, to
20  maximize volumes, and to establish new mixtures with
21  better margin."  Is that right?
22    A.  That's what -- That's what that sentence
23  reads.
24    Q.  Okay.  And has that been your understanding of
25  the course that's been taken since the date of this

Page 127

1  document?
2    A.  I don't know, and I don't have that
3  understanding.
4    Q.  Okay.  Do you have a different understanding,
5  or you just lack understanding?
6    A.  The --
7    Q.  Well, let me ask --
8    A.  Which specific parts of that area do you want
9  me to respond to?
10    Q.  Okay.  Well, has there been an effort to
11  secure registrations, to maximize volumes of triazine
12  herbicides?
13    A.  I don't know.
14    Q.  Has there been an effort to establish new
15  mixtures with better margin?
16    A.  That would be a good business practice, but I
17  don't also -- and we have established new mixtures.  I
18  don't know about margins.
19    Q.  Okay.  Who was Mr. Nyffeler's employer?
20    A.  I don't know.
21        (McFarland Deposition Exhibit No. 16
22         marked as requested.)
23  BY MR. TILLERY:
24    Q.  Please take a look at Exhibit 16.
25        Do you see this?  This is an e-mail exchange

Page 128

1  you were included on, wasn't it?
2    A.  This e-mail exchange has me on one of the --
3  copied on one of the three e-mails -- four.  One of the
4  four.
5    Q.  There were four e-mails here, you see?
6    A.  One, two, three -- Just three.  One of the
7  three.
8    Q.  And the first e-mail is from Mr. Seiler.  Do
9  you see that?
10    MR. POPE:  Top one or the bottom one?
11    THE WITNESS:  Actually, the top one --
12  BY MR. TILLERY:
13    Q.  I'm talking about in date and time, the first
14  one is February 4th, 2011, at 11:52 a.m.  Do you see
15  that?
16    A.  Oh, I see that.  I was counting the Hosmer
17  forwarded this on February 7th.
18        The first one that I see February 4th is from
19  Peter Hertl, 2003.
20    Q.  Actually, I see it from Alfred Seiler.
21        See, the first one in point of time is the
22  bottom one.  Do you see what I'm saying?  The bottom
23  one.  February 4th, 2003, 11:52, Alfred Seiler.
24        Do you see that?
25    A.  Yes, I do.

Page 129

1    Q.  Okay.  You're included on that, right?
2    A.  Yes, I am.
3    Q.  Okay.  Look at the second page where it says:
4  "April 10, atrazine/simazine with special emphasis on
5  Ecotax and endocrine disruption, Regulatory Affairs."
6        Tell me where those people were and where they
7  worked.
8    A.  Hans Peter Buser would have been Syngenta Crop
9  Protection AG.
10    Q.  In Basel?
11    A.  In Basel.
12    Q.  Okay.
13    A.  And Dennis S, I don't remember or know.  I
14  don't know.
15    Q.  He didn't work for you in Syngenta Crop
16  Protection, Inc.?
17    A.  No.  No he didn't work in my department in
18  Syngenta Crop Protection, Inc.
19    Q.  Okay.  There's T. Parshley, he worked for you?
20    A.  And we missed one there.  It's K. Pires.  I
21  don't know.
22        Tom Parshley worked in my department;
23  J. McFarland, that's me; and then there's initials
24  there, HAES, that is our Health and Environmental Safety
25  Group; Dennis Hackett.  He was in Product Safety then.

33 (Pages 126 to 129)

Exhibit 011 Page 33
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

---

Page 130

1    Q.  Where was he in product safety?
2    A.  Syngenta Crop Protection, Inc.
3        Charles Breckenridge, Syngenta Crop
4    Protection, Inc., L. Bray, Syngenta Crop Protection,
5    Inc., in the HAES, all of these are HAES people.
6        Alan Hosmer, Syngenta Crop Protection, Inc.;
7    Bruce Thede, Syngenta Crop Protection, Inc.; Dirk Drost
8    would have been involved with Planning for Syngenta Crop
9    Protection, Inc.; J.R. James with Syngenta Crop
10   Protection, Inc., but I'm not sure which department;
11   H. Weber, I don't know.
12   Q.  He's listed as the Portfolio Leader.  Did he
13   work in Greensboro at Syngenta?
14   A.  I don't know.
15   Q.  Okay.
16   A.  And A --
17   Q.  Zoschke.
18   A.  -- Zoschke I don't know, and A. Nyffeler, I
19   don't know where they worked.
20   Q.  They didn't work for you?
21   A.  They weren't in my department.
22   Q.  Okay.  And it's signed by -- The e-mail is
23   actually signed by three people, right?
24   A.  It has -- Yes.  The signoff on the e-mail says
25   Fredi, Hans-Peter, and Christian.

Page 131

1    Q.  Okay.  Were you at that meeting?
2    A.  I don't remember.
3    Q.  And what is a corn RDT?
4    A.  The RDT is Regulatory Development Team.  This
5    would have been Regulatory Development Team surrounding
6    products that are used in corn, is what I would expect.
7    Q.  You don't know who would have led the
8    meetings?
9    A.  Pardon me?
10   Q.  Do you know who led those meetings?
11   A.  No, I don't.  I'm sorry.
12   Q.  Would the Product Manager likely lead the
13   meeting?
14   A.  I'm sorry.  I don't know.
15   Q.  Okay.
16       (McFarland Deposition Exhibit No. 17
17       marked as requested.)
18   BY MR. TILLERY:
19   Q.  I want to direct your attention now to
20   Exhibit 17.
21   A.  Thank you.
22   Q.  Did Syngenta ever develop a goal with respect
23   to endocrine disruption, how to deal with issues
24   involving endocrine disruption across regions?
25   A.  We have -- We have a plan for endocrine

Page 132

1    disruption required by different regions.
2    Q.  Was there a global action plan for the
3    Syngenta group's product -- Crop Protection Division?
4    A.  I don't know.
5        And you'll see that this memo is a draft, and
6    it has different regional regulatory people on it.  And
7    I'm not on it -- and some science people, and it's dated
8    February 2nd, 2005.
9    Q.  Yes.  But two of your people are on it, people
10   who reported directly to you, Mr. Campbell and
11   Mr. Watson.
12   A.  Two of my people are on it.
13   Q.  And are you saying they didn't tell you about
14   this?
15   A.  What I was answering is I didn't know about
16   the global action endocrine plan that you referred to.
17   Q.  I'm asking you, was there ever a plan, a
18   global plan, involving endocrine disruption and how to
19   deal with issues involving endocrine disruption?
20   A.  There was a global team that met.  I don't
21   know the plan.  Global and regional team.
22   Q.  What was the global team that met?
23   A.  I don't know the specifics.
24   Q.  Okay.  Were you ever part of that?
25   A.  I have been involved in meetings on endocrine,

Page 133

1    but I don't know -- and endocrine disruption testing and
2    Regulatory plans, but I don't know what that is.
3    Q.  What about the global team that met regarding
4    endocrine disruption, tell me about that.  Where did it
5    meet, who headed it, who was on the team?
6    A.  I don't know.
7    Q.  Okay.  Are you saying that other people from
8    your group were not on the team?
9    A.  Regulatory Affairs works on -- works with
10   Syngenta Crop Protection, Inc., does have individuals
11   who have worked at various times in the different
12   testing plans.
13   Q.  Okay.  For that global team?
14   A.  Yeah.  Yeah.  I just don't know exactly what
15   team you're referring to.  But there were groups that
16   met on endocrine disruption to do planning.
17   Q.  Okay.  Well, maybe we ought to do it this way:
18   Tell me all of the either regional or global teams that
19   met on endocrine disruption planning, all of them.
20   A.  I don't know.  I know we have -- we worked on
21   endocrine disruption planning.
22   Q.  Do you know of any -- of any team that met on
23   endocrine disruption issues?
24   A.  We have -- We have a testing -- We have an
25   endocrine disruption testing team in Syngenta Crop

34 (Pages 130 to 133)

Exhibit 011 Page 34
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 134

1 Protection, Inc.
2    Q.  Okay.  Are there any regional teams that you
3 are aware of?
4    A.  And I'm sure they share that with
5 information -- and there might be an official team --
6 but I'm sure they share and coordinate information, or I
7 would expect.
8    Q.  With whom?
9    A.  With my Regulatory -- my Regulatory people
10 involved would be sharing information with Canada and
11 Mexico and also with our global regulatory managers.
12    Q.  Did these people who were sharing information
13 keep you informed about their role in these regional
14 teams?
15    A.  I would have been more involved -- My part
16 would have been more involved in knowing which testing
17 that the US EPA is requiring be done, was starting for
18 which products.
19    Q.  I want to ask you again:  Do you know if there
20 is a global team or a sub team of any group in Syngenta
21 companies that deals with endocrine disruption?
22    A.  There is a -- There is a broad team that works
23 on endocrine disruption testing.
24    Q.  Okay.  Where -- What is the name of the team,
25 and where does it meet?

Page 135

1    A.  I don't know.  I apologize.  I don't know
2 those details.
3    Q.  Do you know anybody who is on the team?
4    A.  In my area, we have had a few different
5 Regulatory managers involved in the team.  And Tom
6 Beidler from our Product Safety Group is involved in
7 different information exchanges and organizing our
8 own -- our own team within Syngenta Crop Protection,
9 Inc.  And he's in the Product Safety Group.
10    Q.  Is he a member of the global team?
11    A.  He would be, I know, sharing information,
12 sharing and coordinating with them, if not a member.
13    Q.  And do you know where the global team is
14 headed?  Is it in Basel?
15    A.  I don't know.  I don't know.
16    Q.  It's not in Syngenta Crop Protection, Inc., is
17 it?
18    A.  For a global team?
19    Q.  Yes.
20    A.  No.  Syngenta Crop Protection, Inc., would be
21 our U.S. and then regional coordination teams.
22    Q.  Okay.  If you look at this document which
23 we've identified as Exhibit 17, on the second -- I'm
24 sorry.  On the first page --
25    A.  Yes.

Page 136

1    Q.  -- under "Endocrine disruption," the outputs,
2 do you see that, the "Shared appreciation of
3 ED-technical positions," what would that be?
4    A.  That would be an understanding of my
5 interpretation -- I don't know exactly what they meant
6 in this e-mail.  But we would generally share
7 information on understanding laboratory studies and what
8 different -- different end points could mean.  But I
9 don't know.  I don't know.
10    Q.  What's "ED-technical" mean?
11    A.  That would have -- With technical, I would
12 have expected it meant scientific aspects of study
13 results.
14    Q.  Would it be endocrine disruption, technical
15 positions?
16    A.  The way I read this is it would generally mean
17 something like that there's an endocrine disruption
18 scientific information, and they would be sharing --
19 sharing the expertise on what they understand and know
20 about that.
21    Q.  They would -- They would have a shared
22 understanding of potential regulatory impact in the next
23 line.  Do you see that?
24    A.  Yes, I see that in the next line.
25    Q.  And then they would do an assessment of the

Page 137

1 future risks for each region?
2    A.  Yes.  That's what the next line says.
3    Q.  And then it said the action plan would be
4 consistent across regions, correct?
5    A.  That's what it says.
6    Q.  Were you ever made aware of the action plans
7 that the Endocrine Disruption Group came up with?
8    A.  I would have been focused mostly on the
9 endocrine disruption testing of our products in our
10 area.  So I don't recall.  I don't recall specifics in
11 this.
12    Q.  Was there endocrine disruption testing done in
13 other Syngenta subsidiaries that was shared with you?
14    A.  I can't think -- Most of the endocrine
15 disruption testing that we're talking about today, this
16 was back in 2005, is on studies that we're doing that
17 are required by the US EPA now for many different
18 products.  And so I can't recall right away the answer
19 to your question.
20    Q.  Okay.
21        (McFarland Deposition Exhibit No. 18
22        marked as requested.)
23 BY MR. TILLERY:
24    Q.  Let's take a look at Exhibit 18, please.  And
25 the heading on this is:  "Active Ingredients' GRA

35 (Pages 134 to 137)

Exhibit 011 Page 35
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 138

1  Responsibilities." Do you see that?
2      A. Yes.
3      Q. And that's Global Regulatory Affairs'
4  responsibilities, right?
5      A. Responsibilities, yes.
6      Q. And if we look at this line, we see -- Strike
7  that.
8          If we look at the document, we see
9  nonselective herbicides, and there's a name, Jean
10 Costello; and then across, it demonstrates who that or
11 what that active ingredient would be, correct?
12     A. Yes.
13     Q. All right. Now let's go down to selective
14 herbicides: Atrazine. Who was the Global Regulatory
15 Affairs manager for atrazine? Was that Mr. Buser?
16     A. At the time of this document, it was
17 Hans-Peter Buser.
18     Q. By what company was he employed?
19     A. Syngenta Crop Protection AG.
20     Q. In Basel?
21     A. In Basel, yes.
22     Q. At that time, Mr. Buser had global
23 responsibility for atrazine and simazine regulatory
24 affairs, didn't he?
25     A. He was the global coordinator in the sense of

Page 139

1  his role organizing the strategy and coordination across
2  the regions of -- across the four different other
3  regions for atrazine.
4      Q. Did he have responsibility for the regulatory
5  affairs of atrazine and simazine?
6      A. In the context of his role as a global
7  coordinator and strategist, yes.
8      Q. Okay. How long did he have that role?
9      A. I don't know.
10     Q. Is there a Global Regulatory Manager for
11 atrazine now?
12     A. Yes.
13     Q. And who is that?
14     A. Philippe Costrop.
15     Q. How long has he had the global regulatory
16 management of atrazine?
17     A. I don't know.
18         (McFarland Deposition Exhibit No. 19
19          marked as requested.)
20     MR. TILLERY: Our reporter says we have to go off
21 the record right now.
22     THE VIDEOGRAPHER: This marks the end of Videotape
23 No. 4 in the deposition of Janis McFarland. The time is
24 2:24.
25         Going off the record.

Page 140

1          (A short break was had.)
2      THE VIDEOGRAPHER: Going on the record.
3          This marks the beginning of Videotape No. 5 in
4  the deposition of Janis McFarland.
5          The time is now 2:35 p.m.
6  BY MR. TILLERY:
7      Q. Please review Exhibit 19, Ms. McFarland.
8      A. (Complying.)
9      Q. Have you seen that document before?
10     A. I don't recall. I don't know. It's a
11 document from May 24th, 2001.
12     Q. Looking at the description of to whom it would
13 be sent and to whom it was sent, that would include your
14 operation, wouldn't it?
15     A. I don't know. I can't tell from that who it
16 was written to.
17     Q. Your remember when this happened, right?
18     A. My memory is it happened from May 1st, 2001,
19 to February 1st, 2002.
20     Q. Right. Mr. Alfred Seiler assumed global
21 responsibility for atrazine and simazine Regulatory
22 Affairs from Hans-Peter Buser. That's what it says?
23     A. That's what the document says.
24     Q. And that included the U.S., didn't it?
25     A. No. I wouldn't --

Page 141

1      Q. So does global in your definition exclude the
2  United States?
3      MR. POPE: In the context of this document or are
4  you talking about --
5      MR. TILLERY: Yes. In the context of this
6  document.
7  BY THE WITNESS:
8      A. In the context of this document, "global"
9  would be his global role.
10     Q. Would "global" include all parts of the
11 Syngenta group of companies that are selling atrazine on
12 the planet Earth?
13     A. He would be coordinating with the different
14 regions on atrazine as the Active Ingredient Regulatory
15 Manager.
16     Q. Right. And that would include the United
17 States, right?
18     A. His role coordinates across the region I work
19 in, yes.
20     Q. Okay. Do you work in the United States?
21     A. Yes.
22     Q. Okay. So it would include the United States,
23 right?
24     A. His global role of coordination, yes.
25     Q. Yeah. Actually, it says his "global

36 (Pages 138 to 141)

Exhibit 011 Page 36
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 142

1  responsibility." Do you read that word
2  R E S P O N S I B I L I T Y to be something other than
3  responsibility? Is that what it says?
4      A. It says global responsibility.
5      Q. Okay.
6          (McFarland Deposition Exhibit No. 20
7          marked as requested.)
8  BY MR. TILLERY:
9      Q. I'm going to show you what's been marked as
10  Exhibit 20. This is an e-mail that recaps a telephone
11  conference that you participated in, isn't it?
12      A. It's an e-mail to me discussing -- discussing
13  along with an e-mail to me and many others on May 15th,
14  2003, discussing an atrazine update telecon.
15      Q. And it's a summary of the main aspects raised
16  and the actions agreed upon, right?
17      A. Yes.
18          I'm going through it right now.
19      Q. Okay. Do you recall who was on that
20  teleconference?
21      A. No, I don't.
22      Q. Does the addressee list at the top of the
23  e-mail correspond with your understanding of who was on
24  the call?
25      A. That's how the e-mail is written, yes.

Page 143

1      Q. Okay. And at that time, was the EU in the
2  process of conducting a review of the registration of
3  atrazine?
4      A. Yes.
5      Q. Okay. Was there some concern within Syngenta
6  that the outcome of the EU review would be unfavorable
7  with respect to the continued registration of atrazine
8  in the United States?
9      A. Could you repeat your question, please.
10      Q. I'll rephrase it.
11          Was there some concern within Syngenta that an
12  unfavorable outcome of the EU review might adversely
13  affect the EPA's interim reregistration eligibility
14  decision regarding atrazine?
15      A. We -- There would have been concern that any
16  negative impact would be -- would be difficult,
17  especially in light that the science review was so
18  favorable in the EU, also the health and safety review
19  was very favorable.
20      Q. And you agreed on one of the options, No. 3,
21  that the best option for the U.S. would be a delay of
22  the start of the discussions in WG Legislation until at
23  least October, correct? Do you see that bullet?
24      A. I see that that's a bullet. I don't know that
25  I agree -- I'm not recalling what WG Legislation is.

Page 144

1      Q. And the next two bullets down is "Consistency
2  of Syngenta's position approach has to be ensured,"
3  correct?
4          Do you see that?
5      A. I see that.
6      Q. And that was something that was concluded in
7  the call as well and agreed upon, right?
8      A. I don't -- I don't recall.
9      Q. Okay. One of the agreed actions was to "Draft
10  a document summarizing Syngenta's options regarding the
11  way forward, (pros and cons), stakeholders to be
12  commented on by all," and that's Hans-Peter.
13          Was he the one drafting it?
14      A. That's what the second bullet refers to.
15      Q. Okay. All right. The NAFTA view would be:
16  "For the U.S. process, and in particular for the much
17  needed support of the growers, any sign of giving in on
18  atrazine in Europe prior to October 31 would be
19  detrimental."
20          Was that your understanding of the conclusion?
21      A. The --
22      Q. Look under "NAFTA view," discussion. Do you
23  see that?
24      A. Thank you. Mm-hmm.
25      Q. Okay.

Page 145

1      A. There would have been a concern that when you
2  have a good science review that you didn't
3  scientifically defend that that would disappoint the
4  growers in the U.S.
5      Q. Where does it say anything about a good
6  science review in that paragraph? Read it to me, would
7  you?
8          Is it in there?
9      A. No. It does not. I was putting that in
10  context.
11      Q. Fine. Now let's go to the next paragraph. It
12  says: "A withdrawal of atrazine in Europe for business
13  reasons prior to 31 October would be very problematic
14  for NAFTA," correct? Was that your understanding?
15      A. Yes. That is what that said.
16      Q. "It would damage the atrazine defense strategy
17  and would strengthen the NGO position," right?
18      A. That's what that says.
19      Q. What is the NGO position?
20      A. I don't know what is exactly meant in that
21  particular part of the sentence.
22      Q. I'm handing you what's been marked as 21 and
23  22 to look at at the same time as they cover a common
24  topic of discussion.
25          (McFarland Deposition Exhibits

37 (Pages 142 to 145)

Exhibit 011 Page 37
be168fc3-22d4-4e49-884b-9a074c8736d1

Page 146

1          Nos. 21 and 22 marked as requested.)
2     MR. POPE:  Is October 1st one 21?
3     MR. TILLERY:  The October 1st one is 21, correct,
4  and the October 3rd one is 22.
5  BY MR. TILLERY:
6     Q.  Do you remember these e-mails?
7     A.  Not right offhand.  I'm reviewing them,
8  though.
9     Q.  Do you remember this topic area being
10 discussed irrespective of whether you remember the exact
11 e-mails?
12    A.  I do.
13    Q.  Okay.  And you remember this because the
14 unfavorable decision being discussed was the decision of
15 the EU to ban atrazine, right?
16    A.  Yes.  To not reregister the atrazine.
17    Q.  All right.  Would that have the effect of
18 banning it?
19    A.  Yes.
20    Q.  Okay.  Now, this e-mail chain involved actions
21 in anticipation of EU's unfavorable decision, right?
22    A.  Yes.
23    Q.  And did Syngenta know that the decision was
24 going to be unfavorable?
25    A.  It looks like from the e-mail chains, I don't

Page 147

1  know when the decision was made, but there was knowledge
2  of it.
3     Q.  Okay.  And this was an effort to try to handle
4  the public relations fallout, wasn't it?
5     A.  Looks like this was an effort to properly
6  communicate that it was happening, yes.
7     Q.  And did that include trying to put it in its
8  light most favorable to Syngenta so it would have the
9  least amount of impact in the United States?
10    A.  I don't -- I don't know.
11        That would be good practice to give accurate
12 information in that light.
13    Q.  It would be good practice to try to put the
14 best light on a decision by a group of countries in
15 Europe to ban the product that you want to continue to
16 sell in America, right?
17    A.  I meant that it would be good practice to give
18 accurate information in light of the situation of the
19 product.  I apologize.
20    Q.  Wasn't the big concern that there would be
21 fallout about the use of the product, continued use of
22 the product, in the United States?
23    A.  The concerns -- The concerns in general were
24 how it would appear to a US EPA, to the growers in the
25 U.S., that it was not being reregistered in Europe.

Page 148

1     Q.  And you wanted to put that, from a public
2  relations standpoint, in its best possible light,
3  correct?
4     A.  We would want to put it in the most accurate,
5  best possible light.
6     Q.  Okay.  And you were in this e-mail exchange
7  working on different versions of a public relations
8  release, correct?
9     A.  I was included -- I was copied on the e-mail
10 where different versions were discussed.
11    Q.  Okay.  And people, for example, like John
12 Atkin were being consulted on this topic.
13        Who was he at that time?
14    A.  John Atkin?
15    Q.  Yes.
16    A.  At that time, I don't know what his exact role
17 was in 2003.
18    Q.  Okay.  What is it now?
19    A.  He is -- He is the Chief Operating Officer in
20 Basel.
21    Q.  For what?
22    A.  In -- I'm not sure the title, the formal title
23 of his -- of his subsidiary company.
24    Q.  What is his responsibility in terms of crop
25 protection business in Syngenta's group of companies

Page 149

1  worldwide?
2     A.  I don't know all of John Atkin's
3  responsibilities.
4     Q.  Do you understand that he's a member of the
5  Syngenta AG Executive Committee?
6     A.  SEC, yes, he is.
7     Q.  And he's a COO of Crop Protection worldwide?
8     A.  I don't know exactly what his title is.
9     Q.  Who is Sherry Ford?
10    A.  Sherry Ford is a communication expert in
11 Greensboro.
12    Q.  Okay.
13        (McFarland Deposition Exhibit No. 23
14        marked as requested.)
15 BY MR. TILLERY:
16    Q.  Would you look at No. 23 for me, please.
17    MR. TILLERY:  I would like the record to reflect
18 I've coughed less than 20 times in this deposition.  I
19 would like you all to acknowledge that.
20    MR. POPE:  Give or take a few.  Certainly less than
21 before, certainly.
22    MR. SUPRENANT:  I know Jerry appreciates that.
23 BY MR. TILLERY:
24    Q.  This is a two-page document updated
25 October 29th, 2003, entitled "EPA Communication Plan:

McFarland, Janis                    11-17-2010
Confidential

Page 150

1    Atrazine IRED Decision." Do you see that?
2        A.   Yes.
3        Q.   And were you involved in this exchange?
4        A.   I am mentioned several times in this -- in
5    this document.
6        Q.   Okay.  As a person who is involved in
7    communicating these things, correct, or helping
8    communicate them?
9        A.   Yes, or having information to share, yes.
10       Q.   Would you agree with me that people at the
11   highest levels of these Syngenta group of companies were
12   also involved in preparing and approving the
13   communication plan which is marked as Exhibit 23?
14       A.   I don't see an approval list here for the
15   plan, but they would have been informed on -- the higher
16   levels would have been -- in different companies -- in
17   the different regions and in global would have been
18   informed.
19       Q.   Okay.  And Mr. Atkin himself reviewed the
20   draft press releases in a conference call for which you
21   were the call leader, didn't he?
22       A.   In the schedule of events, it mentions in this
23   document a schedule for October 30 that I would lead the
24   call on a regulatory update and review of drafts, and
25   John Atkin is listed as -- in that same area.

Page 151

1        Q.   Okay.
2            (McFarland Deposition Exhibit No. 24
3             marked as requested.)
4    BY MR. TILLERY:
5        Q.   We'll move on to Exhibit 24 now.
6            (McFarland Deposition Exhibit No. 25
7             marked as requested.)
8    BY MR. TILLERY:
9        Q.   And while you're looking at it, please look at
10   25.
11           Okay.  Tell me what a Regulatory Science
12   Committee is in the context of the Syngenta companies.
13       A.   And I apologize at all the details on the
14   names of the different committees, they change over
15   time.
16           The Regulatory Sciences Committee in general
17   included Regulatory experts and Product Safety --
18   Product Safety experts and sometimes Stewardship or
19   Product Stewardship experts.
20       Q.   Was there a global component to this
21   committee?
22       A.   Yes, global and regional.
23       Q.   Okay.  And who headed up the global committee?
24       A.   On the October 2004 memo, it says Lewis Smith
25   was the Chair.

Page 152

1        Q.   And where is Lewis Smith from?
2        A.   Lewis Smith has retired.
3        Q.   Where was he from?
4        A.   He was in Basel.  In 2004, he may have been in
5    CTL.
6        Q.   And where is CTL?
7        A.   Manchester, United Kingdom.
8        Q.   Which entity would he have been with at that
9    time?
10       A.   He would have been at both times with Syngenta
11   Crop Protection AG.
12       Q.   Does this committee still exist?
13       A.   We have Regulatory Science Forums now with the
14   same types of combinations of people.
15       Q.   Is it the same responsibility, just a
16   different name?
17       A.   I would say -- I'm trying to recall the exact
18   responsibility, so I don't know.  But we did talk about
19   regulatory science issues.
20       Q.   What kind of decisions did the Regulatory
21   Science Committee and now the Regulatory Science Forum
22   undertake?
23       A.   A lot of the specific examples, a lot of it
24   was information exchanged and sometimes in choosing to
25   do different types of studies on a product that were

Page 153

1    sold in different countries around the world and what
2    the science meant behind that.  But recently, if -- one
3    other example would be, if you get a result on a study
4    and the label would change, the Regulatory Science Forum
5    would discuss whether or not you would change any
6    labeling in that particular case.
7        Q.   If you look on Exhibit 24 under "Atrazine"?
8        A.   Yes.
9        Q.   You see the RSC sponsor to be H. Swaine.  Do
10   you see that?
11       A.   Yes.
12       Q.   Who was H. Swaine?
13       A.   H. Swaine, I don't know his exact title at
14   that -- then.  He's retired from the company.
15       Q.   Did he work in Europe?
16       A.   Yes, he worked in -- he worked in Europe.
17       Q.   Do you know where?
18       A.   I think for part of the merger -- part of the
19   Syngenta -- Since the Syngenta companies were formed in
20   the U.K. and part in Basel, and I don't know the exact
21   timing or even the general timing.
22       Q.   And then his topic involved reviewing the
23   outcome of recent Syngenta science, evaluation of
24   atrazine, identified priority technical weaknesses and
25   endorse a plan to address these.  Identity -- I'm sorry.

39 (Pages 150 to 153)

Exhibit 011 Page 39
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
            Confidential

---

Page 154

1  Identify lessons to be learned and how these might be
2  applied in -- Pronounce that for us.
3      A.  Terbuthylazine.
4      Q.  (Continuing) -- terbuthylazine defense in
5  Europe; is that right?
6      A.  Yes.  That is what is listed in that area on
7  the topics.
8      Q.  And next topic was endocrine disruption
9  project.  The sponsor was Mr. Botham.  Where was he
10 from?
11     A.  P. Botham, he was in Product Safety, Syngenta
12 Crop Protection AG at that time.
13     Q.  In Basel?  Is that right, in Basel?
14     A.  He most likely was in CTL at that time.
15     Q.  In England?
16     A.  In England.
17     Q.  And the topics on the next page include issue
18 management programs in NAFTA where you were the sponsor,
19 right?
20     A.  Yes.
21     Q.  Who chose the members of the global committee?
22     A.  I don't remember.
23     Q.  How were you chosen?
24     A.  Probably by my role in Regulatory Science for
25 NAFTA.

---

Page 155

1      Q.  Okay.  But you don't know how?
2      A.  I don't know.
3      Q.  Does the committee, now forum, operate under
4  the authority of the Head of Global Regulatory Affairs?
5      A.  Yes.  I believe that the Global Head of
6  Regulatory Affairs.
7      Q.  Okay.  Were the decisions made or actions
8  taken by that committee and now forum applicable
9  throughout Syngenta's group of crop protection
10 companies?
11     MR. POPE:  You mean in this meeting, or you're
12 talking about generally?
13     MR. TILLERY:  In general.
14     MR. POPE:  That's what I thought.
15 BY THE WITNESS:
16     A.  The regulatory -- You know what, I will back
17 up.  There might be a chance that the actual lead is in
18 the Product Safety global position.  So I don't know.
19     Q.  And the Product Safety head, that would be
20 Peter Hertl today?
21     A.  If he would be someone in that role, it would
22 be there in Basel, yes, in January.
23     Q.  Okay.  Were the decisions made and actions
24 taken by this committee, the Regulatory Sciences
25 Committee now the Regulatory Sciences Forum applicable

---

Page 156

1  throughout the Syngenta companies?
2      A.  The issues and topics at hand sometimes would
3  involve some regions and not others.  And because a
4  product would not be sold in all regions because of
5  crops.
6      Q.  To the extent a product was sold, it would be
7  encompassed --
8      A.  It would be shared, shared, coordinated
9  information, yes.
10     Q.  But the decision and action taken would apply
11 wherever that product was sold?
12     A.  The action -- The action sometimes would be
13 driven by a regulatory requirement which would only be
14 in one country, so the regulatory would be foreign.  But
15 it wouldn't be taking action in another country where
16 that wasn't a regulatory requirement, but the results
17 would be shared.
18     Q.  Did that committee make decisions about what
19 scientific work would be done with respect to the human
20 health aspects of atrazine?
21     A.  This committee?
22     Q.  Yes.
23     A.  No.  But they would have reviewed science that
24 we would have designed to have happen in Syngenta Crop
25 Protection, Inc.

---

Page 157

1      Q.  They would have reviewed it only, is that what
2  you're saying?
3      A.  They would have been aware of it and
4  understood it.
5      Q.  Do you have the minutes of the regulatory
6  sciences meeting held in Greensboro 27 October 2004?
7      A.  Yes.
8      Q.  And that's on the letterhead of John Street,
9  Head of Global Regulatory Affairs in Basel?
10     A.  Yes.
11     Q.  Okay.  It shows that you were present at that
12 meeting, right?
13     A.  Yes.
14     Q.  And go to Syngenta 894158.
15     A.  Yes.
16     Q.  Actually, go to the preceding page at the
17 bottom, the last sentence where it says:  "The purpose
18 of this meeting is to examine further options for
19 further work to clarify the position and agree the
20 experimental program in principle to meet EPA needs."
21 Do you see that?
22     A.  Yes.
23     Q.  And read the next sentence.
24     A.  "Although the issues mainly relate to the USA
25 registration, there is clearly a global impact which

---

40  (Pages 154 to 157)

Exhibit 011 Page 40
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

## Page 158

1  needs to believe managed given the high profile with
2  atrazine with the media."
3      Q.  Okay.  And then let's go to paragraph 7 of
4  that page.  What does that say?  Would you read that
5  into the record.
6      A.  Paragraph 7:  "The human health position was
7  reviewed.  The main areas for further work were
8  considered to be around the memorandum of agreement."
9  Oh.  This would be -- MOA is mode of action --
10  (continuing) -- "particularly the effect of glutathione
11  availability, and the interpretation of epidemiology
12  data, the AG health study.  We need to remain close to
13  developments on the latter to ensure that appropriate
14  designs are established incorporating relevant
15  statistical analysis.
16      "It is essential to under take a detailed
17  regulatory science review to define work that must be
18  done to underpin the Syngenta science position and how
19  this fits with the regulatory requirements."
20      Q.  "Action," what does it say?
21      A.  "JED to conduct an internal research meeting
22  on the mechanism of action of atrazine.  JRS to schedule
23  a further review at Regulatory Sciences once technical
24  options have been developed."
25      Q.  And this committee, then, was taking direct

## Page 159

1  action with respect to atrazine, wasn't it?
2      A.  They were -- They were reviewing and providing
3  input.
4      It's interesting.  I don't recall that we did
5  one of these things that they said they were going to
6  undertake.
7      Q.  But "Actions," said they were to take action
8  with respect to atrazine, right?
9      A.  Conduct an internal research meeting and to
10  schedule a further review.
11      Q.  Okay.  And this was the meeting of the Global
12  Regulatory Science Group, right?
13      A.  This meeting had participants -- was held in
14  Greensboro and had participants from Product Safety and
15  NAFTA and NAFTA and Syngenta Crop Protection, Inc., and
16  Canada.
17      Q.  And also had L. Smith, who was the Chair of
18  it.  Where was he from?
19      A.  Lewis Smith.
20      Q.  Yes.  Where was he from?
21      A.  He was Head of Development for the Syngenta
22  Crop Protection AG.
23      Q.  And he was the Chair of the group, right?
24      And where is J. Doe from?
25      A.  J. Doe was from Syngenta Crop Protection AG.

## Page 160

1      Q.  The action undertaken at the end said JED.  Is
2  that John Doe?
3      A.  I don't know John's middle initial, but he was
4  the only one that came to mind looking at the names.
5      Q.  And J. Street was the SEC?
6      A.  Yes.
7      Q.  And what was his title?
8      A.  Global Head of Regulatory Affairs with
9  Syngenta Crop Protection AG.
10      Q.  Did that same meeting result in that committee
11  deciding that the ED team's technical conclusion on
12  Syngenta products should be documented and included in a
13  global database as Syngenta's position on the matter?
14  Do you remember that?
15      A.  Where are you reading?
16      Q.  I'm asking you, do you remember?
17      A.  I don't remember.
18      I was looking at Section 5.  I can read it,
19  though.
20      Q.  Well, if this document said that, you would
21  agree with it?  You wouldn't disagree with it, would
22  you?
23      A.  Disagree with, pardon me?
24      Q.  That's all right.  I'll withdraw the question.
25      Did the Regulatory Sciences Committee oversee

## Page 161

1  and give instructions regarding an endocrine disruption
2  team that had to be formed within the Syngenta group's
3  Crop Protection Division?
4      A.  I don't recall.  I'm reading in the minutes
5  here.
6      Q.  I'm asking if you remember that one way or the
7  other.
8      A.  No, I don't remember that.
9      It reads in here that the action was to make a
10  proposal, in these particular notes, but I don't know
11  whether the actions were actually followed through on in
12  a different area.
13      Q.  Actions to make a proposal on what?
14      A.  To monitor -- To monitor the endocrine
15  disruption project in that Area 5.
16      Q.  Okay.  Let's look at Exhibit 26.
17          (McFarland Deposition Exhibit No. 26
18          marked as requested.)
19  BY MR. TILLERY:
20      Q.  Exhibit 26 are minutes of a Regulatory
21  Sciences Committee meeting on April 25th and 26th, 2005,
22  right?
23      A.  Yes.
24      Q.  And this again comes from John Street, Head of
25  Global Regulatory Affairs, right?

41 (Pages 158 to 161)

Exhibit 011 Page 41
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 162

1     A.  Yes.
2     Q.  It shows that people who received this were
3  Lewis Smith, John Doe, Phil Botham, Harry Swaine, Diane
4  Castle, Janis McFarland, and Gary Dickson, right?
5     A.  Yes.
6     Q.  Look on page 3 under "Children's Health."  Do
7  you see that?
8         It says:  "Phil Botham presented the
9  conclusions reached by Sue Barlow who had been contacted
10 to provide an appraisal on the subject and make
11 recommendations to Syngenta."
12        What were the children's health issues that
13 were being discussed?
14    A.  I'll look through and see if I can determine
15 which specific issues.
16    Q.  Okay.
17        Ready?
18    A.  Yes.
19    Q.  Yes.  Who retained Sue Barlow, which entity?
20    A.  I don't know.
21    Q.  What company was Mr. Botham employed by?
22    A.  Syngenta Crop Protection AG.
23    Q.  In Basel?
24    A.  He was either in England or Basel.
25    Q.  Okay.  Now let's go to the second bullet point

Page 163

1  under "children's health."
2     A.  Yes.
3     Q.  Where it says:  "We do already address the
4  critical end-points according to the current state of
5  scientific knowledge and conduct risk assessments to
6  ensure adequate safety mar gins to protect potentially
7  exposed populations recognizing the increased
8  sensitivity of certain vulnerable subpopulations."
9         Who had done those studies?
10    A.  You can't really tell from how he's writing
11 that what precisely -- what specifically he meant.
12    Q.  When you say, "he," are you talking about the
13 author of the document?
14    A.  Well, I was assuming that when we said Phil
15 Botham presented the conclusions, maybe it should have
16 been Sue Barlow came up with the conclusions.  I don't
17 know.
18    Q.  Well, actually he said, "We already address
19 it."
20        Do you know who Sue Barlow was?
21    A.  No.
22    Q.  Tell me if Syngenta Crop Protection, Inc., had
23 done the studies that were referenced that I read.
24    A.  Yeah.  I interpret that these are studies that
25 are required for registrations of all pesticides in

Page 164

1  different regulatory bodies that are so rigorous that
2  you understand the safety margins that's how I interpret
3  it.
4         And so they would have been studies done by
5  the different Syngenta companies.
6     Q.  Do you know that for fact?
7     A.  No.  Studies that we use -- Studies that we
8  use to register pesticides in different companies come
9  from both Syngenta Crop Protection AG and the
10 individuals countries later, the combination.
11    Q.  Have you at Syngenta Crop Protection, Inc.,
12 conducted risk assessments regarding subpopulations of
13 children?
14    A.  Our government regulatory bodies require
15 assessments, and yes, we have the skill sets in Syngenta
16 Crop Protection, Inc., to conduct those assessments.
17    Q.  Have you done them?
18    A.  Yes.
19    Q.  Okay.  Have you reported them?
20    A.  Yes.
21    Q.  To what agency?
22    A.  To different regulatory bodies and to the US
23 EPA in the case of Syngenta Crop Protection, Inc.
24    Q.  And the last bullet point, it says:  "It was
25 agreed that a project team would be formed under the

Page 165

1  leadership of Phil Botham which will scope out the
2  issues and options, define what we want to do, and how."
3         Okay.  Was that done?
4     A.  There was a team that Phil Botham was leading
5  on scientific -- scientific studies on sensitivities to
6  different children.
7     Q.  Okay.  What was the result of that group's
8  actions?
9     A.  I really don't recall -- Those types -- I'm
10 not sure if it's an official team, but it's ongoing that
11 we look at the science related to all sensitive
12 subpopulations.
13    Q.  And has there been any report or conclusion of
14 any of the findings of that report?
15    A.  With each -- product we get registered,
16 there's risk assessments that are submitted to the
17 government regulatory bodies.  And they -- For Syngenta
18 Crop Protection, Inc., we know all of them -- all have
19 assessments to toxicology and health assessments to the
20 different subpopulations.
21    Q.  What are the -- Strike that.
22        How many subpopulations do you test?
23    A.  It's the assessment -- The assessment has
24 different subpopulations on women, teenagers, children;
25 but they're assessments extrapolating from the extensive

Exhibit 011 Page 42
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 166

1  toxicology data in animals.
2      Q.  How do those particular risk assessments
3  assess risks to vulnerable subpopulations?  How do
4  animal studies assess risks to vulnerable
5  subpopulations?
6      A.  There's so many different studies where
7  animals are treated at the litter stage and before and
8  beyond, and we use those toxicological reports where you
9  get no effect, and you put a large safety margin on
10 that.  And then you do a potential -- a risk assessment
11 for different populations in humans based on methodology
12 that the government -- that the government has set out
13 for us to do, so required risk assessments.
14         (McFarland Deposition Exhibit No. 27
15          marked as requested.)
16 BY MR. TILLERY:
17     Q.  I've marked Exhibit 27.  Please identify that.
18     A.  This is a draft agenda dated on May 19th,
19 2005.
20     Q.  For that same committee?
21     A.  And it's for a Regulatory Science Committee
22 meeting.
23     Q.  Do you have a role on any other global
24 committees?
25     A.  We have a --

Page 167

1      Q.  Do you personally?
2      A.  On committees that have both global -- global
3  representation from Syngenta Crop Protection AG as well
4  as regions, yes, I am on -- Well, now this would be more
5  a Regulatory Science Forum, not quite the same makeup of
6  functions.
7          We also have a Global Regulatory -- Global
8  Regulatory team.  I mean a Leadership Team in the
9  Regulatory area with the Regulatory heads from the
10 different regions as well as the Global Regulatory Head.
11     Q.  And who heads that up?
12     A.  That is headed up by -- That's headed up by --
13 by Dave -- David French who is now the Global Head of
14 Regulatory for Syngenta Crop Protection AG.
15     Q.  Okay.  Did the meeting that's reflected here
16 in Exhibit 27 ever take place?
17     A.  I don't know.  I'll look -- I don't know.
18 I'll look at it.
19     Q.  Did it take place?
20     A.  I don't know if this exact agenda took place,
21 but we would have discussed these -- some -- many of
22 these different topics.
23     Q.  Go to the topic under "AMES testing," where it
24 says, Speakers:  Costello and Allen.
25         Do you see that?

Page 168

1      A.  Yes.
2      Q.  Okay.  Where are Mr. Costello and Allen from?
3      A.  J. Costello is a Global Regulatory Manager for
4  mesotrione in Basel, and J. Allen, I do not know.
5      Q.  Okay.  And do you see there at the bottom
6  where it says:  "Mode of action," atrazine, did this
7  committee make a decision about the technical proposal
8  for investigation of the mammalian mechanism of action
9  for atrazine?
10     A.  I don't -- I don't know.
11     MR. TILLERY:  Our reporter says we have to go off
12 the record at this time.
13     THE VIDEOGRAPHER:  This marks the end of Videotape
14 No. 5 in the deposition of Janis McFarland.  The time is
15 now 3:32 p.m.
16         Going off the record.
17         (A short break was had.)
18     THE VIDEOGRAPHER:  Going on the record.
19         This marks the beginning of Videotape No. 6 in
20 the deposition of Janis McFarland.
21         The time is now 3:35 p.m.
22         (McFarland Deposition Exhibit No. 28
23          marked as requested.)
24     MR. POPE:  Thank you.
25     MR. TILLERY:  Sure.

Page 169

1      THE WITNESS:  Thank you.
2  BY MR. TILLERY:
3      Q.  If you would look at Exhibit 28 for me, please
4  and tell me what this is.
5      A.  This is a titled -- Exhibit 28 is titled,
6  "EASY 1-2-3 Implementation Roll Out."
7      Q.  Is it still in effect today?
8      A.  An EASY 1-2-3 roll out is.  I don't know if
9  all the details in here are in effect.
10     Q.  What is it used for?
11     A.  It's used to have data on our -- different
12 data information on our different active ingredients in
13 a database.
14     Q.  Okay.  Are there particular team members
15 responsible for this?
16     A.  The Global Regulatory Affairs Group, the
17 database is located with them in Basel.
18     Q.  Okay.  Look on page 43, if you wouldn't mind,
19 please.
20     A.  Sure.
21     Q.  Okay.  It says:  "EASY 1-2-3 has been
22 conceived, designed and delivered by the Product
23 Registration and Safety Leadership Teams."
24         Where are those teams located?
25     A.  The individuals -- individuals on the

43  (Pages 166 to 169)

Exhibit 011 Page 43
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis                    11-17-2010
Confidential

Page 170

1  different -- different teams are -- that are listed here
2  are located in Syngenta Crop Protection AG.  Some are
3  not currently employed on this list.  The Asia Pacific
4  region, Product Safety, the European Product
5  Registration League is on here; Crop Protection
6  Development, Rolf Furter; Steve Hadfield, Product
7  Safety, Peter Hertl, Product Safety, Wolfgang Iwanzik,
8  Global Regulatory.
9        Do you want me to continue to read them?
10     Q.  Yeah.  These -- Are there any employees of
11  Syngenta Crop Protection, Inc.?
12     A.  I am on here as a Regulatory head.
13     Q.  Okay.
14     A.  And in this EASY 1-2-3 roll out, and I will
15  look for --
16     Q.  Peter Hertl is too, isn't he?
17     MR. POPE:  Was in 2006, you mean.
18  BY THE WITNESS:
19     A.  Peter Hertl, yes, he was Syngenta Crop
20  Protection, Inc., at that time.
21     Q.  And still is at this time?
22     A.  Until January, yes.
23     Q.  Okay.  Any others from that group that are
24  from Syngenta Crop Protection, Inc.?
25     A.  No.  And this would be just the products --

Page 171

1  the regional heads, really, the different region -- of
2  the different countries.
3     Q.  Just to make sure the record is clear, let's
4  go through this.
5        Who did Mr. Botham work for at this point?
6     A.  This would have been just recently.
7        What was the date of this roll out?
8     MR. POPE:  It seems to say February 2006 on that
9  first page if you look closely up in the box.
10     THE WITNESS:  Okay.
11  BY MR. TILLERY:
12     Q.  I frankly cannot give you the exact date other
13  than what it says.
14     A.  That's okay.
15        He would have been -- I believe at this time,
16  he would have been with Syngenta Crop Protection AG.
17     Q.  Okay.  And Angela Brady?
18     A.  Syngenta Crop Protection AG.
19     Q.  John Doe?
20     A.  Also Syngenta Crop Protection AG.
21     Q.  Craig Dunlop?
22     A.  He would have been -- He would have been with
23  his country that he represents.  He's a Regional Head
24  for Asia Pacific, and I don't know -- I don't know his
25  country reporting.

Page 172

1     Q.  You don't know the entity there?
2     A.  Yeah.  I don't know.  He would report to the
3  president of that.
4     Q.  Okay.  Who does Mike Earl work for?
5     A.  He's a Product Safety, Syngenta Crop
6  Protection AG.
7     Q.  Dave French, who did he work for?
8     A.  He would have worked for -- I don't know the
9  entity for our European company.
10     Q.  Okay.  Rolf Furter, do you know where he
11  worked?
12     A.  Syngenta Crop Protection AG.
13     Q.  Steve Hadfield?
14     A.  Also Syngenta Crop Protection AG.
15     Q.  Peter Hertl?
16     A.  Syngenta Crop Protection, Inc.
17     Q.  Wolfgang Iwanzik?
18     A.  Is Global Regulatory for Syngenta Crop
19  Protection AG.
20     Q.  Fraser Lewis?
21     A.  The same.
22     Q.  AG?
23     A.  AG.
24     Q.  Okay.  Steve Maund?
25     A.  The same because he's with Global Product

Page 173

1  Regulatory.  They have more because the different team
2  leads on there.
3     Q.  Then you, and you're listed NAFTA PR, right?
4     A.  Yeah.  Product Registration, that's what that
5  stands for.
6     Q.  Then there's Felix Meier-Manz.  Where's he
7  from?
8     A.  He was in Global Product Registration.
9     Q.  In which company?
10     A.  AG.
11     Q.  And Kersten Mewes?
12     MR. POPE:  When you say, "AG," what do you mean?
13     THE WITNESS:  I'm sorry.  I was shortening that.
14  Syngenta Crop Protection AG.
15  BY MR. TILLERY:
16     Q.  And Kersten Mewes?
17     A.  Syngenta Crop Protection AG.
18     Q.  John Parker?
19     A.  Syngenta Crop Protection AG.
20     Q.  Emilio Puri?
21     A.  Syngenta Crop Protection AG.
22     Q.  Rose Rodriguez?
23     A.  She's would have -- She's the Latin America
24  Head of Regulatory so she reports in to her country
25  head.  And I don't know the official name of that

44 (Pages 170 to 173)

Exhibit 011 Page 44
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

## Page 174

1  company.
2          (McFarland Deposition Exhibit No. 29
3          marked as requested.)
4  BY MR. TILLERY:
5     Q.  If you would look at Exhibit 29, please.
6        Can you tell me what this is?
7     A.  This is a notification with background
8  information on the EASY 1-2-3 Database.
9     Q.  What is the Bates range of the document you're
10  looking at?
11     A.  SYN 03127185.
12     Q.  Okay.
13          (McFarland Deposition Exhibit No. 30
14          marked as requested.)
15  BY MR. TILLERY:
16     Q.  Can you tell me what Exhibit 30 is.
17        I'm trying to determine if this is the
18  Syngenta Endocrine Team we discussed earlier in
19  connection with the minutes of an RDT meeting.
20     A.  Thank you.  I'll look.
21        It's titled, "Atrazine RDT February 05," and
22  then it's subtitled, "Atrazine Ecol.,"
23  ecological,"Endocrine/Amphibian Issues and Actions."
24     Q.  Did you understand -- Strike that.
25        Were you on this committee?

## Page 175

1     A.  I don't know -- I don't know whether I was
2  participating or on this or in this presentation or not,
3  but I'll keep looking to see.
4        It's dated February '05.
5        On page 3, of the document, it gives the
6  different representatives at that time on an Endocrine
7  Team from NAFTA and the European Union.
8     Q.  And could you tell me why they were broken
9  into NAFTA and the EU on page 3 of the document?
10     A.  They would -- Most likely to make sure they
11  had proper representation for different regulatory
12  systems to look at -- for different regulatory bodies
13  and studies.  But I don't know.
14     MR. TILLERY:  Let's go off the record for a few
15  minutes.
16     THE VIDEOGRAPHER:  Going off the record.  The time
17  is now 3:49 p.m.
18          (A short break was had.)
19     THE VIDEOGRAPHER:  Going on the record.
20        The time is now 3:55 p.m.
21     MR. TILLERY:  No further questions.
22     MR. POPE:  I don't think we have any questions,
23  either.
24        Thank you very much.  We would like to reserve
25  signature and designate this deposition is confidential

## Page 176

1  as well as all the exhibits as well.
2     THE VIDEOGRAPHER:  This marks the end of Videotape
3  No. 6 in the deposition of Janis McFarland.
4        Going off the record.
5          (Witness excused.)

## Page 177

1        IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF ILLINOIS
2
3  CITY OF GREENVILLE, et al.,   )
                             )
4          Plaintiffs,   )
                             )
5     vs.          ) No. 10-CV-188-JPG-PMF
                             )
6  SYNGENTA CROP PROTECTION,    )
   INC., and SYNGENTA AG,       )
7                             )
          Defendants.   )
8
9
10     I, JANIS McFARLAND, state that I have read the
11  foregoing transcript of the testimony given by me at my
12  deposition on November 17, 2010, and that said
13  transcript constitutes a true and correct record of the
14  testimony given by me at the said deposition except as I
15  have so indicated on the errata sheets provided herein.
16
17
18          _____
              JANIS McFARLAND
19
   SUBSCRIBED AND SWORN to
20  before me this _____ day
   of _____, 2010.
21
22          _____
              NOTARY PUBLIC
23
24
25

45 (Pages 174 to 177)

Exhibit 011 Page 45
be168fc3-22d4-4e49-884b-9a074c8736d1

McFarland, Janis          11-17-2010
Confidential

Page 178

```
 1    UNITED STATES OF AMERICA     )
      SOUTHERN DISTRICT OF ILLINOIS )
 2                        ) SS.
      STATE OF ILLINOIS           )
 3    COUNTY OF COOK              )
 4
           I, Tracy Jones, Certified Shorthand Reporter,
 5    Registered Professional Reporter, Certified LiveNote
      Reporter, and Notary Public, do hereby certify that
 6    JANIS McFARLAND was first duly sworn by me to testify to
      the whole truth and that the above deposition was
 7    reported stenographically by me and reduced to
      typewriting under my personal direction.
 8         I further certify that the said deposition was
      taken at the time and place specified and that the
 9    taking of said deposition commenced on
      November 17, 2010, at 9:00 a.m.
10         I further certify that I am not a relative or
      employee or attorney or counsel of any of the parties,
11    nor a relative or employee of such attorney or counsel,
      nor financially interested directly or indirectly in
12    this action.
           In witness whereof, I have hereunto set my
13    hand and affixed my seal of office at Chicago, Illinois,
      this 29th day of November, A.D., 2010.
14
15
16
                _____
17              TRACY JONES, CSR, RPR, CLR
                205 West Randolph Street
18              5th Floor
                Chicago, Illinois  60606
19              Phone:  (312) 236-6936
20
21
      CSR No.  084-004553
22
23
24
25
```

Westlaw Deposition Services    800.548.3668 Ext. 1          Exhibit 011 Page 46
be168fc3-22d4-4e49-884b-9a074c8736d1